1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
2              BEFORE THE HONORABLE GLORIA M. NAVARRO
                 CHIEF UNITED STATES DISTRICT JUDGE
3

4

UNITED STATES OF AMERICA,          :
5                                  :
          Plaintiff,               :
6                                  :No. 2:16-cr-00100-GMN-CWH
     vs.                           :
7                                  :
JAN ROUVEN FUECHTENER,             :
8                                  :
          Defendant.               :
9    _____:

10

11

                 PARTIAL TRANSCRIPT OF BENCH TRIAL – DAY 1
12                   TESTIMONY OF THOMAS MICHAEL RADKE

13

14                        November 14, 2016

15

                            Las Vegas, Nevada
16

17

18

19
     FTR No. 7D/20161114 @ 3:26 p.m.
20

21
     Transcribed by:         Donna Davidson, CCR, RDR, CRR
22                           (775) 329-0132
                             dodavidson@att.net
23

24

25    (Proceedings recorded by electronic sound recording,
      transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

2

1                           A P P E A R A N C E S

2

3

    FOR THE PLAINTIFF:
4
    Lisa Cartier-Giroux
5   Elham Roohani
    U.S. ATTORNEYS OFFICE
6   501 Las Vegas Boulevard South
    Suite 1100
7   Las Vegas, Nevada 89101
    (702) 388-6336
8   Lisa.Cartier-Giroux@usdoj.gov
    Elham.Roohani@usdoj.gov
9

10  FOR THE DEFENDANT:

11  Jess R. Marchese
    LAW OFFICE OF JESS R. MARCHESE
12  601 South Las Vegas Boulevard
    Las Vegas, Nevada 89101
13  (702) 385-5377
    Fax: (702) 474-4210
14  marcheselaw@msn.com

15  Benjamin C. Durham
    BENJAMIN DURHAM LAW FIRM
16  601 South 10th Street
    Las Vegas, Nevada 89101
17  (702) 631-6111
    Fax: (702) 946-1396
18  bdurham@vegasdefense.com

19  Michael W. Sanft
    SANFT LAW
20  324 South 3rd Street
    2nd Floor
21  Las Vegas, Nevada 89101
    (702) 382-0905
22  michael@sanftlaw.com

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

3

1        LAS VEGAS, NEVADA, NOVEMBER 14, 2016, 3:26 P.M.

2                            --oOo--

3                    P R O C E E D I N G S

4

5                    THOMAS MICHAEL RADKE

6              called as a witness on behalf of the

7         Government, was examined and testified as follows:

8                     DIRECT EXAMINATION

9    BY MS. CARTIER-GIROUX:

10   Q.    Where do you work, sir?

11   A.    Federal Bureau of Investigation, Las Vegas Division.

12   Q.    And how long have you worked with them?

13   A.    This will be my sixth year.

14   Q.    And what is your title?

15   A.    Information technology specialist, forensic examiner

16   with the Computer Analysis Response Team.

17   Q.    And what are your duties with your agency?

18   A.    My duties include the acquisition and examination of

19   digital evidence as it enters the division.

20   Q.    And did you receive any specialized training in

21   forensic examination?

22   A.    Yes.

23   Q.    And, in fact, sir, did you provide us, which was

24   provided to the defense, with your curriculum vitae?

25   A.    Yes, I did.

4

```
 1            MS. CARTIER-GIROUX:  Your Honor, I would ask
 2    that it be marked as Government's --
 3            COURTROOM ADMINISTRATOR:  45.
 4            MS. CARTIER-GIROUX:  -- 35.
 5            COURTROOM ADMINISTRATOR:  45.
 6            MS. CARTIER-GIROUX:  45.  Sorry.
 7            And may I approach the witness?
 8            THE COURT:  Yes, you may.
 9    BY MS. CARTIER-GIROUX:
10    Q.    Sir, do you recognize Government's 45 for
11    examination?
12    A.    Yes, I do.
13    Q.    And what is that?
14    A.    This is my CV that I provided you.
15    Q.    And does the CV include all of your training and
16    degrees up until recently, up until this date?
17    A.    Yes, it does.
18    Q.    Would Government's 45 for identification aid you in
19    answering questions regarding your qualifications and the
20    prior training that you've had?
21    A.    Yes.
22            MS. CARTIER-GIROUX:  Your Honor, I'm not going
23    to enter it into evidence, but I would ask that he be
24    allowed to look at it if necessary to refresh his
25    recollection.
```

1              THE COURT:  All right.  Any objection from the

2    defense?

3              MR. MARCHESE:  No, Your Honor.

4    BY MS. CARTIER-GIROUX:

5    Q.    Sir, does your training go as far back as what year?

6    A.    Give me a second here.  I believe it's 2005.

7    Q.    2005?

8    A.    Yeah.

9    Q.    So is it fair --

10   A.    I'm sorry.  2004.

11   Q.    2004.  So is it fair --

12             THE COURT:  Why don't we --

13             THE WITNESS:  2004.

14             THE COURT:  -- foundation for this.

15   BY MS. CARTIER-GIROUX:

16   Q.    2004?  So it's --

17             THE COURT:  Okay.  Let's lay a little foundation

18   for this, then, because it looks like he's not that

19   familiar with the information, who put together the CV, did

20   he do it himself, a secretary based on some information?

21   Or just so we know where this is coming from.

22   BY MS. CARTIER-GIROUX:

23   Q.    Did you put together that curriculum vitae?

24   A.    Yes, I did.

25   Q.    Okay.

6

```
 1              THE COURT:  My bad.  I told him to move the
 2   microphone.
 3   BY MS. CARTIER-GIROUX:
 4   Q.    What is your most recent training in forensics
 5   analysis?
 6   A.    My most recent training is this Black Light
 7   Macintosh Essential Advanced Forensic Training II, which
 8   was located at the FBI San Diego Regional Computer
 9   Forensics Laboratory.  That was in August of 2016.
10   Q.    Okay.  And what type of program was that?
11   A.    That was a -- specific to Apple Macintosh related
12   digital evidence.  And it was a forensics class about --
13   not only about the forensic tool, but it was also just a
14   standard forensics class that went into advanced techniques
15   in extracting data from Apple evidence items.
16   Q.    Okay.  Did you also receive training in June of
17   2015?
18   A.    Yes, I did.
19   Q.    And what training was that?
20   A.    That was SANS 408 - Windows Forensic Analysis.  And
21   that class was held at the FBI Northwest Regional Computer
22   Forensics Laboratory in Portland, Oregon.
23   Q.    Okay.  And March of 2015?
24   A.    March of 2015 I was a proctor for the FBI CART.  We
25   have our -- we have like a mock trial that's part of our
```

1    training program for the new examiners.  And I was a

2    proctor for that program.  And it was a five-day -- it was

3    a five-day event, and it was at the College of William &

4    Mary in Williamsburg, Virginia.

5    Q.    Okay.  And in July of 2014?

6    A.    July 2014 was SANS 585 - Advanced Smartphone

7    Forensics.  That was part of a SANS San Francisco, located

8    in San Francisco, California.  It was a six-day training

9    class.

10   Q.    Have you also received training in -- from -- for

11   CART from the FBI?

12   A.    Yes, I have.

13   Q.    Okay.  Can you talk to us about that.

14   A.    So one of the management requirements to be a --

15   part of the Computer Analysis Response Team in the FBI is

16   we have a very structured forensic program.  It equals a

17   little over 300 hours of specialized forensic training.

18        The classes are spread out all over the country.

19   There's several classes that's required, as well as there's

20   a written paper that's required.  You have to submit so

21   many examinations, and you have to complete so many

22   searches in order to become a certified forensic examiner.

23        Once you become an examiner, you're certified in

24   Windows only, and then you have to actually obtain

25   additional training to complete examinations on Apple items

1    and cell phone items.

2    Q.    Have you received certifications from the FBI in not

3    only in Windows but in Apple Macintosh forensics as well as

4    cell phone GPS forensics?

5    A.    Yes.

6    Q.    Have you conducted forensic examinations for the

7    FBI?

8    A.    I have.

9    Q.    How about approximately -- from the time that you

10   began employment with the FBI until today, how many digital

11   devices have you forensically examined?

12   A.    That's a tough question.  But I can tell you that

13   I've completed over -- I believe it's over 200 forensic

14   examinations, and each one, including several forensic

15   evidence items.

16   Q.    Can you tell us a little bit about your academic

17   degrees?

18   A.    I have a bachelor of science in computer security

19   from ITT Technical Institute in Henderson, Nevada.

20         I have a two-year degree, also from ITT, in

21   computer networking.

22         And I'm also a graduate of a police academy.

23   Q.    Okay.  Before working for the FBI as a computer

24   forensic examiner, where did you work?

25   A.    I was a sworn law enforcement officer in the State

 1    of Nevada for the Nevada Attorney General's Office.

 2    Q.    And did you ever act previously as computer forensic

 3    specialist?

 4    A.    Yes.

 5    Q.    When was that?

 6    A.    I was a forensic examiner at the Nevada Attorney

 7    General's Office.  And I was also -- prior to the AG's

 8    Office, I worked at the -- for a federal contractor with

 9    the Department of Energy located in North Las Vegas.

10            MS. CARTIER-GIROUX:  At this time, Your Honor, I

11    would tender the witness as an expert in computer forensic

12    examination.

