1
                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
2
              BEFORE THE HONORABLE GLORIA M. NAVARRO
                 CHIEF UNITED STATES DISTRICT JUDGE
3

4

UNITED STATES OF AMERICA,          :
5                                   :
           Plaintiff,              :
6                                   :No. 2:16-cr-00100-GMN-CWH
       vs.                          :
7                                   :
JAN ROUVEN FUECHTENER,             :
8                                   :
           Defendant.              :
9 _____ :

10

11

                  TRANSCRIPT OF BENCH TRIAL - DAY 1
12                      (Pages 1 through 225)

13

14                        November 14, 2016

15

                          Las Vegas, Nevada
16

17

18

19
   FTR No. 7D/20161114 @ 8:38 a.m.
20

21
   Transcribed by:         Donna Davidson, CCR, RDR, CRR
22                         (775) 329-0132
                           dodavidson@att.net
23

24

25    (Proceedings recorded by electronic sound recording,
      transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

1

                    A P P E A R A N C E S

2

3

    FOR THE PLAINTIFF:

4

    Lisa Cartier-Giroux
5   Elham Roohani
    U.S. ATTORNEYS OFFICE
6   501 Las Vegas Boulevard South
    Suite 1100
7   Las Vegas, Nevada 89101
    (702) 388-6336
8   Lisa.Cartier-Giroux@usdoj.gov
    Elham.Roohani@usdoj.gov
9

10  FOR THE DEFENDANT:

11  Jess R. Marchese
    LAW OFFICE OF JESS R. MARCHESE
12  601 South Las Vegas Boulevard
    Las Vegas, Nevada 89101
13  (702) 385-5377
    Fax: (702) 474-4210
14  marcheselaw@msn.com

15  Benjamin C. Durham
    BENJAMIN DURHAM LAW FIRM
16  601 South 10th Street
    Las Vegas, Nevada 89101
17  (702) 631-6111
    Fax: (702) 946-1396
18  bdurham@vegasdefense.com

19  Michael W. Sanft
    SANFT LAW
20  324 South 3rd Street
    2nd Floor
21  Las Vegas, Nevada 89101
    (702) 382-0905
22  michael@sanftlaw.com

23

24

25

```
                    ┌─TRANSCRIBED FROM DIGITAL RECORDING─┐
```

 1              LAS VEGAS, NEVADA, NOVEMBER 14, 2016, 8:38 A.M.

 2                                --oOo--

 3                        P R O C E E D I N G S

 4

 5              COURTROOM ADMINISTRATOR:  All rise.

 6              THE COURT:  Thank you.  You may be seated.

 7              COURTROOM ADMINISTRATOR:  Are we ready, counsel?

 8              MS. ROOHANI:  Yes.

 9              MR. MARCHESE:  We are.

10              COURTROOM ADMINISTRATOR:  This is the time set

11      for the bench trial in Case No. 2:16-cr-00100-GMN-CWH,

12      United States of America versus Jan Rouven Fuechtener.

13              Counsel, please make your appearances for the

14      record.

15              MS. ROOHANI:  Good morning, Your Honor.  Ellie

16      Roohani and Lisa Cartier-Giroux for the United States.

17              We're joined at counsel table with our case

18      agent, FBI Special Agent Mari Panovich.

19              THE COURT:  Good morning, Ms. Panovich,

20      Ms. Cartier-Giroux, and Ms. Roohani.

21              MR. MARCHESE:  Good morning, Your Honor.  Jess

22      Marchese on behalf of Mr. Jan Rouven Fuechtener.  He's

23      present.  Mr. Benjamin Durham is here, as well, and Michael

24      Sanft.

25              THE COURT:  Good morning, Mr. Sanft,

------------------------------------------------------------
TRANSCRIBED FROM DIGITAL RECORDING

1   Mr. Fuechtener, Mr. Durham, Mr. Marchese.

2            All right.  Anything we need to address before

3   we begin with opening statements?

4            MS. CARTIER-GIROUX:  Yes, Your Honor.  We have a

5   renewed motion for reciprocal discovery.  I just want to

6   make sure on the record that there is no other outstanding

7   discovery that we are entitled to, either based on the

8   witnesses or any other that we would be entitled to under

9   the rule.

10           MR. MARCHESE:  To my knowledge, Your Honor, they

11  are in possession of everything that we intend to introduce

12  at trial.

13           THE COURT:  All right.  Thank you.

14           MS. CARTIER-GIROUX:  Your Honor, the other issue

15  is this morning I filed a memorandum to support an oral

16  motion that we're going to be making at trial.  It's an

17  evidentiary issue.  It's regard to hearsay statements that

18  we believe are exceptions to the hearsay rule.

19           We are planning on introducing, and defense is

20  aware of, some jail calls made by the defendant.  They are

21  statements made by an adverse party.  We believe they're

22  admissible obviously under the rule.

23           But we are also attempting to admit as

24  nonhearsay the statements of the co-conspirator as to the

25  possession of child pornography, which is Frank Alfter, who

TRANSCRIBED FROM DIGITAL RECORDING

1    is the other person in the telephone call.

2              We did the motion just to give the Court the

3    heads-up as opposed to just jumping and saying it's

4    admissible for the truth.  Once we call the witness the

5    Court obviously does not have to rule on that until we get

6    to the end of the government's case.

7              THE COURT:  These are recorded jail calls?

8              MS. CARTIER-GIROUX:  Yes, ma'am.

9              THE COURT:  All right.  So there's no

10   expectation of privacy in those calls.

11             MS. CARTIER-GIROUX:  No, ma'am.

12             THE COURT:  And you're separating them out into

13   two different categories.  One is the admissions by the

14   defendant, anything that he actually said that was

15   inculpatory --

16             MS. CARTIER-GIROUX:  Correct.

17             THE COURT:  -- and then the other category is

18   the other person who is on the phone --

19             MS. CARTIER-GIROUX:  Right.

20             THE COURT:  -- and those statements.  They're

21   not co-conspirator statements.  What --

22             MS. CARTIER-GIROUX:  He's an unindicted

23   co-conspirator.

24             THE COURT:  Oh, unindicted co-conspirator.  I

25   see.  All right.

TRANSCRIBED FROM DIGITAL RECORDING

1              MS. CARTIER-GIROUX:  As to the possession of
2    child pornography.
3              And we believe that during the course of our
4    case, there will be sufficient evidence for the Court that
5    he is an unindicted co-conspirator as to the possession of
6    child pornography, not the original charges in the
7    indictment.
8              And in that -- and for those reasons the
9    statements should come in because the statements are
10   regarding continuing conspiracy to hide the crime from the
11   government.
12             THE COURT:  Okay.
13             MR. MARCHESE:  Well, Your Honor, we're at a
14   little bit of a disadvantage.  Neither Mr. Durham, nor
15   Mr. Sanft, nor myself have seen this motion.  It must have
16   been filed within the last hour or so.
17             So it's kind of difficult for me to give an
18   intelligent response based upon the fact that we haven't
19   seen it.
20             But we'll take a look at it, and we'll address
21   it accordingly as it comes up.  I don't anticipate -- and
22   obviously the government might be able to give more
23   information in reference to this.  But I don't anticipate
24   that this issue will arise today based on the testimony.
25             MS. CARTIER-GIROUX:  And, Judge, just for

TRANSCRIBED FROM DIGITAL RECORDING

1   clarification, we believe it comes in very easily under

2   801(d)(2)(E).  It would have been normally an oral motion,

3   but I understand that the Court -- most courts in this

4   district like us to front issues way in advance.  It's not

5   a motion in limine, it's just something that we would have

6   made orally.

7           THE COURT:  All right.  So it is No. 137 on the

8   docket now.  It was filed today.  As the government said,

9   it's not anything that I need to rule on yet and, in fact,

10  some of the foundation for the second category, the facts

11  that support that necessary foundation, are going to be --

12  or they plan to adduce during trial anyhow, so there's no

13  point in addressing it now.

14          And you can -- Mr. Marchese, you can either

15  address it orally at the time when it arises, or you can go

16  ahead and file a written response if you want to, but it's

17  not necessary.

18          MR. MARCHESE:  Thank you, Your Honor.

19          THE COURT:  All right.  Anything else?

20          MS. CARTIER-GIROUX:  No, Your Honor.

21          THE COURT:  All right.  Let's go ahead and start

22  then with the government's opening statement.

23                  GOVERNMENT'S OPENING STATEMENT

24          MS. ROOHANI:  Good morning, Your Honor.

25          THE COURT:  Good morning.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  There are four counts in this

2     case: possession, receipt, distribution, and advertising of

3     child pornography.  There's no real dispute about the

4     physical evidence in this case, nor can there really be.

5     There is a ton of child pornography found all over the

6     defendant's house.

7          As Your Honor is aware, these are exceptionally

8     graphic and violent videos of children being raped by

9     adults or being forced to engage in sex acts with other

10    juveniles, children, and sometimes even animals.

11         The government anticipates that the only real

12    question for this Court will be who did it.  And the

13    government will prove that the answer to that question is

14    the defendant, Jan Rouven Fuechtener.

15         And we will do that through the defendant's

16    admission, Hotmail e-mails, Grindr, GigaTribe, Skype chats,

17    the forensic evidence, and the sheer volume of child

18    pornography that was found at the defendant's home.

19         I'm going to talk briefly about the evidence in

20    this case, Your Honor, and the charges.

21         Over 9,000 videos of child pornography were

22    found on nine devices seized from the defendant's home.

23    The devices were found in almost every area of the home,

24    including the backyard casita, the covered pool deck area,

25    the kitchen of the main house, in an upstairs office

TRANSCRIBED FROM DIGITAL RECORDING

1   between the master bedroom and a spare bedroom, and in the
2   master bedroom closet.
3           The devices included computers and laptops which
4   were capable of connecting to the Internet to download and
5   distribute child pornography but also external hard drives,
6   SD cards and thumb drives which, as Your Honor is aware,
7   need to be plugged into computers to actually receive those
8   files.
9           And these weren't short videos either.  Most of
10  them were over five minutes long, and some of them were as
11  long as an hour and a half.
12          In terms of the evidence for each of the
13  charges, the first and most straightforward is possession.
14  We have thousands of videos on numerous devices found in a
15  house that's owned by the defendant.
16          We have a statement of the defendant post-
17  *Miranda* saying that he knew that child pornography was
18  being downloaded on computers at his home.
19          When the agents went to execute the search
20  warrant, there were only two people in the house at the
21  time, a visitor, Joel Rosales, who was not residing there,
22  and the defendant.
23          And when the warrant was being executed, agents
24  found child pornography on pause on a computer in the
25  casita.  That computer was password protected, and the

1    defendant gave agents the password that day to that

2    computer.

3            When the defendant was confronted with evidence

4    that there was child pornography on his computers, he lied

5    to save himself.

6            MR. MARCHESE:  Objection.  Argumentative.

7            THE COURT:  It's an opening statement.

8            MS. ROOHANI:  The defendant --

9            THE COURT:  Overruled.  Go ahead.

10           MS. ROOHANI:  Thank you, Your Honor.

11           The defendant claimed that a person named

12   Ferrell downloaded all 9,000-plus videos of child

13   pornography on to all the different devices literally the

14   night before the search warrant was executed.

15           MR. MARCHESE:  Objection.  Misrepresenting the

16   facts.

17           THE COURT:  This is just a statement.  It's not

18   evidence nor argument.  It's just the information that the

19   government plans and believes that they are going to be

20   able to demonstrate with the trial presentation.

21           Go ahead, Ms. Roohani.

22           MS. ROOHANI:  Thank you.

23           Aside from the fact that it would be virtually

24   impossible to download 9,000-plus videos on to nine

25   different devices, the evidence will show that that was a

TRANSCRIBED FROM DIGITAL RECORDING

1    lie.

2            The second charge is receipt.  And there are

3    clear indications from the chats on various platforms,

4    including GigaTribe and Skype, that the defendant was

5    interested in child pornography and was actively trying to

6    obtain it.

7            He shared his password to his GigaTribe folders

8    not only with the undercover agent but also with other

9    friends on GigaTribe.

10           In exchange he asked for their passwords.  And

11   he knew exactly what he was asking for based upon their

12   user names.  For example, the defendant asked the

13   undercover agent, whose user name is pedotraderjoe, which

14   stands for pedophile trader Joe, for the password to the

15   undercover's GigaTribe folder numerous times.

16           In addition, the evidence will show partially

17   downloaded pornography, child pornography, from the Ares

18   peer-to-peer program on numerous devices.

19           And then, of course, there are the literally

20   thousands of images and files of child pornography in the

21   defendant's possession that did not magically appear.  The

22   only natural inference is that the defendant received these

23   files and that he received them from the Internet.

24           Third and fourth are the distribution and

25   advertising counts which I'll discuss together.

TRANSCRIBED FROM DIGITAL RECORDING

1    To better explain the evidence relating to these

2    two counts, I'm going to give you a little bit of minimal

3    context on how the GigaTribe platform works.

4    Sergeant Dennis Carry, who is trained and does

5    training on the GigaTribe platform, will go much more in

6    depth.

7    Like other peer-to-peer programs that Your Honor

8    might be familiar with, GigaTribe lets users download files

9    from one another.  But there is a couple of unique features

10    about the GigaTribe platform that are interesting and

11    relevant to this case.

12    First is that to be able to download from each

13    other the two people have to be friends on GigaTribe.  So

14    unlike other peer-to-peer networks where if I wanted to

15    download a file I could just search from a file name and

16    download it from anybody offering that file, that's not

17    possible on GigaTribe.  You would have to be friends with

18    the person to be able to see their files or to be able to

19    download from them.

20    Second, you have to have a password to the

21    friend's folders to be able to see what's in those folders

22    or to be able to download from those folders.

23    So this means that the users have to have

24    realtime contact to obtain passwords, either through the

25    GigaTribe chat or through some other platform, and then

TRANSCRIBED FROM DIGITAL RECORDING

1    they have to share those passwords to be able to see the

2    files.

3          And, third, once you've obtained the password on

4    GigaTribe, you can look into the friend's folder and see

5    every single file that's in that folder.  In effect, it

6    gives the user notice of what's available for download, and

7    it allows the user to pick and choose what, if anything,

8    they want to download.

9          So briefly I'll explain how this case was

10   initiated.  In August of 2015, the undercover task force

11   officer with the user name pedotraderjoe was accepted as a

12   friend into the GigaTribe network of lars45.

13         On August 4th, lars45 initiated a contact with

14   pedotraderjoe through the GigaTribe chat function and gave

15   pedotraderjoe the password to lars45's three locked shared

16   files titled "AAA," "BBB," and "Girls."

17         Lars45 also asked for pedotraderjoe's files and

18   the password to the folders but was never actually given

19   that password.

20         The task force officer went into the files and

21   saw that each folder had names -- file names indicative of

22   child pornography.

23         Then, about a month and a half later, on

24   September 14th, 2015, the task force officer again logged

25   in to GigaTribe and saw that lars45 was online.  This time

TRANSCRIBED FROM DIGITAL RECORDING

1    the task force officer downloaded files from each of those

2    three folders, AAA, BBB, and Girls, using the password that

3    had been previously provided by lars45.

4              Then using law enforcement software, the task

5    force officer was able to determine the IP address of

6    lars45, and law enforcement was also able to determine that

7    that IP address was associated with the defendant's home

8    address here in Las Vegas.

9              A search warrant was obtained and executed.  And

10   that resulted in the collection of 38 devices throughout

11   the house, nine of which had child pornography.

12             So I'm going to talk for a minute about how do

13   we know that it was the defendant.

14             First, the e-mail address associated with the

15   lars45 GigaTribe account is larsschmidt22@hotmail.com.  The

16   defendant admitted that larsschmidt22@hotmail.com was his

17   e-mail account and that he created that account 10 years

18   ago in Germany.

19             The defendant also admitted that the lars45

20   GigaTribe user name is his account.

21             Then we have actual e-mails from the

22   larsschmidt22@hotmail.com account.  One of the e-mails is

23   from GigaTribe confirming that the lars45 account is, in

24   fact, associated with the larsschmidt22@hotmail.com

25   account.

TRANSCRIBED FROM DIGITAL RECORDING

1          In one e-mail chain the defendant first signs

2     his name as lars45 and two e-mails later in the same chain

3     signs his name as Jan, which, of course, is the defendant's

4     first name.

5          In another e-mail he signs his name as lars45

6     and identifies himself in an attached picture as the one on

7     the left.  When you look at the picture, the one on the

8     left is the defendant.

9          There's an e-mail in a Hotmail account that ties

10     the defendant to the same user name that Your Honor will

11     hear about that had certain Skype chats.  That user name is

12     larsusa22.  On the Skype chats, the defendant used

13     larsusa22 to exchange the password for the lars45 GigaTribe

14     account containing the child pornography in exchange for a

15     live sex show between a father and his daughter.

16          On the Hotmail e-mail that connects the Skype

17     chats and the Hotmail we have the defendant purchasing

18     something from a website called sketchysex.com.  The e-mail

19     was sent to larsschmidt22@hotmail.com, and it thanked Jan

20     Fuechtener for his purchase.  It showed the user name as

21     larsusa22, which is, of course, the same as the Skype

22     account.

23          And then when cross-referencing that e-mail with

24     the defendant's credit card statements, we see that that

25     purchase was actually made by the defendant's credit card.

TRANSCRIBED FROM DIGITAL RECORDING

1          There's also Grindr profiles and chats

2    associated with the defendant's e-mails, janrouven@aol.com

3    and larsschmidt22@hotmail.com, and in those two Grindr

4    profiles the defendant identifies himself as both Jan and

5    lars45.

6          In sum, the evidence will show that the

7    defendant, Jan Fuechtener, is larsschmidt22@hotmail.com,

8    janrouven@aol.com, lars45 on GigaTribe, and larsusa22 on

9    Skype.

10          The evidence will also show that the defendant

11    possessed, received, distributed, and advertised child

12    pornography.

13          Thank you.

14          THE COURT:  Thank you.

15          Mr. Marchese, would you like to make an opening

16    statement now, or do you want to -- or, Mr. Durham, or

17    would you like to wait until after the close of the

18    government's case?

19          MR. MARCHESE:  Your Honor, we'll reserve, with

20    the Court's permission.

21          THE COURT:  All right.

22          MR. MARCHESE:  Thank you.

23          THE COURT:  No problem.

24          You may call your first witness.

25          MS. ROOHANI:  Thank you, Your Honor.  The

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

```
1     government calls Sergeant Dennis Carry.
2                 THE COURT:  And just to be clear, did you decide
3     whether or not you wanted to invoke the Exclusionary Rule
4     or not?  You don't have to.  It's up to you.  But if
5     anybody wants to, let's make it clear.
6                 MS. ROOHANI:  Yes, Your Honor.  We would.
7                 MR. MARCHESE:  And we would concur.
8                 THE COURT:  All right.
9            (Pause in the proceedings.)
10                THE COURT:  Ms. Roohani, do you plan to use the
11    projector, are you or just going to have the information
12    directly on the television screen?
13                MS. ROOHANI:  It's our -- we would hope to be
14    able to put it on the television screen.  If there's some
15    type of malfunction, then we might need to use the
16    projector.
17                THE COURT:  All right.  Well, the projector, I'm
18    told, is not working as properly as it should, so we
19    actually have someone here from IT who is going to come in
20    and take a look at it.  I wasn't sure if you needed to use
21    it.
22                Do you mind if Shawn just comes up and sees if
23    there's something simple he can --
24                MS. ROOHANI:  That's perfectly fine with us,
25    Your Honor.
```

TRANSCRIBED FROM DIGITAL RECORDING

1      THE COURT:  Hopefully it's just not plugged in

2  right or something.  Let's see.  It was working fine last

3  week.

4      You may go ahead and step up.  Remain standing

5  so we can swear you in.

6      COURTROOM ADMINISTRATOR:  Please raise your

7  right hand.

8      You do solemnly swear that the testimony you

9  shall give in the cause now before the Court shall be the

10  truth, the whole truth, and nothing but the truth, so help

11  you God?

12      THE WITNESS:  Yes, I do.

13      COURTROOM ADMINISTRATOR:  Thank you, sir.

14      Please state and spell your full name for the

15  record.

16      THE WITNESS:  Dennis Carry.  D-e-n-n-i-s

17  C-a-r-r-y.

18      MS. ROOHANI:  Sorry, your Honor.

19      THE COURT:  No, that's fine.

20                      DENNIS CARRY

21        called as a witness on behalf of the

22     Government, was examined and testified as follows:

23                  DIRECT EXAMINATION

24  BY MS. ROOHANI:

25  Q.    Sergeant Carry, who is your employer?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    The Washoe County Sheriff's Office.

2    Q.    And how long have you been employed by the Washoe

3    County Sheriff's Office?

4    A.    Almost 21 years.

5    Q.    What are your current duties and responsibilities?

6    A.    I'm the supervisor of the cyber crime unit.  I work

7    supervising the Internet Crimes Against Children Task Force

8    in the north, computer forensics, and I am an active task

9    force officer with the FBI's Child Exploitation Task Force.

10    Q.    Have you held any other positions within the police

11    department?

12    A.    I've worked various positions at the sheriff's

13    office, from detention to patrol detectives, before I was

14    promoted in place as a supervisor of detectives.

15    Q.    Can you tell us a little bit about your formal

16    education?

17    A.    I have an associates degree from Truckee Meadows

18    Community College in addition to other -- multiple other

19    college classes, and then several professional classes.

20    Q.    Okay.  Have you received any specialized training in

21    general computer forensics?

22    A.    Yes, I have.

23    Q.    When and where?

24    A.    I've received close to a thousand hours of incident

25    response training and computer forensics training ever

─── TRANSCRIBED FROM DIGITAL RECORDING ───

 1    since 2004.  And it's been continual until just recently

 2    also.

 3    Q.    Okay.  Have you received any specialized training in

 4    file sharing programs?

 5    A.    Yes, I have.

 6    Q.    And when and where were those?

 7    A.    I've received file sharing training since

 8    approximately 2007, 2008.  It's been continual.  I'm an

 9    instructor for the Internet Crimes Against Children Task

10    Force, and I instruct both state, local, and federal and

11    international law enforcement in the use of file sharing

12    software.

13    Q.    What specific file sharing software do you instruct

14    on?

15    A.    I instruct on the Gnutella file sharing network,

16    the --

17              THE COURT:  Wait.  Go back.  Could you please

18    repeat that again.

19              THE WITNESS:  The Gnutella file sharing.

20              THE COURT:  Gnutella.  Okay.

21              THE WITNESS:  The eDonkey file sharing network,

22    BitTorrent file sharing network, Ares file sharing network,

23    and GigaTribe.  And also other file sharing that's not as

24    commonly known as those types of networks.

25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    BY MS. ROOHANI:
 2    Q.    Such as?
 3    A.    Drobox, SkyDrive, Google Drive.  Other online cloud
 4    storage file sharing.
 5    Q.    Did those trainings include instruction on the
 6    process of downloading the programs?
 7    A.    Yes, they do.
 8    Q.    Did they include instruction on the setup cost as
 9    for those programs?
10    A.    Yes.
11    Q.    Did it include instruction in the sharing
12    capabilities of each of those programs and how they are
13    different from each other?
14    A.    Yes.
15    Q.    Did it include instruction on other aspects, such as
16    chat functions, nonshare functions, et cetera?
17    A.    Yes.
18    Q.    Okay.  Did your training result in you receiving
19    certain qualifications for the different file sharing
20    programs?
21    A.    Yes.
22    Q.    Okay.  I'm going to focus on two.
23          Did you receive certain qualifications regarding
24    the GigaTribe peer-to-peer network?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    What were those qualifications?

2    A.    When I was initially trained on it, several years

3    back, after training on it, using it, helping develop the

4    law enforcement tools and beta testing the law enforcement

5    tools to investigate, I've been an instructor of GigaTribe

6    and all of its functions for several years.

7    Q.    Okay.  Are you -- did you receive certain trainings

8    or receive certain qualifications on the Dropbox platform?

9    A.    Yes.

10   Q.    And the Ares platform?

11   A.    Yes.

12   Q.    Can you explain the Dropbox platform for us first.

13   A.    Dropbox is a cloud storage sharing program.  It

14   doesn't require a user to share or anything like that.

15   People can use it for personal use, and only for personal

16   use, but there are specific nuances that allow you to share

17   with other users.

18        I've met with Dropbox, the company.  I've

19   learned specific details about what can and can't occur.

20   And then I also instruct law enforcement in the use of

21   Dropbox, what evidence can be recovered from Dropbox and

22   specific things with Dropbox as far as forensically when

23   it's installed on a computer.

24   Q.    Okay.  And you also mentioned Ares.  Can you talk

25   about your qualifications on the Ares platform?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    I've been an instructor in the Ares peer-to-peer
 2   file sharing program for several years.  And I have worked
 3   with the developers who have developed the law enforcement
 4   tools.  We've beta tested those tools and different
 5   changes.  And been using that network for, again, several
 6   years.
 7    Q.   Have you previously testified in federal or state
 8   court as an expert witness regarding general computer
 9   forensics?
10    A.    I have.
11    Q.    Approximately how many times?
12    A.    Close to -- somewhere between six and ten times.
13    Q.    Have you ever not been qualified?
14    A.    No.
15    Q.    Have you previously testified in federal or state
16   court as an expert regarding file sharing programs?
17    A.    I have.
18    Q.    How many times?
19    A.    Roughly the same amount of times.
20    Q.    Have you ever not been qualified in that regard?
21    A.    No.
22    Q.    Have you ever previously testified in federal or
23   state court as an expert witness regarding peer-to-peer
24   networks?
25    A.    I have.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Approximately how many times?

2    A.    Roughly the same, but I would say more often

3    specifically peer-to-peer file sharing programs.

4    Q.    Have you ever not been qualified as an expert in

5    peer-to-peer networks?

6    A.    No.

7          MS. ROOHANI:  Your Honor, I would ask for

8    permission to tender the witness as an expert in general

9    computer forensics, file sharing, as well as peer-to-peer

10   networks.

11         MR. SANFT:  No objection, Your Honor.

12         THE COURT:  All right.  So Sergeant Carry will

13   be permitted to testify as an expert related to general

14   forensics computer operations, the file sharing of programs

15   and peer-to-peer network.

16         MS. ROOHANI:  Thank you, Your Honor.

17   BY MS. ROOHANI:

18   Q.    Sergeant Carry, what evidence have you reviewed in

19   this case?

20   A.    I've reviewed evidence from Dropbox and also various

21   reports and artifacts concerning the GigaTribe account and

22   some other accounts involving chats.

23   Q.    Okay.  What is GigaTribe?

24   A.    GigaTribe is what I would refer to as a hybrid

25   file-sharing application.

1              When I say "hybrid," unlike other peer-to-peer

2     file sharing applications, where a user typically enters a

3     search term to find something and downloads, GigaTribe is

4     more enhanced, and it involves sort of a social networking

5     side, where you have to actually engage in some sort of

6     friendship and accept friendships, and you can share files

7     among one another and also engage in chats with

8     individuals.

9     Q.    Okay.  How would two people become friends on

10    GigaTribe?

11    A.    You can befriend people several ways.

12            One, after you install GigaTribe, it actually

13    has an invite button that you can search for users.  Most

14    people search for a user with some word that will be

15    similar to what they're looking for.

16            But on that search page, on that popup window,

17    you also have the ability to look at people who you may

18    have contact or in a contact list, such as your e-mail.

19    And you can send them all invitations and actually see if

20    they're already a GigaTribe user.

21            The other way you can friend people is by going

22    through what they call the tribes.  It's a web portal of

23    GigaTribe, and it allows you to search for people based on

24    things you might have in common.  There's a romance

25    section.  There could be a sports section.

TRANSCRIBED FROM DIGITAL RECORDING

1           And once you go into those groups, you see

2     members that are in those groups, and you can friend them

3     that way.  But you have to send them an invitation or they

4     have to send you an invitation in order for you to become

5     friends.

6     Q.    Can a user password protect their files on

7     GigaTribe?

8     A.    Yes, they can.

9     Q.    And how do they do that?

10    A.    When the user -- once they install GigaTribe, they

11    have the ability to add shareable folders.  When they

12    select that option, they would navigate to where they --

13    what folder they want to share.

14          And then they have -- depending upon the version

15    of GigaTribe, they have options for how many files they

16    want to be in there, if they want to password protect the

17    folder, and if they want to allow for recursive sharing,

18    which is the ability to search folder within folder within

19    folder.

20    Q.    Okay.  And how can people obtain passwords from one

21    another for those folders?

22    A.    Most of the time -- with my experience actually

23    using GigaTribe in a law enforcement role and also

24    interviewing subjects of investigations, most of the time

25    passwords are shared via the chat function of GigaTribe.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  There's an evidence binder up there.  Could
2    you take a look under tab 44.
3              I'm sorry.  Look at the government's exhibit
4    binder, which is the other one.
5              It's been marked for identification purposes as
6    44.  And it's a multipage file.  So if you could go through
7    that and tell me if you recognize it.
8    A.    I do recognize it.
9    Q.    What is it?
10   A.    This is actually a -- I guess printed pages of a
11   PowerPoint that I completed to explain how GigaTribe works.
12   Q.    Okay.  Is that some of the -- are some of these
13   slides included in the trainings that you do on GigaTribe?
14   A.    Yes.
15   Q.    And did you provide this to me as part of what your
16   testimony was going to be about today?
17   A.    I did.
18   Q.    Okay.  Can you explain to me how a person would
19   obtain the GigaTribe software?
20   A.    GigaTribe, the actual software, is free.  They can
21   download it from the Internet usually just by going to
22   GigaTribe.com.  Or you can click on to download.
23   Q.    Are there paid versions of GigaTribe?
24   A.    There's a paid account.  The software is the same.
25   Just once you pay for it, which is called the ultimate

TRANSCRIBED FROM DIGITAL RECORDING

1    account, it gives you enhanced access to features within

2    GigaTribe.

3    Q.    So what are some of those enhanced features?

4    A.    You can have more friends, where the free version

5    limits the amount of friends that you have.

6          The paid version also allows for what we call

7    multiple source downloads.  You can download from multiple

8    people at one time and actually get faster downloads.

9          And you also have a web portal access, you

10   actually don't have to use the application, you can log in

11   via the web into your account.

