1

                        UNITED STATES DISTRICT COURT
                             DISTRICT OF NEVADA
2                   BEFORE THE HONORABLE GLORIA M. NAVARRO
                       CHIEF UNITED STATES DISTRICT JUDGE
3

4

UNITED STATES OF AMERICA,          :
5                                  :
          Plaintiff,               :
6                                  :No. 2:16-cr-00100-GMN-CWH
     vs.                           :
7                                  :
JAN ROUVEN FUECHTENER,             :
8                                  :
          Defendant.               :
9 ──────────────────────────────── :

10

11

                    TRANSCRIPT OF BENCH TRIAL - DAY 2
12                     (Pages 226 through 454)

13

14                          November 15, 2016

15

                            Las Vegas, Nevada
16

17

18

19
     FTR No. 7D/20161115 @ 9:11 a.m.
20

21
     Transcribed by:         Donna Davidson, CCR, RDR, CRR
22                           (775) 329-0132
                             dodavidson@att.net
23

24
     (Proceedings recorded by electronic sound recording,
25   transcript produced by mechanical stenography and computer.)

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    Lisa Cartier-Giroux
     Elham Roohani
5    U.S. ATTORNEYS OFFICE
     501 Las Vegas Boulevard South
6    Suite 1100
     Las Vegas, Nevada 89101
7    (702) 388-6336
     Lisa.Cartier-Giroux@usdoj.gov
8    Elham.Roohani@usdoj.gov

9

     FOR MR. SANFT:
10
     Jess R. Marchese
11   LAW OFFICE OF JESS R. MARCHESE
     601 South Las Vegas Boulevard
12   Las Vegas, Nevada 89101
     (702) 385-5377
13   Fax: (702) 474-4210
     marcheselaw@msn.com
14
     Benjamin C. Durham
15   BENJAMIN DURHAM LAW FIRM
     601 South 10th Street
16   Las Vegas, Nevada 89101
     (702) 631-6111
17   Fax: (702) 946-1396
     bdurham@vegasdefense.com
18
     Michael W. Sanft
19   SANFT LAW
     324 South 3rd Street
20   2nd Floor
     Las Vegas, Nevada 89101
21   (702) 382-0905
     michael@sanftlaw.com
22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1            LAS VEGAS, NEVADA, NOVEMBER 15, 2016, 9:11 A.M.

 2                            --oOo--

 3                    P R O C E E D I N G S

 4

 5            COURTROOM ADMINISTRATOR:  All rise.

 6            THE COURT:  Thank you.  You may be seated.

 7            COURTROOM ADMINISTRATOR:  This is the time set

 8    for day 2 of the bench trial in Case No.

 9    2:16-cr-100-GMN-CWH, United States of America versus Jan

10    Rouven Fuechtener.

11            Counsel, please make your appearances for the

12    record.

13            MS. ROOHANI:  Good morning, Your Honor.  Ellie

14    Roohani and Lisa Cartier-Giroux for the United States,

15    joined by our case agent, Special Agent Mari Panovich.

16            THE COURT:  Good morning, Special Agent Panovich

17    and Ms. Cartier-Giroux, Ms. Roohani.

18            MR. MARCHESE:  Good morning, Your Honor.  Jess

19    Marchese on behalf of Jan Rouven Fuechtener, along with

20    Michael Sanft and Benjamin Durham.

21            THE COURT:  Good morning, Mr. Sanft and

22    Mr. Fuechtener, Mr. Durham, Mr. Marchese.

23            Are we ready to begin?

24            MS. ROOHANI:  We are, Your Honor.

25            THE COURT:  All right.  The government can go
```

TRANSCRIBED FROM DIGITAL RECORDING

1    ahead and -- I think we finished the last witness; is that

2    right?

3              MS. ROOHANI:  That's correct, Your Honor.

4              THE COURT:  All right.  We finished with

5    forensic examiner Thomas Radke.

6              Go ahead and call your next witness.

7              MS. ROOHANI:  Thank you, Your Honor.  The United

8    States calls Kellie Badalucco.

9              COURTROOM ADMINISTRATOR:  Please remain standing

10   and raise your right hand.

11             You do solemnly swear that the testimony you

12   shall give in the cause now before the Court shall be the

13   truth, the whole truth, and nothing but the truth, so help

14   you God?

15             THE WITNESS:  I do.

16             COURTROOM ADMINISTRATOR:  Thank you.  You may be

17   seated.

18             Please state and spell your full name for the

19   record.

20             THE WITNESS:  Kellie Badalucco.  K-e-l-l-i-e

21   B-a-d-a-l-u-c-c-o.

22             MS. ROOHANI:  Kellie, I'm going to ask you to

23   pull that microphone toward you because I could barely hear

24   you.

25             THE WITNESS:  Okay.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  Thank you.

2                    KELLIE BADALUCCO

3            called as a witness on behalf of the

4        Government, was examined and testified as follows:

5                   DIRECT EXAMINATION

6     BY MS. ROOHANI:

7     Q.    Who is your employer?

8     A.    The Federal Bureau of Investigation.

9     Q.    And how long have you been employed with the FBI?

10    A.    Nine years.

11    Q.    What is your current title?

12    A.    Staff operations specialist.

13    Q.    And as a staff operations specialist what are your

14    current duties and responsibilities?

15    A.    I provide tactical and analytical support to the

16    Child Exploitation Task Force.

17    Q.    And does that include sending out subpoenas?

18    A.    Yeah.  I send out subpoenas, I do background

19    investigation, social media exploitation, review search

20    warrant returns, things of that nature.

21    Q.    And were you involved in the investigation of the

22    defendant, Jan Fuechtener?

23    A.    I was.

24    Q.    What was the nature of your involvement in this

25    investigation?  What are some of the things that you did?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I was involved in the very beginning when we got the

2    lead from the Buffalo division.  I helped with the

3    background investigation.  I sent out subpoenas.  I

4    reviewed search warrant returns, things like that.

5    Q.    Were you present the day of the execution of the

6    search warrant?

7    A.    I was.

8    Q.    I'm going to ask you to open up that big binder on

9    your -- the other one, the other big binder.  Thank you.

10   It says government's exhibit.

11            Can you take a look at Government's Exhibit 20A.

12   It's under tab 20.

13            And 20A consists of 14 pages.  Can you flip

14   through those 14 pages for me.

15            Do you recognize that document?

16   A.    Yes.

17   Q.    What is it?

18   A.    It's a Skype conversation between larsusa22 and

19   olwerolwer.

20   Q.    Okay.  And where is that Skype chat derived from?

21   A.    Evidence item 1B3.

22   Q.    And how do you know that?

23   A.    It's on the very first page under "Notes."

24   Q.    Okay.  Did you review this particular document?

25   A.    I did review this evidence item, the direction of

TRANSCRIBED FROM DIGITAL RECORDING

1    Special Agent Panovich.

2    Q.    Did you receive this item from Special Agent

3    Panovich?

4    A.    I did.

5          MS. ROOHANI:  Your Honor, I would move to admit

6    Government's Exhibit 20A.

7          THE COURT:  Any objection to Exhibit 20A?

8          MR. MARCHESE:  No, Your Honor.

9          THE COURT:  All right.  20A will be admitted.

10         (Government's Exhibit 20A received.)

11   BY MS. ROOHANI:

12   Q.    Okay.  Go ahead and take a look at 20B for me.  20B

13   consists of six pages.  Flip through those.

14         Do you recognize this document?

15   A.    Yes.

16   Q.    How do you recognize this document?

17   A.    This is an Excel spreadsheet I made with time

18   conversions from -- that was derived from Exhibit 20A.

19   Q.    Okay.  And you created this document yourself?

20   A.    Yes.

21   Q.    And that was from information derived from 20?

22   A.    Yes.

23   Q.    And what were you attempting to do when you created

24   this document?

25   A.    I made time conversions from UTC to Pacific Standard

TRANSCRIBED FROM DIGITAL RECORDING

1    Time.

2    Q.    Okay.  Go ahead and look at 20C.

3    A.    Okay.

4    Q.    Do you recognize that document?  That's 13 pages?

5    A.    Yes.

6    Q.    What is that?

7    A.    This is the 302 that I wrote from Exhibit 20B that

8    was the document I wrote into our case file of the Excel

9    spreadsheet into the 302 that was entered into our case

10   file.

11   Q.    And that particular document memorializes everything

12   that you did in terms of a work product from 20B; is that

13   right?

14   A.    Yes.

15   Q.    Okay.  And was this document produced to the

16   defense?

17   A.    Yes.

18   Q.    Okay.

19            MS. ROOHANI:  Your Honor, the government would

20   move to admit Government's Exhibit 20B at this time.

21            THE COURT:  Any objection to 20B?

22            MR. MARCHESE:  No, Your Honor.

23            THE COURT:  All right.  So 20B will be admitted.

24         (Government's Exhibit 20B received.)

25

------- TRANSCRIBED FROM DIGITAL RECORDING -------

1    BY MS. ROOHANI:

2    Q.    So we're going to work from 20B.  So let's go to 20B

3    for just a minute.

4              So you mentioned here that you did time

5    conversions from UTC time to Pacific Standard Time.

6    A.    Yes.

7    Q.    Where -- what -- I know that they're not labeled at

8    the top, but can you tell me what the original time was

9    from 20A, what column that would be in?  What is the header

10   of that column?

11   A.    E.  Column E.  A, B, C, D, E.

12   Q.    Okay.

13   A.    So it's the message sent date and time in UTC.  So

14   it's the one, two, three, four, fifth column.

15   Q.    And the Pacific Standard Time conversion is where?

16   A.    F.  So it's the next column over, the message sent

17   date and time, Pacific Standard Time.

18   Q.    How did you calculate those conversions?

19   A.    I used the Google search engine, and I checked a

20   number of different sites.  I subtracted seven hours from

21   UTC time to get Pacific Standard Time because these chats

22   took place in August of 2015, which was not daylight

23   savings time, so the conversion was a difference of seven

24   hours.

25   Q.    Okay.  Let's go ahead and look at 20A.  You

------- TRANSCRIBED FROM DIGITAL RECORDING -------

```
 1   mentioned earlier that these conversations are between a
 2   user named larsusa22 and a user named olwerolwer.
 3            Do you remember that testimony?
 4   A.    Yes.
 5   Q.    Okay.  We're going to go more in depth, but can you
 6   briefly summarize what the nature of these chats are?
 7   A.    The nature of these chats were the user larsusa22
 8   was going to put a folder on GigaTribe, and when he did so
 9   olwerolwer was going to perform a live sex act on Skype for
10   the user larsusa22 to watch.
11   Q.    Okay.  Okay.
12   A.    It was going to be an exchange.
13   Q.    Okay.  And go ahead and look at -- it's Government
14   Exhibit 20A, and at the bottom right it says 002 as the
15   page number.
16            Do you see that?
17   A.    Yes.
18   Q.    Okay.  We'll start on that page.  And you'll notice
19   on the left-hand side under "Record," it has a number;
20   right?
21   A.    Yes.
22   Q.    And I realize this is very small.  And I apologize
23   for that.  Okay?
24            So when I direct you, I'm going to direct you
25   based on the number that's on the left-hand side of the
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    page, okay?  So look at -- what I'm going to call chat
 2    number 308.  It's under record 308.
 3    A.    Okay.
 4    Q.    Who initiated this particular chat?
 5    A.    The author was larsusa22.
 6    Q.    Look at chat number 311 and 312.
 7    A.    Okay.
 8    Q.    Actually, I'm sorry.  Go back to 308.
 9          What did larsusa22 say in 308?  What was the
10    message?
11    A.    "Hi.  What's up?"
12    Q.    Okay.  Now, go to 311 and 312.
13    A.    Okay.
14    Q.    Can you read for us who the author was of 311 and
15    312?
16    A.    The author of 311 and 312 was olwerolwer.
17    Q.    Okay.  And what did olwerolwer say in 311 and 312?
18    A.    "I have a new giga account.  Add me on.  Olwerman."
19          THE COURT:  Can you spell -- I'm sorry.  Can you
20    spell that name, olwer?
21          MS. ROOHANI:  Sure.  It's o-l-w-e-r.  And on
22    Skype it's o-l-w-e-r o-l-w-e-r twice.
23          THE COURT:  Oh, okay.
24          MS. ROOHANI:  Yes.
25          THE COURT:  Thank you.
```

1      THE WITNESS:  And then his name on giga would be

2  olwerman, o-w-l-e-r-m-a-n.

3      THE COURT:  Thank you.

4      THE WITNESS:  And then line 312 says, "When can

5  I download some stuff from you?"  I have a new cam -- "I

6  can give you a cam show tomorrow."

7  BY MS. ROOHANI:

8  Q.   Okay.  And can you read us 313 as well?  Who wrote

9  313?

10  A.   313 the author was olwerolwer.  "When can you let me

11  download some?  I know that I can trust you and show you my

12  daughter.  When" -- sorry.  "When you can let me download

13  some, I know that I can trust you and show you my daughter

14  here."

15  Q.   Okay.  And what did olwerolwer agree to give larsusa

16  to download some stuff, based upon the text in 302 -- 312?

17  Sorry, excuse me.

18  A.   He was going to give him a cam show after larsusa22

19  would let him download some stuff.

20  Q.   Okay.  Go ahead and look at 320, close to the bottom

21  of the page, to 322.

22  A.   Okay.

23  Q.   And also take a look at 328, which is on the next

24  page.

25  A.   Okay.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   Q.    Okay.  Who sent the messages in 320, 321, 322, and
 2   328?
 3   A.    The author of 320, 321, and 322 were larsusa.  And
 4   321 states, "When can I watch?"
 5             321 states, "Hi."
 6             322 states, "Can I watch you fuck?"
 7             328, the author was larsusa22, and it says, "Can
 8   I see your cock now?"
 9   Q.    Okay.  Please look on page 003 at record number 337.
10             Who is the author of this particular message?
11   A.    Olwerolwer.  And the message states, "and then I can
12   fuck her for you."
13   Q.    Up until this time, who is the only female that has
14   been referenced in these chats?
15   A.    The daughter of olwerolwer.
16   Q.    The next page, 355?
17   A.    On the next page, 350 -- 355 --
18   Q.    Wait.  Hold on.  Let me make sure.  Maybe it's the
19   same.  Some of these numbers are out of order.
20   A.    It's on 005.
21   Q.    Yes.
22   A.    Line 335, the author of it is olwerolwer, and it
23   says, "She is here.  I can fuck her now."
24   Q.    And what time is this in Pacific Standard Time?  And
25   you can refer to your creative document 20B, if you need
```

TRANSCRIBED FROM DIGITAL RECORDING

1    to, for 335.

2    A.    355, the Pacific Standard Time is 8:38 a.m.

3          MS. ROOHANI:   A moment's indulgence, Your Honor.

4    BY MS. ROOHANI:

5    Q.    Look at record number 359.

6    A.    Okay.

7    Q.    It's on page 005.

8    A.    Okay.  The author of it is larsusa22, and it says,

9    "I was sleeping."

10   Q.    Okay.  And what is the time on that particular

11   Pacific Standard Time?

12   A.    Hang on one second.  Sorry.  3 -- the time on that

13   one was 12:13 p.m.

14   Q.    And was that referring to the previous time when

15   olwerolwer had reached out to larsusa22 and received no

16   response?

17   A.    Right.  And that was 8:38 a.m.

18   Q.    Okay.  Let's look at entry number 387, which I

19   believe the top of page 007.

20   A.    I'm sorry.  Which number did you say?

21   Q.    387.  Record number 387.

22   A.    387 the author was olwerolwer and said -- he stated,

23   "Okay, please add my friend on giga, olwer2.  When you let

24   them download, then I fuck her in eight to nine hours for

25   you."

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And when you sent out a subpoena return, did you

2    ever determine where olwerolwer lived?

3    A.    Yes.  Olwerolwer is in Germany.

4    Q.    Okay.  Let's look at entry number 120.  Of course, I

5    can't tell you what page it's on.  It is on the bottom of

6    page 10.

7    A.    Okay.

8    Q.    Who wrote this message, and what does this message

9    say?

10   A.    The author for entry 120 is olwerolwer, and it says,

11   "Your lars45 folder is not online for olwer2 at giga."

12   Q.    Now, let's look at number 752, which is on page 13.

13         Who authored this message, and what did they

14   say?

15   A.    Author 752 is larsusa22, and it says, "When can I

16   watch you fuck her?"

17   Q.    And 775 was the response to that.  Who wrote that

18   message?

19   A.    Olwerolwer.  And it says, "Hi, I can fuck her in

20   five hours when she is at my house."

21   Q.    Let's look at message number 868, which is on that

22   same page, a little bit further down.

23   A.    The author of 868 is olwerolwer.  And it says, "Can

24   you put up the lars45 folder in the giga folder for my

25   friend olwer2."

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And 885, which is on the next page?

2    A.    The author is olwerolwer, and it says, "Can you put

3    your lars45 folder in giga?"

4    Q.    Okay.  And, again, based upon these conversations,

5    what caused you to conclude that lars45 -- or, I'm sorry,

6    larsusa22 was going to share his lars45 account for

7    olwerolwer to view in exchange for a live sex show?

8    A.    Because he ends up putting the folder on again.  If

9    you read further down, it leads me to believe that he did

10   put the folder online.

11   Q.    Okay.  And where exactly is that?

12   A.    On 910 it says -- olwer asks him to please put the

13   folder in again.

14         And then the next line olwer says, "Thanks."

15         And larsusa responds, "Yes."

16   Q.    Okay.  And so when you computed these -- the times

17   in 20 -- from 20A into 20B, did you cross-reference those

18   times with anything else that was produced to you under a

19   subpoena return?

20   A.    Yeah.  We subpoenaed the show times for the new

21   Illusion show at the Tropicana, to see if any of these

22   times overlapped with the times that the defendant would be

23   onstage performing, and none of the times overlapped.

24         And we looked at the times that he would be

25   getting ready for the show and when he would be talking to

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    guests of the show afterwards, and none of the times
 2    overlapped within a couple of hours before the show or a
 3    couple hours afterwards.
 4    Q.    So in giving him a range of time for before the show
 5    and after the show, what was the closest amount of time
 6    that -- from the time the show's starting, that these chats
 7    happened?
 8    A.    Approximately three hours.
 9    Q.    All right.  Go ahead and look at Government's
10    Exhibit 21A.
11              THE COURT:  Did you say three hours before or
12    three hours after?
13              THE WITNESS:  Three hours before.
14              THE COURT:  Before.  Thank you.
15    BY MS. ROOHANI:
16    Q.    But there was -- and just to clarify, there was no
17    overlap of time at any point?
18    A.    No.
19    Q.    Okay.  Go ahead and look at what's been marked as
20    Government's Exhibit 21A and B.  And that's under tab 21.
21            Tell me if you recognize those.
22    A.    I do.
23    Q.    How?
24    A.    These are records that I subpoenaed from Grindr.
25    Q.    Okay.  And on that first page, what is that first
```

TRANSCRIBED FROM DIGITAL RECORDING

1    page that's on -- that's Bates number 4061?

2    A.    This is a Grindr profile ID 54111653.  And it is --

3    Q.    Hold on one second.  Go to the page before 21A.

4    A.    Sorry.

5    Q.    Tell me what that is.

6    A.    This is the custodian of records that certified the

7    records that were provided to us by Grindr.

8    Q.    Okay.  And did those certify all the records or

9    certain attached records?

10   A.    The attached records.

11   Q.    Okay.  And were these -- take a look at 21A and B.

12   Were those attached to this particular certification?

13   A.    Yes.

14   Q.    Okay.

15         MS. ROOHANI:  And, Your Honor, I would move to

16   admit these pursuant to the Court's pretrial order.

17         MR. MARCHESE:  No objection.

18         THE COURT:  What are you referring to?  Is this

19   20C?

20         MS. ROOHANI:  21A and B.

21         THE COURT:  Oh.  21A and B.  All right.

22         No objection from the defense to 21A and B?

23         MR. SANFT:  No, Your Honor.

24         THE COURT:  All right.  Those will be admitted.

25         (Government's Exhibits 21A and 21B received.)

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. ROOHANI:

2    Q.    And then go ahead and also take a look at 22A and B.

3    A.    Okay.

4    Q.    Do you recognize those?

5    A.    Yes.

6    Q.    Did those also come with the certifications --

7    A.    They did.

8    Q.    -- as 21A?

9    A.    Yes.

10         MS. ROOHANI:  Your Honor, I would move to admit

11   these under the Court's pretrial order.

12         MR. MARCHESE:  No objection.

13         THE COURT:  And this is 22A and B?

14         MS. ROOHANI:  Yes.

15         THE COURT:  All right.  Those will be admitted.

16         (Government's Exhibits 22A and 22B received.)

17   BY MS. ROOHANI:

18   Q.    All right.  Now, I'm going to direct your attention

19   to 21A.  We're going to talk about that for a little while.

20   Okay?

21   A.    All right.

22   Q.    All right.  So you mentioned that the profile --

23   tell me again what the profile number was that was

24   associated with 21A?

25   A.    21A is Grindr profile 54111653.

TRANSCRIBED FROM DIGITAL RECORDING

```
1    Q.    And what was the e-mail account associated with this
2    particular Grindr account?
3    A.    Janrouven@aol.com.
4    Q.    And where do you see that?
5    A.    It's listed under the e-mail, three lines under the
6    profile picture.
7    Q.    Okay.
8              THE COURT:  Can you repeat that again?  Who
9    was --
10             THE WITNESS:  Janrouven@aol.com.
11             THE COURT:  Okay.
12   BY MS. ROOHANI:
13   Q.    And look at page 714.  So skipping just a couple of
14   pages.
15   A.    Where do you see the page numbers on here?
16   Q.    At the bottom right-hand corner, 00714.
17   A.    They're not labeled that way.
18   Q.    Is yours not numbered?
19   A.    No.
20   Q.    It's really tiny on the bottom right-hand side.
21             Let me do this.  Let me have -- Marissa, can you
22   publish page 714.
23             COURTROOM ADMINISTRATOR:  And what exhibit is
24   this?
25             MS. ROOHANI:  It's Exhibit 21A.  And wait.
```

                    ┌─ TRANSCRIBED FROM DIGITAL RECORDING ─┐

1    Before you go on, I just want to clarify.

2    BY MS. ROOHANI:

3    Q.    So when you saw -- if you click on that monitor in

4    front of you?

5    A.    Uh-huh.

6    Q.    -- in that corner there's a little arrow?

7    A.    Yeah.  Mine aren't labeled.

8    Q.    It's not labeled.  Okay.  Never mind.

9          Where in -- on this page, where did you see that

10   janrouven@aol.com?

11   A.    (Inaudible.)

12   Q.    Okay.

13         All right.  Marissa can you go to 714, please.

14         Okay.  Do you recognize this person?

15   A.    Yes.  Yes.

16   Q.    Who is that?

17   A.    The defendant, Mr. Fuechtener.

18   Q.    And is this a photo that's associated with the

19   profile 540111653?

20   A.    Yes.

21         MS. ROOHANI:  Can you go to 716, Marissa?  And

22   also 717, just for her to be able to see it.  Okay.

23   BY MS. ROOHANI:

24   Q.    Do you recognize the person photographed in these

25   two photos?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Yes.   That appears to be part of the body of the

2   defendant.

3   Q.    And how do you recognize that as being the body of

4   the defendant?

5   A.    It appears to be part of the jawline and the abs of

6   the defendant.

7   Q.    And is 717 and 716, do they seem to be the same

8   photo but cropped?

9   A.    Yes.

10   Q.    All right.   Let's go to the chats associated with

11   the profile which is in 21B.

12   A.    Okay.

13   Q.    And this is going to be impossible to do if you

14   don't have these page numbers.

15          So, Marissa, you're going to have to do that

16   too.

17   A.    These ones are labeled.

18   Q.    Oh, these ones are numbered.   Excellent.

19   A.    Just the profiles aren't labeled in mine.

20   Q.    Can we go to page 002.

21   A.    Okay.

22   Q.    And because these are not numbered like the Skype

23   chats, I'm going to refer to the timestamp.

24   A.    Okay.

25   Q.    The first thing I want to ask you is do these

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    timestamps indicate whether they're in Pacific Standard

 2    Time, UTC time, Eastern Time, or any other?

 3    A.    No, it's not indicated.

 4    Q.    Okay.  And was there any information given to you by

 5    Grindr that would differentiate what time zone that was

 6    from?

 7    A.    Grindr did not indicate what time zone they were

 8    given in.

 9    Q.    Okay.  All right.  So let's look at timestamp on

10    page on 2, 18:39:59?

11    A.    Okay.

12    Q.    Who sent that message?

13    A.    This one was sent by profile 54111653.

14    Q.    And just for clarity, we're just going to refer to

15    that as the 541 profile.  Okay?

16    A.    Okay.

17    Q.    All right.  So the 541 profile, what does that

18    particular message read?

19    A.    "I send it from my other profile.  I am Lars."

20    Q.    Go to the next page, 003.  Timestamp 53:31.

21    A.    Okay.

22    Q.    Who sent that message?

23    A.    541115 -- or 653.

24    Q.    Okay.  And what did that message read?

25    A.    "Family taboo stuff, yng."
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And on the message above it, can you read

2    exact -- just the message above it?

3    A.    "What do you call pervy and kinky in your man?"

4    Q.    Same page, timestamp 55:05.

5    A.    "Brothers having sex."

6    Q.    And was that sent by profile number 541?

7    A.    Yes.

8    Q.    Let's go to page 5.  This is timestamped 17:35:24.

9    A.    Okay.

10   Q.    And was that sent by profile number 541?

11   A.    Yes.

12   Q.    What does that read?

13   A.    "Have them on my other account."

14   Q.    And reading just a couple lines above, what is that

15   referring to?

16   A.    What was your question again?  Can you repeat it?

17   Q.    Yes.  So when he says, "I have them on my other

18   account," what is that referring to, based upon the

19   previous little bit of the conversation?  Maybe I could

20   refer your attention to 17:34:59.

21   A.    Send then a dick pic.  "Send me a dick pic tho."

22   Q.    All right.  Same page, 17:57:29.

23   A.    "On two other accounts."

24   Q.    Was that sent by 541?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

 1   Q.   Go to page 7.  Direct your attention to two

 2   different timestamps, 5:35:26?

 3   A.   Okay.

 4   Q.   And the one right after that, 5:35:35.

 5   A.   "I send them from my other profile."

 6        "Lars here."

 7   Q.   And was that sent by user profile 541?

 8   A.   Yes.

 9   Q.   Next page, 008.  And this is a range, 9:25:38 to

10   9:25:58.  There's about four in there.

11   A.   Can you say this one more time?

12   Q.   Sure.  Let's start with 935 --

13   A.   935?

14   Q.   Sorry, 9:25:38.

15   A.   All right.

16   Q.   541 sent that particular message?

17   A.   Yes.

18   Q.   And what did that person ask?

19   A.   "Where are you?"

20   Q.   And what did the user respond with?

21   A.   "Tropicana."

22   Q.   And then?

23   A.   He asked "You?"

24   Q.   And 541 responded and said what?

25   A.   "Too," smiley face.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              "Shall I come to your room?"

 2              And the other person responded, "Own room?"

 3              To which profile 541 responded, "No."

 4              And then he asked, "You?"

 5              The other person responded, "I have a roommate

 6    tonight."

 7              And he asked "What are you into, Perv?"

 8              "Very few limits here."

 9    Q.    And 541 responded what?

10    A.    "Taboo, family, brothers, brothers, brothers,

11    sisters, yng.  You?"

12    Q.    Okay.  I'm going to have you pause there for a

13    moment.

14              And who sent the message that says "yng"?

15    A.    Profile 54111653.

16    Q.    Okay.  Let's look at the next page.  Starting at

17    9:32:47.

18              First of all, did 541 send this particular

19    message?

20    A.    9:32:47?

21    Q.    Yes.

22    A.    It was sent by the other user.

23    Q.    What did that other user say?

24    A.    "Used to play with a few boys."

25    Q.    And what did profile --
```

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  I can't hear anything you're saying.
2    Do you supply what?
3          THE WITNESS:  "Used to play with a few boys."
4          THE COURT:  You supplied 50 boys?
5          THE WITNESS:  He used to play with a few boys.
6          THE COURT:  Oh, "Used to play with a few boys"?
7          THE WITNESS:  Yes.
8          THE COURT:  Okay.
9          MS. ROOHANI:  Your Honor, would it be easier if
10   I asked Marissa to publish it so you could read along with
11   these chats?
12         THE COURT:  Yes.  Well I don't know how tiny
13   it's going to be.  If I could see it, that would be great.
14         MS. ROOHANI:  This one is a little more
15   readable.
16         THE COURT:  Okay.
17         MS. ROOHANI:  Marissa, can you publish 21B, page
18   009.
19   BY MS. ROOHANI:
20   Q.   Okay.  And, Kellie, I'm going to have you mark again
21   where we're starting.  It's 9:32:47, on that line.
22         So the other user said, "Used to play with a few
23   boys."  That's where we're starting.
24         UNIDENTIFIED SPEAKER:  (Inaudible).
25         MS. ROOHANI:  That's okay.

-------- TRANSCRIBED FROM DIGITAL RECORDING --------

```
 1              THE COURT:  That's okay.

 2   BY MS. ROOHANI:

 3   Q.    What did 541 respond with?

 4   A.    "Where did you find them?"

 5   Q.    And what did the other user reply to that?

 6   A.    "Baby-sat for them."

 7   Q.    Okay.  And what did 541 say to that?

 8   A.    "Hot, wow, you think we could pull something off

 9   together?"

10   Q.    And what did the other person respond with?

11   A.    Be hot -- have to -- "Be hot to have fucking me as

12   we watch some taboo poem."

13   Q.    And based upon the context of this conversation,

14   were they talking about poems?

15   A.    No.

16   Q.    What were they talking about?

17   A.    That was a typo for porn.

18   Q.    Okay.  One moment so I can find my place.

19         Who sent the message that says, "Do you think we

20   can pull something off together?"

21   A.    User 54111653.

22   Q.    Okay.  Let's go to page 11.

23         THE COURT:  When you say this is a typo, is this

24   your typo, or is this from Grindr?  I thought this was

25   something she created.
```

                    ───── TRANSCRIBED FROM DIGITAL RECORDING ─────

 1              MS. ROOHANI:  No, no, this --

 2              THE WITNESS:  That was on the Skype time

 3    conversion.  This is directly from Grindr.

