1           UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
2          BEFORE THE HONORABLE GLORIA M. NAVARRO
                CHIEF UNITED STATES DISTRICT JUDGE
3

4
UNITED STATES OF AMERICA,          :
5                                   :
          Plaintiff,                :
6                                   :No. 2:16-cr-00100-GMN-CWH
      vs.                           :
7                                   :
JAN ROUVEN FUECHTENER,              :
8                                   :
          Defendant.                :
9 _____  :

10

11
                TRANSCRIPT OF BENCH TRIAL – DAY 3
12                  (Pages 455 through 540)

13

14                     November 16, 2016

15
                       Las Vegas, Nevada
16

17

18

19
FTR No. 7D/20161116 @ 12:12 p.m.
20

21
Transcribed by:          Donna Davidson, CCR, RDR, CRR
22                       (775) 329-0132
                         dodavidson@att.net
23

24

25  (Proceedings recorded by electronic sound recording,
    transcript produced by mechanical stenography and computer.)

----------TRANSCRIBED FROM DIGITAL RECORDING----------

```
 1
                        A P P E A R A N C E S
 2

 3
      FOR THE PLAINTIFF:
 4
      Lisa Cartier-Giroux
 5    Elham Roohani
      U.S. ATTORNEYS OFFICE
 6    501 Las Vegas Boulevard South
      Suite 1100
 7    Las Vegas, Nevada 89101
      (702) 388-6336
 8    Lisa.Cartier-Giroux@usdoj.gov
      Elham.Roohani@usdoj.gov
 9

10    FOR THE DEFENDANT:

11    Jess R. Marchese
      LAW OFFICE OF JESS R. MARCHESE
12    601 South Las Vegas Boulevard
      Las Vegas, Nevada 89101
13    (702) 385-5377
      Fax: (702) 474-4210
14    marcheselaw@msn.com

15    Benjamin C. Durham
      BENJAMIN DURHAM LAW FIRM
16    601 South 10th Street
      Las Vegas, Nevada 89101
17    (702) 631-6111
      Fax: (702) 946-1396
18    bdurham@vegasdefense.com

19    Michael W. Sanft
      SANFT LAW
20    324 South 3rd Street
      2nd Floor
21    Las Vegas, Nevada 89101
      (702) 382-0905
22    michael@sanftlaw.com

23

24

25
```

DONNA DAVIDSON   -   (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1          LAS VEGAS, NEVADA, NOVEMBER 16, 2016, 12:12 P.M.

2                              --oOo--

3                      P R O C E E D I N G S

4

5              COURTROOM ADMINISTRATOR:  All rise.

6              THE COURT:  Thank you.  You may be seated.

7              COURTROOM ADMINISTRATOR:  This is the time set

8      for day 3 of the bench trial in Case No.

9      2:16-cr-100-GMN-CWH, United States of America versus Jan

10     Rouven Fuechtener.

11             Counsel, please make your appearances for the

12     record.

13             MS. ROOHANI:  Good morning, Your Honor.  Ellie

14     Roohani and Lisa Cartier-Giroux for the United States,

15     joined by Special Agent Mari Panovich.

16             THE COURT:  Good morning -- or good afternoon

17     Ms. Panovich, Ms. Cartier-Giroux, Ms. Roohani.

18             MR. MARCHESE:  Good afternoon, Your Honor.  Jess

19     Marchese, Benjamin Durham, and Michael Sanft on behalf of

20     the defendant, Jan Rouven Fuechtener.

21             THE COURT:  And good afternoon, Mr. Sanft, Mr.

22     Fuechtener, Mr. Durham, Mr. Marchese.

23             All right.  Are we ready to begin again?  Can we

24     resume?

25             MS. ROOHANI:  We are, Your Honor.  We have one

TRANSCRIBED FROM DIGITAL RECORDING

1    small housekeeping matter.

2              THE COURT:  All right.

3              MS. ROOHANI:  Yesterday when we admitted the

4    jail calls for the purposes of making a clear appellate

5    record, what we've done is we have redacted the entirety of

6    the transcript, save what was shown up on the screen.

7              And we would like to admit that as Government's

8    Exhibit 47.

9              THE COURT:  Is that the next number, Aaron?

10             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

11             THE COURT:  All right.

12             Any objection?

13             It was actually my recommendation because you

14   had originally lodged the entirety of the transcript, the

15   defense said not all of it is relevant, you agreed that you

16   weren't going to try to admit all of it, just parts of it.

17   So my difficulty was in trying to look for the parts that

18   are admitted.  I can't help but scan things that we've only

19   agreed are relevant.

20             So this way I'm not going to look at the

21   entirety of the transcript, just the portions that were

22   actually played yesterday.

23             MR. MARCHESE:  That's correct.  All this

24   testimony or jail call has been entered into evidence, they

25   just simply memorialized it.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  All right.  Thank you.

 2              MS. ROOHANI:  And so, Your Honor, would that be

 3   admitted under 47?

 4              THE COURT:  Yes, No. 47 --

 5              MS. ROOHANI:  May I add --

 6              THE COURT:  -- is admitted.

 7          (Government's Exhibit 47 received.)

 8              MS. ROOHANI:  May I add that to the binder then?

 9              THE COURT:  Yes.

10              MS. ROOHANI:  Thank you.

11              Thank you, Your Honor.

12          (Pause in the proceedings.)

13              MS. ROOHANI:  Thank you, Your Honor.

14              And we are ready to proceed.

15              THE COURT:  All right.  You may go ahead and

16   call your next witness.

17              MS. CARTIER-GIROUX:  United States calls Special

18   Agent Mari Panovich.

19              THE COURT:  Mr. Marchese, do you want us to

20   admonish Ms. Panovich and swear her in again, or just

21   remind her that she's still under oath?

22              MR. MARCHESE:  Just remind her, please.

23              THE COURT:  All right.

24              Good afternoon, Ms. Panovich.  I do remind you

25   you're still under oath.  All right?
```

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CARTIER-GIROUX:  May I inquire?

2          THE COURT:  Yes, you may.

3                    MARI PANOVICH

4      recalled as a witness, having been previously sworn,

5              was examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY CARTIER-GIROUX:

8    Q.   Special Agent Panovich, good afternoon.

9    A.   Good afternoon.

10   Q.   Where are you currently employed?

11   A.   I am employed with the FBI in Las Vegas.

12   Q.   In what capacity?

13   A.   I'm a special agent.

14   Q.   How long have you been employed with the FBI?

15   A.   I've been with the FBI for a little over 12 years.

16          MS. CARTIER-GIROUX:  Judge, can you hear her?

17   Because I can -- do you need the microphone --

18          THE COURT:  Yes.  But go ahead and pull that

19   closer or bend it if you need to.

20          THE WITNESS:  Is that better?

21          MS. CARTIER-GIROUX:  Yes.  For me it is.

22          THE WITNESS:  Okay.

23          MS. CARTIER-GIROUX:  Thank you.

24   BY MS. CARTIER-GIROUX:

25   Q.   What were you before you were an FBI agent?

TRANSCRIBED FROM DIGITAL RECORDING

1  A.    Before I was an FBI agent, I was a funeral director.

2  Q.    When you began working for the FBI and up until now,

3  have you received ongoing training?

4  A.    Yes, I have.

5  Q.    What types of basic training did you receive when

6  you entered into the FBI?

7  A.    Basic law enforcement training.

8  Q.    Okay.  And are you assigned to a particular unit at

9  this time?

10  A.    Yes, I am.

11  Q.    What unit are you assigned to?

12  A.    I'm assigned to the Violent Crimes Against Children

13  unit.

14  Q.    And what types of investigations do you conduct with

15  the Violent Crimes Against Children unit?

16  A.    Mostly online child pornography.

17  Q.    What types of specialized training, if any, have you

18  received in order to help qualify you to do your job?

19  A.    I have received basic online training in regards to

20  child pornography as well as peer-to-peer file sharing

21  program training as -- such as BitTorrent, Ares, and

22  GigaTribe.

23  Q.    Were you involved in the investigation that led to

24  the current indictment against the defendant?

25  A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And how did you become involved in the

2    investigation?

3    A.    I received a lead from the Buffalo division of the

4    FBI.

5    Q.    And was that related to the testimony that we heard,

6    I believe on Monday, from TFO Joseph Ahmed from Buffalo?

7    A.    Yes, it is.

8    Q.    And what information, in summary, did you receive?

9    A.    I received information that an individual utilizing

10   the name lars45 was on the GigaTribe network and had child

11   pornography.

12   Q.    What was -- was it child pornography -- was it

13   available?  What was the child pornography?  What was the

14   interaction?

15   A.    The undercover had obtained child pornography from

16   lars45.

17   Q.    Okay.  And did you receive an IP address from that

18   undercover interaction in Buffalo?

19   A.    Yes.

20   Q.    What was the IP address that you received?

21   A.    May I refer to his report?

22   Q.    If it -- would it refresh your recollection?

23   A.    Yes, it would.

24         MS. CARTIER-GIROUX:  Judge, I'd ask that she be

25   allowed to refer to the 302 from Joseph Ahmed to refresh

TRANSCRIBED FROM DIGITAL RECORDING

1    her recollection.

2              THE COURT:  Any objection?

3              MR. MARCHESE:  No, Your Honor.

4              THE COURT:  Go ahead.

5              THE WITNESS:  The IP address is 68.104.2.249.

6    BY MS. CARTIER-GIROUX:

7    Q.    Okay.  And what is an IP address?

8    A.    It's a unique number that's assigned to -- that a

9    computer is assigned when accessing the Internet.

10   Q.    When it accesses --

11   A.    Internet.

12   Q.    -- the Internet?

13   A.    To access the Internet, yes.

14   Q.    And when you are given an IP address, does it allow

15   you to locate the location of the computer that is

16   utilizing that IP address?

17   A.    Yes.

18   Q.    And how do you do that?

19   A.    Go by -- you have that IP address, and you would

20   find the Internet service provider.  And then I sent a

21   subpoena, based on identifying the IP address, to Cox

22   Communications.

23   Q.    So if you have an IP address on a specific date at a

24   specific time and you find out who the provider is, can

25   that provider then tell you what location that computer was

TRANSCRIBED FROM DIGITAL RECORDING

1    at when it was operating on that particular IP address?

2    A.    Yes.

3    Q.    What was the provider in this case for IP address

4    68.104.2.249 when it was interacting with Joseph Ahmed in

5    Buffalo, I believe on September 14th, 2015?

6    A.    The service provided was Cox Communications.

7    Q.    What did you do to obtain the location of that

8    computer?

9    A.    Served an administrative subpoena to Cox

10   Communications.

11   Q.    Did you receive a return from Cox subpoena providing

12   you with an address?

13   A.    Yes.

14   Q.    What was that address?

15   A.    7080 Donald Nelson Avenue in Las Vegas, Nevada.

16   Q.    And is that address in the State and Federal

17   District of Nevada?

18   A.    Yes, it is.

19   Q.    When you received that address, what did you do?

20   A.    I -- I then conducted my investigation and did a

21   background.

22   Q.    A background as to the address?

23   A.    As to the address and to the occupants of the

24   residence.

25   Q.    What types of things did you did -- do in order to

---

TRANSCRIBED FROM DIGITAL RECORDING

1   find out who resided at that address?

2   A.    I queried the United States Postal Service, to see

3   who was receiving mail at that location, as well as I ran

4   the address through clear and accurate to see who the

5   other -- who the occupants of the home might be.  I ran a

6   search through the assessor's office to see who owned the

7   home.  And I also sent an administrative subpoena to the NV

8   Energy to see who the utilities were listed to.

9   Q.    Did you conduct surveillance yourself outside the

10  home?

11  A.    Yes, I did.

12  Q.    Based on your investigation, did you come to a

13  belief that there were individuals -- specific individuals

14  that were residing in the home?

15  A.    Yes.

16  Q.    Who did you believe was residing in the home?

17  A.    The defendant and Frank Alfter.

18  Q.    Okay.  When you received the IP information with

19  regard to the lars45 user that had files -- child

20  pornography files available for download to the undercover

21  Joseph Ahmed, did the Buffalo task force officer provide

22  you with any documentation as to his interaction with

23  lars45?

24  A.    Yes, he did.

25  Q.    What did he provide you with?

----------- TRANSCRIBED FROM DIGITAL RECORDING -----------

1    A.    He provided me with a disk that had a live capture

2    of the interaction of the downloading that he was able to

3    do, the undercover was able to do, from the lars45 account

4    as well as the files of child pornography that the

5    undercover, Mr. Ahmed, was able to obtain.

6    Q.    Now, you were present during Mr. Ahmed's testimony?

7    A.    Yes, I was.

8    Q.    Is Government's 2A in evidence the disk that the

9    undercover TFO provided you?

10   A.    Yes, it is.

11   Q.    Okay.  Now, you said that the undercover also

12   provided you with the files that he was able to download.

13         Did -- what is Government's 1 in evidence?

14   A.    Exhibit 1?

15   Q.    Yes.

16   A.    Exhibit 1 are three files that were downloaded from

17   lars45.

18   Q.    So Detective Ahmed already testified that they were

19   the downloads from -- that he received that contained --

20   that disk contained some of the downloads he received.

21         Did you actually create that disk?

22   A.    Yes, I did.

23   Q.    And what did you create it from?

24   A.    From the 24 files that Mr. Ahmed had sent me.

25   Q.    And you were given 24 files.  How many of those

TRANSCRIBED FROM DIGITAL RECORDING

