1  KAREN A. CONNOLLY
   **KAREN A. CONNOLLY, LTD.**
2  6600 W. Charleston Blvd., Ste. 124
   Las Vegas, NV 89146
3  Telephone:      (702) 678-6700
   Facsimile:      (702) 678-6767
4  E-Mail:         advocate@kconnollylawyers.com
   *Attorney for Jan Rouven Fuechtener*

5

6              **UNITED STATES DISTRICT COURT**

7                    **DISTRICT OF NEVADA**

8  UNITED STATES OF AMERICA,
                                        CASE NO.: 2:16-CR-100-GMN-CWH
9              Plaintiff,

10 vs.                                   **MOTION TO WITHDRAW GUILTY
                                        PLEA**
11 JAN ROUVEN FUECHTENER,

12             Defendant.

13

14      Defendant herein, JAN ROUVEN FUECHTENER, by and through his attorney of record,

15 KAREN A. CONNOLLY, of the law office of KAREN A. CONNOLLY, LTD., hereby files this

16 *Motion to Withdraw Guilty Plea.* This motion is made and based upon the pleadings and papers on

17 file herein, the following Points and Authorities and any evidence adduced at the time of any hearing

18 in this matter.

19      DATED this ____ day of June, 2017.

20                                KAREN A. CONNOLLY, LTD.

21

22                                KAREN A. CONNOLLY
                                  6600 W. Charleston Blvd., Ste. 124
23                                Las Vegas, NV 89146
                                  Telephone:    (702) 678-6700
24                                *Attorney for Jan Rouven Fuechtener*

25 / / /

26

27

28

Mtn to WD Guilty Plea final.wpd

**MEMORANDUM OF LAW**

1        On November 17, 2016, on what was to be the fourth day of his trial, Defendant Jan Rouven

2  Fuechtener (hereinafter "Rouven") pled guilty to Possession of Child Pornography in violation of

3  18 US Sec 2252 (a)(5)(B); Receipt of Child Pornography in violation of 18 USC Sec. 2252(a)(2) and

4  (b); and Distribution of Child Pornography in violation of 18 USC Sec 2252 (A)(2) and (b). Rouven

5  now seeks to withdraw his plea.

6        The standard under Federal Rule of Criminal Procedure 11 for withdrawing a plea is extremely

7  liberal, and instructs that, "A defendant may withdraw a plea of guilty or nolo contendere . . . after,

8  the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just

9  reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B)  In the Ninth Circuit, leave to

10  withdraw a plea prior to the imposition of sentence "should be freely granted" wherever a "fair and

11  just" reason is presented. *United States v. Navarro-Flores*, 628 F.2d at 1184 (citing *United States*

12  *v. Webster*, 468 F.2d 769, 771 (9th Cir. 1972); *Kadwell v. United States*, 315 F.2d 667, 670-71 (9th

13  Cir. 1963)).  A defendant need only present a "plausible reason" for withdrawal prior to the

14  imposition of sentence. *Navarro-Flores*, 628 F.2d at 1184 (citing *Kercheval v. United States*, 274

15  U.S. 220, 224 (1927); *United States v. Erlenborn*, 438 F.2d 165, 168 (9th Cir. 1973)).  "Such a

16  motion should be considered liberally in favor of the accused." *United States v. Artabane*, 868 F.

17  Supp. 76, 77 (M.D. Pa. 1994) (citing *United States v. Young*, 424 F.2d 1276, 1279 (3rd Cir.1970)).

**BACKGROUND**

18        In February, 2016, attorney Jess Marchese was hired to represent Rouven. On March 31, 2016,

19  attorneys Ben Nadig and Michael Sanft were also retained.[1] Sanft was to be actively involved in the

20  defense of Rouven together with Marchese. Ostensibly, Nadig was to assist with Rouven's defense

21  preparation and be available for Rouven's husband Frank Alfter, if needed. On April, 2, 2016, Sanft

22  made an appearance on the record, Nadig never did. Though in separate law firms, it was Rouven's

23  understanding that the lawyers could all work amicably together. He was wrong.

---

[1]     Undersigned counsel has requested retainer agreements from all of the lawyers referenced herein (except for Amber Craig whose whereabouts are unknown.) To date, *none* have been provided.

Mtn to WD Guilty Plea final.wpd      2

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

1    In May, 2016, Nadig expressed concern with the way Marchese was handling the case and

2    urged Rouven to permit him to take over as lead counsel in place and stead of Marchese.  In the

3    ensuing weeks/months, Rouven became increasingly worried that Sanft and Nadig were not doing

4    anything on his case.  This belief was fueled by Marchese.  He claimed that at a fundraiser they had

5    both attended in July, 2016, Nadig had bragged that he had been paid $100,000 for doing nothing.

