STEVEN W. MYHRE
Acting United States Attorney
Nevada Bar #9635
ELHAM ROOHANI
Nevada Bar #12080
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
elham.roohani@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 2:16-cr-00100-GMN-PAL |
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA (ECF No. 194) |
| vs. | |
| JAN ROUVEN FUECHTENER, | |
| Defendant. | |

The United States of America, through the undersigned, responds to the Defendant's Motion to Withdraw Guilty Plea.  ECF No. 194.  For the reasons set forth below, the Government respectfully requests that this Honorable Court deny the motion.

## STATEMENT OF RELEVANT FACTS

On March 14, 2016, the Defendant was charged by way of criminal complaint of child pornography offenses.  ECF No. 1.  At the detention hearing, the Defendant's privately retained attorney, Jess Marchese, fiercely advocated for the Defendant's release pending trial.  ECF No. 4, 5.  After the Defendant was ordered detained, Mr. Marchese filed a detention appeal on behalf of his client. ECF No. 8.  At the hearing on

1

the detention appeal, Mr. Marchese and a second privately retained attorney, Michael Sanft, zealously advocated for the Defendant's release.  ECF No. 24. From that time, until the time of trial, the Defendant's privately retained attorneys filed numerous motions, responses, and replies.  ECF Nos. 27, 33, 36, 38, 42, 45, 56, 62, 64, 66, 70, 74, 79, 84, 91, 92, 103, 107, 111, 128, 136. At trial, Mr. Marchese, Mr. Sanft, and another retained attorney, Benjamin Durham, all cross-examined government witnesses, made appropriate objections, and made oral motions.  Then, after trial, his retained attorneys continued to file motions on his behalf.  ECF Nos. 149, 156.

## A. Canvas about ability to read, write, and understand English

Before trial, the Defendant sought to waive his right to a jury trial.  ECF No. 79. At the Government's insistence, the Defendant was canvassed prior to calendar call, and the hearing was continued to give the Defendant more time to speak with his attorneys.  ECF Nos. 85, 95. During both of the hearings, the Court specifically canvassed the Defendant about his English proficiency.[1]  *Id.*  During both of those hearings, the Defendant personally represented that he was fluent in spoken and written English.[2] *Id.* As the Defendant represented that he was fluent in spoken and written English, and the Court observed the Defendant's ability to understand English, there was no need for the Court to ask the Defendant if he needed an interpreter.

---

[1] The Defendant's insinuation that he did not understand English and needed an interpreter is false and belied by the record.  ECF No. 194, at 7 n.8. As the Court is aware, the Defendant had been canvassed about his English language proficiency at other hearings, including the hearing on the waiver of jury trial.

[2] The Court heard the credible testimony of Special Agents Gary McCamey and Mari Panovich, both of who testified that the Defendant expressed to them that he was fluent in the English language.  ECF Nos. 140, 141. Furthermore, the Court personally witnessed the Defendant assisting in his own defense in English during the course of trial.

B. **The Government's Case in Chief**

The Government had presented its case-in-chief beginning on November 14 and continuing through to November 16. ECF Nos. 138, 140, 141. Throughout the trial, Mr. Marchese, Mr. Durham, and Mr. Sanft all forcefully cross-examined the Government's witnesses and gave the Defendant a more than adequate constitutional defense. Mr. Marchese, Mr. Durham, and Mr. Sanft also performed admirably considering the Defendant's own behavior. During the course of the trial, the Defendant was visibly jubilant and jovial, which was inappropriate considering the nature and gravity of the charges he was facing. As may have been observed by the Court, court staff, Government counsel, the agents present in the courtroom, and the Defendant's own attorneys who had to admonish him on numerous occasions, the Defendant was far from the anxiety ridden individual he now portrays himself to be.[3]

C. **Plea Agreement**

On the afternoon of November 16, in the middle of Special Agent Mari Panovich's testimony, the Defendant's three privately retained attorneys approached the Government about the possibility of a plea agreement that would allow the Defendant to: (1) avoid the 15-year mandatory minimum sentence for advertising of

---

[3] In fact, when the Defendant became overly animated and outspoken about the Government's German translator testifying, Mr. Sanft told the Defendant to "let me do my job." At another point when the Defendant was inappropriately making grandiose arm motions and facial expressions at Special Agent Panovich during the testimony of another witness, Mr. Marchese had to tell the Defendant to stop his antics. The Defendant's response was to make a "sad face" at Special Agent Panovich. Through the entire trial, Mr. Durham and Mr. Sanft who flanked the Defendant had to repeatedly admonish him to act appropriately. Instead, the Defendant used breaks to hold court for his admirers in the courtroom, joke with his fans in the gallery, and make contextually inappropriate remarks about the evidence to Government counsel and court staff.

child pornography, (2) avoid a sentencing guideline application of a lifetime sentence, and (3) allow the Defendant to argue for the 5-year mandatory minimum sentence. The basic terms of the agreement were reached that day and the plea agreement was committed to writing and sent to defense counsel at 9:48 a.m. on November 17, 2016.[4] On November 17, 2016, after 3 days of trial and when the Government was in the middle of presenting its final witness, the Defendant Jan Rouven Fuechtener pled guilty pursuant to a plea agreement with the Government.  ECF No. 146.

