UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE GLORIA M. NAVARRO
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :
                                   :No. 2:16-cr-00100-GMN-CWH
     vs.                           :
                                   :
JAN ROUVEN FUECHTENER,             :
                                   :
          Defendant.               :
_____    :

TRANSCRIPT OF MOTION HEARING

December 29, 2017

Las Vegas, Nevada

FTR No. 7C/20171229 @ 9:31 a.m.

Transcribed by:          Donna Davidson, CCR, RDR, CRR
                         (775) 329-0132
                         dodavidson@att.net

(Proceedings recorded by electronic sound recording,
transcript produced by mechanical stenography and computer.)

```
                      ─TRANSCRIBED FROM DIGITAL RECORDING─
```

 1                          A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    Elham Roohani
      U.S. ATTORNEYS OFFICE
 5    501 Las Vegas Boulevard South
      Suite 1100
 6    Las Vegas, Nevada 89101
      (702) 388-6336
 7    Elham.Roohani@usdoj.gov

 8
      FOR THE DEFENDANT:
 9
      Karen A. Connolly
10    KAREN A. CONNOLLY, LTD.
      6600 West Charleston Boulevard
11    Suite 124
      Las Vegas, Nevada 89146
12    (702) 678-6700
      Advocate@kconnollylawyers.com
13

14
      Also Present:
15    Special Agent Mari Panovich

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1            LAS VEGAS, NEVADA, DECEMBER 29, 2017, 9:31 A.M.

 2                            --oOo--

 3                    P R O C E E D I N G S

 4

 5            COURTROOM ADMINISTRATOR:  All rise.

 6            THE COURT:  Thank you.  You may be seated.

 7            COURTROOM ADMINISTRATOR:  This is the time set

 8  for the motion hearing regarding document number 194, the

 9  motion to withdraw plea, in case number

10  2:16-cr-100-GMN-CWH, United States of America versus Jan

11  Rouven Fuechtener.

12            Counsel, please make your appearances for the

13  record.

14            MS. ROOHANI:  Good morning, Your Honor.  Ellie

15  Roohani for the United States.

16            I'm joined at counsel table by Special Agent

17  Mari Panovich.

18            THE COURT:  Good morning, Ms. Roohani and

19  Ms. Panovich.

20            MS. CONNOLLY:  Karen Connolly on behalf of

21  Defendant Jan Rouven Fuechtener.

22            THE COURT:  Good morning, Ms. Connolly.  Good

23  morning, Mr. Fuechtener.

