1           UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
2        BEFORE THE HONORABLE GLORIA M. NAVARRO
             CHIEF UNITED STATES DISTRICT JUDGE
3

4
UNITED STATES OF AMERICA,          :
5                                   :
          Plaintiff,                :
6                                   :No. 2:16-cr-00100-GMN-CWH
     vs.                            :
7                                   :
JAN ROUVEN FUECHTENER,             :
8                                   :
          Defendant.               :
9  _____ :

10

11

               TRANSCRIPT OF EVIDENTIARY HEARING (Day 2)
12

13

14                    April 16, 2018

15
                    Las Vegas, Nevada
16

17

18

19
    FTR No. 7D/20180416 @ 1:34 p.m.
20

21
    Transcribed by:        Donna Davidson, CCR, RDR, CRR
22                         (775) 329-0132
                           dodavidson@att.net
23

24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by mechanical stenography and computer.)

```
 1
                    A P P E A R A N C E S
 2

 3    FOR THE PLAINTIFF:

 4    Elham Roohani
      Lisa Cartier-Giroux
 5    U.S. ATTORNEYS OFFICE
      501 Las Vegas Boulevard South
 6    Suite 1100
      Las Vegas, Nevada 89101
 7    (702) 388-6336
      Elham.Roohani@usdoj.gov
 8

 9    FOR THE DEFENDANT:

10    Karen A. Connolly
      KAREN A. CONNOLLY, LTD.
11    6600 West Charleston Boulevard
      Suite 124
12    Las Vegas, Nevada 89146
      (702) 678-6700
13    Advocate@kconnollylawyers.com

14

15    Also Present:
      Special Agent Mari Panovich
16

17

18

19

20

21

22

23

24

25
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              LAS VEGAS, NEVADA, APRIL 16, 2018, 1:34 P.M.

 2                           --oOo--

 3                    P R O C E E D I N G S

 4

 5              COURTROOM ADMINISTRATOR:  All rise.

 6              THE COURT:  Thank you.  You may be seated.

 7              Sorry for the delay.  I was waiting for some

 8    documents that I needed to sign.  And then I decided to

 9    edit them.  And now they're signed and we're done, and we

10    can -- you have my undivided attention.

11              COURTROOM ADMINISTRATOR:  This is the time set

12    for the evidentiary hearing, day 2, in case number

13    2:16-cr-100-GMN-CWH, United States of America versus Jan

14    Rouven Fuechtener.

15              Counsel, please make your appearances for the

16    record.

17              MS. ROOHANI:  Good afternoon, Your Honor.  Ellie

18    Roohani and Lisa Cartier-Giroux for the United States.

19              We are joined by Special Agent Mari Panovich.

20              THE COURT:  Good afternoon.

21              MS. CONNOLLY:  Karen Connolly appearing with

22    Defendant Jan Rouven Fuechtener, who is present in custody.

23              THE COURT:  Good afternoon.

24              All right.  So are we going to go ahead and

25    continue?  I don't remember who was up.  Ms. Roohani.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1            MS. ROOHANI:  Yes, Your Honor.  I had just
 2    finished my cross.  I believe it's Ms. Connolly's turn.
 3            I just wanted to make the Court aware.
 4    Ms. Cartier-Giroux has to leave at 2:15 --
 5            THE COURT:  Okay.
 6            MS. ROOHANI:  -- for a previously scheduled
 7    appointment.  We didn't want you to think she's being rude
 8    if she has to walk out.
 9            THE COURT:  No.  You're free to go whenever you
10    need to.
11            MS. CARTIER-GIROUX:  Thank you, Your Honor.
12            THE COURT:  All right.
13            So Ms. Connolly.
14            MS. CONNOLLY:  I'll be very brief.
15                    BENJAMIN NADIG
16       recalled as a witness, having been previously sworn,
17              was examined and testified as follows:
18                  REDIRECT EXAMINATION
19    BY MS. CONNOLLY:
20    Q.   And, Mr. Nadig, if I ask you any questions I've
21    already asked, I apologize.  As you know we commenced this
22    hearing a few weeks ago.
23            Just a couple of things I want to clarify.
24    A.   I was going to say, I've been there.  But can you do
25    me a favor?  Speak up.  Because I'm pretty hard of hearing.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.    Okay.  When I was asking you questions about who

2   your representation was in this case, you indicated that

3   your representation of Jan was fluid.  Is that accurate?

4   A.    Well, no, I said my representation of Frank was

5   fluid.

6   Q.    Representation was what?

7   A.    Of Frank was fluid.

8   Q.    Okay.  So is your testimony you did not represent

9   Jan?

10  A.    Once again, the intent was to represent Frank.  If

11  Frank was deemed not to be -- not to create a conflict, I

12  could support both Mike and Jess at the time of trial.

13  Q.    Okay.  And you had testified previously that at

14  Frank's request you had went and you had met with Jan on a

15  couple of occasions; correct?

16  A.    That is a fair statement, yes.

17  Q.    And as set forth in an e-mail you sent on September

18  23rd -- September 3rd, 2016, you had reviewed the discovery

19  in the case together with Michael Sanft; correct?

20  A.    Not together.  We had reviewed it independently.

21  But it was his copy, yes.

22  Q.    And you indicated -- so when you were talking about

23  that you spent a significant amount of time on this case,

24  you were referring to the case of the government against

25  Jan; correct?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Well, yes.  In the lens of protecting Frank, but

2    yes.

3    Q.    Okay.  And also in that e-mail, you did, in fact,

4    indicate that you're representing Jan?

5    A.    Inartfully, yes.

6    Q.    And you also indicated in that e-mail that you

7    represented Frank, and one of the reasons you represented

8    Frank was because he was the person that should get blamed;

9    correct?

10   A.    Once again, paraphrasing, but inartfully, yes.

11   Q.    Well, if you want to refresh your recollection, the

12   e-mail is right in front of you there as Exhibit C.  It's

13   halfway down the second page.

14   A.    I'm accepting your representations as true.

15   Q.    Okay.

16   A.    I don't need to refresh my --

17   Q.    And I believe your previous --

18   A.    -- my recollection.

19   Q.    -- testimony was you never got any kind of conflict

20   waiver from Jan or from Frank, did you?

21   A.    I don't know if I testified to that earlier, but we

22   did not, no.

23         And to be fair, to finish that question --

24   Q.    Okay.  I don't need --

25   A.    Well, I would just like to finish my answer, which

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    is that --
 2    Q.    Well, you answered my --
 3    A.    -- Frank --
 4    Q.    You answered my question, so --
 5    A.    All right.
 6    Q.    Thank you.
 7            And you've also -- and I believe we went over
 8    this previously, you met with one of Jan's experts in this
 9    case?
10    A.    Are you talking about the computer expert?
11    Q.    That was Mr. --
12    A.    I don't know what you're talking about.  I was not
13    there for that meeting.
14    Q.    Mr. Marchese was unavailable, he was out of town,
15    there was an expert, and you met with that expert; right?
16    Does that refresh your --
17    A.    No --
18    Q.    -- recollection?
19    A.    -- that is incorrect.  That was the individual who
20    went to the house.
21            Mr. Sanft was there for the individual who went
22    to the house.  I know because I received photographs of
23    various things from Mr. Sanft --
24    Q.    So -- so -- okay.  Let me --
25    A.    -- at Jan's house.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    So you never met with any of the defendant's

2    experts?

3    A.    I did not meet with that expert.  I don't recall any

4    other experts, no.

5              I was not involved in that portion of the

6    case --

7    Q.    So your testimony is you don't recall meeting with

8    any defense expert?

9    A.    No, that's not what I'm saying.  I'm saying I don't

10   recall --

11   Q.    Okay.

12   A.    -- meeting with them.

13   Q.    Now, in this e-mail you indicated -- you made the

14   statement on the very last paragraph where you indicated

15   that Jan will be found guilty.

16   A.    Yes.  And I believed that to --

17   Q.    What did --

18   A.    -- be true.

19   Q.    -- you mean by that?

20   A.    My understanding is that --

21   Q.    This is prior to trial, right, in September of 2016?

22        MS. ROOHANI:  Your Honor --

23        THE WITNESS:  I'm looking --

24        MS. ROOHANI:  -- I'm going to --

25        THE WITNESS:  -- at it --

TRANSCRIBED FROM DIGITAL RECORDING

```
1          MS. ROOHANI:  -- object based on relevance.  I
2    don't see how that's relevant at this point.
3          THE COURT:  Ms. Connolly?
4          MS. CONNOLLY:  I believe that it's going to
5    follow into my next questions which would relate to, When
6    you spoke with Jan, what did you discuss?
7          So his belief and what he communicated in this
8    communication which was forwarded to Jan in addition to a
9    subsequent meeting he had with Jan.
10         THE COURT:  Do you want to know the number of
11   times or the lengths of times that --
12         MS. CONNOLLY:  Okay.
13   BY MS. CONNOLLY:
14   Q.   You met --
15         THE COURT:  -- is that what --
16   BY MS. CONNOLLY:
17   Q.   After this e-mail, do you recall meeting with Jan
18   after -- or you sent this e-mail to Frank; right?
19   A.   Correct.
20   Q.   And you also sent it to Mr. Pacitti and Mike Sanft?
21   A.   That is correct.
22   Q.   And are you aware that -- whether or not this e-mail
23   was provided to Jan?
24   A.   After the fact, clearly -- I don't know if the
25   e-mail was provided, but clearly he had a conversation with
```

1    Frank about it.

2    Q.    And I believe also previously we discussed -- if you

3    look at Exhibit E in front of you, it's an e-mail from

4    yourself to Mr. Marchese.

5    A.    Exhibit what?

6    Q.    Exhibit E?

7    A.    Okay.

8    Q.    And in that you reference yourself as having been a

9    former member of the defense team; right?

10   A.    Yes.

11         MS. CONNOLLY:  Court's indulgence.

12   BY MS. CONNOLLY:

13   Q.    You had a meeting with Mr. -- with Jan, and after

14   your meeting with Jan, Mr. Sanft was put back on the case.

15   Are you familiar with that?  Or does that refresh your

16   recollection?

17   A.    Yes.

18   Q.    Okay.  Did you have a discussion with Jan about

19   putting Mr. Sanft back on the case?

20   A.    It was more of Jan suggesting he was more

21   comfortable with Mr. -- Mike on the stand -- on the case.

22   Q.    And so when did that discussion take place?

23   A.    I don't recall.

24   Q.    Okay.  Would it be fair to say shortly prior to

25   trial?

-TRANSCRIBED FROM DIGITAL RECORDING-

1    A.    To be fair, I think it's closer in time to this

2    e-mail, the September 21st e-mail, than it was to the time

3    of trial.

4    Q.    Would it be fair to say that this -- are you aware

5    of whether or not Jan was alone when he received this

6    e-mail?

7    A.    I don't --

8              MS. ROOHANI:  Your Honor, I'm sorry.  I don't

9    think that Mr. Nadig has the -- can get into

10   Mr. Fuechtener's head, unless he has specific knowledge

11   about what he said, in which case that's hearsay, and he

12   can't testify to that.

13             MS. CONNOLLY:  I wasn't asking for his notes.

14             THE COURT:  So do you want to just rephrase the

15   question then --

16             MS. CONNOLLY:  Okay.

17             THE COURT:  -- so it's --

18   BY MS. CONNOLLY:

19   Q.    So -- and did you -- do you recollect meeting with

20   him after this -- as a result of this e-mail or after this

21   e-mail?

22   A.    Yes.

23   Q.    Okay.  And when you met with him, you didn't contact

24   Mr. Marchese and request his permission to meet with Jan,

25   did you?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    No, I did it at Frank's request.

2    Q.    Okay.  And during that, there was discussion about

3    the defense team?

4    A.    No.  It was a question of whether Mike would come

5    back on.

6    Q.    Okay.  And you encouraged him to bring Mr. Sanft

7    back on; right?

8    A.    I suggested that Mike would be a benefit, yes.

9    Q.    And did you tell him that you were concerned that he

10   was going to get convicted with the current defense team

11   that he had?

12   A.    That's not what I said.  I said with the defense

13   theory, as I had known it, I thought it was a losing

14   theory.

15   Q.    Okay.  And who had made you aware of what the

16   defense theory was?

17   A.    Both Mike and Jess had let me know at various points

18   that -- you know, what the theory was.

19   Q.    So you had discussions with both Mr. Sanft and

20   Mr. Marchese about what Mr. Rouven's defense was going to

21   be at trial?

22   A.    Yes.

23   Q.    And in that September meeting, or right about

24   September, you communicated to him that you didn't have a

25   whole lot of faith in that?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I thought it was problematic, yes.

2    Q.    And you suggested he should bring Mr. Sanft back on?

3    A.    I -- once again, he said he would be more

4    comfortable with Mike coming on.  I just, once again, said

5    the theory was what was problematic.

6    Q.    And you and Mr. Sanft were retained.  You are the

7    one who brought Mr. Sanft on the case initially; right?

8    A.    No, we were both retained at the same time.

9    Q.    Okay.  And that was as a referral from Mr. Pacitti?

10   A.    Yes.

11   Q.    Now, in the e-mail you made the comment to Frank

12   that if Jan were to be in the best possible position going

13   forward that Frank should contact you?

14   A.    That's a fair statement.

15   Q.    Would it be fair to say that Frank did contact you?

16   A.    Yes, he did.

17   Q.    And as a result of that, you went to meet with Jan?

18   A.    After discussing -- and I don't want to get into

19   what I spoke with Frank about, but after that conversation,

20   I met with Jan.

21   Q.    Okay.  So what did you mean -- when you met with Jan

22   at Frank's request, did you discuss with him what you meant

23   in that letter when you said "If Jan wants to be in the

24   best possible position going forward, contact me"?

25   A.    Can you reask that?  I had a brain fart right in the

TRANSCRIBED FROM DIGITAL RECORDING

1    middle of that question.  I apologize.

2    Q.    One more time?

3    A.    I said I didn't --

4    Q.    Okay.  When you met -- wet -- when you met with Jan,

5    were you aware that Jan had -- whether or not Jan had

6    received a copy of your e-mail?

7    A.    No.

8    Q.    Okay.  Did you -- when you met with him, did you

9    discuss the e-mail?

10   A.    Yes.

11   Q.    Okay.  And did you explain to him why you made some

12   of the comments you made in that e-mail?

13   A.    Well, yes.

14   Q.    And what did you tell him?

15   A.    It was more -- the way you are presenting it would

16   suggest that I was driving the conversation, which was not

17   the case.

18   Q.    Well, just answer the question, please.

19   A.    I am answering the question.

20   Q.    No, you're not.

21          I didn't ask you an explanation why you said

22   what you said, I asked, What did you say to him about your

23   e-mail and comments you made in the e-mail?

24   A.    He asked -- he said, and I remember this vividly, he

25   said, "This is a mess, you know, why did I get rid of

TRANSCRIBED FROM DIGITAL RECORDING

1    Mike?"

2            That was how the conversation began.

3    Q.    Okay.

4    A.    And then I don't remember the specifics, but we

5    talked about the theory of the case and my belief in the

6    issues in the theory of the case.

7    Q.    So you disagreed with -- you expressed to him that

8    you disagreed with what his main core of his defense team

9    intended to do at trial?

10            MS. ROOHANI:  Your Honor, I believe that's been

11   asked and answered now four times since we started here

12   today.

13            MS. CONNOLLY:  I can withdraw the question.

14   That's fine.

15            THE COURT:  All right.  Overruled.

16            THE WITNESS:  Then I should answer it.

17            And, yes, I did discuss my concerns with what I

18   believed their theory of the case was, yes.

19   BY MS. CONNOLLY:

20   Q.    And was -- without telling us what he said, how did

21   Jan react?

22   A.    I don't -- I mean, I -- without telling us what Jan

23   said about the theory of the case -- I don't understand the

24   question, I guess, is what --

25   Q.    Was he upset when you told him that you didn't agree

TRANSCRIBED FROM DIGITAL RECORDING

1    with the defense that was being put on by the Marchese

2    team?

3    A.    He was more questioning than upset is what I would

4    call it.

5    Q.    He wasn't happy to hear it, what you were telling

6    him; right?

7    A.    He wasn't surprised to hear it either.

8    Q.    Did you make any comment to him about Amber Craig's

9    removal from the defense team?

10   A.    To be fair, I didn't know that much about it.

11   Q.    You didn't discuss that with him?

12   A.    I might have in passing.  I don't remember

13   everything we talked about.

14   Q.    Do you remember making any comments that it was an

15   indication of the incompetence of the defense team that she

16   got on and then got removed?

17   A.    It -- as you phrase it, no.

18   Q.    Okay.  Well, how would you say what was discussed in

19   regard to that?

20   A.    And, once again, I don't recall exactly, so I --

21   speculating, it was something to the effect of, like, you

22   know, they brought somebody on the case who had already

23   been involved with the case, you know, and so

24   (indiscernible) in a fashion even though they were excluded

25   from the case, something like that.  And that's, once

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    again, me really paraphrasing.

 2    Q.    You certainly didn't put a positive spin on her

 3    removal, did you?

 4    A.    Well, I like Amber.  But if she's excluded from the

 5    case, that's a pretty big error.

 6    Q.    And that's at calendar call, to your knowledge, are

 7    you aware this happened?

 8    A.    I don't know when it happened.

 9          MS. CONNOLLY:  I don't have anything else.

10    Thank you.

11          THE COURT:  Ms. Roohani?

12          MS. ROOHANI:  One brief follow-up question.

13                    RECROSS-EXAMINATION

14    BY MS. ROOHANI:

15    Q.    Mr. Nadig, you were in the middle of answering your

16    question regarding this waiver, and Ms. Connolly cut you

17    off.  Can you complete your answer.

18    A.    Can -- specifically what was that?

19    Q.    Regarding the waiver?

20    A.    Oh, the conflict waiver?

21    Q.    Yes.

22    A.    I told Frank throughout this entire process, and

23    obviously this doesn't violate attorney-client privilege,

24    otherwise I wouldn't bring it up, that my primary

25    responsibility was to him and if there were any issues, I
```

TRANSCRIBED FROM DIGITAL RECORDING

1    wouldn't necessarily advise me talking to Jan.

2    Q.    And based upon your training as a defense attorney,

3    was there a possible defense that would not create a

4    conflict between Frank and Jan?

5    A.    Initially, potentially, yes.

6            MS. CONNOLLY:  Objection.  Speculation and

7    relevance.

8            MS. ROOHANI:  Your Honor, she's gotten into the

9    waiver and has made a big deal about the fact that there

10   was a conflict here.

11           And ultimately if there was a situation where

12   there wouldn't be a conflict, it's certainly relevant and

13   not speculation because he must have thought about it.

14           THE COURT:  Overruled.

15   BY MS. ROOHANI:

16   Q.    And I believe that you had previously indicated on

17   cross that you received an oral waiver both from Jan and

18   Frank?

19   A.    Definitely.

20   Q.    Okay.

21   A.    On more than one occasion.

22   Q.    Okay.  And that was the basis upon which Frank had

23   asked you to go and speak with Jan --

24   A.    Correct.

25   Q.    -- in September?

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  I have no further questions, Your

2     Honor.

3          MS. CONNOLLY:  Briefly, Your Honor?

4          THE COURT:  Yes.

5               FURTHER REDIRECT EXAMINATION

6     BY MS. CONNOLLY:

7     Q.    Following up on that, again, in that e-mail you

8     indicated "One of the reasons I represented you is that you

9     are the person who should be blamed."  Right?

10    A.    Sure.

11    Q.    Okay.  So if your client, Frank, was the one that

12    you shot -- thought should be blamed for this pornography

13    that was on a computer, it would be -- clearly be a

14    conflict for you to go and then have discussed the case

15    with Jan, the individual who is charged with placing

16    pornography on the computers; correct?  Would you agree

17    with that?

18    A.    I do sometimes what my clients direct.

19    Q.    My question was, would you agree with the scenario I

20    just presented to you?  That both lived in the same house;

21    right?

22    A.    Yes.

23    Q.    Okay.  And there was pornography found on computers

24    in that home; right?

