1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE GLORIA M. NAVARRO
CHIEF UNITED STATES DISTRICT JUDGE


UNITED STATES OF AMERICA,            :
                                     :
        Plaintiff,                   :
                                     :No. 2:16-cr-00100-GMN-CWH
    vs.                              :
                                     :
JAN ROUVEN FUECHTENER,               :
                                     :
        Defendant.                   :
_____    :


                TRANSCRIPT OF EVIDENTIARY HEARING (Day 3)



                         April 20, 2018


                        Las Vegas, Nevada






FTR No. 7D/20180420 @ 1:49 p.m.


Transcribed by:          Donna Davidson, CCR, RDR, CRR
                         (775) 329-0132
                         dodavidson@att.net


(Proceedings recorded by electronic sound recording,
transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

1

                              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    Elham Roohani
     Lisa Cartier-Giroux
5    U.S. ATTORNEYS OFFICE
     501 Las Vegas Boulevard South
6    Suite 1100
     Las Vegas, Nevada 89101
7    (702) 388-6336
     Elham.Roohani@usdoj.gov
8

9    FOR THE DEFENDANT:

10   Karen A. Connolly
     KAREN A. CONNOLLY, LTD.
11   6600 West Charleston Boulevard
     Suite 124
12   Las Vegas, Nevada 89146
     (702) 678-6700
13   Advocate@kconnollylawyers.com

14

15   Also Present:
     Special Agent Mari Panovich
16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              LAS VEGAS, NEVADA, APRIL 20, 2018, 1:49 P.M.

 2                              --oOo--

 3                      P R O C E E D I N G S

 4

 5              COURTROOM ADMINISTRATOR:  All rise.

 6              THE COURT:  Thank you.  You may be seated.

 7              COURTROOM ADMINISTRATOR:  This is the time set

 8    for the evidentiary hearing, day 3, in case number

 9    2:16-cr-00100-GMN-CWH, United States of America versus Jan

10    Rouven Fuechtener.

11              Counsel, please make your appearances for the

12    record.

13              MS. ROOHANI:  Good afternoon, Your Honor.

14    Ellie Roohani and Lisa Cartier-Giroux for the United

15    States.

16              We are joined at counsel table with Special

17    Agent Mari Panovich.

18              THE COURT:  And good afternoon, Agent Panovich

19    and Ms. Giroux and Ms. Roohani.

20              MS. CONNOLLY:  Karen Connolly appearing with Jan

21    Rouven Fuechtener, who is present in custody.

22              THE COURT:  Good afternoon, Ms. Connolly, and

23    good afternoon, Mr. Fuechtener.

24              Are we ready to resume hearing testimony in the

25    case?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. CONNOLLY:  Yes.  Yes.
 2              THE COURT:  All right.  So, Ms. Connolly, you
 3    may call your next witness.
 4              MS. CONNOLLY:  Jan Rouven Fuechtener.
 5              THE COURT:  We can go ahead and just swear him
 6    in so that there's no problem.
 7              COURTROOM ADMINISTRATOR:  Please remain standing
 8    and raise your right hand.
 9              You do solemnly swear that the testimony you
10    shall give in the cause now before the Court shall be the
11    truth, the whole truth, and nothing but the truth, so help
12    you God?
13              THE WITNESS:  Yes.
14              COURTROOM ADMINISTRATOR:  Thank you.  You may be
15    seated.
16              Please state your name for the record.
17              THE WITNESS:  Jan Rouven Fuechtener.
18                        JAN ROUVEN FUECHTENER
19              called as a witness on behalf of the
20       Defense, was examined and testified further as follows:
21                   DIRECT EXAMINATION (RESUMED)
22    BY MS. CONNOLLY:
23    Q.   Jan, we had some discussion previously about the
24    fact that is (inaudible).
25              There's no light on.
```

TRANSCRIBED FROM DIGITAL RECORDING

1          COURTROOM ADMINISTRATOR:  Hold the power.  Hold

2     that button.

3          MS. CONNOLLY:  Hold it?

4          COURTROOM ADMINISTRATOR:  Hold it.  Uh-huh.

5     That's your power.

6     BY MS. CONNOLLY:

7     Q.    We had some discussion previously about English is

8     not your primary language; right?

9     A.    Yes.

10    Q.    Okay.  I'll ask you a couple questions about your

11    understanding and comprehension of the English language.

12         MS. ROOHANI:  Karen, can you speak up?  I'm

13    sorry.  I'm having difficulty hearing.

14         MS. CONNOLLY:  Okay.  It sounds really loud.

15    BY MS. CONNOLLY:

16    Q.    I'm going to ask you some questions about your

17    understanding and comprehension of the English language.

18         Have you ever had any formal education in

19    understanding the English language, or is your knowledge

20    just based upon communication and conversations with

21    people?

22    A.    I had English in school in Germany when I was 18 for

23    a few years.  The basics.  And then I got better while

24    talking, mostly on vacations.

25    Q.    Okay.  So do you think you have a good grasp of the

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    English language and that you understand everything that's

 2    spoken and written?

 3    A.    Yeah, conversational English, when I talk with

 4    people, when I read something.

 5    Q.    But do you -- is there ever words that you don't

 6    understand that are spoken?

 7    A.    As this legal thing is progressing, yeah, sometimes

 8    there is -- I have a problem finding the right words to

 9    describe in which state of mind I was or what happened.  Or

10    when I read a court paper -- there's a difference.  When I

11    read it and I can look up words, that's different from

12    being here and looking for words.  I don't have a

13    dictionary and can look up the best word, what would fit

14    best.

15    Q.    Okay.  As the -- you mentioned using a dictionary.

16    Under what circumstances have you used a dictionary?

17    A.    When I get, like, motions or -- I have a legal

18    dictionary.

19    Q.    Oh, at the --

20    A.    Yes.

21    Q.    In custody you have access to dictionaries?

22    A.    Yes.  I ordered one.

23    Q.    You ordered one while in custody?

24    A.    A law dictionary, yeah.

25    Q.    And why did you do that?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    To look up legal words because sometimes there are

2   little differences which are important.

3   Q.    And then what --

4   A.    It's from Westlaw.  It's like a big, expensive

5   leather-bound book.

6   Q.    And when you received a copy of the guilty plea

7   agreement, did you have an opportunity to review that with

8   your dictionary?

9   A.    Not then.  I bought that later.

10   Q.    And you indicated that when Mr. Durham met with you

11   and you were in custody and he went over the guilty plea

12   agreement, you didn't actually have a copy of it, he

13   paraphrased what was in there to you.  Was that your --

14   A.    Yes.

15          MS. ROOHANI:  Objection.  That misstates the

16   testimony.

17          MS. CONNOLLY:  I don't believe it does.

18          THE COURT:  He said he summarized.  Same

19   difference, paraphrased, summarized.  It wasn't word for

20   word was his testimony.

21   BY MS. CONNOLLY:

22   Q.    The day you entered your guilty plea, had you

23   finished reviewing -- or had Mr. Durham finished discussing

24   with you the guilty plea at the time that you were notified

25   it was time to come back into court?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    No.
 2    Q.    Did you -- at some point in time, did you continue
 3  to review it with him?
 4    A.    Yes.
 5    Q.    And where was that?
 6    A.    It was here in the courtroom over there on the
 7  right.
 8    Q.    So that was -- you continued to review it with him
 9  before the judge came in.  Was that accurate?
10    A.    Yes.
11    Q.    Okay.  Now, once the judge came in the courtroom,
12  she provided you what we call a plea colloquy.  Do you know
13  what I'm referring to when I say --
14    A.    Yes.
15    Q.    -- plea colloquy?
16          And what does that -- what does that mean to
17  you?
18    A.    She goes over putting things in the plea to make
19  sure that I understand everything.
20    Q.    Okay.  And, in fact, she spent some time asking you
21  a number of questions related to the guilty plea agreement?
22    A.    Yes.
23    Q.    Okay.  And one of the questions she asked you was if
24  you felt that you understood the terms of the plea
25  agreement.  And do you recall what your answer to that was?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I think I answered yes.

2    Q.    And why did you do that?

3    A.    At that time I thought I understood.  But obviously

4    I didn't understand guidelines and the application.

5    Q.    Okay.

6    A.    I always thought about there is a statutory maximum

7    and minimum.  And when they talked about guidelines I

8    thought that is -- that is that, like --

9    Q.    So you didn't understand the difference between the

10   statutory minimums and maximums and the guidelines or how

11   they interplayed?

12   A.    No, that -- I thought that is the statute or

13   maximum/minimum is when they talk about guidelines because

14   there was never, like, years mentioned.

15   Q.    Okay.  During your plea colloquy, it was never the

16   years mentioned in terms of as they relate --

17   A.    I don't -- I don't recall that when guidelines were

18   mentioned that there was, like, the 40 points mentioned or

19   that they translate to years or to how many years they

20   translate.

21   Q.    Are you talking about during the plea colloquy with

22   the Court?

23   A.    Yes.

24   Q.    Okay.  And the judge asked you if you had sufficient

25   time to go over the plea agreement with your lawyers.

TRANSCRIBED FROM DIGITAL RECORDING

1          And do you remember what your answer to that

2    question was?

3    A.    Yes, I answered "Yes."

4    Q.    And why did you respond in that way?

5    A.    I mean, I had time but -- I didn't ask them

6    questions for things which they didn't explain to me.  So

7    we didn't -- when they didn't -- I didn't ask questions

8    about the guidelines because they were not explained to me

9    in the first place, so he -- Mr. Durham went through the

10   whole thing and --

11   Q.    Well, the --

12   A.    -- there were not more questions, so there were

13   not -- I mean, we can talk a long time about it.  If you

14   talk about the wrong things, then the longest time is -- is

15   not enough.

16   Q.    And they didn't have discussions with you about the

17   guidelines; right?

18   A.    No.

19   Q.    And you remember the judge asking Ms. Roohani if

20   there had ever been any prior plea offers extended to you.

21          Do you remember that question?

22   A.    Yes.

23          MS. ROOHANI:  Objection.  It misstates Your

24   Honor's question at the time of the plea colloquy.

25

TRANSCRIBED FROM DIGITAL RECORDING

1  BY MS. CONNOLLY:

2  Q.   Do you remember the Court asking Ms. Roohani this

3  particular question:

4          Ms. Roohani, were there any formal prior

5      written offers to plead that were either withdrawn

6      or rejected?

7          Do you remember that question?

8  A.   Yes.

9  Q.   And do you remember what the response was from

10  Ms. Roohani?

11  A.   If I recall right, she said there was never a

12  written offer.  There were some talks early on in the

13  beginning with one lawyer, but it --

14  Q.   Okay.  If you don't remember specifically what --

15  A.   Yeah.  I think that's --

16  Q.   -- she said, then I don't want you to speculate.

17  A.   I think that's --

18  Q.   Okay.  Do you remember the judge asking you if you

19  were satisfied with your legal representation; and do you

20  remember what your response was?

21  A.   I said, "Yes."

22  Q.   Okay.  And why did you say that?

23  A.   Because at that time I was.  There was nothing more

24  to say or to do.

25          If I would have known that they didn't explain

TRANSCRIBED FROM DIGITAL RECORDING

1    to me the guidelines and that 40 points means 24.3 years to

2    30, I probably would have said, "No, I'm not happy" at that

3    point.

4    Q.    At some point in time did you later become aware of

5    your exposure under the terms of the guilty plea agreement?

6    A.    Yes.

7    Q.    And do you remember the Court specifically asking

8    you if you had sufficient time to talk to your attorneys

9    about the guidelines and how they might apply to your case?

10   A.    Yes.

11   Q.    And you responded that yes, you had; right?

12   A.    I think so.

13   Q.    What do you think would have happened -- or do you

14   know what would have happened if you would have responded

15   "No" to any of the judge's questions?  Or what did you

16   think would happen if you responded --

17   A.    She would have stopped the proceeding and would have

18   said, "Well, I think they need some more time."

19            Because I experienced the same thing when I

20   waived the jury trial and I didn't answer accordingly to

21   one question and she said, "Well, I think we need to stop

22   this and he needs more time."

23   Q.    Why didn't --

24   A.    So --

25   Q.    Why didn't you tell the judge you needed more time?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    At that moment I -- well, there was no chance.  I

2    mean, there was a point when Ms. Roohani said, "Well, if he

3    is not accepting to the facts, then we proceed with trial,"

4    and I knew from what I learned from Mr. Nadig at that point

5    that with that team --

6               MS. ROOHANI:  Objection.  Calls for hearsay.

7               MS. CONNOLLY:  It's not for the truth of the

8    matter.

9               MS. ROOHANI:  Your Honor --

10              MS. CONNOLLY:  It's for his -- it's for his

11   state of mind and why he did what he did or --

12              THE COURT:  Overruled.

13              MS. CONNOLLY:  -- said what he said.

14              THE COURT:  He can answer as to his state of

15   mind.

16              MS. CONNOLLY:  All right.

17              THE WITNESS:  Yeah.  At that point in time, as I

18   said, there was no -- there was no chance to win trial.  I

19   lost trust in my legal team because of what Mr. Nadig said

20   earlier, that reason back -- and I realized that I had no

21   other chance.  What shall I do, stop at that time and

22   proceed with a trial where I know I will lose?

23   BY MS. CONNOLLY:

24   Q.    Why did you think you would lose if you proceeded to

25   trial?  Why did you feel that?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Because in the middle of trial my lead attorney came

2    and asked for a deal if I ever would consider -- if I

3    ever -- I mean, I can't say what he said, so --

4    Q.    Well, you could say what -- go ahead.

5    A.    He came back into the courtroom and said, "Jan, have

6    you ever thought about a deal?"  And I thought I didn't

7    hear right.

8            I said, "No, why should I?"

9            That's how that all started.

10   Q.    After you the left the courtroom, you indicated that

11   you then became aware of your exposure under the

12   guidelines.

13   A.    Yes.

14   Q.    Okay.  And when did you become aware -- when you

15   say -- okay.  When did you become aware of your -- the time

16   you were looking at, given the guilty plea agreement that

17   you had signed?

18   A.    Say that again, please.

19   Q.    When did you become aware of how much time you were

20   actually facing, given the guilty plea agreement that you

21   had signed?

22   A.    The next day.

23   Q.    And what happened --

24   A.    I see that -- the night that I came back and then

25   the next time I had dayroom.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    And what happened the next day?
 2    A.    I talked another -- I talked with another inmate.
 3    Q.    And who was that?
 4    A.    That was Mr. Bret Humphries.
 5    Q.    And did you believe that Mr. Humphries had
 6    familiarity with the child pornography guidelines and
 7    statutes?
 8    A.    Yes.
 9    Q.    Okay.  And so you had discussions with him about --
10    did you have a copy of your guilty plea agreement at that
11    point?
12    A.    I think so.
13    Q.    Okay.  And did you give him a copy, or did you
14    discuss with him --
15    A.    No, because we had always -- we talked through a
16    door.  I mean, I could have slipped it to him.  But at that
17    point I didn't -- I gave it to him later but not at point.
18    We talked about it.
19    Q.    Okay.  And what did you tell him about it?
20    A.    He asked me questions.  He asked me --
21          MS. ROOHANI:  Objection.  Hearsay.
22          MS. CONNOLLY:  It's not for the truth of the
23    matter.
24          MS. ROOHANI:  Your Honor, it's for no other
25    purpose except for its truth.
```

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  But it's got to do with his state

2   of mind and why he did what he did, not whether or not what

3   Mr. Humphries told him was true or not.

4          THE COURT:  But Mr. Humphries hasn't testified

5   yet.  So your question is what Mr. Humphries told him?

6          MS. CONNOLLY:  Yes.  It's not for the truth of

7   the matter, it's --

8          THE COURT:  You can ask him based upon what

9   Mr. Humphries told him what -- what did you think about

10  that, or what did you feel, or what conclusion did you

11  reach, those kind of state-of-mind descriptions.

12          But he can't testify to what Mr. Humphries

13  actually said.

14  BY MS. CONNOLLY:

15  Q.    What did you -- what did you ask Mr. Humphries?  Did

16  you ask him questions?  Or did you --

17  A.    I came back and stopped in front of his door.  And

18  we talked about how trial was going.  And I told him that I

19  signed a plea.  And he was surprised.  And he wanted to

20  know how many years.

21          MS. ROOHANI:  Objection.  Hearsay.

22          MS. CONNOLLY:  Not for the truth of the matter.

23  (Indiscernible).

24          THE COURT:  It is for the truth of the matter

25  asserted.  But I'll allow it as foundational.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  All right.

2          THE WITNESS:  So I can answer?

3          MS. CONNOLLY:  Yes.

4          THE WITNESS:  Okay.  So he asked --

5          THE COURT:  Don't tell me what he said, ask me

6    what -- tell me what your state of mind was after --

7          THE WITNESS:  Okay.

8          THE COURT:  -- you had a conversation with him.

9          THE WITNESS:  I learned of -- so first I learned

10   that our deals were years out specifically mentioned, so

11   you know what you get in a way.  So I realized, okay, this

12   is not in my deal.  And then I couldn't get an answer of

13   how many years.

14          Then I had to lock down because I just came

15   back.  It was not my dayroom.  When I had a few hours later

16   dayroom, because I was concerned, I went again and talked

17   to him.

18          And then I told him about 40 points, that there

19   are 40 points based on what he wanted to know.  So I looked

20   him up and I told him it is 40 points.  And he was a little

21   bit shocked, in my opinion.

22   BY MS. CONNOLLY:

23   Q.   Okay.  When he told you what that translated in

24   terms of years --

25          MS. ROOHANI:  Objection.

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CONNOLLY:

2     Q.    -- were you --

3              MS. ROOHANI:  Hearsay.

4              THE WITNESS:  He couldn't at that point because

5    we had no more paper, but he knew from his case what --

6    what he learned from his lawyers.

7              MS. ROOHANI:  Objection.  Hearsay.

8              MS. CONNOLLY:  Again, it's not for the truth of

9    the matter --

10             THE COURT:  He hasn't said --

11             MS. CONNOLLY:  -- it's for what he did next.

12   Foundational.

13             THE COURT:  He's not going to say what

14   Mr. Humphries said.  He's doing fine so far.  And --

15             THE WITNESS:  So where were we?

16             So he --

17             THE COURT:  You didn't know what 40 --

18             THE WITNESS:  I told him 40 points.

19             And then we talked about that a little bit from

20   his experience with his lawyer, Paul Riddle.

21             And after that conversation, I learned that

22   in -- usually sometimes in those cases it comes up to,

23   like, 32, and that relates to a 33, I think that's what we

24   talked -- we talked about 33, which would relate to 12 to

25   14 years.

TRANSCRIBED FROM DIGITAL RECORDING

```
1              So, of course, we were standing there, and if 33
2    is 12 to 14 at about, then what is 20 -- or what is 40?
3    BY MS. CONNOLLY:
4    Q.    Okay.  Did you have any discussion about
5    any enhancements or variances or anything of that nature
6    with Mr. Humphries?
7    A.    Yeah, a little bit.
8    Q.    Did you have discussion about --
9    A.    He explained me how that works.
10   Q.    Okay.  So --
11   A.    So we basically --
12   Q.    Without --
13   A.    I knew when -- when 32 or 33 is 12 to 14 years, then
14   I know that if you -- by logic -- I mean, I -- I already
15   guessed it's over 20.
16   Q.    Okay.
17   A.    And when I learned that, the next morning I
18   immediately called my lawyer.
19   Q.    Okay.  So my next question was, so the next morning
20   you contacted Mr. Marchese?
21   A.    Yes.
22   Q.    And why did you do that?
23   A.    To clarify that important thing with the guidelines.
24   Q.    Okay.  Did Mr. Marchese and Mr. Durham and
25   Mr. Sanft, did anybody discuss with you that based upon the
```

TRANSCRIBED FROM DIGITAL RECORDING

1    facts that you had admitted that there could be some points

2    that could apply that were not specifically addressed in

3    the guilty plea agreement under the portion that talked

4    about the points that would apply?

5    A.    No.

6    Q.    So you contacted Mr. Marchese a long time before you

7    received the presentence investigation report; right?

8    A.    Yes.

9    Q.    And at some point you communicated -- did you

10   communicate to Mr. Marchese that you wanted to stay with

11   the plea or you wanted to withdraw the plea?

12           MS. ROOHANI:  Objection.  Leading.

13           THE COURT:  Overruled.  He can answer the

14   question.

15           THE WITNESS:  I called him the next morning, and

16   we talked about that.  I voiced my concerns.

17           He said, "Jan, I will come over."

18           He came over a few hours later with Mr. Pacitti.

19   And we had a long talk.

20   BY MS. CONNOLLY:

21   Q.    Okay.  At that point was it -- did you -- what did

22   you communicate --

23   A.    I told him I want to withdraw that plea.

24   Q.    And then did you have another -- was there any

25   discussion about doing it right then or waiting?  What did

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    you decide to do after your meeting with him?
 2    A.    We had a conversation, and based upon that, I -- he
 3    wanted to wait.
 4             MS. ROOHANI:  Objection.  Hearsay.
 5             MS. CONNOLLY:  It's not for the truth of the
 6    matter, it's for why -- a foundation for why he did what he
 7    did.
 8             THE COURT:  Well, it sounds like it is offered
 9    for the truth of the matter asserted.
10             MS. ROOHANI:  And it's nonresponsive to her
11    question, Your Honor.
12             THE COURT:  The objection is sustained.
13    BY MS. CONNOLLY:
14    Q.    Did you decide to immediately move to withdraw the
15    plea?  Or what did you do next, after your discussion with
16    Mr. Marchese?
17    A.    I --
18    Q.    In terms of what did you do next in terms of --
19    A.    I told another lawyer to hire -- I called another
20    lawyer to hire him to file a motion to withdraw the guilty
21    plea.
22    Q.    Okay.  And did you hire that lawyer ultimately, or
23    did you enter -- what did you do?
24    A.    No.
25    Q.    Why did you decide to -- you needed to get a
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    different lawyer to withdraw the guilty plea versus having

 2    Mr. Marchese or Mr. Sanft or Mr. Durham file that on your

 3    behalf?

