TRANSCRIBED FROM DIGITAL RECORDING

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,        )
                                      ) Case No. 2:16-cr-00100-GMN-CWH
4              Plaintiff,             )
                                      ) Las Vegas, Nevada
5    vs.                              ) March 9, 2018
                                      ) Courtroom 7D
6    JAN ROUVEN FUECHTENER,           )
                                      )
7                                     ) Recording method:
               Defendant.            ) Liberty
8    _____)       9:07 a.m. - 3:58 p.m.

9                                      EVIDENTIARY HEARING, Day 1

10                       *C E R T I F I E D   C O P Y*

11                     TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE GLORIA M. NAVARRO
12            CHIEF UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:      *ELHAM ROOHANI, AUSA*
                             *LISA CARTIER-GIROUX, AUSA*
16                           *UNITED STATES ATTORNEY'S OFFICE*
                             *501 Las Vegas Boulevard South, Suite 1100*
17                           *Las Vegas, Nevada 89101*
                             *(702) 388-6336*

18

19   (Appearances continued on page 2.)

20   Recorded by:           Araceli Bareng

21   Transcribed by:        Amber M. McClane, CCR 914
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada 89101
23                          AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25

TRANSCRIBED FROM DIGITAL RECORDING

1    APPEARANCES CONTINUED:

2    For the Defendant:

3        *KAREN A. CONNOLLY, ESQ.*
         *KAREN A. CONNOLLY, LTD.*
4        *6600 West Charleston Boulevard, Suite 124*
         *Las Vegas, Nevada 89146*
5        *(702) 678-6700*

6

7    Also Present:

8        *MARI PANOVICH, FBI Special Agent*

9

10                          *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

1                              *I N D E X*

2    Defense's Witness:                                    Page

3    Jess Marchese

4         Direct Examination by Ms. Connolly          11

5         Cross-Examination by Ms. Roohani           108

6         Redirect Examination by Ms. Connolly       150

7         Recross-Examination by Ms. Roohani         157

8         Further Redirect Examination by Ms. Connolly  168

9         Further Recross-Examination by Ms. Roohani   169

10        Further Redirect Examination by Ms. Connolly  170

11

12   Michael Sanft

13        Direct Examination by Ms. Connolly         172

14        Cross-Examination by Ms. Cartier-Giroux    212

15        Redirect Examination by Ms. Connolly       237

16        Recross-Examination by Ms. Cartier-Giroux  241

17        Further Redirect Examination by Ms. Connolly  243

18

19   Benjamin James Nadig

20        Direct Examination by Ms. Connolly         247

21        Cross-Examination by Ms. Roohani           273

22

23                         *  *  *  *  *

24

25

TRANSCRIBED FROM DIGITAL RECORDING

1           *I N D E X   C O N T I N U E D*

2                  *E X H I B I T S*

3    EXHIBIT:          ADMITTED:

4    Defense:

5        A               10

6        B               10

7        C               30

8        D               53

9        F               87

10                       * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AMBER M. McCLANE, CCR 914
(702) 384-0429

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              LAS VEGAS, NEVADA; FRIDAY, MARCH 9, 2018; 9:07 A.M.

 2                                --o0o---

 3                          P R O C E E D I N G S

 4              THE COURT:  Thank you.  Good morning.  You may be

 5     seated.

 6              COURTROOM ADMINISTRATOR:  This is the time set for

 7     the evidentiary hearing in Case No. 2:16-cr-100-GMN-CWH,

 8     United States of America versus Jan Rouven Fuechtener.

 9              Counsel, please state your appearances for the

10     record.

11              MS. ROOHANI:  Good morning, Your Honor.  Ellie

12     Roohani and Lisa Cartier-Giroux for the United States.  We are

13     joined by FBI Special Agent Mari Panovich.

14              THE COURT:  Good morning, Ms. Panovich.  Good

15     morning, Ms. Giroux.  Good morning, Ms. Roohani.

16              MS. CONNOLLY:  Karen Connolly appearing on behalf of

17     defendant, Jan Rouven -- Jan Rouven Fuechtener who's present

18     in custody.

19              THE COURT:  Good morning, Ms. Connolly.  Good

20     morning, Mr. Fuechtener.

21              All right.  So this is the defendant's request for an

22     evidentiary hearing.  So we'll go ahead and hear from the

23     defendant's witnesses first subject to cross-examination, and

24     then, afterwards, if the Government has any witnesses that

25     they would like to call, then we'll go ahead and do that.  And
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   we'll see how far we get to the -- I plan to take a break at
 2   noon at lunch, if we're not done yet.  And then my
 3   understanding is that you may be requesting a transcript of
 4   today's hearings before arguing, you'll want to submit it a
 5   brief or --
 6         MS. ROOHANI:  That part of it's news to me, Your
 7   Honor.  I haven't requested it.
 8         THE COURT:  Okay.
 9         MS. ROOHANI:  So I would -- I would be prepared to
10   argue as soon as you were finished with the hearing.  I don't
11   know if Ms. -- Ms. Connolly has requested it.
12         Your Honor, we do have one preliminary matter that we
13   need for you to address.
14         THE COURT:  All right.
15         MS. ROOHANI:  You issued the writ on Mr. Humphries.
16   It appears that his attorney is not intending to be present
17   here today.  The Government believes that we have the right to
18   impeach him both -- both on his bias, and that could
19   potentially require him to make statements that may impact his
20   current pending federal case.  And so we believe that his
21   attorney does need to be here to advise him about his Fifth
22   Amendment privilege to not self-incriminate.  I put that in my
23   opposition to the motion that you ultimately denied as moot as
24   being a -- a concern.  I don't believe it's sufficient that
25   Mr. Ericsson has instructed him that he could be charged with
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    obstruction of justice and perjury.  The fact of the matter is
 2    he would be waiving his Fifth Amendment privilege if he makes
 3    any statements in this particular hearing that would be
 4    beneficial to the Government.  We would be entitled to use
 5    those statements against him in his own case as well,
 6    notwithstanding any potential criminal charges that may be
 7    brought.
 8            So we would like for Your Honor to consider
 9    appointing his current attorney, Mr. Ericsson, for the
10    purposes of this hearing.  It's my understanding that, because
11    Mr. Ericsson hasn't technically been appointed in this
12    particular matter, he couldn't bill under CJA, under the
13    voucher, so that's why I think that he's not here.  And in the
14    event that Mr. Ericsson is not able to be here today, I think
15    that we need to address that before we begin the hearing.  I
16    do have legitimate concerns, Your Honor, and I'm happy to
17    proffer as to why I believe that Mr. Humphries and
18    Mr. Fuechtener are ultimately conspiring to deceive this
19    Court, and so I would ask not only for -- in the event that
20    we're going to be having the hearing today, that
21    Mr. Humphries' counsel be here, that Mr. Humphries be
22    separated from Mr. Fuechtener down in the marshal lock-up in
23    the event that Mr. Humphries doesn't testify before any type
24    of break or that Mr. Humphries or Mr. Fuechtener might be
25    together, and -- and in the event that we're not going to go
```

TRANSCRIBED FROM DIGITAL RECORDING

1    forward today, Your Honor, we'd ask for a continuance rather

2    than bifurcation of the testimony.

3         **THE COURT:**  Aaron, was Mr. Ericsson appointed CJA

4    counsel on Mr. Humphries' original case?

5         **COURTROOM ADMINISTRATOR:**  I believe Mr. Humphries'

6    case is a state case.

7         **MS. ROOHANI:**  No, Your Honor.  It's a federal case

8    pending before Judge Gordon.

9         **COURTROOM ADMINISTRATOR:**  I believe he was CJA.  Let

10   me double-check.

11        **MS. ROOHANI:**  He is CJA, Your Honor.  I can represent

12   that as an officer of the court.

13        **THE COURT:**  All right.  Well, based on the proffer

14   provided by the Government that Mr. Humphries may have

15   potential charges of obstruction of justice and perjury

16   depending on his testimony in this particular matter and needs

17   to be informed as to his Fifth Amendment right to not

18   incriminate himself, I will appoint Mr. Ericsson, if he is

19   available.  If he is not available, then we'll appoint the

20   next CJA attorney who's on the panel -- the panel that would

21   be otherwise appointed to the next case today.

22        And did you, Ms. Connolly, expect to call

23   Mr. Humphries as your first witness or later on?

24        **MS. CONNOLLY:**  No.  Probably one of my last

25   witnesses.

TRANSCRIBED FROM DIGITAL RECORDING

1        **THE COURT:**  Okay.  So we'll revisit that before she

2    calls Mr. Humphries if we need to take a break we can do that

3    as well.

4        **MS. ROOHANI:**  Your Honor, would you entertain my

5    request to keep Mr. -- we would be invoking the exclusionary

6    rule, and so we would ask that you keep Mr. Fuechtener and

7    Mr. Humphries separated down in marshal lock-up in the event

8    that -- because Mr. Fuechtener is sitting here in the

9    courtroom, he ultimately will be hearing the testimony.  And

10   if he is with Mr. Humphries, they have the possibility or the

11   potential to collude to manufacture testimony.

12       **THE COURT:**  Ms. Connolly, do you have any objection

13   to that request?

14       **MS. CONNOLLY:**  When they're in the lock-up, I have no

15   objection from being excluded and separated, no.

16       **THE COURT:**  All right.  So that will be the order

17   subject to the availability of the marshal's office to have

18   enough room available to keep them separated.

19       All right.  So, Ms. Connolly, you may go ahead and

20   call your first witness.

21       **MS. CONNOLLY:**  Judge, we have just a matter of

22   bookkeeping.  We have a couple of exhibits that the Government

23   has stipulated to be admitted.  One is -- if I may approach --

24       **THE COURT:**  Okay.

25       **MS. CONNOLLY:**  -- your clerk?  Exhibit A is a

1    certificate of custodian of records from Henderson Detention

2    Center.  Another one is Exhibit B, is a record from Margo

3    Chan, associate general counsel for the United States Marshal

4    Service.

5         **THE COURT:**  I'm sorry.  Did you say the Government

6    did or did not stipulate to the admission of Exhibit A and B?

7         **MS. ROOHANI:**  Your Honor, I will stipulate to these.

8    I just wanted to state for the record that Defense Exhibit A I

9    received for the first time this morning, but I understand

10   that there's a certificate of custodian of records, and I

11   don't believe that I have a legal basis to object to it.  I

12   just wanted to state for the record that I -- I'd never seen

13   this document before this morning.

14        **THE COURT:**  All right.  So we'll give you some time

15   before cross-examination if you need it to review it more

16   carefully.  It's -- looks to be about 28 pages, I think it

17   says?  Yeah, it's marked 28 pages.  So if we need to, we can

18   go ahead and take a break after direct examination so that you

19   can review it more carefully.

20        Anything else?  No?  Okay.  So Exhibit A and B will

21   be admitted.

22        *(Defense Exhibits A and B, received.)*

23        **THE COURT:**  And you may call your first witness.

24        **MS. CONNOLLY:**  My first witness would be Jess

25   Marchese.  I'm not sure he's here yet, Judge.  We may have to

JESS MARCHESE - Direct Examination

```
1    call some of the witnesses out of order depending on who's

2    here.  Can I go check?

3              THE COURT:  All right.  Yes.  Just go check.

4         (Pause in the proceedings.)

5              COURTROOM ADMINISTRATOR:  Good morning, sir.

6              THE WITNESS:  Good morning.

7         (The witness is sworn.)

8              COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be

9    seated.  Please state and spell your full name for the record.

10             THE WITNESS:  Jess Marchese, J-E-S-S, like Sam,

11   M-A-R-C-H-E-S-E.

12                       DIRECT EXAMINATION

13   BY MS. CONNOLLY:

14   Q.   Good morning, Mr. Marchese.  How are you employed?

15   A.   I'm an attorney.

16   Q.   All right.  And when were you admitted to practice law in

17   the state of Nevada?

18   A.   2002.

19   Q.   2000 what?

20   A.   '2.

21   Q.   2002.

22        And you're licensed to practice in Federal Court,

23   obviously.  Correct?

24   A.   That's correct.

25   Q.   Okay.  And when were you first admitted to practice in
```

JESS MARCHESE - Direct Examination

1   Federal Court?

2   A.   Maybe '03.  Don't quote me on that.  It was somewhere

3   around there.

4   Q.   Okay.  And during that period of time, I assume you've

5   litigated cases in Federal Court?

6   A.   Yes, I have.

7   Q.   Okay.  How many cases do you estimate you've litigated in

8   Federal Court since you were licensed to practice?

9   A.   In Federal Court or generally speaking?

10  Q.   Federal Court.

11  A.   It would be difficult to give an exact number.  I'm sure

12  it's been at least 100.

13  Q.   Okay.  How many cases have you taken to trial in Federal

14  Court?

15  A.   Approximately ten.

16  Q.   And were those two -- were those resolved to a conclusion

17  from start to finish or did they resolve during trial?

18  A.   Actually, Mr. Fuechtener's case was the only one that I

19  can recollect that didn't go to the jury.  I've had some hung

20  juries but --

21  Q.   So you recognize the individual sitting to my left, and

22  you identified him as Mr. Fuechtener.  Correct?

23  A.   Oh, of course I do.  Yes.

24  Q.   And how do you know him?

25  A.   He was my client for this case.

JESS MARCHESE - Direct Examination

1    Q.    Okay.  And his case was involving charges of -- of child

2    pornography.  Correct?

3    A.    That's correct.

4    Q.    Okay.  And how many child pornography cases had you

5    handled in Federal Court prior to representing Mr. Fuechtener

6    in his case?

7              MS. ROOHANI:  Objection.  Relevance.

8              THE COURT:  The objection is to the relevance?

9              MS. ROOHANI:  Relevance of that question, Your Honor.

10   There's been no allegation that Mr. Marchese was not qualified

11   to handle a child pornography case.  I don't see the relevance

12   of that question.

13             THE COURT:  All right.  What's the relevance,

14   Ms. Connolly?

15             MS. CONNOLLY:  Excuse me?

16             THE COURT:  What is the relevance of the question?

17             MS. CONNOLLY:  The relevance is this is a child

18   pornography case, and it's getting to his knowledge of child

19   pornography cases.  In particular, the sentencing guidelines.

20             THE COURT:  All right.  The objection's overruled.

21   You may ask the question.

22             THE WITNESS:  Give or take, probably about ten.

23   BY MS. CONNOLLY:

24   Q.    You've had ten child pornography cases prior to your

25   representation of Mr. Fuechtener?

JESS MARCHESE - Direct Examination

1   A.   And that would be in Federal Court, just to be clear.

2   I've obviously handled them in state court but a different

3   animal.

4   Q.   So to the best of your recollection, prior to your

5   representation of Mr. Fuechtener, you'd had -- you'd

6   represented individuals on approximately ten child pornography

7   cases?

8   A.   Correct.

9         **MS. ROOHANI:**  And to be clear, Your Honor, that's

10   just in Federal Court.

11         **MS. CONNOLLY:**  In Federal Court.

12         **THE COURT:**  Correct.

13   **BY MS. CONNOLLY:**

14   Q.   And how many of those cases were resolved by way of a

15   guilty plea agreement?

16   A.   I'd never taken a child pornography case to trial prior

17   to Mr. Fuechtener's case.

18   Q.   So how many child pornography cases do you estimate were

19   resolved by way of a plea prior to Mr. Fuechtener's case?

20   A.   All the cases I've done had gone way of plea.

21   Q.   How was it that you -- you were retained to represent

22   Mr. Fuechtener.  Correct?

23   A.   (Inaudible.)

24   Q.   Okay.  And I had previously requested a copy of your

25   retainer agreement.  Right?

JESS MARCHESE - Direct Examination

1    A.   You might have, yes.

2    Q.   And you've not provided that to date, have you?

3    A.   If you don't have it, then I didn't.

4    Q.   Do you recall when you were retained to represent

5    Mr. Fuechtener?

6    A.   It was shortly after the initial search warrant in his

7    residence.  I believe that was in January of 2016.  So maybe a

8    week or two thereafter.

9    Q.   Would February 16, 2016, sound accurate?

10   A.   Yeah, it was shortly thereafter.

11   Q.   And who was it that contacted you in regard to

12   representing Mr. Fuechtener?

13   A.   It would have been his entertainment lawyer, I guess, for

14   lack of a better term, Mr. Steve Pacitti.

15   Q.   And so Mr. Pacitti contacted you in regards to

16   representing Mr. Fuechtener?

17   A.   Possibly, yes.

18   Q.   So how much were you paid to represent Mr. Fuechtener?

19        **MS. ROOHANI:**  Objection to relevance.

20        **THE COURT:**  Relevance, Ms. Connolly?

21        **MS. CONNOLLY:**  It goes to motivation, impeachment,

22   bias, state of mind.

23        **THE COURT:**  All right.  Overruled.  You may ask the

24   question.

25        **THE WITNESS:**  Initially I was given a retainer of --

JESS MARCHESE - Direct Examination

1    a pre-indictment, so to speak, retainer of $10,000.

2    **BY MS. CONNOLLY:**

3    Q.    Of how much?

4    A.    $10,000.

5    Q.    How much, in total, were you paid for your representation

6    of Mr. Fuechtener?

7    A.    Total, counting that initial retainer, was a total of

8    $85,000.

9    Q.    And did you bring somebody else on the case to assist, or

10   did you recommend to Mr. Fuechtener that another attorney be

11   hired to assist you with his representation?

12   A.    Yes and no.  It would depend on which time period you're

13   referring to.

14   Q.    Okay.  So you -- you were -- you were hired in

15   approximately February of 2016.  Shortly thereafter, were

16   there any attorneys that were brought on board to represent

17   Mr. Fuechtener?

18   A.    Mr. Michael Sanft and Mr. Benjamin Nadig were brought on.

19   Q.    Okay.  And was that pursuant to your recommendation or

20   somebody else?

21   A.    No.  My understanding is that they -- they had previously

22   met with Mr. Fuechtener.  After he was detained by the

23   magistrate judge, Mr. Fuechtener's husband went and retained

24   those two individuals.

25   Q.    And his husband would be Frank Alfter?

JESS MARCHESE - Direct Examination

1   A.   Yes, correct.

2   Q.   And the allegations in this case essentially start --

3   stem from child pornography that was allegedly found on

4   computers and devices that were in the home that

5   Mr. Fuechtener shared with Mr. Alfter.  Correct?

6   A.   Correct.

7   Q.   Okay.  And you would agree that, in light -- given those

8   facts and circumstances, there would be a conflict with the

9   same attorney representing Mr. Fuechtener and representing

10  Mr. Alfter?  Would you agree with that?

11  A.   Yes.  I mean, he was never ultimately charged.  But,

12  yeah, there could be a conflict there.  Yes.

13  Q.   But he did reside in that home where the devices

14  containing the images were located?

15  A.   To the best of my knowledge, yes, that's been my

16  investigation.  Sure.

17  Q.   So it would be fair to say, in approximately March of

18  2016, Nadig and Sanft were retained?

19  A.   Correct.

20  Q.   What was your understanding of who they were retained to

21  represent?

22  A.   It's difficult to say in looking back.

23  Q.   At that time -- let me ask you, at that time what was

24  your understanding?

25  A.   I honestly am not 100 percent sure.  I cannot say to a

JESS MARCHESE - Direct Examination

1    certainty what exactly the arrangement was because it was

2    nothing that I was ever consulted on.

3    Q.   But was it your understanding that you were to work with

4    Mr. Sanft and Mr. Nadig in a joint representation of Mr. --

5    A.   That --

6    Q.   -- Fuechtener?

7    A.   That I would agree with.

8    Q.   At that point in time?

9    A.   Yes.

10   Q.   Okay.  And would it be fair to say that Mr. Sanft made an

11   appearance on the record as attorney for Mr. Fuechtener in

12   April of 2016?

13   A.   Sounds correct.

14   Q.   So in April of 2016, officially on the record, the

15   attorneys of record for Mr. Fuechtener were you and Mr. Sanft?

16   A.   Sounds right.

17   Q.   Even though Nadig and Sanft were both retained, to your

18   knowledge?

19   A.   Correct.

20   Q.   Okay.  At some point in time -- let me strike that.

21         At some point in time, did you express to

22   Mr. Fuechtener a concern about having Nadig and Sanft -- or

23   Nadig and/or Sanft on the case together with you jointly

24   representing Mr. Fuechtener?

25   A.   And the question was?  I'm sorry.  I want to make sure I

JESS MARCHESE - Direct Examination

1   get this right.  You said did I express a concern?

2   Q.   Yes.

3   A.   Yes, I did.  It was in reference to Mr. Fuechtener's

4   concern as well.

5   Q.   Okay.  And do you remember when that concern arose?

6   A.   I do.  I can't tell you an exact date, but I remember the

7   facts and circumstances arising from it.

8   Q.   And can you explain those to us, please.

9   A.   This was actually at the Henderson Detention Center.  I

10  was a little frustrated --

11  Q.   Let me ask you -- let me ask you, do you know when in

12  terms -- in terms of time frame?  Like, what -- is it April?

13  We're talking Sanft confirms.  In November there's the trial.

14  So within that time frame?

15  A.   Well, I don't want to give an exact date, but I can tell

16  you a frame of reference wise.  Time line wise, it would have

17  been approximately a few weeks before Mr. Durham and -- came

18  on board.

19  Q.   And, at some point, Mr. Durham came on board, and that

20  was at your recommendation.  Right?  Or your suggestion, no?

21  A.   However you want to couch it, yes.

22  Q.   Okay.  And it would be fair to say that, at some point in

23  time, Mr. Nadig and Mr. Sanft were fired and then Mr. Durham

24  was brought on the case?

25  A.   Yes.

JESS MARCHESE - Direct Examination

1  Q.    So were you aware of or do you have any personal

2  knowledge about why Nadig and Sanft were fired?

3  A.    Yes.

4  Q.    And what was your understanding?

5  A.    Going back to when we were talking about the --

6  Q.    In the Henderson Detention Center?

7  A.    Correct.

8  Q.    Okay.

9  A.    There were many times when Jan had asked me, "Where are

10  my other attorneys?"  And I would deflect the situation, you

11  know, and just say, "Hey, you know, they're busy," this, that,

12  the other thing.  Ms. Roohani and I -- I don't know if you've

13  seen the record, but we engaged in a lot of motion practice.

14          The night before, I was responding to some motions, I

15  had a deadline, and my son came up to me and says, "Hey, will

16  you come play with me?"  And I was like, "No, Buddy, I got to

17  do this motion."  I'll be honest.  I got a little frustrated

18  at it.  And then, once again, the next day I visited Jan, and

19  he was asking me, "Where are my attorneys?"  And then I kind

20  of was like --

21  Q.    He's asking where my attorney is?

22  A.    Right.  Something along those lines.  I mean, I don't

23  know if that's the exact verbiage he used but --

24  Q.    He was having -- expressing his concern about not having

25  visits from his attorneys?

JESS MARCHESE - Direct Examination

1      **MS. ROOHANI:** Objection. Leading.

2      **THE COURT:** Overruled. You can answer the question.

3      **THE WITNESS:** He just wanted some -- yeah. I mean, I

4  don't know what his frame of mind was at the time, but he was

5  asking where are they.

6  **BY MS. CONNOLLY:**

7  Q. Would it be fair to say that you visited with him

8  frequently?

9  A. Yes.

10 Q. Fair to say that you visited him with yourself and not

11 with Mr. Nadig and Mr. Sanft?

12 A. No. I believe there were some joint visits. I can't

13 tell you exactly when or with who. I know Nadig and I went

14 one time together.

15 Q. Let me ask you this. Did you ever express to

16 Mr. Fuechtener a concern that Mr. Sanft, when he came to visit

17 with him, never had any files, and your concern that he wasn't

18 reviewing the discovery because he rode his motorcycle,

19 apparently, to the visit?

20 A. It might -- that might have came up. I mean, listen,

21 Jan's not a dumb guy. He might have brought it up to me --

22 Q. Okay. So --

23 A. -- quite frankly.

24 Q. So you were -- so that was a concern that you believe he

25 voiced, that Mr. Sanft, when he was coming to visit, didn't

JESS MARCHESE - Direct Examination

1    appear to be on top of all the discovery?

2    A.   It did come up, yes.

3         **MS. ROOHANI:**  And, Your Honor, can Ms. Connolly, I

4    guess, narrow the time frame here?  Because I don't --

5    depending on when it is, I don't see how it's relevant if it's

6    not close to the time of the plea.

7         **THE COURT:**  Can you --

8    **BY MS. CONNOLLY:**

9    Q.   Well, is Sanft -- Durham substituted in for Sanft in

10   July 24 of 2016.  So it would be fair to say these discussions

11   took place prior to that?

12   A.   I honestly think they came up before and after.  Because,

13   as you know, Mr. Sanft came back on board.

14        **MS. ROOHANI:**  And, Your Honor, on that basis, I'm

15   going to object to this entire line of questioning.  I don't

16   see how it's relevant.  Your Honor's order was that we were

17   talking about the plea agreement and, at this point, we're

18   talking about six or seven months before the -- the plea

19   agreement was ever entered.

20        **MS. CONNOLLY:**  It's relevant to the fact that the

21   Government has argued previously that Mr. Sanft went over the

22   guidelines with Mr. Fuechtener.  In order for him to

23   competently go over the guidelines, he'd have to be familiar

24   with the discovery.  Therefore, whether or not he was familiar

25   with the discovery is relevant.

JESS MARCHESE - Direct Examination

1        **THE COURT:**  The objection's overruled.

2        **THE WITNESS:**  I'm sorry.

3    BY MS. CONNOLLY:

4    Q.   Do you remember the question?

5    A.   I don't remember what it was.

6    Q.   Okay.  So we were talking -- there was some concern that

7    was expressed by Mr. Fuechtener and shared by you that

8    Mr. Sanft is not familiar or reviewing the discovery; is that

9    accurate?

10   A.   Yes.

11   Q.   And that was prior to July -- you believe those

12   discussions took place prior to July of 2016 when Mr. Durham

13   substituted in as counsel?

14       **MS. ROOHANI:**  Objection.  Calls for hearsay.  If

15   Mr. Fuechtener wants to testify about what he told anybody, he

16   can get up and testify.

17       **THE COURT:**  Rephrase the question, Ms. Connolly.

18   BY MS. CONNOLLY:

19   Q.   Your concerns about Mr. Sanft not being familiar with the

20   discovery took place prior to July 2016, and I believe you

21   indicated also after because Mr. Sanft was brought back on the

22   case.  Right?

23   A.   Correct.

24   Q.   And so you indicated there was a time when you went to

25   meet with Mr. Fuechtener and with Mr. Nadig also?

JESS MARCHESE - Direct Examination

1    A.    Yes.

2    Q.    Do you recall when that was?

3    A.    I can't tell you exactly.  I mean, I had so many visits

4    with him.  It would be hard for me to pinpoint a date.  But I

5    can tell you this.  Nadig was in trial at the time, and he had

6    to leave early because I think he was waiting on a jury or

7    something like that.  So whenever he was in trial.

8    Q.    So -- so you had a joint meeting, to the best of your

9    recollection, at least joint -- one joint meeting with Nadig

10   and Mr. Fuechtener?

11   A.    Yes.

12   Q.    Okay.  And is it true that Mr. Nadig interviewed an

13   expert witness because, at some point in time, you were not

14   available?  Was that -- you're shaking your shoulders.  So I'm

15   not sure if --

16   A.    Well, okay.  There was an expert witness -- there were

17   two experts, but there was one in particular who was brought

18   on to view the possibility that someone had hacked into Jan's

19   devices.  He came in from California.  The time frame in which

20   he came in, I had a previously scheduled vacation.  So we

21   needed someone -- because I believe Mr. Alfter was out of the

22   country.  We needed someone there to, you know, kind of guide

23   him around the home, I guess, if you will.  So I said, "Hey,

24   guys, I can't be here.  Can you meet with this guy?"

25             So I don't know if I'd call it an interview, but he

JESS MARCHESE - Direct Examination

```
 1   definitely was there, to my knowledge, and took him around the
 2   premises.
 3          THE COURT:  Which "they" are you referring to was
 4   there?  I'm sorry.
 5          THE WITNESS:  I believe it was both Mr. Nadig and
 6   Mr. Sanft and then, of course, the expert.
 7          THE COURT:  Thank you.
 8          MS. ROOHANI:  And, Your Honor, if he can state the
 9   basis of that belief.  Because, otherwise, I don't know that
10   Mr. Marchese has personal knowledge of this.
11          THE WITNESS:  Well, I coordinated it.  Because, like
12   I said, I was out of town and I -- I said, "Hey, someone's
13   going to need to be there."  And I believe Becky Easterman,
14   who is a close friend of Jan's, she had the key, and I believe
15   she would have let them into the premises.
16   BY MS. CONNOLLY:
17   Q.   So you coordinated a meeting between a potential defense
18   expert, Mr. Sanft, and Mr. Nadig because you were not
19   available?
20   A.   Exactly.
21   Q.   Okay.  So I assume, at that point in time, it was your
22   belief that Mr. Nadig and Mr. Sanft were working as a team in
23   a joint representation of Mr. Fuechtener?
24   A.   They were working on the case, I guess.  I don't know
25   exactly what the roles were.  I mean --
```

JESS MARCHESE - Direct Examination

```
 1    Q.    Okay.  Let me ask you --
 2    A.    -- it's hard for me to say.  You really have to ask them.
 3    Q.    You would agree that, if Mr. Nadig was actually
 4    representing Mr. Alfter, it would be not a good idea for him
 5    to be meeting with a potential expert witness for
 6    Mr. Fuechtener?  Would you agree with that?
 7            MS. ROOHANI:  Your Honor, objection.  I think it
 8    depends on the time frame and I think it calls for a legal
 9    conclusion that is up to Your Honor.
10            THE COURT:  Sustained.
11    BY MS. CONNOLLY:
12    Q.    This meeting with the expert that Mr. Sanft and Mr. Nadig
13    had, do you remember when that was?
14            There is a time reference as July being the time when
15    Durham came on.
16    A.    Well, it obviously had to be before then.
17    Q.    Okay.  Now, did there come a point in time when there was
18    some dissension that occurred between you and Nadig?
19            MS. ROOHANI:  Objection to the characterization as a
20    dissension, Your Honor.
21    BY MS. CONNOLLY:
22    Q.    Did there come a point in time where you received a
23    communication that was offered by Mr. Nadig that was -- you
24    found to be troublesome?
25    A.    Yes.  It was after Mr. Nadig was taken off of the case.
```

JESS MARCHESE - Direct Examination

1    Q.    Okay.

2              **MS. CONNOLLY:**  May I approach, Your Honor?

3              **THE COURT:**  Yes, you may.

4    **BY MS. CONNOLLY:**

5    Q.    Mr. Marchese, can you please review the document

6    (inaudible)?

7    A.    I do.  This is a copy of a communication you just

8    referenced.

9    Q.    Okay.  And that as your -- from the instructions, for

10   lack of a better term, does that indicate that that document

11   was forwarded to you?

12   A.    It was, yes.

13   Q.    And when was that?

14   A.    Oh, okay.

15   Q.    Okay.

16   A.    September 2016.

17   Q.    Okay.  So that document represents to be an e-mail from

18   been Nadig dated September 3, 2016, to the attention of

19   Jan Fuechtener which is cc'd to Steve Pacitti, Sanft Law

20   Group?

21             **MS. ROOHANI:**  Objection.  Hearsay.

22             **MS. CONNOLLY:**  Well, let me --

23             **THE COURT:**  Well, she's just identifying the

24   document.  So I'm -- I'll interpret it.  Rephrase it as if

25   that's what the document --

AMBER M. McCLANE, CCR 914
(702) 384-0429

1    **BY MS. CONNOLLY:**

2    Q.   Does this -- does this --

3          **THE COURT:**  -- purports to be.

4          **MS. CONNOLLY:**  I'm sorry.

5    **BY MS. CONNOLLY:**

6    Q.   Does this Exhibit C appear to be a true and accurate

7    representation of an e-mail that was provided to you on

8    September 21, 2016?

9    A.   It is.

10         **MS. CONNOLLY:**  Move to admit.

11         **MS. ROOHANI:**  I would object on the basis that it's

12   hearsay, Your Honor, and I don't know that she's laid the

13   proper foundation in terms of the relevance of this document.

14   And, in fact, Mr. Marchese hasn't even indicated that he was

15   the author of this document, so it's certainly hearsay.

16   **BY MS. CONNOLLY:**

17   Q.   Are you -- are you familiar with this address at the top

18   of this e-mail from benvegas@me.com?

19   A.   That was the address in which I communicated very

20   frequently with Mr. Alfter.

21   Q.   And the 2marcheselaw@msn.com, what is that?

22   A.   That's my e-mail.

23   Q.   And do you remember receiving this e-mail?

24   A.   Yes, I do.

25         **MS. CONNOLLY:**  Move to admit.

 1          **MS. ROOHANI:**  Same objection, Your Honor.  He's not

 2    the author of this document, and it's an out-of-court

 3    statement offered to prove the truth of the matter.

 4          **MS. CONNOLLY:**  I don't think he has to be the

 5    author --

 6          **THE COURT:**  Is it, Ms. Connolly?  Is it offered to

 7    prove the truth of the matter or the effect that it had on

 8    this witness?

 9          **MS. CONNOLLY:**  The effect that it had on this

10    witness.

11          **MS. ROOHANI:**  And, Your Honor, she hasn't established

12    what --

13          **MS. CONNOLLY:**  Not for the truth of the matter of the

14    assertions therein.  No.  It goes to the issue of the conflict

15    that was discussed in my motion and towards the coercion that

16    was discussed in my motion to withdraw the guilty plea.  State

17    of mind rather than the truth of the matter set forth therein.

18          **MS. ROOHANI:**  And, Your Honor, she doesn't have to

19    admit this document to talk about the effect that it had on

20    Mr. Marchese.  And, in fact, it would be inappropriate for it

21    to be considered for that particular purpose and be admitted

22    for that.  She can certainly ask him questions about the

23    effect it had without admitting the document.  Because the

24    document itself is hearsay.

25          **MS. CONNOLLY:**  It's not hearsay.  It's not being

JESS MARCHESE - Direct Examination

```
 1    offered for the truth of the matter, which is not what has
 2    been represented.
 3            THE COURT:  All right.  So is this a marked exhibit?
 4    I didn't catch the number.
 5            MS. CONNOLLY:  It's marked Exhibit C, Your Honor.
 6            THE COURT:  All right.  The objection's overruled.
 7    Exhibit C will be admitted.
 8        (Defense Exhibit C, received.)
 9    BY MS. CONNOLLY:
10    Q.   I'm going to digress a little bit before we talk about --
11    A.   Sure.
12    Q.   -- that particular document.
13            That document is dated September 3, 2016.  Right?  At
14    some time prior to that, you had expressed some concern to
15    Mr. Fuechtener about Mr. Nadig and/or Mr. Sanft's motivation
16    in being on the case.  Correct?
17    A.   Right.  When they were taken off, sure.
18    Q.   But you recounted to Mr. Fuechtener a -- a conversation
19    you had had with -- and you can tell me -- with Mr. Nadig or
20    Mr. Sanft -- at the Blue Martini in approximately July of
21    2016?
22    A.   No.  I've never been to the Blue -- well, any time in the
23    last ten years to the Blue Martini.
24    Q.   Well, but you -- a conversation you had with Mr. Nadig
25    and/or Mr. Sanft that caused you to be concerned about their
```

JESS MARCHESE - Direct Examination

1    motivations in representing Mr. Fuechtener; is that accurate?

2    A.   Well --

3    Q.   Tell us about the conversation you had with

4    Mr. Fuechtener, to your recollection, about it.

5    A.   Well, I -- I think what you're referring to is the

6    spontaneous statement made by Mr. Nadig in reference to doing

7    nothing.  Is that the one?

8    Q.   Yes.

9    A.   Okay.  That was at a judicial fundraiser --

10        MS. ROOHANI:  And, Your Honor, before Mr. Marchese

11   answers, I believe that it calls for hearsay, and I don't

12   believe that Mr. Marchese can testify as to what Mr. Nadig did

13   or did not say.

14        MS. CONNOLLY:  As he indicated, it was spontaneous,

15   not -- and it's not for the truth of the matter.  It's for the

16   effect on the state of mind of Mr. Marchese and Mr. Fuechtener

17   when that was communicated to him.

18        MS. ROOHANI:  And, Your Honor, Mr. Marchese has

19   indicated that he was not actually present for this

20   particular -- so it's hearsay within hearsay on top of the

21   fact that it's all hearsay, and I believe it is being offered

22   for the truth.

23        MS. CONNOLLY:  I believe it was a statement that was

24   made directly to him by Mr. Nadig and/or Mr. Sanft.

25        THE COURT:  Why don't you lay the foundation so that

JESS MARCHESE - Direct Examination

```
 1    we can understand better what kind of statement we're
 2    considering, and then I'll rule on the objection.
 3  BY MS. CONNOLLY:
 4    Q.   At some point in time, you had a concern -- early on in
 5    the case, prior to July, your understanding was you, Marchese,
 6    and -- you -- sorry.  You, Nadig, and Sanft were jointly
 7    representing Mr. Fuechtener.  Right?
 8          MS. ROOHANI:  I think that misstates the testimony,
 9    Your Honor.
10          MS. CONNOLLY:  Well, he's been asked if it was
11    accurate or not.  He can say yes or no.
12          MS. ROOHANI:  And I believe he said, "I don't know,"
13    and he can't recall, looking at that time, what his
14    recollection was.
15          THE COURT:  Mr. Sanft filed his notice on the docket
16    April 6 of 2016, which is No. 19 on the docket.  And both
17    Sanft and Nadig met with Mr. Fuechtener and his husband and
18    were retained in March.  So I don't have a specific
19    recollection that there was testimony about who Nadig was
20    representing.
21  BY MS. CONNOLLY:
22    Q.   You met with Mr. Nadig and Mr. Fuechtener.  Right?
23    A.   On at least one occasion, yes.
24    Q.   And it was your understanding, at that point in time -- I
25    assume you wouldn't have taken him to meet with your client if
```

JESS MARCHESE - Direct Examination

1    you had believed that he was representing Mr. Alfter, would

2    you?

3        **MS. ROOHANI:**  And, Your Honor, I think it calls for a

4    legal conclusion because it's possible there's a joint defense

5    at that time.  So I think she needs to narrow the time frame;

6    otherwise, I believe it calls for a legal conclusion that

7    Mr. Marchese can't make in this case.

8        **MS. CONNOLLY:**  Mr. Marchese can certainly, as a

9    lawyer and an officer of the court, express his belief and

10   whether or not it would be a conflict for one attorney to

11   represent two people in the case.

12       **THE COURT:**  Okay.  The objection's overruled.  He can

13   answer the question.  You might need to restate it.

14       **THE WITNESS:**  Did I believe if it was a conflict?

15   **BY MS. CONNOLLY:**

16   Q.   Assuming you -- yes.  Did you -- I'm assuming, at that

17   point in time, when you took Mr. Nadig to meet with

18   Mr. Fuechtener, it was your understanding that he was -- he

19   was representing Mr. Fuechtener, that his -- his -- he had

20   Mr. Fuechtener's best interests in mind, would that be

21   accurate?

22   A.   As to the representation, I don't -- I don't know what he

23   was doing.  I got to be honest.  It's so hard for me to say.

24   But in reference to his best interest, I don't believe that he

25   was working against him or anything like that, no.

JESS MARCHESE - Direct Examination

```
 1    Q.   Let me ask you this again.  What we talked about earlier
 2    is this whole case stems from images that were on a device in
 3    a home that Alfter and Fuechtener shared together.  Correct?
 4    A.   Correct.
 5    Q.   Okay.  So a potential defense for Mr. Fuechtener was
 6    that, "Oh, no, it was Mr. Alfter who put those images on the
 7    computer."  Right?
 8    A.   That was definitely a potential defense.
 9    Q.   And so if somebody who was representing Mr. Nadig -- or
10    representing Mr. Alfter was also representing Mr. Fuechtener,
11    that could potentially be a conflict.  Right?
12    A.   Absolutely.
13    Q.   And that type of situation, as an attorney who's been
14    practicing, you would want -- you would want to discuss that
15    with your client.  Correct?
16         MS. ROOHANI:  Objection.  Leading, Your Honor.  This
17    is her witness.  She needs to direct this witness.
18         THE COURT:  What is your objection?
19         MS. ROOHANI:  It's leading.  This is direct
20    examination.  She's leading the witness.  She's
21    cross-examining him.
22         THE COURT:  All right.  Well, is this a foundational
23    question?
24         MS. CONNOLLY:  Yes.
25         THE COURT:  All right.  I'll permit you.  Go ahead.
```

1  **BY MS. CONNOLLY:**

2  Q.   You're aware -- you're aware of the issue of conflict.

3  Right?

4  A.   Absolutely.

5  Q.   As an attorney, you -- if you're representing two people

6  and one's defense may blame the other one, it would not be a

7  good idea to represent both people, would they, unless it's a

8  joint defense?

9  A.   Correct.

10  Q.   But if one's defense is to blame the other, that wouldn't

11  be a joint defense, would it?

12  A.   Correct.

13  Q.   Okay.  And if somebody -- if two individuals in that

14  situation wanted you to represent them, I would assume that

15  you'd want some kind of waiver?

16  A.   Correct.

17  Q.   Because of conflict?

18  A.   Yes.

19  Q.   What would be the conflict you would -- you would -- you

20  would perceive in that kind of situation?

21  A.   Well, your antagonistic defenses.  It's -- as an

22  attorney, the number one thing is always your client's best

23  interest, of course.  So if you have two clients and you're

24  trying to look at both of their best interests and each one is

25  blaming the other one, obviously you're going to have a really

JESS MARCHESE - Direct Examination

 1   hard time with that conflict, even if you were to get the

 2   clients to waive it or something along those lines.

 3   Q.   And did you have any concern about -- did anything of

 4   that nature -- is there anything about this case that gave you

 5   concern that there may be some kind of conflict with Mr. Nadig

 6   or Mr. Sanft's involvement?

 7   A.   A little bit.

 8   Q.   Okay.  And what was that?

 9   A.   Well, exactly what you just explained, but there was so

10   little work done that it never really came -- it never was in

11   the forefront of my mind --

12   Q.   Let me stop you there.  "So little work done,"

13   referencing you or referencing who?

14   A.   Not me.  I mean, obviously I felt I did my job, of

15   course, but --

16   Q.   You reference -- you felt there was very little work done

17   by Nadig and Sanft on behalf of Mr. Fuechtener?

18   A.   Yes.

19   Q.   Okay.  And -- okay.  At some point in time, you discuss

20   with Mr. Fuechtener, I believe, your concern, I would assume.

21   Right?

22   A.   Yes.

23   Q.   Okay.  And as a result of that, was Mr. Nadig and

24   Mr. Fuechtener relieved on the case?

25   A.   Yes.

JESS MARCHESE - Direct Examination

```
 1    Q.   Okay.
 2              MS. ROOHANI:  Mr. Nadig and Mr. Fuechtener, Your
 3    Honor?
 4              THE WITNESS:  Oh.
 5    BY MS. CONNOLLY:
 6    Q.   Sorry.  Mr. Nadig and Mr. Sanft.  I apologize.
 7    A.   Yes.  Sorry.  Somebody's on the ball.
 8    Q.   Okay.  And as a result of that, did something happen that
 9    caused you to -- or thereafter -- let me strike that.  I'm not
10    wording this properly.
11              Defendant's Exhibit C, that is a letter that was --
12    or an e-mail that was sent after Sanft and Nadig were relieved
13    as counsel.  Correct?
14    A.   Yes.
15    Q.   Okay.
16              THE COURT:  I'm sorry, did you say e-mail or letter?
17              MS. CONNOLLY:  It's an e-mail.
18              THE COURT:  E-mail.  Thank you.
19    BY MS. CONNOLLY:
20    Q.   Okay.  And that's an e-mail that was sent to -- and when
21    you communicated with Mr. Fuechtener, you went through the
22    same address which is -- you believe that was also utilized by
23    Mr. Alfter; is that accurate?
24    A.   They had a few e-mails, but I definitely communicated
25    with Mr. Alfter with this FAME address.  Even when
```

JESS MARCHESE - Direct Examination

1    Mr. Fuechtener was out of custody, I don't believe he ever

2    used this, this FAME, because the FAME stands for Frank Alfter

3    Magic -- I don't know what the "E" is but, you know...

4    Q.   So when you received that, you were -- it would be fair

5    to say that you were greatly disturbed by this e-mail when you

6    received it?

7    A.   Of course.

8    Q.   Okay.  And it would be fair to say that, in that e-mail,

9    Mr. Nadig indicated that he and Mr. Sanft were representing

10   both Mr. Fuechtener and Mr. Alfter?

11   A.   Yes.

12   Q.   And that would be problematic to you why?

13   A.   Well, basically what we just said.  That it's --

14   Q.   Conflict?

15   A.   -- conflicting interests.

16        MS. ROOHANI:  And, Your Honor, I don't believe now

17   this is being offered for the effect on the listener but,

18   rather, it is being offered for the truth.

19        MS. CONNOLLY:  If I can finish with my questioning of

20   it?  I've just started asking about the letter.

21        THE COURT:  All right.  Objection's overruled.

22   BY MS. CONNOLLY:

23   Q.   What else was there in that e-mail that caused you

24   concern?

25   A.   What wasn't there?

JESS MARCHESE - Direct Examination

1    Q.    Okay.

2    A.    I mean, I can keep you here all morning.  I mean, one of

3    the things that I think particularly discouraged me was the

4    assertion that Mr. Nadig had not guilty results on these types

5    of cases, which was, in part, true.  The case he was referring

6    to, yes, the defendant did get a not guilty verdict on a

7    count, but he failed to mention that the defendant was, in

8    fact, convicted and got a significant -- at least what I would

9    consider a significant prison sentence.

10   Q.    So in this --

11   A.    So I thought that was a misrepresentation.

12   Q.    So in the e-mail -- the e-mail that was sent to Frank and

13   to Jan, Mr. Nadig, you believe, is making a representation

14   about his abilities on these cases that you didn't believe to

15   be accurate?

16   A.    Yes and no.  I definitely agree with the latter portion,

17   but Jan was in custody at the time so I do know that he --

18   well --

19   Q.    Are you aware that he -- he came and -- that he received

20   a copy of this e-mail?  Are you aware of that fact?

21   A.    He knew about it.

22   Q.    Okay.  And so in addition to that, in the e-mail -- is it

23   accurate that the e-mail indicates that Sanft and Nadig

24   represent --

25            **MS. ROOHANI:**  Objection.  Leading.

JESS MARCHESE - Direct Examination

BY MS. CONNOLLY:

Q.   Besides the fact that the -- what you believe to be a
false statement was -- regarding the results that Mr. Sanft
and Mr. Nadig had obtained in Federal Court, what else in that
e-mail caused you concern?

A.   Well, the -- the assertions of the amount of work that he
had allegedly done on the case.  I mean, listen, I don't
follow the man around.  I don't hack into his computer to see
what he's doing.  But from what I saw, there was no way that
Mr. Nadig did the amount of work that he represented in this
e-mail.

Q.   Were you bothered by -- in one part of the e-mail he
represents that he and Sanft were representing Jan, and then
another part of the e-mail he says that he and Michael Sanft
are representing Alfter.  Correct?

         MS. ROOHANI:  Leading and hearsay, Your Honor.

         THE COURT:  Rephrase the question.

BY MS. CONNOLLY:

Q.   What, in your mind, was the purpose of this e-mail?

A.   Not to give a refund.

Q.   Excuse me?

A.   Not to give a refund.

Q.   And can you -- what was -- is that based upon -- what was
that assumption?  Is it -- were you -- were you -- is it your
understanding that, once they were fired, a refund was

JESS MARCHESE - Direct Examination

```
 1   requested of the retainer?
 2   A.    I don't know that for a fact, but I'm -- I can pretty
 3   confidently say that, based on everything that I had seen and
 4   heard, yes.
 5        MS. ROOHANI:    Your Honor, I'm going to move to strike
 6   that based on hearsay and speculation.
 7        THE COURT:    I don't think it's speculation if he's --
 8   he's explained that based on what he saw and his involvement
 9   in the case.  So the objection's overruled.
10   BY MS. CONNOLLY:
11   Q.    So you received this e-mail but was there a point in
12   time, prior to receiving this e-mail, that you got a frantic
13   phone call from Mr. Fuechtener?
14   A.    Yes, I believe so.
15   Q.    Okay.  Do you remember -- and did that cause you to go
16   and meet with him at the Henderson holding facility?
17   A.    Yes.
18   Q.    Okay.  Do you remember when that was?
19   A.    I can't give you an exact date, but I do remember it
20   would have -- I can safely say it would have been around this
21   time frame.
22   Q.    Would it be fair to say it was in September?
23   A.    Yes.
24   Q.    Okay.  And did you become aware of whether or not Nadig
25   or Sanft had met with Mr. Fuechtener after they had been
```

JESS MARCHESE - Direct Examination

1   terminated as counsel?

2   A.   At a jail visit, Mr. Fuechtener had indicated to me that

3   the previous day Mr. Nadig had went to visit him.

4   Q.   And that was at a time that you were his counsel?

5   A.   Correct.

6   Q.   And that was a point in time when Nadig and Sanft were no

7   longer -- had been fired?

8   A.   Correct.

9   Q.   And Mr. Nadig did not contact you to ask if he can meet

10  with your client before meeting with him, did he?

11  A.   No.

12  Q.   And how did that make you feel?  What did you think about

13  that?

14  A.   Well, it was -- it upset me for many reasons.

15  Q.   It was what?  I'm sorry.

16  A.   It upset me for many reasons.

17  Q.   Okay.  And what were those reasons?

18  A.   Well, obviously, any time that I would go to -- in a

19  situation like that, I would call the attorney and say, "Hey,

20  just to let you know, I'm going to see your client."  That's

21  No. 1.  And then, No. 2, based on what Jan had said to me, I

22  felt that, you know, I was being torpedoed, for lack of a

23  better term.

24  Q.   Torpedoed by Nadig?

25  A.   Yes.

JESS MARCHESE - Direct Examination

```
 1   Q.   What do you mean by that?

 2   A.   Well, he's telling him contrary information.  He was --

 3   he clearly had scared Jan.

 4           MS. ROOHANI:  Objection, Your Honor.  Hearsay as to

 5   what Mr. Fuechtener told Mr. Marchese.

 6           MS. CONNOLLY:  It goes to state of mind.

 7           THE COURT:  I'll admit it as to Mr. Marchese's state

 8   of mind and how it affected him.  It's not evidence of what

 9   was actually said by Mr. Nadig to Mr. Fuechtener.

10   BY MS. CONNOLLY:

11   Q.   You -- how -- you went to go meet with Mr. Fuechtener,

12   and -- as a result of a call you received from him.

13           Let me ask you this.  How was his demeanor when you

14   met with him, Mr. Fuechtener's demeanor?

15   A.   Yeah, in -- and I think this -- I think this was a

16   regularly -- just visit.  I don't think I went there based on

17   a call.  Because I remember being very surprised because he

18   told me, "Oh, I thought you were Nadig."  He was surprised to

19   see me.  He thought Nadig was coming back to see him, and then

20   I was taken aback like, "What?  Nadig came here?"  And he was

21   very emotional.  By that time, I had known Jan very well.  I

22   know how he is.  He's the most happy-go-lucky guy you're ever

23   going to meet in the world, and that -- he was not himself

24   that day.

25   Q.   Would it be fair to say he was very -- he was very upset?
```

JESS MARCHESE - Direct Examination

```
 1    A.    Very.
 2    Q.    And was he upset as a result of the conversation you had
 3    with Nadig?  Was that your understanding without getting into
 4    specifically what he told you?
 5    A.    Definitely.
 6    Q.    And on that meet -- was Mr. Durham present with you when
 7    you were at that meeting?
 8    A.    I believe he was.
 9    Q.    Okay.  And -- and it was shortly after that meeting --
10    would it be fair to say that meeting took place right about
11    September 10?
12    A.    Somewhere in that time frame.  I mean, don't quote me --
13    Q.    Did the log -- the logs have been admitted from the
14    Henderson Detention Center.  So if they reflect it was right
15    about that time, you have no reason to dispute that?
16    A.    No.
17    Q.    Okay.  And then it was shortly after that that you
18    received the e-mail from Nadig.  Correct?  Exhibit C.
19    A.    I have no reason to disbelieve I didn't receive it on the
20    21st of September, 2016.
21    Q.    Okay.  Now, after -- that e-mail indicates that e-mail
22    was cc'd to Mr. Sanft.  Right?  Exhibit C.
23    A.    Yes.
24    Q.    Okay.  And regardless of whether it was true or not, that
25    e-mail indicates that Sanft and Nadig are jointly representing
```

JESS MARCHESE - Direct Examination

1    Alfter and also representing Fuechtener.  Right?  Is that what
2    you would gather from reading this?
3    A.   Yes.
4    Q.   And would you agree that, after seeing these
5    representations that were written by Mr. Nadig, which were
6    cc'd -- let me ask you this.  Did you ever receive any kind of
7    e-mail from Mr. Sanft refuting anything that was contained in
8    this e-mail?
9    A.   Did I receive an e-mail?  No.
10   Q.   If you recall.
11   A.   No, I never -- no, I never received an e-mail from
12   Mr. Sanft.  We had discussed it later, but --
13   Q.   Okay.
14   A.   -- never -- never an e-mail.
15   Q.   So as -- in September of 2016, did Mr. Fuechtener and
16   Mr. Alfter, was there any -- although Mr. Alfter had not been
17   charged, would you -- would you consider him to be a suspect?
18   A.   I would consider him to be an unindicted co-conspirator
19   if I was the U.S. Attorney.  I mean, I'm sure it was a close
20   call to charge him.  But, no, there were definitely some
21   issues there for sure.
22   Q.   And your defense would have been, hey, these were --
23   images were put on by Alfter, not my client, Fuechtener.
24   Right?  Because you were -- you were representing Fuechtener.
25   You never represented Alfter.  Right?

JESS MARCHESE - Direct Examination

1    A.    That would -- well, initially -- and I believe I got a

2    conflict waiver for this.  When the original search occurred,

3    that was the agreement, that -- but then, when he got

4    indicted, it just shifted completely to Jan.

5    Q.    And you shifted to him because you recognized it would be

6    a conflict in representing them both at that point in time?

7    A.    Yeah.  He had a lot more facts to work with.  I mean,

8    based on what I was told originally, I didn't even think that

9    there were ever going to be charges filed, but obviously that

10   wasn't the case.

11   Q.    But you -- you had no intention of representing them

12   both?

13   A.    No.

14   Q.    After you became aware -- after the indictment was filed

15   and became aware of the allegations and the facts and

16   circumstances?

17   A.    No.  My focus went to him 100 percent.  The only time I

18   would speak with Mr. Alfter, obviously with finances and just

19   communication, let him know, "Hey, court's on this day," that

20   kind of thing.

21   Q.    Okay.  So after your meeting with Jan in September,

22   somebody else was brought onto the case.  Right?  At that

23   point, there was you and Durham and then a third person was

24   brought on to the case?

25   A.    Ms. Amber Craig.

JESS MARCHESE - Direct Examination

1  Q.   And that was Amber.  Correct?

2  A.   Yes.

3  Q.   Okay.  And she was brought onto the case, would it be

4  fair to say, on October 10, 2016, calendar call is when she

5  made an appearance on the record?

6  A.   No.  She was working with us prior to that.

7  Q.   Do you remember when she came on, when she started

8  working with you?

9  A.   Had to be at least a month, if not two months-ish.

10 Q.   But do you know when her official appearance was?

11 A.   It was calendar call.

12 Q.   Calendar call.  Okay.

13 A.   Well, she didn't actually make an appearance at calendar

14 call, so -- I don't think she actually made a physical

15 appearance in court.

16 Q.   And who -- who -- who hired her?

17 A.   Well, at my recommendation she was brought on.  Jan had

18 wanted a female attorney, and I thought she would have been a

19 great option.

20 Q.   So was it you that -- that contacted her and --

21 A.   Absolutely.

22 Q.   Okay.  And was there any letter of engagement or retainer

23 agreement worked out with Ms. Craig?

24 A.   Yes, there was an agreement.  I forget exactly --

25 Q.   A written one?  A written agreement?

JESS MARCHESE - Direct Examination

1  A.   I don't think she ever signed it, honestly.

2  Q.   And, again, I had requested from you any written retainer

3  agreements or letter of engagement involving you, Mr. Durham

4  or Mr. -- Ms. Craig, and you haven't provided any of those to

5  date.  Right?

6          MS. ROOHANI:  And, Your Honor, there's no indication

7  that Mr. Marchese would have any retainer agreements with

8  anybody other than himself.

9          MS. CONNOLLY:  I'm asking him if he's provided those.

10         MS. ROOHANI:  And, Your Honor, he can't provide that

11  which he doesn't have.

12         MS. CONNOLLY:  He can say that, "No, I didn't."

13         THE COURT:  The objection's overruled.  He can answer

14  the question whether or not he has a copy of any retainer

15  provided or signed that includes Ms. Amber Craig.

16         THE WITNESS:  I don't believe -- if you don't have

17  it, then I didn't give it to you, obviously.

18  BY MS. CONNOLLY:

19  Q.   Okay.  And were you involved in giving her the retainer

20  that -- the actual funds?

21  A.   Yes.

22  Q.   You were?

23  A.   Yes.

24  Q.   And how much was she given?

25  A.   I want to say she was given 25,000.

JESS MARCHESE - Direct Examination

1    Q.   Could it have been 35,000?

2    A.   Oh.  You know what?  Yeah, I think it was -- I think she

3    was paid ten and then -- I mean, I can get all the

4    machinations, but that -- it could be it.  Because, yeah, she

5    was ten, and then she asked for another 25.

6    Q.   And shortly after her first appearance on the case, the

7    Government moved to exclude her.  Right?

8    A.   Yes.

9         **MS. ROOHANI:**  Your Honor, I believe that misstates

10   his testimony.  He stated she never made an appearance on the

11   case.

12        **MS. CONNOLLY:**  He said she was in court.  So she

13   appeared in court.

14        **MS. ROOHANI:**  He said that she never came to court,

15   Your Honor.

16        **THE COURT:**  No physical appearance; only an

17   appearance on the docket.

18   **BY MS. CONNOLLY:**

19   Q.   So there was an attempt -- there was some paperwork that

20   was filed with the court.  There was errors with the

21   paperwork, right, and getting Amber officially -- do you

22   remember that?

23   A.   Well, yeah.  I mean, it was -- they filed a motion to

24   strike her based upon a conflict, yes.

25   Q.   Okay.  And so they moved -- the Government moved to

JESS MARCHESE - Direct Examination

1   disqualify the entire defense team at calendar call based upon

2   the fact that Amber Craig was on the case.  Right?

3   A.   Correct.

4   Q.   And would that be fair to -- how did -- how -- how did

5   Jan react to that?  Was he happy about that?

6   A.   I mean, he certainly wasn't happy.

7   Q.   Fair to say he was pretty upset?

8   A.   You know, I don't think he was.  Because, I mean, I was

9   always confident that it was okay because I knew that she

10  never gave me any information that was -- that was helpful, so

11  to speak, to the -- any inside information from the

12  Government.

13  Q.   Would you agree that a defendant who is at a calendar

14  call and waiting to go to trial on a case where he's

15  potentially facing life in sentence, it would be stressful for

16  him for the Government to come in and move to preclude his

17  entire defense team?

18          MS. ROOHANI:  Objection.  Calls for speculation and

19  it's leading.

20  BY MS. CONNOLLY:

21  Q.   Based upon your experience and practice of having been

22  doing this since 2002.

23          MS. ROOHANI:  Objection.  Calls for speculation and

24  leading.

25          THE COURT:  Sustained.

JESS MARCHESE - Direct Examination

1    **BY MS. CONNOLLY:**

2    Q.    So this motion by the Government was on October 14, 2016.

3    Does that sound familiar to you?

4    A.    I have no reason --

5    Q.    You wouldn't dispute that.  Correct?

6    A.    No.

7    Q.    Okay.  And there was a hearing.  Right?

8    A.    There was a hearing.  There was motion practice.  Yes.

9    Q.    Okay.  And -- and the -- and the Government vigorously

10   argued to have the entire defense team precluded.  Right?

11   A.    Yes, they did.

12   Q.    And what the judge did or Honorable Gloria Navarro did

13   was preclude Amber from representing?

14   A.    Correct.  And, at that point, I think she even bowed out

15   and just said, "Hey, I don't want anything to do with this."

16   Q.    Okay.  And was there somebody else brought onto the case

17   after?

18   A.    Eventually Mr. Sanft was brought back.

19   Q.    So when was Sanft -- do you remember Sanft was back --

20   when you say -- would it be fair to say right before trial?

21   A.    I guess it depends on what your definition of right

22   before trial, but it had to be at least two weeks before.

23   Because I do remember (inaudible) and whatnot.

24   Q.    So if -- if -- if the Government sought to disqualify

25   Amber Craig on December -- on October 14th and the plea -- or

JESS MARCHESE - Direct Examination

1    the plea agreement -- or the plea agreement was November 17,

2    trial started approximately November 14, so it would be

3    sometime in October, early November?

4    A.   I would say a few weeks before trial.

5    Q.   Let me ask you this.  What kind of volume of discovery

6    did you get in this case?

7    A.   I mean, I guess, for a federal case, it wasn't that big,

8    but there was an initial dump which gave us everything from

9    the initial search warrant.  I believe that there were six

10   devices that they had analyzed originally.  But then, I mean,

11   I believe that they were in excess of 30 devices seized as a

12   result of the investigation.  Not all of them had elicit

13   material, but little by little, as the forensic analysts were

14   doing their job, we'd get dumps here and there of, you know,

15   hey, this device had this, that kind of thing.

16          MS. CONNOLLY:  And may I approach, Your Honor?

17          THE COURT:  Yes, you may.

18          MS. CONNOLLY:  I want to show him what's been marked

19   as Exhibit D.

20   BY MS. CONNOLLY:

21   Q.   By the way, when you received discovery from the

22   Government (inaudible)?

23          MS. CONNOLLY:  May I approach?

24          THE COURT:  Yes.

25   ///

JESS MARCHESE - Direct Examination

1   **BY MS. CONNOLLY:**

2   Q.   When you -- (inaudible) Defense Exhibit D.  Do you

3   recognize these documents that make up Exhibit D?

4   A.   So far I do, yes.

5   Q.   Now, is that fair to say that, when the Government

6   provides discovery, they provide defense counsel with receipts

7   of discovery, and does that appear to be a fair and accurate

8   representation of receipts of discovery that were provided on

9   this particular case?

10  A.   It does.

11  Q.   And do you -- do you have any reason to doubt that you

12  received all these receipts in the discovery that's reflected

13  on these receipts?

14  A.   No, I don't.

15  Q.   Okay.

16          **MS. CONNOLLY:**  Move to admit D.

17          **MS. ROOHANI:**  Your Honor, I don't believe that those

18  are a complete copy of all the discovery receipts.  But

19  subject to that objection, I have no objection to the

20  admission.

21          **THE COURT:**  All right.  Exhibit D will be admitted.

22      *(Defense Exhibit D, received.)*

23  **BY MS. CONNOLLY:**

24  Q.   Now, this top document says Document, under No. 1, 00420

25  to 00452.  Now, that would kind of indicate that there was 420

JESS MARCHESE - Direct Examination

1    pages that were previously provided.  Right?

2    A.   Yes.

3    Q.   Okay.  And when the Government provides discovery,

4    they -- they Bates stamp discovery.  Right?

5    A.   Typically.

6    Q.   And the last page here, the document -- number of

7    documents, it says 4,266?

8    A.   Yes.

9    Q.   Okay.  And so that indicates -- would -- would -- as a

10   defense lawyer doing criminal defense in Federal Court, that

11   would indicate that you received that number of documents from

12   the Government in discovery?

13   A.   Yes.

14   Q.   And that would not include the number of images that were

15   on discs and that were taken from computers et cetera.  Right?

16   A.   No, they don't -- they don't release those.

17   Q.   So in addition to these 4,000 documents, there would have

18   been a bunch of other videos and discs that you would receive.

19   Right?

20   A.   No, not -- we don't receive those.  Those are at the --

21   over by the rental car area in the southern part of Las Vegas.

22   They have them at Metro's lab.  We have access to them, and I

23   did go to the lab, but they don't give those to us.

24   Q.   So you didn't -- the depictions, the videos, and that

25   discovery, you never actually physically received those?  You

JESS MARCHESE - Direct Examination

1  had to go to the U.S. Attorney's Office to look at those?  Do
2  you recall?
3  A.   No.  I -- over -- I forget the name of the street.  I can
4  tell you how to get there but --
5  Q.   You didn't actually get them physically.  You had to go
6  look at them?
7  A.   Yes.
8  Q.   Okay.  So that's in addition to the 4,000-plus pages?
9  A.   Correct.
10 Q.   Okay.  Did Mr. Sanft or Mr. Nadig ever accompany you when
11 you went and reviewed those?
12 A.   Not with me, no.
13 Q.   Now, you indicated that, prior to their removal from the
14 case in July, you had been concerned that you didn't believe
15 that Nadig and Sanft were familiar with the discovery; is that
16 accurate?  And if I'm misstating your testimony, please let me
17 know.
18 A.   That's accurate.
19 Q.   Now -- and you -- you also testified that you believe
20 that Sanft was brought back on the case maybe two months
21 before the trial?
22 A.   No.
23 Q.   Two weeks.  Two weeks.  I'm sorry.
24 A.   Approximately, yeah.
25 Q.   Okay.  During that period of time, did Mr. Sanft meet

JESS MARCHESE - Direct Examination

1   with you or do you have any reason or do you have personal

2   knowledge that he sat and went through all the discovery?

3   A.   Prior to him coming back on?

4   Q.   Yes.

5   A.   No, I have no personal knowledge of that.

6   Q.   What about once he was back on?

7   A.   No, he did.

8   Q.   He went through --

9   A.   Yes.

10   Q.   -- through all of the discovery?

11   A.   Well, I know he looked at the file.  What -- what he was

12   looking at, I -- I don't know.  I didn't, you know, tell him,

13   "Hey, do this.  Do that."

14   Q.   Okay.  Okay.  So when Ms. -- Mr. Sanft -- did you have

15   any discussion with Mr. -- or did you express any concern to

16   Mr. Fuechtener about bringing Mr. Sanft back on the case?

17   A.   Yes.

18   Q.   You did?

19   A.   Yes.

20   Q.   And did you obtain any kind of conflict waiver from

21   Mr. Fuechtener when he wanted to bring Mr. Sanft back on the

22   case?

23   A.   No.

24   Q.   And you didn't bring to the Court's attention that there

25   was any kind of conflict or that you had any concern with

1    Mr. Sanft being brought back in the case?

2    A.    I didn't think there was, no.

3    Q.    You didn't think what?

4    A.    I didn't think there was -- there was, no.

5    Q.    Okay.  But you did have concern?

6    A.    I -- I'm sorry?

7    Q.    But you did have concern with Sanft being brought back on

8    the case?

9    A.    Yeah.  It more had to do with the breakup, I guess, for

10   lack of a better term.  It didn't go well.  We'll leave it at

11   that.

12   Q.    Okay.  And -- and, again, in that e-mail there was

13   indications that Sanft was basically working both sides of the

14   fence; representing Alfter and representing Fuechtener?

15         **MS. ROOHANI:**  And, Your Honor, I'm going to object

16   based on hearsay.  It's being offered for the truth.

17         **THE COURT:**  I think it's being offered to show what

18   Mr. Marchese's concern was.  Because I'm still not clear

19   whether his concern was only about the relationship breakup

20   back and forth or did the concern also include a potential

21   conflict at that point?

22   **BY MS. CONNOLLY:**

23   Q.    Can you expound upon that?

24   A.    Just address --

25   Q.    Yes.

JESS MARCHESE - Direct Examination

1          **THE COURT:**  Well, I think -- I think it's fair to ask

2     those questions.

3          **THE WITNESS:**  -- address Her Honor's question?  Okay.

4          When Mr. Sanft and Mr. Nadig were taken off the case,

5     I spoke with both of them.  Mr. Sanft was not happy.  He was

6     very upset.  It was -- he was -- I mean, he was.  He was just

7     upset.  But I -- I give him credit.  He expressed his

8     concerns.  Mr. Nadig was much more cordial and it was that;

9     you know, no hard feelings, that kind of thing.

10         So fast-forward to when Ms. Craig was then taken off

11    of the case.

12    **BY MS. CONNOLLY:**

13    Q.   I'm sorry.  Fast --

14    A.   Fast-forward to then when Ms. Craig was taken off the

15    case and Jan had expressed, "Hey, let's go get one of the

16    other attorneys."  I actually was the one who said, "Hey, why

17    don't we get Ben?  I'm not really sure if I can work with Mike

18    because there was, you know, the, quote/unquote, blowup that

19    occurred."  That is when I got a copy of this e-mail basically

20    telling me, "Hey, Ben's not who you think he is."  And then

21    Mike was brought back on, and there were no problems after

22    that.  But I -- I never -- the conflict, I didn't see a

23    conflict because I didn't see any work.

24    Q.   Well, in terms of conflict -- but in that e-mail, the

25    representations are -- and I think it specifically sets forth

JESS MARCHESE - Direct Examination

```
 1    in there that Nadig and Sanft represent Fuechtener, and then

 2    they also say that they represent Alfter and that Fuechtener's

 3    defense is going to be to blame Alfter.  Right?

 4    A.   Right.  I'll be honest, that wasn't my main focus on this

 5    e-mail.  It was --

 6    Q.   But it's in there?

 7    A.   -- so many other things.  No, it's in there, but --

 8    Q.   And in there they basically slam you and say --

 9    A.   Well --

10    Q.   -- that you don't know what you're doing in there?

11    A.   Right.  So, of course, personally, I'm going to focus

12    more on that.

13    Q.   And it says in there that he's going to be convicted with

14    you representing him.  Right?

15    A.   Right.  And all these other promises and guarantees and

16    stuff that, you know, I thought was baseless.  Well, and, you

17    know, it's not "they."  It was -- this was authored by Nadig.

18    Mike had nothing to do with this, to my knowledge.

19    Q.   But that was cc'd to Mike Sanft.  Right?

20    A.   For sure.

21              MS. CONNOLLY:  If I may?  May I approach, Your Honor?

22              THE COURT:  Yes, you may.

23    BY MS. CONNOLLY:

24    Q.   I'm going to show you what's been marked as Defendant's

25    Exhibit E.
```

JESS MARCHESE - Direct Examination

1    A.    Yes.

2    Q.    What is that?

3    A.    That is an e-mail from Mr. Nadig to myself in reference

4    to an e-mail in which I sent to Mr. Nadig.

5    Q.    And in the e-mail, that was in response to your request

6    for a copy of any files that they have.  Correct?

7            MS. ROOHANI:  Objection.  No foundation for this.

8    That's not part of this document.  And I've, quite frankly,

9    never seen this document before, Your Honor.

10            MS. CONNOLLY:  I can lay a foundation for it.

11   BY MS. CONNOLLY:

12   Q.    This was an e-mail that you sent -- that was sent to you

13   from Mr. Nadig to your e-mail, cc'd to Mike Sanft, in response

14   to an e-mail that you forwarded to them on September 27, 2016.

15   Correct?

16            MS. ROOHANI:  Objection.  Leading.  She's testifying.

17            MS. CONNOLLY:  I'm sorry?  I didn't hear you.

18            MS. ROOHANI:  She's leading him.  You're testifying.

19            THE COURT:  Sustained.

20            Do you want to ask him to identify the document?

21            MS. CONNOLLY:  What?

22            THE COURT:  Can you ask him to identify the document?

23   BY MS. CONNOLLY:

24   Q.    Can you identify the document?  What is it?

25   A.    I can.  I asked for a copy of Mr. Nadig's file in a prior

JESS MARCHESE - Direct Examination

1   e-mail, and this was his response to me.

2   Q.   And in that e-mail, the representation that was made to

3   you by Nadig is what?

4           MS. ROOHANI:  Objection.  Calls for hearsay.  This

5   document hasn't been admitted.

6           MS. CONNOLLY:  I move to admit.

7           THE COURT:  Sustained.

8           MS. CONNOLLY:  Move to admit --

9   BY MS. CONNOLLY:

10  Q.   Is that -- is that a true and accurate copy of an e-mail

11  you received from Ben Nadig or his e-mail address, or do you

12  recognize that address to be his e-mail address?

13  A.   Yes, I recognize this, and it is true and accurate.  It's

14  what he sent me.  I remember this well.

15          MS. CONNOLLY:  Move to admit.

16          MS. ROOHANI:  I object based on hearsay, Your Honor.

17  And also the fact that I've never seen this document, so it

18  constitutes unfair surprise.

19          THE COURT:  How long is this document?

20          MS. CONNOLLY:  I leave it to the Court's discretion.

21          THE COURT:  How long is the document?

22          MS. CONNOLLY:  One page.

23          THE WITNESS:  Your Honor, just this.

24          THE COURT:  Oh.  It's one page?

25          THE WITNESS:  Yeah.

JESS MARCHESE - Direct Examination

1          THE COURT:  And the other objection was what?  That

2     it was --

3          MS. ROOHANI:  That it's hearsay.  It's being offered

4     for the truth of what is -- is in the e-mail, and I don't

5     believe appropriate foundation has been laid for that either.

6          MS. CONNOLLY:  It's not being offered for the truth

7     of the matter.  It's being offered for, again, the ongoing

8     affect it had on Mr. Marchese or a conflict between Nadig,

9     Sanft, and Marchese, and the fact that Sanft was brought back

10    on to the defense team to do a joint representation at trial.

11         MS. ROOHANI:  And, Your Honor, Mr. Marchese hasn't

12    indicated that this had any effect on him whatsoever.  So I

13    don't believe that appropriate foundation has been laid for

14    this particular document.

15         THE COURT:  All right.  Go ahead and see if you can

16    lay a foundation.

17         MS. CONNOLLY:  Thank you.

18    BY MS. CONNOLLY:

19    Q.   How did you feel when you received that e-mail?

20    A.   I got to be honest.  I wasn't surprised based on the

21    prior Exhibit C that I had received in which there was

22    representation that he worked -- "he" being Mr. Nadig --

23    worked hundreds of hours on the case.  And I hadn't -- I

24    had -- he didn't file a motion.  He didn't hire an expert.  He

25    met with the expert once.  I mean, he barely visited Jan.  I

JESS MARCHESE - Direct Examination

1   don't know what he did over those hundreds of hours.  So when

2   I asked for the file, I want to see the hundreds of hours

3   worth of work.  Maybe there was something in there since he's

4   so confident in his ability to exonerate Mr. --

5   Mr. Fuechtener.  So I was not surprised he didn't give me a

6   copy of his file.

7   Q.   And in this e-mail he, again, refers to him and Mr. Sanft

8   as a team, "Mike and I" --

9        MS. ROOHANI:   Your Honor, objection.  Hearsay.  I

10   don't believe that appropriate foundation has been laid for

11   this line of questioning.  Mr. Marchese has indicated that he

12   wasn't surprised.  So it's also not relevant.

13        THE COURT:   Sustained.

14   BY MS. CONNOLLY:

15   Q.   Okay.  I want to ask some questions about the guilty

16   plea.  Trial commenced on this case.  Do you remember the --

17   approximately was it November 14 --

18   A.   I remember because my birthday's on the 15th.  So I

19   remember being in trial on my birthday.

20   Q.   You were in trial on your birthday?

21   A.   Yeah.

22   Q.   Okay.  And at the conclusion of the Government's case,

23   the last witness was Agent Popovich [sic] who's here.

24   A.   Ms. Panovich, correct.

25   Q.   And at that point in time -- well, let me -- let me

 1    strike that.

 2           Prior to trial, had Mr. -- had there been any

 3    discussions with Mr. Fuechtener or had he ever expressed to

 4    you his intention to want to accept a guilty plea in this

 5    case?

 6    A.   No.  The initial offer was made quite early on.  He was

 7    not interested in that at all.  I mean, it wasn't even a -- a

 8    consideration.  So basically, from early on, this was just a

 9    trial case.

10    Q.   And so he was never -- prior to trial he was never

11    presented with any -- any kind of offer?

12    A.   He was given --

13           **MS. ROOHANI:**  That misstates the testimony, Your

14    Honor.

15           **THE COURT:**  I'm sorry?  I didn't hear.

16           **MS. ROOHANI:**  It misstates his testimony.

17           **MS. CONNOLLY:**  I'm asking him a question.  He can say

18    yes or no.

19           **MS. ROOHANI:**  Then asked and answered, Your Honor.

20           **THE COURT:**  Ms. Connolly, restate the question.

21    **BY MS. CONNOLLY:**

22    Q.   Prior to trial, was there any kind of offer that was

23    communicated to Mr. Fuechtener?

24    A.   Yes.  It was done orally.  We never got to the point of

25    getting it done written by the Government because I didn't

JESS MARCHESE - Direct Examination

1     want to waste their time on something that he had -- he had no

2     interest in the offer.

3     Q.   No interest in the offer.

4           And do you recall sitting down and going over -- let

5     me ask you that.

6           Ordinarily, would it be fair to say that, in your

7     experience as a criminal defense lawyer doing federal

8     practice, that the agreement -- plea agreement that's

9     presented to you normally is the one that's accepted, or is

10    there usually some back-and-forth?

11    A.   No.  Well, I mean, every case is different.  But, yes,

12    certainly it's not out of the ordinary to have some

13    bargaining.

14    Q.   And do you recall ever sitting down with the -- the

15    United States Sentencing Guidelines and going through all --

16    all of Mr. Fuechtener's exposure if you went to trial with

17    offense -- with offense characteristics, enhancements,

18    relevant conduct, and things of that nature?

19    A.   We --

20    Q.   Or was that not done because he didn't want to deal the

21    case?

22    A.   No.  I mean, it was done.  Was it done where I -- we sat

23    down and said, "This is what you're looking at.  You're going

24    to get plus two for this, minus one for that," blah blah blah,

25    all of that?  No.  But, in general, in terms of his -- I was

JESS MARCHESE - Direct Examination

1    told -- I told him, "Hey, listen, your exposer is very high.

2    If you lose, you could die in prison."

3    Q.   But you never actually went through, "Well, there's this

4    number of images, so because there's this number of images,

5    you get X number of points"?

6    A.   You know, we had so many conversations in -- I can't sit

7    here -- I'd be lying if I told you that.  But I know for a

8    fact I went and looked up the guidelines myself, and I think

9    we had some conversations in reference to -- like, for

10   example, at the initial search of his home, there was this

11   hard drive found outside on the ground in between his home.

12   And there's, like, I don't know, maybe 20 feet, his pool, and

13   a gate house -- or a guesthouse, whatever you want to call it.

14   That hard drive alone would have put him at the maximum

15   images.

16        Then, in addition to that, he would have got the

17   enhancements in reference to the nature of the images.  For

18   example, there were prepubescent children on that.  I believe

19   there was some bestiality on that one.  If not, it was

20   definitely on some other devices.  And then there was, you

21   know, some rather violent depictions as well.

22        So I know that I -- I looked up those particular

23   enhancements, and I remember thinking to myself, "Yeah, this

24   isn't good.  He's checking almost every box," with the

25   exception of priors.  He had no criminal history, to my

JESS MARCHESE - Direct Examination

1    knowledge.

2    Q.   But you don't remember specifically sitting down and

3    going through all of those other than telling him you're

4    looking at the rest of your life if you get convicted?

5    A.   I -- I mean, I probably told him, "Hey, listen, you're

6    looking at all these enhancements."  But, Karen, I can't sit

7    here and say on this date, this time I told him that.

8    Q.   So prior -- just to recap, prior to trial, his position

9    was, "I'm going to trial, no deals, I'm not interested, I want

10   to go to trial."  Right?

11   A.   Generally speaking, yes.

12   Q.   And at the close of -- of the Government's case, there

13   was some discussion that was initiated by -- let me -- in

14   trial there was you, Sanft, and Durham.  Right?

15   A.   Correct.  I sat where you're standing.  Jan was where he

16   is sitting now with a much better outfit on.  And then it was

17   Mr. Durham and Mr. Sanft.

18   Q.   Okay.  And at the close of the -- the Government's case,

19   there was some discussion about maybe we should consider a

20   plea?

21   A.   Yes.

22   Q.   And that wasn't initiated by Jan, was it?

23   A.   See --

24   Q.   If you don't --

25   A.   -- I don't know who initiated it.  I know -- because I

JESS MARCHESE - Direct Examination

1    was -- Ms. Panovich was my witness.  So I was kind of focusing

2    on that.  And then I looked over, and then my understanding,

3    as I sit here today, was that I thought it came from Jan.

4    Q.   If you don't know, then I'd rather you not --

5    A.   No.  I thought it came from Jan.  And then, obviously,

6    Ben and Mike were like, "Hey, we should talk about a deal."

7    And then I want to say I'm maybe 99 percent sure I looked at

8    him.  I said, "Hey, do you want me to discuss that?"  And then

9    we --

10   Q.   He was open to discussing it.  Yes?  Right?  But you

11   don't recall --

12   A.   Yes.  No, that's true.

13   Q.   -- whether -- who exactly initiated it because you

14   were --

15   A.   I -- I thought it was him, but if I -- if I'm wrong, I

16   could very well be.

17   Q.   Okay.  Now, let me ask you, there was -- this wasn't a

18   case where, during the agent's testimony, there was

19   revelations that weren't contained in the discovery?  It had

20   already been provided.  That didn't happen in this case?

21   A.   I wouldn't say that.  No, there weren't any bombs, so to

22   speak.

23   Q.   You didn't make allegations of a *Brady* violation, "Judge,

24   we didn't know she was going to say that," it was nothing of

25   that nature?

JESS MARCHESE - Direct Examination

1    A.    No.  I mean, they were -- listen, we didn't -- I'm not

2    going to say that Ellie and I and Ms. -- Ms. Cartier-Giroux

3    had the best relationship on this case, but they didn't -- I

4    don't think that they did anything unethical or dirty, no.

5    Q.    So you -- so you pretty much had everything and -- and

6    you had the agent's grand jury testimony before she testified?

7    A.    No -- yeah, there were no issues.

8    Q.    So what I'm getting at, there was nothing -- there was

9    nothing surprising about the content of her testimony?

10   A.    Well, usually the grand jury testimony is surprising at

11   how little is in there.  You know how that goes.

12   Q.    But you did have that in your review --

13   A.    No, I had it.  Yeah.

14   Q.    -- of it?

15         And -- and I would -- I would assume that her

16   testimony at trial was consistent with her testimony at the

17   grand jury?

18   A.    For the most part, yeah.  I think she even offered some

19   302 that we were previously provided to us.

20   Q.    Okay.  So there was -- after the -- so after the agent

21   testified, would it be fair to say there was some discussion

22   about should we go to the Government and see if we can get --

23   what kind of deal they're willing to offer?

24   A.    Yes.

25   Q.    And that took place during the lunch break.  Right?

JESS MARCHESE - Direct Examination

1    A.    I know we took a break.  I don't know if it was lunch or

2    Her Honor gave us an extended bathroom break or what.

3    Q.    And this -- what I'm about to say is supported by the

4    record.  Would you dispute that on November 16 the Court

5    recessed at 1:34?

6    A.    Yeah, it was -- no, I wouldn't dispute that.

7    Q.    You have no reason to dispute that.  Right?

8    A.    No.

9    Q.    And do you have -- do you have any reason to dispute that

10   court recessed again at 2:52, which means the lunch break was

11   an hour and 15 minutes?

12   A.    Sure.

13            MS. ROOHANI:   Your Honor, I believe that misstates

14   his testimony.  There wasn't a lunch break.  I think he's

15   testified that he doesn't remember there being a lunch break,

16   to the extent that's even relevant.

17   BY MS. CONNOLLY:

18   Q.    And there was a recess where Your Honor left the bench?

19   A.    There were a lot of breaks.

20   Q.    We can call it a recess or a lunch break, but there was a

21   recess where Your Honor left the bench.  Correct?

22   A.    Yes.  There were a lot of breaks towards the

23   negotiations.  Yes.

24   Q.    And would you agree that that was approximately an hour

25   and 15 minutes?

JESS MARCHESE - Direct Examination

1   A.   Sure.

2   Q.   Okay.  And during that period of time, you approached the

3   Government to see if they would be amenable to any kind of

4   plea offers?

5   A.   That's true.

6   Q.   And there was discussion back and forth?

7   A.   Yes.

8   Q.   And there was also a discussion with Jan about whether or

9   not he was amenable to any kind of plea offer or would be

10  willing to accept.  Right?

11  A.   Of course.

12  Q.   Okay.  So would it be fair to say did you, during that

13  period of time, go get a sandwich or some (inaudible) or

14  anything of that nature, if you recall?

15  A.   I would never eat in this courthouse.  No offense to the

16  people, but I always bring my own food.

17  Q.   Okay.

18  A.   I'm a picky eater.

19  Q.   So during that one hour and 15 minutes, there was no firm

20  offer extended, was there?

21  A.   I don't think initially.  I think there was discussion.

22  You know how the United States Attorney's Office is.  They

23  need a lot of approval.

24  Q.   And what you're talking about is, before our individual

25  deputies can make an offer, they generally have to go up and

JESS MARCHESE - Direct Examination

1   go up the chain and have some discussions and find out what

2   they're willing to extend.  Right?

3   A.   Yes.  As a matter of fact, Ms. Silva even came over at

4   one point.

5   Q.   And there was -- would you agree that, when court

6   recessed, that the representations that were made to the Court

7   was that you and the Government needed some more time to go

8   over the terms of the plea offer?

9   A.   That would sound accurate, yes.

10  Q.   At that point in time there had been no firm offer

11  extended?

12  A.   I mean, I guess it depends on what you consider would be

13  a firm offer.  I remember there would be some -- a verbal

14  offer that was relayed.

15  Q.   And what -- what was that?

16  A.   I believe it was the offer that was accepted.  The only

17  issue was he hadn't had it in black-and-white at that point --

18  Q.   Okay.  When you say offer --

19  A.   -- on paper.

20  Q.   -- accepted -- well, the offer that was accepted was a

21  guilty plea that included a base offense level and a number of

22  enhancements.  Right?

23  A.   Correct.  And a sentencing range.

24  Q.   So on -- on the 16th it was not discussed with Jan what

25  potential enhancements were going to apply or what kind of

JESS MARCHESE - Direct Examination

1   offense level you'd have to stipulate, nothing of that nature

2   was discussed with him on the 16th, was it?

3   A.   I -- not from me.

4   Q.   Okay.

5   A.   I can tell you that generally the discussions revolved

6   around the years.

7   Q.   Okay.  So why --

8   A.   And what Her Honor could, quote/unquote, do to him.

9   Q.   Okay.  What -- what was your recollection of what your

10  discussion with him was regarding the, let's say, un --

11  unofficial offer that was -- the Government was willing to

12  extend?

13  A.   We had to plead guilty.  He was looking at two mandatory

14  minimum five years, but they were going to be ran -- or at

15  least -- suggestion to the Court, of course, to be ran

16  concurrent with one another.  And then there was a top-end

17  cap, I guess, if you will.  So you'd have the five on the

18  bottom, and then there was a top-end cap of 30 years.

19  Q.   What was communicated to Jan?  What did you recall

20  communicating to him?

21  A.   Well, there was a lot of things that were communicated to

22  him --

23  Q.   In terms of -- in terms of his -- in terms of the plea,

24  what the Government was willing to do.

25  A.   Well, I told him -- no offense but I told him Ellie's

JESS MARCHESE - Direct Examination

```
 1   going to do something -- is going to be crazy and argue for,
 2   like, 30 years on you.  But I did tell him I don't think that
 3   the Court would do that.  I mean, you have to remember this
 4   was a bench trial.  So we obviously had a lot of faith in
 5   Judge Navarro and what she was going to do in this case.  I
 6   mean, nobody likes these kinds of cases.  I get that.  But we
 7   thought that we had enough mitigating factors to argue that --
 8   Q.   Let me ask you about that.  What mitigating factors did
 9   you think you had to argue?
10   A.   Oh, well, he had a ton.  First of all, I brought out
11   earlier his lack of criminal history, I --
12   Q.   Let me ask you that.  Lack of criminal history -- okay.
13   Just go ahead.  I'm sorry I interrupted you.
14   A.   Okay.  That's one thing.
15   Q.   I'll digress after.
16   A.   I mean --
17   Q.   I don't want to interrupt you so --
18   A.   Yeah.  I mean, it speaks for itself.  He had no record
19   that I knew of.
20   Q.   Mm-hmm.
21   A.   And then I thought the fact that he was -- that he was a
22   foreign national also worked to his advantage because
23   obviously he has immigration consequences based upon this.
24        Plus, culturally, when we've -- when I first got the
25   case, you know, and then I -- I remember telling him, "Hey,
```

1   you're looking at doing, like, life in prison, he was shocked.

2   Because where he's from this -- they -- they -- I want to word

3   this properly.  The punishment is not nearly as severe in

4   Germany as it is here.  So it was a definite surprise to him.

5   Like, "Oh, my gosh.  Over -- you know, where we're from, it's

6   no big deal."  So I thought that that was -- that was

7   definitely in his favor.

8           And then he never got to testify, and I thought he

9   would have made a really good witness.  Mr. Sanft did a good

10  job with him.  But he didn't testify, and, you know, this --

11  all he knew was magic, and he lost his -- his life literally.

12  I mean, at one point in time he even said to me -- I got a

13  little concerned that -- Mr. Happy-go-lucky kicked in again

14  when he got detained, and he's like, "My life's over."  You

15  know, "Oh, my God, I should just kill myself."  I think -- he

16  didn't say it seriously.  It was more in jest but, you know,

17  he was -- he was devastated because he knew the consequences

18  of this getting out into the papers is -- you know, here's a

19  guy -- you got to give him credit, and he started from nothing

20  at -- in the States as just a nobody musician, and then he

21  worked his way up to the Tropicana.

22  Q.   So you thought that would be a mitigating --

23  A.   Absolutely.

24  Q.   That and a lack of criminal history?

25  A.   Yes.

JESS MARCHESE - Direct Examination

```
 1    Q.    Okay.  I need to kind of -- I want to focus on what was
 2    communicated.  Did you tell him that he -- that you thought he
 3    would get between 5 to 15 years, that's what he'd be looking
 4    at?
 5    A.    He had asked me, of course, what -- "Hey, what do you
 6    think, is your opinion?"  And, now, do I make any promises?
 7    No.  I never, ever --
 8    Q.    Understood.
 9    A.    -- do that because this is not my first time testifying
10    on one of these, and I know how that goes.
11          And it's unfair to him to guarantee anything, too.
12    But no.  I probably said something along those lines.  I mean,
13    he was obviously shooting for the five.  I thought the five
14    was a little generous, so to speak.  But based on other cases
15    that I'd seen and, you know, just everything, I -- I thought
16    he would, kind of, be in that range.  I didn't -- I personally
17    didn't think that Her Honor would give him the maximum, no.
18    Q.    You said based on other personal cases you've seen.  What
19    are you referring to in the other --
20    A.    Well, just my --
21    Q.    -- case?
22    A.    Just my experience on other sentences.
23    Q.    Let me ask you --
24    A.    Now, I -- and I believe the -- the case that Nadig talked
25    about, his not guilty I want to say is actually in front of
```

JESS MARCHESE - Direct Examination

1    Judge Navarro.

2    Q.   Now, let me ask you.  This case -- this case had a lot of

3    images.  Right?  There was like --

4    A.   There was --

5    Q.   -- 47,000 images.  Right?

6         Had you ever dealt --

7    A.   He was at the maximum.

8    Q.   Had you ever dealt with a case -- a sentence and case

9    where there had been so many images as there was in this

10   particular case?

11   A.   I mean, you get to a certain point and you stop counting,

12   but I -- I had maximum image -- images before, yes.

13   Q.   But there was -- there was a significant number in this

14   case.  Right?

15   A.   There was a ton of stuff.  And --

16   Q.   And would it be fair to say your -- your -- way more than

17   the usual child pornography case that you were used to

18   handling.  Would that be accurate?

19        Or do you ever recall one where you dealt with this

20   many images?

21   A.   I just did a couple months ago.  But, no, it's --

22   Q.   At the point in time that --

23   A.   -- it's more on the high-end, for sure.

24   Q.   At the point -- at the point in time that you had this

25   case.

JESS MARCHESE - Direct Examination

1    A.    I'd have to go back and look.  I think I did have one guy

2    who had quite a bit.  But, no, I'd agree with you.  This was

3    on the high-end, for sure.  There's a reason it wound up in

4    Federal Court.

5    Q.    Would it be fair to say you hadn't actually had

6    experience being sentenced by Your Honor on a case with this

7    number of images and these type of images?

8    A.    I had never done a child pornography case in front of

9    Judge Navarro prior to this.

10   Q.    And so -- so it would be fair to say that the

11   agreement -- or there wasn't really an agreement on the 16th.

12   There was discussion about the Government may make you an

13   offer.  I think you could get 30, but I think you get between

14   5 to 15; is that -- is that -- I don't want to misstate what

15   you're saying.

16   A.    No, no, no.  That's fine.

17   Q.    I'm just trying to --

18   A.    You're fine.  No, I disagree with that.  It wasn't a

19   written agreement.  We didn't have it in writing.  But it

20   was -- the -- the parameters were orally given.

21   Q.    And what were those?

22   A.    Well, like I -- like I said earlier --

23   Q.    And I may have asked you.  I just want to make sure --

24   A.    Yeah, yeah.

25   Q.    -- that we have it specifically because we've been having

JESS MARCHESE - Direct Examination

```
 1    a lot of dialogue.  So I want to make sure we have --
 2    A.   The biggest thing were the two mandatory minimums, the
 3    fives.  I mean, obviously, as you know how mandatory minimums
 4    work, there's nothing you can do.  I mean, even if Her Honor's
 5    son, God forbid, was being sentenced, she couldn't go under
 6    that.  It just -- that's what the mandatory minimum is.
 7    Q.   Was that he would be doing --
 8    A.   So we had that --
 9    Q.   So he would be doing at least five?
10    A.   No choice.  I mean, you get your 85 percent and that's
11    it.  That's -- that's what you're looking at absent, you know,
12    reworking the agreement, for lack of a better term.
13    Q.   So then court recessed, and everybody went home for the
14    evening.  You didn't meet with him that night.  Right?
15    A.   No.
16    Q.   Okay.  And you got a guilty plea agreement the next day
17    about 9:48.  Right?  Is that accurate?  Or about 10:00?
18    A.   I got up the next day in the morning, yeah.
19    Q.   Okay.  And you -- what did you do when you received it?
20    A.   I don't remember if it was sent to the other attorneys,
21    but if it wasn't, I would have forwarded it.  I believe I had
22    state court first that day.  So I printed it, of course, you
23    know, checked it, made sure that it was -- comported with my
24    understanding of what it was --
25    Q.   Let me ask you that.  Okay.  So it was a 17-page
```

JESS MARCHESE - Direct Examination

 1    document, right, that you got about 10:00 o'clock, 9:58 to be

 2    exact?

 3    A.    Yeah.

 4    Q.    Okay.  So you read through it.  And did you go over it

 5    with your guideline book, or what did you do?

 6    A.    I went through it.  I think we had already -- there was

 7    some discussion about the guidelines, I think, with the

 8    Government the day before because they were really --

 9    Q.    Would it be fair to say that, when you received it,

10    though, you didn't sit down with your book and go through all

11    the facts that were alleged in the plea agreement to see which

12    enhancements or specific offense characteristics would apply?

13    A.    No.  I read the plea agreement.  I would never -- yeah,

14    no.  I -- I read it cover to cover.  I mean, now --

15    Q.    Read it.  And then you came over to the jail, would that

16    be accurate, or with federal --

17    A.    I -- at some point I think -- I mean, don't quote me on

18    this.  I think I had a quick state appearance and then I came

19    over.

20          MS. ROOHANI:  Your Honor, with Ms. Connolly's

21    permission, can we take a short break?  I apologize.

22          THE COURT:  Yeah --

23          MS. ROOHANI:  A comfort break, please.

24          THE COURT:  -- that's fine.  We'll go ahead and take

25    about a 15-minute bathroom break.  I'm told that CJA Attorney

JESS MARCHESE - Direct Examination

1   Dustin Marcello was going to be here in order to help

2   Mr. Humphries to understand.  Do you know if he is --

3        **COURTROOM ADMINISTRATOR:**  He's here, Your Honor.

4        **THE COURT:**  I thought I saw him, but I don't know if

5   he's -- if he's here now.

6        **THE WITNESS:**  He's probably, yeah.

7        **THE COURT:**  Sherry, can you see if he's out there so

8   we can do this on the record and -- Dustin Marcello.

9        *(Pause in the proceedings.)*

10        **THE COURT:**  Good morning, Mr. Marcello.  Thank you

11   for being here today.  We have an individual who has been

12   subpoenaed to testify today.  His name is Mr. Humphries.  He

13   is in custody on a federal charge.  He's represented by

14   Mr. Ericsson on that federal charge.  Mr. Ericsson was

15   contacted first.  Unfortunately, he's not available to be here

16   today.  So if you have no conflict and if you are available, I

17   would like to appoint you today to contact -- to speak with

18   Mr. Humphries who, I believe, is in the building.  Is he in

19   the marshal lock-up on two -- on the second floor.

20        **MR. MARCELLO:**  Just one quick question.

21        **THE COURT:**  Yes.

22        **MR. MARCELLO:**  Who is the defendant that is involved

23   in this particular case?

24        **THE COURT:**  Mr. Jan Fuechtener.

25        **MR. MARCELLO:**  I have no idea who that is.  Okay.

JESS MARCHESE - Direct Examination

1        **THE COURT:**  Okay.  And so Mr. Humphries just needs to

2   be aware for sure of the fact that the Government has stated

3   that, depending on his testimony, there could be an

4   obstruction of justice or perjury --

5        **MR. MARCELLO:**  I see.

6        **THE COURT:**  -- charge, and that he does have a right

7   to a Fifth Amendment invocation of his right to remain silent.

8        **MR. MARCELLO:**  Sure.

9        **THE COURT:**  And what all of the options are and what

10  the effect may or may not be and so forth.

11        Anything else, Ms. Connolly or Ms. Giroux, that you

12  want me to tell Mr. Humphries on record?

13        **MS. CARTIER-GIROUX:**  Just so that Mr. Marcello's

14  aware of, there are statements -- there's a -- there's --

15  there's a potential proffer with regard to bias in this case

16  which would implicate statements of guilt that Mr. Humphries

17  may or may not have made to other individuals, including

18  Mr. Fuechtener.  So I would be asking -- I'm the prosecutor --

19  I was the original prosecutor on that case.  Ms. Roohani is on

20  Mr. Humphries' case.  Ms. Roohani is the current prosecutor.

21  There had been a previous supression hearing where a

22  cooperator had testified.  There's a bunch of statements that

23  Mr. Humphries has previously made to other individuals with

24  regard to his guilt, and there's some questions that I would

25  be asking Mr. Humphries with regard to his bias in this case

JESS MARCHESE - Direct Examination

```
1    and his propensity or need to help out Mr. Fuechtener --
2              THE COURT:  All right.  So --
3              MS. CARTIER-GIROUX:  -- based on statements.
4              THE COURT:  -- it sounds like you're telling me that
5    the -- the problem is not with an obstruction of justice or
6    perjury --
7              MS. CARTIER-GIROUX:  It's both.
8              THE COURT:  -- charge stemming from testimony related
9    to Mr. Fuechtener, but that he also potentially could be
10   exposed to be in the situation where he would have to
11   potentially answer questions about his own charges --
12             MS. CARTIER-GIROUX:  Yes.
13             THE COURT:  -- in the case in which Mr. Ericsson is
14   representing him?
15             MS. CARTIER-GIROUX:  Yes.
16             THE COURT:  All right.  So that was not my
17   understanding.  So I apologize.  I thought it was just --
18             MR. MARCELLO:  Okay.
19             THE COURT:  -- communications Mr. Humphries may or
20   may not have had with Mr. Fuechtener and how that would affect
21   him in a separate charge in a separate case if he were to
22   testify falsely or --
23             MS. CARTIER-GIROUX:  It's -- it's both.
24             THE COURT:  But it sounds like it also implicates --
25             MS. CARTIER-GIROUX:  Yes.
```

JESS MARCHESE - Direct Examination

1          **THE COURT:**  -- his initial -- his current case with

2    Mr. Ericsson.

3          All right.  Well, we'll let Mr. Humphries get started

4    at least with Mr. Marcello so that at least some information

5    can be provided to him, but it does sound, then, like we would

6    need Mr. Ericsson to also be informed and available to meet

7    with Mr. Humphries before Mr. Humphries testifies.

8          **MR. MARCELLO:**  I have Mr. Ericsson's cell phone

9    number.  I've worked with -- a number of cases with him.  I

10   can give him a call if we're going to take a break.

11         Just one quick logistical question.  Is he in here or

12   is he downstairs in the marshal's?

13         **THE COURT:**  I think he's downstairs in the marshal's?

14   Yes.

15         **MR. MARCELLO:**  Okay.

16         **THE COURT:**  I'm being told yes, he's downstairs.  So

17   same building but different floor.

18         **MR. MARCELLO:**  So I'll call Mr. Ericsson, tell him

19   what the issue is after I speak to the Government, see what he

20   says, and I'll be able to report back to the Court what he's

21   told me.

22         **THE COURT:**  Right.

23         **MS. CONNOLLY:**  And just --

24         **THE COURT:**  And if it turns out Mr. Ericsson wants to

25   see him in person and needs more time, then the Court will

1    take that into consideration --

2              **MS. CONNOLLY:**  So -- and counsel -- counsel knows --

3              **THE COURT:**  -- as well.  I think --

4              **MS. CONNOLLY:**  -- Mr. Ericsson had --

5              **THE COURT:**  Just a second, Ms. Connolly.  Let me see

6    what our -- our calendar looks like, Aaron, for -- if we, for

7    whatever reason, can't get to Mr. Humphries today either

8    because of this situation or just time, because we're taking

9    longer with Mr. Marchese than I thought we would.  So do we

10   have time next week available, Aaron?

11             **COURTROOM ADMINISTRATOR:**  We do, Your Honor.  We have

12   most of the day Monday and all day Tuesday available.

13             **THE COURT:**  All right.  So --

14             **MS. CARTIER-GIROUX:**  Judge, I don't know where -- oh,

15   there she is.  But we will also then be asking if you will --

16   are going to continue this, we're going to ask that they be

17   separated; that they not be housed in the same facility,

18   Mr. Humphries and Mr. Fuechtener.

19             **MS. ROOHANI:**  And, Your Honor, unfortunately, I'm

20   actually out all next week.  I'm going to visit my

21   father-in-law who's dying of cancer.  So I will not be here

22   all of next week.  So it would probably -- if I could ask for

23   the week after that.

24             **COURTROOM ADMINISTRATOR:**  And, Your Honor, we do have

25   Monday, the 19th, available.  It would be a late morning

JESS MARCHESE - Direct Examination

1    start.

2            **MS. CONNOLLY:**  I have -- I have --

3            **THE COURT:**  There's a meeting at 10:30, though.

4            **MS. CONNOLLY:**  -- an evidentiary hearing on a murder

5    case in state court on the 19th.

6            **THE COURT:**  We have the afternoon of the 20th.

7    Right?  Tuesday?

8            **COURTROOM ADMINISTRATOR:**  Correct, Your Honor.

9            **MS. CONNOLLY:**  The afternoon of the 20th works for

10   me.

11           **THE COURT:**  All right.  Ms. Roohani, the -- March 20,

12   which is a Tuesday, in the afternoon.

13           **MS. CONNOLLY:**  What time, Your Honor?  Oh.

14           **MS. ROOHANI:**  Your Honor, I can make myself

15   available.

16           **THE COURT:**  All right.  Okay.  So we'll firm --

17   we'll -- we'll confirm that later as the day goes on, but just

18   to have that -- have it in the back of your mind.  So it's

19   10:40 now.  We'll go ahead and take, let's say, a 20-minute

20   break.  Be back here at 11:00 a.m. to continue examination

21   with Mr. Marchese.

22           **COURTROOM ADMINISTRATOR:**  All rise.

23       *(Recess at 10:40 a.m., until 11:09 a.m.)*

24           **COURTROOM ADMINISTRATOR:**  All rise.

25           **THE COURT:**  Thank you.  You may be seated.

JESS MARCHESE - Direct Examination

1          Ms. Connolly, you may continue with direct

2    examination of Mr. Marchese.

3          **MS. CONNOLLY:**  Your Honor, if I may, we have

4    stipulated to the admission of Exhibit E.  If I may approach?

5    It's just a transcript (inaudible).

6          **THE COURT:**  I'm sorry.  This is E?

7          **MS. CONNOLLY:**  Yes.

8          **THE COURT:**  Oh.  I thought the other one was E, the

9    one that was the e-mail that didn't get admitted.

10          **COURTROOM ADMINISTRATOR:**  This will be F.

11          **MS. CONNOLLY:**  This is F.

12          **THE COURT:**  All right.  So this is F.  Thank you.

13          All right.  So F is admitted by stipulation of the

14    parties; is that right, Ms. Roohani?

15          **MS. ROOHANI:**  Yes, Your Honor.  And, Your Honor, it's

16    part of the public record.  It's the transcript of the

17    proceedings.

18        *(Defense Exhibit F, received.)*

19          **THE COURT:**  Okay.

20    BY MS. CONNOLLY:

21    Q.   And, Mr. Marchese, so I think where we left off was that

22    approximately 10:00, on the 17th, in the morning you got a

23    copy of the 17-page plea agreement, you read it, and then you

24    proceeded over to the holding facility here?

25    A.   Correct.

JESS MARCHESE - Direct Examination

1    Q.    Okay.  And who was here when you arrived?

2    A.    I'm sorry.  Who was here what?

3    Q.    When you arrived.

4    A.    I believe Mr. Durham was already in the lock-up.

5    Q.    To your knowledge, did -- when you say he was in the

6    lock-up, what do you mean?

7    A.    Oh.  In this building is the U.S. Marshal's lock-up, and

8    that was where Mr. Rouven was at the time.

9    Q.    Okay.  And can you describe that?

10   A.    Well, you --

11   Q.    What I'm asking about is the area where the defendant is

12   versus the attorneys, if you can describe that environment.

13   A.    It is a secured room from the attorney's side.  You have

14   to be buzzed to get in.  It's not -- it's an okay size.  I

15   mean, you can fit three people in there.  That's not an issue.

16   There's a metal table.  There's Plexiglas.  You can't give

17   anything under the glass.  There's no mechanism to do that.

18   Like, in Henderson you have that drawer, that banker's drawer.

19   You don't have that in the marshal's lock-up.

20   Q.    When you went in there -- so you -- when you first say

21   you went in the marshal's lock-up, which was the room where

22   there was a glass partition separating you from --

23   A.    Yes.

24   Q.    -- from Jan.  Correct?  And Mr. Durham was already in

25   there?

JESS MARCHESE - Direct Examination

1   A.   He was.

2   Q.   Okay.  Do you recall if Mr. Durham had a copy of the plea

3   agreement?

4   A.   I recall he was going over it with Mr. Rouven at the

5   time, yes.

6   Q.   Okay.  So do you -- you -- with -- the e-mail you

7   received was approximately 10:00 a.m.  What time did you get

8   to -- did you get --

9   A.   I'm sorry.  I don't know.

10  Q.   But, to your knowledge, you -- you recall seeing

11  Mr. Durham with a copy of it in his hand?

12  A.   He -- he was sitting down.  Jan was in front of him, and

13  he --

14  Q.   Let me stop you.  When you say Jan -- Jan was on the

15  other side of the Plexiglas --

16  A.   Yeah.

17  Q.   -- right?

18  A.   Right.

19  Q.   And is there -- is it mesh and Plexiglas or just

20  Plexiglas?

21  A.   I think there might be some kind of impediment in front

22  of you, but you can always see the person.

23  Q.   And you have to talk on -- pick up the phone.  Right?

24  A.   No, I don't think so.

25  Q.   No.  So you can just communicate through the Plexiglas?

JESS MARCHESE - Direct Examination

```
 1    A.    Yeah.
 2    Q.    I'm not sure.
 3    A.    In Henderson you have to talk on the phone, but I don't
 4    think down there you do.
 5    Q.    So you went in and there was -- you recall seeing
 6    Mr. Durham with a copy of the plea agreement?
 7    A.    Definitely.
 8    Q.    And what happened when you went in there?
 9    A.    He was -- like I said, he was going over the plea
10    agreement when I came in.  Jan was in a good mood.  I believe
11    Jan had even said something like he liked my suit or something
12    along those lines.  And there was some small talk, but then
13    Ben continued to go over the plea agreement with him.  I kind
14    of just backed off.  You know, too many cooks in the kitchen
15    kind of thing.
16    Q.    So it was Mr. Durham that was -- when you say going over
17    the plea agreement, Mr. Jan did not have a copy.  Correct?
18    A.    No, I would think he would have given him one.  I -- I --
19    I don't recollect that, but I do remember Ben -- like I said,
20    he was sitting there.  It was -- and he was going over it.
21    Q.    Okay.  And did you leave the holding area and go out and
22    speak with the -- go out and speak -- try and speak with the
23    U.S. attorneys or anyone?
24    A.    If -- I might have.  I know that Jan was concerned about
25    some of the enhancements -- well, I shouldn't say plural.
```

JESS MARCHESE - Direct Examination

1   There was one particular enhancement he was concerned about.

2   Q.   So were you going over it with him, or was Ben going over

3   it with him?

4   A.   No.  Ben was doing it.

5   Q.   Ben was --

6   A.   But I was there.

7   Q.   And he had -- Jan had some concern about some something

8   to do with a particular -- a GigaTribe or something?

9   A.   There were -- one of the items that was seized from him

10   was a tablet that he had used.  He was upset because one of

11   the enhancements that was being used were some chats -- I

12   don't know if they were necessarily GigaTribe but regardless

13   they were chats with someone, and he had loaned that tablet

14   out to someone.  There was some convention or something.  He

15   had met some -- some guy, and he was upset because this other

16   guy had made these chats, and the chats had revolved around

17   some offensive, for lack of a better term, conversations.

18   Q.   Do you remember saying anything to him of words to the

19   effect of sometimes you need to admit to something you didn't

20   do?  Do you remember that?

21   A.   Well, we had -- yeah, we did have a conversation along

22   those lines.  My thought process in reference to that was --

23   Q.   I didn't ask you about what you actually said.  My

24   question was do you recall saying something like that to him?

25   A.   I don't know if I said any of those exact terms, but we

JESS MARCHESE - Direct Examination

1    definitely had a conversation about that.

2    Q.    So I'm going to ask you a couple questions about -- about

3    that.  So at that -- and I want to make sure I understand you

4    correctly.  So you didn't actually sit down and review the

5    plea agreement line by line with Jan; that was Ben, to your --

6    to your knowledge, it was Ben who did that?

7    A.    No, he was.  Yeah.

8    Q.    Excuse me?

9    A.    He -- he was the one doing it, yeah.  I was there, but I

10   was not reading it to him or --

11   Q.    Did you -- in terms of -- you indicated that one of the

12   things that you thought was favorable -- so you did review it

13   before you went over it?

14   A.    Yes.

15   Q.    Okay.  And you're -- there was a stipulated offense level

16   which was offense level -- base offense level 40.  Right?

17   A.    Correct.

18   Q.    Okay.  And in terms of this particular -- and it's in

19   front of you for reference.  In terms of that particular plea

20   agreement -- and I want to draw -- if I can take your

21   attention to page nine, line 9 to 20.

22   A.    Okay.

23   Q.    And let me ask you this.  Although in a plea agreement --

24   in a plea agreement, the defense and the Government can

25   stipulate to an offense level.  Right?

JESS MARCHESE - Direct Examination

1          **MS. ROOHANI:**  I'm sorry.  What page are you talking

2     about?

3          **MS. CONNOLLY:**  I was on page 9, line 9 through 20.

4     I'm digressing.  I'm not going to ask questions about that

5     right now.  I'm digressing from that question.

6          **THE WITNESS:**  Okay.

7     **BY MS. CONNOLLY:**

8     Q.   So I'm sorry.  In the -- in the guilty plea, the

9     Government and the defendant can stipulate to a base offense

10    level.  Right?

11    A.   Sure.

12    Q.   Okay.  And, however, the department of parole and

13    probation can come in and they can review the facts and

14    circumstances of the case and they can determine that there's

15    specific offense characteristics or relevant conduct that

16    should be used to enhance a base offense level.  Right?

17         **MS. ROOHANI:**  Objection.  Leading.

18         **THE COURT:**  Is this a foundational question or is

19    this --

20         **MS. CONNOLLY:**  Yes.

21         **THE COURT:**  All right.  I'll -- I'll allow it for

22    foundational purposes.

23    **BY MS. CONNOLLY:**

24    Q.   So generally -- general practice in a guilty plea.

25    Right?  The parole and probation can come in, and even though

JESS MARCHESE - Direct Examination

1    the parties don't stipulate to certain enhancements or

2    specific offense characteristics, parole and probation can

3    come in and say they apply.  Right?

4    A.   Yes, they -- it's very common that they change what we've

5    agreed to.

6    Q.   And -- and the standard is that, if -- if the parties

7    don't stipulate to a certain specific offense characteristic

8    and the Government agrees they're going to ask for no

9    additional offense characteristics and the Court is being

10   presented with no evidence, then chances are there's going to

11   be no additional enhancements because there's been no evidence

12   presented to the Court to support them.  Right?

13   A.   Yes.

14   Q.   Okay.  Now, in this particular case, at the time the plea

15   had entered, the Court had already heard all the evidence?

16   A.   Most of it, yeah.

17   Q.   Okay.  And, in this particular case, if you would go to

18   page 9, line 19 to 20 of the plea agreement.  And can you just

19   read that to yourself, please.

20   A.   You said 19 to 21?

21   Q.   Yes.

22   A.   Okay.

23   Q.   In this particular case, the Government -- it was agreed

24   by the parties that the United States would recommend the

25   Court sentence the defendant to a sentence within the

JESS MARCHESE - Direct Examination

1   applicable guideline range as determined by the parties.
2   Correct?
3   A.   You said 19 to 21?
4   Q.   Oh, I'm sorry.  I'm on -- I'm on -- I'm on the wrong
5   page.  That's my fault.
6         MS. CONNOLLY:   Court's indulgence one second, please.
7   Just a second.  Just a second.
8   BY MS. CONNOLLY:
9   Q.   Okay.  Go to page 6, line 9 -- line -- paragraph 9.  If
10  you could read paragraph 9 to yourself on page 6.
11  A.   Okay.
12  Q.   When you read that, did that -- that is a fact or that's
13  a factual pattern that was stipulated to by Mr. Fuechtener.
14  Right?
15  A.   Yes.
16  Q.   And what that indicates is that there was a jail call
17  between him and his husband where he instructed his husband to
18  delete evidence.  Right?
19  A.   Well, it doesn't exactly say that, but anything their
20  reach should read, yes.
21  Q.   Okay.  I'm going to read it verbatim.  "On a jail call
22  between the defendant and his husband, the defendant instructs
23  his husband to delete evidence on an unspecified account by
24  saying, 'Delete the message if it contains anything that Mari
25  shouldn't read,'" with Mari referring to agent -- Special

JESS MARCHESE - Direct Examination

1   Agent Panovich.  Right?

2   A.   It says that, yes.

3   Q.   Okay.  And when you read that, did it occur to you that

4   Jan was admitting to obstructing justice?

5   A.   I don't remember -- recollect.  I remember what it was

6   all about because, actually, I was the one that --

7   Q.   Okay.  Well, my question was did it occur to you that, by

8   stipulating to that fact, Jan was admitting that he had

9   destroyed evidence which could result in an obstruction?

10          MS. ROOHANI:  Objection.  Calls for a legal

11  conclusion.

12          MS. CONNOLLY:  It's got to do with the advice and his

13  knowledge of the guilty plea agreement when he communicate --

14          THE COURT:  Overruled.  He can answer the question.

15          THE WITNESS:  I honestly don't remember what I was

16  thinking when I read that particular paragraph.

17  BY MS. CONNOLLY:

18  Q.   But you -- you didn't advise him of that?  You didn't

19  say, "Hey, Jan, by stipulating to this fact, parole and

20  probation's going to come in and request a two-point

21  enhancement for obstruction of justice," didn't you?

22  A.   I don't believe so, no.

23  Q.   Okay.  And, in fact, you -- and it's in front of you, a

24  copy of the Presentence Investigation Report.  You would agree

25  that, in the Presentence Investigation Report, parole and

JESS MARCHESE - Direct Examination

1    probation is recommending a two-point enhancement based upon

2    that revelation.  Right?

3    A.    Yes.

4    Q.    Also, on that same page, can you please read to yourself

5    paragraph 7?

6    A.    Okay.

7    Q.    Okay.  Now, are you aware that, pursuant to the United

8    States Sentencing Guidelines, 2DG2.2, that if somebody

9    exchanges -- distributes child pornography in exchange for

10   something of value, that there's a five-point enhancement that

11   should be applied under United States Sentencing Guidelines?

12   Were you aware of that when you read this paragraph?

13   A.    Was I was aware of it?  Yes, I would have been.

14   Q.    Okay.  Did you make your client aware of the fact that,

15   by stipulating to this fact, he was exposing himself to a

16   five-point enhancement that was not contemplated in the

17   stipulated base offense level agreed upon with the Government?

18   A.    I don't believe so, no.

19   Q.    Now, you indicated that it was your belief that you would

20   be able to argue for five years under the terms of -- what you

21   communicated to Jan was that you would be able to argue for

22   five years?

23   A.    Yeah.

24   Q.    Okay.  And, in fact, under the terms of the -- the guilty

25   plea agreement, the terms were -- that was stipulated --

JESS MARCHESE - Direct Examination

1    stipulated agreement with the Government was that Count 2 and

2    3 would run consecutive and Count 1 would run concurrent.

3    Right?  Did I get that right?

4    A.   Well, wait --

5    Q.   No.  Count -- Count 1 -- Count 1 and 3 would run

6    concurrent to each other and Count 3 would run consecutive.

7    No.  Count 2 and 3 consecutive, and Count -- Count 1

8    concurrent.  I apologize.

9         What's your understanding with those counts, one,

10   two, and three?

11   A.   I don't know which count is which but my understanding --

12   Q.   Okay.  Let's go to the guilty plea agreement.

13   A.   -- was that the two mandatory minimums was five, one

14   concurrent --

15   Q.   Hold on.  I'll get you the page.

16   A.   Well, the possession is not the mandatory minimum.  So it

17   would be two and three.

18   Q.   Okay.  So count -- two of those -- there's two counts he

19   pled to.  One was possession, one was receipt, and one was

20   distribution.  Right?

21   A.   Correct.

22   Q.   Okay.  And two of those had a mandatory minimum and one

23   of them didn't.  Right?

24   A.   Correct.

25   Q.   Okay.  And the two that had the mandatory minimum were

JESS MARCHESE - Direct Examination

1    stipulated would run concurrent to each other?

2    A.   Yes, that was my understanding.

3    Q.   Okay.  And then it was agreed that the third count would

4    run consecutive?

5    A.   Correct.

6    Q.   Okay.  So you get two mandatory minimums would run

7    concurrent, the third one consecutive.  Right?

8    A.   Yes.

9    Q.   Okay.  And the one that doesn't have a mandatory minimum

10   was the count of just simple possession?

11   A.   Correct.

12   Q.   Okay.  And are you aware the guideline range for that

13   simple possession was level 22?

14        MS. ROOHANI:  Your Honor, I believe that actually

15   misstates the guideline.

16   BY MS. CONNOLLY:

17   Q.   Do you know what the guideline range for that simple

18   possession was?

19   A.   Well, I mean, if you're adding -- are you talking about

20   the base offense level or with all the enhancements?

21   Q.   The -- the base offense level for that count, possession.

22        Let me try and speed things up.  Whatever that base

23   offense level, the agreement was that that would run

24   concurrent to the five part -- consecutive to the five years.

25   Right?

JESS MARCHESE - Direct Examination

```
 1    A.    That's true.

 2    Q.    Okay.   The five years is 60 months?

 3    A.    Yeah.

 4    Q.    So since the possession count was going to run

 5    consecutive, by agreement there was no possibility that he was

 6    going to receive a sentence of five years.  Because if you

 7    argue for five years, you would be violating the plea

 8    agreement.   Right?

 9    A.    I disagree with that.

10    Q.    Okay.  Well, let's go through this.  The stipulate --

11    when you enter into a guilty plea agreement with the

12    Government, if you enter into some stipulations -- for

13    example, if you stipulate that a possession count is going to

14    run consecutive to a distribution and receipt count and you

15    come to court and ask the Court to run that concurrent, that

16    would be in violation of the stipulated agreement that you had

17    with the Government?

18          MS. ROOHANI:   Your Honor, I actually believe that

19    misstates the plea agreement.  Your Honor has a copy of the

20    plea agreement.  I believe the plea agreement speaks for

21    itself.

22          MS. CONNOLLY:   Okay.  Let's go through it.

23          THE COURT:   Well, the question was Mr. Marchese's

24    understanding of the plea agreement.  Go ahead and ask the

25    question for the witness.
```

JESS MARCHESE - Direct Examination

1        **THE WITNESS:**  I disagree with that.

2   **BY MS. CONNOLLY:**

3   Q.   Okay.  Hold on.  Okay.  Can you please turn to page 10

4   and 14.  It states, "The parties will jointly recommend that

5   the Court alone sentence as imposed or in Count 2 and Count 3

6   concurrently to each other.  The parties further agree that

7   the sentence for Count 1 shall run consecutive to the current

8   sentence imposed on Counts 2 and 3."

9   A.   I agree with that.

10  Q.   So that's what -- that's the agreement between you guys,

11  is that possession counts better run consecutive?

12  A.   Yes.

13  Q.   So if you were to come to the Court and say, "Judge, I'm

14  asking you to run it concurrent," that would be considered a

15  violation of the plea agreement, wouldn't it?

16  A.   Well, I wouldn't ask for it to run concurrent.  You're

17  talking -- I mean, I think we're talking about two different

18  things.  I think you're talking about --

19  Q.   Okay.  Well, but --

20  A.   I'm talking about the total time.

21  Q.   Okay.

22  A.   I agree with you what the plea agreement says --

23  Q.   Okay.  Under the terms --

24  A.   -- but it --

25  Q.   Under the terms of the plea agreement, there's no way --

JESS MARCHESE - Direct Examination

1   or even if you were to ask for a sentence of five years, that

2   would be a violation of the terms of the plea agreement.

3   Because pursuant to the --

4   A.   I --

5   Q.   -- the plea agreement, the -- the five years for the

6   consecutive counts, concurrent counts, and then the possession

7   was to run consecutive.

8   A.   I disagree.

9   Q.   So if you were to come in -- and you believed you could

10   come at sentencing and ask for five years and that would not

11   be a violation of the plea agreement?

12   A.   Yes.  He'd already had time served.  We could have --

13   she -- we could have --

14   Q.   Okay.  I'm not talking about time served.  I'm talking

15   about what you could ask the judge to sentence him to and not

16   be in violation of the plea agreement.

17   A.   My answer is I felt that I could ask for five years under

18   the terms of the plea agreement.

19   Q.   Even with the understanding that the mandatory minimum

20   count --

21   A.   Same answer.

22   Q.   -- was five years.  Right?

23   A.   Same answer as before.

24   Q.   And even though it was stipulated the possession would

25   run consecutive, the time for the possession would have run

JESS MARCHESE - Direct Examination

1    consecutive?

2    A.   Same answer as before.

3    Q.   Now, you indicated that you thought that the fact that he

4    had no criminal history would be a mitigating factor?

5    A.   Yes.

6    Q.   Well, isn't it true that, under the case law and the

7    United States Sentencing Guidelines, when a -- when criminal

8    history becomes a mitigating factor is that the criminal

9    history over-represents the criminal behavior of the

10   defendant?

11        **MS. ROOHANI:**  Objection.  Leading.  It also misstates

12   the law.  There's a difference between a variance and a

13   departure, Your Honor.

14        **THE COURT:**  All right.  I'm going to ask the

15   Government to stop objecting to what the answer is.  Because

16   it's starting to look, to me, like you're trying to hint to

17   the witness when to say yes, I agree, or I don't agree with

18   what Ms. Connolly is asking.  So let her ask the question.  If

19   she's misstating something from the plea or the guidelines or

20   something else, let Mr. Marchese say what his understanding is

21   rather than objecting to what the dictionary definition is.

22        So, Ms. Connolly, please ask your question again.

23   BY MS. CONNOLLY:

24   Q.   Criminal -- there's a criminal history -- what is

25   criminal history Category 1 of the United States Sentencing

JESS MARCHESE - Direct Examination

```
 1   Guidelines for?

 2   A.   What is it for?

 3   Q.   Yeah.  It's for somebody with no criminal history.

 4   Right?

 5   A.   Yeah.

 6   Q.   Okay.

 7   A.   Zero to one points.

 8   Q.   Do you -- do you -- do you know of any case or any

 9   commentary or any guideline that says that somebody with no

10   criminal history should get a further departure based upon

11   their lack of criminal history?

12   A.   I know it's common sense.

13   Q.   And you would agree that those criminal -- would you

14   agree that those criminal history departures usually pertain

15   to a case where somebody's criminal history is

16   over-representative of their criminal behavior?

17   A.   I guess I'm not following you.  What was the question?

18   Q.   Okay.  Criminal history.  Criminal history downward

19   departure.

20   A.   Yeah.

21   Q.   Okay.  So there are times when the Court can do a

22   criminal history departure, right, or a variance?

23   A.   Yes.

24   Q.   And that's in circumstances, generally, where the

25   criminal history is over-representative, it makes --
```

JESS MARCHESE - Direct Examination

 1    A.    Right.

 2    Q.    It makes the background look worse than it really is?

 3    A.    Right.  Okay.

 4    Q.    And that wasn't the circumstance in this case?

 5    A.    No.  He didn't -- he didn't have a criminal history.

 6    Q.    And were you aware also that -- or did you communicate to

 7    Mr. Fuechtener that the united -- that the United States

 8    Sentencing Guidelines discourage departures in child

 9    pornography cases?

10    A.    I don't know if that came up, but I think you're taking

11    my words way too literal in reference to his criminal history.

12    Q.    Say that again.

13    A.    You're taking what I'm saying in reference to the -- his

14    criminal history and it as a sentencing argument way too

15    literally.

16    Q.    Well, literally, we're here and we're talking words.  So

17    I'm trying to do the best I can.

18          And you indicated to me that you thought his lack of

19    criminal history would be grounds for a mitigating factor?

20          **MS. ROOHANI:**  Objection.  Argumentative and leading.

21          **THE WITNESS:**  Every attorney --

22          **MS. CONNOLLY:**  Permission to treat the witness as

23    hostile.

24          **THE COURT:**  All right.  The leading objection is

25    sustained.  But permission to treat him as hostile is not

1    there yet.  So go ahead and just ask the question again.  I

2    think maybe we're just at odds with what it is that the

3    question is seeking to clarify.

4    **BY MS. CONNOLLY:**

5    Q.    You indicated that you believed that the fact that he had

6    no criminal history was significant; is that accurate?

7    A.    Yes.

8    Q.    Well, in the United States Sentencing Guidelines,

9    criminal history falls into a number of categories.  Right?

10   A.    Yes.

11   Q.    And the fact that somebody has no criminal history would

12   mean that they had zero to one criminal history points.

13   Right?

14   A.    You said that already.  Yes.

15   Q.    To help, for your edification, there's a little sheet

16   right in front of you that has the sentencing table.

17          So somebody with no criminal history points falls in

18   a criminal history Category 1.

19   A.    Yes.

20   Q.    So that takes into consideration the fact that somebody

21   has no criminal history?

22   A.    Yes.

23   Q.    Okay.  Do you have a -- do you know of a case or any

24   other authority that indicates that somebody else or an

25   individual who has no criminal background should get a benefit

JESS MARCHESE - Direct Examination

1   beyond being in a criminal history Category 1?

2   A.   No.

3   Q.   There's something else I just wanted to clarify.  We had

4   some talk about if there was a conflict.  You don't have in

5   your file any kind of conflict waiver that was filed by Jan to

6   author -- to waive any conflict with Mr. Sanft being involved

7   in his representation, do you?

8   A.   Can you clarify?  Well, I don't have any conflict waiver,

9   but I don't know exactly what you're referencing.

10  Q.   You don't -- you don't have any kind of written anything

11  in writing from Jan, any kind of waiver wherein it's written

12  that he acknowledges that there could be a conflict with

13  Mr. Sanft coming back on the case and representing him given

14  the fact that he was affiliated with Mr. Nadig who was

15  ostensibly representing Alfter previously?

16  A.   No, I -- there's no waiver.

17  Q.   Okay.

18       **MS. CONNOLLY:**  Court's indulgence.

19       *(Pause in the proceedings.)*

20       **MS. CONNOLLY:**  I don't have anything further.  Thank

21  you.

22       Judge, there was a scheduling issue with Mr. Sanft

23  who couldn't -- had a hearing at 12:00, and so I was just

24  inquiring if we wanted to call him out of order.

25       **MS. ROOHANI:**  And, Your Honor, I would normally have

JESS MARCHESE - Cross-Examination

```
 1    no problem with that, but we have at least 20 minutes of
 2    cross-examination of Mr. Sanft.  So I don't believe that
 3    calling him now would serve any purpose.
 4              THE COURT:  Okay.
 5              MS. ROOHANI:  May I approach, Your Honor?
 6              THE COURT:  Yes, you may.
 7              MS. ROOHANI:  Thank you.
 8                        CROSS-EXAMINATION
 9    BY MS. ROOHANI:
10    Q.   Good morning, Mr. Marchese.
11    A.   Or are we at the afternoon yet?  No, I think we're still
12    morning.
13    Q.   No.  Almost.  Afternoon, Mr. Marchese.  How's that?
14              Mr. Marchese, you answered many questions with
15    Ms. Connolly about the early portion of your representation of
16    Jan.  Do you remember that?
17    A.   Yes.
18    Q.   Initially was there a plan of a joint defense between Jan
19    and Frank?
20    A.   Well, initially time wise, like right after the search?
21    Q.   No.  After the search warrant at the time that Jan is
22    indicted but before the first trial setting in July.
23    A.   A joint defense?  No.
24    Q.   Was there the potential for a joint defense?
25    A.   At that point, no.
```

1    Q.   At that point, was there, in fact, any conflict because

2    Mr. Alfter had not been charged?

3              **MS. CONNOLLY:**  Objection.  Calls for a legal

4    conclusion.

5              **THE COURT:**  Overruled, if he can testify as to his

6    understanding.

7              **THE WITNESS:**  I did not see one.  As a matter of

8    fact, initially, when I got on the case, the day of the

9    detention hearing or Ms. -- I had a conversation with

10   Ms. Cartier-Giroux, and she had indicated to me that they had

11   elected not to indict Mr. Alfter.  So based on what the

12   Government was telling me, I didn't think it was an issue.

13   **BY MS. ROOHANI:**

14   Q.   So in the very early stages of your representation of

15   Jan, from the -- at least from the point of the detention

16   hearing until the first setting when Mr. Nadig got off of the

17   case, there was no conflict between the defenses of -- because

18   Mr. Alfter was never intending to be charged at that point?

19   A.   Correct.

20   Q.   Now, you indicated to Ms. Connolly that at some point in

21   July, a few weeks before Mr. Durham came on the case, you had

22   some concerns about the preparation of Mr. Sanft and

23   Mr. Nadig; is that correct?

24   A.   I had concerns even earlier than that, but they weren't

25   voiced till -- to Jan until that point.

JESS MARCHESE - Cross-Examination

1    Q.    And that -- those concerns were based upon them not

2    reviewing discovery or potentially doing anything on the case?

3    A.    Yeah.  I just didn't see any work getting done.

4    Q.    And you don't work in the same law firm as them?

5    A.    No.

6    Q.    Okay.  So if they were potentially reviewing discovery at

7    their offices, you wouldn't be able to see them doing that?

8    A.    Of course not.

9    Q.    So your belief was based upon what you were seeing and

10   their conversations with Jan?

11   A.    Right.  Everything.

12   Q.    Okay.  And you went to see Mr. -- Mr. Fuechtener

13   sometimes at the Henderson facility by yourself?

14   A.    I think it was usually by myself, yes.

15   Q.    Usually by yourself.

16         And a few times you may have gone with Mr. Sanft or

17   Mr. Nadig?  I believe that was your testimony.

18   A.    Yeah, there -- there were some times.  I can't tell you

19   exactly when.  But, I mean, I'm not going to say they never

20   visited him because that would be a lie.  They did.

21   Q.    So in terms of -- and I guess I'm trying to understand.

22   You visiting Mr. Fuechtener with Mr. Sanft or Mr. Nadig,

23   that's a limited interaction from which you derived your

24   belief that they weren't doing anything on the case?

25   A.    Yeah.  Right.  Whether it be the visits, whether it be

JESS MARCHESE - Cross-Examination

1   person-to-person conversations with Jan, person-to-person

2   conversations with the other attorneys.  It was a totality

3   thing.

4   Q.   And Mr. Sanft actually made an appearance fairly early in

5   the case.  I believe he was at the first detention hearing.

6   Do you remember that?

7   A.   No.  I think it would have been the appeal of the

8   detention hearing, yeah.

9   Q.   Okay.  And, at that point, Mr. Sanft would have reviewed

10  the complaint in this case?

11  A.   I'm sure he would have, yeah.

12  Q.   And that complaint had information about the nature of

13  the evidence.  Would that be fair to say?

14  A.   Correct.

15  Q.   It had information about the nature of the images?

16  A.   Sure.  Yes.

17  Q.   It had information about the number of images?

18  A.   Yes.

19  Q.   It had information about the chats that were part --

20  eventually incorporated as part of the plea agreement?

21  A.   Right.

22  Q.   It had information about -- that Mr. Alfter had provided

23  to Special Agent Panovich?

24  A.   Yes --

25  Q.   Or at least that was --

JESS MARCHESE - Cross-Examination

```
 1    A.    -- no --

 2    Q.    -- proffered at the detention hearing?

 3    A.    You know, it did, yeah.

 4    Q.    Okay.  So all of that information was complained --

 5    contained in the complaint at the complaint stage in this

 6    case?

 7    A.    Yes.

 8    Q.    Okay.  And that would have been information that would

 9    have been available to Mr. Sanft?

10    A.    Yes, if I -- if I remember correctly, we -- we had

11    conversations about that.

12    Q.    And that was information that was available to you and

13    any attorney working on the case because it's a matter of

14    public record.  Correct?

15    A.    Yes.

16    Q.    Okay.  Now, ultimately -- well, let me -- let me back up.

17          Ms. Connolly talked to you about there being a

18    potential defense of blaming Mr. Alfter for this.  Do you

19    remember that?

20    A.    Correct.

21    Q.    Okay.  That's only one possible defense that could have

22    been -- you could have proceeded with at trial?

23    A.    Yes.

24    Q.    That was one possible defense that you proceeded with at

25    trial.  Correct?
```

JESS MARCHESE - Cross-Examination

1    A.    Yes.

2    Q.    That wasn't the only defense that you could have

3    proceeded with?

4    A.    No.  And we had some other -- we never put our

5    case-in-chief on, but there was -- there was some other things

6    we were going to bring up.

7    Q.    And, in fact, that was part of your defense, was that

8    there were other potential people who could have been doing

9    this?

10   A.    Right.  That was mainly the issue.

11   Q.    So there wasn't necessarily an antagonistic defense

12   between Jan and Mr. Alfter?  There could have been but there

13   wasn't necessarily?

14   A.    No.  I mean, I don't think the -- the argument was going

15   to get up and just say it was all Frank.  I think it was going

16   to be more general in that it was other people.

17   Q.    Okay.  Fair enough.

18   A.    But those other people could have been Frank.

19   Q.    Fair enough.

20          Now, let's talk for a minute about this e-mail

21   with -- that Mr. Nadig sent to Mr. Alfter.  You talked with

22   Ms. Connolly about it a little bit.

23   A.    Yes.

24   Q.    Would it be fair to say that your biggest gripe with that

25   e-mail was that you felt Mr. Nadig was attacking you

JESS MARCHESE - Cross-Examination

1   professionally?

2   A.   I would say it would be twofold.  Yeah, of course the

3   attacking.

4   Q.   Okay.

5   A.   And then it was, you know, I go to visit the man and then

6   I have to spend an hour just talking him off the ledge, so to

7   speak.

8   Q.   Okay.

9   A.   And, you know, I have -- I'd rather be working on the

10  case and not Ben Nadig and, you know, childish stuff that I

11  don't even want to be a part of.

12  Q.   Understood.

13          I believe you also testified that your belief about

14  the purpose of that e-mail was essentially a fee dispute

15  between Mr. Alfter and Mr. Nadig?

16  A.   That's correct.

17  Q.   And, as part of that, you felt that Mr. Nadig had to

18  attack you to justify his fee?

19  A.   Yes.  And in the tenor of the e-mails, that he wanted --

20  I think he wanted to kind of get back on the case and then he

21  could justify the fee.

22  Q.   And, at that point, he wasn't -- he wasn't on the case?

23  A.   No.

24  Q.   Okay.  And, at some point, I believe that Mr. Nadig went

25  out to visit Mr. Fuechtener while you were representing him?

JESS MARCHESE - Cross-Examination

```
 1    A.    Correct.

 2    Q.    And he didn't get your permission to do that?

 3    A.    No, he did not.

 4    Q.    Okay.  And, obviously, that would have been your

 5    preference for him to do that?

 6    A.    Well, that's -- so says the State Bar, yeah.

 7    Q.    Fair enough.  Okay.

 8          That was months before trial.  Right?

 9    A.    I believe it was, yes.

10    Q.    So trial in this case happened in November.  This

11    happened in September?

12    A.    I'll take your word for it.  It sounds about right, yeah.

13    Q.    The e-mail happened in about September.  I believe --

14    A.    Yes.

15    Q.    -- Ms. Connolly said around September 10th.  Would that

16    sound about right?

17    A.    Right.

18    Q.    And you indicated that Jan was, I believe you said,

19    anxious or upset when you saw him, and he wasn't himself.  I

20    believe that was the -- the words you used.

21    A.    Definitely.

22    Q.    Okay.  How -- when you went to meet with him that time

23    after Mr. Nadig had met with him, approximately how much time

24    did you spend with Jan and Mr. Durham during that meeting?

25    A.    I -- I know we would normally have the -- the meetings in
```

JESS MARCHESE - Cross-Examination

1    a -- an open setting.  This was not in an open setting.  I
2    don't know why.  It probably wasn't available.  So we did that
3    one in the phone booth, I guess, if you will.  There never was
4    a 20-minute meeting with Jan.  It was usually pretty long.
5    So, I mean, it had to be at least an hour, if not more.
6    Q.   Okay.  So at least an hour?
7    A.   Yeah.
8    Q.   Maybe two hours?
9    A.   That would have been very normal for it to be two hours,
10   yeah.
11   Q.   Okay.  Fair enough.
12           At the end of that meeting, was Jan still not
13   himself, upset, and anxious?
14   A.   I felt we made some headway and we had calmed him down,
15   yes.
16   Q.   Okay.  And this was in September?
17   A.   Yes.
18   Q.   Now, you met with him multiple times after that?
19   A.   For sure.
20   Q.   During those subsequent meetings, did he ever reraise to
21   you the specter of the concerns that Mr. Nadig had brought up
22   with him?
23   A.   Mr. Nadig's name did come up, yes.  In the same tenor of
24   conversation, I would say no.
25   Q.   Okay.  Let's talk about that.  So Mr. Nadig's name came

JESS MARCHESE - Cross-Examination

1    up?

2    A.   Sure.

3    Q.   What were you talking about in terms of your

4    conversations about Mr. Nadig?

5    A.   Well, a lot of it was that e-mail.  Because, you know, it

6    would -- it would come up periodically.  Like, "Listen,

7    just -- we got this.  This is -- don't listen -- don't listen

8    to this.  This is a lie."  I even went and researched the case

9    that he said he got, you know, the not guilty on, things like

10   that.

11   Q.   Okay.

12   A.   And then, you know, just who we were going to bring back

13   on the case, you know, whether it be Mike, whether it be Ben.

14   Obviously it wound up being Mike.  So those sorts of things.

15   Q.   So the conversation was about potentially bringing

16   Mr. Nadig back on to the case?

17   A.   At one point, yes.  But obviously it was -- it was

18   Mr. Sanft.

19   Q.   Okay.  At some point, Jan had brought about the idea of

20   bringing Mr. Nadig back on to the case because you wouldn't

21   have done that?

22   A.   Well, it would have depended on time frame wise.  If it

23   was pre that e-mail, I probably wouldn't have had a problem

24   with it.

25   Q.   Okay.

JESS MARCHESE - Cross-Examination

1    A.   After the e-mail, obviously not.

2    Q.   So after that e-mail, the idea of bringing Mr. Nadig back

3    on the case was Jan's idea; it wasn't your idea?

4    A.   Yeah.   No, I never would have brought that up.

5    Q.   Okay.   At the time that he went to trial, was Mr. -- did

6    Mr. Fuechtener express to you, at any point, concern about the

7    things that Mr. Nadig had told him at the point of trial?

8    A.   No.   It was kind of history at that point.

9    Q.   So he had basically gotten over it or at least --

10   A.   He wasn't --

11   Q.   -- processed it and moved on?

12   A.   He wasn't bringing it up to me.

13   Q.   Okay.

14   A.   Yeah.

15   Q.   Let's talk for a minute about Amber Craig.   Who asked for

16   a female attorney?

17   A.   Jan had brought up the idea.

18   Q.   And would it be fair to say that Jan has really directed

19   this case in terms of attorneys coming on and off the case?

20   A.   I mean, he certainly has a say in it.   I will say that,

21   you know, I think at some point he respected my opinion and

22   would listen to me.   So it wasn't Jan's way or the highway,

23   but no.   I mean, he certainly had a say.   There's no doubt

24   about that.

25   Q.   But there wasn't a situation where you said, "I need to

JESS MARCHESE - Cross-Examination

1    bring on Amber Craig.  You have no say in this"?

2    A.   Oh, no, no.

3    Q.   Okay.

4    A.   As a matter of fact, he met her before any decision was

5    made.

6    Q.   And Jan's the one who ultimately made the decision about

7    whether to bring on Ms. Craig or not?

8    A.   Correct.

9    Q.   Now, let's talk a little bit about the -- the -- the

10   conflicts motion that -- the litigation.

11   A.   Yes.

12   Q.   Okay.  You had testified that you and Mr. Durham felt

13   that there was no issue and you felt that you were going to

14   remain on the case?

15   A.   Yes.  I was confident that we would win, so to speak, the

16   motion.

17   Q.   Okay.  And you also indicated that Mr. Fuechtener was not

18   upset at that time because of the assurances that you gave

19   him?

20   A.   I didn't think so.  I mean, he was upset with Amber for

21   putting us in that situation.  But I don't think -- no, I

22   didn't -- I never sensed that from him.

23   Q.   And shortly thereafter, after that situation resolved and

24   Judge Navarro ultimately excluded Ms. Craig, Mr. Sanft came

25   back on the case?

JESS MARCHESE - Cross-Examination

1    A.    Yes.

2    Q.    And that was Jan's decision?

3    A.    Yes.

4    Q.    That was Jan's request?

5    A.    Yes.

6    Q.    You didn't have a problem with Mr. Sanft at that point?

7    A.    No.  We -- we -- we spoke on the phone.  We had an adult,

8    so to speak, conversation and everything was fine after that.

9    Q.    Okay.

10   A.    To this day it is.

11   Q.    All right.  And from that point when Mr. Sanft came back

12   on the case, how would you describe the relationship between

13   you, Mr. Durham, and Mr. Sanft in presenting a defense for

14   Jan?

15   A.    I thought it actually worked pretty well.  We each, you

16   know, were allocated certain duties and we performed them.

17   Q.    Okay.  Let's talk a little bit about -- Ms. Connolly

18   talked to you about the discovery in this case.  Do you

19   remember that?

20   A.    Yes.

21   Q.    And you looked at the discovery receipts that were there?

22   A.    Correct.

23   Q.    And I believe Ms. Connolly noted that the first discovery

24   receipt is not actually there, the first approximately 420

25   pages of discovery that were produced to you?

JESS MARCHESE - Cross-Examination

1    A.    Correct.

2    Q.    Do you remember that those were -- that particular

3    discovery was produced to you before the detention appeal

4    hearing?

5    A.    Yes, it was early on, for sure.

6    Q.    And that was also produced to Mr. Sanft?

7    A.    Yes.  I believe -- I know this for a fact because I saw

8    it on my Dropbox the other day.  I had shared it with them via

9    Dropbox.

10   Q.    And you had reviewed it because I think you referenced it

11   at the detention hearing?

12   A.    Yes.

13   Q.    And ultimately there were approximately 4,000 pages that

14   were produced in this case?

15   A.    Yes.

16   Q.    Now, after that original 420 pages was made available, I

17   believe you testified that you went down to the Internet

18   Crimes Against Children lab on Bermuda to view that evidence?

19   A.    Yes.  I think I only did that twice, I got to be honest.

20   Well, we hired an expert.  So that was more his job, and I

21   watched, like, two of them and it really just repulsed me.

22   And I said, "This is what you're getting paid for.  Tell me

23   what I need to know."

24   Q.    Okay.  And would it be fair to say that that evidence was

25   always made available to you, to your expert, or anybody else

JESS MARCHESE - Cross-Examination

```
 1    who -- from the defense team who needed to go and take a look
 2    at it?
 3    A.    Yes.  You just make an appointment.  And the expert had
 4    known -- had worked in that unit, so he knew many of the
 5    people.  So he was able to probably get a little more time
 6    than some other people, actually.
 7    Q.    Okay.  So he spent a considerable amount of time looking
 8    at the evidence?
 9    A.    Judging by his bills, yes.
10          MS. CONNOLLY:  Objection.  Calls for speculation what
11    somebody else did.
12          MS. ROOHANI:  He'd certainly have knowledge of it if
13    he's ultimately paying the expert, Your Honor.
14          MS. CONNOLLY:  Hearsay.
15          THE COURT:  Overruled.
16    BY MS. ROOHANI:
17    Q.    Now, Mr. Marchese, is it your understanding that the
18    Government --
19          THE COURT:  Let me -- I'm sorry.  Just to interrupt
20    so that we don't waste time, is my recollection wrong?  Didn't
21    the parties stipulate that it was child pornography?
22          THE WITNESS:  Yes --
23          MS. ROOHANI:  Your Honor --
24          THE COURT:  -- at trial so --
25          MS. ROOHANI:  Yes.  Sort of, Your Honor.  Because,
```

JESS MARCHESE - Cross-Examination

1    ultimately, the -- the Government -- I believe Your Honor said

2    that you would eventually view the images because I believe

3    that that stipulation was not a complete stipulation under

4    Ninth Circuit authority.  So with the caveat of the defense

5    was willing to stipulate that it was, in fact, images of

6    children engaging in sexually explicit conduct, but we did not

7    feel that that was a complete stipulation.  So we didn't get

8    to the point of actually viewing the child pornography but

9    they were willing to stipulate to that.

10             **THE COURT:**  All right.

11             **MS. ROOHANI:**  And I'll clarify it in just a moment,

12   Your Honor.

13   **BY MS. ROOHANI:**

14   Q.   Mr. Marchese, is it your understanding that the

15   Government statutorily cannot make that contraband available

16   to you at your office?

17   A.   No.  It's the law.

18   Q.   It's the law?

19   A.   Yes.

20   Q.   So to meet its discovery obligations, the Government just

21   has to make it available to you and to your expert and ample

22   opportunity for you to review it?

23   A.   Yes.  And that was done.

24   Q.   Would it be fair to say that, after going and viewing not

25   only those images, but your expert, at some point, indicated

JESS MARCHESE - Cross-Examination

1    to you that there was Skype chats that you would want to take

2    a look at?

3    A.    Yes.

4    Q.    And you made a request to me and Special Agent Panovich

5    that we segregate those chats from any contraband and then

6    produce those to you for the ease of your review at your

7    office?

8    A.    Yes.  I didn't remember that, but you bringing that up,

9    it refreshes my mind.  Yeah, we did make that request.

10   Q.    And there was approximately 2,500 pages of Skype chats

11   that we produced to you on paper form.  Would that be fair?

12   A.    Yes.

13   Q.    And so, really, that 4,000 number of pages, a large

14   majority of that was things that your expert had already

15   reviewed at the ICAC office and things that you felt like you

16   wanted to just have the ease of the review at your own office?

17         MS. CONNOLLY:  Objection.  Hearsay.  Speculation of

18   what the expert did or didn't do.

19         THE COURT:  I don't hear -- I'm sorry.  I can't hear

20   you.  Can you bend the mic a little bit?

21         MS. CONNOLLY:  Objection to hearsay and speculation

22   as to what the expert did or did not do.

23         THE COURT:  Ms. Roohani?

24         MS. ROOHANI:  Your Honor, he can testify as to what

25   he personally -- well, it's not offered for the truth, Your

 1    Honor.  It's awfully -- ultimately offered to show the effect

 2    on Mr. Marchese in that he made the request to me.

 3            **THE COURT:**  All right.  The objection's overruled.

 4    **BY MS. ROOHANI:**

 5    Q.   So you -- at some point, your expert communicated

 6    something to you that caused you to ask me for these Skype

 7    chats?

 8    A.   Yes.

 9    Q.   Okay.  Now let's talk a little bit about your

10    conversations with Jan about the sentencing guidelines.  Now,

11    you -- you talked with Ms. Connolly a little bit about that.

12    You went -- you went over the guidelines generally with Jan

13    relatively early in the case.  Do you remember that?

14    A.   Yes.

15    Q.   And you said that you didn't do it with the guidelines

16    book?

17    A.   No.

18    Q.   But you knew the information that the Government was

19    proceeding on based upon the complaint?

20    A.   And the initial discovery dump, yes.

21    Q.   The initial discovery.  So very early on in the case,

22    based upon your experience with child pornography cases, you

23    figured out that virtually every single enhancement applied in

24    this case?

25    A.   Yes.

JESS MARCHESE - Cross-Examination

```
 1    Q.    Okay.  And you generally discussed those enhancements
 2   with Mr. Fuechtener?
 3    A.    Yes.
 4    Q.    Including the number of images?
 5    A.    Correct.
 6    Q.    Including the nature of the images?
 7    A.    Yes.
 8    Q.    Including the pattern and practice because of the chats
 9   that the Government disclosed to you?
10    A.    That, I'm not sure if that came up early, but it came up
11   later.
12    Q.    Okay.  But you certainly had the conversation with him?
13    A.    Yes.
14    Q.    And he -- at least based on what your belief was, he
15   understood what the nature of that particular enhancement was?
16    A.    I mean, it wasn't like I said, "Jan, do you understand
17   that you could get extra points because of the age of these
18   children," or anything like that.  Because we -- we spoke
19   about it, and there were never any follow-up questions, to my
20   recollection.
21    Q.    Did he indicate to you, at any point, that he didn't
22   understand what you were saying?
23    A.    No.
24    Q.    Okay.  And you knew that he had no criminal history?
25    A.    Yes.
```

JESS MARCHESE - Cross-Examination

1   Q.   And that was something that the Government generally

2   agreed with you on?

3   A.   Yes.

4   Q.   But you knew, based upon the facts of the case, the

5   complaint, and the early discovery, that the guidelines range

6   in this case was going to be life?

7   A.   Yes.

8   Q.   And you expressed that to Mr. Fuechtener?

9   A.   Yes.

10  Q.   More than once?

11  A.   Yeah, I believe so.  Probably several times.

12  Q.   And, in fact, the forensic report from just that one

13  device that was found out on the deck, that hit every single

14  enhancement.  Correct?

15  A.   Yes.

16  Q.   And that ultimately gave him a guideline range of life?

17  A.   Yes.

18  Q.   And you expressed that to him?

19  A.   Well, I didn't say, "Hey, that hard drive outside, you

20  know, you can do life just for that."  But, you know, there

21  was several times where we'd be speaking in terms of, "Hey,

22  listen, if you go to trial and you lose, you could do life

23  based on, you know, the nature of the charges."

24  Q.   Okay.  Now, is it your standard practice to generally go

25  over the guidelines with your clients?

JESS MARCHESE - Cross-Examination

1    A.    There's -- I mean, every single client, whether it be

2    child pornography, whether it be a 924(c), a drug case,

3    their -- their concern is typically one thing:  What am I

4    looking at?  So those -- that definitely came up.

5    Q.    And so you told Mr. Fuechtener what he was potentially

6    facing in this case?

7    A.    Yes.

8    Q.    And without getting into the minutia of plus five here

9    and minus two there, you told him about the enhancements?

10   A.    Yes.

11   Q.    And you told him about how certain facts met those

12   enhancements?

13   A.    Yes, very generally, but I -- it came up.

14   Q.    Okay.  And never with the guideline book?

15   A.    No.  I -- I -- not me personally.

16   Q.    Okay.  Now, let's talk about the Wednesday of trial

17   during Special Agent Panovich's testimony.

18   A.    Yes.

19   Q.    Now, Special Agent Panovich was your witness?

20   A.    Correct.

21   Q.    All right.  And you had indicated to Ms. Connolly that

22   you were really paying attention to what Special Agent

23   Panovich was talking about?

24   A.    Yes.

25   Q.    And, at some point during the break, I believe that I

JESS MARCHESE - Cross-Examination

```
 1    needed a restroom break, that you turned and you looked over
 2    and Jan indicated that he was open to discussing a plea
 3    agreement with the Government?
 4    A.    Yes.
 5    Q.    Okay.  And you were sitting there.  You could presumably
 6    hear any type of conversation that was going on between
 7    Mr. Durham, Mr. Sanft, and Mr. Fuechtener.  Correct?
 8    A.    Well, while the agent was testifying, I -- I really don't
 9    remember any of that because it was just I'm pretty much just
10    trying to focus on what she's saying, making sure, you know,
11    she doesn't make any inconsistent statements or anything like
12    that.  But at the break, then, yeah, there was definitely
13    dialogue.
14    Q.    At any point did they threaten Jan?
15    A.    No.
16    Q.    At any point did they try to coerce Jan?
17    A.    Not -- no.
18    Q.    And was the conversation really we should at least
19    discuss this option with the Government?
20    A.    Yes.
21    Q.    And Jan was open to discussing it?
22    A.    Yes.
23    Q.    Is it true that Mr. Fuechtener was upset with how
24    convincing Ms. Panovich was being?
25    A.    I think we were -- we all thought that the Government did
```

JESS MARCHESE - Cross-Examination

```
 1    a good job presenting their case just generally, whether it be
 2    Agent Panovich or the other witnesses.  There was one guy I
 3    didn't care for, but that's another --
 4              MS. CONNOLLY:  Object.  Move to strike to what we all
 5    thought.  Nonresponsive.
 6              MS. ROOHANI:  We can limit it to what Mr. Marchese
 7    thought, Your Honor.
 8              THE COURT:  All right.
 9    BY MS. ROOHANI:
10    Q.   What did you think?
11    A.   I -- I -- there were conversations amongst all of us.
12    But in reference to me, that was my feeling; that the
13    Government put on a compelling case.
14    Q.   And let's talk about what Jan communicated to you.  Did
15    he communicate to you that he thought Special Agent Panovich
16    was his friend?
17    A.   Yes.
18    Q.   And did he indicate to you that he was upset that she was
19    making him look guilty?
20    A.   I think that there were those conversations.  I don't
21    honestly specifically recollect those at trial.  But early on,
22    I mean, he was -- he was a little upset with just the job that
23    the FBI was doing.  I -- I think that he -- well, I know that
24    he, you know, thought that they were his friends, so to speak.
25              MS. CONNOLLY:  I'm sorry?  I didn't hear the last
```

JESS MARCHESE - Cross-Examination

1    thing you said.

2              **THE WITNESS:**  That they were his friends, so to

3    speak.  Or not plural.  Just mainly Ms. --

4    **BY MS. ROOHANI:**

5    Q.   Mari?

6    A.   -- Panovich.  Yeah.

7    Q.   He felt that he had a connection with

8    Special Agent Panovich?

9    A.   Yes.

10   Q.   And it's fair to say that he kept calling

11   Special Agent Panovich who eventually had to tell him to stop

12   calling her?

13   A.   I don't know what she said.  I think she did reach out to

14   me at one point and say, "Hey, you know, your client's been

15   contacting me."  But, yeah, there were -- there were

16   communications and, you know, early on he wanted me to reach

17   out on his behalf to her.

18   Q.   And I believe that you put in an affidavit that was

19   submitted to the Court that Jan's demeanor noticeably changed

20   at the time that Special Agent Panovich began testifying?

21   A.   I would agree with that, yes.

22   Q.   Okay.  Let's talk about this first break.  I believe it

23   was from 1:34 to approximately 2:15 p.m.  During that break

24   when you approached the Government about a potential offer --

25   A.   Yes.

JESS MARCHESE - Cross-Examination

1    Q.   -- let's talk about that.

2         Is your recollection that an offer was given and that

3    offer had been approved through my deputy chief, Cristina

4    Silva, and U.S. Attorney Dan Bogden at that time?

5    A.   I know that there was an offer, and I think it was -- but

6    I -- I know -- I know I didn't have it in writing, but I think

7    that it was approved but it was only orally.  And you guys had

8    to work out some of the -- you know, some of the plea

9    agreement itself.

10   Q.   Okay.  And when we made the representation to the Court

11   that we had some things to work out, it was really to figure

12   out how the Government would be able to argue for the 30 years

13   considering the statutory maximum caps?

14   A.   Yes.

15        **MS. CONNOLLY:**  Objection.  The record speaks for

16   itself.

17        **MS. ROOHANI:**  Your Honor, Ms. Connolly certainly got

18   into this with --

19        **MS. CONNOLLY:**  And -- and I think it's also --

20        **THE COURT:**  Are you referring to a conversation on

21   the record or off the record?

22        **MS. ROOHANI:**  Off the record.

23        **THE COURT:**  Okay.  So off the record?

24        **MS. ROOHANI:**  Off the record, Your Honor.

25        **THE COURT:**  All right.  So the objection's overruled.

JESS MARCHESE - Cross-Examination

1   He can testify to what the conversations were that are not in

2   the transcript.

3         **THE WITNESS:**  We had worked out the parameters, what

4   parties were going to be recommending to the Court as to what

5   the negotiation would be, but you had to work out to make the

6   numbers work in order to get to the -- you know, the high-end

7   or the low-end, and that's what you were mainly working on.

8   **BY MS. ROOHANI:**

9   Q.   And would it be fair to say that you and I had a

10  conversation about what we could represent to the Court,

11  especially considering that these were plea negotiations and

12  that Judge Navarro was presiding over a bench trial at that

13  time?

14  A.   Yes.

15  Q.   And would it be fair to say that we agreed that we were

16  going to be intentionally vague about what we were doing?

17  A.   Yes.

18  Q.   Now, let's talk a little bit about this plea agreement.

19  I'm going to draw your attention to the positions regarding

20  sentencing.

21         I believe you spoke with Ms. Connolly extensively

22  about the concurrent and consecutive --

23  A.   Yes.

24  Q.   -- do you remember that?

25         And you told Ms. Connolly that you believed that you

JESS MARCHESE - Cross-Examination

```
 1   would not be breaching the plea agreement by asking for the
 2   five year mandatory minimum?
 3   A.    Correct.
 4   Q.    Can you explain why you did not believe you were going to
 5   be breaching the plea agreement?
 6   A.    Well, generally speaking, we obviously had -- we were
 7   talking with the mandatory minimum.  I think I was clear on
 8   that.  But in reference to the possession charge, I thought
 9   that the way the plea agreement was drafted, we had some
10   latitude there that, yes, they had to run consecutive.  But if
11   Her Honor just gave him time served and gave him, you know, a
12   deviation from the actual guidelines, and he would not serve
13   over and above that five years.  So that's how I thought we
14   could get there, why I wouldn't think I would be violating the
15   plea agreement.
16   Q.    And based upon your understanding of how federal
17   sentencing works and how the guidelines work, you could have
18   asked for a one-day sentence on the possession charge because
19   there was no mandatory minimum?
20   A.    Right.
21   Q.    I'm going to draw your attention to the very last
22   sentence on page 10.
23   A.    Yes.
24   Q.    And I believe -- and tell me if I'm wrong -- "The
25   defendant may request a downward adjustment pursuant to 18,
```

JESS MARCHESE - Cross-Examination

1    United States Code, Section 3553."

2              Does it say that?

3    A.   Right.  Exactly.

4    Q.   And I -- and I'm going to draw this back to something

5    that you talked about with Ms. Connolly.  You talked a lot

6    about criminal history.  And is it your understanding that one

7    of the factors under 3553 is the nature and circumstances of

8    the defendant?

9    A.   Correct.

10   Q.   And lack of criminal history would certainly be a nature

11   and circumstance of the defendant?

12   A.   Yes.

13   Q.   You also talked about the fact that Mr. Fuechtener was

14   virtually certain to be removed from this country?

15   A.   Correct.

16   Q.   And you felt that you would be able to argue that as part

17   of another 3553 factor?

18   A.   Definitely.

19   Q.   You also testified that his culture, background, and his

20   beliefs would be something that the Court could consider?

21   A.   Yes.

22   Q.   That would also be under a 3553 factor?

23   A.   Yes.

24   Q.   And in making any of those arguments, you would not be

25   breaching the plea agreement?

JESS MARCHESE - Cross-Examination

1    A.    No.

2    Q.    Because there's an exact line in there that specifically

3    talks about that?

4    A.    Yes.

5    Q.    Now, I want to draw your attention to that downward

6    adjustment.

7    A.    Yes.

8    Q.    Now, would it be fair to say that you and the parties

9    could have agreed to write just variance in there, which would

10   be a 3553 factor?

11   A.    True.  Yes.

12   Q.    The parties could have agreed to just write departure in

13   there, which would have referred to something in the guideline

14   book?

15   A.    Yes.

16   Q.    But the parties agreed to write adjustment so you could

17   argue for anything in the guideline book or a variance?

18   A.    Yes.

19   Q.    All right.  And in making any of those arguments, you

20   would not be breaching the plea agreement?

21   A.    No.

22   Q.    And, ultimately, you would have been an effective

23   attorney at the time of sentencing?

24   A.    I'd like to think so, yes.

25   Q.    Arguably.

JESS MARCHESE - Cross-Examination

 1          All right.  Now, let's talk about -- Ms. Connolly

 2   asked you, at some point, if you said to Jan, "Sometimes you

 3   have to admit to things that you just didn't do."

 4          Do you remember that question?

 5   A.   Yes, very well.

 6   Q.   And she didn't allow you to explain your answer.

 7   A.   Correct.

 8   Q.   Tell me a little bit about what your thought process was,

 9   and -- and to the extent that you can remember, what you

10   really told Jan.

11   A.   Okay.  So here -- what we were referring to were those

12   chats.  There was some sports weekend or something revolving

13   around -- at the Tropicana, I believe it was.  And

14   Mr. Fuechtener was there with some other men, and he had

15   loaned his tablet out so he was going to try to -- they were

16   going to try to get guys.  And this individual supposedly had

17   made these chats about -- I think it was something about

18   drugging a young boy and this and that.  And Jan was upset

19   about that because, you know, it's his tablet.  So he's

20   getting those chats attributed to him.

21          So Jan wanted me to go over to you guys and have that

22   taken out because he said, "Hey, I didn't do that."  So I went

23   over and I asked and you said no.  And I said, "Hey, listen,

24   you know, they said no.  They're not going to take it out."

25          So, you know, I said, "Listen, if -- if you want to

JESS MARCHESE - Cross-Examination

```
 1    take the -- the deal, you know, this is how it is.  I mean, I
 2    get it.  I'll argue it at sentencing for you, but, you know,
 3    they're not taking it out.  They -- they want it in there."
 4    Q.   And would it be fair to say that one of the reasons that
 5    that admission had to remain in was to support that pattern
 6    enhancement, that plus-five pattern enhancement?
 7    A.   That's exactly what you told me.  You're like, "Hey, I
 8    want -- we want that plus five on there."  So it was -- it
 9    was -- I don't know.  I mean, but it seemed, to me, it was
10    very difficult for you guys to work out all the numbers on
11    this.  So not only did you want it in there, but also you
12    wanted it in there because it was very hard to work the
13    numbers and it was just going to really blow things up.
14    Q.   And I believe you indicated that Mr. Fuechtener did not
15    have a problem with any of the enhancements except that
16    pattern enhancement?
17    A.   That was the only one he brought up to me.  I mean, I'm
18    sure he didn't like any of them.  I'm sure he wanted a base
19    offense level of two, but yeah.
20    Q.   So he -- he understood the enhancement based upon his --
21    you believed that he understood the enhancement based upon the
22    questions that he was asking you?
23    A.   Yeah, no, that one he specifically brought up, for sure.
24    There was -- he definitely knew about that one.
25    Q.   And he knew that the Grindr chats that he was admitting
```

JESS MARCHESE - Cross-Examination

1    to related to that enhancement?

2    A.    Yes.

3    Q.    So he understood that the facts in the plea agreement

4    lined up with the stipulated offense characteristics?

5    A.    That was my belief.

6    Q.    All right.  Let's talk a little bit about Thursday

7    morning receiving the plea, going over the plea with Jan.

8    A.    Yes.

9    Q.    You testified that you got the plea, you reviewed it, you

10   came over here to marshal lock-up, and Mr. Durham was already

11   going over the plea agreement with Mr. Fuechtener?

12   A.    He was.

13   Q.    Was Mr. Durham, based upon your observation, going over

14   it line by line?

15   A.    Yes.

16   Q.    And I think you indicated that he took the lead on

17   explaining the plea because you thought there might be too

18   many cooks in the kitchen if too many people started talking

19   to Jan?

20   A.    Right.  He was there first.  It just made sense.  He was

21   already doing it.

22   Q.    And that was the point at which Mr. Fuechtener expressed

23   concern over the chats and that corresponding enhancement?

24   A.    I believe that might have been when it was, yes.

25   Q.    Let me go back to the plea agreement for just a minute.

JESS MARCHESE - Cross-Examination

1   Let's go to page -- let's go to page 6.  Let's go to paragraph

2   9 because that's the one that Ms. Connolly had spoke to you

3   about, about the deleting the evidence on an unspecified

4   account.

5   A.   Yes.

6   Q.   Okay.  Have you ever dealt with the obstruction of

7   justice enhancement under the guidelines before?

8   A.   I believe I have.

9   Q.   And is it your understanding, for that enhancement to

10  apply, the Government would have to show that the obstruction

11  related to something material to this case?

12  A.   Yes.

13  Q.   And is it your understanding that, if it's based on an

14  unspecified account, the Government would not be able to meet

15  its burden to apply that enhancement?

16  A.   Yes.

17  Q.   And if, in fact, you had remained attorney of record in

18  this case, would you have objected to the application of

19  that enhancement?

20        **MS. CONNOLLY:**  Objection.  Calls for speculation.

21        **THE COURT:**  All right.  Rephrase the question as to

22  whether or not he was intending to object to that at

23  sentencing, if you tried to --

24        **MS. ROOHANI:**  Sure.

25        **THE COURT:**  -- raise it.

JESS MARCHESE - Cross-Examination

```
 1              MS. ROOHANI:  I'll reframe it.

 2    BY MS. ROOHANI:

 3    Q.    You reviewed the PSR in this case?

 4    A.    Yes.

 5    Q.    You were presumably reviewing it with Jan?

 6    A.    Yes.

 7    Q.    And were you preparing objections to that PSR?

 8    A.    We didn't quite get that far.  We got the -- the PSR,

 9    mailed it to him, Mr. Durham and I had a meeting, and then

10    that's when he started talking about wanting to withdraw his

11    plea.  And then I believe Mr. Durham had contacted the Court

12    in reference to appointing an attorney obviously to go over it

13    with him.  And so, at that point, we kind of -- I kind of

14    stopped.  But I didn't -- I would imagine I would have

15    objected to that.  We just -- we didn't get that far.  I was

16    reviewing it with him.

17    Q.    Jan indicated to you he wanted to withdraw his plea after

18    he reviewed the PSR?

19    A.    There was some talk even sooner than that.  We had a

20    meeting shortly after the plea in reference to that.  Then he

21    backed off of it a little.  And then after, again it was

22    brought up with the PSR.

23    Q.    So he became firm in his intention to withdraw his plea

24    once he saw the recommendation in the PSR?

25    A.    I don't know if firm would be the use --
```

JESS MARCHESE - Cross-Examination

1    Q.    Okay.

2    A.    -- the word I would use.  Because one of the issues was

3    we had to explain to him -- he wanted us to stay on as the

4    attorneys.  But we were like, "Well, no, you're going -- we're

5    basically going to have to argue that we didn't do our job,

6    and that's not how it works."

7              So I think there was a little bit of a conflict

8    there, but eventually, obviously, he moved to withdraw the

9    plea.

10   Q.    Okay.  Let's talk about paragraph 7 in the plea.

11   A.    Okay.

12   Q.    Specifically we talked about that there's a plus-five

13   enhancement for distribution for a thing of value and then a

14   plus-two enhancement for knowing distribution.

15   A.    Right.

16   Q.    Would it be fair to say that the parties only agreed to

17   the plus two?

18   A.    Yes.

19   Q.    And is it also your understanding that, if a defense

20   attorney objects to a particular enhancement, the Government

21   bears the burden of showing that enhancement?

22   A.    Correct.

23   Q.    And is it also your understanding that, if the Government

24   fails to meet that burden, it would be reversible error for a

25   judge to impose that enhancement?

JESS MARCHESE - Cross-Examination

1   A.   Yes.

2   Q.   And in terms of this, would it be fair to say that

3   Judge Navarro had basically heard the evidence already with

4   regard to specifically that chat?

5   A.   Yeah.  I don't think the jail call came in, but I -- that

6   chat, yeah, the Lars (phonetic) chats came in.

7   Q.   So she'd already heard that?

8   A.   I believe so, yeah.

9   Q.   And that was already relevant conduct that she could have

10  considered?

11  A.   Yes.

12  Q.   And specifically, in this plea agreement, there's an

13  entire section called relevant conduct?

14  A.   Correct.

15  Q.   And that was reviewed with Mr. Fuechtener?

16  A.   Yes.

17  Q.   And Judge Navarro, during her plea colloquy, reviewed the

18  idea of relevant conduct with him as well?

19  A.   Yes.

20  Q.   Mr. Marchese, did you send me an e-mail on November, the

21  20th, indicating Mr. Rouven's intention to proffer with the

22  Government?

23  A.   Yes.  That would have been shortly after the meeting I

24  just referenced a few questions ago in which he had talked

25  about withdrawing his plea, and then somehow it came up that

JESS MARCHESE - Cross-Examination

1   he had information about other --

2   Q.   Don't tell me who had information.

3   A.   He had information that he wished to share with the

4   Government, and that -- that was part of the reason he backed

5   off withdrawing his plea; that he thought that he could maybe

6   get some benefit in reference to giving information.

7   Q.   And one of the things that he expressed to you is that he

8   could bring down that stipulated offense level of 40 if the

9   Government eventually provided him with a 5K motion?

10   A.   Yes.  He wanted -- wanted a better deal, so to speak.

11   Q.   And he understood the stipulated guideline range --

12         MS. CONNOLLY:  Objection.  Calls --

13   BY MS. ROOHANI:

14   Q.   -- within three days of the end of trial?

15         MS. CONNOLLY:  Objection.  Calls for speculation as

16   to what he understood.

17   BY MS. ROOHANI:

18   Q.   Did he communicate that to you?

19   A.   He want -- he wanted less than five years.  That was

20   the -- the main focus of the conversation.

21   Q.   And he was willing to cooperate and proffer with the

22   Government?

23   A.   Definitely.

24   Q.   Specifically about admissions some inmates had made to

25   him while he was in custody?

JESS MARCHESE - Cross-Examination

1    A.    Yes.  There was some things prior to him being in

2    custody, too, that he wanted to talk about.  I mean, yeah.

3    Some things prior to custody.

4    Q.    Have you read the motion that Ms. Connolly filed in this

5    particular case?

6    A.    Which -- just the initial motion?  Yeah, I believe I did.

7    It's been a while but --

8    Q.    Have you read the reply in which Mr. Rouven claims actual

9    innocence as a basis to withdraw his motion?

10              MS. CONNOLLY:  I'm sorry.  Can you repeat that

11   question?

12   BY MS. ROOHANI:

13   Q.    In which Mr. Rouven indicates actual innocence as a basis

14   to withdraw his motion.

15   A.    I believe I did.  It's -- like I said, it's been a while.

16   Q.    Have you reviewed the order of Judge Navarro waiving the

17   attorney-client privilege relating to actual innocence and

18   having conversations with me about that?

19   A.    Yes, I did.

20   Q.    In your time of representing Mr. Fuechtener, did he

21   repeatedly tell you, "I'm not into that"?

22   A.    Yes.

23   Q.    And, in your mind, was there a distinction between "I'm

24   not into that" and "I'm innocent"?

25              MS. CONNOLLY:  Objection.  Calls for -- irrelevant.

JESS MARCHESE - Cross-Examination

1          **MS. ROOHANI:**  Your Honor, she's made this an issue by

2    putting it as a motion.  It's within the scope, and I believe

3    it goes to the actual innocence.

4          **MS. CONNOLLY:**  That's not how --

5          **THE COURT:**  I'll allow him to answer the question,

6    and then you can argue to me what weight I should give to it.

7          **MS. ROOHANI:**  Okay.

8          **THE WITNESS:**  I'm not into it and actual innocence,

9    yes, there's a definite distinction.

10   **BY MS. ROOHANI:**

11   Q.   And what is the distinction, in your mind?

12   A.   Well, actual innocence is I didn't do it at all.  I'm not

13   into it is I just don't like child pornography.

14   Q.   Did Mr. Fuechtener admit to you that he knew people who

15   were into child pornography?

16   A.   Yes.

17   Q.   Did he admit to you that he knew he had it at his house?

18   A.   I don't believe that came up, no.

19   Q.   Did he admit to you that he had it at his house for the

20   people who were into child pornography?

21   A.   Did the words ever directly come out of his mouth, no.

22   But being around him, that was my feeling.

23          **MS. CONNOLLY:**  Objection.  Asked and answered.  Move

24   to strike the second part of the answer.  He said no.

25          **MS. ROOHANI:**  Your Honor, he's answering the

JESS MARCHESE - Cross-Examination

1    question.

2            **MS. CONNOLLY:**  He said no.  The rest of it would be

3    speculative then.

4            **THE COURT:**  Sustained.

5    **BY MS. ROOHANI:**

6    Q.    Did Mr. Fuechtener admit to you that he was into random

7    hookups?

8    A.    Yes.

9    Q.    Did he admit to you that those random hookups were into

10   child pornography?

11   A.    Some of them.

12   Q.    Did he admit to you that some of those hookups occurred

13   in the casita at his home?

14           **MS. CONNOLLY:**  Object to this on relevance, this

15   whole line of questioning.

16           **THE COURT:**  She stated that the relevance was to the

17   reply in which the defendant claimed actual innocence.

18           **MS. CONNOLLY:**  I don't think it's appropriate to ask

19   him about a reply that's signed by counsel.  If it was in his

20   affidavit, then it may be appropriate.  But using a pleading

21   that's signed by counsel is verified or sworn to by a client I

22   think is improper.  You have -- she has a signed affidavit.  I

23   don't have issue with questions pertaining to that.  But as to

24   the motion, which was not verified by him, I think is

25   improper.

1          **MS. ROOHANI:**  Your Honor, is Ms. Connolly abandoning

2     the claim of actual innocence?  Because I believe --

3          **THE COURT:**  The question that was going to be my

4     question is, is -- is that then --

5          **MS. CONNOLLY:**  That's not -- the grounds for that --

6     that's not anywhere in his affidavit.

7          **THE COURT:**  But is that a basis that you want the

8     Court to consider in determining whether or not to permit him

9     to withdraw his plea?

10          **MS. CONNOLLY:**  No.

11          **THE COURT:**  All right.  And that's with --

12          **MS. ROOHANI:**  So she's withdrawing the actual

13     innocence as a basis.

14          **THE COURT:**  The Court considers it withdrawn, then,

15     based upon that representation.

16          **MS. ROOHANI:**  A moment's indulgence, Your Honor.

17          *(Pause in the proceedings.)*

18     BY MS. ROOHANI:

19     Q.   I want to talk specifically about right after the plea

20     agreement was entered and Mr. Fuechtener indicating to you

21     that he maybe potentially wanted to withdraw his plea.

22     A.   Okay.

23     Q.   You had indicated to him that you would have to withdraw

24     as attorney of record for him to be able to withdraw his plea?

25     A.   Initially, the first time he brought it up to me, that --

JESS MARCHESE - Cross-Examination

```
 1    it didn't get that far.

 2    Q.    Okay.

 3    A.    When we went over the PSR, that's when we said, "Hey, we

 4    didn't -- we can't be your attorneys anymore."

 5    Q.    You had indicated that he eventually backed off of that

 6    when you indicated to him that you couldn't be his attorney or

 7    you'd have to say that you had done something wrong?

 8    A.    Well, yes and no.  I think it slowed the process down,

 9    but obviously we're here.  So, at some point, he changed his

10    mind.

11    Q.    Did he indicate to you that he wanted you to stay on as

12    his attorney of record?

13    A.    He did, yes.

14    Q.    And did you indicate to him and did you explain to him

15    that you couldn't stay on and have him withdraw his plea

16    because you would have to argue that you actually did

17    something wrong?

18    A.    That's correct.

19    Q.    And he still indicated to you that he had wanted you to

20    stay on at least for some period of time after that?

21    A.    Well, that was where the conflict arose.  You know, he

22    wasn't sure -- he wanted to withdraw his plea but he wanted us

23    as the attorneys.  And then, ultimately, you know, he decided

24    to try to withdraw the plea.

25          MS. ROOHANI:  I'll pass the witness, Your Honor.
```

JESS MARCHESE - Redirect Examination

```
 1              THE COURT:  Redirect, Ms. Connolly?

 2                     REDIRECT EXAMINATION

 3    BY MS. CONNOLLY:

 4    Q.   Isn't it true that the plea was entered on November 17th.

 5    Right?

 6    A.   Yes.

 7    Q.   And pursuant to a phone call you received from Jan asking

 8    you to come visit him and him wanting to withdraw his plea,

 9    you went to visit him on November 19?

10    A.   Time frame sounds correct, yes.

11    Q.   Okay.  So it would be fair to say the next day, after he

12    entered his plea, he called you and expressed he had

13    reservations about his plea, he wanted to withdraw it?

14    A.   Yes.

15    Q.   And when you went to visit him on the 19th, you went to

16    visit him with Mr. Pacitti?

17    A.   He was there.

18    Q.   So you and Mr. Pacitti --

19              MS. CONNOLLY:  May I approach, Your Honor?

20              THE COURT:  Yes, you may.

21    BY MS. CONNOLLY:

22    Q.   Exhibit -- I'm showing you what's been marked admitted as

23    Defense Exhibit J (inaudible) back here.

24              It reflects that on -- on November 19, approximately

25    1:33 p.m., you and Mr. Pacitti visited with Mr. Rouven.
```

JESS MARCHESE - Redirect Examination

1    Correct?  You don't have any reason to dispute that?

2    A.   Yeah, no, we visited him.  Yeah, for sure.

3    Q.   Yeah.  And would it be fair to say that was the last time

4    that you visited with him, do you recall?

5    A.   Well, I got him moved to Pahrump.

6    Q.   But that was the last time you actually met with him?

7    A.   No.

8    Q.   You met with him again?

9    A.   Yes.

10   Q.   When did you meet with him again?

11   A.   Well, I just testified we were going over the plea

12   agreement -- I mean the PSR.  Excuse me.

13   Q.   But the visit on the 19th was after he called you and let

14   you know that he wanted to withdraw his plea?

15   A.   Yes.

16   Q.   You were asked some questions about your interactions

17   with Sanft and Durham.  Based upon -- or Sanft and Nadig.

18   Based upon your interactions with them, you were concerned

19   that they were not familiar or doing any work on the case,

20   they were not familiar enough with the discovery as they

21   should be.  Right?

22   A.   The bigger issue was just them not doing anything.  So, I

23   mean --

24   Q.   Doing something on a case would involve working on the

25   case, reviewing the case?

```
 1    A.    Sure.
 2               MS. ROOHANI:  Objection.  Leading.
 3               THE COURT:  Overruled.
 4    BY MS. CONNOLLY:
 5    Q.    Now, you had some con -- you indicated that -- you made a
 6    comment about having to talk him off the ledge.
 7    A.    Yes.  He was upset.
 8    Q.    Was that -- would that be fair to say that that was
 9    after -- as a result of Mr. Fuechtener receiving a copy of
10    that Ben Nadig e-mail that he was extremely upset?
11    A.    I don't know if he even ever received a copy of the
12    e-mail, but I thought it was in reference to Ben visiting with
13    him and getting him wound up.
14    Q.    So you --
15    A.    Ben Nadig.
16    Q.    So -- so you believed that Mr. Nadig had been putting
17    thoughts in his head about your representation that were
18    causing him to be so upset that you had to go and talk him off
19    the ledge?
20               MS. ROOHANI:  Objection.  Leading.
21               THE WITNESS:  No.
22    BY MS. CONNOLLY:
23    Q.    Okay.  Well --
24    A.    Well, I -- I -- he was -- he was emotional.  He was
25    definitely upset.  I definitely had to talk him off the ledge.
```

JESS MARCHESE - Redirect Examination

1    But I didn't know that he had visited him.  When I showed up

2    there, I was -- first of all, I was shocked to hear that

3    Ben Nadig went there, and he was shocked to see me because he

4    thought I was going to be Ben Nadig.

5    Q.   So that was when Ben Nadig had come to see him about two

6    days before?

7    A.   I think it was the day --

8    Q.   Without your permission.

9    A.   I thought it was --

10   Q.   After he was already --

11   A.   -- the day before, but I could be wrong.

12   Q.   So -- so what was he upset about?

13         **MS. ROOHANI:**  Objection.  Hearsay.

14         **MS. CONNOLLY:**  They opened the door by -- they were

15   the ones that brought it up.

16         **MS. ROOHANI:**  Your Honor, this is a statement of the

17   defendant.  He can testify as to why he was upset.

18         **MS. CONNOLLY:**  They opened the door by asking him

19   about you have to talk him off the ledge.  What were you

20   talking about?

21         **MS. ROOHANI:**  Your Honor, there's no such thing as

22   opening the door to hearsay.

23         **MS. CONNOLLY:**  He's allowed to explain his answer.

24         **THE COURT:**  What's the relevance?

25         **MS. CONNOLLY:**  To his state of -- Mr. Fuechtener's

JESS MARCHESE - Redirect Examination

```
 1    state of mind.
 2              THE COURT:  Well, the state of mind is that he's
 3    upset and had to be talked off the ledge.
 4              MS. CONNOLLY:  In terms of it goes to the conflict
 5    and the representations that were made by the different people
 6    who were representing him and them fighting, and that effect
 7    it had upon his psyche and his --
 8              THE COURT:  So that's already --
 9              MS. CONNOLLY:  -- voluntary -- voluntariness of the
10    plea given.  I think his subjective mind-set was very
11    relevant.
12              MS. ROOHANI:  Your Honor, I believe it assumes facts
13    not in evidence.  At this point, Mr. Nadig was not
14    representing Jan.  I believe that that's been clearly
15    established at this point.  So I don't believe that there's
16    multiple attorneys who represent him telling him different
17    things.  And it's still hearsay.  Mr. Fuechtener's state of
18    mind is not something that Mr. Marchese can speculate on.  And
19    he certainly can tell Your Honor about what Mr. Fuechtener may
20    have told him.  I believe he's already testified as to what
21    his demeanor was, and that's the extent to which he can
22    testify.
23              MS. CONNOLLY:  It was -- the Government was asking
24    specifically about the --
25              THE COURT:  You can't ask him what Mr. Fuechtener
```

JESS MARCHESE - Redirect Examination

1    said, but you can ask Mr. Marchese why Mr. Fuechtener appeared

2    to be on a ledge or something to that effect.  But I --

3           MS. ROOHANI:  Assume -- assuming that his opinion is

4    not based upon hearsay, Your Honor, I believe that would be

5    correct.

6    BY MS. CONNOLLY:

7    Q.   Your understanding was that Mr. Fuechtener was extremely

8    upset and had to be talked off the ledge as a result of a

9    communication he had with Mr. Nadig a day or two before you

10   went to visit him?

11   A.   Yeah.

12   Q.   And you indicated that it was your understanding that

13   Mr. Nadig wanted back on the case?

14   A.   Something along those lines.

15   Q.   And you believed that he wanted back on the case because

16   he'd been asked for a refund of the money that was granted to

17   him for his representation?

18          MS. ROOHANI:  Objection.  Leading.

19          MS. CONNOLLY:  I'm -- he's already testified to this.

20          THE COURT:  The fee dispute, is that what you're

21   referring to?

22          MS. CONNOLLY:  The fact that -- that Mr. Marchese had

23   testified that he believed that Mr. Nadig wanted back on the

24   case, I'm asking the reasons why he thought he wanted back on

25   the case.

JESS MARCHESE - Redirect Examination

1           **THE COURT:**  All right.  He can answer the question.

2           **THE WITNESS:**  I don't think he wanted to give money

3    back.

4    BY MS. CONNOLLY:

5    Q.    I'm sorry?

6    A.    I -- I don't believe that he -- he didn't want to give

7    money back.  That's basically it.

8    Q.    Okay.  And you indicate that you had to spend -- it took

9    you about an hour to talk him off a ledge.  So it took you

10   about an hour to calm him down essentially.  What do you mean

11   by talking him off the ledge?

12   A.    Well, just talk to him about everything and, you know,

13   whatever assertions were made or were not made and say why

14   they were true or not true and just -- you know, just in

15   general.  Just getting his emotions in check, so to speak.

16   Q.    When somebody is on the ledge, fair to say they're pretty

17   upset?

18   A.    Yeah.  And when I say on the ledge, I mean, was he

19   suicidal?  No.  But I had spent enough time with Jan at that

20   point to know his general demeanor and he wasn't himself.

21   Q.    And you believed that -- and I don't -- and if I

22   misstate, please correct me -- that you believed that

23   Mr. Nadig had made false representations about you?

24   A.    Everything, in my opinion.

25   Q.    And Jan was anxious and upset?

JESS MARCHESE - Recross-Examination

1    A.   Yes.

2    Q.   And regarding Amber Craig, when Jan had indicated that he

3    wanted a female on the case, you were the one that suggested

4    Amber Craig?

5    A.   Yes.

6    Q.   And during your -- your -- prior to the trial, just to

7    clarify, it had always been Jan -- Jan had always indicated to

8    you "I'm going to trial"?

9    A.   Yes.

10   Q.   Just to clarify, it was Mr. Durham who went over the plea

11   agreement with him.  You never sat there and went through the

12   plea agreement with Jan line by line, did you?

13   A.   I was there but, no, it was Ben who was doing it.

14          **MS. CONNOLLY:**  I don't have anything else.

15          **THE COURT:**  Any recross?

16          **MS. ROOHANI:**  I just have a few follow-up questions,

17   Your Honor.  May I just stand here, Your Honor, and --

18          **THE COURT:**  Yes, you may.

19                        **RECROSS-EXAMINATION**

20   **BY MS. ROOHANI:**

21   Q.   Mr. Marchese, is it your understanding that fee disputes

22   are dealt with by the State Bar?

23   A.   Yes.

24   Q.   And that it's not an appropriate forum for this Court to

25   deal with that dispute?

JESS MARCHESE - Recross-Examination

1   A.   Unless someone instituted a civil action, no, it's not

2   appropriate.

3   Q.   Did Mr. -- well, let me put it this way.   When

4   Mr. Fuechtener indicated to you on November, the 19th, that he

5   wanted to withdraw his plea, he did not tell you it's because

6   he didn't understand the sentencing guidelines?

7   A.   It seemed, to me, it was more buyer's remorse.

8        MS. CONNOLLY:   Objection.   Calls for speculation.

9   Nonresponsive.

10       THE COURT:   Overruled.

11       THE WITNESS:   It seemed to me it was more buyer's

12  remorse is my recollection.   That he -- you know, he -- he

13  just -- he wanted to go forward and went to trial.

14  BY MS. ROOHANI:

15  Q.   So he just changed his mind?

16       MS. CONNOLLY:   Objection.   Non -- that's not --

17  misstates his testimony.

18       THE COURT:   Overruled.

19  BY MS. ROOHANI:

20  Q.   So he just basically --

21  A.   That was -- that was what I took away with it.   That was

22  my opinion of it.

23  Q.   And you indicated to him that that was not a basis for

24  him to want to withdraw his plea?

25  A.   Yes.

JESS MARCHESE - Recross-Examination

```
1    Q.    Okay.  I'll have you take a look at that -- the Henderson
2    records that are in front of you.  I just want to clarify
3    something on those.
4              Do me a favor.  Turn to page --
5    A.    I'm sorry.  She didn't -- she showed me a copy but
6    it's -- I don't have a copy.  I don't know if --
7              MS. ROOHANI:  May I could --
8              THE WITNESS:  -- they were admitted or --
9              MS. ROOHANI:  Can I take him Defendant's Exhibit A?
10             MS. CONNOLLY:  I may have taken it.
11             COURTROOM ADMINISTRATOR:  It was not given back to
12   me.
13             MS. ROOHANI:  Did you take it?
14             MS. CONNOLLY:  Do you have --
15             THE WITNESS:  Oh, I'm sorry.  It's just the
16   certificate on the top.  Okay.  What page?
17   BY MS. ROOHANI:
18   Q.    Go ahead and take a look at page 2.  It says -- it's the
19   actual subpoena.
20   A.    Okay.
21   Q.    Mr. Fuechtener's birthday is not September, the 15th,
22   1952; is that correct?
23   A.    He does look good for his age, but not -- no.
24   Q.    So it's incorrect -- it's an incorrect birthday on there?
25   A.    Yeah.
```

JESS MARCHESE - Recross-Examination

```
 1    Q.   So it's entirely possible that these records are not
 2    fully responsive to the subpoena?
 3              MS. CONNOLLY:  Objection.  Calls for speculation.
 4    Lack of personal knowledge.
 5              THE COURT:  Sustained.
 6              THE WITNESS:  Well --
 7    BY MS. ROOHANI:
 8    Q.   Okay.  That's not his birthday?
 9    A.   No, it's not his birthday.
10    Q.   Okay.  Do you have any personal reason to believe that
11    these are not complete records?
12    A.   I do.
13    Q.   Okay.  Tell us why.
14    A.   The Henderson Detention Center is -- it's manned by
15    volunteers.  And they're super nice guys and gals, but they're
16    not always, quote/unquote, on the ball.
17              MS. CONNOLLY:  Object based on foundation and
18    personal knowledge.
19              THE WITNESS:  Well, I'm getting there.
20              MS. CONNOLLY:  I mean, he hasn't -- we haven't
21    established that he has any knowledge on how they keep these
22    records or how they're maintained.
23    BY MS. ROOHANI:
24    Q.   Do you have knowledge on how they keep these records?
25    A.   I do.
```

JESS MARCHESE - Recross-Examination

```
 1    Q.   All right.
 2    A.   You disseminated in some of the discovery some of the
 3    jail visits and -- and logs and whatnot.  One of them actually
 4    was incorrectly logged in by the Henderson Detention Center
 5    folks as a non-attorney visit.  I actually -- it's in the
 6    discovery.  There's a -- there's -- you may or may not know,
 7    there's a recorded visit of Jan and I speaking on the phone.
 8    We had discussed filing a motion and actually conflict your
 9    entire office based upon that.  So from seeing that, seeing
10    that they incorrectly logged in an attorney visit as just a
11    social visit, that leads me to believe that they're not on the
12    ball there.  There's always been times when my investigator
13    went to visit Jan and they put him down as a personal visit --
14         MS. CONNOLLY:  Objection to the investigator, the
15    investigator was logged in or not.  That would be double
16    hearsay.  I mean, foundation.  Objection.  Hearsay.
17    Relevance.
18         MS. ROOHANI:  Your Honor, if he has personal
19    knowledge, it's not hearsay.  He's not offering it for the
20    truth but to explain why he has the personal knowledge to be
21    able to lay the foundation for the line of questioning that
22    Ms. Connolly objected to.
23         MS. CONNOLLY:  He didn't say that he was with his
24    investigator.  He was relaying conversations with an
25    investigator.
```

JESS MARCHESE - Recross-Examination

1          **THE WITNESS:**  I -- I have personal knowledge.

2          **THE COURT:**  The testimony started out as the jail

3   records that he received in discovery from the Government in

4   his review as to whether or not they're accurate in

5   determining that there was an inaccurate entry.  Now we're

6   moving into something else that I'm not really sure what we're

7   moving into, so I --

8          **MS. ROOHANI:**  I'll ask a follow-up question.

9          **THE COURT:**  Something about an investigator visit.  I

10  don't know who the investigator is, his or someone --

11         **THE WITNESS:**  Well --

12         **THE COURT:**  -- else's or -- so I can't make a ruling

13  because I don't understand yet what he's talking about.

14         **MS. ROOHANI:**  Why don't I follow up with that, Your

15  Honor.

16         **THE COURT:**  Okay.

17  BY MS. ROOHANI:

18  Q.   Mr. Marchese, are you aware of times that your

19  investigator went to visit Jan?

20  A.   Yes.

21  Q.   And is part of that because sometimes you were with him?

22  A.   Or I would instruct him, yes.

23  Q.   Or you would instruct him and you receive some billing,

24  I'm assuming, from the investigator to correspond with that

25  visit?

JESS MARCHESE - Recross-Examination

1   A.    Sometimes, yes.

2   Q.    Okay.  And so would it be fair to say that there was

3   times that the investigator went to visit Jan that there

4   wasn't a record created or that there was an incorrect record

5   created?

6   A.    Yes.

7           MS. CONNOLLY:  Objection.  If he was with the

8   investigator, he doesn't know if it was logged -- we don't

9   have the records, and the records that have been submitted as

10  an exhibit have an affirmation from the Henderson Detention

11  Center that they're true and accurate records.  We've had no

12  evidence that the records that was reviewed in discovery were

13  true and accurate records that were obtained via subpoena from

14  the detention center.

15          MS. ROOHANI:  Your Honor, may I make a brief proffer?

16          THE COURT:  Well, I don't think the objection is that

17  they're not a true and correct copy of what records Henderson

18  has.  My understanding of the line of questioning is that

19  Henderson may not have logged the information correctly.  Not

20  that --

21          MS. ROOHANI:  And, Your Honor --

22          THE COURT:  No one is saying that this copy is an

23  incorrect, fraudulent copy but rather that the copy itself may

24  be missing information.

25          MS. ROOHANI:  Your Honor, if I can make just a brief

JESS MARCHESE - Recross-Examination

1  proffer to explain what the relevance of this line of
2  questioning is?  Is that it is my personal belief that these
3  are not the complete records of every visit.  Mr. Marchese
4  testified that he spent no less than two hours with Jan on
5  multiple occasions, and these records indicate 15-minute
6  visits.  And so it's my understanding that these records are
7  only partial records of what Henderson may have potentially
8  had.  Specifically, if you look at the disc -- and I believe,
9  Your Honor, it's been admitted as evidence and you can look at
10  it --
11        THE COURT:  All right.  So you're saying that
12  Henderson does have records that have not been provided, that
13  this is not --
14        MS. ROOHANI:  They're not complete --
15        THE COURT:  -- a correct representation?
16        MS. ROOHANI:  They're not complete because the nature
17  of the subpoena wasn't broad enough.  And -- and, Your Honor,
18  I believe that these are -- they're accurate to a certain
19  degree, but I believe these are for video visits because of
20  the way that the disc is labeled.  It says, "Renovo Visit,"
21  which -- and that's the system that Henderson uses for video
22  visits.  But as Your Honor knows, Your Honor authorized open
23  air visits, and I don't believe that those were logged.  And
24  for those reasons, I don't believe that this accurately
25  reflects the number of times that Mr. Marchese, Mr. Sanft,

JESS MARCHESE - Recross-Examination

1    Mr. Durham, and others met with Mr. Fuechtener.

2           **THE COURT:**  Are you saying that open air visits were

3    not logged or they're not logged in the system that was

4    subpoenaed?

5           **MS. ROOHANI:**  They're certainly not logged in the

6    system that was subpoenaed.  So I don't believe that you have

7    those records.  I don't -- I don't have any basis to say that

8    they weren't logged somewhere, Your Honor.

9           **THE COURT:**  I was just going to say, I have no reason

10   to believe that they're not logged --

11          **MS. ROOHANI:**  Correct.

12          **THE COURT:**  -- but maybe not in the -- that

13   particular system, maybe in a different system.  All right.

14          **MS. ROOHANI:**  Okay.  Do you want me to -- do you want

15   to accept that, Your Honor, or do you want me to just try to

16   lay that with Mr. Marchese?

17          **THE COURT:**  If -- well, if there -- if we don't have

18   any admitted evidence about the length of the visits and you

19   want me to accept the length of the visits as evidence, then

20   you need to have him say those magic words.  Otherwise,

21   apparently, I don't have those.

22          **MS. ROOHANI:**  Sure.

23          **THE COURT:**  So if there's missing visits, then you

24   need to have him verify.

25   ///

JESS MARCHESE - Recross-Examination

1   **BY MS. ROOHANI:**

2   Q.   Mr. Marchese, you've reviewed this document, I'm

3   assuming, now?  I see you flipping through it.

4   A.   Yes.

5   Q.   These documents reflect that you spent approximately 15

6   minutes at a time with Mr. Fuechtener?

7   A.   Were there some 15-minute visits?  Yes.  At that time, my

8   Bundy client was there.  So sometimes I would visit him and

9   then maybe just pop in and say, "Hey, Jan, here's what's going

10  on."  But 15 minutes would definitely be out of the ordinary

11  for that to be all the visit was.

12  Q.   Would it be fair to say that there's no two-hour visits

13  that are reflected -- if I represent to you that there's no

14  two-hour visits reflected on this?

15  A.   I'm not seeing that, no.

16  Q.   Okay.  And you did spend multiple -- multiple-hour visits

17  with Mr. Fuechtener?

18  A.   Yes.  Many of them were late when they shut down, meaning

19  I'd go in the back, and when I would leave, no one would be

20  there.  I'd literally have to let myself out.  So if I was to

21  forget something, I'd be locked out.  I would grab my own ID.

22  It would be -- sometimes it would be dark out, and I would

23  just let myself out of the building.

24  Q.   And you did, in fact, file a motion to be able to meet

25  with Mr. Fuechtener not over the phone video system?

1    A.    Yes.

2    Q.    And that was granted?

3    A.    It was.

4    Q.    And on -- many of these visits that are not reflected

5    here were those visits?

6    A.    Yes.  Subject to availability.

7    Q.    Okay.  Specifically now I want to draw your attention to

8    that November 19th visit.  It indicates that you went there

9    with Mr. Pacitti?

10   A.    Correct.

11   Q.    Did that -- again, as a video visit, specifically at

12   visitor station P-16?  I'm looking at page 24 of 18 -- or 24

13   of 28.  Sorry.

14   A.    It wouldn't sound right because I know we went in the

15   back.  The only thing I can possibly think of, I know it was

16   on a weekend, and a lot of times they either have religious

17   services or NA or AA meetings in that room.  So maybe they had

18   something going on and we started as video.  But I -- my

19   recollection of the meeting was face-to-face.

20   Q.    Okay.

21           **MS. ROOHANI:**  Your Honor, I have no further questions

22   for this witness.

23           **THE COURT:**  Redirect?

24           **MS. CONNOLLY:**  One more question.

25

JESS MARCHESE - Further Redirect Examination

**FURTHER REDIRECT EXAMINATION**

1

2  **BY MS. CONNOLLY:**

3  Q.   You never explained to -- or after the guilty plea, you

4  never told Jan that a base offense level of level 40 under the

5  guidelines is a sentence of 292 to 365 months, did you?

6          **MS. ROOHANI:**  Objection.  Relevance as to what

7  happened after the plea agreement or after he entered his

8  plea.

9          **THE COURT:**  The question was you never told.

10          **MS. CONNOLLY:**  Yeah.

11          **THE COURT:**  So the question --

12          **MS. ROOHANI:**  Oh.  I apologize.

13          **THE COURT:**  -- I think covers before, during, and

14  after.

15  **BY MS. CONNOLLY:**

16  Q.   You never told him that base offense level 40 is a

17  guideline range of 292 to 365 months, to your recollection?

18  A.   I can't -- the problem is I don't recall that, but it

19  would be out of the norm for me.

20  Q.   You don't recall then.  I would just say thank you, you

21  don't recall.

22  A.   Well --

23  Q.   I don't want you to speculate or extrapolate upon.  If

24  you don't recall, then --

25  A.   Well, I can say based upon my custom and habit --

1        **MS. CONNOLLY:**  Your Honor, I just --

2        **THE WITNESS:**  -- what I would normally do.

3        **MS. CONNOLLY:**  -- asked him in this particular case.

4        **THE WITNESS:**  Well, based on my custom and habit in

5   every case --

6   **BY MS. CONNOLLY:**

7   Q.   Not based upon your custom and habit.  You don't have a

8   recollection in this particular case of advising him that a

9   base offense level 40 is a guideline range of 292 to 365

10  months?

11  A.   I don't specifically remember telling him that at some

12  point.

13  Q.   Thank you.

14        **MS. ROOHANI:**  One follow up, Your Honor?

15        **THE COURT:**  Yes.

16                **FURTHER RECROSS-EXAMINATION**

17  **BY MS. ROOHANI:**

18  Q.   Just because you don't recall it doesn't mean you didn't

19  do it.  Correct?

20  A.   Exactly.

21  Q.   And it would have been your custom and habit to do it?

22  A.   In every single case plea agreement, that's one of the

23  things that I would go over, would be the possible penalties

24  based upon it.  And, in this case, I would have went -- I --

25  it would have been my recollection to go over that.

JESS MARCHESE - Further Redirect Examination

1    Q.   And it would be exceptionally out of the ordinary for you

2    to not give your client that information?

3    A.   Yes.

4    Q.   And this was not a case that was exceptionally out of the

5    ordinary, by all recollections?

6    A.   Well, I guess it depends on your definition of that, but

7    I -- that's normally what I would do.  That's -- that's all I

8    can say.

9    Q.   Okay.

10        **MS. ROOHANI:**  No further questions.

11        **THE COURT:**  Redirect?

12                    **FURTHER REDIRECT EXAMINATION**

13   BY MS. CONNOLLY:

14   Q.   How many times the first time that you've gone over a

15   plea agreement with your client when he's sitting in lock-up

16   right before he enters the plea?  That's never happened

17   before, has it?

18   A.   What -- what was the scenario?  You said the first

19   time --

20   Q.   Let me -- let me --

21   A.   -- we go over the plea is --

22   Q.   Let me rephrase it.

23   A.   -- when they're in the lock-up?

24   Q.   Usually -- in this particular case, there was one plea

25   agreement that you received at 10:00 on November 17.  Right?

JESS MARCHESE - Further Redirect Examination

1   A.   Yes.

2   Q.   You never met with your client outside of the federal

3   holding facility to go over that plea agreement with him, did

4   you?

5   A.   Well, no.  He's in custody.

6   Q.   Excuse me?

7   A.   He was in custody.

8   Q.   Never had a meeting outside of the federal holding

9   facility in this courthouse.  Right?

10  A.   No.

11  Q.   And you testified previously that it was, in fact,

12  Mr. Durham who went over this specific plea agreement with the

13  client.  Right?

14  A.   Yes.

15  Q.   Thank you.

16       **MS. ROOHANI:**  No further questions, Your Honor.

17       **THE COURT:**  All right.  Thank you, Mr. Marchese, for

18  coming in.  You are excused.

19       It's 12:42.  We'll go ahead and take an hour, or can

20  we take 45 minutes?  We're going to run out of time, I think.

21       Is Mr. Sanft going to be available at 1:30, 1:45?

22       **MS. CONNOLLY:**  Hmm?

23       **THE COURT:**  Mr. Sanft, is that your next witness?

24       **MS. CONNOLLY:**  I -- he had a hearing at 12:00, he

25  said, over in District Court in front of Judge Leavitt so --

MICHAEL SANFT - Direct Examination

1          **THE COURT:**  So when will your next witness be

2    available?

3          **MS. CONNOLLY:**  I had told them to come back at 1:00.

4    And I had just -- Mr. -- Mr. Durham just texted me.  Mr. Nadig

5    was told to come after 1:00, and Mr. Durham, same thing.  So I

6    don't -- well, it's almost 1:00 o'clock.

7          **THE COURT:**  All right.  So you think that you'll have

8    a witness here by 1:30?

9          **MS. CONNOLLY:**  1:30, I would think so, yes.

10          **THE COURT:**  Okay.  So we'll reconvene at 1:30.

11          **MS. ROOHANI:**  Thank you, Your Honor.

12          **COURTROOM ADMINISTRATOR:**  All rise.

13          *(Lunch recess at 12:43 p.m., until 1:43 p.m.)*

14          **COURTROOM ADMINISTRATOR:**  All rise.

15          **THE COURT:**  Thank you.  You may be seated.

16          All right.  Defense -- or, Ms. Connolly, you can call

17    your next witness.

18          **MS. CONNOLLY:**  Michael Sanft.

19          *(The witness is sworn.)*

20          **COURTROOM ADMINISTRATOR:**  Thank you, sir.  You may be

21    seated.  Please state and spell your full name for the record.

22          **THE WITNESS:**  Sure.  Michael Sanft; M-I-C-H-A-E-L,

23    S-A-N-F-T.

24                          **DIRECT EXAMINATION**

25    BY MS. CONNOLLY:

MICHAEL SANFT - Direct Examination

1    Q.   Mr. Sanft, how are you employed?

2    A.   I'm an attorney.

3    Q.   Is that here in Clark County, Nevada?

4    A.   Yes, ma'am.

5    Q.   And when did you -- when were you licensed or admitted to

6    practice law in Las Vegas?

7    A.   2002.

8    Q.   And you're admitted to practice law in Federal District

9    Court?

10    A.   Yes.

11    Q.   And when were you admitted to practice law in Federal

12    District Court?

13    A.   I don't know for sure, but I think it was 2002.

14    Q.   2000 and what?

15    A.   '2.

16    Q.   Okay.  So about the same time?

17    A.   Yes, ma'am.

18    Q.   Okay.  And what is the nature of your practice?

19    A.   Predominantly criminal defense work.

20    Q.   Okay.  And is that state or federal?

21    A.   Both.

22    Q.   Okay.  What portion of your practice would you say is

23    federal practice?

24    A.   It depends on the year.

25    Q.   Okay.

MICHAEL SANFT - Direct Examination

1    A.    So predominantly I would say, over the course of the

2    years that I've been practicing, maybe about 25 percent.

3    Q.    Okay.  Approximately how many child pornography cases

4    have you had taken to trial in Federal Court?

5    A.    That I've taken to trial in Federal Court?

6    Q.    Yes.

7    A.    Two.

8    Q.    Two.

9          And did those go all the way to fruition?

10   A.    Yes.

11   Q.    And --

12   A.    Well, let me take that back.  One of them was Jan's case,

13   and another case was in this department, last name is

14   Byington.  But I think I've had, like, multiple child porn

15   cases but not to trial all the way through.

16   Q.    So in addition to those two child pornography cases, have

17   you represented anybody else in Federal Court on child

18   pornography charges?

19   A.    I'm -- I apologize.  I'm sorry?

20   Q.    I'm sorry?

21   A.    What did you say?

22   Q.    Beside those two cases, have you represented any other

23   individuals in Federal Court on child pornography cases?

24   A.    Yes.  Here in this jurisdiction as well as in Utah.

25   Q.    And how many do you approximate?

MICHAEL SANFT - Direct Examination

```
 1   A.   I -- if you want me to guess, I can guess.  But I don't

 2   know for sure.  I didn't -- I don't keep stats like that.

 3   Q.   Like, less than ten or more than ten?

 4   A.   It would be more than ten.

 5   Q.   Less than 20?

 6   A.   I don't know about more than 20, no.

 7   Q.   Okay.  Are you familiar with the gentleman seated to my

 8   left?

 9   A.   I am.

10   Q.   And how are you familiar with him?

11   A.   I used to represent him.

12   Q.   Okay.

13   A.   That's Jan.

14   Q.   Would it be fair to say that this is

15   Jan Rouven Fuechtener, and he was indicted on child -- child

16   porn charges in approximately March of 2016?

17   A.   Yes, ma'am.

18   Q.   Okay.  And you were retained at some point to represent

19   him --

20   A.   Yes, ma'am.

21   Q.   -- is that accurate?

22        What was -- how did that come about?

23   A.   Another attorney that I know, Ben Nadig, had informed me

24   that -- that --

25   Q.   Without saying what he -- he told you, did he connect you
```

MICHAEL SANFT - Direct Examination

```
 1    with Mr. Fuechtener?
 2    A.    Yes.  We were at Mr. Fuechtener -- can I just say Rouven
 3    or Jan?  Is that all right?
 4    Q.    Jan.  Jan's --
 5    A.    Okay.  Jan.
 6          We were over at Jan's house I think a couple days
 7    after a search warrant had been executed on his home.
 8    Q.    And what was the nature of your relationship with
 9    Mr. Nadig at that time?
10    A.    Just a friend.  Someone who practices criminal defense
11    law as well.
12    Q.    Okay.  So he got ahold of you to participate or be
13    involved with something to do with a search warrant being
14    executed at Jan's house?
15    A.    Yes, ma'am.
16    Q.    Okay.  And then, at some point in time, you were
17    retained?
18    A.    Yes.
19    Q.    And who retained you?
20    A.    Well, you say it in a technical terms or in terms of,
21    like, who wrote the check out to my firm?  Which --
22    Q.    Who wrote a check out to your firm?
23    A.    Frank.
24    Q.    Alfter?
25    A.    Yes.
```

MICHAEL SANFT - Direct Examination

```
 1    Q.   And was that for -- how much was that check for?
 2    A.   $100,000 was my retainer on that case.
 3    Q.   Was Mr. -- do you know whether or not Mr. Nadig and you
 4    were retained the same time or together?
 5    A.   We were retained at the same time.
 6    Q.   Were you retained together to represent Mr. Nadig -- to
 7    represent, I'm sorry, Mr. Jan?
 8    A.   No.  That was not the intent.  The intent was is that
 9    we -- I believe, just at first blush, that Frank also had
10    potential liability with regards to possession of child
11    pornography.  There was a discussion in my office specifically
12    about that issue.
13    Q.   Discussion with who?
14    A.   That would have been with myself, Frank, Mr. Nadig, and
15    Mr. --
16    Q.   Pacitti.
17    A.   Yes.  Pacitti.  Pacitti.  In my office.
18    Q.   Okay.  Do you remember when that was?
19    A.   I believe that that discussion occurred a week or about
20    ten days after Jan's first initial appearance in court, in
21    Federal Court.
22    Q.   After whose initial appearance?
23    A.   Jan's.
24    Q.   Jan's.  Okay.
25         Would you agree that you were -- you and Ben Nadig
```

MICHAEL SANFT - Direct Examination

1   were both retained on March 31, 2016?  Does that sound
2   accurate?
3   A.   I wouldn't have any way to dispute that.
4   Q.   Okay.
5   A.   I don't recall.
6   Q.   So it was your understanding -- what was your
7   understanding of the arrangement between you and Mr. -- Mr. --
8   Mr. Nadig and Jan and Frank?
9   A.   My role in this was to work with Jess Marchese as
10  co-counsel in representing Jan.  Mr. Marchese was initially
11  retained by Jan and Frank to represent him.  And Frank
12  contacted me via e-mail and requested a meeting, and in that
13  meeting I had learned that he felt more comfortable if I was
14  helping Jess with the case.
15  Q.   So -- so just to make sure I'm accurate.  So early on
16  there was an understanding that perhaps Frank and Jan needed
17  two separate attorneys?
18  A.   There was a discussion in my office.  I believe I
19  initiated that particular issue because --
20  Q.   Oh.  So -- so there was --
21  A.   -- it was pretty obvious.
22  Q.   -- a discussion about it then?
23  A.   Yes.  There was a discussion and an agreement that
24  Mr. Nadig would represent Frank in the event that he were to
25  be charged or, in the alternative, if he were to be called as

MICHAEL SANFT - Direct Examination

1  a witness by the Government, but that Frank was going to be

2  represented by Mr. Nadig for potentially possessing child

3  pornography as well.

4  Q.   So, at that point, you -- would it be fair to say that

5  you -- they had -- they needed -- you believed they needed to

6  each have separate counsel or they couldn't have the same

7  lawyer representing both of them?

8  A.   Well, it was just cleaner doing it that way.  And I

9  think, for Frank's purposes, even though he did not believe

10  that he would be charged, I still did not -- I did not feel

11  comfortable with him not having representation.  So Mr. Nadig

12  represented him on that issue.

13  Q.   Okay.  Was there any type of -- I have previously

14  requested via e-mail that you provide me with any kind of

15  retainer agreement or letter of engagement that you had on

16  this case.  Do you recall that?

17  A.   Yes, I do.

18  Q.   And you never provided me with one, did you?

19  A.   No.

20  Q.   Okay.  Is that because there was no actual written

21  retainer agreement or letter of engagement?

22  A.   There was no written agreement between myself and Frank.

23  Q.   Jan.  Was there a written agreement between you and Jan?

24  A.   No.  I mean, he did not sign one for me.

25  Q.   So no written retainer agreement, no letter of engagement

MICHAEL SANFT - Direct Examination

1   saying what exactly you had been retained to do?

2   A.   No.

3   Q.   Okay.  Is it -- did you and Mr. Nadig work together on

4   the case?  When I say "the case" -- let me backtrack.

5        There was some -- let's say there was some -- there

6   was some alleged pornography found on electronic devices

7   located at a home that was shared with Mr. Alfter and Jan.

8   Right?  That's the nexus of the underlying charges?

9   A.   Yes.  Well, I don't know if it was alleged, but there

10  were -- there was pornography found on computers in his home.

11  Q.   Okay.  So there was -- it was images that were found on

12  electronic equipment located in a home that was owned by or

13  shared by Frank and Jan?

14  A.   Yes.

15  Q.   And they were -- they were -- they were a couple; they

16  were married?

17  A.   Yes.

18  Q.   Whether officially or unofficially, they held themselves

19  out as --

20  A.   A couple.

21  Q.   -- husband -- a couple?

22  A.   Yes.

23  Q.   Okay.  Thank you.

24        Is it -- did you and Mr. Nadig work together -- well,

25  let me ask you this.  Is it fair to say that on April 2, 2016,

MICHAEL SANFT - Direct Examination

1    is when you entered an appearance on the record as the

2    attorney for -- one of the attorneys for Mr. Rouven?

3    A.   On the record here in court?

4    Q.   Yes, in Federal Court.

5    A.   Yes, ma'am.

6    Q.   Okay.  So at that time in April, Mr. Marchese had

7    previously appeared in Federal Court.  So for the court

8    record, it was you and Mr. Marchese were the attorneys for

9    Mr. Rouven?

10   A.   That is correct.

11   Q.   Is it fair to say that in the -- that you -- in the

12   ensuing weeks or months that you and Mr. Nadig worked together

13   on the case?

14   A.   Well, it -- if you can reframe the word "work."  And let

15   me -- let me explain why.  We believed that -- that Jan's case

16   was of the utmost importance because of two things.  First of

17   all, the amount of money that we were paid.  And second of

18   all, Frank was --

19   Q.   Say that again.  Because of what?

20   A.   Because of the amount of money of the retainer.  It was a

21   big retainer, and because of the fact that Jan was so well

22   known, at least on the Strip with regards to him being a

23   celebrity, this case deserved all of my time and attention.

24   So I spent a lot of time with regards to this particular case.

25          We had come up with a -- and when I say "we" --

MICHAEL SANFT - Direct Examination

```
 1    Q.    When you say "we," to whom are you referring?

 2    A.    Let me -- let me back up here.  When I say "we," myself

 3    and Jess Marchese came to --

 4    Q.    And you spent a lot of time working with Mr. Marchese on

 5    the case?

 6    A.    Yes, but I want to -- I want to answer your question with

 7    regards to Mr. Nadig.

 8    Q.    Okay.

 9    A.    When I got on the case, I decided that one of the things

10    that we needed to do was to have a weekly or a biweekly

11    meeting to go over discovery issues, potential motion practice

12    issues, and especially issues with regard to visitation for

13    Jan.

14    Q.    With regard to what?

15    A.    Visitation for Jan.

16    Q.    Okay.

17    A.    And so -- and I apologize if I'm not being clear.  But --

18    Q.    I just have hearing problems.  That's --

19    A.    Okay.  Okay.

20    Q.    -- my fault, not yours.

21    A.    All right.  With regards to Jan, Frank was insistent on

22    making sure that we were seeing him on an almost daily

23    basis --

24    Q.    Okay.  But I'll ask you not to refer to anything that

25    Frank said to you because that would be hearsay so --
```

MICHAEL SANFT - Direct Examination

1    A.    Okay.  I had learned that Jan had a desire to be seen

2    pretty much every single day that he was in custody.  So we

3    made sure -- and when I say "we," myself, Mr. Marchese worked

4    in conjunction with Mr. Nadig and Frank to make sure that Jan

5    was being seen.

6    Q.    So you were working with Mr. Nadig on the representation

7    of Jan?

8    A.    No.  Mr. Nadig was there specifically on behalf of Mr. --

9    I'm sorry.  Frank.  And Frank was in our meetings as well.  So

10   when we would meet on behalf of Jan, Frank would attend the

11   meetings and so would Mr. Nadig.

12   Q.    Can you just please talk about -- because I'm not sure

13   who you're referring to when you say "we," so --

14   A.    I apologize.  Mr. Marchese and myself would have

15   Mr. Nadig and Frank in those meetings as well.

16   Q.    Now, those -- the meetings that were had -- let me ask

17   you this.  Do you remember how many meetings you had with --

18   at some point in time, you were relieved on the case.  Right?

19   You were -- your representation was terminated, and then you

20   got back on the case?

21   A.    Yeah.  And I -- I'm --

22   Q.    Was that -- well, your representation was terminated the

23   first time in about July of 2016, would that be accurate?

24   A.    Yes.  I received a substitution of attorney in my office.

25   I didn't understand why but --

MICHAEL SANFT - Direct Examination

1    Q.   Was that Ben Durham substituting in, in place, instead of

2    you?

3    A.   Yes, ma'am.

4    Q.   Okay.  So it's your indication that you met with --

5    approximately how many times from April through June do you

6    recall meeting with Mr. Rouven?

7    A.   I don't know.  I can't recall.

8             MS. CONNOLLY:  May I approach, Your Honor?

9             THE COURT:  Yes, you may.

10   BY MS. CONNOLLY:

11   Q.   I'm not sure if you have it in front of you, Exhibit A

12   (inaudible) --

13           COURT RECORDER:  If you could please talk into the

14   microphone.

15   BY MS. CONNOLLY:

16   Q.   I'm referring you to Defendant's Exhibit A, which has

17   previously been admitted.  Can you please refer, first of all,

18   to the April 3, 2016, date.

19   A.   Yes.

20   Q.   And that indicates that on April 3, 2016, you met by

21   yourself with Mr. Rouven, right, at -- and this is a subpoena

22   duces tecum for the Henderson Detention Center, and you would

23   agree that that's where he was being detained?

24   A.   Yes, he was detained there.

25   Q.   Okay.  So also please note that document indicates that

MICHAEL SANFT - Direct Examination

1   on April 13, 2016, you met with him -- Jan.  Correct?

2   A.   Sure.  If it's in the document, then I don't have any

3   dispute over that.

4   Q.   Okay.  And it also represents on April 26 you met with

5   him?

6   A.   Okay.

7   Q.   And it also represents that you met with him on June 24,

8   2016, with an individual by the name of Nicholas Hall?

9   A.   Sure.  Okay.

10  Q.   Okay.  As an officer of the Court, I would represent that

11  there's no other entries in this document that reflect that

12  you met at the holding facility with Mr. Rouven.  Do you have

13  any reason to dispute that?

14  A.   Yes.

15  Q.   Dispute my representation in regard to what these logs

16  reflect?

17  A.   I don't know about your representation.  But with regard

18  to the logs itself, I don't think they're necessarily

19  accurate.

20  Q.   Okay.  Who is Mr. Hall?

21  A.   I believe he was an expert that we were retaining or

22  potentially going to retain specifically about computer

23  systems.  I don't recall completely, but I think that's what

24  it was about.

25  Q.   Okay.  I'm going to -- I'm going to digress a little bit.

MICHAEL SANFT - Direct Examination

```
 1    So -- and -- and correct me if -- if I misunderstood.  But
 2    what I'm garnering is that you believe that Mr. Nadig would
 3    represent Frank and you would represent Jan?
 4    A.    That was my responsibility was Mr. Jan -- or Jan and not
 5    Frank.
 6    Q.    And would you -- there would be a potential conflict in
 7    Mr. Nadig -- in either of you representing both individuals
 8    because both were suspects in regard to this pornography that
 9    was located on the computers in the home they share.  Would
10    that be accurate?
11    A.    That would be accurate unless both people waived that
12    conflict.
13    Q.    Let me ask that.  You don't have in your possession any
14    kind of waiver that was signed by Jan in this particular case,
15    do you, in regard to dual representation of him and Mr. Nadig?
16    A.    No, we were -- we had come to --
17    Q.    That was a no?  That was a no?
18    A.    Okay.  I -- it's direct examination.
19    Q.    And you --
20    A.    I just want to make sure we're clear.  But if you're
21    going to cross me, the answer is no.
22    Q.    Okay.  And you -- as you previously indicated, that
23    without that kind of a waiver, you didn't think it would be
24    appropriate in this particular case for each of them to have
25    the same legal representation?
```

MICHAEL SANFT - Direct Examination

```
 1    A.    I'm sorry.  You want me to answer the question?  I'll
 2    answer the question.
 3    Q.    Well, yes or no?
 4    A.    If you want to lead me, then that's fine.
 5    Q.    Well, I thought you just told me that, without a waiver,
 6    you didn't think it would be appropriate for Jan and Frank to
 7    have the same legal representation.
 8    A.    We made a decision in the very beginning of my
 9    representation --
10    Q.    I just need to know if that's what you thought about.
11    Because you're the one that brought up a waiver so --
12    A.    Once again, you're leading me on direct examination.  I
13    want to answer the question.
14    Q.    Okay.  My --
15    A.    So either I answer the question -- if you want me to give
16    you the answer, I don't believe a yes-or-no answer is
17    sufficient.
18    Q.    Okay.  I'm going to -- can you please refer to Exhibit C,
19    which is -- I believe that's in front of you.
20          Are you familiar with that document?
21          MS. ROOHANI:  Which one is this?
22          MS. CONNOLLY:  C.  The letter -- the e-mail.  I'm
23    sorry.
24          THE WITNESS:  Yes.
25          MS. CARTIER-GIROUX:  For the record, have the two
```

MICHAEL SANFT - Direct Examination

1    prior questions been withdrawn?

2            **THE COURT:**  What's that?

3            **MS. CARTIER-GIROUX:**  There were two prior questions

4    where there was no answer permitted.  At least I didn't hear

5    the answer.  Are they withdrawn?  Are we moving on to a

6    different question?

7            **MS. CONNOLLY:**  I'm on a different question.  I may go

8    back to those so...

9            **THE COURT:**  All right.

10   **BY MS. CONNOLLY:**

11   Q.   Mr. Sanft, do you recognize that document that's

12   Exhibit C?

13   A.   Yes, I do.

14   Q.   Do you need to take a second to -- are you familiar with

15   it, or do you need to refresh your recollection?

16   A.   Well, I guess you can ask me a question.  If I don't

17   know, I can refer to it.

18   Q.   That is -- that is -- do you recognize that document?

19   A.   I do recognize the document.

20   Q.   So it would be fair to say that this document is an

21   e-mail that is sent from Mr. Ben Nadig dated September 3.  It

22   says, "Attention, Jan Fuechtener," and that you're cc'd on

23   that particular e-mail?

24   A.   Yes.

25   Q.   And -- and -- and can you please look at the top of that

MICHAEL SANFT - Direct Examination

1  where it has two addresses.  It says sanftlawgroup@mac.com and

2  sanftlawgroup -- there's two.  Are those, in fact, your e-mail

3  addresses that were current on September 3, 2016?

4  A.  Yes, ma'am.

5  Q.  Okay.  Do you recall receiving a copy of this e-mail on

6  or about September 3, 2016?

7  A.  I don't know for sure, but it is dated that date.

8  Q.  But you recall receiving this?

9  A.  I did review this document, yes.

10  Q.  Okay.  You reviewed this document.  Okay.

11        Upon reviewing that document, after he -- you had

12  reviewed it, did you find or believe it was necessary to send

13  out any kind of written communication or e-mail refuting

14  anything that was contained in this e-mail?

15  A.  I did not.

16  Q.  Okay.  And you would agree that in this e-mail it

17  indicates that you and Mr. Ben Nadig were working together in

18  the defense of both Frank and Jan, would you or would you not?

19        **MS. CARTIER-GIROUX:**  Objection.  Now the e-mail's

20  being offered for the truth of the matter asserted therein.

21  It was not entered for that purpose.  No foundation has been

22  laid that that would apply to an exception to the Hearsay

23  Rule.  At this time, I'm objecting to this item being

24  referenced to.  It came in only for the state of mind of

25  Mr. Marchese.

1              **MS. CONNOLLY:**  I can certainly call -- excuse

2    Mr. Sanft and bring Mr. Nadig onto the stand and then recall

3    Mr. Sanft later.  I got Mr. Sanft in this order because he has

4    to be in District Court.  Mr. Nadig can certainly come in and

5    testify about the contents of this since he was the one that

6    authored it and it's relevant to the issue why we're here.

7    The reason Mr. Sanft is called right now is as an

8    accommodation.  He was here this morning, and he has to go to

9    state court.

10             **MS. CARTIER-GIROUX:**  Judge, I don't know how this --

11             **THE COURT:**  No.  Sustained.

12             **MS. CONNOLLY:**  I'm sorry, Judge?

13             **THE COURT:**  It was sustained.  The objection is

14   sustained.

15   **BY MS. CONNOLLY:**

16   Q.   So in response to -- you would agree that there's

17   references in this letter to -- there's representations in

18   here about your accomplishments?

19             **MS. CARTIER-GIROUX:**  Objection.  Same objection.  You

20   can ask him about --

21             **THE COURT:**  You can ask him about his

22   accomplishments --

23             **MS. CONNOLLY:**  Okay.

24             **THE COURT:**  -- without having to refer to the letter.

25   ///

MICHAEL SANFT - Direct Examination

```
 1    BY MS. CONNOLLY:
 2    Q.    Is it true that you had received acquittals in Federal
 3    Court on sexual assault cases -- or, I'm sorry, child
 4    pornography cases?
 5    A.    Is it true?
 6    Q.    Is it true?
 7    A.    No.
 8    Q.    Okay.
 9    A.    I mean, I don't know.  No.  I don't think I've ever
10    received --
11    Q.    Just acquittals.
12    A.    In Federal Court?
13    Q.    Yes.
14    A.    No.
15    Q.    Is it true that you and Mr. Nadig were both representing
16    Jan and representing Frank?
17    A.    No.
18    Q.    Okay.  When you received this e-mail, why did you not
19    send out any communication indicating that you did not
20    represent Frank?
21    A.    Well, when I received the e-mail, quite honestly, I never
22    really looked at the e-mail.  The only time that I looked at
23    the e-mail, which is a question you did not ask me, was just
24    recently in preparation of this hearing.
25    Q.    Okay.  So you never reviewed this e-mail -- or you don't
```

MICHAEL SANFT - Direct Examination

```
 1   remember reviewing it around about September of 2016?
 2   A.   I did not.  Now, I did receive it at that point as it
 3   says, but in terms of me reviewing the e-mail, I did not
 4   review it.
 5   Q.   You were relieved as counsel, you indicated, when you
 6   received a substitution of attorney in about July of 2016?
 7   A.   Sure.  Yes.
 8   Q.   Okay.  Were you -- you just indicated you were surprised
 9   when you received that?
10   A.   I was.
11   Q.   Okay.  Did you also receive a request for a refund of
12   funds that had been extended to you on behalf of Mr. Rouven
13   for his representation?
14   A.   No.
15   Q.   So nobody ever asked you directly or indirectly for a
16   refund?
17   A.   No.
18   Q.   How did it -- how did it come -- or who approached you
19   about getting back on to the case?
20   A.   I'm a little bit hazy on details, but I think --
21   Q.   So do you remember what it was?
22   A.   Do I remember when it was?
23   Q.   Yes.
24   A.   I -- I know in terms of procedurally where the case was.
25   It was right before trial, and I believe counsel at that point
```

MICHAEL SANFT - Direct Examination

1   had made a decision that they were going to do a bench trial.

2   I came in right after that decision was made by counsel, by

3   defense counsel.

4   Q.   Without telling me what they said, did anybody discuss

5   with you the reasons why you were being brought back on the

6   case?

7   A.   My understanding was is that Jan --

8   Q.   I'm just -- my question was did anybody discuss with you

9   why you were being brought back on?

10   A.   Yes.

11   Q.   And I was going to ask you who.  Who did -- who did you

12   have those discussions with?

13   A.   I don't recall who it was.

14   Q.   Was it --

15   A.   All I know is that, at some point, Jan had requested my

16   participation back in the case.

17   Q.   So did he ask you directly, or did somebody else

18   communicate that to you?

19   A.   I think I met with Jan.  I was asked to go to -- to

20   Henderson to meet with Jan.

21   Q.   So somebody asked you to go meet with him, but you don't

22   recall who it was that asked you?

23   A.   I want to say it was Frank, but I did -- by that point, I

24   believe Frank was actually out of the country.  He may have

25   been in Germany at the time, and it may have been -- and so I

MICHAEL SANFT - Direct Examination

 1   don't know exactly how that came about.  I apologize.  But --
 2   Q.    Somebody reached out to you and -- and communicated with
 3   you about you getting back on the case, and then you went to
 4   go meet with Jan --
 5   A.    That's --
 6   Q.    -- to the best of your recollection?
 7   A.    That's correct, yes.
 8   Q.    Okay.  Now, so you were representing him from
 9   approximately, would it be safe, from when you made your
10   appearance on the record in March through about July initially
11   and then back on around about October/November?
12   A.    Sure.  Okay.
13   Q.    Okay.  Now, during the course and the scope of your
14   initial block of representation, did Mr. Rouven ever indicate
15   to you that he wanted to pursue plea negotiations?
16   A.    No.  Jan was very insistent from the very beginning he
17   was not guilty of the crimes and could not do what was accused
18   of him.
19   Q.    So the plea negotiations were not explored because he had
20   never expressed to you any desire to want to take a plea.
21   His -- his desire had always been, as communicated to you,
22   "I'm going to trial on this"?
23   A.    Well --
24   Q.    And I'm talking just prior to -- up through July.
25   A.    I understand.

MICHAEL SANFT - Direct Examination

1              Communication with the Government was done

2    predominantly through Mr. Marchese.

3    Q.    Okay.

4    A.    There may have been discussions there.  But in our

5    meetings leading up to the time I was relieved in July, there

6    was no discussion about negotiation because we all worked for

7    Jan because of the fact --

8    Q.    When you say --

9    A.    -- he said he was not guilty.

10   Q.    When you're saying "we," to whom are you referring?

11   A.    This would be everyone that was in that group:

12   Mr. Marchese, myself, you know, Frank, Mr. Nadig, because he

13   was there with Frank, Toby Tobiasson, who was the investigator

14   on the case.  We had other individuals.  I can't remember his

15   name off the top of my head.  He was living in the home.  I

16   mean, we're all on some level supporting Jan and working

17   towards this idea that Jan was not guilty.

18   Q.    Working towards trial?

19   A.    That is correct.

20   Q.    And so is it your testimony that you had a -- you had a

21   number of interactions and meetings with Mr. Marchese during

22   your joint defense of Jan?

23   A.    Well, we kept in contact.  You know, the -- the main

24   thing that happened, once again, is we would have our

25   meetings.  We would discuss what was happening with regards to

MICHAEL SANFT - Direct Examination

1   discovery issues and so forth --

2   Q.   Let me ask you that.  How many meetings do you remember

3   having with Mr. Marchese?

4   A.   You know, I don't -- I don't recall how many meetings

5   there were, but I would -- I want to say maybe about five or

6   six --

7   Q.   Okay.

8   A.   -- meetings that we had.

9   Q.   So he was the main point of contact with the Government.

10  So any discussions about negotiations or pleas would have gone

11  through Mr. Marchese and the Government is that -- I'm

12  paraphrasing, but is that what you're essentially saying?

13  A.   Right.  I -- I mean, I wasn't going to call up Ellie and

14  ask her for an offer.  Because, you know, we wanted one person

15  from our camp to basically be responsible for contact with the

16  Government.

17  Q.   So he was the point person for contact with the

18  U.S. Attorney's Office?

19  A.   Yes, ma'am.

20  Q.   Okay.  Okay.  So prior to you getting off the case in

21  July of 20 -- let me ask you this.  Have you ever done -- you

22  are familiar with just generally the United States Sentencing

23  Guidelines.  Right?

24  A.   Yes, ma'am.

25  Q.   And -- and to get us through this quickly, on -- on --

MICHAEL SANFT - Direct Examination

1   it's not like a state case.  On a federal case, when somebody

2   gets convicted or takes a plea, the sentencing guidelines are

3   used to determine what their guideline exposure is, meaning

4   their term of incarceration.  Right?

5   A.   The advisory guidelines, yes.

6   Q.   Advisory guidelines.

7   A.   Correct.

8   Q.   And the guidelines used to be mandatory, but now they're

9   advisory.  Okay.

10  A.   I don't believe that they were ever necessarily

11  mandatory, but I think judges before would treat them like

12  they were mandatory.

13  Q.   Okay.  But the guidelines -- what is your understanding

14  of what the guidelines are?

15  A.   Commissioned in 1980-something, '6, it was an effort to

16  try to standardize across the United States crimes and

17  punishment.

18  Q.   Okay.  What do you -- what is your understanding of

19  what -- what their role is now or back in 2016?

20  A.   Well, I believe that the role always has been that they

21  were more advisory, that they were -- they were given to

22  judges to allow judges to have sentences that were relatively

23  the same whether you were picked up in Florida for a child

24  pornography case or in San Francisco or Las Vegas, Nevada.

25  Q.   Okay.  And -- and -- and base offense level is different

MICHAEL SANFT - Direct Examination

1    for a -- all different types of cases.  Right?

2    A.   Yes, ma'am.

3    Q.   Okay.  Prior to July of 2016, did you ever sit down with

4    Mr. Rouven and point out to him what his base offense level

5    was based upon the charges he was facing?

6    A.   I recall having a conversation with Mr. -- with Jan at

7    some point about the sentencing guideline ranges.

8    Q.   Okay.  Do you remember specifically about the base

9    offense level, or more generically, like he was facing, like,

10   based upon the -- the -- the -- based upon the guidelines

11   there's a potential life -- there's the guidelines and then

12   there's the United States Code that -- the statutes and

13   certain offenses had mandatory minimum sentencing ranges.

14   Correct?

15   A.   That is correct, yes.

16   Q.   And, in this particular case, he was facing a life

17   sentence if he was convicted of everything under the United

18   States Code.  Correct?  Would that be fair and accurate?

19   A.   His exposure was very -- a lot of time, yes.  A lot of --

20   Q.   So -- so is it your testimony you had a discussion with

21   him about the fact that his exposure was very high given the

22   guidelines and given the United States Code, the statutory --

23   A.   My --

24        **MS. CARTIER-GIROUX:**  Judge, I'm going to object.

25   I've not been objecting to the direct examination being almost

AMBER M. McCLANE, CCR 914
(702) 384-0429

1    exclusively leading, but I am at this time.

2         **THE COURT:**  Please try to rephrase your questions as

3    to non-leading questions.

4    **BY MS. CONNOLLY:**

5    Q.   So you -- you had discussions with -- and I'm -- I'm not

6    trying to misstate or put words in your mouth, but you had

7    some discussions with Jan about his exposure under the

8    criminal scheme with --

9    A.   That --

10   Q.   -- or our criminal code?

11   A.   Yes, ma'am.

12   Q.   And our criminal code consists of the guidelines in

13   conjunction with the United States Code?

14   A.   Sure.

15   Q.   Because some -- some of the sentences have mandatory

16   minimums?

17   A.   Yes, that's correct.

18   Q.   And mandatory minimum, that means the judge cannot go

19   below that?

20   A.   Yes, ma'am.

21   Q.   Okay.  So in terms of this particular case, do

22   you specifically recall what your discussions were with Jan

23   and when they occurred regarding his exposure in this

24   particular case?

25   A.   I don't recall the exact day that it happened, but it was

MICHAEL SANFT - Direct Examination

1    relatively early on in the -- in my representation of Jan.

2    Q.    And do you remember -- and if you don't because it was

3    some time ago -- so this was early on.  That would have been

4    April/May of 2016?

5    A.    I'll tell you the reason why I did it.  Because I do

6    remember specifically having this conversation for two -- and

7    I remember the day in terms of what happened.  It rained,

8    which, in Las Vegas, is unusual sometimes.  I do remember

9    that.  And I do remember having a conversation with him in

10   which -- speaking with Jan is very difficult because Jan likes

11   to talk, and Jan would interrupt and focus back on the fact

12   that he was not guilty and that he would never do these

13   things.

14   Q.    Okay.

15   A.    So I remember specifically making a decision to talk and

16   make an effort to talk to him about the sentencing guideline

17   range because of the fact that I was tired of every time going

18   in and seeing him or listening to other people in the group

19   talk about the fact that Jan kept talking about the same

20   thing.  It was a repetitive sort of thing over and over and

21   over again.  So I decided to make a different visit one time

22   to try to convince him or at least talk to him about the

23   sentencing guideline range because I was tired of talking

24   about everything else.

25   Q.    And what do you -- so what do you mean talk to him about

MICHAEL SANFT - Direct Examination

1    the sentencing guideline range?  What do you recall about that

2    conversation?

3    A.    Going over the charges and saying, "Look, this is what

4    your exposure is per charge," so that he understood.  And the

5    reason for that was, like I said, it was a selfish reason on

6    my part, but it was also to try to put the fear of God in Jan

7    with potentially, if he wanted to take a deal in the future,

8    that he would understand the gravity of the situation.

9    Because up until that point, Jan was acting as if he was going

10   to get out.  And I wanted -- I just -- I wanted him to kind of

11   know that there was more to it than just laughing and having a

12   good time while he was waiting for his trial.

13   Q.    And he was in custody at this time.  Right?

14   A.    Yes, ma'am, he was.

15   Q.    Okay.  And so do you recall specifically what you told

16   him in regard to his exposure?

17   A.    I don't remember specifics, but my practice in Federal

18   Court is to always go over the sentencing guideline ranges

19   with my clients.  Because I believe it's a better way to

20   control the client with regards to exposure.  If they

21   understand what they're potentially looking at, then in the

22   future, if there's an offer, they would value that a little

23   bit differently compared to just springing on the sentencing

24   guideline range when there's an offer.

25   Q.    When you say "sentencing guideline range," are you

MICHAEL SANFT - Direct Examination

1  referring to the fact that some of these charges -- like, for

2  example, the advertising charge had a mandatory minimum of 15

3  years?

4  A.   Of course.  I mean, the -- the statute always trumps the

5  sentencing guideline range.  That's always discussed.  And

6  whenever there's a mandatory minimum, that's the first hurdle

7  you have to jump over.  You talk from that point forward in

8  terms of time.

9  Q.   So -- so do you recall, was it discussing the statutory

10  mandatory minimums with him -- well, let me ask you this.

11  Fair to say that you don't know where a particular -- strike

12  that question.

13        What do you recall specific -- if you -- do you

14  recall specifically the discussion you had with him?

15  A.   I remember -- I -- well, I do remember that I made it a

16  point one time to actually try to discuss the sentencing

17  guideline ranges with Jan, but I kept getting interrupted by

18  Jan.  Jan almost didn't want to hear it.  Because, in Jan's

19  mind, he's not guilty of the crime.  So why would he ever want

20  to discuss crime/punishment when he's not guilty of it?  And

21  so we would go back to the same things that Jan would always

22  talk about before.  So I do remember having a discussion with

23  Jan or trying to initiate a discussion and trying to go over

24  these things.  But he would interrupt and he'd get back into

25  his groove of "I'm not guilty.  It's not me.  I did not do

MICHAEL SANFT - Direct Examination

1    this."

2    Q.   Okay.

3    A.   That's what he would do.  So that's how it would work

4    over and over and over again.

5    Q.   Okay.  Well, you say over and over again, but you

6    initially indicated that you said you remember having a

7    discussion about them early on in the case, and then he

8    indicated "I want to go to trial," so that was it.  Right?

9    A.   Well -- well, yeah.  I never had a discussion with him

10   after that point.  When I say over and over again, I'm talking

11   about in the same -- in the same time that we spent together.

12   Q.   Okay.  So there was no discussion -- so fair to say there

13   was no discussion of -- of a plea agreement until during

14   trial?  To your knowledge.  You don't know that Mr. Marchese

15   did it because he was the point man, but you never had any

16   discussion, that you're familiar of, about a plea until after

17   Agent Popovich --

18          **MS. ROOHANI:**  Panovich.

19          **MS. CONNOLLY:**  I'm sorry.  I don't mean to --

20          **THE WITNESS:**  I spent -- I spent time with Jan in

21   preparation for his testimony after I got back on the case.

22   **BY MS. CONNOLLY:**

23   Q.   And you were just on the case for a couple of weeks

24   before the trial.  Right?

25   A.   That's correct.  And my job was to help prepare Jan for a

 1   potential -- his potential testimony during the course of the

 2   trial.  In my time I spent with Jan, we never discussed an

 3   offer because there was no -- as far as I know, there was --

 4   there was no potential offer to negotiate this case.

 5   Q.   Okay.  And when did -- when did the whole auspice of a

 6   potential offer come about?

 7   A.   During the course of Special Agent -- Popovich?

 8            MS. ROOHANI:  Panovich.

 9            THE WITNESS:  -- Panovich's testimony.  I had an

10   opportunity to sit here, during the course of the entire

11   trial, and I believed, at that particular point, that we

12   needed to at least pitch an offer to Jan.  Because I believe

13   that Jan was going to be found guilty of all charges.

14   **BY MS. CONNOLLY:**

15   Q.   Now, there was -- you -- you -- there was nothing

16   unexpected in the substance of the agent's testimony.  Right?

17   It was you -- the Government had disclosed everything

18   previously?

19   A.   Oh, yeah.  There was no bombshell, you know, discovery

20   issues during the course of the trial.  We were -- we had

21   received all the information from the Government.

22   Q.   Okay.  Okay.  So would it be fair to say that, after her

23   testimony there was a recess of approximately an hour where

24   the discussions that took place between -- well, you tell me.

25   A.   Okay.  During the course of the trial, I sat next to

MICHAEL SANFT - Direct Examination

1    Mr. Nadig -- or Mr. Durham who sat next to -- wait.  How did

2    that work?

3              Jess was in Seat No. 1.  I believe that I may have

4    been sitting next to Jan on one side and Ben on the other

5    side.  I'm not quite sure.  But we were sitting on that side

6    of the table.  During the course of Special Agent --

7              **MS. ROOHANI:**  Panovich.

8              **THE WITNESS:**  -- Panovich's testimony -- I

9    apologize -- I believed at that -- that there had to have been

10   at least one time where we could sit down and maybe try to

11   overt some of the mandatory minimums that were involved here

12   in terms of the five to life and the -- I can't remember if

13   there was a 15 to 30 but --

14   **BY MS. CONNOLLY:**

15   Q.   What did you -- I'm -- what did you say about the five to

16   life?

17   A.   Or five -- I'm sorry.  5 to 20 and a 5 to 20, I think, is

18   what the mandatory minimums or the ranges were for two of the

19   charges.

20   Q.   You were concerned that there -- that at this -- there

21   had been no discussions of plea offers and there needed to be

22   one at this point in time?

23   A.   Well, I believed that we needed to limit Jan's exposure.

24   I was worried.  I was really worried for him.  I didn't want

25   him to do any more time than he needed to do while he was in

MICHAEL SANFT - Direct Examination

1    custody.  So I leaned back and I think I told Ben Durham we

2    need to talk about an offer.  And I believe at the break I

3    then turned to Jess and the two of us said we need to talk

4    about an offer.  And the reason why I did that isn't because

5    Jan necessarily said I want to take a deal.  It was more

6    because of the fact that I believed that he hadn't been given

7    a chance or an opportunity to at least consider that as part

8    of his potential direction for his future.  And I just felt

9    that that was patently unfair because he was definitely going

10   down that road, in my mind, towards a conviction.

11   Q.    Okay.  So who -- who was it that approached the

12   Government about potentially getting a deal or an offer?

13   A.    Well, I mean, to be clear, I -- I believed that Jess'

14   representation of Jan was very aggressive, and I don't know if

15   the Government -- you know, if their relationship was that

16   good or not.  But I remember, at some point, I leaning with

17   Jess and approaching I think it was Ms. Roohani and saying,

18   "Can we -- can we please consider a negotiation?"  They didn't

19   have one in mind, but we had gone to them and said, "Can you

20   please consider a negotiation?"  And then there was some

21   discussion, I believe, back in that room back there at some

22   point to see if we can come to a negotiation.  And then, at

23   that point, we went back to Jan and presented it to him.

24   Q.    What is your recollection of what was presented to Jan?

25   Was it by you?

MICHAEL SANFT - Direct Examination

```
 1              When you say "we," if you can just clarify who's
 2   speaking --
 3   A.   And I apologize --
 4   Q.   Just talk about what you said rather than --
 5   A.   Yes, ma'am.
 6              My understanding was is that there was a potential
 7   negotiation that still needed to be approved by the
 8   Government, by the people that have to approve that type of
 9   offer.  So there was some discussion about seeing what the
10   numbers would look like.  I believe that we came back and
11   there was a discussion, but at that point I just -- I stepped
12   back and the reason for that was I believed that Jan had a
13   better relationship with both Jess and Ben Durham.
14   Q.   Okay.
15   A.   So I was there but I really wasn't part of that portion
16   of the -- the discussions in terms of answering all of his
17   questions.
18   Q.   Okay.
19   A.   Plus, just --
20   Q.   Fair enough.
21   A.   -- having multiple attorneys with their -- you know,
22   everyone answering the question is just -- it gets confusing
23   so...
24   Q.   Okay.  Fair enough.
25              So -- but this discussion was taking place during
```

MICHAEL SANFT - Direct Examination

1    the -- the recess break.  Right?  So during that recess break,

2    Jess went and talked to the Government or you and Jess went

3    and talked to the Government and then came back, and there was

4    some discussion in the courtroom with Jan about what was

5    transpiring?

6    A.    That is correct.  And -- and, you know -- and I just

7    believed at that particular moment that the -- that the

8    Government didn't have to do it.  They had put on their entire

9    case.  They were at the end of their trial, and I just felt

10   that, you know what?  They were being at least open and

11   reasonable to the idea of let's see what we can do here that

12   would be better for Jan.

13   Q.    Okay.  And when -- by the time court recessed that day,

14   to your knowledge, had there been any kind of firm offer

15   extended?

16   A.    I believe that there was a guilty plea agreement at that

17   particular point in --

18   Q.    Well --

19   A.    And I don't -- I don't remember -- I don't remember

20   having a paper in my hand because I did not walk out of here

21   with a paper, as far as I can recall.  But I do believe, at

22   that point, we had come to a negotiation as to what it was

23   going to look like in terms of what he was going to plead to

24   and what the Government was going to agree to in terms of --

25   Q.    You indicate that was more Mr. Durham and Mr. Marchese

MICHAEL SANFT - Direct Examination

1    because they had the better relationships, so you stepped

2    back; is that fair?  Because I don't want you to say anything

3    about what you heard from anybody else is what I'm getting to.

4    A.    And I appreciate that.  I'll try to keep the hearsay out.

5              My role in this, I believe, when I stepped back into

6    the case was only for trial purposes.

7    Q.    Okay.

8    A.    Once again, I like Jan.  I think Jan's a great guy.  I'm

9    sorry that he's here.  But my role in this at the time of

10   trial was to help prep him for potentially testifying and help

11   him with the course of the trial.  That was as far as I felt

12   my representation.  I believe that he had a better connection

13   with Mr. Durham and Mr. Marchese.

14   Q.    Fair enough.

15             So there would be really no point in me asking you

16   questions about the guilty plea agreement because, based upon

17   what you just said, I'm assuming others went over that and

18   others communicated with him about that and not yourself; is

19   that accurate?

20   A.    I would come in every once in a while, and I would

21   just -- I would be here, and then I would be back outside

22   talking with the Government.  And during the time that I was

23   doing that, I did know that there -- that Jan had a lot of

24   questions, and I believe that Mr. Durham or Mr. Marchese were

25   the ones that were answering those questions.

MICHAEL SANFT - Direct Examination

1   Q.   Okay.  Let me take you to the next day, the 17th --

2   A.   Okay.

3   Q.   -- which was when the plea was actually entered.

4         What was your involvement -- well, let me ask you, at

5   some point on the -- at some point, did you come in possession

6   of a guilty plea agreement?

7   A.   I did review the guilty plea agreement, yes.

8   Q.   And when do -- when do you recall -- I can represent that

9   it was e-mailed from the Government to at least Mr. Marchese

10  at approximately 9:58 the next morning, around about

11  10:00 a.m.  So would that help you orientate as to when you

12  received --

13  A.   I --

14  Q.   -- it?

15  A.   I apologize for interrupting.

16        I recall reviewing the guilty plea agreement at one

17  point downstairs in the marshal's holding area.  I think I was

18  running late.  I was coming from state court.  I was coming

19  back over here, and I believe, at that point, there was a

20  discussion already in play.  I think in --

21  Q.   When you say "a discussion already in play," I'm assuming

22  what you mean is that the other attorneys were already in the

23  holding area discussing the guilty plea with Jan?

24  A.   Yes.  I believe at that -- from what I recall, I came in

25  at the --

MICHAEL SANFT - Direct Examination

1   Q.   But they were already in --

2   A.   -- tail end of that.

3   Q.   -- there -- who was already in there talking with him

4   when you came over from state court?

5   A.   I believe it was Mr. Marchese and Mr. Durham.

6   Q.   And --

7   A.   I'm sorry.  And when I say "I believe," those -- those

8   were the two, the attorneys that were in there.

9   Q.   So it would be fair to say you didn't engage in

10  discussions with Jan because, as you've testified a couple of

11  times, your focus was preparing him and getting him ready

12  for -- for trial?

13  A.   Well, if Jan asked me a question, I would answer the

14  question.  If he -- and I don't recall Jan saying to me or

15  asking me if this was a good deal or anything along those

16  lines.  Because I think, at that point, they were going over

17  the details of the actual guilty plea agreement itself.  And I

18  didn't want to step in and -- and we were under a time frame

19  issue because we had to come back up here to court.  And so

20  I -- I just was there.  I saw it.  I reviewed it and, you

21  know, was present during the course of the conversations with

22  Jan.

23          MS. CONNOLLY:  Court's indulgence.  I don't have

24  anything else.  Thank you.

25          THE COURT:  Cross, Ms. Giroux?

1          **CROSS-EXAMINATION**

2     **BY MS. CARTIER-GIROUX:**

3     Q.    Good afternoon.

4     A.    Good afternoon.

5     Q.    So just so that I understand, you came on pretty early in

6     the case.  Correct?

7     A.    Yes.

8     Q.    And I was actually the prosecutor when you first started,

9     right, with the case?

10    A.    Yes.

11    Q.    Okay.  And, in fact, the case originally was done via

12    complaint, not indictment.  Correct?

13    A.    Yes.

14    Q.    And you had a copy of that complaint right from the

15    get-go but once it was filed and you got on the case?

16    A.    Once I got on the case, yes.

17    Q.    Right.  And in that complaint there was a lot of facts

18    about the case itself, including the type of child

19    pornography.  Correct?

20    A.    Yes.

21    Q.    As well as that there were these Grindr chats that were

22    discussed?

23    A.    That was part of it, yes.

24    Q.    And so right from the -- the beginning had some

25    information, at least some (inaudible) -- when you got on the

MICHAEL SANFT - Cross-Examination

1    case, you had some information about what the type of case was

2    and what potentially the type of child pornography and chats

3    you were looking at potentially?

4    A.    Yes.

5    Q.    And you indicated that you had discovery.  Right?  At

6    some point in time, you were given discovery?

7    A.    Yes.

8    Q.    How did you-all share that?

9    A.    I believe that Mr. Marchese would receive it from the

10   Government or go and pick it up from the Government, and then

11   he would disburse it to me.  And then, at some point, I would

12   get that discovery to Mr. Nadig to review as well.

13   Q.    Okay.  And did Jess set up -- Jess Marchese set up like a

14   Dropbox?  Is that where he uploaded it to?

15   A.    We all had Dropbox.  It did go through Dropbox that I can

16   recall.  And I believe that there were discs.  So I may have

17   received, at some point, discs as well, too.  And I don't

18   think it was images.  It was just all files and so forth.

19   Q.    Did you, in fact -- oh.  I'm sorry.  Did I interrupt you?

20   A.    Oh, no.

21   Q.    Okay.  Did you, in fact, purchase a new computer in order

22   to access the discovery and make sure that you were able to

23   view everything?

24   A.    I did not.

25   Q.    You did not?

MICHAEL SANFT - Cross-Examination

1   A.    No.

2   Q.    Okay.  But you had it all on a computer that you were

3   able to look at?

4   A.    Yes.  I mean, there -- if there was files that I could

5   not read, I would have -- there was other people in the

6   offices with PCs.  I would have a Mac, and so sometimes files

7   aren't -- are unreadable.  Proprietary files sometimes from

8   the Government are a little bit difficult to open.

9   Q.    But you indicated on your direct testimony that this case

10  was a case of significance for you.  Correct?

11  A.    Absolutely, yes.

12  Q.    And you wanted to make sure that you were familiar with

13  the discovery as best as possible?

14  A.    That is correct, yes.

15  Q.    Okay.  So if there was something, for example, that you

16  couldn't open, you made sure that you were able to find a

17  means of opening it?

18  A.    Yes.  We had arrangements for things like that.

19  Q.    Okay.  And there were experts on this case as well that

20  were hired.  Right?

21  A.    Yeah.  There were experts we had talked to about

22  potentially hiring and identifying as experts.

23  Q.    Mm-hmm.

24        Do you know whether or not an expert was hired, in

25  fact, to look at the child pornography, do you recall?

MICHAEL SANFT - Cross-Examination

1    A.    I don't recall.  I do recall that there was some

2    discussion about having one of us go down to review it.  And,

3    of course, no one wants that job.  So I believe at that

4    particular point Jess and Mr. Tobiasson, our investigator, had

5    gone down.  I -- that's what I --

6    Q.    It sounds --

7    A.    That's what I recall.

8    Q.    -- like you all had different roles to do, like you had

9    different assign -- you -- Jess did certain things and you did

10   other things; is that right?

11   A.    Well, if Jess said, "I'm going to go do this," and I

12   thought it was a bad idea, I'd tell Jess, "That's a bad idea."

13   Q.    Okay.

14   A.    But, for the most part, you know, criminal defense is --

15   there's no unique sort of thing about the defense.  It's --

16   there are pretty obvious, sort of, issues that come up, and

17   you deal with them.  And if I believed that there was an issue

18   that was not addressed by Mr. Marchese, I would -- we had the

19   kind of relationship where I could call him and say, "Look,

20   hey, I think we should do this or we should do that."

21   Q.    Okay.  But you didn't actually go look at the child

22   pornography; Jess did?

23   A.    I -- I -- I tried to not do that.  I mean, if I'm the

24   only attorney on the case, of course I have that

25   responsibility.  But we have multiple attorneys or -- you

MICHAEL SANFT - Cross-Examination

1    know, Jess and I.  So, at that point, Jess did it.

2    Q.    But you are telling us today that you did go through the

3    actual discovery -- other than the child pornography images,

4    you did go through the discovery at some point?

5    A.    Absolutely, yes.

6    Q.    And in the discovery it had descriptions of some of the

7    images that were located on the device?

8    A.    That is correct, yes.

9    Q.    So that would satisfy your ability to determine whether

10   or not they would, in fact, or are, in fact, images of child

11   pornography?

12   A.    Well, no.  I mean, I would not just take it at the

13   Government's word that that's child pornography unless I was

14   the only attorney on the case.  Then I would have a duty to

15   make sure that I looked at that child pornography to determine

16   in my own mind whether or not they could prove that it's

17   actual child pornography.  In this case, we also had

18   Mr. Marchese, and he drew the short straw to look at the child

19   pornography.  So that's what he did.

20   Q.    Okay.  Which would explain why you didn't go?

21   A.    That is correct.

22   Q.    I got you.

23         Okay.  Now, before you went and spoke with

24   Mr. Fuechtener, when -- when you talked to him about the

25   guidelines, had you gone through the -- the discovery and were

MICHAEL SANFT - Cross-Examination

1    familiar -- was familiar with it?

2    A.   We were still getting it piecemeal.  I think there were

3    still things that were still coming in, and we were still

4    receiving some -- some items.  So I don't necessarily believe

5    that I had all the discovery by that point.  I don't believe I

6    reviewed all of it.

7    Q.   Okay.  But you had enough discovery to determine that we

8    were going to have a number of images that was a significant

9    amount.  Correct?

10   A.   Yes.  I mean, at least 600, above 600.  I mean, I think

11   the -- the estimate at some point was, you know, it started to

12   decline.  I mean, in -- I can't remember the exact number, but

13   I do believe that it met the threshold at least --

14   Q.   Of over 600 images?

15   A.   That is correct.  At least for that particular

16   enhancement in the sentencing guidelines.

17   Q.   And you knew that there was a computer device that was

18   used to view the -- where the images were contained thereon?

19   A.   We had actually a tour at the house when Jan had first

20   called us, and I had an opportunity to go through and see

21   where the Government had taken computer equipment out of the

22   home, in the pool house, in the -- I believe there's like an

23   office area in the front of the house.  And then, at some

24   point later, I did go back into the home with Frank and did a

25   more thorough, sort of, review of the entire house.

MICHAEL SANFT - Cross-Examination

1   Q.   And you also were -- you already testified you were aware

2   of those Grindr chats that we were alleging he was involved

3   in?

4   A.   Yes.  And just to be frank with you, I don't -- I thought

5   that that was kind of a -- a non-issue that would go more

6   towards Jan's proclivities to use that to hookup with

7   consenting adults and not necessarily to promote child

8   pornography.

9   Q.   Right.  But you knew of their existence?

10  A.   Yes.  Yes, ma'am.

11  Q.   And you knew what we were alleging them to -- to be?

12  A.   Correct.  And I believe that that would have been a -- a

13  source of contention during the course of our trial.

14  Q.   And you also knew that he was charged with distribution?

15  A.   Yes, ma'am.

16  Q.   And knowing distribution?

17  A.   Yes.

18  Q.   And you also were aware, at least from the descriptions

19  or maybe even your conversations with Mr. Marchese, that we

20  were alleging that was sadistic or masochistic conduct in the

21  child pornography?

22  A.   Yes.

23  Q.   So when you went to go speak to Mr. Fuechtener, you were

24  aware -- whether or not you were going to potentially dispute

25  it at trial, you were aware of the things that we were

MICHAEL SANFT - Cross-Examination

1   alleging?

2   A.   That is correct.

3   Q.   And the types of offense characteristics that might apply

4   if, in fact, he was convicted at trial?

5   A.   Yes, as enhancements to the base offense level.

6   Q.   So when you -- you said that when you went to go and see

7   him at the jail, you did it so that you -- you went there with

8   this in mind, that you were going to go through the guidelines

9   with him?

10  A.   At least talk specifically about them.  I mean, when you

11  really think about it, the guidelines with regard to this --

12  the enhancements with the base offense level, there's -- it's

13  pretty self-explanatory.  I mean, it's -- there's, you know,

14  there's no subject to interpretation, really, when it comes to

15  the issue of more than 600 images is plus two and use of

16  computer is plus two and whatever else the -- the enhancements

17  are.  I -- I tried to go through it.

18  Q.   You brought the book with you, the guidelines book with

19  you?

20  A.   I did bring the book with me.  I don't know if I ever

21  opened it up because I don't think we ever got far enough

22  where I was actually asked a question about -- Jan

23  specifically about the sentencing guideline ranges.

24  Q.   Okay.  But you attempted to speak to him about it?

25  A.   I did.

MICHAEL SANFT - Cross-Examination

```
 1    Q.   Okay.  And before you even went there, you had -- you
 2    had -- had you, yourself, gone through it to just give -- have
 3    an idea of what you're going to speak to him about and how you
 4    were going to present it?
 5    A.   Maybe, if that was my very first child pornography case,
 6    I would have done it that way.  But, you know, you know where
 7    the pages are, you walk in with the sentencing guideline book,
 8    and you just flip it open, you start going through, here's the
 9    base offense level, here's what you're looking at in terms of
10    exposure.
11         MS. CONNOLLY:  I'm going to object to anything --
12    what he generally does was relevant to what was done in this
13    particular case.
14         MS. CARTIER-GIROUX:  In this particular -- I'll
15    withdraw the question.
16    BY MS. CARTIER-GIROUX:
17    Q.   In this particular case, when you went in, did you feel
18    comfortable enough with your knowledge of the guidelines that,
19    even if you didn't open the physical book, that you could
20    explain to him which characteristics would apply in this case
21    and how they would apply?
22         MS. CONNOLLY:  I'll object to relevance.  It was
23    relevant to what was done.
24         THE COURT:  I'll allow him to answer the question.
25         THE WITNESS:  Yes.  But I typically don't do that.
```

MICHAEL SANFT - Cross-Examination

```
 1    If I'm going to -- if I'm going to discuss the sentencing
 2    guideline range, I would have brought a book.  It would have
 3    either been the little red book or it would have been the
 4    actual big, old book -- and it's not the -- the official
 5    sentencing guideline range commission book, which is a little
 6    bit bigger, but it's the big, fat book that has all the case
 7    law with regards to each sentencing guideline range issues.  I
 8    don't -- I can't remember who -- who makes that particular
 9    book, but it's a third party.  It's not the U.S. Government.
10  BY MS. CARTIER-GIROUX:
11    Q.    Okay.  And -- but you brought a book with you, one of --
12    A.    That is correct.  I remember that specifically because it
13    rained that day, and when I brought the book I was worried
14    about the book getting wet.
15    Q.    Okay.
16    A.    And I was an idiot for riding in the rain on a
17    motorcycle, but that's what I was on, going to meet with Jan
18    at that particular day.
19    Q.    Okay.  So when you met with him on that day, did you
20    attempt --
21          MS. CONNOLLY:   Objection as to foundation on the
22    date.  What day are we talking about?
23  BY MS. CARTIER-GIROUX:
24    Q.    So -- okay.  So you started representation, I believe you
25    testified on direct, sometime in March of 2016; is that
```

MICHAEL SANFT - Cross-Examination

1    correct?

2    A.    Whatever the date is.  I don't recall specifics right now

3    so --

4    Q.    And you were taken off the case sometime in July of 2016?

5    A.    Yes.

6    Q.    So was it earlier towards the initial part of the case or

7    do you think it was -- it was during the summer?

8    A.    It was -- it was to the point where we were establishing

9    a routine with Jan, and I believe that every time everyone

10   went in there, it was the same information given by Jan with

11   regards to the status of his case, the status of the

12   investigation, and I wanted to change it up.  I wanted to

13   bring in something a little different because I was tired of

14   talking the same thing with Jan.  So I bought in the

15   sentencing guideline range to talk to him about that.

16   Q.    So it was sometime in between those -- those -- those

17   months --

18   A.    It would have been in there somewhere.  I don't know

19   exactly where.

20   Q.    Okay.  But it was enough where you actually had already

21   met with him multiple times?

22   A.    Yes.  And I believe it was -- it was definitely after

23   April, but I don't know exactly when that was.

24   Q.    And when you met with him, you -- you tried to talk to

25   him specifically about his exposure, his potential exposure

MICHAEL SANFT - Cross-Examination

1    after trial, if he was convicted?

2    A.    I believe that Jan did not have a clear grasp of the

3    potential that he was looking at, and he was always very

4    positive.  And I appreciate that about him, but I also wanted

5    to keep him in pocket in terms of his expectations.

6    Q.    And did you personally, when you were -- when you were

7    there, at least believe that he could possibly, at a minimum,

8    be convicted of possession of child pornography?

9    A.    That is correct, yes.

10   Q.    So you wanted to make sure that he understood that you --

11   because you thought that, that you communicated to him at

12   least what his exposure would be if he was convicted of that

13   and the rest of the charges?

14   A.    Yes.  Based upon my information and what I learned during

15   the course of my representation, possession of child

16   pornography would have been the very least of his problems.

17   Q.    And you are familiar with these types of cases?

18   A.    Yes.

19   Q.    And you were asked on direct whether you ever had a -- an

20   acquittal.  Who is -- who is Steve Byington?  Is that how you

21   say his last name?  Byington?

22   A.    Byington was an individual that was charged with

23   possession of child pornography.  It was a trial that was

24   actually conducted in this department.

25   Q.    Okay.  And was what -- was one of the counts -- did the

MICHAEL SANFT - Cross-Examination

1    jury find him not guilty on one of the counts?

2    A.   I think -- I think he was found not guilty on a count,

3    and I believe that, because of his testimony, he probably

4    would have been -- he would have ended up with a better result

5    than what he got.

6    Q.   So going back to the day that you met with

7    Mr. Fuechtener.  So I know you don't remember everything that

8    you said.

9    A.   Yes, ma'am.

10   Q.   Right?  But you do remember trying to communicate to him

11   that he could -- what he would get -- what his exposure was

12   for each of the charges?

13   A.   Yes.  And, once again, the reason that I remember that is

14   because -- well, I already explained it.

15   Q.   Right.

16   A.   But, you know, you want to make sure your clients

17   understand the potential that they're walking down in terms of

18   a path.  Because it helps with client control in the future in

19   terms of expectations.

20   Q.   And you weren't just talking about statutory minimums and

21   statutory maximums.  You were talking about what his potential

22   exposure would be with the offense characteristics?

23   A.   Well, both.  Because the fact that you have statutory --

24   or mandatory minimums here, that had to be part of the

25   discussion as well.

MICHAEL SANFT - Cross-Examination

1    Q.   So you discussed the statutory minimums on at least two

2    of the three counts, correct, that there were mandatory

3    minimums?

4    A.   Well, here's -- here's the thing.  It's not like I sat

5    there and I said to Jan, "Jan, do you understand the mandatory

6    minimum in this case?"  Because we never got to that point.

7    He -- he -- Jan has so much information in his head and he's

8    such a jovial and outgoing sort of person that you can't --

9    you can't just talk to the guy.  He doesn't necessarily

10   listen.  And, quite honestly, if he doesn't want to hear

11   something, he's going to ignore it.  And I believed, because

12   of the fact that he kept overtalking me, I don't recall

13   exactly him saying, "Yes, I do understand the sentencing

14   guideline range, I do understand that my exposure is this, and

15   the mandatory minimum is that."  That never happened because

16   we never got to that point.  He just kept interrupting me over

17   and over and over again because he was -- he kept saying it's

18   -- "No, it's not -- it's not me.  I do -- I don't do this.

19   This is not me.  I don't do this."

20   Q.   But he never also asked you, you know, I don't really

21   understand what you're talking about, this doesn't make any

22   sense to me?

23   A.   Correct.  That never happened that way because I -- quite

24   honestly, I don't think he wanted to hear it.  He didn't --

25   because in order for us to have that conversation would mean,

MICHAEL SANFT - Cross-Examination

1    in his mind, that he actually is admitting to something --

2    some crime, some possession.  And he didn't believe that he

3    was guilty of that.

4    Q.   So you provided him with the information.  You're just

5    not 100 percent certain whether he wanted to -- to accept that

6    information?

7    A.   I -- yes.  I walked in there with -- with the intent on

8    that particular day to have that frank and open discussion

9    with regards to sentencing guideline ranges and exposure.  I

10   don't believe that I walked out of there feeling like that was

11   a productive conversation and I believe, at that particular

12   point, he understands the gravity of the situation.  I believe

13   that, every time I walked out of there, Jan was under the

14   impression that he was going to walk out at the end of the

15   trial.

16   Q.   But he never expressed to you similarly that he had any

17   confusion about what he was charged with or what you were

18   saying to him about what his exposure would be?

19   A.   Yes, ma'am.  That's correct.

20   Q.   He just insisted that it's not going to be a worry

21   because I'm not going to be found guilty?

22   A.   That is correct.

23   Q.   You wanted to explain on direct examination about that

24   written waiver that you were being asked about, about the

25   conflict of interest.  Why wasn't there a written waiver

MICHAEL SANFT - Cross-Examination

1   executed?  And -- and just explain to me what was going on

2   with regard to Mr. Nadig's representation of Frank Alfter and

3   your representation of Jan Fuechtener.

4   A.   The only discussion that we ever had where Frank was

5   involved was that very first discussion.

6          **MS. CONNOLLY:**  Object.  Hearsay to anything anybody

7   else said.

8          **MS. CARTIER-GIROUX:**  Judge, on direct examination she

9   asked him whether or not he had executed a -- a waiver of a --

10  a purported conflict of interest.  So I'm asking him why there

11  wasn't one executed.

12         **THE COURT:**  All right.  He can answer that question

13  if he --

14         **THE WITNESS:**  He was -- Frank was never charged.  If

15  Frank was charged, there would have been an execution of

16  some -- well, potentially.  I think, at that point, we would

17  have just built a wall and -- and Ben and Frank would do their

18  own thing and we would do our own thing because Ben and Frank

19  would have their own access to discovery.

20  **BY MS. CARTIER-GIROUX:**

21  Q.   We were -- you looked at some of those -- those Henderson

22  logs in front of you?

23  A.   Yes, ma'am.

24  Q.   Do you -- when you perused through those, did you -- do

25  you think that they completely cover all of the times you had

MICHAEL SANFT - Cross-Examination

```
 1    conversations or met with Mr. Fuechtener or were there open
 2    air conversations that wouldn't have been logged into --
 3    potentially logged into the -- the videoconference --
 4            MS. CONNOLLY:  Objection.  Lack of foundation, his
 5    knowledge as to how these --
 6            MS. CARTIER-GIROUX:  He testified on direct that he
 7    didn't think they were all in there.
 8            MS. CONNOLLY:  He can't testify about whether or not
 9    the document's accurate.  It speaks for itself.
10            THE COURT:  You can ask him why he thought that it's
11    not accurate.
12    BY MS. CARTIER-GIROUX:
13    Q.   Sir, do you think that those records accurately reflect
14    the amount of time you spent with Mr. Fuechtener and the
15    number of visits you had?
16    A.   These?  Well, the reason why I say that they were not
17    accurate before is because the question that was posed to me
18    implied that somehow I did not speak with Mr. Fuechtener or
19    visit with him or spend time with him closer to the time of
20    trial.
21    Q.   Okay.
22    A.   Because I -- because I don't know if it says in here
23    about the September dates or anything along those lines.
24    Q.   Can you take a look?  I think they're in chronological
25    order.
```

 1    A.    Yeah, I don't recall -- let me see when this happened.

 2    September 17th.

 3              No.  If you look on page 23 --

 4    Q.    Mm-hmm.

 5    A.    -- through to page -- it would have been 24, maybe.  I'm

 6    not listed in here at all as far as I can tell.

 7    Q.    If I told you that this --

 8    A.    But I was there.

 9    Q.    I'm sorry.

10              If I told you there were only three meetings listed

11    in there that you've had or met with Mr. Fuechtener at

12    Henderson, would that be accurate?

13    A.    No.

14    Q.    And if I told you that, for example, on May, the 6th, of

15    2016, if you go to that date, it says you only met with him

16    for 40 minutes.  When you normally would meet with

17    Mr. Fuechtener, was it -- was it very short periods of time or

18    longer periods of time?

19    A.    I'm sorry.  Which page are you on, Counsel?

20    Q.    The May 6, 2016, date.  I'm not sure what page.  I don't

21    have a copy of it.

22    A.    May 6, 2016?

23    Q.    It says here May 6 of 2016 at 4:08 p.m.

24    A.    I have -- it looks like Mr. Nadig visited him at that

25    time.

MICHAEL SANFT - Cross-Examination

1    Q.   Oh.  I'm looking at the wrong one.  I'm sorry.  April 26.

2    I apologize.

3    A.   Yes.

4    Q.   Okay.  It says you met with him from 4:24 p.m. to

5    5:03 p.m.  When you would -- would meet -- would meet with

6    Mr. Fuechtener, did you meet with him usually for 30 minutes?

7    A.   Well, let me explain a little bit about -- to answer your

8    question, Henderson Detention Center has a visitation area in

9    which, when you walk in, you sit down.  You have no button to

10   get to call for someone to come get you out.  The button is

11   actually on the client's side of the double-paned glass, which

12   means that I couldn't just reach up, press the button and say,

13   "Oh, Jan, I got to go.  I got to get out of here."

14        So we would -- I would sit there and have my

15   conversations with Jan, and Jan would keep talking until Jan

16   was done talking with me before that button was ever pressed

17   because Jan would press that button.

18   Q.   Okay.

19   A.   So I always expected, whenever I would go down to see Jan

20   in Henderson, that I would block out two hours.  It would be

21   25 minutes drive out to Henderson, drive -- 25 minutes, drive

22   back, and at least an hour to talk to Jan because Jan would be

23   in control of the button --

24   Q.   Okay.

25   A.   -- to press to get me out of -- of visitation.

MICHAEL SANFT - Cross-Examination

```
1    Q.   So if I told you that these records reflect three visits,
2    one on May 16 of 2016 where you spent 40 minutes with Jan, one
3    on September 7 of 2016 where you spent that would be 25
4    minutes with Jan Fuechtener -- oh.  I'm sorry.  I'm looking at
5    the wrong one.  I apologize.  Withdrawn.
6         If I told you that there were four occasions in
7    that -- in those records that you met with Mr. Fuechtener, one
8    being on April, the 3rd, of 2016 for 27 minutes; one on April,
9    the 13th, of 2016 for 15 minutes; one on April 26, 2016, for 9
10   minutes; and one on June 24, 2016, for looks like an hour,
11   would that encompass all the meetings that you had with
12   Mr. Fuechtener during the time that you represented him in
13   this case at Henderson?
14   A.   Nope.  No.  Absolutely not.
15   Q.   Okay.  So that would add up to approximately an hour and
16   nine, an hour and 24 -- that would be less than two hours,
17   according to those records.  Are those records accurate?
18   A.   No.
19        MS. CONNOLLY:  Objection.  Move to strike.  I think
20   it's inappropriate for her to ask him about the accuracy of
21   another piece of evidence that's been admitted.
22        THE WITNESS:  I --
23        MS. CARTIER-GIROUX:  Judge, I can --
24        THE COURT:  I understand what the -- the question is
25   whether or not they accurately reflect the number of visits
```

MICHAEL SANFT - Cross-Examination

1    that he recalls.  That's fine.

2         **THE WITNESS:**  If I can supplement my answer?

3  **BY MS. CARTIER-GIROUX:**

4    Q.   Yes, sir.

5    A.   I don't know why the additional time -- first of all,

6    those other dates, I -- I'm telling you right now Jan loves to

7    talk.  There was no way I would be there for nine minutes.  I

8    would have heard that.  I would have heard a complaint from

9    Frank.  I would have heard a complaint from some of the other

10   individuals that I knew were in contact with Jan.  But with

11   that being said, I spent significant time with Jan, especially

12   in preparation for trial in this matter.  We actually met in a

13   separate room that they allowed us to meet in because of the

14   fact that Jan needed more time on our own.  So we met in a

15   utility room on benches without a wall and without glass and

16   we would sit there and go over his story backwards and

17   forwards.  Because, in my position, trial was going to be like

18   a show, and I wanted Jan to be prepared for that show, to be

19   able to convince the audience that he was not guilty of these

20   crimes.  And so we spent significant time.  I don't know where

21   that time went.  It's not in the record.

22   Q.   Now, you indicated that you -- that on the date of trial,

23   at the point where -- after Agent Panovich, her testimony --

24   after we finished presenting her testimony, you-all hadn't

25   really had an opportunity to cross her yet and yet stopped,

MICHAEL SANFT - Cross-Examination

1   you -- you became aware of a -- some plea negotiations.

2   Right?  That there was an oral offer at least that was made by

3   the Government?

4   A.   I -- for the record, I believe I initiated the

5   consideration for a negotiation.

6   Q.   Okay.  And, in fact, before we left that day, there was

7   an oral offer; it just hadn't been trans -- put -- put into

8   writing?

9   A.   I -- when I was present during those conversations, the

10  Government had to get approval first from the committee in

11  order for them to make the official offer.  Once that official

12  offer was made, I believe it was relayed to Jan.  And then the

13  next day the guilty plea agreement would -- would -- as far as

14  I know.  And I don't recall for sure but that's --

15  Q.   That's what your recollection is?

16  A.   Yes.  I recall sitting in that room over there and

17  waiting with yourself and a few other people for an official

18  offer.

19  Q.   And once that verbal offer was relayed, as far as you

20  know, it was relayed to Mr. Fuechtener?

21  A.   Absolutely, yes.

22  Q.   And when you reviewed the guilty plea agreement the next

23  day, November 17th of 2018 [sic], was the -- the -- the

24  agreement the same as what the agreement was orally the

25  previous day --

MICHAEL SANFT - Cross-Examination

1           MS. CONNOLLY:  I'm going to object --

2   BY MS. CARTIER-GIROUX:

3   Q.   -- as far as you can recollect?

4           MS. CONNOLLY:  -- lack of foundation.  He indicated

5   he wasn't the one that was privy to the -- the discussions

6   about what the plea offer was.  So it would be based on

7   hearsay.

8           THE COURT:  You can ask him based on his personal

9   knowledge, if he knows.

10  BY MS. CARTIER-GIROUX:

11  Q.   Do you understand the question?  Do you need me to repeat

12  it?

13  A.   I was present during the negotiation in the beginning

14  with the Government.

15  Q.   Okay.

16  A.   You know, and -- and just, quite honestly, it really

17  wasn't much of a negotiation.  It was more like, "Please can

18  we do something for Jan?"  That's what the discussion was.

19  There was no, "Hey, your guy's going to lose, you better --

20  you might as well give us a better offer."  It was a, "Please

21  can you please help us?  I want to get something for Jan

22  that's different from what I think he's going to be exposed

23  to."

24           So that discussion, in terms of what it looked like

25  and so forth, I was privy to because I was in that room.  And

MICHAEL SANFT - Cross-Examination

1    we waited I think -- I want to say Cristina was there.

2    Q.    Your recollection is Cristina Silva was present?

3    A.    Yes.  Because she had come down and she was part of the,

4    "Okay, I think we can do this.  We're going to take it

5    upstairs."  So that happened in that room, and so I knew what

6    the -- what the details were.  It was communicated to -- I

7    think Jess was in the meeting the entire time, but Ben Durham

8    was communicated this information.  And that discussion

9    between Ben and Jan and maybe Jess occurred while we were all

10   waiting for the approval to come down the pike from the

11   Government.

12   Q.    Okay.  And at that time, when you were -- when you

13   conveyed it to him, you were discussed -- did you discuss with

14   him or hear his discussion with Mr. Marchese?  Were there

15   discussions regarding his exposure and the difference between

16   after trial and what the deal was going to bring him?

17         **MS. CONNOLLY:**  Objection.  Any discussions with

18   Mr. Marchese is hearsay.

19         **MS. CARTIER-GIROUX:**  If he's present, it goes to his

20   state of mind about what was going to happen.

21         **MS. CONNOLLY:**  State of mind is irrelevant.

22         **THE COURT:**  Are you asking what Mr. Marchese said or

23   are you asking --

24         **MS. CARTIER-GIROUX:**  No, I'm asking --

25         **THE COURT:**  -- Mr. Sanft's understanding?

MICHAEL SANFT - Cross-Examination

1          MS. CARTIER-GIROUX:  I'm asking what his

2  understanding was.

3          THE COURT:  All right.  He can answer that question.

4          THE WITNESS:  And I apologize.  I don't -- can you

5  repeat the question?  I know it was convoluted but --

6  BY MS. CARTIER-GIROUX:

7  Q.   That's okay.  No, it's my fault.

8          So when you -- once you were given the information

9  from Ms. -- because Jan wasn't back there.  Once you were

10  given the information and you came back out and that -- was

11  that information communicated to Mr. Fuechtener?

12  A.   It was communicated to Mr. Durham, and I was present when

13  some of that discussion was taking place.  We were having a

14  powwow in that corner.

15  Q.   And Mr. Fuechtener was present?

16  A.   Yes, he was.

17  Q.   Okay.  And -- and did you participate in discussions at

18  that time about the difference -- what his -- that --

19  withdrawn.

20          Did you participate in discussions about how his

21  exposure would be limited by the potential written plea

22  agreement that would potentially be forthcoming?

23  A.   Yes.

24  Q.   And Mr. Fuechtener was present for that?

25  A.   Yes.  He never left the courtroom, as far as I know.

MICHAEL SANFT - Redirect Examination

```
 1   Q.    Did Mr. Fuechtener at any time indicate, "I don't
 2   understand.  I don't understand.  You need to explain to me
 3   some of this stuff"?
 4   A.    I believe that Mr. -- I recall that Jan had questions.
 5   Q.    And were those questions answered, as far as you knew?
 6   A.    Yes.  I don't believe that Jan walked out of this room
 7   without answers to all of the questions that he asked.
 8         MS. CARTIER-GIROUX:  So I don't have any other
 9   questions for you.  Thank you.
10         THE COURT:  Redirect?
11                   REDIRECT EXAMINATION
12   BY MS. CONNOLLY:
13   Q.    I'm going to ask you a couple of questions about the
14   waiver.  You indicated that, if Frank had been charged, then
15   there would have been a waiver executed.  Right?
16   A.    Yes.  There would have been a waiver executed because --
17   Q.    Okay.  And --
18   A.    -- they were -- they were a conflict.
19   Q.    -- potential charges that could have been filed against
20   Frank would have involved possession of child porn that was
21   located on devices in that home they shared together.  Right?
22   A.    In the very least --
23   Q.    Okay.
24   A.    -- yes.
25   Q.    Okay.  And it would have been -- it would -- it was in
```

MICHAEL SANFT - Redirect Examination

1    Frank's best interest for Jan to plead guilty to those

2    charges.  Because if he pled guilty to possessing those, then

3    it would be difficult for the Government to then come and

4    charge Frank with those because --

5              MS. CARTIER-GIROUX:  Objection.

6              THE WITNESS:  I -- I believe that they were both

7    equally exposed --

8              MS. CARTIER-GIROUX:  I objected to the question.

9              MS. CONNOLLY:  Yeah.

10             THE COURT:  What's the objection?

11             MS. CARTIER-GIROUX:  The objection is, is that it

12   requires for him to speculate on what would be in the best

13   interest of Frank in this case.

14             MS. CONNOLLY:  He's a criminal defense lawyer and he

15   was saying under -- the circumstances under which he thought a

16   waiver should be executed, and that was something the

17   Government asked him about.  So I'm exploring that and his

18   opinion and why that was his opinion.

19             MS. CARTIER-GIROUX:  He didn't represent Frank.  He

20   already testified that his interests were Jan Fuechtener.

21   It's not relevant and his --

22             THE COURT:  Sustained.

23   BY MS. CONNOLLY:

24   Q.   If -- let's say -- I'm going to give you a hypothetical.

25   Let's say that Frank is subsequently charged with possession

AMBER M. McCLANE, CCR 914
(702) 384-0429

MICHAEL SANFT - Redirect Examination

1    of child porn of items that are located in his home.  Okay?

2    Now, if you were representing Frank and he's charged with

3    those and you have Jan who's already pled guilty to possessing

4    those, that would be one of your defenses at trial, wouldn't

5    it?  You would say to the jury, "Look, my client's being tried

6    with possessing these images, but Jan Rouven, he's already

7    pled guilty to those.  He's the one guilty."  Right?

8    A.   Yes.  You could plan B it.  Absolutely.

9    Q.   So given the big scheme of things and given the fact that

10   there was all these images found in this home that they had

11   both occupied, it was in Frank's best interest to have Jan to

12   cop to everything?

13          **MS. CARTIER-GIROUX:**  Objection.

14          **THE COURT:**  Sustained.

15   **BY MS. CONNOLLY:**

16   Q.   So you do agree there would be -- Frank definitely had

17   exposure given the fact that he lived in this home with Jan?

18   A.   I had -- I had a conversation with Jan specifically about

19   the possibility that it was Frank's, not his.

20   Q.   You indicated that the Grindr chats were in the original

21   complaint.  Could you be mistaken about that?

22   A.   I -- I'm not sure what I would be mistaken about outside

23   of the fact that they did list -- oh.  I don't know if they

24   listed --

25   Q.   So would it be fair to say you became aware of Grindr

MICHAEL SANFT - Redirect Examination

1    chats but they may not be in the initial complaint, or do you
2    know for sure they were?
3    A.   I know that there were Grindr chats that the Government
4    believed were somehow part and parcel to the charges here, but
5    I believe that actually worked in Jan's defense more than it
6    would be working against him.
7    Q.   And you -- your indication was that -- or there was
8    testimony you weren't able to basically -- and I'm
9    paraphrasing -- get him to listen about his exposure because
10   he just kept talking and he kept saying, "I'm going to trial,"
11   he didn't want to listen.  Right?
12   A.   Yes.
13   Q.   Is that accurate?
14   A.   That is correct.
15   Q.   So you never -- and your testimony was you never got to
16   the point of actually doing with him, "Hey, Jan, this is what
17   you're looking at"?
18   A.   No.  We had -- we would -- it's -- it would be a
19   stop-and-go.  We'd start and then we'd stop because I'd be
20   interrupted by Jan talking about something else.
21   Q.   Okay.
22   A.   It would always be prefaced, once again, with -- with the
23   statement -- and I don't want to be facetious about it -- you
24   know, "I don't do this.  This is not me."  It would -- it
25   would be that over and over and over and over again.

MICHAEL SANFT - Recross-Examination

1  Q.   And back to -- sometimes when the Government decides to

2  charge people with a crime, they don't always charge everybody

3  at one time.  Right?

4  A.   That is correct, yes.

5        **MS. CONNOLLY:**  Court's indulgence.

6        I don't have anything else.  Thank you.

7        **THE COURT:**  Recross?

8                    **RECROSS-EXAMINATION**

9  **BY MS. CARTIER-GIROUX:**

10  Q.   Mr. Sanft, even if -- if -- to use what Ms. Connolly used

11  in -- in her redirect.  Even if another -- one individual had

12  said -- like Frank -- Frank had said, "Yeah, these were --

13  these were my -- my -- my child pornography," if

14  Mr. Fuechtener had downloaded it for Frank's amusement or

15  entertainment, he could still be found guilty?

16        **THE COURT:**  Again, these are speculation.  We're here

17  to find out what these witnesses did or did not do.  These are

18  legal arguments you can make in closing.

19        **MS. CARTIER-GIROUX:**  Okay.

20        **THE COURT:**  I'll understand them.  I promise you.

21  And it doesn't matter whether the witness agrees or disagrees

22  with you.

23  **BY MS. CARTIER-GIROUX:**

24  Q.   So when you went to speak with Mr. Fuechtener at the time

25  of -- of -- at the time where you went through the guidelines

MICHAEL SANFT - Recross-Examination

 1    with him or tried to go through the guidelines with him but
 2    he -- he kept insisting that he was innocent?
 3    A.    Yes.
 4    Q.    Okay.  At that time, you thought that potentially, even
 5    if it was someone else's, if he alleged that he -- he
 6    downloaded them for somebody else, he could still get
 7    convicted?
 8    A.    Under a possession, that's correct.  It was in his home.
 9    Q.    Correct.  And so you made sure that you tried to go
10    through with him what his exposure was for each of those
11    charged offenses in the indictment?
12    A.    Yes.
13    Q.    Now, he might have insisted that he was innocent, but you
14    spoke to him about it?
15    A.    I tried to speak to him about it, absolutely.
16    Q.    And you gave him the numbers?
17    A.    I gave him the numbers whenever I could.  You know,
18    the -- the bottom line is it's not like we sat here and he
19    recited back to me.  It wasn't me teaching him about the
20    sentencing guidelines and him saying, "Oh, so what if this
21    were to happen or that happened?"  Because that sometimes --
22    clients do that.  That never happened with Jan.  We never got
23    to that point.
24    Q.    Right.  But you told him what his potential exposure was?
25    A.    I tried to tell him what his potential exposure was, and

MICHAEL SANFT - Further Redirect Examination

1   he wasn't listening.

2   Q.   He didn't want to discuss it?

3          **MS. CONNOLLY:**  Objection.  Asked and answered.

4          **THE WITNESS:**  I -- I don't know what his -- his

5   motives were except for the fact that I would characterize Jan

6   as being a Polly Anna; everything is bright and sunny and

7   beautiful, even when it's not.

8   **BY MS. CARTIER-GIROUX:**

9   Q.   But you conveyed the information, and he did with it what

10  he wanted to.  It could be rejected?

11         **MS. CONNOLLY:**  Objection.  Misstates his testimony --

12         **THE WITNESS:**  I tried to convey the information, and

13  he did whatever he wanted with that.

14         **MS. CARTIER-GIROUX:**  Thank you.

15         **THE COURT:**  Redirect?

16                **FURTHER REDIRECT EXAMINATION**

17  **BY MS. CONNOLLY:**

18  Q.   Given the fact that it was difficult to communicate to

19  him and get him to -- it was difficult for you to communicate

20  his exposure, did you ever send him a letter detailing what

21  his exposure was under each and every count?

22  A.   That's not my practice.  No, I did not.

23  Q.   Thank you.

24         **THE COURT:**  Anything else?

25         **MS. CARTIER-GIROUX:**  No, ma'am.

AMBER M. McCLANE, CCR 914
(702) 384-0429

 1          **THE COURT:**  All right.  So you are excused,

 2    Mr. Sanft.  Thank you for coming in this afternoon.

 3          **THE WITNESS:**  Thank you for having me.

 4          **THE COURT:**  You may call your next witness.

 5          **MS. ROOHANI:**  Your Honor, we -- we have a matter to

 6    discuss with you regarding Mr. Humphries, and I believe

 7    Mr. Marcello's here to address Your Honor.

 8          **THE COURT:**  Is that the next witness you were going

 9    to call?

10          **MS. CONNOLLY:**  (Inaudible) because I think some of

11    them had to be (inaudible).

12          **THE COURT:**  Was that the next witness that you were

13    going to call is Mr. Humphries?

14          **MS. ROOHANI:**  No.  But I think it's going to -- it's

15    going to -- it's the incarcerated defendant or the

16    incarcerated -- he is a defendant but not the defendant in

17    this case, Mr. Humphries, the one that you issued the writ

18    for.  I guess, let me put it that way.  I just -- I know that

19    Mr. Marcello's here, and I know that he's been sort of hanging

20    out waiting for us to address this particular issue and it's

21    possible that --

22          **THE COURT:**  It doesn't sound like we're going to get

23    to Mr. Humphries today, are we?

24          **MS. CONNOLLY:**  Well, and that's my concern is that

25    Mr. Nadig indicates that he has to leave by 4:00 o'clock.  So

```
 1    if we get into the issues of Humphries, then we're not going

 2    to be able to get to Nadig because he has to leave at 4:00

 3    so --

 4              THE COURT:   Okay.  So I'll just order that

 5    Mr. Humphries be returned, his subpoena -- or not -- it wasn't

 6    a subpoena.  It was a writ.  That his writ is continued for

 7    his presence to testify on Tuesday, March 20 at 1:00 p.m., and

 8    he is to remain housed separately from Mr. Fuechtener.

 9              MS. ROOHANI:   Your Honor, before you do that, our

10    concern is that Mr. Humphries has indicated to Mr. Marcello

11    that he does not intend to submit to cross-examination by the

12    Government.  And so we believe that there's a basis for you to

13    either have a conversation with him to determine whether the

14    writ needs to be quashed or not, whether he's going --

15              THE COURT:   That's not going to happen today.  He'll

16    have now more time to discuss his concerns with Mr. Ericsson

17    hopefully and -- and also with Mr. Marcello before he returns

18    on Tuesday at 1:00.

19              MS. ROOHANI:   Okay.

20              MR. MARCELLO:   What was that date one more time, Your

21    Honor?

22              THE COURT:   Tuesday, March 20 at 1:00 p.m.

23              MR. MARCELLO:   Thank you.

24              THE COURT:   Thank you.

25              All right.  Ms. Connolly, did you wish to call
```

1     Mr. Nadig?

2             **MS. CONNOLLY:**  Yes.  Yes.

3             **MS. ROOHANI:**  Your Honor, can we take a five-minute

4     break before we keep going through?

5             **THE COURT:**  All right.  Five minutes.

6             **MS. ROOHANI:**  Thank you.

7          *(Recess at 3:07 p.m., until 3:12 p.m.)*

8             **MS. ROOHANI:**  Thank you for your indulgence, Your

9     Honor.

10            **THE COURT:**  Oh, no problem.

11            **MS. CONNOLLY:**  I call Mr. Ben Nadig.

12            **THE COURT:**  Good afternoon.  Go ahead and have a

13    seat.  As soon as Aaron gets back, he'll swear you in.

14            **MR. NADIG:**  Oh.  Okay.

15            **MS. CONNOLLY:**  Mr. -- Mr. Nadig --

16            **MS. ROOHANI:**  Hold on.  He has to be sworn in.

17            **MR. NADIG:**  Yeah, I haven't been sworn in yet.

18            **MS. CONNOLLY:**  I'm sorry.

19            **THE COURT:**  Can you swear in Mr. Nadig?

20         *(The witness is sworn.)*

21            **COURTROOM ADMINISTRATOR:**  Thank you, sir.  You may be

22    seated.  Please state and spell your full name for the record.

23            **THE WITNESS:**  Full name is Benjamin James Nadig;

24    B-E-N-J-A-M-I-N, J-A-M-E-S, N-A-D-I-G.

25

BENJAMIN JAMES NADIG - Direct Examination

1                          **DIRECT EXAMINATION**

2      **BY MS. CONNOLLY:**

3      Q.    Mr. Nadig, good afternoon.  How are you employed?

4      A.    I am an attorney, self-employed.

5      Q.    Okay.  And as an attorney?

6      A.    Correct.

7      Q.    And when were you admitted to practice law in Las Vegas,

8      Nevada?

9      A.    2006.

10     Q.    2006.

11             And are you admitted to practice in Federal Court?

12     A.    I am.

13     Q.    And when were you admitted to practice in Federal Court?

14     A.    I'm guessing 2010 sometime.

15     Q.    2010?

16     A.    Correct.

17     Q.    Okay.  Have you -- during the course and scope of your

18     practice, do you -- have you been involved with any child

19     pornography cases?

20     A.    Any what?

21     Q.    Child pornography.

22     A.    Quite a few.

23     Q.    Okay.  Quite a few.  How many?

24     A.    More than ten.

25     Q.    Okay.  How many in Federal Court?

BENJAMIN JAMES NADIG - Direct Examination

1    A.    I want to say three or four.

2    Q.    Okay.  Are you familiar with the individual sitting --

3    seated to my left?

4    A.    I know Jan, yes.

5    Q.    And how do you know him?

6    A.    Jan was a client of Mike's, and I represented his

7    husband.

8    Q.    You indicated -- and I'm going to move up here because

9    I'm having a little hard time hearing you so...

10            I apologize.  If you can speak up just a little bit.

11            Okay.  You indicated you know him because he was

12   hired -- he was -- say that again.  How do you know him?

13   A.    I represented his husband, Frank, his unindicted husband

14   Frank.  And Michael and Jess represented at the time his --

15   represented Jan.

16   Q.    Okay.  So your testimony is that you were -- were you

17   retained to represent Frank?

18   A.    We were retained -- yes.  We were collectively retained

19   to represent the individuals.  If there was not a conflict,

20   then potentially I could jump on the --

21   Q.    Let me stop you, please.  You say "we were collectively

22   retained."  Who are you referring?

23   A.    When I was hired, I was hired by Frank.

24   Q.    Okay.

25   A.    And Frank also wanted to hire for Jan.  So I was hired to

BENJAMIN JAMES NADIG - Direct Examination

1    represent Frank.  Jan was represented by Mike.  Additionally,

2    at the time, Mr. Marchese was also representing Jan.

3    Q.    Okay.

4    A.    So -- and Frank questioned whether --

5    Q.    Okay.  I don't want you to say anything about what

6    (inaudible).  So -- so when you said we collectively, you're

7    referring to yourself, Mike Sanft, and Jess Marchese; is that

8    correct?

9    A.    No.

10   Q.    Okay.  Who are you referring to when you say we were

11   retained?

12   A.    No.  In the room it was myself, Frank, Steve Pacitti, and

13   Mike Sanft.  During the course of that discussion, it was

14   determined that I would represent Frank.  It was determined

15   that Mike would represent Jan.  There was a question as to

16   whether to remove Jess from the case.  Mike determined that

17   that shouldn't happen, and so Jess stayed on the case with

18   Mike.

19   Q.    Okay.  So at the time that you came on the case, you

20   indicated that Jess was already representing Jan?

21   A.    Correct.

22   Q.    Okay.  And so who was it that reached -- that reached out

23   to you in regard to your representation on this case?

24         And when I say the case, I'm referring to child

25   pornography charges stemming from images that were located on

```
1    electronic equipment located in the home that Jan and Frank
2    owned together.
3    A.   Can you repeat the question?
4    Q.   Okay.  When was it -- or who was it that reached out to
5    you in regard to you representing any of the individuals who
6    resided in a home where child pornography was located?
7    A.   Well, initially --
8              MS. ROOHANI:  Wait.  Your Honor.
9              THE WITNESS:  -- to speed --
10             MS. ROOHANI:  I'm sorry.  I think we need to be very
11   careful here because Mr. Nadig has indicated that he
12   represented Mr. Alfter.  Mr. Alfter's interests haven't been
13   represented I think.  I don't think that there's been a waiver
14   of any privilege between the conversations and things that
15   happened there.  So we need to be exceptionally careful about
16   what he's talking about.  At this point, he's indicated that
17   he was not representing Mr. Fuechtener.  So I don't know that
18   this line of questioning is appropriate.
19             THE COURT:  Want to lay a foundation, Ms. Connolly?
20   BY MS. CONNOLLY:
21   Q.   Was there a point in time in September of 2016 where you
22   authored an e-mail that you sent to the attention of
23   Jan Rouven that you cc'd to Steve Pacitti and Sanft Law Group
24   where you indicated that you represented both Jan and you
25   represented Frank?
```

BENJAMIN JAMES NADIG - Direct Examination

1    A.    No.  I wrote an e-mail to Frank.

2    Q.    So I'm going -- could you please take a look at Exhibit

3    C --

4    A.    Yes.

5    Q.    -- that is -- okay.  Do you recognize that document,

6    Exhibit C?

7    A.    I do.

8    Q.    Okay.  And is that an e-mail from you that's to -- you

9    indicated to -- that it's to Frank?

10   A.    Correct.

11   Q.    Okay.  And on that e-mail and there's some German but it

12   says, "A-N, Jan Fuechtener."  Right?

13   A.    Correct.  However --

14   Q.    Okay.  So -- but that is indicated on that e-mail.

15   Correct?

16   A.    That is -- yes, that e-mail was created with that as the

17   A-N.

18   Q.    And so that is an e-mail address that you used to

19   communicate with Frank at?

20   A.    Correct.

21   Q.    Okay.  And is it your understanding, at the time that

22   this e-mail was sent to Frank, that Frank and Jan were in

23   communication?

24   A.    I would assume so.  I don't know.

25   Q.    Okay.  And isn't it true that, in that e-mail that you

BENJAMIN JAMES NADIG - Direct Examination

1  sent to Frank, that you indicated that both you and Michael --

2  and I'm assuming Michael Sanft -- have spent a significant

3  amount of time working on Jan's case?

4          MS. ROOHANI:  Your Honor, I'm going to object.  I

5  think that this is a privileged communication between an

6  attorney and his client.

7          THE COURT:  Rather than asking him what the e-mail

8  says, do you want to just ask him directly the question

9  whether he's representing --

10  BY MS. CONNOLLY:

11  Q.  Is it true that you have made representations that you

12  and Mike Sanft jointly represented Jan Rouven and -- and Frank

13  Alfter?

14  A.  Theoretically, the way you're asking the question, yes.

15  Q.  Yes?

16  A.  As you're asking it, yes.

17  Q.  Okay.  And are you aware of -- isn't it true that you

18  made representations -- let me strike that.

19          That e-mail communication that I just referred to,

20  which has been referred to as a confidential communication,

21  that was carbon copied to Steve Pacitti and also to Sanft Law

22  Group.  Correct?

23  A.  It was.

24  Q.  Okay.  And as an attorney you know that, if you send a

25  communication to your client which is also sent to other

BENJAMIN JAMES NADIG - Direct Examination

 1   people, then it's essentially no longer privileged because

 2   you're disseminating it to other people other than just your

 3   client?

 4   A.   Well --

 5   Q.   Yes or no?

 6   A.   I didn't know it was a leading question.

 7        Yes, theoretically.

 8   Q.   And this e-mail was not just sent to Frank.  It was also

 9   sent to Steve Pacitti and Mike Sanft?

10   A.   Steve Pacitti would be Frank's --

11   Q.   Steve Pacitti, yes.

12        And, in fact, it was --

13   A.   -- would be Frank's civil attorney.

14   Q.   Okay.  So, again, in that e-mail, isn't it true that you

15   represented that both you and Mr. Michael Sanft have spent a

16   considerable amount of time working on Jan's case?

17        **MS. ROOHANI:**  Objection.  Hearsay.

18        **MS. CONNOLLY:**  It's his e-mail that he authored.

19        **MS. ROOHANI:**  Your Honor, even --

20        **MS. CONNOLLY:**  E-mail --

21        **THE COURT:**  You can ask him if it's true.  She's

22   saying it's hearsay to ask him what the -- what the e-mail

23   says.

24   **BY MS. CONNOLLY:**

25   Q.   Isn't it true that in that e-mail -- isn't it true that

BENJAMIN JAMES NADIG - Direct Examination

1    you represented to Frank and to Steve Pacitti and Mike Sanft

2    that you and Michael were representing both Jan and -- I want

3    to say that you were -- strike that.  That you and Michael had

4    been working together on Jan's case?

5             Would it help to refresh your recollection?

6    A.   No, it wouldn't help refresh my recollection.  I'm trying

7    to answer the question as it's asked.  I guess, theoretically,

8    as you have asked that question, the answer would be yes.

9    Q.   Okay.  Well, isn't it accurate in that e-mail you

10   specifically indicated, referring to Jan, "I am -- I am his

11   attorney, not his psychotherapist"?

12           **MS. ROOHANI:**  Objection.  Hearsay.

13           **MS. CONNOLLY:**  It's his written word.

14           **THE COURT:**  Yeah, overruled.

15           **THE WITNESS:**  Yes.  Once again --

16   **BY MS. CONNOLLY:**

17   Q.   So that -- yes, you did represent in that e-mail that was

18   sent to Frank and cc'd to Pacitti and Mike Sanft that you were

19   the attorney for Jan.  Yes?

20   A.   The relationship was fluid.  The relationship --

21   Q.   The question was just yes or no.  Did you make -- you did

22   make that representation in that e-mail?

23   A.   Like I said, the representation --

24   Q.   Yes?

25   A.   -- was fluid --

1            I -- I appreciate you telling me how to answer my

2    question, but I --

3    Q.   Just please --

4    A.   -- will --

5    Q.   -- yes or no --

6    A.   No --

7    Q.   -- isn't it true that you made --

8            **MS. ROOHANI:**  Your Honor --

9    **BY MS. CONNOLLY:**

10   Q.   -- that representation in that e-mail?

11           **MS. ROOHANI:**  Your Honor, I'm going to object to

12   Ms. Connolly's tone.  Mr. Nadig is trying to answer the

13   question.  She's leading --

14           **THE COURT:**  No, I don't think he is.  Do you want to

15   ask that he be treated as an adverse witness?

16           **MS. CONNOLLY:**  Excuse me?

17           **THE COURT:**  Did you want to ask for him to be treated

18   as an adverse witness?

19           **MS. CONNOLLY:**  Yes, please.

20           **THE COURT:**  All right.  That motion is granted.

21   **BY MS. CONNOLLY:**

22   Q.   Again, isn't it true that, in an e-mail that I've just

23   referred to, that you indicated that you were the attorney for

24   Jan Rouven?

25   A.   Yes.

BENJAMIN JAMES NADIG - Direct Examination

1   Q.   And isn't it true in that e-mail that you indicated that

2   you and Michael had worked extensively together on his case?

3   A.   Yes.

4   Q.   And isn't it true that you indicated in that e-mail that

5   you also represent Frank?

6   A.   Yes.

7   Q.   And isn't it true that you indicated in that e-mail that,

8   if Jan goes to trial, one of his defenses is going to be to

9   blame Frank?

10        **MS. ROOHANI:**  Your Honor, I'd just like to make a

11   standing hearsay objection based upon the form of the question

12   that Ms. Connolly's asking over and over about the e-mail.

13        **THE COURT:**  What is the objection about the form of

14   the question?

15        **MS. ROOHANI:**  She keeps asking about whether he wrote

16   something in the e-mail specifically referring to this e-mail.

17   The e-mail itself is hearsay as Your Honor has indicated to

18   her she can ask about things that he said, but the fact that

19   it's in an e-mail and she's asking it for the truth, that's

20   hearsay.

21        **THE COURT:**  She's not asking what the e-mail says.

22   She's asking if he put that in an e-mail.  So that's not

23   hearsay.

24        **THE WITNESS:**  Can you ask the question again, I'm

25   sorry, because I've already forgot it.

```
 1    BY MS. CONNOLLY:

 2    Q.   In that e-mail you indicated that you and Michael Sanft

 3    had been working together on Jan's case.  Correct?

 4              MS. ROOHANI:  And, Your Honor, I'm going to object.

 5    She said in that e-mail, specifically referring to this

 6    e-mail.

 7              THE COURT:  To be clear, she's referring to

 8    Exhibit C.

 9    BY MS. CONNOLLY:

10    Q.   You made representations that you and Michael Sanft had

11    been working together on Jan Rouven's case?

12    A.   Yes.

13    Q.   You indicate that both you and Mr. Sanft were ready to go

14    to trial in Jan's case in June or July?

15    A.   Yes.

16    Q.   You indicated that, if Jan went to trial with

17    Mr. Marchese, that he was going to be convicted?

18    A.   No.

19    Q.   Okay.  Looking at the first page of the e-mail -- we'll

20    go through it paragraph by paragraph -- you indicated

21    initially that you had done a significant amount of sex cases

22    on a regular basis.

23    A.   Yes.

24    Q.   Okay.  And you indicated that one of the reasons you were

25    successful is that you force the Government to go to trial
```

BENJAMIN JAMES NADIG - Direct Examination

1    immediately.  Correct?

2    A.    If you're paraphrasing.  If we're talking specifically

3    about Jan's case, yes, we believed it was more advantageous.

4    Q.    In the e-mail you indicated that you had success on these

5    types of cases by forcing the Government to go to trial

6    quickly.  Correct?

7    A.    If you say it's in there, yes.  I haven't read this in a

8    long time.

9    Q.    It's right there on -- would it help refresh your

10   recollection to read the e-mail, the first paragraph?

11   A.    I'm -- I'm telling you, if it's in there, I -- yes.

12   Q.    And the next paragraph you indicate that you and Michael

13   spent a significant amount of time on the case --

14   A.    Yes.

15   Q.    -- and that you had gone through the discovery with

16   Mr. Sanft?

17   A.    Yes.

18   Q.    You indicated that one of Jan's experts had been excluded

19   because of Mr. Marchese's interaction with opposing attorneys?

20   A.    Yes.

21   Q.    Isn't it true in the e-mail you indicated that, in

22   October, Jan was going to be found guilty?

23   A.    I believed that -- and I don't -- once again, I didn't

24   read it.  If you say it's in there.  But I believe that what I

25   was trying to express, if it wasn't clear --

BENJAMIN JAMES NADIG - Direct Examination

```
 1   Q.   Okay.  Isn't it -- isn't it true you stated as follows:
 2   "This is what's going to happen in October.  Mr. Marchese is
 3   going to suggest that Kevin, not you, not Jan, is the person
 4   behind the downloading.  The United States Government, having
 5   already prepared for that defense, is going to provide
 6   irrefutable proof as to how that is impossible, and Jan is
 7   going to be found not [sic] guilty"?
 8           MS. ROOHANI:  Objection.  Hearsay.
 9   BY MS. CONNOLLY:
10   Q.   "Found guilty."  Excuse me.
11           MS. CONNOLLY:  It's not hearsay.  It's his own
12   written word.  He's right here.
13           MS. ROOHANI:  Your Honor, she's reading the e-mail
14   into the record.
15           MS. CONNOLLY:  Because he didn't recall it.
16           THE WITNESS:  I don't recall saying I wouldn't be
17   able to have my recollection refreshed by that.  However --
18           MS. CONNOLLY:  It's direct examination.  I'm asking
19   about his own writing.
20           THE COURT:  I'll allow it.  We already have Exhibit C
21   admitted.
22           MS. CARTIER-GIROUX:  It wasn't admitted -- it's not
23   admitted for the truth.  It's admitted to show Mr. Marchese's
24   state of mind.
25           THE WITNESS:  I believe that Jan would be found
```

BENJAMIN JAMES NADIG - Direct Examination

1    guilty based on the defense that was initially posited, yes.

2    **BY MS. CONNOLLY:**

3    Q.    You thought he'd be found guilty if he was represented by

4    Mr. Marchese, correct, and that's what you communicated in

5    this communication?

6    A.    No.

7    Q.    That's not what you're saying here?

8    A.    No.  I'm saying the defense presented by Mr. Marchese is

9    incorrect.

10   Q.    Okay.  You indicated, "in October Mr. Marchese is going

11   to" -- you indicate in here what you believe Mr. Marchese's

12   defense was going to be and that, in your opinion, Jan would

13   be found guilty.  Correct?

14   A.    Correct.

15   Q.    And you indicated that rather than defending Mr. Rouven,

16   Mr. Marchese's focus was to get his friends paid rather than

17   raising an adequate defense?

18   A.    I felt at the time this e-mail was written that Jess'

19   focus was compromised.

20   Q.    Okay.  And in the e-mail you indicated that you believed

21   that Jan's [sic] focus was getting his friends paid rather

22   than raising an adequate defense.  Correct?

23   A.    At the time I wrote this e-mail -- and that was --

24   Q.    I'm asking you about what you wrote in the e-mail.

25   A.    That's what I was -- wrote in the e-mail.  However, that

BENJAMIN JAMES NADIG - Direct Examination

1    was not the intent.

2    Q.    Okay.  I don't have another question.  That was my

3    question.

4    A.    Okay.

5    Q.    And then you indicated that you and Michael together have

6    spent hundreds of hours preparing a -- raising a plausible

7    defense?

8    A.    I felt we had.

9    Q.    You indicated that you and Mr. Sanft had obtained not

10   guilty verdicts on these types of cases in Federal Court?

11   A.    We had a -- Byington was the one we did together --

12   Q.    My question was you represented that?

13   A.    Yes.

14        **MS. ROOHANI:**  And, Your Honor, at this point it seems

15   as though this is being offered for the truth.  So I'm going

16   to just withdraw my hearsay objection and I'm also going to

17   object to this line of questioning as being cumulative.  At

18   this point the e-mail speaks for itself.  Mr. Nadig has

19   indicated that he authored this e-mail.  So I believe Your

20   Honor can just read this e-mail.  We don't need to go through

21   this line of questioning.

22        **THE COURT:**  Ms. Connolly?

23   **BY MS. CONNOLLY:**

24   Q.    You never obtained a not guilty on a child pornography

25   case in Federal Court, have you?

BENJAMIN JAMES NADIG - Direct Examination

1    A.   Was there a --

2              MS. ROOHANI:  Your Honor, was there a ruling on my

3    objection?  I'm sorry.

4              THE COURT:  Now she's asking the question in the

5    right form.

6              THE WITNESS:  Oh.  Okay.  Can you re-ask that

7    question?

8              We have obtained --

9    BY MS. CONNOLLY:

10   Q.   I'm talking about you.  You have not --

11   A.   Yes --

12   Q.   -- obtained any --

13   A.   -- Mike and I have.  On Byington specifically we had not

14   guilties.  He was found guilty of possession; however, he was

15   not found guilty of the other charges associated with --

16   Q.   So that -- and you had one case in Federal Court --

17   A.   And Mike had others.

18   Q.   The one case in Federal Court, your client was acquitted

19   on one charge and convicted on the second charge.  Correct?

20   A.   Correct.

21   Q.   So you initially testified that you were retained to just

22   represent Mr. Alfter; however, you acknowledge that you sent

23   an e-mail to Mr. Alfter representing that you represented him

24   and also that you were representing Jan and had worked on

25   Jan's case with Mr. Sanft?

BENJAMIN JAMES NADIG - Direct Examination

1   A.   Once again, the situation was fluid.

2   Q.   My question was you made that representation?

3   A.   I did.  I did.  As you're characterizing it, I did.

4   Q.   Do you have -- did you obtain -- you didn't -- did you

5   obtain a signed written retainer agreement or letter of

6   retention setting forth what your -- who you were

7   representing?

8   A.   We did not do that.

9   Q.   You never appeared on the record as -- as counsel of

10  record.  Right?  It was Mr. Sanft who appeared as counsel of

11  record?

12  A.   Correct.

13  Q.   How much money were you paid for your retention on this

14  case?

15          MS. ROOHANI:  Your Honor, I'm going to object to the

16  characterization of this case.  He's testified that he

17  represented Mr. Alfter who's not a party to this.

18          MS. CONNOLLY:  And I believe I initially --

19          THE COURT:  He said the representation was fluid.

20          THE WITNESS:  The initial payment was $200,000.  It

21  was split evenly between Mike and I.

22  BY MS. CONNOLLY:

23  Q.   And when did you receive those funds?

24  A.   I have no idea.

25  Q.   Was it around about --

BENJAMIN JAMES NADIG - Direct Examination

1    A.    It was -- it was roughly around the time of
2    Mr. Fuechtener's detention hearing.
3    Q.    Okay.  So March 2016, right about that?
4    A.    If you say so.  Roughly, yes.
5    Q.    And -- and, at some point in time, you were term -- your
6    services were terminated.  Correct?
7    A.    No.
8    Q.    Okay.  You were never -- you were never terminated as
9    counsel?
10   A.    No.
11   Q.    You were never asked for a refund?
12   A.    I was asked for a refund.  I was never terminated.  The
13   refund was specific as to Mike's representing Jan.
14   Q.    Okay.  And this e-mail that you authored, was that -- you
15   authored, was that sent out after a refund was requested?
16   A.    It was sent after Mike was terminated, yes.  I -- I -- I --
17   I'm going to assume after the other time, yes, but I don't
18   know for sure.
19   Q.    And after this -- this e-mail that was authored, it was
20   dated September 3, 2016, after that, isn't it true that you
21   went and you met with Jan at -- in custody?
22   A.    I did meet with Jan after speaking with Frank.
23   Q.    And before you did that, you did not contact Mr. Marchese
24   and advise him that you were going to go and meet with Jan,
25   did you?

BENJAMIN JAMES NADIG - Direct Examination

```
 1    A.    Correct.

 2    Q.    And during that meeting with Jan, you caused him to be

 3    very alarmed about the representation he was receiving from

 4    Mr. Marchese?

 5            MS. ROOHANI:  Objection.  Calls for speculation.

 6            THE COURT:  Can you repeat the question?  I'm not

 7    sure I understood the question.

 8    BY MS. CONNOLLY:

 9    Q.    During --

10            MS. CONNOLLY:  I'll rephrase it.

11    BY MS. CONNOLLY:

12    Q.    You had a meeting with Jan in September of 2016 where you

13    expressed your concern about the representation he was

14    receiving from Mr. Marchese?

15    A.    I went and saw him after talking to Frank, and, yes, we

16    did talk about the concerns about the theory of defense.

17    Q.    And would it be fair to say that, as a result of that

18    conversation or during that conversation, that Jan became very

19    upset?

20            MS. ROOHANI:  Objection.  Calls for speculation.

21            MS. CONNOLLY:  I'm --

22            THE WITNESS:  I mean, if you want me to answer it, I

23    don't recall him becoming upset.

24    BY MS. CONNOLLY:

25    Q.    Okay.  Did he become emotional?
```

BENJAMIN JAMES NADIG - Direct Examination

```
 1    A.    No.

 2    Q.    Okay.

 3    A.    No.  Jan has never been emotional with me.

 4    Q.    Okay.  As a result of -- did you make suggestions to

 5    Mr. Jan Rouven during that meeting as to what he should do in

 6    terms of his defense moving forward?

 7    A.    I told him he should really think about having Mike on

 8    the case.  He expressed concerns about Jess and the things

 9    Jess was doing.  He talked about liking Amber, but now there

10    was a mess with Amber.  I don't know if it was around that

11    time.  He liked Ben Durham.  But, no, I just -- my focus when

12    talking to Jan, after talking to Frank, was to explain to him

13    the inadequacies that I saw and that Mike agreed with

14    regarding the specific defense that was being presented.

15    Q.    So you were concerned about the representation that he

16    was receiving from Marchese and thought he'd be better served

17    with getting Mike back on the case?

18    A.    No.  I thought that, if he had a different theory of

19    defense, he would have a better chance, and I think that he

20    needed more than one perspective in terms of that theory of

21    defense.

22    Q.    And you indicated you -- you spoke with him and he was

23    up -- he was --

24    A.    I never said he was upset.

25    Q.    So you had expressed your reservations about the
```

BENJAMIN JAMES NADIG - Direct Examination

1   representation he was receiving; is that fair to say?

2   A.   No.  I never questioned Jess' -- when I talked to Jan, I

3   never questioned Jess' ability.  I questioned his theory of

4   defense.

5   Q.   And you indicated to Jan that, given the theory of

6   defense and the representation he was receiving, that he was

7   going to be convicted and he should bring Mike back on the

8   case?

9   A.   I thought it was very -- I thought it would have been a

10  smarter move to address some other issues that were being

11  presented.

12  Q.   And you mentioned you had a discussion with him about

13  Amber Craig?

14  A.   Yes.  I had known --

15  Q.   I just want to --

16  A.   Okay.  Yes.

17  Q.   -- orientate you.

18  A.   I -- I don't know when, but yes.

19  Q.   So, at some point in time, you -- after you became aware

20  that Amber Craig had been brought onto the case by Jess

21  Marchese and then she had subsequently been removed from the

22  case?

23  A.   Correct.

24  Q.   Okay.  And you spoke with -- you had a discussion with

25  Jan about that?

BENJAMIN JAMES NADIG - Direct Examination

```
 1    A.    I think the first time I talked to him about Amber he was
 2    happy that she was on the case, and then later she wasn't.
 3    And then Frank had directed me to go see Jan, and we talked
 4    about her getting off the case.  I don't recall exactly.
 5    Q.    And so -- so after Amber was removed, fair to say you
 6    went to meet with Jan in the holding facility?
 7    A.    Any time I met with Jan it was either at Frank's request
 8    or somebody else's request.
 9    Q.    Okay.  And Jan was concerned about the fact that Amber
10    had been removed from his case --
11            MS. ROOHANI:  Object --
12    BY MS. CONNOLLY:
13    Q.    -- accurate?
14            MS. ROOHANI:  Objection.  Hearsay.  Calls -- answer
15    calls for hearsay.
16            MS. CONNOLLY:  I said -- I didn't ask him for what he
17    said.  I asked him if he was concerned.
18            MS. ROOHANI:  Which is the same thing as asking what
19    he said.
20            THE COURT:  Sustained.
21    BY MS. CONNOLLY:
22    Q.    How was -- how was Jan's demeanor when you met with him
23    after Amber Craig had been removed from the case?
24    A.    Jan's demeanor with me was always upbeat.  Jan was always
25    very happy-go-lucky.  Whenever he was talking about something
```

1    serious, his smile would go away and he would have just a
2    straight -- you know, his mouth would be straight, but there
3    was never any distress on Jan's part.
4    Q.   Okay.  But after -- after your meeting with him, are you
5    aware that Mr. Sanft was, indeed, brought back on the case?
6    A.   Yes.
7    Q.   And when you had -- so we're talking you had a meeting
8    with him in September, and then you had a meeting with him
9    after Amber Craig was removed from case; is that accurate?
10          MS. ROOHANI:  Your Honor, can we narrow down the
11   specific date and time frame?
12   BY MS. CONNOLLY:
13   Q.   Did you meet with -- if you look at Exhibit A, it's in
14   front of you, if you would turn to September -- turn to
15   September 7.  It indicates you met with Jan Rouven on
16   September 7.  Is that -- do you have any reason to dispute
17   that?
18   A.   No, I don't.
19   Q.   Okay.
20   A.   And just for the record, I don't know where Exhibit A is.
21   Oh, it's right in front of me.  Okay.
22   Q.   Okay.  Would that be on the September 7 meeting where you
23   expressed your concern to Mr. Rouven about the representation
24   that he was going -- he was -- he was getting, essentially?
25   A.   Once again, every time it was about the theory of the

BENJAMIN JAMES NADIG - Direct Examination

1    case.

2    Q.   And then you, again, met -- your recollection is that

3    you, again, met with Mr. Rouven after Amber Craig was removed

4    from the case, and if I represent that was in October of 2016,

5    would that refresh your recollection?

6    A.   Yeah.  Yeah.  I mean, and to be fair, that might be

7    something I learned through Mike, but I could have sworn I met

8    with him after that.  But I don't know for sure.

9    Q.   And your purpose of that meeting was to convince him to

10   bring Mike back on the case?

11   A.   No.  I told him my issues with the case, and Jan, I'm

12   assuming, talked with Frank to determine what they wanted to

13   do.

14   Q.   And, again, before -- before both of those meetings, you

15   never communicated with Mr. Marchese to request his permission

16   to meet with his client?

17   A.   No.  Any time I went there, I was either directed by

18   Frank or somebody else.

19   Q.   Did you ever obtain any kind of written waiver from

20   either Frank -- or did you ever obtain any kind of waiver from

21   Frank or Jan permitting you to discuss Jan with Frank or Frank

22   with Jan?

23   A.   Did I receive any written waiver?

24   Q.   Yeah, did you obtain --

25   A.   No, I did not obtain a written waiver.

BENJAMIN JAMES NADIG - Direct Examination

1    Q.    How many times do you recall that you met with Jan

2    during -- from February of 2016 through November of 2016, do

3    you recall?

4    A.    I have no idea.

5    Q.    Okay.  Did he contact you in January of 2017 again, or

6    did he contact you at any time after he'd entered his guilty

7    plea?

8    A.    He definitely did.  At least once, if not twice.

9    Q.    Do you remember when?

10   A.    I'm sure that it was within a week of the plea.

11   Q.    And was the -- was the purpose of that conversation to

12   express to you that he was not content with his plea or he

13   sought to withdraw his plea?

14            **MS. ROOHANI:**  Objection.  Calls for hearsay.

15            **THE COURT:**  Sustained.

16   **BY MS. CONNOLLY:**

17   Q.    As a result of those conversations, did you make any

18   suggestions to Mr. Rouven as to what he should do?

19   A.    I believe I talked to him about withdrawing his plea if

20   he felt he had an issue with it.

21   Q.    At any point in time, did you have any words with

22   Mr. Marchese about your meeting with Mr. Rouven or your -- or

23   what had been communicated to Mr. Rouven about statements you

24   had made about Mr. Marchese?

25   A.    No.

BENJAMIN JAMES NADIG - Direct Examination

1    Q.    You never had any discussions with him about that?

2    A.    No.

3    Q.    But there was some written communications back and forth.

4    Correct?

5    A.    Honestly, I don't recall.  There might have been.  I -- I

6    honestly don't recall.

7              MS. CONNOLLY:  Court's indulgence.

8    BY MS. CONNOLLY:

9    Q.    In December of 2016, did you have anyone from your office

10   go meet with him, Jan, to discuss the guilty plea that he had

11   signed, if you recall?

12   A.    I'm sorry?  I'm either hard of hearing or you spoke

13   really softly and I didn't hear you.

14   Q.    In December of 2016, did you direct anyone from your

15   office to go meet with Jan to discuss his case or his plea?

16   A.    Was that post plea?

17   Q.    Yes.

18   A.    Okay.  I don't know.  If it was about withdrawing his

19   plea, Matsuda might have gone and saw -- seen him.  Jess

20   Matsuda.  Wait.  December 2016.  Maybe Liz.  Was Liz working

21   for me then?  Maybe.

22             MS. CONNOLLY:  I don't have anything further.  Thank

23   you.

24             THE COURT:  Cross, Ms. Roohani?

25             MS. ROOHANI:  Yes, Your Honor.

BENJAMIN JAMES NADIG - Cross-Examination

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MS. ROOHANI:** |
| 3 | Q.   Hi, Ben. |
| 4 | A.   Hey there. |
| 5 | Q.   Ben, Karen was asking you a bunch of questions about this |
| 6 | e-mail. |
| 7 | A.   Yes. |
| 8 | Q.   And then she wasn't letting you answer the question. |
| 9 | A.   Yes. |
| 10 | Q.   So can you explain this e-mail to me? |
| 11 | A.   This e-mail was borne out of frustration, to be fair.  We |
| 12 | had been removed from the case.  There had been a bit of a |
| 13 | contentious relationship between Jess and Mike and I regarding |
| 14 | the theory of the case, and there were things that we felt |
| 15 | should have been done sooner, and there were issues that arose |
| 16 | from not doing those things sooner. |
| 17 | Q.   And, really, this e-mail's about a fee dispute.  Right? |
| 18 | A.   When all's said and done, that's part of it, yeah. |
| 19 | Q.   Okay.  And has a Bar complaint ever been filed against |
| 20 | you for this fee dispute? |
| 21 | A.   Yep. |
| 22 | Q.   For the fee dispute specifically? |
| 23 | A.   No. |
| 24 | Q.   Okay.  And Mr. Alfter, did he ever follow up with you |
| 25 | after he sent this original e-mail? |

BENJAMIN JAMES NADIG - Cross-Examination

```
 1    A.    After he sent this e-mail, yeah, Frank and I talked.
 2    Q.    Okay.
 3    A.    I mean, he was the one who directed me to go see Jan
 4    after I sent this e-mail.
 5    Q.    So you had a continued relationship with him after that?
 6    A.    Correct.
 7    Q.    He didn't ask you back for his money again after that.
 8    Right?
 9    A.    He did not.
10    Q.    And, really, any dispute that you and Jess and Mike may
11    have had was about the theory of the defense?
12    A.    In my opinion, yes.
13    Q.    It wasn't a personal conflict between you-all?
14    A.    No.  I genuinely like everybody who's associated with
15    this case.
16    Q.    Would it be fair to say that your theory of the defense
17    was go to trial as quickly as possible, don't let the
18    Government get more forensic evidence against Jan --
19    A.    And more jail calls.
20    Q.    And more jail calls, and try to blame somebody else?
21    A.    Yeah.  I mean, obviously it's not our job to pin the --
22    it on somebody but to just show the chaotic nature of Jan's
23    life and to show that there were other people in the house
24    constantly and you don't have to pin it on anybody but that it
25    could have been one of a multitude of people.
```

BENJAMIN JAMES NADIG - Cross-Examination

```
 1    Q.    Okay.  Fair enough.
 2          You expressed that to Jan relatively early in the
 3    case?
 4    A.    And, yes, other people.
 5    Q.    And you also -- and Frank?
 6    A.    Yes.
 7    Q.    And Jess?
 8    A.    Yes.
 9    Q.    And Mike?
10    A.    Correct.
11    Q.    Multiple conversations were had about that theory of the
12    defense?
13    A.    Correct.
14    Q.    And there was also Jess' theory of the defense?
15    A.    Yes, which was the idea of pirated signals.
16          MS. CONNOLLY:  Objection.  Hearsay of what Jess'
17    theory of the defense was.
18  BY MS. ROOHANI:
19    Q.    What was your understanding of the theory of the defense
20    that Mr. Marchese and Mr. Sanft --
21    A.    My understanding in the meetings --
22          MS. CONNOLLY:  Foundation.
23          THE COURT:  Lay a foundation.
24          MS. ROOHANI:  Certainly.
25    ///
```

BENJAMIN JAMES NADIG - Cross-Examination

1    BY MS. ROOHANI:

2    Q.    There was a conflict about the theory of the defense?

3    A.    There was a conflict.

4    Q.    Mr. Marchese and you had conversations about his theory

5    of the defense?

6    A.    Correct.

7    Q.    And you had an understanding that you -- you understood

8    something about his theory of the defense?

9    A.    Correct.

10   Q.    That was ultimately communicated to Jan?

11   A.    Correct.

12   Q.    That was ultimately communicated to Frank?

13   A.    Yep.

14   Q.    And it was communicated to Mike?

15   A.    True.

16   Q.    And you all had a conversation about it?

17   A.    Yes.

18   Q.    And what was your understanding about the theory of the

19   defense that Mr. Marchese wanted to put forward?

20         MS. CONNOLLY:  Objection.  Calls for hearsay.

21   Anything Mr. Marchese said is hearsay.

22         THE COURT:  Sustained.

23         MS. ROOHANI:  Your Honor, I'm specifically asking

24   what his understanding was, and it's not necessarily what

25   Mr. Marchese specifically told him.

BENJAMIN JAMES NADIG - Cross-Examination

```
 1              THE COURT:  It is offered for the truth, isn't it?

 2              MS. ROOHANI:  It's only offered, Your Honor, to show

 3    that it's not about a personal conflict but rather a

 4    distinction between a theory of the defense, not that it's --

 5    what the theory of the defense is but only that it was

 6    different than the theory of the defense Mr. Nadig had.

 7              THE COURT:  I think you can do that without hearsay

 8    if you say there was two different theories of defense and

 9    there was a disagreement between the theory of defense.

10    BY MS. ROOHANI:

11    Q.   Would it be fair to say Mr. Marchese's defense was not

12    the same as your defense?

13    A.   That is a fair statement.

14    Q.   Okay.  Would it be fair to say that Mr. Marchese's theory

15    of defense and one of the things that was explored through the

16    experts that you met with was hacking?

17    A.   That was discussed.

18    Q.   And those are conversations that also sometimes

19    originated from Jan --

20              MS. CONNOLLY:  I'm going to object to -- ongoing

21    objection to anything that anybody else said.

22              MS. ROOHANI:  And, Your Honor, I'm speaking

23    specifically about the origination from the defendant, and

24    it's not hearsay because he's a party opponent.

25              MS. CONNOLLY:  It is hearsay.  Mr. Marchese
```

BENJAMIN JAMES NADIG - Cross-Examination

1    testified.

2              **THE COURT:**  What are you asking this witness?

3              **MS. ROOHANI:**  I'm asking whether one of the theories

4    of the defenses, which was hacking, originated from the

5    defendant, where he's the one who came up with that theory of

6    the defense.

7              **THE COURT:**  And what is the relevance?

8              **MS. ROOHANI:**  Just to -- again, Your Honor, to show

9    that there's two different theories of the defense, and that

10   Mr. Fuechtener actually had control over his defense.  So this

11   whole conflict is being manufactured by Mr. Fuechtener when

12   he's the one directing the case.

13             **THE COURT:**  But he's not claiming that he -- his

14   defense theory was not pursued at trial.  He's claiming he

15   didn't understand the terms of the plea agreement.

16             **MS. ROOHANI:**  He's also -- and I -- this is another

17   part of the motion, Your Honor.  That the relationship between

18   these attorneys was so contentious that he felt coerced into

19   entering into this plea.  But if the contention was

20   manufactured by him, he can't then complain of that coercion.

21             **THE COURT:**  So you're claiming he manufactured two

22   different theories of defense and then fed them to two

23   different attorneys to create a conflict?

24             **MS. ROOHANI:**  No, Your Honor.  I'm -- I'm -- I

25   guess -- well, I'm proffering, I guess, is that, if the

BENJAMIN JAMES NADIG - Cross-Examination

```
 1    contention arose because the attorney that he chose to proceed
 2    to trial with was pursuing the defense that he came up with,
 3    he cannot then come back and say, "Well, there was a
 4    contention because a different attorney gave me a different
 5    defense, and we ultimately ended up not going with that
 6    defense."
 7             THE COURT:  I'm not going to comment on the
 8    reasonable -- reasonableness or persuasive -- that's an
 9    argument that you can make.
10             MS. ROOHANI:  Okay.
11             THE COURT:  That doesn't seem it has anything to do
12    with the testimony of this witness.  We're here to see what he
13    did, what he didn't do.
14             MS. ROOHANI:  Okay.
15    BY MS. ROOHANI:
16    Q.   You indicated that there was a Bar complaint filed
17    against you in this case?
18    A.   Correct.
19    Q.   By Mr. Marchese?
20    A.   Correct.
21    Q.   It was ultimately resolved in your favor?
22    A.   Correct.
23    Q.   So, as far as you know, no action was taken against you?
24    A.   Correct.
25    Q.   And do you and Mr. Marchese have a professional
```

BENJAMIN JAMES NADIG - Cross-Examination

1   relationship at this time?

2   A.   We do.

3   Q.   You indicated that Mr. Fuechtener has never been

4   emotional with you?

5   A.   I mean, yeah, no, he's -- he's very demonstrative, but,

6   no, he's not -- no, he's not -- he's pretty even keel.

7   Q.   Okay.  Wasn't anxious when you had this conversation with

8   him about the two different theories of the defense?

9   A.   No.  It was more of like a tired parent, I guess is the

10  best way to put it, who's dealing with squabbling children.

11  Q.   Okay.

12  A.   That was what I experienced from Jan, which was kind of

13  funny to me.

14  Q.   And -- and did you indicate to Jan that he was going to

15  lose or win or his chances of winning or losing with any

16  particular theory of the defense?

17  A.   I did say that he would lose with this hacking idea.  I

18  did.  Because there were things found in areas that you

19  couldn't ascribe to hacking.  But did I say he would win with

20  the other one?  No.  Because I never say that.  I would never

21  tell a client that they are going to win.  If I know they're

22  going to lose on something, I will be very honest about that.

23  But I will never, ever tell a client you are going to win.  I

24  say you have a better chance or something to that effect.  But

25  the words "win" never cross my lips.

BENJAMIN JAMES NADIG - Cross-Examination

1    Q.    And you weren't here present at trial?

2    A.    I deliberately avoided trial.

3    Q.    Okay.  So you don't know if a hacking defense was

4    ultimately --

5    A.    I have no idea what happened at trial.

6    Q.    And when you went to the Henderson facility at the

7    direction of Mr. Alfter, does -- and because I don't

8    understand this.  Does a person -- and a person who's

9    incarcerated have the ability to refuse to see you?

10   A.    Yes.

11   Q.    And Jan didn't refuse to see you?

12   A.    Never.

13   Q.    And that was despite the fact that he knew that you

14   represented his husband?

15   A.    Correct.

16   Q.    And despite the fact that he knew was -- you -- or he was

17   represented by Mr. Marchese and Mr. Durham at that --

18          **MS. CONNOLLY:**  Objection.  Speculation as to what he

19   knew or did not know.

20          **THE WITNESS:**  I can -- I might know.

21          **MS. CONNOLLY:**  No.  As to what my client knew or did

22   not know.

23          **THE WITNESS:**  I --

24          **THE COURT:**  Sustained.

25   ///

BENJAMIN JAMES NADIG - Cross-Examination

1   BY MS. ROOHANI:

2   Q.   Did you ever have a conversation with Jan about who you

3   represented?

4   A.   Yes.  But those conversations were more direct and

5   forceful with his husband.

6   Q.   So you made clear to Mr. Alfter that you represented

7   Mr. Alfter?

8   A.   Yes.

9        MS. CONNOLLY:  Assumes facts not in evidence.

10       THE COURT:  Overruled.  You can continue.

11  BY MS. ROOHANI:

12  Q.   You expressed to Mr. Alfter that you represented

13  Mr. Alfter?

14  A.   Yes.

15  Q.   You expressed to Mr. Alfter that you did not represent

16  Jan?

17  A.   Yes.

18  Q.   Now, you indicated that you didn't receive a written

19  waiver.  Did you receive an oral waiver from Jan and Frank to

20  speak with each of them?

21  A.   With --

22       MS. CONNOLLY:  Objection.  Objection.  It would be

23  hearsay if it's not my client.  The only one he can comment

24  about is my client.

25       THE COURT:  Sustained.

BENJAMIN JAMES NADIG - Cross-Examination

 1  BY MS. ROOHANI:

 2  Q.   Did Jan ever give you a waiver to talk to Mr. Alfter

 3  about the nature of his case?

 4  A.   Yes.  Definitely.

 5  Q.   Did Jan ever tell you that you were free to come and

 6  visit him at any time?

 7  A.   Jan requested me to visit him quite often.

 8  Q.   Now, you indicated that you represented Mr. Alfter?

 9  A.   Yes.

10  Q.   But you said that the situation at some point was fluid?

11  A.   Yes.

12  Q.   Can you explain that, please.

13  A.   The situation was, in my experience, I believed -- and as

14  it was pled -- he was identified, I believe -- and you can

15  correct me if I'm wrong -- as an unindicted individual.  I

16  believed that -- and during the course and scope of the

17  investigation that Mr. Marchese was pursuing, that potentially

18  Frank would run into some issues.  Frank, without going into

19  the conversations we had, did not believe he would ever be

20  charged --

21            MS. CONNOLLY:  Objection.

22            THE COURT:  Sustained.

23  BY MS. ROOHANI:

24  Q.   Okay.  At some point, you believe that Jan and Frank did

25  not necessarily have antagonistic defenses?

BENJAMIN JAMES NADIG - Cross-Examination

```
 1    A.    Correct.

 2    Q.    Okay.  And that was fairly early on in the case?

 3    A.    Correct.

 4    Q.    And fairly early on in the case -- and I'm talking before

 5    June/July.  It would be fair to say that you were working with

 6    Mr. Marchese and Mr. Sanft on a mutual defense?

 7    A.    Correct.

 8    Q.    That, in the event that Frank was going to be indicted,

 9    there would be potentially a mutual defense that was not

10    antagonistic?

11    A.    Correct.

12          MS. CONNOLLY:   I'll object to assumes facts not in

13    evidence.

14          THE COURT:   Overruled.

15    BY MS. ROOHANI:

16    Q.    But, at some point, it became clear to you that somebody

17    was going to try to blame Frank?

18    A.    Yes.

19    Q.    At what point was that?

20    A.    September, October, November, right around the time that

21    it was going to trial, the case had turned in such a way and

22    the discovery had come down in such a way that it appeared, to

23    me, that there was no way Jan's defense could not involve

24    Frank as an alternative suspect.

25    Q.    And, at that point, did you stop having communications
```

1  with Mr. Fuechtener?

2  A.   Most -- yes.  Up until -- until after -- until after

3  plea, yes.

4  Q.   Until after the plea.

5        And after the plea, Mr. Fuechtener reached out to

6  you?

7  A.   He did.

8  Q.   Okay.  Shortly after the plea, I believe you testified?

9  A.   As I testified, within a week, I believe.

10  Q.   And during that conversation, did he talk to you about

11  withdrawing the plea?

12  A.   He did.

13  Q.   And did he indicate to you, at any point, that his

14  concern was not understanding the guideline range?

15  A.   That was never mentioned.

16  Q.   Did he ever mention the sentencing guidelines at all?

17  A.   Never.

18  Q.   Did he tell you that his concern was what he was

19  ultimately admitting to his fans?

20  A.   No, that's not what we talked about.

21  Q.   But, to be fair, it wasn't because he didn't understand

22  the guidelines?

23  A.   Correct.  100 percent.

24        **MS. CONNOLLY:**  Objection.  Calls for speculation of

25  what he understood or didn't -- what my client did or didn't

```
1    understand.

2              THE COURT:  Sustained.  You want to lay a foundation?

3              MS. ROOHANI:  Sure.

4    BY MS. ROOHANI:

5    Q.   Mr. Fuechtener called you?

6    A.   He did.

7    Q.   He talked to you about withdrawing his guilty plea?

8    A.   He did.

9    Q.   He specifically gave you reasons why he wanted to

10   withdraw his guilty plea?

11   A.   He did.

12   Q.   And one of those reasons was not "I didn't understand the

13   guideline range"?

14   A.   There were two, and that was not one of them.

15             MS. ROOHANI:  Brief indulgence, Your Honor.

16             THE COURT:  Well, it's 4:00 o'clock now.

17             MS. ROOHANI:  Just one moment.

18             THE WITNESS:  I'll speed, Your Honor.  I just have to

19   pick up my daughter.

20             MS. ROOHANI:  Your Honor, I'll pass the witness.

21             THE COURT:  Well, it's 4:00 o'clock.  So we're going

22   to go ahead and take a break and come back on Tuesday, May 20

23   at 1:00 p.m. with either Mr. Nadig or Mr. Humphries or both

24   or --

25             MS. CONNOLLY:  I have one -- I have one question for
```

BENJAMIN JAMES NADIG - Cross-Examination

1    him.

2              THE COURT:  All right.  One question.

3              MS. CONNOLLY:  Actually, never mind.  It would be

4    better if we just come back in hindsight.

5              THE COURT:  All right.  So be back here on Tuesday

6    March 20 at 1:00 p.m.

7              THE WITNESS:  Can I -- can I look at my calendar,

8    Your Honor?

9              THE COURT:  Yeah, you can work with counsel if you

10   need to be called in a different order.

11             THE WITNESS:  Okay.  Thank you.

12             THE COURT:  Because we had someone else who

13   couldn't -- couldn't testify today that's coming back as well.

14             All right.  So I did enter the order about

15   Mr. Humphries being held.  Right?

16             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

17             THE COURT:  Aaron, we've got that done?  Okay.  So

18   we'll just resume here, then, on Tuesday, the 20th, at

19   1:00 p.m.

20             MS. ROOHANI:  And, Your Honor, I'm sorry.  I actually

21   didn't hear the -- what is the separation order?  It is one

22   will be housed at Henderson and one will be housed at Pahrump

23   or --

24             THE COURT:  Just not housed together.

25             MS. ROOHANI:  Your Honor, can I also ask for a

BENJAMIN JAMES NADIG - Cross-Examination

1    no-contact order?  It's my understanding that there's

2    mechanisms by which, if they're housed in the same facility,

3    they can continue to contact each other.  So I'd ask for no

4    direct or indirect contact through other inmates or through

5    family members, et cetera.

6           **THE COURT:**  All right.

7           **MS. CONNOLLY:**  And my client had made the request

8    that he be able to remain at Pahrump because we're preparing.

9    He has all of his legal work and he indicated that, at

10   Pahrump, that he can be segregated from Mr. Humphries.  So he

11   was just request -- that was his request that he was making

12   with the Court.  I don't know if the Court has any control

13   over that.  He thinks you do but --

14          **THE COURT:**  All right.  I don't think I have -- I

15   don't have any control over that, but I'll recommend that.

16   Because it is Mr. Fuechtener who needs to be able to meet with

17   counsel to prepare for the hearing.  That if they do need to

18   be divided up into two different facilities, that

19   Mr. Fuechtener be permitted to remain at Pahrump.  All right.

20   So we'll see you back here on Tuesday.

21          **MS. CONNOLLY:**  Thank you.

22          **MS. ROOHANI:**  Thank you, Your Honor.

23          **COURTROOM ADMINISTRATOR:**  All rise.

24       *(Proceedings concluded at 3:59 p.m.)*

25       I, AMBER M. McCLANE, court-appointed transcriber, certify

BENJAMIN JAMES NADIG - Cross-Examination

1  that the foregoing is a correct transcript transcribed from

2  the official electronic sound recording of the proceedings in

3  the above-entitled matter.

4

5  /s/ *Amber M. McClane*                5/23/2018

6      Amber M. McClane, CCR 914         Date