13            THE COURT:  Any objection?

14            MR. MARCHESE:  No, Your Honor.

15            THE COURT:  All right.  I just want one

16    follow-up question.

17            I did hear you say that you did receive

18    certifications for forensic reviews of Apple products.

19    What did that entail?  Is it just attending the class, or

20    is there an examination?  How are you granted the

21    certificate?

22            THE WITNESS:  So part of our -- part of our

23    standard training in the Computer Analysis Response Team is

24    we're required to complete annual proficiency examinations.

25    Every year I have to take an exam in my designated

1    specialty in order to maintain my certification.

2              And to this point I've completed all --

3    everything that I was required to do.

4              THE COURT:  Okay.  Thank you.

5              So, yes, at this time I will qualify him as an

6    expert in computer forensic examinations.

7    BY MS. CARTIER-GIROUX:

8    Q.   Sir, I'll have you take a look in that book in front

9    of you at tab -- that will be 31A, for identification, 31B,

10   31C, and 31D.

11   A.   Okay.

12   Q.   Do you recognize those photographs?

13   A.   Yes, I do.

14   Q.   Sir, did you participate in the search warrant on

15   January 19th of 2016 at 7080 Donald Nelson Avenue, here in

16   Las Vegas?

17   A.   Yes, ma'am, I did.

18   Q.   And what's been identified and what you've looked at

19   as 31A -- Government's 31A for identification, 31B, 31C,

20   and 31D, what did those photographs depict?

21   A.   I made entry into the pool house which was located

22   on the property.  And I noticed that there were two

23   computers that were surrounding a -- looked like a bed.

24              One of the computer items was an iMac, which is

25   the bigger Mac with a big screen, and the second item was

1    a -- looked like a MacBook Air, was sitting on the bed.

2              The item in 31A is the MacBook Air that I saw on

3    that day.  I was -- actually when I made entry, part of our

4    standard procedure is to try to complete live capture on

5    any item that might be currently up and running.

6              My experience with these examinations is --

7    especially now today we're starting to see a lot more items

8    that are fully encrypted, which means that if the device is

9    powered down or shut off, then there's no way to retrieve

10   that data without obtaining the password.

11             Out of the two items that I saw, the iMac

12   computer was locked.  When I asked for the password, nobody

13   had the password for that item.

14             The MacBook Air, which is 31A, it was locked

15   with the user account, Frank.  I asked if any of the agents

16   had the password or were able to obtain the password for

17   that item, and they gave me -- one of the agents, Special

18   Agent Wendy Collins, provided me a password, which was

19   simon, s-i-m-o-n, lower case.  That unlocked the item.  And

20   I was able to log in.  And that's the screen that was up

21   after logging in.

22   Q.   So is it fair to say that 31A, 31B, 31C, and 31D are

23   screenshots of an item which was a MacBook Air?  Is that

24   correct?

25   A.   That's correct.

```
 1    Q.    And it was marked as 1B1 into inventory?

 2    A.    That's correct.

 3          MS. CARTIER-GIROUX:  At this time I would offer

 4    31A through D into evidence.

 5          THE COURT:  Any objection?

 6          MR. MARCHESE:  No, Your Honor.

 7          THE COURT:  All right.  They will be admitted.

 8          (Government's Exhibits 31A, 31B, 31C, 31D

 9          received into evidence.)

10          MS. CARTIER-GIROUX:  I'd ask that 31A be

11    published.

12          Actually, I apologize.  Before we do 31A, can we

13    put into -- put up a picture?  Let's look at 4A, which has

14    already been entered, Government's 4A.

15    BY MS. CARTIER-GIROUX:

16    Q.    Do you see 4A on your screen, sir?

17    A.    Yes.

18    Q.    Okay.  Do you recognize what's already been entered

19    into evidence as 4A?

20    A.    Yes.

21    Q.    What is 4A?

22    A.    4A is 1B1.

23    Q.    Is 1B1?

24    A.    It's the MacBook Air.  Yes, ma'am.

25    Q.    Okay.  Let's go to -- now to 31 -- what did I say it
```

1    was?  31A.

2              What are we seeing in 31A?

3    A.    So I noticed on the screen, at the forefront of the

4    screen there's a Netgear router log-on console.

5    Q.    Let me stop.  You -- the prior picture of the

6    MacBook was closed?

7    A.    That's correct.

8    Q.    Who opened the MacBook?

9    A.    I opened the MacBook.

10   Q.    Okay.  When you opened the MacBook, what did you

11   see?

12   A.    When I opened the MacBook, there was a log-on

13   screen.  The screen was actually locked.  And there was a

14   log-on screen with the user name Frank Alfter.

15   Q.    Okay.  Can you take a look at what's been marked

16   then as 31 -- would be -- what?

17             (Discussion held off the record.)

18             MS. CARTIER-GIROUX:  Okay.  Yeah.  Let's look at

19   4B.  Thank you.

20   BY MS. CARTIER-GIROUX:

21   Q.    We're looking at 4B.  Is that the screen you saw

22   when you opened up the MacBook?

23   A.    Yes, ma'am, it is.

24   Q.    Okay.

25   A.    That's the black screen.

1   Q.    Okay.  Now, you indicated that someone in the room

2   gave you the password?

3   A.    That's correct.

4   Q.    Okay.  And what was the password -- was it an agent

5   or a civilian?

6   A.    It was an agent.

7   Q.    Okay.  And do you remember the name of the agent?

8   A.    Special Agent Wendy Collins.

9   Q.    Okay.  Did you put a password into this computer?

10  A.    I did.

11  Q.    What password did you put in?

12  A.    Simon, lower case.  I'm sorry.  S-i-o-m -- I'm

13  sorry, s-i-o -- s-i-m-o-n.

14  Q.    Okay.  And then when you entered the word simon,

15  what happened?  What was the first thing you saw?

16  A.    The screen in 3A was the first screen that came up.

17  Q.    The screen in 3A?

18  A.    Yes.  So if you look at the photos in 3A --

19  Q.    Okay.

20  A.    -- Exhibit 3A.

21  Q.    Can we pull up 3A, please.  31A, you mean?

22  A.    I'm sorry.  31A.  I can see --

23  Q.    31A.

24  A.    Yeah, 31A.

25  Q.    Okay.  So you saw the Netgear?

1    A.    That's correct.  So the Netgear log-in console

2    for -- what that is, it's a screen to access a router.

3    Q.    Okay.  Now, behind that Netgear screen, could you

4    see that there was another image?

5    A.    Yes.  There was a screen behind it that looked like

6    it was a video -- it looked like some type of pornography

7    that was paused.

8    Q.    Okay.  And what did you do in order to see what was

9    behind that screen?  What did you do?

10   A.    So part of the live capture process for us is to

11   identify if an encryption is running on the system.

12        Prior to doing that, I held down the F3 key,

13   which is the Exposé key on a Mac.

14   Q.    Yes.  And what happened?

15   A.    What that key does is essentially it minimizes all

16   of the windows that are currently open on the machine so

17   that I can see every window that's open currently.

18   Q.    Okay.  Can you take a look at 31C.  When you pressed

19   the F3 key, were you able to see what's depicted in 31C?

20   A.    Yes, I did.  That was one of the windows that was

21   open.

22   Q.    Okay.  And what is 31C?

23   A.    31C is a photo that I took of -- this would indicate

24   Finder, which if you're familiar with Windows, it's like

25   Windows Explorer, and it shows you all of the files that

1    are within Finder.

2            And those four files which were indicative of

3    child pornography to me were visible.

4    Q.    Okay.

5            Can you pull up 31D.  And what is 31D?

6    A.    31D is actually a -- I zoomed in on those four

7    files, and that's a photo of -- of those four files that

8    were indicative of child pornography.

9    Q.    Now, while you were there during the search warrant,

10   you were looking at this, could you tell what -- where

11   those files were being stored on the computer?

12   A.    At the time, I did not -- or I could not tell where

13   the -- where the files were located.  I didn't want to play

14   the files because I was afraid I would change timestamps on

15   the files.  And at that point, once I -- once I saw that

16   there possibly was child pornography on the machine, I

17   powered the machine down.

18           I do want to note that there was an SD card that

19   was inserted in the side of the laptop.

20   Q.    Can we go back to 4A, please.

21           Okay.  Can you see anything in this picture that

22   depicts that SD card?

23   A.    Yes.  On the left side you could see the SD card

24   protruding in the photo a little bit.

25   Q.    Is that coming from -- is that next to where the

1    power cord is entering, or is it on the other side?

2    A.    It's on the -- it's on the other side.

3    Q.    You can actually -- if you touch in the corner of

4    that screen, sir, I just put the pencil on for you, you

5    could actually make a mark on the screen.  Can you circle

6    it?  There you go.

7              Now, you indicated that there was another device

8    in the pool or the casita area, and you said that was --

9    what kind of device was that?

10   A.    It was an Apple iMac computer, which is like an

11   all-in-one, like an all-in-one tower computer with --

12   everything's built right in the screen.

13   Q.    Can you take a look at 5B, please, in evidence.

14             THE COURT:  5 what?

15             MS. CARTIER-GIROUX:  B, as in boy.

16   BY MS. CARTIER-GIROUX:

17   Q.    Do you recognize 5B?

18   A.    Yes, that was the item.

19   Q.    Now, you also stated that there was a user -- that

20   that screen was locked as well?