12         And it also allows for more restrictive or

13   enhanced restrictions when it comes to your folders, your

14   shared folders.

15   Q.    And what are some of those enhanced -- excuse me.

16   What are some of those enhanced restrictions on the

17   folders?

18   A.    The password protection, different types of access.

19   It just -- in order to use GigaTribe to its full

20   functionality, you would need to be an ultimate user.

21   Q.    Okay.  When a person is setting --

22         THE COURT:  Can I just interrupt -- I'm sorry --

23   before we go on.

24         So is the password protection not available on

25   the free version of GigaTribe, only on the ultimate

TRANSCRIBED FROM DIGITAL RECORDING

1  version?

2          THE WITNESS:  Correct.

3          THE COURT:  Okay.  Thank you.

4          THE WITNESS:  I should -- to clarify that, the

5  option is there, but it doesn't let you do it.

6  BY MS. ROOHANI:

7  Q.    Okay.  So to be able to password protect the

8  folders, the person would have to have an ultimate

9  subscription?

10 A.    Yes.

11 Q.    Okay.  When a person is setting up a GigaTribe

12 account, what type of information do they have to give to

13 GigaTribe?

14 A.    They have to create a user name.  They have to

15 provide an e-mail address for -- because you'll receive a

16 validation link or a verification link.  And then just

17 whatever screening you choose.

18 Q.    Is it possible to set up GigaTribe without inputting

19 an e-mail?

20 A.    No, not at this time.

21 Q.    And is that the same for the ultimate subscription,

22 you have to put in an e-mail?

23 A.    Yes.

24 Q.    Okay.  And you mentioned a confirmation e-mail.

25 Would a user receive a confirmation e-mail from GigaTribe?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Correct.  You wouldn't be able to actually --

2    although you can launch GigaTribe, you wouldn't be able to

3    engage in the friend invites without clicking on the

4    verification first to unlock it.

5    Q.    Okay.  And does that verification e-mail go to the

6    e-mail that the person used to set up their GigaTribe

7    account?

8    A.    Yes, it does.

9    Q.    Okay.  So once a person downloads GigaTribe and gets

10   signed up and set up, what would the start screen look

11   like?

12   A.    Once they launch it, they will see -- it's kind of

13   like a welcome-to-the-network page.  There will be

14   information about the network itself, whether there is any

15   kind of updates or anything like that.

16         It's more like a news feed, I guess you could

17   say.

18   Q.    Are there any specific tabs that a person would see

19   to be able to launch different aspects of GigaTribe?

20   A.    There's actually multiple tabs.  There's a tab for

21   their profile.  There's a tab for their shared folders.

22   There's a tab for essentially upload/download activity.

23         And then on the left-hand side you would see

24   your friend list and whatever groups they may be in.

25         And there's also the individual tabs that would

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    allow chat.
 2    Q.    In that profile tab that you talked about, what
 3    information would be typically shown on that tab?
 4    A.    Whatever information you put in there.  Typically
 5    it's going to show your home location.  It's going to show
 6    your name and whatever you chose to, I guess, voluntarily
 7    provide as far as a profile.
 8    Q.    And a person can limit the information that they
 9    allow to show on that profile tab too --
10    A.    Yes.
11    Q.    -- is that correct?  Okay.
12          In the tab that you mentioned, folders, what
13    would a person typically see if they clicked on their
14    folders tab?
15    A.    Well, initially you wouldn't have anything until you
16    actually add folders to be shared.  But once a user does
17    add folders, then they would see their shared folders
18    within there.
19    Q.    Okay.  And you mentioned there's an upload/download
20    tab.  Once a person clicked on that, what would be shown on
21    there?
22    A.    The activity tab actually would allow the user to
23    see the upload and download progress of what's occurring.
24          So if people are downloading from them, they
25    could see that.  If you are downloading from others, you
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    would see the progress -- progress bars.
 2    Q.    Okay.  And you mentioned there's a friends tab on
 3    the left.  Would that be the place where a person could
 4    invite friends from?
 5    A.    That's actually the tab where you -- those are the
 6    invitations that have been sent and accepted.  On the top,
 7    towards the top of the screen, there's an add user, a
 8    search for user button.
 9    Q.    Okay.  I want to focus for a minute on that folder
10    tab that we talked about.  Can the user customize their
11    folder settings?
12    A.    They can customize -- well, as far as the -- what
13    they see or other people?
14    Q.    Let's answer both.  Let's go with the first one
15    first and then the second one.
16    A.    So regardless of what they're looking at in their
17    folder tab, they have the ability, just like any other
18    folder viewer in online computer, they can have either a
19    detailed, an icon view, a list view.  In every one of those
20    views they see file names.  The file names are shown
21    regardless of the view.
22            If they have a folder within a folder, they
23    would initially only see the first folder.  They'd have to
24    go inside that to then see subfolders.
25            Most of the time if -- in my experience, I have
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    not found people that were in list view but they were

2    always in icon view so you could see the file names and

3    usually thumbnails.

4    Q.    Okay.  On the folder settings that a person can set

5    up on GigaTribe, can they limit who can download from them?

6    A.    They can in the sense that in order to download in

7    the first place you have to be a friend.  I would have to

8    send an invite to somebody, they would have to accept it,

9    and then I would be able to view the folders that they

10   allow me to view.

11            They can -- a user can group users into

12   different categories.  So you can restrict folder access to

13   certain groups.  If a user is not doing that, then they can

14   see all your folders that you are sharing.  They may not be

15   able to access them if they're password protected, but if

16   they're not password protected, once a user clicks on their

17   friend on the left-hand side, they would see their folders,

18   and then they could access those folders.

19   Q.    So if a friend wanted to see what was inside of each

20   of those folders and not just see the folder name, would

21   they need a password?

22   A.    If it's password protected.

23   Q.    Okay.  And can a user name the folders?

24   A.    Yes.

25   Q.    Can a person change the password for those folders?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    They can change the password and they can change the

2   folder name.

3   Q.    And can they limit access to individuals?  So, for

4   example, if they gave somebody a password, they decide they

5   don't want that person to have access anymore, can they

6   change the password to somehow limit that person's access?

7   A.    They can either change password to limit it, or they

8   can move that user to a different group where that group

9   doesn't have access to that folder.

10  Q.    Okay.  All right.  So let's assume that I want to

11  get a password to a folder from a friend.  What would I

12  have to do?

13  A.    Normally the most common way is engaging in a chat

14  with that friend, with that user.

15         When you send an invite to somebody and they

16  accept it, then you can engage in conversation back and

17  forth within the GigaTribe program.  Although they may chat

18  outside of the program via e-mail or some other means, we

19  usually see it in the program.  And they chat back and

20  forth.  And typically a user will either ask for a

21  password, or it may just voluntarily be provided to

22  somebody by the owner of that folder.

23  Q.    Okay.  And if they wanted to get into the folder and

24  the folder was password protected, what would appear on the

25  screen?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    When they tried to get in the folder, if they don't
2    have a password, a password window would launch and they
3    would enter the password.  Once that occurs, they would be
4    inside the folder.
5    Q.    What if I put in a password on -- today, and
6    tomorrow I want to go back and get into that folder again.
7    Do I need to reinput the password?
8    A.    You do not.
9    Q.    So does the password save somehow in the GigaTribe
10   program?
11   A.    The majority of the time, yes.
12   Q.    And it would -- I wouldn't have to reinput it unless
13   the password had been changed --
14   A.    Correct.
15   Q.    -- is that correct?  Okay.
16         So once we're inside of the folder, we've
17   inputted the password, we've gotten access to the folder,
18   what would we see?
19   A.    You would see all the file names.  They would be
20   shown to you.  File names can verify in these types of
21   investigations.  But you would see the file names, and then
22   most of the time you would see an icon, a thumbnail as to
23   what it may be.
24         But it depends on whether it's a picture, a
25   video, or whatever type of file it might be.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And is it possible, like on a typical computer, can

2    you change the view; so you can have thumbnails or details

3    or icons, whatever it might be?

4    A.    Yes, you can.  In the top left corner of what you're

5    looking at on the screen, there's a display option to

6    change those.

7    Q.    Okay.  If I choose to download a file, is there a

8    place on my GigaTribe where I can see where the file is

9    being downloaded?

10   A.    Yes.

11   Q.    Where is that?

12   A.    It's the progress tab to the activity fields.  You

13   can look at that.

14   Q.    And can I also see what has already been downloaded?

15   A.    Yes, you can.

16   Q.    And where would that appear?

17   A.    You have a folder when you install it for your

18   GigaTribe downloads.  Although you can name it whatever you

19   want.  But that would be the location that your downloads

20   go to when they're completed.

21   Q.    And where does GigaTribe default save its files?

22   A.    In your GigaTribe downloads.

23   Q.    Okay.  Let's talk about the chat function for a

24   minute.

25              Does GigaTribe save the chats that happen in the

TRANSCRIBED FROM DIGITAL RECORDING

1    program?

2    A.    It does most of the time on -- GigaTribe does run on

3    multiple computer platforms, Windows and Mac.

4              But the chats themselves are archived.  They do

5    save within -- on computer.

6    Q.    Where do they save to?

7    A.    It depends on the -- the operating system.  But

8    they're usually in a -- what we would call a configuration

9    folder.  The average user wouldn't typically see that,

10   unless they know where to look.  Forensically we know where

11   to look.  But they would be in the application

12   configuration folder.

13   Q.    Do they get saved to the computer, or do they get

14   saved to a cloud somewhere?

15   A.    The computer.

16   Q.    Okay.  And can you delete chats if you knew where

17   they were saved to?

18   A.    Yes, you could.

19   Q.    Okay.  Speaking about chats, during the course of

20   your career, have you read many chat messages?

21   A.    I have.

22   Q.    And based upon your training and experience, are you

23   familiar with drug terminology?

24   A.    I am.

25   Q.    How?

1    A.     I've been in law enforcement 21 years.  A detective

2  since 2003.  I've come across drug cases in patrol, and the

3  jail prior to that.  But we actively work drug

4  investigations.

5           In my role as a supervisor at my agency, I --

6  I'm not just a supervisor of the cyber crime unit, but

7  detectives in general, which includes drug task forces and

8  working with those drug task forces.

9           But predominantly, because we are a computer-

10  forensic unit, also, we do all of the phone forensics and

11  computer forensics for the drug investigations.  And those

12  are almost always filled with discussions about drugs back

13  and forth and text messages and other types of

14  communications.

15           MR. SANFT:  Your Honor, I'm going to object

16  based on relevancy.  I'm not quite sure how drugs --

17           THE RECORDER:  Mr. Sanft.

18           MR. SANFT:  -- into this particular --

19           THE COURT:  Well, there was a motion in limine,

20  so I think that's the area that we're getting into about

21  one particular chat that was -- Ms. Ellie -- Ms. Roohani is

22  shaking her head yes.  So --

23           MS. ROOHANI:  That is correct, your Honor.

24           THE COURT:  -- I think that I'm remembering this

25  correctly.

TRANSCRIBED FROM DIGITAL RECORDING

1          But I'll let you go ahead, Ms. Roohani, you can

2    respond to the objection.

3          MS. ROOHANI:  And, Your Honor, that is correct.

4    And I am going to limit it to what the Court's instruction

5    was in that pretrial order.  We're not going to go outside

6    the scope of what the Court ordered in that pretrial order.

7          THE COURT:  All right.  The objection is

8    overruled.

9          Before we go there, can I just clarify.

10          MS. ROOHANI:  Certainly.

11          THE COURT:  For the chats, how do the people who

12    are chatting identify themselves?  Is it by the profile,

13    the names?  So, you know, could you be Dennis the Menace,

14    or would you automatically be Sergeant Carry?  Do you give

15    yourself a name when you're chatting and that's what people

16    see?

17          THE WITNESS:  It's your profile name.  So

18    whatever you choose as your profile name when you're

19    setting up the account, that is how you'll be identified on

20    the left-hand side.

21          So if -- for example, if I wanted to make my

22    profile name Las Vegas, which would probably be taken

23    already, but if I was able to get that profile, that is

24    what other users would see.

25          I could create a new account and get a new

TRANSCRIBED FROM DIGITAL RECORDING

1    screen name.  But whatever screen name I choose is what

2    they will see.  And they see it on the left-hand side.  So

3    when you're engaging in a chat back and forth, it's via the

4    screen name.

5              THE COURT:  And then when you go into the

6    configuration folder, is it reflected the same, it's the

7    profile user name?

8              THE WITNESS:  The configuration folder actually

9    initially is a -- it's a numerical identification.  But

10   then forensically you can examine and actually see the

11   specific user name.

12             But to the average user who is just chatting,

13   all they see is the screen name.

14             THE COURT:  But when you go into the

15   configuration folder you see numbers that you can match up

16   later too.  It's not clear when you're looking in the

17   configuration folder that there are GigaTribe users that

18   are chatting that's been preserved?

19             THE WITNESS:  Correct.  To look at -- to look at

20   the application folder just with the naked eye, you

21   wouldn't really see much of relevance.  But to see it

22   through forensic tools, you're able to decode and actually

23   see what it is.

24             THE COURT:  Okay.

25             THE WITNESS:  There are -- there were two

TRANSCRIBED FROM DIGITAL RECORDING

1    different versions of GigaTribe.  Version -- well, there's

2    several versions, but version 2 versus version 3 where it

3    changed where things were and how they're decoded.  But

4    forensically with the tools we examine, we see the screen

5    names.  They are identified in addition to the user account

6    number.

7              THE COURT:  Okay.  Great.  Thank you.

8              MS. ROOHANI:  Your Honor, could I follow up on

9    that?

10             THE COURT:  Sure.

11   BY MS. ROOHANI:

12   Q.   So if a person went into the configuration folder,

13   let's assume my name is Ellie Roohani, which is my name,

14   and that's my user name, that would not appear in the

15   configuration folder.  There's some number that GigaTribe

16   assigns to that user name that would appear in the

17   configuration folder; is that correct?

18   A.   To the naked eye.

19   Q.   Right.  So if a person wanted to delete a certain

20   chat, they wouldn't know that it's the Ellie Roohani chat,

21   they would just know that the number is what was there; is

22   that correct?

23   A.   For the folder, yes.

24   Q.   For the folder?

25   A.   The easiest way to delete a chat is actually within

TRANSCRIBED FROM DIGITAL RECORDING

1   the GigaTribe user interface.  It lets you delete your

2   conversations.  There's just a -- there's a button for

3   that.  That's how most people would do that.

4           There certainly could be forensic wiping

5   program -- what we call wiping programs or computer

6   cleaning programs that are set up and they eliminate that

7   information.

8           THE COURT:  Would deleting the chat on GigaTribe

9   also delete it from the configuration folder, or do you

10  need to take an additional step?

11          THE WITNESS:  Unfortunately, the reality with

12  that is it depends.  And it depends on your computer

13  permissions, how well -- what version of Microsoft Windows

14  you might be using.

15          In theory, it should delete it, because that's

16  where GigaTribe reads it from.  But I've seen it and we've

17  tested where it doesn't.

18          THE COURT:  Okay.

19  BY MS. ROOHANI:

20  Q.   And I want to circle back to the -- we just talked

21  about drug terminology.

22          Based on your training and experience, are you

23  familiar with child exploitation terminology?

24  A.   I am.

25  Q.   And how are you familiar?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I've been working child exploitation cases since

2    2003.  I've been involved in the Internet Crimes Against

3    Children Task Force since the end of 2003, 2004.

4              I teach chat investigations, chat techniques.

5    And as a supervisor, I review chats that our investigators

6    conduct and also chats that we examine forensically, the

7    various terminology.

8              One of the most difficult things with these

9    types of investigations for child exploitation

10   investigations is actually teaching people the proper

11   terminology, wording, and use to portray yourself as the

12   user -- as a normal user to that subject.

13   Q.    So are you also familiar with child exploitation

14   terminology in relation to drug terminology being used

15   together?

16   A.    Yes.

17   Q.    Okay.

18             MS. ROOHANI:  Your Honor, I would ask for

19   permission to tender Sergeant Carry as an expert in drug

20   terminology as it relates to child exploitation cases.

21             THE COURT:  Any objection?

22             MR. SANFT:  Outside of what was stated earlier

23   in court, no, Your Honor.

24             THE COURT:  All right.  So the objection earlier

25   was to the relevance of the testimony.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1           But as to Sergeant Carry's qualifications to
 2   testify as an expert in the child exploitation drug
 3   terminology, do you have any objection to that?
 4           MR. SANFT:  No, Your Honor.
 5           THE COURT:  All right.  So he'll be qualified.
 6           MS. ROOHANI:  Thank you, Your Honor.
 7   BY MS. ROOHANI:
 8   Q.    Sergeant Carry, based on your training and
 9   experience, if you saw the word, and spelled like this,
10   y-n-g in a chat, what would that mean?
11   A.    That would mean young.
12   Q.    And does that have the same meaning as the word
13   young, spelled y-o-u-n-g?
14   A.    Yes, it would.
15   Q.    Okay.  If you saw the word -- the words young porn,
16   spelled y-o-u-n-g space p-o-r-n, what would that refer to?
17   A.    Young porn, in the -- in my experience and what we
18   see, is usually anywhere from very young, could be infant,
19   toddlers, teens, tweens, to very young, usually under 20.
20   Q.    Okay.  If a person said, quote, that he used to play
21   with a few boys, unquote, that he baby-sat for, what age
22   range would that refer to?
23   A.    I would usually want to look at, like, the whole
24   context of it, because certainly one text message or
25   communication can kind of change things a little bit.
```

1            But in the aspect of child exploitation or a

2    discussion of that, it would certainly mean very young, and

3    certainly baby-sitting would involve somebody who is not at

4    the age where they would be left alone or be capable to be

5    left alone.

6    Q.    And in the context of used to play with a few boys,

7    that he baby-sat for, would that refer to an adult?

8    A.    No.

9    Q.    Based on your training and experience, what would

10   the statement, "shall we drug a young?" what would that

11   mean?

12   A.    Based on my experience and training, we would

13   typically see that with young teens, under  -- usually

14   under 18.  We see it heavily involving, like, runaways.

15            But it would mean some -- typically mean some

16   sort of date-rape drug in our experience, whether it's GBH,

17   ecstasy, or something else that would lower a person's

18   inhibitions.

19   Q.    So drug in that case would refer to some type of

20   drug that would inhibit the child's ability to do what?

21   A.    To stop something, prevent something.  We see that

22   very predominantly today.

23   Q.    And young in that context, would that only mean a

24   child?

25   A.    Well, I would say far younger than whoever is

```
 1    discussing the chat.  I couldn't say exactly the exact age.
 2    But based on the context, it would usually mean somebody
 3    under 18.
 4    Q.   And have you ever known the term young to refer to a
 5    legal adult?
 6    A.   I have in a sense of around 18, 17.  But there's
 7    usually more context -- we often see barely legal or some
 8    other wording to show that it's an adult.
 9         But in my experience, most of the
10    communications, the type of investigations we conduct, it's
11    usually an underage individual.
12    Q.   And in the context of young in the same chat as a
13    person baby-sitting for someone, would that refer to a
14    legal adult?
15    A.   I would absolutely think not.
16         MS. ROOHANI:  Okay.  Your Honor, I have no
17    further questions for Sergeant Carry at this time.  I would
18    pass the witness.
19         THE COURT:  All right.
20         Cross?
21         MR. SANFT:  Thank you, Your Honor.
22              CROSS-EXAMINATION
23    BY MR. SANFT:
24    Q.   Is it Sergeant Carry?
25    A.   Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    All right.  And just to make sure we're clear, your

2    testimony is that you actually are employed by Washoe

3    County as a police officer with the county?

4    A.    Yes, I am.

5    Q.    Okay.  You've testified quite a bit about the issue

6    of GigaTribe.  But before I get into that, you've talked a

7    little bit about Dropbox as well.

8    A.    Uh-huh.

9    Q.    Is that a yes?

10    A.    Yes.

11    Q.    Now, with regard to Dropbox, you had said that it's

12    not as common with regards to maybe child pornography or

13    exchange of child pornography on -- with the use of Dropbox

14    as it would be with GigaTribe.

15          Did I hear you correctly earlier?

16    A.    No.  Dropbox is very common to be used for child

17    pornography.  It's extremely common actually today, or at

18    least being identified.

19          I was referring to Dropbox the way it works is

20    different than most other peer-to-peer programs.  Dropbox

21    is cloud storage that you can share, and it's not a -- what

22    we call a traditional peer-to-peer because an item doesn't

23    come from an individual's computer directly, it comes

24    through the cloud storage.

25    Q.    I see.  So you upload a file, it goes into the

1    cloud, and you can access that cloud from any device

2    anywhere, basically in the world, if you have Internet

3    access --

4    A.    Yes.

5    Q.    -- would that be a fair way to say it?

6          Would it be also fair to say as -- of course,

7    that GigaTribe is also the same type of way?  Or is it done

8    locally?  Is there -- if you access something on GigaTribe,

9    is it done through a local computer, or can you do that,

10   say, for instance, in Europe?

11   A.    GigaTribe is different.

12         I like to use analogies when I explain these

13   programs because they're easier to understand.

14         So with GigaTribe, for example, and because it

15   involves friendships, it's kind of like -- I guess the

16   analogy I would use would be a picnic.  People don't know

17   you're having a picnic unless you invite them to come over.

18         If they come over, you could have multiple

19   coolers.  Some might have a padlock, some might be open.

20   They still had to be invited in to know the party -- that

21   the party's there to obtain something.

22         If they want in the folder that is padlocked or

23   password protected, you would have to provide that to them

24   in order for them to see what's inside and take what's

25   inside.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              When you're dealing with something like -- and
 2    you can, as far as the technical side, you can access it
 3    from anywhere.
 4              But when you're doing a file transfer with
 5    GigaTribe, you're getting it from that person's computer.
 6    It has to be on, it has to be running, in order for you to
 7    be able to complete the download.
 8              Unlike Dropbox, where I can add files to
 9    Dropbox, they could store it on Dropbox servers in addition
10    to my computer.  When you share something from there, it's
11    actually coming from the cloud storage provider, not
12    directly from your computer at that time.
13    Q.    I see.
14    A.    So your computer doesn't have to be on in order for
15    somebody to obtain something from you, they just have to
16    have access to a folder that you provided to them.
17    Q.    Okay.  So, for instance, if I ever were to get on
18    GigaTribe, and I'm a -- I'm your friend, you would actually
19    have -- I actually have to look for you to be online in
20    order for me to share a document or a file with you?
21    A.    Correct.
22    Q.    Okay.  So with regards to GigaTribe, you had said
23    that the issue with GigaTribe is that you have to be
24    friends; right?
25    A.    Correct.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Based upon your training and experience, is it fair
2    to say that you know when people are added to a GigaTribe
3    account in terms of friends?
4    A.    You know they become your friend because they either
5    sent you an invite or you sent them an invite, and then it
6    tells you whether or not it was accepted.
7             And on the left-hand side, when you were looking
8    at your friends list, it looks different than somebody who
9    actually is somebody who is your friend, versus invitation
10   sent.  Invitations show in a different part of the list.
11   Your actual friends show where it says "friends."
12   Q.    Okay.  So, for instance, if you want to be my
13   friend, you find me online, you send an invention to me, it
14   could be sitting there for a day, a month, a year before I
15   choose to accept that particular friend request?
16   A.    Correct.
17   Q.    And once I do, then that's logged in as a user
18   contact that's been recognized by me?
19   A.    I don't really know about what you mean by "logged."
20   You see on your list as far as -- I mean, you would be
21   notified, invitation accepted, and then you would see them,
22   they are now one of your friends.
23   Q.    Right.  So, for instance, if you were to look later
24   at some type of list indicating the activity that's going
25   on at GigaTribe, you would determine at that point, okay, I

1    was accepted by Michael Sanft on this day at this time?

2    A.    Yes.

3    Q.    Okay.  Now, with regard to downloads, if a download

4    occurs, and we've -- there's been some discussion about

5    file sharing, but we're talking it could be a small, say,

6    kilobyte type of document, it could be a large, say,

7    gigabyte of information, would that be fair to say?  The

8    range is very wide ranging?

9    A.    Correct.  The types of files that could be shared on

10   GigaTribe are any type of file, virtually any size.

11   Q.    So if a file is to be shared with an individual and,

12   say, for instance, you and I -- I want to share a file with

13   you, and we initiate the download, what shows up on

14   GigaTribe, the request and the acceptance of the file

15   starting or the end portion of the file is completed in

16   terms of its download?

17   A.    No.  To the normal user if I want to download

18   something from somebody's shared folder, I would double

19   click on it or right click and choose to download.  I would

20   be able to look at the progress, but some people may or may

21   not do that.  There's no requirement to do that.

22            Once it downloads -- once the download is

23   complete, it downloads to your GigaTribe download folder,

24   whatever you set it as.

25            So at that time, that's what you would have,

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    just you're initiating the download and that you receive
 2    it.
 3    Q.    Okay.  And both of those items would actually be
 4    stored in some log somewhere, either locally on computer or
 5    somewhere on GigaTribe; would that be fair to say?
 6    A.    Well, in GigaTribe, there's not, like, evidentiary
 7    logs on any kind of public version of GigaTribe that's
 8    logging that information.  Is it -- I don't know if that's
 9    what you're referring to, or if you're referring to the
10    fact that I double clicked on it saying your download is
11    starting.
12    Q.    Right.
13    A.    You would see a download.
14    Q.    Okay.
15    A.    Yes.
16    Q.    Now, in addition to that, your testimony was that
17    there's a chat function that occurs between parties?
18    A.    Yes.
19    Q.    If I were to be online and I wanted to chat with
20    you, if I -- unless you're not online, I can't, say, start
21    a chat with you; would that be fair to say?
22    A.    You can send communications, and I guess they would
23    be there when the other person logs in if they're not
24    logged on at that time.  Of course, for it to be two-way,
25    you -- one person has to be logged on at at least one time.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    It works best when both people are logged on at the same

2    time for communication back and forth.  But you can

3    certainly send messages, and they'll be received later if

4    the person's not online.

5    Q.    Okay.  And your testimony with this Court is just --

6    in terms of you being certified as an expert, at least with

7    experience in analyzing these types of chats, would it be

8    fair to say that you're here only specifically as to

9    shorthand as typically used in chats, not necessarily in

10   terms of just, like, analyzing the chats in this case, for

11   instance?

12   A.    Well, I would say I'm here to answer questions from

13   both sides, whatever that -- whatever that may be.  I've

14   answered some that involve chat terminology in addition to

15   the program itself.

16   Q.    Okay.  Were you able -- at any point during the

17   course of your investigation preparation for this

18   particular trial, able to analyze, confirm chats of Jan

19   Fuechtener to the chats that you saw on GigaTribe?

20   A.    I've analyzed chats that were from -- at least from

21   another program involving, I guess you would say, a mobile

22   based platform.  I haven't analyzed the forensics that had

23   been provided, or whatever the forensic examiner has

24   recovered in relation to all the computer artifacts.  I

25   haven't seen that.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  But I want to be sure we're clear.  What I'm

2    asking specifically is were you able to actually examine

3    the chats in, say, for instance, the linguistics?  Because

4    you've talked a little bit about these shorthand

5    terminologies.  Were you able to analyze known chats from

6    Jan Fuechtener versus the ones that you found or were asked

7    to analyze on GigaTribe?

8    A.    I -- the chats that I've looked at, I wouldn't be

9    able to say specifically whose or what.  I'm looking at the

10   actual context.  I haven't conducted an interview.  I

11   haven't looked at all the evidence.

12         So when you're saying specifically from an

13   individual, I would have to leave that to somebody else to

14   say that's who they were from.

15   Q.    Fair enough.  Now, if I were to be on GigaTribe

16   looking for child pornography, specifically, how does that

17   work?  I mean, is there a group that says child pornography

18   and you click on that?

19   A.    No.  It's actually much harder to find.  You have to

20   find people of similar interest.

21         You could have a lot of friends on GigaTribe and

22   some of them have nothing to do with child pornography, and

23   some do have something to do with child pornography.

24         Child pornography is typically found through

25   what we call keywords or phrases within that community that

1    will likely return child pornography.  It could be a lot of

2    different keywords.

3              We often come across, for example, PTHC is

4    preteen hard core.

5              There are typically words and phrases that do

6    not have any relevance that we know of to anything other

7    than child exploitation type of activity.

8              But usually an individual will befriend

9    individuals, either by the tribes, where they have similar

10   interests, such as romance.  And if you were to go into the

11   romance section -- for example, I was doing an

12   investigation the other day, went into the romance section,

13   and one of the tribe groups was toddler rape.  That's the

14   group name.

15             So based on my experience as an investigator, I

16   would expect that group to involve that.

17             It would be different if I went into a group

18   that said 49ers, where I would think that would be

19   involving football.

20             But all these groups, at least through the

21   tribes, are within areas that might be activities or

22   hobbies that you would navigate through and find

23   whatever -- whatever it is you're looking for.

24             We find groups that involve child pornography

25   and individuals involved with pornography often in a

TRANSCRIBED FROM DIGITAL RECORDING

1    romance area with very specific terminology that we know or

2    expect to be involved with child exploitation.

3    Q.    Now, with regards to the GigaTribe program, is there

4    a search bar that allows you to search the terms so you can

5    find these groups?  Say, for instance, the 49ers, do you

6    type in in a search bar 49ers and look for it within the

7    program?

8    A.    The GigaTribe program -- unlike other peer-to-peer

9    programs that may allow you to search for specific search

10   terms, GigaTribe does not do that.  GigaTribe primarily

11   involves the social networking side, having the friends,

12   seeing what's in their folders.

13         You can -- you can conduct search terms through

14   the tribes, which is, I guess, a web portal or web page,

15   the best way I can explain it where you can conduct search

16   terms and those search terms might be relevant to one of

17   the groups that's in there.

18   Q.    I see.

19   A.    Or one of the users in one of the groups.

20   Q.    Now, we've talked a little bit about signing up for

21   GigaTribe.  And one of the things was the use of an e-mail

22   account.

23   A.    Yes.

24   Q.    Your testimony was that you sign up, there's an

25   e-mail that you put into your sign-up, and then that e-mail

TRANSCRIBED FROM DIGITAL RECORDING

1    is used to certify the user to the GigaTribe account?