 4              THE COURT:  Okay.  Thank you.

 5    BY MS. ROOHANI:

 6    Q.    Okay.  So when you say this is a typo, that is your

 7    belief that this is a typo?

 8    A.    That's my belief that this is a typo.  Grindr is a

 9    mobile application.  So it could be just an auto

10    correction.

11              THE COURT:  Yeah.

12    BY MS. ROOHANI:

13    Q.    And there was nothing in this conversation that

14    indicated they were talking about poems?

15    A.    No.

16    Q.    Okay.  Let's go to 11, please.  Let's start at

17    timestamp 52:23, which --

18    A.    52 --

19    Q.    52:23.  Right there.  Who sent that particular

20    message?

21    A.    I'm sorry.  Could you say it one more time?

22    Q.    Sure.  52:23.  It's also marked on there.

23    A.    Okay.

24    Q.    Marked on the screen.

25    A.    Okay.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   Who sent that particular message?

2   A.   User 54111653.

3   Q.   And what did that user say?

4   A.   "Shall we drug a young?"

5   Q.   And then two lines down what did the other user

6   respond with?

7   A.   "Fuck yes."

8   Q.   Page 12, please.  Timestamp 3:00:30.  Who sent that

9   message?

10  A.   User 54111653.

11  Q.   And what did that message say?

12  A.   "Into yng?"

13  Q.   Same page, 23:02.  Who sent that message?

14  A.   Same user, 54111653.

15  Q.   And what was the question before that, before that

16  particular line?

17  A.   The other user asked what he was into.

18  Q.   And what did 541 respond with?

19  A.   "Taboo stuff, yng and family."

20  Q.   Same page, 23:07:00.  Who sent that message?

21  A.   The other user.

22  Q.   And what did that user ask?

23  A.   "What ages do you like?"

24  Q.   And what did user 541 respond with?

25  A.   "13 through 11.  You?"

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what did the other user respond to that

2    response?

3    A.    "Young legal."

4              THE COURT:  Did you say "13 through 11"?

5              THE WITNESS:  "13 through 16."  Sorry.

6              "You."

7    BY MS. ROOHANI:

8    Q.    Okay.  Page 13, timestamp 13:33:14, who sent that

9    message?

10   A.    User 54111653.

11   Q.    And what does that message read?

12   A.    "It's Jan," smiley face.

13   Q.    And what's the next message say?

14   A.    "Got a new Grindr lol."

15   Q.    And next one?

16   A.    "And put a generic body lol."

17   Q.    Okay.  Now we're going to move on to Government's

18   Exhibit 22A.

19              What is the user number associated with this

20   particular account?

21   A.    2002810.

22   Q.    And what is the e-mail associated with that account?

23   A.    Larsschmidt22@hotmail.com.

24   Q.    Okay.  And I'm going to circle it for you.  But you

25   tell me, did you get that from there?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Okay.

3          730, please.

4          Do you recognize that photo?

5    A.    Yes.

6    Q.    How do you recognize that photo?

7    A.    It's one of the same photos that was used on the

8    last Grindr profile.

9    Q.    And was that the body of the defendant as you had

10   indicated before?

11   A.    Yes.

12   Q.    Okay.  Let's look at some of the chats, which is in

13   22B, specifically page 5.  I'm looking at timestamp 22:55.

14          So in this one, who sent this message?

15   A.    Another user, 63879241.

16   Q.    Oh, I'm sorry.  There's a bunch of 22:55s.  Let's do

17   22:55:30.

18   A.    Okay.  It was sent by 2002810.

19   Q.    And that was the owner of this particular Grindr

20   account?

21   A.    Yes.

22   Q.    And then what did that message say?

23   A.    "No, that's where I live."

24   Q.    What did the other user respond with?

25   A.    "Oh, okay.  Didn't know where you lived."

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And then?

2    A.    "What is the area called?"

3    Q.    And what did user 2002 respond to that?

4    A.    "Centennial."

5    Q.    Are you familiar with where 7080 Donald Nelson is

6    located?

7    A.    Yes.

8    Q.    Is that located in an area of town known as

9    Centennial?

10   A.    Yes.

11   Q.    And was that message sent by the user 2002?

12   A.    Yes.

13   Q.    On page 6, please.  Let me direct your attention to

14   timestamp 8:14:20.

15   A.    Okay.

16   Q.    Who sent that particular message?

17   A.    63879241.

18   Q.    So not the user of this account?

19   A.    No.

20   Q.    And what did that message say?

21   A.    "Babe, you're way out there.  You were just at

22   Tropicana.  What were you there for?  Could have gotten us

23   a room around there."

24   Q.    And what did 2002 respond?

25   A.    "Work there."

------TRANSCRIBED FROM DIGITAL RECORDING------

1    Q.    Where does the defendant work?

2    A.    He worked at the Tropicana.

3    Q.    Page 7, please.  Look at timestamp 10:13:58.

4    A.    Okay.  It was sent by user 2002810.

5    Q.    And what did that person say?

6    A.    "Lars."

7    Q.    Was that in response to any question?

8    A.    No.

9    Q.    And what did the other user respond with?

10   A.    "Lars?"

11   Q.    And jump down next to.  Actually read me the next

12   couple of messages.

13   A.    The user 63879241, "What is Lars?  Why don't you

14   have a boyfriend?  Not suggesting anything.  Just

15   wondering."

16   Q.    And then at 10:31:02, what did that same user

17   respond?

18   A.    "No what, what is Lars?"

19   Q.    Who sent that first message saying "Lars"?

20   A.    Profile 2002810.

21   Q.    Okay.  All right.  Let's go ahead and take a look at

22   Government's Exhibit 23.

23              It's not been admitted yet.  So don't publish.

24              Okay.  I want you to take a look at

25   Government's -- first the page before Exhibit 23A, and then

TRANSCRIBED FROM DIGITAL RECORDING

1    I want you to look at 23A, B, C, D, E, and F.  And tell me

2    if you recognize those.

3    A.    Yes.

4    Q.    Okay.  Let's talk about that very first page before

5    Exhibit 23A.  What is that?

6    A.    It's a business record certification.

7    Q.    And who is that from?

8    A.    Microsoft.

9    Q.    Did you request that from Hotmail.com?

10   A.    Yes.

11   Q.    Okay.  Let's talk about 23A, B, C, D, E, and F.

12         Were these documents derived from a subpoena or

13   a search warrant sent to Hotmail.com?

14   A.    Yes.

15   Q.    And these documents came with a business

16   certification that we've already talked about?

17   A.    Yes.

18         MS. ROOHANI:  Your Honor, I would move to admit

19   these under the Court's pretrial order.

20         MR. MARCHESE:  No objection.

21         THE COURT:  Is this 23A through F and not E, or

22   does it include E?

23         MS. ROOHANI:  There is no -- oh, all of them.

24   Up to F.  E and F.  I'm sorry if I didn't say E.

25         THE COURT:  Yeah.  That's what I was wondering,

TRANSCRIBED FROM DIGITAL RECORDING

1    maybe that one came in later.

2              MS. ROOHANI:  A through F.  All of them.

3              THE COURT:  A through F?

4              MS. ROOHANI:  Yes.

5              THE COURT:  Any objection from the defense?

6              MR. MARCHESE:  No, Your Honor.

7              THE COURT:  All right.  So 23A through F will be

8    admitted.

9         (Government's Exhibits 23A, 23B, 23C, 23D,

10        23E, 23F received.)

11   BY MS. ROOHANI:

12   Q.   Let's talk about 23A.  Okay?  Who is this e-mail

13   from?

14   A.   This e-mail is from GigaTribe.

15   Q.   And who is this e-mail to?

16   A.   It's addressed to larsschmidt22@hotmail.com.

17   Q.   And can you read me the body of the e-mail?

18   A.   The body of the e-mail says:

19             Dear lars45, your bank has declined the

20      payment of your GigaTribe monthly subscription.

21      The most common reasons for a declined payment are

22      card expiration or the reach of your credit limit.

23      Your ultimate license will automatically -- will

24      end automatically on 25/04/21.  If you wish to keep

25      using GigaTribe ultimate license, you may subscribe

-------- TRANSCRIBED FROM DIGITAL RECORDING --------

1      again on the following page.

2              It gives a link to GigaTribe ultimate.  Best

3      regards GigaTribe.

4              MS. ROOHANI:  And, Marissa, I'm going to ask

5      that you publish 23A, please.

6      BY MS. ROOHANI:

7      Q.    What is -- well, when it comes up.  What is the date

8      on this particular e-mail?

9      A.    The date on it is April 14, 2015, at 6:06 p.m.

10     Q.    All right.  Let's look at 23B, page 001.

11             Marissa, you can publish.

12             Who is the -- and this is an e-mail chain; is

13     that correct?

14     A.    Yes.

15     Q.    Okay.  Who is that last e-mail from?

16     A.    The e-mail is from larsschmidt22@hotmail.com.

17     Q.    And who is it to?

18     A.    It's to willrose239@Yahoo.com.

19     Q.    And what is the date on this particular e-mail?

20     A.    April 14th, 2002.  Or 2012.  Sorry.

21     Q.    Okay.  Can you read just that last e-mail in the

22     chain?

23     A.    "Yes, please send me some pics to 702-994-3700.

24     Q.    Do you know whose phone number 702-994-3700 is?

25     A.    Yes, it's the defendant's phone number.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And how do you know that?

2    A.    It came back in a subpoena return that we sent to

3    Verizon Wireless.

4    Q.    Let's look at page 002.  This is an e-mail chain.

5    And I understand that it's a little bit difficult to read.

6    So bear with me.

7              How many e-mails are in this chain?  More than

8    one?

9    A.    Looks like four.

10   Q.    And who are the two parties in this e-mail?  Who are

11   the two e-mail addresses being exchanged between?

12   A.    Larsschmidt22@hotmail.com and

13   homeforrent515@gmail.com.

14   Q.    And what is the date on the latest e-mail?

15   A.    October 25th, '12.

16   Q.    I want you to take a look at that first e-mail in

17   the chain.  Who was it originally signed by?

18   A.    Lars.

19   Q.    And in the last e-mail in the chain, who was it

20   signed by?

21   A.    Jan.

22   Q.    And were they both sent by larsschmidt22@gmail.com

23   -- or @hotmail.com?

24   A.    Yes.

25   Q.    23C?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              Who is this e-mail sent from?
 2    A.     Larsschmidt22@hotmail.com.
 3    Q.     And who is it sent to?
 4    A.     A best.
 5    Q.     And what is the date on this particular e-mail?
 6    A.     October 8, 2015.
 7    Q.     And can you read me the text of this -- the body of
 8    this e-mail?
 9    A.     "Hi, you are hot.  I am 31 years old, athletic body,
10    pick in clothes.  Want to meet?  I am the right one in the
11    picture."
12    Q.     Okay.  And when you were looking at the search
13    warrant return from Hotmail, did you expand these
14    thumbnails?
15    A.     Yes, I looked at the two attachments to the e-mail.
16    Q.     Okay.  And based upon when you were looking at --
17    I'm assuming you looked at multiple attachments to multiple
18    different e-mails?
19    A.     Yes.
20    Q.     Is this photo a complete photo of a thumbnail, or
21    would you have to look at the full thumbnail to be able to
22    see what the full photo looks like?
23    A.     I opened up the two thumbnails to see the full
24    attachment.
25    Q.     Okay.
```

TRANSCRIBED FROM DIGITAL RECORDING

1           Can you go to page 2, Marissa?

2           Is this the full photo of the thumbnail that was

3      in the previous e-mail?

4      A.    Yes.

5      Q.    Who is the person on the right?

6      A.    The defendant, Mr. Fuechtener.

7      Q.    Let's go to 23D.

8           Who is this e-mail from?

9      A.    Larsschmidt22@hotmail.com.

10     Q.    And who is this e-mail to?

11     A.    A Craigslist posting.  And the ID on the other

12     person is 3994612298.

13     Q.    And can you read me the body of that e-mail?

14     A.    "Yes.  Here you go.  I am the left one.  Please send

15     yours as well.  Lars."

16     Q.    So this particular e-mail was signed Lars; correct?

17     A.    Yes.

18     Q.    And what was the date of this e-mail?

19     A.    August 11, 2013.

20     Q.    And same question as before, did you expand the

21     thumbnail on this particular photo?

22     A.    Yes.

23     Q.    Go to the next page.

24           Is that the photo?

25     A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Who is on the left?

2    A.    The defendant, Mr. Fuechtener.

3    Q.    Okay.  Look at 23E.  Who is this e-mail from?

4    A.    Larsschmidt22@hotmail.com.

5    Q.    And is this also to another Craigslist user?  I'm

6    not going to make you read that long number.

7    A.    Yes.

8    Q.    Okay.  Read me the body of that e-mail.

9    A.    "Hello.  I'm a 28-year-old guy.  I have favors to

10   share.  I partied already and fucking horny.  I am bi,

11   athletic body.  I am a swimmer in a show.  I am from

12   Europe.  Enclosed you will find pics.  Let me know if you

13   are still interested."  Signed "Lars."

14   Q.    Okay.  Based upon being an adult living in this

15   world, and also based upon your training and experience and

16   working in the Child Exploitation Task Force, what does bi

17   mean?

18   A.    That someone is interested in males and females.

19   Q.    Okay.  What is the date on this e-mail?

20   A.    June 18th, 2015.

21   Q.    Okay.  And there was a thumbnail attached to this

22   particular photo?

23   A.    Yes.

24   Q.    You expanded that thumbnail?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Page 02, please.

2          Is that the photo?

3    A.    Yes.

4    Q.    Who is the only male in this photo?

5    A.    The defendant, Mr. Fuechtener.

6    Q.    Go to 23F, please.

7          Who is this e-mail from?

8    A.    This e-mail is from safepay.com.

9    Q.    And who is it to?

10   A.    Larsschmidt22@hotmail.com.

11   Q.    And what is the date on this particular e-mail?

12   A.    September 1st, 2015.

13   Q.    Okay.  Can you read me the body of the e-mail

14   starting from "thank you."

15   A.    "Thank you, Jan Fuechtener, for purchasing through

16   SafePay.  Below is the information regarding your purchase.

17   Purchase information:  Website, www.sketchysex.com.

18   Purchase ID:  34702584.  Transaction ID:  51273052.  User

19   name:  Larsusa22.  Password:  Sketchysex123.

20   Q.    What was the transaction amount?

21   A.    The transaction amount was 24.95.

22   Q.    And at the very bottom it says "statement

23   descriptor."  Can you read me that line.

24   A.    Where --

25   Q.    "For your privacy."  The very last line of the

TRANSCRIBED FROM DIGITAL RECORDING

1    e-mail.

2    A.    "For your privacy, safepay.com will appear on your

3    statement."

4    Q.    Okay.  Are you familiar with the name larsusa22 in

5    any other way?

6    A.    Yes.

7    Q.    Where?

8    A.    On the Skype chats.

9    Q.    And is that the same user name as used on Skype?

10   A.    Yes.

11   Q.    Did you cross-reference this charge with any charge

12   on a credit card statement?

13   A.    Yes.

14   Q.    And go ahead and turn to Government's Exhibit 24.

15         What is that document?

16   A.    This is the certification of the Bank of America

17   records that were subpoenaed.

18   Q.    Okay.  And go ahead and flip through all of

19   Government's Exhibit 24.

20         Do you recognize that?

21   A.    Yes.

22   Q.    What is it?  What is it?

23   A.    These are the records that were subpoenaed from Bank

24   of America.

25   Q.    Okay.  And that first page, you said that it was

TRANSCRIBED FROM DIGITAL RECORDING

1    sent with an authorization or authentication; is that

2    correct?

3    A.    Yes.

4              MS. ROOHANI:  Your Honor, I would move to admit

5    Government's Exhibit 24 pursuant to the Court's pretrial

6    order.

7              THE COURT:  Any objection?

8              MR. MARCHESE:  No objection.

9              THE COURT:  All right.  Exhibit 24 is admitted.

10         (Government's Exhibit 24 received.)

11   BY MS. ROOHANI:

12   Q.    Okay.  Is this a document that you cross-referenced

13   with that SafePay?

14   A.    Yeah, we cross-referenced to see if that charge was

15   made by Mr. Fuechtener by the Bank of America charge card.

16   Q.    Okay.  I'm going to direct your attention to Bates

17   stamp at the bottom.  It says 3968.  And specifically to

18   the charge that posted on 9/4 that was made on 9/1.

19   A.    Yes.

20   Q.    Can you publish that, please.  Okay.  I realize that

21   you don't have it, so I'm going to point you to where I'm

22   talking about.  Right there.

23             What was the description of that charge?

24   A.    It was safepay.com.

25   Q.    And was that the same as what it said on the e-mail

TRANSCRIBED FROM DIGITAL RECORDING

1    @hotmail?

2    A.    Yes.

3    Q.    Who was the payee on that particular account?  Who

4    did the payment get made to?

5    A.    Safepay.com.

6    Q.    What was the amount?

7    A.    24.95.

8    Q.    And does that also match the e-mail?

9    A.    Yes.

10   Q.    Do you know whose credit card made that purchase?

11   A.    Jan Feuchtener.

12   Q.    How do you know that?

13   A.    Because it says right here.

14   Q.    Okay.

15         And I want to go to a couple of pages before

16   that, Marissa.  And I will tell you which one.  That one.

17   Sorry.  Go back to 3967.

18         And did you -- is there another person who owns

19   a credit card on this particular account?

20   A.    Yes.

21   Q.    And who is that?

22   A.    Frank Alfter.

23   Q.    How do you know that?

24   A.    Because it says it right here.

25   Q.    And for the entire month of August, did

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Mr. Fuechtener and Mr. Alfter make purchases on these
 2    particular accounts?
 3    A.    Yes.
 4    Q.    Okay.
 5           MS. ROOHANI:  Your Honor, I'd pass the witness
 6    at this time.
 7           THE COURT:  All right.
 8           Any cross?
 9           MR. MARCHESE:  Yes.  Thank you.
10                   CROSS-EXAMINATION
11    BY MR. MARCHESE:
12    Q.    Good morning.
13    A.    Good morning.
14    Q.    You testified on direct examination that you were a
15    part of the search in this particular case?
16    A.    Yes.
17    Q.    Okay.  And what was your role in the search?
18    A.    I kept the photo log during the search warrant.
19    Q.    I'm sorry?
20    A.    I kept the photo log during the search warrant.
21    Q.    Okay.  So we've had some prior testimony.  Obviously
22    you weren't here.  But would it be fair to say that some
23    other individuals go in and secure the house -- I believe
24    that was a SWAT team --
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    -- and then once that home is secure, at that point

2    the rest of the team, for lack of a better term, would make

3    entry into the house; correct?

4    A.    Yes.

5    Q.    And you would be part of that team?

6    A.    Yes.

7    Q.    Okay.  Approximately what time did you arrive at the

8    residence on that day?

9    A.    I don't recall what time the entry was made.

10   Probably early in the morning, maybe 7:30.

11   Q.    Okay.  And how long were you at the residence on

12   that day?

13   A.    We were probably there until 1:00 or 2:00 in the

14   afternoon.

15   Q.    Now, you had also testified on direct examination

16   that part of your job is background?

17   A.    Yes.

18   Q.    Meaning, you're just going to take a look and see

19   exactly what it is that you're dealing with.  Is that fair

20   to say?

21   A.    Yes.

22   Q.    What steps did you take in order -- because every

23   case is different, obviously.

24   A.    Yes.

25   Q.    What steps did you take in order to get a background

TRANSCRIBED FROM DIGITAL RECORDING

1   on this particular case?

2   A.    I helped serve some subpoenas.  We saw what IP

3   addresses came back to the residence.  I did some social

4   media work to see who else was living at the house, if

5   there was other people that -- who might be at the

6   residence when the team made entry, things of that nature.

7   Q.    Okay.  What social media research did you do?

8   A.    I looked at Facebook, things that were open to the

9   public.  Looked at Twitter.  Looked at -- to see if the

10  defendant had a MySpace or other things that were publicly

11  available.

12  Q.    Based on your investigation, what were you able to

13  find in reference as to who was residing at the Donald

14  Nelson residence?

15  A.    It appeared that the defendant, Mr. Fuechtener, and

16  his husband, Frank Alfter, were the only two residents at

17  the Donald Nelson house.

18  Q.    Were you able to find out anything in reference to

19  Mr. Fuechtener's biographical data; meaning relatives,

20  brothers, sisters, aunts, uncles, anything of that nature?

21  A.    No.  I could tell that he was a German citizen.  He

22  appeared to be here legally at that time.  But other than

23  that, it didn't look like he had any other family members

24  that resided here with him.

25  Q.    Okay.  So based on your investigation, he had no

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    family members that resided in the United States; correct?
 2    A.    No.
 3    Q.    And the only other person, to your knowledge, based
 4    on your investigation, that resided with Mr. Fuechtener
 5    would have been his husband, Frank Alfter --
 6    A.    Yes.
 7    Q.    -- correct?
 8          Now, obviously you were at the search; correct?
 9    A.    Yes.
10    Q.    And fair to say this is not your average three-
11    bedroom, two-bath house?
12    A.    No.
13    Q.    Okay?
14    A.    It was a beautiful home.
15    Q.    Very large; correct?
16    A.    Yes.
17    Q.    Did you ever look into the square footage, or could
18    you guesstimate to the Court what the square footage of the
19    home would be?
20    A.    I don't recall what the square footage of the home
21    was.
22    Q.    Okay.  Do you know how many bedrooms, give or take?
23    A.    I think it was approximately six or seven bedrooms.
24    Q.    Okay.  We can both agree, large house?
25    A.    Yes.
```

1   Q.    Okay.  Now, based on your investigation, you said

2   you checked some IP addresses; correct?

3   A.    Yes.

4   Q.    Did you have any contact with GigaTribe?

5   A.    I don't believe we had contact with GigaTribe before

6   the search warrant.

7   Q.    Okay.  Do you remember receiving an e-mail

8   approximately December 2nd of 2015 from GigaTribe?

9   A.    I don't recall.

10  Q.    If I was to show you a copy of that e-mail, would

11  that refresh your recollection?

12  A.    It could.

13  Q.    126 through 129.

14        Would you just take a look at that real quick

15  and see if that refreshes your recollection?

16        (Discussion held off the record.)

17        MS. CARTIER-GIROUX:  Could I just ask we be

18  shown something before it be shown to the witness because

19  we don't have a copy of it, and it's not a defense exhibit.

20  So if we could just take a look at it first.

21        MR. MARCHESE:  126 through 129.

22        MS. ROOHANI:  We don't have our --

23        MS. CARTIER-GIROUX:  I don't have my -- I would

24  have to look through eight binders.  So if we could just

25  look at the exhibit before it's shown --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MR. MARCHESE:  (Inaudible) my black binder is
 2     right there.
 3              THE COURT:  Just to be clear, these are copies
 4     that the defense obtained from the government?
 5              MR. MARCHESE:  (Inaudible.)
 6              THE COURT:  Okay.  It's just a matter of there's
 7     voluminous information that's difficult to find, even with
 8     the Bates stamp?  So they're not Bates stamped?
 9              MR. MARCHESE:  (Inaudible.)
10              THE COURT:  Is there more than one number 126?
11              MR. MARCHESE:  No.
12              MS. ROOHANI:  No, Your Honor.  We just don't
13     actually have -- there's over 4,000 pages of Bates numbers.
14     That's why we're -- don't have necessarily all of them with
15     us.  We just wanted to see what it was.
16     BY MR. MARCHESE:
17     Q.    Does that refresh your recollection?
18     A.    Yes.
19     Q.    (Inaudible.)
20     A.    Okay.
21     Q.    And do you remember receiving that e-mail now?
22     A.    Yes.  Thank you for refreshing my memory.
23     Q.    And what was the purpose of that e-mail?
24     A.    We were trying to get IP address information to
25     subpoena from Cox Communication.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And part of that is basically you want to tie

2    this lars45 user name to my client, Mr. Fuechtener; fair to

3    say?

4    A.    Right.  Before we serve his search warrant, we want

5    to be absolutely certain that we're getting the right

6    house.

7    Q.    Okay.  Through the course of your investigation, did

8    it come -- become clear to you what it was or is that my

9    client does for a living?

10   A.    Yes.

11   Q.    And what is that?

12   A.    He was a magician on the Las Vegas Strip.

13   Q.    Do you know how old he is?

14   A.    Yes.

15   Q.    How old is he?

16   A.    He's in his mid 30s.  I think he's 37 or 38 now.

17   Q.    Okay.

18   A.    I think from that subpoena to GigaTribe, we were

19   hoping to get an e-mail address that the GigaTribe account

20   was set up with, to help with the background investigation.

21   Q.    Sure.  And that came back actually to a

22   larsschmidt@hotmail -- 22, excuse me --

23   A.    Right.

24   Q.    --@hotmail.com?

25   A.    And that was -- that helped with the background

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    investigation.

 2    Q.    And part of your investigation was actually to go

 3    and subpoena the Hotmail records; correct?

 4    A.    Correct.

 5    Q.    And you did that?

 6    A.    Uh-huh.

 7    Q.    Is that a yes?

 8    A.    Yes.

 9    Q.    Did you review all those records personally or --

10    A.    Yes.

11    Q.    Okay.  So you go through them, and I guess you flag

12    documents, for lack of a better term, as hot, ones that you

13    think would be useful to your investigation; correct?

14    A.    Yes.

15    Q.    And some of those documents would have been the ones

16    that we just saw in court; correct?

17    A.    Yes.

18          MR. MARCHESE:  Your Honor, permission to

19    approach with Defense Exhibit 5040?

20          THE COURT:  Yes.

21    BY MR. MARCHESE:

22    Q.    Showing you this document.  Do you recognize this

23    document?

24    A.    I do recognize this document.

25    Q.    Okay.  And is that one of the documents that was
```

---
TRANSCRIBED FROM DIGITAL RECORDING
---

1    procured as a result of your Hotmail subpoena?

2    A.    Yes.

3    Q.    And it fairly and accurately depicts what you saw of

4    that e-mail?

5    A.    Yes.

6              MR. MARCHESE:  Your Honor, at this time, defense

7    moves to enter 5040 into evidence.

8              THE COURT:  Any objection?

9              THE WITNESS:  Is it just the one attachment, or

10   there was --

11             MR. MARCHESE:  Well -- the reason that I printed

12   it off was -- I don't know if you recollect, but this is

13   actually that (indiscernible) --

14             THE WITNESS:  Right.  Okay.  And then this one

15   was a screenshot.  I'm familiar with this e-mail.  This was

16   a screenshot from a Kevin Kleeping's Facebook account.

17   Q.    Correct.  Okay.

18             THE COURT:  All right.  So any objection to

19   Defendant's Exhibit 5040 being admitted?

20             MS. ROOHANI:  Your Honor, I'd just like to voir

21   dire the witness briefly, if that's okay, with regard to

22   the attachments to the e-mail.

23             Because in the Defense Exhibit that's given to

24   us, there's actually two photos, and I need to know what

25   she was shown.

```
 1              THE COURT:  So is it two pages, Defense Exhibit
 2     5040?
 3              MS. ROOHANI:  It's actually three pages in our
 4     defense book.  There's an additional page.
 5              MR. MARCHESE:  Oh.
 6              THE WITNESS:  I was just shown two.
 7              THE COURT:  All right.  Well, go ahead,
 8     Ms. Roohani.
 9                     VOIR DIRE EXAMINATION
10     BY MS. ROOHANI:
11     Q.   Go ahead and open up that defense book in front of
12     you to 5040.  It's actually tab 40.
13              THE COURT:  Did you say the defense book or the
14     government book?
15              MS. ROOHANI:  This is the defense book.  This is
16     not a government exhibit.
17              THE COURT:  Okay.  She's in the other book.
18     BY MS. ROOHANI:
19     Q.   And how many pages are included on that particular
20     exhibit?
21     A.      Three.
22     Q.   Do you recognize all of these?
23     A.   The third one is different than the attachment
24     that's actually to the e-mail.
25     Q.   And how do you know that it's different?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Because the attachment to the e-mail is a screenshot

2    from Facebook.

3    Q.    And is that not what the third page is in the

4    defense exhibit?

5    A.    In the defense exhibit this is a NetClean report

6    picture.

7    Q.    Okay.  And is the -- is the photo itself the same?

8    A.    Yes.

9    Q.    But the attachment that was to the e-mail that you

10   said that you were familiar with, how is that different?

11   A.    It's a screenshot that shows it's from Kevin

12   Klepping's Facebook.  It's a screenshot.

13   Q.    Okay.

14         MS. ROOHANI:  Your Honor, I would -- I have no

15   objection to the first two pages of Defense Exhibit 5040

16   being admitted, but this is not a complete exhibit in terms

17   of -- I do have an objection to that last page being

18   admitted as part of this exhibit.

19         THE COURT:  What's the objection to the third

20   page being admitted?

21         MS. ROOHANI:  It's not part of the e-mail, and

22   she's not familiar with that particular -- that particular

23   photo as being part of this e-mail.

24         THE COURT:  All right.  Well, she's familiar

25   with the photograph.  She said where it was taken from.

TRANSCRIBED FROM DIGITAL RECORDING

1    But I agree she's saying that it doesn't belong with that

2    e-mail.  It's a separate document.  But she's still

3    familiar with the document.

4              THE WITNESS:  This one is printed from NetClean.

5              MR. MARCHESE:  It's the same photo, correct,

6    just a larger photo from NetClean?

7              THE WITNESS:  It's taken from somewhere else.

8              MR. MARCHESE:  Correct.

9              THE WITNESS:  This one is taken from NetClean.

10   But this one shows that it's a screenshot from somewhere

11   else.

12             THE COURT:  So why don't we divide it up as a

13   Defense Exhibit 5040, the first two pages, and 5040A can be

14   the third page as a separate exhibit that's not part of the

15   e-mail.

16             MR. MARCHESE:  I -- what I'm feeling is that the

17   objection is that we're somehow trying to mislead the

18   Court.

19             All we did is a very small thumbnail.  We just

20   printed a larger picture that we had found on one of the

21   devices.  It's the same picture, it's just larger.  And we

22   found it in a different spot.  Same picture.  Just bigger.

23             MS. ROOHANI:  Your Honor, I have a copy of the

24   actual attachment.  So if I could show that to

25   Ms. Badalucco, then we could enter this particular photo.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  All right.  Well, I have no problem

2    adding the third page to 5040 and then removing the third

3    page that was provided and just marking it as a different

4    exhibit, so it could still be available so we can see it in

5    a larger view.