```
1   files contained images or videos of child pornography?

2   A.    I reviewed all 24, and 21 of them, I believe,

3   contained child pornography.

4   Q.    Now, explain to us, please, how you make a

5   determination of whether or not an image or a video

6   contains child pornography.

7   A.    Based on the age of a child.  But sometimes you can

8   tell if they're infants, toddlers, prepubescent children;

9   and then young teenagers, based on the maturity of the

10  body, development of breasts, any pubic hair.

11  Q.    Okay.  What is an age-difficult image?  What does

12  that mean?

13  A.    It would be an image or a video of a child that -- a

14  teenager that may look to be closer to 18 or 18.

15  Q.    Okay.  When you testify, as you did now, that the

16  images -- these 21 images -- sorry, 21 files contain child

17  pornography, are they age difficult, including

18  age-difficult images or videos, or are these ones that are

19  regarding prepubescent children?

20  A.    The 21 that I reviewed and deemed as child

21  pornography are of child pornography, not of age difficult.

22  Q.    Okay.  And the three files that are on Exhibit 1 in

23  evidence, Government's Exhibit 1 in evidence, are they

24  child pornography?

25  A.    Yes, they are.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.

2              MS. CARTIER-GIROUX:  I'd ask at this time, Your

3    Honor, that Exhibit 1, the three files on there, be

4    published.

5              Judge, I do ask that we not play it on the large

6    screen, if we could just play it on our individual screens,

7    if --

8              THE COURT:  All right.  Mr. Marchese --

9              MS. CARTIER-GIROUX:  -- that would be okay with

10   defense.

11             THE COURT:  -- any objection?

12             MR. MARCHESE:  Your Honor, no, we don't object.

13   At this point we would actually stipulate to these

14   particular videos meeting the element of child pornography.

15   Obviously the Court will have the ability to view the

16   exhibit, if it so pleases.  But based on the nature of the

17   charges and what we know the contents to be, we would do

18   the stipulation.

19             THE COURT:  All right.

20             So, Ms. Cartier-Giroux, it sounds like we don't

21   need to play them, unless there's some other reason to play

22   them.

23             MS. CARTIER-GIROUX:  Judge, on some of the ones

24   that we're going to be doing later from the devices from

25   the home, I am going to need to at least pull them up

----------- TRANSCRIBED FROM DIGITAL RECORDING -----------

1    because we're going to be discussing the file paths on

2    those videos.

3              We don't have to play them all, if he's going to

4    stipulate to all the CP -- I'll ask for each disk -- but,

5    you know, I do need to have them at least pulled up at some

6    point in time for her to testify.  Because she doesn't have

7    the file paths memorized.

8              THE COURT:  Okay.  And by the file path, what

9    are you referring to?

10             MS. CARTIER-GIROUX:  The file path will tell us

11   what user it was saved under on the device.  So we're going

12   to put that into evidence.

13             There's been an issue, or there's been

14   questioning, about numerous users on these devices.

15             THE COURT:  Is that on the image or is that some

16   other artifact that's on -- that's saved with the image,

17   not --

18             MS. CARTIER-GIROUX:  Let me -- can I just ask?

19   BY MS. CARTIER-GIROUX:

20   Q.   Can you testify as to the user path without actually

21   pulling up the image?

22   A.   I actually have my notes with them.  If I could

23   refer to them, I can tell you the file paths without

24   pulling up the image.

25             MS. CARTIER-GIROUX:  Would you prefer that, Your

TRANSCRIBED FROM DIGITAL RECORDING

1    Honor?

2           THE COURT:  That's fine.

3           MS. CARTIER-GIROUX:  Okay.  My question, then,

4    is this, is that some of these images -- are they going to

5    stipulate to -- I'll just have her testify, and we'll deal

6    with it later.

7           THE COURT:  Okay.  All right.

8           MS. CARTIER-GIROUX:  Let's just go this way.

9           THE COURT:  We'll give it a try this way.  If it

10   doesn't work out, we can always go back and play them.

11          MS. CARTIER-GIROUX:  And, Judge, I do assume

12   that the Court is going to at least look at some of them.

13   We have a computer -- because you're going to have to

14   decide whether or not -- despite the stipulation, whether

15   or not they are, in fact, child pornography.

16          THE COURT:  Yeah, I'll have to make a finding.

17          MS. CARTIER-GIROUX:  Okay.  That's fine.

18   BY MS. CARTIER-GIROUX:

19   Q.    All right.  Then so how many videos on Exhibit 1?

20   You said three?

21   A.    Yes.

22   Q.    Okay.  And are they in a variety of lengths?

23   A.    Yes, they are.

24   Q.    Okay.  Are some of the videos more than five minutes

25   long?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    On Exhibit 1, do some of the videos portray what

3    would be referred to as bondage?

4    A.    On file -- on Exhibit 1, I'm not sure, but I know on

5    other files that I've created for the exhibit purposes,

6    there are.

7    Q.    Okay.  So we'll talk about them --

8    A.    Yes.

9    Q.    -- when we get to those.  Okay.

10              I want to bring you to January 19th --

11              Oh, Judge, I'd ask that it be entered into

12   evidence.  Did I already ask that?

13              THE COURT:  Exhibit 1?  Not yet.

14              MS. CARTIER-GIROUX:  It's already in evidence.

15   I apologize.

16              THE COURT:  That's right.

17              MS. CARTIER-GIROUX:  Withdrawn.

18   BY MS. CARTIER-GIROUX:

19   Q.    Let's talk about January 19th, 2016.

20   A.    Yes.

21   Q.    What, if anything, did you do on January 19th of

22   2016?

23   A.    On January 19th of 2016, I submitted an affidavit

24   for a federal search warrant.

25   Q.    And of what -- of -- for what?  What was the search

TRANSCRIBED FROM DIGITAL RECORDING

1    warrant for?

2    A.    For the residence of 7080 Donald Nelson Avenue.

3    Q.    Okay.  And what were you looking for at that

4    residence?

5    A.    For child pornography and devices related to such.

6    Q.    Did you draft an operation plan?

7    A.    Yes, I did.

8    Q.    When was the search warrant executed?

9    A.    On January 21st, 2016.

10   Q.    Did you make entry yourself first or was SWAT

11   present?

12   A.    Las Vegas FBI SWAT was present when we made entry.

13   Q.    Okay.  Were you there when SWAT entered?

14   A.    I was there.  I was outside of the entrance.

15   Q.    Okay.  And were two people identified to you as

16   being in the house at the time SWAT made entry?

17   A.    Yes.

18   Q.    And who were those individuals?

19   A.    The defendant and Joel Rosales.

20   Q.    Okay.  Was there anyone else at the house?

21   A.    No, not at that time.

22   Q.    Did SWAT order the individuals in the house to exit

23   the house?

24   A.    Yes.

25   Q.    Joel Rosales, do you know if he was interviewed?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes, he was.

2    Q.    Who was he interviewed by?

3    A.    He was interviewed by two of our task force

4    officers.

5    Q.    Do you know who they are?

6    A.    Yes.

7    Q.    Who?

8    A.    TFO Brandon Trotter and TFO Jason Darr.

9    Q.    Was his interview recorded?

10    A.    Yes, it was.

11    Q.    Before coming here to testify, did you review that

12    interview?

13    A.    Yes, I did.

14    Q.    Okay.   During the search warrant, where was the

15    defendant when this -- when he was removed from the house,

16    where did he go?

17    A.    He was with me.

18    Q.    He stayed with you?

19    A.    Yes, he did.

20    Q.    Did you have an opportunity to speak with the

21    defendant on January 21st of 2016?

22    A.    Yes, I did.

23    Q.    Where was he interviewed?

24    A.    He was interviewed with myself in TFO Vince Ramirez'

25    vehicle.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And did you attempt to record that interview?

2    A.    Yes, I did.

3    Q.    Were you able to record it?

4    A.    I was not.

5    Q.    Why not?

6    A.    There was a malfunction with the -- the recorder,

7    and I did a test of the recorder, and you can hear -- I did

8    preserve the test.  I said, "Test test test," pressed stop,

9    and then went to record when we were interviewing with the

10   defendant.  And when I got back to the FBI office and

11   submitted it to ELSUR, I was told that there was -- the

12   interview was not captured.

13   Q.    Okay.  Was there a witness to the interview?

14   A.    Yes, there was.

15   Q.    Who was the witness?

16   A.    Task Force Officer Vince Ramirez.

17   Q.    Did you take notes during?

18   A.    Yes, we did.

19   Q.    Did you also prepare a report, commonly referred to

20   as a 302?

21   A.    Yes.

22   Q.    Did you provide the notes as well as the report to

23   the government?

24   A.    Yes.

25   Q.    Okay.  When you were in the car with the -- vehicle,

TRANSCRIBED FROM DIGITAL RECORDING

1   before you interviewed him, did you provide the defendant

2   with his *Miranda* rights?

3   A.    Yes.

4   Q.    Did you do that in English or in German?

5   A.    In English.

6   Q.    Okay.  Did you offer the defendant the opportunity

7   to have the *Miranda* rights read to him in German?

8   A.    Yes.

9   Q.    Did you have a German-speaking officer available to

10  do that?

11  A.    Yes, we did.

12  Q.    What did the defendant tell you when you offered him

13  to have his rights read to him in German?

14  A.    He said that his English was very well, so well,

15  that he did his business contracts in English and that he

16  didn't feel the need for an officer.

17  Q.    Did you have an opportunity to speak to the

18  defendant?