6    Marchese suggested to Rouven that he remove the Sanft/Nadig team, replacing them with attorney

7    Ben Durham.  On July 24, 2016, Ben Durham substituted in as counsel in place and stead of Sanft.

8    Following their discharge, Rouven and Alfer requested a refund of the $200,000 which had

9    been paid to Nadig and Sanft;  $100,00 for Nadig and $100,000 for Sanft.   Nadig refused to refund

10   any of the money claiming he and Sanft had worked extensively and diligently on the case.  When

11   asked to turn the file over to Marchese, he refused.

12   In response to the request for a refund, on September 3, 2016, Nadig penned a scathing email

13   to Alfter wherein he maligned lead counsel Marchese and tried to get back on the case.  See, Exhibit

14   A, redacted email from Ben Nadig to Frank Alfter dated September 3, 2016.  Therein, Nadig twice

15   stated that Rouven would be convicted at trial with his current defense team; essentially claiming

16   they were incompetent and motivated by money.   He stated that Marchese was a *"desperate*

17   *individual"* who had already harmed Rouven's chances of prevailing; the government was prepared

18   for their defense and Rouven would be convicted.   He claimed Marchese went out of his way to

19   discredit Nadig and Sanft because "*the fee was a big deal to him*" and he was "*more interested in*

20   *getting his friends paid[2] rather than raising and adequate defense.*"  He declared that Marchese

21   wanted Nadig and Sanft off the case[3] so he could hire his friends run the show.

22   As well as attacking defense counsel's abilities, in the email Nadig made audacious claims

23   about his own skills claiming that he and Sanft had secured *"NOT GUILTY"* verdicts in similar cases

24   in federal court.[4]  He claimed Rouven would be acquitted if represented by he and Sanft stating there

25   _____

26   [2]    Rouven hired Ben Durham and Amber Craig at the recommendation of Marchese.

27   [3]    Nadig had been recommended by attorney Steve Pacitti.  Nadig recruited  Sanft.

28   [4]    Marchese claims this was a lie.

1  were *"literally a number of defenses that [he] could raise that would lead to Jan being found not*

2  *guilty."*

3      On or about September 7, 2016, unsolicited and without consent of counsel of record,[5] Nadig

4  met personally with Rouven at Henderson jail and reiterated everything he had stated in the email

5  to Alfter.

6      On September 10, 2016, after receiving a frantic call from Rouven, Durham and Marchese met

7  with Rouven.  According to Marchese, Rouven, was "*very emotional*" and he had to "*talk him off*

8  *the ledge*."  Marchese has claimed that "*Mr. Nadig scared the client by making untrue*

9  *representations*" about him and his chances of winning the case. According to Marchese, in what

10  he described as  unethical conduct, Nadig lied to Rouven in an attempt discredit him and get back

11  on the case thereby leaving Rouven emotionally distraught.  See, Exhibit B, redacted communication

12  authored by Jess Marchese dated November 30, 2016.  Marchese convinced Rouven that he and

13  Durham were prepared and better able to handle the case than were Nadig and Sanft.

14      As Marchese pointed out, there was an obvious conflict with Nadig representing both Rouven

15  and Alfter,[6] yet Marchese permitted Nadig to assist with the defense of Rouven.  In fact,  Nadig met

16  _____

17  [5]   NRPC Rule 4.2.  Communication With Person Represented by Counsel.  In

18  representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer

19  in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

20  [6]   NRPC Rule 1.7.  Conflict of Interest: Current Clients.

21  

22  (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

23  (1) The representation of one client will be directly adverse to another client; or

24  (2) There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client

25  or a third person or by a personal interest of the lawyer.

26  (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

27  (1) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

28  (2) The representation is not prohibited by law;

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1 │ with defense experts.

2 │      After Nadig and Sanft were relieved, given Nadig's accusations that Marchese and Durham

3 │ were not equipped to handle the case by themselves, Rouven thought it best to bring one more

4 │ lawyer onto the defense team.  Amber Craig was recommended by Marchese.  Craig is a former

5 │ Assistant United Sates Attorney.  Marchese was provided with even more funds for Craig.  The day

6 │ before calender call, on October 10, 2016, she filed petition for permission to practice though not

7 │ admitted to the bar of the court.  The notice completed by Craig and Marchese was a mess and

8 │ incomplete.  The court directed counsel to read the local rules and resubmit a proper request for

9 │ admission to practice.  As soon as they filed the corrected document, on Octber14, 2017, the

10 │ government moved to disqualify the entire defense team because Amber Craig had confidential

11 │ information about the case which she had garnered as an AUSA.  It was now mere days before trial

12 │ and Rouven was facing the disqualification of his entire defense team.  A hearing was held on

13 │ October 24, 2016, the day trial was actually scheduled to commence.  Craig was ordered off the case

14 │ in a scathing rebuke by the court.  Though Craig took Rouven's money, she apparently did nothing

15 │ on the case and has not refunded the money provided for her services.