Prior to the Court accepting the Defendant's change of plea, Special Agents from the FBI were present in the Courtroom and observed the Defendant discussing the plea agreement with his attorneys.  The two Government attorneys also observed the Defendant discussing his plea agreement with his attorneys. In fact, court staff asked if the Defendant was ready for the district judge to enter the courtroom, and because the Defendant was not done discussing the plea agreement with his attorneys, the hearing was delayed.  During the delay, at the Defendant's direction, Mr. Marchese and Mr. Sanft inquired from Government counsel about negotiating more favorable terms.

---

[4] The Court cannot rely on the Defendant's recollections of what happened the day of the change of plea. The Defendant represents that he arrived at the courthouse at 9:00 a.m., "anxiously waited 3 hours before anyone met with him," met with his attorneys behind a mesh screen an hour before trial was set to resume, reviewed the plea agreement for half an hour, and spent additional time reviewing the plea agreement in the courtroom. ECF No. 194.

The Defendant's timeline makes no sense. Trial was set to resume at 12:00 p.m. ECF No. 141. The change of plea hearing began at 12:31 p.m. ECF No. 142, 166. Thus, if the Defendant arrived to the Courthouse at 9:00 a.m. and waited three-hours as he says, it was noon before his attorneys met with him. But, if his attorneys also met with him an hour before trial was set to begin at 12:00 p.m. as he says, then his attorneys also met with him at 11:00 a.m. This then throws off the amount of time he says his attorneys spent reviewing the agreement with him. Assuming the Defendant's assertions are true, his attorneys have bent the space-time continuum.

However, the Government responded that the offer was the only, final, and best offer. Otherwise, the Government was prepared to continue the trial as the Government had nearly completed its case-in-chief. Then, the Defendant's attorneys continued to discuss the agreement with him further, until he indicated that he was ready to plead guilty.

As part of the signed plea agreement, the Defendant admitted and declared under the penalty of perjury that the facts set forth in the plea agreement were true and correct, and that the facts as set forth in the Plea Agreement would be admissible against him for any purpose. ECF No. 146, at 4, 6. During its case-in-chief that was nearly complete at the time of the change of plea, the Government introduced evidence to support each of the facts as set forth in the plea agreement. Those facts include the background of the investigation, as well as facts to support the stipulated base offense level, specific offense characteristics, and enhancements. *Id.* at 7.

The plea agreement also set forth that the parties would jointly recommend that the Court run the sentences imposed on Count 2 and 3 consecutively to the sentence imposed on Count 1 to achieve a sentence within the applicable sentencing guideline range as determined by the parties. The Defendant acknowledged that the lowest possible sentence he could receive under the statutory mandatory minimum would be five-years. The Defendant also understood that, if the Court followed the recommendation of the parties, he could be sentenced under the stipulated Sentencing Guideline range associated with an adjusted offense level of 40. Thus, if the Court followed the recommendation of the parties, the Defendant could seek a sentence of 60 months and the United States could seek a sentence as high as 365 months, assuming

a criminal history category I.[5] By way of the plea agreement, the Government was giving up the right to seek a lifetime term of imprisonment and the 15-year mandatory minimum sentence on Count 4, notwithstanding the fact that the Government had already produced evidence in the trial to support the guideline range and conviction.

### D. Plea Colloquy

During the lengthy, 45-minute plea colloquy, the Court found that the Defendant "[was] fully competent and capable of entering an informed plea, that his plea of guilty [was] knowing and voluntary, supported by an independent basis in fact containing the essential elements of the offenses charged. . . " ECF No. 166, at 38. Several points about the hearing bear mentioning:

- The Defendant swore to tell the truth under the penalty of perjury. *Id.* at 4.
- The Defendant answered "yes," when asked if he reads, writes, and understands the English language. *Id.* at 5.
- The Defendant answered "okay," when told by the Court that if he did not understand any question, the Court would repeat or clarify the question. *Id.* at 9. The Defendant was also encouraged to speak with his attorneys if he did not understand any of the questions. *Id.*
- The Government represented that the parties would jointly recommend that the Court run the sentences imposed on Count 2 and 3 to run concurrently to each other; and that the sentence for Count 1 shall run consecutive to the

---

[5] If the Court abides by the recommendation of the parties, the sentencing range is 5 to ~30 years. The low-end 5 years contemplates the 5-year mandatory minimum sentences on receipt/distribution to run concurrently with one another and for the Court to impose no custodial term on the possession count. The high-end ~30-years contemplates the 20-year statutory maximum on receipt/distribution to run concurrently with one another and to run consecutively to a 10-year sentence on possession. The plea agreement was designed specifically to make it possible for the Defendant to seek a 5-year custodial sentence and to create an upper limit on what the Government could seek.

concurrent sentence imposed on Counts 2 and 3. *Id.* at 15.