24            All right.  Well, this is the time set for the

25  motion filed by Mr. Fuechtener to withdraw his guilty plea
```

TRANSCRIBED FROM DIGITAL RECORDING

1    which was entered after the government had called on all of

2    its witnesses, and the last witness was not quite yet

3    finished but had presented sufficient testimony.

4            We did take a break for the afternoon and then

5    the next morning so that the parties could continue to

6    consider whatever information they needed to consider.

7    They asked the Court for a break, and I did grant that and

8    some additional time afterwards.

9            But now we have a change of counsel.  We have

10   some allegations that have been made regarding prior

11   counsel and counsel that was retained apparently either for

12   both Mr. Fuechtener and his husband or just for his husband

13   but also was providing assistance or not.  It's quite not

14   clear.

15           And there's also information about another

16   attorney, who was Mr. Fuechtener's business attorney but

17   who also was attending, and I recall seeing, and may or may

18   not have been providing the information as well.

19           So by my count we have Mr. Marchese, who was

20   lead counsel at trial, along with Mr. Ben Durham.

21   Mr. Sanft was on, then off, and back on again.  Those were

22   the attorneys of record.

23           We also had Mr. Ben Nadig, who never made an

24   appearance in the case but apparently was retained and also

25   providing information.

TRANSCRIBED FROM DIGITAL RECORDING

1          And then we had the attorney whose name escapes

2    me, who was this civil business attorney as well.

3          So let's go ahead and hear argument from

4    Ms. Connolly.  Keeping in mind the Court is aware that the

5    standard of proof is not so high as it would be in this

6    situation because trial has begun but there is not a

7    conviction, and there is not a requirement that the Court

8    be convinced that the defendant's either due process rights

9    under the Fifth Amendment or that there's ineffective

10   assistance of counsel.

11         So go ahead, Ms. Connolly.

12         MS. CONNOLLY:  Thank you, Your Honor.

13         As you indicated, under Rule 11 a defendant may

14   withdraw a plea of guilty after the Court accepts the plea

15   but before it imposes sentence if the defendant can show

16   fair and just reason for requesting the withdrawal.

17         The Ninth Circuit Court of Appeals has indicated

18   the standard for withdrawing a plea is a liberal standard.

19         The Ninth Circuit has indicated that leave to

20   withdraw plea prior to imposition of sentence should be

21   freely granted if there's a fair and just reason presented

22   for doing so.

23         The Ninth Circuit has also indicated that a

24   defendant need only present a plausible reason for

25   withdrawal prior to imposition of sentence.

TRANSCRIBED FROM DIGITAL RECORDING

1          And, again, the standard should be construed

2    liberally in favor of the defendant.

3          In this particular case there's two main reasons

4    why this Court should permit Mr. Fuechtener to withdraw his

5    plea.  The first one is that he was not properly advised by

6    counsel as to his exposure under the guilty plea agreement.

7          From reading the affidavits being submitted,

8    it's evident that none of those attorneys advised him that

9    he had stipulated, agreed that his sentencing range was

10   24.3 to 30 years.

11         What they all indicate in their -- collectively,

12   in their affidavits, is they led him to believe or advised

13   him he was facing five to 30.

14         None of the attorneys went over the sentencing

15   guidelines with him.  It's painfully evident from reviewing

16   those affidavits that they had a fundamental lack of

17   understanding of federal sentencing.

18         In federal sentencing the Court must consider

19   and the parties must consider the United States Code and

20   the guidelines.

21         What they did in this case was advise

22   Mr. Fuechtener that under the United States Code the

23   mandatory minimum was five years.  So they told him, "You

24   can get five to 30.  We're going to argue for -- we're

25   going to argue for five years," even though it was a level

TRANSCRIBED FROM DIGITAL RECORDING

1    40, stipulated level 40.

2              And that's what they did tell him in the

3    courthouse.

4              What's also important is that nobody took the

5    time to meet with him to go over -- to go over the guilty

6    plea for a considerable period of time.  And let me digress

7    a little and talk about how the plea went down.

8              It was in the middle of trial.  The defendant's

9    lawyers panicked because for some reason they were

10   surprised at how well the Special Agent Panovich testified,

11   even though, if they had done their due diligence, if they

12   had done their required pretrial preparation, there should

13   have been no surprises.

14             They had grand jury transcripts.  They had

15   discovery.  So they should have been quite well aware as to

16   the nature of this agent's testimony.

17             They indicate, "Well, she testified so well,"

18   they were surprised.  She's a special agent.  She's trained

19   to testify.  Again, that should be no surprise to anyone.

20             They indicate, "Well, when we saw how well she

21   testified, we panicked."

22             And also this is a trial in front of Your Honor,

23   not a jury.  Your Honor would be motivated by the facts,

24   not the passion shown by the agent testifying.

25             However, that's apparently -- allegedly they

TRANSCRIBED FROM DIGITAL RECORDING

1    were so shocked at the nature of her testimony or how well

2    she testified that they thought there needed to be a guilty

3    plea.

4           Never prior to this point in time had the issue

5    of entering a guilty plea or pleading guilty been discussed

6    with my client.  He had no discussion whatsoever, which if

7    the testimony of the agent was so compelling, plea

8    negotiation should have taken place a long time previously.

9           Anyway, they're in the middle of the trial.

10   There's a recess, I believe, after the government was

11   finished with their case in chief, and there was some

12   discussion about dismiss -- doing a plea -- or dismissing

13   the advertising charge, which carried mandatory minimum of

14   15 years.

15          There was no plea agreement.  And I'm not going

16   to go through it in detail because I set it forth in my

17   reply, the timeline which reflects and which proves that

18   there was really no substantive discussion with my client

19   during the day about the plea agreement.

20          And as the Court's aware, the government can't

21   even offer a plea agreement unless they go and get it

22   approved by supervisors.

23          After the lunch break, I believe, when the

24   government put on the record, "Look, we need over the

25   evening, we need to go and talk and see if we can come down

TRANSCRIBED FROM DIGITAL RECORDING

1   with what kind of plea agreement."

2          There was a recess that evening.  It would have

3   been incumbent upon counsel at that point in time to meet

4   with their client, to meet with Jan and say, "Look, this is

5   what we're anticipating, and this is what your guideline

6   range is going to be, and this is going to be your

7   exposure.  Now, we've already heard testimony, and the

8   government has already presented its case in chief, so

9   there's going to be all these specific characteristics or

10  relevant conduct that may apply."

11         That never took place whatsoever with him.

12         The plea agreement was proffered by the

13  government at 10:00 the next morning.  10:00 they forwarded

14  the plea agreement to counsel.  The plea was entered at

15  12:12.  So two hours from defense counsel getting that plea

16  agreement and Jan Rouven entering his plea.

17         And the record also reflects -- and Mr. Durham

18  indicated, he was still discussing the plea agreement with

19  the defendant when he walked into the courtroom.  So it's

20  evident, from the evidence, from the record and from the

21  affidavits, there was no substantive discussion with him

22  about his exposure.

23         He was aware there was a level 40.  "You're

24  stipulating to a level 40."  But he had no idea that was

25  24.3 to 30 years.  He found out that that evening when he

TRANSCRIBED FROM DIGITAL RECORDING

1   went to -- back to the holding facility and an inmate

2   brought to his attention, "Jan, you just stipulated to 24.3

3   to 30 years."

4           The next morning he called Mr. Marchese and told

5   him he wanted to withdraw his plea.  And that is

6   undisputed.

7           The significance of the stipulated 24 to 30

8   years and the fact that they did not explain this to him is

9   just incomprehensible.

10           The government, in footnote 14 of their

11   opposition, indicates that if he argues that the stipulated

12   sentence isn't 24 to 30 years, he'll be violating the plea

13   agreement.

14           Mr. Pacitti, who is the one lawyer he trusted in

15   this whole case, he told him, "You're facing five to 15.

16   You could get five years."

17           I provided you with an e-mail that he sent to my

18   office with all frankness where I requested an affidavit,

19   he refused to do that, didn't want to throw his friends

20   under the bus.

21           So I provided you with the e-mail that I sent to

22   him after our conversation verifying that you told me -- he

23   told the defendant, "You're facing five to 15."

24           There was no possibility, no possibility

25   whatsoever, impossible for him to get five years.

TRANSCRIBED FROM DIGITAL RECORDING

1    There's three counts that he was pleading guilty

2    to.  Count 1 was to run consecutive to Count 2 and 3.

3    Count 2 and 3 had the mandatory minimum five years.  Base

4    offense level for Count 1 was 22.  That's 41 to 51 months.

5    He agreed, he stipulated that Count 1 is to run

6    consecutive to Count 2 to 3.  So, again, impossible.

7    You're stipulating to five years plus a minimum of 41 to 50

8    month -- -1 months on top of that.

9    There was no discussion with him about variances

10   or departures.

11   And I think it's significant that Mr. Sanft, in

12   his affidavit, indicated that "We told him we'll argue for

13   five years, we'll argue mitigating, we'll argue that you

14   came and you had this great career and you had no criminal

15   history."

16   This is not state court.  And it's not five to

17   30 and we go in and we say some things to the judge and we

18   hope the judge will give the low end.  It has to be

19   pursuant to the guidelines.  And under the guidelines, the

20   fact that he has no criminal history is not a grounds for a

21   variance.

22   The sentencing commission has specifically -- in

23   the commentary, has indicated that that is not a grounds

24   for a variance whatsoever.

25   So Mr. Sanft, based upon what he said in his

TRANSCRIBED FROM DIGITAL RECORDING

1    affidavit, provided erroneous advice.

2            Likewise, the fact that he had a great career is

3    not a grounds for a variance.  Relevant conduct wasn't

4    discussed at all.  And that's huge in this case because the

5    case -- the state had already presented its case in chief.

6            And as set forth in the presentence

7    investigation report, there was evidence presented that

8    supports some relevant conduct, so that relevant conduct

9    had been proven and was applicable even though the

10   government wasn't specifically going to come and request

11   it.

12           It is evident, from reviewing the affidavits,

13   that the attorneys didn't even know his exposure under the

14   guidelines.  They were looking at the statutes below,

15   "Look, he can -- mandatory minimum of five years.  You can

16   get five years."

17           It wasn't realistic, and it was ineffective for

18   them not to take the time to go meet with him and spend

19   some time in explaining to him the significance of what he

20   was pleading to, just what it was he was pleading to, what

21   it meant, what his exposure was.  No discussion.

22           And they pretty much all admitted there was no

23   discussion of the guidelines with him.

24           There wasn't any discussion with him about the

25   variance and what the Court -- what the Court's obligation

TRANSCRIBED FROM DIGITAL RECORDING

1    is in terms of a variance.

2            The Court can grant variances, however is

3    discouraged from doing so unless there's some factor not

4    adequately taken into consideration by the sentencing

5    commission.

6            Well, my estimation, there's none of those

7    factors in this case.  Because I've researched it.  It has

8    to be factors not adequately taken into consideration by

9    the sentencing commission.  And if the Court does a

10   variance, the Court has to explain in detail the reasons

11   for a variance and the reasons for the extent of the

12   deviation.

13           So we're looking at a presentence investigation

14   report that's based upon testimony and evidence that's

15   already presented to the Court with not a 30-year sentence,

16   but a life sentence.  Life.  Again, never explained to him.

17   He had no idea.  He thought he was looking at five years

18   because that's what he was told, "You can get five years."

19           Not only was it not possible, but it was in

20   no -- no -- it was not realistic whatsoever.

21           Also, pursuant to the plea agreement, it would

22   be a violation of the plea agreement if he requests for a

23   downward departure or variance for anything other than his

24   criminal history.  And criminal history is not a ground for

25   variance because Ninth Circuit has already stated that.

TRANSCRIBED FROM DIGITAL RECORDING

1          That's fair and it's just to let him withdraw

2     his plea under the circumstances because he was not

3     properly advised.  He was not aware of his exposure under

4     the sentencing guidelines.  He was misinformed about the

5     basic sentencing range.  And under the Ninth Circuit case

6     of *Toothman*, that is a grounds for him to withdraw his

7     plea.

8          Also in the *United States versus Bonilla* the

9     Court indicated that erroneous or inadequate legal advice

10    is a grounds to withdraw the plea.  Defendant is not

11    required to show that he would have not pled guilty but

12    only the proper legal advice of which he was deprived could

13    at least have plausibly motivated a reasonable person in

14    the defendant's position not to have pled guilty.

15          Now, the whole nexus apparently of the reason

16    why he pled guilty was because a five-year mandatory

17    minimum was gone.  He's facing 24 to 30 years.  Stipulated

18    sentence.

19          The other reason why, in the interest of

20    fairness, he should be able to withdraw his plea is because

21    of the shenanigans amongst his lawyers in this case: the

22    bickering between Sanft and Marchese and the debacle with

23    Amber Craig.

24          Marchese was saying how Nadig bragged about

25    having been paid $100,000 for doing nothing.  Nadig saying

TRANSCRIBED FROM DIGITAL RECORDING

1    Marchese was out of his league and only wants his friends

2    to get paid and is in it for the money.

3            You have Pacitti, who is a business lawyer,

4    trying to mediate between the lawyers, having no criminal

5    experience whatsoever and giving him advice.

6            The exhibits I presented -- I would submit,

7    Judge, the exhibits that I presented to my underlying

8    motion are just unwillful, lack of a better term, when a

9    man is facing as much time as he was facing, to have to be

10   dealing with that kind of bickering and back stabbing

11   between his defense counsel.

12           So Marchese encourages him to fire Sanft.  He

13   had Sanft and Nadig.  And then he had Marchese.  Marchese's

14   concerned that Sanft and Nadig are doing nothing.  So he

15   counsels him to fire Sanft and Nadig, who refused to refund

16   the $200,000 that he paid them.

17           So when that money is requested back by his

18   husband, Sanft shoots out an e-mail and starts backstabbing

19   Marchese.  With Nadig and Sanft out of the picture,

20   Marchese hires Durham and then he hires Amber Craig.

21           Not only did Nadig go behind Marchese's back,

22   now Nadig had already been fired, yet he goes and meets

23   with Mr. Fuechtener, without advising Mr. Marchese he was

24   doing so, and scares the living daylights out of him, tells

25   him that he's going to be convicted.  "You will be

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    convicted with Marchese.  If you had hired me and Sanft,

 2    you would be acquited.  We've won cases, sex cases like

 3    these in federal court," which, according to Mr. Marchese,

 4    was a complete lie.

 5              It's getting closer and closer to trial.  Amber

 6    Craig's brought in on the eve of trial because obviously

 7    Marchese and Durham feel they're not prepared, they need to

 8    bring in a former US prosecutor to help them.

 9              And this Court considers dismissing the entire

10    defense time on the eve of trial at request of the

11    government because of her conflict.

12              Where were the grownups in this case, is the

13    question I must ask.  The way he was treated collectively

14    by those attorneys is shameful.

15              His confidence was already in tatters.  His

16    confidence had been -- of his own defense time had been

17    undermined by each other when Agent Panovich testifies and

18    then his lawyers flip out and say, "We've got to take a

19    deal, we've got to take a deal."  I would submit that the

20    second reason under the fundamental fairness standard as to

21    why he should be permitted to withdraw that plea.

22              Now I want to talk a little bit about also the

23    fact that his plea was not -- and under Rule 11, the

24    standard is less stringent than moving to withdraw the plea

25    because it was not knowing and voluntary.
```

TRANSCRIBED FROM DIGITAL RECORDING

1            However, I would submit in this particular case

2    that his plea was not knowing and voluntary.

3            Voluntariness of the plea depends upon whether

4    counsel's advice was within the range of competence

5    demanded of attorneys in criminal cases.  That's *Hill*

6    *versus Lockhart*.

7            Attorneys practicing in federal court have to be

8    familiar with the United States Sentencing Guidelines.  And

9    they're complicated.  We all know they're complicated.

10   It's a special art.  And it's evident, again, just from --

11   my inclination was to request an evidentiary hearing;

12   however, I don't even think it's necessary, given their

13   affidavits, because I think their affidavits show they

14   didn't know how the United States Sentencing Guidelines

15   applied in this particular case.  They were focused on the

16   United States Code.

17            To be knowing and intelligent a plea must be --

18   an act must be done with sufficient awareness of the

19   relevant circumstances and consequences.  That's *Brady,*

20   clearly, in this particular case.

21            And again, I think it's very compelling that not

22   one of those attorneys, not one of them in their affidavit

23   said, "Yes, we told Jan he was stipulating to a sentence of

24   24 to 30 years."  Because they didn't.