25    A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    To computers that both Jan and Frank had access to;
 2    right?
 3    A.    I believe so.  There might have been one or two
 4    that --
 5    Q.    The majority of which they --
 6    A.    -- were password --
 7    Q.    -- both had access?
 8    A.    Yes.
 9    Q.    Okay.  And Jan is charged with the one who is
10    responsible for the pornography on those computers?
11    A.    Correct.
12    Q.    And the ultimate suspect, you would agree, would be
13    Frank because he lived in the house with Jan; right?
14    A.    He did live in the house with Jan.
15    Q.    And, in fact, in your letter you indicated that he
16    was a more likely suspect because he had a predilection for
17    younger individuals; right?
18    A.    That is a fair statement.
19    Q.    Then you would agree that it would be a conflict in
20    you representing both Jan and Frank under that scenario?
21    A.    Under your scenario, theoretically, yes.
22             MS. CONNOLLY:  Thank you.
23             MS. ROOHANI:  One follow-up, Your Honor.
24             THE COURT:  All right.
25
```

TRANSCRIBED FROM DIGITAL RECORDING

1                    FURTHER RECROSS-EXAMINATION

2    BY MS. ROOHANI:

3    Q.    There was also a possible defense that it was

4    somebody else that wasn't Jan or Frank; correct?

5    A.    Correct.  There were at least two other people who

6    had been living at the house during that period of time.

7    And there had been a preliminary investigation as to those

8    individuals.

9            By the time Mike got back on the case, I don't

10   know if that was followed up on.  But, yes, initially there

11   was discussion of other people having done this work.

12   Q.    And you weren't present at trial?

13   A.    I was not.

14   Q.    You weren't aware of the defense that was put on at

15   trial?

16   A.    At the time of trial, I was not.  Once Mike got back

17   on the case, I did not, because I did not have any contact

18   with them regarding their strategy of the case.

19   Q.    And at the time that the government had charged --

20   or indicated that we believed that Frank was an unindicted

21   co-conspirator, did you have any other contact with the

22   defense team regarding this case?

23   A.    Once it was determined that Frank was a potential

24   co-conspirator, I had no contact with the defense team.

25   Q.    Because at that point the conflict became concrete?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yeah, definitely, it's apparent.

2         MS. ROOHANI:  No further questions.

3              FURTHER REDIRECT EXAMINATION

4    BY MS. CONNOLLY:

5    Q.    Again, that e-mail we were referencing when you

6    indicated that the main suspect should be Frank is dated

7    September 26, 2016; right?

8    A.    I have --

9    Q.    I'm -- yeah, actually September --

10   A.    What exhibit are we looking at?

11   Q.    -- 3rd.  It's Exhibit C.

12   A.    Okay.  Exhibit C shows a date of -- and tell me if

13   I'm wrong -- September 3rd, 2016.

14   Q.    Okay.  And then, to your recollection, are you aware

15   that the indictment came down in about March of 2016?

16   A.    Yes, there was an indictment in March --

17   Q.    And trial proceeded in November 2016?

18   A.    That is correct.

19   Q.    So two months before trial you still believed that

20   it was Frank who should have been blamed; right?

21   A.    I --

22   Q.    Based on that e-mail?

23   A.    I think that he was a valid suspect.

24   Q.    Excuse me?

25   A.    I think he was definitely a valid suspect.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  Thank you.

2          THE COURT:  Anything else --

3          MS. ROOHANI:  Nothing further, Your Honor.

4          THE COURT:  -- Ms. Roohani?  All right.

5          Thank you for coming in, Mr. Nadig.

6          THE WITNESS:  Thank you.

7          MS. CONNOLLY:  Steve Pacitti.

8          THE COURT:  All right.

9          COURTROOM ADMINISTRATOR:  Please raise your

10   right hand.

11          You do solemnly swear that the testimony you

12   shall give in the cause now before the Court shall be the

13   truth, the whole truth, and nothing but the truth, so help

14   you God?

15          THE WITNESS:  I do.

16          COURTROOM ADMINISTRATOR:  Thank you, sir.  You

17   may be seated.

18          Please state and spell your full name for the

19   record.

20          THE WITNESS:  Steven Pacitti, P-a-c-i-t-t-i.

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

STEVEN PACITTI

called as a witness on behalf of the

Defense, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CONNOLLY:

Q.    Good afternoon, Mr. Pacitti.  How are you employed?

A.    I'm a self-employed attorney.

Q.    Okay.  And what is your area of practice?

A.    Transactions, corporate, tax, entertainment.

Q.    Any experience in criminal law?

A.    Clerking when I was in law school.

Q.    Okay.  Any experience in federal criminal defense?

A.    No.

Q.    Okay.  Are you familiar with the gentleman in the beautiful yellow jumpsuit?

A.    Yes, I am.

Q.    And how do you know him?

A.    Jan and Frank were clients of mine for their show at the Tropicana.

Q.    Okay.  When did -- when did you first become the attorney for Jan?

A.    I have no recollection.  Probably four or five years ago.

Q.    Okay.  And how would you describe the relationship you had with Jan?

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Very friendly.

2   Q.    Very what?

3   A.    Friendly.

4   Q.    Okay.  And you became aware that he was -- or you

5   became -- early January 2016, did you become aware that

6   there was some police activity at the home he shared with

7   Frank?

8   A.    Yes.

9   Q.    Okay.  And as a result of that, did you contact or

10  suggest that he hire any particular attorneys to represent

11  him in a subsequent indictment related to that activity?

12  A.    I'd originally suggested that he talk to Ben Nadig.

13  They weren't -- he wasn't -- asked for another referral,

14  and I sent him to Jess Marchese.

15  Q.    Do you know timing-wise when you made the Nadig

16  referral versus the Marchese?

17  A.    No, I don't remember.

18  Q.    Okay.  But it wasn't the same time?

19  A.    No.

20  Q.    Would it be fair to say that when Jan had expressed

21  some discontent with Nadig, that's when you made the

22  Marchese referral?

23  A.    Yes.

24  Q.    If the indictment came down in March of 2016, do you

25  have any recollection when you think it was you referred

1  him to Marchese?

2  A.    No, I have no recollection.

3  Q.    Did you --

4  A.    It would have been right -- oh, Marchese?  I don't

5  know when Marchese would have been.  But the Nadig would

6  have been right after the raid.

7  Q.    And did you make a recommendation of Mike Sanft, or

8  was that --

9  A.    No.

10  Q.    Okay.  So you made the recommendation of Nadig, and

11  then when he had -- Jan expressed some discontent, you

12  recommended Marchese?

13  A.    Yes.

14  Q.    Okay.  Were you aware there was any -- what is your

15  understanding of who was actually representing Jan?

16  A.    Who was representing Jan?

17  Q.    Who was representing him, yes.

18  A.    I don't really know.  But I know the attorneys were

19  having some discussion about who is representing who.

20        I kind of made the intro -- I was at the meeting

21  for the initial introduction, and after that I kind of let

22  them do their own thing.

23  Q.    Were you aware if there was any kind of strife or

24  dissension among the lawyers who were representing him?

25  A.    I know there was some kind of -- there was some kind

```
 1   of disagreement among them.  Because I don't have any dog
 2   in the fight, and I don't really generally have any input
 3   in that, I just kind of let it go and ignored it.
 4   Q.    So you didn't get involved with it?
 5   A.    No, not at all.
 6   Q.    Okay.  Let me fast forward a little bit to the --
 7   prior to trial, did you have any meetings with Jan, or did
 8   you have any discussion with him about his exposure under
 9   the federal sentencing guidelines or under the federal
10   statutes for the --
11   A.    No.
12   Q.    -- activity in which he had been charged?
13   A.    No.
14   Q.    Okay.  And you were present for the trial; right?
15   A.    I think I was there one day.
16   Q.    Okay.
17   A.    I wasn't there for the whole trial, no.
18   Q.    Okay.  And there came a point in time when you were
19   actually sitting with him at defense table, right, during
20   a -- was it during a break or was there some discussions
21   about --
22   A.    No, I never sat with him at the defense table.
23   Q.    Okay.  You were aware that at -- midway -- or were
24   you sitting through the trial when the government was
25   presenting its case?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    When they rested, I was there that day.

 2    Q.    Okay.  And you were aware -- are you aware of

 3   whether or not there was some discussions after the

 4   government rested its case about resolving the case by way

 5   of a plea agreement?

 6    A.    Yes.

 7    Q.    Okay.  And were you involved in those discussions

 8   with the government?

 9    A.    Yes.  We weren't at the defense table.  We were at a

10   room somewhere.

11    Q.    Okay.  So when I asked you previously if you were at

12   the defense table, you were at the defense table when there

13   was discussions about the proposed guilty plea; right?

14    A.    Correct.  That's what I was clarifying.

15    Q.    But there was no actual -- on the day that you had

16   discussions at the defense table with Jan, who was present

17   from the defense perspective?

18    A.    Jess Marchese, Ben, and Jan, I think.

19    Q.    Okay.  And there was no actual plea agreement

20   presented; right?

21    A.    No.  It had just been an offer that the state --

22   that the US Attorney had just made an offer, and it was

23   just being discussed generally.

24    Q.    And your understanding was -- of the offer, was that

25   the judge had the discretion to give him a sentence of 5 to
```

TRANSCRIBED FROM DIGITAL RECORDING

1    15; right?

2    A.    That the -- my understanding was that the charge

3    that carried the 15-year minimum was being dropped, leaving

4    only the charges with 5-year minimum.

5    Q.    Okay.  And you represented to Jan that would be

6    within -- let me ask you.

7            You've known him for quite some time.  He speaks

8    English; right?

9    A.    Yes.

10   Q.    It's not his first language?

11   A.    Yes.

12   Q.    Okay.  Is he -- you had indicated to me previously

13   that he speaks English, but he doesn't necessarily have an

14   understanding for all the nuances in the language?

15   A.    I don't know how -- what he understands for the

16   nuances.  I deal with a lot of -- in the entertainment

17   practice, I deal with a lot of nonEnglish speaking people.

18           And you're never quite sure -- they're really

19   good at faking, but you're never quite sure how big their

20   vocabulary really is.

21   Q.    Okay.  And so I just want to talk specifically about

22   Jan.

23           So -- so do you remember having a discussion

24   with him where you indicated that it would be within the

25   judge's discretion, he could potentially get 5 to 15?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Well, the discussion was -- that I recall was, when
2    the charge --
3    Q.    I'm asking about what you said to him?
4    A.    Yeah, I said that "In the judge's discretion" --
5    there was a lot of discussion about the judge's discretion.
6          So I said, "In the judge's discretion, if the
7    judge was so inclined, she could sentence you for something
8    less than 15 years."
9    Q.    Okay.  And you mentioned that -- you mentioned five
10   years to him, that in her discretion --
11   A.    Right, because --
12   Q.    -- she could give him five years?
13   A.    -- that would be the minimum of the remaining
14   charges.  So there could be -- in the judge's discretion,
15   it would be permissible for her to sentence him to
16   somewhere between 5 and 15.
17   Q.    Okay.  During those discussions, was there any
18   discussions about the United States Sentencing Guidelines?
19   A.    No.
20          MS. CONNOLLY:  I don't have anything else.
21   Thank you.
22          THE COURT:  Ms. Cartier-Giroux.
23                    CROSS-EXAMINATION
24   BY MS. CARTIER-GIROUX:
25   Q.    Good afternoon, Mr. Pacitti.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Good afternoon.
 2    Q.    I just have a few questions for you.
 3          When you worked in the -- in the civil realm
 4    with Jan and Frank, who did you deal with usually in terms
 5    of the contract discussions and negotiations?
 6    A.    Frank, primarily, but Jan was usually involved, yes.
 7    Q.    Okay.  In terms of the discussions about things, was
 8    it Frank that was usually --
 9    A.    Frank was --
10    Q.    -- in charge --
11    A.    -- clearly the businessman, yes.
12    Q.    Okay.  So you really don't have a basis -- is it
13    fair to say you don't really have a basis to assess whether
14    or not Jan could understand what his plea agreement was or
15    not understand?  Is that fair?
16    A.    I've never seen the plea agreement, so I don't know
17    how involved the language is.
18          But I -- like I said, I don't know what his
19    ability to read, I don't know what his ability to
20    interpret, I don't know any of those things.
21    Q.    So you would be guessing, is that --
22    A.    Yes.
23    Q.    -- fair to say?
24    A.    It would be pure conjecture.
25    Q.    Okay.  And have you ever seen the plea agreement in
```

TRANSCRIBED FROM DIGITAL RECORDING

1    this case?

2    A.    No.

3    Q.    And you already indicated that you're not -- you

4    don't practice criminal law, so you're not really familiar

5    with the sentencing guidelines?

6    A.    No.

7    Q.    But you were present at least to some discussion

8    about the mandatory minimum in this case?

9    A.    Yes.  And that is what -- Jess would discuss what

10   was the -- kind of the nuts and bolts of the offer.  And

11   then I would say, "From what I'm hearing" and try to

12   interpret it or make it more concrete, something like that.

13   Q.    Okay.

14   A.    But I always started out with, "What I'm hearing

15   from your attorney."  I would say, "From what I'm hearing,"

16   then I would make a statement.

17   Q.    Okay.  And you never met with Jan to discuss the

18   criminal matters without the other attorneys, the criminal

19   lawyers present; correct?

20   A.    I probably had discussions with him because he would

21   constantly say, "I'm not into that, I'm not into that, I'm

22   not into that."

23   Q.    Okay.  But in terms of this sentence --

24   A.    No.

25   Q.    -- did you discuss it outside the presence of his

TRANSCRIBED FROM DIGITAL RECORDING

1   criminal attorneys?

2   A.    No.

3   Q.    And were you present when he pled guilty?

4   A.    Excuse me?

5   Q.    Were you present when he pled guilty?

6   A.    No.

7            MS. CARTIER-GIROUX:  I don't have any other

8   questions.  Thank you, sir.

9            MS. CONNOLLY:  Just very briefly.

10           THE COURT:  Ms. Connolly?

11                   REDIRECT EXAMINATION

12  BY MS. CONNOLLY:

13  Q.    You indicated -- I'm sorry.  You indicated that you

14  were interpreting for Jan what the attorneys were saying.

15  So, in other words, you were trying to put it into layman's

16  terms?

17  A.    Perspective, yes, yes.

18  Q.    And you did that because you felt he needed that?

19  A.    Sometimes lawyers have a tendency to speak in their

20  own language.  And as lay- -- if I -- I would consider

21  myself in criminal law to be more of a layperson.  I

22  consider myself more like Jan than Jess.

23           So it was something that I -- if I heard him say

24  something and I could simplify it and say it the way a

25  layperson would say it, I think I was in a position to do

TRANSCRIBED FROM DIGITAL RECORDING

1    that, yes.

2    Q.    And, again, you wouldn't have done that if you

3    didn't think it was helpful?

4    A.    Correct.

5              MS. CONNOLLY:  Thank you.

6              MS. CARTIER-GIROUX:  Very quickly.

7                        RECROSS-EXAMINATION

8    BY MS. CARTIER-GIROUX:

9    Q.    Now, you don't -- do you speak German?

10   A.    No.

11   Q.    Okay.  So when you say you were interpreting,

12   basically you were just reiterating in a different fashion

13   the same thing in English what his attorneys were saying?

14   A.    In the context of a bilingual discussion,

15   interpretation is probably a bad word.  It's probably more

16   simplifying.

17   Q.    Okay.  And you never indicated to him that he could

18   get less than five years --

19   A.    No.

20   Q.    -- correct?

21   A.    No.

22   Q.    So it's very clear that five years was a mandatory

23   minimum in this case as far as the discussions you

24   witnessed?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1      MS. CARTIER-GIROUX:  I don't have any other

2   questions.

3                   FURTHER REDIRECT EXAMINATION

4   BY MS. CONNOLLY:

5   Q.    Do you remember making the comment that he could get

6   out when he was 43?

7   A.    There would have been some math, yeah.  I would have

8   said if it was -- if he was 38 at the time, and I'm trying

9   to remember how old he was, and say, so let's say one of

10  the things to make something concrete, I would have said if

11  he -- "If she could, in her discretion, if she decided to

12  sentence you for five years, you would be 43; whereas if

13  you went through and were found guilty of the crime with a

14  minimum of 15 years, you would get out at 53."

15      MS. CONNOLLY:  Okay.  Thank you.

16                   FURTHER RECROSS-EXAMINATION

17  BY MS. CARTIER-GIROUX:

18  Q.    But you never told him he was going to get five

19  years?