 4    A.    After the meeting with him and Mr. Pacitti -- with

 5    Mr. Marchese and Mr. Pacitti, I felt that he wouldn't do

 6    that or wouldn't do that in my interest or --

 7    Q.    Was there any mention of there being a conflict,

 8    that you needed to get different counsel?

 9              MS. ROOHANI:  Objection.  Hearsay.

10              MS. CONNOLLY:  It's not for the truth of the

11    matter.  It's why he did what he did.

12              They're making an issue, say he waited so long

13    to withdraw his plea.  So this is relevant to why he waited

14    to withdraw his plea, not to the truth of whatever was

15    said.

16              THE COURT:  Well, he said that he told

17    Mr. Marchese and Mr. Pacitti during the visit that he

18    wanted to withdraw the plea but Mr. Marchese did not, as

19    far as he know, file a motion to withdraw the plea.

20              And so he called a different lawyer to try to

21    hire that lawyer to withdraw the plea but then did not hire

22    a different lawyer?  So where are you -- so your next

23    question is just --

24              MS. CONNOLLY:  Well, my issue is, is the

25    government earlier had made an issue of why he waited so
```

1    long to file the motion to withdraw the plea, implying that

2    it wasn't something he wanted to do close in time to the

3    entry of the plea, so why he did -- why he waited is

4    relevant.  It's not for the truth of what was said to him.

5              THE COURT:  So ask him that.  Why did he wait?

6    Why didn't he continue to persist?

7    BY MS. CONNOLLY:

8    Q.    Why did you not immediately file a motion to

9    withdraw the guilty plea after your discussions with

10   Marchese?

11   A.    I called one lawyer, and he wanted to come visit me

12   in Henderson.  It was -- I called that lawyer a few times

13   in the first two weeks of December.  First I had to get the

14   number because I have no phone book there and I can't look

15   up things.  And I don't know -- there is not a list on the

16   wall with lawyers.  There's a list with public defenders,

17   but I didn't qualify at that time for a public defender, so

18   I had to get numbers of lawyers.

19              And I was in segregation on top of that; so that

20   was extremely difficult to get numbers of lawyers I could

21   call.  Because I wasn't at home, that was an extremely

22   difficult process and that took a while.

23              And then I called in the first two weeks of

24   December.  This is right before Christmas.  So the lawyer I

25   called wanted to come visit me before Christmas, but he

TRANSCRIBED FROM DIGITAL RECORDING

1    then said I need --

2              MS. ROOHANI:  Objection.  Hearsay.

3              THE WITNESS:  Oh, I learned from him that --

4              MS. CONNOLLY:  It's not for the truth of the

5    matter.  It's for foundation on why he waited.

6              If they're not going to make an issue of his

7    delay, then I don't need to go down here.  But if they're

8    alleging that he delayed and he didn't really want to

9    withdraw his plea because he waited so long, then it's

10   relevant.

11             MS. ROOHANI:  And, Your Honor, he's not

12   answering the question that's being posed to him.

13             MS. CONNOLLY:  Yes, he did.

14             THE COURT:  The question was why didn't he file

15   the motion to withdraw his plea.

16             MS. CONNOLLY:  And he's explaining why he

17   didn't.  It's not a one-word answer.

18             THE COURT:  Okay.  So he didn't have a phone

19   number for a different attorney.  All that they had posted

20   was the Federal Public Defender number, and he did not

21   qualify for the Federal Public Defender.  He was in

22   segregation, so it was difficult to find a list of lawyer

23   numbers to call.

24   BY MS. CONNOLLY:

25   Q.   Okay.  And then what did you do?

TRANSCRIBED FROM DIGITAL RECORDING

1  A.   And then I got moved in January to Pahrump.  Then I
2  lost the number of the lawyers I called and had to stop
3  that whole process from there again.

4       But there it was a little bit easier because
5  there was a case manager with an office I could go in, they
6  could look up numbers.  And I started the whole process.

7       Then I called that lawyer I called already in
8  Henderson and asked what was going on, why he didn't visit
9  me.

10       And he said, "Well, I didn't" --
11            MS. ROOHANI:  Objection, Your Honor.
12            THE COURT:  Sustained.
13  BY MS. CONNOLLY:
14  Q.   What did you do next?
15  A.   The problem was that --
16  Q.   How many lawyers did you talk to?
17  A.   -- lawyers couldn't -- I called four to -- I called
18  four, and then two gave me other two numbers.  I called six
19  lawyers altogether.

20       But the big problem was they said, "We can't
21  come" --
22            MS. ROOHANI:  Objection.
23            THE COURT:  Sustained.
24            THE WITNESS:  -- "visit you."
25            THE COURT:  Sustained.  Stricken.

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. CONNOLLY:

2    Q.    Was there difficulties -- did you get diff- -- have

3    difficulties in having a lawyer come visit you due to the

4    fact that you were out in Pahrump, which is a three-hour --

5            MS. ROOHANI:  Objection.  Leading.

6            THE COURT:  Sustained.

7    BY MS. CONNOLLY:

8    Q.    Did you have difficulty getting lawyers to come

9    visit you in Pahrump?

10   A.    Yes.

11   Q.    And how many lawyers came to visit you in Pahrump,

12   to talk to you about withdrawing your plea?  Or

13   representing you?

14   A.    Four.

15   Q.    And then ultimately you hired me; correct?

16   A.    Yes.

17   Q.    Do you recall when it was you hired me?

18   A.    Huh?

19   Q.    Do you remember when it was you hired me?

20   A.    It was -- I think we met the first time in April or

21   May of last year.  And after you got permission from my

22   previous lawyers and that --

23   Q.    Let me ask you.  So my question was, do you remember

24   hiring me in April or May of last year?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   And you had interviewed -- you indicated -- was it

2   your testimony you had interviewed a number of lawyers?

3   A.   Yes.

4   Q.   Okay.  And did these lawyers request money from you

5   to represent you?

6   A.   Yes.

7   Q.   And nobody was offering to do it for free?

8   A.   No.

9   Q.   Okay.  Did you have access to your own money while

10  incarcerated?

11  A.   No.

12          MS. CONNOLLY:  I don't have anything else at

13  this time.

14          THE COURT:  Ms. Roohani or Ms. Cartier-Giroux?

15          MS. CONNOLLY:  Do you want me to take this off?

16  Leave it on?

17          COURTROOM ADMINISTRATOR:  Just mute it.  Just

18  push it once.

19                      CROSS-EXAMINATION

20  BY MS. ROOHANI:

21  Q.   Hi, Jan.  How are you?

22  A.   I'm fine.  How are you?

23  Q.   I'm good.  I wanted to talk a little bit just about

24  you for a few minutes if that's okay?

25  A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    You were an entertainer; correct?

 2    A.    Yes.

 3    Q.    And you had a show on The Strip?

 4    A.    Yes.

 5    Q.    At the Tropicana Hotel?

 6    A.    Yes.

 7    Q.    And you were the headliner of that show?

 8    A.    Yes.

 9    Q.    I believe your face was on a billboard outside the

10    Tropicana for a lengthy period of time?

11    A.    Yes.

12    Q.    And your show -- how many nights a week did that

13    show run?

14    A.    Six nights a week.

15    Q.    Six nights a week.

16          And part of that show was drama?  There was

17    lights, pyrotechnics; correct?

18    A.    No, we didn't have pyro, but we had lights.

19    Q.    Lights.  Okay.

20    A.    Yes.

21    Q.    You had choreography?

22    A.    Yes.

23    Q.    You had other people working for you?

24    A.    Yes.

25    Q.    It was show biz; right?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    Acting?  Part of that --

3    A.    I never -- I always was myself, but, yeah.

4    Q.    You were yourself.  But it was a persona.

5          Are you acting the same way here today that you

6    acted in your show?

7          MS. CONNOLLY:  I'm going to object.  He

8    indicated he didn't act.

9    BY MS. ROOHANI:

10   Q.    The way you're answering questions for me today and

11   for Ms. Connolly today, is that the same way that you spoke

12   in your show?

13   A.    I would think so.

14   Q.    Was it a little bit more pizzazz in your show?

15         It's not a trick question.  I just want to know

16   about --

17   A.    What was the word?  What --

18   Q.    Was it more energetic in your show?

19         MS. CONNOLLY:  Objection.  She's not letting him

20   answer the question.  She just keeps throwing them at him.

21   Argumentative.

22   BY MS. ROOHANI:

23   Q.    Tell me about your show.  Talk to me about your

24   show.

25         MS. CONNOLLY:  Objection.  It's an improper

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    question.  "Talk to me about the show."  It's not a

 2    question.

 3                MS. ROOHANI:  Your Honor?

 4                THE COURT:  I'm not sure it's relevant enough

 5    just to ask him to talk about the show.  You want to --

 6    BY MS. ROOHANI:

 7     Q.   Tell me --

 8                THE COURT:  -- focus it?

 9    BY MS. ROOHANI:

10     Q.   Tell me about some of the different parts of your

11    show.  What are some of the tricks that you did in your

12    show?

13                MS. CONNOLLY:  Objection.  Relevance.

14                MS. ROOHANI:  Your Honor, it's absolutely

15    relevant.  It goes to bias.  It goes to motivation.

16                MS. CONNOLLY:  Bias and motivation?

17                MS. ROOHANI:  Which is always relevant as --

18                MS. CONNOLLY:  Well, bias --

19                MS. ROOHANI:  -- cross-examination.

20                MS. CONNOLLY:  -- and motivation is relevant.

21    But how does what he did in his show have to show bias or

22    motivation?

23                THE COURT:  Well, I think we're getting at

24    credibility and truthfulness, and she can certainly ask

25    questions about whether he has a character persona, whether
```

1    he has acting experience or training and so forth.

2    BY MS. ROOHANI:

3    Q.    So, Jan --

4    A.    Yeah.

5    Q.    -- tell me a little bit about your show.

6            MS. CONNOLLY:  I'm going to object to the form

7    of the question.

8            THE COURT:  Ask a more specific question than

9    just "Tell me about your show."

10   BY MS. ROOHANI:

11   Q.    Did you do different illusions in your show?

12   A.    Yes.

13   Q.    And as part of those different illusions, did you

14   sometimes interact with your audience?

15   A.    Yes.

16   Q.    And in interacting with your audience, you had to

17   speak to them?

18   A.    Yes.

19   Q.    And when you spoke to them, you spoke to them in

20   English, I'm presuming?

21   A.    Yes.

22   Q.    And you had a microphone on when you were

23   performing?

24   A.    Yes.

25   Q.    And when you were performing you spoke loudly, I'm

TRANSCRIBED FROM DIGITAL RECORDING

1    assuming?

2    A.    Yes.

3    Q.    And you had to have energy during your show because

4    you had to get your audience worked up; right?

5    A.    I always was myself, and that was my -- my big

6    advantage.  I never had, like, a rehearsed text.

7              I mean, it was a certain routine every day, but

8    my standalone point was that I was very (indiscernible) and

9    myself, and it wasn't like a -- like a -- sometimes you go

10   to shows and you see it's like they just do what they do

11   every day, and it's not the person itself.

12   Q.    Okay.  So it's your testimony that the way that

13   you're speaking here in court today was the same way that

14   you spoke in your show?

15   A.    With one difference.  What I did there was routine.

16   I did it every day.  This is a one-of-a-kind situation.

17   Q.    Okay.  So you're more authentic here or your more

18   authentic in your show?

19   A.    I think it has nothing to do with being authentic.

20   It's --

21   Q.    Well, let me ask -- Jan?

22   A.    Uh-huh.

23   Q.    I get to ask you questions --

24         MS. CONNOLLY:  Your Honor, I would object to her

25   cutting him off every time she doesn't get the answer that

TRANSCRIBED FROM DIGITAL RECORDING

 1    she wants.

 2              MS. ROOHANI:  Because he's not answering the

 3    question --

 4              MS. CONNOLLY:  He can't answer the question.

 5    You cut him off.

 6              THE COURT:  Overruled.  He wasn't answering the

 7    question.

 8              Go ahead, Ms. Roohani.

 9              MS. ROOHANI:  Okay.

10    BY MS. ROOHANI:

11    Q.    So I'm going to ask you a question.  If you don't

12    understand the question, ask me and I can rephrase it and I

13    can repeat it.  But just answer the question that I'm

14    asking you.

15              Do you think that you're more authentic here,

16    because this is a unique situation, or do you think you're

17    more authentic in your show?  There's one option.  It's

18    either here or the show.  Those are the two options that

19    I've given you.  So pick one of those two.

20    A.    Or not the same -- cannot be the same?

21              THE COURT:  He doesn't have to pick one of the

22    two.  It could be or the same in both --

23              THE WITNESS:  No, it's the same.

24              THE COURT:  -- or in --

25              MS. ROOHANI:  The same --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  -- or neither.
 2   BY MS. ROOHANI:
 3    Q.    Same authenticity here as in your show.  Is that
 4   your testimony?
 5    A.    Yeah.
 6    Q.    Okay.  You had a strong fan base?
 7    A.    Yes.
 8    Q.    And there's some of your fans who came to the trial?
 9              MS. CONNOLLY:  Objection --
10              THE WITNESS:  Yes.
11              MS. CONNOLLY:  -- relevance.
12              THE WITNESS:  Yes.
13              MS. ROOHANI:  Your Honor, it goes to
14   credibility, bias, and motivation.
15              MS. CONNOLLY:  Why the fans came to his show?
16              THE COURT:  Overruled.
17   BY MS. ROOHANI:
18    Q.    Fans came to the trial?
19    A.    Yeah, I think so.
20    Q.    There's fans in the courtroom here today?
21    A.    Yes.
22    Q.    And --
23    A.    One.
24    Q.    One fan.
25              And she's come to almost all of your hearings.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    So you have a strong fan base?

 2    A.    Yes.

 3    Q.    And your show was in English?

 4    A.    Yes.

 5    Q.    And you received many awards as part of that show?

 6    A.    Yes.  Not part of that show, part of shows I did in

 7    Germany too.

 8    Q.    You're a good magician, illusionist?

 9    A.    That's you to --

10    Q.    Other people --

11    A.    -- judge.

12    Q.    Okay.

13          MS. CONNOLLY:  Objection.  She's doing it again,

14    not letting him answer the question and talking over him.

15          THE COURT:  Overruled.  Go ahead.

16    BY MS. ROOHANI:

17    Q.    You were voted Best Magic Show in Las Vegas in 2015?

18    A.    By the Review Journal, yes.

19    Q.    You were.  And you're a good showman?

20    A.    I would hope so.

21    Q.    And Mari came to watch your show?

22    A.    That's what she told me.

23    Q.    She told you she enjoyed your show?

24    A.    She told me she saw the show.

25          MS. CONNOLLY:  Objection.  Calls for hearsay.
```

1           THE WITNESS:  I don't know if she saw it, but

2    she told me she saw it.

3           MS. ROOHANI:  Okay.

4           THE WITNESS:  Oh, from what she said, I think

5    she -- she talked about some -- I think she must have seen

6    it to talk about that.

7           MS. CONNOLLY:  Object again to hearsay.

8           THE COURT:  Is it hearsay, Ms. Roohani?

9           MS. ROOHANI:  It's being offered to show his

10   motivation, Your Honor.  It's state of mind.  Not for the

11   truth of whether Ms. Panovich actually went to watch the

12   show or not or what she actually told him.

13          MS. CONNOLLY:  Relevance of what somebody else

14   came to see your show.

15          THE COURT:  You didn't ask him if he believed

16   her.

17          MS. ROOHANI:  I think he's effectively answered

18   that, Your Honor.

19          I can move on.  No big deal.

20   BY MS. ROOHANI:

21   Q.   And, Mr. Rouven, you were voted Best Illusionist in

22   Las Vegas because you got people to believe in your

23   illusions?

24          MS. CONNOLLY:  Objection.  Compound question.

25          MS. ROOHANI:  It's not compound.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  No, it's not impound.  Overruled.
 2   BY MS. ROOHANI:
 3   Q.    Correct?
 4   A.    No.
 5   Q.    You didn't get people to believe in your illusions?
 6   A.    It has -- that has nothing to do with the award.
 7              MS. CONNOLLY:  Objection.  Calls for speculation
 8   as to what he got other people to believe or not believe.
 9              THE COURT:  Well, he's voted Best Magic Show.
10   He's an illusionist.  Overruled.
11   BY MS. ROOHANI:
12   Q.    You didn't get people to believe in your illusions?
13              MS. CONNOLLY:  Again, object --
14              THE WITNESS:  I would think so.
15   BY MS. ROOHANI:
16   Q.    Okay.  Not trick questions, Jan.  I'm not here to
17   trick you --
18   A.    Well, then --
19              MS. CONNOLLY:   Objection.  This is not --
20   BY MS. ROOHANI:
21   Q.    -- I just want to get to the --
22   A.    -- it has --
23              MS. CONNOLLY:  -- a question.
24   BY MS. ROOHANI:
25   Q.    -- truth.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    -- nothing to do with the awards.

2    Q.    Okay.  Let's talk about some of the things that you

3    talked with Karen about.  Okay?

4          You were born in Germany?

5    A.    Yes.

6    Q.    And you started visiting the United States when you

7    were 18 years old; correct?

8    A.    Yes.

9    Q.    And you told Karen on direct that you began learning

10   English when you were in Germany?

11   A.    Yes.

12   Q.    And you used English when you came and you visited

13   here from the time that you were 18?

14   A.    Yes.

15   Q.    Okay.  And you came here multiple times from the

16   time that you were 18 until you eventually moved here; is

17   that right?

18   A.    Yes.

19   Q.    And you eventually finally moved here in 2010?

20         Well, that's what you testified on direct;

21   right?

22   A.    Yes.  End of 2010.

23   Q.    I believe you said November of 2010 --

24   A.    Yes.

25   Q.    -- you moved here?

TRANSCRIBED FROM DIGITAL RECORDING

1              And you swore under oath on direct that you were

2      fluent in English.  Do you remember that?

3      A.    Yes.

4      Q.    I believe you said it multiple times; correct?

5      A.    I don't recall.

6      Q.    You told us once on Monday that you were fluent in

7      English; is that right?

8              MS. CONNOLLY:  Objection.  Asked and answered.

9      He's already said he testified he was fluent in English.

10             MS. ROOHANI:  He said he didn't know, Your

11     Honor, so I'm attempting to clarify.

12             MS. CONNOLLY:  No, he didn't know how many --

13             THE COURT:  Overruled.  He may answer the

14     question --

15             MS. CONNOLLY:  -- times he said it.

16             THE COURT:  -- and clarify.

17     BY MS. ROOHANI:

18     Q.    On Monday you told us you were fluent in English; is

19     that right?

20     A.    If you have that on the record, then that's right.

21     Q.    And today when you were talking with Karen, again --

22     you told us again that you were fluent in English; is that

23     correct?

24     A.    Yes.

25     Q.    I want you to tell me since 2010, when you moved

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    here, tell me every time that you've used a German
 2    translator when looking at legal papers.
 3    A.    Every time.
 4    Q.    Tell me how many times you've used a German
 5    translator to look at legal papers first.  Let's start
 6    there.  How many times total?
 7    A.    Six times.
 8    Q.    Six times.  All right.  Tell me about the first
 9    time.
10    A.    First time was the contract we signed with the
11    Clarion Hotel on Convention Center Drive.
12    Q.    And you hired a German translator for that?
13    A.    It was -- it was someone we knew and trusted.
14    Q.    Someone you knew and trusted, but somebody
15    translated it out for you?
16    A.    Parts of it, big parts of it, most parts.
17    Q.    That's the first time.
18    A.    The legal parts of it.
19    Q.    Tell me about the second time.
20    A.    The second time was when we moved the show to the
21    Riviera.  There was a new different contract, and we had
22    some things -- we didn't understand certain things and
23    couldn't look them up.
24    Q.    When you say "We," you mean you?
25    A.    Me and my husband and business partner Frank.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  So you got a translator there too?

2    A.    We got parts translated.

3    Q.    Did you hire that person?

4    A.    We didn't pay for it, but it was someone we -- we

5    knew and trusted who helped us from Germany with that.

6    Q.    Okay.  Third time?

7    A.    Third time was when we renewed that contract a year

8    later because there was a change in management and in the

9    union, so they added a bigger part.

10   Q.    And so you used that translator to translate just

11   that one part?

12   A.    I think there was one part we got a different person

13   to clarify.

14   Q.    So you've now used two translators.  Okay.

15   A.    Uh-huh.

16   Q.    Fourth time you used a translator?

17   A.    Fourth time was that next year there was a new

18   contract.

19   Q.    With the Riviera?

20   A.    Yeah.

21   Q.    Fifth time, please?

22   A.    And then the last year there was a change -- I mean,

23   I have to -- it's been a while.

24   Q.    Okay.

25   A.    So but you just -- you don't need to know the

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    details, you want to know --
 2    Q.    Where was the -- who was the contract --
 3    A.    It was the last contract at the Riviera.
 4    Q.    Riviera.  Any other times?
 5    A.    And then we asked that same person -- we always
 6    asked when we had the contract at the Tropicana.
 7    Q.    Okay.  So six times when you've dealt with contracts
 8    you've talked to a translator?
 9    A.    Yes.
10    Q.    And that Tropicana contract, that's the contract
11    that Steve Pacitti wrote up for you?
12    A.    He looked over it too, but that wasn't the German
13    translator.
14    Q.    I understand that.  But the --
15    A.    It was another time.
16    Q.    It was a different Tropicana contract?
17    A.    No, that was the -- we just had -- well, we
18    didn't -- technically we had two -- but that was the same
19    contract, the first contract end of -- I start at the end
20    of 2014.
21    Q.    Okay.
22    A.    It was that contract.
23    Q.    Fair enough.  So total of six times since you've
24    been in the United States you've used a translator for
25    legal documents?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Yes.

2   Q.    Okay.  Let's talk about that a little bit more,

3   okay?

4   A.    Yes.

5   Q.    Contracts with Steve Pacitti.

6           Mr. Pacitti negotiated some contracts with you;

7   correct?  Or for you?

8   A.    Yes.

9   Q.    And that was with the Tropicana?

10  A.    Yes.

11  Q.    And that dealt with your show?

12  A.    Yes.

13  Q.    And your show actually continued through to January

14  of 2016; is that right?  Or February of 2016?

15  A.    March.

16  Q.    March of 2016.  Okay.

17  A.    Yes.

18  Q.    But the last contract that you used a translator for

19  was a 2014 Tropicana contract?

20  A.    That was the one which runs from November 2014 to

21  November --

22  Q.    2015?

23  A.    -- 2015.  And then there was a new one.

24  Q.    Okay.  That contract dealt with money, how much the

25  Tropicana was going to pay you?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    No.  They didn't pay us.

 2    Q.    The Tropicana did not pay you?

 3    A.    No.

 4    Q.    You paid the Tropicana to perform?

 5    A.    I can explain.  I can go into detail -- it's like

 6  not a yes/no question.

 7    Q.    All right.  That's fine.

 8              There were some legal obligations in the

 9  contract; fair to say?

10    A.    Yes.

11    Q.    You were going to do some things, and the Tropicana

12  was going to do some things?

13    A.    Yes.

14    Q.    All right.  That agreement was in English?

15    A.    Yes.

16    Q.    And specifically I'm talking about the November 2015

17  contract that you were performing under when you were

18  arrested in this case.  That was in English?

19    A.    Yes.

20    Q.    Have you ever had a contract with the Tropicana

21  written in German?

22    A.    They translated parts we got the year before.

23    Q.    The contract that you got from the Tropicana, was it

24  ever written in German, or was it written in English?

25    A.    In English.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Okay.  And you read that agreement?  I'm
 2    specifically talking about the November '15 --
 3    A.    I didn't read the whole agreement, no.
 4    Q.    Do you typically sign agreements that you don't
 5    read, Mr. Fuechtener?
 6    A.    Yes.
 7    Q.    You do do that?
 8    A.    Sometimes.
 9    Q.    And you understand that there's legal obligations
10    that come along with agreements; right?
11          Yes-or-no question.
12    A.    In that case --
13    Q.    Yes-or-no question, Mr. --
14          MS. CONNOLLY:  Judge, I object.  She's --
15    BY MS. ROOHANI:
16    Q.    You understand --
17          MS. CONNOLLY:  -- not letting him answer.  It's
18    not a yes-or-no question.
19          THE WITNESS:  Yeah, it's not a yes/no.  I have
20    to go into detail a little bit.
21    BY MS. ROOHANI:
22    Q.    Okay.  So it's not a yes-or-no question whether you
23    realized --
24    A.    Let's put like this.  If I -- if there --
25    Q.    -- that there's legal --
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    -- is a legal obligation --

2    Q.    No, no, no, no.  Mr. Fuechtener, there's no pending

3    question.

4    A.    Okay.

5    Q.    Let me ask the question.  If there's something

6    Ms. Connolly wants to ask you, she's going to get back up

7    here and ask you.  Okay?

8    A.    Uh-huh.

9    Q.    So if you only answer my questions, we'll go through

10   this a lot faster.  Okay?

11   A.    Okay.

12   Q.    All right.  So you don't understand that when you

13   sign a contract there might be legal implications --

14   A.    Yes.

15   Q.    -- to that contract?

16         You understand that?

17   A.    Yes.

18   Q.    And understanding that, you still sign contracts

19   that you haven't read?

20         Yes-or-no question.

21   A.    Yes.

22   Q.    Okay.  And that 2015 agreement with the Tropicana,

23   you didn't have that contract translated?

24         MS. CONNOLLY:  Asked and answered.  Objection.

25         THE WITNESS:  We had that German translator we

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    talked about.
 2    BY MS. ROOHANI:
 3    Q.    Okay.  So that was for the 2014 contract.  I'm
 4    talking about the 2015 contract.
 5              You previously testified that he did not
 6    translate the 2015 contract.  Are you changing your
 7    testimony?
 8    A.    No, the '15 was --
 9              MS. CONNOLLY:  Objection, misstates --
10              THE WITNESS:  -- a renewal.
11              MS. CONNOLLY:  -- his testimony.
12              THE WITNESS:  It was pretty much the same.
13    BY MS. ROOHANI:
14    Q.    Okay.  So you did not have the 2015 contract
15    translated into German?
16    A.    I don't recall signing that because it was a
17    renewal.  I have a manager who can sign in my name.
18    Q.    Okay.
19    A.    I mean --
20    Q.    Mr. Fuechtener, you're --
21    A.    -- it's complicated.
22    Q.    Okay.  Fair enough.
23              You bought a house?
24    A.    Yes.
25    Q.    You bought two houses when you were in Las Vegas;
```