21   A.    Yes.

22   Q.    Did any of the agents in the room that you were with

23   knew that -- know the password of that computer?

24   A.    They did not.

25   Q.    Okay.  What was the screen, the log-in name on that

18

1    one?

2    A.    The name on that one was Jan Rouven.

3    Q.    And that would be -- take a look at 5C.

4    A.    Yeah, that's right.

5    Q.    Okay.  Were you the examiner who examined the

6    digital devices in this case that were recovered from the

7    search warrant?

8    A.    Yes, I did.  All the items.

9    Q.    Okay.  I'm going to talk to you specifically -- oh,

10   actually, after you reviewed -- did the forensics on the

11   items, what did you do with your reports that were

12   generated as a result?  What did you do with them?

13   A.    So upon completion I generated all the reports, and

14   I gave those to the case agent.

15   Q.    Who was the case agent?

16   A.    Mari Panovich.

17   Q.    I'm going to talk to you specifically about some

18   devices.  Specifically, I'm going to talk to you about 1B1,

19   1B2, 1B3, 1B7, 1B13, 1B16, 1B21, 1B30 and 1B37.  Okay?

20           Did you prepare DELREX reports pursuant to your

21   forensics examination of these devices?

22   A.    Yes, I did.

23   Q.    Before we talk specifically about those reports,

24   what did you do -- like, how do you examine these devices,

25   like, specifically what is the procedure?

1    A.    So the standard procedure is the case agent submits

2    a request, a written request into our national database,

3    which then is assigned to the corresponding examiner, which

4    happened to be me.

5              I received multiple requests for the evidence

6    items.  Those 1B1 numbers that you listed were included in

7    the request that I received from Special Agent Panovich.

8              Upon reviewing that request for examination, the

9    items then are checked out of our Las Vegas -- FBI Las

10   Vegas evidence control unit.  And I ask the evidence

11   control unit to pull those items for me with a strict chain

12   of custody.

13             I checked the items out.  And then at that point

14   the forensic examination procedure starts.

15             So first step is acquiring a good working

16   forensic image of that item, which means it's a -- I

17   capture a bit-for-bit copy of the computer memory or hard

18   drive using one of our CART -- FBI CART approval tools.

19   And then I verify that the images that I captured matches

20   the original evidence item.

21             Upon the completion of the -- of the imaging

22   process, I make a copy of the images.  So I work on a

23   working copy.  I don't work on the master copy.

24             I then process the forensic image file using a

25   forensic tool, one of several forensic tools that I thought

1  was appropriate to provide the case agent with the

2  information as quickly as possible.

3  Q.    What do you do to maintain or to ensure that there

4  are no changes made to the devices by you processing them,

5  for lack of a better term?

6  A.    So part of the imaging acquisition process is the

7  generation of a hash value, which is very similar to a

8  digital fingerprint.  I'm not sure the exact mathematical

9  number, but it's a mathematical equation that's generated

10  at the end, and it comes up with a string of numbers.  And

11  the chances of that matching any other item is a very large

12  number.

13          And we verify that that matches the original

14  prior to doing any more work.

15  Q.    Okay.  Did you generate any reports from your

16  examination of the items that I previously stated?

17  A.    Can you repeat that?  I'm sorry.

18  Q.    Did you generate any reports, what's commonly

19  referred to as a DELREX report?

20  A.    Yes, I did.

21  Q.    Did you do a DELREX report for all of the items that

22  you processed?

23  A.    I generated a DELREX report which covered -- it

24  included every 1B item that was asked in the request.

25  Q.    And what is a DELREX report?

1    A.    So a DELREX report is just an acronym for our

2    digital evidence lab report of examination.  It's my FBI

3    paper report that it's our policy that can only be

4    completed by a certified forensic examiner and the FBI.

5    Q.    And what types of information does it contain?

6    A.    So it includes the date that the request was

7    submitted.  It includes what was asked in the request by

8    the case agent.  It includes which 1B items are requested

9    for examination.

10          It details the forensic artifacts that were

11   extracted from the items as well as the derivative evidence

12   that I generated on the back end, which would be the

13   digital reports that I created during the course of the

14   examination.

15   Q.    Can you take a look at what's been previously marked

16   as 10A for identification, 10B for identification, and 10C

17   for identification.

18   A.    Okay.

19   Q.    Do you recognize those?

20   A.    I do.

21   Q.    What is 10A, 10B, and 10C, government's exhibits for

22   identification?  What are they?

23   A.    Those are my reports of examination for those

24   specific 1B items.

25   Q.    And were they made in conjunction with your forensic

1    examination in this case of those items?

2    A.    Yes, they were.

3            MS. CARTIER-GIROUX:  At this time we would offer

4    10A through C into evidence.

5            THE COURT:  Any objection?

6            MR. MARCHESE:  No, Your Honor.

7            THE COURT:  All right.  10A through C will be

8    admitted.

9        (Government's Exhibits 10A, 10B, 10C received

10            into evidence.)

11   BY MS. CARTIER-GIROUX:

12   Q.    Sir, can you take a look at what's been marked for

13   identification as Government's 11, 12, 13, 14, 15, 16

14   through 19.  Just look at them, and then I'm going to ask

15   you some questions.

16   A.    Okay.

17   Q.    Do you recognize those items?

18   A.    I do.

19   Q.    What are they?

20   A.    Those are copies of my derivative evidence that I

21   created.  And each one contains extraction, a forensic

22   extraction of a -- in a digital report from a specific 1B

23   item.

24   Q.    And what is an IEF?

25   A.    So IFE, it's an acronym for Internet Evidence

```
 1    Finder.  It's a commercially available tool that's made by
 2    a company called Magnet Forensics.  It's one of our
 3    approved tools to use on digital evidence.
 4              I like to use that tool and conduct extractions.
 5    It does a really good job on extracting social-media
 6    related artifacts, peer-to-peer related artifacts, and
 7    other, like, web-related forensic artifacts; and it puts
 8    them in an ease --  fairly easy to read report so the case
 9    agent can review it easily.
10    Q.    Okay.  Specifically Government's 11 for
11    identification, what is that IEF report of?
12    A.    Okay.  So it's Internet Evidence Finder extraction
13    report from evidence item 1B1.
14    Q.    Okay.  And is that the IEF that you did in this case
15    for --
16    A.    It is, yes.
17    Q.    -- 1B1?
18              Government's No. 12 for identification, what is
19    that?
20    A.    12 is Internet Evidence Finder extraction report
21    from evidence item 1B2.
22    Q.    Again, is that your IEF report that you generated in
23    your forensics examination in this case?
24    A.    Yes, it is.
25    Q.    Government's No. 13 for identification, what is
```

24

1    that?

2    A.    It's an Internet Evidence Finder report from

3    evidence item 1B3.

4    Q.    And is that again your report that you created, the

5    IEF that you created as a result of your examination in

6    this case?

7    A.    Yes, it is.

8    Q.    Of 1B3?

9    A.    Yes.

10   Q.    And what is Government's 14 for identification?

11   A.    14 is a -- that's Internet Evidence Finder report

12   from item 1B6.

13   Q.    1B6 or 1B7?

14   A.    I'm sorry.  It's hard to read.  It's -- there's like

15   marker on here.

16   Q.    And is that the IEF report that you generated in

17   your examination in this case?

18   A.    It is, yes.

19   Q.    What is Government's Exhibit 15 for identification?

20   A.    So 15 is Internet Evidence Finder extraction report

21   from evidence item 1B13.

22   Q.    And is that the report, the IEF report that you

23   generated in your investigation in this case?

24   A.    Yes, it is.

25   Q.    And what about Government's Exhibit 16 for

1   identification?

2   A.    16 is Internet Evidence Finder report from evidence

3   item 1B16.

4   Q.    And, again, is that your report generated in this

5   case?

6   A.    Yes, it is.

7   Q.    And what about Government's Exhibit 17 for

8   identification?

9   A.    Yes, it is.  It's -- actually, it's -- let me move

10  it up here so I can read it.

11          So it's Internet Evidence Finder extraction

12  report in evidence item 1B21.

13  Q.    Okay.  Again, is that something that you created as

14  a result of your examination in this case?

15  A.    Yes, it is.

16  Q.    And what is Government's Exhibit 18 for

17  identification?

18  A.    Sorry.  This is list under 19?  I don't think

19  it's --

20  Q.    18?  It would be 18.

21  A.    Yeah.  I don't have an 18 on here.  It goes to 19.

22  Q.    Oh, okay.  I'm sorry.

23          May I approach?

24          THE COURT:  Yes, you may.

25          MS. CARTIER-GIROUX:  Thank you.

1          THE WITNESS:  Yes.

2   BY MS. CARTIER-GIROUX:

3   Q.    Do you recognize Government's Exhibit 18 for

4   identification?

5   A.    Yes, I do.  It's Internet Evidence Finder report

6   from evidence item 1B30.

7   Q.    And did you create that report as a result of your

8   forensics in this case?

9   A.    Yes, I did.

10  Q.    And, finally, what is Government's Exhibit 19 for

11  identification?

12  A.    Okay.  19 is Internet Evidence Finder report from

13  evidence item 1B37.