2    A.    Yes.

3    Q.    Okay.  And in addition to that, your testimony is

4    that you go into your e-mail, you click on the certified

5    button, and then it says congratulations, or something

6    along those lines, you're now a GigaTribe user?

7    A.    Yes.

8    Q.    Okay.  Now, did you ever, at any point, determine in

9    this case when the e-mail was sent for the GigaTribe

10   accounts with regards to the lars45 account to the time

11   that the person actually accepted the GigaTribe request?

12   A.    No, I haven't looked at the forensic aspects as far

13   as what e-mail has been recovered or not recovered on what

14   device.  E-mail is accessible from so many different

15   devices.  But I haven't looked at any of that.

16   Q.    Okay.  And then, just finally, your testimony as

17   well with regards to the downloads or the uploads,

18   basically.  Specifically in this case, I'm assuming that

19   you took a look at the evidence with regards to whether or

20   not my client was the person responsible for the GigaTribe

21   account; correct?

22   A.    No.  I haven't been asked to look at that.

23   Q.    Okay.  So your testimony here today is just kind of

24   a general overview of the GigaTribe account?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Outside of that particular knowledge, do you

2    have any other knowledge with regards to the investigation

3    in this case?

4    A.    I've read reports for the investigation, what

5    they've discovered, at least partially with forensics

6    relating to at least some devices.  But I haven't seen a

7    full final report or anything like that.

8    Q.    If a person -- if I were to first sign up for

9    GigaTribe, your testimony earlier was that automatically

10   GigaTribe would either actually look at your address book,

11   I would assume, and then look to see e-mail accounts on

12   there and see if maybe those people are users of GigaTribe

13   and then try to link the -- would that be a fair assessment

14   of --

15   A.    It's an option that the user has when they're

16   searching for new users.  You can give it access to your

17   e-mail account, where it will look at the contact list and

18   try to compare if any of your -- the people listed in your

19   contacts are already GigaTribe users.

20         You will also have the option to send them

21   invites if they're not.

22   Q.    Okay.  Can you use a GigaTribe account without

23   accepting the certification?

24   A.    No.

25   Q.    Not at all?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Not at this time.  If you were able to -- you

2    haven't been able to for several years, I believe, at the

3    very least.  When it was first developed that could be

4    possible, but at least for the last several years you have

5    to click on verification.

6    Q.    Now, in the terms -- in addition to that, when a

7    person is accepting a person as a contact, you testified

8    earlier that you can actually limit the person's scope of

9    their access to your folders; right?

10   A.    Yes.

11   Q.    Okay.  With regard to this particular case, were you

12   ever requested or asked to look at the activity in this

13   particular case about requests for folders or sharing or

14   anything like that?

15   A.    No.

16          MR. SANFT:  Your Honor, may I have a moment?

17          THE COURT:  Yes.

18          MR. SANFT:  Thank you, Your Honor.  I have no

19   further questions.

20          THE COURT:  Okay.  I have just two questions.

21          The first one is whether or not the GigaTribe

22   program itself is password protected on the computer.

23          So if I download GigaTribe, it's on my computer,

24   but I've shared my computer with other people, can they

25   automatically go into my GigaTribe account, or is there a

TRANSCRIBED FROM DIGITAL RECORDING

1    way to password protect it?

2              THE WITNESS:  Well, it would depend.  The

3    account is password protected.  When you create a screen

4    name and you create your password, you do have to do that.

5    But it can also store your password.

6              So if another user chooses to use your computer

7    if the password is stored, then the program could run.

8              THE COURT:  All right.  And then as to the

9    chatting, it seems very clumsy that if I send you a request

10   and I have to wait for you to eventually get on your

11   computer to send me a consent and then you have to wait for

12   me to actually be on the computer to receive your consent,

13   to look at your files, then I look at maybe five files, I

14   only like number four, I tell you to have more like number

15   four, I have to wait for you to actually be -- so is there

16   a notification feature so that the users know that someone

17   has sent them an invitation or a chat, or do you actually

18   have to be checking it constantly to keep a communication

19   going?

20             THE WITNESS:  You have to check the computer.

21   GigaTribe is -- even on the law enforcement side, it

22   requires the person to be actively engaging in order to be

23   productive with it.

24             Normally most of the chats that we are involved

25   in are back and forth.  You might have the initial one

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    where you send an invite, you might mention something,

 2    maybe you can send a password to your shared folder.  But

 3    typically if you are going to be back and forth, most of

 4    the time it's realtime, but you can send messages and wait

 5    until they get answered.

 6              THE COURT:  Okay.  Thank you.

 7              MS. ROOHANI:  Just a few questions, Your Honor.

 8              THE COURT:  Of course.  Go ahead.

 9                      REDIRECT EXAMINATION

10    BY MS. ROOHANI:

11    Q.    Sergeant Carry, Mr. Sanft asked you about remote

12    access to GigaTribe.  Do you remember that?

13    A.    I'm sorry.  He asked about what?

14    Q.    About remote access to GigaTribe on the web

15    platform?

16    A.    You can remote access, yes.

17    Q.    Okay.  If a person remote access GigaTribe, say from

18    Europe, would they still have to download the file onto

19    their computer to be able to view it?

20    A.    Yes.

21    Q.    So there's no web-based cloud platform for GigaTribe

22    for a person to be able to view the files that they have,

23    say, on their home computer on the cloud?

24    A.    No.  The -- the web access of GigaTribe isn't cloud

25    based in the traditional sense of, like, when we were
```

TRANSCRIBED FROM DIGITAL RECORDING

1    discussing Dropbox and Dropbox has their servers.

2    GigaTribe, they're not maintaining the files.

3         If I was an ultimate user and I wanted to access

4    my files via the web, my computer with GigaTribe would

5    actually have to be running.

6         But then through my phone or through any other

7    web-capable device I could log in to it to access files.

8    But it still has to be running at one place.

9    Q.    And to see the file -- say, for example, my home

10   computer is what has my GigaTribe running and I'm

11   travelling, and I want to view also sub-similar files, I

12   would have to then pull -- redownload those files onto my

13   local device that I'm travelling with to be able to view

14   those files --

15   A.    Yes.

16   Q.    -- is that correct?  Okay.

17        Mr. Sanft asked you about what shows up when

18   people are downloading.  Do you remember those questions?

19   A.    Yes.

20   Q.    Okay.  If a person signs -- if the person who is

21   hosting the file or sharing the file signs off in the

22   middle of a download, what happens to the person who is

23   downloading the file?

24   A.    Your download's interrupted.  It would stop because

25   it does require the other computer to still be on.

1           We'll see that in our investigations repeatedly

2    where law enforcement, for example, we have nothing to

3    offer, we're not going to share child pornography.  We

4    often share what appear to be fake files for GigaTribe and

5    most other peer-to-peer law enforcement-wise.  It's great

6    because we see the file names.  That's what we're looking

7    for, file names.  That's what's being shown.

8           But once we start downloading, they will usually

9    ask -- get access to our shared folders, at least what

10   we're portraying to be shared.  If you see nothing's there,

11   they often just terminate the download.

12          They might unfriend us, which terminates the

13   download; or they might move folders out or just terminate

14   the connection by shutting down, especially if they think

15   it's law enforcement.  We've had that happen many times.

16   Q.    So to get a complete download, the person would have

17   to remain friends the entire time during the download, the

18   password would have to not change the folder, and then the

19   person offering the file has to not terminate the

20   connection?

21   A.    Correct.

22   Q.    Okay.  On the chat function is there -- on other

23   chat programs that I'm aware of, there's -- I'm here, I'm

24   away, I'm offline.  Is there an away function on GigaTribe?

25   A.    There is.  You can -- you can set your status, and

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    you can tell people that you're not there, but the

 2    computer's still online.

 3    Q.    Okay.  And if the person is on away status, can

 4    downloads occur?

 5    A.    They can.  Because their computer's up and running.

 6    It's just it's more of the social networking side of

 7    saying, "Hey, I'll be right back, I stepped away," but the

 8    computer's up and running.  You haven't terminated any kind

 9    of connections or anything.

10    Q.    And would the chats come through if the person was

11    on away status?

12    A.    They would certainly go to them.  But if they're not

13    there to view them, they wouldn't be there.  But I can have

14    my status set as away, and I'm still there at the computer

15    typing and doing anything I want.

16    Q.    Okay.  I want to talk about -- when was GigaTribe

17    developed?

18    A.    I'm sorry?  What?

19    Q.    When was GigaTribe originally developed?

20    A.    I don't remember the original date.  For some reason

21    I keep thinking sometime around 2006, 2007, but I don't

22    remember the actual date.  It had been around for quite a

23    while and more popular in other countries before it

24    became -- before we saw it so much in the United States.

25    Q.    Okay.  And Mr. Sanft asked you some questions about
```

----TRANSCRIBED FROM DIGITAL RECORDING----

```
 1    the e-mail confirmation.  So I just want to follow up on
 2    that.
 3              In March 2015 to January of 2016, does the
 4    person have to approve that confirmation and click that
 5    validation link in the confirmation e-mail to be able to
 6    use GigaTribe?
 7    A.    You would have to at that time.
 8    Q.    Okay.
 9    A.    But you wouldn't know -- the issue with GigaTribe
10    and your profile is you can change your e-mail address at
11    any time.  Whether that's the original e-mail address or
12    not, we would have no way to know forensically or law
13    enforcement what the original one is, only what it is
14    today.
15    Q.    Okay.
16    A.    Based on their profile.
17    Q.    Okay.  And let's assume that somebody continues to
18    get e-mails from GigaTribe, say about whether a paid
19    subscription is not going to be continued for nonpayment.
20    Would that ever go to an account that hadn't been
21    validated?
22    A.    No, it would have been whatever the user set up in
23    GigaTribe.  I -- let me clarify -- to clarify that, if you
24    have an e-mail today that you validate your account, if you
25    go into GigaTribe and change your e-mail address and all
```

TRANSCRIBED FROM DIGITAL RECORDING

1     the future e-mails would go to that, that user e-mail

2     address, but in order for you to have a paid subscription

3     you'd have to do some sort of online billing, which will

4     send receipts and verifications and notifications about

5     your account status because it's not indefinite, it does

6     expire.

7     Q.    So even if the validation e-mails say somebody

8     deleted it from their e-mail, the continued e-mail from

9     GigaTribe would go to the e-mail address on file for the

10    account?

11    A.    Yes.

12    Q.    Okay.  I'll talk a little bit about the chat.

13          Do you know, based on your training and

14    experience, what the word pedo, p-e-d-o, stands for in

15    child exploitation terms?

16    A.    Yes.

17    Q.    What does it stand for?

18    A.    It stands for pedophile.

19    Q.    And is that a commonly-known term in child

20    exploitation circles?

21    A.    It's probably one of the two most common terms we

22    ever come across.

23    Q.    What is the second most common?

24    A.    PTHC.

25    Q.    Which stands for?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Preteen hard core.

2    Q.    Okay.  And I want you to take a look at Government's

3    Exhibit 21B, only for identification purposes.

4          Specifically page -- at the bottom right it says

5    21B-008 to 012.

6    A.    I'm sorry.  What were the numbers?

7    Q.    018 to 012.  On 21B.  Do you recognize those pages?

8    A.    I do.

9    Q.    Okay.  So when Mr. Sanft was asking you if you had

10   reviewed any chats in this case, is that the chat that you

11   were referring to?

12   A.    That is correct, this is the same chat.

13   Q.    Okay.  And based upon your training and experience,

14   does this look like it came from GigaTribe?

15   A.    Yes, it does.

16   Q.    Does it look like it could also come from a

17   different platform?

18   A.    There are other platforms that are similar as far as

19   they use profile IDs also.

20   Q.    Okay.

21   A.    But this is -- this is in the GigaTribe format.

22   Q.    And but based upon the numbers, you wouldn't be able

23   to tell whether this is GigaTribe or some other platform;

24   right?  That would have to come from some other evidence?

25   A.    Correct.  These numbers refer to the user profile,

TRANSCRIBED FROM DIGITAL RECORDING

1    whether it's a source profile ID and the target profile ID.

2    Q.    And did me or anybody from my office ever tell you

3    where these chats did come from?

4    A.    I do know that they were -- that chats were

5    recovered from one of the evidence artifacts.  But I never

6    reviewed all the artifacts.

7    Q.    Okay.  All right.

8         MS. ROOHANI:  A moment's indulgence, Your Honor.

9         We don't have any more questions, Your Honor.

10        THE COURT:  All right.

11        Any more cross, Mr. Sanft?

12        MR. SANFT:  Yes, Your Honor.

13        THE COURT:  Go ahead.

14                        RECROSS-EXAMINATION

15   BY MR. SANFT:

16   Q.    Sergeant Carry, when the government asked you

17   specifically about the remote access feature, you testified

18   that you can access GigaTribe on your phone, for instance.

19   Would that be one way to access -- exercise or access

20   GigaTribe, is by phone?

21   A.    Yes, you could.  I'm sorry.

22   Q.    Did you want to finish review?  I don't want to

23   interrupt what you're doing.

24   A.    I'm sorry.  Go ahead.

25   Q.    How about iPads?  Can you use -- or tablets?  Can

TRANSCRIBED FROM DIGITAL RECORDING

1   you use GigaTribe on that kind of feature as well?

2   A.    You can access the web portal, yes.  You can't

3   download the program.  You can access the web portal.

4   Q.    Okay.  For instance, on your iPhone and your iPad,

5   there's not an app for that, for GigaTribe?

6   A.    Correct.

7   Q.    And so if you were to be accessing it from your PC

8   or your Macintosh computer, you would actually download

9   software on to your computer that's stored locally on your

10  computer as an application?

11  A.    The GigaTribe platform itself, yes, has to be -- you

12  could use it on a Mac, on a Windows computer.

13  Q.    Okay.  Now, you've talked a little bit about the web

14  access.  Is it one of those things where I get on GigaTribe

15  through my phone, for instance, type in my user name and

16  password, and then are able to access my folder from inside

17  GigaTribe?

18  A.    If the -- if your computer is running.  If your

19  GigaTribe computer or a computer running GigaTribe is

20  running somewhere.

21  Q.    Okay.  Now, in addition to that, your testimony was

22  is that the payment issue of the pro version -- and you

23  said you're familiar with this account for years; right?

24  A.    I'm sorry.  What?

25  Q.    You've been familiar with GigaTribe for years?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    With the pro version it's the payment of a credit

3    card, and it enabled you, as you testified earlier, to a

4    vast amount of access to files and so forth and friends and

5    that kind of thing?

6    A.    Yes.

7    Q.    With regards to the payment issue, would it be fair

8    to say that in the GigaTribe program itself, it will notify

9    you if you're coming up to a due date with regards to your

10   annual payment, for instance, of the pro version of

11   GigaTribe?

12   A.    You should be notified that your account is -- your

13   ultimate subscription is expiring.

14   Q.    Right.

15   A.    That you would be referred back to a basic or a

16   nonultimate if you don't pay.

17   Q.    So it's not only just an e-mail version that's sent

18   out to your e-mail box but, in addition to that, on the

19   actual GigaTribe interface there would be notification that

20   you're coming up to your year?

21   A.    Yes.

22   Q.    Okay.  And I just -- just as a matter of

23   clarification.  It's my last question.

24         You had testified, when the government had asked

25   you specifically about my example of being in Europe and

TRANSCRIBED FROM DIGITAL RECORDING

1    accessing GigaTribe -- if I were to get on my phone and

2    access GigaTribe through my phone, could I initiate a

3    download from my phone to my computer back home if it was

4    on?

5    A.    Can you place files on your computer?

6    Q.    Or just initiate say, for instance, a download?  If

7    I went back to the Europe example, if I was in Europe and

8    I'm looking through my GigaTribe through the web portal and

9    I see a file I want to download, I'm talking with a friend

10   of mine and I want to download that file, because I'm on my

11   phone, I'm assuming I can't do it there.  But can I

12   download directly to my computer back home if it's on?

13   A.    The web portal access allows you to access your

14   files.  You wouldn't have the chat functions and all that

15   with the GigaTribe user on your phone.  You would have to

16   use another means.

17         But it allows you essentially remote access into

18   your folders -- into your files, and you would be able to

19   download something to your phone.  On your phone it would

20   be cached or stored completely different than on a normal

21   computer hard drive.  But it just allows you to access it.

22   Q.    Were you ever asked in this case to look through any

23   type of cache or any type of record indicating that a phone

24   that was possessed by my client, Jan, or an iPad possessed

25   by him was used to access the GigaTribe account --

TRANSCRIBED FROM DIGITAL RECORDING

1     A.     No --

2     Q.     -- remotely?

3     A.     -- I haven't been asked to look at that.

4     Q.     Okay.  But that would be information that would be

5     stored, more than likely, either locally in your web cache

6     of your browser, your Internet browser, on either the iPad

7     or the iPhone, that would allow you that type of

8     information.  Would that be fair to say?

9     A.     It would depend on the device, and it would depend

10    on the browser itself.  A mobile device is far better at

11    not having Internet history and Internet caches if you

12    delete it.  So it would depend.

13              MR. SANFT:  No further questions, Your Honor.

14              THE COURT:  I don't -- I have a question.

15    Because I think I missed the answer here.

16              So the web portal that you can access with your

17    mobile device would permit you to have access to your own

18    files that you already have on your GigaTribe program on

19    your computer?

20              THE WITNESS:  Yes.

21              THE COURT:  But could you access someone else?

22    For example, I sent you a friend request, but now I have to

23    go to Europe.  I check to see if you've accepted me as a

24    friend yet, and you've said yes.  Can I now begin the

25    download?  Or do I have to go back to my computer before I

TRANSCRIBED FROM DIGITAL RECORDING

1    could do that?

2              THE WITNESS:  You would have to use your

3    computer.

4              THE COURT:  So I couldn't use my iPhone or any

5    other mobile device?

6              THE WITNESS:  No.  The purpose of the web-based

7    capability of GigaTribe is to access your own files and

8    folders.

9              THE COURT:  Okay.  Thank you.

10             THE WITNESS:  And I'm sorry, Judge.  I -- can I

11   clarify something?

12             THE COURT:  Yes.

13             THE WITNESS:  I'm sorry.  I was asked to look at

14   the chats here.  And when it comes to the format, forensic

15   programs often export things very similar.  These are the

16   Grindr chats that -- I think I had stated these are

17   GigaTribe chats, but these are the Grindr chats.  But the

18   format is very similar as far as a profile ID and

19   everything.  But these are Grindr.

20             THE COURT:  So that's Exhibit 21B?

21             MS. ROOHANI:  Yes.

22             MS. CARTIER-GIROUX:  Yes, Your Honor.

23             THE COURT:  And how do you know that they're

24   Grindr chats and not GigaTribe?  What's the difference?

25   What is the distinction that comes to your mind?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE WITNESS:  Reading through the chats to tell
 2    if there's actually -- they're links that involved Grindr
 3    itself in application for mobile platforms.
 4              Where I -- I think I stated when a forensic
 5    person exports them they -- you could export them very
 6    similarly as far as profile IDs, dates, and then the
 7    content.
 8              So once I looked at it, I could see that that's
 9    the Grindr chat.
10              THE COURT:  Okay.  Thank you.
11              Redirect, Ms. Roohani?
12              MS. ROOHANI:  I just have one question.
13                    FURTHER REDIRECT EXAMINATION
14    BY MS. ROOHANI:
15    Q.    I want to be absolutely clear.  The web access for
16    GigaTribe, if you web -- access is different than being
17    able to watch a video that is on your home folders; is that
18    correct?
19    A.    The web access lets you access anything on your home
20    folder, as long as your home folder is on -- or I should
21    say your computer is on and the GigaTribe program is
22    actively running, then you could access and watch it.  But
23    it doesn't have the same functions as far as chat or any of
24    those other features.
25              It's purely a file access capability.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And to -- I guess maybe I'm trying to understand the

2    distinction between accessing a file -- I can access the

3    file and see that it exists, right, and then I can -- if I

4    want to view the file on my phone, what do I have to do?

5    A.    You would just click on the file to -- the file to

6    download.  And it would open up, download to your phone.

7          Just on -- on -- for example, an iPhone, an

8    iPhone doesn't typically have, like, a folder where it

9    stores stuff.  An Android-type device typically does have a

10   download folder where it would store -- store items, maybe

11   on the external memory card or another place on the phone.

12   So it's device specific.

13         But, yes, you can absolutely click on -- you can

14   access your web portal, you can click on a movie or an

15   image, for example.  It will download to your phone, and

16   you can view it on that device.

17   Q.    But if it doesn't download to your phone, you cannot

18   watch it on your phone; is that correct?

19   A.    Correct.  It's -- I guess it's a technical aspect.

20   If you're viewing it on your phone, it's downloading to

21   your phone in realtime, but it has to get there first.  It

22   doesn't do some sort of remote viewing where it never came

23   to you, it has to download to the device to read it.

24   Q.    Okay.

25   A.    To be able to see it.  It might -- it doesn't even

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    stream like the typical news.  But even when that happens,
 2    it's a download to your device.
 3    Q.    Okay.
 4    A.    But it may not be recoverable.
 5              MS. ROOHANI:  Okay.  That's it, Your Honor.
 6              THE COURT:  All right.  What about if you have
 7    something like Jump Start or some of the other programs
 8    that provide remote access to your computer, then you could
 9    view it?  But, like you're saying, it wouldn't be
10    downloaded on your device, it would still be on your
11    computer, but you could still see it realtime?
12              THE WITNESS:  Correct.  If you used mobile
13    devices with applications, you certainly could have a
14    remote desktop app, a VNC client, or something like that.
15    In that aspect you are remoting into the device usually in
16    a full-function mode where you are still using the device
17    on the other end, not just the folder on it.
18              So if that was the case, if you had remote
19    desktop on your app, then you can remote in and use your
20    computer on the other side.
21              THE COURT:  Then would there be any forensic
22    fingerprint of that?  On the phone or on the --
23              THE WITNESS:  No.
24              THE COURT:  Okay.
25              THE WITNESS:  No, there wouldn't be.
```

———— TRANSCRIBED FROM DIGITAL RECORDING ————

```
 1              THE COURT:  All right.  I've lost track of where
 2   we were.  I think recross.
 3              Mr. Sanft, any other questions?
 4              MR. SANFT:  Well, Your Honor, just based upon
 5   your questions as well as the government's.
 6                   FURTHER RECROSS-EXAMINATION
 7   BY MR. SANFT:
 8   Q.   Your testimony on the access portion of this, you
 9   said that in order for you to view something -- so, for
10   instance, if you and I are -- I just want to make sure
11   because I'm a little bit confused too.
12              If I download something from your -- from your
13   client or -- not from your client, but from you to my
14   account, and then I leave and I go somewhere and I want to
15   access what I just downloaded from you, I could do that?
16   Is that what we're talking about?
17   A.   Well, if you -- if we -- if you had ultimate
18   subscription, you could access it through the web portal,
19   but it requires an ultimate subscription.  Like law
20   enforcement, for example, we don't -- when we're conducting
21   these investigations, we don't have an ultimate
22   subscription.  We would have no way of logging in through
23   the web portal to see what we've -- what we've downloaded.
24              Some users have ultimate, some users don't.  For
25   you to have that functionality of being able to access your
```

TRANSCRIBED FROM DIGITAL RECORDING

1    files from anywhere, you have to have a paid subscription.

2              And once you have that paid subscription, you

3    can access your own files from anywhere, as long as it's

4    something that you've already downloaded, GigaTribe is

5    running, and it's in that folder.

6    Q.   Okay.  And you had -- the government had -- or

7    actually I think the Court had asked you specifically about

8    the forensic fingerprints, or something along those lines.

9              You've been able to determine whether or not

10   someone's actually downloaded something off of the web

11   portal.

12             Would it be fair to say, of course, is that your

13   Internet cache would be one way of determining whether or

14   not you've accessed that Internet portal?

15   A.   Forensically?  Your Internet activity should be

16   fairly consistent regardless what you access.  But it all

17   depends on what browser you're using, what your browser

18   settings are, like in private browsing, or something

19   similar to that, and also the device.

20             Again, a mobile device is less likely to keep

21   data when it comes to Internet history than a computer with

22   a traditional hard drive because of the way the hard drives

23   work.

24             But it would all depend.

25             So if you're asking would you absolutely find

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    that in your Internet cache, Internet history, there's no
 2    way to determine that.  It depends on the user's use of
 3    cleaning programs, how much they're on the Internet, and
 4    things like that.
 5              But if I was a forensic examiner, I would
 6    certainly look for that in one aspect relatively quickly.
 7    You might find that it's not even there, not even worth
 8    further investigation.
 9              Most of the time GigaTribe, in our
10    investigations, have to do with the actual use of the
11    program, other than just a person accessing their own files
12    from time to time.
13    Q.    Well, let me ask you this final question.
14              Going back to the idea of remote access.  If I
15    am accessing my GigaTribe account, can someone at the same
16    time access my GigaTribe account while I'm currently using
17    the account?
18    A.    If -- you mean, if you have GigaTribe on multiple
19    computers?
20    Q.    Sure.  Yeah.  We have it on multiple computers.  I
21    get online.  I'm on the GigaTribe account.  I'm chatting
22    with someone.  Can someone else get on that same account at
23    the exact same time as me?
24    A.    It would bump you off.  It would bump you off.  You
25    only -- only one user can have -- can be logged into the
```

TRANSCRIBED FROM DIGITAL RECORDING

1    program at one time.

2              It is possibly logged into a web portal, but the

3    actual program itself that includes the chat and all that

4    other activity, only one user at a time.  If you log in

5    from a different device, it will bump the other one off.

6              MR. SANFT:  Thank you.

7              No further questions.

8              THE COURT:  Thank you.

9              Anything else, Ms. Roohani?

10             MS. ROOHANI:  No.  No, Your Honor.

11             And we would ask that -- if there are no further

12   questions, that Sergeant Carry be excused.

13             THE COURT:  All right.

14             Does the defense need to have Sergeant Carry on

15   stand-by for any potential recall, or can we go ahead and

16   allow him to be excused?

17             MR. SANFT:  We don't anticipate recalling him,

18   Your Honor.

19             THE COURT:  All right.  Thank you very much,

20   Sergeant Carry.  You're all done.  Please be careful on the

21   way down with the steps.  And I don't think any wires were

22   moved, but just in case, please be careful with your step

23   there.

24             (The witness was excused.)

25             THE COURT:  Ms. Roohani, would you like a

TRANSCRIBED FROM DIGITAL RECORDING

1    bathroom break, or do you want to call your next witness?

2         MS. ROOHANI:  I would love a bathroom, Your

3    Honor.

4         THE COURT:  Okay.  Let's take a 10-minute

5    bathroom break.  It's 10:10.  Let's plan to be back here at

6    10:20 as much as you can.  The bathrooms are the furthest

7    they could possibly be, so I understand.  Don't rush.  If

8    we start a little bit late, that's okay.  But try to be

9    back here in about 10.

10        COURTROOM ADMINISTRATOR:  All rise.

11        (Recess from 10:10 a.m. until 10:25 a.m.)

12        COURTROOM ADMINISTRATOR:  All rise.

13        THE COURT:  Thank you.  You may be seated.

14        (Pause in the proceedings.)

15        THE COURT:  I think we're all back from the

16   bathroom break.  Is that right?

17        All right.  So before we go forward, I was told

18   by my courtroom deputy that we might have to change up the

19   timeline today a little bit.  So it looks like we have an

20   attorney who needs to leave a little bit before lunch, is

21   that right, and won't be back until a little bit after

22   lunch?  So we need to take an extended lunch.

23        What time do you propose?

24        MR. DURHAM:  Your Honor, I have a meeting with

25   the US Attorney on a separate case at 12:00.  And then I

1    have an appearance in front of Judge Hoffman at 1:30, but I

2    don't anticipate it will take longer than a half hour.  So

3    until 2:00.

4              THE COURT:  All right.  So is it the US

5    Attorney's Office just right next door?

6              MR. DURHAM:  Yes.

7              THE COURT:  Okay.  And that's at 12:00 noon?

8              MR. DURHAM:  Correct.

9              THE COURT:  Okay.  So we can break at 11:50?

10             MR. DURHAM:  Yes.  Or even noon.  I mean, I

11   can --

12             THE COURT:  All right.  And then you believe

13   you'll be back from Judge Hoffman's by 2:00?

14             MR. DURHAM:  2:00.

15             THE COURT:  Okay.

16             MR. DURHAM:  And depending on what witness the

17   government plans on calling, if I'm late, obviously

18   Mr. Marchese or Mr. Sanft can start without me.

19             THE COURT:  Oh, so you do want us to start

20   without you?  We were planning to start at 1:00, but if

21   you're not going to be here, is that a problem?  Or does it

22   depend on who they're going to call?

23             MR. DURHAM:  Correct, yeah.  It will depend on

24   who they're going call.  So I guess 2:00, just to be safe,

25   if the government's okay with that and the Court's okay

TRANSCRIBED FROM DIGITAL RECORDING

1    with that.

2              THE COURT:  Okay.  So we'll break at 11:50.

3    When we break, we'll ask the government to let us know who

4    you plan to call in the afternoon so we know whether or not

5    Mr. Durham needs to be -- if we need to wait for Mr. Durham

6    to be back at 2:00 or if we can go forward with a different

7    witness that's not his witness.

8              MS. ROOHANI:  Your Honor, we -- we do have one

9    witness that we can call out of order, which is Albert

10   Giangregorio.  But it depends on where we are -- I mean, if

11   you don't mind us taking somebody out of order.  But I

12   don't know if --

13             THE COURT:  Well, let's wait and see at 11:50

14   where we are.

15             MS. ROOHANI:  Certainly.

16             THE COURT:  And then we can find out when he

17   needs to be back.

18             All right.  So, Aaron, do we need to bring down

19   the screen?

20             MS. ROOHANI:  That would be great.

21             THE COURT:  All right.  The United States may

22   call its next witness.