6           MR. MARCHESE:  And, Your Honor, how did you want

7    to have me mark this?

8           THE COURT:  Oh, I was recommending, since it's

9    already marked as Defendant's Exhibit 5040, just make it

10   5040A.

11          MR. MARCHESE:  Got it.

12          THE COURT:  To show that it's -- that that's --

13   that it's similar to and that's where it falls in line for

14   purposes of having it conveniently located, but that it

15   isn't actually part of 5040.

16          MR. MARCHESE:  Thank you.

17              CROSS-EXAMINATION (Resumed)

18   BY MR. MARCHESE:

19   Q.    Do you recognize that?

20   A.    Yes.

21   Q.    How do you recognize it?

22   A.    It's one of the attachments to that e-mail.

23   Q.    All right.  Same exact photo; correct?

24   A.    Yes.

25   Q.    Just from a different place; correct?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Fair and accurate depiction?

3    A.    Yes.

4         MR. MARCHESE:  Move it into evidence, Your

5    Honor.

6         THE COURT:  Any objection?

7         MS. ROOHANI:  No objection, Your Honor.

8         THE COURT:  All right.  So Defense Exhibit 5040,

9    the three original pages with the e-mail, the correct

10   e-mail attachment is admitted.

11        (Defendant's Exhibit 5040 received.)

12        THE COURT:  And then 5040A, did you also want to

13   include that so we can see the larger picture?

14        MR. MARCHESE:  Actually, can I grab that one

15   from you?  I apologize.

16        Thank you.

17   BY MR. MARCHESE:

18   Q.    And showing you what's been brought into evidence as

19   5040, and you previously testified that you recognized

20   this?

21   A.    Yes.

22   Q.    And can you read the text on this?

23   A.    "I can host right now.  Do you know any trannies?  I

24   might have a few.  Send me a pic of your fat cock again."

25   Q.    And this appears to be an e-mail from the

TRANSCRIBED FROM DIGITAL RECORDING

1    larsschmidt address; correct?

2    A.    Yes.

3    Q.    And it was a Craigslist ad; is that correct?

4    A.    Yes.

5    Q.    Okay.  Isn't it true that there were many e-mails in

6    the sent folder off of the Craigslist ad; is that fair to

7    say?

8    A.    Yes.

9    Q.    Okay.  Did you review all the sent items?

10   A.    I reviewed -- yes.

11   Q.    Okay.  Isn't it true that basically the majority of

12   the e-mails from this time period, we're talking March of

13   2015 to your subpoena, the greater majority of the e-mails

14   that were in the sent folder were from the Craigslist ad;

15   fair to say?

16   A.    Yes.

17   Q.    Isn't it also fair to say that this e-mail didn't

18   really have a lot of activity, it was a lot junk e-mails,

19   Best Buy, Viagra, things of that nature?

20   A.    There was a lot of junk e-mails in his e-mail

21   account.

22   Q.    Okay.  And I'm just going to publish this photo that

23   we had just entered into evidence.

24         What is this a picture of, so the Court is

25   aware?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Frank Alfter.  And then in that middle one is Kevin

2    Klepping.  And I don't recognize the third person in the

3    photo.

4    Q.    And basically all this is is just a larger photo of

5    the thumbnail from the e-mail that was sent as larsschmidt;

6    right?

7    A.    Yes.

8    Q.    Can we go back briefly to this.  Why don't you blow

9    it up.  And what we're going to be focusing on is the

10   profile picture.

11         Now, this picture is obviously a man holding his

12   private area; fair to say?

13   A.    Yes.

14   Q.    At any time during your subpoena to Grindr, did you,

15   in fact, match this picture with any of your subpoena

16   requests?

17   A.    No.

18   Q.    Part of your subpoena request was also to subpoena

19   the information regarding the janrouven@aol account; is

20   that correct?

21   A.    Yes.

22   Q.    Isn't it true that that account information came

23   back to Frank Alfter; correct?

24   A.    I believe so.

25   Q.    You also sent out a subpoena request in reference to

TRANSCRIBED FROM DIGITAL RECORDING

1   the larsusa account, 22 account?

2          Do you remember doing that back in May 2nd of

3   2016?

4   A.    Yes.

5   Q.    Okay.  Isn't it also true that the account

6   information came back to Frank Alfter on that particular

7   account?

8   A.    I don't recall.

9   Q.    Okay.  If I was to show you a copy of your -- I

10  believe it's a 302 -- yes, your 302, would that refresh

11  your recollection?

12  A.    Yes.

13  Q.    And would you just take a look at that, please, and

14  see if that refreshes your recollection.

15  A.    Yes.

16  Q.    And isn't it true that when you sent out your

17  subpoena, that the -- for larsusa22, that the account

18  information came back to Frank Alfter; correct?

19  A.    It did.

20          MS. ROOHANI:  Your Honor, could Mr. Marchese --

21  this -- I just want to be clear, because this is not

22  admitted into evidence, who this is coming from.  Because

23  it says Mindgeek.  So I just want to clarify who, what

24  company the subpoena's coming from.

25

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MR. MARCHESE:

2      Q.    Do you --

3             THE COURT:  You mean who was subpoenaed?

4             MS. ROOHANI:  Yes.

5             THE COURT:  All right.  So the subpoena was to

6    Hotmail or --

7             MR. MARCHESE:  The subpoena was in reference to

8    her, the witness, sending out a subpoena request for the

9    user name larsusa22.

10            THE COURT:  To whom was the subpoena sent?

11            MR. MARCHESE:  Sent --

12            THE WITNESS:  It was to PornHub.

13            THE COURT:  Say it again.  PornHub?

14            THE WITNESS:  PornHub.

15            THE COURT:  Thank you.

16            THE WITNESS:  And PornHub is by Mindgeek.  And

17   so when we sent the subpoena for larsusa for PornHub, the

18   account came back.

19            I want to say that Frank Alfter was the --

20            MR. MARCHESE:  There's no question pending.

21            THE WITNESS:  Okay.

22            MR. MARCHESE:  Yeah.  Sorry.

23   BY MR. MARCHESE:

24     Q.    Now, I want to turn your attention to these Grindr

25   chats that were entered into evidence.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              Did you go through the same process with that
 2    with the e-mails that you looked at all those chats --
 3    A.    Yes.
 4    Q.    -- and you saw what you thought might have some
 5    evidentiary value and took it from there?
 6    A.    Yes.
 7    Q.    Okay.  And I'm not going to go through all of them,
 8    because I know you just did, and I have some as well that I
 9    want to show you.
10              Because you basically just picked out the ones
11    for trial that you thought would be useful.  There are
12    other chats; correct?
13    A.    Yes.
14    Q.    But in the interest of judicial economy and, you
15    know, we'd like to all have a Thanksgiving here, you kind
16    of condensed it to make it easier for everyone?
17    A.    Yes.
18    Q.    Okay.  Now, if you could go into the government's
19    binder under Exhibit 21.
20    A.    Yes.
21    Q.    Actually, you know what, I'll just print it.  I'll
22    make your life and government's life a little bit easier.
23    I'm going to show you 21B-10.  And I've actually got it
24    highlighted for you.
25              So this one with the arrow, that's from 556780.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Okay.

2    Q.    And it's the government's contention that 54111653

3    is to my client, Mr. Fuechtener.  Fair to say?

4    A.    Yes.

5    Q.    Okay.  So that phone number is sent from another

6    individual to my client allegedly; correct?

7    A.    Yes.

8    Q.    Were there any steps taken in reference to that

9    phone number?

10   A.    That phone number was sent to Mr. Fuechtener.

11   Q.    Right.  But as a result, to your knowledge, of the

12   government's investigation, did anyone try to contact this

13   unknown individual on the other end of this chat?

14   A.    Not to my knowledge.

15   Q.    Because one of the difficult things with Grindr is

16   we're just going off of text messages; correct?

17   A.    Correct.

18   Q.    We don't actually know who it is; correct?

19   A.    Right.

20   Q.    One of the tools that the government obviously uses

21   to send out subpoenas, see whose account it is; correct?

22   A.    Right.

23   Q.    Try to match pictures with the account; correct?

24   A.    Right.

25   Q.    So we don't actually -- can't see who is behind the

TRANSCRIBED FROM DIGITAL RECORDING

1   keyboard or the text message or anything like that;

2   correct?

3    A.    Correct.

4    Q.    Would you agree with me that it would have been very

5   helpful for the government to contact this individual to

6   see if, in fact, they recognized Mr. Fuechtener?

7    A.    Could have been, but that's not my job role.

8    Q.    Okay.  That's someone else's job?

9    A.    Yes.

10   Q.    Okay.  Now, I want to -- actually, if you take a

11   look at Defense Exhibit 5035?

12   A.    Would that be in here?

13   Q.    I'm sorry?

14   A.    Would that be in here?

15        THE COURT:  35?

16   BY MR. MARCHESE:

17   Q.    Or 35.  I'm sorry.  Okay.

18        Those are some Grindr chats that hopefully you

19   recognize.  Would those be some of the ones that you had

20   extracted from the Grindr account?

21   A.    There's a lot in here.  I'm not sure if I recognize

22   this other profile.

23   Q.    Well, there are ones from this 54111653 user name;

24   correct?  We know that.

25   A.    Right.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    We've talked about that user name.

2          Okay.  Do they look familiar to you?

3    A.    I don't recognize all of them.  But if they're from

4    our subpoena that we turned over to you in discovery.

5    Q.    Okay.  You do recognize some of them; correct?

6    A.    Yes.

7    Q.    All right.  And based on what you recognize, it is

8    fairly and accurately depicting what you received to your

9    subpoena from Grindr; correct?

10   A.    I can't be sure of that because I don't have our

11   return in front of me.

12   Q.    Okay.

13   A.    And there was a lot of information returned to us.

14   I'm not entirely sure.

15         MR. MARCHESE:  Well, Your Honor, I would still

16   move for them pursuant to the Court's order.  If not, then

17   I guess I would ask that we take a break, I will show her

18   the entire --

19         THE COURT:  Are they Bates stamped?  Did you

20   receive those from the government?

21         MR. MARCHESE:  Yes.  They were in 2028.

22         THE COURT:  So do you have any objection,

23   Ms. Roohani?

24         MS. ROOHANI:  No, Your Honor.  I do believe that

25   because these are Bates stamped, these did come under the

TRANSCRIBED FROM DIGITAL RECORDING

1    Court's pretrial order that admitted them.  So I have no

2    objection.

3              THE COURT:  All right.  So Exhibit 5035 will be

4    admitted.

5              MR. MARCHESE:  Okay.

6         (Defendant's Exhibit 5035 received.)

7    BY MR. MARCHESE:

8    Q.    Now, on direct examination there was some questions

9    about time from Grindr; correct?

10             It's your testimony that you were not able to

11   ascertain the actual times that these messages are sent?

12   A.    I wasn't sure.  I guess (indiscernible) looking at

13   it.

14   Q.    Well, would you agree with me it's either going to

15   be one or two times, it's either going to be Pacific

16   Standard Time or UTC time?

17   A.    Yes.

18   Q.    Okay.  And UTC time is going to be minus seven or

19   eight, depending on daylight savings?

20   A.    Yes.

21   Q.    It gets a little confusing, but we got to go through

22   it.

23             All right.  So I'm going to show you the first

24   one, the first page.  I'll publish it for you, make it

25   easier.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              Okay.  Now, I got this highlighted to make it a
 2    little bit easier because I know it's small.  You can read
 3    it okay, though?
 4    A.    Yes.
 5    Q.    Okay.  And we've established previously it's your
 6    testimony you believe that 51 -- 54111653 is, in fact,
 7    Mr. Fuechtener; correct?
 8    A.    Yes.
 9    Q.    And on this particular document it says that this
10    individual doesn't have a phone and that he's on a
11    friend's -- or he or she is on a friend's iPad; correct?
12    A.    Yes.
13    Q.    Okay.  It also says that the individual needs to
14    leave the house and has to get to work; correct?
15    A.    Yes.
16    Q.    Okay.  What time does it say there?  So that's 1954?
17    A.    Yes.
18    Q.    Okay.  So if that's military time, is that going to
19    be approximately 7:54?
20    A.    Yes.
21    Q.    p.m.?
22    A.    Yes.
23    Q.    And if it's UTC time, it's going to be approximately
24    11:00 or noon; correct?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Do you see that phone number there, the 775 number;
2    correct?

3    A.    Yes.

4    Q.    Okay.  Isn't it true that in the course and scope of
5    your investigation that you sent out subpoenas, never at
6    any point in time did the 775 -- 475-4251 number come back
7    to my client, Mr. Fuechtener?

8    A.    We sent out a (indiscernible) to that for Level 3
9    Communications and never received a response.

10   Q.    Okay.  So the answer is no, you did not have any
11   nexus to that account and Mr. Fuechtener; fair to say?

12   A.    (No audible response.)

13   Q.    Okay.  I'm going to turn the page to the next
14   exhibit.  Okay.

15         Now, you see the first highlight.  That's from
16   the 614 user profile; correct?

17   A.    Yes.

18   Q.    It's not the government's contention that the 614
19   profile is my client; correct?

20   A.    Yes.

21   Q.    And that is a -- asking a question, "Dan?"  Correct?

22   A.    Yes.

23   Q.    And then this Dan individual is answering him, "Yep,
24   I'm back"?

25   A.    Correct.

TRANSCRIBED FROM DIGITAL RECORDING

 1    Q.    Okay.  And then if you go down a little bit you see
 2    my pen mark on the screen?
 3    A.    Uh-huh.
 4    Q.    And it says, "Okay, I want to sea Lars2"; correct?
 5    A.    Yes.
 6    Q.    Now, it's the government's contention that my client
 7    is, in fact, Lars; right?
 8    A.    Yes.
 9    Q.    Okay.  And would it appear that based on this Grindr
10    chat that Lars is speaking in the third person or talking
11    about someone else; fair to say?
12    A.    Yes.
13    Q.    And then later down it says, "I'm actually waiting
14    to hear from him right now."  Okay?  That's what it says?
15    A.    (No audible response.)
16    Q.    I'm going to show you the next page.
17          The first chat is from 6149 that's not, the
18    government's contention, being my client, Jan, where this
19    individual is asking, "Are you alone?"  Correct?
20    A.    Yes.
21    Q.    And then if you go down a few lines, if you look at
22    541, it -- this individual states, "A client, old guy";
23    correct?
24    A.    Yes.
25    Q.    And the last one here, if you look at the first

------------------------------------------------------------
TRANSCRIBED FROM DIGITAL RECORDING
------------------------------------------------------------

1    highlight that's from 581, where this is -- the

2    individual's asking, "Why were your pics different people?"

3             And 541 responds, "I am 28"; correct?

4    A.    Yes.

5    Q.    And that does not comport with your knowledge of the

6    defendant or his age; correct?

7    A.    No.

8    Q.    It also says from 541 that someone else used his

9    profile; correct?

10   A.    Yes.

11   Q.    Now, I want to turn your attention to defense 36.

12   It's in the binder.  If you could take a look.

13             Did you get a chance to look at it?

14   A.    Yes.

15   Q.    Or do you need more time?

16   A.    I can see it.  It's just really small.

17             MS. ROOHANI:  Your Honor, I know that

18   Mr. Marchese -- this is the Skype chat that we talked about

19   yesterday that's difficult to read.  We just got the Bates

20   numbers minutes before court started.

21             I would like to ask for some time to review

22   this.  I don't even know what it is -- what it says.

23             MR. MARCHESE:  Well, we -- this is what they

24   gave us.  They've had this for months.  I mean, obviously

25   they've went through it.  It even has some of their chats

------------------------------------------------------------

TRANSCRIBED FROM DIGITAL RECORDING

1   on it from this olwer individual.  I mean, I'll take a

2   break --

3          THE COURT:  Ms. Roohani, are you saying this is

4   something new, this is not --

5          MR. MARCHESE:  No.

6          THE COURT:  -- something that the government

7   provided to the defense?

8          MS. ROOHANI:  We did provide it to the defense,

9   Your Honor.  But looking at their exhibit, when they gave

10  it to us -- and, again, they just -- again, they've been

11  complaining the whole time that there's a lot of evidence

12  in this case.  And we have read the Skype chats.  But I

13  can't -- based on what they gave us up until this morning,

14  we couldn't even decipher what chats these were.

15         So I'd like to have an opportunity to look at

16  them.  Not a long opportunity.  Five, ten minutes would be

17  sufficient.  But I still have to find it in our discovery.

18         THE COURT:  All right.  Well, then, let's go

19  ahead and take our 10-minute bathroom break now.  And then

20  you can take a look at it.

21         But I will advise the witness that you're not to

22  speak to any of the attorneys during this break.  Just go

23  stretch, walk around, use the bathroom, but don't talk to

24  any of the attorneys.  And then we'll resume --

25         MR. MARCHESE:  I won't speak to her, but if she

TRANSCRIBED FROM DIGITAL RECORDING

1    likes, maybe it will be easier if we publish the exhibit

2    while no one's around, and maybe she can expand it so she

3    cannot go blind.

4              THE COURT:  Oh, you mean zoom into it?

5              MR. MARCHESE:  Just so it makes it easier.

6    Because I see her pulling out and straining up there.  So

7    if we can maybe put it -- if she wants to use this, it

8    might be a little bit easier for her.  Because I do concede

9    it's a little bit difficult to read.  We just had

10   formatting problems.  I mean we --

11             THE COURT:  Right.  But when --

12             MR. MARCHESE:  -- use it on my laptop, which

13   expands.

14             THE COURT:  -- we come back, if you want to go

15   ahead and zoom it for her to review, that's fine.

16             MR. MARCHESE:  Yes.

17             THE COURT:  But during the break, she's not to

18   look at anything and talk to any of the attorneys.

19             MR. MARCHESE:  Right.

20             MS. ROOHANI:  And, Your Honor, we will actually

21   have to go back to the office to be able to pull this

22   because this was originally produced on a disk for the

23   defense, so we don't have the disk.

24             MR. MARCHESE:  I will give -- I have the disk.

25   My laptop screen expands.  They can look at whatever they

TRANSCRIBED FROM DIGITAL RECORDING

1    like.

2              THE COURT:  Okay.

3              MS. ROOHANI:  That will be great.  Thank you.

4              THE COURT:  Thank you.  We'll be back -- it's

5    10:36.  Try to be back here in 10, 15 minutes.

6              COURTROOM ADMINISTRATOR:  All rise.

7         (Recess from 10:36 a.m. until 10:49 a.m.)

8              COURTROOM ADMINISTRATOR:  All rise.

9              THE COURT:  Thank you.  You may be seated.

10         (Pause in the proceedings.)

11             THE COURT:  Are we ready?

12             MS. ROOHANI:  Yes, Your Honor.

13             MR. MARCHESE:  Yes, Your Honor.

14             THE COURT:  All right.  So you're ready,

15   Ms. Roohani?

16             MS. ROOHANI:  Yes.

17             THE COURT:  All right.  So we're back on the

18   record.  And the government has had a chance to review

19   Defendant's Exhibit 5036.

20             Can we go forward now?

21   BY MR. MARCHESE:

22   Q.   Okay.  So did you have an opportunity to review

23   those Skype chats?

24   A.   The only Skype chats I had a chance to review in my

25   duties were the ones between olwer -- or larsusa22 and

TRANSCRIBED FROM DIGITAL RECORDING

1    olwerolwer.

2    Q.    Okay.  And there are, in fact, Skype chats

3    between -- in this exhibit between the olwerolwer -- I'm

4    sorry, I keep butchering that -- and larsusa?

5    A.    It looks like it, yes.

6    Q.    Okay.  Did you not review the other ones or what --

7    A.    I wasn't asked to review those ones.

8    Q.    Okay.

9    A.    I -- Agent Panovich.

10   Q.    Okay.  So only the agent -- you just acted at the

11   direction of the agent to look at the certain e-mails?

12   A.    Yes.

13   Q.    Or Skype chats, I should say?

14   A.    Yes, for Skype I was only asked to review the

15   larsusa22 and olwerolwer ones.

16             MR. MARCHESE:  Court's indulgence.

17             And I apologize, Your Honor.  These were not

18   admitted yet.  Correct?

19             THE COURT:  Correct.

20   BY MR. MARCHESE:

21   Q.    Now, these Skype chats, did you extract them and

22   give them to the agent?

23   A.    They were extracted, I believe, by our CART

24   examiner.

25   Q.    Okay.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  By your what?
 2              THE WITNESS:  CART examiner.
 3              THE COURT:  Cart examiner?
 4              THE WITNESS:  Thomas Radke.
 5              THE COURT:  Okay.  I thought you said cart, like
 6    a go-cart.
 7              THE WITNESS:  No.  I think they came from
 8    evidence item 1B3.  That's where the larsusa22 and
 9    olwerolwer ones came from at least.
10    BY MR. MARCHESE:
11    Q.   Okay.  And all of these particular Skype chats are,
12    in fact, with the user name Lars 22; is that correct?
13    A.   It looks like that, yes.
14    Q.   Actually, I apologize.  I'm misstating the evidence.
15    There are a few from janrouven.
16    A.   Okay.
17    Q.   Does that comport with your knowledge of what you
18    know in this case?
19    A.   The only ones that I reviewed came from larsusa22.
20    Q.   Okay.  But did you ever see ones from janrouven and
21    then go ahead and just overlook those because those weren't
22    what you were focusing on?
23    A.   The only Skype ones I reviewed were from larsusa22.
24    Q.   Okay.  But did you see Skype chats from janrouven?
25    A.   No.
```

                         TRANSCRIBED FROM DIGITAL RECORDING

 1     Q.    Okay.  So no other --

 2     A.    If I did --

 3     Q.    User names?

 4     A.    -- I don't remember seeing those.

 5     Q.    Okay.  Any other user names?

 6     A.    Skype user names?

 7     Q.    Correct.

 8     A.    No, not that I recall.  Not belonging to the

 9     defendant.

10            MR. MARCHESE:  Court's indulgence.

11         (Pause in the proceedings.)

12            MR. MARCHESE:  Pass the witness, Your Honor.

13            THE COURT:  All right.

14            Redirect, Ms. Roohani?

15            MS. ROOHANI:  Yes, Your Honor.

16                      REDIRECT EXAMINATION

17     BY MS. ROOHANI:

18     Q.    Okay.  Ms. Badalucco, we're going to start -- we're

19     going to jump around a little bit.  So bear with me.

20            Do you remember you testified on

21     cross-examination about a subpoena request that came from

22     Mindgeek?

23     A.    Yes, I looked at it briefly.

24     Q.    Okay.

25            THE COURT:  Can you spell that.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. ROOHANI:  Mindgeek, M-i-n-d-g-e-e-k.
 2    BY MS. ROOHANI:
 3    Q.    And you testified that that is the owner of
 4    pornhub.com.
 5              Do you remember that?
 6    A.    Yes, that's what I recalled.
 7    Q.    Okay.  And I want to show you the subpoena return
 8    that -- it's the same thing that the defense showed you --
 9    and I'll show it to them first.
10              It's Bates number 459 -- sorry, 457 -- 456, 457,
11    450 -- I'm skipping 458 because we wrote on it, and I don't
12    want to give you something we wrote on, even though you can
13    see it because I -- can we turn the Elmo off?
14              COURTROOM ADMINISTRATOR:  Do you not need that?
15              MS. ROOHANI:  No.  Thanks.
16              459 and 460.
17              I'm going to give that to you.
18              Your Honor, may I approach?
19              THE COURT:  Yes.
20              MS. ROOHANI:  Thank you.
21    BY MS. ROOHANI:
22    Q.    So you testified, based upon that document that
23    Mr. Marchese showed you that the name associated with that
24    is Frank Alfter; is that correct?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   Was there also a credit card on that?

2   A.   Yes.

3   Q.   Is it possible that Mr. Alfter is not --

4           MR. MARCHESE:  Objection, speculation.

5           THE COURT:  Sustained.

6   BY MS. ROOHANI:

7   Q.   What does the name on that tell you?  Does that tell

8   you that the user name associated with that account is

9   Frank Alfter, or is it that the user -- Frank Alfter is

10  associated with the credit card on that account?

11  A.   Frank Alfter could be the name of the payee on

12  the -- or the credit card.

13  Q.   But it's unclear from that subpoena what Frank

14  Alfter is referring to?

15  A.   Yes.

16  Q.   Okay.

17  A.   Frank Alfter could be just the name on the credit

18  card.

19  Q.   Okay.

20          MS. ROOHANI:  And then may I approach to get

21  that back, Your Honor?

22          THE COURT:  Yes.

23          MS. ROOHANI:  Thank you.

24          THE WITNESS:  That's what I was trying to

25  clarify when he stated no more questions.

────────── TRANSCRIBED FROM DIGITAL RECORDING ──────────

 1   BY MS. ROOHANI:

 2   Q.    Mr. Marchese also asked you about an e-mail that you

 3   had sent to GigaTribe?

 4   A.    Yes.

 5   Q.    Do you remember that?

 6         And you would read that e-mail; is that correct?

 7   A.    Yes.

 8   Q.    And you testified on cross-examination that you were

 9   trying to get the e-mail address associated with the lars45

10   account?

11   A.    Yes.

12   Q.    Do you remember if that came back to a specific

13   e-mail?

14   A.    I believe it was the larsschmidt22@hotmail.com.

15   Q.    And did that come back also with a password to the

16   lars45 account?

17   A.    I believe it did.  But I don't recall what that was.

18   Q.    If I showed it to you, would that refresh your

19   recollection?

20   A.    Yes.

21         MS. ROOHANI:  Jess, do you want to take a look

22   at this?

23         Your Honor, may I approach?

24         THE COURT:  Yes.

25         MS. ROOHANI:  Thank you.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE WITNESS:  And the password was Lars 1234.

2   BY MS. ROOHANI:

3   Q.    Okay.  Does that maybe -- was there also other

4   information on the subsequent pages that came back as part

5   of that e-mail?

6   A.    Yes.  It had the contacts of his friends or contacts

7   on GigaTribe.

8   Q.    And did one of those contacts -- was one of those

9   contacts pedotraderjoe?

10  A.    Yes.

11  Q.    Was one of those contacts olwerolwer?

12  A.    Yes.

13  Q.    Okay.  I need you to look at the defense exhibit,

14  which I have now taken out of the binder, and I have no

15  idea what number this is, the Grindr chats.  Is that 35?

16  A.    I believe so.

17  Q.    Yes.  Go ahead and take a look at that.

18          Okay.  Look at the Bates stamp number at the

19  bottom, 2028.

20  A.    Okay.

21  Q.    Okay.  Mr. Marchese spoke with you about a few

22  highlighted portions, "I don't have a phone, it's broken,

23  this is my friend's iPad," and then that person gives a

24  phone number.

25          Do you remember that?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    And you testified on cross-examination that there

3    was no return after you sent the subpoena request, there

4    was no return on that?

5    A.    Correct.

6    Q.    So you can't say definitively one way or the other

7    whether that is Mr. Fuechtener's phone number or somebody

8    else's phone number?

9    A.    Correct.

10   Q.    Go ahead and take a look at page 2055, same exhibit.

11   And I'm about halfway down.  It's the highlighted portion

12   that says, "I want to see Lars2."  And earlier in that

13   conversation the person identifies himself as Dan.

14            Do you remember that?

15   A.    Yes.

16   Q.    In the Grindr chats that you reviewed, when another

17   person is using the Grindr account, do they identify

18   themselves by a name or "I'm using my friend's Grindr"?

19   A.    Can you repeat the question?

20   Q.    Sure.  So, for example, on this particular one a

21   person named Dan is using the account, and he identifies

22   himself.  Is that correct?

23   A.    Yes.

24   Q.    Okay.  The Grindr chats that you reviewed, when

25   another person is using the Grindr, do they identify

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    themselves as another person?  Do they identify themselves
 2    as Dan or speak about Lars in the third person?
 3    A.    Yes.
 4    Q.    I'm going to ask you -- I understand it's a
 5    complicated question.  So let me ask you one more time.
 6          So here it says, "I want to see Lars2."
 7    A.    Okay.
 8    Q.    Would Lars be speaking about himself in the third
 9    person?
10    A.    No.
11    Q.    Okay.  So if Dan is speaking about Lars --
12    A.    Right.
13    Q.    -- it's clear that it's not Lars speaking?
14    A.    Right.
15    Q.    Okay.  Go ahead and look at page 2059, specifically
16    the text that says, "I am 28."
17    A.    Right.
18    Q.    Do you remember that?
19    A.    Yes.
20    Q.    Okay.  I want you to look -- also look at
21    Government's Exhibit 23E.  It's one of the Hotmail e-mails
22    that we spoke about.  Okay.  Mr. Marchese asked you how old
23    the defendant was.
24          Do you remember that?
25    A.    Yes.
```

                      TRANSCRIBED FROM DIGITAL RECORDING

 1    Q.    And you said he was in his mid 30s?

 2    A.    Yes.

 3    Q.    Looking at Government's Exhibit 23E, the person -- I

 4    previously identified a person in the photo attached as the

 5    defendant; correct?

 6    A.    Yes.

 7    Q.    And in that particular e-mail, how old does the

 8    defendant identify himself as?

 9    A.    28.

10    Q.    In that e-mail does the defendant also identify

11    himself as being bisexual?

12    A.    Yes.

13          He also signed that one Lars and attached a

14    photo of himself.

15    Q.    Mr. Marchese directed your attention to Government's

16    Exhibit 21B, page 010.  Can you please go to that.

17    A.    Can you say that one again?

18    Q.    21B, page 10.

19    A.    Where is this?

20    Q.    Government's Exhibit, I'm sorry.  Government's

21    Exhibit -- it's under tab 21.  And it's actually Grindr

22    chat.  Page 10 was specifically asking you about the phone

23    number 603-359-0869.

24          Do you remember your testimony about that?

25    A.    Can you say the tab one more time?  I'm sorry.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Sure.  It's 60 -- he asked you about the phone

2    number 603-359-0869.

3    A.    Yes.

4    Q.    And you testified that it wouldn't have been part of

5    your duties to be able to look up that phone number to

6    determine who it belonged to.

7            Do you remember that testimony?

8    A.    Not that I wouldn't be able to look up who it

9    belonged to, but to contact that person to see if they met

10   up with --

11   Q.    Correct.

12   A.    -- Lars.

13   Q.    Who would be the correct person to be able to look

14   into that phone number?