19  A.    Yes.

20  Q.    In your conversations with the defendant, did he

21  give you any indication that he did not have a mastery of

22  the English language?

23  A.    No.  His English was very good.

24  Q.    In the interview with the defendant in Task Force

25  Officer Ramirez' vehicle, did you ask the defendant where

TRANSCRIBED FROM DIGITAL RECORDING

1  he worked?

2  A.    Yes.

3  Q.    Where did he tell you he worked?

4  A.    He actually volunteered that he was a headliner at

5  the Tropicana Hotel.

6  Q.    At that time did you also ask the defendant who was

7  residing at the house located at 7080 Donald Nelson Avenue?

8  A.    Yes.

9  Q.    Who did he tell you was residing in the house?

10  A.    He told me his business manager, Frank Alfter and a

11  friend of theirs named Kevin was staying at the house.

12  Q.    Did he say he also stayed --

13  A.    He said that --

14  Q.    -- himself?

15  A.    Oh, yes, he himself lived at the home.

16  Q.    So there were three people at that time residing in

17  the house?

18  A.    Yes.

19  Q.    Okay.  Did he tell you how long the friend, Kevin,

20  had been staying at the house?

21  A.    He said approximately two months.

22  Q.    Did you ask the defendant where Mr. Alfter and the

23  friend named Kevin were?

24  A.    He had volunteered actually that they were on a

25  six-week world cruise.

TRANSCRIBED FROM DIGITAL RECORDING

1  Q.    During the course of your questioning of the

2  defendant, did you ask him whether or not he used any

3  social media apps?

4  A.    Yes.

5  Q.    Specifically did you ask him whether or not he used

6  the social media app Grindr?

7  A.    Yes.

8  Q.    Did he indicate whether or not he used Grindr?

9  A.    Yes, he did.

10  Q.    What did he tell you?

11  A.    He said that he used Grindr to meet people and to

12  hook up.

13  Q.    Did you at that time also ask the defendant whether

14  or not he used the site PornHub?

15  A.    He volunteered that he used the site PornHub.

16  Q.    Did you discuss the GigaTribe platform with the

17  defendant?

18  A.    Yes.

19  Q.    Did you ask him whether or not GigaTribe would be

20  found on any of the devices in his home?

21  A.    Yes.

22  Q.    What did he tell you?

23  A.    He said that GigaTribe might be found on a device in

24  his home.

25  Q.    Did he admit at any time that he had used GigaTribe

TRANSCRIBED FROM DIGITAL RECORDING

1   before?

2   A.    Yes.

3   Q.    Did you also discuss the security of the wireless

4   Internet in the home?

5   A.    Yes.

6   Q.    Was -- did the defendant tell you whether or not the

7   Internet was secured with a password?

8   A.    Yes.  He said it was a secured wireless Internet.

9   Q.    Did he indicate to you whether or not who knew that

10  password?

11  A.    Yes.

12  Q.    What did he tell you?

13  A.    He said that he gave the password to guests that

14  came to the home.

15  Q.    Did you ask him specifically about who had access to

16  the computers in the house?

17  A.    Yes.

18  Q.    What did he tell you?

19  A.    He said that he and Frank had had access to the

20  computers in the home.

21  Q.    Did he indicate that they shared those computers?

22  A.    Yes.

23  Q.    Did you ask the defendant to provide you with his

24  e-mail address?

25  A.    Yes, I did.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    What did he tell you his personal e-mail address

2    was?

3    A.    He said his personal e-mail address was

4    woworks@aol.com.

5    Q.    Can you spell that, please?

6    A.    Sure.  It's w-o-w-o-r-k-s@a-o-l.com.

7    Q.    Did the defendant provide with you any additional

8    e-mail addresses that he utilized?

9    A.    Yes.  He said that he and Frank had shared an e-mail

10   address.

11   Q.    What was that e-mail address?

12   A.    Famevegas@me.com.

13   Q.    Can you spell that?

14   A.    Sure.  It's f-a-m-e-v-e-g-a-s@m-e.com.

15   Q.    Did you ask him whether or not there were any other

16   e-mail addresses that he utilized?

17   A.    Yes, I did.

18   Q.    What did he tell you?

19   A.    He said he did not have any other e-mail addresses.

20   Q.    Did you ask him at that time for the cell phone

21   number that he used?

22   A.    Yes, I did.

23   Q.    What was that number he provided?

24   A.    He told me that his cell phone number was Area Code

25   702-622-3232.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    At some point in your investigation later on, was a

2    subpoena issued to Verizon Wireless by Kellie Badalucco --

3    I think that's how you say --

4    A.    Badalucco.

5    Q.    Badalucco.

6          -- that returned a different cell phone number

7    for Mr. Fuechtener?

8    A.    Yes.

9    Q.    Can you tell us about that?

10   A.    Yes.  I don't have that number memorized off the top

11   of my head.  But I did -- we sent a subpoena request asking

12   for subscriber information on the phone number that the

13   defendant had provided to me.  And when we got the

14   subscriber information back, it came back to the defendant

15   at the 7080 Donald Nelson Avenue address with a different

16   cell phone number.

17   Q.    Would it refresh your recollection as to the other

18   cell phone number if I provided you with the 302 from

19   Verizon?

20   A.    Yes.

21   Q.    I'm referring to Verizon Wireless.

22   A.    Yes, it would.

23         (Discussion held off the record.)

24         THE COURT:  Is this a different number or an

25   additional number?  I missed that.

```
                    TRANSCRIBED FROM DIGITAL RECORDING
```

   1              THE WITNESS:  An additional number.

   2              THE COURT:  Okay.

   3              MS. CARTIER-GIROUX:  She won't know.  I'll have

   4    to show it to her.

   5              MR. MARCHESE:  Okay.

   6              MS. CARTIER-GIROUX:  May I approach?

   7              THE COURT:  Yes, you may.

   8              THE WITNESS:  Thank you.

   9    BY MS. CARTIER-GIROUX:

  10    Q.    Does the 302 refresh your recollection?

  11    A.    Yes, it does.

  12    Q.    What is the number that Verizon provided -- tell us

  13    what happened.  How did you get that?  What was the

  14    response?

  15    A.    We sent a subpoena request for the subscriber

  16    information on the initial number that the defendant had

  17    provided me with.  And we -- the response that we got back

  18    was that the subscriber was the defendant at 7080 Donald

  19    Nelson Avenue, and that the contact phone that was

  20    associated to that account was 702-994-3700.

  21    Q.    Okay.  So you sent information to verify that that

  22    702-622-3232 number belonged to the defendant?

  23    A.    Correct.

  24    Q.    And they came back and said there's also another

  25    number connected with him?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    That's correct.

2    Q.    Okay.  When you spoke with the defendant, was he

3   aware that the search warrant was to locate child

4   pornography on devices at the residence?

5    A.    Yes.

6    Q.    Okay.  Did he volunteer any statements to you with

7   regard to Mr. Alfter accessing child pornography from the

8   residence?

9    A.    Yes, he did.

10    Q.    What did he tell you?

11    A.    He said that it was a German phrase, that it

12   wouldn't necessarily translate, but he said that he would

13   put his hand in fire that Frank was not into child

14   pornography.

15    Q.    Did the defendant make any statements with regard to

16   whether or not he wanted Frank Alfter to find out about the

17   search warrant for child pornography in the house?

18    A.    He did not want Frank to know.

19    Q.    Okay.  Did you ask the defendant at the time if he

20   knew what child pornography was?

21    A.    Yes, I did.

22    Q.    What did he tell you?

23    A.    He said he knew that it was sexually explicit

24   material of a child under the age of 18.

25    Q.    Okay.  Did there come a point in time when you

TRANSCRIBED FROM DIGITAL RECORDING

1   decided to have another individual interview the defendant?

2   A.    Yes.

3   Q.    Who was that individual?

4   A.    Special Agent Gary McCamey.

5   Q.    Was he at the search warrant location?

6   A.    No, he was not.

7   Q.    Where was he?

8   A.    He was back at our FBI office in Las Vegas.

9   Q.    Did the defendant agree to go speak with Special

10  Agent McCamey?

11  A.    Yes.

12  Q.    Did you tell the defendant whether or not he had to

13  go?

14  A.    I told him it was 100 percent voluntary.

15  Q.    Okay.  How did he get to Special Agent McCamey?

16  A.    He drove himself.

17  Q.    Were you present during the interview with Special

18  Agent McCamey?

19  A.    I was not.

20  Q.    Did you come in at some point during the interview?

21  A.    Yes, at the defendant's request.

22  Q.    Okay.  Before you came in at the end of the

23  interview, did you have an opportunity to speak with

24  McCamey?

25  A.    Yes.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1  Q.   Did you learn at that time, before you spoke with

2  the defendant a second time, that the defendant had

3  admitted that the larsschmidt22@hotmail.com was his e-mail?

4  A.   Yes.

5  Q.   Did you also learn from McCamey that the lars45

6  GigaTribe account had belonged --

7          MR. MARCHESE:  Objection.  Hearsay.

8          MS. CARTIER-GIROUX:  Well, if you let me ask my

9  next question, it'll explain why I asked --

10         THE COURT:  Why don't you lay a foundation

11 for --

12 BY MS. CARTIER-GIROUX:

13 Q.   Did he tell you that --

14 A.   Yes.

15 Q.   -- he had also admitted the lars45 GigaTribe?

16 A.   Yes.

17         MS. CARTIER-GIROUX:  At this time I'd like to

18 show the witness what's been previously marked as

19 Government's 48.

20         May I approach the witness?

21         THE COURT:  Yes.

22         THE WITNESS:  Thank you.

23 BY MS. CARTIER-GIROUX:

24 Q.   After you spoke with McCamey and he told you what we

25 just discussed, did you speak with the defendant again?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Yes.

2   Q.    Did you ask the defendant whether or not he would

3   execute a document, a consent form, so that you could

4   access that larsschmidt22 account as well as the lars45

5   account?

6   A.    Yes.

7   Q.    What is what's been marked as Government's 48 for

8   identification?

9   A.    It is a -- an FD-1086, which is a Federal Bureau of

10  Investigation consent to assume online identity

11  authorization form.

12  Q.    And what does that consent form that you -- the FBI

13  believes that consent form allows you to do?  What does the

14  F -- what would you believe that that consent form would

15  allow you to do?

16  A.    This consent form gives us permission, from the

17  owner of an account, to take over the account completely

18  and control it.

19  Q.    So is it similar to if you go to someone's house and

20  you have them write out -- sign the consent to search form?

21  A.    Yes.

22  Q.    This allows you to go in, look around, if you want

23  to take something out, you could potentially take something

24  out?