16 │      The government seeking to recuse his entire defense team on the eve of trial was devastating

17 │ for Rouven.  An expert Marchese told him needed had  been excluded and now an attorney he had

18 │ hired at Marchese's recommendation,   had also been excluded.   And,   he was facing the

19 │ disqualification of the entire defense team; he was fraught with worry and anxiety.

20 │      Rouven had been placed in an untenable position: facing the rest of his life in prison on

21 │ heinous charges for which he had always maintained his innocence, he was caught in a tug of war

22 │ between feuding lawyers, each accusing the other of being incompetent and motivated by greed.  .

23 │ With his confidence  in Marchese eroding, in desperation Rouven reached back out to the attorney

24 │

25 │

26 │     (3) The representation does not involve the assertion of a claim by one client against

27 │     another client represented by the lawyer in the same litigation or other proceeding
   │     before a tribunal; and

28 │     (4) Each affected client gives informed consent, confirmed in writing.

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1  his trusted entertainment lawyer, Steve Pacitti, had recommended to him in the first place; Ben

2  Nadig. He convinced Rouven to put Sanft back on the case.

3      The above and foregoing is information is essential to understanding of Rouven's state of mind

4  when, mid way through trial, as the defense was about to begin, Marchese turned to him and

5  suggested he take a deal- something that had never been contemplated.

6                              **ARGUMENT**

7      Rouven should be permitted to withdraw his guilty plea because: 1) Rouven did not receive

8  effective assistance of counsel and; 2) Given the totality of the circumstances, the guilty plea was

9  coerced.

10     JAN ROUVEN FUECHTENER'S GUILTY PLEA WAS NOT KNOWING AND

11     VOLUNTARY IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED

12     STATES CONSTITUTION

13     Due process guarantees under the fifth amendment require that a defendant's guilty plea be

14  voluntary and intelligent. *Boykin v. Alabama*, 395 U.S. 238 (1969). A plea of guilty is voluntary

15  "only if it is entered by one fully aware of the direct consequences' of his plea. *Brady v. United*

16  *States*, 397 U.S. 742 (1970)

17     Because a guilty plea is a waiver of the Fifth Amendment's protection against compulsory

18  self-incrimination, the right to a jury trial and the right to confront one's accusers, *Boykin v.*

19  *Alabama,* 395 U.S. 238, (1969); *McCarthy v. United States*, 394 U.S. 459, 466 (1969), it must be

20  a knowing, intelligent act "done with sufficient awareness of the relevant circumstances and likely

21  consequences." *Brady v. United States*, 397 U.S. 742,(1970).

22     On the third day of trial, November 16, 2016, as the State was about to rest and his defense

23  was to commence, Marchese asked Rouven if he would consider a plea deal. Rouven was taken by

24  surprise since nothing unexpected had occurred during trial to cause this abrupt change in strategy.

25  It had always been his intent to proceed to trial. Marchese approached the prosecution to find out

26  if a plea was possible. The government responded that it would need overnight to contemplate the

27  request and prepare a plea agreement. The defense team told Rouven that the government would

28

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700 Facsimile: (702) 678-6767

drop the advertising charge which carried a mandatory minimum sentence of 15years. They indicated his exposure would be substantially reduced and he could receive a sentence as low as 5 years whereas he would get life if convicted. Rouven equivocated so his trusted entertainment lawyer, Steve Pacitti, who is not a criminal defense lawyer and is unfamiliar with United States Sentencing Guidelines, was enlisted to encourage Rouven to accept a deal even though no guilty plea agreement had been proffered. He spoke with Rouven int the courtroom, in the presence of the other attorneys and told him he *could* feasibly be out in 5 years.

None of his lawyers met with Rouven that evening. He was alone in his cell terrified about what was transpiring. The next morning, November 17, 2016, Rouven arrived at the court house at approximately 9:00AM. He anxiously waited 3 hours before anyone met with him. None of Rouven's  lawyers availed themselves of this opportunity to meet with their client to go over the plea in conjunction with the Guidelines. When Rouven did meet with his lawyers, it was behind a mesh screen, an hour before the trial was scheduled to resume. Durham spent approximately one half hour going over the guilty plea agreement with Rouven when the marshal indicated that they needed to go into the courtroom. In the courtroom, Durham continued to read the written plea agreement with Rouven. With the judge about to enter the court room and Nadig's warning resonating in his mind; his attorneys were unprepared, he would be convicted, Rouven felt he had not choice but to accept the guilty plea.