- The Government represented that the Government would seek a sentence within the applicable sentencing guideline range as determined by the parties unless the defendant committed an act that would result in the loss of the downward adjustment for acceptance of responsibility. *Id.*

- The Court clarified that the Government will be asking for a guideline range sentence, but the Defendant can ask for a downward adjustment through a departure or a variance. *Id.* at 19.

- The Court further clarified that the only joint agreement is that Counts 2 and 3 will be concurrent and that Count 1 will be consecutive to Counts 2 and 3. *Id.*

- The Defendant answered "no," when asked if he had any questions of the Court about anything discussed. *Id.* at 29.

- After hearing Government counsel's recitation of the terms of the plea agreement, the Defendant answered "yes," when asked if he understood the terms. *Id.* at 20.

- The Defendant answered "yes," when asked if he understood that he did not have to enter a guilty plea. *Id.*

- The Defendant answered "yes," when asked if he had sufficient time to review the plea agreement with his attorneys. *Id.* at 5.

- The Defendant answered "yes," when asked if his attorneys answered all his questions. *Id.*

- The Defendant answered "yes," when asked if he was satisfied with the legal representation they provided to him. *Id.*

- The Defendant answered "yes," when asked if he had sufficient time to discuss his plea with his attorneys. *Id.* at 20.

- The Defendant answered "yes," when asked if his attorneys had answered all of his questions about the plea agreement. *Id.*

- The Defendant answered "yes," when asked if he was satisfied with the legal representation his attorneys provided to him. *Id.*

7

- The Defendant answered "yes," when asked if he had sufficient time to talk to his attorneys about how the guidelines applied to the facts of his case. *Id.* at 25.
- The Defendant answered "yes," when asked if his attorneys answered all his questions about the guidelines. *Id.*
- The Defendant answered "yes," when asked if he understood that the Court could impose a sentence more or less severe than the guideline range. *Id.* at 26.
- The Defendant conferred with counsel on three occasions. *Id.* at 22, 35, 36.
- The Defendant answered "no," when asked if anyone made any threats or promises to force him to plead guilty. *Id.* at 30.
- The Defendant answered "no," when asked if anyone told him that if he did not plead guilty, some other negative or adverse action would be taken against him. *Id.*
- The Defendant answered "no," when asked if anyone made any promises to him about what his sentence would be. *Id.*

Far from the characterization of the Defendant in the motion, the Defendant did not go softly into the night. The Defendant quibbled with virtually every fact in the plea agreement. *Id.* at 32-35. And then, the Government gave the Defendant a way to finish allocuting without undermining the whole plea agreement. *Id.* at 35. The Defendant conferred with his attorneys and then knowingly and voluntarily decided to proceed with his plea. *Id.* But even then, the Defendant continued disputing facts relating to the stipulated offense characteristics, not the elements of the offenses. *Id.* at 36. The Court accepted the Defendant's plea. *Id.* at 38.

8

Seven months later[6] – only one month after retaining new counsel – and on the eve of sentencing, the Defendant filed the instant motion seeking to withdraw his guilty plea arguing that (1) his attorneys failed to advise him as to the sentencing consequences of his plea rendering it unknowing and involuntary and (2) that the totality of attenuating circumstances rendered his plea coerced.

**E.   <u>Motion to Waive Privilege</u>**

To intelligently respond to the instant motion considering the assertions of ineffective assistance of counsel, the Government sought and obtained an order deeming that the Defendant waived the attorney-client privilege between himself Jess Marchese, Esq., Benjamin Durham, Esq., and Michael Sanft, Esq., as to any and all conversations specifically regarding the plea agreement. ECF No. 206.

On Friday, July 28, 2017, the undersigned spoke with Mr. Marchese, Mr. Durham, and Mr. Sanft, separately. Present with the undersigned was Special Agent Mari Panovich. Each have submitted sworn affidavits/declarations recounting the substance of those conversations.  *See* Ex. A (Affidavit of Jess Marchese), B (Affidavit of Benjamin Durham), and C (Declaration of Michael Sanft). Contrary to the Defendant's *unsworn* assertions in his motion, his attorneys *swear under the penalty of perjury* that they each informed him of the low and high-end ranges under the terms of the plea

---

[6] The Court may consider "a defendant's delay in moving to withdraw a plea as a barometer of the defendant's candor with the court about his reasons for withdrawal." *United States v. Garcia*, 401 F.3d 1008, 1013 (9th Cir. 2005). The Government submits that the Defendant's statement that he wanted to withdraw his plea the following morning, ECF No. 194, at 8, should be looked upon with great skepticism considering that his formal request was made seven months later, and he did not discharge his retained attorney for six months after the attorneys refused to file the request.

9

agreement. *Id.* All confirmed that the Defendant is fluent in English and had no issues understanding them when speaking about the plea agreement. *Id.* Mr. Durham personally explained the difference between concurrent and consecutive terms. *See* Ex. B. In short, each of the Defendant's *unsworn* arguments are in direct contradiction of the three independent *sworn* statements of his formerly retained attorneys.