25            And to a layman, saying you're stipulating to a

TRANSCRIBED FROM DIGITAL RECORDING

1    level 40 means nothing.  It means nothing unless you

2    present your client with the sentencing guidelines, "This

3    is what it means.  These are the enhancements that could

4    apply.  This is the relevant conduct.  This is the specific

5    offense characteristics."  And go through them all.

6            And there's absolutely no reason for the failure

7    to (indiscernible) they had to drive to Pahrump.  Clearly

8    they didn't want to drive to Pahrump, but even though they

9    had been in trial for only two days, not months, not weeks,

10   nobody, not one of them, went over and met with him that

11   night.

12           They didn't even meet with him that morning for

13   a substantial period of time.  Once they got the plea, then

14   Mr. Durham started reading it to him.

15           So they say, "We explained it to him," yet he

16   was still reading it to him when they walked into the

17   courtroom.

18           The plea must be knowing and intelligent, an act

19   done with sufficient awareness of the consequences.

20           I'd also submit that not only was the plea not

21   knowing and voluntary, but it was also coerced.  And when

22   we're considering coercion, we look at this subjective

23   state of mind, and that's from that *Iaea* case, the Ninth

24   Circuit case.

25           And the behaviors and actions of the attorneys

TRANSCRIBED FROM DIGITAL RECORDING

1    in this case were a one-of-a-kind debacle.  And they

2    destroyed his psyche and his confidence and essentially

3    overcame the (indiscernible) of any man who would be facing

4    trial.  He was facing life with these charges.

5              And we may well believe he could have fired all

6    these attorneys.  In the background, he had Mr. Pacitti

7    coming in.  He had hired his friends.  He didn't want

8    anybody to be upset at each other.

9              He's telling him, "Just keep going with these

10   guys, just keep going with these guys."

11             A guilty plea must be stricken if freewill is

12   overborne by the prosecutor or by the accused's lawyers.

13             I submit in this particular case that the plea

14   was not knowing and not voluntary and that it was coerced.

15             But I would submit the -- quite clearly, given

16   the fact that -- given the liberal standard that he has

17   presented plausible reason for withdrawal of his plea and

18   he should be permitted to withdraw his plea.  Thank you.

19             THE COURT:  Thank you, Ms. Connolly.

20             Ms. Roohani?

21             MS. ROOHANI:  Yes, Your Honor.

22             Your Honor, I want to start by noting that in my

23   response to Ms. Connolly's motion, I specifically pointed

24   out the case of *United States versus Ross* and *United States*

25   *versus Castello*.

TRANSCRIBED FROM DIGITAL RECORDING

1          And in those two cases, it makes abundantly

2     clear that the statements that a defendant makes during the

3     plea colloquy carry a presumption of veracity, and the

4     Court can consider those, especially when later statements

5     directly contradict those.

6          That is an indication to the Court that this is

7     done for some purpose other than an attack on the knowing

8     and voluntary character of the plea or based upon coercion.

9          So I would submit that Ms. Connolly, in her

10    reply, did not ever respond to that argument.  And so she's

11    effectively conceded that the colloquy was sufficient.  So

12    I just wanted to start with that because I think it's

13    important to the Court's consideration.

14          But I'd also like to address a few of the things

15    that Ms. Connolly spoke about.  And I'll start what she --

16    with what she ended with, which was the -- what she called

17    the shenanigans of the attorneys.

18          Now, Your Honor, I -- when we originally got

19    this motion, we had submitted a motion of our own to waive

20    the attorney-client privilege to specifically talk about

21    what the nature of the conversations between Mr. Fuechtener

22    and his retained attorneys was in relation to the plea

23    agreement.

24          And the reason that we limited it to that is

25    because it is completely irrelevant what happened well

TRANSCRIBED FROM DIGITAL RECORDING

1    before trial.  All of the things that happened -- and I

2    don't know, and, quite frankly, Your Honor, it doesn't

3    matter what happened between Mr. Marchese and Durham and

4    Sanft and Nading and Amber Craig and Mr. Pacitti and --

5    whatever happened, Your Honor resolved all of that before

6    trial even started.  You disqualified Ms. Craig, based on

7    conflict, and you did not disqualify Mr. Marchese and

8    Mr. Durham.

9              And then Mr. Sanft came back on the case.  So

10   all of this was resolved well before trial began and well

11   before a plea was ever entered.  So all of that is

12   completely irrelevant.

13             In terms of the arguments relating to

14   ineffective assistance and Mr. Marchese, Mr. Durham, and

15   Mr. Sanft not advising Mr. Fuechtener about the sentencing

16   guidelines, it seems that the person who is confused about

17   how federal sentencing works is Ms. Connolly and not

18   Mr. Durham and Sanft.  And I'd like to point out why, Your

19   Honor.

20             First, there's two ways that the Court can

21   essentially move away from the sentencing guidelines.  And

22   the guidelines are advisory.  They're not mandatory.

23   They're not binding on Your Honor in any way.

24             The only thing that binds Your Honor is the

25   mandatory minimum and the mandatory -- or the statutory

TRANSCRIBED FROM DIGITAL RECORDING

1   maximum.  And that was made clear by Your Honor and by

2   myself during the plea colloquy.

3        The guidelines are advisory.  Now, a variance is

4   based on the 3553(a) factors.  So Your Honor could very

5   well consider the nature and circumstances of this

6   defendant.  That would obviously include his criminal

7   history so Mr. Sanft was not incorrect when he said you

8   could consider that.

9        Mr. Sanft was not incorrect when he said that

10  you could look at his employment history.  Again, that is

11  based on a variance.  Now, a departure is based upon

12  something that's in that guideline book.  A guideline that

13  we can specifically point to.

14        Now, that's different.  Your Honor could

15  consider either one of those, and under the plea agreement

16  his attorneys would be entitled to argue either for a

17  variance or a departure.  And they were not limited in that

18  way.  So all of the things that his attorneys told him were

19  actually true.

20        More importantly, he takes issue with the fact

21  that he was given a range of five to 30 years.  And he

22  says, "Well, that's not accurate because that doesn't tell

23  us anything about the guidelines."  But it does tell us

24  something about the guidelines.

25        Because if you don't apply the guidelines and

TRANSCRIBED FROM DIGITAL RECORDING

1    you look at just the statutory maximum sentences, Your

2    Honor could have sentenced him up to 60 years because

3    there's a 20-year cap on each of those counts.  You could

4    have run them consecutive, and he could be sentenced to 60

5    years.

6              Now, life is 720 months, but with -- putting

7    that aside for a moment, the 30-year cap is based on that

8    40 adjusted offense level.

9              So they did tell him about the guidelines.  They

10   didn't call it that.  But, of course, they don't need to

11   call it that.  They don't need to explain legally what the

12   difference between a variance and a departure is.  They

13   don't need to legally explain what a 40 means on the

14   sentencing table.

15             They don't need to explain to him how you move

16   down and then you move across.  None of that is relevant.

17   And it's not necessary for them to explain that to provide

18   effective assistance.

19             In giving that 50 -- that 5-to-30-year range,

20   they did explain to him the sentencing guidelines.  And

21   Your Honor can find that based upon their affidavits.

22             Your Honor obviously heard all the testimony in

23   the case.  And in speaking with Mr. Marchese, Durham, and

24   Sanft, the issue was not how compelling Special Agent

25   Panovich testified.  The fact was, is that the way that the

TRANSCRIBED FROM DIGITAL RECORDING

1    government presented its case -- and Mr. Sanft commented on

2    this.  He said, "It is very methodical.  You gave all the

3    puzzle pieces, but Special Agent Panovich is the one who

4    put it all together.  It wasn't what she said or how she

5    said but the fact that the entire case came together when

6    she was testifying."

7              And as Your Honor will remember, she went

8    through device by device, talked about what it was found

9    and where it was found and the forensic paths of all the

10   files and ultimately caused all of that evidence to point

11   back to the defendant.

12             Up until that point, I submit, Your Honor, that

13   the government had not proven its case.  It was through

14   Special Agent Panovich's testimony that we were able to

15   prove our case.

16             And so they were rightfully concerned.  And

17   quite frankly, Your Honor, as it's set forth in the

18   affidavit, I'm sure you observed it, Mr. Fuechtener's

19   demeanor changed during Special Agent Panovich's testimony.

20             A person who had been joking the entire time

21   throughout trial all of a sudden became somber.  Because he

22   realized where this trial was going.

23             Ms. Connolly also keeps talking about a

24   stipulated sentence, Your Honor, and that he was agreeing

25   to a stipulated sentence.

TRANSCRIBED FROM DIGITAL RECORDING

1          I submit, Your Honor, a stipulated sentence is

2     essentially a binding plea.  And this was not a binding

3     plea under 11(c)(1)(C), this is a plea under 11(c)(1)(A)

4     and (B), which of course leaves Your Honor very wide

5     latitude and discretion in imposing that sentence.

6          Now, agreeing to a stipulated guideline range is

7     very different than a stipulated sentence.

8          The way that Ms. Connolly is making it seem is

9     that the defendant agreed that he would be sentenced

10    between 24 and 30 years.  But, of course, there was no such

11    agreement whatsoever.

12         In fact, that plea agreement was specifically

13    designed with the two counts running concurrent solely that

14    Mr. Fuechtener could ask for a five-year sentence.  The

15    government didn't need to agree to that, but that is part

16    of the negotiations.

17         Now, in terms of Mr. Pacitti, Ms. Connolly

18    points to Mr. Pacitti's e-mail.  Of course, she points to

19    the part of the e-mail where she is talking about the

20    5-to-15-year sentence.

21         But his e-mail, if you read the last exchange,

22    says that he will not file an affidavit or sign an

23    affidavit because he could not remember what happened, and

24    he was trying to help out the defendant.  He didn't say he

25    was trying to help out Mr. Marchese and Mr. Durham and

1    Mr. Sanft and to protect them in some manner.  He said that

2    he was trying to protect the defendant.