20  A.    No, no, no, no.

21      MS. CARTIER-GIROUX:  Thank you.

22      MS. CONNOLLY:  I don't have anything else.

23      THE COURT:  All right.  Thank you, Mr. Pacitti.

24      MS. CONNOLLY:  Mr. Durham.

25      COURTROOM ADMINISTRATOR:  Please remain standing

TRANSCRIBED FROM DIGITAL RECORDING

```
1    and raise your right hand.

2            You do solemnly swear that the testimony you

3    shall give in the cause now before the Court shall be the

4    truth, the whole truth, and nothing but the truth, so help

5    you God?

6            THE WITNESS: Yes.

7            COURTROOM ADMINISTRATOR:  Thank you, sir.  You

8    may be seated.

9            Please state and spell your full name for the

10   record.

11           THE WITNESS:  Benjamin Durham, B-e-n-j-a-m-i-n,

12   last name D-u-r-h-a-m.

13                       BENJAMIN DURHAM

14            called as a witness on behalf of the

15        Defense, was examined and testified as follows:

16                     DIRECT EXAMINATION

17   BY MS. CONNOLLY:

18   Q.    Mr. Durham, how are you employed?

19   A.    I'm sorry?

20   Q.    How are you employed?

21   A.    I'm an attorney.

22   Q.    And what kind of practice?

23   A.    Primarily criminal defense.

24   Q.    Okay.  And when were you first licensed to practice

25   law in Nevada?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    2001.
 2    Q.    Okay.  Do you, in your practice, practice federal
 3   criminal defense?
 4    A.    Yes.
 5    Q.    Okay.  Have you ever gone to trial on a child
 6   pornography case?
 7    A.    Are you speaking about this one?
 8    Q.    No, not including this case.
 9    A.    No.
10    Q.    Okay.  How many child pornography cases have you
11   represented defendants on in federal court?
12    A.    I couldn't tell you off the top of my head, but I
13   would say --
14    Q.    Less than 10?
15    A.    Yes.
16    Q.    Okay.  And how many child pornography cases have you
17   been involved in plea agreements on?
18    A.    Probably the same.
19    Q.    You don't know -- do you know a number?
20    A.    I couldn't tell you.
21    Q.    Okay.  Could it be one?
22    A.    It could be.
23    Q.    How do -- do you know the individual sitting in
24   yellow?
25    A.    Jan.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    How do you know him?

 2    A.    I worked on his case.

 3    Q.    Okay.  And you're one of the attorneys that

 4    represented Jan for a trial which took place in

 5    approximately November of 2016; right?

 6    A.    Correct.

 7    Q.    And you came on the case in July of 2016?

 8    A.    That sounds right.

 9    Q.    Okay.  And you were substituted in in place of

10    Michael Sanft; is that accurate?

11    A.    Correct.

12    Q.    Okay.  And did you stay on the case from July

13    through trial?

14    A.    I did.

15    Q.    Okay.  In what capacity?  Were you lead attorney or

16    backup attorney?  Or what was your understanding of your

17    involvement in the case?

18    A.    I guess I was like a second chair.

19    Q.    Second chair to Mr. Marchese?

20    A.    Correct.

21    Q.    Okay.  And the facts of this case involved child

22    pornography on computers; right?

23    A.    Right.

24    Q.    Thousands of images; right?

25    A.    Right.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Did you ever go and review those images?

2    A.    The actual images?

3    Q.    Yes.

4    A.    I did go to an office that was over off of -- near

5    the 215 and Gillespie, I think.

6    Q.    Okay.

7    A.    And I reviewed -- I didn't review all the images,

8    but I did review some of them with --

9    Q.    There was a huge volume of videos --

10   A.    There was.

11   Q.    -- and images.

12         Fair to say you didn't go through all of those?

13   A.    No.

14   Q.    Was somebody else -- was -- and we heard testimony

15   that you guys pulled straws, so to speak, and somebody else

16   was assigned to go and review those videos.

17         Does that sound familiar to you?

18   A.    I don't remember that.

19   Q.    You don't specifically recall doing it, other than

20   going over there that one time?

21   A.    I remember going over that one time, yeah.

22   Q.    How much time did you spend reviewing materials on

23   that particular occasion?

24   A.    It was a couple hours.

25   Q.    Now, prior to trial, did you have -- you never had

TRANSCRIBED FROM DIGITAL RECORDING

1    any discussions with Jan about any kind of plea in this
2    case, did you?
3    A.    No, not that I recall.
4    Q.    Okay.  And prior to trial, you don't recall going
5    over -- I would anticipate since there was no plea on the
6    table, and he didn't indicate he wanted to plea, you didn't
7    go over the federal sentencing guidelines with him?
8    A.    Correct.
9    Q.    Now, you were present during trial, and at some
10   point during trial, after the state -- after the government
11   had rested its case, there was discussions about taking a
12   negotiation in the case?
13   A.    Correct.
14   Q.    Now, was it fair to say that Mr. Marchese was the
15   one that brokered that deal with the government, or were
16   you involved also?
17   A.    I think that was him, yeah.  I don't recall
18   having -- being part of a plea negotiation.
19   Q.    Okay.  So the negotiations, to your recollection,
20   were between Jess Marchese and one of the government
21   attorneys?
22   A.    Yeah.  I think Mike Sanft might have been present,
23   but I couldn't tell you for sure.
24   Q.    You were the attorney that -- let me strike that.
25         There was no -- on the day there was plea

TRANSCRIBED FROM DIGITAL RECORDING

1    negotiations in court, there was no actual plea agreement

2    proffered until the next day; is that true?

3    A.    That's my understanding, my recollection.

4    Q.    Do you remember when you first got -- or when did

5    you first understand the terms of the negotiation?

6    A.    I don't remember if it was later that night or the

7    next morning.

8    Q.    Okay.  Now, you didn't go meet with Jan the evening

9    after the state rested its case, did you?

10   A.    No.  I met with him the following morning.

11         MS. ROOHANI:  Your Honor, just to be clear, we

12   hadn't rested.  I recognize that that's probably the easier

13   way to refer to it.  But we had not closed our case in

14   chief.  So I just want to make sure that the record is

15   clear in terms of that.

16         MS. CONNOLLY:  After Agent Panovich's testimony.

17         MS. ROOHANI:  She was not finished with her

18   testimony.

19         MS. CONNOLLY:  Oh, okay.  That was my

20   understanding.  I guess that was incorrect.

21   BY MS. CONNOLLY:

22   Q.    After Agent Panovich had left the stand on that

23   particular day and there was conversations about a guilty

24   plea, and you didn't receive a copy of the guilty plea

25   until the next morning, to the best of your recollection?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Correct.

 2    Q.    Okay.  And do you remember what time you received

 3   that guilty plea agreement?

 4    A.    I don't.

 5    Q.    Okay.  Do you remember how you came in possession of

 6   a copy of the guilty plea agreement?

 7    A.    It was e-mailed to me.

 8    Q.    By whom?

 9    A.    I don't remember for sure -- I don't remember if the

10   government e-mailed me and Jess or if Jess forwarded it to

11   me.

12    Q.    Okay.  But you came over to the holding facility

13   here at the federal court and -- with a copy of the guilty

14   plea agreement?

15    A.    Yes.

16    Q.    Okay.  And fair to say then you met with Jan?

17    A.    Yes.

18    Q.    Okay.  And you met with him in one of the little

19   anterooms?

20    A.    Yes.

21    Q.    Okay.  And there was a screen separating you and

22   Jan?

23    A.    Yes.

24    Q.    Okay.  Do you recall whether or not Jan had a copy

25   of the guilty plea agreement?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I don't remember if -- if the marshal came and

2    brought it around to him or not.

3    Q.    Okay.  There was previous testimony that you were

4    the individual that went over the guilty plea agreement

5    with him.  Is that accurate?

6    A.    Yes.

7    Q.    Okay.  So this guilty plea agreement is

8    approximately 17 pages long; correct?

9            It's right --

10   A.    If you say so.

11   Q.    It's right in front of you up there.  It's not

12   marked as an exhibit, but as a courtesy.

13   A.    Okay.

14   Q.    So if you could just grab that, because I'm going

15   to --

16   A.    Got it.

17   Q.    -- ask you some questions about it.

18   A.    Okay.

19   Q.    So the guilty plea agreement is 17 pages long?

20   A.    Okay.

21   Q.    Right?

22   A.    Yes.

23   Q.    Okay.  So you were on one side -- at one portion of

24   the room, there was a partition between you, and Jan was on

25   the other side of the partition; right?

1    A.    Yes.

2    Q.    Who else was -- when you went over the guilty plea

3    agreement with him, who else was in the room?

4    A.    From what I recall, I started going over it with

5    him, and then Jess Marchese arrived shortly after.

6    Q.    Would it be fair to say Jess was going in and out?

7    Do you recall?

8    A.    I don't remember him going in and out, no.

9    Q.    Okay.  If you could turn to page 8.

10          Based on that plea agreement -- this is a

11   stipulated plea agreement; right?  In other words, the

12   defense and the prosecution had agreed upon certain

13   representations that were made in this plea agreement?

14   Once everybody had signed it.

15   A.    What specifically --

16   Q.    Okay.  Well, actually let me start with -- let me

17   start with -- let's go to page 2.

18   A.    Okay.

19          MS. ROOHANI:  Your Honor, and for the record,

20   this hasn't been admitted, but I believe she's referring to

21   docket entry number 146.

22          MS. CONNOLLY:  I move to admit.

23          MS. ROOHANI:  I have no objection to that.  It's

24   already in the record.

25          MS. CONNOLLY:  Okay.

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CONNOLLY:

2    Q.    The guilty plea indicated that Jan would be pleading

3    guilty to Count 1, Possession of Child Pornography; Count

4    2, Receipt of Child Pornography; Count 3, Distribution of

5    Child Pornography; right?

6    A.    Correct.

7    Q.    Okay.  And then if you turn to page 4, under a

8    section titled, "Facts Supporting Guilty Plea," there's a

9    whole bunch of facts; right?

10   A.    Yes.

11   Q.    Go through page 6.

12         And these are facts that the government and Jan

13   were stipulating to; in other words, they're agreeing upon

14   these are the facts that support this guilty plea; right?

15   A.    Yes.

16   Q.    Okay.  And then I'll have you turn to page 7.

17         There's a number of calculations.  There's a

18   base offense level of 22 and then there's a number of

19   enhancements; right?

20   A.    Yes.

21   Q.    And then on page 8, it indicates the adjusted

22   offense level is a level 40.

23   A.    Correct.

24   Q.    Okay.  Did you explain to -- do you remember,

25   specifically recall telling Jan what a level 40 meant?

1   A.    I don't have any specific recollection, but I'm sure

2   I did.

3   Q.    Okay.  Well, I don't want you to speculate if you

4   don't recall then.  You don't specifically -- do you

5   remember if you had a guideline book with you?  Did you sit

6   down with him and go over the guideline book with him?  Do

7   you recall?

8   A.    I don't remember what I ate yesterday, Karen, sorry.

9   Q.    Okay.

10  A.    I don't specifically.

11  Q.    Okay.  Fair enough.

12  A.    I can tell you that I -- whenever I'm going over a

13  plea with a client --

14  Q.    Well, I don't want to talk about usually --

15  A.    Okay.

16  Q.    -- I just want to talk about if you remember in this

17  specific --

18  A.    I don't have any specific recollection.

19  Q.    Okay.  And you -- in most cases, it would be fair to

20  say that you don't get presented with a guilty plea

21  agreement -- or let me strike that.

22        In most cases the first time you go over a

23  guilty plea agreement with a defendant is not usually in

24  the anteroom right before they come in and enter a plea;

25  right?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    That's fair to say.

2    Q.    In most cases we get guilty pleas and we get to go

3    over them, we go back and forth with the government

4    sometimes on enhancements and facts?

5    A.    True.

6    Q.    That never took place in this particular case?

7    A.    No.

8    Q.    The first time you got the guilty plea in your hands

9    was about 10:00 that morning when it was e-mailed to you?

10   A.    Sometime that morning, yes.

11   Q.    And the first time that Jan ever saw the guilty plea

12   agreement, you don't remember specifically if the marshals

13   gave him a copy, but to the best of your recollection was

14   that morning around about the same time as you have it?

15   A.    Yes.

16   Q.    Okay.  Do you remember telling Jan or -- that he'd

17   potentially get five years under this guilty plea

18   agreement?

19   A.    No, I don't remember specifically telling him that.

20   Q.    Okay.  So you could have?  You just don't recall?

21   A.    I would have told him the lowest he could get was

22   five years.

23   Q.    And, in fact, if you -- pursuant to the guilty plea

24   agreement, two of the counts were going to be run together,

25   and those two counts had a mandatory minimum of five years?

1    A.    Correct.

2    Q.    All right.  And a third count was a count which

3    didn't have a mandatory minimum, but that count was going

4    to run consecutive?

5    A.    Correct.

6    Q.    Does that refresh your recollection a little bit?

7    A.    Yes.

8    Q.    Okay.  Could you please turn to the presentence

9    report.  There's a copy of it right in front of you.  And

10   turn to page 25.

11           MS. ROOHANI:  And, again, Your Honor, this has

12   not been admitted as evidence.

13           THE COURT:  Well, she didn't move to admit it.

14           I think, Aaron, would it be Exhibit G?

15           COURTROOM ADMINISTRATOR:  G would be the next in

16   line, Your Honor.

17           MS. CONNOLLY:  I'd move to admit it.  I know

18   they're not normally public, but I would want to move, if I

19   could, move to --

20           MS. ROOHANI:  And, Your Honor I don't believe

21   she's laid the proper foundation with this witness to admit

22   this evidence.

23           THE COURT:  All right.  Well, let's -- all

24   right.  So the plea agreement, which is on the docket is

25   number 146, is that the one that's admitted as Exhibit G,

TRANSCRIBED FROM DIGITAL RECORDING

1    Aaron?

2              COURTROOM ADMINISTRATOR:  Yes, Your Honor.

3              THE COURT:  All right.

4         (Exhibit G received.)

5              MS. CONNOLLY:  Okay.

6    BY MS. CONNOLLY:

7    Q.    Now, if you look at -- please look at paragraph 48.

8    A.    Okay.

9    Q.    And it indicates the guideline for violation of 18

10   U.S.C., Section 2252 is 22.

11             Fair to say that's -- that was the count that

12   didn't have a mandatory minimum of five years?

13   A.    I'm not sure.

14   Q.    Okay.  But there was -- the count that didn't have

15   the mandatory minimum was going to run consecutive; right?

16   A.    Correct.

17   Q.    Are you aware that a level 22 under our sentencing

18   guidelines with a criminal history category of I is 41 to

19   51 months?

20   A.    That sounds right.

21   Q.    Okay.  So you would agree that it was a 5-year

22   mandatory minimum on the other two counts, and the minimum

23   that he could receive, assuming that the base offense level

24   is correctly calculated and the presentence investigation

25   report level 22 with a guideline range of 41 to 51 months,

TRANSCRIBED FROM DIGITAL RECORDING

1   the minimum he could receive would be 60 plus 41, 101

2   months?

3    A.    I don't agree with that.

4         MS. ROOHANI:  Your Honor, and I'm also going to

5   object based on leading.  Ms. Connolly has been leading

6   Mr. Durham from the very beginning.  At this point I'm

7   going to object on the nature and the way that she's asking

8   these questions.

9         MS. CONNOLLY:  Well, I can -- we can do it the

10  sort of torturous route if we want, but --

11        THE COURT:  All right.

12        MS. CONNOLLY:  But I mean --

13        THE COURT:  You're laying a foundation.  You can

14  lead until we get to the point you're trying to make,

15  then --

16  BY MS. CONNOLLY:

17   Q.    You're aware that in a guilty plea agreement I

18  would -- did you -- let me ask you that.

19         Did you know, pursuant to this guilty plea

20  agreement, there was two counts that were to run

21  consecutive, one count to run -- two counts to run

22  concurrent, one to run consecutive, did you know what the

23  base offense level for that consecutive count was?

24   A.    For the distribution count?

25   Q.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Well, I believe based on the plea agreement that a
2    base offense level encompassed all three counts.
3    Q.    Okay.  The two counts were run consecutive, the
4    5-year mandatory minimums; right?  So we know on those the
5    minimum he can get is five years; right?
6    A.    Correct.
7    Q.    And then the third count was to run consecutive.
8    What was the base offense level for that third count?
9    A.    I -- I don't know, off the top of my head.
10   Q.    So if you don't know, would it be fair to assume
11   that you didn't advise Jan that morning of what the base
12   offense level for that consecutive count was?
13   A.    I don't think that's fair to assume.  I just don't
14   have it in front of me.  I mean --
15   Q.    So you don't -- well, let me ask you this.
16         You just got that plea agreement that morning
17   and established that; right?
18   A.    Yes.
19   Q.    Okay.  And do you -- do you have an independent
20   recollection of getting the guilty plea before you came
21   over to meet with Jan and going through your guideline book
22   to determine what the base offense level was for the third
23   consecutive count?
24   A.    I would have done that.
25   Q.    Do you recall doing that?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I mean, not specifically.

2    Q.    Okay.  Please turn to the guilty plea agreement page

3    6, paragraph 9, and read that to yourself, please.

4    A.    Sorry, which paragraph?

5    Q.    Paragraph 9.  Page 6, paragraph 9.

6    A.    Okay.

7    Q.    Okay.  Now, did you advise Jan that, given the facts

8    set forth in that paragraph, that he was exposing himself

9    to an obstruction of justice enhancement?

10   A.    I don't remember.

11   Q.    Okay.  And direct your attention to paragraph 7.  If

12   you could please read that to yourself.

13   A.    Okay.

14   Q.    Did you advise Jan that pursuant to United States

15   Sentencing Guideline 2G2.2 he was exposing himself to an

16   additional five-point enhancement based upon that factual

17   statement to which he stipulated?

18   A.    I don't remember.

19   Q.    And if you turn to page 7, do you see anywhere --

20   this is the anticipated offense level calculation.  It

21   doesn't say anything in there about a two-level enhancement

22   for obstruction of justice, does it?

23   A.    No.

24   Q.    And it doesn't have an enhancement in there for

25   distributing child pornography in exchange for a thing of

TRANSCRIBED FROM DIGITAL RECORDING

1  value, does it?

2  A.    No.

3  Q.    Okay.  Are you aware that under the application of

4  the United States Sentencing Guidelines that the Court must

5  rely upon the factual stipulations in plea agreements in

6  determining the appropriate guideline level on a particular

7  case?

8  A.    Would you repeat that?  Sorry.

9  Q.    Okay.  Under the United States Sentencing Guidelines

10  the Court, when it entertains a plea agreement, has to rely

11  upon the factual admissions that are set forth in the plea

12  agreement and use those to calculate the specific guideline

13  range?

14  A.    Yes, the Court has to have a factual basis --

15  Q.    Okay.

16  A.    -- yes.

17  Q.    And you don't recall whether or not you advised Jan

18  that under paragraph 7 and 9 on page 6 that he was facing

19  additional enhancements that are not calculated on page 7

20  of the plea agreement, did you?

21  A.    I don't remember.

22  Q.    Do you indicate that -- your testimony was that you

23  believed you communicated the lowest that he could receive

24  was five years?

25  A.    Correct.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Are you aware that given the base offense
2    level that's set forth in the plea agreement, the only way
3    he could get to five years would be if the district court
4    gave a significant variance of downward departure?
5    A.    Yes.
6    Q.    Okay.  And given the best case scenario with a level
7    40 with a range of 292 to 365, that's 24 years.  In order
8    for this particular judge to give him five years, she had
9    to depart down on those 20 years.  Yes?
10   A.    Correct.
11   Q.    Have you ever known of Judge Navarro to depart 20
12   years in any particular case?
13   A.    Not in any of my particular cases, no.
14   Q.    Okay.  Did you -- have you ever known Judge Navarro
15   to depart 10 years in any particular case?
16   A.    I couldn't tell you.
17   Q.    So when you told Jan that the lowest he could
18   receive is five years, you didn't even know if that was
19   feasible in this particular case?
20   A.    I told him what was -- under the guidelines, that
21   that was the lowest that he could get, but that ultimately
22   it's up to the judge.
23   Q.    But you would agree in order for the judge to
24   entertain five years, she would have to depart?
25   A.    Of course.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Did you discuss departures with Jan?

2    A.    Yes.

3    Q.    Okay.  And did you tell him that there was facts or

4    circumstances in his particular case that would warrant a

5    departure?

6    A.    I believe I told him that he had circumstances that

7    would help him get a variance.

8    Q.    And what were those?

9    A.    Just his history.  I mean, he had done a lot of good

10   in the community.

11   Q.    And what do you mean "his history"?

12   A.    He didn't have any criminal history as far as I

13   know.

14   Q.    Are you aware that most individuals that are charged

15   with child pornography don't have criminal histories?  Do

16   you know whether they do or not?

17   A.    I don't know that or not.

18   Q.    Do you know whether the lack of criminal history has

19   ever in the United States been a grounds for a departure or

20   variance in a child pornography case?

21   A.    I don't know.

22   Q.    Okay.  So besides the fact that he had no criminal

23   history, was there anything else that you indicated to him

24   that might warrant a variance or departure?

25   A.    The fact that he had done a lot of good work in the

TRANSCRIBED FROM DIGITAL RECORDING

1    community.

2    Q.    Okay.  Meaning?

3    A.    Community service, volunteering.

4    Q.    And do you know whether or not under where there's

5    an abundance of case law there's any case law that says

6    that being a good citizen should warrant a departure in a

7    typical case, or a variance?

8    A.    I mean, under the factors under 3553, she can look

9    at his -- the nature and circumstances, his history, his

10   family history, all those kind of things.

11   Q.    Besides the 3553 factors, which the Court can

12   consider the circumstances of the individual; right?

13   A.    Correct.

14   Q.    Okay.  Do you know of any case law where in the

15   Ninth Circuit there's been a variance or departure

16   documented based upon good deeds of the individual in the

17   community?

18   A.    No, I couldn't tell you that.

19   Q.    Were you also -- were you aware of how many images

20   there were in the particular case?

21   A.    I don't recall right now.

22   Q.    Are you aware of -- are you aware that in the

23   presentence investigation report indicates that the volume

24   of pornographic images in this case was unprecedented?

25   A.    I don't remember that.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Have you reviewed a copy of the presentence

2    investigation report?

3    A.    Not recently, no.

4    Q.    But you did initially?

5    A.    I did.

6    Q.    And I apologize if I asked you this.  I asked you if

7    you had ever known Judge Navarro to do a 15-year departure

8    or a 20-year departure in a child pornography case.

9          Do you know of any judge in this district ever

10   doing that kind of a departure?

11   A.    I don't know that.

12         MS. CONNOLLY:  Court's indulgence.

13         Just a couple more questions.

14   BY MS. CONNOLLY:

15   Q.    Do you remember how much time you got to spend with

16   Jan that morning when you had the guilty plea agreement and

17   were reviewing it with him?

18   A.    I would be guessing.

19   Q.    It wasn't a significant period of time; would that

20   be fair to say?

21   A.    Two or three hours if I had to -- if I had to guess.

22   Q.    If you -- I can represent that that guilty plea

23   agreement was sent over to Mr. Marchese approximately 9:58.

24   The court recessed about noon.

25   A.    Okay.  So two hours.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   Q.    Well, that would be if you got here right when the
 2   guilty plea was -- so two hours, less than two hours;
 3   right?
 4   A.    I wouldn't -- I couldn't tell you for sure.
 5   Q.    And that was the only discussion you ever had with
 6   him about plea agreements or guidelines or the sentencing,
 7   the federal sentencing structure; right?
 8   A.    As far as I remember.
 9          MS. CONNOLLY:  Thank you.
10          MS. ROOHANI:  Are you done with him?
11          MS. CONNOLLY:  Yes.
12          THE COURT:  Ms. Roohani, cross?
13                   CROSS-EXAMINATION
14   BY MS. ROOHANI:
15   Q.    Mr. Durham, how are you?
16   A.    Good.
17   Q.    I'm going to start briefly with the affidavit that
18   you had submitted to me.
19          Do you remember in that affidavit you indicated
20   that Jan was only concerned about the Grindr chat facts
21   that were in the plea agreement?
22   A.    Sorry.  That he was only concerned with what?
23   Q.    With the facts regarding the Grindr chats that were
24   in the plea agreement?
25   A.    Yeah, he was concerned with some of those facts.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And did -- was part of the reason that he was

2  concerned with those facts is because he understood that

3  that led to a five-point enhancement for pattern of

4  behavior?

5              MS. CONNOLLY:  Objection.  Calls for speculation

6  as to what his understanding was.

7  BY MS. ROOHANI:

8    Q.    Is that something that you explained to Jan?

9    A.    Honestly, I couldn't tell you.  I couldn't remember.

10   Q.    Did you explain to him -- well, let me ask you this.

11             Did he ask for those facts to be removed from

12  the plea agreement?

13   A.    I believe he did.

14   Q.    And did you, Mr. Sanft, or Mr. Marchese come and ask

15  either me or Ms. Cartier-Giroux if we could remove those

16  facts from the plea agreement?

17   A.    I believe that -- yeah, I don't remember who did,

18  but I believe we talked about that.

19   Q.    And did either me or Ms. Cartier-Giroux indicate to

20  whoever it was that those could not be removed?

21             MS. CONNOLLY:  I'm going to object to -- he

22  can't testify about what Ms. Cartier-Giroux or Ms. Roohani

23  represented to some other person.

24             THE COURT:  Sustained.

25

 1   BY MS. ROOHANI:

 2   Q.    After Jan had asked for those facts to be removed

 3   from the plea agreement, and the government indicated that

 4   they could not be removed because they supported --

 5            MS. CONNOLLY:  Objection.  Assumes facts not in

 6   evidence.

 7            THE COURT:  Sustained.

 8   BY MS. ROOHANI:

 9   Q.    Did someone communicate to you, whether it was

10   Mr. Marchese or Mr. Sanft, that the government would not

11   remove those facts from the plea agreement?

12            MS. CONNOLLY:  Objection.  Hearsay.

13            THE WITNESS:  My recollection is actually

14   that --

15            MS. CONNOLLY:  Is there a -- objection.

16            THE COURT:  He can testify as to his personal

17   recollection without stating what other people said.

18            If you can answer the question that way, go

19   ahead.  But if not, then maybe we can rephrase it again.

20            THE WITNESS:  Actually, my recollection was

21   actually that I had spoken to you directly about those

22   facts, and you said that you were not going to change any

23   of the facts in the plea agreement.

24   BY MS. ROOHANI:

25   Q.    And the reason that the government stated they

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   weren't going to change those facts is because those facts

 2   supported a plus-five enhancement for the pattern of

 3   practice?

 4   A.    That was already in the plea agreement.

 5   Q.    Yes.

 6   A.    Yes.

 7   Q.    And you explained to Mr. Fuechtener that that was

 8   the reason why those facts could not be removed from the

 9   plea agreement?

10   A.    Yes.

11   Q.    So at some point Mr. Fuechtener, based upon what you

12   explained to him, understood that facts in the plea

13   agreement lined up with certain enhancements --

14             MS. CONNOLLY:  Objection --

15   BY MS. ROOHANI:

16   Q.    -- that were in the plea agreement?

17             MS. CONNOLLY:  -- as to what he understood.

18   Calls for speculation.

19             MS. ROOHANI:  Your Honor, the way I asked it is

20   based upon what he explained to Mr. Fuechtener.

21             THE COURT:  If you're asking him what he

22   explained --

23             MS. ROOHANI:  Yes.

24             THE COURT:  -- then that would be an appropriate

25   form of the question.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. ROOHANI:  Okay.

 2   BY MS. ROOHANI:

 3   Q.    And you explained to him that's why those facts

 4   could not be removed from the plea agreement?

 5   A.    Yes.

 6   Q.    Okay.  You explained to him that facts in the plea

 7   agreement lined up with certain enhancements in the plea

 8   agreement?

 9   A.    Yes.

10   Q.    And to explain that to him, you had to understand

11   how some of the enhancements in the guideline book works?

12   A.    Correct.

13   Q.    Fair to say that's not the first time you've ever

14   looked at the guideline book?

15   A.    That's fair to say.

16   Q.    Fair to say you've negotiated multiple plea

17   agreements in the past on not just child pornography cases

18   but other cases?

19   A.    Yes.

20   Q.    You understand how base offense levels work?

21   A.    Yes.

22   Q.    You understand how enhancements work?

23   A.    Yes.

24   Q.    You understand how grouping works?

25   A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And you understand how concurrent and consecutive

2    sentences work?

3    A.    Yes.

4    Q.    And you explained all that to Mr. Fuechtener?

5    A.    Yes.

6    Q.    Now, I want to go chronologically.  Let's start with

7    when Special Agent Panovich was in the middle of her

8    testimony and we took a break.

9          Do you remember that?

10   A.    Yes.

11   Q.    Who approached the government to -- about a

12   potential plea offer?

13   A.    I think Mr. Marchese did.

14   Q.    Would it be fair to say at that time you were

15   sitting with Mr. Fuechtener?

16   A.    Yes.

17   Q.    Would it be fair to say at that point you probably

18   had the best relationship and the ability to communicate

19   with Mr. Fuechtener?

20   A.    I don't know about that.

21   Q.    Okay.  And at some point did Mr. Marchese or Sanft

22   ultimately come back and convey an offer?

23          MS. CONNOLLY:  Objection.  Hearsay.

24          MS. ROOHANI:  I'm not asking about the terms of

25   that --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  She's not asking the terms yet, just
 2    whether or not they came back --
 3              MS. ROOHANI:  Yes.
 4              THE COURT:  -- and --
 5              THE WITNESS:  Yes.  Like a -- sort of a general,
 6    yeah, understanding of what an offer might be.
 7    BY MS. ROOHANI:
 8    Q.   And what was your understanding, generally, about
 9    what that offer would be?
10              MS. CONNOLLY:  Objection.  Calls for hearsay.
11    He wasn't privy to the conversation.
12              MS. ROOHANI:  His understanding is not hearsay,
13    Your Honor.
14              MS. CONNOLLY:  Well, it would -- based on
15    hearsay.  His understanding is based on hearsay.
16              MS. ROOHANI:  And, Your Honor, there are facts
17    in evidence that both Mr. Marchese and Mr. Sanft all
18    testified to this.
19              MS. CONNOLLY:  It doesn't mean that it can come
20    in through him.
21              THE COURT:  Were they consistent with the plea
22    agreement, the written plea agreement that you received the
23    next morning?
24              THE WITNESS:  Yes.  They were -- I mean, they
25    weren't given to me by the government, they were given to
```

TRANSCRIBED FROM DIGITAL RECORDING

1    me by Mr. Marchese.