TRANSCRIBED FROM DIGITAL RECORDING

1   right?

2   A.    Yes.

3   Q.    Those houses were in your name?

4   A.    In our name.

5   Q.    Your name and Frank's name?

6   A.    Uh-huh.

7   Q.    And that also dealt with legal obligations?

8   A.    Yes.

9   Q.    You had to pay the bank?  The bank gave you some

10  money; fair to say?

11  A.    No.

12  Q.    Okay.  Who did you buy the house from?

13  A.    Ask that again.

14  Q.    Who did you buy the house from?

15  A.    From previous owners.

16  Q.    Okay.  Did you pay all cash for that house?

17  A.    Yes.

18  Q.    Did you sign a deed related to that house?

19  A.    What is that?

20  Q.    You don't know what a deed is?

21  A.    If I'm correct, that is a -- a land -- is that a

22  land document?

23  Q.    Yes, that's a document that --

24  A.    -- that you own a part of land?  Okay.

25  Q.    Okay.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Yeah, then I --

 2    Q.    The house was in your name?

 3    A.    Yeah, in our name.

 4    Q.    You didn't buy the house -- nobody gave you a house

 5  for free.  Would that be fair to say?

 6    A.    No.

 7    Q.    All right.  You paid some money for that house?

 8    A.    Yes.

 9    Q.    There's some documents that you signed --

10    A.    Yes.

11    Q.    -- related to that house?

12    A.    Yes.

13    Q.    Those documents were in English?

14    A.    Yes.

15    Q.    They were legal documents?

16    A.    Yes.

17    Q.    And you did not have those translated into German?

18    A.    No.

19    Q.    You signed those documents?

20    A.    Yes.

21    Q.    You read those documents before you signed them?

22    A.    Yes.

23    Q.    Didn't ask for a German translator for those

24  documents?

25    A.    No.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    You had a trust agreement with your husband?
 2    A.    Yes.
 3    Q.    That was a pretty complicated trust agreement?
 4    A.    I don't think so.
 5    Q.    You think it was an easy trust agreement?
 6    A.    It got explained to us from a expert and that like a
 7    family law firm --
 8    Q.    Okay.  Explained to you --
 9    A.    -- who went over it.
10    Q.    Explained to you in English?
11    A.    Yes.
12    Q.    You didn't get a German translator for that?
13    A.    No.
14    Q.    You understood that you were entering into that
15    agreement to avoid probate; correct?
16    A.    At that time, no.
17    Q.    So you thought you were entering an agreement, and
18    you had no idea what that agreement was about?
19    A.    Well, we had a -- we had a purpose, but it was that
20    purpose.
21    Q.    Okay.  A legal purpose for signing that document?
22    A.    Yeah, you could -- yeah, you could call it a legal
23    purpose.
24    Q.    Okay.  And you read that agreement?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    You understood that agreement?

2    A.    Yes.

3    Q.    It dealt with money?

4    A.    It -- what I remembered was for the house.

5    Q.    Okay.  So --

6    A.    I mean --

7    Q.    -- assets, money, houses, dealt with --

8    A.    It was things I never really dealt with.  That was

9    my husband's part.  He dealt with it.

10          And to be honest with you, I mean -- what -- did

11   that answer your question?

12   Q.    You signed that agreement?

13   A.    I signed it, yes.

14   Q.    Did you understand that agreement when you signed

15   it?

16   A.    For the most part, yeah.

17   Q.    Are you in the habit of signing agreements you don't

18   understand, Mr. Fuechtener?

19   A.    Say that again.

20   Q.    Are you in the habit of signing agreements that you

21   don't understand?

22   A.    Sometimes if someone else who I trust looked over

23   and said it's okay to sign.

24   Q.    So Frank told you it was okay to sign it?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    You didn't ask for a German translator for that

2    agreement?

3    A.    No.  It wasn't that important for me.

4    Q.    Oh, your house wasn't that important to you,

5    Mr. Fuechtener?

6    A.    It wasn't as important as my life --

7    Q.    Okay.

8    A.    -- like this is.

9    Q.    Hold on.

10         Did you tell your husband on a jail call to

11   protect the houses, Mr. Fuechtener?

12   A.    I don't recall that.

13   Q.    So if I have a copy of a jail call where you talked

14   to your husband about protecting the houses, your testimony

15   is still that you didn't care about the houses and they

16   weren't that important?

17   A.    I talked in German with him.  You say "protect."

18   That's a translation.  So I would need to hear it and

19   then --

20   Q.    Okay.  Fair enough.

21   A.    I need the context.

22   Q.    All right.  Fair enough.

23         You were there the morning that Mari executed

24   the search warrant at your house?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And Mari talked to you that morning?

2    A.    Yes.

3    Q.    She told you what she was looking for?

4    A.    Yes.

5    Q.    She told you she was investigating somebody who was

6    downloading and sharing child pornography over the

7    Internet?

8    A.    She talked about downloading in the morning when we

9    talked.

10   Q.    And she was talking about child pornography?

11   A.    Yes.

12            MS. CONNOLLY:  I'm going to object to relevance.

13   It's beyond the scope of direct.

14            THE COURT:  Ms. Roohani?

15            MS. ROOHANI:  Mr. Fuechtener conducted extensive

16   conversations and has signed multiple documents in English.

17   There's certainly been an insinuation that he wasn't fluent

18   or didn't understand what was going on.

19            I think I'm allowed to probe this.

20            MS. CONNOLLY:  He's never said he didn't

21   understand the spoken language.

22            THE COURT:  What is --

23            MS. ROOHANI:  It goes to bias and motivation as

24   well, Your Honor, his credibility.

25            MS. CONNOLLY:  It's got nothing to do with bias

TRANSCRIBED FROM DIGITAL RECORDING

1    and motivation.

2              THE COURT:  Communication with Special Agent

3    Panovich, Mari Panovich, how does that relate to his bias?

4              MS. ROOHANI:  He understands legal

5    ramifications, Your Honor.  He understands how to -- the

6    nuances of the English language and legal intricacies, and

7    that's what I'm attempting to probe here.

8              And I'm just laying the foundation for a few

9    questions, if you'll let me -- give me a little bit of

10   latitude here.

11             THE COURT:  All right.  If that's the direction

12   you're going.

13             MS. ROOHANI:  Okay.

14             THE COURT:  Objection overruled.

15   BY MS. ROOHANI:

16   Q.    You knew that Mari was investigating child

17   pornography?

18   A.    Yes.

19   Q.    You knew that there were serious charges involved

20   with child pornography in this country?

21   A.    No.

22   Q.    You thought that there was no serious consequences

23   for having child pornography?

24   A.    Not consequences like this.

25   Q.    Okay.  You knew that when you spoke with an FBI

TRANSCRIBED FROM DIGITAL RECORDING

1    agent that that could have legal consequences for you?

2    A.    Yes.

3    Q.    You knew that you had to tell the truth to that FBI

4    agent?

5    A.    Yes.

6    Q.    And before Mari started to interview, she asked you

7    if you needed an interpreter?

8    A.    Yes.

9    Q.    And you told her no?

10   A.    Yes.

11   Q.    You told her that you spoke English so well that you

12   signed your own business contracts that were written in

13   English?

14   A.    Yes.

15   Q.    And you signed some papers with Mari --

16   A.    Yes.

17   Q.    -- correct?

18         There's a waiver of *Miranda* that you signed with

19   Mari?

20   A.    Yes.

21   Q.    That was written in English?

22   A.    Yes.

23   Q.    And you read that?

24   A.    No.

25   Q.    Somebody read it to you?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    I'm -- I think so.

 2    Q.    You signed your name on a piece of paper regarding

 3   the Miranda warnings?

 4    A.    I don't recall.

 5    Q.    All right.  Let me refresh --

 6    A.    If you -- I mean, you have the document.

 7    Q.    I sure do.

 8          Mr. Fuechtener, would looking at that piece of

 9   paper help refresh your recollection?

10    A.    Yes.

11          MS. ROOHANI:  May I approach, Your Honor?

12          THE COURT:  Yes, you may.

13          THE WITNESS:  Thank you.

14   BY MS. ROOHANI:

15    Q.    Take a look at it and then turn it over, okay?

16          Do you recognize that document?

17    A.    Yes.

18    Q.    What is it?

19    A.    That's an advice of rights.

20    Q.    Miranda warnings?

21    A.    Yes.

22    Q.    Your signature's on that page?

23    A.    Yes.

24    Q.    That page is written in English?

25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    You signed that document?

2    A.    Yes.

3    Q.    After you read it?

4    A.    I don't recall reading it.

5    Q.    Somebody --

6    A.    I signed it.

7    Q.    So you sign documents that you don't know what they

8    mean.  That's your testimony?

9    A.    I trusted her.  I mean --

10   Q.    You trusted an FBI agent who was at your house to

11   investigate you --

12   A.    Yes, I did.

13   Q.    -- for child pornography?

14   A.    Yes, I did.

15   Q.    Okay.  You didn't ask Mari for a German translator,

16   did you?

17            MS. CONNOLLY:  Objection.  Already asked and

18   answered.

19            THE COURT:  I think the question was as to

20   before he signed.

21            MS. ROOHANI:  Yes, Your Honor.

22            THE COURT:  Are you talking about at any point

23   later on --

24   BY MS. ROOHANI:

25   Q.    I'm talking about --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  -- during the interview.
 2    BY MS. ROOHANI:
 3     Q.     -- when you were signing that Miranda form that was
 4    written in English, did you ask Mari for a German
 5    translator?
 6     A.     No.
 7     Q.     Did you ask anyone for a German translator that day?
 8     A.     Yes.
 9     Q.     Who did you ask for a German translator that day,
10    Mr. Fuechtener?
11     A.     There was a friend at the house, and we had, like, a
12    brief -- I think he brought it out, and I made a --
13     Q.     Who's that friend?
14     A.     -- about that.
15     Q.     Who was that?
16     A.     It was Joel Rosales.
17     Q.     Does Joel speak German, Mr. Fuechtener?
18     A.     No.
19     Q.     How is he going to translate --
20     A.     Except for three words.
21     Q.     Was he going to translate that Miranda form for you
22    into German?
23     A.     No, it wasn't -- we didn't -- it wasn't him who --
24    we talked about a translator, a professional translator.
25     Q.     So it's your testimony that Mari asked you if you
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    needed a translator; correct?
 2              MS. CONNOLLY:  Objection.  Already asked and
 3    answered.
 4              MS. ROOHANI:  It's going to impeachment, Your
 5    Honor.
 6              THE COURT:  Overruled.
 7    BY MS. ROOHANI:
 8    Q.    Mari asked you if you needed a translator; correct?
 9    A.    Yes.
10    Q.    And you had told Mari no?
11    A.    Yes.
12    Q.    And Mari told you if at any point you need a German
13    translator, you could ask her, and she would get you a
14    German translator?
15    A.    I don't recall that.
16    Q.    She told you that there was a German-speaking
17    officer who could translate for you?
18    A.    Yes.
19    Q.    She told you that if at any point you needed
20    translation, you could ask her, and she would get that
21    officer for you; correct?
22    A.    That I don't recall.
23    Q.    And it's your testimony that you did not ask Mari
24    for a translator but instead you asked Joel, who doesn't
25    speak German?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1     A.    No.

 2            MS. CONNOLLY:  Objection.  Misstates his

 3     testimony.

 4     BY MS. ROOHANI:

 5     Q.    Now, when Mari --

 6            THE COURT:  Sorry.  The objection is sustained.

 7     It does misstate the testimony.

 8     BY MS. ROOHANI:

 9     Q.    When you were talking to Mari, you were talking to

10     her in a car; correct?

11     A.    Yes.

12     Q.    There was another officer there?

13     A.    Yes.

14     Q.    He was sitting in the front seat?

15     A.    If you say so.

16     Q.    Was Mari sitting in the back seat?

17     A.    I don't recall who was sitting where.  I think -- I

18     think she was sitting in the back seat --

19     Q.    Okay.

20     A.    -- and he was sitting in the front seat.

21     Q.    And Joel wasn't in the car?

22     A.    No.

23     Q.    And, in fact, other investigators were -- if you

24     have knowledge of this, if you have knowledge, other

25     investigators were talking to Joel; correct?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Yeah, I saw that later when we came out.
 2    Q.    And, in fact, you were deliberately separated from
 3  Joel; correct?
 4          MS. CONNOLLY: Objection.  Calls for speculation.
 5  He wouldn't know why the officers did what they did.
 6          THE COURT:  Sustained.
 7  BY MS. ROOHANI:
 8    Q.    Were you separated from Joel?
 9    A.    Yes.
10    Q.    And you didn't interact with Joel while the search
11  warrant was being executed?
12    A.    I did interact with him.
13    Q.    When Mari --
14    A.    While the search warrant was executed.
15    Q.    Before you were talking to Mari, you did not talk to
16  Joel; correct?
17    A.    It depends when.
18    Q.    When you were talking to Mari --
19    A.    We talked all day until noon.
20    Q.    You did not talk to Joel during that time; correct?
21    A.    I did talk to him.
22    Q.    When Mari --
23    A.    And to her.
24    Q.    I'm being very specific, okay?
25    A.    Uh-huh.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    When Mari was at your house?

2    A.    Yes.

3    Q.    Later on you talked to Mari on the phone, and I know

4    that.

5    A.    Uh-huh.

6    Q.    We'll talk about that in a minute.

7          When Mari was at your house, you did not talk to

8    Joel; correct?

9    A.    No.

10   Q.    Okay.  You did not talk to Joel?

11   A.    No.  I talked to Joel when Mari was at the house.

12   Sorry.

13   Q.    Okay.  Not a problem.

14         Mari also talked to you about a consent form --

15   do you remember that -- to take over your lars45 account?

16   A.    Yeah, that was later the day.

17   Q.    All right.

18   A.    Uh-huh.

19   Q.    You talked to Mari about that?

20   A.    Yes.

21   Q.    Your conversation with her was in English?

22   A.    Yes.

23   Q.    And that form was written in English?

24   A.    Yes.

25   Q.    It's a legal form?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    I don't know.

 2    Q.    Standard FBI form?

 3          MS. CONNOLLY:  Objection.  Asked and answered.

 4    He didn't know.

 5          THE WITNESS:  At that point I didn't -- I

 6    didn't -- I didn't pay attention on that -- to that.

 7    BY MS. ROOHANI:

 8    Q.    Okay.  Did you read the form?

 9    A.    No.

10    Q.    You did not read the form?

11    A.    No.

12          MS. CONNOLLY:  Objection.  Asked and answered.

13    BY MS. ROOHANI:

14    Q.    Your testimony that you did not read the form --

15          MS. CONNOLLY:  Objection.  Asked and answered

16    three times.

17          THE COURT:  Sustained.

18          MS. ROOHANI:  Okay.

19    BY MS. ROOHANI:

20    Q.    Mr. Fuechtener, if I showed you a form had your

21    signature on it, would that help refresh your recollection?

22          MS. CONNOLLY:  Actually --

23          THE WITNESS:  I know --

24          MS. CONNOLLY:  -- he didn't say --

25          THE WITNESS:  -- the form.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. ROOHANI:

2    Q.    You do know the form?

3    A.    Yeah.

4    Q.    In fact, you are aware of the form that I'm talking

5    about?

6    A.    Yes.

7    Q.    It's your testimony that you did not read that form?

8    A.    At that time I didn't.

9    Q.    So you didn't tell Mari --

10   A.    He told me what to do and where to fill things, and

11   then we -- it was like -- for me it was like -- like a note

12   you print over the computer where you leave things free

13   and --

14   Q.    It was a print --

15   A.    I mean, I know what it was about, what she wanted,

16   let's put it like that.

17   Q.    Okay.  You understood what she wanted.  You

18   understood what the form was about; fair?

19   A.    Yes.

20   Q.    You understood that the form was wanting to take

21   over the lars45 GigaTribe account?

22   A.    Yeah.  That -- I didn't understand it like that.

23   Q.    Did you sign that document, Mr. Fuechtener?

24   A.    I don't recall, but I think you have it in your

25   hands, so let's take a look.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Did you write on that form, Mr. Fuechtener?

2    A.    I wrote something on that form, yes.

3    Q.    If I showed you that form, would it help you refresh

4    your recollection about the form?

5    A.    I know what it looks like.

6    Q.    You know what it looks like?

7    A.    Yeah.

8    Q.    You wrote on it --

9    A.    I saw it in court.

10   Q.    You saw it in court?

11   A.    Uh-huh.

12   Q.    And it was about the takeover of the lars45

13   GigaTribe account?

14   A.    Yes.

15   Q.    These are not trick questions.  Okay.

16   A.    I have to be careful.

17           MS. CONNOLLY:  Objection.

18   BY MS. ROOHANI:

19   Q.    Mr. Fuechtener, you asked Special Agent Panovich if

20   you could write something on that form.