14  Q.    And was that the evidence report that you generated

15  for 1B37 in this case?

16  A.    Yes, it is.

17          MS. CARTIER-GIROUX:  At this time, the

18  government would offer 11 through 19 into evidence.

19          THE COURT:  Any objection?

20          MR. MARCHESE:  No, Your Honor.

21          THE COURT:  All right.  11 through 19 will be

22  admitted.

23       (Government's Exhibits 11, 12, 13, 14, 15,

24       16, 17, 18, 19 received into evidence.)

25

1    BY MS. CARTIER-GIROUX:

2    Q.    Other than the DELREX reports and the IEFs that you

3    generated for the items that you reviewed in this case, or

4    analyzed in this case, did Special Agent Panovich ask you

5    to provide her with a copy of GigaTribe chats from item

6    1B30?

7    A.    Yes.

8    Q.    Could you look at Government's No. 43 for

9    identification, please.

10              Do you recognize it?

11   A.    I do.  It's --

12   Q.    What is that?

13   A.    It's Internet Evidence Finder report from item 1B30,

14   specifically the GigaTribe chats.

15   Q.    So did you extract the GigaTribe chats from the IEFs

16   in item 1B30?

17   A.    Yes, I did.

18   Q.    And are those chats on that disk?

19   A.    They're in a PDF file on the disk, yes.

20              MS. CARTIER-GIROUX:  At this time I'd offer

21   Government's 43 into evidence.

22              THE COURT:  Any objection to No. 43?

23              MR. MARCHESE:  No, Your Honor.

24   BY MS. CARTIER-GIROUX:

25   Q.    Were you also requested to extract from the items

```
 1    that I named to you earlier, 1B1, 1B2, 1B3, 1B7, 1B13,

 2    1B16, 1B21, 1B30, 1B37, were you asked to look for Ares --

 3    potential Ares downloads?

 4     A.    Yes, I did.

 5     Q.    And could you take a look at item 42A, Government's

 6    42A for identification?

 7                COURTROOM ADMINISTRATOR:  I'm sorry.  To

 8    clarify, was Exhibit 43 admitted?

 9                UNIDENTIFIED SPEAKER:  No.

10                MS. CARTIER-GIROUX:  Oh, I thought I just asked

11    for it to be.

12                UNIDENTIFIED SPEAKER:  Yes, 43 was.

13                MS. CARTIER-GIROUX:  I just asked for that to be

14    admitted.

15                COURTROOM ADMINISTRATOR:  I don't believe I

16    heard her --

17                MS. CARTIER-GIROUX:  Oh, I'm sorry.

18                THE COURT:  You identified it as being the

19    GigaTribe chats that were provided in a PDF format.  But

20    there was no motion to have it admitted.

21                MS. CARTIER-GIROUX:  I apologize.  I thought I

22    did.  I'm ahead of myself.

23                At this time, I would move -- I'd request that

24    43 be moved into evidence.

25                THE COURT:  Any objection to No. 43?
```

1            MR. MARCHESE:  No, Your Honor.

2            THE COURT:  All right.  43 will be admitted.

3            MS. CARTIER-GIROUX:  Thank you.

4         (Government's Exhibit 43 received into

5         evidence.)

6            THE COURT:  Now we're talking about 42A, the

7    Ares downloads --

8            MS. CARTIER-GIROUX:  Yes.

9            THE COURT:  -- right?  All right.

10   BY MS. CARTIER-GIROUX:

11   Q.   Do you recognize 42A?

12   A.   Yes, that's Internet Evidence Finder report that I

13   created from item 1B2 for Ares.

14   Q.   So is 42A the Ares downloads that you were able to

15   extract from the IEF from 1B2?

16   A.   Yes.

17            MS. CARTIER-GIROUX:  At this time, I would move

18   42A.

19            THE COURT:  Any objection to 42A?

20            MR. MARCHESE:  No objection.

21            THE COURT:  All right.

22            MS. CARTIER-GIROUX:  I'm sorry.

23            THE COURT:  It's all right.  It will be

24   admitted.

25

30

```
 1              (Government's Exhibit 42A received into
 2          evidence.)
 3              MS. CARTIER-GIROUX:  Okay.
 4    BY MS. CARTIER-GIROUX:
 5     Q.    Can you look at 42B for identification.
 6     A.    It's the Internet Evidence Finder report from item
 7    1B3 for Ares specifically.
 8     Q.    And is that the Ares -- are those the Ares downloads
 9    that you extracted from the IEF for 1B3?
10     A.    Yes.
11              MS. CARTIER-GIROUX:  At this time I'd ask that
12    42B be admitted.
13              THE COURT:  Any objection?
14              MR. MARCHESE:  No objection.
15    BY MS. CARTIER-GIROUX:
16     Q.    Can you take a look at 42C, please.
17              THE COURT:  All right.  So 42B will be admitted.
18          (Government's Exhibit 42B received into
19          evidence.)
20    BY MS. CARTIER-GIROUX:
21     Q.    What is 42C?
22     A.    42C is the Internet Evidence Finder report from item
23    1B7 for Ares.
24     Q.    And is that -- those are the Ares downloads from 1B7
25    that you extracted from the IEF from 1B7?
```

1    A.    Yes, it is.

2              MS. CARTIER-GIROUX:  At this time I would ask

3    that 42C be admitted.

4              THE COURT:  Any objection to 42C?

5              MR. MARCHESE:  No, Your Honor.

6    BY MS. CARTIER-GIROUX:

7    Q.    Can you take --

8              THE COURT:  All right.  So 42C will be admitted.

9              (Government's Exhibit 42C received into

10              evidence.)

11   BY MS. CARTIER-GIROUX:

12   Q.    Can you take a look at 42D.

13   A.    42D is the IEF, Internet Evidence Finder report

14   extractions from evidence item 1B16 for Ares.

15   Q.    And is that the Ares downloads that you extracted

16   from the IEF from 1B16?

17   A.    Yes, it is.

18              MS. CARTIER-GIROUX:  At this time I'd ask that

19   42D be admitted.

20              THE COURT:  Any objection to 42D?

21              MR. MARCHESE:  No, Your Honor.

22              THE COURT:  All right.  That will be admitted.

23              (Government's Exhibit 42D received into

24              evidence.)

25

1    BY MS. CARTIER-GIROUX:

2    Q.    Can you look at 42E.

3    A.    It's the Internet Evidence Finder report from item

4    1B30, Ares.

5    Q.    Are those the Ares downloads that you extracted from

6    the IEF from 1B30?

7    A.    Yes.

8            MS. CARTIER-GIROUX:  At this time, I would ask

9    that 42E be admitted.

10           THE COURT:  Any objection to 42E?

11           MR. MARCHESE:  No, Your Honor.

12           THE COURT:  It will be admitted.

13       (Government's Exhibit 42E received into

14       evidence.)

15   BY MS. CARTIER-GIROUX:

16   Q.    Take a look at 42F, please.

17   A.    42F is the Internet Evidence Finder report

18   extractions from evidence item 1B37, Ares.

19   Q.    And are those the Ares downloads that you extracted

20   from the IEF of 1B37?

21   A.    Yes, they are.

22           MS. CARTIER-GIROUX:  At this time I would ask

23   that 42F be admitted.

24           THE COURT:  Any objection to 42F?

25           MR. MARCHESE:  No, Your Honor.

1            THE COURT:  That will be admitted.

2            (Government's Exhibit 42F received into

3            evidence.)

4    BY MS. CARTIER-GIROUX:

5    Q.    Mr. Radke, did Ms. Panovich, Special Agent Panovich

6    ask you to take a look at item 1B3 and extract search terms

7    from that item?

8    A.    Yes.

9    Q.    And could you take a look at Government's 34 for

10   identification.  Do you recognize 34?

11   A.    I do.  That's Internet Evidence Finder report

12   extractions specifically for Google searches from evidence

13   item 1B3.

14   Q.    And did you extract those search terms from 1B3 and

15   place them on the desk?

16   A.    I did, yes.

17            MS. CARTIER-GIROUX:  At this time we would offer

18   34 for identification into evidence.

19            THE COURT:  Any objection to 34?  34 is the

20   Internet evidence forensic report for the Google search

21   terms from 1B3?  Is that right?

22            MR. MARCHESE:  What are the Bates numbers on

23   those?

24            MS. CARTIER-GIROUX:  The Bates numbers?

25            THE COURT:  Exhibit 34.

```
 1              MS. CARTIER-GIROUX:  They aren't Bates stamped,
 2    they're just on the --
 3              THE COURT:  It's just a disk?
 4              MS. CARTIER-GIROUX:  The disk.  They're
 5    extracted from the device.
 6              THE COURT:  It's a CD?
 7              MR. MARCHESE:  Okay.  So when were they turned
 8    over?
 9              MS. CARTIER-GIROUX:  Yes.
10              MR. MARCHESE:  When were they turned over?
11              MS. CARTIER-GIROUX:  They were turned over --
12    these were in the IEFs so they were available to you at
13    ICAC.
14              MR. MARCHESE:  On the 37 devices?
15              MS. CARTIER-GIROUX:  It's identified as which
16    one it was, which is from 1B30.
17              MR. MARCHESE:  So they weren't turned over to
18    us, and we were just supposed to go look at them is what
19    you're saying?
20              MS. CARTIER-GIROUX:  The device -- all of the
21    IEFs were available for them to look at at ICAC, which
22    would include any search terms on any of the devices.
23    They're in the IEF.
24              THE COURT:  So they're available where?
25              MS. CARTIER-GIROUX:  At the ICAC office where
```

1    the devices are kept.