23             MS. CARTIER-GIROUX:  The United States calls

24   Joseph Ahmed.

25             COURTROOM ADMINISTRATOR:  Please remain standing

TRANSCRIBED FROM DIGITAL RECORDING

```
1    and raise your right hand.
2              You do solemnly swear that the testimony you
3    shall give in the cause now before the Court shall be the
4    truth, the whole truth, and nothing but the truth, so help
5    you God?
6              THE WITNESS:  I do.
7              COURTROOM ADMINISTRATOR:  Thank you.  You may be
8    seated.
9              Please state and spell your name for the record.
10             THE WITNESS:  Joseph Ahmed.  First name
11   J-o-s-e-p-h, last name A-h-m-e-d.
12             MS. CARTIER-GIROUX:  May I inquire?
13             THE COURT:  Yes, go ahead.
14                        JOSEPH AHMED
15          called as a witness on behalf of the
16       Government, was examined and testified as follows:
17                    DIRECT EXAMINATION
18   BY MS. CARTIER-GIROUX:
19    Q.   Good morning, Detective Ahmed.
20             Where do you work?
21    A.   I am detective for the City of Buffalo, New York
22   Police Department.
23    Q.   And how long have you been a detective with the
24   Buffalo Police Department?
25    A.   Approximately 11 years.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what did you do before that?

2    A.    I was in patrol in Buffalo PD.

3    Q.    And how long were you a patrol officer?

4    A.    Approximately eight years.

5    Q.    Okay.  Were you ever a member of the Child

6    Exploitation Task Force?

7    A.    Yes.  I still am affiliated with it.

8    Q.    Okay.  And in what capacity?

9    A.    Task Force Officer for FBI Buffalo.  So Deputy US

10   Marshal since August or September of 2006 to current.

11   Q.    Have you ever acted in an undercover capacity as a

12   member of the Child Exploitation Task Force?

13   A.    Yes.

14   Q.    And what does a -- when you're acting in undercover

15   capacity, what does that mean?  Like, what do you do for

16   the child exploitation --

17   A.    Well, in child exploitation cases, it can range from

18   monitoring file sharing networks to having an online

19   persona, in which you engage potential offenders, using an

20   alias.

21         It can also involve Craigslist or other, you

22   know, similar back-page-type investigation.  So it ranges.

23   Q.    I'm going to bring you to specifically September --

24   or actually August of 2015 and then, thereafter, September

25   of 2015.

TRANSCRIBED FROM DIGITAL RECORDING

1           Were you involved as an undercover for the Child

2    Exploitation Task Force working on the GigaTribe file

3    sharing program network?

4    A.    Yes.

5    Q.    And did you have an undercover user name?

6    A.    I did.

7    Q.    What was that user name?

8    A.    Pedotraderjoe.

9    Q.    Did you pick that user name?

10   A.    I did.

11   Q.    Why did you pick that user name?

12   A.    Because the user name is indicative of the type of

13   files that I was, you know, purporting to share.

14   Q.    And what type of files were you purporting to share?

15   A.    Those depicting child pornography.

16   Q.    Were you involved in any tribes when you were acting

17   as pedotraderjoe?

18   A.    In terms of tribes, I'm not sure what you mean.  I'm

19   sorry.

20   Q.    Okay.  Were you members of any groups on GigaTribe?

21   A.    Yeah.  I'm sure that I was accepted into various

22   friend groups.  Users accept you into their friend groups

23   or you accept them into your friend groups.  So, yes, I

24   was.

25   Q.    When you were online using GigaTribe, are you using

TRANSCRIBED FROM DIGITAL RECORDING

1    the GigaTribe program that is currently available to

2    subscribers or that was available to subscribers in 2015,

3    or are you using an older version?

4    A.    An older version.

5    Q.    Okay.  And does GigaTribe allow the FBI to use this

6    older version of GigaTribe?

7    A.    Yes.

8    Q.    And we heard testimony previously that the new

9    version of GigaTribe, if you are not an ultimate

10   subscriber, doesn't allow you to password protect your

11   folders.

12           Does the version that you were using, this older

13   version, which was permitted law enforcement to be used,

14   did they -- did that version allow you to password protect

15   your folders?

16   A.    It did.

17   Q.    And did you have an ultimate subscription?

18   A.    No, I did not.

19   Q.    When you were on the GigaTribe platform, were you

20   also running a law enforcement program at the same time?

21   A.    Yes.

22   Q.    Were you able to screen capture your interactions?

23   A.    Yes.

24   Q.    Did the law enforcement program that you used also

25   have a capacity of something called Comcast?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    CommView.

2    Q.    CommView.  I'm sorry.

3    A.    Yes.

4    Q.    And what would CommView allow you to do?

5    A.    CommView manages packet transfer.  So if you think

6    of a file that you download from another user, like a

7    picture, and imagine that that picture is made up of a

8    thousand packets, so individual pieces of the picture,

9    CommView tells you where those packets came from.

10        And you don't actually have a full file until

11   your machine captures all those packets and reassembles

12   them into the picture that you see.

13   Q.    So what does CommView give you in order to tell you

14   where your packets are coming from?

15   A.    CommView provides you the IP address of origin, the

16   locality that that IP address is originating from, at least

17   the country, sometimes the state, if it's available, among

18   other things, and it will show you an approximate number of

19   packets -- not packets, check that data, you know, in

20   bytes, kilobytes, what have you, megabytes that has been

21   transferred between your IP address and that IP address.

22   Q.    So is it fair to say that CommView allows you to get

23   the IP address from the computer, where the computer is,

24   that you're being allowed to download from?

25   A.    That is correct.  It's the IP address of origin,

------------------------- TRANSCRIBED FROM DIGITAL RECORDING -------------------------

1     correct.

2     Q.    Okay.  In August -- at the end of August and

3     September of 2015, were you friends on GigaTribe with a

4     user name lars45?

5     A.    Yes.

6     Q.    How did you become friends with lars45?

7     A.    Well, I accepted lars45 into my friend network, I

8     believe it was August 3rd of 2015; and in that case, since

9     I accepted that user into pedotraderjoe's friend network, I

10    believe that I would have been in possession of or had an

11    invite from him.

12          So you receive invitations, and you, as a

13    GigaTribe user, have to actively decide, yes, I would like

14    to be friends with this person or trade with this person or

15    no.

16          And I would have said at that point, okay, I'll

17    accept the invitation.

18    Q.    Okay.

19    A.    But it may have come with the group of invitations

20    all at the same time.  So I'm not positive, you know,

21    exactly, you know, if I looked at that specifically.  But I

22    would accept groups at a time all the time.

23    Q.    But there came a point in time where you became

24    friends with this lars45?

25    A.    Yes, I believe it was August 3rd.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Of what year?

2    A.    2015.

3    Q.    All right.  And when you're friends with someone on

4    GigaTribe, and specifically when you were friends with

5    lars45, were you able to see file folders that lars45 had?

6    A.    Yes.

7    Q.    And do you recall how many he had that you were able

8    to see?

9    A.    I recall that there was three folders containing

10   various files in each.

11   Q.    Okay.  Now, this lars45 individual, do you recall

12   whether or not he had a regular subscription or an ultimate

13   subscription?

14   A.    Ultimate.

15   Q.    Okay.  So would it be fair to say that with his --

16   with his -- were his folders password protected?

17   A.    Yes, they were.

18   Q.    Okay.  And did there come a point in time where he

19   gave you access to his folders?

20   A.    Beginning on August 4th.  And I did not -- for

21   whatever reason, I did not monitor the software on August

22   4th.  I may not have been at work, it may have been the

23   wrong time of day, et cetera.

24         On August 4th I received a message from user

25   lars45 asking for the password to the files that I was

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   sharing.  And then a few messages later lars45 provided the
 2   password for his files.
 3   Q.    Now, you just testified that you received a message
 4   from lars45 with the password to the files.  Was that
 5   through the chat function on GigaTribe?
 6   A.    Yes.
 7   Q.    Before you came in here to testify, did you review
 8   some of the United States exhibits, specifically -- and it
 9   would be in the book in front of you -- Exhibit 1 for
10   identification, Exhibit 2A for identification, Exhibit 2B
11   for identification, and Exhibit 2C for identification; 2C
12   having numerous pages to it, I believe 50 or 60 pages to
13   it?
14   A.    Yes.
15   Q.    Okay.  Starting with number -- let's start with 2A.
16   2A.  What was, if -- if you could recognize 2A, what is 2A?
17   A.    2A is a disk containing the undercover session with
18   lars45 from my undercover user name.
19   Q.    Okay.  And did you view that disk?
20   A.    Yes.
21   Q.    You viewed the contents?
22   A.    I did.
23   Q.    And is that -- is what's contained on 2A the
24   recording that you just testified with regard to your
25   interaction with lars45 on September 14th of 2015?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.   Yes.

2         MS. CARTIER-GIROUX:  At this time I'd move to

3    admit 2A.

4         THE COURT:  Any objection?

5         MR. DURHAM:  No objection, Your Honor.

6         THE COURT:  All right.  Exhibit 2A will be

7    admitted.

8         (Government's Exhibit 2A received.)

9    BY MS. CARTIER-GIROUX:

10   Q.   2B.  Take a look at 2B.  Do you recognize what is

11   Government's 2B for identification?

12   A.   Yes.

13   Q.   What do you recognize 2B to be?

14   A.   These are -- or this is a screen capture of my view

15   of the GigaTribe software, and I captured this using

16   Camtasia, using a video capture.

17   Q.   Okay.  So is it fair to say what's in 2B for

18   identification is a screenshot of what is contained in the

19   video 2A, it's one screenshot of it?

20   A.   Yes.

21        MS. CARTIER-GIROUX:  At this time we would move

22   for 2B to be admitted.

23        MR. DURHAM:  No objection.

24        THE COURT:  All right.  So 2B will be admitted.

25        (Government's Exhibit 2B received.)

TRANSCRIBED FROM DIGITAL RECORDING

1  BY MS. CARTIER-GIROUX:

2  Q.    What about 2C?

3  A.    That is another screenshot from that same video.

4  Q.    Now, 2C, is it not a series of screenshots that goes

5  1 through -- could you tell me --

6  A.    Yes.

7  Q.    -- what number it is?  Is it 60 --

8  A.    Yes.

9  Q.    -- 1 through 57?

10  A.    Yes.

11  Q.    Okay.  And do those screenshots fairly and

12  accurately reflect instances in the video from 2A?

13  A.    Yes.

14        MS. CARTIER-GIROUX:  At this time we'd move to

15  admit 2C.

16        THE COURT:  Any objection to 2C?

17        MR. DURHAM:  No.

18        THE COURT:  All right.  2C will be admitted.

19     (Government's Exhibit 2C received.)

20  BY MS. CARTIER-GIROUX:

21  Q.    I'm going to have you take a look at 2B.  If we

22  could put that up on the monitor, please.

23        Just so you know, sir, these are actually --

24  it's like ESPN, you can touch the screen, and it will make,

25  like, a circle.

1    A.    Okay.

2              COURTROOM ADMINISTRATOR:  Marissa, try pulling

3    the VGA out.  Because it looks like they didn't give us two

4    buttons for that table.  So it looks like the VGA should

5    take over when you pull the VGA.

6         (Discussion held off the record.)

7              MS. CARTIER-GIROUX:  Your Honor, I just gave it

8    to him in a different format.

9              THE COURT:  Okay.

10             MS. CARTIER-GIROUX:  It might be easier just to

11   run it off that.  Thank you.

12        (Discussion held off the record.)

13   BY MS. CARTIER-GIROUX:

14   Q.    So we're looking right now at Government's 2B1.

15   What do we see happening in 2B1?  What is this a picture

16   of?

17   A.    That is a screen capture from the Camtasia video

18   that I started and use any time that I'm doing a UC

19   session --

20   Q.    Okay.

21   A.    -- on GigaTribe.

22   Q.    And it looks like the tab that's visible is which

23   tab?

24   A.    The profile tab.

25   Q.    Of which user?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Lars45.

2    Q.    Okay.  And under the word lars45 at the top, yeah,

3    there -- do you see where the pointer is?

4    A.    Yeah.

5    Q.    The lars45 at the top, underneath it, do you see any

6    words written?

7    A.    It says "connected," and then "(away)."

8    Q.    And what does that mean to you?

9    A.    That means that that user's computer is currently

10   connected to the GigaTribe file sharing software and that

11   the user is most likely not there at that moment.

12   Q.    Okay.  When you say "most likely," is it because the

13   user can set that to whatever -- even if they're sitting

14   there, can set it to away?

15   A.    Right.  Yeah.

16   Q.    Okay.  But the connected -- what does that tell you

17   when it says "connected"?

18   A.    Connected means that they are online at that moment.

19   Q.    What does that mean you can do, if you're able to

20   access their folders?

21   A.    You can share files with them at that moment.

22   Q.    And can you download from them as well?

23   A.    Yes.

24   Q.    Okay.  There is something called status, do you see,

25   under loading information?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    What does that say there?

3    A.    That says "Accepted in my network August 3rd, 2015."

4    Q.    And what does that mean?

5    A.    That is the first time that I accepted lars45 into

6    the friend group or user group of pedotraderjoe.

7    Q.    Okay.  And let's look at the public information

8    section.  What do you see under user name?

9    A.    Let me see here.  Well, there's lars45.  And then

10   the license is ultimate.

11   Q.    What does that mean?

12   A.    That's the type of license that -- the version of

13   GigaTribe that they're using.  Obviously a higher level

14   license allows things like multiple downloads or, as you

15   referred to before, password protected files.

16   Q.    So this would be what would be called an ultimate

17   subscription?

18   A.    Yes.

19   Q.    And underneath there's something called -- what's it

20   say, "user since" --

21   A.    That says that lars45 was created March 21, 2015.

22   Q.    Okay.  And then let's look down further.

23         Now, all the fields aren't filled in except for

24   those fields.  The other fields that aren't filled in, are

25   they optional fields?

------------------------------TRANSCRIBED FROM DIGITAL RECORDING------------------------------

1   A.    They are.  The fields that you see filled in there

2   are default fields that the program populates for you.

3   Q.    Okay.

4   A.    But if you, for instance, wanted to put something in

5   about your age or your sex or your country, that's up to

6   you --

7   Q.    Okay.

8   A.    -- the user.

9   Q.    Let's look at 2B2.  What do we see in 2B2?

10   A.    On August 4th, lars45 sends me a message at 1:47,

11   "Hi."

12   Q.    Okay.  Now, August 4th, I see lars45, it says

13   "0408."

14   A.    Correct.

15   Q.    How come that's not April 8th?

16   A.    Because the software -- and I'm not sure if it's the

17   designers of the software, but they put the -- they use the

18   day first before the month.

19   Q.    Like in Europe?

20   A.    Yes.  Correct.  Because that's where the -- this is

21   French.  GigaTribe is a French platform.  That's who

22   designed it.

23   Q.    Okay.  So on August 4th, lars45 reached out to you

24   in the chat function of GigaTribe?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
1    Q.    And are you friends at this point?

2    A.    Yes.

3    Q.    Okay.  And he says to you, "Hi" --

4    A.    He says "Hi," and then about four hours later, five

5    hours later "pass?"  So --

6    Q.    What does "pass?" mean to you?

7    A.    He's inquiring what about the password to the files

8    that I am sharing.

9    Q.    Okay.  And you already testified that your --

10   because of the version of GigaTribe that you were using,

11   your folders were password protected?

12   A.    Yes.

13   Q.    Okay.  And what's the next thing that lars45 says --

14   lars45 says to you?

15   A.    He says, "Mine is 9090."

16   Q.    Now, this 9090, what did that turn out to be?

17   A.    That turned out to be the password to the three

18   files that he was sharing.

19   Q.    Okay.  And then next it says "bell received."  What

20   is that?

21   A.    That is an audible tone that another user will send

22   to you to kind of alert you to the fact, hey, I'm here.  So

23   it comes out that -- if you have speakers on your computer,

24   you hear a bell.  And that is to get you, the other user,

25   to say, oh, here I am, let me start talking to this person.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    In order to, like, ring the bell on your end, do
 2   they have to physically do it, like a horn in a car, you
 3   have to not --
 4    A.    Absolutely.
 5    Q.    Okay.
 6    A.    Yeah.
 7    Q.    And what is the next communication that you
 8   received, and at what time, from lars45 after he tries to
 9   get your attention?
10    A.    7th of August at 8:16, is that 6 or an 8?  I'm
11   sorry.  8:16.  And it says "Hi."
12    Q.    Okay.
13    A.    Then that's followed by another bell to get my
14   attention.  And then again inquiring what the password to
15   my files would be.
16    Q.    Okay.  And then what happens next?
17    A.    Then there is -- I log on the 17th of August, and I
18   ask are you there?  I say, "You there?"
19    Q.    Okay.
20    A.    He replies -- or, I'm sorry, lars45 replies about
21   five hours later, "Yes."  And then "Hi" about almost at the
22   same time.
23    Q.    Let's now turn to 2C1.  2C1.  Okay.
24          What do we see in 2C1?  It looks like the
25   folder's tab is hit.  What are we seeing here?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Okay.  So those are the folders that that profile is
2   currently sharing, or willing to share, and there are three
3   of them.  They're labeled "AAA," "BBB," and then the word
4   "Girls."
5   Q.    Okay.  And, again, this -- these screenshots are
6   coming from what date?
7   A.    Those are from the date of the UC section, which if
8   I recall correctly was -- is it September?
9   Q.    September 14th?
10  A.    September 14th, yeah.
11  Q.    Okay.  And let's now go to 2C2.  And what is 2C2
12  telling us?
13  A.    So I attempted to look at folder AAA to see what's
14  contained therein, and then it prompts me with a request
15  for the password for that folder.
16  Q.    So is it fair to say that this lars45 user had his
17  passwords password protected?  Right?
18  A.    His folders were -- yes, they were password
19  protected.
20  Q.    So his folders were password protected?
21  A.    Yes.  Yes, they were.
22  Q.    And even though you were friends with him, could you
23  get in those folders without the password?
24  A.    No.
25  Q.    Okay.  Let's go to 2C3.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              What do we see in 2C3?
 2    A.    That is me entering the password 9090.
 3    Q.    Okay.  And then let's go to 2C4.  And after entering
 4    the password, what did it allow you to do?
 5    A.    It allows you to see the types of files and the
 6    titles of those files contained within the folder AAA.
 7    Q.    And can you tell from this screenshot how many files
 8    are in AAA?
 9    A.    At the moment I looked at it?
10    Q.    Yes.
11    A.    Let's see.  17.
12    Q.    Okay.  And on the bottom of the screen, you see next
13    to the folder 17 elements.  What does that mean?
14    A.    That's a reference to how many files are actually in
15    there.
16    Q.    Okay.  And actually on here, we can actually see --
17    in the lower right-hand corner can we see the time and the
18    date?
19    A.    Yes.  That's the time on my machine.
20    Q.    Okay.  Let's go to 2C5.
21              What are we seeing in 2C5?
22    A.    That is -- I've highlighted the file titled
23    "Girls" --
24    Q.    Okay.
25    A.    -- being shared by lars45.
```

1    Q.    And why don't we go to 2C6.

2          And what are we doing in 2C6?

3    A.    It's the prompt asking me for the password to access

4    that file.  And I have populated that with the password

5    9090.

6    Q.    Okay.  Let's go to 2C7.

7          Now, after you entered that password into the

8    Girls folder, what did you -- were you able to get in?

9    A.    Yes.

10    Q.    Okay.  And how many files are in that folder?

11    A.    This one says 17.

12    Q.    Let's go to 2C8.  Oh, I'm sorry.  Before -- it's

13    okay.  You can stay there.

14          When you were looking at 2C7, and you can check

15    in your book, are they -- do they appear to be images or

16    videos?

17    A.    Videos.

18    Q.    Okay.  Similarly with AAA, when we were looking at

19    it, did they appear to you to be images or videos?

20    A.    Videos.

21    Q.    All right.  And looking at 2C8, what is this screen

22    we have popped up in front of your screen?

23    A.    That is CommView, which is the program that we

24    referenced earlier that is running during the entire UC

25    session.  And it is normal for me to check the status of

TRANSCRIBED FROM DIGITAL RECORDING

1   CommView to make sure -- to see which IP address I'm

2   connected with and has the most packet transfers.

3   Q.    And how can you tell which IP address you're

4   connected with from CommView?

5   A.    At the time, at this one the -- this one's a little

6   harder because initially, if you look at the third and

7   fourth sections that say "in" and "out," that is the data,

8   in and out of the connection from my computer to those

9   various IP addresses.

10              And at that point they're all relatively similar

11  low numbers.  But what I look for then is which of those

12  begins to increase dramatically when I start downloading

13  files or they attempt to download from me.

14              So that's kind of me previewing to see, okay,

15  who am I connected with, and now I know, okay, what am I

16  going to look for, when, you know, when I get to that.

17  Q.    Okay.  Let's go to 2C9.

18              THE COURT:  I'm sorry.  Can we just back -- so

19  2C8, you still don't know who lars45 is yet on Comcast?

20              THE WITNESS:  I do.

21              THE COURT:  On CommView?

22              THE WITNESS:  And that one I do because if you

23  look, the -- if you see the second from the top, there's a

24  little arrow.

25              THE COURT:  Okay.  So that's your current

                    ─ TRANSCRIBED FROM DIGITAL RECORDING ─

1    connection?

2              THE WITNESS:  Yeah, that's -- I know that's the

3    one I'm looking at because following the IP address it says

4    United States.  So --

5              THE COURT:  Can you read that number for me?

6    It's just too tiny for me.  I know it starts 192.

7              THE WITNESS:  I'll do my best.  That's the local

8    IP, which is going to be my internal IP, and then what you

9    want is the remote IP because that's the IP of that user.

10   And it looks like 68 --

11   BY MS. CARTIER-GIROUX:

12   Q.    It's the one that starts -- 68?

13   A.    Yeah; .104.2.249.

14             THE COURT:  Okay.  So I got 68.104.2.249?

15             THE WITNESS:  Yes.

16             THE COURT:  Thank you.

17             MS. CARTIER-GIROUX:  Okay.  Let's go to the next

18   one, 2C9 -- all right.

19   BY MS. CARTIER-GIROUX:

20   Q.    Now, when you take your icon and you -- I'm sorry,

21   when you take your cursor and you hover over the file, the

22   video file, does it show you the name of the file?

23   A.    Yeah.  Because what you see in the initial

24   screenshot is sometimes only a partial name because the

25   name is too long.  So I'll just double check it by doing

TRANSCRIBED FROM DIGITAL RECORDING

1    that.  And that's what I did in that.

2    Q.    And can you read what this file name is in this

3    girl's folder that we're hovering over right now?

4    A.    I'm going to do my best here.

5    Q.    Okay.

6    A.    "Kidsbox-ThaiLolita-Lolita collection" -- and I

7    can't really read the next part, but "12 Y girl fucked by

8    14 YO boy" and something with -- I'm sorry.

9    Q.    That's okay.

10   A.    It's hard to read.  And then ".13" something "good

11   mature.AVI."  I'm sorry.

12   Q.    That's okay.

13   A.    It's hard for me.

14   Q.    That's okay.

15         Let's go to 2C10.  All right.

16         Can you read the file that you're hovering over

17   now, 2C10, which is from the girl's folder?

18   A.    Yeah. "!!new 13 YO Lee and 12 YO girl."

19   Q.    Now --

20   A.    Back and forth, back and forth.

21   Q.    Okay.  When you're doing that, when you're hovering

22   over and you're seeing what -- the file names, why are you

23   doing that in this section, what are you trying to

24   accomplish by doing that?

25   A.    Well, I'm looking for file types that are indicative

TRANSCRIBED FROM DIGITAL RECORDING

1    of child pornography.  And the term YO is reference to

2    years old.  So that tells you in the initial title this is

3    purported to depict an 11-year-old -- I'm sorry,

4    13-year-old and a 12-year-old.

5      Q.    Okay.  Let's look at 2C11.

6            Again, 2C11, can you read the file name of the

7    icon that you're hovering on?

8      A.    Yes.  "6 years old boy fucking his mom," and then

9    the file extension, I'm not sure what -- I'm sorry.

10     Q.    That's okay.

11     A.    The file extension is really small.

12     Q.    Now, let's go to 2C12.

13            What are we doing in 2C12?

14     A.    That is highlighted the folder "BBB."

15     Q.    So we've already gone into AAA, we've gone into

16   Girls, and now we're going into BBB?

17     A.    Correct.

18     Q.    Let's go to 2C13.  Okay.

19            In BBB, this is the first screenshot, how

20   many -- does it indicate on 2C13 how many files are

21   contained in BBB?

22     A.    At that moment, 838.

23     Q.    And let's go to 2C14.  Okay.

24            Can you tell what we're doing in 2C14?

25     A.    Now, I've highlighted one of the video files.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Uh-huh.  And what is that video file name?

2    A.    I can't make out the first character.  "Dad fucks

3    his son very deep."  And it's followed by a number and then

4    the file extension MP4.  I can't tell if that's a duration

5    after the number.

6    Q.    Okay.  Let's go to 2C15.

7          Now, is it fair to say that what you're doing in

8    the video is you're scrolling through all the files

9    contained in BBB?

10   A.    Yes.

11   Q.    Okay.  And what do we see in 2C15?

12   A.    2C15 I've highlighted or I'm about to click on for

13   download possibly that file name, which is a series of

14   numbers.

15   Q.    When you look for -- I mean, when you look for the

16   files to download, what are you looking for?  Because

17   obviously you're not going to download 838 files.

18   A.    Well, what I'm looking for is when we -- when I do

19   an undercover session of this nature, I want to, if I can,

20   I'm looking for someone who is sharing predominantly or a

21   majority of files containing child pornography; i.e., it's

22   not a mistake to have -- it could -- may be a mistake to

23   have one.  It's absolutely possible that they could have

24   downloaded from another user.

25          I'm looking for somebody who absolutely has an

TRANSCRIBED FROM DIGITAL RECORDING

```
1    abundance of these.  So while I'm highlighting these

2    titles, I'm showing myself, hey, I'm not wasting my time

3    here, there's a lot of titles indicative, in my experience,

4    of files containing child pornography.

5    Q.    Okay.  Let's go to --

6              THE COURT:  Why do -- I'm sorry.  Just before we

7    move on.  Why do some of them have, like, a construction

8    column?  Does that mean that it's --

9              THE WITNESS:  Okay.  So that is --

10             THE COURT:  -- corrected or something?

11             THE WITNESS:  No.  So when you -- when you're --

12   when your computer, or any computer, wants to show you a

13   video, it needs an application to open the video for you.

14             So if it's a Windows machine, like your machines

15   here, it would be Windows Media Player.  And there's that

16   little icon -- I don't know if you're familiar with it,

17   with the four colored windows.  That icon is for VLC Media

18   Player.  It's another application that will open the video.

19             So it's showing you, when you open that video,

20   that VLC Media Player is going to open it.  And the pylon

21   is their icon for that media player.

22             THE COURT:  And what about the ones that don't

23   have the pylon that are just --

24             THE WITNESS:  That is Windows Media Player.  And

25   the reason that happens sometimes is if you look at some of
```

TRANSCRIBED FROM DIGITAL RECORDING

1    the -- like if you look at the middle of the screen

2    right -- let me see, right here --

3              THE COURT:  You can just draw on it.

4              THE WITNESS:  I don't know how to draw on it.

5              MS. CARTIER-GIROUX:  It's not drawing.

6              THE WITNESS:  Oh, 12 YO, I don't know if you can

7    see that.

8              THE COURT:  Top right-hand corner in the green.

9              THE WITNESS:  That is actually good right there,

10   right where you are.  "12-14 YO cute boy" -- oh, I'm sorry.

11             MS. CARTIER-GIROUX:  There you go.

12             THE WITNESS:  I don't want to mess everything

13   up.  I don't want to set us back.

14             MS. CARTIER-GIROUX:  You're not.

15             THE WITNESS:  Cool.  Right there.  That one.

16             So as the end of that file title you see MP.4.

17   That is a file extension.  And that MP.4 is a number of

18   different file extensions that tell your machine this is a

19   video.

20             My machine is set, the default setting on my

21   machine on this day is to play any .MP4 titles, you know,

22   file extensions using VLC Media Player.

23             The ones with the Windows icon, like this one up

24   here, (inaudible) the one right there, is .WMV.  For

25   whatever reason, VLC wasn't set as the default player

TRANSCRIBED FROM DIGITAL RECORDING

1    for .WMV files at that time.

2              THE COURT:  Okay.

3              THE WITNESS:  If it was, they would all be

4    pylons, you know, those as well.  So there's a number of

5    different kinds of videos, MP4, you know, WAV files, AVI,

6    .AVI is another one.

7              So depending on which, whichever one is set for

8    the default for that particular app, that media player will

9    play.

10             THE COURT:  Okay.  Thank you.

11   BY MS. CARTIER-GIROUX:

12   Q.   Let's look at 2C17.

13             In 2C17 it looks like you're pulling on -- down

14   on one of the tabs.  What are you -- what are you doing?

15   A.   I am changing the size of the -- I'm making sure

16   that the icons are as big as possible because that lets me

17   read the file titles a little easier, a little quicker.

18   Q.   Okay.  Let's look at 2C18.

19             What did you do with 2C18?

20   A.   That is, I believe, an alphabetical listing.  I

21   arranged them by title.

22   Q.   Okay.

23   A.   And that is sometimes a faster way for me to scan

24   the list and find titles with phrases consistent with child

25   pornography.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Does it also help you see the size of the

2    file?

3    A.    It does.

4    Q.    Also on this page, on the 2C18, are you able to see

5    the last modification date of the file?

6    A.    Yes.

7    Q.    Okay.  And when you were looking at these 838

8    elements, was there a date that appeared to be fairly

9    consistent throughout?

10   A.    It appears March 21, 2015.

11   Q.    Okay.  And is it fair to say that the dates within

12   that were either March 21st, 2015, or within three to four

13   days from that particular day?

14   A.    It appears as though, yes, from what I see here,

15   yes.

16   Q.    Okay.  But the earliest date appears to be March

17   21st, 2015?

18   A.    Yes.

19   Q.    Let's look at 2C19.

20         What are we doing in 2C19?

21   A.    Hovering over one of the videos that the title looks

22   like "NUD_boy.mp4."

23   Q.    And then 2C20?

24         Same thing?

25   A.    Yes, I'm still on that particular video.

-------------------- TRANSCRIBED FROM DIGITAL RECORDING --------------------

1    Q.    Then 2C21?

2    A.    Now I'm hovering over another file title that is a

3    video "10-year-old boy rides dad 17 seconds.WMV."

4    Q.    Let's go to 2C22.

5            What are you looking at there?

6    A.    Another video titled "9Yboycum.MP4."

7    Q.    And 2C23?

8    A.    That is a file titled "vid-2015" and then some of

9    it's obscured.