15   A.    I could look into it but not to contact him.

16   Q.    Okay.  Would Special Agent Panovich be able to

17   contact him?

18   A.    Yes.

19   Q.    Would Special Agent Panovich be able to send out a

20   lead to determine who that person was?

21   A.    Yes.

22   Q.    And would Special Agent Panovich also be in charge

23   of determining --

24           MR. MARCHESE:  Objection.  Leading.

25           THE COURT:  Sustained.

                     ┌─ TRANSCRIBED FROM DIGITAL RECORDING ─┐

 1  | BY MS. ROOHANI:
 2  | Q.    Who would be in charge of determining who this
 3  | person is?
 4  | A.    Special Agent Panovich.
 5  | Q.    Okay.
 6  |         MS. ROOHANI:  A moment's indulgence, Your Honor.
 7  |         (Pause in the proceedings.)
 8  |         MS. ROOHANI:  Your Honor, I pass the witness at
 9  | this time.
10  |         THE COURT:  Cross?
11  |         MS. ROOHANI:  Oh, you know what?  I forgot one
12  | more thing in my pile of papers.
13  |         THE COURT:  Sure.
14  |         MS. ROOHANI:  Can I ask one more question?  Is
15  | that all right?
16  | BY MS. ROOHANI:
17  | Q.    Do you remember you were looking at certain
18  | attachments with Mr. Marchese from the Defense Exhibit
19  | 5040?
20  | A.    Yes.
21  | Q.    Okay.  I want you to look at what has been marked as
22  | Defense Exhibit 5040A that hasn't been admitted, I don't
23  | think -- I'm not --
24  |         COURTROOM ADMINISTRATOR:  It has been admitted.
25  |         MS. ROOHANI:  It has been admitted?  Okay.

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. ROOHANI:

2    Q.    Go ahead and take a look at 5040A.  And then take a

3    look at the third page of 5040.

4    A.    Okay.

5    Q.    Okay.  What is the difference between these two

6    photos?  5040A is what, in particular?  Was that the

7    attachment to the Hotmail e-mail?

8    A.    That one that was admitted was the one that --

9    Q.    Just don't worry about whether it's admitted or not.

10   Just go ahead and look at 5040, which is the one we swapped

11   out; is that right?  We swapped it out?

12                MR. MARCHESE:  I think we just added it as an

13   additional exhibit.

14   BY MS. ROOHANI:

15   Q.    Okay.  You testified on cross-examination that the

16   original 5040 that was part of the defense exhibit is from

17   NetClean; is that correct?

18   A.    Yes.

19   Q.    Okay.  And then you also testified that there was a

20   Facebook screen grab.

21                MS. ROOHANI:  And, Your Honor, if -- it seems as

22   though she's not -- can I approach the witness to show her

23   the two --

24                THE COURT:  Yes --

25                MS. ROOHANI:  -- different photos?

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  -- you may.

2          MS. ROOHANI:  Thank you.

3    BY MS. ROOHANI:

4    Q.    So you testified on cross-examination that the

5    actual attachment to the e-mail was from Facebook?

6    A.    Yes.

7    Q.    Okay.  And looking at those two photos, is the

8    difference between those two photos that there's black bars

9    at the top and bottom --

10   A.    Yes.

11   Q.    -- of one of them?

12          Is that what indicated to you that it was from

13   Facebook as opposed to some other platform?

14   A.    Yes.

15   Q.    The other photo --

16   A.    Yes.

17   Q.    -- where you testified it was from NetClean --

18   A.    Yes.

19   Q.    -- that photo is the -- the subjects in the photo

20   are the same?

21   A.    Yes.

22   Q.    In the two photos are the same?

23          But the place that the photos came from are

24   different?

25   A.    Yes.

————TRANSCRIBED FROM DIGITAL RECORDING————

1    Q.    Okay.  The photo in the NetClean came from where?

2    Do you know?

3    A.    No.

4    Q.    Okay.  Do you know where the photo from -- the other

5    photo, the one from Facebook, where that potentially came

6    from?

7    A.    It came from Facebook.

8    Q.    And could anybody take that photo from Facebook?

9    A.    Yes.

10   Q.    I also would like for you to take a look at the text

11   of that e-mail in 5040.

12   A.    Okay.

13   Q.    Does the person ever identify themselves as Lars?

14   A.    No.

15   Q.    Does the person ever identify themselves as Jan?

16   A.    No.

17   Q.    And are you familiar with the photo of the man

18   holding a picture of his -- or holding his penis?

19   A.    That was the same photo that was sent out in several

20   other e-mails.

21   Q.    And did some of those e-mails, were some of those

22   e-mails sent by the defendant or a person identifying

23   themselves as the defendant?

24   A.    Yes.

25           MS. ROOHANI:  Now I pass the witness, Your

TRANSCRIBED FROM DIGITAL RECORDING

 1     Honor.

 2              THE COURT:  Recross?

 3              MS. ROOHANI:  May I approach to get those two

 4     photos from her?

 5              THE COURT:  Yes.

 6              MS. ROOHANI:  Thank you.

 7              MR. MARCHESE:  What exhibit number am I up to?

 8              COURTROOM ADMINISTRATOR:  5042 will be your

 9     next.

10           (Discussion held off the record.)

11              MR. MARCHESE:  Your Honor, may I approach the

12     witness?

13              THE COURT:  Yes.

14                      RECROSS-EXAMINATION

15     BY MR. MARCHESE:

16     Q.    You were asked a lot of questions about this

17     particular e-mail that's two-sided.

18     A.    Okay.

19     Q.    And you remember this particular e-mail because

20     there's been some testimony about it; correct?

21     A.    Yes.

22     Q.    And that was an e-mail that you received in the

23     course and scope of your investigation in this particular

24     case; correct?

25     A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And it's a fair and accurate depiction of what you

2    received in the course and scope of your investigation?

3    A.    Yes.

4              MR. MARCHESE:  Your Honor, at this time we're

5    going to mark this as Defendant's Exhibit 5042 and ask that

6    it be entered into evidence.

7              THE COURT:  Any objection?

8              MS. ROOHANI:  No objection, Your Honor.

9              THE COURT:  All right.  Exhibit 5042 will be

10   admitted.

11        (Defendant's Exhibit 5042 received.)

12             MR. MARCHESE:  And based upon that, Your Honor,

13   I have no recross.

14             THE COURT:  Any redirect?

15             MS. ROOHANI:  No, Your Honor.

16             THE COURT:  All right.  So thank you very much.

17             We'll go ahead and release her; right?  Or do we

18   need to recall her?

19             MS. ROOHANI:  No, Your Honor, we don't

20   anticipate that.

21             THE COURT:  All right.  So thank you very much

22   for your service.  Go ahead and take anything with you that

23   you brought.  But make sure to leave the exhibits here.

24        (The witness was excused.)

25             THE COURT:  The government may call its next

TRANSCRIBED FROM DIGITAL RECORDING

 1    witness.

 2              MS. ROOHANI:  United States calls Gary McCamey.

 3         (Discussion held off the record.)

 4              COURTROOM ADMINISTRATOR:  Please raise your

 5    right hand.

 6              You do solemnly swear that the testimony you

 7    shall give in the cause now before the Court shall be the

 8    truth, the whole truth, and nothing but the truth, so help

 9    you God?

10              THE WITNESS:  I do.

11              COURTROOM ADMINISTRATOR:  Thank you.  You may be

12    seated.

13              Please state and spell your full name for the

14    record.

15              THE WITNESS:  Gary McCamey, M-c-c-a-m-e-y.

16              MS. ROOHANI:  And, Your Honor, before I start

17    asking Special Agent McCamey any questions, I wanted to

18    give a disclaimer to the -- this could be done at sidebar

19    if we had a jury.

20              Mr. McCamey is a polygrapher.  I have instructed

21    him, and I'm instructing him now, that he is not to talk

22    anything about the methodology or anything having to do

23    that.  I just wanted to let you know that because it was --

24    there was -- the interview was given as part of a

25    polygraph, it wasn't recorded in any way.

TRANSCRIBED FROM DIGITAL RECORDING

1              So I wanted to give that disclaimer to the Court

2    ahead of time.  And that's why I won't be asking him

3    questions related to that.

4              THE COURT:  He gave who a polygraph?

5              MS. ROOHANI:  The defendant.

6              THE COURT:  Oh, okay.

7              MS. ROOHANI:  And we're not going to be

8    eliciting any testimony dealing with that.  But I just

9    wanted to give the Court a heads-up that that is why some

10   of the answers that Mr. McCamey gives, it's based upon

11   that.  And so I'm not going to elicit any testimony about

12   that.

13             Of course, if the defense opens it up on to

14   that, then I would ask to redirect him.

15             MR. DURHAM:  Your Honor, I'd just like to make a

16   record.  I'm not sure why the government is even bringing

17   that up, I mean, to Your Honor.  Now it's already -- I

18   mean, it's out there.  I know obviously Your Honor can --

19             THE COURT:  Yeah, I was not aware of it.

20             But -- so but this witness, Mr. McCamey, or

21   McCamey, I'm sorry if I pronounce it wrong, he's not -- so

22   what is the substance of his testimony going to be?

23             MS. ROOHANI:  Your Honor, specifically the only

24   reason I brought it up is because he interviewed the

25   defendant, and that interview was not recorded.  So if the

1   defense asks questions about why it wasn't recorded, I just

2   want to put the Court on notice that I will have to bring

3   up the fact that it was that.

4           That's why I wanted to put you on notice.  It's

5   an awkward situation because it is a bench trial.

6   Typically we would do this at sidebar, outside of the

7   presence of the jury, to make you aware of that and make

8   the defense aware of that.  But because it's a bench trial,

9   I wanted to front that issue with you.

10          THE COURT:  All right.  Well, because it is a

11  bench trial, I'm the finder of fact.

12          MS. ROOHANI:  Absolute --

13          THE COURT:  So you're just going to be asking

14  questions about admissions --

15          MS. ROOHANI:  Yes.

16          THE COURT:  -- that were made by the defendant

17  during the interview?

18          MS. ROOHANI:  Yes.

19          THE COURT:  Okay.  Go ahead and proceed.

20          MR. MARCHESE:  Your Honor, I think Mr. Durham

21  wanted to lay a little bit of --

22          THE COURT:  Oh, go ahead, Mr. Durham.  Yes.

23  Make your record.

24          MR. MARCHESE:  Your Honor, what he wanted to say

25  is that now what the government has done is they've created

1    a negative inference against my client in reference to the

2    polygraph.

3              It's their witness.  They can control their

4    witness.  They can direct their witness to testify

5    accordingly.

6              So now the problem is is I know that it's a

7    bench trial, I know that obviously the Court knows the law

8    and the Court will insulate itself from these issues.  But

9    this is -- I don't know why this was even elicited.  We

10   weren't going to get into this.  If it is, it's on us.

11             But now we've created the problem with this

12   self-serving statement that the government has made about

13   this polygraph.  This was never going to come up until they

14   brought it up.  So that's our issue, Your Honor.

15             THE COURT:  All right.  Well, I agree.  It's

16   unusual, but I'm not going to belabor the point.  There's

17   no evidence of anything that's been provided yet, just an

18   explanation given by the government, which is just

19   argument, not evidence.  So there's no evidence of

20   anything --

21             MS. ROOHANI:  Judge, the point is, I don't know

22   if they know it's a procedure for the FBI not to record a

23   polygraph interview.

24             THE COURT:  Well, you can ask them.

25             MS. ROOHANI:  So to avoid that being in the

1    record --

2              THE COURT:  That's the problem is why is it

3    being brought up to me instead of if you don't know what

4    they know, then ask them what they know or don't know; and

5    if they have an issue then, you know, we could bring it up

6    and discuss it if it's necessary.

7              So, again, I don't want to belabor it because

8    we've got the kids coming in.  And, of course, as I've said

9    before, I'm not going to have the kids come in and observe

10   this particular trial.  So I don't want to run out of trial

11   time.  Let's go ahead and just get started with this

12   witness before we need to break.

13                        GARY MCCAMEY

14          called as a witness on behalf of the

15       Government, was examined and testified as follows:

16                      DIRECT EXAMINATION

17   BY MS. ROOHANI:

18   Q.    Special Agent McCamey, who is your employer?

19   A.    The Federal Bureau of Investigation.

20   Q.    And how long have you been employed with the FBI?

21   A.    A little bit over 17 years.

22   Q.    And what are your current duties and

23   responsibilities?

24   A.    I am a special agent.

25   Q.    Okay.  Were you involved in the investigation of the

------------------------------------------------------------
TRANSCRIBED FROM DIGITAL RECORDING

1    defendant, Jan Fuechtener?

2    A.    I was.

3    Q.    And what date did you become involved?

4    A.    January 21st, 2016.

5    Q.    And was that the date that the search warrant was

6    executed in this case?

7    A.    It was.

8    Q.    During your involvement in this case, did you have

9    an opportunity to speak with Mr. Fuechtener?

10   A.    I did.

11   Q.    Before you spoke with him, did you read him his

12   *Miranda* rights?

13   A.    Yes, I did.

14   Q.    Was he in custody at that time?

15   A.    No, he was not.

16   Q.    And to be clear, was he free to leave?

17   A.    Yes, I made it clear that he was free to leave at

18   any point during the --

19   Q.    Was he handcuffed at any point?

20   A.    No, he was not.

21   Q.    Was he allowed to use the bathroom?

22   A.    He was allowed to use the bathroom, and I believe I

23   offered him something to drink, also.

24   Q.    Okay.  Was he instructed that he could stop the

25   interview at any time?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Okay.  Was he explained about his right to counsel?

3    A.    Yes.

4    Q.    And at no point did he invoke his right to counsel?

5    A.    No, he did not.

6    Q.    And did he waive those rights in writing as well

7    that day?

8    A.    Yes, he did.

9    Q.    Let's talk about the interview with Mr. Fuechtener.

10   We already talked about how it was held on January 21st.

11   Where was it held?

12   A.    It was at the Las Vegas division of the Federal

13   Bureau of Investigation.

14   Q.    And what time of day was that?

15   A.    The interview started at approximately 1:30 p.m.

16   Q.    Was that interview recorded?

17   A.    No, it was not.

18   Q.    Did Mr. Fuechtener come alone or did he come with

19   someone else?

20   A.    He drove himself there.

21   Q.    Okay.  And was anyone else in the interview room

22   with you during this interview?

23   A.    Not at -- not through the majority of the interview.

24   At the conclusion, Special Agent Panovich came into the

25   interview room.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And was that at the request of the defendant?  Was

2    that --

3    A.    Yes.

4    Q.    Before your interview with the defendant, did you

5    learn certain information from Special Agent Panovich?

6    A.    Through Special Agent Panovich and a review of the

7    search warrant affidavit.

8    Q.    Did she explain to you what the investigation was

9    about?

10   A.    Yes.

11   Q.    And what was your understanding?

12   A.    My understanding that it was a child pornography

13   investigation, that it involved the sharing of child

14   pornography images, via peer-to-peer software.

15         I knew that the user name associated with the

16   peer-to-peer software was lars45.

17         I knew that there was an associated e-mail of --

18   account of larsschmidt22@hotmail.com.

19         I knew that the log-on information, the IP

20   information associated with the lars45 account came back to

21   7080 Donald Nelson.

22         I knew that the subscriber to the Internet there

23   was Jan Fuechtener.

24         I knew that a search warrant had been executed

25   at 7080 Donald Nelson earlier that morning and that there

TRANSCRIBED FROM DIGITAL RECORDING

```
1    had been images of child pornography found there and that
2    Mr. Fuechtener was present.
3    Q.    Okay.  During your interview with the defendant, did
4    you ask him if he used the e-mail address
5    larsschmidt22@hotmail.com?
6    A.    I did.
7    Q.    And what was his response?
8    A.    He told me that that was his e-mail account, that he
9    had established it several years prior, and that he had
10   used it for the purposes of going on Craigslist and eBay.
11   Q.    At that point did you tell him that you knew that
12   the lars45 account was associated with
13   larsschmidt22@hotmail.com?
14   A.    I did.
15   Q.    Okay.  Did you ask him if he used the user name
16   lars45 in any of his peer-to-peer accounts?
17   A.    I did.
18   Q.    And what was his response?
19   A.    Well, he -- he actually changed his response to that
20   three separate times.
21   Q.    All right.  Let's start with the first time.
22   A.    Okay.
23   Q.    What did he tell you the first time?
24   A.    So the first time he told me that he was not
25   familiar with the lars45 account, that he did not create
```

TRANSCRIBED FROM DIGITAL RECORDING

1   it, he did not use it, and he did not know who did.

2   Q.    Okay.  At that point when he -- hold on one moment.

3         The second time that you asked him the question

4   about the lars45 peer-to-peer account, what was his

5   response?

6   A.    Well, he actually told me that -- he brought it up

7   and he said, you know, "I'm a little bit concerned about

8   the question you asked me about the lars45 account."  He

9   said, "I probably did create that account for the purposes

10  of sharing files, including magic videos, but never child

11  pornography."

12  Q.    Okay.  And you said that he changed his answer a

13  third time.  What was the third answer that he gave you?

14  A.    So near the conclusion of the interview, I asked him

15  to explain how an account that he said that he created was

16  used from a computer associated with his address to

17  trade -- or share child pornography files with an

18  undercover officer.

19        At that point he corrected me and said, "I told

20  you that I probably established the account."  And he said

21  that he probably let a person that he identified as

22  Ferrell, who was someone that he was having a sexual

23  encounter with, use the account.

24  Q.    Did he tell you how long he had been having a sexual

25  encounter with Ferrell?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    He told me -- he referred to it as a hookup, and I

2    verified that he meant a sexual encounter, and he said that

3    he was having this encounter for approximately eight

4    months.

5    Q.    Could he tell you any identifying information about

6    Ferrell?

7    A.    I asked him -- when he told me that he had somebody

8    that was particularly interested in child pornography, I

9    asked him who this person's name was, and he said, "Well, I

10   don't know his name."

11            And I said, "Well, you told me you've been

12   having an encounter with him for eight months."

13            His response to that was, "Well, I have him

14   saved in my phone under the name Ferrell because that's the

15   street he lives on."

16   Q.    So the defendant blamed Ferrell for the child

17   pornography that were on his devices?

18   A.    Yes.  He told me that he had spent the night there

19   the night before and that this person, Ferrell, had used

20   Mr. Fuechtener's computer for the purposes of watching

21   child pornography.  And he said that all the images there

22   were based on him spending the night the night before.

23   Q.    Okay.  Did the defendant attempt to blame anyone

24   other than Ferrell?

25   A.    No, he didn't.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    During the course of your interview, were you able

2    to observe the defendant's demeanor?

3    A.    I was.

4    Q.    And based upon your training and experience in

5    interviewing suspects, did you ask him some of the same

6    questions more than once?

7    A.    I did.

8    Q.    Why?

9    A.    I told him at some point in time during the

10   interview that he was being evasive.  He had changed his

11   answer twice relating to the child pornography.  In other

12   words, initially he told me, "I don't know anything about

13   the child pornography."  He then later tells me that this

14   person Ferrell had stayed at his house, and he knew that

15   the child pornography was there.

16          He had changed his answer three times relating

17   to the lars45 account.

18          And then I had also asked him about specific

19   images that were on the thumb drive that had documents

20   related to him.

21          When I asked him where those images came from,

22   his response to me was, "I'm not interested in child

23   pornography, I'm not interested in children."

24          So I kept asking him, "That's not the question I

25   asked you.  I asked you, did you download them?  Are these

1    yours?"

2              And he continued to say, "I'm not interested in

3    children."

4              MS. ROOHANI:  I just have a few more questions,

5    Your Honor.  I know we're coming up to our timeline so --

6              THE COURT:  Aaron, did you see them out there?

7              COURTROOM ADMINISTRATOR:  Your Honor, they are

8    out there.

9              THE COURT:  Okay.  They are out there.  The kids

10   are out there.

11             So let's go ahead and take our break for lunch.

12   And we'll go ahead and resume at 1:00 p.m.

13             Sir, you're still going to be under oath.  And

14   we ask you that during this break, have lunch, go to the

15   restroom, stretch, get some fresh air, but don't speak to

16   any of the attorneys.  All right?

17             THE WITNESS:  Okay.

18             THE COURT:  Thank you.

19         (The noon recess was taken at 11:23 a.m.)

20                        *    *    *

21

22

23

24

25

```
 1          LAS VEGAS, NEVADA, NOVEMBER 15, 2016, 1:06 P.M.

 2                            --oOo--

 3

 4          COURTROOM ADMINISTRATOR:  All rise.

 5          THE COURT:  Thank you.  Please be seated.

 6          COURTROOM ADMINISTRATOR:  This is the time set

 7   for the continuation of day 2 of the bench trial in Case

 8   No. 2:16-cr-100-GMN-CWH, United States of America versus

 9   Jan Rouven Fuechtener.

10          Counsel, please make your appearance for the

11   record.

12          MS. ROOHANI:  Good afternoon, Your Honor.  Ellie

13   Roohani and Lisa Cartier-Giroux for the United States,

14   joined by Special Agent Panovich.

15          THE COURT:  Good afternoon.

16          MR. MARCHESE:  And Jess Marchese, Benjamin

17   Durham, and Michael Sanft on behalf of the defendant, Jan

18   Rouven Fuechtener.

19          THE COURT:  Good afternoon.

20          All right.  So everybody is back.

21          Do we have Mr. -- is it McCamey?  McCamey.

22          MS. ROOHANI:  We should.  He was outside.

23          MR. MARCHESE:  And before then, Your Honor, the

24   defense has a motion.

25          THE COURT:  All right.
```

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. MARCHESE:  We wanted to make a motion for a

2    mistrial based upon the fact that the government, before

3    they called Mr. McCamey, unsolicited, for no particular

4    reason known to the defense, brought up his role in the

5    case and the fact that there was a polygraph given in this

6    particular case.

7          It is our position that the government solicited

8    that information, and it gives a negative inference to the

9    client, as we all know, that polygraph results are

10   inadmissible in federal court.

11         So based upon that it's unfairly prejudicial to

12   Mr. Fuechtener, it was through no fault of the defense's,

13   it was completely the government's fault and solicited that

14   information.  If this was a jury trial, it would be

15   completely improper for them to bring it up in front of the

16   jury.  And as the judge being the finder of the fact, I

17   can't see the distinction as to why it would be necessary

18   for them to bring it up in front of Your Honor.

19         THE COURT:  All right.  Well, the problem is

20   that what will we do?  I declare a mistrial today and then

21   we do it over again, and I forget what I heard last time?

22   I mean, it would still be something that's in my mind.  It

23   would just delay things.

24         Mr. Fuechtener would stay in jail longer until

25   we got another trial date.

1           So I don't think the remedy would be a mistrial

2     necessarily.  I don't see how that would help you.

3           If we had a jury, we could just dismiss that

4     jury, call a new jury, start over again.  That's fine.

5           But as it is, the cat's out of the bag, the

6     bell's been rung, whatever all those sayings are.

7           I can put that aside.  I understand that the --

8     whether or not there was a polygraph, whether or not there

9     were results or conclusive results of that polygraph they

10    would not be admissible and it's not going to influence my

11    decision.  I'll base my decision based on the facts that

12    are admitted and the testimony that's provided.  And I will

13    not rely on the fact that there may or may not have been a

14    polygraph or any results from that interview process.

15          But I don't know if you wanted to add anything

16    to that, Ms. Cartier-Giroux.

17          MS. CARTIER-GIROUX:  Judge, just for the record,

18    we did not provide you with the results.  We did not even

19    talk about that.

20          The purpose of stating it is because the Court

21    is the person -- if there was a jury or when there isn't a

22    jury, you decide the admissibility of evidence.  So de

23    facto, you are going to hear things that may not be

24    admissible.  And it is assumed that the Court can set those

25    things aside.

TRANSCRIBED FROM DIGITAL RECORDING

1           If this was a jury trial, I would absolutely

2   bring up to the Court that there is a possibility on

3   cross-examination, based on the fact that it isn't recorded

4   and the FBI now has a policy of recording interviews, that

5   that may come as a question.

6           Now, I placed it on the record to avoid because

7   had we done it, he could have made a legitimate motion for

8   mistrial, if that was the answer because it's in the

9   record.

10          Now, the Court could have said, "I'm going to

11  not take that into consideration because it is a bench

12  trial."

13          But nothing that we did was improper.  We

14  provided the Court with a potential issue with regard to

15  the witness.  They might have preferred, and maybe the

16  Court might have preferred, that we just tell them.

17          But we wanted it on the record that we have, in

18  fact, advised the witness that he was not to mention that

19  and that we wanted to put them on notice that that would be

20  a possible answer because that is the explanation as to why

21  it was not recorded.

22          We were not acting in bad faith, we were doing

23  what we would normally do in the course of a jury trial,

24  which we would do with Your Honor as a bench trial, knowing

25  that you have to make these types of decisions with regard

1    to admissibility and can set those things aside.

2              THE COURT:  Well, there might be a question that

3    the best practice here might have been to just talk to

4    defense counsel, to make sure that they understood why you

5    were not going to be going into whether or not it was

6    recorded or not recorded, unless they wanted to get into

7    the polygraph and they say, "No, of course we don't want

8    the judge to know about polygraph," then that would be

9    (inaudible) say if I asked, "Well I don't understand why

10   this witness didn't record it," you could both say, "Your

11   Honor, we knew that wasn't recorded and we're comfortable

12   with that, we don't have an issue with it.  It was properly

13   not recorded."

14             "Oh, okay, counsel."  I can tell you more often

15   than I would like, I'm kept in the dark about things in

16   civil cases all the time, and I don't like it, but it does

17   happen, and I understand the reason why it has to be that

18   way.

19             So there's other ways of doing it.  We almost

20   never have bench trials in criminal cases, so I don't

21   expect everyone to be well versed in all these different

22   things we do.  In civil cases, more often than not they're

23   bench trials just because they think it goes quicker and it

24   saves them money.