25  A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   Q.    Okay.  And did the -- did you ask the defendant to
 2   write out his e-mail address on that document?
 3   A.    Yes.
 4   Q.    Is -- did he write it out in his own handwriting?
 5   A.    Yes, he did.
 6   Q.    What e-mail did he write on that document that he
 7   was giving you consent to access?
 8   A.    Larsschmidt22@hotmail.com.
 9   Q.    Did the defendant also write out the GigaTribe
10   account user name that he was giving you consent to access?
11   A.    Yes.
12   Q.    Did he write it out in his own handwriting?
13   A.    Yes.
14   Q.    What did he write on that form?
15   A.    Lars45.
16         MS. CARTIER-GIROUX:  At this time we would move
17   to admit Government's 48 in evidence.
18         THE COURT:  Any objection?
19         MR. MARCHESE:  No, Your Honor.
20         THE COURT:  All right.
21         MR. MARCHESE:  We would renew our objection to
22   the hearsay statements of what Mr. McCamey said that
23   Mr. Fuechtener allegedly told him in the interview as
24   double hearsay.  I understand where it might be an
25   admission on my client's behalf, but I'm not seeing where
```

TRANSCRIBED FROM DIGITAL RECORDING

1    the exception would be as to what Mr. McCamey told to the

2    agent.

3            THE COURT:  All right.  Well, I think up until

4    now she's only testified about her discussions with the

5    defendant directly, not -- did I miss something?  I don't

6    think she testified about what Mr. McCamey told --

7    McCamey? -- told her.

8            MS. CARTIER-GIROUX:  She testified that she had

9    learned that he had told Mr. McCamey -- it explains why she

10   would ask him to write out e-mail addresses on that form,

11   basically.

12           THE COURT:  All right.

13           MS. CARTIER-GIROUX:  It's not for the truth.

14   It's just to explain why is she giving him a form and

15   asking him to write out consent if neither of those -- he

16   admitted to her, neither of those accounts were his.

17           THE COURT:  All right.  Objection's overruled.

18           MR. MARCHESE:  So it's being offered not for the

19   truth of the matter?

20           THE COURT:  Right.

21           MR. MARCHESE:  Okay.  That's fine.

22        (Government's Exhibit 48 received.)

23           MS. CARTIER-GIROUX:  The statements on McCamey.

24   The statements on 48 are being offered for the truth.

25           Okay.  May I proceed?

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  Yes.

2          MS. CARTIER-GIROUX:  Okay.

3   BY MS. CARTIER-GIROUX:

4   Q.    Was the authorization, the consent to access those

5   accounts, ever signed by the defendant, ultimately executed

6   by you and the defendant?

7   A.    No.

8   Q.    Why not?

9   A.    As he was filling it out, he had wanted to -- the

10  defendant said that he wanted to add a note to it saying

11  that the child pornography that would be found in the

12  account did not belong to him.

13  Q.    So he wanted to write that on that, and then he

14  wanted you to sign that form?

15  A.    Yes.

16  Q.    Okay.  So basically he wanted you to alter the

17  consent that he was consenting so long as you acknowledged

18  that it wasn't his?

19  A.    Yes.

20  Q.    Did you decide at that point in time that you could

21  not execute the form with him?

22  A.    Yes.

23  Q.    Okay.  What happened to -- what did you do with the

24  form?

25  A.    I just -- I explained to him that we couldn't do

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1   that.  And TFO Ramirez was with me.  We both explained that
 2   we couldn't do that, that -- I took the consent form and I
 3   tore it in half so that he -- the defendant could see that
 4   I had destroyed it and wasn't going to do anything to alter
 5   it in any way.
 6   Q.    Okay.  And you provided that form in discovery;
 7   correct?
 8   A.    Yes.  I took the two pieces and made a copy
 9   together.
10   Q.    You made a copy together, and you also -- did you
11   also provide the torn pieces, separated?
12   A.    Yes, I did.
13   Q.    Okay.  Now, 48, what is that copy?
14   A.    48 is a copy of the consent form that I made the
15   copy from the original of with Jan Rouven Fuechtener's
16   name, larsschmidt22@hotmail.com --
17   Q.    And --
18   A.    -- and lars45.
19   Q.    -- did you put the pieces together --
20   A.    Yes --
21   Q.    -- when you copied --
22   A.    -- I did.  And I also made copies of each half.
23   Q.    Okay.
24             MS. CARTIER-GIROUX:  Judge, at this time we'd
25   ask that 48 be published.
```

------------------------- TRANSCRIBED FROM DIGITAL RECORDING -------------------------

```
 1               THE COURT:  You may go ahead and publish 48.
 2          (Discussion held off the record.)
 3               MS. CARTIER-GIROUX:  Judge, it's not in.  It's
 4     something we added.  So I withdraw that request.
 5               THE COURT:  All right.
 6               MS. CARTIER-GIROUX:  It's in evidence.
 7     BY MS. CARTIER-GIROUX:
 8     Q.    On January 22nd, the day after --
 9     A.    Yes.
10     Q.    -- did the defendant contact you to speak with you?
11     A.    Yes, he did.
12     Q.    Okay.  On that date, on January 22nd, 2016, the day
13     after the search warrant, did the defendant give you the
14     lars45 GigaTribe account password?
15     A.    Yes, he did.
16     Q.    What did he tell you the password was to the lars45
17     account?
18     A.    He said that the password was either lars123 or
19     lars1234.
20     Q.    Now, prior to the search warrant, had you sent a
21     subpoena to GigaTribe to find out the subscriber
22     information relating to the lars45 GigaTribe account?
23     A.    Yes, I did.
24     Q.    Did the -- did GigaTribe return -- make a return on
25     that subpoena?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Did the return contain the password to lars -- the

3    lars45 account?

4    A.    Yes, it did.

5    Q.    What was the password provided to you by GigaTribe

6    when it made the return prior to the execution of the

7    search warrant?

8    A.    Lars1234.

9    Q.    I want to talk to you about the digital devices that

10   were removed from the home, specifically the digital

11   devices containing child pornography.

12         Did you have an opportunity, before testifying

13   and throughout the investigation, to review the IEFs which

14   are in evidence, the NetClean reports and the DELREX

15   reports, also in evidence, from the forensic examiner

16   Radke's forensic analysis of the computers taken from the

17   home?

18   A.    Yes, I did.

19   Q.    Okay.  Did you prepare a summary chart to help you

20   testify here today?

21   A.    Yes, I did.

22   Q.    Was the chart created from using the various reports

23   and IEFs from the forensics as well as your examination of

24   the images and files on the digital devices from the home?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Did you provide me with a copy of that summary
 2    report before you came here to testify?
 3    A.    Yes, I did.
 4    Q.    Is that summary report in the exhibit list marked as
 5    Government Exhibit 41 for identification?
 6    A.    Yes, it is.
 7    Q.    Would it help you to look at that chart periodically
 8    during your testimony to help you not have to go through a
 9    bunch of different documents in order to get the answers to
10    the questions?
11    A.    Yes, I would.
12          MS. CARTIER-GIROUX:  Judge, at this time, I
13    would ask that she be allowed to look at the summary chart
14    when necessary, if she needs to, to answer questions.
15          THE COURT:  All right.
16          MS. CARTIER-GIROUX:  The defense has a copy, and
17    they've had a copy.
18          THE COURT:  Okay.
19    BY MS. CARTIER-GIROUX:
20    Q.    And what devices --
21          THE COURT:  It's helpful -- I'm sorry.  It's
22    helpful if she could indicate when she's looking at it and
23    when she's --
24          MS. CARTIER-GIROUX:  Oh, perfect --
25          THE COURT:  -- remembering --
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1              MS. CARTIER-GIROUX:  Perfect --
2              THE COURT:  -- just to be clear.
3    BY MS. CARTIER-GIROUX:
4    Q.    So when -- like the judge says, when you're going to
5    look at it, tell us.
6    A.    Okay.
7    Q.    Okay.  Special Agent Panovich, did all the devices
8    in the home that were taken from the home contain child
9    pornography?
10   A.    No, they did not.
11   Q.    Which devices that were removed from the home
12   contained child pornography?
13   A.    They were evidence items 1B1, 1B2, 1B3, 1B7, 1B13,
14   1B16, 1B21, 1B30, and 1B37.
15   Q.    Okay.  We're going to talk about each one of those
16   devices individually now --
17   A.    Yes.
18   Q.    -- okay?  Let's talk first 40  22.
19              With 1B1.  What was 1B1?
20   A.    And I'm going to refer to my notes a little bit.
21              1B1 was an Apple MacBook Air.
22   Q.    And when you say you refer to your notes, are you
23   talking about your summary --
24   A.    Summary --
25   Q.    -- chart?
```

TRANSCRIBED FROM DIGITAL RECORDING

1      A.     -- chart, yes.

2      Q.     Okay.  Can we pull up what's been placed in evidence

3  as Government's Exhibit 4A.

4      Q.     What is in Government's 4A?

5      A.     4A is evidence item 1B1.

6      Q.     Okay.  And can we pull up 3A.  What is 3A?

7      A.     3A is a sketch of the casita.

8      Q.     Okay.  Can you, using your finger, it should be

9  activated, circle where 1BA was located in the casita.

10          (Discussion held off the record.)

11              MS. CARTIER-GIROUX:  Okay.

12              THE WITNESS:  In that area.

13  BY MS. CARTIER-GIROUX:

14     Q.     All right.  Can we go back to 4A, please.

15          Now, did you -- when you interviewed the

16  defendant on the date of the search warrant on the 21st,

17  did you talk to him about the casita?

18     A.     Yes.

19     Q.     Now, the casita was the room where we heard special

20  agent -- forensic examiner Radke talk -- testified that

21  there was a video on pause on this device, 1B1 --

22     A.     Yes.

23     Q.     -- correct?

24          Did you talk to the defendant about what the

25  casita -- who was staying in the casita, what the casita

————— TRANSCRIBED FROM DIGITAL RECORDING —————

```
 1   was for?

 2   A.    Yes.

 3   Q.    What did he tell you?

 4   A.    He said -- he referred to the casita as the fun

 5   house and that he brought guests there.

 6   Q.    What did he do with guests there?

 7   A.    Had sexual relations and --

 8         MR. MARCHESE:  Objection.  Relevance.

 9         THE COURT:  Ms. Cartier-Giroux?

10         MS. CARTIER-GIROUX:  Judge, there's pornography

11   on the devices.  It's relevant.

12         THE COURT:  All right.  Objection overruled.

13         Go ahead.

14   BY MS. CARTIER-GIROUX:

15   Q.    This device, 1B1, what was the user name on this

16   device?  Can you pull up 4B, please?

17   A.    The user name on this device was Frank Alfter.

18   Q.    Okay.  Now, Radke testified, the forensic examiner

19   testified, that Special Agent Wendy Collins had given him a

20   password simon, s-i-m-o-n, which --

21   A.    Uh-huh.

22   Q.    -- unlocked this computer.

23   A.    Yes.

24   Q.    Where did the password simon come from?

25   A.    The defendant gave me the password.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    When did he give you the password?

 2    A.    When we were in TFO Ramirez' vehicle.

 3    Q.    When you were outside while the search warrant was

 4   being done?

 5    A.    Yes.

 6    Q.    Now, did you examine the forensic reports on this

 7   device?

 8    A.    Yes, I did.

 9    Q.    How many files of child pornography were found on

10   1B1?

11    A.    There was one file --

12    Q.    Okay.

13    A.    -- of child pornography.

14    Q.    I'm sorry?

15    A.    One file --

16    Q.    Okay.

17    A.    -- of child pornography.

18    Q.    And what was the file creation date of that file?

19    A.    I'm going to look at my chart here.

20          It was August 19th of 2015.

21    Q.    And can you tell us what the file path was of that

22   video, that one child pornography file?

23          Or, sorry, was it a video?

24    A.    Yes, it was a video.

25    Q.    Okay.  What was the file path of that one child
```

```
------------ TRANSCRIBED FROM DIGITAL RECORDING ------------
```

1   pornography video?

2   A.    May I refer to the file paths that I have available?

3        MS. CARTIER-GIROUX:  Judge, since we can't pull

4   up the video, can we have her look at that?

5        THE COURT:  Yes.

6        THE WITNESS:  The -- I'm sorry.  Do you want the

7   file name and the file path?