It was not until that evening that Rouven became aware of his Guideline exposure during a discussion with a fellow inmate[7]. The inmate also made him aware of the meaning of consecutive versus concurrent counts[8]. For the first time, Rouven became aware of the severity of the Guideline sentencing range under the plea agreement; he was alarmed and devastated. First thing in the

---

[7] The inmate's whose name will not be disclosed a this time, is willing and able to testify about his discussion with Rouven that night.

[8] Although Rouven is fluent in English is not his first language. He did not understand the difference between concurrent and consecutive counts. It was a fellow inmate who explained to him the difference. Rouven was never asked if he needed an interpreter.

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

morning he called Marchese and advised that he wanted to withdraw his ple*a*.  During a subsequent

phone conversation, Marchese reiterated to Rouven that the judge *could* give him 5 years.

**DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO ADVISE ROUVEN OF HIS EXPOSURE UNDER THE UNITED STATES SENTENCING GUIDELINES**

Ineffective assistance of counsel rendered Rouven's plea involuntary.  A defendant's claim that an attorney's advice in the plea context constituted ineffective assistance of counsel under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Hill v. Lockhart*, 474 U.S. 52, (1985).The defendant must show that his counsel fell below an objective standard of reasonableness, and must show prejudice as well. *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985). As to prejudice,  the inquiry is whether "there is a reasonable probability that, but for the counsel's errors, the petitioner would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59.

In the guilty plea agreement (GPA,)  the parties stipulated that count 1 would run consecutive to concurrent sentences imposed on counts 2 and 3. (GPA, Page 10.)  Each count carried a statutory maximum of 20 years.  Count 2 and 3 each count carried mandatory minimum sentence of 5 years.

At no time did any of the lawyers explain to Rouven his sentencing exposure under the United States Sentencing Guidelines.  Their focus had been solely on the fact that the 15 year count was being dismissed and Rouven could potentially  feasibly get 5 years,

The base offense level set forth in the plea agreement is level 40.  Rouven was not advised that the Guideline range for that base offense level is 292-365 months which is **24.3 - 30 years**.  Fair and just reason to withdraw a plea may exist where a defendant is misinformed about the basic sentence range he is facing, United States v. Toothman, 137 F.3d 1393 (9th Cir. 1998)

Taking into consideration specific offense characteristic which were never discussed with Rouven, as set forth in the Presentence Investigation Report (PSR), the adjusted base offense level is not 40, it is a considerably higher level 47.  Under the Guidelines an offense level of 43 and above is **LIFE**!  USSG Sec. 5 A (Sentencing Table) Rouven was never told that the Guideline range under the plea was **LIFE**.  The concept of specific offense characteristics and their affect on the Base

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

Offense Level and Guideline range, was not explained to Rouven.

The GPA states that the court can consider all relevant conduct.(GPA Page 8.)  The concept of relevant conduct was not explained to Rouven.  Likewise, potential applicable enhancements were not discussed.

Rouven submits it is ineffective assistance per se for counsel to advise a defendant  to accept a "deal" with a  sentencing  range of **LIFE**!  The Guidelines themselves recognize the rarity of a guideline range above 43.

> "In rare cases......, a total offense level more than 43 may result from the application of the guidelines.  A total offense level or more than 43 is to be treated as an offense level 43.  Chapter USSG Chapter 5, part A, (comment n.2.)

With two points off for acceptance of responsibility, USSG Sec 3E1.1(a) the adjusted base offense level is 45 with a requisite sentence under the Guidelines of **LIFE.**

Maximum terms of life are not even available under the charged statutes.  The Guideline range is higher than the statutory maximums.  Under the Guidelines "[w]here the statutorily authorized sentence is less than the  minimum of the applicable guideline range, the statutorily authorized sentence [is] the guideline sentence."  USSG Sec. 5G1.1(a), PSR, paragraph 107.  The maximum statutorily authorized penalties for each count is 20 years for count one; 20 years for count 2; and 20 years for count 3, for a Guideline range of 720 months or 60 years.

As stated by the United States Department of Parole and Probation in the PSR, paragraph 133:

> ***"The defendant's current guidelines, if adopted***
> ***by the court, recommend a sentence of life to 720 months; the rest of his life***."

This was the "deal" negotiated by Rouven's lawyers.

Rouven was not advised that there were grounds for the government to ask for even more time. He was not aware that there were grounds for the government to seek an upward departure based upon the number of images and length of recordings.  5K2.0 (a)(1)(B), PSR paragraph 128, and length of visual depiction, as discussed in paragraph 129 of the PSR.