## DISCUSSION

A criminal defendant has no right to withdraw a guilty plea. *United States v. Rubalcaba*, 811 F.2d 491, 493 (9th Cir. 1987). However, a district court may permit withdrawal of a guilty plea prior to sentencing upon a showing by the defendant of any "fair and just reason," a standard that is liberally applied. Fed. R. Crim. Proc. 11(d)(2); *United States v. Ortega-Asciano*, 376 F.3d 879, 883 (9th Cir. 2004); *United States v. Nagra*, 147 F.3d 875, 880 (9th Cir. 1998). "Fair and just reasons for withdrawal include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Ortega-Asciano*, 376 F.3d at 883. "The defendant has the burden of demonstrating the existence of at least one of these conditions." *United States v. Showalter*, 569 F.3d 1150, 1154 (9th Cir. 2009).

The Defendant does not rely on any of the recognized bases for withdrawal of his plea. *See Ortega-Asciano*, 376 F.3d at 883. Instead, he attempts to argue that his plea was given through fear and coercion or otherwise unfairly obtained. *See Rubalcaba*, 811 F.2d at 493.

**1. The Defendant's sworn statements during the plea colloquy undermine each of his unsworn arguments.**

1
2
3
4
5
6
7

"Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea." *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008). Thus, the Court need not grant any request to withdraw when the reasons given contradict statements made during the plea colloquy. *United States v. Castello*, 724 F.2d 814, 815 (9th Cir. 1984). This allows the court to deny a request to withdraw when the defendant has simply changed his mind. *Garcia*, 909 F.2d at 1348.

8
9
10
11

This is a case where the defendant has simply changed his mind.  In dissecting the Defendant's motion, he makes several claims, all of which were squarely addressed and contradict statements made during the plea colloquy. The Government addresses each in turn.

12
13
14
15
16
17
18
19

The Defendant alleges some level of disagreement between Mr. Marchese and Benjamin Nadig, an attorney who has never been an attorney of record in this case. The Defendant claims that alleged disagreements caused him to feel that his attorneys of record were "unprepared." ECF No. 194, at 7. Not only is this belied by the defense presented at trial but, at the plea colloquy, the Defendant answered "yes," when asked if he was satisfied with the legal representation his attorneys provided to him. ECF No. 166, at 20. By the Defendant's own admission, Mr. Nadig was retained to represent the Defendant's husband, Frank Alfter, should the need arise. ECF No. 194, at 2. Likewise,

20
21
22
23
24

Mr. Nadig sent the attached email to Mr. Alfter. *Id.* at Ex. A.[7]  In any event, the Defendant knew that Mr. Nadig had not made an appearance since the inception of this case. He knew about these alleged disagreements and their effect before answering the Court's question. His current *unsworn* arguments are in direct contradiction of his *sworn* statements made during the plea colloquy.

The Defendant insinuates that he was not given enough time to review the plea agreement with his attorneys because he had to meet with his lawyers behind a mesh screen for some period of time; and he spent one half hour reviewing the guilty plea with Mr. Durham in the courtroom.[8] ECF No. 194, at 7. But, during the plea colloquy, the Defendant answered "yes," when asked if his attorneys had answered all of his questions about the plea agreement. ECF No. 166, at 20. Further, the Defendant answered "yes," when asked if he had sufficient time to talk to his attorneys about how the guidelines applied to the facts of his case. *Id.* at 25. Of course, the Defendant's timeline conflicts[9] with independent accounts of how long he conferred with counsel,

---

[7] Any discussion of Mr. Nadig, Ms. Craig, Mr. Alfter, Steve Pacitti, alleged conflicts issues, or fee disputes are entirely irrelevant to the Court's analysis. These matters are appropriately the subject of State Bar Complaints. Importantly, all these issues were fully within the Defendant's knowledge months before trial and his change of plea, and are contradicted by his statements during the plea colloquy.

[8] The Defendant also states that none of his lawyers met with him the afternoon of November 16 or the morning of November 17. ECF No. 194, at 7.  This is false as recounted by Mr. Marchese who indicates that he spoke with the Defendant at length about the verbal offer the afternoon of November 16; *see* Ex. A, and both Mr. Marchese and Mr. Durham who independently indicate that they met with the Defendant in the U.S. Marshal lockup the morning of November 17. *See* Exs. A and B. It is of no consequence that his attorneys did not meet with the Defendant at the Nevada Southern Detention Facility the evening of November 16 because his attorneys did not have the formal offer from the Government, and had discussed the basic terms with the Defendant during the course of the afternoon. Further, it is equally unimportant that his attorneys did not meet with him at the Nevada Southern Detention Facility the evening of November 17 because the Defendant had already pled guilty.

[9] As discussed *supra* in footnote 4, the timeline is also internally inconsistent.

12

which was witnessed by Special Agents from the FBI present in the courtroom, the Government attorneys, court staff, and his attorneys. Most importantly, the Defendant was asked if he needed additional time by court staff *and was given that time,* which is precisely why his change of plea began 30 minutes after it was originally scheduled. Only when the *Defendant* indicated that he was ready did the hearing proceed, and the Defendant confirmed under penalty of perjury that he had sufficient time to discuss the plea with his attorneys. His unsworn allegations now directly contradict sworn statements made during the plea colloquy.