3              And, Your Honor, in terms of the relevant

4    conduct, the relevant conduct portion is written in the

5    plea agreement.  You went over it with Mr. Fuechtener.  I

6    went over it with Mr. Fuechtener.  He specifically said he

7    understood it when I read it.  He specifically said he

8    understood it when you read it.

9              So it's disingenuous for him to now turn around

10   and say that you couldn't consider relevant conduct and he

11   didn't know that.

12             In terms of *Toothman*, Your Honor, as is set

13   forth in our response, *Toothman* is not particularly

14   instructive in the sense that in that case there was two

15   different potential forms of coercion.  And in *Toothman* the

16   Ninth Circuit didn't say that that amounted to coercion.

17   They actually remanded it back to the district court for a

18   hearing.

19             And so, as we set forth in our brief, Your

20   Honor, there has been no case, and the defendant can't

21   point to a single case in circuit courts across this

22   country or in state courts anywhere, that have found that

23   coercion is sufficient to get out of a plea agreement.

24             And in-fighting between attorneys that occur

25   months before a trial even begins certainly can't be the

TRANSCRIBED FROM DIGITAL RECORDING

1   basis to withdraw a guilty plea such that the coercion was

2   so overwhelming.

3              I wanted to just point out two more things, Your

4   Honor, in terms of one of the things that Ms. Connolly had

5   talked about in her motion was that you might remember that

6   the defendant tried to hedge during his colloquy and there

7   were certain facts in the plea agreement that he was not

8   comfortable, I guess, verbalizing and admitting on the

9   record is probably the best way to put that.

10             But you asked him pointed questions to admit to

11  the elements of the offense.

12             And if you go back and you look at the

13  transcript, you'll note that when you asked him questions

14  about the essential elements of the offense, whether he

15  possessed the child pornography, whether he received the

16  child pornography, and whether he distributed the child

17  pornography, he did not falter one bit.

18             He said "Yes," and he didn't try to hedge in any

19  way.

20             The only two things -- or three things, that he

21  tried to sort of hedge on was, one, with the number of

22  images.  And, Your Honor, that's page 36 of the transcript.

23  I don't know if you have that available.

24             You asked him:

25              "Paragraph 5 is about the amount of child

TRANSCRIBED FROM DIGITAL RECORDING

1    pornography found in the devices and so forth.

2            Do you agree with the facts in paragraph 5?"

3            He conferred with his counsel.

4            And then he said:

5             "Your Honor, it is correct, but I believe

6    there are many duplicates."

7            He didn't say, "Those are not my images, they

8    weren't on my computer, I'm not the one who put them

9    there"; he said, "They're duplicates."

10            Again, that goes to the number of images

11   sentencing enhancement.

12            Then we talk about paragraph 7, which he said --

13   at the top of page 37:

14             "And then paragraph 7 is the one that talks

15    about the Skype user name and sharing the GigaTribe

16    lars45 folder.

17            Do you agree with the facts in that paragraph?"

18            The defendant says:  "Yes."

19            He doesn't say, "No, I need to think about it,

20   I'm not sure about this."  He admitted to distribution

21   through that paragraph by itself.

22            You skip paragraphs 8 and 9.  Specifically

23   paragraph 8 related to the Grindr chats, which is really

24   what the defendant was having issues on taking

25   responsibility for, and paragraph 9, which talked about him

1    asking his husband to delete messages that Special Agent

2    Panovich shouldn't have seen.

3              So when you look back, Your Honor, the defendant

4    doesn't have any issue admitting to the essential elements

5    of the crime.  The problem that he has is with certain

6    enhancements which, of course, Your Honor can consider

7    anyway.  And you could have accepted his guilty plea even

8    without him accepting those enhancements.  Or the facts

9    that would support those enhancements.

10             He never said that he wasn't guilty.  He never

11   said that he was innocent.  He never said that he didn't

12   want to plead guilty.

13             You asked him specifically whether he was

14   pleading guilty because in truth and fact he was guilty,

15   and he said yes.  Again, he did not waiver.

16             You specific -- and, again, Your Honor -- and

17   I'll just note back, and I'm not going to go through the

18   entire response that I filed, but every single claim that

19   the defendant is now making is directly refuted by the plea

20   colloquy.

21             And any statements that he makes now that are

22   going to refute that you should look upon with great

23   caution, specifically because we got a draft of the

24   presentence report right before the defendant decided to --

25   that he wanted to withdraw his guilty plea or at least put

TRANSCRIBED FROM DIGITAL RECORDING

1    that on the record.

2            And so I would ask that you look upon that with

3    great caution and deny his motion.  Thank you, Your Honor.

4            THE COURT:  Just a minute, Ms. Roohani.

5            So it sounds like there were not any prior

6    similar offers to plead guilty that were made and discussed

7    that would have provided Mr. Fuechtener with more knowledge

8    or understanding about what a plea agreement would look

9    like or what -- how the guidelines work.

10            MS. ROOHANI:  And I can represent to Your Honor

11   there was very early on in this case, probably in May of

12   2016, Mr. Marchese -- I asked him, I said, "Is your client

13   interested in an offer?"

14            And he said, "No, he's not interested in an

15   offer.  If you would like to give me something, I will take

16   it to him."

17            But at that point we did not offer him anything.

18            So there was some early discussions of a plea.

19   However, as Mr. Sanft set forth in his affidavit, it is his

20   normal practice to go through the guidelines, once he's

21   looked at the discovery in the case, which was provided

22   very early on, and Mr. Sanft did go through the guidelines

23   with Mr. Fuechtener very early on.

24            And, of course, Your Honor, that didn't

25   necessarily change -- the facts of this case didn't change

TRANSCRIBED FROM DIGITAL RECORDING

1    as it went along such that the guidelines would change.

2    The guidelines have always been what they are in terms of

3    what the evidence would show.

4           MS. CONNOLLY:  Mr. Sanft --

5           THE COURT:  All right.  So I'll give you a

6    moment to reply, but I'm still making sure I understand

7    that -- the government's response.

8           So I would not normally think that two hours to

9    review a plea agreement is insufficient when there has been

10   prior time taken between attorney and client to understand

11   basically how the guidelines work, what the exposure is,

12   things of that nature, which usually are discussed before

13   trial, when there is a trial, and then sometimes the issue

14   is just a couple of points differential because of the

15   characteristic that maybe the defendant doesn't want to be

16   in the plea agreement but the government insists needs to

17   be in the plea agreement, and then at some point they come

18   to an agreement to drop that special characteristic.

19          So two hours would be more than enough for

20   someone to go over a plea agreement like that, that just

21   isn't -- consists of a minor change and something that has

22   already been explained and understood.  So it sounds like

23   this was a -- brand new to Mr. Fuechtener.

24          I am concerned because in the plea agreement

25   there is a statement that the parties stipulate and agree

TRANSCRIBED FROM DIGITAL RECORDING

1    to the following calculation of the defendant's offense

2    level, and then it has a base offense level with the

3    enhancements and a total adjusted offense level of 40.

4    That's after the two points are deducted for acceptance of

5    responsibility.

6              And then the relevant conduct that the probation

7    office included in its calculation, when we look at the

8    presentence report, specifically on page 33, paragraph 109,

9    explains the impact of the plea agreement and how the

10   presentence investigation report calculation is different.

11             The two things that it includes are the

12   obstruction of justice and the -- let's see, the knowing

13   distribution other than through acts described previously.

14             So, for example, for the obstruction of justice

15   what they're using is the information that the defendant

16   instructed his husband to delete those e-mails, evidence

17   that Special Agent Panovich might be interested in seeing.

18             So, of course, the government can agree to not

19   present information regarding that claim, and then the

20   Court would be able to determine that those special

21   characteristic points level would not be added.

22             But in this case, it was specifically already

23   provided in testimony, and now no cross-examination, so you

24   could say untested testimony, but it was also included in

25   the plea agreement on page 9, paragraph 9 of the plea

TRANSCRIBED FROM DIGITAL RECORDING

1    agreement.

2              So he's agreeing that those facts are correct,

3    which would mean it would be difficult for the Court to

4    find that it's not applicable if he's agreeing to those

5    facts.

6              And you're right, he didn't have to agree to

7    those facts.  They weren't necessarily part of the

8    agreement that wouldn't need to be in there, but they were

9    in there, and he did agree to them.  And then, likewise,

10   with the other five levels that were added by the probation

11   office, it's information that was already provided in the

12   plea agreement.

13             So I -- I'm not inclined to find that the

14   attorneys did not understand the sentencing guidelines, but

15   I think the only one who said he even reviewed it with the

16   defendant was Mr. Sanft.

17             I believe Mr. Marchese and Mr. Durham both said

18   in their affidavit that they -- either they said they

19   didn't or they didn't say that they did.  Maybe that's how

20   I'm remembering it.  But I think Mr. Sanft was the only one

21   who said he reviewed it with Mr. Fuechtener, but that was

22   early on, not at the time of the plea.  So it looks like

23   nobody reviewed it with him at the time of the plea.

24             It does seem a bit rushed in consideration of

25   those specific circumstances in this case as opposed to a

TRANSCRIBED FROM DIGITAL RECORDING

1    case where you already have had a plea offer and there's

2    just a matter of trying to fine-tune the details and make

3    minor changes that don't really take so long to explain and

4    understand.

5          So how -- how am I supposed to feel comfortable

6    that Mr. Fuechtener did, in fact, understand the plea

7    agreement?  I know we go through this in the canvass, but I

8    don't go through the facts, and -- any more so than just to

9    ask him whether or not he agrees or disagrees with the

10   facts that are stated in the plea agreement.