2    BY MS. ROOHANI:

3        Q.    But they were consistent with the written plea

4    agreement that you received the next morning?

5        A.    Yes.

6        Q.    There was nothing different from what was conveyed

7    to Mr. Fuechtener by you on Wednesday than what was

8    conveyed --

9                MS. CONNOLLY:  Objection --

10   BY MS. ROOHANI:

11       Q.    -- to him on --

12               MS. CONNOLLY:  -- as to what was conveyed to

13   Mr. Fuechtener.  It's hearsay.  He doesn't know what was

14   conveyed to Mr. Fuechtener.  He can only talk about what he

15   conveyed.

16               MS. ROOHANI:  Your Honor, if he conveyed it to

17   Mr. Fuechtener, it's not hearsay.

18               MS. CONNOLLY:  Well, then he didn't say he

19   conveyed.  You said what was conveyed to him, without

20   designating by whom.

21   BY MS. ROOHANI:

22       Q.    Did you convey to Mr. Fuechtener the terms of the

23   plea agreement on Wednesday?

24       A.    Before we had the written plea?

25       Q.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes, I would have conveyed to him the -- just the

2    general terms.

3    Q.    And did you convey those same terms to him on

4    Thursday?

5    A.    Yes.

6    Q.    Now, when you received the plea agreement, did you

7    go over the plea agreement before you came over here to the

8    federal courthouse?

9    A.    Yes.  It was e-mailed to me, so --

10   Q.    Did you have your guideline book with you?

11   A.    Yes.

12   Q.    Did you meet with Jan at the marshals lockup on the

13   second floor?

14   A.    Yes.

15   Q.    Did you discuss with him the terms of the plea

16   agreement?

17   A.    Yes.

18   Q.    Did you attempt to go through, and I understand it's

19   difficult, but attempt to go through the plea agreement

20   with him line by line?

21   A.    Yes.

22   Q.    And eventually was Jan brought up to the courtroom

23   by the marshals?

24   A.    Yes.

25   Q.    And did you meet him up here?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    And when you met him up here, did you, in fact, go

3    through the plea agreement with Jan line by line?

4    A.    A second time?

5    Q.    To the extent that eventually the entire plea

6    agreement was covered with him line by line.

7    A.    Yes.

8    Q.    Okay.  And you were the person to do that?

9    A.    Yes.

10   Q.    And you had the guideline book with you?

11   A.    I can't tell you that I did for sure, but I would be

12   very surprised if I didn't.

13   Q.    Okay.  Fair to say that you don't specifically

14   remember what color the cover of the guideline book was,

15   but it's something in your normal practice you would have

16   done?

17   A.    Yes.

18   Q.    Did you have a copy of the sentencing table in the

19   back of the book with you?

20   A.    Yes.

21   Q.    Okay.  Did you have that either in electronic form

22   or in paper form with you?

23   A.    Yes.

24   Q.    Did you show that to Jan?

25   A.    Yes.

Q. Did you show him that a criminal -- that a, sorry, an offense level of 40 with a criminal history I corresponded with 292 to 365 months?

A. I would have -- yes, I would have showed him that.

MS. CONNOLLY: Objection. If he -- he said "I would think so," speculation. He said he doesn't -- he didn't recall if he went over the guideline table with him. He didn't recall if he had the book with him.

MS. ROOHANI: Your Honor, he just testified that he did, in fact, have the table with him.

MS. CONNOLLY: He's speculating. He said he didn't know.

THE COURT: He said he didn't recall if he had the book, but he did recall that he had the table.

BY MS. ROOHANI:

Q. And so did you show Mr. Fuechtener a copy of this table? I believe you testified yes?

A. The sentencing table?

Q. Yes.

A. Yes.

Q. And did you show him that an offense level 40, criminal history category I, going down on the table and then across, was 292 to 365 months?

A. Under criminal history I.

Q. Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    And did he see it?

3    A.    Yes.

4    Q.    Did he acknowledge that he saw it?

5    A.    Yes.

6    Q.    Did he ask you any questions about that number?

7    A.    I couldn't recall that.

8    Q.    But he asked you questions about the Grindr chats?

9    A.    I do remember that.

10   Q.    And you explained to him that those facts needed to

11   stay in the plea?

12   A.    I did after I had tried to get them removed, yes.

13   Q.    Okay.  And you indicated to him that those lined up

14   with the guidelines that are in the plea agreement?

15   A.    Correct.

16   Q.    And those guidelines when you count them up match up

17   to the 40?

18   A.    Correct.

19   Q.    And you believed his criminal history category to be

20   I?

21   A.    Yes.

22   Q.    So you explained to him that the true sentencing

23   exposure that he was --

24            MS. CONNOLLY:  I'm going to object to the

25   prosecutor essentially testifying.  I know it's

TRANSCRIBED FROM DIGITAL RECORDING

1    cross-examination, but this is not a usual, you know,

2    cross-examination situation.  Every question has been her

3    testifying so far.

4              THE COURT:  He can answer yes or no to her

5    representations.  It's fine.  Overruled.

6    BY MS. ROOHANI:

7    Q.   So you explained to him that his exposure was 292 to

8    365 months under the terms of the plea agreement?

9    A.   Yes.

10   Q.   Okay.  Now, another part of that plea agreement also

11   talks about relevant conduct; correct?

12   A.   Correct.

13   Q.   And that's pretty standard language in plea

14   agreements that you've reviewed in the past?

15   A.   Correct.

16   Q.   You understand how relevant conduct works?

17   A.   Yes.

18   Q.   And that's something that the Court can always

19   consider?

20   A.   Correct.

21   Q.   In fact, it's statutorily mandated that the Court

22   can consider all facts about the defendant under 3661; is

23   that correct?

24   A.   Correct.

25   Q.   So in terms of the relevant conduct, because you

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1    have gone through this plea agreement with Mr. Fuechtener
 2    line by line, you explained relevant conduct to him?
 3    A.    Correct.
 4    Q.    You explained to him that the judge can consider
 5    facts from the evidence?
 6    A.    Correct.
 7    Q.    And, in fact, at that point Judge Navarro had heard
 8    the majority of the facts --
 9    A.    She had.
10    Q.    -- of this case?
11    A.    Yes.
12    Q.    And you're familiar with how plea agreements work in
13    terms of enhancements that perhaps the parties don't agree
14    to?
15    A.    Yes.
16    Q.    And you're familiar that if the parties didn't agree
17    to an obstruction of justice enhancement and probation
18    applied it, you could object, and under Ninth Circuit law
19    the judge couldn't apply that?
20    A.    Correct.
21    Q.    And that was your understanding?
22    A.    Yes.
23    Q.    And have you in the past objected to enhancements
24    that have been in plea agreements that the parties didn't
25    agree to?
```

                    TRANSCRIBED FROM DIGITAL RECORDING

1      A.    Yes.

2      Q.    And, in fact, in those cases did the judge not apply

3    those enhancements?

4      A.    Correct.

5      Q.    And you have a case that you cite?

6      A.    Off the top of my head?

7      Q.    No.  But just generally?

8      A.    Yeah.

9      Q.    And you've cited it before?

10     A.    Yes.

11     Q.    And, in fact, under the terms of the plea agreement,

12   if the government had sought an obstruction of justice

13   enhancement, the government would be breaching the plea

14   agreement?

15     A.    That's correct.

16     Q.    And in any event, the Court had already heard the

17   evidence, so it was coming in under relevant conduct?

18     A.    Correct.

19     Q.    Let's talk a little bit about when Mr. Fuechtener

20   wanted to withdraw his guilty plea.

21           Did he talk to you on the phone or in person

22   about that?

23     A.    I talked to him on a video monitor across the

24   street, and I also met with him in Pahrump in person.

25     Q.    And was that shortly after he had received the PSR

—TRANSCRIBED FROM DIGITAL RECORDING—

1    in this case?

2    A.    I don't remember.

3    Q.    Did he -- in fact, had he received the PSR, even if

4    it wasn't shortly in time --

5            MS. CONNOLLY:  I'm sorry, I didn't hear the

6    question.

7    BY MS. ROOHANI:

8    Q.    Was it -- had he received the PSR at that point?

9            MS. CONNOLLY:  I'm going to object.  It assumes

10   facts not in evidence.  He said he didn't know if he had

11   the PSR.

12           MS. ROOHANI:  That's why I'm asking the

13   question, if he had the PSR.

14           THE COURT:  Overruled.  He can answer that

15   question.

16           THE WITNESS:  I remember meeting with Jan across

17   the street, through the probation video, with Jess.  But I

18   don't know for sure if he had the PSR at that point.

19           And when I met with him in Pahrump, I think that

20   he had the PSR, but I -- I'm not a hundred percent sure.

21   BY MS. ROOHANI:

22   Q.    Did you think he had a PSR because he stated to you

23   that he wanted to withdraw his plea based upon the

24   recommendation in the PSR?

25   A.    In Pahrump?

TRANSCRIBED FROM DIGITAL RECORDING

```
1    Q.    At any point that you met with him?

2    A.    Oh, I'm -- I would be speculating.  But I'm sure

3    that came in to --

4    Q.    Did he indicate to you that he did want to withdraw

5    his guilty plea at some point?

6    A.    He did.

7    Q.    Did he say it was because he didn't understand what

8    he was facing?

9    A.    I don't recall that.

10             MS. ROOHANI:  Brief indulgence, Your Honor.

11             Your Honor, I'll pass the witness.

12             THE COURT:  Ms. Connolly?

13                      REDIRECT EXAMINATION

14   BY MS. CONNOLLY:

15   Q.    You didn't explain to Jan there was a potential

16   seven additional points that could get base -- that could

17   get added to his base offense level based upon the

18   stipulated facts set forth in the plea agreement, did you?

19             MS. ROOHANI:  Your Honor, I'm sorry.  I didn't

20   hear the beginning of that.  I'm sorry.