21           Do you remember that?

22   A.    No.

23   Q.    You don't remember that?

24   A.    No.

25   Q.    You don't remember saying, "Can I write on here

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   that" --
 2              MS. CONNOLLY:  Objection.
 3   BY MS. ROOHANI:
 4   Q.    -- "I'm not into that"?
 5              MS. CONNOLLY:  Objection.  Asked and answered
 6   twice.  She's on her third time.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  No, that's not what I asked.
 9   BY MS. ROOHANI:
10   Q.    Okay.  What did you tell her you wanted to write on
11   there?
12   A.    Well, it has been a while, and I wanted to add to
13   that form that I didn't share or download child pornography
14   with that account and --
15   Q.    That's what you wanted to write on the form?
16   A.    That's what I wanted to write on that form --
17              MS. CONNOLLY:  And she's cutting him off without
18   letting him answer the question.
19              MS. ROOHANI:  He already answered the question.
20              THE COURT:  Sustained.
21   BY MS. ROOHANI:
22   Q.    Go ahead and finish answering.
23   A.    I wanted to write that down.  And then Ms. Panovich
24   and Mr. -- the police officer, Mr. Vicente Ramirez, they
25   had a short talk in the car if they could do that.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    And then he said, "Well, we can't do that.  We

2  can't have him sign that."  And then they ripped it apart.

3  And for me, the form was gone.

4  Q.    So you understood that if you did not agree with

5  something on that form, you didn't have to sign it?

6  A.    It -- it -- it didn't come to my mind that this is

7  something I would need to sign.  At -- at that moment there

8  wasn't an official form for me.  It was a question for me

9  to write certain things down.

10    And I wanted to add something, and that couldn't

11  be done, and then they dismissed the whole form idea.

12  Q.    Okay.  That's what I'm asking you.

13    You wanted to add something to the form;

14  correct?

15  A.    Yeah.

16  Q.    They told you it couldn't be done; correct?

17  A.    They told them amongst themselves.  And then they

18  ripped it apart.  And then --

19  Q.    And you didn't sign the form; correct?

20  A.    No.

21  Q.    Okay.  So you understood that if you didn't like a

22  term in a legal document, you could add it --

23    MS. CONNOLLY:  Objection.

24  BY MS. ROOHANI:

25  Q.    -- correct?

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. CONNOLLY:  Assumes facts not in evidence it

2    was a legal document.

3          Oh, I'm sorry.

4          THE COURT:  What is the question -- what is the

5    objection?  That the form is not in evidence?

6          MS. CONNOLLY:  Yeah, I don't even know what

7    doc- -- she's talking about a document, reference it being

8    a legal document.  We don't have the document.  It's not in

9    evidence.

10          She's asked him about something he signed years

11    ago asking him if it's a legal document.  Assumes facts not

12    in evidence.

13          MS. ROOHANI:  I'm happy to admit the document,

14    Your Honor.

15          THE COURT:  All right.  Go ahead.

16          MS. ROOHANI:  May I approach, Your Honor?

17          THE COURT:  Yes, you may.

18          THE WITNESS:  Thank you.

19          COURTROOM ADMINISTRATOR:  Your Honor, for the

20    record, this exhibit is being marked as Exhibit 1.

21          THE COURT:  All right.  Exhibit --

22    BY MS. ROOHANI:

23    Q.    Mr. Fuechtener, do you recognize that document?

24    A.    Yes.

25    Q.    What is it?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    It's a ripped apart form which is put together

2    and -- which was showed to me in that car.

3    Q.    Is it a fair and accurate depiction of the form that

4    you looked at in the car?

5    A.    Well, the one in the car was like a complete one,

6    and this is the one which they ripped at the end and all

7    put together and photocopied, yeah.

8    Q.    Fair to say --

9    A.    It's how it looks like.

10    Q.    -- it looks like it was copied when it was put back

11    together?  Fair?

12    A.    Say that again.

13    Q.    It looks like there's a tear if you look down?

14    A.    Yes.

15         MS. ROOHANI:  Your Honor, I would move to admit

16    Government's Exhibit 1.

17         THE COURT:  Any objection to Exhibit 1?

18         MS. CONNOLLY:  Just to relevance.

19         THE COURT:  So Exhibit 1 will be admitted.

20         MS. ROOHANI:  Thank you, Your Honor.

21         (Exhibit No. 1 received.)

22    BY MS. ROOHANI:

23    Q.    All right.  Mr. Fuechtener, this is the document

24    that you wanted to add something to; correct?

25    A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And Special Agent Panovich and Mr. Ramirez had a

2    conversation and said that you couldn't add something to

3    it; correct?

4    A.    Yes.

5    Q.    And you did not sign this document; correct?

6    A.    No.

7    Q.    And the reason you didn't sign this document is

8    because you wanted to add something to it; correct?

9    A.    Yeah, that was one of the reasons.

10   Q.    All right.  So you knew that if there was a term

11   that you didn't like, you shouldn't sign a document;

12   correct?

13   A.    That wasn't a document for me.  At that moment I

14   didn't see it as a legal document.

15   Q.    It is a document, correct, Mr. Fuechtener?

16   A.    If you -- yeah.  I mean, for me it wasn't a legal

17   document at that time.

18   Q.    At the time of it, it says "Federal Bureau of

19   Investigation"?

20   A.    I didn't read that.

21          MS. CONNOLLY:  I'm going to object to the

22   reference of it being a legal document, also.

23          The document was generated by the FBI.  That

24   doesn't necessarily make it a legal document.  So object

25   to --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  It depends on --

 2              MS. CONNOLLY:  -- characterization.

 3              THE COURT:  -- how you're defining a legal

 4   document.  Did you mean this is just the standard FBI form?

 5              MS. ROOHANI:  Maybe I can clarify, Your Honor.

 6              THE COURT:  All right.

 7   BY MS. ROOHANI:

 8   Q.    You understood that you would be giving up certain

 9   rights by signing this document, correct, Mr. Fuechtener?

10   A.    No.

11   Q.    So consent to assume online identity authorization

12   form didn't tell you you were giving up certain rights?

13   A.    I didn't read that.

14   Q.    All right.  Did Special Agent Panovich tell you that

15   you would be giving up your right to the lars45 --

16              MS. CONNOLLY:  Object --

17   BY MS. ROOHANI:

18   Q.    -- account?

19              MS. CONNOLLY:  Objection.  Hearsay as to what

20   Special Agent Panovich did or did not say.

21              MS. ROOHANI:  It's going to his state of mind,

22   Your Honor.  It's not offered for its truth.

23              THE COURT:  Overruled.  He may answer the

24   question.

25              THE WITNESS:  I don't recall.
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    BY MS. ROOHANI:
 2    Q.    You didn't sign this document?
 3    A.    No.
 4    Q.    You wanted to add something to this document?
 5    A.    Yes.
 6    Q.    And you didn't sign it because you wanted to add
 7    something to it?
 8              MS. CONNOLLY:  Objection.  Misstates his
 9    testimony.
10              THE COURT:  He can answer the question.
11              THE WITNESS:  Well, I was in a hurry.  I mean,
12    the whole context should be -- I think it's important to
13    have the context of that whole situation.
14    BY MS. ROOHANI:
15    Q.    You didn't ask for a German translator when you were
16    talking about this document with Special Agent Panovich,
17    did you?
18    A.    No.  I had a show in an hour after that.
19    Q.    That wasn't the question.
20    A.    I know.
21    Q.    All right.
22              You agreed to submit to a polygraph in this
23    case, Mr. Fuechtener; correct?
24    A.    Yes.
25    Q.    And in conjunction with that, you interviewed with
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Special Agent Gary McCamey?

2    A.    Yes.

3    Q.    You remember that?

4    A.    Yes.

5    Q.    And you knew that your truthfulness was being

6    measured in that interview?

7    A.    Yes.

8            MS. CONNOLLY:  Objection.  Relevance.

9            THE COURT:  I'm assuming there's some document?

10           MS. ROOHANI:  Yes, Your Honor.

11           THE COURT:  All right.  Objection overruled.

12   BY MS. ROOHANI:

13   Q.    And you signed some papers with Special Agent

14   McCamey; correct?

15   A.    It was on a tablet, yeah.

16   Q.    You signed --

17   A.    I think.

18   Q.    -- a document on a tablet?

19   A.    Yes.

20   Q.    It was a waiver form; correct?

21   A.    I just signed it.  I didn't read it.  I just signed

22   it.

23   Q.    And it's your testimony that you're in the business

24   of signing documents you haven't read, Mr. Fuechtener;

25   correct?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1                MS. CONNOLLY:  Judge, misstates what he just
 2   said.
 3                THE COURT:  He can answer the question.
 4                THE WITNESS:  Well, I trusted that person.  He
 5   said this needs to be signed, that we can proceed, and at
 6   that -- I signed two things, and at that point I didn't
 7   understand the difference, I just signed it.
 8                Yes, I just signed it without reading it.
 9   BY MS. ROOHANI:
10   Q.    It's your testimony that you trusted people that you
11   had just met that day, Mr. Fuechtener?
12   A.    Well, he wasn't -- I mean, he wasn't --
13   Q.    Did you just meet them that day, Mr. Fuechtener?
14   A.    Yes.
15   Q.    It's your testimony that you trusted them?
16   A.    Yes.
17   Q.    And that's why you signed those document?
18   A.    Yes.
19   Q.    And you signed them despite the fact that you had
20   just met them that day?
21   A.    Yes.
22                MS. CONNOLLY:  Objection.  Asked and answered.
23   BY MS. ROOHANI:
24   Q.    You did not ask Special Agent McCamey for a German
25   translator?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    No.

2   Q.    All right.  Jan, how many attorneys have worked on

3   this case for you?

4   A.    Five.

5   Q.    Tell me who they are.

6   A.    Five.

7   Q.    Five?  Who?

8   A.    Mr. Jess Marchese, Mr. Ben Nadig, Mr. Michael Sanft,

9   and Mr. Durham, and Ms. Amber Craig.

10  Q.    Ms. Connolly has never worked on this case for you?

11  A.    Oh, yeah, of course.

12          MS. CONNOLLY:  I didn't hear your question.  I'm

13  sorry.

14  BY MS. ROOHANI:

15  Q.    Ms. Connolly has never worked on this case for you?

16  A.    Yeah, she -- she would be the sixth.

17  Q.    Mr. Pacitti never worked on this case for you?

18  A.    He always was -- oh, I mean, I didn't -- I thought

19  you meant the -- yeah, you can add him to the list, I

20  guess.

21  Q.    You testified on direct that four other attorneys

22  also consulted with you on this case; correct?

23  A.    Yeah.

24  Q.    Okay.  That was about the motion to withdraw the

25  plea?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Uh-huh.

2    Q.    And you told them what you wanted to do?

3    A.    Yes.

4    Q.    You offered to pay them?

5    A.    Yes.

6    Q.    They didn't want to work for free?

7    A.    Uh-huh.

8    Q.    And they declined to take the case?

9          MS. CONNOLLY:  Objection.  Misstates his

10   testimony.  And it's irrelevant.

11         THE COURT:  He can answer the question.

12         THE WITNESS:  No, they didn't decline.

13   BY MS. ROOHANI:

14   Q.    They're not representing you here today, are they?

15   A.    No.

16   Q.    Did you decide to not go with them?

17   A.    It was with some of them --

18         MS. CONNOLLY:  Objection.  I think it's getting

19   into attorney-client --

20         THE WITNESS:  I decided --

21         MS. CONNOLLY:  -- information.  Why he did or

22   did not hire a prior -- a specific attorney has nothing to

23   do with --

24         MS. ROOHANI:  Your Honor, Ms. Connolly went into

25   it on direct, and I would ask that Your Honor deem that the

TRANSCRIBED FROM DIGITAL RECORDING

1    privilege is waived.

2              I'm not getting into the substance of the

3    conversations regarding what their advice was, but just if

4    they agreed to represent him or not.  Which I don't --

5              MS. CONNOLLY:  I think that -- it is

6    attorney-client privilege if they agreed to represent him

7    or not.

8              THE COURT:  All right.  Overruled.  I think she

9    can ask the question whether or not they --

10   BY MS. ROOHANI:

11   Q.   Did they decline to take your case?

12   A.   One did.

13   Q.   So three others agreed to take your case?

14   A.   Yes.

15   Q.   But they're not here today?

16   A.   No.

17   Q.   You talked a little bit -- your attorney asked some

18   questions of the other attorneys about how much they got

19   paid.  So I'd like to ask you some questions about that,

20   okay?

21   A.   Yes.

22   Q.   How much did you pay Ben Nadig?

23   A.   Jess Marchese paid him.

24   Q.   Jess paid Ben Nadig?

25   A.   No, Ben Nadig -- Frank helped to pay Ben Nadig.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    Your husband paid Ben Nadig?

 2    A.    Yes.

 3    Q.    Because Mr. Nadig represented your husband?

 4    A.    No.

 5    Q.    How much did he get paid?

 6    A.    Huh?

 7    Q.    How much did he get paid?

 8    A.    $100,000, from what I heard.  I never saw any proof

 9   of that, but --

10    Q.    How much did you pay Mr. Pacitti?  For this case?

11    A.    For this case, I don't know.

12    Q.    You didn't --

13    A.    Frank Alfter dealt with that because I was

14   incarcerated.

15    Q.    Mr. Pacitti didn't actually get paid for this case,

16   did he?

17    A.    I don't know.

18          MS. CONNOLLY:  Objection.  He indicated he

19   didn't know, Mr. Alfter dealt with that.

20   BY MS. ROOHANI:

21    Q.    Mr. Marchese, how much did he get paid?

22          THE COURT:  Maybe you could change the form of

23   the question to how much you believe they got paid.