2            THE COURT:  So these disks were kept with the

3    devices, not in a separate --

4            MS. CARTIER-GIROUX:  He extracted the

5    information and put them on a disk as opposed to me taking

6    the device and plugging it in and --

7            THE COURT:  Right.

8            MS. CARTIER-GIROUX:  -- playing it for you.

9            THE COURT:  But that disk was not available to

10   the defense?

11           MS. CARTIER-GIROUX:  The disk was produced

12   specifically for the trial.  It wasn't produced -- it was

13   extracted from the item and brought so that we could show

14   them, so that it was -- I mean, the agent could testify

15   what she saw on the device.  It's just the actual terms

16   that were --

17           THE COURT:  Okay.

18           MS. CARTIER-GIROUX:  -- removed.

19           THE COURT:  So how is this represented?  Is it

20   also in a PDF form or something else?

21           THE WITNESS:  The contents on the disk in

22   Exhibit 34 are there -- it's a PDF report that you can open

23   up.

24           THE COURT:  Could we print out a PDF report for

25   the defense, or does it contain child pornography that we

1    can't provide to them but only make available?

2              MS. CARTIER-GIROUX:  It's just a really long

3    spreadsheet.  I mean, I could make them a copy of that

4    particular disk, if you want me to make a copy of it.

5    That's very easy to do I guess.

6              THE COURT:  I think so if it's -- so it is a PDF

7    is what you're saying?

8              MS. CARTIER-GIROUX:  It is a PDF.

9              THE WITNESS:  It's a PDF, yes, ma'am, yes, Your

10   Honor.

11             THE COURT:  So we could just make a copy of the

12   disk and then --

13             MS. CARTIER-GIROUX:  It's -- yeah, I couldn't

14   make --

15             THE COURT:  -- the defense could just open it on

16   their own computer and slide the bar back and forth to see

17   the very long document.

18             Otherwise, I'm afraid we're going to have the

19   same problem as before where if it's a long document and

20   you print it to fit the page, then the text is going to be

21   teeny tiny; right?

22             So I think you'd prefer to have it,

23   Mr. Marchese, in a PDF so --

24             MR. MARCHESE:  Correct.

25             THE COURT:  -- you can look at it and then --

1            MR. MARCHESE:  Here's the issue.

2            THE COURT:  -- we'll just hold off on whether or

3      not it's admissible.  We'll give you an opportunity to

4      review it.

5            MR. MARCHESE:  We were under the assumption that

6      we were given anything that was not considered to be child

7      pornography.  We were having these issues a week or two ago

8      in reference --

9            THE COURT:  No --

10           MR. MARCHESE:  -- to the Giga chats.

11           THE COURT:  -- that was my recollection too.

12           MR. MARCHESE:  Yeah.

13           THE COURT:  I'm with you.  There was material

14     that couldn't be provided in the ordinary discovery format

15     because it's something that is not supposed to be

16     disseminated.  And so that was made available for you to go

17     check it out and look at it to make sure that it was what

18     it was represented to be.

19           But the other documents that are not actually

20     child pornography, this is just a list of terms, it sounds

21     like the spreadsheet could be made available to the

22     defense, and we'll just reserve a ruling on whether or not

23     this exhibit is admissible until they have a chance to look

24     at it.

25           If there's no prejudice, then it will be

1    admissible.  If you need more time, then I'll give you more

2    time.  If it shouldn't be admitted, then it won't be

3    admitted.

4              MR. MARCHESE:  All right.  Thank you.

5              THE COURT:  And I think that's a fair objection.

6    And so it is sustained.

7    BY MS. CARTIER-GIROUX:

8    Q.    Is that the -- are those the search terms from --

9    that you extracted at the request of Agent Panovich for

10   trial?

11   A.    Yes, they have.

12   Q.    Okay.  And they come from which item?

13   A.    They were extracted from item -- from evidence item

14   1B3.

15             MS. CARTIER-GIROUX:  I'm sorry, Judge, I just

16   want to make it clear for the record.

17             Because this is a receipt case, it would be an

18   ordinary thing for us to have a witness testify as to

19   search terms.  Any search terms would be relevant, would be

20   something that we would pull off of an IEF.  We don't even

21   have to admit that.  She could testify to it directly.

22             THE COURT:  Right.  But if you --

23             MS. CARTIER-GIROUX:  But I just wanted to make

24   it clear we weren't trying to hide the ball.

25             THE COURT:  -- want to admit the document, then

1    that's different.

2            MS. CARTIER-GIROUX:  Okay.

3            THE COURT:  It's separate.  Yes.

4            MS. CARTIER-GIROUX:  Okay.  That's fine.  But we

5    weren't trying to hide the ball.

6            THE COURT:  So if I do not admit Exhibit 34,

7    that doesn't mean your agent can't testify about it.

8            MS. CARTIER-GIROUX:  Okay.

9    BY MS. CARTIER-GIROUX:

10   Q.    After you analyzed and processed all of the devices

11   that were provided to you and -- is it fair to say that you

12   processed or forensically examined all of the devices, not

13   just the ones that I've been speaking to you about today?

14   A.    That's correct.

15   Q.    All right.  That information, those reports, what

16   did you do with them?

17   A.    So the way that our process works, after they're --

18   after the items are processed, I immediately copy the items

19   up to our local forensic network.

20           It's a stand-alone network that doesn't go to

21   the outside that's only available at our Bermuda offsite

22   location.  So I make it available on our network for the

23   agent to review.  And I notify her that it's ready to

24   review.

25           In addition I create the disks that are included

1    here.

2    Q.    Can you tell me what a CMOS battery default is?

3    What is a CMOS battery default?

4    A.    So a CMOS battery is actually located in a computer

5    item to -- it's used to keep track of the time on the

6    system.  It's basically a watch battery.

7            THE COURT:  Can you just spell for me CMOS?  Is

8    it C-I-M-A-S or --

9            THE WITNESS:  It's C-M-O-S.

10           THE COURT:  C-M-O-S.  Okay.

11   BY MS. CARTIER-GIROUX:

12   Q.    And when there is a CMOS battery default, what

13   happens to time/date stamps?

14   A.    So when the battery dies on a computer system,

15   essentially the time goes back to the default time of the

16   system.

17   Q.    Okay.  And if I gave you, for example, like

18   sometimes those default times, for example, on a Windows

19   operation system, could they go back -- what is a common

20   date that we see on a Windows operation system for the CMOS

21   default?

22   A.    There's different times, depending on the type of

23   system that we're examining.

24           But January 1st, 1970, is a common default time

25   for a UNIX based or a Macintosh.  Macintosh is based on

41

1    UNIX, so -- on a UNIX based system.

2    Q.   So, for example, in January of 1970, were there

3    thumb drives?

4    A.   Not that I'm aware of.

5    Q.   Okay.  So if you saw an image that had a date on it

6    from January 1st, 1970, on a thumb drive, what would you --

7    what would your conclusion be as to why it was dated

8    January 1st, 1970?

9    A.   Can you be specific on which timestamp you're

10   referring to so I could create a time?

11   Q.   The creation date?

12   A.   Creation date.  Okay.  It would tell me that the

13   battery died on the system or there was some type of

14   corruption during the file transfer.

15            MS. CARTIER-GIROUX:  Court's indulgence.

16            Your Honor, I have no other questions.  I pass

17   the witness.

18            THE COURT:  All right.

19            Cross?

20                    CROSS-EXAMINATION

21   BY MR. MARCHESE:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   Mr. Radke, what is your title again?

25   A.   Yes, sir.  It's information technology specialist

42

```
 1    forensic examiner, the Computer Analysis Response Team.

 2    Q.    Can I just call you specialist?  Is that easiest?

 3    A.    FE might be easier.

 4    Q.    FE.  Okay.

 5          So turning your attention to the date of the

 6    search, you testified that you were on premises on that

 7    particular date; correct?

 8    A.    Yes, sir.

 9    Q.    Okay.  When did you arrive at the premises?

10    A.    We were staged prior to entering the property.  The

11    agent -- it was early in the morning, and the agents made

12    entry.  They cleared the property.  And then we were

13    notified that we could make entry.

14    Q.    Okay.  And when was that?

15    A.    I don't recall the exact time, but it was around

16    8:00 a.m. in the morning.

17    Q.    At what time?

18    A.    If I recall it was around 8:00 a.m. in the morning.

19    Q.    Okay.  So at about 8:00 a.m., you then entered the

20    premises; correct?

21    A.    Yeah.  I vaguely rec- -- I don't know the exact

22    time, but yes.

23    Q.    General speaking eight-ish.  We won't hold you to

24    it, but that general timeframe?

25    A.    Yes.
```

43

1    Q.    Where do you go once you enter the premises?

2    A.    So once we make -- once I made entry, I actually

3    went into our -- we have a vehicle that we use for forensic

4    previews that was located -- it was our evidence response

5    vehicle that was parked out in front of the residence.  And

6    that's where I was located.