10   Q.    Okay.

11   A.    That's another video file --

12   Q.    2C24?

13   A.    Another video file titled "11 years old cums while

14   fucking videos," and then there's some more to it.

15   Q.    Okay.  2C25?

16   A.    "19 YO fucks 9 YO movie 001.WMV."

17   Q.    20 -- 2C26.

18   A.    "Best From Boy Porn," I'm sorry, it's obscured.  I'm

19   queuing all these for download.  These are the files I'm

20   selecting and queuing for download.

21   Q.    And as you were going through the 838 videos that

22   you were looking, did you -- did you come to a conclusion

23   that the majority of them appear to be child exploitation

24   videos?

25   A.    Yes.

 1    Q.    Let's go to 2C27.

 2    A.    Okay.

 3    Q.    Is that similarly a title that appears to be --

 4    A.    Yes.  "11 YO boy I met at the park came home" with

 5    -- or "WI..."

 6    Q.    Let's go to 2C29.

 7    A.    That -- well, the one highlighted up above is "Best

 8    From Boy Porn.BB AVI video."

 9    Q.    Okay.  So at this point you're just trying to queue

10    them up to download?

11    A.    Correct.

12    Q.    Okay.  And because you don't have the ultimate

13    subscription, do you have to download one at a time?

14    A.    Yes.  You have to wait for each download to

15    complete.

16    Q.    Okay.  Let's go to 2C30.

17    A.    Okay.  This one the highlighted video is "boy +

18    peeing + on + dad" asterisks "video" is followed by some

19    more asterisks, and then the rest of the title.

20    Q.    All right.  2C31, what is the next video you're

21    downloading?

22    A.    Yes.  "12YO," and I'm not sure, "MP4."

23    Q.    Okay.  And 2C32?

24    A.    "10 YO chubby show.MP4."

25    Q.    Okay.  And then 2C33?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I think it's Lula.  Is that Lula?  I'm not sure.

2    But the initial one -- I'm sorry, I can't read that very

3    well.  But then it says, "9 YO boy and" man -- "and men in

4    car," followed by a word that got cut off good because

5    it's -- can't see the whole title.

6    Q.    Okay.  And let's go to 2C34.

7    A.    Yes.

8    Q.    What do we see in 2C34?

9    A.    Well, when I would queue up the next one in the

10   list, it wouldn't let me start until the prior download had

11   finished, and that is a prompt from GigaTribe to say, hey,

12   if you want to be able to download multiples at one time,

13   you can now upgrade to the ultimate version, 4v.

14   Q.    Okay.  I'm going to skip ahead to, let's look at --

15   let's go to 2C39.

16         So what are you doing at 2C39?

17   A.    2C39 I'm highlighting the Girls folder again.

18   Q.    Okay.  Are you going into that folder to start

19   downloading from there now?

20   A.    It would appear so, yes.

21   Q.    Okay.  Let's look at 2C40.

22   A.    That is the list of files contained within the Girls

23   folder.

24   Q.    Okay.  And what are you clicked on to?

25   A.    I've highlighted "2012 man boy and girl.AVI."

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Let's go to 2C41.
 2    A.    That is the file titled "5 YO toddler girl
 3    fuck.MPG."
 4    Q.    And then 2C42?  I think that's the same, actually.
 5    A.    Yes, same file title as last.
 6    Q.    So let's go to 2C43.
 7    A.    2C43 is a series of exclamation points, "Kids box-
 8    Thai Lolita-Lolita collection."  And Lolita is another very
 9    common term for a young girl.
10    Q.    Let's go to 2C44.
11    A.    "PTHC," which is preteen hard core, "boy mom 6. -- I
12    think it says "03" and then ".FLB," which is another title
13    of video file extension.
14    Q.    Okay.  And then 2C45?
15    A.    "Zoo pedophilia 10 YO school girl," and it looks
16    like "MAD 03," and then a series of numbers.
17    Q.    Okay.  Let's look at 2C46.
18          What do we see in 2C46?
19    A.    2C46 is the transfers tab.  And that shows all the
20    videos that I've queued for download so far and how much of
21    that video is downloaded.
22          The ones with the green bars tell me that that
23    is complete.  The ones with the open blank are queued and
24    have not begun.
25          And the one in the middle there with the blue
```

------------------------------------------------------------
TRANSCRIBED FROM DIGITAL RECORDING

```
 1    bar is currently downloading.
 2    Q.    Okay.  Let's look at 2C47.
 3    A.    That is a -- that's the same page.
 4    Q.    That's the same page?
 5    A.    That's very similar, yes, showing that one is still
 6    downloading.
 7    Q.    How many downloads were you able to accomplish
 8    during the session?  How many video files?
 9    A.    I believe it was 24.
10    Q.    Okay.  And let's look at 2C49, actually.  So what do
11    we see in 2C49 now?
12    A.    That is CommView.  Now I'm checking it again to make
13    sure that, first of all, that it's still running; and,
14    second of all, because I want to be sure that the IP
15    address that I'm exchanging with has the high numbers of
16    packet transfer.
17    Q.    Okay.  And let's go -- and the IP address that you
18    are downloading from, the first one you already told us is
19    yours.  But what is that second one?
20    A.    68.104.2.249.
21    Q.    Is that the same IP address that you saw earlier on
22    in your session?
23    A.    Yes.
24    Q.    Okay.  Let's go to 2C50.
25          What do we see in 2C50?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    That is the same CommView screen, but I moved the

2    view over a little bit, and I'm looking in that one, I'm

3    just trying to show the direction that most of the packet

4    transfer's coming -- is in.  So I'm downloading from him.

5    Or that user, I'm sorry, I'm downloading from lars45, that

6    user.

7              And then it tells you what port it's coming in

8    and some other stuff.  But I believe that I'm just trying

9    to show the whole view of the Comcast --

10   Q.    Of the Comcast, okay.

11   A.    -- display.

12   Q.    Let's go to 2C51.

13   A.    Okay.  That's the end view.  So the slider bar in

14   that window right there, I've moved it all the way over to

15   the right.  And that, again, is showing me -- if you look

16   at the bytes here, that's showing me that lion's share of

17   what is coming in -- or to my computer, is from that IP

18   address.

19   Q.    Okay.  So is that fair to say that there will be

20   confirmation for you of where the information is being --

21   A.    Yes.

22   Q.    -- brought into?

23   A.    Yes.

24   Q.    Okay.  Go ahead and look -- take a look at 2C52 and

25   then 2C53, you can do them all at the same time, 2C54 --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    you have the book in front of you.  It's better to do it
 2    from --
 3    A.    Yes.
 4    Q.    -- 2C55 and 2C56.
 5          What's being done in those --
 6    A.    That's a continuation of me highlighting more videos
 7    for a possible download.  And I do that, again, to queue up
 8    more.  But I also do that to show whatever investigator
 9    ends up with this -- so let's say the session was
10    terminated quickly and I couldn't download those videos,
11    I'm showing on the video all the types of files that it
12    appears as though this person is sharing.  So I'm trying to
13    at least communicate that with whoever ends up with this
14    case, be it me or somebody else.
15    Q.    Okay.  And then 2C57.
16    A.    That is the -- that is another screenshot of the
17    transfers from lars45.
18    Q.    Okay.
19    A.    And there's some more that have been queued up by
20    me.
21    Q.    Did you -- were you able -- you indicated that you
22    were able to download approximately 24 video files?
23    A.    Yes.
24    Q.    Did you view those video files?
25    A.    I did.
```

1  Q.   Based on your training and experience, did it appear
2  that some of those video files, not all of them, contained
3  child pornography?
4  A.   Yes.
5  Q.   When you say that, what makes you decide that in
6  your -- based on your experience?
7  A.   Well, the definition of child pornography is lewd
8  and lascivious display of the genitals.  That's one of
9  them.  And it's also sexual acts involving what appears to
10  be a minor child.
11       And in these videos, the ones that I identified
12  as containing it contained what appeared to be minor and,
13  in many cases, prepubescent children in various sexual acts
14  with, you know, adults, adult males.
15  Q.   Okay.  And did you make a -- is there a -- did you
16  basically provide a CDR to the investigator, the ultimate
17  investigator in the case of these downloads?
18  A.   I did.
19  Q.   Can you look at Exhibit 1 for identification.
20       Before coming in here to testify, did you -- did
21  you view Exhibit 1 for identification?
22  A.   I did.
23  Q.   And what did you find Exhibit 1 to be?
24  A.   That contains the videos that were downloaded from
25  user lars45.

```
                    TRANSCRIBED FROM DIGITAL RECORDING
```

1    Q.    By you on September 15th -- or September 14th, 2015?

2    A.    Yes.

3              MS. CARTIER-GIROUX:  At this time I'd move to

4    admit Government's Exhibit 1.

5              THE COURT:  Any objection?

6              MR. DURHAM:  No objection.

7              THE COURT:  Exhibit 1 will be admitted.

8         (Government's Exhibit 1 received.)

9              MS. CARTIER-GIROUX:  Court's indulgence.

10             THE COURT:  While you're doing that, let me just

11   ask the witness.  One of the titles used the word "box."

12             Is that a term of art?  Does that mean

13   something?  Or is it just a box, like a moving box, or does

14   box mean something?

15             THE WITNESS:  To be entirely honest, I'm not

16   sure.

17             THE COURT:  Okay.  That's fine.  I was just

18   wondering.

19             THE WITNESS:  That's not a -- that's not -- some

20   of them have the word "kids box."  That's -- and

21   sometimes -- and I don't know in that case, but in some

22   cases that is indicative of a copulation.  Sometimes

23   they'll put together a bunch of kid videos, and they'll

24   call it a box video, kids box video.

25             But that's -- I'm not -- I couldn't say that

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   that's what that was.

 2              THE COURT:  Okay.  Thank you.  I appreciate

 3   that.

 4              MS. CARTIER-GIROUX:  Could you -- I'm sorry,

 5   Judge.  Can I ask him one more --

 6              THE COURT:  Of course, yes.

 7              MS. CARTIER-GIROUX:  Just for clarification.

 8              Could we look at 2C45.

 9   BY MS. CARTIER-GIROUX:

10   Q.    On some of the screenshots you can see at the bottom

11   portion down here -- do you see where I'm pointing?

12   A.    Yes.

13   Q.    You can see what appears to be -- what is that?

14   What are we seeing?

15   A.    That is -- you're seeing kind of a blowup of what I

16   have highlighted up above, and that is showing the status

17   of it, which is queued by me, and who it's coming from,

18   which is lars45.

19   Q.    Okay.  And above it, that bar, that means that --

20   what does that bar show?

21   A.    Well, there's a little down arrow right here, which

22   is pretty hard to see.

23   Q.    Right.

24   A.    That indicates I'm going to download.  And that bar

25   is telling me that that download either hasn't started or
```

----------------------------- TRANSCRIBED FROM DIGITAL RECORDING -----------------------------

1    is just -- is still empty.  Nothing's been downloaded with

2    regard to that file yet.

3    Q.    And above it, what is that line?

4    A.    That's the title.  "Zoo pedophilia, 10 YO school

5    girl mad 03_125_Al dog and" girl, or "GRL fucking hard

6    core," I don't know if it's CLP, but ".WMV."

7          MS. CARTIER-GIROUX:  Thank you.

8          I have no further questions at this point.  I

9    pass the witness.

10         THE COURT:  Defense.  Mr. Durham?

11                    CROSS-EXAMINATION

12   BY MR. DURHAM:

13   Q.    Good morning, Detective Ahmed.

14   A.    Good morning.

15   Q.    So the first time that you were accepted into lars45

16   group of friends was August 3rd, 2015?

17   A.    It appears as though I accepted him into my group

18   August 3rd, 2015, yes, sir.

19   Q.    Okay.  Now, you've explained that the -- this is a

20   French program, so the month and date is backwards;

21   correct?

22   A.    I -- that's why I assume it's listed that way,

23   because in Europe they list the day first and then the

24   month.

25   Q.    Okay.  If I could refer you to Exhibit 2B2.  That's

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    the printout of the screenshot, correct, of the chat
 2    between you and lars45?
 3    A.    Yes.
 4    Q.    So after lars45 it says "04-08."  It's your
 5    testimony that would have been August 4th; correct?
 6    A.    Yes.
 7    Q.    Of 2015.  Next to that it looks like it has a
 8    timestamp, 0147?
 9    A.    Yes.
10    Q.    What time zone are we talking about with that
11    timestamp?
12    A.    I'm not positive if it's UTC.  I'm not sure.  I
13    can't say for certain.  So mine with -- if you look down
14    where it says pedotraderjoe, it has 1313; and if we compare
15    that with the -- if we compare that with my documentation
16    of the date and time of the download, and I'm going off the
17    top of my head, but I believe it was around 9:00 a.m., mine
18    says 9:00 a.m., but on this it says 1313.
19          So I think that's UTC.  I think it's just a
20    different time conversion.  So that's their -- their time
21    conversion.
22    Q.    Okay.
23          THE COURT:  (Indiscernible) Buffalo?
24          THE WITNESS:  Yes, ma'am.
25          THE COURT:  Okay.  Thank you.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   BY MR. DURHAM:

2   Q.    So it's your best guess, based on those numbers,

3   that the timestamps here would actually be about seven

4   hours earlier if we're talking about UTC time?

5   A.    Off the top of my head, I'm not sure, because I

6   think that the conversion for East Coast time from UTC -- I

7   know it for GMT, for Greenwich, meaning it's five hours.

8              I don't know what it would be on the West Coast.

9   And any time I need to convert, I use an app for that.  So

10  I put that in, and it tells me.  That's all.  So I'm not

11  positive.

12  Q.    Okay.  Okay.

13             So 0147, that's not actually 1:47 in the

14  morning; is that fair to say?

15  A.    Not East Coast time, no.

16  Q.    And not UTC time either?

17  A.    I'm not positive.

18  Q.    Okay.

19  A.    Honestly.

20  Q.    Now, the folders, once you were able to log in, you

21  were given the password of 9090; correct?

22  A.    Yes.

23  Q.    And that was the same password for all three

24  folders?

25  A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And those folders were organized into three

2    separate or three different names; correct?

3    A.    Yes.

4    Q.    You had "AAA" was one of the folders?

5    A.    Correct.

6    Q.    "BBB," and a folder titled "Girls"?

7    A.    Yes.

8    Q.    And fair to say that the "Girls" folder contained

9    videos of females?

10   A.    It did have some videos of females.  I can't recall

11   all of them, but, yes, there was some, yes.

12   Q.    So when you contacted -- or, I'm sorry, when you

13   started to download these files September 14th, 2015, that

14   would have been 9:38 Eastern Time?

15   A.    I believe so, yes.

16   Q.    Okay.  So that would have been 6:38 Pacific Time?

17   A.    Correct.

18   Q.    Okay.  And it indicates under the lars45 on that

19   same exhibit that it says "connected," and then in

20   parentheses "away"?

21   A.    Yes.

22   Q.    Does that mean that the user's not necessarily at

23   their computer at that time?

24   A.    It could, yes.

25   Q.    And it's your understanding based upon your review

TRANSCRIBED FROM DIGITAL RECORDING

1    of these files that were in these folders that the majority

2    of these files originated around March 21st, 2015?

3    A.    I don't know that they originated then.  It could be

4    that the -- when you create a user profile in GigaTribe --

5    so, you know, I sign up for GigaTribe, and on that when I

6    sign up, I designate a group or a file to be shared.

7              And maybe if that was the date that lars45

8    started and said, okay, I'm going to share these files,

9    that might be why that date is -- it says "date modified,"

10   that might be what that's for.

11             But date modified, I -- again, I can't say with

12   certainty that that's what it's for, but usually that's how

13   it would work.

14   Q.    Okay.  Now, you connected the IP address, or you

15   were able to retrieve the IP address; correct?

16   A.    Yes.

17   Q.    Okay.  And an IP address, is that -- does that

18   correspond with a specific device or location?

19   A.    It corresponds with a location.

20   Q.    Okay.  And how is that IP address generated?

21   A.    It is -- well, to access the Internet, you have to

22   have a pathway to do it.  And an Internet service provider

23   is assigned a group of addresses.  So they get assigned a

24   number range that they're allowed to assign to whomever is

25   using the Internet.

TRANSCRIBED FROM DIGITAL RECORDING

1      So that -- that Internet connection at that date

2  and time was assigned that number by the Internet service

3  provider, and that's how they, you know, bill you for

4  service, what have you.  This is how they keep an account

5  of who's getting Internet service.

6  Q.   Okay.  Now, you generated a report based on this

7  September 14th download; correct?

8  A.   Yes.

9  Q.   Okay.  And in that report you indicated that you had

10  downloaded 24 video files from the user lars45?

11  A.   Yes.

12  Q.   And 22 of them contained images of child

13  pornography?

14  A.   Yes.

15  Q.   Okay.  In your report did you indicate -- did you

16  mention the August 4th chat with Lars when the password was

17  provided?

18  A.   I'm sorry, but I don't recall.  If I could look at

19  the report, I could tell you, but I don't recall.

20  Q.   Would it refresh your recollection if I showed you

21  the report?

22  A.   Yeah.  I have a copy of it.

23  Q.   Would you take a minute and look at that real quick?

24  A.   Sure.  Thanks.

25       No, it does not.

TRANSCRIBED FROM DIGITAL RECORDING

 1    Q.    Okay.  Does it reflect when you first were accepted

 2    into lars45 group on August 3rd in your report?

 3    A.    No, it does not.

 4    Q.    Okay.  Your report doesn't indicate the specific

 5    times when he was accepted -- or you were accepted into

 6    this group; correct?

 7    A.    No.

 8    Q.    And it does not date -- state the specific times on

 9    August 4th when the password was provided; correct?

10    A.    No, it does not.

11          MR. DURHAM:  Court's indulgence?

12          THE COURT:  Yes.

13          MR. DURHAM:  Pass the witness, Your Honor.

14          THE COURT:  Redirect?

15          MS. CARTIER-GIROUX:  Yes.  Very briefly.

16                    REDIRECT EXAMINATION

17    BY MS. CARTIER-GIROUX:

18    Q.    Now, you were just asked whether certain items were

19    in your report or not in your report.  The information with

20    regard specifically to when he became -- lars45 became your

21    friend and him -- the time and date of him giving you the

22    password, is that contained in the video capture that is

23    Exhibit 2A?

24    A.    Yes.  The -- the document -- this 302, the reason

25    it's not in there is because this document is a reference

TRANSCRIBED FROM DIGITAL RECORDING

1      strictly to that date and time in that section.

2      Q.    Okay.

3      A.    So I didn't preface it with that.  None of that goes

4      in there.  Just the way that this one is structured.

5      That's why we do the video capture, correct.

6      Q.    And you -- you were asked the question about the

7      date modified for the March 21st, 2015, date.  And you

8      indicated on cross-examination that it could have been the

9      date that lars45 was created; correct?

10     A.    Yeah.  Well, maybe not the date that lars45 was

11     created, but it was the date that the user -- it could have

12     been, okay?  I can't say this positively.  But it could

13     have been the date that the user lars45 designated those

14     files to be shared on GigaTribe.

15     Q.    Okay.  So it could have been a date where a folder

16     was created, and those files are moved into the folder;

17     correct?

18     A.    Yes.

19     Q.    Or it could have been a date where that folder

20     became viewable to you?

21     A.    Yes.

22            MS. CARTIER-GIROUX:  Okay.  Thank you.

23            THE COURT:  Any more cross?

24            MR. DURHAM:  No, Your Honor.

25            THE COURT:  All right.  So it's 11:34.

TRANSCRIBED FROM DIGITAL RECORDING

1          We'll go ahead and let Mr. Ahmed step down.  And
2     we don't -- do we expect to have to recall him?  Is he free
3     to go?
4          MS. CARTIER-GIROUX:  No, Your Honor.  He can be
5     released.
6          THE COURT:  All right.  We'll go ahead and
7     release you.  Take with you what you brought, and leave the
8     exhibits we have to keep.
9          THE WITNESS:  Oh, yeah.  I'm just closing this
10    up.
11         THE COURT:  All right.  Thank you.
12         And please be careful on the way down with the
13    steps and wires.
14         (The witness was excused.)
15         THE COURT:  Do you want to get started,
16    Ms. Roohani?  We have a couple, maybe just 20 minutes left.
17         MS. ROOHANI:  We can get started and then
18    continue after lunch.
19         THE COURT:  All right.  Let's do that.  Let's
20    call the next witness, please.
21         MS. ROOHANI:  The United States calls Sue
22    Flaherty.
23         COURTROOM ADMINISTRATOR:  Please raise your
24    right hand.
25         You do solemnly swear that the testimony you

```
 1   shall give in the cause now before the Court shall be the
 2   truth, the whole truth, and nothing but the truth, so help
 3   you God?
 4              THE WITNESS:  Yes, sir, I do.
 5              COURTROOM ADMINISTRATOR:  Thank you.  You may be
 6   seated.
 7              THE WITNESS:  Thank you.
 8              COURTROOM ADMINISTRATOR:  Please state and spell
 9   your full name for the record.
10              THE WITNESS:  Sue Flaherty.  Last name
11   F-l-a-h-e-r-t-y.
12                          SUE FLAHERTY
13            called as a witness on behalf of the
14        Government, was examined and testified as follows:
15                        DIRECT EXAMINATION
16   BY MS. ROOHANI:
17   Q.    Ms. Flaherty, who is your employer?
18   A.    I'm a special agent with the FBI here in Las Vegas.
19   Q.    And how long have you been a special agent with the
20   FBI?
21   A.    A little over 20 years.
22   Q.    What are your current duties and responsibilities?
23   A.    I'm assigned to the Child Exploitation Task Force.
24   Q.    And what are the responsibilities of that task
25   force?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    We investigate primarily Internet crimes against

2    children, child exploitative matters.

3    Q.    Were you involved in the investigation of the

4    defendant, Jan Rouven Fuechtener?

5    A.    Yes, I was.

6    Q.    Okay.  And on what date did you become involved?

7    A.    It was roughly mid January of last year.

8    Q.    And what was happening on that date?

9    A.    We have received information of an individual that

10   was utilizing GigaTribe and was sharing files depicting

11   child pornography.

12   Q.    And did you or a member of your team obtain a search

13   warrant?

14   A.    Yes.

15   Q.    And did your involvement begin on the day of the

16   execution of the search warrant?

17   A.    Yes.  On January 23rd of 2015 our task force

18   executed a search warrant.

19   Q.    Okay.  What were your duties on the day of the

20   execution of the search warrant?

21   A.    I was assigned as a search team leader.

22   Q.    And what does that mean?

23   A.    The search team leader ensures that search protocols

24   are adhered to, evidence is tagged and recovered,

25   photographed, documented, and a property receipt -- that

TRANSCRIBED FROM DIGITAL RECORDING

1    search procedures are followed.

2    Q.    And does that sometimes include previewing certain

3    devices on scene?

4    A.    Yes, it will.

5    Q.    Okay.  When you make entry into the house, what is

6    the typical entry search protocol as it relates to

7    photographing the scene?

8    A.    After -- after the residence is secured, we do

9    what's called entry photos.  Our photographer will

10   photograph room by room.  Each room is identified with a

11   letter or a number identifying the location of that room

12   within the residence.

13        The photographs are logged into a photo log to

14   represent what photo number was -- and what was

15   photographed in that number.

16   Q.    And where are you when the person is taking

17   photographs?

18   A.    On that particular day, I walked through the

19   residence with the photographer and the individual doing

20   the photo log.

21   Q.    Okay.  And when you were able to walk through the

22   residence, were you able to view each room as it existed

23   that day?

24   A.    Yes, I was.

25   Q.    Okay.  Were you able to see the layout of the house?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes, I was.

2    Q.    In total how many devices and items were collected

3    that day?

4    A.    On that day, there were 37 items that were

5    categorized on the evidence recovery log.

6    Q.    Okay.  Go ahead and open up that big binder in front

7    of you to Exhibits 3A, 3B, 3C, and 3D.  Take a look at

8    those.

9            COURTROOM ADMINISTRATOR:  What were those

10   exhibit numbers?

11           MS. ROOHANI:  3A, 3B, 3C, and 3D.  They're all

12   under tab 3.

13           THE WITNESS:  Okay.

14   BY MS. ROOHANI:

15   Q.    Do you recognize those?

16   A.    Yes, I do.

17   Q.    What are they?

18   A.    3A is a sketch of the -- what was identified as a

19   casita, a small dwelling to the rear of the residence.

20   Q.    Okay.  What is 3B?

21   A.    3B is the sketch of the first floor of the main

22   house of the target residence.

23   Q.    What is 3C?

24   A.    And 3C is the second floor of the main house.

25   Q.    Okay.  What is 3D?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    And 3D is a diagram, sketch diagram of the layout of

2   where the main house was in proximity to the garage and a

3   front office area.

4   Q.    Okay.  Are these diagrams a fair and accurate

5   depiction of the layout of the defendant's residence the

6   day the search warrant was executed?

7   A.    Yes, they are.

8   Q.    And are these the same as these demonstrative

9   exhibits that we have here?

10          Let me ask you this.  Have you seen these

11  demonstrative exhibits before?

12  A.    Yes, I have.

13  Q.    Where have you seen them?

14  A.    I've seen them in your office.

15  Q.    Okay.  And they are the same as -- they're just

16  blown-up copies of 3A, 3B, 3C, and 3D; is that correct?

17  A.    Yes, they are.

18          MS. ROOHANI:  Your Honor, I would move to admit

19  these as exhibits.

20          THE COURT:  So you're moving to admit exhibits

21  3A through D, but not the blown-up demonstrative?

22          MS. ROOHANI:  Also 3A through D only because I'm

23  going to later have her mark on the -- those exhibits.

24          So if the defense would like to take a look at

25  these, I can represent that they're direct copies of --

─ TRANSCRIBED FROM DIGITAL RECORDING ─

```
 1              THE COURT:  Okay.  Any objection, Mr. Marchese?

 2              MR. MARCHESE:  No, Your Honor.

 3              And in the future I would ask that before

 4   exhibits are published that they be admitted into evidence.

 5              But no objection as to these exhibits.

 6              THE COURT:  All right.

 7          (Government's Exhibits 3A, 3B, 3C, 3D

 8          received.)

 9   BY MS. ROOHANI:

10   Q.    Special Agent Flaherty, as part of your duties as

11   evidence custodian, did you fill out a receipt of a

12   property log?

13   A.    Yes.  That was being filled out as evidence was

14   being seized.

15   Q.    And -- go ahead.

16   A.    Oh, at the end of -- or the conclusion of the

17   search, the copy -- a copy, a signed copy is left at the

18   residence, along with a copy of the search warrant.

19   Q.    And does that typically include what piece of

20   evidence was found where?

21   A.    It will include -- the properties received includes

22   what evidence is being seized from the residence.  The

23   evidence recovery log details out where the evidence was

24   recovered.