25             But needless to say, Ms. Cartier-Giroux, you're

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    correct, that I can put it aside.  I'm not going to allow
 2    it to influence my decision in the end.
 3              And we can just go forward.
 4              I think we were, I'll look back at my notes,
 5    with Mr. McCamey.
 6              I remind you, sir, that you still are under
 7    oath.  So thank you for coming back.  The question I have
 8    in my notes refer to the fact the defendant drove himself,
 9    the witness came -- was alone with Mr. McCamey until Agent
10    Panovich entered at the end.
11              Oh, no, I'm sorry.  There's one more page here.
12    So it goes on, actually the whole -- just the three
13    versions with Ferrell at the end and then the witness told
14    the defendant he was being evasive, inconsistent; the
15    defendant said he wasn't interested in child porn.  That's
16    where we left off.
17              That's why I like to take breaks in between
18    witnesses instead of in the middle of witnesses, but
19    that -- we couldn't do that today.
20              MS. ROOHANI:  And I just have one more question
21    in that line of questioning.
22              I'm sorry, Your Honor.  May I --
23              THE COURT:  Oh, yes, go ahead.
24              MS. ROOHANI:  Okay.
25
```

------- TRANSCRIBED FROM DIGITAL RECORDING -------

1    BY MS. ROOHANI:

2    Q.    In relation to the lars45 user name, did the

3    defendant ever give you the same answer twice?

4    A.    No, he didn't.

5    Q.    How many answers totally did he give you?

6    A.    There were three separate answers relating to that.

7    Q.    Okay.  Did the defendant confirm his address for

8    you?

9    A.    He did.

10   Q.    And what was that?

11   A.    7080 Donald Nelson.

12   Q.    And did he confirm who lives at the residence?

13   A.    Yes.

14   Q.    Who was that?

15   A.    He said that he lived there with his husband, Frank

16   Alfter, and someone who he identified as Kevin.

17   Q.    Okay.  Did he confirm who has access to the

18   computers in his house?

19   A.    He did.

20   Q.    Who was that?

21   A.    He said himself, Frank, and Kevin.

22   Q.    Okay.  Did you ask him if Frank or Kevin could have

23   put the child pornography on to the computers?

24   A.    I did.

25   Q.    And what did he respond?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    He said he did not believe that they did that.

 2    Q.    And did the defendant confirm that he uses

 3    peer-to-peer software?

 4    A.    Yes.

 5    Q.    Did he identify which peer-to-peer software he uses?

 6    A.    Not specifically to me, no.

 7              MS. ROOHANI:  And I'll pass the witness, Your

 8    Honor.

 9              THE COURT:  All right.  Cross?

10                       CROSS-EXAMINATION

11    BY MR. DURHAM:

12    Q.    Agent McCamey, how long have you worked for the FBI?

13    A.    A little over 17 years.

14    Q.    Okay.  And prior to that, were you in another branch

15    of law enforcement?

16    A.    I was a probation officer and a police officer for

17    about six years prior to that.

18    Q.    Okay.  So your entire career has been spent in law

19    enforcement?

20    A.    That is correct.

21    Q.    Okay.  How many interrogations have you participated

22    in during your career?

23    A.    Many.

24    Q.    Okay.  If you had to estimate?

25    A.    Hundreds.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Hundreds?  Okay.  And you've received specialized

2    training in interrogation?

3    A.    I have.

4    Q.    Okay.  And the primary purpose of your interrogation

5    is to the elicit a confession; is that fair to say?

6    A.    The primary reason is to get to the core truth.

7    Q.    Okay.  Now, given your background in law

8    enforcement, would it be fair to say that when you are

9    observing or interviewing somebody, your perceptions may be

10   a little different than, say, my perceptions, or someone

11   who doesn't have a law enforcement training or background?

12   A.    In what context?

13   Q.    Well, for example, the way that you view something

14   or perceive something through your lens, based on your

15   background, might be different than someone who has not

16   ever been in law enforcement?

17   A.    I like to think of myself as impartial.

18   Q.    Okay.

19   A.    As impartial as I possibly can be.

20   Q.    Okay.  Have you ever worked a nonlaw enforcement

21   job?

22   A.    I have.

23   Q.    Okay.  What was that?

24   A.    I worked when I was -- when I was in college, I had

25   a job for a human resources company where we worked with

TRANSCRIBED FROM DIGITAL RECORDING

1   the Americans with Disabilities Act.  I went to different

2   locations and did accessibility audits to provide them with

3   ways they could make their stores accessible to persons

4   with disabilities.

5   Q.   Okay.  Other than that, it's been strictly law

6   enforcement?

7   A.   There was some retail jobs when I was in high

8   school.

9   Q.   Okay.  You've never worked for, say, a defense

10  attorney; correct?

11  A.   Correct.

12  Q.   You've never worked on the other side, I guess I

13  would say?

14  A.   That's correct.

15  Q.   Okay.  Now, this interview that took place with

16  Mr. Fuechtener, that was January 21st, 2016?

17  A.   That is correct.

18  Q.   Okay.  And prior to that interview, you were given

19  some background information as a foundation for your

20  interview?

21  A.   Yes.

22  Q.   Now, some of the information that you were provided

23  was that Mr. Fuechtener had denied being in possession of

24  child pornography; correct?

25           MS. CARTIER-GIROUX:  Objection.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  Objection, Your Honor.  It calls

2     for inadmissible -- the answer calls for inadmissible

3     hearsay.  The United States -- this is not a statement --

4     it's a self-serving statement of the defendant.  It's not

5     admissible under Rule 810 -- (2)(A).

6          MR. DURHAM:  It just goes to foundation for his

7     basis before he conducted the interview.

8          THE COURT:  So the question was what

9     information -- repeat your question.

10          MR. DURHAM:  He was -- my question was, as part

11     of the information he was provided as a basis for his

12     interview, one of those things was that Mr. Fuechtener

13     denied having possession of child pornography.

14          THE COURT:  All right.  So you're not offering

15     it for the truth of the matter asserted but rather to

16     determine his state of mind.  Is that --

17          MR. DURHAM:  And his frame of reference --

18          THE COURT:  -- what you're asking?

19          MR. DURHAM:  -- before beginning the interview.

20          THE COURT:  All right.  So for that limited

21     purpose, I'll allow it.

22     BY MR. DURHAM:

23     Q.    Is that true?

24     A.    Could you repeat the question?

25     Q.    That Mr. Fuechtener -- what you were aware of --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   made aware of and part of your frame of reference before
 2   you began this interview was that Mr. Fuechtener had denied
 3   being in possession of child pornography?
 4   A.    That's correct.
 5   Q.    Okay.  You were also -- part of your frame of
 6   reference is based on the fact that there had been multiple
 7   devices, electronic devices found at the residence in
 8   question; correct?
 9   A.    Generically that there was multiple devices that had
10   images of child pornography on them, yes.
11   Q.    Okay.  And Mr. Fuechtener indicated to you that he
12   shared that residence with his husband?
13   A.    Yes.
14   Q.    As well as another -- an acquaintance; correct?
15   A.    Yes.
16   Q.    Now, as part of your frame of reference, were you
17   provided information as to what particular devices were
18   located in the residence?
19   A.    No.
20   Q.    Okay.
21   A.    Other than the -- other than that there was a thumb
22   drive that had documents relating to Mr. Fuechtener and
23   child pornography.  But nothing relating to specific
24   devices.
25   Q.    Okay.  So but you were provided information
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    regarding a thumb drive?
 2    A.    Yes.
 3    Q.    And that thumb drive allegedly contained child
 4    pornography?
 5    A.    That's my -- was my understanding, yes.
 6    Q.    Okay.  Were you made aware of where that thumb drive
 7    was located?
 8    A.    No.
 9    Q.    Okay.  But you did ask Mr. Fuechtener some questions
10    about the thumb drive; correct?
11    A.    I did.
12    Q.    Okay.  Do you think it would have been important for
13    you to know where that thumb drive was located?
14    A.    Not necessarily in the context, it was more
15    important for me to know that there were personal documents
16    related to him on that thumb drive.
17    Q.    Okay.  And were you aware of what particularly those
18    documents were?
19    A.    No.
20    Q.    Okay.  Were you made aware that those -- that that
21    thumb drive also had documents related to Frank Alfter on
22    them?
23    A.    No.
24    Q.    You were aware that this residence is about 12,000
25    square feet?  It's a large residence?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    I knew it was a large residence.  I had no idea how

2   big.

3   Q.    Okay.  And Mr. Fuechtener shared the residence with

4   more than one person; correct?

5   A.    That's what he told me.

6   Q.    He also told you that there were guests that

7   frequented the house?

8         MS. ROOHANI:  Objection, Your Honor.  He did not

9   testify to that on direct.

10        MR. DURHAM:  I'm asking him what Mr. Fuechtener

11  told him.

12        MS. CARTIER-GIROUX:  It's hearsay.

13        MS. ROOHANI:  And it's hearsay.

14        THE COURT:  And it would be hearsay if you're

15  trying to use it for the truth of the matter asserted and

16  it's a -- not an inculpatory admission but rather an

17  exculpatory statement it would be hearsay.

18        MR. DURHAM:  That's fine, Your Honor.

19  BY MR. DURHAM:

20  Q.    When you interviewed Mr. Fuechtener, he -- he drove

21  to your office; correct?

22  A.    Yes.

23  Q.    Okay.  He agreed to participate in this interview?

24  A.    Yes.

25  Q.    Did you find him to be cooperative?

1    A.    To the extent that he cooperated in the interview

2    but not generally cooperative when it came to answering

3    specific questions that he was asked.

4    Q.    Did you find that he was trying to be helpful?

5    A.    No.

6    Q.    During your interview?

7    A.    No.

8    Q.    No?

9    A.    No.  I found that he was trying to be evasive.

10   Q.    Okay.  And that's based on your training and

11   experience as a law enforcement officer?

12   A.    And based on the fact that he changed his story

13   relating to lars45 on three occasions, that he changed his

14   story relative to whether he knew there was child

15   pornography in the house on one occasion and the fact that

16   when I asked him about the thumb drives specifically, he

17   answered questions that should have been answered yes or no

18   when, "I'm not interested in children."

19   Q.    Okay.  And when you say "should have been answered

20   yes or no," you didn't want an explanation for anything,

21   you just wanted a yes or no answer?

22   A.    I repeatedly asked him if those images on that thumb

23   drive were his or whether he was responsible for

24   downloading them or keeping them.  And his response to me

25   was, every time, "I'm not interested in children."

------- TRANSCRIBED FROM DIGITAL RECORDING -------

1        I would tell him, "That's not the question I

2    asked you."

3        And I would ask the question again.  Again, he

4    would tell me, "I'm not interested in children."

5    Q.    Okay.  And this was throughout the course of the

6    interview; correct?  How long did the interview take?

7    A.    Three hours, approximately.

8    Q.    Okay.  And so for three hours you asked him the same

9    questions over and over again?

10   A.    I asked him similar questions over the course of the

11   three-hour period relating to the child pornography.

12   Q.    Okay.  And you phrased some of those questions

13   differently, I assume?

14   A.    I don't know as though I asked him the same question

15   every single time verbatim.  I'm sure that they were at

16   some point phrased --

17   Q.    Okay.

18   A.    -- somewhat differently.

19   Q.    Now, this interview was not recorded; correct?

20   A.    Correct.

21   Q.    So we have to take your word for it; correct?

22   A.    That's correct.

23   Q.    Okay.  And -- but you did take notes?

24   A.    I did.

25   Q.    Okay.  And two pages of notes; is that fair to say?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.   I believe so.

2   Q.   Okay.  And these notes are what you used -- if I

3   could show those to you.  Does that look like your notes?

4   A.   It does, yes.

5   Q.   Okay.  These notes were used to generate a

6   typewritten report?

7   A.   They were used as a guide to generate a typewritten

8   report, correct.

9   Q.   As a guide, okay.

10          So did you generate anything else during the

11  interview besides these two pages of handwritten notes?

12  A.   Did I generate anything, any other written or

13  recorded recording of this interview with Mr. Fuechtener?

14  Q.   Besides these two pages of handwritten notes?

15  A.   There is a demographic section that asks for name,

16  date of birth, social security number, highest level of

17  education, criminal history, things like that, that I type

18  into the computer.

19  Q.   Okay.  But as far as the substance of the interview,

20  just these two pages of handwritten notes?

21  A.   That's correct.

22  Q.   And these were taken during the course of a

23  three-hour interview?

24  A.   Yes.

25  Q.   Just these two pages?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Okay.  And so is it your testimony that these two

3    pages of handwritten notes are an accurate and true

4    recording of your interview, the substance of your

5    interview with Mr. Fuechtener?

6    A.    They are a guide to help me write my report, yes.

7    Q.    So they're just a guide?

8    A.    Yes.

9    Q.    Okay.  And that report, the typewritten report,

10   which is the formal report you prepared, was prepared the

11   next day?

12   A.    The next morning, yes.

13   Q.    The next morning.  You didn't prepare it right after

14   the interview?

15   A.    No, I did not.

16   Q.    Okay.  But you used these notes to prepare the

17   report?

18   A.    I did.

19   Q.    Okay.  And based on these notes you generated a

20   three-page report?

21   A.    That's correct.

22   Q.    Typewritten?

23   A.    (No audible response.)

24   Q.    Now, did you have a chance to review your

25   handwritten notes before you testified today?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    No.

2    Q.    Do you recall the substance of your notes, more or

3    less?

4    A.    Do I recall the substance?  The substance is related

5    to what's in my report, yes.

6    Q.    Okay.  But you did review your report; right?

7    A.    I did review my report, yes.

8    Q.    Okay.  You would agree with me that it's important

9    that your notes be accurate?

10   A.    That's correct.

11   Q.    Okay.  Because we don't have a recording, we don't

12   have something objective that other people can look at,

13   we're basing it entirely off of your notes; correct?

14   A.    Correct.

15   Q.    Okay.  Do you recall writing down -- well, let me

16   back up.

17         You were told that there was -- you were

18   provided with an e-mail address of Lars 22 --

19   larsschmidt22@hotmail.com?

20   A.    Correct.

21   Q.    And before you began the interview, part of the

22   information you were given was that that e-mail address was

23   somehow connected to lars45 and the GigaTribe account?

24   A.    That's correct.

25   Q.    Okay.  Do you recall in your notes writing

```
 1   larsschmidt22@gmail as that being the e-mail account that
 2   Mr. Fuechtener set up?
 3   A.   Do I recall writing that?  No.
 4   Q.   If I showed that to you, would that refresh your
 5   recollection?
 6   A.   I am not disputing that I probably wrote that.
 7   Q.   Okay.  Well, if I show it to you, would you like to
 8   look at that?
 9   A.   Okay.  If you'd like to show it to me.
10   Q.   You don't -- you don't --
11   A.   I'm not disputing that that's what's in my notes.
12   Q.   Okay.  Well, you would agree with me that that's
13   something that's an important fact, right, the e-mail
14   address in this case?
15   A.   Gmail as opposed to Hotmail?
16   Q.   Correct.  So that's an error on your part; correct?
17   A.   That's an error in my notes.
18   Q.   Okay.
19   A.   That's accurate.
20   Q.   And, once again, those notes were used as a basis
21   to --
22   A.   But it's --
23   Q.   -- do your typewritten report?
24   A.   But my report reflects Hotmail.
25   Q.   So a large portion of your report then was based on
```

TRANSCRIBED FROM DIGITAL RECORDING

1   your memory alone?

2   A.   No.   Again, my notes were used as a guide.   If I

3   wrote Gmail in my notes, that was obviously a mistake.   But

4   it's used as a guide.

5   Q.   This interview, you said, lasted about three hours;

6   correct?

7   A.   That's correct.

8   Q.   And during that time did you notice Mr. Fuechtener

9   being tired at all, sleepy?

10   A.   Not that I -- not that I recall.

11   Q.   Okay.   Do you remember him -- do you remember if he

12   had to be anywhere at a certain time?

13   A.   Not that I recall.

14   Q.   Do you remember him trying to cut the interview

15   short?

16   A.   The only thing I remember is near the end he asked

17   to speak to Special Agent Panovich, which I allowed him to

18   do.

19   Q.   Okay.   Have you ever interrogated a German national

20   before?

21   A.   Have I ever interviewed a German national?   Not that

22   I can recall.

23   Q.   Okay.   Have you ever interrogated somebody who is

24   not from the United States?

25   A.   I have conducted interviews from -- of persons that

TRANSCRIBED FROM DIGITAL RECORDING

1    are not from the United States.

2    Q.    Okay.  Fair to say that Mr. Fuechtener's English is

3    his second language?  Was that your impression?

4    A.    No, actually my impression was that he understood

5    everything very well.

6    Q.    That wasn't my question.  Was it your understanding

7    that English was his second language?

8    A.    I understood that he was of German descent.

9          But when you ask me that question, that implies

10   that he didn't understand the English language.  He

11   understood the English language.  And I don't know how well

12   he understands German.  I assume fairly well.

13   Q.    So you're aware he was a German national.  He was

14   born in Germany; correct?

15   A.    Correct.

16   Q.    Okay.  You're saying that he understood English

17   fairly well?

18   A.    Yes.

19   Q.    Okay.  My question is, are you aware that English is

20   his second language?

21   A.    No.

22   Q.    Okay.  Would you agree with me that people from

23   different cultures tend to express themselves

24   differently --

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.    -- than, say, you or I?

2   A.    Yes.

3   Q.    Okay.  And people from different cultures, even when

4   they speak English, may understand something differently

5   than you or I?

6   A.    On occasion, yes.

7   Q.    For example, depending on how a question is phrased;

8   is that fair to say?

9   A.    That's fair to say, yes.

10  Q.    Or maybe the tone in somebody's voice when they're

11  saying something?

12  A.    In certain occasions, yes.

13  Q.    Now, you stated that you felt that Mr. Fuechtener

14  was being evasive; correct?

15  A.    That's correct.

16  Q.    In your typewritten report do you recall how many

17  times Mr. Fuechtener denied viewing child pornography?

18  A.    Viewing child pornography?

19  Q.    Do you recall how many times he denied it?

20        MS. ROOHANI:  Your Honor, again, it's hearsay,

21  calls for hearsay, self-serving statement made to Special

22  Agent McCamey.  It's not admissible.

23        THE COURT:  Mr. Durham, what is the purpose of

24  the question?

25        MR. DURHAM:  I'll move on, Your Honor.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  Well, is it to demonstrate -- or to
2    impeach the defendant's -- or the witness's statement that
3    the defendant was inconsistent?
4           MR. DURHAM:  Your Honor --
5           THE COURT:  Are you trying to show a consistency
6    as opposed to the inconsistency?
7           MR. DURHAM:  Your Honor, the report is replete
8    with denials.  And so the purpose of asking him if he
9    recalls that is because he's basically -- what I'm getting
10   from his testimony is that Mr. Fuechtener was waffling or
11   was not completely answering the question.
12           And so the way I read the report is that he
13   denied it multiple times.
14           THE COURT:  All right.  So it sounds like you're
15   trying to ask him the question in order to elicit evidence
16   of a consistency as opposed to inconsistency.
17           For that limited purpose, I'll allow you to do
18   that.  But I'm not allowing it as an actual statement for
19   the truth of the matter asserted by the defendant, rather
20   to permit you to have leeway to demonstrate whether, in
21   fact, the defendant was inconsistent or actually provided
22   some consistent answers for the weight of whatever that's
23   going to be worth.
24           It might not be worth very much.  But I'm going
25   to let you go ahead and get into it.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MR. DURHAM:  Thank you, Your Honor.

 2    BY MR. DURHAM:

 3    Q.    Is that fair to say, that he made multiple denials

 4    to you?

 5    A.    What he said multiple times was that he was not

 6    interested in children.

 7    Q.    Okay.

 8    A.    He said that multiple times.

 9    Q.    You don't recall him saying multiple times that he

10    was not interested in child pornography?

11    A.    Again, what I recall him saying multiple times was,

12    "I'm not interested in children."

13    Q.    Okay.  And that's just obviously, again, once again,

14    based on your recollection?

15    A.    Correct.

16    Q.    Because we don't have a recording of this interview;

17    correct?

18    A.    Not an audio recording.

19    Q.    Correct.

20    A.    We have a report.

21    Q.    Correct.  Which is based on your two-page

22    handwritten notes; correct?

23    A.    Correct.

24    Q.    Did you conduct any other interviews in reference to

25    this investigation?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    No.

2    Q.    Okay.  Was this your only role in this

3    investigation?

4    A.    Yes.

5    Q.    Okay.  And, once again, other than your two-page

6    handwritten report and the typewritten report, you did not

7    generate any other reports; correct?

8    A.    My two-page handwritten notes?

9    Q.    Correct.

10   A.    Correct.

11        MR. DURHAM:  If I could have the Court's

12   indulgence?

13        THE COURT:  Sure.

14        MR. DURHAM:  Pass the witness, Your Honor.

15        THE COURT:  All right.  I just had a question

16   that I need to clarify as far as the Hotmail account on the

17   notes, handwritten notes, versus the -- I'm sorry, no.  It

18   was actually -- I had written down the Gmail account was

19   written in the handwritten notes, but the typed notes say

20   Hotmail.

21        So did someone help you to draft your

22   typewritten notes or review and edit the report before it

23   was finalized?

24        THE WITNESS:  My handwritten notes said Gmail,

25   which is obviously an error.  My report says Hotmail.  So,

TRANSCRIBED FROM DIGITAL RECORDING

1    again, I used my notes as a guide.

2              I didn't realize I had written Gmail, but I

3    knew -- I just did the interview, I did the report, I knew

4    it was Hotmail.  I knew that from -- from discussing it.

5    And I wrote Gmail down, but my report reflects Hotmail.

6              THE COURT:  So had you shown your handwritten

7    notes to anyone --

8              THE WITNESS:  No.

9              THE COURT:  -- before you created the

10   typewritten notes?

11             THE WITNESS:  No.

12             THE COURT:  Okay.

13             THE WITNESS:  But I had reviewed -- I had

14   reviewed the search warrant, I had reviewed it with him,

15   and I didn't say Gmail to Mr. Fuechtener.  I wrote it in my

16   notes.

17             THE COURT:  Okay.  Thank you.

18             Ms. Roohani?

19             MS. ROOHANI:  Just a few questions, Your Honor.

20                     REDIRECT EXAMINATION

21   BY MS. ROOHANI:

22   Q.    And I'm going to start where Judge Navarro just

23   ended.  I'd like to show you your handwritten notes.  And

24   this is Bates stamped number 421 and 422, which I believe

25   Mr. Durham was also referring to.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. ROOHANI:  Do you have any objection to me
 2   showing it to him?
 3              MR. DURHAM:  No.
 4              MS. ROOHANI:  Your Honor, may I approach?
 5              THE COURT:  Yes.
 6   BY MS. ROOHANI:
 7   Q.    Go ahead and take a look at that and tell me how
 8   many times are the words "larsschmidt22@" with no suffix
 9   appear on that page -- on those two pages?
10   A.    Once.
11   Q.    Once.  And is that on the first page or is it on the
12   second page?
13   A.    It's on the first page.
14   Q.    And then where does the larsschmidt22@gmail appear?
15   A.    On the second page.
16   Q.    Top of the page, bottom of the page?
17   A.    Towards the bottom half.
18   Q.    Okay.  When you generate notes when you're taking an
19   interview, is that intended to be a transcript of that
20   interview?
21   A.    No.
22   Q.    Is it intended to be a verbatim account?
23   A.    No.
24   Q.    Is it just there to refresh your recollection for
25   when you go to generate your --
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Again --
 2    Q.    -- typewritten notes?
 3    A.    -- it's a guide to help me write my report.
 4    Q.    Okay.  And when you spoke with Mr. Fuechtener, did
 5    you ask him about larsschmidt22@hotmail?
 6    A.    Yes.
 7    Q.    Did you ask him about larsschmidt22@gmail?
 8    A.    No.
 9    Q.    And that's based upon your recollection; it's also
10    upon your report?
11    A.    It's based upon my report on my recollection, the
12    fact that I had studied the affidavit, spoke to Special
13    Agent Panovich about it.
14    Q.    So when you wrote those notes and you wrote Gmail,
15    what is your explanation for why you wrote Gmail --
16    A.    It's a mistake.
17    Q.    It's a mistake?
18    A.    An error on my part.
19    Q.    Human error?
20    A.    Yes.
21    Q.    Okay.  Mr. Durham asked you some questions about
22    whether Mr. Fuechtener appeared tired.
23          Did Mr. Fuechtener ask to leave at any point in
24    the middle of this interview?
25    A.    No.
```

1   Q.    Did he ask to come back another day to complete the

2   interview because he wasn't feel well --

3   A.    No.

4   Q.    -- he was tired, anything like that?

5         And then you answered -- you asked -- Mr. Durham

6   asked you some questions about the yes or no question that

7   you had asked Mr. Fuechtener.

8         Do you remember that yes or no question?

9   A.    Yes.  Oh --

10  Q.    Where he gave you the answer that he wasn't

11  interested in children?

12  A.    Correct.

13  Q.    And you indicated that you had asked a yes or no

14  question.

15        Can you tell me that question again?

16  A.    Yeah.  I had asked him whether or not the images

17  that were on the thumb drive were his, whether or not those

18  images belonged to him, whether that thumb drive belonged

19  to him.

20  Q.    Okay.  And you -- why were you intending to ask that

21  question as a yes or no question?

22  A.    Because it's a simple answer.  It's a direct

23  question, "Are they yours?  Do they belong to you?"

24  Q.    And if he had answered "yes," would that have been

25  an admission?

TRANSCRIBED FROM DIGITAL RECORDING

1  A.    Yes.

2  Q.    And if he had answered "no," would that have been a

3  denial?

4  A.    Yes.

5  Q.    But he didn't answer "yes," as an admission, or

6  "no," as a denial?

7  A.    That's correct.

8  Q.    When you were speaking with Mr. Fuechtener, did he

9  ask you at any point to repeat yourself or to explain

10  yourself in different words because he didn't understand

11  the --

12  A.    No.

13  Q.    -- questions he was asking you?

14        Did he speak with an accent?

15  A.    He had a slight accent.

16  Q.    Okay.  Did he ask for a translator at any point?

17  A.    No.

18  Q.    And when you asked him that yes or no question and

19  he told you, "I'm not interested in children," did you

20  explain to him why you were asking that question?

21  A.    I -- he would kind of go off on a tangent about the

22  types of people that he was interested in, including the

23  SWAT guys that came in the house.

24        And I would bring him back around.  I would say,

25  "That's not what I'm interested in.  That's not the

1    question I asked you.  I'm asking you about these images

2    that are on the thumb drives."  And again he would answer

3    me.

4    Q.    And did you indicate to him that you were expecting

5    either a yes or no answer from that?

6    A.    I told him that -- I told him that he was being

7    evasive because he was not directly answering my

8    question --

9    Q.    And --

10   A.    -- that -- yes, that it was essentially a yes or no

11   question.

12   Q.    And when you told him he was being evasive, what did

13   Mr. Fuechtener say to you?

14   A.    He told me that he was choosing his words carefully

15   because he did not want anyone to get in trouble, and he

16   didn't want to lose his job.

17   Q.    Okay.

18          MS. ROOHANI:  A moment's indulgence, Your Honor.

19          Your Honor, I'd pass the witness.

20          THE COURT:  Recross?

21                  RECROSS-EXAMINATION

22   BY MR. DURHAM:

23   Q.    Agent, so today you're testifying 10 months late --

24   after this interview occurred; correct?

25   A.    Correct.

TRANSCRIBED FROM DIGITAL RECORDING

 1    Q.    And are you testifying just based on your
 2   recollection?
 3    A.    And refreshment from my report.
 4    Q.    Okay.  And that report was, once again, based on
 5   your two-page handwritten notes; correct?
 6    A.    In part.
 7    Q.    Okay.  The other part was based on your
 8   recollection?
 9    A.    Of the interview that I conducted 12 hours before I
10   did the report.
11    Q.    Okay.  You took the handwritten notes on the 21st;
12   you prepared the report on the 22nd?
13    A.    Correct.
14    Q.    Okay.  You would agree with me that there's -- the
15   report contains additional information that is not
16   contained in your handwritten report; correct?
17    A.    That's correct.
18    Q.    Okay.  And that's all just based off of your
19   recollection?
20    A.    Again, notes -- the notes are there as a guide, and
21   it's based on, yes, the recollection of the interview I did
22   12 hours earlier.
23    Q.    Okay.  The notes are not verbatim, correct, of
24   what -- word for word of what --
25    A.    They are not verbatim, that is correct.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  So what you're writing down here, we just

2    have to take your word for it; correct?  They're not

3    verbatim?

4    A.    (No audible response.)

5    Q.    Okay.  So it's basically what you wrote down as far

6    as what you were perceiving, what you were viewing, your

7    frame of reference as far as this interview goes; correct?

8    A.    So the notes are based on what he's telling me.

9          And when I say they're not verbatim, they're not

10   word for word; otherwise, we'd have 15 pages of notes or

11   somewhere in that area.

12   Q.    Okay.  Well, these are serious charges, aren't they?

13   A.    Yes, they are.

14   Q.    Wouldn't it important to have these reports as

15   accurate and complete as possible?

16   A.    And they are accurate.

17   Q.    If you had -- you just stated that if you had done

18   it word for word it would have taken about 15 pages;

19   correct?

20   A.    That's -- that's probably if I had done verbatim,

21   word for word, everything that he said.

22         Because you got to remember, he's denying,

23   denying, denying.  He's talking -- I'm sorry.  He's talking

24   on tangent, he's talking on tangent, I'm bringing him back

25   to the issue.  He's denying, he's denying, he's denying.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    He's going off on a tangent, I'm bringing him back to the
 2    issue.
 3              That's the way the interview went for three
 4    hours.
 5    Q.    Okay.  So it would have been too much to ask for you
 6    to write down verbatim how the interview went?
 7    A.    I have never written verbatim notes of how --
 8    verbatim notes of an interview.  I've never taken absolute
 9    verbatim notes of an interview.
10    Q.    Okay.  So your two pages of handwritten notes were
11    basically what you thought was relevant to this interview?
12    A.    My two pages of handwritten notes are the
13    information related to the child pornography issues and
14    related to the trading of -- or the sharing of the images
15    relating to the images that were at the house relating to
16    his responses to the images that were at the house relating
17    to the lars45 and the larsschmidt e-mail accounts, the
18    pertinent information relating to what Mr. Fuechtener has
19    been charged with.
20    Q.    So Mr. Fuechtener answered some of your questions;
21    correct?
22    A.    He did, yes.
23    Q.    And you were taking these notes contemporaneously
24    with his answers?
25    A.    I was taking the notes, some of them
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   contemporaneously, some of them as -- as I recalled what he

 2   told me.

 3            So not all of them are being taken

 4   contemporaneously with the interview itself.

 5   Q.    And then you waited until the following day to

 6   prepare your typewritten report?

 7   A.    Yes.

 8   Q.    Okay.  Would you agree with me that this would have

 9   been a lot easier and more complete if this interview had

10   just been recorded?

11   A.    I absolutely agree.

12            MR. DURHAM:  Pass the witness.

13            THE COURT:  My memory is that you stated the

14   interview started at 1:30; is that right?

15            THE WITNESS:  Correct.

16            THE COURT:  And you said it took a couple of

17   hours?

18            THE WITNESS:  Roughly three.

19            THE COURT:  What time does your shift end?

20            THE WITNESS:  My shift?  What time do I usually

21   go home?

22            THE COURT:  Yeah.

23            THE WITNESS:  5:00, 5:30.

24            THE COURT:  All right.  And so the next day when

25   you came back to work, that's when you typed up the report?
```

TRANSCRIBED FROM DIGITAL RECORDING

1              THE WITNESS:  Right.

2              THE COURT:  And did you talk to anyone or share

3     your notes with anyone before you typed up the report?

4              THE WITNESS:  I did not share my notes.  I

5     discussed with Special Agent Panovich what he had told me

6     during the interview.

7              THE COURT:  Do you recall if she corrected you

8     on maybe some misunderstanding as to whether it was Gmail

9     or Hotmail?

10             THE WITNESS:  No.  And, again, my recollection

11    is there was no misunderstanding other than I wrote Gmail

12    down in my notes.

13             THE COURT:  Do you have a Gmail account?

14             THE WITNESS:  I used to, yeah.

15             THE COURT:  Okay.

16             Go ahead, Ms. Roohani.

17             MS. ROOHANI:  I just of one question.

18                  FURTHER REDIRECT EXAMINATION

19    BY MS. ROOHANI:

20    Q.   The statements that Mr. Fuechtener gave you that

21    day, are they correctly and accurately reflected in your

22    report?

23    A.   Yes.

24    Q.   Your typewritten report?

25    A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1             MS. ROOHANI:  That's it, Your Honor.

2             THE COURT:  Anything else, Mr. Durham?

3             MR. DURHAM:  No, thank you, Your Honor.

4             THE COURT:  Thank you very much, Mr. McCamey,

5     for coming in.  And just be careful to only take with you

6     whatever documents you brought with you.  Yeah, leave the

7     other evidence here.

8             Would the government like to call its next

9     witness.

10            MS. ROOHANI:  We would, Your Honor.  And may we

11    ask that Mr. McCamey be released so that -- for his

12    purposes of --

13            THE COURT:  Yeah.  He's on the defendant's list.

14            Did the defense intend to recall him for any

15    purpose?

16            MR. DURHAM:  No, Your Honor.

17            THE COURT:  All right.  Yes, he'll be released.

18            MS. ROOHANI:  Thank you.

19         (The witness was excused.)

20            MS. ROOHANI:  At this time, the United States

21    calls Josh Rodriguez.

22            COURTROOM ADMINISTRATOR:  Please raise your

23    right hand.

24            You do solemnly swear that the testimony you

25    shall give in the cause now before the Court shall be the

TRANSCRIBED FROM DIGITAL RECORDING

1    truth, the whole truth, and nothing but the truth, so help
2    you God?
3              THE WITNESS:  Yes.
4              COURTROOM ADMINISTRATOR:  Thank you, sir.  You
5    may be seated.
6              Please state and spell your full name for the
7    record.
8              THE WITNESS:  And middle name?
9              COURTROOM ADMINISTRATOR:  First and last.
10             THE WITNESS:  Okay.  Joshua Rodriguez,
11   J-o-s-h-u-a.  Rodriguez is R-o-d-r-i-g-u-e-z.
12             MS. CARTIER-GIROUX:  May I inquire?
13             THE COURT:  Yes.
14             MS. CARTIER-GIROUX:  Thank you.
15                        JOSHUA RODRIGUEZ
16             called as a witness on behalf of the
17        Government, was examined and testified as follows:
18                        DIRECT EXAMINATION
19   BY MS. CARTIER-GIROUX:
20   Q.   Sir, where do you work?
21   A.   At the Henderson Police Department for the Henderson
22   Detention Center.
23   Q.   How long have you worked there?
24   A.   Come April, it will be seven years.
25   Q.   And what is your position?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I am the intelligence and classification officer for

2    the Henderson Jail.

3    Q.    Okay.  And at the Henderson Jail, are you aware

4    whether or not the defendant, Mr. Fuechtener, is currently

5    being held there?

6    A.    Yes, he is.

7    Q.    Okay.  And when there is a person at the jail, are

8    they able to make telephone calls?

9    A.    Yes.

10   Q.    And are they assigned any kind of number or code

11   when they make a phone call?

12   A.    Yes.  They have an inmate ID number with a PIN they

13   choose for security purposes.

14   Q.    And what do they have to do with the inmate ID

15   number when they make a phone call?

16   A.    They have to enter in their inmate ID number

17   followed by their PIN when they make phone calls.

18   Q.    Okay.  And does the Henderson Detention Center keep

19   records of the calls?

20   A.    Yes.  It's through a telephone company for

21   facilities for jails and prisons called Securus.

22   Q.    Do they not only make a record of the -- that the

23   call took place, but do they record those calls?

24   A.    Yes, they do.

25   Q.    Can you take a look in that binder in front of you

TRANSCRIBED FROM DIGITAL RECORDING

```
1    what's been marked -- and it will be on the tab.  Look on
2    tab 25.  It will be the first -- the first exhibit would be
3    25A for identification.
4    A.    All right.
5    Q.    Okay.  Can you actually take the disk out for me.
6    A.    Okay.
7    Q.    I'm going to have to use it again.  Okay.  Can you
8    turn to tab 26A.  And also remove that exhibit.  And also
9    27A.
10             Now, prior to you coming in to testify, did you
11   review what is contained on 25A, 26A, and 27A marked for
12   identification?
13   A.    Yes.
14   Q.    And what are -- what is 25A, 26A, and 27A?
15   A.    They are telephone calls made from the defendant's
16   inmate telephone account at the Henderson Detention -- from
17   the Henderson Detention Center.
18   Q.    Okay.  These calls that are contained on 25A, 26A,
19   27A, are they calls kept and preserved in the ordinary
20   scope of the business of Henderson detention facility?
21   A.    Yes.
22   Q.    Is it a regular part of the business of the
23   Henderson detention facility to keep and maintain such
24   telephone calls?
25   A.    Yes, through the Securus telephone company.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And are those calls and were those calls kept within

2    the custody and control of the Henderson Detention Center?