8        MS. CARTIER-GIROUX:  Yes, please.

9        THE WITNESS:  The file name is hot boy and

10  man.avi.  And the file path is users\Frank\desktop.

11  BY MS. CARTIER-GIROUX:

12  Q.    And take a look at Government's 30 for

13  identification.

14  A.    Yes.

15  Q.    What is Government's 30 for identification?

16  A.    30 is the exhibit disk that I created with the child

17  pornography file.

18  Q.    Okay.  And did that -- is that the file that you had

19  pulled off the NetClean report --

20  A.    Yes.  And that came --

21  Q.    -- that came from this device?

22  A.    -- 1B1.

23  Q.    Okay.  And do you know how long that file lasts, how

24  many minutes the video is?

25  A.    Not without -- not without looking at it.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.   Without playing it?

2    A.   Yes.

3           MS. CARTIER-GIROUX:  Judge, I'd ask that exhibit

4    30 be entered into evidence.

5           THE COURT:  Any objection to Exhibit 30?

6           MR. MARCHESE:  No, Your Honor.

7           MS. CARTIER-GIROUX:  And it's my understanding

8    that the defense is going to stipulate that this video file

9    contains images of child pornography.

10           MR. MARCHESE:  That is correct.

11           THE COURT:  All right.

12           MS. CARTIER-GIROUX:  Okay.

13           THE COURT:  So Exhibit 30 is admitted.

14       (Government's Exhibit 30 received.)

15    BY MS. CARTIER-GIROUX:

16    Q.   Did you look at the Safari history on this device?

17    A.   Yes, I did.

18    Q.   Now, you indicated earlier that when you spoke with

19    the defendant on the date of the search warrant, on January

20    21st, 2016, that he advised you that he used the website

21    PornHub?

22    A.   Yes.

23    Q.   Was there Safari history on 1B1 for the website

24    PornHub?

25    A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Can you tell us a little bit about what you saw?

2    A.    It showed that the user name was larsusa22 and that

3    PornHub had been last accessed on January 20th, 2016.

4    Q.    Now, January 20th, 2016, that's the day before the

5    search warrant was executed; correct?

6    A.    That's correct.

7    Q.    Were you able to compare the traveller -- travel

8    information that's been entered into evidence of Mr. Alfter

9    with that date?

10   A.    Yes.

11   Q.    Was Mr. Alfter out of the country at that time?

12   A.    Yes, he was.

13   Q.    What about Mr. Kevin Klepping?

14   A.    Yes, he was also out of the country.

15   Q.    I'm going to have you take a look at -- can you pull

16   up 10A, the DELREX report in evidence.

17         If you could turn to page 5 of that document,

18   which is Bates stamped 00074.

19         At the top of the screen on the DELREX report

20   does it indicate the ownership information for 1B1?

21   A.    Yes, it does.

22   Q.    So does it indicate how many users 1B1 is set up

23   for?

24   A.    For two.

25   Q.    And what are the user names?

TRANSCRIBED FROM DIGITAL RECORDING

1      A.     Frank and shared.

2      Q.     Okay.  Can we go to page 6.  Okay.

3             And what do we see on -- under the 1B1 account,

4      1B1 computer with regard to Skype accounts on the DELREX on

5      page 6?

6      A.     On 1B1 there were two Skype user accounts that were

7      located; one being Frank Alfter, and the other one being

8      Jan_Rouven.

9      Q.     Okay.  And the Frank Alfter Skype account, was it

10     associated with an e-mail address?

11     A.     Yes, it was.

12     Q.     What e-mail address was it associated with?

13     A.     Famevegas@me.com.

14     Q.     And is that the e-mail address that the defendant

15     told you he shared with Mr. Alfter?

16     A.     Yes, it is.

17     Q.     And what is the profile created date for that Skype

18     account associated with that e-mail address?