The only way Rouven can avoid a life sentence under the terms of the "deal, " is if the district

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

1   court grants him a *generous,* significant downward variance.  The same thing the court could do if

2   Rouven had continued with trial and was convicted.  Although the guidelines are advisory, district

3   courts are directed to grant variances only when a case falls outside the heartland of cases.  Rita v.

4   United States, 551 U.S 338 (2007)   When the district court decides that an outside-Guidelines

5   sentence is warranted, the court must consider and explain "the extent of the deviation and ensure

6   that the justification is sufficiently compelling to support the degree of the variance." Gall v. United

7   States, 552 U.S. 38 (2007) Rouven was not advised that in order to avoid a life sentence, the district

8   court would likely have to find that his case falls outside the "heartland" of cases.  The he will never

9   see freedom unless the court grants an enormous, discouraged, downward variance, was never even

10   mentioned.  The government will undoubtably argue against any kind of  variance.  Significantly,

11   the Guidelines generally forbid downward departures in child pornography cases.  See, USSG 5K2.0

12   The possibility of a 5 year sentence, which Rouven was led to believe was feasible, is a virtual

13   impossibility.

14         In context of requests to withdraw a plea, the case of alleged erroneous or inadequate legal

15   advice, the defendant must demonstrate that proper advice "'could have at least plausibly motivated

16   a reasonable person in [the defendant's] position not to have plead guilty had he known about [the

17   erroneous advice] prior to pleading.'"*United States v. Mayweather*, 634 F.3d 498, 504 (9th Cir. 2010)

18   (quoting *United States v. Garcia,* 401 F.3d 1008, 1011-12 (9th Cir. 2005)  If Rouven had known that

19   under the terms of the "deal" he would avoid a life sentence only if the district court granted him a

20   generous, discouraged variance, he would  never accepted the plea.  He was not even aware that the

21   court could grant a downward variance even if he continued with his trial and was convicted.

22         An attorney's failure to predict accurately a defendant's sentence will not constitute a "fair and

23   just reason for requesting the withdrawal" unless the attorney "grossly mis-characterized" the

24   possible sentence and the defendant demonstrates that this "plausibly could have motivated his

25   decision to plead guilty." *United States v. Davis*, 428 F.3d 802, 808 (9th Cir. 2005); see also *United*

26   *States v. Briggs*, 623 F.3d 724, 729 (9th Cir. 2010).  Counsel's grossly mis-characterized Rouven's

27   exposure under the plea agreement. Where a defendant enters a plea of guilty upon the advice of

28

1  counsel, "the voluntariness of the plea depends on whether counsel's advice  was within the range

2  of competence demanded of attorneys in criminal cases.' " Hill v. Lockhart, 474 U.S. 52 (1985)

3  Rouven did not receive competent  assistance of counsel.

4      An attorney's performance is deficient if it is not "reasonable considering all the

5  circumstances." *Strickland*, 466 U.S. at 688.  Failure to review the USSG  with Rouven was  not

6  reasonable.

7      "A claim of ineffective assistance may be used to attack the voluntariness and hence the

8  validity of a guilty plea." *United States v. Keller*, 902 F.2d 1391, 1394 (9th Cir.1990).  To establish

9  a claim of ineffective assistance of counsel, the petitioner must show that counsel's advice was both

10  defective and prejudicial, Id.  Rouven has met his burden.  Moreover, the plea agreement speaks for

11  itself.

12      To be valid, a guilty plea must be voluntary, knowing and intelligent.  *Boykin v. Alabama*, 395

13  U.S. 238, 242 (1969).  Rouven's plea was not knowing, intelligent and voluntary and thus amounted

14  to a due process violation.  "Due process ... require[s] that a defendant's guilty plea be voluntary and

15  intelligent." Id. at 235 (citing *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274

16  (1969)).

17      A plea of guilty is voluntary "only if it is entered by one fully aware of the direct consequences'

18  of his plea." *Carter v. McCarthy* 806 F.2d at 1373 (quoting *Brady v. United States*, 397 U.S. 742,

19  755, 90 S.Ct. 1463 1472, 25 L.Ed.2d 747 (1970) Rouven was not advised of all of the direct

20  consequences of his plea.  Rouven's plea is constitutionally infirm due to ineffective assistance of

21  counsel.

22  ROUVEN'S GUILTY PLEA WAS COERCED UNDER THE TOTALITY OF

23  CIRCUMSTANCES

24      The actions of his lawyers  render Rouven's plea involuntary.  A guilty plea can be rendered

25  involuntary by the actions of defense counsel. *Iaea v. Sunn*. 800 F.2d 861, 867 (9th Cir.1986).