The Defendant posits, albeit in a footnote, that he did not understand the difference between concurrent and consecutive counts.[10]  ECF No. 194, at 7 n.8. However, at the plea colloquy, the Defendant answered "yes," when asked if he reads, writes, and understands the English language. ECF No. 166, at 5. The Defendant answered "okay," when told by the Court that if he did not understand any question, the Court would repeat or clarify the question. *Id.* at 9. The Defendant was also encouraged to speak with his attorneys if he did not understand any of the questions. *Id.* The Government represented that the parties would jointly recommend that the Court run the sentences imposed on Count 2 and 3 to run concurrently to each other;

---

[10] The Defendant allegedly received some legal advice from an unidentified jailhouse lawyer. ECF No. 194, at 7 n.7. Aside from the fact that the advice was not trained legal advice, it is also irrelevant. After-the-fact conversations with non-lawyers are irrelevant to whether the Defendant's plea was knowing, voluntary, and intelligent and whether the Defendant received effective assistance of counsel before pleading guilty. Moreover, as Mr. Durham swears in his affidavit, he personally explained the difference between consecutive and concurrent sentences, and their relevance to the plea agreement. *See* Ex. B. Indeed, the parties specifically designed the plea agreement to run certain counts concurrent and consecutive and much care was taken to have the math add up to allow the Defendant the ability to seek a 60-month custodial term and the Government to seek up to 365 months.

13

and that the sentence for Count 1 shall run consecutive to the concurrent sentence imposed on Counts 2 and 3. *Id.* at 15. The Court further clarified that the only joint agreement is that Counts 2 and 3 will be concurrent and that Count 1 will be consecutive to Counts 2 and 3. *Id.* at 19. After hearing Government counsel's recitation of the terms of the plea agreement, the Defendant answered "yes," when asked if he understood the terms. *Id.* at 20. The Defendant answered "no," when asked if he had any questions of the Court about anything discussed. *Id.* at 29. The Defendant cannot have it both ways. His current unsworn arguments directly contradict his sworn statements to the Court that he understood the English language and that he had no questions about anything discussed.

The Defendant alleges that he was unaware of his sentencing exposure during the plea colloquy because his attorneys never discussed the severity of the sentencing range with him. ECF No. 194, at 7. But, after hearing Government counsel's recitation of the terms of the plea agreement, the Defendant answered "yes," when asked if he understood the terms. ECF No. 166, at 20. The Defendant answered "no," when asked if he had any questions of the Court about anything discussed. *Id.* at 29. The Defendant answered "yes," when asked if his attorneys answered all his questions about the guidelines. *Id.* at 25. The Defendant answered "yes," when asked if he understood that the Court could impose a sentence more or less severe than the guideline range. *Id.* at 26. While the Court did not, and could not have, specifically told the Defendant the possible number of months he was facing, both the Government and the Court told the Defendant the minimum and maximum statutory penalties. *Id.* at 14-15, 23-24. The Defendant's sworn answers to the Court's questions directly

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

undermine and contradict his current unsworn arguments.

The Defendant claims that he "felt he had not [sic] choice but to accept the guilty plea," because of the alleged "warning" from Mr. Nadig "resonating in his mind."[11] ECF No. 194, at 7. The Defendant additionally asserts that his "trusted entertainment attorney" "encouraged [him] to accept a deal."[12] ECF No. 194, at 7. However, the statements at the colloquy contradict these claims. Specifically, the Defendant answered "no," when asked if anyone made any threats or promises to force him to plead guilty. *Id.* at 30. The Defendant answered "no," when asked if anyone told him that if he did not plead guilty, some other negative or adverse action would be taken against him. *Id.* at 30. The Defendant answered "no," when asked if anyone made any promises to him about what his sentence would be. *Id.* at 30. The overarching and glaring problem with the Defendant's argument is that the alleged warning and advice were given by third parties *who have never been associated with this case.*[13] Moreover, the Defendant's own sworn statements during the colloquy directly contradict his

17

18

19

20

21

22

23

24

---

[11] When closely read, the "warning" was not a warning at all. *See* ECF No. 194, at 17. At best, Mr. Nadig and Mr. Marchese had a difference of opinion about defense strategy. And, this is not surprising considering that Mr. Nadig represented Mr. Alfter who had adverse interests to the Defendant, as an unindicted co-conspirator. However, the majority of the email reads as a response regarding a fee dispute, which is not a basis for a Defendant to withdraw his plea. In any event, the Defendant did not express a single moment's concern to his attorneys about Mr. Nadig's alleged warning but saw fit to ask all three attorneys about how the plea agreement would affect his image, and how he would be perceived by his fans and the media.

[12] As indicated by Mr. Marchese, Mr. Durham, and Mr. Sanft, at most, Mr. Pacitti was present as a friend to the Defendant and was not acting as the Defendant's attorney and was not being paid for any services.