11         And I recall that there was a section about the

12   Grindr, I remember in here, page 6, line 8 -- paragraph 8

13   on page 6.

14         But other than that, I'm not -- I'm not -- I'm

15   on the edge.  I'm very much on the edge here.  And I don't

16   have to be convinced, it just has to be a fair and just

17   reason and a plausible reason.  And it certainly is

18   plausible at this point that Mr. Fuechtener understood the

19   information provided in the colloquy, which, you're right,

20   does provide a presumption that the plea is knowing and

21   voluntary.  And it's already quite lengthy.  These plea

22   colloquies are extremely long.

23         But they depend on the attorney having already

24   provided the defendant with some information.

25             MS. ROOHANI:  And, Your Honor, I can represent

TRANSCRIBED FROM DIGITAL RECORDING

1    to you, as an officer of the court, and, of course, this --

2    at the time that -- if you go back and look at the

3    transcript of what was happening in trial, we couldn't very

4    well tell you what we were doing because we were in the

5    middle of trial and you were the fact finder, and it would

6    be completely inappropriate for us to do that.

7              Now, I can represent to you as an officer of the

8    court that we had the guidelines prepared -- the government

9    had the guidelines prepared before trial ever even began.

10             So when the defense came and asked me and

11   Ms. Cartier-Giroux for an offer, we went back to the

12   witness room that's right outside the courtroom, I laid it

13   out for them, I said, "This is what he has to agree to."

14             We went through it.  I had a guideline book with

15   me.  We looked at it.  We looked at what the numbers would

16   be.

17             So everybody knew what the numbers would be.

18   Everybody knew what facts would be meeting up with every

19   single thing.

20             The only reason -- and it's my understanding,

21   because Mr. Sanft and Mr. Marchese and Mr. Durham kept

22   coming back into this courtroom during that break.  It was

23   my understanding that they were actually conveying some of

24   this to the defendant at that time.

25             The only reason that they couldn't sit down and

TRANSCRIBED FROM DIGITAL RECORDING

1    talk with him about it is because they wanted the written

2    plea agreement.  And really the last thing that we needed

3    to hammer out was which counts would run concurrent versus

4    consecutive to each other so we wouldn't run up against any

5    statutory maximum problems.  That was the last thing that

6    needed to be hammered out.

7              And, quite frankly, that's not even the issue at

8    this point anyway.

9              So in terms of the guidelines, the guidelines

10   had been decided upon within minutes of them asking us for

11   an offer.

12             And so I do believe that they spoke with their

13   client about it.  To the extent that Your Honor wants to

14   hold an evidentiary hearing for that portion of it, I think

15   that you can call them up there and ask them that.

16             I do believe that they didn't specifically say

17   that, but of course, Your Honor, I didn't know that was the

18   pointed question that I needed to ask them to be able to

19   put it in this affidavit.

20             I do believe that the affidavit certainly

21   suggests that they talk to him about it; otherwise, it

22   doesn't make sense that they would put the 30-year cap on

23   that.

24             And in terms of Your Honor -- you'll remember

25   that Mr. Fuechtener had a problem with the Grindr chats;

1   right?  And so talking a little about obstruction of

2   justice enhancement and the distribution for a thing of

3   value, because I know that the PSR came back different than

4   what the plea agreement said, it's the government's intent,

5   based upon his fighting, I guess, if you will with that

6   Grindr chat for us to present evidence and show by a

7   preponderance of the evidence that that enhancement should

8   apply, which is what we would be entitled to do under the

9   plea agreement.

10           We are not entitled to, under the plea

11   agreement, seek any other enhancement such as obstruction

12   of justice, regardless of what is in the plea agreement in

13   terms of that, and the government would not be presenting

14   any evidence regarding that obstruction of justice

15   enhancement.

16           THE COURT:  But you have a plea agreement, so

17   it's already been provided.

18           MS. ROOHANI:  And I believe that the defendant

19   fully understood that in terms of the relevant conduct.

20           And of course, Your Honor, this is a little bit

21   strange to begin with, right, because typically people

22   don't come and ask for a plea agreement when you're the

23   majority of the way through trial where Your Honor has

24   heard the majority of the evidence.

25           But that was a risk that the defendant took.

TRANSCRIBED FROM DIGITAL RECORDING

1    And the government gave him an out.  We said, "If you don't

2    want to enter into this plea agreement, that's fine, let's

3    just continue with trial."

4              And he said, "No, I want the plea agreement."

5              And he agreed to enter the plea agreement

6    knowing that Your Honor could consider relevant conduct and

7    certainly things that he would sign under the penalty of

8    perjury in the plea agreement.

9              Of course, he knew that -- he understands

10   English.  He read the plea agreement.  He represented to

11   you that he read the plea agreement.  He represented to you

12   that he understood everything in that plea agreement.

13   And, of course, he knew that he was admitting to that and

14   that Your Honor could consider it.

15             And so in that way, it's -- it equally makes

16   sense that if -- and, quite frankly, Your Honor, it

17   doesn't, I guess, matter one way or the other whether you

18   add that obstruction of justice enhancement or not because

19   the guideline range is ultimately going to come back to

20   what it is.  Because it caps out at a certain amount

21   anyway.  And so that should not ultimately be the hang-up

22   here.

23             And in terms of them having additional time to

24   talk with him, I do believe -- and, again, you know

25   Mr. Marchese, Mr. Durham, and Mr. Sanft.  They are

TRANSCRIBED FROM DIGITAL RECORDING

1    practitioners in this district.  They do federal cases all

2    the time.

3              Mr. Sanft specifically said that it is his

4    practice to go through the guidelines with the client.

5    Over the course of representation and based upon the

6    representations that they have made to you in this

7    affidavit, I believe that you can conclude that they did

8    actually talk to him about the sentencing guidelines.

9              And to the extent that you're not comfortable --

10             THE COURT:  Does Mr. Sanft say he actually spoke

11   to Mr. Fuechtener about the guidelines?  He just said it's

12   practice.  But I think he was on the case, and then he

13   wasn't on the case.  And he didn't come back in the case

14   until right before trial; right?

15             MS. CONNOLLY:  If you see his affidavit, what he

16   says is, "I've been practicing in federal court" --

17             THE RECORDER:  Ms. Connolly?  Ms. Connolly --

18             THE COURT:  Oh, go ahead and pull the microphone

19   towards you.  You're taller than our microphones are.

20             MS. CONNOLLY:  In his plea he says:

21              It's my custom to always go over the

22        Federal Sentencing Guidelines...I did review the

23        sentencing guidelines... I cannot recall the

24        specific day, as most of the time -- of my time

25        spent with him revolved around his repetition of

TRANSCRIBED FROM DIGITAL RECORDING

1    the same investigative leads and defenses he felt

2    was important.

3              And he was out of the -- he was out of the case

4    for a big block of time.  And he came in on the eve of

5    trial.

6              So he didn't say, "I went over the guidelines

7    specifically in this case," it was more generally, "It was

8    my custom to do that."

9              THE COURT:  So it looks  like we don't have --

10             MS. ROOHANI:  Well, Your Honor, if you --

11             THE COURT:  -- any evidence that anyone went

12   over the guidelines with Mr. Fuechtener.

13             I know you are assuming that they did, when

14   they're coming in and out of the courtroom, when you're in

15   the attorney conference room just outside the doors and

16   then the defense attorneys are coming in and out, but the

17   defense attorneys also say in their affidavits that

18   Mr. Fuechtener's greatest concern was how this was going to

19   appear to his fan base, how the media was going to feel

20   about this or his reputation and the business.  I think

21   that seems --

22             MS. CONNOLLY:  And, Judge, I set --

23             THE COURT:  -- consistent with --

24             MS. CONNOLLY:  -- I set out a timeline, and in

25   fact I even provided you the transcript where Ms. Roohani

TRANSCRIBED FROM DIGITAL RECORDING

1   says, "I think Mr. Marchese and I concur that we do need

2   time until tomorrow to have some discussions to figure out

3   some things."

4         She got the plea agreement to Marchese at 10:00.

5   He had to come over here by 12:00, and then they're back in

6   front of the Court at 12:00.

7         And I went through the whole timeline in my

8   motion on -- in my reply, and I pointed out that there was

9   a recess; however, they didn't meet with him during the

10   recess.  And I even got the marshal records showing they

11   didn't meet with him during the recess.

12         And you're correct it was general discussion

13   about, "We're going to (indiscernible) 15 years, you could

14   get five years" and, you know, stuff the Court was

15   (indiscernible).

16         But quite clearly, with that transcript, they

17   both needed time to talk, according to Ms. Roohani.

18         MS. ROOHANI:  And, Your Honor, maybe if I could

19   clarify.

20         Special Agent Panovich was there when I spoke

21   with Mr. Sanft.  We had a conversation with him over the

22   phone.  And after that I asked him to memorialize that and

23   send it to me in affidavit.

24         In Special Agent Panovich's 302, which

25   memorialized that conversation, it reads:  It's standard

TRANSCRIBED FROM DIGITAL RECORDING

1    operating procedure for Sanft to discuss sentencing

2    guidelines in all federal cases he worked on, to include

3    Fuechtener, which is what is in his affidavit.

4            But then he said he recalled going over the

5    sentencing guidelines at the beginning of taking the case.

6    He did go over the guidelines with the defendant.

7            And I believe if you called him to the stand he

8    would testify to that.

9            MS. CONNOLLY:  And I would submit they didn't

10   even have all the discovery at the beginning of the case.

11   He can't possibly go over the guidelines and all applicable

12   enhancements with the volume of the images in this case.