21   BY MS. CONNOLLY:

22   Q.    You did not explain to Jan that there could be an

23   additional seven points added to his base offense level

24   based upon facts stipulated to in the plea agreement, did

25   you?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    A.    I don't remember that.
2    Q.    Okay.  And you indicated that you have never --
3    again, to clarify, you have never done a guilty plea
4    agreement in a child pornography case before?
5    A.    I don't --
6    Q.    In federal court --
7    A.    That I --
8          MS. ROOHANI:  I believe that misstates his
9    testimony.
10   BY MS. CONNOLLY:
11   Q.    Have you ever done a guilty plea agreement in a
12   child pornography case?
13   A.    I don't recall.
14   Q.    Okay.  In a child pornography case it's not like a
15   run-of-the-mill drug case where you -- you have on a
16   regular basis; right?
17   A.    Yeah, they're not --
18   Q.    Fair to --
19   A.    -- common.
20   Q.    -- say with a drug case or a gun case you're
21   familiar with the kind of enhancements that are going to
22   apply; right?
23   A.    Yeah.  For the most part.
24   Q.    You can get a couple points or you can get points
25   for a leader/organizer, or you can get points for a gun
```

TRANSCRIBED FROM DIGITAL RECORDING

1    being used.  You're familiar with -- more familiar with

2    those guidelines than child pornography guidelines and

3    enhancements; right?

4    A.    I see them more often.

5    Q.    And, again, you don't have independent recollection

6    of -- prior to this case, having reviewed the -- all

7    potential enhancements in a child pornography case?  Well,

8    you couldn't.  You didn't review the images, did you?

9              MS. ROOHANI:  Misstates his testimony.

10             THE WITNESS:  Could you repeat the question?

11   BY MS. CONNOLLY:

12   Q.    Okay.  You didn't review all the images in this

13   case, did you?

14   A.    No.

15   Q.    You reviewed some?

16   A.    Right.

17   Q.    Okay.  And you weren't aware of all the applicable

18   enhancements that could apply under the facts of this

19   guilty plea?

20   A.    I mean, there could have been a bunch of other ones,

21   I'm sure.

22   Q.    And you weren't aware of those because this was the

23   first time you'd ever done a child pornography case, and

24   you just got the guilty plea the morning the plea was

25   entered; right?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I mean, we stipulated to the offense

2    characteristics, so --

3    Q.    Okay.  But you didn't advise Jan that although there

4    was certain enhancements that had been stipulated to, there

5    could be additional ones that apply?

6    A.    I don't recall specifically.

7    Q.    Okay.  And, again, to clarify, you told -- you told

8    me today and previously that you don't specifically recall

9    if you had a United States Sentencing Guideline book with

10   you that morning when you came over and met with him in

11   regard to the guilty plea agreement, do you?

12   A.    Right.

13   Q.    So when you say, "Yes, I believe I did go over

14   them," that's based upon your usual practice?

15   A.    Yes.

16   Q.    And you indicated that you thought that when you got

17   the guilty plea that you reviewed the guidelines in your

18   office before you came over?

19   A.    Yes.

20   Q.    Okay.  Well, if you didn't get the guilty plea

21   agreement until 10:00 and court resumed at 2:00, that would

22   have cut in -- that means that you met with Jan for less

23   than two hours because you had to spend some time in your

24   office going over the guidelines; right?

25   A.    Fair.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    So when you say that you recall going over the

2   table, is that what you know you did, or you're speculating

3   that you did that because that's your common practice to

4   do?

5    A.    I remember going over the table.

6    Q.    You had the table.  In what format do you have the

7   table -- did you have the table?  Do you recall?

8    A.    I have the table inside my guideline book.

9    Q.    But you don't recall if you had the guideline book

10  with you or not?

11   A.    No, I don't.

12          MS. CONNOLLY:  Thank you.

13          MS. ROOHANI:  Briefly, Your Honor?

14          THE COURT:  Yes.

15                   RECROSS-EXAMINATION

16  BY MS. ROOHANI:

17   Q.    Mr. Durham, did you have your iPad with you during

18  trial, or some sort of tablet with you?

19   A.    I believe so.

20   Q.    Did you have the capacity to look up the guideline

21  table on that?

22   A.    Yes.

23   Q.    Is it possible that that's what you looked at?

24   A.    Possible.

25   Q.    I want you to look at page 7 of that plea agreement

TRANSCRIBED FROM DIGITAL RECORDING

1    that's in front of you, document 146 on the docket.  I

2    believe it sets forth the enhancements.

3              You answered some questions about Ms. -- with

4    Ms. Connolly about those enhancements.  I want to go

5    through them one by one.

6              In terms of material depicted prepubescent

7    minor, what do you believe that enhancement to encompass?

8    A.    It's pretty self-explanatory.

9    Q.    That enhancement is self-explanatory; fair?

10   A.    Yes.

11   Q.    Okay.  What about knowing distribution?  What do you

12   think that encompasses?

13   A.    Allowing others to view the images or to share the

14   images with other people.

15   Q.    And you did it knowingly.  Again, self-explanatory.

16   Fair to say?

17   A.    Yeah.  Yeah.

18   Q.    What about sadistic or masochistic conduct?  What do

19   you think that would encompass?

20   A.    That's self-explanatory as well.

21   Q.    Something about the images being sadistic or

22   masochistic?

23   A.    Right.

24   Q.    In terms of pattern of activity, I believe we've

25   already talked about this one, in terms of the Grindr chat.

TRANSCRIBED FROM DIGITAL RECORDING

1    Is that what you understood it to mean?

2    A.    Yes.

3    Q.    In terms of use of a computer, what did you believe

4    that to mean?

5    A.    Self-explanatory.

6    Q.    And in terms of 600-plus images, what did you

7    believe that to mean?

8    A.    That he -- that they found more than 600 images.

9    Q.    Would it be fair to say that at that point Special

10   Agent Panovich had already testified that over 2,000 images

11   had been found on the three devices of the seven that we

12   had gone through?

13   A.    It's fair to say.

14   Q.    Okay.  So in terms of understanding the guidelines,

15   you would agree with me that these are self-explanatory

16   guidelines for the most part?

17   A.    Yes.

18   Q.    So you didn't necessarily need to review in detail

19   your sentencing guideline book to explain these

20   enhancements to Mr. Fuechtener?

21   A.    No.

22   Q.    Okay.

23        MS. ROOHANI:  Pass the witness, Your Honor.

24        THE COURT:  Ms. Connolly?

25        MS. CONNOLLY:  I don't have anything further.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  Mr. Durham, looking at page 6,
2   paragraph 7 --
3           THE WITNESS:  Of the plea agreement?
4           THE COURT:  Yes.  I think it's document 146
5   which has been admitted as Exhibit G.
6           THE WITNESS:  Uh-huh.
7           THE COURT:  In that paragraph 7 did you ever
8   question why those facts are provided in the plea
9   agreement?
10          THE WITNESS:  Did I ever question them?
11          THE COURT:  Yes.  Did it ever occur to you, Why
12  are these facts in the plea agreement?  Are they related to
13  something -- some special enhancement or some other element
14  of the offense?
15          THE WITNESS:  I don't recall today.  But I'm
16  sure I looked at it when I received the plea agreement.  I
17  don't remember if that was one of the -- one of the
18  paragraphs that we tried to get removed or not.
19          THE COURT:  What about paragraph 9?
20          THE WITNESS:  I think we also -- if I recall, I
21  think we also mentioned that one to the government.  But I
22  don't remember specifically.
23          THE COURT:  All right.  Ms. --
24          MS. ROOHANI:  Can I ask --
25          THE COURT:  It's actually Ms. Connolly's

TRANSCRIBED FROM DIGITAL RECORDING

1   witness.

2           Ms. Connolly, did you have any follow-up?

3           MS. CONNOLLY:  No.

4           THE COURT:  All right.  Ms. Roohani --

5           MS. ROOHANI:  I have two brief follow-ups.

6                   FOLLOW-UP EXAMINATION

7   BY MS. ROOHANI:

8   Q.   Let's talk about first about paragraph 7.  It's

9   talking about the distribution of child pornography.

10          Were you present for the plea colloquy?

11  A.   Yes.

12  Q.   Do you remember at some point Judge Navarro asked

13  Mr. Fuechtener, "Did you offer to distribute child

14  pornography by sharing your Gigatribe lars45 folder?"

15  A.   I don't remember that specifically, but --

16  Q.   If I represented to you that that was from the

17  transcript of the proceedings --

18  A.   Yes.

19  Q.   Okay.  And in terms of the pattern and practice

20  enhancement -- I'm sorry.  Let me back up.

21          In terms of the distribution enhancement, could

22  this fact be used to support a knowing distribution?

23  A.   Yes.

24  Q.   Okay.  In terms of the pattern or practice, could

25  this be one of the two patterns of behavior that's required

TRANSCRIBED FROM DIGITAL RECORDING

1    to support that enhancement?

2    A.    Yes.

3    Q.    And by itself, would the Grindr chat support that

4    enhancement?

5    A.    The pattern?

6    Q.    Yes.  By itself, would the Grindr chats support it?

7    A.    I don't believe so, no.

8    Q.    So this paragraph 7 would be required to support

9    that plus-five enhancement?

10              MS. CONNOLLY:  I'm objecting to the prosecutor

11   essentially giving him the answers to the question when

12   she's asking him.

13              THE COURT:  Yes.  Just rephrase it.  Is it your

14   understanding then that's why --

15   BY MS. ROOHANI:

16   Q.    Is that your understanding?

17   A.    Yes.

18   Q.    Let's talk about paragraph 9.

19              In terms of paragraph 9, in that unspecified

20   account, would the government, in your estimation, be able

21   to apply an obstruction of justice enhancement if it was

22   not related to this case?

23              MS. CONNOLLY:  Objection.  Assumes facts not in

24   evidence.

25              THE COURT:  Repeat the question.  I'm not sure I

1    understood it.

2    BY MS. ROOHANI:

3    Q.    On paragraph 9, it specifically talks about

4    Mr. Fuechtener asking his husband to delete evidence,

5    quote, on an unspecified account.  Do you see that?

6    A.    Yes.

7    Q.    Did the government ever establish what that

8    unspecified account was?

9    A.    I don't think so.

10   Q.    Okay.  And so for an obstruction of justice

11   enhancement to apply, based upon your experience as a

12   criminal defense attorney and practicing in this court,

13   would the government have to link that to something related

14   to this case?

15   A.    That's my understanding.

16   Q.    Okay.  So if the government couldn't link that or

17   produce additional evidence to show that that unspecified

18   account was related to this case, was it your understanding

19   that the Court could not apply that enhancement?

20             MS. CONNOLLY:  Judge, I -- objection.  It's

21   misstating the law.

22             MS. ROOHANI:  I don't believe it's misstating

23   the law, Your Honor, and I believe it's also --

24             THE COURT:  Are you asking him what he thought

25   at the time --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  Yes.

2          THE COURT:  -- or what he thinks now?

3    BY MS. ROOHANI:

4    Q.    What you thought at the time?  Or now?  I guess

5    let's start with what you thought at the time.

6    A.    At that time I didn't believe it supported the

7    obstruction enhancement.

8    Q.    Okay.  And now do you believe it supports the

9    obstruction enhancement?

10   A.    No.

11   Q.    Okay.

12          MS. ROOHANI:  I hope that clarifies, Your Honor.

13          THE COURT:  Then what was the purpose of

14   paragraph 9, the facts in paragraph 9?  Why was that

15   included?

16          MS. ROOHANI:  Are you asking me, or are you

17   asking Mr. Durham, Your Honor?

18          THE COURT:  Mr. Durham.

19          MS. ROOHANI:  Okay.

20          THE WITNESS:  I don't remember, Your Honor.

21          THE COURT:  And going back to paragraph 7, the

22   Skype paragraph that Ms. Roohani was describing for the

23   distribution enhancement, because it states that the

24   defendant shared his Gigatribe folder, was it necessary to

25   include an exchange for a thing of value for it to be

TRANSCRIBED FROM DIGITAL RECORDING

1    distribution?

2              THE WITNESS:  I don't believe --

3              THE COURT:  Was it your understanding you

4    need -- distribution requires an exchange for a thing of

5    value, or could it be just distribution if you're sharing

6    the Gigatribe folder?

7              THE WITNESS:  I couldn't tell you the answer to

8    that.

9              THE COURT:  All right.

10             MS. ROOHANI:  Your Honor, could I follow up on

11   that?

12             THE COURT:  Sure.

13                      FOLLOW-UP EXAMINATION

14   BY MS. ROOHANI:

15   Q.    Would having a conversation and agreeing to

16   exchange something for a thing of value show the knowing

17   aspect of the distribution?

18   A.    Sure.

19   Q.    And, in fact, under 2G2.2, the government -- or the

20   Court would not be able to apply an enhancement unless

21   there was a knowing aspect to it; correct?

22   A.    That's correct.

23   Q.    So, in fact, if the file was shared by itself and

24   didn't include that specific language, potentially there

25   would not be specific facts to support a knowing

────────TRANSCRIBED FROM DIGITAL RECORDING────────

1    distribution.  Would that be fair to say?

2    A.    That's correct.

3          MS. CONNOLLY:  May I follow up?

4          THE COURT:  Yes.

5                    FOLLOW-UP EXAMINATION

6    BY MS. CONNOLLY:

7    Q.    Under 2G2.2(b)(3)(B), the enhancement is that it's

8    distribution in exchange for valuable consideration;

9    correct?  That's a separate enhancement when it's

10   distribution for something in return, for consideration.

11         For your reference, you can go to paragraph --

12   page 25, paragraph 50 of the PSR.

13   A.    Are you saying that that's different than the

14   distribution?

15   Q.    Well, for distribution you don't have to have

16   valuable consideration; right?  You can distribute

17   something without getting value for consideration in

18   exchange for that; right?

19   A.    Right.

20   Q.    In fact, the pattern of activity means those kind of

21   distribution of the pornography; right?

22   A.    Right.

23   Q.    And that enhancement was anticipated in the plea

24   agreement.  In fact, there was an enhancement set forth in

25   the plea agreement for pattern of activity which involved

TRANSCRIBED FROM DIGITAL RECORDING

1    distribution; right?

2    A.    Right.

3    Q.    And this particular enhancement set forth in

4    paragraph 50, page 25 of the PSR involves specifically in

5    exchange for valuable consideration.

6    A.    So you're saying that's a different enhancement?

7    Q.    Yes.  Would you agree with that?

8    A.    I will take your word for it.

9              MS. CONNOLLY:  Thank you.

10                   FURTHER FOLLOW-UP EXAMINATION

11   BY MS. ROOHANI:

12   Q.    And, again, Mr. Durham, just to be clear, if the

13   parties didn't agree to that enhancement, it was your

14   understanding that the Court couldn't apply that

15   enhancement.  Would that be fair to say?

16   A.    Correct.

17             MS. CONNOLLY:  Did you say you are aware the

18   Court could apply that enhancement?

19             MS. ROOHANI:  He believed that they would not be

20   able to apply that enhancement.

21             THE WITNESS:  Correct.

22                   FURTHER FOLLOW-UP EXAMINATION

23   BY MS. CONNOLLY:

24   Q.    Because I asked you previously if you were aware of

25   application note 1B where it indicates that the Court has

TRANSCRIBED FROM DIGITAL RECORDING

1    to look at stipulated facts in the plea agreement and apply

2    the applicable guidelines.  Are you aware of that?

3    A.    Yes, but --

4    Q.    In other words, the Court just can't ignore facts

5    that have been stipulated to by the government and the

6    defense, can it?

7    A.    No.

8         MS. CONNOLLY:  Thank you.

9              FURTHER FOLLOW-UP EXAMINATION

10   BY MS. ROOHANI:

11   Q.    You said, "Yes, but."  Can you please finish your

12   answer.

13   A.    I think it's two different things that we're talking

14   about.

15   Q.    Okay.  Can you explain?

16   A.    I mean, there has to be a factual basis for the

17   Court to accept the plea.  But then for the Court to imply

18   the different enhancements under the guidelines is to me a

19   different -- talking about sort of a different thing.

20   Q.    Okay.  So --

21   A.    So if we stipulated, in my experience, to the

22   particular guidelines and the enhancements and then

23   probation comes in and recommends additional enhancements,

24   the government can't -- is bound by the enhancements that

25   were negotiated, and under whatever that case law is you

-TRANSCRIBED FROM DIGITAL RECORDING-

1   came in here and argued for those enhancements, you would

2   be violating the plea agreement.

3            Obviously the judge can impose whatever

4   enhancements she deems appropriate under the law.  But in

5   my experience, I've never had a judge do that when the

6   parties have stipulated to those enhancements.

7   Q.    And, in fact, you've seen the reverse happen.  Would

8   that be fair to say?

9            You and I recently worked on a case, Jazzmin

10   Dailey, and the parties had agreed to a specific

11   enhancement that probation didn't apply?

12   A.    Correct.

13   Q.    And at that point we asked the Court to consider the

14   facts in the plea agreement and explained why those facts

15   met a specific enhancement?

16   A.    True.

17   Q.    And in your estimation, has the reverse happened,

18   there might be facts in the plea agreement, or certain

19   things that probation is applying, that the Court

20   ultimately doesn't apply because the parties did not agree

21   to that?

22   A.    Correct.

23   Q.    Okay.  Thank you.

24

25

1                    FURTHER FOLLOW-UP EXAMINATION

2    BY MS. CONNOLLY:

3        Q.     And those cases, those involve cases where you and

4    the government have specifically stipulated to certain

5    facts?  There's cases where parole and probation will come

6    in and say, Oh, I read in the police report that the

7    defendant did X, Y, and Z, and based upon what's in the

8    police report there should be an enhancement; right?

9        A.     Yes.

10       Q.     And so you come to court and parole and probation

11   argues for that, and the government says, "We're not going

12   to request that, we're not presenting any evidence that the

13   enhancement applies," and then the Court doesn't apply it;

14   right?

15       A.     Right.

16       Q.     You'd agree that's different to a case, such as the

17   one here, where based upon the stipulated facts, facts that

18   have been agreed upon by the defendant and the government,

19   that's different from parole and probation just looking at

20   a hearsay police report and suggesting to the Court that

21   enhancement applies?  You would agree those are two

22   entirely different situations; right?

23       A.     I'm not sure I understand.

24       Q.     Okay.

25       A.     I'm sorry.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    In some cases parole and probation will come in, and

2    they get the police reports, and they'll suggest a

3    two-point enhancement based upon information they've read

4    outside of the plea agreement?

5    A.    Okay.

6    Q.    Right?

7    A.    Right.

8    Q.    We come across those cases?

9    A.    Yes.

10   Q.    And the government would stand up and say, "We're

11   not requesting that enhancement, Judge"?

12   A.    Right.

13   Q.    And in order for the Court to give that enhancement,

14   the government has to present some facts --

15   A.    Right.

16   Q.    -- to support the enhancement; right?

17   A.    Right.

18   Q.    Okay.  And in those particular cases, there weren't

19   facts set forth in the guilty plea agreement that supported

20   the enhancements, were there?

21   A.    No.  Generally, the facts will support whatever

22   enhancements are in the plea agreement.

23   Q.    So I'm talking -- so in this particular case, based

24   on specific facts that were stipulated to, there's certain

25   enhancements that apply under the United States Sentencing

TRANSCRIBED FROM DIGITAL RECORDING

1    Guidelines that were not included in this plea agreement;

2    right?

3    A.    That's what it sounds like.

4    Q.    Okay.

5              MS. CONNOLLY:  I don't have anything else.

6              MS. ROOHANI:  Your Honor, I'm going to reserve

7    the rest for argument.  I don't think that Mr. Durham will

8    have specific knowledge to what I would like to argue to

9    Your Honor.

10             MS. CONNOLLY:  I'm sorry.  I didn't hear what

11   you said.

12             MS. ROOHANI:  I'm going to save the rest for

13   argument.

14             MS. CONNOLLY:  Okay.

15             THE COURT:  All right.  So, Mr. Durham, as you

16   sit here today, you don't recall what the purpose was of

17   that paragraph 9 being included in the plea agreement?

18             THE WITNESS:  I don't have any independent

19   recollection, no.

20             THE COURT:  And there was no enhancement for

21   obstruction that was contemplated in the plea agreement?

22             THE WITNESS:  Correct.

23             THE COURT:  All right.  Nothing -- anything

24   else?

25             MS. ROOHANI:  Not from the government.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  All right.  Thank you for coming in,
 2    Mr. Durham.  You're excused.
 3          (The witness was excused.)
 4              MS. CONNOLLY:  Jan Rouven Fuechtener.
 5              THE COURT:  Did you have any other witnesses,
 6    Ms. Connolly?
 7              MS. CONNOLLY:  Excuse me?  He was talking to me.
 8    I didn't hear you.
 9              THE COURT:  Did you have any other witnesses to
10    call?
11              MS. CONNOLLY:  Yes, Jan Rouven Fuechtener.  I'm
12    going to have --
13              MS. ROOHANI:  Do we want to deal with the
14    Humphries' situation now?
15              MS. CARTIER-GIROUX:  I'm sorry?
16              MS. ROOHANI:  I don't know that we're going to
17    finish with Jan.  Do you want to (inaudible).
18              MS. CONNOLLY:  You want to call him --
19              MS. ROOHANI:  I'm not.  Are you going to call
20    him?
21              MS. CONNOLLY:  I'm going to put him on after
22    him.
23              MS. ROOHANI:  Do you want to just deal with the
24    situation as to whether he's going to testify?
25              MS. CONNOLLY:  Sure.
```

1           MS. ROOHANI:  Your Honor, we -- it's my

2     understanding that Ms. Connolly, after she calls

3     Mr. Fuechtener, is also going to call Bret Humphries, who

4     Your Honor submitted the writ for testificandum on him.

5           We have something that has been brought to our

6     attention by Dustin Marcello, who you appointed for

7     Mr. Humphries.  And I believe Mr. Marcello is here, and he

8     can speak to it a little bit further.

9           But my understanding is that Mr. Humphries says

10    that he will only answer questions about this case, he will

11    not answer any questions about his case whatsoever, but I

12    have a good faith basis upon which to ask him questions

13    that go to his -- go to bias regarding the facts of his

14    case.

15          And so I'd like to do that outside of the public

16    hearing.  I don't know if you'd like to hear that at

17    sidebar.  But I do believe I have a good faith basis to ask

18    him questions about his case and certain statements that

19    he's made to Mr. Fuechtener while in custody that will

20    certainly reflect on his bias.

21          And in the event that he will refuse to answer

22    those questions, I believe it's either appropriate for Your

23    Honor to refuse to allow him to testify, or, alternatively,

24    if he is going to testify and then not answer those

25    questions, to strike his testimony.

TRANSCRIBED FROM DIGITAL RECORDING

1          I'm just trying to sort of head this off rather

2    than having to hear all the testimony and then move to

3    strike it.

4          So I don't know if Your Honor wants to deal with

5    that now.  I know Mr. Marcello is here.  He's billing for

6    it.  I figured we should deal with this now before we get

7    to that point.

8          THE COURT:  So what are the questions that you

9    intend to ask that are about his case?  He's not been to

10   trial yet or pled guilty; right?

11         MS. ROOHANI:  No.  And his trial is scheduled

12   coming up within the next month.

13         Specifically, Your Honor, I believe that

14   Mr. Humphries has made certain admissions regarding his

15   guilt to Mr. Fuechtener while in custody, and I believe

16   that his testimony is in the hope that Mr. Fuechtener will

17   not come and speak with the government regarding those

18   admissions.

19         And I believe that I have the right to probe on

20   that issue to see what admissions he's potentially made to

21   Mr. Fuechtener and any type of consideration that

22   Mr. Fuechtener may have given him for his testimony.

23         THE COURT:  And so, Mr. Marcello, do you mind

24   coming up and letting us know if you were aware whether

25   there is an issue that's going to be coming up here.

TRANSCRIBED FROM DIGITAL RECORDING

1           MR. MARCELLO:  And, Your Honor, what the issue

2    should be is I've spoken to Mr. Humphries.  Without getting

3    into the substance of our discussions, essentially he is

4    going to take the position that he will only testify as to

5    this case, what he has to testify as to this case, and

6    anything related to his case he is going to refuse -- or

7    has indicated to me he would refuse to answer, either

8    related to his case -- there was two things.

9           One, there was they had some type of motion that

10   involved an informant in that hearing.  Ultimately, I

11   believe the Court ruled in his favor.  Anything related to

12   that motion or the circumstances that gave rise to that

13   motion, he would refuse to answer; anything to do with his

14   underlying charges that he's going to trial on, he would

15   refuse to answer; but otherwise would testify to -- and be

16   subject to cross-examination as to any facts or

17   circumstances related to his testimony in this case and

18   this case only.

19           THE COURT:  Okay.  Well, I agree that he has a

20   right to not answer any questions that are specifically

21   about his case.

22           If he is asked questions that are broader, such

23   as, "Did you discuss your case with Mr. Fuechtener?" "How

24   many times did you discuss your case with Mr. Fuechtener?"

25   How long were those discussions?" or something like that,

1   would that, in your opinion, would that still be violating

2   his right to remain silent and not incriminate himself?

3           MR. MARCELLO:  Well, that--

4           THE COURT:  See, the issue is the government is

5   trying to elicit facts to demonstrate bias.  I don't know

6   that we need to really get into details, but just whether

7   or not they've had discussions in general about each

8   other's cases.

9           MR. MARCELLO:  Again, I don't know the extent to

10  how far he's going to be willing to answer questions as to

11  those.  I'm just relaying what he indicated to me, that if

12  asked those questions about his case, that he would refuse

13  to answer them.

14          I think generic, general questions like that,

15  probably he would say, but I wouldn't know until he's up

16  here.

17          He had just indicated to me that he would --

18  again, this is why the government wanted to bring it to

19  your attention, to see whether he would be stricken or

20  limited or whatever's going to happen.

21          But basically anything related to that motion,

22  the granting of that motion, and his case he has indicated

23  that he wouldn't testify to.

24          How far until we get to that point, I don't know

25  until he starts getting asked the questions and either

---TRANSCRIBED FROM DIGITAL RECORDING---

1    wants to consult with me or not or refuses to answer them,

2    and then the Court has to take some kind of action.

3              I don't know how far he's willing to allow the

4    questioning.  And again, whether or not you make rulings,

5    whether it's relevant, not relevant, whatever it is, but

6    that's just what he's indicated to me, and that's what I

7    communicated to both parties.

8              THE COURT:  All right.

9              So, Ms. Roohani, if I limit your questioning to

10   generally whether or not there's been discussion about each

11   other's cases and how many times and for how long, do you

12   think that would still violate his right to remain silent

13   and not incriminate himself?

14             MS. ROOHANI:  Well, Your Honor, I guess as a

15   preliminary matter, I believe I have the right to ask him a

16   little bit more than that.  Because it's my understanding

17   that the conversations were specifically about

18   Mr. Humphries' guilt, not just, Hey, I have this motion

19   pending and I'm going to file this or these are generally

20   the charges.

21             Because I imagine that the questions that Your

22   Honor would allow me to ask under what you're indicating is

23   not going to get to bias at all, it's going to get to, Did

24   you generally talk to this human being at some point during

25   the course of your life?  And I don't think that that goes

TRANSCRIBED FROM DIGITAL RECORDING

1    to bias.  And, quite frankly, I don't even understand why
2    that would be relevant in terms of what we're trying to do
3    here.
4                And I'm in an awkward position, Your Honor,
5    because I think if I explain to you why I have a good faith
6    basis to ask these questions, I think you would understand
7    why it would be an abuse of discretion for you to not allow
8    me to ask these questions going to actual bias under the
9    Ninth Circuit authority.
10               So I don't want to do it publicly, Your Honor.
11   I don't know if we can have a sidebar where I can discuss
12   it.
13               I've briefly discussed it with Ms. Connolly.
14   But I think if I explain to you why I have a good faith
15   basis, you'll understand a little bit more.  If you would
16   entertain a sidebar.
17               MS. CONNOLLY:  And, Judge, I have some -- well,
18   since they're going to get into this, I will put on the
19   record that it's been communicated to me by Mr. Ericcson on
20   at least a couple of occasions that he's been asked -- that
21   the government has -- Ms. Roohani has asked him to
22   communicate to his client that the government, if he does
23   not testify truthfully, will seek obstruction of justice
24   and perjury charges against him.  Not on one occasion, but
25   on several occasions that's been communicated to him.

TRANSCRIBED FROM DIGITAL RECORDING

1          And I consider that to be their attempt to

2   intimidate this witness into not testifying on my client's

3   behalf -- or not testifying at all.  Because it's been

4   several times.  And how can they be privy to conversations

5   they've had between the two of them?  I think it's an

6   attempt to preclude him from coming in and testifying and

7   intimidating him.

8          THE COURT:  All right.  Well -- so what is --

9   so, Ms. Roohani, what is your proffer for the good faith

10  basis?  Why does that need to be sealed or off -- or

11  outside the presence of the public?

12         MS. ROOHANI:  I'm concerned that it might put

13  Mr. Fuechtener at risk of harm.

14         And I've been instructed by my office to not put

15  it on the public record, Your Honor.  So if you're not

16  inclined to take it at sidebar --

17         THE COURT:  All right.  Well, then why don't we

18  go ahead then -- I don't think there's very many people

19  here who aren't part of the case.  I think I recognize just

20  about everyone except for maybe two people.  Is that right?

21  I don't know if maybe they belong to any of the counsel.

22         Ms. Connolly, anybody with you maybe?

23         MS. ROOHANI:  I believe there's one -- just one

24  member of the public here, Your Honor.