24          MS. ROOHANI:  Sure.

25
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    BY MS. ROOHANI:
 2      Q.    How much --
 3              THE COURT:  Because he's saying that he didn't
 4    make the payment.  I think that's why it might be
 5    getting --
 6              MS. ROOHANI:  Sure.
 7    BY MS. ROOHANI:
 8      Q.    How much do you --
 9      A.    I believe 85,000.
10      Q.    How much do you believe Mr. Sanft got paid?
11      A.    100,000.
12      Q.    How much do you believe Mr. Durham got paid?
13      A.    Fifty thousand.
14      Q.    How much do you believe Ms. Craig got paid?
15      A.    Twenty-five thousand.
16      Q.    And how much did Ms. Connolly get paid --
17              MS. CONNOLLY:  Objection.
18    BY MS. ROOHANI:
19      Q.    -- to file this motion for you?
20              MS. CONNOLLY:  Objection.  Relevance.
21              What I'm getting paid has got nothing to do with
22    what happened to withdrawing the plea.  It's irrelevant.
23              THE COURT:  Sustained.
24    BY MS. ROOHANI:
25      Q.    You've had multiple conversations with these
```

TRANSCRIBED FROM DIGITAL RECORDING

1    attorneys; is that correct?

2              MS. CONNOLLY:  Objection to them all -- they.

3              MS. ROOHANI:  I didn't --

4              MS. CONNOLLY:  It could be -- the question --

5    it's an improper question if she's referring to all

6    attorneys.  Maybe he had lots of conversations with some

7    and none with others.

8    BY MS. ROOHANI:

9    Q.   Have you had a conversation with all of these

10   attorneys, Mr. Fuechtener?

11   A.   Yes.

12   Q.   Have you had multiple conversations with some of

13   them?

14   A.   Yes.

15   Q.   And in your conversations with these attorneys, did

16   you ever ask for a translator?

17   A.   No.

18   Q.   Did you ever hire a translator yourself?

19   A.   Not for this case.

20   Q.   And you met with some of these attorneys for just a

21   few minutes sometimes; right?

22   A.   Yeah.  Yes.

23   Q.   And you met with them, with some of the attorneys,

24   for a couple hours at times?

25   A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    And you covered lots of different topics with them?

 2    A.    Yes.

 3    Q.    You went over different defenses that you would come

 4  up with; right?

 5    A.    Yes.

 6    Q.    You talked to them about complicated computer

 7  issues?

 8    A.    No.

 9    Q.    You never talked to them about potential hackers?

10    A.    No.

11    Q.    You never talked to them --

12          MS. CONNOLLY:  Objection --

13  BY MS. ROOHANI:

14    Q.    -- about pirated signals?

15          MS. CONNOLLY:  -- to relevance.

16          MS. ROOHANI:  Ms. Connolly made it relevant when

17  she admitted Mr. Nadig's e-mail, Your Honor.

18          THE COURT:  All right.  Overruled.

19  BY MS. ROOHANI:

20    Q.    You never talked to them about computer issues?

21    A.    There was a computer expert.

22    Q.    You never talked to your attorneys ever about any

23  computer --

24    A.    I did.  I talked to them.

25    Q.    You did.  Okay.
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Yeah.

2   Q.    You talked to them about hackers?

3   A.    I don't recall.

4   Q.    You talked to them about pirated signals?

5   A.    I don't remember that that was ever a topic.

6   Q.    Mr. Fuechtener, do you remember when you testified

7   on direct that you read that e-mail from Mr. Nadig?

8   A.    Yes.

9   Q.    And in that e-mail it talked about pirated signals.

10        Do you remember that?

11  A.    Yes.

12  Q.    So your testimony now is you've never talked to

13  anybody about pirated signals?

14  A.    When I read that --

15  Q.    That's not the question --

16  A.    -- I read it the first time --

17  Q.    No, no, no, no, no.  Hold up.

18  A.    -- no, I didn't --

19  Q.    Hold up.

20  A.    -- talk to anybody.

21        MS. CONNOLLY:  Objection to her not letting him

22  finish.

23        MS. ROOHANI:  That's not the question.  You're

24  not answering the question.

25        THE COURT:  He was answering the question.  Let

TRANSCRIBED FROM DIGITAL RECORDING

1    him finish the question.

2            MS. ROOHANI:  Okay.

3            THE WITNESS:  When I read that in that e-mail, I

4    read the first time about pirated signals.  I don't recall

5    having heard that before.

6    BY MS. ROOHANI:

7    Q.    Okay.  Mr. Nadig came out to talk to you.  That's

8    what you testified about on direct.

9    A.    Yes.

10   Q.    He talked to you about the defenses; correct?

11   A.    No.

12   Q.    You didn't testify on direct that he talked to you

13   about potential defenses?

14   A.    He talked about potential but not what they were.

15   Q.    You didn't testify on direct that he talked to you

16   about that e-mail?

17           MS. CONNOLLY:  Objection.  That misstates what

18   he --

19           THE WITNESS:  He talked to me about that e-mail.

20   BY MS. ROOHANI:

21   Q.    Okay.  And in that e-mail it talks about pirated

22   signals --

23   A.    Yes.

24   Q.    -- correct?

25           Okay.  When you talked to Mr. Nadig about the

TRANSCRIBED FROM DIGITAL RECORDING

1    e-mail and about the pirated signals, you were speaking to

2    him in English; correct?

3    A.    Yes.

4    Q.    All right.  And you never asked him for a

5    translator; correct?

6    A.    No.

7    Q.    You never asked any of your attorneys for a

8    translator; correct?

9    A.    Yes.

10   Q.    You did ask them or you did not ask --

11   A.    No, they -- when there was a problem, they explained

12   things.

13   Q.    You didn't ask them for a translation --

14   A.    No.

15   Q.    -- in German?  All right.

16         And you didn't have a translator with you

17   through these proceedings either?

18   A.    No.

19   Q.    Talk about firing your attorneys.

20         You knew that you could fire your attorneys for

21   any reason; right?

22   A.    Yes.

23   Q.    That's why you fired Mike Sanft?  You knew you could

24   fire Mike Sanft?

25   A.    My -- at that time -- I didn't fire him.  I took him

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    off the case and then put him back on; so he technically

 2    was not fired.  But if -- I mean, I didn't see it that way

 3    when I took him off the case.

 4    Q.    Explain to me what taking somebody off a case means

 5    to you.

 6    A.    It means that his name disappears in the initial

 7    court papers.  You -- he's no longer the official -- one of

 8    the official lawyers who can come in here and be here when

 9    we talk about the case.

10    Q.    Okay.  You testified on direct that you fired

11    Mr. Sanft because you felt like he wasn't doing anything;

12    is that right?

13    A.    Yes.

14    Q.    Okay.  And you testified on direct that you thought

15    you would get your money back from him; is that right?

16    A.    Well, if I testified that, then I testified that.

17    Q.    So it's still your testimony that Mr. Sanft was

18    being -- working on your case, even though you were trying

19    to get money back from him?

20              MS. CONNOLLY:  Objection.  Misstates his

21    testimony.

22              THE COURT:  Sustained.

23    BY MS. ROOHANI:

24    Q.    You fired Mr. Sanft, didn't you?

25    A.    How do you mean that?  What --
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    You're the one who took him off the case?

 2    A.    Yes.

 3    Q.    Jess is not the person who took him off the case?

 4    A.    Huh?

 5    Q.    Jess didn't take him off the case; right?

 6    A.    He strongly suggested that.

 7    Q.    No, no, no.  Stop.  Hearsay.

 8          MS. CONNOLLY:  Objection.  She asked the

 9    question.  She needs to let him answer.  She asked him what

10    Jess did or didn't do.  He needs to be allowed to answer

11    that.

12          MS. ROOHANI:  I didn't --

13          THE COURT:  Sustained.

14          MS. CONNOLLY:  Opened the door.

15          THE COURT:  He can answer the question.

16    BY MS. ROOHANI:

17    Q.    Go ahead.

18    A.    Yeah.  There was a meeting in Henderson in a meeting

19    room, and there was Mr. Marchese, Mr. Durham, and myself,

20    and they brought a paper.  And me and Mr. Marchese decided

21    together, at that point, that it would be the best to --

22    for the further proceedings, to replace Mr. Sanft with

23    Mr. Durham.

24    Q.    Did Mr. Sanft represent Mr. Marchese?

25    A.    Did Mr. Sanft represent Mr. Marchese?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Correct.

2    A.    No.

3    Q.    Mr. Sanft represented you?

4    A.    Yes.

5    Q.    You're the person who decided to take Mike off the

6    case?

7            MS. CONNOLLY:  Objection.  He already answered

8    that him and Mr. Marchese decided it was best to substitute

9    Mr. Durham.

10           MS. ROOHANI:  That wasn't the question, Your

11   Honor.

12           MS. CONNOLLY:  He just testified to that.  She's

13   misstating his testimony.

14           THE COURT:  Sustained.  I think we --

15   BY MS. ROOHANI:

16   Q.    I believe you testified on direct that you were the

17   person calling the shots; correct?

18           MS. CONNOLLY:  Objection.  Misstates his

19   testimony.

20           THE WITNESS:  Calling the shots?  I don't recall

21   that.

22   BY MS. ROOHANI:

23   Q.    Making the decisions about the case?

24   A.    With my lawyers.

25   Q.    You testified on direct that it was your decision to

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   bring Amber Craig --
 2            MS. CONNOLLY:  Objection.
 3   BY MS. ROOHANI:
 4    Q.    -- on to the case?
 5            MS. CONNOLLY:  Asked and answered.
 6            MS. ROOHANI:  I'm not -- Your Honor --
 7            THE COURT:  Overruled.  She can ask her
 8   question.
 9            MS. ROOHANI:  -- if Ms. Connolly could let me
10   finish my question.
11            THE COURT:  Go ahead and ask your question.
12   BY MS. ROOHANI:
13    Q.    You testified on direct that it was your decision to
14   bring Amber Craig on the case; correct?
15    A.    Yes.
16    Q.    You wanted a female attorney?
17    A.    Yes.
18    Q.    That was your idea?
19    A.    No.
20    Q.    You testified on direct that that was --
21    A.    It was our idea.  I mean --
22    Q.    You talked to Jess about it?
23    A.    Yes.  He found her.  I mean --
24    Q.    You wanted the female attorney; correct?
25    A.    Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    You made the decision to bring on Ms. Craig?

2            MS. CONNOLLY:  Objection.  Asked and answered

3    three times.

4            THE COURT:  Overruled.  He can answer the

5    question.

6            THE WITNESS:  Yeah, I made the final decision,

7    yes.

8    BY MS. ROOHANI:

9    Q.    The same way that you made the decision to take

10   Mr. Sanft off the case?

11           MS. CONNOLLY:  Objection.  Asked and answered.

12   He and Marchese.

13           THE WITNESS:  Yeah, we together -- I trusted --

14   at that point, I trusted -- I mean, I sometimes did what my

15   lawyer said because I trusted him.

16           And then I, of course, took the decision.  But

17   that's -- that's how it is in these proceedings.

18   BY MS. ROOHANI:

19   Q.    Okay.  After the complaint was filed in this case,

20   Jan, you met with pretrial services.

21           Do you remember that?

22   A.    Yes.

23   Q.    You interviewed with them?

24   A.    Yes.

25   Q.    And that was on March 15th, 2016?  Correct?  That

TRANSCRIBED FROM DIGITAL RECORDING

1   was the date you were arrested?

2   A.   Yes -- if -- yes.

3   Q.   Okay.  You didn't ask them for a German translator,

4   did you?

5   A.   No.

6   Q.   And you made your initial appearance in front of

7   Judge Leen.

8        Do you remember that?

9   A.   Yes.

10  Q.   And Judge Leen asked you if you needed an

11  interpreter?

12  A.   I don't remember that.

13  Q.   And you said "No"?

14  A.   But you probably do.  So if she said that --

15  Q.   She asked you if you needed --

16  A.   -- and I said "No," then --

17  Q.   -- and you said "No."

18  A.   -- that's true.

19  Q.   Okay.  She asked you if you had read the charges in

20  the complaint?

21  A.   Yes.

22  Q.   And you said "Yes"?

23  A.   Yes.

24  Q.   She asked you if you knew what you were charged with

25  in the complaint?

TRANSCRIBED FROM DIGITAL RECORDING

 1    A.    Yes.

 2    Q.    And you said "Yes"?

 3    A.    Yes.

 4    Q.    Didn't ask for a translator; correct?

 5    A.    No.

 6    Q.    Then you had an arraignment and plea in front of

 7    Judge Hoffman?

 8    A.    Yes.

 9    Q.    Do you remember that?

10    A.    Yes.

11    Q.    That was on April 6, 2016?

12    A.    Yes.

13    Q.    And Judge Hoffman asked you if you needed an

14    interpreter?

15    A.    Yes.

16    Q.    And you said "No"?

17    A.    No.  Yes.

18    Q.    You said "No"?

19    A.    Yes.

20    Q.    All right.  And he asked you if you read the charges

21    in the indictment?

22    A.    Yes.

23    Q.    And you said "Yes"?

24    A.    Yes.

25    Q.    He asked you if you understood what you were charged

TRANSCRIBED FROM DIGITAL RECORDING

1    with in the indictment?

2    A.    Yes.

3    Q.    And you said "Yes"?

4    A.    Yes.

5    Q.    And you would agree with me that those -- the

6    complaint and the indictment are legal documents?

7    A.    Yes.

8    Q.    You had a waiver of jury trial in front of Judge

9    Navarro.

10              Do you remember that?

11   A.    Yes.

12   Q.    That was on -- first on October 6.  Let's talk about

13   that date first, okay?

14   A.    Yes.

15   Q.    Judge Navarro asked you if you needed an

16   interpreter?

17   A.    Yes.

18   Q.    And you said "No"?

19   A.    Yes.

20   Q.    And then Judge Navarro asked you some questions

21   about your mental health.

22              Do you remember that?

23   A.    Yes.

24   Q.    And she asked you some questions about your

25   education?

1    A.    Yes.

2    Q.    And at some point you had some questions?

3    A.    Yes.

4    Q.    And Judge Navarro gave you more time to think about
5    it?

6    A.    Yes.

7    Q.    And you told her, "I don't need more time."

8          Do you remember that?

9    A.    Yes.

10   Q.    But she insisted?

11   A.    Yes.

12   Q.    And during that time, you didn't ask for a German
13   interpreter?

14   A.    No.

15   Q.    Then you came back on October 11th.

16         Do you remember that?

17   A.    Yes.

18   Q.    Again, Judge Navarro asked you if you needed an
19   interpreter?

20   A.    Yes.

21   Q.    You said "No"?

22   A.    Yes.

23   Q.    And that time you waived your right to a jury trial?

24   A.    Yes.

25   Q.    You did not ask for a German interpreter then

TRANSCRIBED FROM DIGITAL RECORDING

1   either?

2   A.    No.

3   Q.    And you sat through trial.  You sat through the

4   trial?

5   A.    Yes.

6   Q.    Okay.  Fair to say you didn't have an interpreter

7   there either?

8   A.    No.

9   Q.    And you had paid your --

10  A.    Yes.  No interpreter.

11  Q.    No interpreter.  Okay.

12        And that's because you didn't want one?

13  A.    I thought I didn't need one.

14  Q.    You didn't need an interpreter?

15  A.    I thought at that point I didn't need one.

16  Q.    All right.  You actively participated in your trial?

17  A.    Yes.

18  Q.    You were talking to your attorneys?

19  A.    Yes.

20  Q.    In English?

21  A.    Yes.

22  Q.    About legal concepts?

23  A.    Yes.

24  Q.    And you never asked for an interpreter?

25  A.    No.

1   Q.   And at this hearing you've been involved; fair to

2   say?

3   A.   Yes.

4   Q.   You've been chatting with Ms. Connolly at the table?

5   A.   Yes.

6   Q.   About legal concepts?

7   A.   Yes.

8   Q.   And you've been able to communicate with her without

9   a translator?

10  A.   Yes.

11  Q.   Didn't ask for an interpreter?

12  A.   No.

13  Q.   Talked about the plea agreement?

14       Mr. Durham read it to you; correct?

15  A.   No.

16  Q.   Mr. Durham -- I just want to be clear.  It's your

17  testimony Mr. Durham did not read your plea agreement to

18  you; correct?

19  A.   He did not read it to me.

20  Q.   Okay.  You testified under oath on direct that

21  Mr. Durham, quote, explained the whole plea agreement to

22  you line by line; correct?

23  A.   He didn't explain it line by line.

24  Q.   So you didn't testify on direct that he explained

25  it to you line by --

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    I didn't know the right words.

2             Ms. Connolly said "paraphrased," and that was a

3    good word.

4    Q.    Okay.  He paraphrased it to you line by line.  I

5    believe that was your testimony on direct.

6    A.    I could explain you what he exactly did.

7    Q.    Just answer my question, okay.

8             You would agree with me that there's some pages

9    in your plea agreement that talk about sentencing

10   guidelines; right?

11   A.    Yes.

12   Q.    That's pages 7 and 8?

13   A.    Yes.

14   Q.    And you would agree with me that your plea agreement

15   includes a page about what we were going to ask Judge

16   Navarro to do in terms of your sentence; correct?

17   A.    Ask that again.

18   Q.    Is there also a page in the plea agreement that

19   talks about what the parties are going to request in terms

20   of your sentence?

21             Do you remember that?

22   A.    No.

23   Q.    Would it help for you to look at the plea agreement?

24   A.    Yes.

25   Q.    Okay.  Go ahead and look at that plea agreement on

TRANSCRIBED FROM DIGITAL RECORDING

1    page 10.  I believe it says "Positions Regarding Sentence."

2    A.    Which exhibit is this?

3          Okay.  I got it.

4    Q.    All right.  Let's go to page 10, please.

5    A.    Okay.

6    Q.    Does that help you remember?

7    A.    Yes.

8    Q.    All right.  There's a page in the plea agreement

9    that talks about positions regarding sentence?

10   A.    Yes.

11   Q.    And it says in there that the parties agree that

12   Count 1 is going to run consecutive to 2 and 3, which will

13   run concurrent to each other; correct?

14   A.    Yes.

15   Q.    And Mr. Durham explained to you the difference

16   between consecutive and concurrent?

17   A.    I don't recall that.

18   Q.    When he paraphrased the entire plea agreement to you

19   line by line, he explained to you the difference between --

20          MS. CONNOLLY:  Objection.

21   BY MS. ROOHANI:

22   Q.    -- consecutive and concurrent?

23          MS. CONNOLLY:  Misstates the testimony.  He

24   didn't say he paraphrased it line by line.  And

25   paraphrasing doesn't mean line by line.

TRANSCRIBED FROM DIGITAL RECORDING

1            MS. ROOHANI:  He agreed with me that that was

2   his --

3            MS. CONNOLLY:  Compound.

4            MS. ROOHANI:  -- testimony on direct, Your

5   Honor.

6            THE COURT:  That's not my recollection.

7   BY MS. ROOHANI:

8   Q.   Do you remember Ms. Connolly asked you some

9   questions about the plea colloquy?

10  A.   Yes.

11  Q.   Judge Navarro asked you if you understood the plea

12  agreement.

13            Do you remember that?

14  A.   Yes.

15  Q.   And you said "Yes"?

16  A.   Yes.

17  Q.   And that's because Mr. Durham explained the plea

18  agreement to you; correct?

19  A.   No.

20  Q.   Mr. Durham took the time to go through each section

21  with you; correct?

22  A.   Yes.

23  Q.   That includes the section on positions regarding

24  sentence?

25  A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    That includes the section on the sentencing

2    guidelines?

3    A.    Yes.

4    Q.    So he went through it with you?

5    A.    Yes.

6    Q.    And that's why when Judge Navarro asked you if you

7    had enough time to talk to your attorneys about the plea

8    agreement, you said "Yes"?

9    A.    Yes.

10   Q.    And then Mr. Durham explained to you the facts;

11   correct?

12   A.    When?

13   Q.    When he was going over the plea agreement with you.

14   A.    Some of the facts, yeah.

15   Q.    Your testimony he only went over some of the facts

16   with you?

17   A.    Yes.

18   Q.    He didn't go over all of them with you?

19   A.    I mean, it's 17 pages, and we went over it in a

20   pretty short time.  He went through every -- he said

21   something to every point, let's put it like that.

22   Q.    Because he went over every section with you?

23   A.    Yes.

24   Q.    And he went over the facts with you?

25   A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   And he explained the facts to you?

2   A.   Some facts he explained.

3   Q.   Okay.  You asked him to take out some of the facts;

4   correct?

5   A.   Yes.

6   Q.   All right.  And then came and asked me and

7   Ms. Cartier-Giroux if we'd take out those facts?

8   A.   I think it was Mr. Marchese and Mr. Sanft first who

9   were down, but I might remember wrong.

10  Q.   And then told you that the government said no.

11  A.   Yes.

12  Q.   And he explained to you why the government wouldn't

13  take it out?

14  A.   No.

15  Q.   He did not explain to you that it related according

16  to the specific offense characteristics?

17          MS. CONNOLLY:  Objection.  Asked and answered.

18          THE WITNESS:  No, he did not.  He said -- or he

19  told me that he doesn't know -- he said the chats are not

20  criminal.  He said, "The Grindr chats are not criminal, I

21  don't know why the government put that in.  Don't worry

22  about that."

23          I wanted to have them out because they were my

24  chats.

25

TRANSCRIBED FROM DIGITAL RECORDING

 1    BY MS. ROOHANI:

 2    Q.    Mr. Fuechtener, you were sitting in this courtroom

 3    when Mr. Durham testified; correct?

 4    A.    Yes.

 5    Q.    And you heard him testify that he told you about

 6    this; correct?

 7    A.    Yes.

 8    Q.    And it's still your testimony that he never talked

 9    to you about specific offense characteristics; correct?

10              MS. CONNOLLY:  Objection.  It misstates his --

11              THE WITNESS:  I didn't know --

12              MS. CONNOLLY:  -- testimony.

13              THE WITNESS:  -- that this was an offense -- is

14    deemed as on offense characteristic.  For me that was like

15    one of the facts which I didn't agree with.

16    BY MS. ROOHANI:

17    Q.    It's your testimony that Mr. Durham went over the

18    positions regarding sentence with you; correct?

19    A.    Yes.

20    Q.    It's your testimony that he went over the section

21    that talks about guidelines; correct?

22    A.    Yes.

23    Q.    And in that section it says "Specific Offense

24    Characteristics"; correct?

25    A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1   Q.   It's still your testimony that he never talked to

2   you about that?

3   A.   He --

4   Q.   Yes or no?

5   A.   What you understand what is talking about?  What

6   does that mean?

7   Q.   I believe your testimony was that he explained each

8   section to you; correct?

9          MS. CONNOLLY: Objection.  She's misstating.  He

10  said a number of times that he's paraphrased it, and she's

11  taken what he says and saying that he says something else,

12  continually misstating what he testified to.

13         THE COURT:  Sustained.

14  BY MS. ROOHANI:

15  Q.   He paraphrased that section to you; correct?

16  A.   What does paraphrase mean exactly?

17  Q.   That was your language, Mr. Fuechtener --

18  A.   No, it was --

19  Q.   -- so why don't you tell me?

20  A.   My lawyer said that.

21  Q.   Okay.  You answered her question "Yes."

22         So you tell me what you think paraphrase means.

23  A.   Okay.  Shall I --

24  Q.   No.  What does paraphrase mean to you?

25  A.   Going over points and making -- giving a -- like

TRANSCRIBED FROM DIGITAL RECORDING

1    a -- see, now I'm looking for a word.  I'm looking for the

2    German word like -- like when you see a movie and you

3    explain to your husband after the movie -- what an awful

4    movie, you explain like in five minutes, and you say what

5    happened in the movie and go -- like you give a compact

6    overview over a paragraph with your own words.

7    Q.    Do you --

8    A.    Not with the words in here.  He uses his own words

9    and says this means this, this means that, that what I

10   understand.  I'm not paraphrasing.  And that's what I think

11   he did.

12   Q.    So he used the word "explain" twice when you told me

13   he paraphrased.

14            So from now on when I say the word "explain," I

15   mean paraphrase.  Okay?

16            MS. CONNOLLY:  Objection.

17            THE WITNESS:  No, that's not explaining.

18   It's --

19   BY MS. ROOHANI:

20   Q.    That was your words, Mr. Fuechtener.

21   A.    Yeah, then I used the --

22            MS. CONNOLLY:  Objection.  She's misstating --

23            THE WITNESS:  -- wrong words.

24            MS. CONNOLLY:  -- what he said again.  He just

25   said --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              THE COURT:  Sustained.  You're being
 2   argumentative.
 3   BY MS. ROOHANI:
 4    Q.    Mr. Durham showed you --
 5              THE COURT:  He's using the word explaining, but
 6   he's describing summarizing, which is exactly what
 7   Mr. Durham said that he said -- he did, summarized each
 8   section.
 9              MS. ROOHANI:  Okay.
10              So would you like for me to use the word
11   summarize?  I'm not trying to be argumentative, Your Honor.
12   Just tell me what word to do, I guess, when I'm talking
13   about this.  Explain?  That's what my brain goes to.  But
14   if you want me to use paraphrase, I'm happy to use
15   paraphrase.  If you want me to use summarize, I'm happy to
16   use that too.
17              THE COURT:  Ms. Connolly?
18              MS. CONNOLLY:  I would ask summarize.  I
19   believe --
20              MS. ROOHANI:  All right.
21              MS. CONNOLLY:  -- Mr. Durham said he summarized.
22              MS. ROOHANI:  Okay.  Fair enough.
23   BY MS. ROOHANI:
24    Q.    Mr. Durham summarized the section on the sentencing
25   guidelines to you; correct?
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    A.    As he thought it is correct, as he understood it,
2    yeah.
3    Q.    He summarized that for you; correct?
4    A.    Yeah.
5    Q.    Okay.  And in that section it says "Specific Offense
6    Characteristics"; correct?
7    A.    Yes.
8    Q.    So he summarized specific offense characteristics
9    for you as well; correct?
10   A.    Yes.
11   Q.    All right.  So he summarized that section for you?
12   A.    Yes.
13   Q.    That section includes things that says "Prepubescent
14   Minor" --
15   A.    Yes.
16   Q.    -- correct?
17         He summarized that for you?
18   A.    Let's see.  Which page was that?
19   Q.    7 and 8.
20   A.    Oh, yeah, I got it.  Page 7.  Yes.
21   Q.    And he summarized knowing distribution for you?
22   A.    That he just -- these things he just read to me.
23   Q.    So he read it to you?
24   A.    Uh-huh.
25   Q.    Okay.  So you knew it was in the plea agreement?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    And you knew it was directly under a section called

3    Specific Offense Characteristics?

4    A.    I didn't -- I mean, he was behind the mesh.  I had

5    no documents.  Yeah, he went over it.  I mean, he read it,

6    yeah, okay.

7    Q.    He showed you the sentencing table, Mr. Fuechtener,

8    didn't he?

9    A.    No, he didn't.

10   Q.    He showed you that a level 40 corresponded to 292

11   to --

12   A.    No, he didn't.

13   Q.    -- 365 months?

14         And that's why when Judge Navarro asked you if

15   your attorneys answered all your questions about the plea

16   agreement, you said "Yes"?

17   A.    That was not why I said "Yes."

18   Q.    You told Judge Navarro that your attorneys answered

19   all your questions for you; correct?

20   A.    Yes.

21   Q.    You did that under oath?

22   A.    Yes.

23   Q.    You know what under oath means?

24   A.    Yes.

25   Q.    And Judge Navarro asked you if you had sufficient

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    time to talk to your attorneys about the guidelines.
 2              Do you remember that?
 3    A.    Yes.
 4    Q.    And she asked you if they talked to you about how
 5    they might apply to the facts in your particular case?
 6    A.    Yes.
 7    Q.    Do you remember that?
 8              And you said "Yes"?
 9    A.    Well, I think it's not a yes-or-no answer.
10    Q.    Did you --
11    A.    I mean, I said "Yes," yeah.  I did.
12    Q.    You said "Yes"?
13    A.    Yeah.  It's on the record.
14    Q.    And you did that under oath?
15    A.    Yes.
16    Q.    And Judge Navarro asked you if your attorneys
17    answered all of your questions about the guidelines;
18    correct?
19    A.    Yes.
20    Q.    And you said "Yes"?
21    A.    Yes.
22    Q.    You didn't tell her, that's not a yes-or-no
23    question; correct?
24    A.    No.
25    Q.    You said "Yes," unequivocally?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    You testified on direct that you saw that number 40

3    in the plea agreement.

4            Do you remember that?

5    A.    When I was back in Henderson.

6    Q.    You never --

7    A.    But I testified --

8    Q.    -- saw the number 40 in the courtroom?

9    A.    Well, I -- yeah, I saw it.

10   Q.    And you saw that in a section called Guidelines?

11   A.    I don't recall that.

12   Q.    Tell me what the heading of that section is,

13   Mr. Fuechtener.

14   A.    Application of Sentencing Guideline Provisions.

15   Q.    Okay.  And you heard Judge Navarro ask me to

16   summarize the terms of the plea during that colloquy.

17           Do you remember that?

18   A.    Yes.

19   Q.    And you heard me talk about the guidelines when I

20   summarized it; correct?

21   A.    Yes.

22   Q.    And that's why when Judge Navarro asked you if you

23   understood everything I said, you said "Yes"?

24   A.    Yes.

25   Q.    And then you heard Judge Navarro ask you if you had

TRANSCRIBED FROM DIGITAL RECORDING

1    enough time to talk to your attorneys about the guidelines?

2    A.    Yes.

3    Q.    And whether they explained to you how they apply to

4    the facts of your case?

5    A.    Yes.

6    Q.    And you said "Yes"?

7    A.    Yes, I did.

8    Q.    And you heard Judge Navarro ask you if your

9    attorneys had answered all your questions about the plea

10   agreement?

11   A.    Yes.

12   Q.    And you heard Judge Navarro ask you if your

13   attorneys answered all your questions about the guidelines;

14   correct?

15   A.    Yes.

16   Q.    Okay.  And you never said to her, Wait, what are you

17   talking about, what are the guidelines; correct?

18   A.    No.

19   Q.    At the beginning of that hearing, Judge Navarro

20   said, "If you have any questions you can ask me."

21          Do you remember that?

22   A.    Yes.

23   Q.    You didn't ask her any questions; correct?

24   A.    I told you earlier that the word "guidelines" for me

25   meant something different than it actually does.

1           So that's why I never asked that question in the

2      first place, because I didn't know what I didn't know what

3      I have to ask.

4      Q.    Okay.  I believe you said that you thought the

5      guidelines meant the statutory minimum and the statutory

6      maximum; is that right?  That's what you told --

7      A.    Yeah, like in every contest, like a minimum and a

8      maximum, that is a range, and I thought they talked about

9      that range.

10     Q.    Mr. Fuechtener, go ahead and look at page 9 of that

11     plea agreement.

12     A.    Okay.

13     Q.    There's a heading under number -- the Roman numeral

14     seven.  Can you read that for me?

15     A.    Additional Sentencing Information?

16     Q.    No, on page 9 --

17     A.    Yeah.

18     Q.    -- there's --

19     A.    Application of Sentencing Statutes?

20     Q.    Uh-huh.

21     A.    Yeah.

22     Q.    What does the header of "A" say?

23     A.    "Maximum Penalty."

24     Q.    And does that talk about the statutory maximum?

25     A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    And B?

2    A.    Yes.

3    Q.    That talks about the mandatory minimum?

4    A.    Yes.

5    Q.    There's a whole separate section that deals with --

6    A.    Yeah.

7    Q.    Okay.  But it's your testimony that you thought that

8    the guidelines were talking about that?

9    A.    Yes.

10   Q.    All right.  Let's talk about Mr. Humphries.  You had

11   indicated in your motion that a fellow inmate had told you

12   about the guidelines.

13         Do you remember?

14   A.    Yes.

15   Q.    Did you read the motion that Ms. Connolly filed --

16   A.    Yes.

17   Q.    -- for you?

18         And in that motion it said that he talked to you

19   about the guidelines that evening that you changed your

20   plea; correct?

21   A.    Yes.

22   Q.    And I believe you testified on direct that that was

23   Mr. Humphries; right?

24   A.    Yes.

25   Q.    And it was your testimony that when you were housed

TRANSCRIBED FROM DIGITAL RECORDING

1    at Henderson, you were next door to Mr. Humphries in terms

2    of --

3    A.    Yes.

4    Q.    You guys were friends?

5    A.    Say it again?

6    Q.    Were you friends?

7    A.    Well, that is a hard word to use in a jail

8    surrounding.  But I am -- he's about the age of my husband.

9    I found some trust in him.  And he seemed like a smart man.

10         And I latched a little -- like you -- is that

11   the right word --

12   Q.    Sure.

13   A.    -- like -- yeah.

14   Q.    Okay.  He was nice to you?

15         MS. CONNOLLY:  Object.

16         THE WITNESS:  Well, he's not always nice, but he

17   was, like -- yeah, I -- we -- we talked to each other.

18   BY MS. ROOHANI:

19   Q.    Okay.  You talked to each other?

20   A.    Yeah.

21   Q.    You weren't enemies?

22   A.    He gave me advice.

23   Q.    Okay.  Perfect.  He gave you advice?

24         Is Mr. Humphries a lawyer?

25   A.    No.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Has he ever gone to law school?

2    A.    No.

3    Q.    Has he ever studied the sentencing guidelines?

4    A.    No.

5    Q.    Any formal education regarding law --

6    A.    I don't know.  I don't think so.

7    Q.    Okay.  You don't think that he --

8    A.    No.

9    Q.    And you talked to each other about your cases;

10   right?

11   A.    Yes.

12   Q.    Talked to each other about what you were each

13   accused of?

14   A.    Say that again.

15   Q.    You talked to each other about what you were accused

16   of?

17   A.    Yes.

18   Q.    You talked to each other about what you did and did

19   not do?

20   A.    Yes.

21   Q.    And in the motion it says that that night

22   Mr. Humphries is the person who explained the guidelines to

23   you; correct?

24   A.    Yes.

25   Q.    And it's your testimony that he explained the

TRANSCRIBED FROM DIGITAL RECORDING

1   specific offense characteristics to you; correct?

2   A.    Yes.

3   Q.    He -- I'm trying to be clear.  Is it your testimony

4   that he explained to you the enhancement for prepubescent

5   minor?

6   A.    He didn't mention it like that.  I mean, I can tell

7   you exactly what, to make it clear.

8   Q.    Well, let me ask you a question.

9         You just told me that Mr. Durham read that to

10  you; correct?

11  A.    Yes.

12  Q.    But it's your testimony that Mr. Humphries explained

13  it to you?

14  A.    It's -- I mean, yeah.  Yes.

15  Q.    Okay.  He explained what the enhancements were?

16  A.    We talked about points and accumulation of points

17  and a translation to a -- to a sentencing to a

18  recommended -- I mean, to a guideline range which the judge

19  uses as a starting point.  And that concept was totally new

20  for me.

21        Mr. Durham didn't talk about that with me.

22  Q.    Okay.

23  A.    He went over and read this -- he read those -- those

24  enhancements, which I didn't know that it -- how that whole

25  concept of enhancement works.  At that time he read that,

TRANSCRIBED FROM DIGITAL RECORDING

1    and there were points behind it which could be -- which I

2    didn't know what they relate to.

3    Q.    And Mr. --

4    A.    And then it was -- and then he went to the next

5    point.

6    Q.    Mr. Humphries is the person who explained that to

7    you.  That's your testimony; right?

8    A.    He explained to me how that all adds up in a, like,

9    standard case.  And from what he knew and -- that came --

10   added up to 32 or 33.

11          And then for the first time I heard that that

12   translates to years.  I never heard that before, that

13   that's -- that that has something to do with it.

14   Q.    But it was your testimony on direct that you thought

15   that the guidelines talked about the statutory minimum of

16   five years and the --

17   A.    Yeah, I wouldn't --

18   Q.    -- statutory maximum.

19   A.    Yeah, back then I wouldn't call it statutory.

20   Q.    Okay.

21   A.    I knew that it was a range, yeah.

22   Q.    Of years?

23   A.    Yes.

24   Q.    Okay.  And it's your testimony that Mr. Humphries

25   explained that pattern of behavior enhancement to you?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Mr. Humphries?

2    Q.    That was your testimony.

3    A.    No, he didn't explain that --

4            MS. CONNOLLY:  Misstates his testimony.

5            THE WITNESS:  -- to me.

6    BY MS. ROOHANI:

7    Q.    So he explained the guideline --

8            MS. CONNOLLY:  He was not allowed to say what

9    Mr. Humphries said to him.

10            THE COURT:  That's true.

11    BY MS. ROOHANI:

12    Q.    And so I'm asking you, did Mr. Humphries explain the

13    pattern of behavior enhancement --

14    A.    No.

15    Q.    -- to you?  Okay.

16            But it's your testimony that he explained to you

17    what a level 40 meant?

18    A.    No.  We just -- we didn't have a sentencing table at

19    hand.

20    Q.    Okay.  So in your motion when you say that he's the

21    one who told you what your sentencing exposure was, did

22    Mr. Humphries have the guideline table memorized?

23            MS. CONNOLLY:  Your Honor, I'm going to object

24    to the reference of -- he never signed the motion.  So

25    she's trying to use the motion to --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. ROOHANI:  Okay.

 2              MS. CONNOLLY:  He never signed the motion.  He

 3   signed an affidavit.

 4              MS. ROOHANI:  I'd love to address that, Your

 5   Honor.

 6              THE COURT:  Okay.  Go ahead and address that

 7   instead.

 8   BY MS. ROOHANI:

 9   Q.    Mr. Fuechtener, you signed an affidavit in this

10   case; correct?

11   A.    Yes.

12   Q.    All right.  Who wrote that affidavit?

13   A.    Ms. Connolly.

14   Q.    Did you read it before you signed it?

15   A.    Yes.

16   Q.    You understood that when you were swearing and

17   deposing and saying --

18   A.    Yes.

19   Q.    -- that you were doing it under the penalty of

20   perjury?

21   A.    Yes.

22   Q.    Have you looked at that recently?

23   A.    Yes.

24   Q.    Okay.  And in that you swear under the penalty of

25   perjury that you read the motion to withdraw; correct?
```