7    Q.    Okay.  So you're in the vehicle.  And then when you

8    entered the premises, the Donald Nelson residence, where do

9    you go at the Donald Nelson residence?

10   A.    Typically after the photos are taken of the

11   property, we have evidence custodians that film everything

12   and that take photos of every room.

13   Q.    Okay.  But where did you personally go?

14   A.    I remember going to several rooms in the house

15   looking for live computers.

16   Q.    Okay.  So that's where you went.  You initially went

17   into the main house area.  Is that fair to say?

18   A.    Yes.

19   Q.    Okay.  And you were looking for live computers;

20   correct?

21   A.    That's correct.

22   Q.    Did you find any live computers at that time?

23   A.    During the search for live computers, I did find a

24   live computer.

25   Q.    Okay.  In the main house?

1    A.    It was in the -- in the pool house.

2    Q.    Okay.  In the live -- house you did not find any

3    live computers; correct?

4    A.    I don't recall.  I don't recall if there were any.

5    Q.    Okay.  You didn't generate any reports documenting

6    that there were any live computers in the house when you

7    initially entered the premises; is that correct?

8    A.    The report I generated --

9    Q.    That's a yes or a no.

10   A.    There were no live computers in the house.

11   Q.    Okay.  Let's turn to the guest house.

12          Now, you've testified that there was a live

13   computer in the guest house; correct?

14   A.    That's correct.

15   Q.    Okay.  I'm going to show you what's been marked and

16   put into evidence as Government's trial exhibit 4.

17          MS. CARTIER-GIROUX:  Do you want us to put it

18   up?  We can put it up so you don't have to use the Elmo.

19          MR. MARCHESE:  Whatever.  There we go.  Okay.

20   BY MR. MARCHESE:

21   Q.    Do you recognize this, sir?

22          Thank you, though.

23   A.    Yes, I do.

24   Q.    Okay.  Is this the live computer that you were

25   referring to?

45

1    A.    Yes, it is.  It's 1B1.

2    Q.    Okay.  And when you entered the pool house and you

3    saw 1B1, is this the way that you saw this particular

4    laptop?

5    A.    Yes.

6    Q.    Okay.  So it was closed; correct?

7    A.    It was closed.

8    Q.    All right.  How did you determine that this computer

9    was in fact live, for lack of a better term?

10   A.    So when I opened the lid on the computer, the lock

11   window came up.

12   Q.    Okay.  When you say the lock window, I'm showing you

13   what's been marked as 4B.  Is this the lock window that

14   you're referring to?

15   A.    Yes, it is.

16   Q.    Okay.  So bear with me.  You walk in, you see the

17   computer, you open it up, you see the lock window; correct?

18   A.    That's correct.

19   Q.    Now, I'm sure you're quite good at your job.  But at

20   this point there's not much you can do without a password.

21   Is that fair so say?

22   A.    On this particular system, that's correct.

23   Q.    Okay.  And at some point in time you got the

24   password; correct?

25   A.    Yes.

1    Q.    And when you received the password, you entered the

2    password, and is this what came up next, Government's 31A?

3    A.    Yes, that's correct.

4    Q.    Okay.  Now, at some point in time that particular

5    item was seized and taken back to the lab into evidence;

6    correct?

7    A.    That's correct.

8    Q.    And it was your job to go ahead and do a forensic

9    analysis on that particular item; is that right?

10   A.    Forensic examination.

11   Q.    Okay.  Now, when you do your forensic examination,

12   what's the first thing that you do?

13   A.    First thing that we do after receiving the request

14   for exam from the case agent, we review the request for

15   examination specific to whatever 1B items that the case

16   agent is requesting.

17   Q.    Okay.  So in this particular case, you're looking

18   for child exploitation materials.  Fair to say?

19   A.    That's correct.

20   Q.    All right.  So what is the name of the program in

21   which you use to do this analysis?

22   A.    There's several.  I don't rely on one specific

23   forensic tool.

24   Q.    Let's focus on this one particular item that we were

25   just looking at, the MacBook.  Which one did you use on

1    that one?

2    A.    So the tools that I chose for this particular exam

3    were -- there's one tool named NetClean, which is --

4    NetClean is a tool that's -- was designed exclusively for

5    child exploitation type of -- type of cases.  That's one of

6    our approved tools.

7           That tool is used in conjunction with the very

8    large hash set which contains millions of known child

9    pornography files.

10   Q.    Okay.

11   A.    Signature files.

12   Q.    So it's NetClean?

13   A.    NetClean and IEF were the two tools I used.

14   Q.    Okay.  What is the difference between NetClean and

15   IEF?

16   A.    So NetClean is specific to child exploitation, that

17   essentially it's used to pull out graphics and video files

18   only, and it categorizes them based on whether or not it's

19   suspected CP or not or child pornography or not.

20          Internet Evidence Finder is unique.  It actually

21   does pull out photos and videos, but it also expands on

22   peer-to-peer -- peer-to-peer tools, web-based e-mails, chat

23   messages like -- and some more obscure third-party chat

24   programs, like Grindr and some of these other programs.

25   And it does a pretty good job of displaying those messages.

1    Q.    Okay.  So you use NetClean to find the child

2    exploitation materials; correct?

3    A.    Yes.

4    Q.    And you're going to use IEF to maybe boost the

5    investigation, to try to find chats and things of that

6    nature that would be helpful for the agent and the FBI and

7    the United States Attorney's Office to put their case

8    together.  Fair to say?

9    A.    That's correct.

10   Q.    Okay.

11         MR. MARCHESE:  Court's indulgence.

12   BY MR. MARCHESE:

13   Q.    Now, your report, your reporting examination, it's

14   Bates No. 70, do you recognize this?  I believe they've

15   been brought into evidence already.

16   A.    Yes.

17   Q.    Okay.  What is that report based off of?  Is it

18   NetClean, is it IEF, is it both?  What?

19   A.    Both.

20   Q.    Okay.

21         MS. CARTIER-GIROUX:  Judge, I'm not sure what

22   report we're looking at.  I apologize if I didn't hear.

23         MR. MARCHESE:  Bates No. 70.

24         MS. CARTIER-GIROUX:  70?  Okay.  So that would

25   be Exhibit 10A.

1    BY MR. MARCHESE:

2    Q.    Mr. Radke, you're familiar with the report we're

3    talking about; correct?

4    A.    Do you mind if I could take a look at the report.

5    Q.    All right.  If you don't know what it is, it's 10A.

6    A.    10A.  Okay.  Okay.  Yes, that's my report.

7    Q.    Okay.  And on that report, one of the things that

8    you look into would be the users; correct?

9    A.    That's correct.

10   Q.    Okay.  And you examined 1B1; correct?

11   A.    That's correct.

12   Q.    Okay.  There were two user names associated with

13   1B1; correct?

14   A.    Correct.

15   Q.    You also went ahead and examined item 1B3; correct?

16   A.    That's correct.

17   Q.    That was another item that was found in the pool

18   house?

19   A.    Correct.

20   Q.    Or the casita?  It would be the Apple iMac?

21   A.    Yes.  That's the second item.

22   Q.    That also had two user names; correct?

23   A.    The shared user name is a system user name.

24   Q.    Okay.  You have it listed as two user names,

25   correct, on your report?

1    A.    Yes.

2    Q.    Okay.  In reference to 1B6, the Sony laptop, there

3    are actually seven system user names in which you have

4    listed on your report; is that correct?

5    A.    That's correct.

6    Q.    Okay.  Item number 1B16, that's another item that

7    you looked at in your report, the Apple MacBook Pro;

8    correct?

9    A.    That's correct.

10   Q.    That particular item had three system user names; is

11   that right?

12   A.    Yes, that's correct.

13   Q.    Okay.  Was there a point in time when you looked at

14   item 1B30 as well?

15   A.    1B30, yes.

16   Q.    Yes.  That is a Gateway PC?

17   A.    Yes.

18   Q.    Okay.  Isn't it also true that on our report you had

19   six user names listed on that particular item; correct?

20   A.    I don't have that report in front of me.  Which --

21   can you -- can you give me the exhibit number for that

22   particular report?

23            THE COURT:  18.

24            MR. MARCHESE:  19?

25            THE COURT:  18.

1          MR. MARCHESE:  18.

2          MS. CARTIER-GIROUX:  It's 10C.

3          MR. MARCHESE:  10C, like Charlie?

4          THE WITNESS:  Okay.  Can you repeat the

5    question, sir.

6    BY MR. MARCHESE:

7    Q.    There were six user names associated with item 1B30;

8    is that correct?

9    A.    Okay.  Yes, that's correct.

10   Q.    Okay.  Now, when you review all these files,

11   basically what you do is you just put it through the

12   computer, and then the program, that NetClean program we

13   previously discussed, it searches for these hashtag values;

14   isn't that correct?

15   A.    It does.  However, I don't review the material, I

16   make the material available for review for the case agent.

17   Q.    Correct.  So what you do is you get the device, you

18   run the program, the program spits out the results, and

19   then you forward it to the case agent to take whatever

20   appropriate steps are necessary?  Fair to say?

21   A.    That's correct.

22   Q.    Okay.  So when there are large numbers of files on

23   several devices, you don't know how many of those files are

24   in fact duplicates?  Is that fair to say?