25   Q.    And were you in charge of reviewing the logs to the
```

TRANSCRIBED FROM DIGITAL RECORDING

1    extent that others filled them out that day?

2    A.    Yes, I was.

3    Q.    And when you reviewed them, did you double check

4    their work?

5    A.    Yes, I did.

6    Q.    Were those logs fair and accurate representations of

7    the evidence as it was collected that day?

8    A.    Yes, it was.

9    Q.    Okay.  You said that you made sure that the evidence

10   was photographed.  While the photos were being taken, are

11   you just reviewing the work of the person taking the photo

12   and the person making the log?

13   A.    As -- as the entry photos were being taken, I was

14   with the photographer.  After the search is initiated, I am

15   there as evidence is being collected.

16          Standard procedures is that the photographer

17   photographs evidence in place.

18   Q.    And those entry photographs that were taken and then

19   the -- based upon -- let me rephrase that.

20          The entry photographs that were taken, were

21   those fair -- did you review those photos later on?

22   A.    Yes, I did.

23   Q.    And were those fair and accurate depictions of the

24   residence as you made entry?

25   A.    Yes.  Our procedure for entry photographs, as we go

TRANSCRIBED FROM DIGITAL RECORDING

1    through, I label the rooms with numbers or letters, the
2    photographer then photographs the room as it is, as we made
3    entry.
4    Q.    Okay.  And then when the -- when you're doing that
5    initial entry into the house, are you also noticing where
6    certain devices might be?
7    A.    Yes.  If they're obvious in the room, I will take
8    note of them.
9    Q.    Okay.  And so when you later on reviewed photos of
10   devices in place, were those also fair and accurate
11   depictions as you saw them when you made entry into the
12   house?
13   A.    Yes, they were.
14   Q.    Okay.  At some point in the investigation, is each
15   device collected assigned an evidence number?
16   A.    Yes.  As the evidence is placed into our evidence
17   vault, it's assigned a specific number that documents what
18   that item is to the degree of serial number and model
19   numbers.
20   Q.    Okay.  I would like for you to give us the tour of
21   this house using Exhibits 3A, 3B, 3C, and 3D.
22         So I think you mentioned that 3D was the entry
23   area?
24   A.    Yes.
25   Q.    So can you -- and I see that they're also numbered

TRANSCRIBED FROM DIGITAL RECORDING

1   with certain letters.

2   A.    So start with 3D?

3   Q.    Yes.

4   A.    Okay.

5   Q.    And if you could also indicate -- if you're

6   referring to a room, if you could indicate the letters that

7   you're being -- referring to as well, that would be

8   helpful.

9   A.    Sure.  So Exhibit 3D is a diagram that designates

10  where the main house is, a courtyard, and a garage, and

11  then an office area.

12          So upon entry from the street, off to the left

13  would be the garage area identified as AV, as in Victor.

14          Off to the right was a front office area

15  identified as AW.

16          Within the office area is a bathroom and a

17  closet area identified as AY and AX.

18          Continuing on through the courtyard --

19          THE COURT:  Well, which way is the street?  I'm

20  sorry.

21          THE WITNESS:  Okay.  The street is to the bottom

22  of the diagram.

23          THE COURT:  Okay.

24          THE WITNESS:  So the bottom of the diagram is

25  where you would make entry into the outer perimeter of the

-- TRANSCRIBED FROM DIGITAL RECORDING --

1    residence.

2              Then, as I mentioned, off to the right was the

3    garage area.

4              And then off to the left was, like, a front

5    office area.

6              THE COURT:  Okay.

7              THE WITNESS:  Then the courtyard, if you

8    continue on straight up through the courtyard, it's the

9    front door of the residence.

10             And then in the diagram, it's depicted where the

11   main house is.

12             THE COURT:  Okay.

13   BY MS. ROOHANI:

14   Q.    I think you mentioned that 3B is the first floor of

15   the main residence.  So can you -- let's go there and

16   continue the tour.

17   A.    Yes.  3B is a diagram of the first floor of the main

18   house.

19             Starting at the bottom of the diagram is where

20   the front entryway into the house is.

21             There's closet spaces off to the right and left

22   identified as AD, AA, and AC.

23             Continuing on into the main house, off to the

24   right is, like, a formal dining room area.  It's a large

25   open room identified as AB.

TRANSCRIBED FROM DIGITAL RECORDING

1           Off to the left is a spiral-type staircase

2      leading up to the second floor.

3           Continuing on straight into the house is, like,

4      a formal living room area identified as AE.

5           Off to the left is a bedroom identified as AF.

6           Within that bedroom is a bathroom, AG.

7           Continuing on from around, down on the diagram,

8      is a second bedroom identified as AH.

9           From the formal dining room area off to the

10     right, you continue on into a kitchen area.  Well, a

11     hallway leading in the pantry.

12          The hallway is AJ.

13          The pantry is AK.

14          Then the kitchen area is AL.

15          Within the kitchen area, there's several kitchen

16     islands.

17          Straight on is an informal dining area

18     identified as AN.

19          Off to the right of that is a bar-type area

20     identified as AM.

21          Immediately to the right of the bar area is a

22     door that leads out to the back patio area.

23          Down from the patio door is an informal living

24     room area identified as AO.

25          Continuing on around, it's a hallway identified

TRANSCRIBED FROM DIGITAL RECORDING

1  as AT.

2              There's a secondary staircase that leads up to

3  the second floor to the right of the hall.

4              THE COURT:  Wait.  I can't see AO.  Oh, I

5  thought AO was the kitchen.

6              THE WITNESS:  AO is, like, an informal living

7  room area.

8              AL is the kitchen area.

9              THE COURT:  Oh, okay.  Thank you.

10             THE WITNESS:  Sure.  From the hallway identified

11 as AT, to the right is a laundry room area identified as

12 AR.

13             And there's additional closets within that

14 laundry area.

15             Then straight on down the hallway is a door

16 leading into the garage area, which is identified as AU.

17 BY MS. ROOHANI:

18 Q.   Okay.  So that's the end of the first floor.

19             The second floor is Exhibit 3C.

20 A.   Yes.  Exhibit 3C is a sketch of the second floor of

21 the main house.  In the center of the sketch there's where

22 the winding staircase leads up to the second floor.

23             As you continue around -- when you reach the

24 second floor, there's a closet space off to the right, AZ.

25             You continue on around.  And then there's a

TRANSCRIBED FROM DIGITAL RECORDING

1    doorway to the master bedroom, which is identified as A1.

2                To the left of the master bedroom here's a hall

3    that leads to a study, a study-type area identified as A2.

4                From the study area there's another hallway that

5    goes down to where there's a bathroom A4 to the right.

6                And then A3 is the hallway that leads to a

7    closet area identified as A5, and then a workout room

8    identified as A6.

9                Exiting the master bedroom, if you continue on

10   to the right down that hallway, there's a closet on the

11   left that's identified as A8.

12                And then to the right is another bedroom

13   identified as A9.

14                Within that bedroom is a -- two closet spaces,

15   A10 -- or, I'm sorry, one closet space, A10, and a

16   bathroom, A11.

17                Exiting that spare bedroom is a hallway where

18   you can go left or right.  If you go right, to the top of

19   the diagram is another spare bedroom identified as A12, a

20   bathroom area within that, and a closet within that spare

21   bedroom.

22                Exiting that bedroom coming out to the left is

23   an office-type space identified as A15.  Within that office

24   is a closet, A17, and then another bathroom area, A16.

25                Exiting out of that office space is where

TRANSCRIBED FROM DIGITAL RECORDING

1    there's a secondary staircase leading to the second floor.

2              Just beyond that staircase is another office

3    area identified as A18 and a closet space within that

4    identified as A20.

5              Exiting that office space and to the bottom of

6    the diagram is another office space identified as A21.

7    Both of those, A18 and A21, have separate bathrooms within

8    them.

9    Q.    Special Agent Flaherty, just to be clear, when you

10   say "spare bedroom," what caused you to believe that that

11   was used in the bedroom?

12   A.    The two rooms, A9 and A12, identified as bedrooms,

13   have beds in them.  They appeared to be set up as a spare

14   bedroom type space.

15   Q.    And do you say that there's spare bedrooms because

16   they don't indicate that a person might be living there at

17   that particular time?

18   A.    I'm sorry?

19   Q.    When you say that they're spare bedroom, what caused

20   you to believe that it was spare and it was not being lived

21   in at that time?

22   A.    There were clothing items within the spare bedrooms,

23   but they didn't have enormous amount of clothing items.  It

24   wasn't a lived-in-type bedroom.

25   Q.    And when you said there's an office space, what

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   caused you to believe that it was an office space?
 2   A.    The three rooms identified as office spaces, A15,
 3   A18, and A21, all three of those rooms had desks, chairs,
 4   computers.  There were no beds or dressers in those
 5   bedrooms.
 6   Q.    Okay.  Let's continue to the --
 7            THE COURT:  Well, it's actually 11:53 -- now
 8   it's 11:54.  So we're going to go ahead and take our break
 9   so that Mr. Durham can make his meeting.
10            What time do you want to be back?
11            Mr. Durham, would this be your witness to
12   cross-examine?
13            MR. DURHAM:  No, Your Honor.
14            THE COURT:  So is it okay if we come back and
15   start up again at 1:10?
16            MR. MARCHESE:  I'll leave it up to the Court's
17   pleasure.
18            THE COURT:  I don't want to handicap you.  So
19   it's up to you.  If you want, we can wait until 2:00.
20            MR. SANFT:  Your Honor, the only issue is that
21   we don't know what the government's next witness will be
22   after Ms. Flaherty; so based upon that, it may be somebody
23   that Mr. Durham is assigned to cross-examine.  So if we
24   know that information --
25            THE COURT:  So, Ms. Roohani, who did you plan to
```

TRANSCRIBED FROM DIGITAL RECORDING

1    call after Ms. Flaherty?

2              MR. MARCHESE:  Can we just do 1:45, Your Honor?

3    If Mr. Durham isn't back by that time, we can begin.

4              THE COURT:  Okay.

5              MS. ROOHANI:  It will be Al Giangregorio of

6    Homeland Security Investigations.

7              THE COURT:  All right.  So 1:45?

8              MR. MARCHESE:  Please.

9              THE COURT:  All right.  We'll be back here at

10   1:45.

11             You're still under oath.  But you can go have

12   lunch and stretch and go to the bathroom.  Just don't talk

13   to anyone about your testimony.

14             THE WITNESS:  Thank you.

15             THE COURT:  You're welcome.  Thank you.

16        (The noon recess was taken at 11:54 p.m.)

17                        *    *    *

18

19

20

21

22

23

24

25

```
                       TRANSCRIBED FROM DIGITAL RECORDING
```

 1              LAS VEGAS, NEVADA, NOVEMBER 14, 2016, 1:51 P.M.

 2                                 --oOo--

 3

 4              COURTROOM ADMINISTRATOR:  All rise.

 5              THE COURT:  Thank you.  You may be seated.

 6              COURTROOM ADMINISTRATOR:  This is the time for

 7     the continuation of the bench trial in Case No.

 8     2:16-cr-100-GMN-CWH, United States of America versus Jan

 9     Rouven Fuechtener.

10              Counsel, please enter your appearance for the

11     record.

12              MS. ROOHANI:  Good afternoon, Your Honor.  Ellie

13     Roohani and Lisa Cartier-Giroux for the United States,

14     joined by Special Agent Mari Panovich, our case agent.

15              THE COURT:  Good afternoon.

16              MR. MARCHESE:  Good afternoon, Your Honor.  Jess

17     Marchese, Benjamin Durham, Michael Sanft for the defendant,

18     Jan Rouven Fuechtener.

19              THE COURT:  All right.  And good afternoon.

20     Looks like everyone is back on time.  Thank you.

21              Let's go ahead and have Ms. Flaherty resume.  Is

22     that --

23              MS. ROOHANI:  Your Honor?

24              THE COURT:  Did you want to take someone else?

25              MS. ROOHANI:  No.  We just have one point to

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   bring up with the Court before we call Special Agent
 2   Flaherty back.
 3             THE COURT:  Oh, okay.
 4             MS. ROOHANI:  Judge, I just want to clarify, and
 5   I have already talked to Mr. Marchese about it.  We
 6   received our exhibits today.
 7             There is one exhibit where we just have a sticky
 8   tab in it, which is Exhibit No. 31.  It just says "DB
 9   folder."
10             Mr. Marchese has indicated that he had e-mailed
11   it to us, but we have not received it.  I don't know if the
12   file is too large.  But we still don't have that item.
13             Additionally I asked him, and I believe that
14   Mr. Durham was going to give it to us, Exhibit No. 36
15   appears to be Skype chats.  There are over 3,000 Skype
16   chats.
17             These are not legible.  So I -- even if I wanted
18   to look through the 3,000 of them, which I don't, I
19   wouldn't be able to find it because I can't read them.
20             If he would provide me, and I think he will,
21   with the Bates stamp numbers, since they would be from our
22   discovery, that would help us greatly and avoid wasting
23   time later on.
24             THE COURT:  Okay.
25             MS. ROOHANI:  Same difference with the --
```

TRANSCRIBED FROM DIGITAL RECORDING

1    there's some GigaTribe chats -- Grindr chats.  We received

2    a cert form from Grindr.

3             I obviously do not have any objection if those

4    chats fell within the cert form.  I just need to be

5    directed where in the discovery those chats are so I can

6    verify that they are, in fact, covered by the cert form.

7             THE COURT:  Okay.  So as to the exhibit that's

8    called "DB folder"?

9             MR. MARCHESE:  Yes.  It's the Dropbox folder,

10   Your Honor.  I sent it on November 7th to them.  It's a

11   large file.  I put it on a PDF.  It's about 90 or so pages.

12   I sent it to the government on the 7th.

13            It didn't come back to me.  They were asking me

14   about it.  Once again at lunch today, I did the same thing.

15   They're saying they have not received it.

16            So my guess is I'm probably going to have to

17   break it up and send it to them.  So that was the issue

18   there.

19            THE COURT:  Okay.

20            MR. MARCHESE:  So we'll get it to them.  It's in

21   their possession too.  It's also on the devices, I can

22   represent to the Court.

23            But, regardless, so they don't have to go back

24   and search through the 38 or so devices, I'll just get it

25   to them, and there won't be an issue.  And then we'll get

TRANSCRIBED FROM DIGITAL RECORDING

1    them the Bates numbers.  It's not a problem.

2            The only reason the format they gave us the

3    Skype chats in, she's a hundred percent correct, it's very

4    difficult to read; so what Mr. Durham did was he expanded

5    it slightly; but when he expanded it, the Bates numbers

6    went off the page.

7            So in trying to make it easier, he actually made

8    it more difficult.  But we'll get them the range numbers of

9    the chats, and hopefully that will allay any concerns they

10   have.

11           THE COURT:  Okay.  And can you do that before we

12   start again tomorrow?

13           MR. MARCHESE:  Yes.

14           THE COURT:  Okay.  Thank you.

15           MS. ROOHANI:  Thank you.

16           THE COURT:  All right.  So shall we have

17   Ms. Flaherty come back in?

18           MS. ROOHANI:  Yes, Your Honor.  Thank you.

19           THE COURT:  Good afternoon, Special Agent

20   Flaherty.  Come on up.  Be careful.  They reset up the

21   demonstrative pictures there.

22           THE WITNESS:  Thank you.

23   BY MS. ROOHANI:

24   Q.    Special Agent Flaherty, before we left off, we were

25   on Government's Trial Exhibit 3B.  I just wanted to make

1    sure that we had finished and you had identified everything

2    that was on this before we move on to the next one.

3            It's under tab 3 -- 3B is -- I believe it was

4    the -- no, I lied.  3C, which is the second floor.

5    A.    Okay.  And, no, I -- my apologies.  There was a

6    section off of the master bedroom that I did not cover.

7    Q.    Okay.  Go ahead.

8    A.    So off of room A1, the master bedroom, there is a

9    hallway to the right.  It was kind of an arch hallway,

10   small hallway.  But it leads back into two closet areas;

11   one labeled A15, and the other one labeled A26.

12           And then down from that -- or that hallway leads

13   to a bathroom area.

14   Q.    Is that A15 or A25, just to be clear?

15   A.    Oh, I'm sorry.  The smaller closet's A25, and the

16   larger closet's A26.

17   Q.    And A24 is what?

18   A.    A24 is the bathroom area.

19   Q.    Okay.  Anything else on 3C that we haven't

20   discussed?  Because I just want to be sure that that's

21   complete.  I think we've got all of it.

22   A.    No, I believe that's it.

23   Q.    Okay.  Let's move on to Exhibit 3A, which you

24   indicated is, I believe, the backyard casita area.

25           Can you walk us through what this is, and then

TRANSCRIBED FROM DIGITAL RECORDING

1    also how will we get to this point from where -- what

2    you've already described?

3    A.    Okay.  From the first floor of the main house, I

4    indicated there was a door off of the bar/kitchen area,

5    that led to a back patio.  In the backyard, there was a

6    large swimming pool.  And just behind the swimming pool was

7    a casita, which is diagramed in Exhibit 3A.

8    Q.    Okay.  Can you walk us through that, please.

9    A.    Yes.  So the entryway into the casita is off to the

10   left at the bottom of the diagram.

11        Upon entering the casita, it's a large open room

12   identified as BA.

13        As you enter into the large room, to the left is

14   a kitchen area identified as BB.  There's an island in the

15   kitchen identified as the number 3.

16        Then proceeding up on the diagram is an open

17   dining room area.  There was a dining room table in the

18   center of that room.

19        Also as you enter into room BA, to the left side

20   and to the top of the diagram was a bed, two nightstands.

21   The bed's identified, I believe, as number 4.  Two

22   nightstands to the top of the bed.  And then there were two

23   tables to the foot of the bed.

24        Just down from the bed was a couch, an end

25   table, another couch, some chairs.  Off to the far right of

TRANSCRIBED FROM DIGITAL RECORDING

```
1    the room was a closet identified as BC.  And then a

2    bathroom area just down from the closet area identified as

3    BD and BE.

4            Also in the large room identified as BA, to the

5    far right side, the bottom part of the diagram, was a

6    smaller bed.

7    Q.   Okay.  You identified on -- in the BA area, you said

8    that it was -- there was a bed and it's marked with the

9    number 4.  I don't see the number 4.  So can you clarify --

10   maybe you misspoke, or maybe I'm just not seeing it.

11   A.   It was -- the bed itself, on the far end, it's kind

12   of -- it's a small number.  It's just -- it was a numeric

13   identification for the larger bed in the room.

14   Q.   Okay.  Okay.  Now I'm going to show you -- I'm going

15   to have you take a look at -- take a look at Government's

16   Exhibits 4A and 4B.  And tell me if you recognize those

17   photos.

18   A.   Yes, I do.

19   Q.   What are they photos of?

20   A.   They're photographs of an Apple laptop that was on

21   the larger bed inside the casita.

22   Q.   And 4B?

23   A.   4B is the screen saver, or the log-on screen of that

24   laptop.

25   Q.   What was the -- are they a fair and accurate
```

TRANSCRIBED FROM DIGITAL RECORDING

1    depiction of that device as it appeared the day of the

2    execution of the search warrant?

3    A.    Yes, they are.

4    Q.    And what evidence ID numbers were those assigned?

5    A.    Those were entered into evidence and assigned -- 1B1

6    was the Apple laptop.

7    Q.    Okay.  And was there another device that is perhaps

8    not pictured also in that device?

9    A.    Yes, as we were logging in evidence, there was an SD

10   card that was inside the laptop.  It was entered into

11   evidence as 1B2.

12   Q.    Okay.

13         MS. ROOHANI:  Your Honor, I would move to admit

14   Government's Exhibits 4A and 4B into evidence.

15         THE COURT:  Any objection?

16         MR. MARCHESE:  No, Your Honor.

17         THE COURT:  All right.  So 4A will be admitted.

18         (Government's Exhibit 4A received.)

19   BY MS. ROOHANI:

20   Q.    Special Agent Flaherty, where were these two devices

21   found?

22         And if you need to refer back to the three

23   exhibits, let us know.

24   A.    They were located on top of the large bed that was

25   inside the casita in room BA.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  So I'm going to ask you to mark that on the

2    demonstrative.

3    A.    Sure.

4            THE COURT:  Just to be clear, the question was

5    4A and 4B, right, for admission?

6            MS. ROOHANI:  Yes.

7            THE COURT:  You moved for both?

8            MS. ROOHANI:  Yes, 4A and 4B, yes, Your Honor.

9            THE COURT:  And no objection from the defense;

10   is that right?

11           MR. MARCHESE:  No, Your Honor.

12           THE COURT:  All right.  So I apologize.  I only

13   actually admitted 4A, not 4A and 4B.

14           So I'll admit both.  Thank you.

15           MS. ROOHANI:  Okay.  Thank you.

16        (Government's Exhibit 4B received.)

17   BY MS. ROOHANI:

18   Q.    All right.  Go ahead and take a look at Government's

19   Exhibit 5A, 5B, and 5C.

20           And do you recognize those photos?

21   A.    Yes, I do.

22   Q.    What are they photos of?

23   A.    Exhibit 5A is -- was an entry photo that was taken

24   upon entering the casita towards the right top side of the

25   room.

DONNA DAVIDSON - (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what is 5B?

2    A.    5B is an Apple -- it was an All-in-One computer that

3    was on one of the tables at the foot of the large bed

4    inside the casita.

5    Q.    And what is 5C?

6    A.    And 5C is the log-on screen of the Apple All-in-One

7    computer.

8    Q.    Are these photos fair and accurate depictions of

9    these devices as they were found on the day of execution of

10   the search warrant?

11   A.    Yes, they are.

12   Q.    And was this particular Apple All-in-One device

13   pictured in 5B, was that assigned an evidence number?

14   A.    Yes, the apple All-in-One was assigned 1B3.

15   Q.    Okay.

16        MS. ROOHANI:  Your Honor, I would move to admit

17   Exhibits 5A, 5B, and 5C into evidence.

18        THE COURT:  5A, B, and C, any objection?

19        MR. MARCHESE:  No, Your Honor.

20        THE COURT:  All right.  That will be admitted.

21        (Government's Exhibits 5A, 5B, 5C received.)

22   BY MS. ROOHANI:

23   Q.    And, Special Agent Flaherty, can I ask you to please

24   mark on the demonstrative where this particular device was

25   found.

TRANSCRIBED FROM DIGITAL RECORDING

1        Special Agent Flaherty, please take a look at

2   Government's Exhibit 6A and 6B.

3        Do you recognize these photos?

4   A.   Yes, I do.

5   Q.   What are they photos of?

6   A.   Exhibit 6A depicts -- I indicated off of the

7   kitchen, the bar area, there was a door to the back patio.

8   This is the back patio.  You can see the door in the center

9   of the photograph.

10  Q.   And what is 6B?

11  A.   6B was an external -- or it was a router and

12  external hard drive that was on the back patio.

13  Q.   Are these photos a fair and accurate depiction of

14  that device as it was found on the day of the search

15  warrant?

16  A.   Yes, they are.

17  Q.   And what was the evidence number that was assigned

18  to the external hard drive?

19  A.   The external hard drive was assigned 1B7.

20       MS. ROOHANI:  Your Honor, I would move to admit

21  Government's Exhibit 6A and 6B.

22       THE COURT:  Any objection to 6A and B?

23       MR. MARCHESE:  No, Your Honor.

24       THE COURT:  They will be admitted.

25       (Government's Exhibits 6A and 6B received.)

TRANSCRIBED FROM DIGITAL RECORDING

1   BY MS. ROOHANI:

2   Q.    And, Special Agent Flaherty, can you please mark on

3   the demonstrative where 6A -- or 1B7 was found.

4            I'm going to have you take a look at

5   Government's Exhibit 6C.  Do you recognize this photo?

6   A.    Yes, I do.

7   Q.    What is it a photo of?

8   A.    So, off of the patio door, inside by the kitchen,

9   adjacent to the kitchen, was a bar area.  This depicts that

10  bar area.

11  Q.    And was there a device depicted in this particular

12  photo?

13  A.    There is a device in this photo.  It's difficult to

14  see.  There was an Apple laptop that was recovered from

15  this area.

16  Q.    Could you -- could you explain generally where that

17  might be?

18  A.    Yes.  So on our evidence recovery log, we document

19  not only what was recovered, what rooms it was recovered,

20  but where within that room it was recovered.  And it was

21  recovered from the -- by the sink area on the island.

22  Q.    Okay.  And is this a fair and accurate depiction of

23  this area of the house on the day of the execution of the

24  search warrant?

25  A.    Yes, it is.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Is it also a fair and accurate depiction of where

2    that device was found?

3    A.    Yes.

4    Q.    And did you tell me what the device number

5    associated with that was?

6    A.    It was assigned 1B16.

7    Q.    Okay.

8          MS. ROOHANI:  Your Honor, I'd move to admit

9    Government's Exhibit 6C.

10         THE COURT:  Any objection?

11         MR. MARCHESE:  No objection.

12         THE COURT:  It will be admitted.

13         (Government's Exhibit 6C received.)

14         MS. ROOHANI:  Okay.  Your Honor, and I would ask

15   that that be published just so Special Agent Flaherty can

16   circle for the Court where that particular device was

17   found.  Maybe.  Okay.

18         THE WITNESS:  So you're in the center island

19   area --

20         MS. ROOHANI:  Aaron, could you show her how to

21   do the circle thing.

22         COURTROOM ADMINISTRATOR:  (Inaudible).

23         THE WITNESS:  Oh, okay.

24   BY MS. ROOHANI:

25   Q.    Go ahead and circle where it was found in that area.

TRANSCRIBED FROM DIGITAL RECORDING

1    Okay.

2              And, Special Agent Flaherty, can you also mark

3    on the demonstrative what area of the house this is?

4              Thank you, Aaron.

5              Please take a look at Government's Exhibits 7A

6    and 7B.

7              Do you recognize these photos?

8    A.    Yes, I do.

9    Q.    What are they photos of?

10   A.    These are photos of room A18, one of the upstairs

11   office -- Exhibit 7A is as you enter the office from the

12   hallway, and then Exhibit 7B was an Apple laptop computer

13   that was on the floor as you made entry into the office.

14   Q.    Are they fair and accurate depictions of the room

15   and the device as they were found the day of the execution

16   of the search warrant?

17   A.    Yes, they are.

18              MS. ROOHANI:  Your Honor, I'd move to admit

19   Government's Exhibits 7A and 7B.

20              THE COURT:  Any objection to 7A and B?

21              MR. MARCHESE:  No, Your Honor.

22              THE COURT:  They will be admitted.

23         (Government's Exhibits 7A and 7B received.)

24   BY MS. ROOHANI:

25   Q.    Special Agent Flaherty, what is -- the device that

-------------------------TRANSCRIBED FROM DIGITAL RECORDING------------------------

```
 1   is depicted in 7B, what is the evidence number that was
 2   associated with that?
 3   A.    It was assigned 1B13.
 4   Q.    Okay.  And can you mark on the demonstrative where
 5   this is in the house?
 6   A.    Yes.
 7   Q.    I bet you didn't think you were going to get a
 8   workout today.  Sorry about that.
 9           Please take a look at Government's Exhibits 8A
10   and 8B.
11           Do you recognize these photos?
12   A.    Yes, I do.
13   Q.    What are they photos of?
14   A.    They're also of room A18, one of the offices
15   upstairs.  Exhibit 8A is, as you enter from the hallway,
16   the main part of the office area.  And then Exhibit 8B
17   depicts the desk that was to the far left side of the
18   office area.
19   Q.    Are there any devices depicted in this particular
20   photo, 8B?
21   A.    Yes.  Next to -- I'm sorry, it was to the far right
22   side of the office area.  8B there was a Gateway computer
23   that was on the floor by the desk area.
24   Q.    And what was the evidence number assigned to that
25   device?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    That was 1B30.

2    Q.    And was there any other devices found in this room?

3    A.    Yes.  There was an external hard drive that was

4    found on the top of the desk behind the monitor.

5    Q.    Okay.  And what was the device number associated

6    with that?

7    A.    That was 1B21.

8    Q.    Are these photos a fair and accurate depiction of

9    both the rooms and the devices as you saw them the day of

10   the execution of the search warrant?

11   A.    Yes, they are.

12           MS. ROOHANI:  Your Honor, I'd move to admit

13   Government's Exhibits 8A and 8B.

14           THE COURT:  Any objection?

15           MR. MARCHESE:  No, Your Honor.

16           THE COURT:  They'll be admitted.

17        (Government's Exhibits 8A and 8B received.)

18           MS. ROOHANI:  I would ask that Government

19   Exhibit 8B be published so Special Agent Flaherty can

20   indicate where the devices are.

21   BY MS. ROOHANI:

22   Q.    And same as before, can you mark where 8 -- 1B21 is

23   in that photo.

24           And so what color is that device?

25   A.    It was a white external hard drive.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And then where is 1B30?

2          Okay.  And I would ask that you mark on the

3    demonstrative where those two devices are found.

4          And so just to be clear, 1B13, 1B21, and 1B30

5    were all found in the same room?

6    A.    Yes, they were.

7    Q.    Take a look at Government's Exhibit 9A, 9B, and 9C.

8          Do you recognize these photos?

9    A.    Yes, I do.

10   Q.    What are they photos of?

11   A.    These photos were taken inside the larger closet

12   identified as room A26 off the master bedroom.

13   Q.    And is there any devices depicted in these photos?

14   A.    Yes.  In Exhibit 9C, on top of the counter or

15   dresser that was inside the closet, there was a large gold

16   box.  This depicts the gold box.

17         Inside the gold box is a blue and white USB

18   drive.

19   Q.    And what evidence number was assigned to that USB

20   drive?

21   A.    It was assigned 1B37.

22   Q.    Is this a fair and accurate depiction of both that

23   large closet as well as the device as it appeared on the

24   day of the execution of the search warrant?

25   A.    Yes, it is.

1        MS. ROOHANI:  Your Honor, I would move to admit

2   Government's Exhibits 9A, 9B, and 9C.

3        THE COURT:  Any objection?

4        MR. MARCHESE:  No, Your Honor.

5        THE COURT:  All right.  Thank you.  It will be

6   admitted.

7        (Government's Exhibits 9A, 9B, 9C received.)

8        MS. ROOHANI:  And I would ask that we publish

9   9C, just so Special Agent Flaherty can identify the device.

10       Can you circle -- wait.  When it comes up.  Can

11   you circle for us the device, please.

12       And I would ask that you mark on the

13   demonstrative where 1B37 was found.

14       A moment's indulgence, Your Honor.

15       Your Honor, I don't have any more questions for

16   Special Agent Flaherty at this time, and I would pass the

17   witness.

18       THE COURT:  Thank you.

19       Cross, Mr. Marchese?

20       MR. MARCHESE:  Thank you, Your Honor.

21                   CROSS-EXAMINATION

22   BY MR. MARCHESE:

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   So turning your attention to the date of the search,

1    it was your testimony on direct examination that you were

2    the search team leader; is that fair to say?

3    A.    Yes, that's correct.

4    Q.    Okay.  So as the search team leader, would it be

5    fair to say that you're kind of quarterbacking the whole

6    thing, making sure that all the policies and procedures of

7    the FBI are followed?

8    A.    Yes.

9    Q.    Okay.

10   A.    To most part, yes.

11   Q.    I believe that the term that you used were the

12   protocols; correct?

13   A.    Yes, that's correct.

14   Q.    But you're not the one actually taking these

15   pictures, you're just simply going around and making sure

16   that all the items of evidentiary value are photographed

17   and things of that nature; is that fair to say?

18   A.    It would be more fair to say that upon entry I was

19   with the photographer as the initial photos were made.

20          After the search was initiated, the

21   photographs -- the people searching would call the

22   photographer to take additional photographs.  That would

23   have been covered in a search brief, where law enforcement

24   personnel were told about search procedures.

25   Q.    Okay.  So, numerically, what number are you on to

TRANSCRIBED FROM DIGITAL RECORDING

1    the premises?  First?  Last?  Middle?

2    A.    On this particular search, we were not -- I did not

3    enter the residence until it was secured.  Then I would

4    have been with the photographer and our photo log person.

5    So the three of us would have made entry together.

6    Q.    Okay.  So initially there is a team that goes on to

7    the premises, secures it, and then gives you the okay to go

8    ahead with the CSI or photographers to come in; is that

9    fair to say?

10   A.    On this particular search, yes, that's correct.

11   Q.    Okay.  Because they're all different; correct?

12   A.    Yes.  Very much so.

13   Q.    This is a very large property; is that fair to say?

14   A.    Yes.

15   Q.    It's over an acre?

16   A.    Yes.

17   Q.    On the front of the house is just a street; correct?

18   A.    Yes, that's correct.

19   Q.    And then to one side is just a vacant lot; correct?

20   A.    Correct.

21   Q.    To the back of the house is a parking lot; is the

22   correct?

23   A.    To the rear I believe was the orchard, but it was an

24   open space, yes.

25   Q.    Okay.  We can agree that there's nothing -- there's

---
TRANSCRIBED FROM DIGITAL RECORDING
---

```
 1    no building behind the rear of the house?

 2    A.    That's correct.

 3    Q.    And then there's a residence to the other side;

 4    right?

 5    A.    Yes, to the west side of the residence.

 6    Q.    Now, as you get on the scene, what is the first

 7    thing that you do?

 8    A.    The first thing would be, I believe -- I would

 9    assign an individual to label the rooms, with either

10    letters or numbers or a combination of both.

11    Q.    Okay.  And one of the things you're going to do is

12    you're going to make sure that the scene is not upset;

13    correct?

14    A.    That's correct.

15    Q.    Because you want to maintain the integrity of the

16    scene; correct?

17    A.    Right.  Through the entry photos, we are documenting

18    how the residence was when we entered.

19    Q.    Okay.  So at that point, everyone is instructed not

20    to move anything so as to preserve the evidentiary -- the

21    evidentiary integrity of the premises?

22    A.    That's correct.  Yes.

23    Q.    Okay.  And you're going to do that by, you know,

24    making sure that you don't knock anything over; correct?

25    A.    That's correct.
```

Case 2:16-cr-00100-GMN-DJA  Document 190  Filed 06/19/17  Page 168 of 225

168

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    You probably wear gloves.  Is that another thing

2    that might occur?