3    A.    Yes.

4    Q.    And did you, in fact, provide those calls to the

5    special agent in this case, Mari Panovich?

6    A.    Yes.  I reviewed the telephone calls, and I even

7    printed up a telephone summary report of when the calls

8    were made and that they were made from the defendant's

9    telephone account and that they originated from the

10   Henderson Jail.

11   Q.    And did, in fact, you verify on each of these calls

12   the PIN number was associated with the defendant while

13   housed at the facility?

14   A.    Yes.

15           MS. CARTIER-GIROUX:  I would ask that 25A, 26A,

16   and 27A just remain marked for identification at this point

17   in time.  They are certified records, Your Honor.  I'm

18   going to call Special Agent Panovich, because the calls are

19   in a foreign language, to identify the voices.  So subject

20   to connection.

21           So at this time I'm not offering them.  But they

22   are certified -- we're offering them as certified business

23   records.  I still have to authenticate them further since

24   they are not in English.

25           THE COURT:  All right.  Any objection so far?

1           MR. DURHAM:  No.

2           THE COURT:  Okay.  Go ahead.

3           MS. CARTIER-GIROUX:  I don't have any further

4     questions for the witness.

5           THE COURT:  All right.

6           Any cross?

7           MR. SANFT:  Your Honor, we have no questions.

8           THE COURT:  All right.  Thank you very much for

9     coming in this afternoon.  You're all done.

10          Is he released as well?  Or is he going to be

11    playing --

12          MS. CARTIER-GIROUX:  Can he just wait, and then

13    we can release him after if no one needs to recall him?

14          THE COURT:  All right.  Okay.  So you're not

15    released yet.  We might need to recall you.  But just be

16    careful on your way down with the steps.

17          MS. CARTIER-GIROUX:  I just want to wait until

18    they're actually entered.

19          THE COURT:  Right.  We still need you to wait

20    outside because of the Exclusionary Rule.

21          These are all the exhibits; right?  He can leave

22    these all here.

23          MS. CARTIER-GIROUX:  Yes.

24          Your Honor, I'm going to call Special Agent Mari

25    Panovich for the specific purpose of just finishing up

TRANSCRIBED FROM DIGITAL RECORDING

1    the -- to enter the calls into evidence.

2                    THE COURT:  Okay.

3                    MS. CARTIER-GIROUX:  At this time, the United

4    States calls Mari Panovich.

5                    THE COURT:  I just wasn't sure whether you need

6    to ask him about the recording, whether there's notice

7    given before -- that the phone is recorded, but I see that

8    it's in the transcript.

9                    MS. CARTIER-GIROUX:  Yes.

10                   THE COURT:  So that's what was my delay, was I

11   was trying to double check and make sure we had everything

12   we needed.

13                   COURTROOM ADMINISTRATOR:  Please raise your

14   right hand.

15                   You do solemnly swear that the testimony you

16   shall give in the cause now before the Court shall be the

17   truth, the whole truth, and nothing but the truth, so help

18   you God?

19                   THE WITNESS:  Yes, I do.

20                   COURTROOM ADMINISTRATOR:  Thank you.  Please

21   state and spell your full name for the record.

22                   THE WITNESS:  Sure.  Thank you.  Mari Panovich,

23   M-a-r-i P-a-n-o-v-i-c-h.

24

25

TRANSCRIBED FROM DIGITAL RECORDING

| | |
|---|---|
| 1 | MARI PANOVICH |
| 2 | called as a witness on behalf of the |
| 3 | Government, was examined and testified as follows: |
| 4 | DIRECT EXAMINATION |
| 5 | BY MS. CARTIER-GIROUX: |
| 6 | Q.   Special Agent Panovich, before coming in here to |
| 7 | testify, did you have an opportunity to listen to what -- |
| 8 | the calls contained in 25A, 26A, and 27A for |
| 9 | identification? |
| 10 | A.   Yes, I did. |
| 11 | Q.   And are you familiar with the voices of the |
| 12 | individuals in those three calls? |
| 13 | A.   Yes, I am. |
| 14 | Q.   Okay.  With regard to the defendant, are you |
| 15 | familiar with the defendant's voice? |
| 16 | A.   Yes, I am. |
| 17 | Q.   Have you ever interviewed him? |
| 18 | A.   Yes, I have. |
| 19 | Q.   Have you spoken to him? |
| 20 | A.   Yes, I have. |
| 21 | Q.   Have you listened to other jail calls, other than |
| 22 | these three, purportedly by the defendant with regard to |
| 23 | his inmate PIN number? |
| 24 | A.   Yes, I have. |
| 25 | Q.   How many calls do you think that there are from the |

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    defendant that have been available to you?

 2    A.    Hundreds.

 3    Q.    Okay.  Are the calls in different languages?

 4    A.    Yes, they are.

 5    Q.    What languages?

 6    A.    German and English.

 7    Q.    Okay.  And even in the calls with -- that are spoken

 8    in German, are you familiar with the tone of the

 9    defendant's voice and the sound of his voice?

10    A.    Yes, I am.

11    Q.    Do you recognize the person making the calls in 25A,

12    26A, and 27A for identification?

13    A.    Yes, I do.

14    Q.    Who do you recognize that person to be, based on

15    your familiarity?

16    A.    As the defendant.

17    Q.    In 25A, 26A, 27A, the person whom the defendant is

18    speaking to is -- are you familiar with that person's

19    voice?

20    A.    Yes, I am.

21    Q.    Are you familiar with an individual named Frank

22    Alfter?

23    A.    Yes.

24    Q.    Have you spoken to Frank Alfter?

25    A.    Yes, I have.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   Have you interviewed Frank Alfter?

2   A.   Yes, I have.

3   Q.   Have you listened to other phone calls or jail calls

4   with -- from the defendant, where the other person on the

5   line appeared to you to be the same voice?

6   A.   I'm sorry.  Say that again.

7   Q.   Same voice that the defendant is talking to in these

8   three calls?

9   A.   Yes.

10   Q.   Okay.  During the phone calls that you've listened

11   to, where you were able to understand, did the defendant

12   ever address the other individual whose voices are recorded

13   in 25A, 26A, and 27A by name?

14   A.   Yes, he does.

15   Q.   What does he call him?

16   A.   Frank.

17   Q.   The person who the defendant is speaking to in 25A,

18   26A, 27A, based on your familiarity with Frank Alfter's

19   voice, based on your listening to the hundreds of jail

20   calls, based on defendant calling this individual Frank,

21   who do you believe that person to be?

22   A.   Frank Alfter.

23        MS. CARTIER-GIROUX:  At this time I would offer

24   25A, 26A, 27A into evidence.

25        THE COURT:  Any objection?

1          MR. MARCHESE:  Yes, Your Honor.  We would ask

2    for more foundation and the Court to withhold allowing this

3    into evidence until the proper foundation is laid; namely

4    these chats -- or these recordings are in German, is our

5    understanding.

6          THE COURT:  I'm not sure I understand the

7    objection.  Are you objecting --

8          MR. MARCHESE:  Well, there's no foundation.  I

9    don't think -- believe they've laid the proper foundation

10   yet.  So we're --

11         THE COURT:  She said she already listened to the

12   recordings, she's spoken to both the defendant and his

13   husband, she recognizes their voices, and they sound the

14   same as the voices.  So --

15         MR. MARCHESE:  Correct.  But I still think that

16   there's another level, which is there's still a hearsay

17   issue to come in.

18         So if we allow -- if we don't object -- I mean,

19   I'm not disputing that Ms. Panovich knows my client's

20   voice, knows Mr. Alfter's voice.  That's not my objection.

21         My objection is if we allow it to come in at

22   this point, then we've obviously waived our right.  So

23   we're going to take the position that these are hearsay

24   statements; and some may be allowed in and some may not,

25   but I don't think this is the time for us to lodge that

TRANSCRIBED FROM DIGITAL RECORDING

1    objection.

2            So we're -- at this point, that's where we're

3    at.  We don't think there's a foundation.  Because we're

4    going to have hearsay issues down the road.  And if we

5    allow it in now, it's in evidence.  We can't unring the

6    bell.

7            THE COURT:  All right.  Well, the defendant's

8    statement wouldn't be hearsay; right?  So are you saying

9    that the other person's statements would be hearsay?

10           MR. MARCHESE:  We're saying all the statements

11   would be hearsay and they all need to meet hearsay

12   objections.  And some may and some may not.  But we're not

13   there yet.

14           THE COURT:  Do you want to respond,

15   Ms. Cartier-Giroux, for the record?

16           MS. CARTIER-GIROUX:  Our intention is to

17   introduce portions of these statements that are nonhearsay.

18   They are statements by a party opponent.

19           They come in.  Whether they're inculpatory,

20   exculpatory, they come in.  They're his statements.  We can

21   put them in.

22           We're not going to put the entire -- if you

23   don't want to put the entire exhibit in in German, that's

24   fine.  We'll put in the portions through the translator.

25           But the basis of them coming in is established.

TRANSCRIBED FROM DIGITAL RECORDING

1   It's his voice.  The calls are certified records -- well,

2   certified -- they're business records.  They're not

3   certified, they're business records, which we established

4   by Mr. Rodriguez.

5           So the contents of the calls can come in.  I'm

6   okay with not putting the actual full disks in.  But we'd

7   like now to be able to admit the statements within the

8   calls through the translator.  I think we've established a

9   basis for it.

10          THE COURT:  All right.  So if I -- and I agree

11  with you that the defendant's statements are statements by

12  a party opponent and they're not hearsay and they are

13  admissible.

14          I guess the question is whether the statements

15  by Mr. Frank Alfter would be hearsay or not --

16          MS. CARTIER-GIROUX:  Right.

17          THE COURT:  -- since he's not on the stand --

18          MS. CARTIER-GIROUX:  Well, they --

19          THE COURT:  -- which is usually the case.

20          MS. CARTIER-GIROUX:  They would come in anyway

21  at this point in time with regard to the defendant's

22  statements because his statements are in response to some

23  of the statements made by Mr. Alfter.

24          The Court can make a decision at the end of our

25  proof, at the end of our final witnesses as to whether or

TRANSCRIBED FROM DIGITAL RECORDING

1    not the Court finds that Mr. Alfter is, in fact, an

2    unindicted co-conspirator in this case.

3            And part of that proof is going to come in, we

4    believe, through those calls.  There's not a *Crawford* issue

5    with those calls.

6            So at this point in time we don't want you to

7    rule on whether or not Mr. Alfter's statements come in as

8    nonhearsay.

9            But we would like to be able to introduce the

10   calls because we have established that they are relevant,

11   that they are admissible, at least as nonhearsay as to

12   Mr. Rouven's phone calls, and we have established that they

13   are, in fact, calls made by him kept in the regular course

14   of business by the Henderson Detention Center.

15           THE COURT:  All right.  They'll be admitted as

16   business records.

17       (Government's Exhibits 25A, 26A, 27A

18       received.)

19           MR. MARCHESE:  And just to be clear, Your Honor,

20   I just wanted to lay my found -- my record, and I think I

21   already have, that we are objecting at this point that many

22   of these statements could, in fact, be hearsay.

23           THE COURT:  I'm not sure how the defendant's

24   statements could be hearsay, but depending on whether or

25   not Mr. Alfter is a co-conspirator or not, then his

------------------------------TRANSCRIBED FROM DIGITAL RECORDING------------------------------

```
 1     statements may or may not be hearsay.  But we'll get to

 2     that at the end.

 3              MS. CARTIER-GIROUX:  Judge, I apologize.  I have

 4     one other question.

 5              THE COURT:  Sure.

 6     BY MS. CARTIER-GIROUX:

 7     Q.    While you're up there, could you take a look at 28A

 8     for identification.

 9              And this relates to the translator.  We want to

10     do it at the same time, that's why I'm asking these

11     questions now.

12              Do you recognize 28A?

13     A.    Yes, I do.

14     Q.    What is 28A for identification?

15     A.    It is a GigaTribe chat.

16     Q.    Okay.  Is that -- where does that GigaTribe chat

17     come from?

18     A.    It's from evidence item 1B3.

19     Q.    Okay.  And did that GigaTribe chat come -- was that

20     extracted from IEF -- it's from 1B3; correct?

21     A.    Yes, correct.

22     Q.    IEF report 1B3, which has already been admitted as

23     Exhibit 13?

24     A.    Yes.

25     Q.    Okay.  And what language are those GigaTribe chats
```

TRANSCRIBED FROM DIGITAL RECORDING

1    in?

2    A.    In German.

3              MS. CARTIER-GIROUX:  At this time I'd offer 28A

4    in evidence.

5              THE COURT:  Any objection to 28A?

6              MR. MARCHESE:  No, Your Honor.

7              THE COURT:  All right.  28A will be admitted.

8          (Government's Exhibit 28A received.)

9              MS. CARTIER-GIROUX:  I don't have any other

10   questions.  Thank you.

11             THE COURT:  Any cross?

12             MR. MARCHESE:  No, Your Honor.

13             THE COURT:  All right.

14             Thank you, Ms. Panovich.  I think you'll be

15   back.  But thank you for now.

16             THE WITNESS:  Thank you.

17          (The witness was excused.)

18             THE COURT:  Did you want to call another

19   witness?

20             MS. ROOHANI:  Yes, Your Honor.  I'm sorry.  I

21   didn't hear you.

22             We would call Philip Schapery.

23             Judge, may we release Mr. Rodriguez now, since

24   the call's been admitted?  Can we release him?  Or do you

25   want him to stay?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  Yeah, well, I think we can release
 2    him.
 3              MS. ROOHANI:  Thank you.  We just don't want him
 4    sitting here all day, Your Honor.
 5              THE COURT:  Go ahead.
 6              COURTROOM ADMINISTRATOR:  Please raise your
 7    right hand.
 8              You do solemnly swear that the testimony you
 9    shall give in the cause now before the Court shall be the
10    truth, the whole truth, and nothing but the truth, so help
11    you God?
12              THE WITNESS:  I do.
13              COURTROOM ADMINISTRATOR:  Thank you, sir.  You
14    may be seated.
15              Please state and spell your first and last name
16    for the record.
17              THE WITNESS:  Philip Schapery, S-c-h-a-p-e-r-y.
18              MS. ROOHANI:  And, Your Honor, I'll note
19    Mr. Schapery is battling a little bit of a cough, so -- I
20    believe that he has it under control.  But there's water up
21    there if you need it at any time.  If you need to take a
22    break, just let us know.
23              THE COURT:  There's water right there.
24
25
```

```
                    TRANSCRIBED FROM DIGITAL RECORDING
```

<pre>
 1                        PHILIP SCHAPERY

 2               called as a witness on behalf of the

 3         Government, was examined and testified as follows:

 4                        DIRECT EXAMINATION

 5   BY MS. ROOHANI:

 6   Q.    Mr. Schapery, who is your employer?

 7   A.    The FBI.

 8   Q.    And how long have you been working for the FBI?

 9   A.    Ten years.

10   Q.    What are your current duties and responsibilities?

11   A.    I translate documents and audio, and sometimes I do

12   interpreting.

13   Q.    And is that -- into what language, to and from which

14   languages?

15   A.    English and German.

16   Q.    Have you held any other positions within the FBI?

17   A.    No, ma'am.

18   Q.    Okay.  Tell us a little bit about your formal

19   education.

20   A.    I started learning German back in high school, where

21   I took four years of German.  At the same time when I was

22   in high school, I was an exchange student in Germany.

23         The following year I also went back to Germany

24   for the summer with some Texas A&M students, and we went

25   through a six-week course at the Goethe Institut at Passau,
</pre>

1    Germany.

2            Then after high school I attended Texas A&M

3    studying electrical engineering, but I also took 24 credit

4    hours of German at that time.

5    Q.    Okay.  Did you receive a minor degree in German?

6    A.    Texas A&M didn't give minor degrees at the time.

7    But I had enough hours to be close to a minor at least.

8    Q.    Did you take any FBI courses related to translation?

9    A.    When you first start, you take what they call LAST

10   training, language analyst specialist training.

11           And subsequent to that, I've taken two

12   interpreting courses at the FBI.

13   Q.    Okay.  For how many years have you been speaking

14   German?

15   A.    Over 40.

16   Q.    How many times have you traveled to Germany?

17   A.    Somewhere between 20 and 30 times.

18   Q.    And were those visits emersion into the German

19   culture and German language?

20   A.    Yes.

21   Q.    How do you maintain your skills in the German

22   language?

23   A.    I've taken continuing education courses, like at the

24   German-Texan Heritage Society, for seven years.

25           I also watch a lot of German satellite

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    television.  I read German a lot.  Plus I translate it
 2    every day at work.
 3    Q.    Okay.  Have you previously testified in court as a
 4    German-to-English translator?
 5    A.    No.
 6    Q.    And have your translations been used in court
 7    before?
 8    A.    Yes.
 9    Q.    And if you haven't testified, I'm assuming that
10    those translations have been stipulated to; is that
11    correct?
12    A.    That's correct.
13    Q.    Okay.  Do you know about how many times your
14    translations have been used in court?
15    A.    I don't know exactly because we're not always
16    informed when we're used.
17    Q.    Do you have a ballpark?
18    A.    There were several times specifically I know they
19    were stipulated to.  And beyond that, I heard they were
20    going to court, but I never heard anything back.
21    Q.    Okay.  Does the FBI have any quality control
22    measures for translations?
23    A.    Yes.  When you're a new linguist, your first 40
24    hours is quality reviewed by a senior linguist.  And then
25    from that time forward, every year samples of your work are
```

TRANSCRIBED FROM DIGITAL RECORDING

1   quality reviewed by another linguist.

2   Q.    Have you ever not passed one of those quality

3   reviews?

4   A.    Yes.  The very first one that I went through 10

5   years ago I failed because of one word, which I could not

6   read properly because it was a fax of a fax and tiny print,

7   and there was a letter "I" in there that completely changed

8   the meaning of the word, so I failed because of that one

9   word.

10  Q.    And how many words do you have to misread to come up

11  with a nonpassing score?

12  A.    You could fail just because of one word if that word

13  is important.

14  Q.    Okay.  Can you tell us about that one word that

15  caused you to fail that particular quality review?

16  A.    Yeah.  The German word was *aktien,* a-k-t-i-e-n, and

17  it looked to me like the word was *akten*, which means files,

18  like you put in a file cabinet.

19        So I thought somebody had stolen someone's

20  files, when they had stolen shares of stock.

21  Q.    So you did not see the "I" --

22  A.    I couldn't make out the "I" because it was smeared.

23  Q.    Okay.  Have you ever not passed since that time?

24  A.    I've never not passed since then.

25  Q.    And how many times -- I think you mentioned once a

TRANSCRIBED FROM DIGITAL RECORDING

1    year that the quality review comes up?

2    A.    That's right.

3    Q.    Have you passed a quality review this year?

4    A.    Yes.

5    Q.    And when you said you didn't pass, that was 10 years

6    ago?

7    A.    Yes, 10 years ago.

8    Q.    Okay.  And I'm assuming you've received additional

9    training since that time?

10   A.    Yes.

11   Q.    Okay.  Sometimes when you are working with the FBI,

12   are you asked to review other people's translations?

13   A.    Yes.

14   Q.    And what do you look at when you're reviewing

15   somebody else's translation?

16   A.    First thing is you're looking for mistranslations to

17   correct, you are looking for awkward translations that

18   don't quite sound right and could be expressed more

19   clearly, and you're looking for grammatical and spelling

20   errors.

21   Q.    Okay.  So when you review an audio recording, would

22   you play the audio recording if you're reviewing somebody

23   else's work?

24   A.    Yes.

25   Q.    And you review their translation?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Correct.

2   Q.    And then do you change every error or just

3   significant errors?

4   A.    I change errors.  I change errors that are certainly

5   pertinent errors.  If it's just a matter of expression

6   where I could say one where he said another, I don't

7   necessarily change that if it's clear what it means.

8   Q.    Okay.  And do you do a verbatim translation, word

9   for word?

10  A.    At the FBI we're taught that we don't do

11  word-for-word translations, we do meaning-for-meaning

12  translations.

13  Q.    And what is the purpose for doing a

14  meaning-for-meaning translation as opposed to

15  word-for-word?

16  A.    Because if you try to do a word-for-word translation

17  from German into English, you would come out with a bad

18  translation that's hard to understand or inaccurate.

19  Q.    Is that due to certain terms of phrase that might

20  exist in German that don't exist in English?

21  A.    Yes, that's exactly right.

22  Q.    Okay.  You did some translations for this case; is

23  that correct?

24  A.    Yes.

25  Q.    Okay.  When you translated the -- what were those

TRANSCRIBED FROM DIGITAL RECORDING

1    things that you translated in this case?

2    A.    These were jailhouse calls.

3    Q.    Okay.  Did you also translate or review a

4    translation of a chat in this case?

5    A.    Yes.

6    Q.    Okay.  When you translated the jail calls, were

7    there certain things in the jail calls that made it

8    difficult for you to do the translation or cause you to go

9    back and double check your work?

10   A.    Yes.  Any time you're translating audio, there are

11   times when people, if there's two people, they'll be

12   talking over each other.  Sometimes they'll speak quickly,

13   sometimes they'll speak softly, sometimes they'll mumble;

14   so you have to replay sections over and over at times to

15   hear exactly what they said.

16   Q.    Okay.  And when you -- do you review the same audio

17   over and over again to try to get to the correct

18   translation?

19   A.    Yes, I do.

20   Q.    Okay.  Were there any things in the -- in these

21   particular jail calls that you listened to where there

22   wasn't a translation issue, where you just had difficulty

23   hearing what was going on?

24   A.    Yes.

25   Q.    And how did you indicate those in your specific

TRANSCRIBED FROM DIGITAL RECORDING

1    translations?

2    A.    If -- if you cannot hear it at all, if there's

3    just -- you listen to it again and again, you don't

4    understand it, because of mumbling or whatever, you can put

5    in brackets, and you put "UI," which is unintelligible.

6    Q.    And if there's overlapping voices, how do you

7    indicate that?

8    A.    You put "OV" within brackets.

9    Q.    Okay.  Was there anything in these particular

10   translations that left you scratching your head, wondering

11   what was going on?

12   A.    Occasionally.  And when that happens, if I can make

13   out what's being said but I don't understand it, I'll check

14   the dictionary or consult a colleague.

15   Q.    Okay.  And did you have to do that in this case?

16   A.    Yes.

17   Q.    And after you consulted a colleague and you

18   consulted the dictionary, that is when you created your

19   final translation?

20   A.    That's right.

21   Q.    Okay.  The majority of -- if -- I assume that you

22   reviewed the translations in this case; is that correct?

23   A.    Yes.

24   Q.    And when you reviewed those, do you remember, on

25   average, the number of grammatical or punctuation errors

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   that you may have changed?
 2   A.    The number, they were just occasional, sporadic.
 3   Q.    Okay.  And in terms of changing a word here or
 4   there, sporadic as well?
 5   A.    Sporadic, yes.
 6   Q.    Okay.
 7            MS. ROOHANI:  Your Honor, I would ask for
 8   permission to tender Mr. Schapery as an expert in
 9   German-to-English translation.
10            THE COURT:  Any objection?
11            MR. SANFT:  Your Honor, I don't know if we can
12   at this point certify him as an expert.  He's never
13   testified in court before.
14            I do understand that maybe among FBI translators
15   he would be considered to be a -- proficient at his job.
16   But with regards to his ability to testify here as an
17   expert, we haven't heard anything about him either being a
18   teacher or, in the alternative, producing written
19   documentation or lecturing or doing anything at all that
20   would tell me that outside of the FBI he is an expert.
21            And based upon that, I think we can say that
22   he's a proficient worker for the FBI but not an expert in
23   this case.
24            THE COURT:  Anything else you want to add for
25   the record, Ms. Roohani?
```

1        MS. ROOHANI:  Your Honor, Mr. Schapery did

2   testify that his translations have been stipulated to

3   numerous times in court, and although he hasn't had to

4   testify, he's only not had to testify because they were

5   stipulated to.

6        And so I would proffer that he is actually

7   qualified in German-to-English translation, both upon his

8   extensive training outside of the FBI, including numerous

9   trips to Germany, including studying in Germany, and

10  staying proficient.

11       And, more importantly, Your Honor, if there is

12  any challenge to the translation, of course, the defense is

13  able to challenge those translations once Mr. Schapery

14  actually testifies.

15       THE COURT:  All right.  Well, he has been

16  translating from German to English for 10 years.  He

17  testified that he's been taking quality review examinations

18  and also keeping up on his proficiency in the German

19  language, both by the work that he does daily as well as

20  watching -- I don't remember if he said it was satellite

21  TV, is that what you said, satellite TV shows in German,

22  which is the more conversational German as opposed to maybe

23  the academic German, which sometimes is more helpful in

24  these cases.

25       I'll go ahead and accept him as -- and certify

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    him as an expert.

 2              Everybody needs to be an expert once before

 3    they -- just because he hasn't been one before, it's

 4    important to highlight that, but it doesn't mean that he

 5    can't ever be.

 6              And certainly if there is any question as to the

 7    translation, the defense has an opportunity to highlight

 8    where a word or a phrase might be incorrectly translated.

 9              So I don't see that there's any prejudice in

10    certifying him as an expert in English - or

11    German-to-English translation at this point.

12              MS. ROOHANI:  Thank you, Your Honor.

13    BY MS. ROOHANI:

14    Q.    Agent Schapery, during the course of your

15    involvement in this case, did you review the translations

16    of other linguists who had translated the jail calls in

17    this case?

18    A.    Yes.

19    Q.    Okay.  The binder -- I think it's the binder that's

20    open in front of you.  Can you take a look Government's

21    Exhibit 25A, 26A, 27A.

22    A.    25A, there's nothing there.

23              MS. CARTIER-GIROUX:  The discs are out.

24              MS. ROOHANI:  Oh, I'm sorry.  I have the disks.

25              Your Honor, may I approach?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  Sure.
 2              MS. ROOHANI:  Okay.  Thank you.
 3              THE COURT:  Now, there's a couple of disks
 4    already here.
 5              THE WITNESS:  Okay.  So I see a disk that says
 6    25A.  Sorry.
 7    BY MS. ROOHANI:
 8    Q.    What's marked as Government's Exhibit 25A,
 9    Government's 26A, and Government's 27A, do you see those
10    disks?
11    A.    Yes, ma'am.
12    Q.    Do you recognize those disks?
13    A.    Yes, ma'am.
14    Q.    Are those the jail calls that you translated?
15    A.    Yes, ma'am.
16    Q.    Okay.  And go ahead and just take a look at -- I'm
17    just marking these, Your Honor -- take a look at 25B, 26B,
18    and 27B.  I believe those are in the binders.
19    A.    Okay.
20    Q.    Do you recognize those?
21    A.    Yes, ma'am.
22    Q.    You do recognize those?
23    A.    Yes.
24    Q.    Are those your translations of those jail calls?
25    A.    Yes.
```

1    Q.    And did you do the original translation on those, or
2    did you review the translations of others on those?
3    A.    I reviewed them.
4    Q.    And have you accepted and adopted those translations
5    as being your official translations as well?
6    A.    Yes.
7    Q.    Okay.  And is it your testimony that those
8    translations are true and correct German-to-English
9    translations?
10   A.    Yes.
11   Q.    Okay.  Have you reviewed those calls and
12   translations recently?
13   A.    Yes.
14   Q.    And as part of that, did you load up into some fancy
15   program that Marissa runs over there, the translations with
16   the timestamp of the translations that are in front of you?
17   A.    Yes.
18   Q.    Okay.
19         MS. ROOHANI:  Your Honor, I believe call 25B --
20   I believe these clips have been admitted of the jail calls.
21   And I'm going to -- I'm going to explain to Your Honor what
22   the problem with this is.
23         The program that we run plays the jail call in
24   German and will scroll the translation.  For the purposes
25   of a clear appellate record, I would ask that we be able to

TRANSCRIBED FROM DIGITAL RECORDING

1    play the call in German and the translation but to make

2    sure that -- for the purposes of appeal, that it's clear.