19     A.     April 29, 2012.

20     Q.     Is there another Skype user on that -- on 1B1?

21     A.     Yes.

22     Q.     Who is it?

23     A.     Jan_Rouven.

24     Q.     Uh-huh.  Is it associated with an e-mail address?

25     A.     It is.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    And what is the e-mail address it is associated
 2   with?
 3    A.    Janrouven@aol.com.
 4    Q.    And when was the profile for Jan_Rouven associated
 5   with janrouven@aol.com created?
 6    A.    That was September 16th of 2008.
 7    Q.    Exhibit 30, the one video file, what was the user
 8   path for that video?
 9    A.    The user path was users\Frank.
10    Q.    So it came from the user Frank?
11    A.    Correct.
12    Q.    Okay.  And, again, 1B1, that is the device that the
13   defendant provided you the sign-in password for; correct?
14    A.    Yes.
15    Q.    I want to talk -- can you pull up 31A, please.
16          Do you recognize 31A in evidence?
17    A.    Yes, I do.
18    Q.    What is 31A in evidence?
19    A.    It's a screenshot of 1B1.
20    Q.    And do you see on the screen this telephone number
21   up on top of that video?
22    A.    Yes, I do.
23    Q.    Okay.  Can you go to, please, 31C, please.
24          Forensic expert -- examiner, not expert,
25   forensic examiner Radke indicated that there were files
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    that were being played, this one being the ARESTRA yo boys.
 2              Were you able to find -- can you go back, I'm
 3    sorry, to 31A.
 4              Were you able to find that video with that
 5    telephone number on it --
 6    A.    Yes.
 7    Q.    -- that was on pause --
 8    A.    Yes.
 9    Q.    -- on 1B1 during the warrant?
10    A.    Yes.
11    Q.    Is that video a video of child pornography?
12    A.    Yes.
13    Q.    Let's go to -- back to 4A, please.
14              Let's talk now about 1B2.  What was 1B2?
15    A.    1B2 was an SD card that was inserted, if I could
16    draw on the screen, into the side of 1B1.
17    Q.    Can you show us where -- is it portrayed in the
18    picture?
19    A.    (No audible response.)
20    Q.    Okay.  Were you able to review the forensic
21    examination reports with regard to 1B2?
22    A.    Yes, I was.
23    Q.    And how many files of child pornography were found
24    on 1B2?
25    A.    If I may refer back to the summary chart.
```

TRANSCRIBED FROM DIGITAL RECORDING

1           What exhibit number was that?  I'm sorry.

2      Q.    41, I think.

3      A.    There were 21 child pornography files located on

4      1B2.

5      Q.    Okay.  Were you able to bring in today some of the

6      files that you located -- that were located -- those child

7      pornography files located on 1B2?

8      A.    Yes.

9      Q.    Can you look at Exhibit 31C?

10     A.    Sorry.

11     Q.    Can you look at Exhibit 30 -- I think it's 32 --

12     yes, 32, for identification.

13     A.    Sure.  Yes.

14     Q.    Okay.  And what is Exhibit 32 for identification?

15     A.    32 contains five child pornography video files that

16     I extracted from that clean and created this disk.

17           MS. CARTIER-GIROUX:  Judge, at this time we'd

18     offer Government's 32 for identification into evidence.

19           MR. MARCHESE:  No objection, Your Honor.

20           THE COURT:  So these are from the NetClean that

21     was performed on the media card that was inside the laptop

22     on top of the bed in the casita?

23           THE WITNESS:  That's correct.

24           THE COURT:  Okay.  Thank you.

25           Exhibit 32 will be admitted.

TRANSCRIBED FROM DIGITAL RECORDING

1          (Government's Exhibit 32 received.)

2              MS. CARTIER-GIROUX:  And I'm submitting that

3     there's a stipulation that these files are, in fact, child

4     pornography files?

5              MR. MARCHESE:  That's a correct statement, Your

6     Honor.

7              THE COURT:  So she testified there was 21 child

8     pornography files.  But Exhibit 32 is five of those 21?

9              THE WITNESS:  Yes.  I just did a --

10             THE COURT:  Okay.  I just want to make sure I'm

11    following.

12             THE WITNESS:  Yes.

13             MS. CARTIER-GIROUX:  Judge, what we did is, each

14    one of these, you'll see, is only pulling some of the files

15    because they were going to be played in court as exhibits.

16             THE COURT:  That's fine.

17             MS. CARTIER-GIROUX:  So that's why.

18    BY MS. CARTIER-GIROUX:

19    Q.   What were the creation dates of -- what was the

20    earliest creation date of the video files or image files in

21    this -- on this device?

22    A.   If I may refer back to the chart.  Sorry.  There's a

23    lot of dates, and I don't want to get anything wrong.

24             On 1B2 the earliest creation date was March

25    25th, 2015.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what was the latest child pornography file

2    creation date?

3    A.    September 30th of 2015.

4    Q.    What were the file paths of the files, at least the

5    CP files that you have on Government's 32 in evidence?

6    A.    If I might refer to the content.  The file path is

7    no name.  And in parentheses it says it's

8    "(fat" f-a-t "32, 2)\kkk."

9    Q.    Okay.  Now, this is an SD card; correct?

10   A.    That is correct.

11   Q.    All right.  Are --

12   A.    And actually --

13   Q.    So again --

14   A.    I'm sorry.  So you want all five of the file path

15   names?

16   Q.    Do they all have the same user?

17   A.    The user is -- yeah, it's no name on all of them.

18   Q.    Okay.  And it comes from a KKK file?

19   A.    Four of the five do.

20   Q.    Okay.  And what does the fifth one come from?

21   A.    Nothing.  It just ends at the end parentheses.

22   Q.    Okay.  On this 1B1 -- 1B2 device, this memory card,

23   was there remnants of incomplete child pornography

24   downloads from the peer-to-peer sharing program Ares?

25   A.    Yes, there was.

---

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And can you look at 42A in evidence in the

2    binder.

3    A.    Sure.  Yes.

4    Q.    Okay.  What is 42A?

5    A.    42A is a disk of -- it's an Ares -- an IEF report of

6    an extraction from Ares of the incomplete file.

7    Q.    From this device?

8    A.    From 1B2.

9    Q.    Okay.  Now, what is Ares?

10   A.    Ares is a peer-to-peer file sharing program.

11   Q.    So it allows you to download things from online?

12   A.    Yes.

13   Q.    Okay.

14   A.    Or allow things --

15   Q.    Or share?

16   A.    Yes.  Share, yes.

17   Q.    Now, you indicated that they are incomplete

18   downloads of child pornography.

19          What makes you believe that these downloads are

20   of child pornography?

21   A.    The file titles are indicative of child pornography.

22   Q.    Okay.  Let's take a look at DELREX 10A in evidence.

23          Can you turn to page 6, which is Bates stamped

24   00075.

25          On the DELREX under 1B2, does it indicate the --

-- TRANSCRIBED FROM DIGITAL RECORDING --

1   that there were Ares incomplete downloads?

2   A.    Yes.

3   Q.    What -- what about the title or titles of the

4   downloads would make it indicate to you that it was child

5   pornography?

6   A.    The -- the -- if you can see the file path name on

7   this one is "boy_scout_fuck_fest."

8   Q.    Okay.  Let's look at 1B3 now.  Can we see 5B,

9   please.

10          What is 5B in evidence a picture of?

11  A.    That is evidence item 1B3.

12  Q.    What was that item?

13  A.    That was an Apple iMac All-in-One.

14  Q.    And what was the user name for that that came up on

15  that CPU?

16  A.    That user name on that was janrouven.

17  Q.    Can we look at 5C, please, in evidence.

18          Does that depict the user name that was from

19  that device?

20  A.    Yes, it does.

21  Q.    Let's go back to 5B, please.

22          Where was that device located?

23  A.    That device was located in the foot of the casita at

24  the foot of the bed.

25  Q.    Can you pull up 3A, please.

----------- TRANSCRIBED FROM DIGITAL RECORDING -----------

1       Can you circle on 3A where it was located in a

2   room?

3   A.    Sure.

4   Q.    Thank you.

5       Was there child pornography on 1B3, the Apple

6   MacBook All-in-One CPU with user name janrouven?

7   A.    Yes, there was.

8   Q.    How many child pornography files were on this

9   device?

10  A.    This device -- I'm going to refer again to my

11  notes -- there were 256 child pornography files.

12      Also there was one child bestiality and seven

13  child bondage photo -- files.

14  Q.    Oh, I'm sorry.  I don't think I asked you this.

15      Back on 1B2, were there any bondage or

16  bestiality files?

17  A.    Yes, there was.  I'm sorry I didn't add that.

18      There were two child bondage photos on evidence

19  item 1B2.

20  Q.    And, again, when you designated bondage files, what

21  are you looking for?

22  A.    Children are in sexual positions, activity that are

23  bound by duct tape or rope or gags or anything of that

24  nature.

25  Q.    And you said bestiality files.  What do you look for

TRANSCRIBED FROM DIGITAL RECORDING

1    when you designate something as a bestiality file?

2    A.    It's children having -- engaging in sex with

3    animals.

4              THE COURT:  And you said that was on 1B2.  Is

5    that -- those are out of the 21 files.  But are they out of

6    the five that you marked as Exhibit 32?

7              THE WITNESS:  So there's a total of -- there's

8    21 of child pornography.  We separate them out.  So 21 of

9    child pornography and then two of child bondage.  And I did

10   include on the disk of five, there is at least one child

11   bondage file.

12             THE COURT:  What about the bestiality?  Is that

13   included on the 21 --

14             THE WITNESS:  That --

15             MS. CARTIER-GIROUX:  That's on 1B3.  I can --

16             THE WITNESS:  -- would be on the next device --

17             MS. CARTIER-GIROUX:  That's on 1B3, Judge.

18             THE WITNESS:  -- on 1B3.  So on 1B --

19             THE COURT:  Okay.  So no --

20             THE WITNESS:  I'm sorry?

21             THE COURT:  -- bestiality in 1B2, only in 1B3?

22             THE WITNESS:  Correct.

23             THE COURT:  1B3 is 256 child porn, including

24   seven bondage, one bestiality.  So there the bondage is

25   included with the 256.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE WITNESS:  It's in addition to the --

 2              THE COURT:  In addition?

 3              THE WITNESS:  -- the 256.

 4         Yes.  Yes.

 5              THE COURT:  All right.

 6              THE WITNESS:  On any device that has, I

 7    separated them out.  And I -- on the video I did -- on the

 8    disk I did include the child bestiality and child bondage.

 9              THE COURT:  Okay.  I'm sorry for asking it.

10    Let's see --

11              THE WITNESS:  No, that's okay.

12              THE COURT:  -- so it's 256 just regular child

13    pornography, plus seven bondage, plus one bestiality; so

14    we're talking 264?

15              THE WITNESS:  Correct.

16              THE COURT:  Okay.  Sorry.  Thank you.

17    BY MS. CARTIER-GIROUX:

18    Q.    Did you put some of the files on to a disk and bring

19    them here to court today?

20    A.    Yes, I did.

21    Q.    Could you take a look at Government's 33 for

22    identification?

23    A.    Yes.

24    Q.    Do you recognize 33 for identification?

25    A.    Yes, I do.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And is that the -- what's on 33 for identification?

2    A.    On 33 there's five files, and there's going to be --

3    and I don't remember the exact number of images versus

4    videos, but there's going to be at least one image and one

5    video file, that there's five files on there.

6    Q.    Okay.

7    A.    Of child pornography.

8    Q.    What are the file paths of those videos or images of

9    child pornography?

10   A.    The file path is users\rouven\dropbox\movies 1 -- do

11   you want me to keep going?

12   Q.    Yes.

13   A.    Okay.  It is "!!2011[MB]Boy O'Riley 8yo hottest BJ!"

14   Q.    Okay.  The other video files or image files, what is

15   the user path for them?

16   A.    I'm sorry.  I could -- the other user paths, there

17   are other ones, users\rouven\desktop\kkk.

18   Q.    Let's look at DELREX 10A in evidence.  Can we look

19   at page 5 of that document, please, which is 00074.

20          Do you see the user's -- the ownership

21   information for 1B3?

22   A.    I'm sorry.  What page was -- oh, I can look at it.

23   Q.    Page 5.  Do you see where --

24   A.    Yes, I do.

25   Q.    Okay.  Who are the two -- what are the two user

TRANSCRIBED FROM DIGITAL RECORDING

1    names on 1B3?

2    A.    The two users are Rouven and shared.

3    Q.    Okay.  And you just testified that the child

4    pornography on that device was under which user?

5    A.    Under Rouven.

6    Q.    On this device was there any indication of

7    ownership, any identifiers, photos, documents?

8    A.    Yes.  There were photos and videos.

9    Q.    How many?

10   A.    There were over seven.

11   Q.    Seven?

12   A.    Yes.  On 1B3?

13   Q.    Uh-huh.

14   A.    Yes.

15   Q.    Can you look at your summary chart.

16   A.    Sure.

17   Q.    For 1B3.

18   A.    Oh, I'm so sorry.  On 1B3 there's over 2,285

19   personal photos.  I apologize.

20   Q.    Okay.  So there were over 2,285 personal photographs

21   of whom?

22   A.    Of the defendant.

23   Q.    What is the earliest child pornography file creation

24   date on 1B3?

25   A.    The earliest creation date is February 20th of 2015.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what was the latest child pornography file

2    creation date on that device?

3    A.    October 10th of 2000 -- I'm sorry, yes, October 10th

4    of 2015.

5              MS. CARTIER-GIROUX:  At this time, Your Honor,

6    I'd ask to offer Exhibit 33 for identification into

7    evidence.

8              THE COURT:  Any objection to 33?  I'm sorry?

9              MR. MARCHESE:  No objection.

10             THE COURT:  All right.  Exhibit 33 will be

11   admitted.

12          (Government's Exhibit 33 received.)

13             MS. CARTIER-GIROUX:  And is there a stipulation

14   that this device, this video contains images or videos of

15   child pornography?

16             MR. MARCHESE:  It's also a correct statement,

17   Your Honor.

18             THE COURT:  Okay.  All right.

19   BY MS. CARTIER-GIROUX:

20   Q.    I'll have you take a look at 42B in evidence.

21   A.    Yes.

22   Q.    Okay.  What do you recognize 42B in evidence to be?

23   A.    42B is an IEF, a disk of IEF extractions of the Ares

24   partial download files.

25   Q.    So were there Ares incomplete child pornography

TRANSCRIBED FROM DIGITAL RECORDING

1   downloads on this device?

2   A.   Yes, there were.

3   Q.   How many?

4   A.   Two.

5   Q.   Can we pull up, same document, which is 10A, but

6   let's move to page 6, which would be 00075.

7        Do you see on 10A the Ares incomplete downloads

8   from the forensic review?

9   A.   Yes.

10  Q.   Okay.  What is the file path for the incomplete

11  child pornography downloads on this device?

12  A.   It is "users/rouven/library/application support/

13  giga " --

14  Q.   I'm asking you about the Ares, not the GigaTribe.

15  A.   Oh, I'm so sorry.  I apologize.

16  Q.   My arrow is in a bad place.

17  A.   No, that's okay.  That's okay.

18        The user is, I'm sorry, is -- user is

19  "users/rouven/desktop/kkk/"

20  Q.   Now, the Ares incomplete downloads, that is -- I am

21  correct to say that that is in the same file path as some

22  of the CP videos that you testified to about that is

23  contained in Government's 33 in evidence?

24  A.   Yes.

25  Q.   Were there also GigaTribe chats on this device?

-------------------- TRANSCRIBED FROM DIGITAL RECORDING --------------------

1    A.    Yes, there were.

2    Q.    Okay.  Again, looking at 10A above the Ares

3    incomplete download section --

4    A.    Yes.

5    Q.    -- was there a GigaTribe folder on this device?

6    A.    Yes, there was.

7    Q.    And what user path was it located in?

8    A.    That was located in "users/rouven/library/

9    application support/giga tribe/."

10   Q.    Okay.  On this device there were chats, GigaTribe

11   chats?

12   A.    Yes, there were.

13   Q.    Okay.  And who were -- which GigaTribe chats, who

14   were they between?

15   A.    Between lars45 and an individual known as

16   KaiUweJensen.

17   Q.    Okay.  And would that be on Exhibit 28B in evidence?

18   Can you pull that up?  Sorry.  28A.  Is it 28A?  No, it's

19   28B.  Actually 28A.  I apologize.

20         Is 28A the chats from the GigaTribe from 1B3?

21   A.    Yes, it is.

22   Q.    And you indicated that's between the lars45 and the

23   KaiUweJensen that we heard testimony about previously in

24   this trial?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Okay.  And in -- in some the chats are discussing
 2    what?
 3    A.    That lars45 is having trouble downloading the
 4    GigaTribe application on to his Mac.
 5    Q.    Okay.
 6    A.    And so he's going to try his PC.
 7    Q.    Can you pull up --
 8              MS. CARTIER-GIROUX:  And, Judge, this is
 9    actually -- this is the issue that -- the document that
10    wasn't in evidence, or the exhibit that wasn't in evidence,
11    which is 34.  You wanted me to give a copy to Mr. Marchese.
12    It's the search terms --
13              THE COURT:  These are the search terms --
14              MS. CARTIER-GIROUX:  From 1B3.
15              THE COURT:  For 1B3.
16              Any objection, Mr. Marchese?
17              MR. MARCHESE:  No, Your Honor.
18              THE COURT:  All right.
19              MS. CARTIER-GIROUX:  At this time, we'd move --
20    actually, take a look at 34.
21    BY MS. CARTIER-GIROUX:
22    Q.    We had previous testimony from forensic examiner
23    Radke that these were search terms that were pulled from
24    the IEF from 1B3.
25    A.    That is correct.
```

TRANSCRIBED FROM DIGITAL RECORDING

 1   Q.    Do you -- are those the search terms that you had

 2   asked forensic examiner Radke to pull from that IEF?

 3   A.    Yes.

 4          MS. CARTIER-GIROUX:  At this time we'd offer 34B

 5   into evidence.

 6          THE COURT:  Any objection?

 7          MR. MARCHESE:  No, Your Honor.

 8          THE COURT:  Just 34, not 34B, right?  Just 34?

 9          MS. CARTIER-GIROUX:  Could we publish 34,

10   please.

11          THE COURT:  So no objection to 34 --

12          MS. CARTIER-GIROUX:  Oh, it's a disk?  We won't

13   publish it then.

14          THE COURT:  -- is that, Mr. Marchese?

15          MR. MARCHESE:  That's our understanding, Your

16   Honor.

17          THE COURT:  All right.

18          MS. CARTIER-GIROUX:  Okay.

19          THE COURT:  Exhibit 34 will be admitted.

20        (Government's Exhibit 34 received.)

21          MS. CARTIER-GIROUX:  34 is a disk.

22          THE WITNESS:  It is a disk.

23          MS. CARTIER-GIROUX:  So I'm just going to have

24   you testify.