26  Coercion is a basis for withdrawing a plea. *United Sates v. Caro*, 997 F.2d 657 (9th Cir, 1992)

27      To determine the voluntariness of a guilty plea, we examine the totality of the circumstances.

28

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

1 | *Brady v. United States*, 397 U.S. 742, 749 Under the totality of circumstances, the plea was

2 | involuntary. The concern is not solely with the subjective state of mind of the defendant, but also

3 | with the constitutional acceptability of the external forces inducing the guilty plea. *Id.* The nature

4 | and circumstances of the guilty plea render it coercive.

5 | The dissension amongst the attorneys together with the erroneous legal advice, renders the

6 | guilty plea coerced. Further, the one lawyer with whom Rouven had an established relationship

7 | predating the Indictment and trusted implicitly, gave him legally flawed advice. Pacitti who had

8 | no familiarity or experience with the practice of federal criminal defense, was enlisted to counsel

9 | Rouven to accept the plea. Pacitti confirmed what had already been told to Rouven; that he could

10 | be out in as little as five years. He did no independent research but merely repeated what defense

11 | counsel had told him.

12 | It is axiomatic that to be voluntarily and understandingly made a plea of guilty must be solely

13 | the product of the accused's informed free will. A guilty plea is not voluntary and must be stricken

14 | if that free will is overborne by the prosecutor or by the accused's lawyer. See *Mosher v. Lavallee*,

15 | 491 F.2d 1346 (2 Cir. 1974); *Wellnitz v. Page*, 420 F.2d 935, 936 (10 Cir. 1970)

16 | The Ninth Circuit have historically applied different tests for a defendant seeking to withdraw

17 | a guilty plea based on a due process violation and a defendant seeking to withdraw a guilty plea

18 | based on ineffective assistance of counsel. See *Torrey v. Estelle*, 842 F.2d 234, 235–37 (9th

19 | Cir.1988). Rouven is seeking to withdraw his plea due to both ineffective assistance of counsel and

20 | based upon a due process violation

21 | Rouven's request should be considered liberally and in his favor. *United States v. Artabane*,

22 | 868 F. Supp. 76, 77 (M.D. Pa. 1994) (citing *United States v. Young*, 424 F.2d 1276, 1279 (3rd

23 | Cir.1970)). He has shown fair and just reason for requesting the withdrawal. Given that leave to

24 | withdraw a plea prior to the imposition of sentence should be freely granted and that he has presented

25 | more than a "plausible reason" for withdrawal, prior to the imposition of sentence, Rouven's request

26 | should be granted. See, FRCP 11, *Navarro-Flores*, 628 F.2d at 1184 (citing *Kercheval v. United*

27 | *States*, 274 U.S. 220, 224 (1927); *United States v. Erlenborn*, 438 F.2d 165, 168 (9th Cir. 1973)).

28 |

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

**CONCLUSION**

The totality of circumstances surrounding the entry of Jan Rouven's Fuechtener's guilty plea dictate that he should be permitted to withdraw the plea.  If the relief requested is not granted based upon the pleadings, an evidentiary hearing is warranted.

DATED this _____ day of June, 2017.

KAREN A. CONNOLLY, LTD.

KAREN A. CONNOLLY
6600 W. Charleston Blvd., Ste. 124
Las Vegas, NV 89146
Telephone:    (702) 678-6700

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of KAREN A. CONNOLLY, LTD., and on the

_22_ day of June, 2017, I served a true and correct copy of the above and foregoing *Motion to*

*Withdraw Guilty Plea* via the CM/ECF system upon the following:

☒    by depositing the same in the U.S. Mail, First Class Mail, with postage fully prepaid, at Las

Vegas, Nevada, addressed as follows:

Cristina D. Silva, United States Attorney
Daniel D. Hollingsworth, United States Attorney
Elham Roohani, United States Attorney
Lisa Cartier-Giroux, United States Attorney
Mark E. Woolf, United States Attorney

an Employee of KAREN A. CONNOLLY, LTD.

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

EXHIBIT "A"

From: famevegas@me.com
Subject: Bens email
Date: Wed, 21 Sep 2016 17:15:16 +0200
To: marcheselaw@msn.com


Von meinem iPad gesendet

Anfang der weitergeleiteten E-Mail:

**Von:** Ben Nadig <ben@lasvegasdefenselawfirm.com>
**Datum:** 3. September 2016 um 04:24:01 MESZ
**An:** Jan Fuechtener <famevegas@me.com>
**Kopie:** Steve Pacitti <SPacitti@gdallashorton.com>, "sanftlawgroup@mac.com"
<sanftlawgroup@mac.com>
Betreff: Jan's Matter

Frank,

I hope you are doing well, I know that Jan is in a tough spot. I want to clear some things up so you
understand where I am coming from. First, I do a significant amount of sex cases on a regular basis,
Michael does too. We have been quite successful in limiting our client's exposure in these types of
cases. One of the reasons we are so successful is that we force the government to go to trial
immediately, we do not allow them to get additional time to review the evidence and add
additional charges.