[13] It is axiomatic that assistance of counsel relates to counsel of record on the relevant case at the time of the rendering of the advice. To hold otherwise would allow advice of jailhouse lawyers and any lawyer unfamiliar with the case giving passing advice to be included within the ineffective assistance of counsel framework. This would create an entirely unworkable rule.

current unsworn assertions.

The Defendant chose his counsel, and in effect chose his defense. If he did not like the defense his attorneys were planning, or had concerns about their ability, he could have discharged those attorneys.   *United States v. Brown*, 785 F.3d 1337, 1348 (9th Cir. 2015) (explaining that a criminal defendant has the right to fire his retained lawyer for any reason or for no reason at all.) He did not. He knowingly and voluntarily proceeded to trial, and then when the government was almost finished presenting its case-in-chief, chose to plead guilty. He cannot withdraw his plea by maligning his retained attorneys simply because he has changed his mind after reviewing the Pre-Sentence Report.

### 2.  The Defendant's plea was knowing and voluntary.

When the record reflects the defendant's plea was knowing and voluntary, and made with full understanding that the court was not bound by any sentencing agreement, the district court does not abuse its discretion in refusing to allow withdrawal of the plea. *United States v. Garcia*, 909 F.2d 1346, 1349 (9th Cir. 1990).

The Defendant argues that his plea was not knowing and voluntary because he did not understand his "Guideline exposure," or "the meaning of consecutive versus concurrent counts." ECF No. 194, at 7.  As addressed above, these arguments are directly contradicted by the Defendant's own statements during the plea colloquy, which shows that his plea was knowing and voluntary. Moreover, the Defendant was directly told that the Court was not bound by any sentencing agreement.  ECF No. 166, at 26. Further, the Defendant answered "yes," when asked if he understood that the Court could impose a sentence more or less severe than the guideline range. *Id.* at 26. Accordingly, pursuant

to *Garcia*, because the Defendant was told that the Court was not bound by any sentencing agreement, the Defendant should not be allowed to withdraw his guilty plea.

But more importantly, the three *sworn* affidavits/declarations that independently corroborate one another show definitively that the Defendant's *unsworn* arguments are utterly false and nothing more than a bad faith attempt to withdraw a completely knowing and voluntary plea. All three of his attorneys correctly explained the Guideline exposure under the plea agreement. Mr. Durham personally explained the difference between the meaning of consecutive versus concurrent. For these reasons, the Defendant should not be allowed to withdraw his guilty plea.

**3.  The Defendant was afforded a constitutionally adequate defense.**

The Defendant cites *United States v. Toothman* for the proposition that a "fair and just reason to withdraw the plea may exist where a defendant is misinformed about the basic sentence range he is facing." ECF No. 194, at 8.

*Toothman* is readily distinguishable from this case. In *Toothman*, the defendant was "told one thing about the Guidelines during the Rule 11 colloquy, and experience[d] another." *United States v. Toothman*, 137 F.3d 1393, 1400 (9th Cir. 1998).  Specifically, because "there was no agreement as to the appropriate application of the Guidelines," the Court advised the Defendant during the colloquy that his sentencing exposure was 10 to 16 months, but the Presentence Report calculated a guideline range of 168 to 210 months based on a different guideline provision. *Id.* at 1398, 1400. But unlike *Toothman*, the plea agreement and the PSR both calculate virtually the same guidelines. Unlike *Toothman*, there is an agreement as to the appropriate application of the Guidelines, and that agreement largely corresponds with the guideline range in the PSR. *Toothman*

17

1   has no application to this case.

2       The Defendant also cites *Davis* arguing that, because his attorney "grossly

3   mischaracterized" his possible sentence, he should be allowed to withdraw his plea. "A

4   defendant may demonstrate a fair and just reason for plea withdrawal by showing that

5   his counsel's gross mischaracterization plausibly could have motivated his decision to

6   plead guilty." *United States v. Davis*, 428 F.3d 802, 808 (9th Cir. 2005). In making this

7   argument, the Defendant claims that the "erroneous" advice from his attorneys

8   destroyed the voluntariness of his plea.

9       *Davis* relied on the rule originally espoused in *Garcia*. *United States v. Davis*, 428

10  F.3d 802, 808 (9th Cir. 2005) (citing *Garcia*, 401 F.3d at 1011-12). *Garcia* in turn held

11  that if the Defendant's "only asserted 'fair and just reason' for withdrawing the plea is

12  lack of voluntariness itself," then "the fact that a plea was voluntary, knowing, and

13  intelligent" can count against the defendant's attempt to withdraw the plea. *Garcia*, 401

14  F.3d at 1012.

15      The Defendant's reliance on *Davis*, and implicitly *Garcia*, fails for two reasons.

16  First, this case specifically fits into the exception identified by the *Garcia* court – the

17  Defendant's "fair and just reason" for withdrawal is lack of voluntariness. ECF No. 194,

18  at 11 ("voluntariness of the plea depends on counsel's advice. . ."; "ineffective assistance

19  may be used to attack the voluntariness. . ."). Second, although it is abundantly apparent

20  that there was no failure in the advice of counsel, any supposed failure in the advice of

21  counsel was entirely negated by the thorough canvassing of the Court. The Court