13   He didn't have the information at the beginning of the case

14   to be able to have a cogent, intelligent discussion with

15   him about all applicable guidelines.

16           MS. ROOHANI:  And, Your Honor, and I'll note

17   that the majority of the discovery of this -- you'll

18   remember at the beginning of this case, Mr. Marchese was

19   very insistent that we go to trial in June.

20           So the bulk of the discovery had been produced

21   at the complaint stage.

22           So before this case was ever indicted they had

23   the discovery.  We also had a detention hearing before Your

24   Honor, a detention appeal before Your Honor.  And I made it

25   a point to make sure that Mr. Marchese had every single

TRANSCRIBED FROM DIGITAL RECORDING

1    piece of paper that I had before that detention hearing.

2              So it cannot be -- and all of those -- the

3    enhancements, Your Honor, all come from the defendant's

4    computer, including the chats, including all the counts,

5    all the evidence come from the defendant's devices.

6              We didn't gather this from additional sources,

7    confidential sources of other people.  This is all evidence

8    that was in the defendant's computers, which the defense

9    had access to from the very beginning.  And we went above

10   and beyond to produce that to them in paper format.

11             So it's just false to say that they didn't have

12   access to this information.

13             MS. CONNOLLY:  And, Judge, this is electronic

14   evidence, so they had to hire experts and investigators to

15   go through and organize.

16             This is not a 302 in a drug case where you go

17   over with your client and say, "Okay, this is the level of

18   drugs, this is what you're looking at, let's look at the

19   guideline range."

20             This is a far more complicated case than your

21   run-of-the-mill drug case, where it's easy to calculate the

22   guidelines.  And they never went over it with him.

23             Marchese was the lead counsel.  Sanft was in and

24   out.  Marchese never went over it with him.  Durham never

25   went over it with him.

TRANSCRIBED FROM DIGITAL RECORDING

1                 MS. ROOHANI:  And, Your Honor, I'll just note,

2     before I sit down, this is the last thing I'll ultimately

3     say on this is that --

4                 THE COURT:  Just a minute, Ms. Roohani.  Are you

5     saying that the defense had all of the evidence at the

6     detention hearing and then there was no additional evidence

7     that was provided before trial?

8                 Because I remember that there was.

9                 MS. ROOHANI:  Yes.  And I can clarify, Your

10    Honor.

11                The 302s that were produced in this case, the

12    forensic reports and all of the things that were associated

13    with that, had been produced before the detention hearing.

14                The things that were -- there were thousands of

15    pages produced after the detention hearing.  But it was

16    because the defense had asked us to print out this -- they

17    had gone down to the office, they had looked at these Skype

18    chats that we were specifically referring them to at the

19    office.  And they said, "Can you print those out for us?"

20                That was the chats that ultimately became the

21    additional evidence that came through, and as well as the

22    Dropbox evidence which we never even got to and is not even

23    considered as part of the plea agreement.

24                That was the additional evidence that came after

25    the detention hearing.  The majority of this investigation,

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    with the exception of the Dropbox stuff, was completed
 2    before the detention hearing and gave rise to the ultimate
 3    charges in this case.
 4              So -- and again, Your Honor, you'll remember at
 5    the detention hearing where I argued, Mr. Marchese argued,
 6    Mr. Sanft was sitting directly next to him, and I presented
 7    Your Honor with a copy of the forensic report.
 8              So to say that they didn't know the number of
 9    images or where the chats were, it was all in the forensic
10    report.  Your Honor saw that forensic report.  It was
11    entered as evidence at trial.
12              So they did have access to all of this
13    information, and all of that information created the basis
14    of the ultimate guidelines in this case.  So they did have
15    the information to be able to advise them of that.
16              And Mr. Sanft told Special Agent Panovich and
17    myself, he indicated it in his affidavit that he did advise
18    the defendant of those guidelines.
19              MS. CONNOLLY:  And, Judge, I would indicate in
20    the letter from Mr. Nadig he even points out that he and
21    Mr. Sanft didn't meet with my client very often, it was --
22    again, it was Marchese, who was the lead counsel, was the
23    one that was meeting with my client on a regular basis.
24              He was the one that was consistent from start to
25    finish.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  So Mr. Sanft's affidavit says that:
 2         I have been practicing in federal court
 3     cases for the entire length of my career.  It is my
 4     habit and custom to always go over the Federal
 5     Sentencing Guidelines with my client.  Although I
 6     did review the sentencing guidelines with
 7     Fuechtener, I cannot recall the specific day, as
 8     most of the time spent with him revolved around his
 9     repetition of the same investigative leads and
10     defenses he thought were important.
11              It does sound like he's equivocating his review
12     of the guidelines with Mr. Fuechtener.
13              I'm inclined to either grant the motion or have
14     an evidentiary hearing, but I cannot deny the motion based
15     on the information that's been provided.
16              MS. ROOHANI:  And if that's the case, Your
17     Honor, we would ask that you hold an evidentiary hearing.
18     Because I believe if you hear testimony from Mr. Marchese,
19     Mr. Sanft, and Mr. Durham, that they will tell you that
20     they did go over the sentencing guidelines with
21     Mr. Fuechtener.
22              MS. CONNOLLY:  But they won't tell you they went
23     over the guidelines.  If they went over the guidelines,
24     they would have put it in their affidavit.  Nobody went
25     over the guidelines or this plea agreement with him.
```

TRANSCRIBED FROM DIGITAL RECORDING

1       They could have gone to see him the night before

2  and spent some time, and they chose not to do that for

3  whatever reason.

4       And that was fatal, I would submit.

5       THE COURT:  So, Ms. Roohani, what -- what

6  specifically do you think that the evidentiary hearing

7  would produce that would be helpful?

8       MS. ROOHANI:  Well, Your Honor, if your concern

9  is whether they went over the sentencing guidelines with

10 him, I will submit to you that I did not ask them that.

11 Had I asked them that, I do believe that the answer to that

12 question would be yes.

13      And, quite frankly, Mr. Sanft told us, and this

14 is in the 302, that Special Agent Panovich again was taking

15 notes as we're having this conversation with him.  He said,

16 "I did go over these guidelines with him."

17      If that's your concern, I believe that you will

18 receive testimony that they did go over the guidelines with

19 him.

20      And that would be sufficient.  That would be

21 enough to overcome any objections that he had that he

22 didn't understand what the number 40 meant.

23      MS. CONNOLLY:  I think they'd have to have gone

24 over the guidelines in the context of this plea.

25      THE COURT:  Right, the plea agreement.

TRANSCRIBED FROM DIGITAL RECORDING

1           MS. CONNOLLY:  And they couldn't do that.

2           And as the Court indicated, if they'd had a plea

3    agreement before, what usually happens is we go back and

4    forth and we bicker over two points here or two points

5    here.

6           There was no plea agreement in this complex

7    nature of a case.

8           So even if they just generically discussed

9    guidelines, which we all do, with, "Here's the guidelines,

10   here's the criminal history on the top, and here's the

11   specific offense characteristics, and this is how the

12   sentence is calculated," it wasn't discussed specific to

13   this guilty plea.  And we know that.

14           MS. ROOHANI:  We don't know that, Your Honor.

15           MS. CONNOLLY:  We know that because he didn't

16   have the guilty plea until 10:00 that morning.

17           MS. ROOHANI:  And if between 10:00 and 12:30,

18   when he entered the plea, if they went over it with him,

19   then that would be sufficient.  My --

20           MS. CONNOLLY:  Well, no, they -- the record

21   shows that Mr. -- Mr. Durham was --

22           THE COURT:  Just a minute.

23           So Mr. Marchese's affidavit says that he

24   informed the defendant that his exposure was five to

25   possibly upwards of 30, that he did not believe that the

TRANSCRIBED FROM DIGITAL RECORDING

1    judge would sentence him to life.

2         So it sounds like he did understand that there

3    was a possibility of a minimum of five years.  He says

4    that -- where is it here?  Let's see.  It's document 216-1

5    on page 2, paragraph 9, Mr. Marchese's affidavit:

6         I personally told the defendant that he

7         would serve a minimum of five years and that the

8         government would ask for him to serve a really high

9         sentence, possibly upwards of 30 years.  I

10        explained that Judge Navarro would decide the

11        sentence but that I did not personally believe that

12        Judge Navarro would sentence the defendant to life.

13        I personally explained that the defendant would be

14        deported after serving his sentence.

15             MS. CONNOLLY:  It doesn't say anything about --

16             THE COURT:  So that supports the defendant's

17    claim that he believed that there was a five-year minimum

18    that was an option that he was going to be able to obtain.

19             MS. ROOHANI:  That is an option that he would be

20    able to attain if Your Honor varied or departed downward.

21             MS. CONNOLLY:  It was not a realistic option.

22             MS. ROOHANI:  It's irrelevant --

23             MS. CONNOLLY:  It isn't irrelevant --

24             MS. ROOHANI:  -- whether it was realistic or

25    not.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. CONNOLLY:  -- to say that an attorney
 2    mis- -- gives their client unrealistic evidence or
 3    unrealistic advice.  That's their obligation, to give
 4    realistic advice to the defendant.
 5              He doesn't say in his affidavit even that he
 6    told him the stipulated sentence is 24 to 30 years.
 7    Nowhere in any affidavit does it say that.
 8              THE COURT:  There on page -- let's see, document
 9    216-2, which is Mr. Durham's affidavit --
10              MS. CONNOLLY:  Stipulated guideline --
11              THE COURT:  -- paragraph 9, it says:
12               I personally explained that the plea
13          agreement dropped the advertising charge which
14          carried a 15-year mandatory minimum sentence.  I
15          also explained that the sentence -- sentencing
16          guideline range under the plea agreement was a
17          five-year mandatory minimum with slightly over 30
18          years on the high-end cap for the government's
19          argument.  I explained that we could present
20          mitigating evidence to the Court at the time of
21          sentencing to argue for the lowest possible
22          sentence.
23              And he says he also explained the difference
24    between executive and current terms.  So that's why I'm not
25    spending time on that particular question.
```

TRANSCRIBED FROM DIGITAL RECORDING

1                But as to the five-year --

2                MS. ROOHANI:  And, Your Honor, that 30 years can

3      only refer to the guideline range in the plea agreement.