25         THE COURT:  Just one?

─TRANSCRIBED FROM DIGITAL RECORDING─

1          MS. ROOHANI:  Uh-huh.

2          THE COURT:  All right.  So if you don't mind,

3     that one person, is it -- all right.  All right.  If you

4     don't mind, it's easier if you just step outside, and we'll

5     close the doors, and then we'll let you know as soon as

6     we're able to go back on the public record.

7          (Record sealed from 3:05 p.m. to 3:27 p.m.)

8          THE COURT:  Okay.  So we're going to go ahead

9     now and unseal the courtroom so that we can let the public

10    back in.

11         We're going to take about a 10-minute bathroom

12    break as well.

13         MS. ROOHANI:  Thank you, Your Honor.

14         THE COURT:  And then we're going to resume.

15         And are you going to call Mr. Fuechtener?

16         MS. CONNOLLY:  Correct, Your Honor.

17         THE COURT:  Okay.  So that will be the plan.

18    We'll be back -- it's 3:23.  Be back about 3:35.

19         MS. ROOHANI:  Thank you, Your Honor.

20         COURTROOM ADMINISTRATOR:  Off record.

21         (Recess from 3:27 p.m. until 4:07 p.m.)

22         COURTROOM ADMINISTRATOR:  All rise.

23         THE COURT:  All right.  Thank you.  You may be

24    seated.

25         All right.  So the hearing is no longer sealed.

-TRANSCRIBED FROM DIGITAL RECORDING-

1            And, Ms. Connolly, you may go ahead and call

2    your next witness.

3            COURTROOM ADMINISTRATOR:  Please raise your

4    right hand.

5            You do solemnly swear that the testimony you

6    shall give in the cause now before the Court shall be the

7    truth, the whole truth, and nothing but the truth, so help

8    you God?

9            THE WITNESS:  Yes.

10            COURTROOM ADMINISTRATOR:  Thank you, sir.  You

11    may be seated.

12            Please state and spell your full name for the

13    record.

14            THE WITNESS:  Jan Rouven Fuechtener.

15                    JAN ROUVEN FUECHTENER

16              called as a witness on behalf of the

17         Defense, was examined and testified as follows:

18                       DIRECT EXAMINATION

19    BY MS. CONNOLLY:

20    Q.    Do you mind if I call Jan?

21    A.    Yeah, you can.

22    Q.    And you were indicted on March 30th of 2016, when a

23    federal indictment was filed against you; right?

24    A.    Can you speak a little bit louder.

25    Q.    On March 30th, 2016?  In March of 2016, there was an

```
 1   indictment filed against you in federal court; right?

 2   A.    Yes.

 3   Q.    And had you -- at that point in time, did you have

 4   counsel that had been previously hired to represent you?

 5   A.    Yes.

 6   Q.    And who was that?

 7   A.    It was Jess Marchese.

 8   Q.    Okay.  And Mr. Marchese, how did you come in contact

 9   with Mr. Marchese?

10   A.    Steve Pacitti recommended him.

11   Q.    And how did you know Steve Pacitti?

12   A.    He was my entertainment lawyer.

13   Q.    And for how long had Mr. Pacitti represented you?

14   A.    Probably since 2012.

15   Q.    2012.  Let me ask you.  You are not a native of the

16   United States; right?

17   A.    No.

18   Q.    And where were you born?

19   A.    In Germany.

20   Q.    Where were you educated?

21   A.    In Germany.

22   Q.    And what was the extent of your education in

23   Germany?

24   A.    I never -- it's -- I could study.  I think that's --

25   Q.    Did you go to college?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    It's a high school diploma.  I did 13 years of

2    school and could go to college.

3    Q.    Okay.  So you didn't go to college in Germany?

4    A.    No.

5    Q.    Okay.  When did you come to the United States?

6    A.    I came here, like -- the first time I came here when

7    I was 18 on vacation and to see (indiscernible) and magic

8    shows.

9          And then from nearly every other year, but on

10   vacation.

11   Q.    When did you move to the United States?

12   A.    In 2000 -- we came here -- November 2010.

13   Q.    2010.  And how old were you at that time?

14   A.    Well, I'm born 1977.

15   Q.    33?

16   A.    Yeah, it's already eight years.

17   Q.    Okay.  So -- and your primary language is what?

18   A.    German.

19   Q.    But you obviously -- what's your understanding of

20   the English language?  You speak it, you read it?

21   A.    Yes.

22   Q.    Okay.  Fluently speak it?

23   A.    Well, it's -- I -- it's hard to explain.  Sometimes

24   when I'm in a discussion, it's hard to find nuances, like

25   it's black and white, good or bad.  Especially like in a

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   legal or in a business setting, it's hard to -- when it's a

 2   discussion, I don't find the right words.

 3   Q.    If there's a lot of people talking --

 4   A.    So it was always a disadvantage in business because

 5   you have always a disadvantage against native speakers

 6   because you always look for the right words, especially

 7   when I'm nervous or when it's like a business discussion

 8   and you need to find the right words quick.

 9   Q.    So if there's a lot of people --

10         MS. ROOHANI:  Objection.  Nonresponsive.

11         MS. CONNOLLY:  I'm sorry.  I didn't hear you.

12         MS. ROOHANI:  It's nonresponsive to the

13   question.

14   BY MS. CONNOLLY:

15   Q.    Do you understand every word that's spoken in the

16   English language?

17   A.    No.

18   Q.    Okay.  Do you understand generally -- what about

19   your comprehension of the written English language?  How

20   would you describe that?

21   A.    It depends what -- what kind of document it is.  If

22   it's like the menu in Pahrump, of course I can read that.

23   If it's --

24   Q.    Okay.  You need to speak slowly.

25   A.    If it's the menu in Pahrump or something like that,
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    everyday things, I, of course, can read and know what it

2    means.

3              When it's a novel, I have to look up certain

4    words.

5              When it's something legal, I would look it up or

6    ask people.

7    Q.    Okay.  Let me go back to Mr. Pacitti.

8              So Mr. Pacitti, you indicated, started

9    representing you in about 2000 and --

10   A.    '12.

11   Q.    '12.  How would you describe your relationship with

12   Steve Pacitti?

13   A.    Good.

14   Q.    You trusted him?

15   A.    Yes.

16   Q.    So he was the one that recommended Mr. Marchese to

17   you?

18   A.    Yes.  That was the only lawyer I knew, and I called

19   him.

20   Q.    Okay.

21   A.    And we went to dinner, and he said -- I explained to

22   him what happened, and he said, Well --

23   Q.    Okay.  Without -- we don't want to get into anything

24   that Mr. Marchese said.

25              Okay.  So you hired Mr. Marchese.  And then did
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   there come a point in time when you hired -- or more
 2   lawyers were hired on your behalf?
 3   A.    Yes.
 4   Q.    Were you in custody --
 5            MS. ROOHANI:  I'm sorry.  Can you -- can you
 6   repeat that?  I didn't understand what you said.
 7   BY MS. CONNOLLY:
 8   Q.    Was there a time where other lawyers were hired on
 9   your behalf?
10   A.    Ask the question again.
11   Q.    Okay.  Did there come a point in time when other
12   lawyers were hired on your behalf to represent you?
13   A.    Yes.
14   Q.    Okay.  And when was that, approximately?
15   A.    That was --
16   Q.    March of 2016?
17   A.    Yeah.  It was after I got arrested but before I went
18   to the court to --
19   Q.    Before the --
20   A.    -- you call that.
21   Q.    Before the indictment.  But the time of the
22   detention hearing, there was more than just Mr. Marchese
23   representing you; right?
24   A.    Yes.  That was later.
25   Q.    Okay.  So you had Mr. Marchese, and then you hired
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Nadig and Sanft?

2              Upon whose --

3    A.    Yes.

4    Q.    Who recommended to you that you hire Nadig and

5    Sanft?

6    A.    Steve Pacitti.  And he recommended Ben Nadig.

7    Q.    Okay.  And would it be fair to say that Mr. Sanft

8    made an appearance on the record; in other words, he filed

9    something with the Court representing that he was your

10   lawyer on April 2nd, 2016?

11   A.    Yes.

12   Q.    Okay.  And I'm going to fast forward at bit.

13             In July of 2016, you substituted Mr. Durham in

14   place -- instead in place of Mr. Sanft; right?

15   A.    I don't know the exact date.  But if you have that,

16   it was -- yeah, that sounds right.

17   Q.    Okay.  Without telling me what anybody else said,

18   what were the circumstances that caused you to release

19   Mr. Sanft and retain Mr. Durham to represent you?

20   A.    I had a meeting in Henderson with Jess.  It was over

21   the video screen.  And he said, "Jan" --

22             MS. ROOHANI:  Objection.  Hearsay.

23   BY MS. CONNOLLY:

24   Q.    I said without saying what anybody else told you.

25   A.    Okay.  Well, what --

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  He ended --

2    A.    Ask again.

3    Q.    What was it that caused you to hire -- to release

4    Mr. Sanft and hire Mr. Durham in his place?

5    A.    I felt that Mr. Sanft is doing nothing.

6    Q.    Okay.  And who was it that caused you to believe

7    that?

8          Without telling me what they said, who was it

9    that caused to you feel that way?

10         MS. ROOHANI:  Objection.

11   BY MS. CONNOLLY:

12   Q.    Or did you feel that way on your own?

13         MS. ROOHANI:  Objection.  Answer will cause --

14   call for hearsay.

15         MS. CONNOLLY:  I'm not asking him what was said.

16         MS. ROOHANI:  If his --

17   BY MS. CONNOLLY:

18   Q.    Caused -- what caused you to feel that way?

19   A.    Yeah.  Initially that was Jess --

20   Q.    So after you had discussions with Jess, you felt

21   Mr. Sanft not doing enough on your case?

22   A.    Yes.  Jess, in a way, opened my eye --

23   Q.    You can't say what anybody else said.

24   A.    No, he didn't say anything, but he opened my eyes

25   with -- what I learned after that conversation with Jess

TRANSCRIBED FROM DIGITAL RECORDING

1    was that --

2                MS. ROOHANI:  Objection.  Hearsay.

3                THE COURT:  Overruled.  I'm not sure if it's the

4    truth of the matter asserted.

5    BY MS. CONNOLLY:

6    Q.   Go ahead.

7    A.   Well, I felt he's doing nothing.

8    Q.   Okay.  Well what was your understanding of what

9    Mr. Nadig's involvement in your case was?

10   A.   To work together with Michael Sanft on my defense.

11   Q.   What about Marchese?  What was the difference

12   between Marchese, Sanft, and Nadig?

13   A.   They all were supposed to work together.

14   Q.   And you?

15   A.   Yes.

16   Q.   Okay.  At any point in time did you, in writing or

17   orally, indicate that you waived any conflict and any of

18   those attorneys representing you and also representing

19   Frank?

20   A.   Ask it again.

21   Q.   Okay.  At any point in time did you sign a waiver

22   saying that it was okay for Mr. Nadig to represent you and

23   represent Frank, your husband?

24   A.   No.

25   Q.   Did you ever orally have a discussion with Mr. Nadig

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1    about any potential conflicts and him representing you and
 2    representing Frank?
 3    A.    No.
 4    Q.    Did you ever orally represent to Mr. Nadig that you
 5    would waive any conflict in him representing you and also
 6    representing Frank?
 7    A.    No.
 8    Q.    Now, Frank is your husband; right?
 9    A.    Yes.
10    Q.    And you and he live together?
11    A.    Yes.
12    Q.    And where did you live together at?  What was the
13    residence address?
14    A.    Here in Las Vegas?
15    Q.    Yes.
16    A.    At 7080 Donald Nelson Avenue.
17    Q.    Okay.  And that's the home where there was some --
18    where computers were received -- were seized, and based
19    upon information found on those computers a federal
20    indictment was filed against you?
21              MS. ROOHANI:  Objection.  Leading.
22              THE COURT:  I didn't hear the last part of the
23    question.
24    BY MS. CONNOLLY:
25    Q.    That's the home where those items seized, and based
```

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1    upon information that was on those computer a federal

 2    indictment was filed against you?

 3              MS. ROOHANI:  Objection.  Leading.

 4              THE COURT:  I think the Court can take judicial

 5    notice of that, that that's the same address that's

 6    represented as where the --

 7              THE WITNESS:  Yes.

 8              THE COURT:  -- computers were found.

 9    BY MS. CONNOLLY:

10    Q.    Okay.  And besides you and Frank, was there anybody

11    else residing in that home?

12              MS. ROOHANI:  Objection.  Relevance.

13              MS. CONNOLLY:  It's completely relevant in the

14    fact that on cross-examination one of the witnesses,

15    Ms. Roohani brought out the fact that Frank was -- or tried

16    to establish that Frank was not the only alternate suspect

17    because there was other individuals residing in the home.

18              THE COURT:  Court agrees.  Overruled.

19    BY MS. CONNOLLY:

20    Q.    Was there anyone else residing in that home besides

21    you and your husband, Frank?

22    A.    Yes.

23    Q.    And who was that?

24    A.    There was Kevin Klepping.  That's someone we know

25    from Germany, and he wanted to relocate to Las Vegas and --
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    When --
 2    A.    -- help --
 3    Q.    When did he reside with you?
 4    A.    Well, with me --
 5    Q.    Was it for a long period --
 6    A.    It was during the time I was at the Tropicana --
 7    Q.    Was it for weeks or months?
 8    A.    -- met him there.
 9          It was for -- the longest period was probably --
10    I mean, don't nail me down on that, but I would say six
11    weeks to two months.  That was the longer, then he went
12    to --
13    Q.    Do you understand --
14    A.    -- Germany for a while and came back.
15    Q.    Do you understand the difference between somebody
16    residing there and somebody staying there?
17    A.    I would say staying means more permanent and
18    residing could be anything else.
19    Q.    Okay.
20    A.    But maybe I'm wrong.
21    Q.    So --
22    A.    No, I don't know what that exactly --
23    Q.    So this individual -- would it be fair to say, was
24    this individual actually living in that address, or was he
25    visiting?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.   He had his toothpaste and toothbrush and his

2   suitcases there, so --

3   Q.   Okay.

4   A.   -- at that time he was living there, yeah.

5   Q.   And his name wasn't on the lease or on any --

6   A.   No.

7   Q.   -- of the utilities?

8        And he was there for about six weeks?

9   A.   No, that was the longest period at a time.

10  Q.   Okay.  So he came and went?

11  A.   Yeah.

12  Q.   Okay.

13  A.   Again, it might be more, it might be -- I would need

14  to, I mean, look into that.

15  Q.   So he didn't live there consistently?

16  A.   No.  It was planned -- there was plan to, but he --

17  I mean, until --

18  Q.   When I say consistently, in other words, that wasn't

19  his only -- that was not his primary residence?  That

20  wasn't his house?