TRANSCRIBED FROM DIGITAL RECORDING

1   A.    Yes.

2   Q.    And you said, you swore under the penalty of

3   perjury, that all of the factual assertions set forth

4   therein are accurate; correct?

5   A.    Yes.

6   Q.    So you were effectively swearing to all the factual

7   assertions --

8   A.    Yes.

9   Q.    -- in the motion; correct?

10  A.    Yes.

11  Q.    All right.  Now let's talk about the motion.

12        In that motion you swore under the penalty of

13  perjury, through that affidavit --

14        MS. CONNOLLY:  Objection.  He didn't say

15  anything in the motion under penalty of perjury.

16        THE COURT:  It's an affidavit.

17  BY MS. ROOHANI:

18  Q.    In the affidavit you were talking about the motion

19  that I'm referring to; correct?

20  A.    Yes.

21  Q.    All right.  In that affidavit you swore that

22  everything in the motion was true?

23  A.    Yes.

24  Q.    You read that motion?

25  A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Read it recently?

2    A.    Not recently.

3    Q.    You read it before you signed the affidavit, though?

4    A.    Yeah.  Yeah.

5    Q.    Were you incorporating the motion into the

6    affidavit?

7    A.    The affidavit, if I remember right, came -- came way

8    later.  It came after your response and after the whole

9    lawyer thing.  So yeah.  It was later.  And I haven't read

10   it before I signed the affidavit.

11   Q.    You didn't read the motion before you signed the

12   affidavit?

13   A.    Not -- I mean, probably a month before.  But not

14   before I signed it again.

15   Q.    Ms. Connolly represents you; right?

16   A.    Yes.

17   Q.    She's your agent?

18   A.    Yes.

19   Q.    She can make statements on your behalf to the Court?

20   A.    Yes.

21   Q.    And so when you swear that her statements are true

22   in that motion, they become your statements; right?

23   A.    Yes.

24   Q.    All right.  So you said in that motion that

25   Mr. Humphries is the one who told --

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              MS. CONNOLLY:  Objection.  He didn't say
 2     anything in that motion.
 3              Why don't you just say -- continually
 4     misrepresenting what he said or didn't say or -- or didn't
 5     say.
 6              He didn't sign the motion.  So why does she keep
 7     saying he signed the motion?  Or he said something in the
 8     motion?
 9              THE COURT:  He signed an affidavit swearing that
10     all the information in the motion was true and correct.
11              MS. ROOHANI:  May he answer the question, Your
12     Honor?
13              THE COURT:  You may answer the question.
14              MS. ROOHANI:  Thank you.
15     BY MS. ROOHANI:
16     Q.   You wrote in that affidavit or swore in the
17     affidavit that everything in the motion --
18     A.   Yes.
19     Q.   -- was true?  Okay.
20              And in that motion it says that Mr. Humphries is
21     the person who told you that night --
22     A.   Uh-huh.
23     Q.   -- that the level 40 corresponds to 292 to 365
24     months; correct?
25     A.   Yes.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    That's not true; correct?

2    A.    Well, he -- I mean, I said that earlier.  He -- we

3    talked about what a 33 is and so we knew it's not -- I

4    mean --

5    Q.    He didn't --

6    A.    -- it's over 20 years, and it is over 20 years.  So

7    he told me the right thing.  I mean --

8    Q.    Did he tell you that the number 40 corresponded to

9    292 to 300 --

10   A.    Not exactly.  But --

11   Q.    If he didn't exactly say that, then it's not true

12   that Mr. Humphries is the person who told you that night

13   what your real sentencing exposure was; correct?

14   A.    That's a legal question.  I -- I mean --

15   Q.    Did he tell you that the 40 corresponded to 292 to

16   365 months?

17   A.    No.

18   Q.    Okay.  You testified that you called Jess the first

19   thing the next morning and --

20   A.    Yes.

21   Q.    -- to get out of the plea?

22          Now, during your time at Henderson, and later

23   when you were together at Pahrump, Mr. Humphries made some

24   admissions to you; correct?

25   A.    What do you mean by "admissions"?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    Q.    He told you some things about his case?
 2    A.    Is admission like he -- I mean --
 3    Q.    That he was guilty?
 4          MS. CONNOLLY:  Objection.  It would call for
 5    hearsay.
 6          THE WITNESS:  See, now I would need to look up
 7    the word "admission."
 8          MS. CONNOLLY:  Excuse me, I have an objection to
 9    anything --
10          THE COURT:  Sustained.
11          MS. CONNOLLY:  -- the content of anything --
12    BY MS. ROOHANI:
13    Q.    You told Mr. Marchese -- this is not offered, Your
14    Honor, for the truth -- that Mr. Humphries made admissions
15    to you?
16    A.    I didn't say --
17          MS. CONNOLLY:  Assumes facts not in evidence.
18          THE WITNESS:  We talked about his case.
19    BY MS. ROOHANI:
20    Q.    You talked about his case?
21    A.    We talked about his case.
22    Q.    The facts of his case?
23    A.    We talked about his case.
24    Q.    You told Mr. Marchese that you talked about
25    Mr. Humphries's case?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2              MS. CONNOLLY:  Objection.  Anything he said to

3    Mr. Marchese is attorney-client privilege.

4              THE COURT:  No, he's already waived that.

5              MS. CONNOLLY:  I guess we have the parroting

6    here.

7              THE COURT:  He's already waived it.

8              MS. ROOHANI:  I'm sorry, Your Honor?

9              THE COURT:  Go on.  He's -- Mr. Fuechtener has

10   waived his attorney-client privilege --

11             MS. ROOHANI:  Thank you.

12             THE COURT:  -- with Mr. Marchese.

13   BY MS. ROOHANI:

14   Q.    And you asked Mr. Marchese how you could use that

15   information to your advantage?

16   A.    Say it again?

17   Q.    You asked --

18   A.    No, I didn't ask him that.

19   Q.    You never told Mr. Marchese to tell the government

20   about the things about Mr. Humphries?

21   A.    Mr. Marchese was leading that conversation.  I never

22   asked him anything about something like that.

23   Q.    You had a conversation with Mr. Marchese about that?

24   A.    That was the next day when Mr. -- he was there with

25   Mr. Pacitti, and it was mainly about the plea.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Did you have a conversation with Mr. Marchese about

2    Mr. Humphries's case?

3    A.    Yes.

4    Q.    And about certain things that Mr. Humphries told

5    you?

6    A.    It's over a year.  I don't remember what exactly we

7    talked.

8    Q.    Did you talk about how good looking Mr. Humphries

9    was?

10   A.    No.

11   Q.    Did you talk about Mr. Humphries's case?

12          MS. CONNOLLY:  I'm sorry.  I didn't hear that.

13          THE WITNESS:  Well, we talked also about other

14   things, about not how good looking he is, but about private

15   things, we talk about things --

16          MS. CONNOLLY:  Objection.

17          THE WITNESS:  I mean --

18          MS. CONNOLLY:  -- into what discussions --

19          MS. ROOHANI:  State of mind, Your Honor.

20          MS. CONNOLLY:  Anything that Mr. Humphries said

21   would be hearsay.

22          MS. ROOHANI:  Not for its truth, Your Honor.

23          THE COURT:  The question was not what

24   Mr. Humphries said, the question was whether this defendant

25   spoke to Mr. Marchese about what information he had

TRANSCRIBED FROM DIGITAL RECORDING

1    received about Mr. Humphries and Mr. Humphries' case from

2    Mr. Humphries.

3    BY MS. ROOHANI:

4        Q.    You talked to Jess about that?

5        A.    We talked about this case.

6        Q.    Okay.  Now, you have heard -- just a moment.

7              When you talked to Mr. Marchese about

8    Mr. Humphries, part of that conversation was about how you

9    could use that information to help you in your case;

10   correct?

11       A.    I don't remember that.

12       Q.    You indicated that Mr. Humphries got his information

13   from Mr. Riddle.

14             Do you remember that?

15             MS. CONNOLLY:  Objection.  He indicated he

16   didn't remember what he discussed.

17             THE COURT:  Overruled.  He can answer the

18   question.

19   BY MS. ROOHANI:

20       Q.    You indicated on direct that Mr. Humphries got

21   his --

22       A.    Yes.  About --

23       Q.    -- information from Mr. --

24       A.    -- the sentencing guidelines and the points and the

25   application and the translation to years.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    From Mr. Riddle?

2    A.    Yes.

3    Q.    Do you know that Mr. Riddle hasn't represented

4    Mr. Humphries in about four years?

5    A.    Oh, yes.  But he knew that exactly because he -- he

6    just knew it.  I mean --

7    Q.    But you don't know if that was correct; right?

8    A.    I -- no.  I -- I highly, highly assumed that this is

9    correct because Mr. Riddle is familiar with deals.

10   Q.    But you're getting your information secondhand;

11   correct?

12   A.    Yeah.  But better than -- better than -- I mean, I

13   didn't get it from my lawyer, so I had to get it

14   secondhand, yeah.

15   Q.    So you don't know for sure that what Mr. Humphries

16   told you was legally correct; right?

17   A.    At that moment, I -- for me it was, yeah --

18   Q.    I understand --

19   A.    It was --

20   Q.    I understand that you believed it.

21   A.    Uh-huh.

22   Q.    Do you know for certain that the information that

23   Mr. Humphries gave you was legally correct?

24        MS. CONNOLLY:  Objection to relevance.

25        THE COURT:  Overruled.  It is relevant.  He can

TRANSCRIBED FROM DIGITAL RECORDING

1    answer the question.

2              THE WITNESS:  Well, in the same way as I thought

3    that Mr. Durham's information was correct.

4    BY MS. ROOHANI:

5    Q.    So you think that Mr. Humphries, who has never gone

6    to law school, is the equivalent of Mr. Durham who has?

7    A.    In certain things, yes.

8    Q.    Okay.  So not what you believe.  You know that the

9    information that Mr. Humphries gave you is correct?

10   A.    I highly --

11             MS. CONNOLLY:  Objection, calls for spec --

12             THE WITNESS:  -- trusted.  I don't know.

13             MS. CONNOLLY:  Lack of foundation.

14   BY MS. ROOHANI:

15   Q.    You don't know --

16   A.    I don't know.

17             MS. CONNOLLY:  Lack of foundation.

18             THE WITNESS:  I don't know.

19             MS. CONNOLLY:  Lack of foundation as to whether

20   or not he would know whether the information he was given

21   was correct.

22             THE WITNESS:  I couldn't check it there.

23   BY MS. ROOHANI:

24   Q.    So you don't know?

25   A.    So, no, of course, I don't know.

-TRANSCRIBED FROM DIGITAL RECORDING-

1    Q.   All right.

2              THE COURT:   Overruled.

3    BY MS. ROOHANI:

4    Q.   You've heard Ms. Connolly make some arguments about

5    conflict of interest during these proceedings; right?

6    A.   Yes.

7    Q.   And that conflict of interest was based on Frank

8    being an alternative suspect?  Is that --

9    A.   Not mainly.

10             MS. CONNOLLY:   Objection.

11   BY MS. ROOHANI:

12   Q.   What -- whatever your understanding is.

13             What was your understanding about how this

14   conflict of interest worked?

15   A.   That one lawyer can't represent two different

16   persons with different interests.

17   Q.   Okay.  And so the different interest is Frank could

18   be the suspect; right?

19   A.   Yeah.

20   Q.   Okay.  Let's go back to the time of the search

21   warrant when you talked to Mari.

22   A.   Yes.

23   Q.   You told Mari it wasn't Frank; right?

24   A.   I told her I would put my hand in the fire for Frank

25   that he wouldn't do something like that.

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    Okay.  And you explained that German saying to her;

2    right?  It's a German saying?

3    A.    Yeah, I used the German saying.

4    Q.    Okay.  But you translated that into English?

5    A.    Without a translator, yes.

6    Q.    Okay.  So you translated a saying into English

7    because Mari doesn't speak German?

8    A.    No.

9    Q.    To your knowledge.

10          So you translated and you said, "I would put my

11   hand in the fire that --

12   A.    Yeah --

13   Q.    -- "it's not Frank?"

14   A.    -- we say that in Germany when we think something.

15   Q.    Which means it's not Frank?  That's what you

16   believed?

17   A.    At that point, yeah.

18   Q.    All right.  And when you talked to Special Agent

19   Gary McCamey at the time of the polygraph, you told him,

20   "It's not Frank and it's not Kevin."

21          Do you remember that?

22   A.    No, I don't remember that.

23          I can't say that because I don't -- I can't make

24   that statement.

25   Q.    Did you first tell Special Agent McCamey that you

TRANSCRIBED FROM DIGITAL RECORDING

1   did not know who put those files on your computer?

2   A.    I don't recall that conversation.  But if you have

3   it on -- I mean, you have it there.

4   Q.    Well, it doesn't matter what I have here, Jan, I

5   need to remember -- I need to know what you remember.

6   A.    I don't.

7   Q.    Okay.  Did you -- so I'll just ask you again.

8         Did you tell him at first that you didn't know

9   who put it on your computer?

10  A.    Yes.

11  Q.    And you told him that --

12  A.    I mean, my computer, which is --

13        MS. CONNOLLY:  Object to --

14        THE WITNESS:  -- you know, it's --

15        MS. CONNOLLY:  -- relevance of this.

16        THE WITNESS:  I don't want to say things here --

17        THE COURT:  Overruled.

18        THE WITNESS:  -- which -- there is no my

19  computer.  I mean --

20  BY MS. ROOHANI:

21  Q.    Okay.  The devices in your house.  You told him you

22  don't know how it got there?

23  A.    I -- I don't know what I told him.

24  Q.    Okay.  You told him that you did not think that

25  Frank or Kevin were responsible?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    I don't --
 2              MS. CONNOLLY:  Objection.  He testified he --
 3              THE WITNESS:  -- know.
 4              MS. CONNOLLY:  -- didn't know what he told them,
 5    so --
 6              THE COURT:  Overruled.  She can ask the question
 7    to try to remind him or refresh his recollection.
 8    BY MS. ROOHANI:
 9    Q.    You told Special Agent McCamey that you did not
10    think that Frank or Kevin were --
11    A.    I --
12    Q.    -- respons- --
13    A.    It's more than two years, that conversation.  I --
14    Q.    Do you remember Special Agent McCamey testifying
15    during trial?
16    A.    Yeah.  Yes.
17    Q.    Do you remember him testifying about that during
18    trial?
19    A.    I don't remember that.
20    Q.    Okay.  When the search warrant was executed at your
21    house, there was actually some child porn playing in the
22    casita; correct?
23    A.    I don't know.
24    Q.    You heard the evidence at trial --
25    A.    And I think there was nothing playing.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Q.    It was paused --

2    A.    I don't know.

3    Q.    -- on the computer --

4    A.    I don't know.

5    Q.    -- in the casita?

6          You don't remember hearing that testimony

7    during trial?