25   A.    The way that the NetClean program operates is it

52

1     identifies the duplicate files for us.  So it breaks it out

2     by unique file and by duplicate file.  And in my file count

3     in my report, those numbers that are in there detail which

4     ones are duplicates and which ones were unique.

5               A unique file would be, you know, a

6     one-of-a-kind file -- file count, and then the duplicates

7     would include the duplicate.

8     Q.    Okay.  But when you do each separate device, it

9     doesn't say a duplicate from, say, item 1B1 to 1B3; is that

10    correct?

11    A.    I generated a NetClean report for each 1B item --

12    Q.    Correct.

13    A.    -- during the exam.  And it did detail -- if there

14    were duplicates, it detailed there were duplicates per

15    item.

16    Q.    But that is -- that is specific to each device;

17    correct?

18    A.    That's correct.

19    Q.    Okay.  So if 1B1 had the same file ten times, it

20    would stay on; correct?

21    A.    That's correct.

22    Q.    But if 1B1 had it and let's say we had ten devices

23    that all had it one time, so ten times total, NetClean

24    would not show that each device had the same file one time?

25    Fair to say?

1    A.    That's correct.

2    Q.    Okay.  In this particular case, you also looked at

3    item 1B14, which would have been the MacBook Pro 500.  Do

4    you remember that?

5    A.    1B --

6    Q.    And I don't believe -- that would be something

7    that's in your own report.  I don't believe that's been

8    entered into evidence.

9    A.    There was a report done for every 1B item.

10   Q.    Correct.  I don't believe that the government has

11   entered it into evidence.

12         Have you -- you generated a report for 1B14;

13   correct?

14   A.    I believe I did.

15   Q.    Okay.  Do you have your reports with you today?

16   A.    The reports here.

17   Q.    Just the exhibits?

18   A.    Just the exhibits here.

19   Q.    Okay.  And so you didn't bring your report?

20   A.    No.  Not -- I wasn't allowed to bring my report,

21   sir.

22   Q.    You weren't allowed to?

23   A.    Yes, that was my understanding.

24   Q.    So you don't remember the 1B14 report; is that

25   correct?

| | |
|---|---|
| 1 | A.    Not without the report in front of me, I don't -- |
| 2 | Q.    Okay. |
| 3 | A.    I don't recall. |
| 4 | Q.    If I was to show you a copy of that report, would |
| 5 | that refresh your recollection? |
| 6 | A.    Yes. |
| 7 | MR. MARCHESE:  3722. |
| 8 | MS. CARTIER-GIROUX:  Yeah, I have it, if he |
| 9 | wants. |
| 10 | BY MR. MARCHESE: |
| 11 | Q.    And if -- just take a look at it real quick, sir. |
| 12 | And then if that refreshes your recollection -- |
| 13 | A.    Okay. |
| 14 | Yes. |
| 15 | Q.    Okay.  And in reference to 1B14, if I was to tell |
| 16 | you that you found 1785 images, would you agree with me on |
| 17 | that statement? |
| 18 | A.    Can I have that back? |
| 19 | Q.    No problem. |
| 20 | A.    Okay.  There were 1785 image files, graphics files. |
| 21 | There were 701 -- I'm sorry, 12 video files.  The total was |
| 22 | 1797. |
| 23 | Q.    Okay.  And were there any files that you found that |
| 24 | would have been child exploitation? |
| 25 | A.    I basically took the -- I took the processed item |

|    |                                                                  |
|----|------------------------------------------------------------------|
| 1  | and I put it up for the case agent to review.  So I wasn't      |
| 2  | in the position to identify child pornography.                   |
| 3  | Q.    Did you flag any items of child pornography?              |
| 4  | A.    I did not.                                                 |
| 5  |       MR. MARCHESE:  Court's indulgence.                         |
| 6  | BY MR. MARCHESE:                                                 |
| 7  | Q.    Now, turning back to your report, you also extracted      |
| 8  | some Skype user accounts; is that correct?                       |
| 9  | A.    That's correct.                                            |
| 10 | Q.    And on -- that would have been on -- 1B1 would have       |
| 11 | been one of the devices in which you found Skype user           |
| 12 | accounts; correct?                                               |
| 13 | A.    Correct.                                                   |
| 14 | Q.    And that had two different individuals who were           |
| 15 | Skype -- Skype accounts, Frank Alfter and Jan_Rouven.  Does     |
| 16 | that sound correct?                                              |
| 17 | A.    Can you tell me which --                                   |
| 18 | Q.    Bates 75, page 6 of your report.                          |
| 19 |       MS. CARTIER-GIROUX:  It's 10A.                             |
| 20 |       THE WITNESS:  I'm sorry.  10A?                             |
| 21 |       THE COURT:  Two users.  Under Exhibit 10A are             |
| 22 | there two users listed?  We're on 1B1 on the Skype user         |
| 23 | accounts.                                                        |
| 24 |       THE WITNESS:  Okay.  The answer is yes, there             |
| 25 | were two users on 1B1 under Skype.                               |

```
 1    BY MR. MARCHESE:

 2    Q.    Okay.  And then on 1B3, were there three users for

 3    Skype?

 4    A.    Yes.

 5    Q.    Okay.  Now, in reference to those Skype chats, is

 6    that something that you just take off and give it to the

 7    agent, or do you actually review the material?

 8    A.    So I extract the data in a forensically sound manner

 9    and then I generate the report which contains all the

10    artifacts that were extracted.  I provide that to the case

11    agent, and then the case agent goes through the material to

12    determine what's related to his or her investigation.

13    Q.    Okay.  So the answer is no, you don't review them;

14    correct?

15    A.    That --

16    Q.    You just make them forensically available to the

17    agent to use in the investigation?

18    A.    Depending on the case -- I mean, I am trained to

19    find that stuff.  I will actually go in, if I find

20    something that I think is relevant, I'll notify the case

21    agent that it's available to review, and I'll point them to

22    the item.

23    Q.    Okay.

24    A.    It really -- it just depends on the case.  Every

25    case is different.
```

1    Q.    Sure.  Was this a case in which you started looking

2    at the Skype chats, or was this one where you just burned

3    it on to a disk or whatever format you use and gave it to

4    the case agent?

5    A.    So the way that the tools work, it's -- I'm going to

6    see the results of the searches during the processing

7    phase.  It's impossible for me not to see the forensic

8    artifacts that it extracts.

9              So in this particular case, I mean, I did look

10   at the Skype user accounts.  I did read through the search

11   warrant.  It did give details on what she was looking for.

12   Q.    Okay.  But did you go through each and every Skype

13   chat?

14   A.    I did not.

15   Q.    Okay.  You just went through it, found it, burned it

16   to a disk, gave it to the case agent?  Fair enough?

17   A.    That's correct.

18   Q.    Also in your report on 1B7, you found some folders

19   in which you included in your reports; is that correct?

20   A.    That's correct.

21   Q.    And one of the folders said root/kkk/arrestra/

22   (phonetic) a bunch of other numbers and some words.  Do you

23   see that there?

24   A.    Yes, I do.

25   Q.    Okay.  Does that have any significance to you, or is

1    that just the name of the file?

2    A.    So the folder resided on item 1B7.  And the folder

3    title was KKK.  And the name of the file was that long file

4    name, the arrestra 3333 boy -- boyscout underscore fuck

5    underscore fast underscore PT dot MPEG.

6              That file -- the title of the file was Gay Kids

7    Orgy.  That was located on -- at the root of 1B7.

8    Q.    So it's your testimony that Gay Kids Orgy is the

9    name of the file; correct?

10   A.    Well --

11   Q.    Correct?

12   A.    That was the name of the artifact, yes.

13   Q.    Okay.  And then it's under file -- I think what was

14   it, KKK or something like that?

15   A.    Yeah.  The folder title was KKK and then the file

16   was contained inside that folder.

17   Q.    Okay.  Now, also through the course of your

18   investigation were you able to review item -- items, excuse

19   me, 1B29 and 1B31, and respectfully those are the HB

20   Pavilion 800 and another Apple iMac.

21              Do you have any recollection of that?  I do have

22   your reports here, if you need it.

23   A.    They sound -- yes, they sound familiar, but I'd have

24   to look at the report, yes.

25              (Discussion held off the record.)

1    BY MR. MARCHESE:

2       Q.    And if you took a look at that just to refresh your

3    recollection, sir.  Referring to 29 and 31.

4       A.    Okay.  Yes.

5       Q.    Have you now refreshed your recollection that you

6    did a report on that?

7       A.    I did, yes.

8       Q.    Did you do the I -- the Internet-related forensic

9    artifacts on those two particular --

10              THE RECORDER:  Mr. Marchese.

11   BY MR. MARCHESE:

12      Q.    Did you do Internet-related forensic artifact

13   extractions from those particular two devices?

14      A.    Bear with me.  Let me validate.

15      Q.    Pages 6 and 7.

16              THE COURT:  And which devices are we talking

17   about here?

18              MR. MARCHESE:  1B29 and 1B31, Your Honor.

19              THE COURT:  Thank you.

20              THE WITNESS:  1B29, yes, Internet Evidence

21   Finder was completed on that item.

22   BY MR. MARCHESE:

23      Q.    Okay.  Same thing with 31?

24      A.    31?  Let me validate 31 here.  29 was DLV63.  31,

25   yes, DLV61.  No, I'm sorry, that was -- I'm sorry.  That

1    was NetClean.  Yeah, I don't see one on -- I don't see an

2    IEF report for 1B31 on the list here.  I see one for 32.

3    Yeah, I don't see one on there.

4    Q.    If you look at pages 7 -- 6 and 7 of your report,

5    does that refresh your recollection?