3    A.    Yes, absolutely.

4    Q.    Okay.  And the reason for that is, obviously, you

5    don't want anyone's prints transferred on to any items of

6    evidentiary value; fair to say?

7    A.    Fair to say.

8    Q.    Okay.  How many people were -- agents, officers,

9    detectives, how many team total were on this particular

10   search?

11   A.    I don't have the exact count, but there was in

12   excess of 20.

13   Q.    Okay.  Now, and I'm sorry, I apologize.  I'm getting

14   old here.  I forgot what the testimony was.

15         What was -- how long have you been an agent?

16   A.    Twenty years.

17   Q.    How many searches have you done?

18   A.    Hundreds.

19   Q.    And of the hundreds -- 20, that's a larger amount

20   than what you typically do on a search; is that fair to

21   say?

22   A.    We would -- we would determine the personnel needed,

23   depending on the size of the residence, the size of the

24   property.

25   Q.    All right.  And it would be fair to say given the

TRANSCRIBED FROM DIGITAL RECORDING

1    size of the property, you would need more people?

2    A.    Yes, that's correct.

3    Q.    So in this particular case, you testified that 37

4    items were retrieved in total; correct?

5    A.    Yes, that were seized.

6    Q.    Okay.  And those 37 items, those would be the items

7    that the entire search team would go around the home, look

8    at, and feel that those were of evidentiary value; correct?

9    A.    Yes.  We would also, as part of the search, digital

10   items, we would try to preview on scene to determine if

11   they were of evidentiary value.  So certain items may have

12   been collected, previewed, and returned.

13   Q.    Okay.  So which items were those?

14   A.    There were two cell phones that were returned, I

15   believe some CDs, DVDs that were not seized.

16   Q.    Any computers, to your knowledge?

17   A.    I do believe that there were two -- no, I'm sorry,

18   not to my knowledge.  There were not computers that were

19   not seized.

20   Q.    Okay.  Now, was there something else, maybe like a

21   tablet or something along those lines, or -- and I'm not

22   trying to put words in your mouth, I just --  you seemed

23   hesitant.

24   A.    No.  And I'm trying to remember exactly what was

25   seized -- or what was taken, collected, and then returned.

TRANSCRIBED FROM DIGITAL RECORDING

1    But really it was two cell phones, and I believe there was

2    a bag of CDs or DVDs mixed.

3    Q.    Okay.  But computer-wise, it's your testimony that

4    there were no computers that were forensically analyzed on

5    the scene and left on the premises; is that fair and

6    accurate?

7    A.    As best I can remember, yes, that's correct.

8    Certain items may not have been able to have been previewed

9    on scene, depending on the operating systems or something

10   to that effect.

11   Q.    Okay.  And at the end of the search, you prepared a

12   property log; correct?

13   A.    Yes, that's correct.

14   Q.    And a receipt; correct?

15   A.    Yes.

16   Q.    So you stayed on the premises for the entire search,

17   and then once it was done, obviously at some point in time,

18   you left?

19   A.    Were.

20   Q.    Okay.  Now, on direct examination you were asked

21   some questions about what was found and where it was found.

22            One of the items that you had mentioned would

23   have been item B5.  That was a tablet.  Is that -- do you

24   recollect that particular item?

25   A.    Not 1B5 directly, no.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.    Okay.  Do you not remember it or --

2   A.    I wasn't asked about it on direct.

3   Q.    Okay.  Now, if you look on the casita, which would

4   be Government's Trial Exhibit 3A -- do you have that in

5   front of you?

6   A.    Yes, I do.

7   Q.    Okay.  And this was entered into evidence.  And on

8   that particular exhibit, there's a legend on that.  Do you

9   see that?

10  A.    Yes, I do.

11  Q.    Okay.  And that legend has a 1, 2, and a 3.  And

12  number 3 is listed as a tablet; is that correct?

13  A.    That is correct.

14  Q.    Okay.  And that particular item, do you remember

15  that being logged into evidence as item 1B5?

16        And if you need to refresh your recollection, I

17  totally understand.

18  A.    Yes.  If I could, I could tell you exactly what 1B

19  number it was entered into.

20  Q.    Yeah.  Go ahead.

21  A.    Okay.  Thank you.

22  Q.    And just read it to yourself, and let me know when

23  your memory has been refreshed.

24  A.    Yes, 1B5 was an Apple iPod Air.

25  Q.    Okay.

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    And it was recovered from the kitchen island area.

2    Q.    And when you say the kitchen area, we're still

3    referring to the guest house, casita, pool house?

4    A.    Yes.

5    Q.    Not the main portion of the house?

6    A.    No, into the casita area.

7         (Discussion held off the record.)

8    BY MR. MARCHESE:

9    Q.    Okay.  I'm going to show you what's been previously

10   entered into evidence as Government's Exhibit No. 4.

11        Can you see the name on the screen of that

12   particular item?

13   A.    Yeah.  The user name is Frank Alfter.

14   Q.    You also mentioned on direct examination that there

15   was another item of evidentiary value that was taken out of

16   the pool house, but it was -- I believe it was item 1B2 is

17   a -- some sort of a SIM card or an external card plugged

18   into the laptop, I believe?

19   A.    It was an SD card --

20   Q.    Okay.

21   A.    -- that had been inserted inside, yes.

22   Q.    All right.  Is there any particular reason that that

23   wasn't -- that was booked into evidence but not pictured?

24   A.    At the time that the laptop was removed from the

25   casita, we didn't realize the SD card was inside it.  It

1    was upon preview that the SD card was discovered.

2    Q.    Okay.

3    A.    And then it was entered or logged as a separate

4    item.

5    Q.    All right.  So it was just overlooked?

6    A.    Yes.

7    Q.    Human error?

8    A.    As part of the photographs, yes.

9         COURTROOM ADMINISTRATOR:  Mr. Marchese, that

10   last exhibit, what was the number on there?

11        THE COURT:  4?

12        COURTROOM ADMINISTRATOR:  4?

13        MR. MARCHESE:  4, yes.

14        THE COURT:  The one in the Frank Alfter name --

15        MR. MARCHESE:  4B as in boy.

16        THE COURT:  -- on the computer screen?

17        COURTROOM ADMINISTRATOR:  Thank you.

18   BY MR. MARCHESE:

19   Q.    But it would be normal protocol to take a picture of

20   all items of evidentiary value; is that fair to say?

21   A.    It is our protocol to do so.  It -- mistakes can

22   happen, or it could be removed prior to a photograph being

23   taken.  But typically we try not to do that.

24   Q.    Okay.  I'm also going to show you what the

25   government brought into evidence as Trial Exhibit 6A.

TRANSCRIBED FROM DIGITAL RECORDING

1   Okay.

2           Do you recognize this picture?

3   A.    Yes, I do.

4   Q.    And which picture was this?

5   A.    This was the picture of -- from the first floor of

6   the main house, the doorway leading to the back patio area.

7   Q.    And as you testified earlier, that's a fair and

8   accurate depiction of how it was when you guys went in and

9   captured it via photograph; correct?

10  A.    Yes, that's correct.

11  Q.    Okay.  I'm going to show you Government's Trial

12  Exhibit 6B.  And what is that a picture of?  Same thing?

13  A.    That is the router and then an external hard drive

14  that was plugged in the back patio.

15  Q.    Okay.  But that's the same device, correct, just a

16  close-up?

17  A.    Yes, it is.

18  Q.    Okay.  And this one was knocked over or moved over,

19  as opposed to the other one, which was standing straight

20  up; is that fair to say?

21  A.    Yes, that's correct.

22  Q.    Okay.  And is that normal procedure, to move items

23  or knock them over, or whatever happened, before you take a

24  picture of them?

25  A.    It wouldn't be normal.  In this particular case, it

TRANSCRIBED FROM DIGITAL RECORDING

```
1    could have gotten knocked over in a number of ways.
2             But, more specifically, if we need to see the
3    brand name of an item and it can't be seen standing up, we
4    will turn it sideways.  I would speculate that was the
5    reason.
6    Q.    Okay.  So the idea was that you wanted to see it say
7    Netgear; correct?
8    A.    Yes.
9    Q.    Okay.  But if it was standing up, you could still
10   see it says Netgear; right?
11   A.    You -- possibly.
12   Q.    Yes.
13   A.    The Exhibit 6A depicts how it was as we're doing our
14   entry photos.
15   Q.    Right.
16   A.    So 6A would depict how it was.
17   Q.    Okay.  Now, Government's Exhibit 6C -- and I
18   apologize.  Ms. Roohani went over this with you already,
19   but I just wanted to go over it again.
20            So it's your testimony that this is where item
21   1B16 was acquired.  That would have been a laptop; correct?
22   A.    Yes, that's correct.
23   Q.    All right.  And it's your testimony that it's -- I'm
24   just going to point to it with my pen.  Is this where it
25   was found?
```

1    A.    Yeah.  It was just adjacent to the sink that was on
2    the island and the bar.
3    Q.    Okay.  Can you see it in this picture or --
4    A.    It is -- in this particular picture, it's really
5    difficult.  If the picture's blown up, you can see a small
6    edge of it.
7    Q.    Okay.
8    A.    But it's difficult to see in this picture.
9    Q.    All right.  And since it's difficult to see, there
10   are no other pictures of that particular item; correct?
11   A.    That's correct.
12   Q.    Okay.  And, once again, it would not be normal
13   protocol to not take pictures of items that were seized for
14   evidentiary value; fair to say?
15   A.    That's fair to say.
16   Q.    Okay.  And just bear with me a moment.  I'm about to
17   show you a series of pictures that have not come into
18   evidence just yet.
19        MR. MARCHESE:  Your Honor, permission to
20   approach with Exhibits 5012, 5013, 5032, 5033, 5037, and
21   5038.  And these will be defenses exhibits which have not
22   been entered.
23        THE COURT:  Any objection, Ms. Roohani?
24        MS. ROOHANI:  No, Your Honor.  I believe she's
25   just identifying them at this time.  Yeah, that's fine.

TRANSCRIBED FROM DIGITAL RECORDING

```
1              THE COURT:  Okay.
2              MR. MARCHESE:  May I approach, Your Honor?
3              THE COURT:  Yes, you may.
4              MR. MARCHESE:  Thank you.
5    BY MR. MARCHESE:
6    Q.    Just take a look at these series of pictures and see
7    if you recognize them at first, and then we will take
8    them as we go.
9    A.    I recognize them all.  I would have to refresh my
10   memory as to room A21, what it depicted.  But, yes, I
11   recognize the picture.
12   Q.    You recognize the picture?
13   A.    Yes.
14   Q.    All right.  And these pictures were all taken on the
15   day of the search, which we've been referring to and you've
16   been testifying to?
17   A.    Yes, that's correct.
18   Q.    Okay.  And they're all fair and accurate depictions
19   of the pictures that were taken on the day of the search of
20   the specific items which are depicted in these pictures?
21   A.    Yes, that's correct.
22   Q.    Okay.
23              MR. MARCHESE:  Your Honor, at this time defense
24   moves to enter 5012, 5013, 5032, 5033, 5037, and 5038 into
25   evidence.
```

1           THE COURT:  Any objection?

2           MS. ROOHANI:  No objection, Your Honor.

3           THE COURT:  All right.  5012, 5013, 5032, 5033,

4    5037, and 5038 will be admitted.

5           (Defendant's Exhibits 5012, 5013, 5032, 5033,

6           5037, 5038 received.)

7           MR. MARCHESE:  Thank you.  And permission to

8    publish 50 --

9           THE COURT:  Yes --

10          MR. MARCHESE:  -- 38?

11          THE COURT:  -- you may.

12   BY MR. MARCHESE:

13   Q.   And, Special Agent, do you recognize this particular

14   picture?

15   A.   Yes, I do.  That is the entryway into the master

16   bedroom.

17   Q.   Okay.  And does it appear that this bed is not made;

18   correct?

19   A.   Yes.

20   Q.   Okay.

21          THE COURT:  Is this 5012?

22          MS. ROOHANI:  This is 38.

23          MR. MARCHESE:  38, Your Honor.  I apologize.

24          THE COURT:  Okay.

25          MR. MARCHESE:  I can go in order, if Your Honor

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    would rather, if it makes it easier.
 2                THE COURT:  No, no, it doesn't matter.  I'm just
 3    trying to match up the photo with the number I wrote down.
 4    But I couldn't see the number on the picture.
 5                MR. MARCHESE:  I'm so sorry.  I just went
 6    numerically, and then I skipped.  I apologize.
 7                THE COURT:  That's all right.  So master bedroom
 8    is 5038.  Got it.
 9    BY MR. MARCHESE:
10    Q.   And I'm going to show you what's been marked as
11    5012.
12                Do you recognize this?
13    A.   Yes.  This -- this is one of the office areas on the
14    second floor of the main house.
15    Q.   Okay.  And to your recollection, were there any
16    items seized of evidentiary value out of this room?
17    A.   I -- to the best of my knowledge, I don't recall.
18    But I could look and refresh my memory.
19    Q.   Okay.  No, it's okay.
20    A.   Okay.
21    Q.   If you don't remember, you don't remember.  I don't
22    want to put words in your mouth, like I said.
23                And this is 5013.  Yes, 5013.
24                And this picture, what is your recollection
25    regarding this picture?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    It's identified as room A21.  This -- this is one of

2    the -- another office on the second floor of the main

3    house.

4    Q.    Okay.  And when you say "another office," how many

5    offices were on the second floor of the house?

6    A.    We identified three individual office rooms.

7    Q.    Okay.  So the one that I just showed you the picture

8    of previously, this one, and then there's the other one

9    with the green chair that you took the Gateway PC and the

10   hard drive out of; correct?

11   A.    That's correct.

12   Q.    Okay.  And I'm just going to show you one of them.

13   And this is 5033.

14         Do you recognize this photo?

15   A.    Yes.

16   Q.    And what is that a photo of?

17   A.    It's a photograph of one of the closets that -- as

18   you enter the master bedroom, if you go left and down that

19   hallway, there were two closets.  It's one of those

20   closets.

21   Q.    I also wanted to go back to Government's Exhibit 8A.

22   And you remember this picture.  This was that other office

23   that we were just referring to.  I'm sorry.  Take your

24   time.

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And this is of some importance because there

2    were two particular items in which the government just

3    asked you questions about on direct examination.  Number

4    one, this black computer tower.

5              And apparently there was a hard drive found

6    behind that monitor; is that correct?

7    A.    That's correct.

8    Q.    But there's no picture of that hard drive that was

9    found behind the monitor; is that correct?

10   A.    Not specifically of the hard drive.  It -- on this

11   particular photo if you zoom in, you can see a portion of

12   the external hard drive.

13   Q.    Okay.  There was not a picture taken specifically of

14   that hard drive; correct?

15   A.    That's correct.

16   Q.    Okay.  And, once again, would you agree with me that

17   that's not protocol to take items that have evidentiary

18   value and not take a picture of them directly?  Fair to

19   say?

20   A.    Fair to say.

21              MR. MARCHESE:  Court's indulgence.

22         (Pause in the proceedings.)

23   BY MR. MARCHESE:

24   Q.    Almost done.  What time did you arrive at the

25   residence on that particular day?

1    A.    It was approximately 7:00 a.m.

2    Q.    Okay.  And was that when the search began, or did

3    everyone just start meeting there and then the search begin

4    at a separate time?

5    A.    The search began later, after the residence was

6    secured.

7    Q.    Okay.

8    A.    It would have begun the security aspect around

9    approximately 7:00.

10   Q.    Okay.  So someone else, obviously not yourself, has

11   been your testimony, goes in around 7:00; and then you come

12   in at what time, if you know?

13   A.    It was approximately an hour, hour and a half later.

14   Q.    And then when did you leave the premises that day?

15   A.    I don't recall exactly what time.  It would have

16   been, as best as I can recall, around 1:00 p.m.

17   Q.    Was there still other law enforcement officials

18   there when you left?

19   A.    They left when I left.  But, yes --

20   Q.    Okay.

21   A.    -- I was one of the last groups to leave.

22   Q.    Okay.

23         MR. MARCHESE:  Pass the witness, Your Honor.

24

25

TRANSCRIBED FROM DIGITAL RECORDING

REDIRECT EXAMINATION

BY MS. ROOHANI:

Q.    Special Agent Flaherty, I want to start where
Mr. Marchese left off.  You had mentioned at 7:00 a.m. is
when everyone arrived and that the scene was secured.

       Who secured the scene?

A.    It was Las Vegas SWAT.

Q.    And why was SWAT called in this instance?

A.    For a number of reasons.  The size of the property;
unknown, as far as weapons; given these violations, there
tends to be suicidal risks.

Q.    And so SWAT cleared the residence, and after SWAT
cleared the residence, only after that did you and members
of your team enter; is that correct?

A.    That's correct.

Q.    Okay.  Mr. Marchese asked you some questions about
some photos not being taken of devices directly.

       Do you remember those questions?

A.    Yes, I do.

Q.    Do you also remember your testimony on direct where
you talked about how you were one of the first people in
the house?

A.    Yes, that's correct.

Q.    And you also testified on direct that there were
fair and accurate -- the evidence list that was made that

TRANSCRIBED FROM DIGITAL RECORDING

1    day and the evidence logs that were made that day were fair

2    and accurate and they were correct, is that -- do you

3    remember that?

4    A.   Yes, that's correct.

5    Q.   Is it your testimony that all of the evidence, even

6    if it wasn't specifically taken, had a photo of it, that it

7    was properly logged and inventoried?

8    A.   Yes, it was.

9    Q.   Mr. Marchese asked you about Defense Exhibit 5012.

10            If you could flip to that, please.

11   A.   Is there a --

12   Q.   I think it's tab 12.

13   A.   Thank you.

14   Q.   It's a photo of an office.

15            Do you remember that?

16   A.   Yes.

17   Q.   And you also testified on cross that you didn't

18   remember what devices, if any, were collected from that

19   room.

20            Do you remember that?

21   A.   Yes, I do.

22   Q.   And you mentioned that it would refresh your

23   recollection if you could look at the evidence log.

24            Do you remember that too?

25   A.   Yes.

1    Q.    I would ask that you look at the evidence log and

2    tell me what devices, if any, were collected from that

3    room.

4    A.    Yes, there were items taken from that room.

5    Q.    Can you tell me the evidence numbers associated with

6    those devices, please?

7    A.    Yes.  Evidence item 1B17 was a Passport external

8    hard drive that was on the desk.

9          Evidence item 1B25 was an Iomega hard drive that

10   was in the -- inside a box that was on a niche on the wall.

11         And that's it.

12   Q.    Okay.  Take a look at Defense Exhibit 5013 that

13   Mr. Marchese went over with you.  It's in the room labeled

14   A21.

15   A.    Yes.

16   Q.    Were there devices collected from that room?

17   A.    There were.  I don't recall what evidence item they

18   were.

19   Q.    Would reviewing your notes refresh your recollection

20   on those?

21   A.    Yes, it would.

22   Q.    Please do that.

23   A.    Evidence item 1B14 was an Apple MacBook laptop

24   recovered on a brown desk.

25         Evidence item identified as 1B31 was an Apple

---

TRANSCRIBED FROM DIGITAL RECORDING

1    All-in-One computer that was on a black desk.

2              Evidence item 1B34 was an Apple iPhone that was

3    on a docking station.

4              And that is it.

5    Q.   And it would be fair to say that of the 37 devices

6    collected, we've only reviewed a few of them?

7    A.   That's correct.

8    Q.   Okay.  Go ahead and take a look at Government's

9    Exhibit 4A.

10   A.   Do you have a tab number?

11   Q.   I'm sorry?

12   A.   A tab number?

13   Q.   Oh, it's tab 4 in the government's folder.

14   A.   Sorry.  My apologies.

15   Q.   And you testified on direct and on cross that this

16   is item 1B1 and 1B2.

17             Do you remember that?

18   A.   Yes, I do.

19   Q.   Is it policy to take apart every device on scene to

20   see what other things might be inserted into that device?

21   A.   No, it would not be.

22   Q.   And why is that not the policy?

23   A.    In this particular case, it -- because it was

24   previewed on scene was when the SD card was located.  There

25   would be -- there have been occasions where a laptop might

TRANSCRIBED FROM DIGITAL RECORDING

1   have an SD card aside of it, and it wouldn't be found until

2   it was forensically examined.

3   Q.    Okay.

4           MS. ROOHANI:  A moment's indulgence, Your Honor.

5           THE COURT:  Sure.

6           MS. ROOHANI:  Your Honor, I would pass the

7   witness if defense is inclined to ask Special Agent

8   Flaherty any more questions.

9           THE COURT:  Any further cross?

10          MR. MARCHESE:  No, Your Honor.

11          THE COURT:  All right.  Thank you very much,

12  special agent.  You can go ahead and step down.  If you

13  brought any reports with you, go ahead and take them, but

14  leave the exhibits there --

15          THE WITNESS:  Yes, ma'am, thank you.

16          THE COURT:  Thank you.

17          MS. ROOHANI:  And, Your Honor, we would ask that

18  she be released and she not subject to recall.

19          THE COURT:  Any objection?

20          MR. MARCHESE:  No, Your Honor.

21          THE COURT:  All right.  You are released.  Thank

22  you very much for coming.

23          (The witness was excused.)

24          THE COURT:  All right.  Ms. Roohani, do you want

25  to take a quick 10-minute restroom break before we call the

TRANSCRIBED FROM DIGITAL RECORDING

```
1    next witness?
2               MS. ROOHANI:  That would be lovely, Your Honor.
3               THE COURT:  It's 2:46.  Let's try to be back
4    here before 3:00 p.m., certainly.
5               COURTROOM ADMINISTRATOR:  All rise.
6          (Recess from 2:46 p.m. until 2:56 p.m.)
7               COURTROOM ADMINISTRATOR:  All rise.
8               THE COURT:  Thank you.  Ms. Roohani, do you want
9    to call your next witness.
10              MS. ROOHANI:  Yes, Your Honor.  The United
11   States calls Albert Giangregorio.
12              COURTROOM ADMINISTRATOR:  Please raise your
13   right hand.
14              You do solemnly swear that the testimony you
15   shall give in the cause now before the Court shall be the
16   truth, the whole truth, and nothing but the truth, so help
17   you God?
18              THE WITNESS:  Yes, I do.
19              COURTROOM ADMINISTRATOR:  Thank you, sir.  You
20   may be seated.
21              THE WITNESS:  Thank you.
22              COURTROOM ADMINISTRATOR:  Please state and spell
23   your full name for the record.
24              THE WITNESS:  Yes.  My name is Albert
25   Giangregorio, and that's spelled G-i-a-n-g-r-e-g-o-r-i-o.
```

TRANSCRIBED FROM DIGITAL RECORDING

1            ALBERT GIANGREGORIO

2          called as a witness on behalf of the

3      Government, was examined and testified as follows:

4                    DIRECT EXAMINATION

5    BY MS. ROOHANI:

6    Q.    Agent Gregorio -- Agent Giangregorio, I abbreviated

7    your last name, I apologize -- who is your employer?

8    A.    I work for the Department of Homeland Security,

9    Homeland Security Investigations.

10   Q.    And how long have you worked for the Department of

11   Homeland Security?

12   A.    I have been employed with HSI since July of 2010.

13   Q.    And before that, who did you work for?

14   A.    I worked for the United States Air Force Office of

15   Special Investigations since 2004.

16   Q.    Okay.  What are your current duties and

17   responsibilities as part of your duty?

18   A.    I am currently a program manager for the illicit

19   financial proceeds unit in Washington, DC.

20   Q.    At any point have you been involved in child

21   exploitation cases?

22   A.    Yes, I have.  I was a group supervisor for the child

23   exploitation investigative group here in Las Vegas from

24   2014 through September 16th of this year.

25   Q.    So up until very recently you were working on child

TRANSCRIBED FROM DIGITAL RECORDING

1  exploitation cases?

2  A.    Yes, ma'am.

3  Q.    Okay.  Were you involved in the investigation of the

4  defendant, Jan Fuechtener?

5  A.    Yes, I was.

6  Q.    And as part of your investigation, did you receive

7  official Department of Homeland Security travel records for

8  both Mr. Fuechtener and Frank Dietmar Alfter?

9  A.    Yes, I did.

10  Q.    Okay.  Go ahead and take a look at Government's

11  Exhibit 29.  It's in that big binder in front of you under

12  tab 29.

13  A.    Okay.

14  Q.    Go ahead and look through all the pieces of paper

15  under tab 29.  I believe there's a total of eight pages.

16         Do you recognize those documents?

17  A.    Yes, I do.

18  Q.    How do you recognize them?

19  A.    I requested the crossing history for Mr. Alfter and

20  requested these records be certified.

21  Q.    Okay.  And what are these records?  Are these

22  crossing records?

23  A.    Excuse me?

24  Q.    What are these records?

25  A.    These records are border crossing records in our

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    system called the Treasury Enforcement Telecommunications
 2    System, which tracks all foreign and domestic travel inside
 3    and out of the United States.
 4              So these are just records indicating when
 5    someone crossed.
 6    Q.    And you indicated that you asked for these records
 7    to be certified.  Is that indicated anywhere in this
 8    document?
 9    A.    Yes, it should be on that first page with the
10    certification from the customs and border protection
11    official.
12              MS. ROOHANI:  Okay.  Your Honor, I would move to
13    admit these documents under the Court's pretrial order.
14              THE COURT:  Can you tell me again which exhibits
15    are we referring to?
16              MS. ROOHANI:  This is just Exhibit No. 29.
17              THE COURT:  29.  Any objection?
18              MR. SANFT:  No objection, Your Honor.
19              THE COURT:  All right.  29 will be admitted.
20         (Government's Exhibit 29 received.)
21    BY MS. ROOHANI:
22    Q.    After you requested these records, did you provide
23    these documents to the case agent in this case, Mari
24    Panovich?
25    A.    Yes, I did.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  You mentioned those are crossing records, and

2    you mentioned that they came from a particular program.

3              Can you tell me how these documents are

4    maintained?

5    A.    How they're maintained?  They're maintained in the

6    Treasury Enforcement Telecommunications System, which is

7    accessed by HSI agents and most other agencies.  So but

8    primarily Homeland Security agents.

9    Q.    And what all does it log or record?

10   A.    It logs any information related to the entry of an

11   individual into the United States.  So name, date of birth,

12   any identifying information, passport numbers, time and

13   date of crossing.

14             It will also include, like, inspector

15   information, whichever inspector processed you into the

16   United States, any secondary examination results, anything

17   along those lines.

18   Q.    Okay.  And how do you typically access these

19   records?

20   A.    Through -- access through a specific program on my

21   desktop computer that's proprietary to the Department of

22   Homeland Security.

23   Q.    And does that have a user name and a password for

24   you, specifically?

25   A.    Yes, it does.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Does passport information about the traveller get
2    logged in the system?
3    A.    Yes.  So every passport has a scannable piece of
4    information.  So that gets scanned by the inspector, and
5    all the information is downloaded into the Treasury
6    Enforcement Telecommunications System.
7    Q.    And does it also include the arriving and departing
8    port and any airline inflammation -- information that might
9    be there?
10   A.    Correct.  Yes, it does.
11   Q.    And what type of inform -- when you seek these
12   documents, what information are you typically looking for?
13   A.    I'm generally looking for time and date of travel,
14   when they came in, where they came from, any information
15   the inspector might have placed in there.  Also, I am
16   looking for any subject records, anything associated along
17   those lines.
18           I think, generally, that's about it.
19   Q.    And would these records confirm a person's presence
20   in the United States at any particular time?
21   A.    Absolutely.
22   Q.    Okay.  Does the record change if the person is
23   entering by land, perhaps on an airplane, as opposed to a
24   cruise or by sea?
25   A.    No, all crossings, all recorded crossings into the

TRANSCRIBED FROM DIGITAL RECORDING

1   United States are documented.

2           So land border, it would just be -- obviously

3   you wouldn't have any flight information or ship

4   information.  But it would document what border crossing

5   you came in, if you came in to San Ysidro, San Diego,

6   whatever it might be.

7           Same thing with a vehicle.  If you entered

8   through the border on a vehicle, it would capture the

9   vehicle information.  But it's all reported the same.

10  Q.    Okay.  And you testified that you would know when a

11  person is in the United States.

12          Would you also know when a person is not in the

13  United States from these records?

14  A.    Yes.

15  Q.    Okay.  At some point during your investigation, did

16  you make contact with Frank Alfter?

17  A.    Yes, I did.

18  Q.    When was that?

19  A.    January 31st of 2016.

20  Q.    Where did you make contact with him?

21  A.    At McCarran International in Las Vegas, Nevada.

22  Q.    And was he travelling -- going to travel, or was he

23  returning from travel?

24  A.    He was returning from London, I believe, a British

25  Airways flight from London.

------------------------------- TRANSCRIBED FROM DIGITAL RECORDING -------------------------------

1    Q.    But he was returning back to the United States from

2    wherever he was?

3    A.    Correct.  Coming inbound into the United States.

4    Q.    And was that international travel?

5    A.    Yes, that's correct.

6    Q.    Who was he travelling with?

7    A.    He was travelling with Kevin Klepping.

8    Q.    Okay.  Did you speak with Mr. Alfter and

9    Mr. Klepping at McCarran Airport that day?

10   A.    Yes, I did.

11   Q.    Did you ask them if they would allow you to examine

12   any electronic devices that they would have with them?

13   A.    Yes, I did.

14   Q.    And did they consent to that?

15   A.    Yes, they consented to search of the devices.

16   Q.    What were the devices that you looked at?

17   A.    The devices were -- there were two Apple iPhones, I

18   don't know exactly which version, and then there was also

19   an Apple Air -- a MacBook Air.