3    And I don't know if the circuit's going to be able to

4    actually play whatever fancy program it is that Marissa has

5    put on here.

6              I would ask that we be able to read those also

7    in English into the record.

8              THE COURT:  Aren't you admitting the transcript?

9              MS. ROOHANI:  We are not admitting the

10   transcript, Your Honor, because that is the complete call.

11   We're not actually admitting the complete call into the

12   record, just portions of the calls.  They're very long

13   calls.

14             MR. SANFT:  Your Honor, I think at this

15   particular point, the previous objection by the defense,

16   with regards to the hearsay issue, I think we have to

17   address that.

18             If Mr. Schapery is going to testify as to the

19   accuracy of the translation, I think he's done enough to at

20   least testify that his work in this case was accurate.  But

21   with regards to actually looking at the content of each of

22   these phone calls, I think we're traversing back into the

23   area that we objected to earlier, which is the issue of the

24   hearsay --

25             THE COURT:  All right.

TRANSCRIBED FROM DIGITAL RECORDING

1    MR. SANFT:  -- with regards to Frank Alfter's

2  conversations with our client.

3    THE COURT:  And I think you're right.  I have

4  one more question for Mr. Schapery, though.

5    When you said that you reviewed these

6  transcripts that were created by a different linguist, did

7  you listen to them and read through the translation at the

8  same time, or were you just reading through the transcript?

9    THE WITNESS:  No.  I'm listening to the audio,

10  and I'm looking at the translation while I'm listening.

11    THE COURT:  All right.  And did you find any

12  errors that you corrected?

13    THE WITNESS:  Yes.

14    THE COURT:  And how does that work?  When you

15  find what you believe to be an error, do you go back to the

16  person who did it, and you both sit down and listen to it a

17  third time, or how does that work?

18    THE WITNESS:  No, no.  You play the audio.  We

19  have foot pedals.  You play it.  If you think the audio

20  doesn't match the translation, you can hit a foot pedal to

21  go back up, play it again, play it again.

22    After you've listened to it several times, you

23  convince yourself is it right or wrong?  And if it needs to

24  be fixed or not, you fix it there on the spot on your

25  computer.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  So you can just override the

2     linguist?  You don't have to go back and have the linguist

3     tell you why they thought it was something else?

4           THE WITNESS:  There are times when we do, but

5     it's not required.

6           THE COURT:  Okay.  All right.  And so my

7     understanding is the government doesn't want to just admit,

8     at this point, the statements from the defendant that are

9     in the transcript, you want to play portions of it that

10    includes Mr. Alfter's statements as well?

11          MS. ROOHANI:  Right.  So, Your Honor, the

12    entirety of these calls are between the defendant and

13    Mr. Alfter.  What we are introducing is portions of these

14    calls.

15          What we would submit to Your Honor is that we

16    can admit the calls now, and you can consider those --

17    Mr. Alfter's statements nonhearsay until the government is

18    done presenting its case.

19          If you find that Mr. Alfter is an unindicted

20    co-conspirator, at that time you can go back, obviously,

21    and look at those statements and consider them for the

22    truth of the matter asserted because they would be

23    nonhearsay statements of an unindicted co-conspirator.

24          But for the purpose of them coming in, the

25    decision doesn't need to be made right now as to whether

1    they're being considered for the truth today or whenever

2    the government closes its case.

3                THE COURT:  Okay.  Well, I'm not going to

4    preadmit them.  I'll allow you to play them for the purpose

5    of determining whether or not Mr. Alfter is a

6    co-conspirator, and I'll withhold my decision on whether or

7    not they're going to be admissible.  I'll let you play them

8    so we can at least start to understand what your proffer is

9    for why Mr. Alfter could be a --

10               MS. ROOHANI:  Your Honor, I'll let

11   Ms. Cartier-Giroux talk specifically, because she's

12   prepared to argue.

13               THE COURT:  Okay.

14               MS. ROOHANI:  Sorry.

15               THE COURT:  No, that's fine.

16               MS. CARTIER-GIROUX:  Judge, the calls would come

17   in with Mr. Alfter's statements on there, and the -- if we

18   had a jury, the jury would be instructed that the

19   statements of the defendant are admitted for the truth

20   under 801, but that they can consider the statements of the

21   other person not for the truth but in relationship to the

22   answers provided by the defendant.

23               So the calls are admissible.  The question is

24   whether or not the Court, at the end of this trial, will

25   consider the statements in addition to the defendant's

1    statements as being for the truth of the matter asserted as

2    opposed to just coming in to --

3              THE COURT:  Provide context --

4              MS. CARTIER-GIROUX:  Correct.

5              THE COURT:  -- for the defendant's statements.

6              MS. CARTIER-GIROUX:  Exactly.  So the calls are

7    admissible in the sense that they would come in normally.

8    If he was not alleged to be an unindicted co-conspirator,

9    those calls would come in for the defendant's statements,

10   and Alfter's statements would come in but, as I said, only

11   to put that into context.

12             So we're just asking --

13             THE COURT:  So the question is whether

14   Mr. Alfter's statements are to be considered as offered for

15   truth of the matter asserted --

16             MS. CARTIER-GIROUX:  Right.

17             THE COURT:  -- or just to provide context to

18   defendant's --

19             MS. CARTIER-GIROUX:  And as --

20             THE COURT:  -- admissions.

21             MS. CARTIER-GIROUX:  -- we were saying is that

22   we believe that the calls themselves -- and the rule does

23   allow, if you look in -- and I can provide -- I don't know

24   if I put it in the motion or not, I don't remember what I

25   wrote, but there is case law that supports that the Court

TRANSCRIBED FROM DIGITAL RECORDING

1    can look at the actual statement itself, as well as outside

2    information, to determine whether or not that person is, in

3    fact, an unindicted co-conspirator.

4            So you're permitted to consider the call itself,

5    as well, to determine whether or not that person in the

6    call, that other speaker is, in fact, an unindicted

7    co-conspirator.  So you'd have to listen to that call,

8    anyway, in order to make that determination.

9            But we believe that it is admissible, at least

10   at this point in time, as the defendant's statement.

11           THE COURT:  All right.

12           Mr. Marchese?

13           MR. MARCHESE:  Well, there's several issues

14   here.  First off is relevance.  Many portions, and there's

15   many conversations, of the conversations are just

16   completely irrelevant.  Whether or not Mr. Alfter needs to

17   go pay a certain bill has nothing to do with the nature and

18   circumstances of this case.

19           So if any witness was to get up and start

20   talking about that, an objection would have been lodged for

21   relevance and, quite frankly, the Court probably would

22   sustain it.  So that's the first hurdle that the government

23   needs to overcome.

24           Now we have the hearsay issue.  I'm assuming

25   what they're saying is that Mr. Alfter is an unindicted

1      co-conspirator in reference to the possession, the

2      distribution, the receipt, and the advertising counts.

3               We would argue to the Court that he is not an

4      unindicted co-conspirator because the conspiracy would, in

5      fact, end at the time of the search.  Because at that time

6      the conspiracy is over, it's done.  They have taken all the

7      devices.  There is no more advertising that they are, in

8      fact, charging.  It was all done back in August.

9               Further, the possession, there can be no

10     possession because it's all in the possession of the

11     government.  So the conspiracy is over.

12               So what is -- what goes on in conversations

13     months later, there's no ongoing co-conspiracy.

14               So even if the Court finds he is a

15     co-conspirator, it wouldn't be relevant because the

16     conspiracy has ended at the time of the search.

17               Further, the government has --

18               THE COURT:  I thought there was an allegation

19     that the conspiracy continued because the defendant was

20     asking his husband to hide evidence related to this

21     particular offense.

22               MS. CARTIER-GIROUX:  That is actually true.  In

23     the call, there is -- in one of the calls we are going to

24     offer, there is a conversation between Mr. Alfter and the

25     defendant with regard to destroying potential items that

TRANSCRIBED FROM DIGITAL RECORDING

1    Special Agent Panovich -- deleting items that Special Agent

2    Panovich shouldn't know about.

3              MR. MARCHESE:  Well, and that's why we need to

4    take each of these issues piecemeal.  Because that's, like,

5    one pane.  And we have pages and pages.

6              Not to mention there's also hearsay upon

7    hearsay.  There's Mr. Alfter talking on these jail calls

8    about what other people are saying.

9              So not only do they have to get over the first

10   hurdle of hearsay, they have to get over the second hurdle

11   of hearsay.

12             So just to allow these in in their totality is a

13   big problem, Your Honor.  And I don't think they -- and I

14   believe that the Court made the correct ruling to allow

15   them in and then see what should be allowed in and what not

16   to be allowed in.

17             Because, as we said earlier, once the bell is

18   rung, we can't undo it.  And the government needs to meet

19   all these separate hurdles, whether it be relevance,

20   hearsay, et cetera.

21             MS. CARTIER-GIROUX:  And, Judge, first of all, I

22   disagree -- respectfully disagree with Mr. Marchese with

23   regard to when a conspiracy can end.  It doesn't

24   necessarily have to end at a point in time where there's an

25   arrest.  It can continue if the -- if the object of the

TRANSCRIBED FROM DIGITAL RECORDING

1    conspiracy can continue after there's an arrest.  But

2    that's just not a correct statement of the law.

3            Second, the portions that we are going to play,

4    we provided him with the three transcripts.  The portions

5    that we are going to play, I can make a proffer to the

6    Court -- Ms. Roohani can make a proffer to the Court as to

7    what portions we're playing, they are relevant to the

8    issues with regard to the e-mail, with the issues with

9    regard to the destruction of evidence, and they're also

10   relevant with regards to (inaudible).

11           MS. ROOHANI:  Your Honor, specifically, going

12   call by call, on Government's Exhibit 25B, it is the

13   defendant giving Mr. Alfter his e-mail address and

14   indicating it's an admission by the defendant that it is,

15   in fact, his e-mail.

16           On Government's Exhibit 26B is the defendant's

17   response to Mr. Alfter's allegations that there were

18   passwords changed on the computer, and it's coming in for

19   the truth of the defendant's reaction, which is he didn't

20   actually object to that, he, in fact, conceded it.

21           And then on -- wait.  That's right.  27B is

22   specifically related to the ongoing conspiracy.  First,

23   there's a portion where Mr. Alfter's -- sorry,

24   Mr. Fuechtener tells Mr. Alfter that they have to embellish

25   the number of people who were at the house and the people

1    who had access to the house and the computer, which the

2    government submits is an indication -- or at least

3    consciousness of guilt; and then in another portion where

4    Mr. Fuechtener is instructing Mr. Alfter to delete the

5    evidence that Special Agent Panovich should not see, and

6    Mr. Alfter asks for further instructions, and

7    Mr. Fuechtener confirms those instructions.

8           Those are the only portions that we are

9    intending to admit.  We submit that those are all

10   absolutely relevant.  The first two are relevant to the

11   charges in this case dealing with who is

12   larsschmidt22@hotmail.com, which, as Your Honor knows, is

13   an important thing for the government to be able to prove.

14          The second call is about -- is showing that it

15   is the defendant who has access to all the computers and

16   has dominion and control over those computers, and is

17   exerting that dominion and control over those computers.

18          And the third goes to the fact that Mr. Alfter

19   is an unindicted co-conspirator.

20          So I think that we've shown relevance.  And

21   Mr. Marchese is absolutely correct.  I will say that he's

22   absolutely correct that the entirety of these calls are not

23   relevant, which is why the government is not intending to

24   admit the entirety of these calls but rather only the

25   portions that are relevant.

TRANSCRIBED FROM DIGITAL RECORDING

1               And we are confident, Your Honor, that you will

2     be able to listen to these calls, and, when you make a

3     determination as to whether or not Mr. Alfter is an

4     unindicted co-conspirator, you can either decide to look at

5     those statements for the truth of the matter asserted, and

6     if you ultimately find that we have not met our burden,

7     then you can still look at those calls to determine

8     Mr. Fuechtener's reactions to those.  And Mr. Alfter's

9     statements wouldn't come in for the truth of the matter

10    asserted but to show the impression that they are making on

11    the listener, which is Mr. Fuechtener.

12               THE COURT:  All right.  So I'm going to go ahead

13    and allow you to play the excerpts from the three different

14    calls to demonstrate the admission of the e-mail address or

15    knowledge of the e-mail address, the concede the password

16    change due to the control over the computer at issue, and

17    the other call I think is about embellishing how many

18    people are at the house, and the possible destruction of

19    evidence.

20               If that's what the calls -- if that is the

21    substance of what the calls provide, that does sound like

22    they are relevant.  And as I said before, the defendant's

23    statements are clearly inconsistent statements by a party

24    opponent, so they -- those would be admissible.  Whether or

25    not Mr. Halfter -- Alfter, I keep saying Halfter, After,

TRANSCRIBED FROM DIGITAL RECORDING

1    a-f-t-e-r?  No.

2              MS. ROOHANI:  Alfter.

3              THE COURT:  Alfter, that's what it is,

4    A-l-f-t-e-r, whether or not his statements are hearsay or

5    not or just offered to provide context for defendant's

6    statements I'll decide after -- after I hear all the

7    evidence that the government has to proffer on that issue.

8              Are we going to keep Mr. Schapery here to help

9    us with the translation?

10             MS. ROOHANI:  Yes, Your Honor.  Obviously he is

11   subject to cross, but I -- I don't know how this technology

12   works, so I have to ask the people in charge of that.

13   Please hold.

14             THE COURT:  Okay.

15             MR. MARCHESE:  And, just briefly, Your Honor, I

16   just wanted to lay a little bit more of a record.

17             Obviously Mr. Alfter is not here to be

18   cross-examined, so I feel that there's a confrontation

19   issue.

20             There's also, in my opinion, a notice issue.

21   The pleadings say nothing about a conspiracy.  So the first

22   time we heard about this, as Your Honor is aware, is a

23   motion filed about an hour before court.  The parties

24   weren't put on notice until we were actually in court to

25   start the trial.

TRANSCRIBED FROM DIGITAL RECORDING

1        MS. ROOHANI:  Your Honor, as we noted in our --

2    in the written memorandum in support of the oral motion

3    that we are obviously intending to make or have made at

4    this point is that the Supreme Court has held that this is

5    not a pretrial motion, that this is a motion to be made at

6    trial, and it is typically made after the government rests

7    its case in chief because that would be the point at which

8    the government would have had to prove that Mr. Alfter is

9    an unindicted co-conspirator.

10        So to the extent that the defense is arguing

11    untimeliness, that's directly refuted by the Supreme Court

12    case law.

13        And so we would submit that we originally filed

14    this before court to give the Court an opportunity to

15    consider the issues because we know that in this district

16    the judges would prefer to have things in writing and also

17    to be able to consider that during the course of the trial.

18    And that's why we did it that way.  It wasn't intended to

19    be in bad faith or to blindside the defense in any way.  We

20    are following the authority as set forth by the Supreme

21    Court.

22        THE COURT:  All right.  Go ahead and play the --

23        MS. ROOHANI:  Okay.  I have to admit them first.

24    So may I approach Mr. Schapery?

25        THE COURT:  Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1            MS. ROOHANI:  And these have been admitted as --
2    or, I'm sorry, marked as Government's Exhibit 46A, 46B, and
3    46C.
4            And these are clips from what was originally
5    marked as 25A, 26A, and 27A.
6    BY MS. ROOHANI:
7    Q.   So do you recognize these as being the clips from
8    those particular files?
9    A.   Yes.
10   Q.   Okay.
11           MS. ROOHANI:  And, Your Honor, we would move to
12   admit the clips at this time.  And that is Government's
13   Exhibits 46A, 46B, and 46C.
14           THE COURT:  All right.  Subject to any changes
15   later as to the proffer.
16           (Government's Exhibits 46A, 46B, 46C
17           received.)
18           MS. ROOHANI:  And, Your Honor, I would ask that
19   46A, which is an excerpt from the jail call which was
20   marked at 45B, be played for the Court.
21           I believe that it will play it in German on the
22   audio, and I will scroll the English translation.
23   BY MS. ROOHANI:
24   Q.   And, Mr. Schapery, I would ask that you watch the
25   translation, also listen to the audio, and make sure that

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    it's a fair and accurate depiction of what you originally
 2    translated and put into the system as being played.
 3              THE COURT:  Do you know what page this is going
 4    to be on the transcript?
 5              MS. ROOHANI:  There's a portion from page 5 and
 6    there's a portion from page 7 and 8 which has been marked
 7    as Government's Exhibit 25 -- on this particular call,
 8    Government's Exhibit 25B.
 9          (Audiotape played.)
10              MS. ROOHANI:  And that was from page 5.
11          Okay.
12          (Audiotape played.)
13    BY MS. ROOHANI:
14    Q.    Okay.  Agent Schapery, is that a correct
15    translation, and is that your translation as loaded into
16    the same audio?
17    A.    Yes.
18    Q.    Okay.
19          Let's take a look at -- I'm sorry?
20          (Discussion held off the record.)
21              MS. ROOHANI:  Oh, I'm sorry, there was one more
22    on there, Your Honor.  Oh, it continues.
23          (Audiotape played.)
24              MS. ROOHANI:  And, Your Honor, just to be clear,
25    that's a continuation of actually the same portion.  It was
```

1    just broken up into two clips.

2            THE COURT:  So that's all 45A, which was taken

3    from 25A; is that right?

4            MS. ROOHANI:  It's 46A, which is taken from 25A.

5            THE COURT:  Okay.  Thank you.

6            MS. ROOHANI:  And, Your Honor, for the -- I

7    think we can come -- well, Your Honor, I would ask that we

8    be able to read the same into the record from this

9    particular thing for the purposes of making a clear

10   appellate record.

11           THE COURT:  And we don't have a printout of

12   this?

13           MS. ROOHANI:  Not this particular portion.  I

14   guess I could potentially put a printout of this as an

15   additional exhibit.

16          If that would be preferable to Your Honor, I

17   would absolutely be happy to do that.

18          THE COURT:  Yeah.  That's what we saw.  If you

19   could just print out what we just saw, that's fine.

20          MS. ROOHANI:  Certainly.  We'll do that.  And

21   we'll put that into the -- we'll add that as additional

22   exhibits.

23          THE COURT:  Okay.

24          MS. ROOHANI:  All right.  Let's take a look at

25   Government's Exhibit 47A, which is drawn from Government's

TRANSCRIBED FROM DIGITAL RECORDING

1    Exhibit 26A.

2              MS. CARTIER-GIROUX:  It's actually 46B.

3              MS. ROOHANI:  46B.  I lied.  I want to be able

4    to tell Your Honor what pages we're on.  We're on pages 9

5    and 10 of the transcript.

6              26B.  Go ahead.

7         (Audiotape played.)

8              MS. ROOHANI:  Okay.

9    BY MS. ROOHANI:

10   Q.    Is that a true and correct translation -- is that

11   your translation and also the audio that you heard when you

12   did that translation?

13   A.    Yes.

14   Q.    Okay.

15              Let's look at Government's Exhibit 46C drawn

16   from 27A.

17              The translation, Your Honor, from 27B begins on

18   page 11, and then the second clip begins on page 13.

19         (Audiotape played.)

20              MS. ROOHANI:  And that was from page 11 and page

21   13, as well, Marissa.

22         (Audiotape played.)

23   BY MS. ROOHANI:

24   Q.    Is that also your translation matched up to the

25   audio?

1    A.    Yes.

2    Q.    Okay.  Go ahead and take a look at what's been

3    marked -- or been admitted as Government's Exhibit 28A.

4    It's under tab 28.  Agent Schapery, look at Government's

5    Exhibit 28A, which has been admitted.  And then also take a

6    look at the document behind it, which is marked as 28B.

7         And I realize that the font on that is virtually

8    microscopic.  But do you recognize 28A?

9    A.    Yeah, I can read it.  Yes, I do.

10   Q.    Okay.  And do you recognize 28B?

11   A.    Yes, I do.

12   Q.    How do you recognize 28B?

13   A.    How do I recognize it?

14   Q.    Yes.

15   A.    I reviewed it.

16   Q.    Okay.  And did you adopt that particular translation

17   as your own?

18   A.    Yes, I did.

19   Q.    Okay.

20         MS. ROOHANI:  Your Honor, I would move to admit

21   Government's Exhibit 28B into evidence at this time.

22         THE COURT:  But not -- but 28A has already been

23   admitted; right?

24         MS. ROOHANI:  Yes, Your Honor.

25         THE COURT:  All right.  So it's just 28B at this

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    point.
 2              Any objection?
 3              MR. MARCHESE:  No, Your Honor.
 4              THE COURT:  All right.  So 28B will be admitted.
 5         (Government's Exhibit 28B received.)
 6    BY MS. ROOHANI:
 7    Q.    And I just wanted to note, were you the original
 8    translator of this particular document?
 9    A.    No, I was not.
10    Q.    Were you the original reviewer of this particular
11    document --
12    A.    No, I was the second reviewer.
13    Q.    Okay.  And have you adopted this particular
14    translation as your own?
15    A.    Yes, I have.
16    Q.    Okay.  So looking at the second page of that, which
17    is Bates number 3520, it's marked as page 1, what is this?
18    What is this a translation of?
19    A.    Are you looking at the summary page?
20    Q.    Yes.
21    A.    So that is a summary of the chat --
22    Q.    Okay.
23    A.    -- between two people.
24    Q.    It's an actual chat message.  And who is the chat
25    between?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    KaiUweJensen and lars45.

2    Q.    And what date did this particular chat take place

3    on?

4    A.    March 21st, 2015.

5    Q.    And can you -- at the top has a summary translation.

6    Can you tell us what that summary translation says?

7    A.    On March 21st, 2015, 1720300, (KaiUweJensen)

8    contacts 1720769, lars45, in a chat session and says that

9    one film or movie is not much, to which lars45 replies that

10   he has more films and suggests seeing whether this one

11   works out.

12        He, lars45, adds that he has a Mac computer,

13   that it, the film, wouldn't start.

14        KaiUweJensen comments in reply that because

15   lars45 constantly goes offline everything breaks off.

16        Lastly, lars45 writes that he is installing it,

17   the film, on his PC, to see whether it works out.

18   Q.    Okay.  And I just have one more question for you.

19        There is a word in German that I would like for

20   you to translate for me.  And I speak zero German, so I'm

21   just going to spell it for.  A-n-g-e-k-l-i-n-g-e-l-t.  What

22   does that translate to?

23   A.    It means somebody is ringing you up or calling you.

24   Q.    Okay.

25        MS. ROOHANI:  And, Your Honor, I would pass the

TRANSCRIBED FROM DIGITAL RECORDING

1    witness at this time.

2              THE COURT:  Any cross?

3                        CROSS-EXAMINATION

4    BY MR. SANFT:

5    Q.    Sir, talking a little bit about your qualifications

6    earlier, you said something about working in this field for

7    about how long again, 10 years?

8    A.    I've worked for the FBI for 10 years.

9    Q.    Okay.  And I didn't catch what you did prior to

10   working for the FBI.

11   A.    Are you asking professionally?  I was an electrical

12   engineer for 25 years.

13   Q.    All right.  And so what made you change from

14   becoming electrical engineer into going into translation

15   for the FBI?

16   A.    Well, 9-11 happened at the same time as I was no

17   longer too thrilled with my existing profession at the

18   time.  And after a couple years the FBI contacted me -- or

19   rather, excuse me, some months later the FBI contacted me

20   to see if I was still interested, and I was; so while I was

21   still employed as an engineer, I took all of their exams,

22   passed all of their exams, and took about another two years

23   before they offered me a contract.

24   Q.    All right.  Now, one of the things that you had

25   testified here in court was that the FBI requires -- or at

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    least makes determination as to translations based upon
 2    meaning-for-meaning instead of word-for-word.
 3              Do you recall that?
 4    A.    That's right.
 5    Q.    And the reason you had given was because, hey, you
 6    know, if you were to just translate literally every word,
 7    like, for instance, putting it in Google Translate, you'd
 8    come up with basically a bunch of garbled words put
 9    together because there's no syntax, would that --
10    A.    It would be a confusing translation.
11    Q.    I'm sorry?
12    A.    It would be a confusing translation.
13    Q.    Okay.  But with regard to translation, for instance,
14    how do you make a determination based upon what you're
15    hearing as to, for instance, slang?  And I'm not talking
16    just specifically about what you see on television, but
17    just in terms of actual slang being two individuals who
18    talk the language and speak the language and share the same
19    experience over time.  How do you make that determination?
20    A.    If the words that you hear literally make absolutely
21    no sense, then that's one indication it could be an idiom.
22    And then if I had not -- if I was not familiar with that
23    idiom I would research it, you know, either on the Internet
24    or dictionary or ask a colleague to see if that's an idiom.
25              Other times if I can't determine that it's an
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    idiom, I would just put down a word-for-word translation.
 2    Q.    There is one of the clips that we saw here in court
 3    today was a clip in which the word "mysterious" was used.
 4              Do you recall that particular line?
 5    A.    Yes.
 6    Q.    Is that one of the idioms you're talking about in
 7    which you just put the word down for what is the literal
 8    translation and not necessarily what it may mean to the
 9    individuals?
10    A.    In that case I recall using it was the literal
11    translation.
12    Q.    Okay.  The other word that we've talked a little bit
13    about here in court was the issue with the word
14    "embellish."  How do you pronounce that word in German?
15    A.    Ausschmücken.
16    Q.    Is that the word that you had heard?
17    A.    Yes.
18    Q.    And --
19    A.    Or ausschmückte, past tense, I think.
20    Q.    Can you spell that word for the Court.
21    A.    A-u-s-s-c-h-m-u, with an, umlaut, c-k-e-n.
22    Q.    I'm sorry.  You went a little bit too fast, and I
23    don't speak German.  So I apologize.
24    A.    A-u-s-s-c-h-m-u, with two dots on top, c-k-e-n.
25    Q.    -- c-k-e-n?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Right.

2    Q.    And that's the word that you had heard in the

3    translation to mean embellish?

4    A.    That's right.

5    Q.    The word -- and I'm going to spell the word for you,

6    v-e-r-s-c-h-o, with two little dots over it, n-e-r-n.  What

7    does that word mean in German?

8    A.    Can you spell it one more time?

9    Q.    V, as in Victor, e-r-s-c, as in Charlie, h-o, with

10   two little dots over it, n-e-r-n.  What does that word

11   mean?

12   A.    *Verschönern*?

13   Q.    Yes.

14   A.    To make something more beautiful.

15   Q.    Okay.  Now, if I were to type that word into Google

16   Translate and it comes up with the word embellish, would

17   that be wrong?

18   A.    Would that be wrong?

19   Q.    Would that be a wrong translation, according to

20   Google Translate?

21   A.    Embellish -- *ausschmücken* can also mean to decorate.

22   So if that's what you're driving at, and *ausschmücken* also

23   means to make something prettier, like *verschönern* means to

24   make it prettier, then, yes, *ausschmücken* could also mean

25   to make it prettier.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    So, for instance, in the conversation that the Court

2    had heard specifically about individuals that may have come

3    in and out of the house, could another interpretation at

4    least understanding be, for instance, that the people that

5    were coming in that were so unsavory that we wanted to

6    brighten them up or at least make them look prettier or not

7    as much like criminals coming in and out of the house?

8    A.    That's not how I interpreted it.

9    Q.    Okay.  But, once again, you weren't asked to look

10   at, for instance, the understanding of two individuals in

11   terms of their actual conversation, either between Jan and

12   her -- and his husband Frank; right?

13   A.    Uh-huh.

14   Q.    Is that a yes?

15   A.    Yes.

16   Q.    Okay.  Now, in addition to that, your testimony was

17   that you were given these recordings to translate; is that

18   right?  By the FBI?

19   A.    Correct.

20   Q.    Were you told beforehand what the purpose or what

21   the general investigation was with regards to Jan

22   Fuechtener?

23   A.    Yes.

24   Q.    So you understood prior to translating that there

25   was an issue with regard to child pornography?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Maybe about the idea that it was located on hard

3    drives or computers in a home that's found in his home?

4    A.    Correct.

5    Q.    And based upon that knowledge, you then started to

6    translate?

7    A.    That's right.

8    Q.    Wouldn't it be fair to say, of course, that if you

9    had just been given a bunch of tapes and gone into a room

10   and said translate these tapes, that you would not have had

11   the ability to at least put context in terms of what you

12   were translating?

13   A.    Context is always important when you're doing the

14   translation.

15   Q.    Okay.  So with regards to your translation, you were

16   translating with an understanding that this is what you

17   were looking for, or this is what your employer was looking

18   for, which is regards to child pornography, the presence of

19   child pornography, and whether or not these individuals

20   knew that there was child pornography; correct?

21   A.    Correct.

22   Q.    You had also testified, as well, as to corrections

23   of translations, that you had seen things that you thought

24   need to be corrected and you corrected those translations?

25   A.    Yes.

1    Q.    Do you have a copy of the corrections of those

2    translations here?

3    A.    No.

4    Q.    Do you keep a copy with regards to what you see as a

5    possible misinterpretation of translation and notify that

6    or put that into a report anywhere?

7    A.    No.

8    Q.    And was this particular translation or series of

9    translations ever peer reviewed, looked at by anybody else?

10   A.    Well, these translations were at least done by two

11   people, and sometimes by three, meaning they were at least

12   reviewed by someone else or, in a couple cases, by someone

13   else and me.

14   Q.    And are those people listed in your report?

15   A.    They are listed on the cover sheets of each

16   translation.

17   Q.    And with regard to the translations of each of these

18   individuals, do you have specifically where they translated

19   the portions of their contribution to the translations in

20   this case?

21   A.    I don't understand your question.  Do I have them?

22   Q.    Meaning, do you -- can you tell us here, for

23   instance in court today, where the document that we saw

24   here today was translated by yourself as well as somebody

25   else, and who that person is?

1    A.    That is the joint translation of the individuals you

2    see on the cover page.

3    Q.    Okay.  So -- but, for instance, we can't be here

4    today telling the Court, for instance, that specifically

5    one of the individuals that is part of your team translated

6    this portion of the call or this other person translated

7    this other portion?

8    A.    It was not done in portions.

9    Q.    Okay.

10          MR. SANFT:  I have no further questions, Your

11   Honor.  Thank you.

12          THE COURT:  I want to clarify on that same line,

13   which picks up on a question I had before.

14          So I understand that on the front of the

15   transcript it will say who was the linguist and who

16   reviewed it, and then eventually you review it, as well.

17   But you're saying you could override their changes.

18          So could the linguist have come up with one

19   translation, the reviewer changes it, and then you change

20   it back?  You said it sounded like there could have been

21   several versions as a particular word might have been used

22   more --

23          THE WITNESS:  There were working versions --

24          THE COURT:  Right, so --

25          THE WITNESS:  -- on the computer.

TRANSCRIBED FROM DIGITAL RECORDING

1       THE COURT:  But there's nowhere that we could

2  see to track changes, edits that have been made to the

3  translation as different people review it and fine tune it?

4       THE WITNESS:  I think --

5       THE COURT:  Or revert it to the original?

6       THE WITNESS:  -- if I could find working copies

7  that might exist, you would have to subpoena the FBI to go

8  through the hard drives of the linguists to find that they

9  might have on their hard drives.

10      THE COURT:  But it's not part of the process

11 when you review or anyone else reviews something and

12 changes the translation to create a log or a list or --

13      THE WITNESS:  No.  At the very end, there's a

14 final translation, and that's what we submit.

15      THE COURT:  And do you tell anyone, just for

16 performance review, so that if someone has mistakes, their

17 supervisor knows about it?

18      THE WITNESS:  I can certainly give informal

19 feedback to the linguist if I found a lot of mistakes.

20      THE COURT:  Do you remember if that word,

21 "embellishment," was one of the words that might have been

22 edited?

23      THE WITNESS:  I didn't change that word.  I

24 checked it.  I looked in at least three different

25 dictionaries, and embellishment was the number one

-------- TRANSCRIBED FROM DIGITAL RECORDING --------

```
 1    translation for that word in those three different

 2    dictionaries.