25

TRANSCRIBED FROM DIGITAL RECORDING

1   BY MS. CARTIER-GIROUX:

2   Q.   Did you review 34?

3   A.   Yes, I did.

4   Q.   Okay.  The search terms -- when I say search terms,

5   what do I -- what does that mean to you?

6   A.   Words that were -- keywords that are put into, like

7   in this case, Google to find information about something on

8   the Internet.

9   Q.   Did you find any search terms in Google with respect

10  to GigaTribe?

11  A.   Yes, I did.

12  Q.   And what search terms did you find with respect to

13  GigaTribe?

14  A.   There was one GigaTribe problems Mac, GigaTribe

15  can't download, and then there was some in German with

16  GigaTribe.  And that was all on March 21st of 2015.

17        MS. CARTIER-GIROUX:  Can you pull back up 28A,

18  please, for me.

19  BY MS. CARTIER-GIROUX:

20  Q.   Now, the date of the conversation, the GigaTribe

21  chats on this device between lars45 and KaiUweJensen is

22  occurring on what -- sorry -- on what date?

23  A.   On March 21st, 2015.

24  Q.   Okay.  And you just indicate that the search on

25  Google was done also on March 21st, 2015; correct?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    That's correct.

2              MS. CARTIER-GIROUX:  Can you pull up 2B1 for me

3    in evidence?

4              THE COURT:  Can you make the middle part bigger.

5    BY MS. CARTIER-GIROUX:

6    Q.    2B1 is in evidence and was testified to by TFO Ahmed

7    that this is the lars45 profile?

8              What is the user creation date on this profile?

9    A.    March 21st, 2015.

10             MS. CARTIER-GIROUX:  Can you pull up DELREX 10A,

11   please, page 5.  Let's go to page 7.

12   BY MS. CARTIER-GIROUX:

13   Q.    Were there Skype chat messages found on 1B3?

14   A.    Yes, there were.

15   Q.    Okay.  And the Skype chat messages, what user path

16   were they located on?

17   A.    Under the users/rouven.

18   Q.    Okay.  And were there Skype user accounts extracted

19   from the device?

20   A.    Yes, there were.

21   Q.    Okay.  What -- how many were there -- how many were

22   extracted?

23   A.    Three.

24   Q.    Okay.  What was the first one that was extracted?

25   A.    Frank Alfter.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Okay.  And was there an e-mail address associated
 2   with Frank Alfter's Skype account?
 3    A.    Yes.
 4    Q.    What was the e-mail?
 5    A.    Famevegas@me.com.
 6    Q.    And, again, is that the e-mail address that the
 7   defendant indicated that he shared with Mr. Alfter?
 8    A.    Yes, it is.
 9    Q.    What is the profile creation date?
10    A.    It is April 29, 2012.
11    Q.    Is there another Skype user from 1B3?
12    A.    There is.
13    Q.    Uh-huh.  And what is the Skype account name?
14    A.    It's Jan_Rouven.
15    Q.    And what is the name associated with Jan_Rouven?
16    A.    Jan Rouven.
17    Q.    And what is the e-mail address?
18    A.    Janrouven@aol.com.
19    Q.    And what is the profile creation date or time?
20    A.    September 16th, 2008.
21    Q.    And is there a third Skype account name associated
22   with 1B3?
23    A.    There is.
24    Q.    What is it?
25    A.    Larsusa22.
```

1    Q.    And does that have an e-mail address associated with

2    it on this device?

3    A.    It does.

4    Q.    What is it?

5    A.    Larsschmidt22@hotmail.com.

6    Q.    Now, as indicated on the top of the page, the file

7    path of the Skype chat messages found on this account were

8    under which user path?

9    A.    Under users/rouven.

10   Q.    Okay.  What Skype messages, if any, were found on

11   1B3?

12   A.    There were Skype messages between an individual

13   known as olwerolwer and larsusa22.

14   Q.    Is that other Skype messages contained in

15   Government's admitted Exhibit 20A?

16         Can you pull up 20A.  It's in evidence.

17         You don't have to look through the binder.

18         Go to 20 -- yeah, 20 -- there we go.

19   A.    Yes, they are.

20   Q.    Okay.  And those were the Skype messages that were

21   found on this account; correct?

22   A.    That is correct.

23   Q.    Under the Rouven user path?

24   A.    Yes.

25   Q.    Were there Grindr messages also found on this

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    account?
 2     A.    Yes, there were.  Yes.
 3            MS. CARTIER-GIROUX:  Can you go back to 7,
 4    please, page 7, again, of 10A.
 5            THE COURT:  When you say on Exhibit 20A, those
 6    are the Skype messages from 1B3, so it's Skype user Rouven
 7    or the Skype user Lars?
 8            THE WITNESS:  The Skype user name was larsusa22.
 9    But it was under -- the user on the computer account was
10    Rouven.
11            THE COURT:  Okay.
12    BY MS. CARTIER-GIROUX:
13     Q.    For clarification, the Skype conversations were
14    found under the user path Rouven?
15     A.    Correct.  Yes.
16     Q.    But the Skype name was lars20 --
17     A.    Yes.
18     Q.    Larsusa22?
19     A.    That is correct.
20     Q.    Okay.  And that's the larsusa22 that's connected
21    with the larsschmidt22@hotmail.com?
22     A.    That is correct.
23     Q.    That was created on August 7, 2015?
24     A.    Yes.
25            MS. CARTIER-GIROUX:  Does that clarify?
```

------------------------------------------------------------------------

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  Yes.  Thank you.

2           MS. CARTIER-GIROUX:  Okay.

3           THE COURT:  Thank you.

4   BY MS. CARTIER-GIROUX:

5   Q.    All right.  So there was GigaTribe chats, you

6   indicated; right?

7   A.    You -- I'm sorry?

8   Q.    I'm sorry.  Grindr?

9   A.    Yes, Grindr.

10  Q.    Okay.  If you look at page 7 of the DELREX report,

11  what is the Grindr account that was found on 1B3?

12  A.    The user ID number was 54111653.

13  Q.    And when you saw this Grindr account number

14  54111653, what did you do with it?  When you saw it?

15  A.    I sent a subpoena to Grindr for account information

16  related to that user ID number.

17  Q.    Okay.  And did you get the Grindr information or

18  Grindr chats that have previously been admitted as Exhibits

19  21A, 21A, the Grindr profile information, 21B, the Grindr

20  chats, 22A, Grindr profile information, 22B, Grindr chats

21  in evidence?

22  A.    Yes.

23  Q.    Okay.  There was a question to a previous witness,

24  and I can't remember who it was, with regard to the Grindr

25  chat.

TRANSCRIBED FROM DIGITAL RECORDING

1              Can you pull up 21B, pages 10 through 11.  Start

2    at page 10.

3              This was the "shall we drug a young" chat --

4    A.    Uh-huh.

5    Q.    With the phone number 603-359-0869?

6    A.    Yes.

7    Q.    Did you do any investigation to try to determine who

8    that individual was?

9    A.    Yes, I did.

10   Q.    What did you do?

11   A.    I sent a subpoena for subscriber information on that

12   phone number.  It was -- also did subscriber information

13   through Grindr for that ID account and was able to identify

14   who that individual was.

15   Q.    Okay.  What did you do with that -- when you were

16   able to identify that person?

17   A.    I identified that the individual resides in the

18   state of Virginia.  And so I sent a lead to our FBI office

19   in Washington field office.

20   Q.    Okay.  Same question with regard to the Skype user

21   olwer -- how do you pronounce it?

22   A.    I say it olwerolwer.

23   Q.    Okay.

24   A.    I'm not sure that that's correct, though.

25   Q.    That was having conversation with larsusa22.

TRANSCRIBED FROM DIGITAL RECORDING

1          Did you do anything to further investigate who

2   that Skype user was?

3   A.    Yes, I did.

4   Q.    What did you do?

5   A.    I subpoenaed Grindr -- I'm sorry, not Grindr,

6   GigaTribe, because I wanted to see, one, if the -- if

7   lars45 was a contact with this olwer.  In their content of

8   their conversation they were talking about giga.  I

9   identified that they were, in fact, associates on GigaTribe

10  and got the subscriber information for his account, for the

11  olwer account.

12  Q.    Okay.  Let's continue to the next device.  1B7.

13  A.    Okay.

14  Q.    What is 1B7?

15          Can you pull up 6B, please.

16  A.    I actually have a copy of my summary chart with me

17  that I brought up here.  Is it okay if I use that instead

18  of the one in the binder?

19  Q.    The one in the binder is the same one that you gave

20  me, so --

21  A.    Yes.

22  Q.    -- if it's okay with the Court and defense --

23          THE COURT:  That's fine.

24          MS. CARTIER-GIROUX:  -- that she use her own

25  one?  Judge, are you okay with that as opposed to the

----------- TRANSCRIBED FROM DIGITAL RECORDING -----------

1    exhibit?

2              THE COURT:  Yes.  If it's the same one that the

3    defense has had an opportunity to review, then --

4              MS. CARTIER-GIROUX:  Okay.

5              THE WITNESS:  Okay.  So I'm sorry.  Go ahead.

6              MS. CARTIER-GIROUX:  Look on the screen.

7              THE WITNESS:  Yes.

8    BY MS. CARTIER-GIROUX:

9    Q.    1B7 --

10   A.    Yes.

11   Q.    -- is that 1B7 in 6B?

12   A.    Yes, it is.

13   Q.    What was 1B7?

14   A.    1B7 was an external hard drive, My Passport external

15   hard drive.

16   Q.    Okay.  And where was that located?

17   A.    It was outside of the back patio area between the

18   main house and the pool house.

19   Q.    Okay.

20   A.    By the casita.  Sorry.

21   Q.    The casita and the main house?

22   A.    The casita and the main house, yes.

23   Q.    Okay.  Was there child pornography on this device?

24   A.    Yes, there was.

25   Q.    How many child pornography files were found on this

TRANSCRIBED FROM DIGITAL RECORDING

1  device?

2  A.    Referring to my summary chart, there was 3,322 child

3  pornography files.

4  Q.    Okay.  And were there any child bestiality files

5  found on this?

6  A.    There were.  There why nine child bestiality files

7  as well as nine child bondage files.

8  Q.    Were there any personal identifiers, photographs,

9  documents, found on this device?

10  A.    Yes, there were.

11  Q.    How many?

12  A.    There were over seven.

13  Q.    Okay.  And when I say personal ident- -- what were

14  they, if you can --

15  A.    One in particular I remember being a video, and it

16  was of the defendant and some friends.

17  Q.    What was the earliest child pornography file

18  creation date on this device?

19  A.    Referring back to the summary chart, it was April

20  14th of 2014.

21  Q.    And what was the latest child pornography file

22  creation date on this device?

23  A.    January 21st of 2016.

24  Q.    I'd ask you to take a look at Exhibit 35 for

25  identification.

----------------- TRANSCRIBED FROM DIGITAL RECORDING -----------------

1           Do you recognize 35 for identification?

2   A.    Yes, I do.

3   Q.    What is Government's 35 for identification?

4   A.    35 is a compilation of videos and images that I

5   pulled from NetClean device -- from device 1B7.

6   Q.    And are they videos or images of child pornography?

7   A.    They are, yes.

8   Q.    Okay.  So are any of them bestiality files or

9   bondage files?

10  A.    Both, yes.

11  Q.    Are they videos?

12  A.    There's -- yes, videos and -- the images of are

13  child pornography, but the videos of are bondage and

14  bestiality.