In the present case, you have heard some things that are not true. Primarily, Michael and I spent a
significant amount of time on this case. Michael and I went through the discovery and found a
number of issues that we would have destroyed at trial. ██████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████ An expert,
actually two experts were retained to develop this theory. These experts were excluded through
motion by the United States of America. One of the reasons those experts were challenged is due
to present counsel's interaction with opposing attorneys. Should you request proof it will be
provided. In both Michael and I's perspective those experts were neither needed nor
required. What is interesting is that you are not challenging present counsel's need for those
experts nor requesting a refund for said experts. However you are requesting a refund from both
Michael and myself.

I want to emphasize to you that throughout the entire process when you requested that Mr. Marchese be removed, both Michael and I stressed that you keep him on in a supporting role. Specifically, when you and I met at Blue Martini, I told you he could be advantageous in a secondary role and that you needed to emphasize that I would take the lead and he would be supportive. You never discussed that with him and when you discussed that with Mr. Marchese your dissatisfaction with Michael and I, he did not hesitate to suggest alternative counsel to both Mr. Sanft and myself.

Now, you have paid for two additional attorneys, Ms. Craig and Mr. Durham, and the trial has been set out until October. Mr. Sanft and myself were ready to go in both June and July. Due to delays by Mr. Marchese, the first for an expert who Mr. Marchese said ▨▨▨▨▨▨▨▨▨▨▨▨▨and is now excluded from testifying and a second because the United States dropped a significant amount of additional discovery on Mr. Marchese (which both myself and Mr. Sanft advised Mr. Marchese would happen) who was not prepared for that additional discovery, Jan's trial is now set for October. This date flies in the face of what Michael and I advised and has SIGNIFICANTLY PREJUDICED Jan.

This is what is going to happen in October, Mr. Marchese is going to suggest that ▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ The United States Government, having already prepared for that defense, is going to provide irrefutable proof as to how that is impossible and Jan is going to be found guilty.

One of the reasons I represented you is that you ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ That is one of literally a number of defenses that I could raise that would lead to Jan being found not guilty, However, it appears present counsel wanted to get his friends paid rather than raising an adequate defense.

Michael and I have spent hundreds of hours raising a PLAUSIBLE defense and we were ready to do so, unfortunately an individual who we protected and covered for went out of his way to discredit us because this fee is a big deal to him. He told you that we weren't prepared and that these other individuals who you would pay EXTRA money to would help him out. For those reasons, rather than talking to us, you terminated our relationship and went with the apparently desperate individual who incurred more costs.

Ask yourself this Frank. who caused you to pay more money; the individuals who have done these cases and have gotten NOT GUILTY results on these types of charges in federal court or the individual who has had you pay for more than one "expert" who is not admissible at trial and for his friends to get hired so that he can direct the show. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨ It will appear that somebody wanted to get his friends paid.

Yes Michael and I didn't see Jan as much as he would like, I saw him four times, Michael saw him more. I didn't see him because I didn't need to listen to his nonsense, i'm his attorney not his psychotherapist and the same goes for Michael. Present counsel saw him more because he felt that the fee justified the contact, we didn't. My time was more valuable focusing on the facts of the case, not justifying my fee as I ran my restaurant. Michael's was too. If you ever want to question us on who had a greater command of the case or who would be more effective in front of a jury please do so, because I know the answer. And if you want Jan to be in the best possible position going forward, please contact me at your earliest possible convenience. But if you want to fee dispute us I can justify every hour that would justify the fee and Michael can too. ▨▨▨▨▨▨▨▨

██████████ knew about the hard drives ████████████ and ask him who met with the "experts" he wanted to retain that were excluded by the Government and ask him who has actually been out to the property to understand what occurred. I know the defense you will get and I know the defense you actually deserve so I welcome the questions.

Thank you for you time,
Ben

As an addendum, I know certain thing were represented to you about Michael and I's preparation. Please call me and grill both of us about our preparation and you will find that representations made by present counsel border on defamatory. As to a refund, I believe that our billing will show that we exceeded the retainer and I will challenge anything that suggests otherwise.