22  explained the offenses, identified for the Defendant each offense's elements, and

23  informed him of the maximum possible sentences. The Court asked numerous questions,

24

18

and followed up to those questions with more questions to assure itself that the Defendant's plea was in fact voluntary. Based on the Defendant's answers during the extensive plea colloquy, including the Defendant's stated approval of his legal representation at the time, the Court found the Defendant to be "fully competent and capable of entering an informed plea, that his plea of guilty is knowing and voluntary, supported by independent basis in fact containing the essential elements of the offenses charged." ECF No. 166, at 38. The Defendant fails to point to any particular "gross mischaracterization" by any of his retained attorneys that would outweigh the Defendant's own statements to the contrary made under oath during his change of plea hearing. Additionally, all the admissible *sworn* evidence before the Court shows that the only characterizations made to the Defendant were legally and factually correct.

The Defendant also proclaims without citation to a single case that "it is ineffective assistance per se of counsel to advise a defendant to accept a 'deal' with the sentencing range of **LIFE**!" ECF No. 194, at 9 (emphasis in original). Aside from the fact that the bold statement is unsupported by any authority whatsoever, it also completely misrepresents the plea agreement. By taking the "deal," the Defendant *avoided* a sentencing guideline range of life because the Government agreed to not present any additional evidence to support any other specific offense characteristics or enhancements. Likewise, it is a misrepresentation to state that the Government could seek an upward departure because to do so, the Government would have to breach the very "deal" of which the Defendant complains. Finally, the Defendant is simply incorrect when he states that "under the terms of the 'deal' he would avoid a life sentence only if the district court granted him" a variance.  ECF No. 194, at 10.  The Defendant

19

effectively avoids a life sentence *by virtue of the plea agreement* unless this Honorable Court varies or departs upward against the recommendation of the parties; however, that was a risk he took at the time he entered into the plea agreement.

The Defendant repeatedly emphasizes the advice of his counsel that he could hypothetically receive a sentence of 5 years, suggesting that this advice is incorrect (it is not), and citing the Sentencing Guidelines, asserts that this sentence "is a virtual impossibility." ECF No. 194, at 10. This statement and the majority of the Defendant's motion shows a fundamental lack of understanding about how federal sentencing works. Post-*Booker*, the sentencing guidelines are advisory and not mandatory. *United States v. McCandless*, 841 F.3d 819, 823 (9th Cir. 2016) ("A defendant's advisory Sentencing Guidelines range is only one of several factors that the court must consider in evaluating what sentence to impose.") The Court is in no way forbidden or limited from departing or varying from the Sentencing Guidelines.   Furthermore, at sentencing, the Government "bears the burden of proving, by a preponderance of the evidence, the facts necessary to enhance a defendant's offense level under the Guidelines." *United States v. Showalter*, 569 F.3d 1150, 1159–60 (9th Cir. 2009). The Court may freely "consider information relevant to the sentencing determination provided that the information has sufficient indicia of reliability to support its probable accuracy." *Id.* (citation, alteration, and internal quotation marks omitted). Although the Court "may rely on undisputed statements in the PSR at sentencing," a defendant's objection obligates the Court "to resolve the factual dispute, and the government bears the burden of proof. The court

may not simply rely on the factual statements in the PSR."[14] *Id.*

Given the Defendant's utter lack of remorse and obstinate refusal to accept any responsibility for his actions, it should not come as a surprise that the Government will be seeking a sentence at the high end of the Sentencing Guidelines range as determined by the parties, as permitted by the plea agreement. Not only did the Defendant insist on taking this case to trial, he only sought a guilty plea after sitting through the Government's case-in-chief and witnessing the overwhelming amount of evidence against him. The Defendant's three retained attorneys prudently advised him that the plea agreement was to his benefit. The Government had presented a strong case of advertising child pornography and had proven the charge with the Government's first exhibits and witnesses. That charge *alone* carried a mandatory minimum sentence of 15 years, with a Guideline range of life. By pleading under the terms of the plea agreement, the Defendant avoided the 15-year mandatory minimum sentence being able to argue for 5 years imprisonment and eliminated the Government's ability to seek a lifetime term of imprisonment. That advice constitutes effective, rather than ineffective, assistance of counsel.

### 4. The totality of the circumstances do not show coercion.

---

[14] The Court heard virtually all of the Government's case in chief and it is the Government's position that the Court may consider all that evidence as relevant conduct. Additionally, the Court may consider all the facts set forth in the plea agreement to determine the appropriate guidelines range, notwithstanding the stipulated offense characteristics. But, in any event, the Government will not be presenting *additional* evidence to support any specific offense characteristics or enhancements *not expressly contained* with the plea agreement. The Government reserves the right to present evidence to support the stipulated offense characteristics should the Defendant (yet again) breach the plea agreement by objecting to the stipulated guideline range.