4      Otherwise, 30 years doesn't make any sense.  It just

5      doesn't make sense.

6                Then the answer would had to have been 60 years

7      because Your Honor could run all three of them consecutive.

8      30 years only works, in any mathematical equation, if

9      you're talking about this plea agreement.

10               Otherwise, Your Honor, there's a five-year

11     mandatory minimum on the receipt count and a five-year

12     mandatory minimum on the distribution count.  The only way

13     he could receive five years is by talking about the plea

14     agreement because they run concurrent.  Mathematically

15     speaking, that is the only thing that they could be talking

16     about.

17               So to the extent that you are not inclined to

18     deny the motion today, I do believe that based upon what

19     they -- and, again, Your Honor, maybe it's my fault because

20     I didn't specifically ask them this question, so they

21     didn't know to put this into the plea agreement -- or into

22     the affidavit, but I do believe that they would testify

23     that they talked to him about the guidelines.

24               And it's indicated in their affidavits that they

25     did talk to him about the guidelines, based upon the things

TRANSCRIBED FROM DIGITAL RECORDING

1  that they told you that they told him.  They could not be

2  talking about anything else.

3            MS. CONNOLLY:  I can tell you, as an officer of

4  the court, that Mr. Pacitti told me in the courtroom there

5  was no discussion about guidelines.  The discussion was,

6  "You can get five years, potentially get five years."

7            They didn't have the guilty plea agreement.

8  It's a 17-page document.  So if Mr. Marchese had it in his

9  hand at 10:00, by assuming he ran right over here, they had

10 to read a 17-page document with him, never mind sit down

11 and explain it to him and go over it with the guidelines.

12            As the Court indicated, insufficient time, just

13 on its face, that would be a plausible reason to -- or a

14 fair and just reason to let him withdraw the plea, given

15 the exposure in this case.  And for them not to have come

16 in and requested additional time I think was ineffective.

17            THE COURT:  All right.  Well, I don't think that

18 I could with all the information presented, not just here

19 in the hearing but in all the documents, as well, that I

20 can deny the motion and expect that the circuit court would

21 look at this and be comfortable with that decision.

22            So to save some time, I think we should just

23 have an evidentiary hearing so that we can at least get the

24 facts a little bit more clear.  Because it does appear as

25 if there is a fair and just reason to withdraw the plea at

1    this time.  But the Court's not clear whether that

2    information does, in fact, exist or not.

3          The -- again, a lot of this information depends

4    on what the attorneys told the defendant.  The defendant

5    has provided his own affidavit, which is attached to the

6    reply.  And I think I bookmarked that.  No, I didn't.  I

7    have this here.  It's at the end.

8          MS. ROOHANI:  It's document 222, Your Honor.

9          THE COURT:  That's right.  It was filed

10   separately.

11         And he says:

12          I was never told by my lawyers that under

13      the sentencing guidelines the recommended sentence

14      was 24 to 30 years.  The guidelines were not

15      explained to me.  I never knew the guideline table

16      until after I pled guilty and then by a fellow

17      inmate.

18          I had no idea of the significance of the

19      guidelines when I pled guilty.  I knew I was a

20      level 40 but had no idea what that meant in terms

21      of years.  Had I known, I would never have pled

22      guilty.  I would have taken my chances at trial and

23      the legal process.

24          So even though the Court does explain in the

25   plea colloquy what the mandatory minimums are, what the

TRANSCRIBED FROM DIGITAL RECORDING

1    maximum sentence is for each of the counts, and that they

2    can be run concurrent and consecutive, my canvass is

3    limited to the statutory minimums and maximums and how they

4    can run.

5            I don't break down what the guideline range is,

6    other than what is represented in the plea agreement is

7    certainly something that he has to have reviewed and

8    understood.  But I don't explain to him what the plea

9    agreement includes as a guideline range or that there are

10   facts that are included in that plea agreement which would

11   tend to support additional special characteristics being

12   considered even though they are not part of the plea

13   calculation.

14           So in the two different paragraphs there's, you

15   know, the section on facts and there's the section about

16   the calculation, and the calculation comes down to a 42

17   minus 2 is 40, doesn't include the levels for the other

18   facts.  But the facts are in the plea agreement regarding

19   him deleting or instructing someone to delete e-mails,

20   which would support an obstruction of justice, special

21   characteristics, and the one about him providing -- sharing

22   pornography in consideration of not a monetary gain but the

23   ability to watch someone else have sex with their daughter,

24   that five-level increase.  That -- all that specific

25   information is included in the plea agreement.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  And, Your Honor, I -- to be clear,

2    I still don't understand, and perhaps you can explain to

3    me, why it's relevant that there's additional facts in the

4    plea that may potentially give rise to additional

5    enhancements if the government is not seeking those

6    enhancements.

7          THE COURT:  If the government is not seeking

8    those enhancements, then why are those facts included in

9    the plea agreement?  And how is the defendant able to argue

10   for a five-year sentence if the information in the plea

11   agreement actually -- the facts in the plea agreement

12   justify a higher guideline range than what's in the plea

13   agreement?

14          MS. ROOHANI:  Well, and Your Honor, if the

15   government -- for example -- and I'm just speaking

16   hypothetically.  If we had put that fact in the plea

17   agreement specifically to trick somebody into agreeing to

18   an obstruction of justice enhancement, that would make

19   sense.

20          But if we put that fact in the plea agreement

21   because it was the evidence that was presented at trial

22   with no intention that it ever -- if it -- essentially if

23   it was accidentally put in the plea agreement, because it's

24   something that the government has felt that it had already

25   proven, then I don't think that that should be held against

TRANSCRIBED FROM DIGITAL RECORDING

1    defense counsel for not advising him of it or against the

2    government.  I don't think that that's -- can be part of

3    the calculus at that point.

4              MS. CONNOLLY:  I think that's huge.  That's

5    their job, is to make sure that there's nothing that's

6    going to come in and trip them up.

7              And, again, if you look at footnote 14 out

8    there, government's response is pretty evident that they're

9    not going to make any objection to this Court considering

10   evidence that was presented.

11             They specifically say in there:

12              In the event that the government will not

13        present -- be presenting additional evidence to

14        support any specific offense characteristics or

15        enhancements not expressly contained in the plea

16        agreement, the government reserves the right to

17        present evidence to support the stipulated offense

18        characteristics should defendant breach.

19             Right before that they indicate:

20              The Court heard virtually all the

21        government's case in chief and it is the

22        government's position that the Court may consider

23        all that evidence as relevant conduct.

24             So, again, they're speaking out of both sides of

25   their mouth.  (Indiscernible) come up here and judge -- and

TRANSCRIBED FROM DIGITAL RECORDING

1    specifically say you should apply these, but you should

2    because you've heard the evidence.

3              And as the judge, it is incumbent upon you to

4    consider that.  So although they may not be specifically

5    requesting it, it's relevant conduct.  That certainly

6    wasn't told to him by his counsel.

7              MS. ROOHANI:  But it was told to him by Your

8    Honor, it was told to him by me, and he agreed that he

9    understood it.

10             MS. CONNOLLY:  He has counsel.  He has lawyers

11   to advise him.  They didn't tell him obstruction or -- as

12   the government indicated, their entire case in chief was

13   presented.

14             The Court has to look at everything, not just

15   what the government's telling the Court to follow.  That

16   wasn't explained to him.

17             And, again, it's beyond dispute that he wasn't

18   advised that he was stipulating to a guideline range of 24

19   to 30 years.

20             THE COURT:  Well -- and that's a good point,

21   because they do all say that it's five years as a minimum.

22   This is a statutory minimum, not a guideline minimum.  The

23   minimum under the guidelines that he agreed to was a level

24   40, which is not a five-year sentence.  And their

25   affidavits state that what they --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  So there again --

2          THE COURT:  -- communicate to him was that it

3     was a five-year minimum.  That's a statutory minimum.

4     That's not the guideline minimum range.

5          So, again, we're back to what I had written down

6     before, which was I'm not sure that they really explained

7     the guidelines to him and his guideline exposure under the

8     plea agreement.

9          What they're saying is that they explained what

10    the statutory minimum and maximums were.  But --

11          MS. ROOHANI:  And, Your Honor, I just -- I want

12    to clarify because I think that this is important going

13    forward, is I don't believe that there's any authority that

14    says that an attorney has to specifically say, "This is the

15    low end of the guideline range, this is the high end of the

16    guideline range that you're stipulating to."  I don't think

17    there's any case authority that says that.

18          *Toothman*, which is the only thing that the

19    defendant cites, talks about using two different guideline

20    provisions that cause a huge discrepancy, a difference of

21    10 to 16 months versus 100 and something to 200 months.

22    That would make sense.

23          And, more importantly, Your Honor, a lot of

24    this -- these numbers are driven by criminal history.  And

25    so if they didn't know his criminal history, they couldn't

TRANSCRIBED FROM DIGITAL RECORDING

1    have said 24 to 30 years or whatever it might be.

2              So it's also driven by that.  So I just want to

3    be clear --

4              THE COURT:  Well, there are cases that cover

5    those situations because those are more common.