21  A.   At that time, it was.  He left back to Germany after

22  the search and said, "This is all too much for me, and

23  I'm -- I don't want to work for you and" --

24  Q.   Okay.  But there --

25  A.   -- "I leave."

```
 1    Q.    Okay.  What I'm trying to establish is, you and

 2    Frank owned this house together --

 3    A.    Yes.

 4    Q.    -- right?

 5          That was your house?

 6    A.    Yes.

 7    Q.    And this individual from Germany, he was a guest in

 8    your home?  You said, "Come stay with me" --

 9    A.    Yes.

10    Q.    -- "in my" --

11    A.    Yes.

12    Q.    -- "in our home"?

13    A.    Yes.

14    Q.    And that home was one that you and Frank owned?

15    A.    Yes.

16    Q.    And how long had you and Frank lived in that house?

17    A.    I think we moved in -- it was around Christmas.  I

18    would say it was Christmas 2012.

19    Q.    Okay.  So you had lived in that --

20    A.    And I'm not sure about that.  We moved in

21    Christmas --

22    Q.    It would be fair to say you and Frank lived in that

23    house together for a number of years?

24    A.    Yes.

25    Q.    And this individual came and went, and the longest
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    period of time he ever spent, you said, was six weeks?
 2    A.    Yeah.  Maybe two months --
 3    Q.    Okay.
 4    A.    -- maybe six weeks.
 5    Q.    Did he have full rein of the home?
 6    A.    Yes.
 7    Q.    He could go everywhere in the house?
 8          Do you know what I meant when I say "full rein
 9    of the house"?
10    A.    Yes.
11    Q.    Okay.  Does this individual have full rein of the
12    house?  In other words, was he able to go everywhere?
13    A.    Well, there were areas of exclusivity.  For example,
14    he didn't go into my walk-in closet.
15    Q.    He wasn't allowed --
16    A.    Or my bathroom, you know, because it's my bathroom.
17    We had enough, so he wasn't there.
18          But we never talked about that, but that was --
19    Q.    Okay.
20    A.    -- understood.
21    Q.    Okay.  So you indicated that the reason -- okay.
22          You said you let Sanft go and you put Durham on
23    because you were concerned that he wasn't doing anything on
24    the case?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1  Q.    What about Nadig?  Did he continue to be -- or did

2  you think he continued to be your lawyer, or was he fired?

3  Or what was your understanding of what his ongoing

4  involvement in the case was?

5  A.    That he is my lawyer.  He had one time where he

6  said, "I have a" --

7  Q.    Don't tell --

8  A.    -- "capital murder case in" --

9  Q.    -- you can't --

10  A.    -- "Utah" --

11          MS. ROOHANI:  Ob --

12  BY MS. CONNOLLY:

13  Q.    You can't say what anybody else said --

14  A.    Okay.

15  Q.    Okay.  You can't say what anybody else said to you.

16  A.    Yeah.  He --

17  Q.    Okay.  So in July of 2016, when Durham substituted

18  in for Sanft, who was on your defense team at that point in

19  time, to your knowledge?

20  A.    Jess.  Can I call him Jess?

21  Q.    Yes.

22  A.    Jess and Benjamin Durham.

23  Q.    And what about -- so what was Nadig doing?

24  A.    Nadig was working in the background.  But, I mean,

25  at that time we took off -- I took off Michael Sanft, who

1   works in hand with Nadig, or worked in hand with Nadig on

2   my case.

3              So when I took him off, the first question was,

4   Well, you might get money back because now he's off the

5   case, he didn't do anything.  That was what -- what I

6   learned from a conversation with Mr. Pacitti.

7              So at that point I was --

8              MS. ROOHANI:  Objection.  Hearsay.

9              MS. CONNOLLY:  Marchese.

10             THE WITNESS:  Mr. Pacitti.

11  BY MS. CONNOLLY:

12  Q.    Okay.  So you had -- you had met with both

13  Mr. Marchese and Mr. Pacitti and discussed what Mr. Sanft

14  and/or Mr. Nadig were doing on the case?  Is that fair to

15  say?  Prior to July.

16  A.    With Mr. Marchese, yes.  And then with Mr. Pacitti,

17  the conversations were about --

18  Q.    When?

19  A.    -- getting a refund.

20             That was shortly after --

21  Q.    After --

22  A.    -- I took Mr. Sanft off the case.

23  Q.    Well, if you look at Exhibit C, which is in front of

24  you.

25             Did you ever get a copy of that e-mail?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    And how did you receive a copy of that e-mail?  If

3    you recall?

4    A.    Jess brought it to me --

5    Q.    Okay.

6    A.    -- during a visit.

7    Q.    Do you know when he brought that to you?

8    A.    No.

9    Q.    Would it be September of 2016?

10   A.    Well, I can't say what he said, so he -- he brought

11   it.  And I learned after when I back --

12           MS. ROOHANI:  Objection.  Hearsay.

13   BY MS. CONNOLLY:

14   Q.    Just -- my question was when -- okay.  You can't say

15   what anybody else said to you.  Okay?

16           When do you believe --

17   A.    I received it about two weeks after it got sent.

18   Q.    Okay.  Now, let me ask you.  Prior to receiving that

19   e-mail, had you had any discussion with any of the lawyers

20   about accepting a plea on this case?

21   A.    No.

22   Q.    Had you had any discussion with any of your lawyers

23   about the United States Sentencing Guidelines?

24   A.    No.

25   Q.    Had any of your lawyers come and met with you with

TRANSCRIBED FROM DIGITAL RECORDING

1    the United States Sentencing Guideline book and gone and

2    went over it with you?

3    A.    No.

4    Q.    Did any of your lawyers discuss with you that based

5    upon materials that were disclosed on the images that you

6    would be facing --

7                MS. ROOHANI:  Objection.  Leading.

8                MS. CONNOLLY:  I can strike that.

9    BY MS. CONNOLLY:

10   Q.    So at no point in time prior to September 2016 did

11   any lawyer go over a guideline book with you?

12   A.    No.

13   Q.    And there was no discussion about plea, pleading

14   out?

15               MS. ROOHANI:  Asked and answered.

16               THE WITNESS:  No.

17   BY MS. CONNOLLY:

18   Q.    Had you indicated to any of your lawyers prior to

19   September of 2016 that you were interested in accepting any

20   kind of plea negotiations?

21   A.    Ask it again.

22   Q.    Prior to September 2016, had you indicated to any of

23   your lawyers that you were willing to entertain any kind of

24   plea negotiation?

25   A.    No.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  Did Mr. Nadig -- do you recall if Mr. Nadig

2    met with you on September 7, 2016?

3    A.    If he met with me on September 7, 2016?

4    Q.    The day of the e-mail is September 3rd.

5          Do you remember that after that e-mail you

6    received a visit from Mr. Nadig?

7    A.    Yes.

8    Q.    Okay.  And how did you feel -- after you had that

9    conversation with Mr. Nadig, how were you feeling?

10   A.    Confused.

11   Q.    Okay.  And that was based upon representations that

12   were made by Mr. Nadig, or what made you feel confused?

13   A.    The whole situation.  And, yes, representations he

14   made.

15   Q.    Okay.  How did you feel when you received a copy of

16   that letter, that e-mail?

17   A.    Terrified.

18   Q.    So when you received that e-mail, and after you had

19   a visit from Mr. Nadig, what did you do?  What did you do

20   about the information that was disclosed in that e-mail and

21   by Mr. Nadig?

22   A.    I talked with him about it and asked him about

23   certain things he's saying, how he -- how he means it and

24   what is it all about.

25   Q.    Did he make you feel better after he explained the

TRANSCRIBED FROM DIGITAL RECORDING

1    e-mail?

2    A.    Yes, a little.  Yeah.  He did.

3    Q.    Okay.  And what did you do as a result -- after you

4    spoke with Mr. Nadig, did Mr. Marchese come meet with you?

5    A.    Yes.

6    Q.    And how did --

7    A.    Actually, I expected Mr. Marchese when Mr. Nadig

8    came.

9           MS. ROOHANI:  Objection.  Nonresponsive.  And

10   there's no pending question.

11          THE WITNESS:  Okay.

12   BY MS. CONNOLLY:

13   Q.    Mr. -- did Mr. --

14   A.    Okay.

15   Q.    In relation to the time frame of this e-mail, who

16   met with you first, Nadig or Marchese?

17   A.    Mr. Nadig.

18   Q.    Okay.  And when did Mr. Marchese meet with you,

19   shortly thereafter, a couple days later?

20   A.    The same day.

21   Q.    Okay.  And was that at your request?

22   A.    No.

23   Q.    Okay.  And how did you feel about the relationship

24   between Nadig and Marchese?

25   A.    After -- before this e-mail, it was, I would say, a

1    professional, like colleagues work together.

2              But after that e-mail, that was no longer the

3    case.

4    Q.    And how did you feel -- how did you think -- what

5    was your belief or feeling about their relationship at that

6    point and the fact that Nadig was still on your team and

7    Marchese was still on your team?

8    A.    Say the last part again.

9    Q.    Okay.  How did you feel after you received the

10   e-mail and after talking with Marchese and Nadig about them

11   both representing you on this case?  How did you feel about

12   that?

13   A.    Confused.

14   Q.    Okay.  Did -- did you discuss your concerns with

15   Mr. Marchese and Mr. Nadig?

16   A.    With Mr. Marchese, I did.

17   Q.    Okay.  And did you decide to do anything as a result

18   of your conversation with Mr. Marchese?

19   A.    On that day?

20   Q.    At any subsequent time?

21   A.    I put Michael Sanft -- following those

22   conversations, I decided to put Michael Sanft back on the

23   case.

24   Q.    Okay.  Now, did you also -- let me ask you a little

25   bit about -- who is it that convinced you to put -- or did

TRANSCRIBED FROM DIGITAL RECORDING

1    somebody convince you to put Sanft back on the case?

2              MS. ROOHANI:  Objection --

3              THE WITNESS:  Yes.

4              MS. ROOHANI:  -- calls for hearsay.

5              MS. CONNOLLY:  Not for the truth -- I'm not

6    asking him what they said, I'm asking if he did

7    something --

8              MS. ROOHANI:  But if --

9              MS. CONNOLLY:  -- as a result of that.

10             MS. ROOHANI:  -- they convinced him, Your Honor,

11   then I think you can infer what the conversation was about.

12             THE COURT:  Sustained.

13   BY MS. CONNOLLY:

14   Q.    After your con- -- after your meeting with

15   Mr. Nadig, what did you do as a result of your -- did you

16   bring anybody else back on the case as a result --

17   A.    Yes.

18   Q.    -- of your discussions?

19             And who was that?

20   A.    Mr. Sanft.

21   Q.    Okay.  Amber Craig was brought on the case.  What

22   was your thinking about that?  Why was Amber Craig brought

23   on to the case?

24             Without telling me what anybody else said, why

25   did you decide to bring Amber case -- Craig back on to the

TRANSCRIBED FROM DIGITAL RECORDING

1   case?

2   A.    I wanted to have a female lawyer in my defense

3   team --

4   Q.    Okay.

5   A.    -- for trial --

6   Q.    Was that --

7   A.    -- because the initial --

8   Q.    -- your idea?

9   A.    -- idea --

10  Q.    Was that your idea, or was that an idea that was

11  raised by somebody else?

12          MS. ROOHANI:  Objection.  Hearsay.

13          MS. CONNOLLY:  I'm not asking him what they said

14  or what -- who said it, I'm asking if it was his idea or

15  somebody else's.  That's not hearsay.

16          MS. ROOHANI:  Same as before, Your Honor.

17          THE COURT:  Just asking if that was his idea?

18          MS. ROOHANI:  No, whose --

19          THE COURT:  Well, he can answer.

20          Was that your idea to bring in Amber Craig?  Or

21  a woman, rather, just any woman?

22          THE WITNESS:  I had a conversation with

23  Mr. Marchese about it, and that's how -- you know, you work

24  with a lawyer and you talk, and then I -- I would say it

25  was both our idea.

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CONNOLLY:

2       Q.    Well, after --

3       A.    But I -- once I thought about it, I said, "Yes, I

4    want that."

5       Q.    Okay.

6       A.    So --

7       Q.    So after discussion with Mr. -- and this was all

8    preceding that e-mail from Mr. Nadig?

9       A.    (No audible response.)

10      Q.    After the e-mail from Mr. Nadig, you had a

11   discussion with Mr. Marchese and decided you wanted to

12   bring Amber Craig on to the case?

13      A.    Yes.

14      Q.    Okay.  Well, at that point in time, what was your

15   understanding of what Mr. Nadig's involvement was in your

16   defense?  Was he on the case, off the case, or --

17      A.    I had -- my feeling was that he works on my case but

18   officially stays -- as far as court hearings, stays in the

19   background.

20            So he wouldn't come here when there was a

21   hearing, and he wouldn't be on official-like documents on

22   the record.  But he worked on my case.

23      Q.    Okay.

24      A.    He worked on my defense.

25      Q.    And so you listened to what he had to say?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    So let me take the hearing on October 10, 2016.  It

3    was calendar call.

4            What do you remember happening on that day in

5    regard to Amber Craig.

6    A.    She wasn't here.  She didn't appear.

7    Q.    Okay.  On October 14th, just to orient you as to the

8    date, was there a motion filed by the prosecution in regard

9    to Amber Craig's involvement on your case?

10   A.    Yes.

11   Q.    Okay.  And that was a motion to disqualify your

12   entire defense team; right?

13   A.    Yes.

14   Q.    And how did you feel when you saw and read that

15   motion?  Did you get a copy of the motion?

16   A.    No.

17   Q.    You were never provided with a copy of it?

18   A.    No.

19   Q.    Okay.  You were present in the hearings, though,

20   involving that motion; right?

21   A.    I met with Jess and I think Mr. Durham at that

22   point, and they -- I mean, I -- yeah, I met with them.  And

23   then after the meeting I knew there's a problem.

24   Q.    And how did that make you feel when the government

25   moved to disqualify your entire defense team?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I was afraid that I lose her and eventually my whole

2    defense team, like just weeks before trial -- and besides

3    everything else what happened before, that concerned me.

4    It was just one more problem to deal with.

5    Q.    Okay.  Now, was Mr. Sanft on the defense team at

6    that point, or had he not been brought back on yet?

7    A.    That's a good question.

8          No, he hasn't been brought on.

9    Q.    He was brought on --

10   A.    He was brought on after that whole Amber Craig

11   issue.

12   Q.    Okay.  Okay.  I had asked you if prior to September

13   there had been any discussion about pleading guilty or

14   accepting a plea.

15         What about prior to trial?  Between September

16   and trial, which is in November, did you ever indicate to

17   your defense team that you wanted to negotiate the case or

18   ask him to negotiate your case?

19   A.    No.

20   Q.    Okay.  During that period of time, did any member of

21   your defense team come down and sit with you and go over

22   the United States Sentencing Guidelines with you?

23   A.    No.

24   Q.    I'm showing you a copy of the federal sentencing

25   guidelines manual.

TRANSCRIBED FROM DIGITAL RECORDING

1          Did anybody ever sit down and go over any

2     provisions of this book with you?

3     A.    Yes.

4     Q.    They did.  And when was that?

5     A.    That was last -- last summer.

6     Q.    Okay.  Prior to you entering your guilty plea, did

7     anybody sit down with a book like that --

8     A.    No.

9     Q.    -- and go over -- okay.

10    A.    I mean, to be clear, that was you last summer.

11          MS. ROOHANI:  Objection.  Hearsay.

12          THE COURT:  How is that hearsay?

13          MS. CONNOLLY:  That's not hear --

14          THE COURT:  He met with her for the first time

15    when he met with counsel?

16    BY MS. CONNOLLY:

17    Q.    So it's your testimony the first person that went

18    over United States Sentencing Guidelines, that book, with

19    you was me?

20    A.    Yes.

21    Q.    And that was last summer?  Summer of 2017?

22    A.    Yes.

23    Q.    Okay.  So --

24          THE COURT:  Just to be clear, counsel showed the

25    2016 version, and I'm not really sure how -- how often --

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  It was the --

2          THE COURT:  -- defense attorneys buy a new

3    version.

4          MS. CONNOLLY:  It's the gray 2016 version.

5          THE COURT:  Right.  So I'm not sure if it was --

6          MS. CONNOLLY:  I guess I need to upgrade, but --

7          THE COURT:  Yeah, I'm not sure if at the time it

8    was the gray 2016 or the kind of aqua/turquoise 2015.

9          Either of these books look familiar to you?

10          THE WITNESS:  This looks familiar.

11          THE COURT:  Okay.  And that -- and he's pointing

12    to the gray 2016.

13    BY MS. CONNOLLY:

14    Q.    Prior to trial, did anybody explain to you or go

15    over -- between September and trial, did anybody ever go

16    over with you the fact that the sentence you get is based

17    upon number of images, kind of images, length of videos, or

18    anything of that nature?

19    A.    I had a general understanding that, of course, what

20    the facts are influence a possible sentence.

21    Q.    What --

22          MS. ROOHANI:  Objection.  Nonresponsive.

23          THE COURT:  Overruled.

24    BY MS. CONNOLLY:

25    Q.    Well, what was your understanding prior to trial of

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   what the sentencing structure was in federal court?
 2   A.    I had no idea about that.
 3   Q.    When was the first time -- when was the first time
 4   that there was any discussions about you potentially
 5   accepting a plea negotiation on your case?
 6   A.    That was after -- during trial in the break of
 7   Ms. Panovich's testimony.
 8   Q.    Okay.  And how did you feel -- who broached the
 9   issue of -- without saying what they said, who was the one
10   that raised the prospect of your pleading --
11   A.    Mr. Marchese.
12   Q.    -- accepting a guilty plea?
13         Who?
14   A.    Mr. Marchese.
15   Q.    Mr. Pacitti?
16   A.    Marchese.
17   Q.    Marchese.
18   A.    Jess Marchese.
19   Q.    Marchese.  Mr. Marchese.
20   A.    Yes.  Sorry.
21   Q.    And how did that make you feel?
22   A.    Confused.
23   Q.    And why were you confused?
24   A.    He was -- I never like -- yeah, confused.  Extremely
25   confused.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And why were you confused?

2    A.    Because we never talked about a deal.  We in the

3    middle of trial.  My counsel decided on calendar call, yes,

4    we're ready.  We go to trial.  This is a case -- a case

5    which has -- how did -- yeah, we can take this case to

6    trial.

7              They didn't say, "We need time before," they

8    said, "Well, we need another month for this, we need

9    another month" --

10   Q.    Don't say what anybody said to you.

11   A.    But they -- yeah.

12   Q.    You said --

13   A.    With that understanding they go to trial and we go

14   through trial from the beginning to end with a defense,

15   with mounting a defense.

16   Q.    Okay.  So you said you felt confused?

17   A.    Yes.

18   Q.    Okay.  And then --

19   A.    Anxious.  I got like -- yeah.

20   Q.    Okay.  And what was your understanding of the plea

21   that was being extended to you before you got the guilty

22   plea?

23   A.    On that day?

24   Q.    Yes.

25   A.    That the -- I mean, there was no plea yet.  That the

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    government would drop the advertising charge, which carries
 2    a 15-year minimum, and that that would mean the new minimum
 3    then would be five years.
 4    Q.    Okay.  On that day in court, what was your
 5    understanding what your exposure would be under the plea
 6    agreement that was being discussed?
 7    A.    On that day, after talking to Mr. Pacitti,
 8    Mr. Marchese, Mr. Durham, Mr. Sanft, I thought it will be
 9    between 5 and 15 years.
10    Q.    Okay.  Did anybody explain to you how the plea
11    agreement would work?  Or what would be contained in the
12    plea agreement?
13    A.    I knew at that point that it will be a written
14    contract with lots of details in it which need to be
15    figured out.
16    Q.    Okay.  What was your understanding of how the
17    sentence would be calculated?
18    A.    I had at that point no idea.  I never thought about
19    that.
20    Q.    So all you're aware is that you're looking at 5 to
21    15?
22    A.    Yes.
23          MS. ROOHANI:  Objection.  Misstates testimony.
24    BY MS. CONNOLLY:
25    Q.    What was your understanding, after you had that
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    meeting with your counsel -- nobody came and met with you
 2    that night; right?
 3    A.    No.
 4    Q.    And what was your understanding of the amount of
 5    time that the judge could give you under the plea agreement
 6    that was being written up by the government?
 7    A.    What my understanding was?
 8    Q.    Yes.
 9    A.    Well, I learned that --
10    Q.    Well, just at that point in time?
11    A.    At that point in time, I knew that it can't be
12    predicted, but it -- it will be in that range.
13    Q.    Okay.  In light of the fact that you had indicated
14    that it was never your intention to take any kind of guilty
15    plea, why, at this point, were you then willing to
16    entertain a guilty plea?
17    A.    I thought I have no other choice.  My -- I lost --
18    at that point, when Mr. Marchese brought that idea, I lost
19    all my -- at that moment, I lost all my confidence in my --
20    in my defense team and what -- what Mr. Nadig said months
21    before (indiscernible) in my head, and it was, like, yes,
22    he was all along right.
23    Q.    Who was all along right?
24    A.    Mr. Nadig.
25    Q.    And what did you mean by that?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1            MS. ROOHANI:  Objection.  Calls for hearsay.
 2   BY MS. CONNOLLY:
 3   Q.    What was the impression that Mr. Nadig left you in
 4   regards to the competency of the people that were -- you
 5   were going to trial with, that were going to try the case?
 6   A.    That with --
 7            MS. ROOHANI:  Objection.  Calls for hearsay.
 8            MS. CONNOLLY:  It doesn't -- it was the
 9   impression that was left with him.
10            MS. ROOHANI:  The impression that --
11            THE WITNESS:  My --
12            MS. CONNOLLY:  Which is relevant to his --
13   relevant to his request to withdraw the guilty plea.
14            THE WITNESS:  With --
15            MS. CONNOLLY:  Wait.  The judge has to rule.
16            THE COURT:  Well, it's sustained.
17            But you could ask him why he lost confidence in
18   his defense team.
19   BY MS. CONNOLLY:
20   Q.    Why did you lose confidence in your defense team?
21   A.    Because of the things from the conversation and the
22   e-mail with Mr. Nadig, they (indiscernible) in my head, and
23   I felt they --
24   Q.    Well, what --
25   A.    That they're unprepared, that they -- that this is
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   way over their head, that they ill-equipped, that they --
 2   they --
 3   Q.   Was that --
 4   A.   A lawyer who in the middle of trial says, "Well,
 5   have you ever thought about a deal?" when the whole year
 6   before that never was brought up, I thought a lawyer who
 7   think he can't win at trial, he won't win at that point; a
 8   lawyer who thinks he can win, he can win.
 9        At that point, I felt they -- we can't win if
10   they say, "Well, have you ever thought about a plea?"
11   Q.   Did that e-mail that you received from Mr. Nadig
12   play into how you felt?
13   A.   Yes.
14   Q.   And what about your discussions with Mr. Nadig and
15   his comments in regard to the defense that was being
16   presented by Marchese?
17   A.   I thought I made a mistake by not following Nadig's
18   advice at that point.
19   Q.   Say that again.
20   A.   I thought I made a mistake by not following Nadig's
21   advice as --
22        MS. ROOHANI:  Objection.
23        THE WITNESS:  -- on that point.
24   BY MS. CONNOLLY:
25   Q.   Now, if you had followed Nadig's advice, what would
```

1    you have done previously?

2              MS. ROOHANI:  Objection.  Calls for hearsay.

3              MS. CONNOLLY:  No, it doesn't.

4              MS. ROOHANI:  If he'd followed his advice, that

5    would be hearsay.

6    BY MS. CONNOLLY:

7     Q.    What would you have --

8              THE COURT:  Sustained.

9    BY MS. CONNOLLY:

10    Q.    -- have done?

11             MS. CONNOLLY:  I didn't ask him what the advice

12   was.

13             THE COURT:  Sustained.

14             THE WITNESS:  I would have put --

15             THE COURT:  It was sustained.

16             She can ask a different question.

17             MS. CONNOLLY:  Okay.

18             THE COURT:  Or just reformat it so that --

19   BY MS. CONNOLLY:

20    Q.    Would it be fair to say that you were getting -- how

21   would you say the information that you were getting from

22   Mr. Sanft -- Mr. Nadig compared with the information you

23   were getting from Mr. Marchese prior to November 17?

24             MS. ROOHANI:  Objection.  Calls for --

25

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CONNOLLY:

2    Q.    Was it consistent?

3              MS. ROOHANI:  -- hearsay.

4              MS. CONNOLLY:  It's not -- I'm not asking for

5    the truth of the matter of anything.

6              THE COURT:  Overruled.  He can answer the

7    question.

8    BY MS. CONNOLLY:

9    Q.    How would you compare the advice you were getting

10   from Nadig versus the advice you were getting from

11   Marchese?  Was it --

12   A.    At that point?

13   Q.    Was it consistent or conflicting?

14   A.    Conflicting.

15   Q.    Would it be fair to say that you chose to go with

16   one over the other prior to the plea?

17   A.    It was like a roller coaster ride.  It was up and

18   down.  It was that team and then the next came in and

19   said -- and then the next day I came in, and after that I

20   decided to put another lawyer back on the case, and then I

21   had another one.  This is -- I mean, as the record

22   states --

23   Q.    Okay.  You're using --

24   A.    -- it changed.

25   Q.    Okay.  But the court reporter can't take down

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   your -- you're using your emotions.  The court reporter
 2   can't take down what you're emoting, so you need to say
 3   rather than motioning with your arms.
 4   A.    Yeah.  I felt confused.
 5   Q.    Now, you indicated that when they talked about
 6   pleading guilty, you were thinking about what Nadig had
 7   said and the information that was in the e-mail?
 8   A.    Yes.
 9   Q.    And you indicated that you felt they weren't
10   prepared or you couldn't proceed with them?
11   A.    Yeah.  It was, like, months before I basically
12   learned, according to that advice, with that defense you
13   will lose.
14             MS. ROOHANI:  Objection.  Hearsay.
15             MS. CONNOLLY:  It's not for the truth of the
16   matter.  It's how his state of mind --
17             THE COURT:  Overruled.
18   BY MS. CONNOLLY:
19   Q.    So Mr. Nadig has said that to you before, and then
20   in the middle of trial that's how you felt?
21   A.    Yes.  And -- I mean, of course I listened to my
22   lawyer, the lawyer I trust.
23   Q.    And who is the lawyer you --
24   A.    And then --
25   Q.    And who is the lawyer you trust?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    And that changed before.

2    Q.    Okay.  Well --

3    A.    Before trial, the defense team which I brought to

4    trial, it was the defense team at that moment I trusted,

5    because that's why I choose that defense team.

6    Q.    Who?

7    A.    Mr. Marchese and Mr. Durham and Mr. Sanft.

8    Q.    And then when the prospect of a plea was raised, who

9    did you trust?

10   A.    At that moment, I lost confidence in them.  And then

11   I -- everything from these previous meetings and talks and

12   laying down and thinking and going over things reasoned

13   back, and I said, "Yeah, Nadig was right."

14   Q.    Okay.  How did those people who were advising you in

15   the courtroom that day, Pacitti, Sanft, Durham, and

16   Marchese, at that point in time, who did you trust the most

17   out of that group?

18            MS. ROOHANI:  Objection.  Relevance.

19            MS. CONNOLLY:  It's relevant based upon what

20   they were telling him.  We've heard from all the witnesses.

21   I'll be following up with that.

22            THE COURT:  Overruled.  He can answer the

23   question.

24            THE WITNESS:  Mr. Pacitti.

25

-TRANSCRIBED FROM DIGITAL RECORDING-

1    BY MS. CONNOLLY:

2    Q.    So the representations he made to you in regard to

3    how much time you were facing, did you trust what he told

4    you?

5    A.    Based on what I experienced at the defense table,

6    yes.

7    Q.    Okay.  Now, the Court recessed that day.  That

8    evening did anybody come meet with you to discuss potential

9    plea negotiations?

10   A.    No.

11   Q.    Okay.  When was it that you were presented with a

12   guilty plea?

13   A.    The next morning in the lawyer visitation room here

14   at the courthouse.