8          MS. CONNOLLY:  Object.

9          THE WITNESS:  I heard --

10         MS. CONNOLLY:  It's beyond --

11         THE WITNESS:  -- that testimony, yeah.

12         MS. CONNOLLY:  It's beyond the scope of --

13   BY MS. ROOHANI:

14   Q.    You heard the testimony during trial?

15         MS. CONNOLLY:  Object.  It's beyond --

16         THE WITNESS:  That something was paused, yeah.

17         MS. CONNOLLY:  Objection.  Beyond the scope of

18   direct examination and relevance.

19         THE COURT:  Sustained.

20   BY MS. ROOHANI:

21   Q.    You told Special Agent McCamey that it was some guy

22   called -- that you called Ferrell?

23         MS. CONNOLLY:  I object to the relevance of

24   this.

25         THE COURT:  Overruled.  He can answer the

1   question.

2   BY MS. ROOHANI:

3      Q.   You told Special Agent McCamey that the way that

4   the child porn --

5      A.   At that point I was guessing what could have

6   happened, and I mentioned that person, yeah.

7      Q.   Okay.  And you said that -- you guessed -- so it's

8   your testimony today that you guessed that it was somebody

9   named Ferrell?

10           MS. CONNOLLY:  I'm going to object to the

11   relevance of this entire line of questioning.

12           THE COURT:  Overruled.

13   BY MS. ROOHANI:

14     Q.   You guessed that it was Ferrell?

15     A.   Well, it's hard for me to now say what I did two

16   years ago and how I -- there was a search.  And at the same

17   day, I mean, they -- I got up at, what was it, 7:30, 8:00,

18   and then --

19     Q.   I'm -- let me --

20     A.   No, it was in the afternoon there was this interview

21   surrounding that lie detector, and I at that point thought

22   what could have happened.  And --

23     Q.   That's all I'm trying to figure --

24     A.   And that's why I --

25     Q.   Okay.

1    A.    -- was honest with Mr. McCamey and --

2    Q.    Fair enough.  Okay.  That's all I'm trying to figure

3    out.

4    A.    Okay.

5    Q.    Fair enough.

6          So at the beginning of your interview with

7    Special Agent McCamey, you said, "I don't -- I don't know

8    who it could be."

9          And then later on -- correct?

10   A.    I don't know what I -- what I --

11   Q.    Okay.  That's fine.

12         You don't remember?

13   A.    I don't remember.

14   Q.    Later on in the interview you told him, "I think

15   it's this guy Ferrell, he must have been the one who put

16   the child porn on the computers"; correct?

17   A.    I don't remember.

18   Q.    Okay.  And it's your testimony that you don't

19   remember anything that happened at trial regarding this

20   testimony; correct?

21   A.    Certain things.

22         MS. CONNOLLY:  Objection.  Misstates his

23   testimony.

24   BY MS. ROOHANI:

25   Q.    You remember the testimony?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    Certain -- yeah, certain things I remember.
 2    Q.    Okay.  After your change of plea, Jess sent you to
 3  Dr. Chambers; correct?
 4    A.    Yes.
 5    Q.    Okay.  And you submitted to a psychosexual
 6  evaluation?
 7    A.    I don't know if it was that.
 8    Q.    What did you think it was?
 9          MS. CONNOLLY:  Objection, relevance.
10          THE COURT:  Ms. Connolly, can you turn the
11  microphone so it's like down towards the --
12          MS. CONNOLLY:  This one.
13          THE COURT:  The one that's in front of you.
14  Yeah.  There you go.  It bends, so you can just pull it
15  down, so I can hear you.
16          MS. CONNOLLY:  Objection.  Relevance.
17          THE COURT:  There you go.  I hear you.
18          Okay.  What is the relevance, Ms. Roohani?
19          MS. ROOHANI:  He made inconsistent statements to
20  Dr. Chambers, as well, Your Honor.
21          THE COURT:  All right.
22  BY MS. ROOHANI:
23    Q.    Do you remember talking to Mr. -- Dr. Chambers?
24    A.    Yes.
25    Q.    Okay.  Do you remember telling Dr. Chambers that all
```

TRANSCRIBED FROM DIGITAL RECORDING

1   the child porn had been downloaded by Joel?

2           MS. CONNOLLY:  Again, object to the relevance of

3   this, what it has to do with his request to withdraw his

4   plea.

5           THE COURT:  Credibility, Ms. Roohani?

6           MS. ROOHANI:  Absolutely, Your Honor.

7           THE WITNESS:  I don't think that I said that.

8   BY MS. ROOHANI:

9   Q.   If I showed you Dr. Chambers' report, would that

10  help reference your recollection?

11  A.   Well, that's his report.  It --

12  Q.   Would it --

13  A.   It's not --

14  Q.   -- help you remember what you talked to him about?

15  A.   No.

16  Q.   It won't help you remember?

17  A.   No.

18  Q.   Okay.  So you don't remember telling Dr. Chambers

19  that it was Joel?

20          MS. CONNOLLY:  Objection.

21          THE WITNESS:  When -- I mean --

22          MS. CONNOLLY:  Asked and answered.

23          THE COURT:  Overruled.  He can answer that

24  question.

25          Do you remember telling Dr. Chambers that it was

-TRANSCRIBED FROM DIGITAL RECORDING-

1   Joel who looked at the child pornography?

2           THE WITNESS:  We talked about him, but I

3   don't -- I don't think he said it that way.

4           THE COURT:  Are Joel and Ferrell the same

5   person --

6           THE WITNESS:  No.

7           THE COURT:  -- just in case?  Okay.

8           MS. CONNOLLY:  And just for my edification, I

9   don't know how -- if this was -- could I see what --

10          MS. ROOHANI:  And, Your Honor, just for the

11  record, this is part of the psychosexual evaluation that

12  was included as part of the PSR that Ms. Connolly has been

13  referring to; so I believe it's actually within Your

14  Honor's -- it's not really judicial notice, but I think

15  it's within the purview of the PSR.

16          MS. CONNOLLY:  Is this attached to something

17  that's already been filed?  I've never seen this, so I'm --

18  my question would be how did the government become in

19  possession of this?  I've never seen this document.

20          MS. ROOHANI:  It was forwarded to me by his

21  former counsel.

22          MS. CONNOLLY:  I'm sorry.  I can't hear you.

23          MS. ROOHANI:  It was forwarded to me by his

24  former counsel in anticipation of sentencing after the

25  first draft of the PSR came out.

1    THE COURT:  It was not -- it was not filed

2    because it was a change of counsel; right?

3    MS. ROOHANI:  It wasn't filed, Your Honor,

4    because it's a sensitive document, and I think that it was

5    intended to be attached to the PSR at the time of

6    sentencing.  It's directly referenced in the PSR, Your

7    Honor.

8    MS. CONNOLLY:  I have concerns about whether or

9    not this should have been provided, if it -- if

10   Mr. Fuechtener was made aware it was going to be provided.

11   He obviously has a -- you know, a doctor-patient

12   privilege.  I've never seen this before.  It was never

13   provided to me when I was provided a copy of the file.

14   THE COURT:  I'm looking at the presentence

15   report.

16   MS. ROOHANI:  I can tell you the paragraph, Your

17   Honor, if you give me a moment.

18   Paragraph 87.

19   THE COURT:  87.  Okay.

20   MS. ROOHANI:  And, Your Honor, I'm a little bit

21   concerned, considering that Ms. Connolly is

22   Mr. Fuechtener's counsel and that he hasn't communicated to

23   her that he interviewed with Dr. Chambers.

24   If you look at the report, and I can provide

25   Your Honor with a copy of it, specifically indicates that

————TRANSCRIBED FROM DIGITAL RECORDING————

1    he was referred to Dr. Chambers by his prior counsel.

2              Mr. Fuechtener has indicated that on -- during

3    his testimony as well.  And specifically on page 2 it says

4    that he was informed of the purpose of the evaluation and

5    the limits of the confidentiality, that this report would

6    be provided to the Court and opposing counsel.

7              MS. CONNOLLY:  I've just -- I've never seen it

8    until now, so --

9              MS. ROOHANI:  If she'd like to take time to

10   review it, Your Honor, I'm happy to give that to her.

11             THE COURT:  All right.  Let's do that.

12             MS. ROOHANI:  And just for the record, Your

13   Honor, it's specifically to impeach Mr. Fuechtener based on

14   a prior inconsistent statement.

15             MS. CONNOLLY:  If you could refer me to the

16   portion of it, we may be able to -- I may not have an issue

17   with it.

18             MS. ROOHANI:  Page 2, defendant's current

19   offense.

20             MS. CONNOLLY:  Where?  Can you just show me

21   where you're at.

22             MS. ROOHANI:  The paragraph here.

23             MS. CONNOLLY:  Okay.

24             MS. ROOHANI:  As well as the following page.

25   Maybe we can take a break --

1           MS. CONNOLLY:  I don't -- this is -- you can ask

2      him.  I don't -- you can ask him about this.

3           MS. ROOHANI:  Your Honor, do we want --

4           MS. CONNOLLY:  And I don't think it's a prior

5      inconsistent -- this is a document -- it would be a prior

6      inconsistent statement if it was something that he had

7      written.  This is a document that's written by a third

8      party who is not here in court to testify.

9           So it's in the report doesn't necessarily mean

10     it's a verbatim statement that was made by Mr. Fuechtener.

11     It's not his statement.  It's not a written statement

12     signed by him or an oral statement recording of what he

13     said.  So it wouldn't be a prior inconsistent statement.

14           THE COURT:  My guess is that if she asks him and

15     he denies making that statement, then Ms. Roohani can

16     contact Dr. Chambers and have him come in, and --

17           MS. CONNOLLY:  Potentially.

18           THE COURT:  -- then it would be an inconsistent

19     statement.  So she can ask him whether or not he made the

20     statements that are represented in the report and

21     attributed to him.

22           MS. ROOHANI:  Thank you, Your Honor.

23           MS. CONNOLLY:  That's fine.  I don't object to

24     that.

25

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1    BY MS. ROOHANI:

 2    Q.    Mr. Fuechtener, did you tell Dr. Chambers that Joel

 3    was the person who was involved in file sharing networks?

 4              MS. CONNOLLY:  Objection.  It misstates -- it

 5    misstates what -- if she's going to use this as a prior

 6    inconsistent statement, she needs to paraphrase it or

 7    indicate what it accurately says.

 8              MS. ROOHANI:  Your Honor, it literally reads,

 9    "Joel" --

10              MS. CONNOLLY:  "Most likely" is the terminology

11    that's in the report.  So it's not prior inconsistent

12    statement unless you accurately give him the opportunity to

13    confirm it or deny it.

14              MS. ROOHANI:  I'm happy to read the sentence,

15    Your Honor.

16              THE COURT:  All right.  Go ahead and read the

17    sentence.

18    BY MS. ROOHANI:

19    Q.    Did you acknowledge that there was child pornography

20    on the media in your home to Dr. Chambers?

21              MS. CONNOLLY:  Objection.  It misstates what it

22    says.

23              THE COURT:  What does it say, Ms. Connolly?

24              MS. CONNOLLY:  She's taking the words she likes

25    that are better for her case and throwing those at him and
```

TRANSCRIBED FROM DIGITAL RECORDING

1    not --

2              THE COURT:  What does it say?  I don't have it.

3    What does it say?

4              MS. CONNOLLY:  You're asking me?

5              THE COURT:  Yes.

6              MS. CONNOLLY:  It says:

7                 Mr. Fuechtener admitted to viewing Internet

8        pornography on his personal computers but he

9        insisted that he was not interested in child

10       pornography.  He acknowledged that it was on the

11       media in his home, explaining that it was most

12       likely downloaded by his friend Joel, who was

13       involved in file sharing networks.

14             THE COURT:  All right.  So it's a long --

15   there's many different factual pieces of information in

16   that.

17             Do you want to just ask him if he agrees or

18   disagrees; and if he disagrees you can take it portion by

19   portion and figure out --

20   BY MS. ROOHANI:

21   Q.    Did you say that to Dr. Chambers?

22   A.    I never got that report either.

23   Q.    I understand --

24   A.    So, yeah.

25   Q.    You did say that?

TRANSCRIBED FROM DIGITAL RECORDING

```
1    A.    Maybe -- I mean --

2    Q.    Did you tell Dr. Chambers -- or did you admit to

3    Dr. Chambers that you viewed Internet pornography on your

4    personal computers?

5    A.    Regular pornography --

6    Q.    Okay.

7    A.    -- yeah.

8    Q.    Did you tell Dr. Chambers that you were not

9    interested in child pornography?

10   A.    Yes.

11   Q.    Did you acknowledge that it was on the media on --

12   in your home?

13   A.    Yes.

14   Q.    That's referring to child pornography; correct?

15   A.    Yes.

16   Q.    All right.  Did you explain that it was likely

17   downloaded by Joel?

18   A.    I don't think that I said it like that, likely -- I

19   mean, there was a lot and lots of -- I mean --

20   Q.    That's okay.

21   A.    -- I don't --

22         MS. CONNOLLY:  Judge, can she please let him

23   answer.  He's trying --

24         THE WITNESS:  I think --

25         MS. CONNOLLY:  -- to explain his answer, and
```

TRANSCRIBED FROM DIGITAL RECORDING

1    she's talking --

2              THE WITNESS:  Mr. Chamber uses this --

3              MS. CONNOLLY:  -- over him.

4              THE WITNESS:  -- it seems like, in an excuse --

5              MS. CONNOLLY:  Wait.  Hold on.

6              Judge, she keeps talking over him.

7              THE COURT:  He can answer the question.  Finish

8    the question.  Or he can answer the question.  Go ahead and

9    finish your answer.

10             THE WITNESS:  It seems like Dr. Chambers uses --

11   uses it as an excuse.  I don't -- and I never -- first of

12   all, I never -- I didn't hire him.  He came to Henderson.

13   And Jess never told me that he's hired.  But I talked to

14   him.  He's a -- we had a long good talk.  And, I mean --

15   BY MS. ROOHANI:

16   Q.    Okay.  Jan?

17   A.    But I never got that report.  And I don't know what

18   I said a year ago.

19   Q.    That wasn't the question I asked you.  Okay?

20             The question I asked you is, did you tell

21   Dr. Chambers that there was child pornography in the media

22   in your home?

23   A.    Yes.

24   Q.    And did you explain that it was likely downloaded by

25   your friend Joel?  Yes or no?

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    A.    I -- I don't know.

 2    Q.    Okay.  Did you tell him that Joel was the one who

 3   was involved in file sharing networks?

 4    A.    Yes.

 5    Q.    Okay.  Did you tell him --

 6    A.    I remember that.

 7    Q.    -- that Joel had lost his car and his apartment?

 8    A.    Yes.

 9    Q.    Did you tell him that you allowed Joel to stay in

10   your home?

11    A.    I --

12    Q.    Did you tell him that?  It's okay if the answer is

13   no.

14    A.    I think so.

15    Q.    I just want to know, yes or no?

16    A.    I mean, yeah, I think so.

17    Q.    Okay.  And Joel is Joel Rosales; correct?

18    A.    Yes.

19    Q.    Joel Rosales was on your witness list; right?

20    A.    Yes.

21    Q.    And that was the same Joel that was at your house

22   when Mari executed the search warrant?

23    A.    Yes.

24    Q.    That was the same Joel that you didn't tell Mari was

25   the one who downloaded the child porn; right?
```

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    When did I say that to her?

2    Q.    You did not tell Mari that it was Joel; right?

3    A.    No.

4    Q.    Well, you told Dr. Chambers that it was Joel?

5    A.    That was --

6              MS. CONNOLLY:  Objection.

7              THE WITNESS:  -- a year later.

8              MS. CONNOLLY:  Misstates his statement.

9              THE WITNESS:  I mean --

10   BY MS. ROOHANI:

11   Q.    This is the Joel who had been living at your house

12   for some time; right?

13   A.    I mean, what I talk -- what I told Mari was at the

14   day of the search, based on my knowledge on that day, what

15   I talked with Mr. Chambers would be way later after having,

16   like, 4,000 pages of discovery.

17   Q.    Did you tell Mari --

18   A.    I mean, it makes a difference.

19   Q.    Did you tell Mari that Joel had been living at your

20   house for some time?

21   A.    If I tell Mari --

22              MS. CONNOLLY:  Objection, again, to relevance.

23              THE WITNESS:  I don't think of -- I don't think

24   that I told Mari that.

25

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. ROOHANI:

2    Q.    Did you tell Dr. Chambers that Joel had been living

3    at your house --

4    A.    Yes.

5    Q.    -- for some time?

6              So on direct, when Ms. Connolly asked you who

7    were all the people who are living in your house, and you

8    said only Kevin, that was a lie?

9    A.    I wouldn't call it a lie.  I mean, I don't -- at

10   that morning there could be thousands of reason --

11   thousands of reasons why I'm not telling her why someone is

12   living at the house.

13   Q.    On direct you testified that only Kevin was living

14   at your house; correct?

15   A.    Yes, living, yeah.  Staying or -- I mean, we

16   clarified that.

17   Q.    And now your testimony is that Joel was also staying

18   at your house?

19   A.    He wasn't living there.

20   Q.    Let's talk a little bit more about that affidavit,

21   Mr. Fuechtener.

22              You wrote in the affidavit that all the factual

23   assertions in the motion were true; correct?

24   A.    Yes.

25   Q.    Have you seen that motion recently?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    No.

2    Q.    I'm going to ask you some questions about it.  So if

3    you need a copy of it, just let me know --

4    A.    Okay.

5    Q.    -- okay?

6          On page 2 does it say, "In February 2016

7    attorney Jess Marchese was hired to represent Rouven"?

8    A.    Yes.

9    Q.    But you testified on direct that you hired

10   Mr. Marchese in March of 2016; correct?  Yes or no?

11   A.    Give me the days again, please.

12   Q.    In the motion you wrote that you hired him in

13   February of 2016; correct?

14   A.    February of --

15          MS. CONNOLLY:  Objection.  He didn't --

16          THE WITNESS:  -- 2016 --

17          MS. CONNOLLY:  -- write anything in the motion.

18          She keeps saying he wrote in the motion.  He

19   didn't write anything in the motion.

20          THE COURT:  All right.  He signed an affidavit

21   swearing that the facts in the motion were correct, and he

22   read the motion before signing the affidavit, and in that

23   motion it said what?

24          THE WITNESS:  February --

25

TRANSCRIBED FROM DIGITAL RECORDING

1    BY MS. ROOHANI:

2    Q.    "2016 attorney" --

3    A.    Yes --

4    Q.    -- "Jess Marchese" --

5    A.    -- that's when I --

6    Q.    -- "was hired" --

7    A.    -- first -- it was prearrest; correct?

8    Q.    I don't know.

9    A.    Oh, you know.

10   Q.    You would have to answer the question.  I don't know

11   why you're asking me.

12   A.    Well, it has been a while.

13   Q.    Okay.  Yeah.

14   A.    Yes, I -- I -- yeah.  February --

15   Q.    You read that in the motion.  You swore it was true;

16   correct?

17   A.    Yes.

18   Q.    You swore in your affidavit that in February 2016

19   Jess Marchese was hired to represent you; correct?

20   A.    Yes.

21   Q.    And on direct, when Ms. Connolly asked you the

22   question, you said that Jess was hired in March of 2016;

23   correct?  Yes or no?

24   A.    Yeah.  Yes.

25   Q.    Okay.  You do understand that both of those things

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    can't be true; right?

 2    A.    When she asked me the dates -- I mean, that can be

 3    verified, so when she asked me if I say --

 4    Q.    So --

 5    A.    Yes, it sounded right.  It sounded right, that date.

 6    And I hired him basically twice.  I had him first

 7    prearrest, and he got a payment apart from his second time

 8    after the arrest, so -- when he was hired for the case.  So

 9    maybe that is the misunderstanding.  I don't know.  Maybe

10    there the dis- --

11    Q.    So it's your --

12    A.    -- dates comes from.

13    Q.    It's your testimony that when you wrote in the

14    motion February 2016, or wrote in the affidavit that

15    incorporated the motion that it was February 2016 --

16              MS. CONNOLLY:  Judge, asked and answered.  He

17    just explained it.

18              MS. ROOHANI:  You need to let me finish my

19    question.  Your Honor --

20              MS. CONNOLLY:  And it's relevance at this point.

21    He just explained it.  It's cumulative.

22              THE COURT:  Overruled.  She can finish her

23    question.

24    BY MS. ROOHANI:

25    Q.    In the motion when it says February 2016 and when
```

TRANSCRIBED FROM DIGITAL RECORDING

1    you testified on direct it was March 2016, it's your

2    testimony now that you hired Mr. Marchese twice?  That's

3    your explanation?

4    A.    Yeah.  That's how I could call it.

5    Q.    Okay.  All right.

6    A.    And I don't know if this is the problem with the

7    dates.  I don't have my calendar, I don't -- I have -- I

8    don't know when I actually hired him on the day.

9    Q.    When Ms. Connolly asked you that question, you

10   immediately agreed with her; correct?

11   A.    I would assume that she has the right date.  I

12   mean --

13   Q.    Okay.  You assumed that she had the right date?

14   A.    Uh-huh.

15   Q.    Okay.  On the motion, on page 7, it was written, and

16   you affirmed that this was true, that they indicated -- and

17   I'm skipping a portion -- that "He would get life if

18   convicted"; correct?

19   A.    That she wrote that in the motion?

20   Q.    As your agent, she wrote in the motion, "They

21   indicated he would get life if convicted."  Correct?