6    A.    Okay.  There's 29.  31.  Okay.  Yes.  Yes.

7    Q.    Is there a difference between either of those two

8    reports?

9    A.    It gives the file count of the items that were

10   extracted.

11   Q.    Okay.  And you would agree with me that the file

12   count is exactly the same on items 1B29 and 1B31; correct?

13   A.    I'd have to look at each item line by line.

14   Q.    Okay.  Well, let's take the first one.

15   A.    I mean, they look the same, yes.

16   Q.    Okay.  They look the same, but they are two separate

17   items?  Is that fair to say?

18   A.    That's correct.

19             MR. MARCHESE:  Court's indulgence.

20             THE COURT:  Yes.

21             MR. MARCHESE:  Pass the witness, Your Honor.

22             THE COURT:  Redirect?

23             MS. CARTIER-GIROUX:  Yes.  Very briefly.

24

25

REDIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q.    Sir, what is a live computer?  What does that mean?

A.    Live computer is a computer that's powered on in the powered-on state.  It's up and running.

Q.    On -- you indicated in your direct testimony and also on cross-examination that you do not make a determination of whether or not there are child pornography images on these devices; correct?

A.    That's correct.

Q.    So, for example, on 1B30 -- 1B29 and 1B31, do you have any idea whether or not there was child pornography on them?

A.    No.

Q.    What about 1B14?

A.    No.

Q.    And who makes that determination?

A.    The -- the case agent.

Q.    So would the case agent go through the NetClean reports or the IEFs or even and read your DELREX, as well, and make a determination of whether or not the items that you imaged did in fact contain child pornography?

A.    Yes.  In fact, after review by the case agent on the evidence items, the case --

        MR. MARCHESE:  Objection, nonresponsive.

1          THE COURT:  Sustained.  I'm not sure that he can

2    give an answer as to what the other case agent does unless

3    he's there with her.  It might be hearsay anyway.  I don't

4    know.  Maybe there's a training program where they do it as

5    a team.  But --

6    BY MS. CARTIER-GIROUX:

7    Q.    Do you -- I apologize -- I withdraw.

8          Do you provide the case agent with your forensic

9    reports?

10   A.    I do.

11   Q.    Okay.  And it is -- who in the process of people

12   makes the determination whether or not the devices that

13   you've imaged contains child pornography?

14   A.    The case agent.

15   Q.    So it is not your responsibility nor your duty to

16   make that determination; correct?

17   A.    That's correct.

18   Q.    And you provide the agent with the devices as well

19   as the report so that she can go through them to make that

20   determination?

21   A.    That's correct.  The DELREX report is generated at

22   the end of the exam, after the reviewing agent has a chance

23   to review the material.  That's not generated until --

24   until the agent has completed her review.

25   Q.    And it's not --

1    A.    Or his review.

2    Q.    -- the DELREX report that makes the determination of

3    whether or not the devices contain child pornography;

4    correct?

5    A.    That's correct.  It's what's included in the

6    forensic tool and what the case agent identifies.

7    Q.    Okay.

8              MS. CARTIER-GIROUX:  I don't have any more

9    questions.  Thank you, sir.

10              THE WITNESS:  Thank you.

11              THE COURT:  Cross?

12              MR. MARCHESE:  No, Your Honor.

13              MS. CARTIER-GIROUX:  Your Honor?

14              THE COURT:  Yes.

15              MS. CARTIER-GIROUX:  Can he be excused?  Or do

16    you need him present for the other exhibit, the one that

17    wasn't admitted, the chats?

18              THE COURT:  I just have one -- yeah, he can go

19    as soon as I just clarify this one last thing.

20              So you mentioned the DELREX report is what is

21    generated after the case agent does her review.  So your

22    contact is twice, is at the beginning you're extracting the

23    directive data, creating these reports, using your forensic

24    tools, then the case agent reviews it.  And then how do you

25    create the DELREX?

1          THE WITNESS:  So the -- all the DELREX is, just

2    to clarify, the DELREX is just simply my paper report.  And

3    that's done at the very end of the examination.  So all of

4    the forensic work is completed.  You know, it starts with

5    the forensic imaging, that's phase one; phase two, I

6    process the data; phase three, I put it up for review for

7    the case agent; the fourth phase then would be the case

8    agent notifies me they're completed, and then I generate

9    the digital reports.

10          A lot of it depends on the tool too and what

11   type of device that I'm doing the exam on.  So in the case

12   of a cell phone item, cell phone I just extract the report

13   out and hand it to the case agent.  In the case of a

14   computer item, the way that our forensic software works is

15   we have the capability to make it available for the agent,

16   and the agent can actually flag the files that they deem as

17   child pornography, and then there's -- and then they notify

18   me, and I create the actual derivative evidence then.

19          At that point, whatever -- once that phase is

20   done, then I generate the digital reports, which is what

21   you have here, and then I complete my DELREX report, and

22   then I basically verify that the images haven't changed

23   throughout the review process.  Does that make sense?

24          THE COURT:  Okay.  Well, I haven't seen a DELREX

25   report, so maybe I'm asking questions that are unnecessary.

1    I just wanted to make sure that the information then in the

2    DELREX report all comes from you.

3              Or it sounds now like -- more like it's a little

4    bit of a combination between information that you've

5    received from the case agent in creating that final

6    product.

7              THE WITNESS:  These cases are so large, Your

8    Honor, that there's -- realistically, there's just no way

9    humanly that I could go through that much data myself.  So

10   we work as a team.  Especially -- a lot of our -- or

11   actually I would say most of our cases in the FBI are

12   significantly large.

13             And my objective is, because there's a lot of

14   live -- there's a lot of live victims in this type of

15   violation, my objective is to get the data up as quickly as

16   possible for the cases to start to review, which is what I

17   did in this particular case.

18             But that's -- that's our process.  After I

19   complete the -- generate the derivative evidence, those go

20   into our -- into our evidence control unit with a chain of

21   custody.  So there's a master copy that goes in there.

22   That doesn't change.  And then I make a bunch of other

23   copies, like two or three other working copies.  And that's

24   what I provided the case agent.

25             THE COURT:  And so when the case agent then is

```
 1   done with her review, she contacts you.  And what's in that
 2   DELREX?  It's just a summary of the relevant as opposed to
 3   a laundry list of everything you found?
 4            THE WITNESS:  The DELREX report details what the
 5   tools find.  So in the case of NetClean, which that's
 6   our -- that's our main tool for identifying child
 7   pornography, because of the hash sets that we use that are
 8   put out by the child victim information by (indiscernible),
 9   that's the quickest way to do it.
10            I mean, basically we process all the -- process
11   all the evidence through those tools.  And then it flags on
12   what's known as child pornography, what's not known as
13   child pornography.  And then case agent looks at it to make
14   the final determination of whether it really is or not.
15            Because there's a lot of -- there are some false
16   hits.  But the case agent looks at every one -- every file,
17   flags the ones that they think are child porn based on
18   their experience, and then I generate the report on the
19   back end.
20            So I take the output of that tool, and I copy it
21   into my DELREX report.  And that's where those numbers
22   comes from that identify the unique files and the --
23            THE COURT:  So does the DELREX incorporate the
24   case agent's opinion of what was or was not child porn?
25            THE WITNESS:  Yes.
```

1          THE COURT:  Okay.  Thank you.

2          Any other questions based on the questions that

3     I asked that you want to clarify?

4                    FOLLOW-UP EXAMINATION

5     BY MS. CARTIER-GIROUX:

6     Q.    Sir, the DELREX report doesn't have Agent Panovich's

7     conclusion as to what is child porn and what is not; does

8     it?

9     A.    That's correct.

10    Q.    It does not contain her conclusions?

11    A.    It does not, correct.

12          MS. CARTIER-GIROUX:  Okay.  I just wanted to be

13    clear.  Thank you.

14          MR. MARCHESE:  Nothing based on that, Your

15    Honor.  Thank you.

16          THE COURT:  All right.  Thank you.  Yes, you are

17    excused.  Thank you very much for coming in.

18          (The partial transcript was concluded.)

19                    *   *   *   *   *

20

21

22

23

24

25

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                          PAGE

3    THOMAS MICHAEL RADKE
          Direct Examination By Ms.                     3
4         Cartier-Giroux
          Cross-Examination By Mr. Marchese            41
5         Redirect Examination By Ms.                  61
          Cartier-Giroux
6         Follow-up Examination By Ms.                 67
          Cartier-Giroux

7

8                        E X H I B I T S

9
     GOVERNMENT'S                                   ADMITTED
10   10A, 10B, 10C                                       22
     11, 12, 13, 14, 15, 16, 17, 18, 19                 26
11   31A, 31B, 31C, 31D                                 12
     42A                                                30
12   42B                                                30
     42C                                                31
13   42D                                                31
     42E                                                32
14   42F                                                33
     43                                                 29
15

16

17

18

19

20

21

22

23

24

25

69

1                              -o0o-

2          I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____        __2/13/17__

7          Donna Davidson                      Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25