20   Q.    Okay.

21   A.    One of the brand-new ones.

22   Q.    And each of the cell phones belonged to each of the

23   individuals?

24   A.    Correct.  One to Mr. Alfter and one to Mr. Klepping.

25   Q.    And who --

TRANSCRIBED FROM DIGITAL RECORDING

 1    A.    I'm sorry.  The MacBook Air belonged to Mr. Alfter.

 2    Q.    Okay.  And did you search these devices?

 3    A.    Yes, I did.

 4    Q.    And when you searched the devices, did you find --

 5  were you searching for evidence of child exploitation or

 6  child pornography?

 7    A.    Yes, specifically for that.

 8    Q.    When you searched Mr. Alfter's devices, were there

 9  any images of child pornography?

10    A.    Nothing.

11    Q.    Was there any indication whatsoever of anything

12  dealing with child exploitation?

13    A.    Absolutely not.

14    Q.    When you searched Mr. Klepping's devices, were there

15  any images of child pornography?

16    A.    No, there were not.

17    Q.    Was there anything indicative of child exploitation

18  on his phone?

19    A.    Nothing suggestive of it.

20    Q.    Did you return the devices to Mr. Alfter and

21  Mr. Klepping after you had searched them?

22    A.    Yes.

23    Q.    Okay.  I'm going to ask you to take a look at those

24  crossing records.

25              And can you tell me, was Mr. Alfter in the

1    United States on May 9th, 2015?

2    A.    Yes, according to these records, he would have been

3    in the United States.

4    Q.    Can you tell me where you see that?

5    A.    Yes.  So about halfway down the page, and there's no

6    page number, page number 1 of the text records, it shows

7    that Mr. Alfter crossed into the United States from

8    Frankfurt International Airport on May 7th, 2015, into the

9    Las Vegas International -- McCarran International Airport,

10   and then departed the United States on -- about eight days

11   later, on May 15th, 2015, from Las Vegas back to Frankfurt

12   International Airport.

13   Q.    And if you look at the bottom right-hand of the

14   page, that's 29-007?

15   A.    Yes.

16   Q.    Okay.  So the entry is three-quarters of the way

17   down, 5/7/15; is that fair?

18   A.    Yes.

19   Q.    And then he arrived -- how do you know that that's

20   an arrival on 5/7/15?

21   A.    So -- no, I may have read it wrong.  I'm not

22   normally seeing it from a printed -- yes.  Okay.

23         So on 5/7/15, there's an "O" under direction, if

24   you see the column that reads "Direction."  "O" stands for

25   outbound.

TRANSCRIBED FROM DIGITAL RECORDING

1           So he was outbound for Frankfurt International

2   Airport on 5/7/15 to Las Vegas International or Las Vegas

3   McCarran International.  And so that "O" designates the

4   direction of travel.

5           And then on 5/15, you'll indicate -- you'll see

6   an "I" is indicated under the "Direction" column.  "I"

7   represents inbound.  And so he was inbound from Las Vegas

8   into Frankfurt International.

9           Departing -- wait a minute.  Am I reversing it?

10  Q.    I'm asking you.

11  A.    Yeah.

12  Q.    So you tell me.

13  A.    No, I'm just -- I'm not used to this format.  I

14  apologize.

15  Q.    Okay.

16  A.    Arriving location.  Yes, I've reversed it, I think.

17  So I apologize.  It's a little different than how our

18  system prints it out.

19  Q.    Okay.

20  A.    So --

21  Q.    And the reason that it's different is because this

22  is a certified copy --

23  A.    Correct.

24  Q.    -- and so the way that you typically read it is

25  different?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes, correct.

2    Q.    So I just want to be clear --

3    A.    Yes.

4    Q.    -- on 5 -- I'm asking about May 9th, 2015.

5    A.    Yes.

6    Q.    On 5/7/15 it says, "Frankfurt International

7    Outbound."

8          Does that indicate that he went from Las Vegas

9    to Frankfurt or Frankfurt to Las Vegas?

10   A.    So he -- on 5/7, he went outbound to Frankfurt.

11   Q.    Okay.

12   A.    And from Las Vegas International.

13   Q.    Okay.

14   A.    And then flew back in to the country on 5/15 --

15   excuse me -- yeah, 5/15/15.  So my apologies again.

16   Q.    So on May 9th he was not in the United States?

17   A.    Correct.  Correct.

18   Q.    All right.

19         MS. ROOHANI:  I have nothing further for

20   Mr. Giangregorio.

21         And I'll pass him at this time, Your Honor.

22         THE COURT:  Any cross?

23         MR. SANFT:  Yes, Your Honor.

24

25

TRANSCRIBED FROM DIGITAL RECORDING

                        CROSS-EXAMINATION

 1
 2      BY MR. SANFT:
 3      Q.    Is it agent?
 4      A.    Yes, special agent.
 5      Q.    And it's Agent Giangregorio?
 6      A.    Yes, sir.
 7      Q.    All right.  Agent, your testimony here today is
 8      based upon a search that you conducted of Mr. Alfter and
 9      Mr. Klepping, and it looks like this was done in October --
10      January 31st?  Is that right?
11      A.    Of 2016, yes, sir.
12      Q.    Okay.  Now, I have a document here, it looks like
13      it's labeled "Department of Homeland Security."
14            Did you author this particular document in
15      furtherance of your investigation?
16      A.    I don't see the documents on --
17      Q.    Let me just -- let me cut to the chase here.
18            How many documents or how many reports did you
19      author in furtherance of this particular incident?
20      A.    Did I personally author?
21      Q.    Yes.
22      A.    I believe one.
23      Q.    Okay.  And with regards to the document that you
24      authored, did anyone else author any other documents
25      besides the one that you authored?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Would it have been the other -- looks like a

3    computer expert or somebody that was present, Mr. Horvath?

4    A.    Yes.  He did -- I don't believe he authored a report

5    though.

6    Q.    Okay.  And with regards to his participation in this

7    is that he helped you in reviewing the electronic devices

8    that you have found?

9    A.    Correct.  Yes.

10   Q.    Okay.  Now, just taking us back on that particular

11   day on January 31st, 2016, you had already been notified by

12   authorities here in Las Vegas that Mr. Frank Alfter and

13   anybody that he was with was people of interest to this

14   investigation; is that correct?

15   A.    Yes.  So I also had received notification, so my own

16   records and -- received notification, and then CVP also

17   contacted me.  So yes.

18   Q.    Okay.  And in addition to that, you were aware of a

19   search that had been executed on Mr. Alfter's home 10 days

20   prior to your meeting with Mr. Alfter?

21   A.    Yes, I was aware.

22   Q.    All right.  Were you also aware -- at this

23   particular point I'm assuming you were, that he was here

24   under a visa, and was a native of Germany?

25   A.    Yes.

1  Q.   Okay.  Were you also aware that Mr. Klepping was

2  also a native of Germany and was also here on a -- was it

3  E2 visa?  Is that what visas they were here under?

4  A.   I believe Mr. Alfter was under the E2 visa.  I

5  learned that that day as he entered.

6         And I'm not exactly sure what Mr. Klepping came

7  in.  He was probably a B1, B2, which is a visitor visa.

8  But I'm not exactly sure of his status, what he came in on,

9  what visa.

10  Q.   Okay.  And so as the government had asked you

11  earlier, you were aware of when they were actually going to

12  come into the United States or why?

13  A.   Correct.  Prior to their arrival.

14  Q.   All right.  So you were able to at least make some

15  preparations for their arrival to interview them?

16  A.   Yes.

17  Q.   Let me ask you this question.  Do you speak German?

18  A.   I do not.

19  Q.   Did anyone in your party have an opportunity to at

20  least help with potentially interpreting the German

21  language, either to you or to Mr. Klepping or to

22  Mr. Alfter?

23  A.   No.

24  Q.   Now, one of the things that occurs is that you have

25  an opportunity to review the devices, and you had an

1   opportunity to review them for potential child porn; is

2   that correct?

3   A.    Yes.

4   Q.    All right.  Now, turning, for instance, to the

5   MacBook.  Do you handle at all the Macintosh operating

6   system or the Apple operating system?

7   A.    Yes.

8   Q.    You know what that is?

9   A.    Yes.

10  Q.    Do you know what that is?

11  A.    Yes.  Yes.

12  Q.    Okay.  Do you know what the difference is between

13  the MacBook Air and the MacBook?

14  A.    Generally, yes.  But I'm not a forensics agent, so I

15  couldn't give you the nuts and bolts of the differences,

16  so --

17  Q.    Okay.  Now, with regards to the item that you had

18  seized that was Mr. Alfter's, it was basically a laptop

19  computer running the Apple operating system or the

20  Macintosh operating system?

21  A.    Correct.

22  Q.    All right.  And your testimony is that you had an

23  opportunity to review that MacBook, and you said that --

24  and I want to make sure we're clear, you could not find or

25  there was absolutely not any type of child -- evidence of

TRANSCRIBED FROM DIGITAL RECORDING

 1    any type of child pornography on that computer?

 2    A.    Uh-huh.

 3    Q.    Is that a yes?

 4    A.    Yes, that's what I said.

 5    Q.    Your review of this particular MacBook, was it just

 6    basically typing into the MacBook, like, say, the extension

 7    JPG to see if there were any photographs and then review

 8    the photographs to determine whether there were child

 9    pornography on the MacBook?

10    A.    Yes.  So we connected a live preview with my

11    forensics agent, Jacob Horvath, and we just basically did a

12    review of the computer, just to identify any files, video

13    images, anything along those lines indicative of child

14    pornography.

15    Q.    Okay.  Did you ever have an opportunity to review

16    any of the stored chats on the MacBook?

17    A.    No, I did not.

18    Q.    And did you have an opportunity to at least identify

19    which programs or applications were on that particular

20    MacBook?

21    A.    We looked through the MacBook.  I remember looking

22    through the applications that were on it, but I don't

23    remember exactly which ones they were.

24    Q.    Do you recall if there was a Dropbox application on

25    the MacBook?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I do not.

2    Q.    Did you ever at any point look for a Dropbox

3    application on the MacBook?

4    A.    Not specifically, no.

5    Q.    Now, I'm assuming that because of the fact that you

6    were looking for child pornography, you also looked at the

7    search history or at least the browsing history --

8    A.    Correct.

9    Q.    -- of the MacBook?

10   A.    Yes.

11   Q.    And your testimony was that you did not identify

12   anything that you considered to be a child pornography

13   website?

14   A.    Correct.

15   Q.    What kind of child pornography websites were you

16   looking for?  Or what, based upon your experience, would

17   indicate to you a child pornography website?

18   A.    I mean, any site that's indicative of child

19   pornography, any type of pornography site, something along

20   those lines.  We're just looking through a general cursory

21   review to see if we see anything, any specific website,

22   maybe long and drawn out type of website, user name and

23   password, any type of sites.

24        I don't have any specific one, you know, LS

25   models, or anything like that, we were looking for.  We

TRANSCRIBED FROM DIGITAL RECORDING

1    were just looking in general.

2    Q.    Did you ever at any point in your view of this

3    history on the MacBook indicate or at all see if the

4    MacBook had accessed through a web portal GigaTribe?

5    A.    I did not, no.

6    Q.    How about the issue of the use of the German

7    language?  Your report indicates that you observed that the

8    MacBook had a lot of German language on there.

9    A.    Yes.

10   Q.    Do you know what the words are in German for child

11   pornography or child exploitation or anything along those

12   lines?

13   A.    No.  But generally the files are -- regardless of

14   language, we've done multiple investigations where there's,

15   you know, child pornography in different language, whether

16   it be Italian, German, French.  We've seen it all.  The

17   files remain the same.

18            So there's certain file indicators that we look

19   for.  And with the assistance of my forensics agent, we

20   were looking for those type files.  So -- and that's all we

21   were looking for.

22            This was not a forensics -- in-depth forensics

23   examination.  This was a live preview.  We didn't have any

24   detailed forensics.  We didn't image the computer or

25   anything along those lines.  We were just looking for files

TRANSCRIBED FROM DIGITAL RECORDING

1    and images indicative of child pornography.  And generally

2    those are in the file names, so -- regardless of the

3    language.

4    Q.    Okay.  So you chose not to make or obtain any type

5    of forensic image or copy?

6    A.    Correct, yes.

7    Q.    What was the reason for that?

8    A.    Again, it was just a live preview.  It was a border

9    search.  It was on consent.  We just wanted to make sure

10   that there were no images, and we were -- just decided to

11   return.

12         There were no obvious images.  Now, whether they

13   were hidden, something along those lines, could have been

14   possible.  But, you know, we didn't see anything.

15         In the general area where 90 percent of our, you

16   know, investigations we generally find child pornography,

17   we didn't see any indication of child pornography files.

18   Q.    So would it be fair to say you characterized your

19   particular review of the MacBook as it more like a pat and

20   frisk versus an actual digging into pockets to pull out

21   what was inside the pockets; right?

22   A.    We did look in all the traditional places, the

23   files, you know, that would be seen from a hard-drive

24   perspective.

25         So it was more than a cursory search, just a

TRANSCRIBED FROM DIGITAL RECORDING

1   light, you know, touching or frisk.  But it wasn't a

2   full-on forensics image, where we were breaking down every

3   single file.

4   Q.    Okay.  In addition to that, did you ever have an

5   opportunity to review on the MacBook, for instance, any

6   type of application with regards to, say, Grindr or

7   anything like that?

8   A.    I don't -- from that specific examination?

9   Q.    Yes.

10   A.    I don't recall.

11   Q.    And just to be fair, of course, would it -- I just

12   want to make sure we're clear.  You weren't given specific

13   details as to things that you may be looking for that was

14   of interest; right?

15   A.    Correct.

16   Q.    You just did a cursory -- or a general search?

17   A.    Correct.  Yeah.

18   Q.    Now, you had testified, as well, that you had

19   reviewed phones?

20   A.    Yes.

21   Q.    Those two phones were iPhones?

22   A.    Yes.

23   Q.    Apple phones?

24   A.    Yes.

25   Q.    And I'm assuming that they were locked?  Or were

1    they not locked?

2    A.    I don't recall specifically.  But if they were

3    locked, we would have asked the individual, as part of the

4    consent, to provide the password.

5    Q.    Did you have an opportunity to at least document or

6    capture the apps that were on each phone?

7    A.    We reviewed them.  I do remember some basic, you

8    know, applications that we generally see on iPhones.  But I

9    don't have a specific list, so --

10    Q.    Okay.  And, once again, you were just looking

11    specific -- just generally at photographs and video that

12    was on those phones?

13    A.    Correct.  We were looking for files or evidence of

14    child pornography, not for chats or anything along those

15    lines.

16    Q.    Okay.

17    A.    Unless they were images embedded in those chats.

18    So --

19    Q.    All right.  In addition to that, you had said that

20    you had filed these items.  Did they just give them to you

21    voluntarily, or did you find them within their luggage?

22    A.    I don't recall specifically, but -- because CVP

23    initiated the secondary inspection.  So the phones were

24    probably out by the time I got there.

25            As part of an examination they were requested to

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    present all of their belongings, including baggage, phones,

 2    electronic devices.

 3              So I'm sure they were asked, as coming into the

 4    United States those are all subject to search.

 5              So at that point they were on the belt.  I asked

 6    them if we could do a consent search, and they both agreed.

 7    Q.    But just to make sure we're clear, agent, you never

 8    searched the baggage that's -- the suitcases that were

 9    there?

10    A.    I did not personally search the baggage.  I

11    assisted.  I was in the area.  But I didn't physically go

12    through the luggage myself.

13    Q.    Did anybody -- did you observe anyone physically

14    going through Mr. Alfter's luggage or Mr. Klepping's

15    luggage before --

16    A.    Yes.  Yes, I did.

17    Q.    Okay.  And when I say that, how does that look like?

18    I mean, is that in a room?  How does that work?

19    A.    So at the -- what do they call it, the federal

20    inspection area of McCarran International Airport, you have

21    a line of primary booths.  When you first come into the

22    country, you see the immigration agent sitting in the

23    booth.  So you go, you present your document.  You go

24    through that particular line.  That's immigration.

25              There is a secondary inspection area with large
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    belts that are belt -- maybe four or five belts across the
2    room that are specifically U-shaped.
3              So the inspector's in the middle of the belt,
4    there's a belt on his left and his right, or her could be,
5    as well, and so that area they put the bag, the belt moves
6    up to a level where the inspector can inspect it.  And
7    that's where they were at that point.
8    Q.    Do you know who it was, the inspector that actually
9    inspected the luggage?
10   A.    I do not recall the specific inspector, no.
11   Q.    Did you capture that in your report in -- anywhere?
12   A.    No.  But I believe -- yeah, they're not here.  There
13   are -- there is an inspection record --
14   Q.    Let me just cut to the chase.  You don't have to
15   find it if you don't --
16   A.    Okay.
17   Q.    -- can't find it now.
18             The person that does that inspection, is he told
19   what to look for specifically in the luggage?
20   A.    He's looking for contraband.
21   Q.    And when you say "contraband," it would be typically
22   things that would stick out to you, like, for instance,
23   large sums of cash, cocaine, that kind of thing?
24   A.    Anything contrary or prohibited by US law.
25   Q.    Okay.  Correct.  And would it be fair to say that if
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    someone has a hard drive in his luggage going through that
 2    particular search, they would not identify it necessarily
 3    as contraband; correct?
 4    A.    Not necessarily.  But that's not to say if there's
 5    prior history that that wouldn't -- you know, for an
 6    individual who maybe has been subject of a search warrant,
 7    or something along those lines, for a specific crime, then
 8    that may become more of an applicable place to hide illegal
 9    activity, so --
10    Q.    Do you have any documentation, either here or with
11    the government, or anywhere else, that would indicate that
12    anyone that searched Mr. Alfter's luggage or Mr. Klepping's
13    luggage was told to look specifically for hard drives or
14    electronic items inside that luggage?
15    A.    No.
16              MR. SANFT:  No further questions, Your Honor.
17              THE COURT:  Redirect, Mr. Roohani?
18              MS. ROOHANI:  Briefly, Your Honor.
19                       REDIRECT EXAMINATION
20    BY MS. ROOHANI:
21    Q.    Special agent, when you spoke with Mr. Alfter and
22    Mr. Klepping, did they speak English?
23    A.    Yes.
24    Q.    Did they speak English fluently?
25    A.    Yes.
```

1    Q.    Did they understand what you were saying?

2    A.    Yes.

3    Q.    Did you understand what they were saying?

4    A.    Yes.

5    Q.    Okay.

6    A.    And more than likely, I don't remember specifically,

7    but whenever I deal with somebody who speaks a foreign

8    language, I generally ask if they need any language

9    requests.

10   Q.    And did you ask that in this case?

11   A.    I most likely.  Every -- I've been a customs

12   inspector prior to my experience, so it's something I

13   always ask.  So I'm sure I did.

14         MR. SANFT:  Objection, Your Honor.  That's

15   speculation.

16         THE COURT:  Sustained.

17   BY MS. ROOHANI:

18   Q.    How many child pornography and child exploitations

19   have you yourself worked on?

20   A.    Oh, boy.

21   Q.    Ballpark?

22   A.    Maybe 30.

23   Q.    Okay.

24   A.    30 investigations.

25   Q.    You're familiar with search terms that people use

------------------------------------------------------------------
TRANSCRIBED FROM DIGITAL RECORDING
------------------------------------------------------------------

1   looking for child pornography?

2   A.   Yes.

3   Q.   You're familiar with file names and parts of file

4   names that would be indicative of child pornography?

5   A.   Correct.

6   Q.   Did you look for those search terms on those

7   computers?

8   A.   Yes.

9   Q.   Did you find any?

10  A.   No.

11  Q.   Not a single one?

12  A.   No.

13  Q.   If you had found even a single search term that

14  looked like it could be child pornography, would you have

15  retained that computer or imaged it?

16  A.   Yes.

17          MS. ROOHANI:  One moment, Your Honor.

18          (Pause in the proceedings.)

19          MS. ROOHANI:  Your Honor, I have nothing further

20  for Agent Giangregorio.

21          THE COURT:  All right.  Redirect?  Or, I'm

22  sorry, recross?

23          MR. SANFT:  Just one question based upon --

24          THE COURT:  Sure.

25          MR. SANFT:  -- the government's question.

TRANSCRIBED FROM DIGITAL RECORDING

                        RECROSS-EXAMINATION

1

2    BY MR. SANFT:

3    Q.    Agent, do you have a list of those search terms that

4    you look for inside the -- either the phones or the

5    MacBook?

6    A.    Do I have a list where?

7    Q.    Well, I'm -- I just want to know if you have a list

8    of the terminology of terms that you look for when you're

9    looking for what you believe to be child pornography

10   contained in a certain electronic item?

11   A.    Yes.  We have lists that we maintain at the office.

12   Q.    Do you have a list here?

13   A.    I do not.

14   Q.    Did you incorporate a list in your reports that you

15   provided to the government?

16   A.    No.

17   Q.    Do you ever, in your reports -- or have the other

18   person that was involved in the search do the same thing,

19   look for that -- have that list in his report, as far as

20   you know?

21   A.    I don't understand the question.

22   Q.    Well, you had Mr. Horvath, who was the other person

23   who helped you with the search; is that correct?

24   A.    Correct, yes.

25   Q.    And would it be fair to say that his job, as well as

1    yours, is to look at the same material --

2    A.    Yes.

3    Q.    And both of you make an assessment as to whether

4    something is child pornography or not?

5    A.    Yes.

6    Q.    Did he have a list that he referred to, in terms of

7    what he'd be looking for that would help him identify child

8    pornography, just based upon the file name?

9    A.    I don't know if he had a list with him that

10   particular day.

11   Q.    And do you know if -- whether or not he ever

12   authored a report, that would have included search terms

13   that he was looking for specifically on these items?

14   A.    No, he didn't author a report, I know that.

15   Q.    And just to make sure we're clear here, your

16   testimony was, is that Mr. Klepping spoke perfect English?

17   A.    No, I didn't say that.

18   Q.    Okay.  Well, can you describe for me how much

19   English Mr. Klepping knew?

20   A.    They both spoke communicable English.

21   Q.    I'm asking specifically about Mr. Klepping.  I

22   understand Mr. Alfter.  But tell me the level of English

23   comprehension that Mr. Klepping had.

24   A.    He answered all of our questions.

25   Q.    Is that caught on videotape or is that on videotape?

TRANSCRIBED FROM DIGITAL RECORDING

1     A.    No.

2     Q.    Is that on audio tape?

3     A.    No.

4     Q.    That's based upon your assessment here today?

5     A.    Yes.

6     Q.    And you don't speak German?

7     A.    I do not.

8           MR. SANFT:  No further questions, Your Honor.

9           THE COURT:  Any redirect?

10                    FURTHER REDIRECT EXAMINATION

11    BY MS. ROOHANI:

12    Q.    Was Mr. Klepping able to give you the password for

13    his phone?

14    A.    Yes.

15    Q.    And he spoke well enough English to be able to do

16    that for you?

17    A.    Yes.

18          MS. ROOHANI:  No more questions, Your Honor.

19          MR. SANFT:  No further questions, Your Honor.

20    Thank you.

21          THE COURT:  All right.  Thank you, sir.  You may

22    go ahead and take anything you brought in with you, but

23    leave all the exhibits here that were already here.

24          THE WITNESS:  Do you want me to close that book

25    for you?

1           THE COURT:  Sure.  Thank you.

2           Ms. Roohani, do you want to call your next

3    witness?

4           MS. ROOHANI:  Yes.  And we would ask that

5    Special Agent Giangregorio be released.  I believe he has

6    travel plans for this evening.

7           MR. SANFT:  No objection, Your Honor.  Thank

8    you.

9           THE COURT:  All right.  You are released, sir.

10   Thank you for coming in today.

11        (The witness was excused.)

12           MS. ROOHANI:  The United States calls Thomas

13   Radke.

14           COURTROOM ADMINISTRATOR:  Please remain standing

15   and raise your right hand.

16           You do solemnly swear that the testimony you

17   shall give in the cause now before the Court shall be the

18   truth, the whole truth, and nothing but the truth, so help

19   you God?

20           THE WITNESS:  I do.

21           COURTROOM ADMINISTRATOR:  Thank you, sir.  You

22   may be seated.

23           Please state and spell your full name for the

24   record.

25           THE WITNESS:  Thank you.  Thomas Michael Radke,

1    T-h-o-m-a-s M-i-c-h-a-e-l R-a-d-k-e.

2              THE COURT:  You can go ahead and adjust the

3    microphone towards you if you'd like.

4              MS. ROOHANI:  May I inquire?

5              THE COURT:  Yes, you may.  Go ahead.

6              MS. ROOHANI:  Thank you.

7         (Refer to separate transcript for testimony

8         of Thomas Michael Radke, previously

9         transcribed.)

10             *      *      *      *      *

11             THE COURT:  All right.  Well, it's 4:52.  So I

12   don't think we're going to get very much in to the next

13   witness.  So let's go ahead and recess for the night.

14             I'm looking at the calendar here that we put

15   together.  And it has us starting at 9:00 a.m. tomorrow.

16   But I could start earlier, at 8:30, if you all are

17   available to start at 8:30.  It's up to you.  I'm looking

18   at my calendar.  I don't have anything at 8:30.

19             MS. ROOHANI:  We are available, Your Honor, if

20   that's easier for you.

21             THE COURT:  All right.

22             Mr. Marchese, Mr. Durham, how are you --

23             MR. MARCHESE:  Unfortunately, we have private

24   practices to run.

25             THE COURT:  Right.  So that's why I'm asking you

TRANSCRIBED FROM DIGITAL RECORDING

1    if you want to start --

2              MR. MARCHESE:  I'm scrambling.  I'm waiting on

3    the text to come back if they'll cover my state court.  So

4    if we could do 9:00, just to be safe.

5              THE COURT:  Okay.  So we'll start tomorrow at

6    9:00.  We do need to end between 11:50 and 8:30.  I do have

7    students coming in.  Obviously I don't want them to observe

8    this particular case.  So I think they're going to be

9    observing a different case, and then I'll just be speaking

10   to them in general.  So I just need to take a little break

11   at 11:30.  And then we can resume again at 1:00.

12             So you all will just have a little bit of a

13   longer lunch.  And then we'll be done at about 4:15 because

14   we have a yearly attorney admission ceremony beginning at

15   4:30 in the courtroom next door, in the ceremonial

16   courtroom.

17             So that's the plan for tomorrow.

18             And then for Wednesday the plan is 1:00 to 5:00

19   p.m.; Thursday 1:00 to 5:00 p.m.; and then we'll see as we

20   get closer to the weekend.

21             All right?

22             MR. SANFT:  Yes, Your Honor.

23             THE COURT:  Okay.  We'll see you back here

24   tomorrow at 9:00 a.m.

25             And, Aaron, you're going to lock it up so they

TRANSCRIBED FROM DIGITAL RECORDING

1    can keep stuff here, or do they need to take everything
2    with them?
3              COURTROOM ADMINISTRATOR:  Yes, Your Honor.  They
4    can keep things in the courtroom.
5              MS. ROOHANI:  Your Honor --
6              THE COURT:  And when I say that, I have to
7    qualify it with, one time we were having trial, leaving
8    everything, it was a multiple defendant case, so everybody
9    had a lot of different things out here, and Lance calls me,
10   our clerk of court calls me about 5:30 in the morning and
11   says, "Your Honor, when I call you at 5:30 it means bad
12   news."
13             And a water mane had broke, and it the leaked
14   out on everything.  They were able to take out as much
15   stuff as they could.  But there were things that were
16   destroyed.
17             So when I say you can leave them in here, I'm
18   just saying we'll lock it up so no person can come in here.
19   But I can't guarantee that there won't be any other damage.
20             Yeah, you can still see a little.  We did pretty
21   good, but you see it still.  We even had to redo the tables
22   and the carpeting and everything.
23             MS. ROOHANI:  Your Honor, since I'm to provide
24   defense with a copy of 34, that is the only copy, and it's
25   already been -- well, it hasn't been admitted, but it's --

TRANSCRIBED FROM DIGITAL RECORDING

1    may I take that copy --

2              THE COURT:  Yeah.  Burn a new copy --

3              MS. ROOHANI:  -- and burn a copy --

4              THE COURT:  -- and give it to them please.

5              MS. ROOHANI:  Thank you.

6              COURTROOM ADMINISTRATOR:  All rise.

7          (The proceedings adjourned at 4:56 p.m.)

8                        *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    GOVERNMENT'S WITNESSES:                        PAGE

 3    DENNIS CARRY
          Direct Examination By Ms. Roohani          18
 4        Cross-Examination By Mr. Sanft             46
          Redirect Examination By Ms. Roohani        61
 5        Recross-Examination By Mr. Sanft           68
          Further Redirect Examination               74
 6        By Ms. Roohani
          Further Recross-Examination                77
 7        By Mr. Sanft

 8    JOSEPH AHMED
          Direct Examination                         84
 9        By Ms. Cartier-Giroux
          Cross-Examination By Mr. Durham            122
10        Redirect Examination                       128
          By Ms. Cartier-Giroux
11
      SUE FLAHERTY
12        Direct Examination By Ms. Roohani          131
          Cross-Examination By Mr. Marchese          164
13        Redirect Examination By Ms. Roohani        183

14    ALBERT GIANGREGORIO
          Direct Examination By Ms. Roohani          189
15        Cross-Examination By mr. Sanft             200
          Redirect Examination By Ms. Roohani        212
16        Recross-Examination By Mr. Sanft           215
          Further Redirect Examination               217
17        By Ms. Roohani

18

19

20

21

22

23

24

25
```

| 1 | E X H I B I T S |
|---|---|

| GOVERNMENT'S | ADMITTED |
|---|---|
| 1 | 120 |
| 2A | 92 |
| 2B | 92 |
| 2C | 93 |
| 3A, 3B, 3C, 3D | 136 |
| 4A | 154 |
| 4B | 155 |
| 5A, 5B, 5C | 156 |
| 6A and 6B | 157 |
| 6C | 159 |
| 7A and 7B | 160 |
| 8A and 8B | 162 |
| 9A, 9B, 9C | 164 |
| 29 | 191 |

| DEFENDANT'S | ADMITTED |
|---|---|
| 5012, 5013, 5032, 5033, 5037, 5038 | 178 |

1                           -o0o-

2          I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____        6/16/17

7          Donna Davidson                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25