 3              THE COURT:  But in context, it could also mean

 4    to beautify, you said, or to --

 5              THE WITNESS:  Yes.  I mean, in context it could

 6    also mean simply to add more detail.

 7              THE COURT:  All right.

 8              Ms. Roohani?

 9                     REDIRECT EXAMINATION

10    BY MS. ROOHANI:

11    Q.    Mr. Sanft asked you a question about whether certain

12    words in different context can mean different things.

13              Do you remember that question?

14    A.    Yes.

15    Q.    Can the word login mean something different in a

16    different context, whether it's a drug case or a child

17    pornography case?

18    A.    Login?  I don't think so.

19    Q.    What about the word computer?

20    A.    No.

21    Q.    What about the word people?

22    A.    No.

23    Q.    What about the word pool house?

24    A.    (No audible response.)

25    Q.    So those words would have the same meaning
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   regardless of whether it was a drug investigation, a gun
 2   investigation, a child pornography investigation?
 3   A.    Yes.
 4   Q.    I want to look back at the word embellish in
 5   context.  Of course, I can't find where it is.  One moment.
 6         Look at Government's Exhibit 27B.  27B, page 11.
 7         And, actually, Marissa, can you queue up 46C to
 8   the word embellish.
 9         Let me ask you a few questions while this gets
10   set up.
11         You testified that the word embellish could mean
12   decorate; right?
13   A.    That's one possibility.
14   Q.    And it could also mean add more detail; is that
15   correct?
16   A.    That's right.
17   Q.    All right.  And that's the translation of the word
18   that starts with an A that I'll never be able to pronounce?
19   A.    Ausschmücken.
20   Q.    That word.
21         (Pause in the proceedings.)
22         MS. ROOHANI:  Okay.  Just pause right there.
23   BY MS. ROOHANI:
24   Q.    In this -- can you read me what that sentence says,
25   please, on -- it's on your screen.  That highlighted
```

TRANSCRIBED FROM DIGITAL RECORDING

1    sentence.

2    A.    "Frank, we have to embellish a bit more how many

3    people were actually there."

4    Q.    And in this context, if you change the word

5    "embellish" to "decorate," would that make any sense?

6    A.    No.

7    Q.    If you changed it to "add more detail," would that

8    make any sense?

9    A.    Yeah, add a bit more detail, that would make sense.

10   Q.    Would it make change if you were changing the number

11   of people, or is the number a finite people?  If there's

12   five people, there's five people; right?

13   A.    I -- could you rephrase your question, please?

14   Q.    Sure.  The number of people, how many people were

15   actually there, does that talk about a number of people or

16   does it talk about a quality of people?

17   A.    How many.

18   Q.    How many.  And so in that instance, does "add more

19   detail" make any sense?

20        MR. SANFT:  Objection, Your Honor.  It goes

21   for -- speculation.  The document is what the document is.

22        MS. ROOHANI:  I'm trying to --

23        MR. SANFT:  We're asking here not for an

24   interpretation as to what the person means.  Outside of the

25   translation, in and of itself, I don't know if this person

TRANSCRIBED FROM DIGITAL RECORDING

```
 1     is qualified to answer that question.  And if he is, then
 2     I'm going to have to ask him a whole bunch of more
 3     questions, specifically what everything means in these
 4     documents.
 5               I just don't believe that he is qualified to
 6     answer that outside of the translation itself.
 7               THE COURT:  Ms. Roohani?
 8               MS. ROOHANI:  And, Your Honor, I'm not asking
 9     him to figure out the intent of the person saying this
10     particular statement.  I'm trying to get him to explain why
11     he used the word "embellish" as opposed to "add more
12     detail" in this particular instance.
13     BY MS. ROOHANI:
14     Q.    So in this particular instance, when you used the
15     word "embellish," did you use the word "embellish" because
16     a different meaning did not make any sense, or did you use
17     it because it's the number one definition?
18     A.    I used it because it was the number one definition
19     in three different dictionaries I looked at.
20               MS. ROOHANI:  Okay.  Then I don't have any
21     further questions for this particular witness, Your Honor.
22               THE COURT:  All right.  So there's no ruling on
23     the objection because she restated the question.  So --
24               MR. SANFT:  Yes, Your Honor.
25               THE COURT:  All right.
```

TRANSCRIBED FROM DIGITAL RECORDING

| | |
|---|---|
| 1 | MR. SANFT:  I do have a question. |
| 2 | THE COURT:  Any more cross?  Go ahead. |
| 3 | RECROSS-EXAMINATION |
| 4 | BY MR. SANFT: |
| 5 | Q.    How accurate is Google Translate? |
| 6 | A.    Not very. |
| 7 | Q.    It's not very accurate?  Okay. |
| 8 | So, for instance, if I were to type in this word |
| 9 | *"ausschmücken"* in here, and the number one thing that pops |
| 10 | up is "decorate," you're telling us today that that would |
| 11 | not be very accurate? |
| 12 | A.    In some contexts, it's perfectly accurate. |
| 13 | Q.    Okay.  So, once again, going to the issue with |
| 14 | regards to context, you're not here to testify necessarily |
| 15 | to context, you're here just to translate -- to testify as |
| 16 | to translation of words; right? |
| 17 | A.    That's right. |
| 18 | Q.    Okay.  Now, the screen that had popped up here a |
| 19 | second ago and the government had put up that particular |
| 20 | line that was up there, specifically you're testifying here |
| 21 | today and you're saying, hey, the word embellish fits |
| 22 | better because of the remainder of the sentence; right? |
| 23 | A.    It fits -- it fits in this context. |
| 24 | Q.    Okay.  Now, let me ask you this question. |
| 25 | Did you read the translations before and after |

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    this particular clip shown to the government or as shown to
 2    the Court here today?
 3    A.    Are you talking about ahead of this line or --
 4    Q.    Yes.
 5    A.    Have I read what came before and what came after?
 6    Yes, I have.
 7    Q.    Okay.  And would it be fair to say that those
 8    typically -- those lines typically would help add meaning
 9    to what this particular line is, which is line 04 that's
10    now shown on the screen in front of you?
11    A.    I can't answer that.
12    Q.    Okay.  Well, let me ask you this.
13          Do you have anywhere else in this translation
14    where there's a discussion about adding people or adding
15    numbers of people to potential witnesses that could have
16    been in that home?
17    A.    I don't recall that.
18    Q.    Okay.  So the only thing that we have in this case
19    is we have the word embellish that's used in the actual
20    line here in line 04 and line 05 of the item that you see
21    in front of you?
22    A.    That's right.
23    Q.    Okay.  And so based upon that, even though you're
24    saying at this particular point that no other word would
25    have fit, your understanding was the word -- and I'm --
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I didn't say that.  I didn't say that no other word

2    would fit.  I said that you could also say add a bit more

3    detail.

4    Q.    Oh, okay.

5    A.    That's what I said.

6    Q.    All right.  Well, let's just talk about that for a

7    second.

8          Why didn't you put that word in there?

9    A.    Because I checked three different dictionaries --

10   actually it was the first word that was there by the

11   original translators, and I checked three different

12   dictionaries, and it came up as that's the main

13   translation.

14         It fits the context.  So I left it alone.

15   Q.    So, for instance, if you had put the word in there

16   or the series of words, "Frank, we have to add more detail

17   as to how many people are actually there," your testimony

18   here today is that would actually fit as well?

19   A.    Yes.

20   Q.    And you're telling us today that because of the fact

21   that you chose the word "embellish," that was just a coin

22   flip?

23   A.    It wasn't a coin flip.

24         Like I said, I wasn't sure if it was the right

25   translation, so I checked multiple dictionaries to make

TRANSCRIBED FROM DIGITAL RECORDING

1    sure.  Yeah, that's the first thing that always come up.

2    It does fit the context.  So I left it alone as embellish.

3    Q.    Okay.  But, once again, your testimony here today is

4    if you were to substitute the word "embellish" for the

5    phrase "more detail," meaning to add more detail, then that

6    would also be accurate in terms of translation?

7    A.    That is correct.

8              MR. SANFT:  No further questions, Your Honor.

9              THE COURT:  Redirect?

10             MS. ROOHANI:  Just one brief question.

11                  FURTHER REDIRECT EXAMINATION

12   BY MS. ROOHANI:

13   Q.    When you said you checked three dictionaries, what

14   three dictionaries did you check?

15   A.    There was the PONS online dictionary, there was LEO,

16   and then there was the CC German dictionary.

17   Q.    And are those three --

18   A.    Three different online dictionaries.

19   Q.    And those are published by German-speaking people?

20   A.    I don't know who publishes them.

21   Q.    Okay.  Are those considered credible dictionaries?

22   A.    They are commonly used in the business.

23   Q.    Okay.  And so you -- the original translator

24   translated that word to mean embellish; is that correct?

25   A.    That's right.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    And then you double checked that?

 2    A.    I triple checked it, basically.

 3    Q.    You triple checked it.  Okay.

 4              MS. ROOHANI:  I don't have any further

 5    questions, Your Honor.

 6              THE COURT:  Mr. Sanft, anything else?

 7              MR. SANFT:  I'm sorry.

 8                   FURTHER RECROSS-EXAMINATION

 9    BY MR. SANFT:

10    Q.    Did you ever look at the Alfter and Rouven or

11    Fuechtener dictionaries as well?

12              MS. ROOHANI:  Objection.  Objection, Your Honor.

13              MR. SANFT:  Let me ask you the reason for that.

14    Once again, I want to make sure we're clear.

15    BY MR. SANFT:

16    Q.    You don't know the individuals that are involved in

17    this case; right?

18    A.    That's correct.

19    Q.    You don't know their history; right?  You're not

20    there with them every day.  You don't hear their language

21    and how they speak to one another; correct?

22    A.    Correct.

23    Q.    And so even though you choose one word, "embellish,"

24    your testimony is that the other word, which is --

25              THE COURT:  "Add more detail."
```

1    BY MR. SANFT:

2    Q.    -- "add more detail," thank you, Your Honor -- is

3    equally as accurate of a translation?

4    A.    I think it is -- I think it's fair.  I chose

5    embellish because two other linguists had gone with it,

6    three dictionaries I checked used the same definition.  And

7    that's why I stuck with it.

8    Q.    Okay.  Once again, when I asked the first question

9    about the Fuechtener and the Alfter dictionaries, I

10   wasn't -- I'm trying to be a little bit facetious, but I'm

11   telling you right now, you don't know these individuals --

12   A.    I don't know --

13   Q.    -- you can't tell --

14   A.    -- what's in their head at the time they speak a

15   word.

16            MR. SANFT:  Thank you, Your Honor.

17            I appreciate it.

18            THE COURT:  Anything else, Ms. Roohani?

19            MS. ROOHANI:  No, Your Honor.

20            THE COURT:  All right.  I think we're all done.

21            Thank you very much for coming in this

22   afternoon.  Please be careful to only take with you things

23   you brought in.  I don't think you brought anything, did

24   you?

25            THE WITNESS:  I didn't bring anything.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  Yeah, you didn't.  Good for you.

2           Well, thank you.  Please be careful on the way

3    down with those steps.

4           Did you want to release him or have him on

5    stand-by?

6           MR. SANFT:  Your Honor, if we could ask for this

7    witness to be on stand-by for a quick second.  We want to

8    just review one other translation.  It went by really fast,

9    and so I need an opportunity to at least read that

10   translation.

11          THE COURT:  So did you want to re- -- all right.

12   Did you want to continue cross?  Is what you're saying, you

13   need a break before you're sure whether you're done

14   crossing him?

15          MR. SANFT:  Well, the problem that I have in

16   this case, Your Honor, is that there is additional words

17   that were at least said in the audio translation that went

18   by really fast that I need an opportunity to at least

19   identify as a word that may be misinterpreted in this case.

20   And it's a very significant word.  And if you just want him

21   up on the stand, we can do it.

22          THE COURT:  All right.  Well, we need to take a

23   bathroom break -- I was going to take a bathroom break

24   after this witness anyway.

25          So we're not going to release you just yet.  You

1    can go stretch, use the bathroom yourself.  Please don't

2    talk to the attorneys.  You're still under oath.  We may or

3    may not recall you just to ask you about a few more terms.

4    All right?

5                THE WITNESS:  Okay.

6                THE COURT:  All right.  So let's go ahead and

7    take our break.  It's 3:10.  Try to be back here about

8    3:20ish.

9                COURTROOM ADMINISTRATOR:  All rise.

10               (Recess from 3:11 p.m. until 3:29 p.m.)

11               COURTROOM ADMINISTRATOR:  All rise.

12               THE COURT:  Thank you.  You may be seated.

13               Do you need some more time to listen to the

14   recording and review it with the transcript?

15               MR. SANFT:  Your Honor, the government's been

16   very helpful and we've been able to look at that

17   information.  I do have a few questions for the --

18               THE RECORDER:  Mr. Sanft --

19               MR. SANFT:  I'm sorry.

20               THE RECORDER:  Thank you.

21               MR. SANFT:  I apologize, madam clerk.

22               We do have some further questions for the

23   interpreter.

24               THE COURT:  All right.  Go ahead.

25

TRANSCRIBED FROM DIGITAL RECORDING

1              FURTHER RECROSS-EXAMINATION

2    BY MR. SANFT:

3    Q.   Sir, have you had an opportunity to listen as we

4    were listening to the portion of the government's exhibit,

5    I think it's Exhibit 26 --

6              UNIDENTIFIED SPEAKER:  It's 25A.

7              MR. SANFT:  Okay.  This would be 25A.

8              THE WITNESS:  Yes, I heard you playing back a

9    portion of it.

10   BY MR. SANFT:

11   Q.   All right.  And if you just follow with me down to

12   line 08, which is the line that says, "No, you have to

13   enter mine, enter larsschmidt22," that line is now

14   highlighted by the government.  Thank you.

15   A.   Okay.

16   Q.   With regards to that, I'm going to ask if we could

17   just replay the German translation -- or the German

18   conversation that occurred up until that point.

19        (Audiotape played.)

20             MR. SANFT:  Okay.  We can stop there.

21   BY MR. SANFT:

22   Q.   Now, your translation is that, "No, I have to enter

23   mine."

24             Could you be mistaken on that translation?

25   A.   Maybe.  Why?

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.   Well, let me ask you this.

2              MR. SANFT:  Your Honor, I do have what I believe

3    is the correct German that was actually said on that

4    particular thing.

5              THE COURT:  Is there an alternative translation?

6              MR. SANFT:  Yes, Your Honor.

7              THE COURT:  Go ahead.  You can ask.

8              MR. SANFT:  I'm going to show this to the

9    government, though.  I'm sure that they're not going to

10   understand it like this.

11        (Discussion held off the record.)

12             MR. SANFT:  And, Your Honor, as the government's

13   doing that, what I'd like to do at this particular point is

14   mark this as Defense proposed Exhibit A.

15             Oh, actually do we have -- whatever is next in

16   number.

17             COURTROOM ADMINISTRATOR:  5043.

18             MR. SANFT:  5043, Your Honor.

19             THE COURT:  All right.  Any objection to 5043?

20             Is it just being marked, or are you moving it

21   for admission?

22             MR. SANFT:  Well, at this point, I'm going to

23   just mark it for identification purposes --

24             THE COURT:  Okay.

25             MR. SANFT:  -- since we're going to present it

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    to the interpreter.
 2              THE COURT:  All right.
 3              MR. SANFT:  And there's no objection from the
 4    government on this?
 5              MS. ROOHANI:  Not for marking, no, Your Honor.
 6              MR. SANFT:  May I approach?
 7              THE COURT:  Yes.
 8          (Discussion held off the record.)
 9              MR. SANFT:  Your Honor, may I approach the
10    witness?
11              THE COURT:  Yes, you may.
12    BY MR. SANFT:
13    Q.    Sir, I'm showing you what's been marked as Defense
14    Exhibit 5043, not for purposes of admission, but can you
15    read that particular line?
16    A.    (Reads in German.)
17    Q.    Is that correct?
18    A.    Yeah.  So he's saying, "No, that's not what I mean."
19    Q.    Okay.
20              THE RECORDER:  Mr. Sanft --
21              MR. SANFT:  I'm sorry.
22              THE RECORDER:  Thank you.
23              MR. SANFT:  Thank you.
24    BY MR. SANFT:
25    Q.    If you could just repeat that again so we could hear
```

TRANSCRIBED FROM DIGITAL RECORDING

1   the intonations and the way it sounds on the record,

2   please.

3   A.    (Speaks in German.)

4   Q.    All right.

5          MR. SANFT:  And if the government could replay

6   the portion of the audio that we're asking for.

7          (Audiotape played.)

8          MR. SANFT:  You can pause it.

9   BY MR. SANFT:

10  Q.    Would it be fair to say that what you have just

11  read, which is Defense Exhibit 5043, the words on that

12  paper with regards to what we just heard on the audio would

13  be relatively the same sound?

14  A.    They're similar, yeah.

15  Q.    Okay.  And would it be fair so say that because of

16  the fact that you're listening to a conversation between

17  two individuals, that you could have been mistaken in terms

18  of the translation of that particular phrase that was said

19  between two individuals as we had heard earlier?

20  A.    Yes.

21          MR. SANFT:  I have no further questions, Your

22  Honor.

23          THE COURT:  Any redirect?

24          MS. ROOHANI:  Sure.

25

------------------------------------------------------------

TRANSCRIBED FROM DIGITAL RECORDING

1                FURTHER REDIRECT EXAMINATION

2  BY MS. ROOHANI:

3   Q.    You said that they are similar when Mr. Sanft just

4  asked you that question.

5            Do you remember that?

6   A.    Yeah.

7   Q.    Are they the same?

8   A.    No.

9   Q.    How are they not the same?

10  A.    Well, *meinen*, the German word *meinin* is like in

11  English "to mean."  Also *mein*, same in English, is

12  possessive, okay.  And he's speaking very quickly, and it

13  did sound like he was saying you have to give mine.

14            But hearing it again, I can now hear this.

15  Q.    Okay.

16            MR. SANFT:  And then, Your Honor, just for the

17  record, what the witness has done is basically pointed to

18  Defendant's Exhibit 5043 as the "this."

19            THE COURT:  The record will -- yes, the record

20  will reflect the witness was pointing to Defense 5043.

21            MS. ROOHANI:  Okay.  Can you go down to

22  highlight 6, 7, and 8, Marissa.

23  BY MS. ROOHANI:

24  Q.    On line 6, who is making the statement?  What are

25  the letters before that?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Frank.

 2    Q.    F-A?  And I'll represent that that's Frank.

 3          Can you read me what that says?

 4    A.    "So then I can enter my correct login name and

 5    e-mail and then it can" --

 6    Q.    And then JF, which is the defendant, says?

 7    A.    "No, you have to enter mine" --

 8    Q.    Or, alternatively, "No, that's not what I mean,"

 9    which is what the defense has provided you with; is that

10    correct?

11    A.    So this line came from line 8?

12    Q.    Yes.  I would assume.  If you had to pick a

13    translation --

14    A.    Yeah, that's right.  Yeah.  So what he wrote here

15    sounded correct when he played it back from this line here.

16    Q.    If you had to pick which one was correct -- more

17    correct, which one would you pick?

18    A.    (Speaking in German), No, that is not what I mean.

19    Q.    Okay.  Finish reading the end of that sentence for

20    me.

21    A.    For JF?

22    Q.    Yes.

23    A.    So, "No, that is not what I mean.  Enter

24    larsschmidt22."

25    Q.    Okay.  And Frank Alfter previously said, "Enter my
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    correct login name and e-mail?"  And the defendant
 2    responds, "No, that's not what I mean," and then tells him
 3    what to enter; is that correct?
 4    A.    Correct.
 5    Q.    Okay.  I also need you to take a look at -- hold on
 6    for just one minute.
 7              Marissa, can you go further down in that call,
 8    please.  Okay.  Specifically highlight lines 1 and 2.
 9              Can you read me those two lines?
10              MR. SANFT:  Your Honor, I'm going to object to
11    this.  Unless the question is, is it to the accuracy of the
12    translation of the German language in the English language,
13    I'm not quite sure what the purpose of the line of
14    questioning would be by the government.
15              MS. ROOHANI:  Your Honor, that's fine.  I'll
16    withdraw the question.
17              I have no more questions for this witness.
18              THE COURT:  All right.  Do you have any other
19    cross, Mr. Sanft?
20              MR. SANFT:  I just have one other cross, and
21    that is this.
22                    FURTHER RECROSS-EXAMINATION
23    BY MR. SANFT:
24    Q.    The time that we spent together, would it be fair to
25    say, of course, that translation is not like a scientific
```

DONNA DAVIDSON - (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    method, where something could be proven over and over and
 2    over again, it's subject to interpretation?  Right?
 3    A.    I can't say yes to that.
 4    Q.    Okay.  But can you also say no to that?
 5    A.    Depends on the context.
 6    Q.    Right.  So, for instance, if two people are having
 7    a -- because of history and so forth, you can't make a
 8    determination as to the accuracy of the translations, you
 9    can up to a certain point, but there's still limitations to
10    the translations that you gave in this case; right?
11    A.    Could you please rephrase that question?
12    Q.    It was a bad question.
13          What I'm asking for specifically is, at least
14    what we've demonstrated here in court today, is that
15    interpretation isn't an exact science?
16    A.    Well, this is -- what we're talking about here is
17    translation.
18    Q.    Right.  So what I'm saying is that with regards to
19    translation as a whole, it's not an exact science; right?
20    A.    It can be an exact science, but it's not like math.
21    Q.    Sure.  Which means that the same equation over and
22    over again means the same thing; right?
23    A.    You can have a word that has many different
24    meanings.  You can have a phrase that has many different
25    meanings.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.    Right.  And so the issue with -- and the challenge,

2   I'm assuming that you do in your job, is that making a

3   determination as to what the right meaning is to a specific

4   phrase or to a conversation that's occurring between two

5   people, that's the challenge in your job; right?

6   A.    That's the challenge, yes.

7   Q.    Okay.  And, once again, would it be fair to say that

8   based upon at least the items that we looked at today, is

9   that you've testified one way and now you've agreed that it

10  potentially could be another way, and that could be

11  throughout the entire documents that you've provided here

12  to the Court?

13  A.    No.  You highlighted a sentence and gave a different

14  translation after listening to it.  I agree that this

15  particular line or that part of the line was mistranslated

16  and this was the correct translation.

17  Q.    Okay.

18          MR. SANFT:  No further questions, Your Honor.

19          THE COURT:  All right.  And, for the record,

20  when he said this was a mistranslation, he was pointing to

21  the screen; when he's pointing to what was a correct

22  translation, he's pointing to Defense Exhibit 5043.

23          MR. SANFT:  Thank you, Your Honor.

24          THE COURT:  So did you want to move to admit

25  5043?

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. SANFT:  Your Honor, at this point, based

2    upon our discussion I think that would be prudent.

3          We'll move for admission.

4          THE COURT:  Any objection from the government?

5          MS. ROOHANI:  No objection, Your Honor.

6          THE COURT:  All right.

7          MS. ROOHANI:  And if I could just ask one more

8    question of Mr. Schapery?

9          THE COURT:  Sure.  So Defense Exhibit 5043 will

10   be admitted.

11         (Defendant's Exhibit 5043 received.)

12         MS. ROOHANI:  And, Your Honor, may I ask one

13   more question?

14         THE COURT:  Yes, you may.

15              FURTHER REDIRECT EXAMINATION

16   BY MS. ROOHANI:

17   Q.   With the exception of that one sentence, do you

18   stand by all of the other translations that you have done

19   and presented today in court?

20   A.   Yes, I do.

21         MS. ROOHANI:  Thank you.

22         THE COURT:  Any other cross, Mr. Sanft?

23         MR. SANFT:  No, Your Honor.

24         THE COURT:  All right.  So can we release him

25   now, or do you think you want --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  We're not intending to recall him

2     at this time, so we would be -- we would ask for him to be

3     released.  He doesn't live in Las Vegas.  And I imagine

4     that he might want to travel home to his family.

5          THE COURT:  All right.  Well, thank you,

6     Mr. Schapery, for coming in today.  We'll go ahead and

7     release you from your subpoena.

8          Again, just be careful, but only -- yeah, leave

9     that because that's now an exhibit.  And you take your

10    water bottle.  And be careful on the way down with those

11    steps.

12          (The witness was excused.)

13          THE COURT:  All right.  Does the government like

14    to call its next witness?

15          MS. ROOHANI:  Your Honor, we have anticipated

16    one more witness, or potentially more than one.  The one

17    that we have anticipated, Special Agent Mari Panovich, we

18    anticipate that she is going to be on the stand

19    significantly longer than whatever time we have left for

20    today.

21          We would ask, if it's okay with you, if we could

22    start again tomorrow with Special Agent Panovich and then

23    any potential additional witnesses that the government

24    might intend to call.

25          THE COURT:  All right.  So you're saying you

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    don't have any other witnesses today?
 2              MS. ROOHANI:  Right.  That's correct.
 3              MR. MARCHESE:  And we have no problem with that,
 4    Your Honor.  I think we're -- both parties are on schedule.
 5    We should be able to wrap up this week.
 6              I -- as a side note, I have to be in state court
 7    in Judge Ellsworth's chambers at 4:30 p.m.  I'm not in
 8    trouble, don't worry.  So that would work well for me as
 9    well.
10              THE COURT:  All right.  So tomorrow we'll plan
11    to be here from 1:00 to 5:00 p.m.; is that right?
12              Could we possibly do noon tomorrow, from noon to
13    5:00?
14              MS. ROOHANI:  Noon will be fine for the
15    government, Your Honor.
16              THE COURT:  Does that work for the defense?
17              MR. MARCHESE:  Yes, Your Honor.
18              THE COURT:  All right.  So we'll do 12:00 noon
19    to 5:00 tomorrow, Wednesday, and then we still have plans
20    for Thursday 1:00 to 5:00.  And Friday, potentially, 1:00
21    to 3:30.  Is that what we were thinking?
22              So we might get cut short on Friday afternoon is
23    the reason why I'm trying to find little pockets of extra
24    time wherever I can this week.
25              All right.  So let's plan to be back here at
```

TRANSCRIBED FROM DIGITAL RECORDING

1    noon tomorrow.

2              MS. ROOHANI:  Your Honor, just for planning

3    purposes, the government does plan to end its close in

4    chief -- case in chief tomorrow.

5              THE COURT:  All right.  Thank you.

6              All right.  So we'll be in recess.

7              COURTROOM ADMINISTRATOR:  All rise.

8              THE COURT:  Off record.

9         (The proceedings adjourned at 3:44 p.m.)

10                    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    GOVERNMENT'S WITNESSES:                          PAGE

3    KELLIE BADALUCCO
         Direct Examination By Ms. Roohani           230
4        Cross-Examination By Mr. Marchese           271
         Voir Dire Examination By Ms. Roohani        280
5        Cross-examination (Resumed)                 283
         Redirect Examination By Ms. Roohani         303
6        Recross-Examination By Mr. Marchese         316

7    GARY MCCAMEY
         Direct Examination By Ms. Roohani           322
8        Cross-Examination By Mr. Durham             338
         Redirect Examination By Ms. Roohani         357
9        Recross-Examination By Mr. Durham           362
         Further Redirect Examination                367
10       By Ms. Roohani

11   JOSHUA RODRIGUEZ
         Direct Examination By                       369
12       Ms. Cartier-Giroux

13   MARI PANOVICH
         Direct Examination By                       375
14       Ms. Cartier-Giroux

15   PHILIP SCHAPERY
         Direct Examination By Ms. Roohani           385
16       Cross-Examination By Mr. Sanft             418
         Redirect Examination By Ms. Roohani         427
17       Recross-Examination By Mr. Sanft           431
         Further Redirect Examination                434
18       By Ms. Roohani
         Recross-Examination By Mr. Sanft           435
19       Further Recross-Examination                 439
         By Mr. Sanft
20       Further Redirect Examination                443
         By Ms. Roohani
21       Further Recross-Examination                 445
         By Mr. Sanft
22       Further Redirect Examination                448
         By Ms. Roohani

23

24

25

```
 1                        E X H I B I T S

 2     GOVERNMENT'S                          ADMITTED
       20A                                        232
 3     20B                                        233
       21A and 21B                                243
 4     22A and 22B                                244
       23A, 23B, 23C, 23D, 23E, 23F               261
 5     24                                         269
       25A, 26A, 27A                              381
 6     28A                                        383
       28B                                        416
 7     46A, 46B, 46C                              411

 8     DEFENDANT'S                           ADMITTED
       5035                                       293
 9     5040                                       284
       5042                                       317
10     5043                                       448

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           -o0o-

2      I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____        6/18/17

7         Donna Davidson                        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25