15          MS. CARTIER-GIROUX:  At this time we'd offer

16  Exhibit 35 into evidence.

17          THE COURT:  Any objection to Exhibit 35?

18          MR. MARCHESE:  No, Your Honor.

19          THE COURT:  And --

20          MS. CARTIER-GIROUX:  And, again, is there a --

21          THE COURT:  -- is there also a stipulation that

22  these are --

23          MS. CARTIER-GIROUX:  Thank you.

24          THE COURT:  -- videos of bondage and images of

25  child pornography?

------------------------------ TRANSCRIBED FROM DIGITAL RECORDING ------------------------------

1     MR. MARCHESE:  That's correct, Your Honor.

2     THE COURT:  Thank you.

3     (Government's Exhibit 35 received.)

4   BY MS. CARTIER-GIROUX:

5   Q.    What are the file paths associated with these videos

6   and images?

7   A.    For these videos and images, the file path -- and I

8   just want to make sure for all of them -- it is

9   "mypassport(NTFS,2)\lars45."

10  Q.    So is that indication that there are -- are there

11  any child pornography videos or files that were in the

12  lars45 folder that was -- that the user name made available

13  to the undercover?

14  A.    The undercover in -- the lars45 was not -- the

15  folder itself was not available to the undercover --

16  Q.    Okay.

17  A.    -- when he was there.

18       The undercover was able to access "AAA," "BBB,"

19  and "Girls."

20  Q.    Okay.  So those videos were not the same videos as

21  what the undercover accessed?

22  A.    On 1B7, not necessarily these photos, but out of the

23  over 3,000 that we did find, there were some.  Of the files

24  that the undercover downloaded from lars45 were, in fact,

25  found on device 1B7.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Okay.  So the lars45 folder being available, that
 2  was the one to olwer --
 3    A.    Yes, that they discovered, olwerolwer, that they --
 4    Q.    Olwerolwer?
 5    A.    -- discussed.  They discussed this lars45 folder.
 6    Q.    Okay.
 7    A.    Yes.
 8    Q.    But some of the images in that lars45 folder were
 9  images or videos available to the undercover?
10    A.    Not of the lars45 -- because the lars45 folder was
11  not available.
12    Q.    No, I'm saying the --
13    A.    Of the account.
14    Q.    -- some of the images or videos contained within the
15  lars45 folder were available, not through the lars45 folder
16  but --
17    A.    I see what you're saying, yes.
18    Q.    -- there were some --
19    A.    On that external, yes.
20    Q.    Okay.
21    A.    Sorry.
22    Q.    That's okay.  I want you to answer --
23    A.    Yes.
24    Q.    -- correctly.
25    A.    That is correct.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Were there any Ares -- incomplete Ares

2    downloads of child pornography on 1B7?

3    A.    Yes.

4    Q.    Can you look at 42C in evidence.

5    A.    Yes.

6    Q.    What is Exhibit 42C in evidence?

7    A.    42C is a disk of extraction from IEF of the three

8    files of the Ares incomplete downloads.

9    Q.    Okay.

10          And can you pull up 10A, page 7 of the DELREX,

11   please.  Exhibit 10A, page 7.  Okay.

12          Do you see the Ares incomplete downloads on the

13   DELREX for 1B7?

14   A.    Yes, I do.

15   Q.    Okay.  And the file paths for the Ares incomplete

16   downloads, are they the same file paths as the child

17   pornography that you had testified with regard to Exhibit

18   35?

19   A.    Yes.

20   Q.    And how many incomplete downloads were there on 1B7?

21   A.    On 1B7, there were three.

22   Q.    Okay.  And the first title was what?

23   A.    "Gay Kids Orgy."

24   Q.    Can we go to the next page 8, please.  And the

25   second title was?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    "PTHC Brazil Kids."

2   Q.    And what does PTHC stand for?

3   A.    Preteen hard core.

4   Q.    Okay.  And from the actual file path, can you tell

5   whether or not this may or may not contain child

6   pornography?

7   A.    The file name is indicative of child pornography.

8   Q.    Is that because of the "boy scout fuck fest" --

9   A.    The "boy scout fuck fest" and the "PTHC."

10   Q.    Okay.  And what was the third title?

11   A.    The third title is -- I never -- it's "PTHC center

12   OPVA 2013 Thai new feb2012 mom son."

13           THE COURT:  Can you go back to the page

14   preceding to that that said the "Gay Kids Orgy."  Doesn't

15   that also have the boy scout, the same incomplete download?

16   Am I looking at that wrong?

17           MS. CARTIER-GIROUX:  She's looking at --

18           THE WITNESS:  The file path name?

19           THE COURT:  Uh-huh.

20           THE WITNESS:  Yes, that is in the file path

21   name.

22           THE COURT:  So it's both under "Brazil" and

23   under the "Gay Kids"?

24           THE WITNESS:  Yes.

25

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CARTIER-GIROUX:

2    Q.    So does it look like there were two attempts to

3    download the same type of image?

4    A.    It's probably -- I would say that without looking at

5    it, just looking at the file path name itself, I would say

6    that it's two different.  Because if you see the

7    "ARESTRA_33" and then it continues on, and then it's "boy

8    scout," and then on the second one is the --

9                THE COURT:  Oh, it's different.

10               THE WITNESS:  -- "PTHC Brazil Kids."  It's

11   ARESTRA underscore, underscore a lot of explanation points,

12   boy scout.  So it's structured differently.

13               So I've seen that in the past in my -- in my

14   experience, I've seen it where you have -- you can have

15   file path names similar and different content.

16               THE COURT:  So the Brazil one, is it MPG -- can

17   we go back to the preceding page.

18          (Inaudible.)

19               THE COURT:  All right.

20               MS. CARTIER-GIROUX:  Yes.  Let's go on to the

21   next device, which is 1B13.

22               Can you pull up 7A, please?

23               Judge, can we -- can we just take --

24               THE COURT:  Oh, yes.  Let's take a break.  I

25   actually meant to --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CARTIER-GIROUX:  Sorry.  I got a special

2     request from --

3          THE COURT:  Yes.  Let's go ahead and take a

4     break for about 10 -- 10, 15 minutes or so.

5          THE WITNESS:  Thank you.

6          THE COURT:  I know the bathroom is very far away

7     from the courtroom.

8          And we'll just remind Agent Panovich that you

9     are still under oath.  Please don't talk to any of the

10    attorneys during the break.  All right?

11         THE WITNESS:  Yes.  Thank you, ma'am.  Thank

12    you.

13         COURTROOM ADMINISTRATOR:  All rise.

14         Off record.

15         (Recess from 1:34 p.m. until 2:52 p.m.)

16         COURTROOM ADMINISTRATOR:  All rise.

17         THE COURT:  All right.  Thank you.  You may be

18    seated.

19         All right.  So are we going to resume testimony

20    or -- I had a rumor communicated to me that perhaps you all

21    needed a little bit more time before we could resume.

22         MS. ROOHANI:  Yes, Your Honor.  We are drafting

23    a document for the defense's review, and we would

24    potentially be ready to present it to the Court at 4:00.

25         So we would ask for a short recess until 4:00 to

DONNA DAVIDSON - (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   see if we can get that done.  And if not, then we'll be
 2   prepared to proceed at that time.
 3               THE COURT:  All right.
 4               So 4:00, Mr. Marchese?
 5               MR. MARCHESE:  That's all correct.  And we will
 6   obviously stay here.
 7               THE COURT:  All right.  So are the marshals
 8   going to take the defendant back, or will you have an
 9   opportunity to meet with the defendant once the paperwork
10   is ready?
11               MR. MARCHESE:  We'd certainly like access to
12   him.  I'll leave it up to the marshals however they want
13   to --
14               THE COURT:  All right.  Marshals, can you make
15   that happen so that when paperwork is ready the defense can
16   have an opportunity to review it with the defendant?
17               MARSHAL:  Yes, Your Honor.
18               THE COURT:  All right.  Thank you.
19               MS. CARTIER-GIROUX:  Thank you, Your Honor.
20               THE COURT:  All right.  So we'll be back here at
21   4:00 p.m.
22               COURTROOM ADMINISTRATOR:  All rise.
23           Off record.
24          (Recess from 2:53 p.m. until 4:42 p.m.)
25               COURTROOM ADMINISTRATOR:  All rise.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1                THE COURT:  Thank you.  You may be seated.
2                All right.  So let me take this off.
3                It's 4:42.  I don't want to have my staff stay
4      beyond 5:00.  And I hope you all understand that.  So I'm
5      going to continue this until tomorrow.
6                I did check my calendar.  And we could have you
7      start as early as 12 or 12:30 if you want to try to make up
8      for some lost time.  I don't know if you have a suggestion
9      as to when.  But originally we weren't going to resume
10     tomorrow until 1:00.  So that's what you all thought the
11     calendar would be like tomorrow, 1:00 to 5:00.
12               But if you -- if you're willing to come in at
13     12:00 or 12:30 instead, I can be here.
14               MS. ROOHANI:  Your Honor, that's fine with the
15     government.  And we do anticipate -- I think that
16     Mr. Marchese and I concur that we do need time until
17     tomorrow to have some discussion and figure out some
18     things.
19               So if it would be okay with you, 12:00 is fine
20     with us, if it's okay with them, and we should be ready to
21     go at that point.
22               THE COURT:  All right.
23               Mr. Marchese, I know all three of -- you and
24     your two co-counsel are all private attorneys that have
25     other things going on.  And I had told you you would have
```

TRANSCRIBED FROM DIGITAL RECORDING

1    tomorrow morning free.

2              But do you want to start at 12 noon, or do you

3    want to start at 1:00?

4              MR. MARCHESE:  We'll make it work.  My only

5    concern is, do we know when he's going to be transported?

6              THE COURT:  You can talk to the marshals about

7    that to make sure that he'll be here at a certain time if

8    you want to be able to meet with him and discuss things

9    before court.

10             It looks like maybe he could be here as early as

11   with the first transport.

12             MR. MARCHESE:  That's what he's indicating.

13             THE COURT:  Okay.  And the marshal's shaking his

14   head yes.  So they could get that done maybe.

15             MR. MARCHESE:  Noon works for us.

16             THE COURT:  All right.

17             So does that work for you, Aaron?  We'll start

18   at noon?

19             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MS. ROOHANI:  And thank you so much for your

22   patience with us, Your Honor.  We know this is a little bit

23   awkward.  But thank you.

24             THE COURT:  All right.  You're welcome.

25             And if there's any other changes, some things

TRANSCRIBED FROM DIGITAL RECORDING

1   you think of, please contact the courtroom deputy so that

2   we can squeeze in some other hearing instead if it turns

3   out you're not going to be using the courtroom.  All right?

4   Thank you.

5            MS. ROOHANI:  Thank you.

6            THE COURT:  We'll see you tomorrow.

7            COURTROOM ADMINISTRATOR:  All rise.

8            THE COURT:  Off record.

9        (The proceedings adjourned at 4:44 p.m.)

10                    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                           PAGE

3    MARI PANOVICH
         Direct Examination By Cartier-Giroux          460
4

5                        E X H I B I T S

6    GOVERNMENT'S                                  ADMITTED
7    30                                               498
     32                                               504
8    33                                               513
     34                                               517
9    35                                               529
     47                                               459
10   48                                               487

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        -o0o-

2         I certify that the foregoing is a correct

3     transcript from the electronic sound recording

4     of the proceedings in the above-entitled matter.

5

6     _____        __6/18/17__

7         Donna Davidson                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25