I am genuinely disappointed in where we are because Michael and I were excited and motivated to try this case, this is where we succeed. We never disparaged co counsel and we never caused additional expense. Now you have exponentially increased your expense and I can tell you exactly how the defense will go, how the government will counter and how Jan will be found guilty. And there is nothing I can do based on current circumstance., so I am sorry Frank, I wished better for both you and Jan

EXHIBIT "B"

*JESS R. MARCHESE, ESQ.*

November 30, 2016

VIA US MAIL

████████████████

███████████████

To Whom it May Concern:

████████████████ and what I would couch as unethical conduct in reference to his alleged representation of Mr. Jan Rouven Fuechtener and/or his husband Frank Alfter.  I use the term alleged because I am still to this day unsure exactly of whom he actually represented.

████████████████████████████████████

████████████████████████████████████, I am personally unaware of any work done on behalf of Jan by Mr. Nadig other than one meeting with the case experts because I was out of town.

At a fundraiser in I believe July, I became extremely concerned about Mr. Nadig's motivations on the case.  At that function, he joked that "he was getting paid $100,000 to do nothing."███

Other than one phone conversation, I did not hear anything from Mr. Nadig until co-counsel (Benjamin Durham) and I visited Jan on September 10, 2016.  The day before, Mr. Nadig visited Jan unsolicited at the Henderson Detention Center trying to get back on the case. He did not ask for either attorney's permission to have this meeting.  This visit was in response to Mr. Alfter asking for his money back in an email.  At that meeting, Mr. Nadig scared the client by making untrue representations about counsel and the client's chances of winning the case.  As a result, the client became very emotional which caused counsel to waste their time diffusing the situation.

Prior to this visit, Mr. Nadig sent a response to the aforementioned email asking for reimbursement on September 3, 2016 (see Exhibit A).  The greater majority of this email is lie.

Mr. Nadig claims that a significant amount of time was spent on the case by him. I obviously do not follow him around to see what he is doing all day, but I can say that he did not file a notice of appearance, file one motion, suggest any motion be filed, suggest any exhibits, suggest any witnesses, draft any subpoena requests, find any experts, direct any experts, get the investigator, direct the investigator, and I highly doubt he even read the discovery. I cannot remember one useful suggestion that he had on the case. I can safely say that without doing any of the above items that it is a near impossibility that he spent the hundreds of hours on this case that he claims to have spent.

Mr. Nadig also claims that he wanted to go to trial in June. This is both laughable and a lie. I have no idea how he could have gone to trial in June as he never filed a notice of appearance

Further, if he was going to assist at trial, he never discussed his role, any exhibits, voir dire, witness lists, etc.

Mr. Nadig also lied to Mr. Alfter in that he claimed that two experts were retained, noticed, and excluded from testifying at trial because of my interaction with opposing attorneys.

Mr. Nadig is also incorrect when he claims that the client was significantly prejudiced due to the continuances.

Lastly, Mr. Nadig claims that his trial strategy is to not read the discovery and rush to trial. That absurd statement speaks for itself-especially considering that the client was literally facing life in prison.

Mr. Nadig also claims that he and Mr. Sanft "have gotten not guilty results on these types of charges in federal court." This is another lie. The case to that he is referring to resulted in his client getting sentenced to 168 months in federal prison. (See Exhibit 3)

Mr. Nadig also lies when he says that the reason "I got my friends hired" was so that I could "direct the show." First of all, I make no decisions as to the representation. As I told the client countless times, I worked for him and I must do what he tells me as long as it does not violate laws or ethical rules. It was the *client's* desire to bring on alternate counsel, not mine because he saw Mr. Nadig's apathetic attitude towards the case (see Mr. Nadig's email describing the client's input as "nonsense"). Of course, I gave input on co-counsel, but the final decision was solely his to make. Next, Mr. Nadig took zero interest in the case and was representing Mr. Alfter, █████████████████████████████████████████████████████████████████████

When Mr. Nadig's email came to my attention, I asked him for a copy of the file per the client's request. Since Mr. Nadig represented that he had spent hundreds of hours of work on the file and basically guaranteed successful results, Jan and I thought there would have been some excellent things to use for his defense at trial. Mr. Nadig refused to forward a copy of his file to me after asking him twice. ████████████

Although this is not in Mr. Nadig's email, Mr. Nadig also represented that had he been the attorney at the detention hearings that he would've had the client released. There is no plausible way that he could've predicted that outcome-just another example of his unethical practices.

████████ Mr. Nadig is, ██████████████████████████████████████ He preyed upon vulnerable people at a difficult time in their lives by lying to them for the sole reason of not giving them a refund for the services he never provided. He visited Jan unsolicited in violation of ethical rules ███████████████████████ talking Jan "off the ledge" based upon his egregious misrepresentations. He failed to forward a copy of Jan's file when asked on two occasions. He lied about his track record and basically everything █████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

Sincerely,

Jess R. Marchese, Esq.