In making this claim, the Defendant cites two cases which divorce the facts from the holdings, and thereby make the cases inapposite.  The Defendant cites *Iaea v. Sunn*, 800 F.2d 861 (9th Cir. 1986), for the proposition that defense counsel's actions can render a plea involuntary.  ECF No. 194, at 11. *Iaea* is a federal habeas corpus case pre-dating the Antiterrorism and Effective Death Penalty Act of 1996, involving a state case where there was a threat to withdraw as counsel of record *coupled* with the threat made by the defendant's brother to withdraw bail prior to trial. *Iaea*, 800 F.2d at 867. As the state court made no factual findings relating to coercion at all, the Court held that remand to the federal district court for consideration of the facts in the first instance.  *Id.* at 868.

Interestingly, *Iaea* notes that several cases "have discussed claims that coercion by non-attorney third parties can render pleas involuntary," but *Iaea* also recognized that "*none of these cases* has found conduct that rose to a level of coercion that would invalidate a plea." *Id.* at 867 (emphasis added).  Notably, each of the cited cases includes direct and explicit coercion rather than the mere alleged dysfunction described by the Defendant here. *See United States v. Webster*, 468 F.2d 769 (9th Cir. 1972) (alleging coercion by an accomplice); *Melnick v. United States*, 356 F.2d 493 (9th Cir. 1966) (alleging coercion by co-defendant); *Wojtowicz v. United States*, 550 F.2d 786 (2d Cir. 1977) (alleging coercion by family); *Lunz v. Henderson*, 533 F.2d 1322 (2d Cir. 1976) (alleging coercion by family); *but see United States ex rel. Mascia v. Zelker*, 450 F.2d 166, 169 (2d Cir. 1971) (suggesting that only acts of government officials can render plea involuntary).

While the Government agrees that true and verified, direct and explicit coercion is a basis to withdraw the guilty plea, *United States v. Caro*, 997 F.2d 657 (9th Cir. 1993),

cited by the Defendant for the proposition does not aid his cause. *Caro* concerned and considered only the "additional risk of coercion" in "package plea deal agreements" with multiple defendants. *Id.* at 659. The Court remanded for further proceedings to determine whether co-defendants *actually* pressured Caro into signing the agreement. *Id.*

The cases cited are procedurally, factually, and legally distinct. *Iaea* is procedurally inapplicable as it came before the court on a 28 U.S.C. § 2254 habeas appeal.   The standards of review and indeed constitutional standards are greatly different for federal habeas appeals of state court convictions. *Iaea* is also factually distinct. Unlike *Iaea* which alleged actual threats made by his defense attorney and brother, here, the Defendant has not alleged a single actual threat made by a single person. Instead, he asserts irrelevant information about alleged personality disputes. Further distinguishable from *Iaea*, where the attorney threatened to withdraw prior to trial, here the Defendant has not alleged that his attorneys threatened to withdraw at all at any point. Finally, legally speaking, *Iaea* is also unavailing because *it did not hold* that the two threats in combination amounted to coercion. It merely held that the federal district court should consider the factors and make a coercion determination in the first instance. Likewise, *Caro* is factually inapplicable because there is only one Defendant in this case, and no "additional risk of coercion" due to a package plea deal.

In making this coercion argument, the Defendant propounds a completely untenable rule. Taken to its logical end, the Defendant could claim coercion because he was unreasonably dwelling on (1) bad advice from a jailhouse lawyer or a law student who gave a passing opinion at a barbeque; (2) conflicting advice he received from two

jailhouse lawyers; or (3) a fight he had with his spouse the morning of the change of plea. The Defendant does not allege any explicit threats or direct coercion, and has not cited to a single case, analogous or otherwise, that has allowed withdrawal of a plea based on coercion. The Court should find that his arguments fail.

### **CONCLUSION**

Aside from irrelevant, specious, and impertinent unsworn and exceptionally inflammatory allegations, the Defendant offers no factual or legal basis for this Court to allow him to withdraw his guilty plea. His statements at the plea colloquy undermine every one of his arguments made here. Furthermore, the sworn statements of his attorneys definitively lay to rest any ineffective assistance of counsel claims. But, in any event, any alleged failure by his attorneys does not amount to ineffective assistance of counsel as it was remedied by the Court's own canvass during the colloquy. Finally, the Defendant's unsworn allegations of minor disagreements in defense strategy between his retained attorney and an attorney representing his husband do not even remotely rise to the level of coercion required to withdraw a guilty plea. Accordingly, the Government respectfully requests that this Court deny the Defendant's motion.

**DATED** this 11th day of August, 2017.

Respectfully,

STEVEN W. MYHRE
Acting United States Attorney

/ s / Elham Roohani
_____
ELHAM ROOHANI
Assistant United States Attorney

24

1
2

## <u>CERTIFICATE OF SERVICE</u>

3    I certify that I am an employee of the United States Attorney's Office.  A

4    copy of the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S**

5    **MOTION TO WITHDRAW GUILTY PLEA (ECF No. 194)** was served upon

6    counsel of record, via Electronic Case Filing (ECF).

7        **DATED** this 11th day of August, 2017.

8

9                                                        / s / Elham Roohani

10                                                    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                                        ELHAM ROOHANI
                                                        Assistant United States Attorney

11
12
13
14
15
16
17
18
19
20
21
22
23
24

25