6              So that's not an issue here.  He has no criminal

7    history.

8              MS. ROOHANI:  Okay.  So I guess that if we're

9    going to have an evidentiary hearing, would it be

10   preferable to Your Honor for us to now go and speak with

11   Mr. Marchese, Durham, and Sanft, asking them specifically

12   about what they told him regarding the guidelines and

13   submit affidavits to Your Honor to streamline this process,

14   or would you prefer to have an evidentiary hearing?

15             MS. CONNOLLY:  Judge, I would maintain -- I

16   would want to bring in Mr. Pacitti regarding what he told

17   him, and also the inmate -- and I haven't revealed his name

18   because I don't want there to be negative repercussions,

19   but he's willing to come in and talk about he said, "This

20   is what level 40 is," and how he reacted when he made him

21   aware, "You just stipulated the guideline range was 24 to

22   30 years."

23             MS. ROOHANI:  And I would submit, Your Honor,

24   that Mr. Pacitti's advice to him, as a civil attorney, is

25   completely irrelevant, especially --

TRANSCRIBED FROM DIGITAL RECORDING

1           MS. CONNOLLY:  It is completely relevant.  He's

2   his lawyer.  He should have kept his mouth shut if he

3   didn't know how the guidelines work or he didn't know

4   something about criminal defense.  He certainly shouldn't

5   have still sat there and said, "You could get five years,

6   Jan, five to 15."

7           Again, that's maybe how the state court works

8   where you have a range, it's certainly not how federal

9   court work, and he had no business saying anything to him

10  or giving any recommendations to him.

11          MS. ROOHANI:  And, Your Honor, if I may?

12          THE COURT:  I think we'll go ahead and set an

13  evidentiary hearing.

14          How long do you need, Ms. Connolly, to prepare?

15          MS. CONNOLLY:  I'd say 30 days.

16          MS. ROOHANI:  Your Honor, I'll be in trial.

17          MS. CONNOLLY:  Whatever's convenient.  We're in

18  no rush.

19          THE COURT:  So you'll be in trial, Ms. Roohani,

20  until when, approximately?

21          MS. ROOHANI:  I'm in trial on January 16th; I'm

22  again in trial on February 5th, Your Honor.

23          MS. CONNOLLY:  What was that, I'm sorry?

24  February 5th?

25          MS. ROOHANI:  Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1             MS. CONNOLLY:  I also have a trial that week.

2             THE COURT:  So are you requesting something in

3     March?

4             MS. CONNOLLY:  Yes, please.

5             COURTROOM ADMINISTRATOR:  Your Honor, we do have

6     all day Wednesday, March 7, available.

7             MS. CONNOLLY:  March 7th, did you say?

8             COURTROOM ADMINISTRATOR:  Yes.

9             We could start at 9:00 that morning.

10            THE COURT:  I'm wondering if we shouldn't do

11    this on a Friday --

12            MS. CONNOLLY:  March 7th works for me.

13            THE COURT:  -- in case we're in trial.

14            COURTROOM ADMINISTRATOR:  We do have March 9th

15    available, Your Honor.

16            MS. CONNOLLY:  What was the other one?  I'm

17    sorry?

18            COURTROOM ADMINISTRATOR:  March 9th.

19            MS. CONNOLLY:  9th?

20            THE COURT:  All right.  So how about Friday,

21    March 9th, starting at 9:00?

22            MS. CONNOLLY:  Yes.

23            MS. ROOHANI:  And, Your Honor, may I request

24    that you tell me specifically what the parameters of this

25    hearing are, and if Ms. Connolly will allow me to speak

TRANSCRIBED FROM DIGITAL RECORDING

1    without being interrupted, I would appreciate it, in terms

2    of Mr. Pacitti and his additional inmate.

3          It's my understanding based upon the

4    conversation that we've been having today, is that Your

5    Honor was concerned with the advice that Mr. Durham,

6    Mr. Sanft, and Mr. Marchese had given to Mr. Fuechtener as

7    his retained attorneys who were noticed on this case.

8          Mr. Pacitti in the letter that was attached by

9    Ms. Connolly to her motion said that he is not

10   comfortable --

11         THE COURT:  If you're asking what are the

12   parameters of the hearing, they're the information provided

13   in the motion and the reply and the response that's already

14   been filled with the Court as well as the information

15   provided here at the evidentiary hearing.

16         So I'm not limiting or excluding any of the

17   information that's already on the record that is part of

18   this motion that would consistently be part of the

19   evidentiary as well.

20         MS. ROOHANI:  Does that include any

21   disagreements between Mr. Nadig, Ms. Craig?  Because the

22   motion was significantly --

23         THE COURT:  Inasmuch as they are relevant to the

24   issue, then, yes.  If they're not relevant to the issue,

25   then there would be no need to go into those.  So --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  And to be clear, Your Honor, the

2     burden is on Ms. Connolly to show that he wasn't given this

3     information.  Would that be fair to say?

4          THE COURT:  The burden is on Ms. Connolly to

5     demonstrate that the defendant can show a fair and just

6     reason for requesting the withdrawal.

7          MS. ROOHANI:  Okay.  Thank you, Your Honor.

8          THE COURT:  Also there is a matter that I wanted

9     to address because of the situation with the plea agreement

10    being in question and the request to withdraw.

11         There was a prior hold on the funds that were in

12    the trust.  It was $975,300 and there was a request that

13    that -- that those funds not be withheld since they were

14    going to be released to pay the fine, forfeiture, and

15    restitution pursuant to the plea agreement.

16         But if the plea agreement is going to be

17    withdrawn -- and I'm not saying it is or isn't, but it

18    looks like there's that potential, I wanted to make sure

19    that I was clear what was going on with that -- those

20    funds.  Had they already been released, or are they still

21    being withheld?

22         MS. CONNOLLY:  Judge, and we're fine with you

23    holding those until March, until we have this evidentiary

24    hearing.

25         MS. ROOHANI:  They've been deposited with the

1    court clerk.  They're being held with the court.

2              THE COURT:  All right.  So they're still

3    being --

4              MS. CONNOLLY:  I can't speak for --

5              THE COURT:  -- held with the Court.

6              MS. CONNOLLY:  -- Mr. Alfter and his counsel.

7    But on behalf of Mr. Fuechtener, we're fine with just

8    leaving them for now.

9              THE COURT:  All right.  Okay.  So that will be

10   the order, then, that they'll still remain deposited with

11   the court as they are now, and we'll decide after the

12   motion to withdraw is resolved whether we need to address

13   those funds any differently than what has already been

14   ordered.

15             So we'll see you back here then Friday,

16   March 9th, at 9:00 a.m.

17             MS. CONNOLLY:  Thank you.

18             MS. ROOHANI:  Thank you, Your Honor.

19             THE COURT:  Thank you, counsel.

20             COURTROOM ADMINISTRATOR:  Your Honor, one

21   additional thing.

22             The sentencing is currently set for February

23   15th.  Do we want to see if the parties are willing to

24   stipulate that, or we can continue it now?

25             THE COURT:  Yes.  Let's go ahead and continue

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    that now until after the evidentiary hearing.  What would

 2    be the next date?

 3                COURTROOM ADMINISTRATOR:  We do have Thursday,

 4    March 22nd, at 10:00 a.m.

 5                MS. CONNOLLY:  I'm sorry.  I wasn't paying

 6    attention.

 7                MS. ROOHANI:  Your Honor, we had previously

 8    stipulated to 45 days after the resolution --

 9                MS. CONNOLLY:  Yes.

10                MS. ROOHANI:  -- of the motion.

11                THE COURT:  Okay.

12                MS. CONNOLLY:  Is this the sentencing date

13    you're talking about?  I'm sorry.

14                THE COURT:  All right.  So the evidentiary

15    hearing is Friday, March 9th.

16                COURTROOM ADMINISTRATOR:  So approximately 45

17    days, Your Honor, would be Thursday, April 26, 2017, at

18    9:00 a.m.

19                MS. ROOHANI:  2018?

20                COURTROOM ADMINISTRATOR:  Yes.

21                MS. CONNOLLY:  That's spring break?  Can you do

22    it -- I think that might be spring break.  Can you do it

23    (indiscernible).

24                COURTROOM ADMINISTRATOR:  I'm double checking

25    that date, Your Honor.
```

TRANSCRIBED FROM DIGITAL RECORDING

1              Spring break for Clark County this year is

2    actually March 23rd.

3              MS. CONNOLLY:  May 26 is sentencing?

4              COURTROOM ADMINISTRATOR:  April.

5              MS. CONNOLLY:  April 20 --

6              COURTROOM ADMINISTRATOR:  April.

7              MS. CONNOLLY:  At what time?

8              COURTROOM ADMINISTRATOR:  9:00 a.m.

9              MS. CONNOLLY:  And then the evidentiary hearing

10   starts at 9:00 on the 9th?

11             COURTROOM ADMINISTRATOR:  Correct.

12             THE COURT:  So both are at 9:00 a.m.:

13   Evidentiary hearing is Friday, March 9th, at 9:00 a.m., and

14   then sentencing is continued until Thursday, April 26, at

15   9:00 a.m.

16             All right.

17             COURTROOM ADMINISTRATOR:  Off record.

18             THE COURT:  Off record.

19        (The proceedings concluded at 10:51 a.m.)

20                    *    *    *

21

22

23

24

25

1                              -o0o-

2          I certify that the foregoing is a correct

3          transcript from the electronic sound recording

4          of the proceedings in the above-entitled matter.

5

6          _____        1/12/18

7          Donna Davidson, RDR, CRR, CCR #318      Date
           Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25