15   Q.    Do you remember what time it was?

16   A.    No.  There is no clock.

17   Q.    Okay.  How long --

18   A.    They pick us up in Henderson --

19   Q.    Okay.  Here, how long --

20   A.    -- at 7:00, and then I was here probably at 7:40.

21   And then I was waiting a long time.

22   Q.    That's not -- the question was, do you remember what

23   time it was when they came to meet with you?

24   A.    No.

25   Q.    Okay.  Do you remember how much time you spent

TRANSCRIBED FROM DIGITAL RECORDING

1    talking with Mr. Durham about the guilty plea agreement?

2    A.    Not exactly.

3    Q.    Did you have a copy of it?

4    A.    No.

5    Q.    Okay.  So you heard Mr. Durham testify that he went

6    over the guilty plea agreement.  Tell us about that.

7          What happened when he went over the guilty plea

8    agreement with you?  How did that come about?

9    A.    Well, he came in first.  He was here before.  And as

10   I remember, he had no copy yet.

11         A short time later Mr. Marchese came with the

12   printed out copy.

13   Q.    Okay.

14   A.    And then he had the copy.  And then he put the copy

15   on the table.  And then a little bit later, Mr. Sanft came

16   in and kept the door open because it's, like, not very big.

17         He was standing in the door, and Mr. Marchese

18   was standing inside, and Mr. Durham was sitting.

19         And for the first time I had the copy and went

20   with me --

21   Q.    So you --

22   A.    -- through it.

23   Q.    But you didn't have a copy on your side?

24   A.    No.  I had to look through that mesh.  Actually, I

25   just -- I heard more what he said than looking on the

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    document.
 2    Q.    So he was reading it to you?
 3    A.    Not line by line.
 4    Q.    Did he go -- you've heard our discussion about
 5    enhancements.  Would he go over, A, the enhancements that
 6    were set forth in there and what that meant?
 7    A.    Can I -- to clarify your previous question?
 8    Q.    Go ahead.
 9    A.    I think it was like this.  Okay.  This is this and
10    this means that, so he made it --
11    Q.    He para- --
12    A.    It's legal -- it's legal -- it's a legal contract.
13    Q.    He paraphrased it?
14    A.    So he said this means that and this means this and
15    this means that, yes.
16    Q.    Okay.  Did he tell you what your base offense level
17    was?
18             THE COURT:  Which "he" are we talking about?
19    Because there's three other attorneys in there.
20             MS. CONNOLLY:  Okay.
21    BY MS. CONNOLLY:
22    Q.    Who --
23    A.    Mr. Durham.
24             THE COURT:  All right.
25
```

TRANSCRIBED FROM DIGITAL RECORDING

1   BY MS. CONNOLLY:

2   Q.   Mr. Durham was the one -- Mr. Durham was the one who

3   read the plea agreement to you?

4   A.   Yes.  After, like, two pages, the other two lawyers

5   left.

6   Q.   Okay.  So it was just you and Mr. Durham in there?

7   A.   Yes.

8   Q.   Okay.  Did he and -- what did he tell you about your

9   base offense level?  Did you understand it was a level 40?

10           MS. ROOHANI:  Objection.  That misstates the

11  plea agreement.

12  BY MS. CONNOLLY:

13  Q.   Did you understand that the adjusted base offense

14  level under the plea agreement was a level 40?  4-0?

15           THE COURT:  You said 40 or 14?

16           MS. CONNOLLY:  40.

17           THE COURT:  40.

18           MS. CONNOLLY:  4-0.

19           THE WITNESS:  At one point I saw that number in

20  that 17-page document, yes.

21  BY MS. CONNOLLY:

22  Q.   Did you know what that meant?

23  A.   No.

24  Q.   Did he explain to you what a base offense -- an

25  adjusted offense level 40 meant?

1    A.    No.

2    Q.    No?  Did he tell you that under the United States

3    Sentencing Guideline based on the enhancements that were

4    agreed upon, the sentencing guideline range was 24.3 to 30

5    years?

6    A.    No.

7    Q.    Did he explain to you that based upon facts that

8    were stipulated to, there could be additional enhancements

9    that might apply?

10   A.    I wouldn't know in the first place about

11   enhancements, so if he would talk about -- that whole

12   concept wasn't clear back then.

13          But, no, he didn't.

14   Q.    So you've never had any -- you testified previously,

15   you've never had discussions about the guidelines or

16   enhancements or anything of that nature previously?

17   A.    No.  And to make that clear, the beginning of that

18   meeting was still about if -- if to take a plea.

19   Q.    Because you had --

20   A.    So that took some time.  It was not like they came

21   in at the thing and started.  It was still me, like -- this

22   was the first -- the day before ended with there is no

23   plea.  I went home and had a sleepless night and came the

24   next morning and was still prepared to continue trial.

25          It was not -- it's not that I had a decision in

TRANSCRIBED FROM DIGITAL RECORDING

1    my mind.  It was just a possibility, an --

2    Q.    Well, why did you --

3    A.    An option.

4    Q.    -- not decide to proceed to trial and to take the

5    guilty plea?

6    A.    I thought I had no other option --

7    Q.    Why?

8    A.    -- at that point.

9          Because --

10   Q.    Well, the judge said you could either plea or you go

11   to trial; right?  So why did you not just proceed with the

12   trial?

13   A.    No, because it -- I lost trust in that team when

14   they came with the plea.

15         No new facts have been brought up.  Everything

16   was -- was clear.  There was -- the government didn't bring

17   anything new in, which me and the defense team wouldn't

18   be -- wouldn't know, wouldn't have known.

19         I mean, if it was all new -- and that's why I

20   didn't understand when they came with a plea, the --

21   Q.    There was --

22   A.    It's like --

23   Q.    There was no surprising testimony?  Is that what

24   you're saying?

25   A.    Not for me.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.    Okay.  So you --

2   A.    I mean, for them --

3   Q.    -- were surprised --

4   A.    -- obviously.

5   Q.    So you were surprised --

6           MS. ROOHANI:  Objection.  Calls for speculation.

7           THE COURT:  Sustained.

8   BY MS. CONNOLLY:

9   Q.    So you were surprised because -- let me strike that.

10          There was nothing surprising from the evidence

11  that you had seen presented; right?  There was nothing that

12  you hadn't anticipated being presented by --

13  A.    No.

14  Q.    -- the government?

15  A.    No.

16  Q.    Okay.  And yet here they were saying, "We need to

17  talk negotiation"?

18  A.    Yes.

19  Q.    Okay.  And so --

20  A.    At the worst moment for me.  I mean, in the -- it's

21  like something breaks apart, like a building breaks apart

22  in front of me.

23          The first thought I had, "Oh, my God, Nadig was

24  right."

25          MS. ROOHANI:  Objection.  Nonresponsive.

1    BY MS. CONNOLLY:

2    Q.    You indicate "Nadig was right."  What do you mean by

3    that?

4    A.    With what he said earlier about defenses and the

5    anticipated defense and the team and that they were

6    unprepared and --

7              MS. ROOHANI:  Objection.  Hearsay.

8              MS. CONNOLLY:  It's not for the truth of the

9    matter.

10              THE WITNESS:  There were also mistakes which

11    I --

12              THE COURT:  It is.

13              MS. CONNOLLY:  You need to let the judge rule on

14    the objection.

15              THE WITNESS:  All right.

16              THE COURT:  And it is for the truth of the

17    matter asserted.  So it's sustained.

18    BY MS. CONNOLLY:

19    Q.    That's how he made you feel.  You felt that --

20    A.    Yes.

21    Q.    Okay.  So their reaction in conjunction with

22    comments that had been made by Mr. Nadig to you in person

23    and the e-mail made you feel, what, that you need to go to

24    trial, or you need to take a plea?

25    A.    That I take a plea.

                    ┌TRANSCRIBED FROM DIGITAL RECORDING┐

1      Q.    And what was your understanding of your exposure

2    under the guilty plea?

3              MS. ROOHANI:  Objection.

4    BY MS. CONNOLLY:

5      Q.    In other words --

6              MS. ROOHANI:  Asked and answered.

7    BY MS. CONNOLLY:

8      Q.    -- the time you were facing?

9              MS. ROOHANI:  Asked and answered.

10             THE COURT:  Overruled.  He can answer the

11   question.

12   BY MS. CONNOLLY:

13     Q.    What was your understanding of how much -- after

14   you -- after Mr. Marchese -- after Mr. Durham -- so it's

15   your testimony he came and paraphrased the guilty plea

16   agreement to you?

17     A.    Yes.

18     Q.    How much time did you think you were facing?

19     A.    Something, yeah, between 5 and 15 years.

20     Q.    When did you -- when was the first time you actually

21   found out your exposure?  When was the first time that

22   anybody actually sat down and went over and explained to

23   you, if you look at the guilty plea agreement that's in

24   front of you --

25     A.    I -- is it here?

TRANSCRIBED FROM DIGITAL RECORDING

1  Q.    The guilty --

2  A.    I wanted to take it, but I didn't.

3  Q.    It should be in front of you.  Guilty plea.

4         MS. CONNOLLY:  May I approach, Your Honor?

5         THE COURT:  Yes, you may.

6         MS. CONNOLLY:  Exhibit G.

7  BY MS. CONNOLLY:

8  Q.    Turn to page 7.  7 through page 8.

9         When did you first find out what this all meant?

10 A.    I had an idea the next day.

11 Q.    The next day.  When you talked about the

12 enhancements and the points.  When did this -- when did --

13 A.    The next day means after I took the plea, when I

14 went back to the jail, that night and the next morning.

15 Q.    And that was based upon a conversation that you had

16 with somebody at the jail --

17 A.    Yes.

18 Q.    -- facility?

19        And what did you do when you found out what that

20 base offense level 40 meant?  In terms of years?

21 A.    The next morning I called Jess.

22 Q.    And what did you tell him?

23 A.    I said, "Jess, is there any -- I didn't understand

24 that, and is there any way to -- to -- because it's a day

25 later, can you go to the judge and say, 'Well, he didn't

TRANSCRIBED FROM DIGITAL RECORDING

```
1    understand it, he wants to undo it'"?
2    Q.    So that was the day after you had a --
3    A.    The morning after, yeah, when --
4    Q.    The morning after you had a --
5    A.    -- I had dayroom --
6    Q.    -- discussion --
7    A.    -- I went to the phone, yes.
8    Q.    And then he came and met with you; right?
9    A.    Yes.
10   Q.    And then as a result of that conversation, did
11   you -- was it determined you need to find other counsel?
12   A.    Say it again?
13   Q.    After that conversation, was it determined that you
14   need to find other counsel?
15   A.    Not at that meeting.  That was a little bit later.
16   He came with Mr. Pacitti together --
17   Q.    Okay.
18   A.    -- on that day.
19   Q.    Okay.  At any point in time did anybody, prior to
20   me, explain to you how the United States Sentencing
21   Guidelines worked?
22   A.    Yes.
23   Q.    And was that a lawyer or a nonlawyer?
24   A.    No.
25   Q.    Nonlawyer?
```

1      A.    It was a nonlawyer.

2      Q.    And who was that?

3      A.    It was Mr. Humphries.

4      Q.    And that was the person you talked to back at the

5      jail facility after you entered your plea?

6      A.    I came back that night and passed by that -- we are

7      neighbors.  But it's like a solitary confinement.

8      Q.    Without saying what he said to you.

9      A.    Okay.  So I came back.  I just explained how that is

10     there.  They are like 16 cells.  And I passed by his door,

11     because I was his neighbor.  And through the door you can

12     communicate.

13            And I can't say what I said, huh?

14     Q.    Yes.

15     A.    So I said, "Well, I had to take a deal."  And then

16     we talked about that a little.

17            And after that conversation, I knew that there

18     is a little bit more to it.

19            But then over the PA they said, "Fuechtener

20     lockdown" because I just -- it wasn't my dayroom, I came

21     from court.  So I could just talk with him for, like, two

22     minutes.

23            So I went to my cell, and then when I had my

24     next dayroom, my hour dayroom, I went out and talked again

25     to him, and then we had more time.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And what did you tell him about your understanding

2    of the plea agreement?

3    A.    Based on a question he asked --

4    Q.    No, my question was --

5    A.    What did I tell him?

6    Q.    -- what did you --

7    A.    I told him that there are no years in that plea

8    deal.

9    Q.    There's no years --

10   A.    There's no years which -- there is no -- there is no

11   such sentence which says about government and we, we all

12   asked for a sentence of blah, blah, blah.

13   Q.    Okay.

14   A.    Of whatever year.

15   Q.    What did he --

16   A.    So there was nothing in it.  There was no years in

17   it.  There was no sentence in it.

18   Q.    What did you tell him was your understanding of the

19   number of years you were facing with an adjusted offense

20   level of 40?

21   A.    What my understanding was?

22   Q.    Yes.

23   A.    After that -- after --

24   Q.    What did you tell --

25   A.    -- what I learned?

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    -- him was your understanding of what a base

2    level -- adjusted offense level 40 --

3    A.    I had no understanding about that.

4    Q.    That's what you said to him, "I don't know what base

5    offense level 40 means"?

6    A.    Yes.

7    Q.    And after your discussion --

8    A.    I mean, he asked me --

9    Q.    Without saying what he said.

10   A.    He asked me --

11             MS. ROOHANI:  Objection.  Hearsay.

12             MS. CONNOLLY:  Without saying what he said.  You

13   can't --

14             THE WITNESS:  I can't say that he asked me.  Oh,

15   I can't say what he said.  Okay.

16   BY MS. CONNOLLY:

17   Q.    Did you make any comment to Mr. Humphries --

18   A.    I learned -- I didn't know about -- I knew about the

19   40.  I knew there is a number 40 points which I could

20   state, but I didn't know that that would relate to a

21   sentence --

22   Q.    You didn't know --

23   A.    -- to years and months.

24   Q.    You didn't know that that was 24.3 --

25   A.    No --

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    -- to 30 years?

2    A.    -- I didn't know that -- that could be -- for me

3    that was a number 40 between -- it could be, like, halfway

4    between zero and a hundred.  Like, I had no concept of that

5    number.

6    Q.    So it was your testimony that prior to receiving the

7    presentence investigation report, you contacted counsel and

8    told them that you wanted to withdraw your plea?

9    A.    Yes.

10    Q.    And that was after --

11    A.    Several counsel --

12    Q.    And that was after --

13    A.    -- I contacted.

14    Q.    -- you had discussions with Mr. Humphries?

15    A.    Yes.

16    Q.    Are you aware of whether or not Mr. Humphries is

17    aware of the United States Sentencing Guidelines and how

18    they apply in child pornography cases?

19              MS. ROOHANI:  Objection.  Calls for speculation.

20              MS. CONNOLLY:  I asked if he was aware.

21              MS. ROOHANI:  Calls for speculation.

22              MS. CONNOLLY:  It's not for the truth of the

23    matter.

24              THE COURT:  If he's aware of what?

25              MS. CONNOLLY:  If he -- I can't remember what

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    the question was.  If he knew whether or not Mr. Humphries

 2    was aware of how the sentencing guidelines work in child

 3    pornography cases.

 4                THE COURT:  Did you believe Mr. Humphries

 5    understood the guidelines?

 6                MS. CONNOLLY:  I can do that.

 7    BY MS. CONNOLLY:

 8    Q.    Did you believe that Mr. Humphries understood the

 9    guidelines and how they work?

10    A.    Yes.

11    Q.    And how did you feel about the information that he

12    provided to you?  Or how did it make you feel in relation

13    to the fact that you had already pled guilty?

14    A.    I knew that I got to do something.  I couldn't

15    look -- after from what I learned, I wanted to look it up,

16    but I couldn't look that up in Henderson.  I couldn't look

17    up what that would mean.

18    Q.    If you had known the base offense level was a

19    sentencing guideline range of 24.3 to 30 years and the

20    Court could only go below that if the Court decided to do a

21    departure or variance, would you have entered the guilty

22    plea?

23                MS. ROOHANI:  Objection.  Calls for speculation.

24                MS. CONNOLLY:  No, it doesn't.

25                THE COURT:  So you're asking him knowing --
```

1              MS. CONNOLLY:  If he knew what the actual

2     guideline range was in terms of years, would he have

3     accepted the guilty plea.

4              THE COURT:  I think it is speculation.  But you

5     can ask him now that he knows a little bit more --

6              MS. CONNOLLY:  Okay.

7     BY MS. CONNOLLY:

8     Q.    Once you found out what -- let me ask -- because I

9     asked you two questions.

10             Once you found out that under United States --

11    under the sentencing table the guideline range was 24.3 to

12    30 months, would you take a deal for that?

13    A.    No.

14    Q.    Okay.  And what about are you aware of the fact that

15    the Court can actually give you a guideline range that's

16    higher than that?  Were you aware of that?

17    A.    No.

18    Q.    Okay.  Were you aware that the Court could rely upon

19    some of the facts that were contained in your guilty plea

20    agreement and go higher than an adjusted offense level of

21    40?  Were you aware of that?

22    A.    No.

23    Q.    Were you aware that based upon the facts that you

24    had stipulated to in the guilty plea agreement, that your

25    guideline range was actually life?

1    A.    No.

2    Q.    If you had known that, would you have pled guilty?

3    A.    No.  Actually how I felt, I mean, to --

4    Q.    But there's no --

5    A.    Okay.

6              MS. CONNOLLY:  Court's indulgence.

7              THE COURT:  Well, you know what, it's 5:00.  So

8    why don't we just take our recess.  And that way you can

9    think about whether or not you need to ask more questions.

10             MS. CONNOLLY:  Thank you.

11             THE COURT:  We will continue, remind me, Aaron,

12   was it this Friday at 1:30?

13             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

14             THE COURT:  All right.  So this Friday, April

15   20th, at 1:30 p.m. here in this courtroom, 7D.

16             MS. CONNOLLY:  Can I ask how late you'll go on

17   Friday, just so I know for trial purposes?

18             THE COURT:  How late do you want to go?  Do you

19   want to go 4:30 instead of 5:00?

20             MS. CONNOLLY:  4:30.

21             THE COURT:  All right.  So we'll do 4:30 on

22   Friday.

23             MS. CONNOLLY:  Thank you.

24             MS. ROOHANI:  Your Honor, is the separation

25   order between Mr. Fuechtener and Mr. Humphries still in

TRANSCRIBED FROM DIGITAL RECORDING

1    effect?

2              THE COURT:  It should still be in effect.  Did I

3    have a -- did I have a date on there for when it expired?

4              MS. ROOHANI:  I didn't even see the order, Your

5    Honor.  But I don't know how it went to the marshals.

6    That's why I was just double checking.

7              THE COURT:  All right.  We'll enter a minute

8    order, Aaron, that the order is still in effect --

9              MS. ROOHANI:  Thank you, Your Honor.

10             THE COURT:  -- declaring the marshals to keep

11   him separate from the witness, Mr. Humphries.

12             COURTROOM ADMINISTRATOR:  And, Your Honor --

13             THE COURT:  -- until --

14             COURTROOM ADMINISTRATOR:  -- for clarification,

15   I can include that in the minutes today.  They were in the

16   minutes last time.

17             Will the writ also be continued to this Friday

18   so that Mr. Humphries can be brought back?

19             THE COURT:  Yes, please.

20             COURTROOM ADMINISTRATOR:  Okay.

21             MS. CONNOLLY:  Thank you.

22             THE COURT:  All right.  So we will go ahead and

23   take our evening break and go off record.

24             COURTROOM ADMINISTRATOR:  Off record.

25        (The proceedings concluded at 5:10 p.m.)

1                          I N D E X

2    DEFENDANT'S WITNESSES:                              PAGE

3

     BENJAMIN NADIG
4         Direct Examination By Ms. Connolly              4
          Recross-Examination By Ms. Roohani             17
5         Redirect Examination By Ms. Connolly           19
          Recross-Examination By Ms. Roohani             21
6         Further Redirect Examination                   22
          By Ms. Connolly
7
      STEVEN PACITTI
8         Direct Examination By Ms. Connolly             24
          Cross-Examination By Ms. Cartier-Giroux        30
9         Redirect Examination By Ms. Connolly           33
          Recross-Examination By                         34
10        Ms. Cartier-Giroux
          Further Redirect Examination By                35
11        Ms. Connolly
          Further Recross-Examination By                 35
12        Ms. Cartier-Giroux

13   BENJAMIN DURHAM
          Direct Examination By Ms. Connolly             36
14        Cross-Examination By Ms. Roohani               58
          Redirect Examination By Ms. Connolly           74
15        Recross-Examination By Ms. Roohani             78
          Follow-up Examination By Ms. Roohani           82
16        Follow-up Examination By Ms. Roohani           86
          Follow-up Examination By Ms. Connolly          87
17        Follow-up Examination By Ms. Roohani           88
          Follow-up Examination By Ms. Connolly          88
18        Follow-up Examination By Ms. Roohani           89
          Follow-up Examination By Ms. Connolly          91
19
     JAN ROUVEN FUECHTENER
20        Direct Examination By Ms. Connolly            103

21
                        E X H I B I T S
22
     GOVERNMENT'S                                    ADMITTED
23   G                                                   49

24

25

1              -o0o-

2     I certify that the foregoing is a correct

3     transcript from the electronic sound recording

4     of the proceedings in the above-entitled matter.

5

6     _____     __4/30/18__

7     Donna Davidson, RDR, CRR, CCR #318      Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25