22   A.    Yes.

23   Q.    You testified on direct that none of your lawyers

24   ever told you that you would get life if you were

25   convicted; isn't that true?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    They never gave me a --

2              MS. CONNOLLY:  Object.  I believe that misstates

3    his testimony.

4              THE WITNESS:  They never gave me a sentence

5    prediction or what would happen if --

6    BY MS. ROOHANI:

7    Q.    So you're maintaining that testimony, that they

8    never told you that you would get life if you were

9    convicted?

10   A.    We didn't talk about that.

11   Q.    That's your testimony; correct?

12   A.    I mean, we talked -- I mean, they made a

13   statement -- can I say that statement?

14   Q.    No.

15   A.    Okay.

16   Q.    On the motion on page 7, you would agree with me

17   that it reads, "In the courtroom Durham continued to read

18   the plea agreement with Rouven"; correct?

19   A.    Yes.

20   Q.    All right.  But you testified on direct, numerous

21   times now, and on cross that Mr. Durham never read you the

22   plea agreement; isn't that true?

23   A.    Yes.

24   Q.    You do understand that both of those two things

25   can't be true?

1    A.    Well, we -- I think we solved that with a word.

2    Q.    Mr. Fuechtener, do you understand what the word

3    "read" means?

4    A.    Yes.

5    Q.    What does it mean to you?

6    A.    When you read something.

7    Q.    Okay.  So you testified on direct that Mr. Durham

8    never read the plea agreement to you; correct?

9    A.    Yes.

10   Q.    You testified that he paraphrased it for you; that

11   he summarized it for you --

12   A.    Yes.

13   Q.    -- correct?

14         Are reading and paraphrasing the same thing,

15   Mr. Fuechtener?

16   A.    No.

17   Q.    No.  So when you affirmed in your affidavit that it

18   was true that Mr. Durham continued to read the plea

19   agreement with you, that was true or false?

20   A.    Isn't that why we have that hearing, to bring that

21   all out what exactly happened?

22         I mean, I talked to my lawyer, but, of course,

23   she has to write the motion.  I don't write the motion.  I

24   mean --

25   Q.    Okay.  You signed the affidavit?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.

2    Q.    You swore under the penalty of perjury that

3    everything in the motion was true?

4    A.    Yes.

5    Q.    You had read the motion at some point?

6    A.    Yes.

7    Q.    You swore under the penalty of perjury that

8    everything that you had read was true?

9    A.    Yes.

10   Q.    And the testimony you're giving today, also under

11   oath, is now different; correct?  Yes?

12   A.    I don't know.  Yeah.

13   Q.    Okay.

14             MS. ROOHANI:  A moment's indulgence, Your Honor.

15             Your Honor, I'll pass the witness.

16             THE COURT:  And just to make sure, we're talking

17   about page 7 of the motion, which is -- oh, I guess I don't

18   have the motion number.

19             MS. ROOHANI:  It's at the top, Your Honor.  It

20   says, "He would get life if convicted."

21             THE COURT:  Line 15, "In the courtroom Durham

22   continued to read the written plea agreement with Rouven."

23             MS. ROOHANI:  Yes, Your Honor.

24             THE COURT:  All right.  I just wanted to make

25   sure I have the right part.

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  If you give me a moment, Your

2     Honor, I have a lot of stuff up here.

3          THE COURT:  Yes.

4          Any other questions, Mr. Roohani, or do you pass

5     the witness?

6          MS. ROOHANI:  Oh, I pass the witness, Your

7     Honor.

8          THE COURT:  All right.

9          All right.  Ms. Connolly.

10                    REDIRECT EXAMINATION

11    BY MS. CONNOLLY:

12    Q.    Jan, you didn't prepare the motion that Ms. Roohani

13    has been asking you questions about; right?

14    A.    No.

15    Q.    It was filed before you reviewed it, in fact; right?

16    A.    Yes.

17    Q.    Okay.  And then afterwards, several weeks later, I

18    presented you with an affidavit -- let me ask you this.

19         When you reviewed the motion, was there any

20    facts that jumped out to you as being completely false?

21    A.    No.

22    Q.    Okay.  And we have discussed the motion before it

23    was prepared; right?

24    A.    Yes.

25    Q.    Okay.  So when you signed an affidavit saying that

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    everything in there was true and correct, were you
 2    referring to every single word written on that motion from
 3    start to finish?
 4             MS. ROOHANI:  Objection.  Leading.
 5             THE COURT:  I'll let him answer the question.
 6             THE WITNESS:  No, I thought about the -- the big
 7    picture of the motion.
 8    BY MS. CONNOLLY:
 9    Q.    And the big picture of the motion was generally
10    everything in there was pretty much true; right?
11    A.    Yes.
12             MS. ROOHANI:  Objection.  Leading.
13             THE WITNESS:  I mean, except the case law.  You
14    are the legal expert with that, so I trust your legal
15    advice.
16    BY MS. CONNOLLY:
17    Q.    And in reference to you discussing the case with
18    Mr. Humphries, you discussed your plea agreement with him
19    the evening after and the next morning; right?
20             MS. ROOHANI:  Objection, leading.
21             THE WITNESS:  Well, I don't --
22             THE COURT:  Sustained.
23    BY MS. CONNOLLY:
24    Q.    You discussed -- when did you discuss the plea
25    agreement --
```

1    A.    Okay.

2    Q.    -- with Mr. Humphries?

3    A.    I came to Henderson, it was like at 6:00, 7:00,

4    that -- I mean, after -- yeah, they picked us up.  So I

5    came in the --

6    Q.    Was it the evening?

7    A.    -- evening, early evening, yeah, when we usually

8    come and they pick us up from court and bring us back.

9          And I came into the unit and passed by his door,

10   and we had a quick conversation that I signed a plea, and

11   he asked me how --

12   Q.    So you discussed it with him the evening of --

13         MS. ROOHANI:  Your Honor, I'm going to -- Your

14   Honor, I'm going to object on the basis that Ms. Connolly

15   is cutting off Mr. Fuechtener's answer.

16         MS. CONNOLLY:  I'm not -- I'm trying to get --

17   we can spend another hour doing this.  I'm trying -- he's

18   already testified.  I'm trying to get through this.

19         MS. ROOHANI:  The same way she objected to mine,

20   Your Honor, I'm going to object to hers.

21         THE COURT:  All right.  So let him answer the

22   question.

23         THE WITNESS:  So I came back, passed by his

24   door, and we had a short talk.  And I told him I signed the

25   plea.  And he asked me how many years.  And I said there

TRANSCRIBED FROM DIGITAL RECORDING

1    are no years in the plea.

2              And then the officer, through the PA system,

3    said, "Fuechtener lockdown," so I had to go to my cell.

4    And that was the end of that conversation.

5              And then when I had my regular dayroom, my

6    hour -- everybody gets an hour dayroom within 24 hours,

7    when I had my next dayroom, which was, I think --

8    sometimes, I mean, they give it to us at 8:00, sometimes

9    2:00 at night, at 3:00 in the morning, or at 8:00.  So it

10   was the next time I had dayroom that was I think later that

11   evening, but it could be the night.

12             It was before the next morning when I came out

13   the next day and called Jess.  So I had then, during my

14   next regular dayroom I went again and talked to him.  And

15   then he asked me about the points.

16   BY MS. CONNOLLY:

17   Q.   So the conversation started the evening you entered

18   the plea --

19   A.   Yes, immediately when I came back.

20   Q.   -- and continued through the next day?

21   A.   Yes.  It was interrupted, and then we had another

22   conversation during my dayroom.

23   Q.   But -- and do you remember specifically the exact

24   words that were spoken by Mr. Humphries the evening of the

25   plea and exact words spoken by Mr. Humphries the next day?

1    A.    No.

2    Q.    Do you remember the gist of the conversation which

3    began the evening of and continued through the next day?

4              MS. ROOHANI:  Objection.  Leading.

5              MS. CONNOLLY:  I'm summarizing what he just

6    stated and asked him if that's accurate.

7              MS. ROOHANI:  Objection.  Asked and answered.

8              THE COURT:  Yeah, either way.

9              MS. CONNOLLY:  Okay.

10   BY MS. CONNOLLY:

11   Q.    So based upon -- what led you to the determination

12   that under the terms of the guilty plea agreement, which

13   you signed in court, you were facing 27 -- a minimum of 27

14   years under the guidelines?

15             MS. ROOHANI:  Objection.  Misstates the law.

16             THE COURT:  She wasn't trying to state the law.

17   She's saying what was it that led you to believe that.

18             So he can answer the question.  Overruled.

19             MS. ROOHANI:  Then it assumes facts not in

20   evidence.  He's not testified that that's what he believed

21   what it was.

22             MS. CONNOLLY:  Are they both objecting?

23             MS. ROOHANI:  She's not even --

24             MS. CONNOLLY:  Let me withdraw that.

25

TRANSCRIBED FROM DIGITAL RECORDING

1   BY MS. CONNOLLY:

2   Q.    When did you become aware -- who made you aware of

3   the amount of time you were facing with the base offense

4   level of 40 or an adjusted offense level of 40?

5   A.    Mr. Humphries.

6   Q.    And that conversation commenced the evening after

7   you entered the guilty plea and went on through the next

8   day; right?

9   A.    Yeah.  We had to stop.  I locked down, and when I

10  had my next dayroom, the first thing I did, went to his

11  door, and we finished that conversation.

12  Q.    When you were answering my questions, were you

13  answering to the best of your ability?

14  A.    Yes.

15  Q.    How much older than you is Frank?

16           MS. ROOHANI:  Objection.  Relevance.

17           MS. CONNOLLY:  They're the ones that are asking

18  him all the questions about Frank and Joel and who could

19  potentially be an alternate suspect.  It's relevant to

20  that.

21           MS. ROOHANI:  I --

22           THE COURT:  Overruled.  He can answer the

23  question.

24  BY MS. CONNOLLY:

25  Q.    How much older than you is Frank?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.     17 years.

2    Q.     17 years.  How old were you when Frank met you?

3              MS. ROOHANI:  Objection.  Relevance.

4              MS. CONNOLLY:  It's the same -- it's the same

5    relevance.  If they'll let me finish the questions, you'll

6    see the relevance.

7              THE COURT:  How old he was when he met Frank?

8              MS. CONNOLLY:  Well, I think the government is

9    trying to make an argument, will make an argument that

10   Frank was not an alternate suspect.  Frank's age, the age

11   difference in when he met Jan is relevant to whether or not

12   Frank was an alternate suspect as determined by Mr. Nadig

13   or Mr. Marchese.

14             MS. ROOHANI:  And I don't see how --

15             MS. CONNOLLY:  They're the one that opened the

16   door --

17             MS. ROOHANI:  -- it's relevant.

18             MS. CONNOLLY:  -- to this by trying to suggest

19   that Frank was never an alternate suspect, therefore, there

20   was never a conflict because he wasn't a valid suspect.

21             MS. ROOHANI:  I don't understand how

22   Mr. Alfter's age makes him an alternative suspect, and I

23   don't understand how they -- when they met makes him an

24   alternative suspect either, Your Honor.

25             MS. CONNOLLY:  How old he was and the fact that

TRANSCRIBED FROM DIGITAL RECORDING

1    he was very young when a far older man met him and engaged

2    in sexual relationship with him becomes relevant since it

3    was kiddy porn that was found on the computers and why his

4    lawyers believe that Frank was the alternate suspect as

5    stated by Mr. Nadig in the e-mail.

6               MS. ROOHANI:  Assumes facts not in evidence,

7    Your Honor.

8               MS. CONNOLLY:  And they're the ones that are

9    trying to represent there's no conflict, ergo there was

10   no -- he wasn't an alternate suspect.

11              THE COURT:  You're trying to say it's relevant

12   because that's why his attorneys thought that there was a

13   conflict --

14              MS. CONNOLLY:  They need a conflict waiver, yes.

15              THE COURT:  He didn't ask his attorneys that.

16   I'm not sure you can get that information out of

17   Mr. Fuechtener.

18              I mean, it doesn't logically necessarily link to

19   what the attorneys believed.

20              MS. CONNOLLY:  Well, I think he -- at some

21   point, he became aware that that's what they thought and

22   the reasons why they thought that Frank was an alternate

23   suspect.

24              MS. ROOHANI:  And I believe Your Honor is

25   correct, that those are questions that are better posed to

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   the attorneys and not Mr. Fuechtener.

 2              THE COURT:  I understand the point you're trying

 3   to make, and I --

 4              MS. CONNOLLY:  Okay.

 5              THE COURT:  -- think that's fine.  You can argue

 6   it if you want to in closing for this motion today.

 7              MS. CONNOLLY:  We will.

 8              THE COURT:  But we're not going to get into

 9   their personal relationship.  It's not necessary.

10   BY MS. CONNOLLY:

11   Q.   And there were also a lot of questions and about new

12   business arrangements.  And you indicated you had a

13   business manager; right?

14   A.   Yes.

15   Q.   And who was your business manager?

16   A.   Frank.

17   Q.   Okay.  Who was the one that was involved with more

18   of the daily -- I won't say minutia, but I use a better --

19   the daily business practices of your entertainment?

20   A.   He --

21   Q.   Who was the one that negotiated the contracts and

22   read all the contracts?

23   A.   He did that.

24   Q.   Okay.  So would it be fair to say you were the

25   performer and he was the business person?
```

TRANSCRIBED FROM DIGITAL RECORDING

1          MS. ROOHANI:  Objection.  Leading.

2    BY MS. CONNOLLY:

3    Q.    Well, you tell us.  Wasn't --

4    A.    Well, mainly, yes.  But sometimes there were, like,

5    meetings when he took me with him to the business meetings

6    to learn, you know, how that all worked.  And so then we --

7    we both talked about those business things.  But mainly

8    that was his part, and I was --

9    Q.    And you --

10   A.    And he was the -- he did those things, and I was the

11   talent, how you call that.

12   Q.    Okay.  And so you had Frank that you trusted, and

13   you also said you had an attorney, an attorney that was

14   your business lawyer?

15   A.    Yes.

16   Q.    Okay.  Now, who is it that negotiated the various

17   contracts that you were asked about?  Was that your

18   business lawyer?  Or who negotiated those?  Did you

19   negotiate those contracts?

20   A.    No.

21   Q.    Okay.  Did somebody else negotiate those contracts

22   on your behalf?

23   A.    Yes.

24   Q.    And did you trust that person?

25   A.    Yes.

1    Q.    And so when that person presented you with a

2    contract to sign --

3    A.    I sign it.

4    Q.    Did you believe it -- that person was acting in your

5    best interests?

6    A.    Yeah, of course.

7    Q.    Has Mr. Pacitti always been your business attorney,

8    or was there somebody else?

9    A.    No, in Vegas it was always him.

10   Q.    Okay.  So it would be fair -- so just to summarize,

11   you were not intricately involved in negotiating those

12   business contracts, that was the attorney that did that

13   with the Tropicana on your behalf?

14   A.    The legal aspects, yeah, he did.  And the -- all

15   other aspects Frank did and --

16   Q.    Were the other --

17   A.    -- I became more involved when it was about, like,

18   actual performance and --

19   Q.    Would it be fair to say --

20   A.    -- artistic questions.

21   Q.    -- there were some things in the contracts about

22   what the performance would be and then other portions had

23   to do with legalities?

24   A.    Yes.  Liability is a big part of these contracts.

25   Q.    Would you consider yourself a trusting person?

TRANSCRIBED FROM DIGITAL RECORDING

1    A.    Yes.  Very.

2    Q.    Now, you indicate -- you made some comment about

3    some of the documents you may have signed at the time of

4    the search and that you were in a rush because you had to

5    do a show.  You were telling us about that.

6              THE COURT:  You know, speaking of a rush, it's

7    4:30.  So we're obviously not --

8              MS. CONNOLLY:  Okay.

9              THE COURT:  -- going to be done today with him.

10   So why don't we go ahead and take a break.

11             MS. CONNOLLY:  I can get --

12             THE COURT:  Aaron, what was the next date that

13   you said we had available if we didn't finish today?

14   Because we have Mr. Humphries also.

15             COURTROOM ADMINISTRATOR:  Your Honor, I do

16   believe we start trial May 7.  We are in trial the next

17   possibly two weeks.

18             THE COURT:  Well, we start trial Monday.

19             COURTROOM ADMINISTRATOR:  Correct.  I believe

20   May 11 is a good date.  We have all day available.

21             MS. CONNOLLY:  It's good with me, I think.  I

22   had a trial that's supposed to start that week in state

23   court, but I don't think it's -- oh, no it got taken off,

24   so --

25             MS. ROOHANI:  And I also have a trial that's

TRANSCRIBED FROM DIGITAL RECORDING

1    supposed to start in front of -- Mr. Humphries' trial

2    that's supposed to start in front of Judge Gordon, Your

3    Honor, on the 7th.

4              MS. CONNOLLY:  May 11 works, though.

5              THE COURT:  Okay.  And I have four trials that

6    day.  But you don't think any of those are going to go,

7    Aaron?

8              COURTROOM ADMINISTRATOR:  Your Honor, the

9    criminal cases might go.  They're getting to that point

10   where they may go.  But I haven't heard yet from the

11   attorneys.

12             MS. ROOHANI:  Your Honor, do you have any

13   availability on May the 4th?

14             THE COURT:  That's also what I was thinking.

15             MS. CONNOLLY:  I don't think -- I have --

16   well --

17             THE COURT:  I'm sorry.  What was that, you

18   can't --

19             MS. CONNOLLY:  I have a Mandarin client who I

20   have been appointed to represent, and I haven't gone to see

21   her yet because we couldn't get an interpreter.  I'm

22   supposed to go out there and see her.

23             THE COURT:  On May 4th?

24             MS. CONNOLLY:  And I haven't met with her yet.

25   On May 4th, yes.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              If it was a non-Mandarin speaking, I wouldn't
 2    quibble with it, but --
 3              THE COURT:  Can we do it Thursday afternoon, the
 4    3rd?  Why did we have that --
 5              MS. CONNOLLY:  Which date?
 6              COURTROOM ADMINISTRATOR:  Your Honor, we have
 7    the 3rd blocked off for trial.
 8              THE COURT:  Yeah.  I was going to say, was that
 9    our extra day for trial --
10              MS. CONNOLLY:  I have a trial that afternoon.
11    And I have a whole bunch of state stuff that morning.
12              MS. ROOHANI:  Can we do a half day on the 4th,
13    Your Honor, perhaps in the afternoon?
14              THE COURT:  That was what I was looking at.  I'm
15    in court in the morning, but we had the afternoon --
16              MS. CONNOLLY:  Which day?
17              THE COURT:  -- blocked off for trial.
18              MS. ROOHANI:  On the 4th.
19              COURTROOM ADMINISTRATOR:  It's the 4th.
20              THE COURT:  I was trying to figure out if that
21    was the last day of trial or if that was the extra last
22    day.  Sometimes they go over.
23              So let's just go ahead and set it then for May
24    7th.
25              MS. CONNOLLY:  May 7th?
```

TRANSCRIBED FROM DIGITAL RECORDING

1           MS. ROOHANI:  Your Honor, I'm in trial that day.

2           MS. CONNOLLY:  I'm available that day.

3           MS. ROOHANI:  Actually, Mr. Humphries is also

4    not available because he'll also be in trial that day, Your

5    Honor.

6           MS. CONNOLLY:  It's going to go?

7           MS. ROOHANI:  Absolutely.

8           THE COURT:  On May 11?  Are you in trial on

9    Fridays?

10          MS. CONNOLLY:  The 11th, I believe I'm available

11   on the 11th.

12          MS. ROOHANI:  If we can do it on the afternoon,

13   just so I can make sure that -- I think by then we'll be

14   done with trial.

15          THE COURT:  Okay.

16          MS. CONNOLLY:  That's fine.

17          THE COURT:  Does that work, Aaron?

18          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

19   We'll start at 1:00, Your Honor?

20          THE COURT:  What time?

21          COURTROOM ADMINISTRATOR:  1:00.

22          THE COURT:  Yeah.

23          MS. CONNOLLY:  What was that date -- I'm

24   sorry -- again?  The 11th?

25          COURTROOM ADMINISTRATOR:  Friday, May 11, at

TRANSCRIBED FROM DIGITAL RECORDING

1    1:00 p.m.

2              THE COURT:  All right.  So we'll see you back

3    here Friday, May 11, at 1:00 p.m.

4              MS. ROOHANI:  Your Honor, just one brief point.

5              Before the hearing today, I observed

6    Ms. Connolly talking to Mr. Fuechtener I believed about the

7    content of his testimony.  So I'm just going to ask that

8    she not talk to him about the content of his testimony

9    between now and the time that we come back, since he is in

10   the middle of his testimony.

11             THE COURT:  All right.  That will be the order.

12             MS. ROOHANI:  Thank you, Your Honor.

13             COURTROOM ADMINISTRATOR:  Your Honor, one final

14   thing.  Will the previous order regarding Mr. Humphries and

15   Mr. Fuechtener's contact --

16             THE COURT:  Yes, that will continue.

17             COURTROOM ADMINISTRATOR:  Okay.  Thank you, Your

18   Honor.

19             MS. CONNOLLY:  And the marshals will transport

20   him?

21             COURTROOM ADMINISTRATOR:  Off record.

22             MS. CONNOLLY:  Thank you.

23             THE COURT:  All right.  Thank you.

24         (The proceedings concluded at 4:34 p.m.)

25                       *    *    *

1                          I N D E X

2    DEFENDANT'S WITNESSES:                          PAGE

3    JAN ROUVEN FUECHTENER
         Direct Examination (Resumed)                  4
4        By Ms. Connolly
         Cross-Examination By Ms. Roohani            27
5        Redirect Examination By Ms. Connolly       155

6
                         E X H I B I T S
7
     GOVERNMENT'S                                ADMITTED
8    1                                               69

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2          I certify that the foregoing is a correct

3       transcript from the electronic sound recording

4       of the proceedings in the above-entitled matter.

5

6       _____     _4/30/18_

7       Donna Davidson, RDR, CRR, CCR #318       Date
        Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25