TRANSCRIBED FROM DIGITAL RECORDING

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:16-cr-00100-GMN-CWH
 4             Plaintiff,         )
                                  ) Las Vegas, Nevada
 5   vs.                          ) May 11, 2018
                                  ) Courtroom 7D
 6   JAN ROUVEN FUECHTENER,       )
                                  )
 7                                ) Recording method:
               Defendant.         ) Liberty
 8   _____) 1:37 p.m. - 4:58 p.m.

 9                                  EVIDENTIARY HEARING, Day 4

10                          CERTIFIED COPY

11                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE GLORIA M. NAVARRO
12               CHIEF UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:    ELHAM ROOHANI, AUSA
                           LISA CARTIER-GIROUX, AUSA
16                         UNITED STATES ATTORNEY'S OFFICE
                           501 Las Vegas Boulevard South, Suite 1100
17                         Las Vegas, Nevada 89101
                           (702) 388-6336
18

19   (Appearances continued on page 2.)

20   Recorded by:          Araceli Bareng

21   Transcribed by:       Amber M. McClane, CCR 914
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25
```

TRANSCRIBED FROM DIGITAL RECORDING

1    APPEARANCES CONTINUED:

2    For the Defendant:

3         KAREN A. CONNOLLY, ESQ.
          KAREN A. CONNOLLY, LTD.
4         6600 West Charleston Boulevard, Suite 124
          Las Vegas, Nevada 89146
5         (702) 678-6700

6

7    Also Present:

8         MARI PANOVICH, FBI Special Agent

9

10   For Brett Alan Humphries:

11

          DUSTIN A. MARCELLO, ESQ.
12        PITARO & FUMO, CHTD.
          601 Las Vegas Boulevard South
13        Las Vegas, Nevada 89101
          (702) 474-7554
14                          * * * * *

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

1                    *I N D E X*

2   Defense's Witnesses:                                    Page

3   Jan Rouven Fuechtener

4        Continued Redirect Examination by Ms. Connolly      6

5        Recross-Examination by Ms. Roohani                  32

6        Further Redirect Examination by Ms. Connolly       103

7        Further Recross-Examination by Ms. Roohani         107

8        Further Redirect Examination by Ms. Connolly       111

9

10  Bret Alan Humphries

11        Direct Examination by Ms. Connolly                114

12

13                    *  *  *  *  *

14                  *E X H I B I T S*

15  EXHIBIT:      ADMITTED:

16                    (None offered.)

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

1          LAS VEGAS, NEVADA; FRIDAY, MAY 11, 2018; 1:37 P.M.

2                              --oOo---

3                      P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  All rise.

5          **THE COURT:**  Thank you.  You may be seated.

6          **COURTROOM ADMINISTRATOR:**  This is the time set for

7    the evidentiary hearing, Day 4, in

8    Case No. 2:16-cr-100-GMN-CWH, *United States of America versus*

9    *Jan Rouven Fuechtener.*

10         Counsel, please make your appearances for the record.

11         **MS. ROOHANI:**  Good afternoon, Your Honor.  Ellie

12   Roohani and Lisa Cartier-Giroux for the United States.  We are

13   joined at counsel table by Special Agent Mari Panovich.

14         **AGENT PANOVICH:**  Good afternoon.

15         **THE COURT:**  Good morning, Agent Panovich and

16   Ms. Giroux and Ms. Roohani.

17         **MS. CONNOLLY:**  Karen Connolly appearing with

18   Jan Rouven Fuechtener who's present.

19         **THE COURT:**  Good morning, Ms. Connolly.  Good

20   morning -- I'm sorry.  Good afternoon, Ms. Connolly.  Good

21   afternoon, Mr. Fuechtener.

22         So I understand that we don't have Mr. Humphries here

23   yet and we expect that he hopefully will be here by 3:00,

24   3:30.  But, in the meantime, we had not finished

25   cross-examination of Mr. Fuechtener.  So we can certainly make

TRANSCRIBED FROM DIGITAL RECORDING

```
1    use of our time, and if we need to take a break after that,
2    then we can.  But why don't we go ahead and get started
3    with -- or resuming Mr. Fuechtener's testimony.
4           MS. CONNOLLY:  And Judge, also, Mr. Marcello should
5    have been here.  My office has been in contact with his
6    office, and they've advised that they'll text him and make
7    sure that -- or text him and notify him that Mr. Humphries is
8    going to be here around 3:00.
9           THE COURT:  Is that him?  I think he -- I thought I
10   saw him through the door.
11          MS. CONNOLLY:  Oh.  There he is.
12          THE COURT:  All right.  Mr. Marcello, we don't have
13   Mr. Humphries yet.  I'm told that he is possibly going to be
14   transported and available between 3:00 and 3:30.  So should he
15   go wait, then, on the second floor to talk to him?
16          COURTROOM ADMINISTRATOR:  They will most likely bring
17   him straight up here, Your Honor.
18          THE COURT:  Okay.  Okay.  So we'll -- we'll --
19   I'll -- we'll take a break in between Mr. Fuechtener and
20   Mr. Humphries, and then see if there's any -- anything that we
21   need to address before we go forward with Mr. Humphries.
22          All right.  So, Mr. Fuechtener, come on up, sir.
23   We'll put you back up here on the witness stand.
24          COURTROOM ADMINISTRATOR:  Your Honor, would you like
25   me to swear in the defendant again since it's --
```

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1       **THE COURT:**  Yeah, let's go ahead and swear him in

2   again since it's been a while.

3       *(Defendant sworn.)*

4       **COURTROOM ADMINISTRATOR:**  Thank you.  You may be

5   seated.

6       Please state and spell your full name for the record.

7       **THE DEFENDANT:**  Jan Rouven Fuechtener.

8       **MS. CONNOLLY:**  May I proceed?

9       **THE COURT:**  Yes, you may.

10       **CONTINUED REDIRECT EXAMINATION**

11  BY MS. CONNOLLY:

12  Q.   Jan, when we were last here, you were asked some

13  questions about signing some documents when there was a search

14  warrant executed at your house, and you made a comment that

15  you were in a -- that you signed them quickly because you were

16  rushed.  Can you explain what you meant by that comment?

17  A.   That is referring to the document I signed in the car.

18  Q.   There was testimony --

19  A.   Yeah, it was --

20  Q.   -- about a document --

21  A.   It was like we had -- we had -- we had the main interview

22  in the morning in the car, and then I went back to the house

23  for a while.  And then I drove myself to the FBI building for

24  the polygraph.

25  Q.   And I believe you indicated that you didn't review

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    paperwork clearly because you had to rush for a show?

2    A.    And then, after this, my show was coming near.  It was,

3    like, I don't know, 4:00 or 5:00, and we wanted to go to my

4    home to look at some -- a list of passwords up.  And on the --

5    Q.    I think -- I think --

6    A.    -- on the way to the home, I realized -- I put in the

7    address in my navigation from the Tropicana.  I realized I

8    can't go home and then to the Tropicana.  I will be late for

9    the show.  So I -- the -- the lights.  They were driving in

10   front of me, and so I signalized them, hmm, there's

11   something -- there's an issue.  So they drove into a parking

12   lot and I followed.  And then I jumped into their car to say,

13   "Well, we can't go to my home now.  I will be late for the

14   show."  And then they came with that.

15          So I was in that rush, and they came with that

16   document, which I was supposed to fill out.  And then we ended

17   up not filling it out.  So that was a whole rush situation.

18   If I would have been -- if I would have had more time, I would

19   have probably looked better or more in detail.

20          It's like signing my tax return.  I trust my tax

21   lady, and I -- when I'm in a rush, I sign it.  And when I have

22   a little bit of time, I sit down with her and we go over it.

23   So that was the whole situation.

24   Q.    So your -- when you made that comment, you were

25   referencing you didn't really read the document because you

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1   were in a rush?

2   A.   No.  We talked about it, Ms. Panovich and -- and

3   explained it and --

4   Q.   Okay.

5   A.   -- but I didn't read it.  Like, I didn't -- as I said,

6   it -- I didn't perceive it as a document.  It was more like a

7   notepad, like --

8   Q.   Had you, in your practice in your life or your business,

9   signed documents without reviewing them carefully?

10   A.   Yes.

11   Q.   And why would you do that?

12   A.   Because I -- I trust the person who prepared the

13   document.  It was -- it was like an engagement contract.

14   Like, for example, that Tropicana contract was 60 pages.  And

15   there were also parts which the management has to sign because

16   the management has my management.  So technically I don't need

17   to sign, but certain pages I had to sign.  And I -- I trusted

18   my manager and -- and my lawyer, my entertainment lawyer.

19   They went over this for two months.  It took, like, two months

20   from the first draft through changes.  And then, of course,

21   I -- I signed.  I don't read the whole thing.

22   Q.   You made some comment about that you paid attention to

23   the artistic elements of the contract.  What do you mean by

24   that?

25   A.   Yes.  Like -- like, show times, when we can go on the

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    stage.  There was another show.  Everything which has to do

2    with -- with the show itself.

3    Q.   So you relied --

4    A.   Like fire.  We had a fire permit to get.  Those things I

5    looked over.  I looked over the things which I dealt with

6    beforehand to see if it's correct.  But that's -- that was,

7    like, two pages.  It was -- it was a separate part.

8    Q.   So you didn't really deal with the business aspects, is

9    that what you're saying?

10   A.   No.  If I have people I trust, if I go to Lowe's and buy

11   a washing machine and I'm alone and they show me something, of

12   course I look over it because I have never seen that.

13   Q.   But if you're relying upon someone else, then you rely --

14   A.   Yes.

15   Q.   -- upon -- okay.

16   A.   My -- my -- the person who prepares the tax return, I

17   just sign it and --

18   Q.   Okay.  You --

19   A.   Like, nowadays, when I log in, in Pahrump, to my e-mail

20   account, there's, like, two pages, which no one ever reads

21   that.  You know, you -- you click okay.

22   Q.   Okay.  But you made -- there was some questions about --

23   you were asked some questions about the documents that you

24   signed relative to the mortgage statements for your house.

25   Did you review all those, or did you rely upon somebody else

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1   telling you it was okay to sign them?

2   A.   Can you ask again?

3   Q.   Okay.  You were -- you were asked some questions about

4   the fact that you had a home.

5   A.   Yes.

6   Q.   And that you had obviously signed some documents,

7   mortgage/real estate documents, relative to purchasing and

8   financing that home.  Do you remember that?

9   A.   Yes.

10  Q.   And you were asked if you signed that without reading

11  everything.

12  A.   Yes.

13  Q.   And you indicated that you did.  Right?

14  A.   Yes.  That was the second home.  And even with the first

15  home, it's -- it's -- we had -- for every -- every time we had

16  a Realtor whom we trusted.

17  Q.   So you trusted --

18  A.   And we were friends, so we -- we trusted him.  We talked

19  about everything, and then he said this is basically a -- from

20  the Realtor's association.  It's like a standard contract to

21  fill in, and --

22  Q.   So you didn't --

23  A.   -- Frank checked that --

24  Q.   -- review --

25  A.   -- and I -- I signed it because I trusted him.  I trusted

the Realtor.

Q. Okay.

A. I look over, you know, certain things. I look -- the last page, I look at the price and the taxes and stuff like that.

Q. Okay.

A. But not the whole, like, contract, word by word.

Q. So it wasn't unusual for you to read a -- or to sign a document without having -- having thoroughly reviewed it all and understanding everything in it. Would that be accurate?

A. Yeah, that was not unusual.

Q. Okay. But in regard to a -- there was some -- asked you some questions about the guilty plea agreement, and there was some questions about whether it was paraphrased for you or whether it was read to you. Okay? So I want to talk a little bit about that.

So the first time you saw a guilty plea was the -- was the morning you entered your guilty plea when you were back in the marshal's office. Right?

A. Yes.

Q. And I believe your testimony was that you never got an actual copy at that point in time?

A. No. Mr. Durham had the copy and there was the mesh screen, and I got it before we got up here in the courtroom.

Q. But did you have a copy of it when he was, for lack of a

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    better term, I'm going to say going over it with you.  Did you

2    have your copy on your side or no?

3    A.    No.

4    Q.    Okay.  Now, was it -- was it -- you said there was a

5    screen.  Was that screen -- could you see through it or was

6    it -- was it --

7    A.    Yeah.  When the light is on, on both sides, you can.

8    It's like a metal-like mesh.

9    Q.    Did Mr. Durham hold --

10   A.    But it's like -- like, hey, I can see a person, but I --

11   Q.    So you --

12   A.    -- I couldn't read a word like --

13   Q.    So you couldn't read --

14   A.    It was hard.

15   Q.    You couldn't read the words that were on the guilty plea

16   agreement that Mr. Durham had?

17   A.    No, not -- not without leaning over.  I mean, sometimes

18   I --

19   Q.    Well, I'm asking what --

20   A.    -- was leaning over.

21   Q.    -- what did you do.

22          Did you read the document that he had on the other

23   side of the screen while he was going over it --

24   A.    No.

25   Q.    -- with you?  Okay.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

```
 1            Now, in terms of going over it with you, did he read
 2    it -- did he read it to you line by line?
 3    A.   No.
 4    Q.   What did he do?
 5            Let me stop, and let me ask you that.
 6            When he first came to meet with you -- let me back
 7    up.
 8            When court recessed the day before, there was no
 9    guilty plea agreement and the terms of the deal had not yet
10    been negotiated or resolved between the Government and your
11    attorneys.  Right?
12         MS. ROOHANI:   Objection.  Misstates testimony.
13         MS. CONNOLLY:   Excuse me?
14         MS. ROOHANI:   It misstates the testimony, Your Honor.
15         MS. CONNOLLY:   Well, he can correct me if I'm
16    incorrect.  I was asking him about what occurred.
17    BY MS. CONNOLLY:
18    Q.   The day before, after you were taken away, were you --
19    was there an agreement -- had the agreement of the terms of
20    the negotiation been agreed upon?
21    A.   You mean taken away back to Pahrump?  Like, at the end of
22    the --
23    Q.   At the end of the day --
24    A.   Um-hum.
25    Q.   -- on the 16th, I believe, after the testimony when your
```

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    lawyers went to the Government and there was talk about

2    whether or not you should take a deal, were the terms of that

3    negotiation agreed upon when you were taken back to Pahrump,

4    to your knowledge?

5    A.   I do not --

6    Q.   Were they communicated --

7    A.   -- think so, no, because they --

8    Q.   Were they communicated to you?

9    A.   No.

10   Q.   Okay.

11   A.   And I think the last thing which has been said between

12   Ms. Roohani and Jess Marchese was, like --

13          **MS. ROOHANI:**  Objection.  Hearsay.

14          **THE DEFENDANT:**  -- time --

15          **MS. ROOHANI:**  I'm sorry, Your Honor.

16   **BY MS. CONNOLLY:**

17   Q.   Just answer the question.  Okay?

18          So no, the terms of the deal --

19   A.   No.

20   Q.   Okay.  That evening you went back to Henderson, I

21   believe.  Right?

22   A.   Yes.

23   Q.   And none of your lawyers met with you that evening to

24   discuss any -- whether or not you wanted to plead.  Right?

25          **MS. ROOHANI:**  Objection.  Leading.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    BY MS. CONNOLLY:

2    Q.   Did any of your lawyers meet with you that evening to

3    discuss whether or not you should continue with the trial or

4    whether or not you should accept a negotiation, the terms of

5    which had not yet been agreed upon?

6             MS. ROOHANI:  Objection.  Leading.

7             THE COURT:  Overruled.  He can answer the question.

8             THE DEFENDANT:  No.

9    BY MS. CONNOLLY:

10   Q.   Okay.  So when Mr. Durham came to meet with you in the

11   morning with the guilty plea -- plea agreement, prior to him

12   having the guilty plea agreement, did anybody discuss with you

13   the issue of whether or not you wanted to go to trial or

14   whether or not you wanted to negotiate the case by way of a

15   plea deal?

16   A.   Yes.

17   Q.   When?

18   A.   When I -- I came to the courthouse that morning not with

19   the mind-set to sign a plea deal but I knew that there can be

20   a talk about it and there is a possibility or we continue with

21   trial.  So I -- those were those -- my two options.  So when I

22   came, of course I asked --

23   Q.   What were you --

24   A.   -- "What are we going to do?"

25   Q.   Who were you -- when you say you asked what you were

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    going to do, who -- who are you referring to?

2    A.   All three lawyers, but I started with -- with Mr. Durham

3    because he was the first one.

4    Q.   Okay.  So --

5    A.   And we talked about how -- he said how he perceived how

6    trial went and this and that and -- and I wanted an

7    explanation why they think this would be -- this or that way

8    would be the best to proceed.  So that -- that took time.

9    Q.   So --

10   A.   I wasn't even thinking about details about the plea.  In

11   my mind, I was thinking -- I had to make -- make the decision

12   going to trial, continue with trial, or take a plea deal,

13   which wasn't there yet.

14   Q.   Okay.  So -- so when -- when the lawyers first came in

15   there, they didn't have an agreement and there was just some

16   discussion about what's going on, what should I do; is that

17   fair or am I -- I want to make sure I'm not misunderstanding

18   what you're saying.

19   A.   Mr. Marchese brought the agreement, but that was before

20   we actually looked into that.  There were talks about the

21   decision to take.  And then Mr. Sanft came.  They had the door

22   open because it was, like, a small room.  So Mr. Sanft --

23   Sanft was standing in the doorway and Mr. Durham was sitting.

24   Mr. Marchese was standing.  And I asked what -- "Why?  What's

25   going on?"

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1   Q.   So there was some discussion before Mr. Durham actually

2   started talking to you about the terms of the negotiation?

3   A.   Yes.

4   Q.   Okay.  And let's talk about him going over the -- over

5   the actual guilty plea agreement with you.  I want to clarify.

6   Did he read it to you?  Did he summarize it to you?  What --

7   like, what did -- what did he explain to you?  Not in words

8   but what was your understanding of -- of what he was

9   communicating to you?

10  A.   He did it in a way -- I mean, I think every person who

11  was like a --

12  Q.   Okay.  We're just talking about what Mr. Durham did.  Did

13  he read it to you?  Like --

14  A.   No, he didn't read it.  Like, he -- certain things he

15  totally skipped, but he told me what it is about.  He said,

16  "This is standard and you -- you waive your right for appeal."

17  But that's a big paragraph, maybe half a page.  So he said,

18  "Well, that's" -- and so certain things he explained more than

19  others, but he didn't read it.

20  Q.   Okay.

21  A.   He didn't read it word by word.

22  Q.   Did you have an opportunity to read the agreement line by

23  line by yourself?

24  A.   No.  I mean, I --

25  Q.   Okay.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

```
 1    A.   We could have done that when we were up here, but that
 2    was already in -- in that -- in that --
 3    Q.   But my --
 4    A.   -- rush.
 5    Q.   -- my question was --
 6              MS. ROOHANI:  Your Honor, I'm going to object to
 7    Ms. Connolly cutting off Mr. Fuechtener's answer.
 8              THE COURT:  Overruled.  She can --
 9    BY MS. CONNOLLY:
10    Q.   My question was --
11              THE COURT:  -- redirect him to respond to the
12    question.
13    BY MS. CONNOLLY:
14    Q.   -- did you read the guilty plea agreement line by line?
15    A.   No.
16    Q.   In regard to specific offense characteristics, what did
17    that mean to you?
18    A.   At that point?  At that time?
19    Q.   Yes.
20    A.   Nothing.  I mean --
21    Q.   What do you mean?  You didn't know --
22    A.   -- I had no grasp.
23    Q.   I'm sorry.  I didn't hear what you said.
24    A.   I had no grasp -- grasp about that.  I mean --
25    Q.   Well, you said no grasp --
```

Page 19 of 134


JAN ROUVEN FUECHTENER - Continued Redirect Examination

1   A.   It's hard not to -- to go back of -- now, of course, I

2   know things, but back then I think it wasn't even mentioned

3   like that.

4   Q.   Okay.

5   A.   I mean, I don't recall that.

6   Q.   Okay.  Did Mr. Durham show you (inaudible) of the guilty

7   plea agreement with the sentencing guideline table?  Did

8   Mr. Durham show you the sentencing guideline table when you

9   were going over the guilty plea agreement?

10  A.   No.

11  Q.   Had he shown you that -- and now he indicated that his

12  recollection was that he did go over that.  Your testimony is

13  that he didn't?

14  A.   He didn't.  He had no book.  None of my lawyers had,

15  like, a book --

16  Q.   So when they met --

17  A.   -- or something.

18  Q.   -- with you, none of them had a book?

19  A.   No.

20  Q.   At the time you entered the -- the guilty plea, when you

21  were going over the plea agreement, what did the guidelines

22  mean to you?  What was your understanding of what the

23  guidelines were?

24  A.   At the time they --

25  Q.   Yes.

(702) 384-0429

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    A.    -- we went over it?

2    Q.    At the time between when you signed the guilty plea

3    agreement and when you entered your plea.

4    A.    He -- since he didn't read that line by line for me, that

5    was the minimum and maximum, like the statutory minimum and

6    maximum, and even though I know that it's at another part but

7    I didn't -- we didn't go -- I didn't understand that -- that

8    difference.

9    Q.    You didn't understand the difference between the statutes

10   and the guidelines?

11   A.    I wasn't -- it confused me.

12   Q.    Was it clarified for you before you entered your plea in

13   front of the Court?

14   A.    Not really.

15   Q.    Okay.  Let me ask you this.  When you entered the plea,

16   were you aware that there was things contained therein that

17   you didn't understand?  When you entered your plea and when

18   you signed it, were you aware that there was terms and things

19   in there which you did not understand?

20   A.    Yes.

21   Q.    Okay.  So why did you go forward?

22   A.    Because certain things Mr. Durham said, this is like a --

23   a -- a standard agreement.  He said he knows these agreements.

24   Of course there are special things which are custom tailored

25   to that plea, but certain things he -- he just -- I mean, a

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    lot of things, actually, because there was -- there was simply

2    not enough time and I trusted him and...

3    Q.    You trusted him --

4    A.    The problem was also that guideline, it was never -- 24

5    to 30 years was never meant -- that that was never mentioned.

6    It wasn't written in the deal, and it wasn't mentioned later.

7    Q.    Did anybody explain to you what that level 40, 24.3 to 30

8    years, meant in terms of what that meant to the Court?

9    A.    You mean what -- what 40 points translates to?  No.

10   Q.    Well, what that -- what that -- what -- since the

11   guideline range was -- was -- was 40, what does that mean in

12   terms of what the judge was going to do?  Was that explained

13   to you?

14   A.    No.  For me, it was 40 is a number.

15   Q.    Okay.

16   A.    It could be --

17   Q.    Let me ask you this --

18          **MS. ROOHANI:**  Your Honor, I'm going to ask that

19   Mr. Fuechtener be allowed to finish answering the question.

20          **MS. CONNOLLY:**  I thought he was finished.

21   **BY MS. CONNOLLY:**

22   Q.    Were you finished answering the question?

23   A.    It could be -- well, 40 could be from zero to 100.  It

24   could be less than half.  I mean, I didn't know that that

25   whole thing ends at -- at 42 or 43.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    Q.   The guideline range --

2    A.   If someone would have told me that, well, this is here

3    and -- and this has something to do with the sentencing and

4    you are at 40, but 40 -- it cuts off at 42.

5    Q.   Are you referring to the guideline table?

6    A.   Yeah.

7    Q.   Okay.  Now, you indicated that Mr. Durham was the one who

8    went over the guilty plea agreement with you.  Who signed the

9    guilty plea agreement?  Which lawyer signed on your behalf?

10   A.   Mr. Marchese signed it.

11   Q.   So Durham went over it with -- with you but Marchese

12   signed it?

13   A.   Yes, um-hum.

14   Q.   Did you have any prior experience in the criminal justice

15   system?

16   A.   No.

17   Q.   Did you have any prior experience in Federal Court?

18   A.   With the court?

19   Q.   In Federal Court.

20   A.   No.

21   Q.   As a -- did you have any experience with the court system

22   in a civil -- in the civil arena?

23   A.   Yes.

24   Q.   Okay.

25   A.   Back in Germany.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    Q.    Excuse me?

2    A.    In Germany.

3    Q.    Okay.  Had you had any experience with the Federal Court

4    system in the civil arena in America?

5    A.    No.

6    Q.    Now, you indicated that there was -- let me strike that.

7          You were asked some questions about the motion to

8    withdraw the guilty plea that I have prepared on your behalf.

9    They asked you some questions about that.  After that motion

10   was filed, you then signed an affidavit --

11   A.    Yes.

12   Q.    -- regarding the fact -- okay.

13         When you read that motion, was there anything that

14   jumped out at you as being blatantly false?

15   A.    No.

16   Q.    Is that why you signed the affidavit saying everything in

17   there was true and accurate?

18   A.    Yes.

19   Q.    Were all the essential facts true?  Were most of these --

20   well, all the essential facts true?

21   A.    Yes.

22   Q.    From your perspective, they were true?

23   A.    Yes.

24   Q.    Who was the first person to actually show you a

25   guideline -- sentencing guideline table?

JAN ROUVEN FUECHTENER - Continued Redirect Examination

```
 1    A.    That was another inmate in Pahrump.  Because there we had
 2    the possibility to look it up in the law library.  So my --
 3    my -- my cellie actually went down with me and showed it to
 4    me, showed me that table --
 5    Q.    And when was that --
 6    A.    -- on a -- on a PDF.
 7    Q.    And when was that?
 8    A.    That was end of January.
 9    Q.    Okay.  So Mr. Humphries never showed you the table?
10    A.    No.
11    Q.    Okay.  Now, when you spoke with Mr. Humphries, was he in
12    Henderson or was that --
13    A.    He was in --
14    Q.    -- in Pahrump?
15    A.    -- in Henderson.  There was no -- we had no access to the
16    table because that law library has state law -- I mean --
17    Q.    In Henderson --
18    A.    I think he tried to find it, but he couldn't find it.
19    And it was not like in -- in Pahrump, there is a law library
20    room.  There are law library computers in the dayroom.  And in
21    Henderson, it's -- you have to be in a hallway when you
22    segregate it at night.  So it's all -- it's not so easy there.
23    Q.    But you indicated he was the one that made you aware that
24    a level 40 was far above five years?
25          MS. ROOHANI:  I'm sorry.  Can you repeat that?  I
```

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    didn't hear you.

2    **BY MS. CONNOLLY:**

3    Q.   Was your testimony that he was the one that made you

4    aware that level 40 was far above five years?

5    A.   Yes.

6    Q.   But he didn't have the actual table there?

7    A.   No.

8    Q.   And I believe your testimony was he knew that based upon

9    conversations he had with -- with his -- Mr. Riddle and based

10   upon his research for his own case.  Right?

11   A.   Yes.

12   Q.   You were also asked some question about the lawyers who

13   had represented you.  Prior to my taking over representation,

14   who selected the lawyers who represented you?  Was that you or

15   somebody else?

16          **MS. ROOHANI:**  Objection.  Relevance.

17          **THE COURT:**  What's the relevance?

18          **MS. CONNOLLY:**  It's relevant in light of the fact the

19   State [sic] opened the door and -- and asked him about other

20   lawyers he'd hired and paid money to.  So I want to know if he

21   was the one that actually hired those or not.  I think it's

22   relevant.

23          **THE COURT:**  All right.  I'll allow it.  Overruled.

24          **THE DEFENDANT:**  Well, let's go back to the beginning.

25   ///

JAN ROUVEN FUECHTENER - Continued Redirect Examination

**BY MS. CONNOLLY:**

1

2    Q.    You were in custody.  Right?

3    A.    It was like that.  Before the arrest, like, after the

4    search at the house and -- of course people told me, "Well,

5    you need a lawyer for this.  You -- you -- you have to have a

6    lawyer."  And I said, "Well, there's no arrest."  And they

7    said, "Well, you have to have a lawyer.  I mean, that's the

8    FBI."

9             So then I asked Pacitti, and he first mentioned

10   Mr. Nadig and Mr. Sanft.  Like, that was a day after the

11   search.  And then Mr. Nadig and Mr. Sanft came to the house

12   for a consultation.  They did a walk-through, and I didn't

13   want to hire them because I wanted to wait for my husband to

14   come back, and we agreed to meet again then.

15            So -- and -- and their fee was, like, for me for --

16   when there is no -- no arrest and no charge, I think that was

17   quite expensive.  So I called Mr. Pacitti and said, "What do

18   you think, Steve?  That's expensive."  He said, "Yeah.  I

19   mean, I can ask another one," and --

20       **MS. ROOHANI:**  Your Honor, I'm going to object based

21   on hearsay.  It's nonresponsive.  I don't even know where it's

22   going, quite frankly.

23   **BY MS. CONNOLLY:**

24   Q.    My question was who hired -- who selected the lawyers

25   that represented you before me?

AMBER M. McCLANE, CCR 914
(702) 384-0429

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    A.    Pre-arrest, I hired Mr. Marchese from the outside

2    still --

3    Q.    Who recommended the lawyers --

4    A.    Mr. Pacitti.

5          **MS. ROOHANI:**  And, Your Honor, he's -- he's answering

6    the question and she's cutting him off.

7          **MS. CONNOLLY:**  He wasn't answering the question.  I

8    was anticipating an objection from the State [sic] that he was

9    being nonresponsive.

10   **BY MS. CONNOLLY:**

11   Q.    The question was who selected the lawyers that

12   represented you?

13   A.    Well, to be really detailed, as I said, pre-arrest, Steve

14   Pacitti then recommended Mr. Marchese who had a fee we agreed

15   upon.  Like, that was a small fee just because there was no

16   charge and nothing just to communicate with the FBI.  And

17   then, after my arrest, with -- I had nothing to do with that.

18   My husband and Steve Pacitti --

19   Q.    I just need --

20   A.    Steve Pacitti recommended them -- again, Marchese and

21   Nadig and Sanft -- and my husband hired them --

22   Q.    So your husband --

23   A.    -- for trial.

24   Q.    So your husband had Marchese, Sanft, and who else?

25   A.    Yes.  He went to the office and -- with Mr. Pacitti.

JAN ROUVEN FUECHTENER - Continued Redirect Examination

```
1    Q.   So did you ever sign -- did you ever sign a retainer
2    agreement with them?
3    A.   No.
4    Q.   And so they were recommended by Pacitti, and your
5    husband, Frank, paid them?
6    A.   Yes.
7    Q.   Okay.  And what about the rest of the lawyers that
8    represented you?
9    A.   Well, then, later we talked about having a female lawyer,
10   and then Mr. Marchese found Ms. Craig.
11   Q.   And who paid her?
12   A.   He -- Mr. Marchese paid her.  He had like a trust
13   account, which my husband again filled up, and he did that.
14   So -- and same with Mr. Durham.  Mr. Marchese recommended and
15   found and brought Mr. Durham and paid him.
16   Q.   Okay.  So I just want to get the time line right.  After
17   you entered your guilty plea, that evening you discussed it
18   with Mr. Humphries in Henderson?
19   A.   Yes.
20   Q.   And then when were you transported back to Pahrump?
21   A.   I think it was on January 14 of the following year.
22   Q.   So you spent some time in Henderson before you were
23   transported back?
24   A.   Yes.
25   Q.   Okay.  After you talked with Mr. Humphries -- and, again,
```

JAN ROUVEN FUECHTENER - Continued Redirect Examination

```
 1    I'm trying to -- because we have your testimony a couple of

 2    weeks ago.  I want to make sure it's -- I have it accurate.

 3    The next day, after you talked with Mr. Humphries, you

 4    contacted Mr. Marchese?

 5    A.    Yes.

 6    Q.    And then he came and met with you and Mr. Pacitti?

 7    A.    Yes.

 8    Q.    And the reason you contacted them was because you were --

 9    because the information you had obtained from Mr. Humphries

10    the night --

11    A.    Yes.

12    Q.    -- after you entered your plea?

13    A.    Yes.

14    Q.    And -- and, again, I -- and if I misstate your testimony,

15    please let me know.  Did you testify that somebody recommended

16    that you get a second opinion?

17    A.    Yes.

18    Q.    And was that -- I believe Mr. Marchese testified to that?

19    A.    That was during a video visit, I think it was, end of

20    February or beginning of March, then, and they -- I said

21    again, "Well I want to withdraw" --

22    Q.    Well, you were transported --

23    A.    -- and then they -- yeah -- they said, well -- they put

24    their heads together and said, "Well, we should get a second

25    opinion.  Maybe we should get another lawyer appointed from
```

 1      the court who can give him a second opinion" --

 2              MS. ROOHANI:  Objection.  Hearsay.

 3              THE COURT:  Overruled.

 4      BY MS. CONNOLLY:

 5      Q.   When did you notify Mr. Marchese that you wanted to

 6      withdraw the plea?

 7      A.   The day after I told him, but he wasn't really --

 8      Q.   So my question was when did you tell him you wanted to

 9      withdraw your plea?

10      A.   That was during that video visit.

11      Q.   At Henderson?

12      A.   In -- in Pahrump.

13      Q.   And how long was that after you -- so you started

14      discussing it with him the day after?

15      A.   Yes.

16      Q.   When you called him?

17      A.   So he knew I wanted to do that, and he wanted to look

18      into and -- so we were a little bit in limbo.

19      Q.   And did you consult with any other attorneys before you

20      indicate -- before you decided that, yes, that's what I want

21      to do?

22      A.   Yes.  I got my own second opinion.

23      Q.   I'm sorry?

24      A.   I got my own second opinion.

25      Q.   Okay.  And how easy was it for you to have access to

JAN ROUVEN FUECHTENER - Continued Redirect Examination

1    attorneys between the time you entered your plea and the time

2    you hired me?

3              MS. ROOHANI:  Objection.  Asked and answered.

4              THE COURT:  I'll allow it.

5              THE DEFENDANT:  It was -- it wasn't easy.

6    BY MS. CONNOLLY:

7    Q.   What did you have -- what did you have to do if --

8    A.   Because I was in Pahrump.  And, again, they have lawyer

9    numbers, phone numbers, but just from the Federal Public

10   Defenders.  So I need a retained lawyer.  So basically I asked

11   other inmates, and I got some recommendations.  And, by now, I

12   knew what to look for because I had experience with lawyers.

13   And then I had to put them -- each and every lawyer I first

14   had to put the number on that do not record list, which takes

15   a week there for each lawyer before I can call them and be

16   sure that that phone call is, like, lawyer-client privileged.

17   Q.   So --

18   A.   And then I had to come out to Pahrump, which is a drive,

19   and lawyers don't have -- I mean, that's a -- that is a drive.

20   Not everybody has time to come immediately.  Some lawyers

21   even -- one lawyer even charged, like, a fee just to come out

22   and talk to me about a -- a plea withdrawal.

23             MS. CONNOLLY:  I don't have anything else.

24             THE COURT:  Ms. Roohani?

25             MS. ROOHANI:  Your Honor, can I have a very short

JAN ROUVEN FUECHTENER - Recross-Examination

1    restroom break before I begin?

2              **THE COURT:**  Sure.

3              **MS. ROOHANI:**  Thank you.

4              **THE COURT:**  Go ahead and take a ten-minute break.

5              **COURTROOM ADMINISTRATOR:**  All rise.

6         *(Recess at 2:11 p.m., until 2:23 p.m.)*

7              **THE COURT:**  Let's go back on the record then.

8    Recross?

9              **MS. ROOHANI:**  May I approach and proceed, Your Honor?

10             **THE COURT:**  Yes, you may.

11             **MS. ROOHANI:**  Thank you.

12             Your Honor, before I begin, I'm going to ask that you

13   instruct Ms. Connolly to not make speaking objections.  When I

14   was reviewing the transcript, I believe that she's trying to

15   coach Mr. Fuechtener.  So I would ask that she not make

16   speaking objections.  If she's going to object, I'm happy to

17   have Your Honor rule on those.  But I have concern that she's

18   attempting to coach him.

19             **THE COURT:**  All right.

20                       **RECROSS-EXAMINATION**

21   BY MS. ROOHANI:

22   Q.    Mr. Fuechtener, you testified that you know what an oath

23   is.  Correct?

24   A.    Say it again.

25   Q.    You know what an oath is?

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.    Yes.

 2    Q.    Okay.  Tell me what an oath is.

 3    A.    An oath is a certification, a statement to tell the

 4    truth.

 5    Q.    And what does the truth mean?

 6    A.    The truth.

 7    Q.    Does that mean that you're not going to say things that

 8    are lies?

 9    A.    The truth -- and as -- as best as you can -- there's like

10    a wording for that.  Like, tell the truth and nothing but the

11    truth and --

12    Q.    Okay.  So the truth means no lies.  Correct?

13    A.    Yes.

14    Q.    You took an oath at the beginning of this hearing.

15    Correct?

16    A.    Yes.

17    Q.    You've taken that oath many times in this courtroom; is

18    that right?

19    A.    Yes.

20    Q.    And that oath was you do solemnly swear that the

21    testimony you shall give in the cause now before this Court

22    shall be the truth, the whole truth, and nothing but the

23    truth, so help you God?

24    A.    Yes.

25    Q.    Okay.  You remember taking that oath?
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.    Yes.
 2    Q.    Okay.  In the context of that oath, what does the whole
 3    truth mean?
 4    A.    The whole truth.  It's like it makes the statement of the
 5    truth stronger --
 6    Q.    Okay.
 7    A.    -- in my opinion.
 8    Q.    Does that mean no lies?
 9    A.    Yes.
10    Q.    Does that mean no partial lies?
11    A.    Yes.
12    Q.    Does that mean the partial truth?
13    A.    No.
14    Q.    It means the whole truth.  Fair?
15    A.    Yes.
16    Q.    You signed an affidavit in this case; is that correct?
17    A.    Yes.
18    Q.    And you understood that it says on there "sworn, deposes,
19    and says."  Correct?
20    A.    Yes.
21    Q.    What does that mean to you?
22    A.    That means that I agree to everything which is in there,
23    and -- and it's a difference because you sit with a notary
24    and... but I wouldn't sign it if there would be something
25    grossly mischaracterized in it.
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   Q.    When you sign something that says "sworn, deposes, and
 2   says," you understand that that's the equivalent of you taking
 3   an oath.  Correct?
 4   A.    Pretty much.
 5   Q.    When you say "pretty much," explain why you say pretty
 6   much and it's not a yes-or-no answer.
 7   A.    Well, because in -- in that case, because my lawyer
 8   prepared that in her wording, and I just sign it when I'm in
 9   court and take an oath.  It's like question/answer.  I can
10   explain things if they are misunderstood.  So I -- I would
11   think it's better to be -- the oath in court is pretty much
12   the same but the -- the affidavit I sign that that was what --
13   what is, is true.  The big thing.
14   Q.    Fair to say that the affidavit was written by your
15   attorney?
16   A.    Yes.
17   Q.    The motion was written by your attorney.  Right?
18   A.    Yes.
19   Q.    The reply was written by your attorney?
20   A.    Yes.
21   Q.    If there were mistakes in it, you should ask for her to
22   correct it if you're swearing that it's the truth.  Correct?
23   A.    Yes.
24   Q.    If it's something that's less than the whole truth, you
25   should ask for her to correct it; would that be fair to say?
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
1    A.    If I see something like that, yes.

2    Q.    You had previously testified that you read the motion.

3    Correct?

4    A.    Yes.

5    Q.    And you previously testified that you read the reply?

6    A.    Yes.

7    Q.    In that affidavit -- do you remember that affidavit?

8    A.    Yes.

9    Q.    I'm going to ask you some questions about it.

10            MS. ROOHANI:  So with Your Honor's permission, I'd

11   like to provide him with a copy of it.  It's already in the

12   docket, Your Honor.

13            THE COURT:  And which part of the docket are you

14   referring to?

15            MS. ROOHANI:  It's Docket No. 222.

16            THE COURT:  Thank you.  Yes.  Go ahead.

17            MS. ROOHANI:  May I approach, Your Honor?

18            THE COURT:  Yes.

19            THE DEFENDANT:  Thank you.

20   BY MS. ROOHANI:

21   Q.    Okay.  We'll start at the -- let's start at the top.

22            MS. ROOHANI:  And, Your Honor, do you need a copy?

23            THE COURT:  No.  I have it here.

24   BY MS. ROOHANI:

25   Q.    So it starts with, "I, Jan Rouven Fuechtener, having been
```

1    duly sworn, deposes, and says that the following assertions

2    are true."

3            Is that what it says?

4    A.    Yes.

5    Q.    And is that the part of the oath that we were talking --

6    A.    Yes.

7    Q.    You swore that you were fully competent to testify

8    regarding these matters.  Correct?

9    A.    Yes.

10   Q.    And you swore that the things that were in this were

11   based upon your own personal knowledge.  Correct?

12   A.    Yes.

13   Q.    And then, No. 2, it says that you have read the motion to

14   withdraw filed by your attorney, Karen Connolly, and the

15   reply?

16   A.    Yes.

17   Q.    And then you said you swore that all of the factual

18   assertions set forth therein are accurate?

19   A.    Yes.

20   Q.    What does the word "all" mean to you, Mr. Fuechtener?

21   A.    In that case, all factual assertions, all.  Not just --

22   Q.    Everything?

23   A.    -- a few.  All.

24   Q.    It means everything.  Fair?

25   A.    Hmm?  Yes.

1  Q.   You didn't say it was mostly true.  Right?

2  A.   No.

3  Q.   And you didn't say it was big picture true.  Correct?

4  A.   Yes.

5  Q.   So you said all of the factual assertions were true.

6  Fair?

7  A.   Yes.

8  Q.   And you didn't try to correct Ms. Connolly, right, about

9  anything in the motion or the reply?

10  A.   There was a draft she sent and there was I think some

11  things we -- we talked about, and I think we changed some

12  things.  And the final motion she filed without having me read

13  it again.  And when I received it, of course I read it, and I

14  was happy with it.

15  Q.   Okay.  So everything in the motion that was filed, it's

16  your testimony that all of it, everything, is true?

17  A.   Yes.

18  Q.   I believe you testified on redirect as to that as well.

19  Correct?

20  A.   Yes.

21  Q.   And it's also true that you read the reply?

22  A.   Yes.

23  Q.   Did you read the reply before it was filed?

24  A.   I don't think so.

25  Q.   Have you read the reply since the time it was filed?

JAN ROUVEN FUECHTENER - Recross-Examination

```
1    A.    After it, I got a copy.

2    Q.    Is there anything in the reply that is not all true?

3    A.    Well, it has been a while since I read it.

4    Q.    Do you want a copy of it?

5          MS. CONNOLLY:  I'm going to object.  I think this is

6    improper to ask him -- is she going to ask him to read an

7    entire pleading?  If she has specific portions of it, then I

8    think that would be appropriate but...

9          THE COURT:  Which one are we talking about here now?

10   We've got --

11         MS. ROOHANI:  I'm specifically talking about Docket

12   No. 194, Your Honor, which is the motion to withdraw guilty

13   plea that we've been talking about, as well as document 221,

14   which is the reply.

15         THE COURT:  Right.  So 221.

16         MS. ROOHANI:  221 specifically at this time.

17         MS. CONNOLLY:  I would also object based upon the

18   fact that he didn't sign that document and he hasn't asserted

19   an affidavit attesting to anything in the reply.  So it would

20   be improper to ask him about a document he didn't prepare or

21   didn't sign off on.

22         THE COURT:  221 is only two pages.  That's not the

23   one you're referring to.  You're referring to the 222.

24         MS. ROOHANI:  221 is the reply, Your Honor.  It's 13

25   pages.  222 is the affidavit that's two pages.
```

JAN ROUVEN FUECHTENER - Recross-Examination

1          THE COURT:  Okay.  I see the attachments here are
2    separate on mine.  Okay.  Are the facts just on page 1 through
3    6 or did you want him to look at all of it?  The rest looks to
4    be legal argument but maybe there are some facts in there too.
5          MS. ROOHANI:  I can direct him to the pages, Your
6    Honor, as we go.
7          THE COURT:  Let's do that.
8          MS. ROOHANI:  Okay.  May I provide him with a copy of
9    the motion and the reply, though, Your Honor, for his
10   reference during questioning?
11         THE COURT:  Yes, please.
12   BY MS. ROOHANI:
13   Q.   Okay, Jan.  First I want you to look at document 222.
14   That's your affidavit.
15   A.   Okay.
16   Q.   And specifically on No. 2, can you read the first two
17   sentences for me?
18   A.   "That I have read the motion to withdraw filed by my
19   attorney, Karen Connolly, and reply.  All of the factual
20   assertions set forth therein are accurate."
21   Q.   Okay.  And it's your testimony that everything in those
22   two documents that I've given to you is true?
23   A.   Well, if you ask me like that, I would say -- I can read
24   it again now.  Maybe you have something that you want to --
25   Q.   Well, and we'll go --

AMBER M. McCLANE, CCR 914
(702) 384-0429

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.   -- talk about?

 2    Q.   -- we'll go over it page by page.  But I want you to tell

 3    me the timing of how things happened.  I don't want you to

 4    tell me about your conversations --

 5    A.   Um-hum.

 6    Q.   -- with Ms. Connolly.  But tell me about the time line of

 7    how the motion got written, when it was filed, when you

 8    reviewed it, when the reply was filed, what you reviewed in

 9    the --

10         MS. CONNOLLY:  Compound question.

11  BY MS. ROOHANI:

12    Q.   I -- just give me a narrative of -- of the things that

13    happened, Jan.

14         THE COURT:  Ask one by one.

15         MS. ROOHANI:  Sure.

16  BY MS. ROOHANI:

17    Q.   When -- when did you talk to Ms. Connolly about the

18    motion?

19    A.   I believe it was in May of last year.

20    Q.   Okay.

21    A.   I don't -- if I -- I tell you as good as I remember.

22    Q.   Okay.

23    A.   Not on the day.  But I think we started talking about it

24    in -- in -- in May.  Maybe end -- end -- end of April,

25    beginning of May.
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    Q.   Okay.  So if -- if the motion was filed on June the
 2    22nd -- I'm not going to hold you to it.  Around about May you
 3    started talking to Karen about the motion.  Fair?
 4    A.   When?
 5    Q.   When you're talking to her about the facts that went into
 6    this motion.
 7    A.   Yeah.  That was during, like, two personal meetings.
 8    Q.   Okay.
 9    A.   And that was in May --
10    Q.   Okay.
11    A.   -- I would say.
12    Q.   Was that the first thing that happened with you having a
13    conversation with Karen?
14    A.   No.
15    Q.   Okay.  What was the first thing that happened?
16         MS. CONNOLLY:  Objection.  Relevance and privileged.
17         THE COURT:  What is the relevance?
18         MS. ROOHANI:  Your Honor, I'm trying to figure out
19    the time line to see when he's reviewed things to potentially
20    explain why there's discrepancies in this motion versus his
21    testimony.
22         MS. CONNOLLY:  Well, I suppose she can ask him.
23         THE COURT:  If there are particular discrepancies you
24    want to ask him about --
25         MS. ROOHANI:  Okay.
```

JAN ROUVEN FUECHTENER - Recross-Examination

1              **THE COURT:**  -- go through those.

2    BY MS. ROOHANI:

3    Q.    Okay, Jan.  Go ahead and look at the motion.  Take a look

4    at page 4.

5    A.    Four?

6    Q.    Four.

7    A.    Okay.

8    Q.    Of the motion, that's No. -- it says document -- at the

9    top it says document 194.

10   A.    Yes.

11   Q.    Take a look at page 4.

12   A.    Okay.

13   Q.    And in the paragraph that starts, "On or about

14   September 7, 2016," and the paragraph that starts, "On

15   September 10, 2016."  Can you read those two paragraphs to

16   yourself, and tell me if there's anything in those two

17   paragraphs that is not the full, all, everything truth.

18   A.    When I read the motion --

19   Q.    I'm talking about today.  Right now.  Is there any --

20   A.    Okay.

21   Q.    Is there anything there that's not true today as we stand

22   here?

23   A.    It takes a while.  I'm just double-checking the days

24   and...

25   Q.    Okay.

JAN ROUVEN FUECHTENER - Recross-Examination

1    A.    What is Exhibit B?  I don't even see.  I just want to --

2    it says, "See Exhibit B, redacted communication offered by

3    Jess Marchese dated November 30, 2016."

4    Q.    I'll represent to you that's a September 3 e-mail that

5    Mr. Nadig sent to your husband.

6    A.    Not the -- there is another one mentioned authored by

7    Jess.  The other one was the one from Nadig.

8    Q.    Aside from that, is there anything that's not true?

9    A.    Well, I don't know if -- if that date, since I didn't

10   send the e-mail and -- I just -- let's say I trusted the

11   dates.

12   Q.    Okay.

13   A.    I didn't go back and check each and every date.  But let

14   me see what else.  Yeah, I think that's pretty much true.

15   Except I didn't check the dates.

16   Q.    Except for the dates?

17   A.    Yeah.

18   Q.    You think that the dates might be important?

19   A.    Yes.

20   Q.    Why would the dates be important?

21   A.    To show a time line.

22   Q.    So if the dates were not correct, do you think that

23   that's something that the Court should consider?

24   A.    Yes, that should be, then, corrected.

25   Q.    All right.  So you're not sure about the dates here?  Do

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    you want to change any of those dates?
 2    A.    I mean, it's -- the -- those e-mails are easy to check
 3    because they are -- they have a date on it and --
 4    Q.    And you're talking about Exhibit B.  Right?
 5    A.    Exhibit B and the original e-mail and that September 7
 6    meeting.  I mean, I -- I -- it could have been.
 7    Q.    Okay.
 8    A.    It was around that time.
 9    Q.    Did you testify on direct examination that you received
10    that e-mail, that September 3 e-mail, approximately two weeks
11    after it was sent?
12    A.    If I said that, that -- that was how I remember it.
13    Q.    Okay.  And -- and in this motion it says that Mr. Nadig
14    came to see you on September, the 7th; is that correct?
15    A.    I don't know if the date is correct.
16    Q.    I'm asking if it says that in the motion.
17    A.    It says that, yeah.
18    Q.    Okay.  Does it also say in the motion that on
19    September 10 you placed a frantic call to Mr. Durham and
20    Marchese and then they came to see you?  Is that what it says
21    in the motion?
22    A.    I know that was a few days after that visit from Nadig.
23    Q.    It was --
24    A.    So the time line in between is correct.  There were a few
25    days in between.
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
1    Q.   Did you testify on direct that Mr. Marchese came to see
2    you the very same day that Mr. Nadig came to see you?
3    A.   Yes but we don't know if this is -- he came often.  I
4    mean, he came during -- he came several times.  I don't know
5    if this is the time -- the time I mention is the time my
6    lawyer mentioned in the motion.  There were lots of meetings
7    and talks about that whole issue.  It was, like, a -- I don't
8    know if I can say that.
9    Q.   Let me ask you a question.  Okay?
10   A.   Okay.
11   Q.   So it's your testimony that on September, the 7th,
12   Mr. Nadig came to you and he told you some things that were in
13   that e-mail.  Correct?
14   A.   Yeah.  I don't know, again, about the date.
15   Q.   Okay.
16   A.   And he came with Mr. Sanft, actually, but he talked.  So
17   I would say that's correct.
18   Q.   So now your testimony is that Mr. Nadig came with
19   Mr. Sanft on the 7th?
20   A.   Yes, that's how I remember it.
21   Q.   Okay.  And Mr. Nadig talked to you about the contents of
22   that e-mail?
23   A.   The e-mail he sent previously.
24   Q.   And it's your testimony that you hadn't seen that e-mail
25   on that day, September, the 7th, when Mr. Nadig and Mr. Sanft
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    came to see you?

2    A.    No.  When he came to see me, I hadn't seen the e-mail.

3    Q.    So he just talked to you about the contents of the

4    e-mail?

5    A.    Yes.

6    Q.    And --

7    A.    I knew some of the contents already from Mr. Marchese.

8    But, yeah, he talked to me about the contents.

9    Q.    You were upset after you had that conversation with

10   Mr. Nadig.  Correct?

11   A.    Yes.

12   Q.    And Mr. Marchese, you testified on direct, came to see

13   you that very day.  Correct?

14   A.    I remember a day -- I think that was that day.  They both

15   came and didn't know one from the other that they -- it was

16   like a surprise.

17   Q.    Okay.  But it's your testimony that it wasn't until three

18   days later that you talked to Mr. Marchese about the e-mail?

19   A.    That was that call.

20   Q.    So it's your testimony that, despite the fact that you

21   were -- tell me what word.  How did you feel?

22   A.    Yeah.  Yeah, it was like that.  We talked about it.  I

23   was upset.  I went back to my cell, thought about the whole

24   thing, and then I called him.  And I was still upset about

25   that whole situation.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    Q.    So there's a date missing in the motion is your testimony
 2    now?
 3    A.    Yeah, if you do it very detailed, but then there are lots
 4    of dates missing.
 5    Q.    Do you think it would be important to tell Judge Navarro
 6    all the important facts when you were filing this motion?
 7    A.    Yes.
 8    Q.    And would that be an important fact to show that you were
 9    actually upset?
10    A.    But it says that.
11    Q.    I understand that.  Do you think it's an important fact
12    that you were actually upset on that same day?  Do you think
13    that's something that should have been put in the motion?
14    A.    I didn't talk with Ms. Connolly that detailed about my
15    emotions.
16    Q.    Okay.
17    A.    I think she took that and put it in -- I mean, it --
18    Q.    Okay.
19    A.    It's true.
20    Q.    I just want to be clear.  There's some things in this
21    motion that you didn't tell Ms. Connolly at all?
22    A.    I think I --
23              MS. CONNOLLY:  Objection to what he did --
24              THE DEFENDANT:  Well --
25              MS. CONNOLLY:  -- or didn't tell me.
```

JAN ROUVEN FUECHTENER - Recross-Examination

1            THE COURT:  Do you want to point specifically to

2     something, not just saying something in this motion?

3     BY MS. ROOHANI:

4     Q.    Specifically it said, "On September 10th, 2016, after

5     receiving a frantic call" -- I'm talking about the word

6     "frantic."  It's your testimony that you did not communicate

7     that to Ms. Connolly but that she put that word in?

8     A.    No.  I -- we talked about that call.

9     Q.    Did you tell her -- you testified just now that you

10    didn't tell her about how you were feeling or emotions.  Would

11    that be correct?

12            MS. CONNOLLY:  I'm going to object to her nitpicking

13    at conversations that are attorney-client privileged and

14    exactly what was said or was not said.  I don't think that's

15    appropriate.

16            THE COURT:  Sustained.

17    BY MS. ROOHANI:

18    Q.    Let's move on.  Go ahead and take a look at that reply.

19    It says at the top of the document 221.

20    A.    Okay.

21    Q.    Specifically go to page 6.  And there's a paragraph in

22    the middle of the page.  It says, "In regard to advice given

23    by Nadig and Pacitti."

24    A.    On page -- on page 5?

25    Q.    Page 6.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.    Page 6.  Okay.  Yes, I have it.

 2    Q.    That paragraph in the middle, it says, "In regard to

 3    advice given by Nadig and Pacitti."

 4          Do you see that?

 5    A.    Yes.

 6    Q.    Read that paragraph and tell me if there's anything in

 7    there that you'd like to change.

 8    A.    It looks good for me.

 9    Q.    Okay.  I want to draw your attention to the sentence that

10    says, "Both Nadig and Pacitti were paid for lawyers dispensing

11    legal advice to Rouven about the case"?

12    A.    Yes.

13    Q.    You don't want to change that?

14          MS. CONNOLLY:  Objection --

15          THE DEFENDANT:  Well --

16          MS. CONNOLLY:  Objection.  He already testified there

17    was nothing in the paragraph he wanted to change.  Asked and

18    answered.

19    BY MS. ROOHANI:

20    Q.    Is it your testimony that that sentence is true?

21    A.    Well, I understood it a little different.

22    Q.    Did I misstate what was said in that sentence?  Go ahead

23    and read it -- read it --

24    A.    Can I -- can I explain it?

25    Q.    Tell me what you thought that meant.
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.    Both Nadig and Pacitti were paid lawyers dispensing legal
 2    advice to Rouven about the case.  Well, I would say Pacitti
 3    was paid to be my -- our civil attorney and not to give legal
 4    advice in the case but he wavered nevertheless.
 5    Q.    Do you want to change --
 6    A.    But I would -- yeah, that -- that would -- to clarify, he
 7    was not paid to give advice on the criminal case.  That is
 8    true.  So that --
 9    Q.    So it's your testimony that he was paid but he wasn't
10    paid to give advice about the case?
11    A.    No.  He was paid to give civil advice.
12    Q.    He was not paid to give advice on the criminal case?
13    A.    No.
14    Q.    But it's your testimony that he was actually paid for
15    something?
16    A.    I think so, yeah.
17    Q.    When I asked you on cross-examination about what
18    Mr. Pacitti was paid, you said you don't know.  Correct?
19    A.    Yes.
20    Q.    You said you didn't even know if he got paid at all.
21    Isn't that true?
22    A.    Yes.  That was for the civil matters.
23    Q.    When I asked you that question, you didn't specify
24    criminal or civil, did you, Mr. Fuechtener?
25    A.    No.
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   Q.   You just said, "I don't know."  Correct?
 2   A.   If he got paid, yes.
 3   Q.   (Inaudible) look at -- sorry.  Same document, look at
 4   page 8, please.  I specifically want you to look at the bottom
 5   of page 8.
 6   A.   Okay.
 7   Q.   And there's a sentence that says, "That is because he did
 8   not agree with those facts as they were false"?
 9   A.   Yes.
10   Q.   Did you read that?
11   A.   Yes.
12   Q.   Is there anything about that sentence you'd like to
13   change?
14   A.   Yeah, I could change something.
15   Q.   What would you change?
16   A.   I would change in -- that is because he did not agree
17   with the facts he quibbled about.
18   Q.   Okay.  And one of -- was one of those facts the Grindr
19   chat facts?
20   A.   Yes.
21   Q.   So it's your testimony that when you're talking about
22   that, you were talking about the Grindr chat facts?
23   A.   And other things.  I mean, it says in the sentence
24   before, "Rouven states that he quibbled with virtually every
25   fact in the plea agreement."
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    Q.   All right.  So --

2    A.   So that is -- that -- I mean, that --

3    Q.   Was virtually --

4    A.   That you could -- yeah, that second sentence could be

5    changed.

6    Q.   Okay.  What would you change it to?

7    A.   Referring to that virtually every fact that I quibbled

8    with because it's -- in (inaudible) of that sentence.

9    Q.   Fair enough.  Facts you quibbled with.  He did not agree

10   with the facts that he quibbled with as they were false, would

11   that be fair?

12   A.   I would call it like that.

13   Q.   Okay.  Tell me what facts in the plea agreement you

14   believed to be false.

15   A.   Do you have the plea agreement?  Do you have a copy?

16   Q.   I sure do.

17        MS. CONNOLLY:  I'm going to object.  This is beyond

18   the scope of redirect examination.  I didn't ask him anything

19   about the facts contained in the guilty plea agreement on my

20   redirect.

21        MS. ROOHANI:  Your Honor, Ms. Connolly did ask him

22   about the affidavit, and he said that it was big picture true.

23   So I'm trying to ascertain what is true and what is not true,

24   and I believe that that is absolutely within the scope.

25        THE COURT:  Right.  Overruled.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1          MS. CONNOLLY:  I didn't ask him -- the affidavit

 2    pertains to the motion to reply.  It has nothing to do with

 3    the guilty plea.

 4          MS. ROOHANI:  And, Your Honor, it specifically says

 5    reply in the affidavit --

 6          MS. CONNOLLY:  It's way outside the scope.

 7          THE COURT:  Overruled.  He can answer the question.

 8    BY MS. ROOHANI:

 9    Q.   I'm going to show you -- this is my copy.  So I'm going

10    to get it back from you at the end, but this has been admitted

11    as --

12    A.   Yes.

13    Q.   -- Defense Exhibit G.

14          MS. ROOHANI:  May I approach, Your Honor?

15          THE COURT:  You may.

16          THE DEFENDANT:  Thank you.

17          MS. ROOHANI:  Um-hum.

18          COURTROOM ADMINISTRATOR:  And that was G,

19    Ms. Roohani?

20          MS. ROOHANI:  G.

21          COURTROOM ADMINISTRATOR:  Thank you.

22          THE DEFENDANT:  So you want to --

23    BY MS. ROOHANI:

24    Q.   Tell me which facts -- which paragraphs -- which

25    paragraphs are false.
```

JAN ROUVEN FUECHTENER - Recross-Examination

1          **MS. CONNOLLY:**  I'd also object to --

2          **THE DEFENDANT:**  That is a hard question --

3          **MS. CONNOLLY:**  I'd also object on the grounds of

4    relevance.

5          **THE COURT:**  The facts that are provided that are

6    provided to the Court is the basis for the withdraw of plea,

7    those are relevant and that's -- overruled.

8          **MS. ROOHANI:**  Thank you, Your Honor.

9    BY MS. ROOHANI:

10   Q.   Jan, I'm specifically looking at page 4 --

11   A.   Yes.

12   Q.   -- page --

13   A.   That's where I am.

14   Q.   Page 4, page 5, and page 6.  So you've read those facts

15   before.  Right?

16   A.   Yes.

17   Q.   So tell me which paragraphs are false.

18   A.   Well, in every paragraph is something false.

19   Q.   Tell me what's false in paragraph 1.

20   A.   Well, that's actually -- one is correct if the dates -- I

21   mean, you provided the -- I -- I believe the dates are

22   correct.

23   Q.   I'm going to have you jump to paragraph --

24   A.   But, in fact I can't -- like, hundred files, I mean, I

25   don't know.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    Q.    Okay.

 2    A.    But, I mean, we had -- you presented it.  I -- I believe

 3    it's -- it's right.

 4    Q.    I'm going to have you look at paragraph 8.

 5              MS. CONNOLLY:  Which paragraph?

 6              MS. ROOHANI:  Paragraph 8.  It's on page 6.

 7              MS. CONNOLLY:  Is that on page 6?

 8              MS. ROOHANI:  Yes.

 9    BY MS. ROOHANI:

10    Q.    Is that one of the facts that you quibbled with at the

11    time of the plea colloquy?

12    A.    It was one of the facts, um-hum.

13    Q.    So -- and I'm talking back about the reply when it said,

14    "That is because he did not agree with those facts as they

15    were false," were you specifically talking about part, at

16    least, about paragraph 8?

17    A.    Yeah.  That's on the record.

18    Q.    So it's your testimony that paragraph 8 is false?

19    A.    Yes.

20    Q.    Why?

21    A.    I didn't engage in those chats.

22    Q.    Okay.

23    A.    In here it says the defendant.  So not just a user or...

24    Q.    Mr. Fuechtener, didn't you testify on cross-examination

25    that you wanted the Grindr chats out of the plea because
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    quote, "They were my chats"?

2    A.    Say it again.

3    Q.    Didn't you testify on cross-examination that you wanted

4    the Grindr chats out of the plea because, quote -- those are

5    your words -- "They were my chats"?

6    A.    No, they were not my chats.  I mean, then that -- why

7    would I say I want them out because they are my chats?

8    Q.    Mr. Fuechtener, do you remember that I asked you a

9    question about the specific offense characteristics that

10   Mr. Durham talked to you about?

11   A.    Yes.

12   Q.    And I said to you, "Did he not explain to you that it

13   related that fact to the specific offense characteristic"?

14   A.    No, he did not.

15   Q.    Okay.  And that was your answer?

16   A.    Yes.

17   Q.    You said, "No, he did not"?

18   A.    And I think I answered more than that.

19   Q.    Yes, you did.  I'm going to read it to you.

20            "He said or he told me he doesn't know.  He said the

21   chats are not criminal.  He said the Grindr chats are not

22   criminal.  I don't know why the Government put that in.  Don't

23   worry about that."

24            Do you remember saying that?

25   A.    Yes.

JAN ROUVEN FUECHTENER - Recross-Examination

 1    Q.    And then you remember saying, "I wanted to have them out
 2    because they were my chats"?
 3    A.    Then that -- no.  That wouldn't make sense.
 4    Q.    Mr. Fuechtener, did you testify under oath and say, "I
 5    wanted to have them out because they were my chats"?
 6    A.    No.
 7              MS. CONNOLLY:  Objection.
 8              THE DEFENDANT:  I mean --
 9              MS. CONNOLLY:  He just --
10              THE DEFENDANT:  No.
11              MS. CONNOLLY:  -- indicated that that was incorrect.
12    Just because they're in a transcript doesn't mean that it's
13    verbatim absolutely what he said, especially when he's talking
14    with an accent.
15              THE COURT:  Sustained.
16    BY MS. ROOHANI:
17    Q.    Mr. Fuechtener, do you know that the transcript is the
18    official record of this court?
19    A.    Yes.  Of course.
20    Q.    And you haven't sought to fix that record in any way,
21    have you?
22    A.    I haven't seen the record.
23    Q.    Would it help you remember your testimony if I gave you a
24    copy of the transcript?
25    A.    Yes.

JAN ROUVEN FUECHTENER - Recross-Examination

1          **MS. ROOHANI:**  Your Honor, may I approach?

2          **MS. CONNOLLY:**  Also, Judge, I think this is improper

3    when, as his lawyer, I haven't had an opportunity to review

4    the transcript.  Just because it's in the transcript doesn't

5    necessarily mean that it's accurately taken down, again,

6    especially with somebody who has an accent.

7          **MS. ROOHANI:**  Your Honor, it's a transcript of the

8    proceeding, the last proceeding --

9          **THE COURT:**  Well, it may or may not be correct

10   because of his accent.  I agree.  But -- especially when it's

11   one word off as to whether he's saying those are aren't --

12   aren't -- those are my chats, not my chats, they aren't my

13   chats.

14   **BY MS. ROOHANI:**

15   Q.   Mr. Fuechtener, would you --

16         **THE COURT:**  I think we're spending --

17   **BY MS. ROOHANI:**

18   Q.   -- like the Court --

19         **THE COURT:**  -- a lot of time on a very minor point.

20   But go ahead.

21   **BY MS. ROOHANI:**

22   Q.   Would you like the Court and reporter to check the

23   transcription against the audio?

24   A.   Yes.

25   Q.   Go ahead and look at page 11 of document 221.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   A.    Okay.
 2   Q.    Specifically --
 3   A.    221.
 4   Q.    221, page 11, line 8.  It says, "Rouven maintains his
 5   innocence."
 6              Do you see that sentence?
 7        MS. CONNOLLY:  Where are you at?
 8        THE DEFENDANT:  Yes.
 9        MS. ROOHANI:  Page 11 --
10        THE COURT:  Page 11 --
11        MS. ROOHANI:  -- line 8.
12        THE DEFENDANT:  Yes.
13   BY MS. ROOHANI:
14   Q.    It says, "Rouven maintains his innocence"?
15   A.    Yes.
16   Q.    Anything about that you'd like to change?
17   A.    It's not a yes-or-no answer.  Can I explain?
18   Q.    Do you maintain your innocence, Mr. Rouven?
19   A.    At what point?
20   Q.    Now, today, as we stand here, do you maintain that you
21   are innocent?
22   A.    I made an assertion of innocence.
23   Q.    Despite the fact that you pled guilty in this case?
24        MS. CONNOLLY:  Objection.  I think we're way afar
25   afield of my redirect at this point, Your Honor.  She's
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    basically opening up her cross -- initial cross-examination

2    again and trying to clean it up.

3          MS. ROOHANI:  We were specifically talking about the

4    big picture.  We're still talking about things that are in the

5    motion that he's attested are true that are not true.

6          THE COURT:  Sustained.  Move on.

7    BY MS. ROOHANI:

8    Q.   You testified on redirect that Mr. Humphries was the

9    person who made you aware of your guideline exposure under the

10   plea.  Do you remember that?

11   A.   Yes.

12   Q.   Can you look at the motion, Document No. 194, page 7.

13   A.   Okay.

14   Q.   And that's what you swore as being true on lines 19 and

15   20.  Correct?

16   A.   With the affidavit.

17   Q.   But the affidavit, you swore that that sentence was true?

18   A.   Yes.

19   Q.   On cross-examination, you testified that Mr. Humphries,

20   in fact, did not tell you that the number 40 corresponded to

21   292 to 365 months.  Do you remember that?

22   A.   Yes.

23   Q.   So is it your testimony that Mr. Humphries did not advise

24   you of the true guideline range or that he did advise you of

25   the true guideline range?

JAN ROUVEN FUECHTENER - Recross-Examination

1    A.    He advised me of the guideline exposure --

2    Q.    Which would be --

3    A.    -- like in that --

4    Q.    -- 292 to 365 months.  Correct?

5    A.    That's not how I read that when I read the motion.

6    That's not how I understood it.

7    Q.    Is your guideline exposure under the terms of the plea

8    agreement 292 to 365 months?

9    A.    Yes.

10   Q.    And so when you read guideline exposure, it was referring

11   to 292 to 365 months?

12   A.    Not for me.

13   Q.    What does guideline exposure mean to you, Mr. --

14   A.    The word exposure, when I read it, for me, that means

15   exposure is, like, to -- something to -- not like a little

16   thing.  Exposure to way more than that.  Exposure is -- I

17   understand -- I have a different understanding of that word.

18   Q.    Okay.  What do you think that that meant?

19   A.    What I'm exposed to.

20   Q.    Which is what?

21          MS. CONNOLLY:  Object -- I'm going to object to the

22   relevance of what he thought it meant.  That was a plea deal

23   that was prepared by his attorney, that was signed by his

24   attorney, he didn't write it, and what it meant to him is

25   really irrelevant.

1    **THE COURT:**  Overruled.  He can answer the question.
2    BY MS. ROOHANI:
3    Q.   What did that mean to you?
4    A.   At what -- at which time?
5    Q.   When you swore that this was true, what did it mean to
6    you?
7    A.   That the exposure is way higher than what I think my
8    lawyers represented to me.
9    Q.   And what was that?
10   A.   And it's higher than what -- what Mr. Humphries
11   explained.  Because he explained and came out to 32 or 33 and
12   this is even higher.  It's an even higher exposure.  That's
13   how I understood the sentence.  So to answer your question,
14   exposure, when I swore to it, didn't mean the exact range of
15   40 points.  It meant, for me, an exposure higher than what I
16   understood what it was.
17   Q.   At the time that the reply was filed, what did your --
18   what was your understanding of the exposure of -- what
19   Mr. Humphries told you your sentencing exposure was?
20   A.   According to the guidelines?
21   Q.   Yes.  According to the plea agreement.
22   A.   More than 12 to 14 years.
23   Q.   More than 12 to --
24   A.   More.  Way more.  And he said probably over 20 years.
25   Q.   He said probably over 20 years?

1    A.    Um-hum.

2    Q.    He did not tell you it's 24.3 to 30 years.  Correct?

3    A.    No.

4    Q.    Go ahead and take a look at that reply, page 3.  The very

5    first sentence of the full paragraph starting on line 3.

6    A.    Okay.

7    Q.    Anything you want to change about that sentence?  And I'm

8    specifically talking about, "Rouven became aware" --

9    A.    Yeah.  I want to see the context of the word.

10   Q.    -- "that he had stipulated to a sentencing range of 24.3

11   to 30 years the evening after his plea when a fellow inmate so

12   advised him," is there anything --

13   A.    Well, yeah, I would -- I would clarify that.

14   Q.    You would clarify it because it's false.  Correct?

15   A.    Yes.

16   Q.    That sentence is false?

17   A.    Yes.

18   Q.    Mr. Humphries did not tell you --

19          **MS. CONNOLLY:**  Objection --

20   **BY MS. ROOHANI:**

21   Q.    -- your guideline exposure --

22          **MS. CONNOLLY:**  Objection --

23   **BY MS. ROOHANI:**

24   Q.    -- correct?

25          **MS. CONNOLLY:**  -- asked and answered.

JAN ROUVEN FUECHTENER - Recross-Examination

1          **THE COURT:**  Sustained.

2    **BY MS. ROOHANI:**

3    Q.   Mr. Humphries gave you incorrect information, didn't he,

4    Mr. Fuechtener?

5    A.   No --

6          **MS. CONNOLLY:**  Objection --

7          **THE DEFENDANT:**  -- I don't think so.

8          **MS. CONNOLLY:**  -- as to relevance.

9          **THE COURT:**  Sustained.

10   **BY MS. ROOHANI:**

11   Q.   All right.  You testified today with Ms. Connolly that

12   Mr. Durham did not read the plea agreement with you.  Do you

13   remember that testimony?

14   A.   Yes.

15   Q.   Go ahead and look at the motion, page 7, lines 15 and 16.

16   A.   Okay.

17   Q.   Anything you want to change about that?

18   A.   13 to 16?

19   Q.   15 to 16.

20   A.   15 to 16.  Yeah, I would -- in line 15, I would change

21   the word "read."

22   Q.   That sentence, as it's written in the motion, is false.

23   Correct?

24   A.   I didn't perceive it that way when I read it and swore to

25   it.  Because read -- read was, for me, the appropriate word

JAN ROUVEN FUECHTENER - Recross-Examination

1    to --

2    Q.    What does the word "read" --

3    A.    -- to go over.  That would include that -- for me,

4    it's -- that's the black-and-white thing.  I have, like -- I

5    didn't know paraphrase.  I didn't know that -- let -- yeah,

6    when I read it -- when I read the motion, I perceived it the

7    way he had it, that word.  It's -- that's how I read it.

8    Q.    Didn't you previously testify on cross-examination,

9    Mr. Fuechtener, that you did not believe the word "read" and

10   "paraphrase" meant the same thing?

11   A.    Say it again.

12   Q.    Didn't you previously testify that the words "read" and

13   "paraphrase" do not mean the same thing?

14   A.    Yes.

15   Q.    Did you previously testify the words "read" and

16   "summarize" don't mean the same thing?

17          MS. CONNOLLY:  I'm going to object to relevance.

18   This has already been gone over on direct examination.

19          THE COURT:  Overruled.  He can answer it.

20          THE DEFENDANT:  Yes.

21   BY MS. ROOHANI:

22   Q.    And didn't you previously testify that "read" means to

23   read something?

24   A.    It would include that, yeah.

25   Q.    So it's your testimony that reading something includes

JAN ROUVEN FUECHTENER - Recross-Examination

1    not -- I'm trying to understand.  Is it now that reading also

2    includes summarizing and paraphrasing?

3         **MS. CONNOLLY:**  I'm going to object to the relevance

4    of this.

5         **THE DEFENDANT:**  No.

6         **MS. CONNOLLY:**  She's badgering him.  He's already

7    asked and answered it multiple times.

8         **THE COURT:**  Overruled.  He can clarify his

9    understanding of the words we're using and whether or not the

10   meaning that he has attached to those words is the same as the

11   meaning that we may attach to those words.

12   **BY MS. ROOHANI:**

13   Q.   So, to you, "read" means the exact same thing as

14   "paraphrasing" and "summarizing"?

15   A.   It's not exactly the same thing, no.

16   Q.   So when you read in this where it says when Mr. Durham

17   continued to read --

18   A.   Um-hum.

19   Q.   -- the plea agreement with you, that that meant

20   summarize?  To you.

21   A.   Yes.  Because I know what he did.

22   Q.   And I believe you previously testified that Mr. Durham

23   did not read the guidelines to you line by line.  Correct?

24        **MS. CONNOLLY:**  Objection.  Misstates -- misstates his

25   testimony.

1           **THE COURT:**  Overruled.

2     **BY MS. ROOHANI:**

3     Q.   You testified today that Mr. -- Mr. Durham did not read

4     the guidelines portion of that plea to you line by line.

5     Correct?

6     A.   Which section do you mean by guideline?

7     Q.   Ms. Connolly asked you if Mr. Durham read the guideline

8     section to you line by line.  Do you remember that question?

9     A.   Yes.

10    Q.   You said no.  Correct?

11    A.   Yes.

12    Q.   On cross-examination, when I asked you specifically about

13    that section, you testified that Mr. Durham -- that section

14    only, he did actually read it to you.  Correct?

15    A.   What's there missing about the section?  Did -- when we

16    talked about this, did we have the section in -- is it, like,

17    on page 7, section 6?

18    Q.   Did I refer you to pages 7 and 8 in that plea agreement

19    the last time we were here?

20    A.   Okay.  Yes.

21    Q.   Did you turn to page 7 at that time?

22    A.   Yes.

23    Q.   And did I ask you, "He summarized knowing distribution

24    for you?"

25           Did I ask you that question?

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    A.    Yes.

 2    Q.    And did you say, "These things he just read to me"?

 3    A.    Yes.

 4    Q.    And did I clarify, "So he read it to you?"

 5    A.    That part, yeah, he read to me.

 6    Q.    And you said, "Uh-huh," meaning yes?

 7    A.    When did I say -- ah.

 8    Q.    I'm reading the transcript.  It says, "Uh-huh."  Did that

 9    mean yes?

10    A.    Yes.

11    Q.    So the guidelines portion of this plea agreement was, in

12    fact, read to you?

13    A.    Yes.  I mean, the -- not A and B because that's a long

14    text, but when it goes to one and it goes to the list, he read

15    that list to me.

16    Q.    Under the section guidelines, he read it to you?

17    A.    Yeah, without the paragraph and that -- I mean --

18    Q.    He read it to you.  Correct?

19    A.    Yeah.

20    Q.    Go ahead and look at the reply.

21    A.    Say it again.

22    Q.    The reply, page 4, lines 21 and -- to 23.

23    A.    Okay.

24    Q.    Specifically --

25    A.    Which pages?
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    Q.    Page 4.

2    A.    Okay.

3    Q.    Specifically talking about the sentence, "Rouven

4    represents that Durham spent approximately an hour going over

5    the agreement with him.  This included reading the 17-page

6    document."

7              All right.  Is there anything about that sentence you

8    want to change?

9    A.    Which line are you --

10   Q.    Page -- lines 21 to 23.  "Rouven represents that

11   Durham" --

12   A.    All right.  Thank you.  I found it.

13             Yeah, that could be clarified.

14   Q.    Clarified to mean?

15   A.    Rouven represents that Durham spent approximately an hour

16   going over the agreement with him.  Going over the 17-page

17   document with him.

18             Now, after I learned -- now I will change it.  Back

19   then I wouldn't have changed it.

20   Q.    So going over something with you is the same as reading

21   something with you, Mr. Rouven?

22   A.    Say it again.

23   Q.    Is going over something with you the same as reading it?

24   A.    No.

25   Q.    So, here, where it says that he spent an hour going over

JAN ROUVEN FUECHTENER - Recross-Examination

1   the agreement with you, and then it says "this included

2   reading it" --

3   A.   Um-hum.

4   Q.   -- you would agree with me that going over something and

5   reading something are two different things?

6   A.   Now I would agree.

7   Q.   So it's your testimony that, when you read reading there,

8   you thought it meant going over it, so it was saying the same

9   thing twice?

10  A.   Yeah.  I read it in the same meaning as -- at the other

11  time when she mentioned and called it reading.

12  Q.   You testified today that Mr. Durham skipped entire parts

13  of the plea agreement.  Do you remember that testimony?

14  A.   Yes.

15  Q.   Well, didn't you testify on cross that Mr. Durham, quote,

16  "Said something to every point"?

17  A.   Yes.

18  Q.   You would agree that saying something to every point does

19  not constitute skipping entire parts of the plea agreement?

20  A.   No, I wouldn't agree.

21  Q.   So you can skip entire parts of plea agreements and still

22  say something to every point, that's your testimony?

23  A.   Yes.

24  Q.   All right.

25  A.   I mean, can I explain?

1    Q.    Sure.

2    A.    I'm -- I'm -- I just want to make sure that you

3    understand it.

4    Q.    I'm trying to understand it, too.

5    A.    There were certain sections where he said, "Jan, don't

6    worry about this.  That doesn't apply to you," which means

7    he -- he didn't explain it.  And, actually, learning now it

8    does apply.  But back then he -- he skipped it but by saying

9    something.  That's --

10   Q.    Did you testify --

11   A.    That's what I mean.

12   Q.    When Ms. Connolly asked you if Mr. Durham paraphrased the

13   plea agreement, didn't you testify that he said, "This is this

14   and that is this and this is that," that was your testimony.

15   Correct?

16   A.    Yes.

17   Q.    And that is saying something to each part of the plea

18   agreement.  Correct?

19   A.    Yes.

20   Q.    So it's your testimony that, when he said, "This is this

21   and that is that," he said, "Don't worry about this, this

22   doesn't matter"?

23   A.    That would -- that includes that, yeah.  "This is this

24   and that is that and that means you don't have to worry about

25   it."

JAN ROUVEN FUECHTENER - Recross-Examination

1    Q.   You testified today that, at the beginning of the

2    conversation with Mr. Durham, the morning that you entered

3    your plea, that part of the conversation was still about

4    whether you were going to take the plea or not.  Correct?

5    A.   Yes.

6    Q.   And specifically you had previously testified that you

7    had gone home, you had a sleepless night, you came back the

8    next morning, and you were still prepared to continue trial.

9    Correct?

10   A.   Yes.

11   Q.   You testified previously that taking a deal was one of

12   the options that you had?

13   A.   Yes.

14   Q.   You testified today that you don't look at documents if

15   you trust the people who've drafted those documents.  Correct?

16   A.   Yes.

17   Q.   Who drafted that plea agreement, Mr. Fuechtener?

18   A.   I would think your team together with Mr. Marchese over

19   the phone?  I mean, you -- you -- the United States Attorney's

20   Office makes the draft, but I would think you talk about

21   certain things.

22   Q.   Okay.  So the draft that -- that -- of the plea agreement

23   that you had was drafted, in part, by the United States

24   Attorney's Office?

25   A.   Yes.

JAN ROUVEN FUECHTENER - Recross-Examination

```
1    Q.   That is the entity that's prosecuting you for child
2    pornography crimes.  Correct?
3    A.   Yes.
4    Q.   So it's your testimony that you didn't look at that
5    document because you trust the people who drafted that
6    document.  Correct?
7              MS. CONNOLLY:  Objection.  Misstates his testimony.
8              THE COURT:  Overruled.  He can -- he can answer.
9              THE DEFENDANT:  Ask the question again.
10   BY MS. ROOHANI:
11   Q.   You testified today that you don't look at documents if
12   you trust the people who wrote those documents.  Correct?
13   A.   Yes.
14   Q.   And you know that the United States Attorney's Office,
15   who is prosecuting you, is one of the people at least who
16   drafted that document.  Correct?
17   A.   Yes.
18   Q.   So it's your testimony that you would sufficiently trust
19   the United States Attorney's Office and not read that plea
20   agreement and sign it because you trusted the people who
21   drafted that document?
22   A.   No, that's not -- no.
23   Q.   Okay.  So you did not trust the people who drafted that
24   document?
25   A.   I trusted my lawyers at that point.
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    Q.    Did your lawyers draft that plea agreement?

2    A.    No.

3    Q.    Who drafted that plea agreement?

4    A.    Your office.

5    Q.    You testified that you don't look at things if you trust

6    the people who drafted it.  Correct?

7    A.    That's --

8          MS. CONNOLLY:  Objection.  That misstates --

9          THE DEFENDANT:  It includes that.

10         MS. CONNOLLY:  -- his testimony.  He never said he

11   doesn't look at anything ever.  He said sometimes he trusts

12   the people that are working for him.

13         MS. ROOHANI:  That misstates his testimony.

14         THE COURT:  Sometimes he trusts the person and

15   sometimes he looks at the artistic things or things that he's

16   interested in looking at but not all of it.

17         MS. ROOHANI:  Okay.

18         THE COURT:  So that's...

19   BY MS. ROOHANI:

20   Q.    Would it be fair to say there was important things in a

21   plea agreement, Mr. Fuechtener?

22   A.    There were important things in it?

23   Q.    Would you agree that there's important things in a plea

24   agreement?

25   A.    Yes.

JAN ROUVEN FUECHTENER - Recross-Examination

1   Q.   I believe you previously testified that that was your

2   life on the line.  Correct?

3   A.   I didn't see it, when I signed it, that -- that way.  But

4   now I -- I -- I mean, afterwards I learned and then I

5   testified that.

6   Q.   Your testimony is that your attorneys told you you were

7   looking at 5 to 15 years in prison but you did not think that

8   that had any implications in that plea agreement.  Correct?

9   A.   If that had any --

10  Q.   It's your testimony your attorneys told you that that

11  plea agreement said 5 to 15 years.  Correct?

12  A.   No.

13  Q.   What did you think that plea agreement said,

14  Mr. Fuechtener?

15  A.   That --

16           MS. CONNOLLY:  I'm going to object to --

17           THE DEFENDANT:  -- the judge has a big --

18           MS. CONNOLLY:  -- the form of the question, what that

19  plea agreement said.  That plea agreement said multiple

20  things.  So I think it's an improper question.

21           MS. ROOHANI:  I can narrow it, Your Honor.

22  BY MS. ROOHANI:

23  Q.   In terms of -- in terms of your possible sentence, what

24  do you think that plea agreement said?

25           MS. CONNOLLY:  I'm sorry.  Can you repeat that,

JAN ROUVEN FUECHTENER - Recross-Examination

1    please?

2    **BY MS. ROOHANI:**

3    Q.    In terms of the possible sentence, what do you think that

4    plea agreement said?

5    A.    After the explanations of --

6    Q.    No.

7    A.    -- my lawyers?

8    Q.    The day you signed that plea agreement.

9    A.    Well, that was that day.  That it is realistic -- very

10   realistic to receive a five-year sentence but, of course, they

11   can't guarantee that.  And that the judge has, like, a -- a

12   big -- it's a big range and it's -- it's up to her discretion

13   and up to sentencing which arguments and all that will be

14   brought forth.

15   Q.    And what was the top end of the range that you thought

16   that plea agreement talked about?

17   A.    The top end is, like -- it's 20 years per charge.

18   Q.    So you understood that Judge Navarro could sentence you

19   up to 60 years under that plea agreement.  Correct?

20   A.    Yes.

21   Q.    And it's your testimony that the potential of spending 60

22   years in prison was not sufficiently important for you to read

23   that plea agreement?

24             **MS. CONNOLLY:**  Objection.  Misstates his testimony.

25             **THE COURT:**  Sustained.

JAN ROUVEN FUECHTENER - Recross-Examination

1   **BY MS. ROOHANI:**

2   Q.   If you were looking at 60 years in prison, which you

3   testified that you were, do you think it would be important

4   for you to read that plea agreement?

5   A.   I didn't want to testify that I was looking at 60 years.

6   Q.   Twenty years per count --

7   A.   It's a possibility.

8   Q.   It was a possibility?

9   A.   Yeah.

10  Q.   A possibility of 60 years in prison, do you think it

11  would have been important for you to read a document that

12  could secure that?

13  A.   I trusted my lawyers at that point, and I perceived it in

14  a -- in a way that this wouldn't happen.

15  Q.   Despite the fact that your attorneys told you that they

16  couldn't guarantee you anything.  Correct?

17  A.   I mean, that day -- that -- every reasonable person in my

18  position would have received it after the explanation that

19  this 60 years won't happen.  It just won't happen.  That they

20  guaranteed me.

21          **MS. ROOHANI:**  I'm going to move to strike that for

22  speculation, Your Honor.

23  **BY MS. ROOHANI:**

24  Q.   Want to know what you think, Jan.

25  A.   Hmm.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    Q.    What did you think would happen under this plea agreement
 2    if Judge Navarro had the discretion to go up to 60 years?
 3          MS. CONNOLLY:  Objection.  He never said -- misstates
 4    his testimony.
 5          THE DEFENDANT:  Well, I had the understanding that
 6    that wouldn't happen.
 7    BY MS. ROOHANI:
 8    Q.    Did your attorneys promise you that?
 9    A.    They didn't promise it.
10    Q.    I want to talk about you trusting in your lawyers.
11    A.    Yes.
12    Q.    So it's your testimony that you trusted your attorneys to
13    tell you what was in the plea.  Correct?
14          You trusted your attorneys to tell you what was in
15    the plea agreement.  Correct?
16    A.    Yes.
17    Q.    And that's why you didn't read it?
18    A.    That was one part.  That was one reason.
19    Q.    So what was the other reason that you didn't read the
20    plea agreement?
21    A.    Time pressure.  Downstairs, when we weren't finished and
22    then the -- the -- the one U.S. Marshal came and he didn't
23    know.  He -- the U.S. Marshals thought there's a trial to be
24    continued at noon, so they came rushing in and they didn't
25    care about the plea agreement.  They said, "We need to dress
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    him out."  And then, of course, the lawyers said what the

2    marshals -- you know, it -- they have custody over me there.

3    So they took me out and they dressed me out, and I -- someone

4    came running in with something so that was -- it was a rush.

5    I thought I can sit there and read -- can talk, which we

6    probably could have had if we would have -- all my lawyers

7    would have asked for it.

8    Q.    When you were down in marshal lock-up, you were reading

9    that plea agreement through a mesh screen; is that right?

10   A.    I didn't read it through the mesh screen.

11   Q.    You --

12   A.    Yeah, I --

13   Q.    -- were talking about the plea agreement through a mesh

14   screen?

15   A.    Yes.

16   Q.    At some point you were brought up to the courtroom?

17   A.    Yes.

18   Q.    There's no mesh screen in the courtroom?

19   A.    No.

20   Q.    You had the opportunity to talk to all three of your

21   attorneys at that time.  Correct?

22   A.    Yes.

23   Q.    And, in fact, you did talk to them --

24   A.    Yes.

25   Q.    -- for a considerable period of time?

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1              In fact, Mr. Blazevich asked if we were ready at some
 2   point, and you said, "No, I'm not ready," isn't that correct?
 3   A.   Um-hum, yeah.
 4   Q.   Okay.  Mr. Blazevich gave you additional time.  Correct?
 5   A.   Yes.
 6   Q.   Judge Navarro gave you additional time?
 7   A.   Yes.
 8   Q.   Judge Navarro again asked if you were ready and you said
 9   that you were ready.  Correct?
10   A.   Yes.
11   Q.   And only at that point did Judge Navarro come out on the
12   bench?
13   A.   Yes.
14   Q.   So it's your testimony that you didn't have enough time,
15   but you still told Judge Navarro that you were ready to
16   proceed?
17   A.   At that time, I felt that I was ready.
18   Q.   Okay.  And when you did the plea colloquy, you were
19   placed under oath.  Correct?
20   A.   Yes.
21   Q.   Judge Navarro asked you if you had sufficient time to
22   talk about the plea with your attorneys.  Correct?
23   A.   Yes.
24   Q.   She asked you specifically if you had --
25           MS. CONNOLLY:  Objection.  We've gone -- she's gone
```

JAN ROUVEN FUECHTENER - Recross-Examination

1  way beyond the scope of my redirect and she already went over

2  this on her cross-examination.

3         MS. ROOHANI:  I'm attempting to impeach his prior

4  answers, Your Honor.

5         THE COURT:  It's not proper and --

6         MS. CONNOLLY:  And, again, this is recross --

7         THE COURT:  -- not proper impeachment the way that

8  you're doing it.  You're just reading him the transcript and

9  asking him if his recollection is that the transcript is

10  correct.  I'm not sure what...

11 BY MS. ROOHANI:

12 Q.   I want to be clear.  It's your testimony today that you

13 did not have sufficient time to review that plea agreement.

14 Correct?

15 A.   In retrospective from today, I would say yeah.  But at

16 that day, I felt it was sufficient time.

17 Q.   Mr. Fuechtener, did you previously testify that you lost

18 trust in your legal team when they came in with that plea

19 agreement?

20 A.   I think I testified it was a little bit earlier.  It was

21 even before when I lost trust.

22 Q.   You lost -- when did you lose trust with them?

23 A.   When Mr. Marchese came in from that little break and

24 said, "Jan, have you ever thought about a deal?"

25 Q.   That was the point?

JAN ROUVEN FUECHTENER - Recross-Examination

1    A.    That was the point when -- yeah, when I thought -- I

2    mean, having never talked -- I mean, we never talked about a

3    deal.  They never mentioned one.

4    Q.    Okay.

5    A.    And he comes into the courtroom with shaking hands,

6    eating something, and -- and says, "Jan, have you ever thought

7    about a plea?"

8    Q.    Okay.  So it's your testimony that that's the point at

9    which you lost trust in your legal team.  Correct?

10   A.    Yeah.  It was even a little bit earlier than that, but

11   that was the -- the key moment where I lost trust.

12   Q.    But you still trusted them to explain the terms of the

13   plea agreement to you?

14   A.    I felt I had no other choice.

15   Q.    Mr. Fuechtener, do you know that your attorneys have a

16   legal obligation to present offers to you?

17            **MS. CONNOLLY:**  Objection to relevance.

18            **THE COURT:**  Sustained.

19   **BY MS. ROOHANI:**

20   Q.    Ms. Connolly asked you questions today about that number

21   40 in the plea agreement.  Do you remember that?

22   A.    The number four in the --

23   Q.    The number 40, four-zero, in the plea agreement, and you

24   testified that it didn't have any meaning for you.

25   A.    Where is that to review?  Sorry.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    Q.    The specific offense characteristics --

 2    A.    I'm confused.

 3    Q.    -- pages 7 and 8.

 4          MS. CONNOLLY:  I'm sorry?  I didn't hear you.

 5          MS. ROOHANI:  Pages 7 and 8.

 6          THE DEFENDANT:  Okay.

 7          MS. CONNOLLY:  Of the guilty plea agreement?

 8          MS. ROOHANI:  Yes.

 9          THE DEFENDANT:  And your question was?

10    BY MS. ROOHANI:

11    Q.    You saw that number 40.  You testified to that.  Correct?

12    A.    That number four?

13    Q.    Forty, four-zero.

14    A.    Oh, the -- yeah.

15    Q.    You saw --

16    A.    Well, I -- yeah.

17    Q.    You saw that the day that you signed the plea agreement?

18    Did you previously testify --

19    A.    I don't remember seeing the 40 then, to be honest.

20    Q.    Did you previously testify on direct examination that you

21    saw the number 40 before you signed that plea agreement?

22    A.    I don't recall that.

23          MS. ROOHANI:  A moment's indulgence, Your Honor.

24    BY MS. ROOHANI:

25    Q.    Did you previously testify on direct that you saw the
```

AMBER M. McCLANE, CCR 914
(702) 384-0429

 1   number 40 in the plea agreement?  Do you remember that?

 2   A.   That was two weeks ago.  In the hearing?

 3   Q.   Would looking at the transcript help refresh your

 4   recollection?

 5   A.   Okay.  Yeah --

 6          **MS. ROOHANI:**  Your Honor, may I --

 7          **THE DEFENDANT:**  -- I probably said that.

 8          **MS. ROOHANI:**  -- approach?

 9          **THE COURT:**  You may.

10   **BY MS. ROOHANI:**

11    Q.   Specifically --

12          **MS. ROOHANI:**  And, Your Honor, I don't know if this

13    is picking up.

14   **BY MS. ROOHANI:**

15    Q.   I'm specifically referring to the number 40 --

16    A.   Yeah, yeah --

17         *(Simultaneous crosstalk.)*

18   **BY MS. ROOHANI:**

19    Q.   -- said, "Yeah" --

20    A.   -- okay.

21    Q.   -- "I saw I that."

22    A.   No, I said that.  Um-hum.

23    Q.   So you testified on direct that you saw the number 40 in

24    the plea agreement before you signed it.  Correct?

25    A.   Yes.

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   Q.   You also testified that you did not understand what that
 2   meant, that's what you told Ms. Connolly today?
 3   A.   Yes.
 4   Q.   Is it your testimony that you saw something in a plea
 5   agreement and you didn't ask a single question about it?
 6            MS. CONNOLLY:  Objection.  Misstates his testimony.
 7            MS. ROOHANI:  I'm asking him, Your Honor.  I'm not
 8   stating his testimony at all.
 9            THE COURT:  Overruled.
10            THE DEFENDANT:  It -- at that point, it didn't have a
11   meaning to me.
12   BY MS. ROOHANI:
13   Q.   Did you have -- did you ask any --
14   A.   I saw it but I didn't know what it -- what it meant.
15   Q.   You saw it.  Correct?
16   A.   Um-hum.
17   Q.   You didn't know what it meant.  Correct?
18            And you didn't ask any questions about it.  Correct?
19   A.   Yes.
20   Q.   So when you don't understand things, Mr. Fuechtener, you
21   don't ask questions about them; is that your testimony?
22            MS. CONNOLLY:  Objection.  Misstates his testimony.
23   She's being argumentative.
24            THE COURT:  Sustained.
25   ///
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    BY MS. ROOHANI:
 2    Q.   You didn't ask any questions to your attorneys about
 3    that --
 4              MS. CONNOLLY:   Objection.  Asked and answered.
 5    BY MS. ROOHANI:
 6    Q.   -- correct?
 7              THE COURT:   Sustained.
 8    BY MS. ROOHANI:
 9    Q.   Did you ask your attorneys any questions about that
10    number, Mr. Fuechtener?
11              MS. CONNOLLY:   Objection.  Asked and answered.
12              THE COURT:   I don't think that one's been asked.
13    BY MS. ROOHANI:
14    Q.   Did you ask your attorneys any questions about that
15    number 40?
16    A.   No.
17    Q.   Did you ask Judge Navarro any questions about that number
18    40?
19              MS. CONNOLLY:   Objection.  Relevance.  Again, she's
20    doing a redo of her cross-examination of my direct.  This is
21    beyond the scope of my redirect.
22              THE COURT:   Overruled.  He can answer.
23    BY MS. ROOHANI:
24    Q.   Did you ask Judge Navarro about anything that number 40?
25              MS. CONNOLLY:   I would also object that the
```

1  transcript and record speaks for itself.

2          **THE COURT:**  Overruled.  I think this is a foundation

3  for another question.  So he can answer.

4  **BY MS. ROOHANI:**

5  Q.   Did you ask Judge Navarro what that number 40 meant?

6  A.   When I was in the courtroom with Judge Navarro, I think

7  that wasn't -- the 40 wasn't mentioned again, so I didn't ask

8  about it at that point.  That wasn't in my mind to ask.  That

9  wasn't on my mind.  I didn't ask her.

10 Q.   And I just want to be -- I want to be clear.  You saw it,

11 you didn't understand it, you didn't know what it was, you

12 didn't ask anybody about it --

13         **MS. CONNOLLY:**  Objection --

14 **BY MS. ROOHANI:**

15 Q.   -- that's your testimony?

16         **MS. CONNOLLY:**  -- asked and answered.

17         **THE COURT:**  Sustained.

18 **BY MS. ROOHANI:**

19 Q.   Let's talk a little bit about Mr. Humphries.  I believe

20 you had previously testified that Mr. Humphries had some

21 familiarity with the child pornography guidelines or you

22 believed that he did?

23 A.   Yes.

24 Q.   I believe you talked on redirect with Ms. Connolly about

25 this, that he got his information from Paul Riddle.  Correct?

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   A.   Yes.
 2          MS. CONNOLLY:  Objection.  This is beyond my
 3   redirect.
 4          MS. ROOHANI:  This is directly the question she asked
 5   in her redirect, Your Honor.
 6          THE COURT:  Yeah, you just asked this in your direct.
 7   Overruled.
 8   BY MS. ROOHANI:
 9   Q.   And specifically on redirect you testified that that
10   number 33 corresponded to 12 to 14 years, and that's what
11   Mr. Humphries told you.  Correct?
12          MS. CONNOLLY:  And I'm going to object.  That was not
13   discussed on redirect.  That was in my direct examination two
14   weeks ago, and she's redoing her cross-examination, not her
15   recross of my redirect.
16          MS. ROOHANI:  His specific answer was 33 corresponded
17   to 12 to 14 --
18          MS. CONNOLLY:  That was --
19          MS. ROOHANI:  -- years.
20          MS. CONNOLLY:  -- appropriate for cross-examination,
21   not now.
22          THE COURT:  Overruled.
23   BY MS. ROOHANI:
24   Q.   That was your understanding, 33 corresponded to 12 to 14
25   years, and that's what Mr. Humphries told you?
```

JAN ROUVEN FUECHTENER - Recross-Examination

1   A.   Well, what I -- how I perceived it was that usually in

2   those cases, like you say, a ballpark of those cases, like

3   this case, other cases, he -- I mean, after I talked to him, I

4   had the understanding that, even with a lower guideline --

5   even with lower guideline points than 40, the sentence is 12

6   to 14 years.  And he said it.  He said what -- I mean, I can't

7   say what he -- he -- I mean --

8   Q.   I want to know what your --

9   A.   That's how I remember it --

10   Q.   -- understanding --

11   A.   -- but --

12   Q.   Your understanding was that 33 corresponded to 12 to 14

13   years.  Correct?

14   A.   I think I said at about --

15   Q.   About 12 to --

16   A.   -- something.

17   Q.   Okay.  And you testified that that was based on

18   Mr. Humphries' conversation with you.  Correct?

19        **MS. CONNOLLY:**  Object again.  This is way beyond the

20   scope.

21        **THE COURT:**  Sustained.

22   **BY MS. ROOHANI:**

23   Q.   Mr. Fuechtener, do you know that Mr. Humphries'

24   guidelines are significantly higher than 33?

25        **MS. CONNOLLY:**  Objection.  Relevance.

AMBER M. McCLANE, CCR 914
(702) 384-0429

1      **THE COURT:**  Sustained.

2   **BY MS. ROOHANI:**

3   Q.   You testified that -- on redirect that you guessed the

4   number 40 would be over 20 years based upon the fact that the

5   number 33 was almost 12 to 14?

6   A.   After the conversation --

7      **MS. CONNOLLY:**  That was direct examination.  It

8   wasn't redirect.

9      **THE COURT:**  Overruled.

10  **BY MS. ROOHANI:**

11  Q.   You guessed that the number 40 would be over 20 years

12  based upon the number 33 being approximately 12 to 14 years.

13  Correct?

14  A.   I didn't guess.  He -- he -- we both -- we had no

15  guideline table.  I mean, and it -- it -- the estimate was

16  correct, proved to be correct.  It is over 20 years.

17  Q.   But it's not --

18  A.   And that's what he told me or that's what -- I mean,

19  we -- yeah.

20  Q.   But you didn't have a guideline book.  Correct?

21  A.   No.

22  Q.   You didn't have a guideline table.  Correct?

23  A.   No.

24  Q.   Mr. Humphries didn't have that guideline table memorized.

25  Correct?

JAN ROUVEN FUECHTENER - Recross-Examination

1   A.   I think he -- he -- he has a very good memory, better

2   than mine, and --

3   Q.   So it's your testimony --

4   A.   -- he talked about it over and -- yeah, I -- I think he

5   has a -- he has a basic memory of the guideline table.  Yes, I

6   do think that.

7   Q.   Okay.  So it's your testimony that Mr. Humphries had the

8   guideline table memorized to some degree?

9        MS. CONNOLLY:   I'll object based on foundation.

10  Speculation.

11       MS. ROOHANI:   It's his belief, Your Honor.

12       MS. CONNOLLY:   Relevance.  What's relevant is what he

13  told him, not what his knowledge was based upon.

14       MS. ROOHANI:   Your Honor, if Mr. Humphries provided

15  incorrect information to Mr. Fuechtener and that was the basis

16  for him to seek to withdraw his motion, it's absolutely

17  relevant.

18       MS. CONNOLLY:   And it's beyond the scope.  She's

19  redoing her --

20       THE COURT:   But you're asking him -- you're asking

21  Mr. Fuechtener if he believes that Mr. Humphries has memorized

22  the guideline table?

23       MS. ROOHANI:   Correct.  Because if he didn't have it

24  memorized and didn't have the guideline table, then the

25  number's potentially incorrect, Your Honor.

JAN ROUVEN FUECHTENER - Recross-Examination

1    MS. CONNOLLY:  It's an improper question.

2    Speculation.

3    THE COURT:  This wasn't what the testimony was.

4    They're extrapolating from one number what another number

5    should be.  There's no reason to believe he thought there was

6    memorization involved.

7    BY MS. ROOHANI:

8    Q.   Did Mr. Humphries do some type of mathematical equation

9    to get to that number?

10    MS. CONNOLLY:  Objection.  Foundation.

11    THE DEFENDANT:  Mathematical?  I mean, he... his

12    equation was more based on certain facts than mathematical but

13    you could -- maybe you could call it mathematical.

14    BY MS. ROOHANI:

15    Q.   Okay.

16    A.   I can -- again, I can clarify what I mean.

17    Q.   How did Mr. Humphries get to that number for you?

18    MS. CONNOLLY:  Objection.  Relevance.  What's

19    relevant is his understanding, what he believed, and his state

20    of mind.  Where Humphries got his information from is

21    completely irrelevant.

22    MS. ROOHANI:  Your Honor, if Mr. Humphries misled

23    Mr. Fuechtener in an effort to get him to try to withdraw his

24    plea, it's absolutely relevant.

25    MS. CONNOLLY:  Well, that's not --

JAN ROUVEN FUECHTENER - Recross-Examination

1    **THE COURT:**  How is that relevant?

2    **MS. ROOHANI:**  It's relevant because, not only does it

3    impeach Mr. Fuechtener's intent in filing a motion and his

4    entire testimony, but it's also potentially impeachment of

5    Mr. Humphries.  I have to lay foundation with somebody.

6    **THE COURT:**  Overruled.  You can ask him -- rephrase

7    the question.

8    **MS. ROOHANI:**  Okay.

9    BY MS. ROOHANI:

10   Q.   Mr. Humphries gave you a number.  He estimated that it

11   would be over 20 years.  Correct?

12   A.   There was a few estimates.  There was, like, a certain --

13   there was a mathematical -- there was a thing -- there was

14   a -- a -- a certain fact he told me how that is to be

15   calculated.

16   Q.   Tell me.  Tell me, what is that?

17   A.   Okay.  He said -- we talked about 12 to 14, and then he

18   said that the guideline table, the more up you go -- a point

19   is way more.  So he said, like, five points -- from 20 to 25

20   is less year difference than from 35 to 40.

21   Q.   Okay.

22   A.   And he said this is -- if you go up there, that is five

23   points is over ten years, I believe he said.  And when it's

24   lower, it goes -- I don't know.  How do we call that?  It

25   goes -- the more up you go, the wider the range gets, so the

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1   more severe 40 points is.  He -- and it proved to be right
 2   because it could -- the span is -- is getting larger.  That's
 3   how he explained it.
 4   Q.   Mr. Humphries didn't tell you that 40 corresponded to 24
 5   to 30 years?
 6           MS. CONNOLLY:  Objection.  It's already been asked
 7   and answered numerous times.
 8           THE COURT:  Sustained.
 9   BY MS. ROOHANI:
10   Q.   When he did the math for you or he explained that to you,
11   he didn't explain to you how he got to the number that he got.
12   Correct?
13   A.   Well, not exactly --
14           MS. CONNOLLY:  Objection.  Asked and answered.  He
15   already told her how he got the number multiple times.
16           THE COURT:  Sustained.
17   BY MS. ROOHANI:
18   Q.   You talked about -- with Ms. Connolly about the process
19   that you went through to get an attorney to file this motion
20   for you?
21   A.   Yes.
22   Q.   Mr. Humphries recommended his own lawyer, Tom Ericsson,
23   didn't he?
24           MS. CONNOLLY:  Objection.  Relevance.
25           MS. ROOHANI:  It's absolutely relevant, Your Honor.
```

```
 1              MS. CONNOLLY:  Irrelevant.  Mr. Ericsson's not

 2      sitting here.

 3              MS. ROOHANI:  Your Honor, I'm going to object to her

 4      speaking objections.

 5              THE COURT:  Sustained.

 6      BY MS. ROOHANI:

 7      Q.   You and Mr. Humphries were originally housed together in

 8      Henderson.  Correct?

 9      A.   Yeah, we were neighbors.

10      Q.   Okay.  And that was at the time of the trial.  Correct?

11      A.   Yes.

12      Q.   And then you had your attorneys file a motion to have you

13      moved to Pahrump, and I believe you testified on redirect that

14      was in January?

15      A.   Yes.

16      Q.   And Mr. Humphries asked to be moved to Pahrump to help

17      you?

18      A.   No.  I don't know what his --

19              MS. CONNOLLY:  Objection --

20              THE DEFENDANT:  -- intention was --

21              MS. CONNOLLY:  -- foundation --

22              THE DEFENDANT:  -- but I don't think so.

23              MS. CONNOLLY:  -- calls for speculation.

24      BY MS. ROOHANI:

25      Q.   But you don't know that that was his intention?
```

JAN ROUVEN FUECHTENER - Recross-Examination

1          **THE COURT:**  I did not hear the objection.  What was

2     the objection?

3          **MS. CONNOLLY:**  The objection was foundation.  Calls

4     for speculation.  Relevance.

5          **MS. ROOHANI:**  If he knows, Your Honor.

6          **THE COURT:**  Right.  If he knows.

7     **BY MS. ROOHANI:**

8     Q.   If you know, did Mr. Humphries ask to be moved to Pahrump

9     to help you with your motion?

10    A.   No, that was not the reason.

11    Q.   It's your understanding that that was not the reason?

12    A.   That was not his -- his reason.

13    Q.   Did Mr. Humphries offer to write the motion for you?

14         **MS. CONNOLLY:**  Objection.  Relevance.  Mr. Humphries

15    didn't write the motion.

16         **MS. ROOHANI:**  It goes to Mr. Fuechtener's motivation,

17    Your Honor, his credibility, as well as Mr. Humphries'

18    motivation and credibility.

19         **MS. CONNOLLY:**  It's completely irrelevant.

20         **THE COURT:**  All right.  I'll allow it as to

21    motivation.

22    **BY MS. ROOHANI:**

23    Q.   Did Mr. Humphries offer to write the motion for you?

24    A.   I was approaching my sentencing date, and had no new

25    lawyer.  And Mr. Humphries indeed said, if everything fails,

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    you can send something to the judge and you have to add an
 2    extension to the local rule that you can do that without a
 3    lawyer if you don't -- if you can't find a lawyer.  And yes,
 4    with that, he offered assistance.
 5    Q.   Did you ever use your money in your commissary to buy
 6    things for Mr. Humphries?
 7    A.   I mean, yeah, there was a time -- I mean, there was an --
 8    an incident where I ordered one or two products and gave it to
 9    Mr. Humphries once I received it.  That is -- yeah, that is
10    true.
11    Q.   When Mr. Humphries became sick, did you call his wife
12    with your phone money to tell her how he was?
13             MS. CONNOLLY:  Object to relevance.
14             MS. ROOHANI:  It goes to Mr. Humphries' motivation
15    and Mr. Fuechtener's motivation, Your Honor.
16             MS. CONNOLLY:  It --
17             THE COURT:  What is the question?
18             MS. CONNOLLY:  We're talking --
19             THE COURT:  Whether he did what?
20    BY MS. ROOHANI:
21    Q.   Did you use the phone money that was put on your account
22    when Mr. Humphries became sick to call Mr. Humphries' wife and
23    talk to her?
24             MS. CONNOLLY:  That was after.  That happened -- it
25    was after the discussion about what were the terms of the
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1    guilty plea, if it happened.  So it wouldn't be relevant.
 2              MS. ROOHANI:  Certainly it's going to go to
 3    Mr. Humphries' motivation to get up on the stand and lie for
 4    Mr. Fuechtener, Your Honor.
 5              THE COURT:  All right.  Overruled.
 6              THE DEFENDANT:  Yes, I --
 7    BY MS. ROOHANI:
 8    Q.   You called his wife?
 9    A.   Yes.
10    Q.   You talked to her about how he was because he was sick?
11    A.   She didn't know anything.
12    Q.   You called her?
13    A.   And I called her, yeah.
14    Q.   When Mr. Humphries' wife was unable to afford gas money
15    to come and see him, you offered to ask Trina to pick her up.
16    Correct?
17    A.   Yeah, Trina offered that.  We had a talk.  It was
18    actually her idea --
19              MS. CONNOLLY:  I'm going to object to this line of
20    questioning.  Again --
21              THE DEFENDANT:  -- to do that.
22              MS. CONNOLLY:  -- it's beyond the scope of my
23    redirect.  This is cross-examination.  It should have been
24    brought up then if it was relevant.
25              THE COURT:  How much more of this do you have,
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
1    Ms. Roohani?

2           MS. ROOHANI:  Maybe five more questions, Your Honor.

3           THE COURT:  All right.  Wrap it up.

4    BY MS. ROOHANI:

5    Q.   Did you offer for Ms. -- for Trina to pick up

6    Mr. Humphries' wife when she couldn't afford to come and

7    visit?

8    A.   Yeah, they -- they hashed that out.

9    Q.   You were the intermediary.  Correct?

10   A.   I mean, I don't think so but -- but maybe I was.

11   Q.   You testified on cross-examination that you wouldn't

12   describe Mr. Humphries as your friend.  Correct?

13   A.   That I would.

14   Q.   You would not characterize him as your friend, is that

15   what you told me?

16   A.   In my recall --

17          MS. CONNOLLY:  Again, it's beyond --

18          THE DEFENDANT:  -- it's hard --

19          MS. CONNOLLY:  -- it's beyond the --

20          THE DEFENDANT:  -- in that environment --

21          MS. CONNOLLY:  -- the scope of my -- it's beyond the

22   scope of my redirect.

23          MS. ROOHANI:  It's foundational, Your Honor.  I have

24   one more question after this.

25          MS. CONNOLLY:  She's going way beyond --
```

JAN ROUVEN FUECHTENER - Recross-Examination

```
 1              THE COURT:  All right.  Well, you brought --
 2              MS. CONNOLLY:  -- the --
 3              THE COURT:  -- did bring up Mr. Humphries during your
 4    redirect.  Overruled.
 5    BY MS. ROOHANI:
 6    Q.    You testified on cross-examination that you would not
 7    characterize Mr. Humphries as being your friend.  Correct?
 8              MS. CONNOLLY:  I'll object to --
 9              THE DEFENDANT:  Did I say that?
10              MS. CONNOLLY:  -- her referencing cross-examination.
11    That's not -- she's going back to a question she asked on
12    cross-examination.  It's improper.
13              THE COURT:  Sustained.
14    BY MS. ROOHANI:
15    Q.    Did you do these things for Mr. Humphries, buying him
16    commissary, talking to his wife, offering to have Trina bring
17    her there --
18              MS. CONNOLLY:  Objection.  Compound.
19    BY MS. ROOHANI:
20    Q.    -- in exchange for his testimony in your favor?
21              MS. CONNOLLY:  Objection.  Compound.
22              THE DEFENDANT:  No.
23              THE COURT:  Overruled.
24    BY MS. ROOHANI:
25    Q.    If Judge Navarro let you withdraw your plea, do you
```

JAN ROUVEN FUECHTENER - Recross-Examination

1    understand that the Government could charge you with more

2    crimes?

3              **MS. CONNOLLY:**  Objection.  Relevance.

4              **MS. ROOHANI:**  It's relevant, Your Honor.

5              **THE COURT:**  Sustained.

6    **BY MS. ROOHANI:**

7    Q.   If Judge Navarro let's you withdraw your plea, do you

8    understand you won't get a more favorable deal?

9              **MS. CONNOLLY:**  Objection.  Relevance.

10             **THE COURT:**  Sustained.

11   **BY MS. ROOHANI:**

12   Q.   If Judge Navarro allows you to withdraw your plea, do you

13   understand that, if you're convicted, your guideline range

14   will be life?

15             **MS. CONNOLLY:**  Objection.  Relevance.

16             **THE COURT:**  Sustained.

17   **BY MS. ROOHANI:**

18   Q.   Did Mr. Humphries tell you that, if you're convicted,

19   that there's a treaty where you can serve your sentence in

20   Germany?

21             **MS. CONNOLLY:**  Sorry?  I didn't hear.

22             **THE DEFENDANT:**  He didn't tell me that.

23   **BY MS. ROOHANI:**

24   Q.   Is that something that you believe?

25   A.   Yes.

JAN ROUVEN FUECHTENER - Further Redirect Examination

1  Q.   You believe that you can serve your sentence in Germany?

2          MS. CONNOLLY:  I'm sorry?  I didn't hear.  I can't

3  hear you.

4          MS. ROOHANI:  He believes he can serve his sentence

5  in Germany.

6          THE DEFENDANT:  There is a treaty --

7          MS. CONNOLLY:  Objection.  Relevance.

8          THE COURT:  Sustained.

9          MS. ROOHANI:  A moment's indulgence, Your Honor.

10          Your Honor, I'll pass the witness.

11          THE COURT:  Redirect.

12          MS. CONNOLLY:  Briefly.

13                  FURTHER REDIRECT EXAMINATION

14  BY MS. CONNOLLY:

15  Q.   When I prepared the motion to withdraw the guilty plea,

16  did I go over with you every verb that I used in the motion?

17          MS. ROOHANI:  Objection.  Leading.

18          THE COURT:  Overruled.  He can answer the question.

19          THE DEFENDANT:  No, you didn't.

20  BY MS. CONNOLLY:

21  Q.   When I prepared the motion to withdraw the guilty plea,

22  did I go over every noun I used in the motion with you?

23  A.   Every?

24  Q.   Noun.

25  A.   Noun?

AMBER M. McCLANE, CCR 914
(702) 384-0429

JAN ROUVEN FUECHTENER - Further Redirect Examination

1    Q.    Noun.

2    A.    Oh.  Noun.  No.

3    Q.    When I prepared the motion to withdraw the guilty plea,

4    did I go over every adjective I used in the motion?

5    A.    No.

6    Q.    Do you know what an adjective is?

7    A.    No.  Yes.  It was a long time ago in Germany.  Yeah, I --

8    no, you didn't.

9    Q.    So, in fact, when I prepared the motion, did I go over

10   any of the language with you that I used in the motion?

11   A.    No.

12   Q.    When I prepared the reply, did I go over with you any

13   nouns -- any of the nouns I was going to use in the motion in

14   the reply?

15   A.    No.

16   Q.    Did I go over with you any of the verbs I was going to

17   utilize in the reply?

18   A.    No.

19   Q.    Did I go over with you any adjectives I used in the

20   reply?

21   A.    No.

22   Q.    Did I go over with you my writing style and which writing

23   style I should use when I prepared the motion or when I

24   prepared the reply?

25   A.    No.

JAN ROUVEN FUECHTENER - Further Redirect Examination

1    Q.   When you signed the affidavit saying that the facts set

2    forth in the motion and reply were accurate, is that because

3    you believed they were or because you thought there was false

4    information in there?

5    A.   I believed they were.

6    Q.   When you signed that affidavit, did you go through the

7    motion line by line before you filed that -- signed that

8    affidavit?

9    A.   No.

10   Q.   Did you go over the reply line by line before you signed

11   the affidavit?

12   A.   No.

13   Q.   And your -- in fact, did I consult with you about any of

14   the words I used in any of the pleadings that I filed on your

15   behalf?

16   A.   No.

17   Q.   Ms. Roohani asked you some questions about the meeting

18   you had with Mr. Nadig in September.  You received an e-mail

19   ultimately that was penned by -- or Mr. -- that Mr. Nadig

20   wrote.  Right?

21   A.   At some point, yeah, I received it.

22   Q.   Now, had -- had Mr. -- prior to you receiving that

23   e-mail, had Mr. Nadig been saying positive or negative

24   times -- things about Mr. Marchese?

25        **MS. ROOHANI:**  Objection.  Exceed the scope and

 1    relevance.

 2            **MS. CONNOLLY:**  It's not beyond the scope.  She's

 3    talking about -- Ms. Roohani is trying to make an issue of the

 4    timing of the information that was contained in the affidavit

 5    and whether or not -- whether or not he was aware of Mr. Nadig

 6    saying negative things about Mr. Marchese prior to receiving

 7    that in an e-mail is relevant.

 8            **THE COURT:**  Overruled.  He can answer the question.

 9            **THE DEFENDANT:**  Yeah, he made those statements,

10    negative statements.

11    BY MS. CONNOLLY:

12    Q.   So the first time you heard Mr. Nadig say negative things

13    about your defense team was not when you received that --

14    A.   No.

15    Q.   -- e-mail?

16            The information that was contained in that e-mail,

17    was that new information or information that had been

18    previously communicated to you by Mr. Nadig when he met with

19    you?

20    A.   A good part of it had been communicated before, but there

21    were also some new things in it.

22    Q.   Are you testifying -- do you -- how is your memory?

23    A.   How is my memory?  My memory depends on the situation.

24    It's a one-of-a-kind situation where I've never been in --

25    Q.   Let me ask you this --

JAN ROUVEN FUECHTENER - Further Recross-Examination

1    A.   -- especially before that -- being, like, in a cell all

2    the time and against the wall, you think -- you remember

3    things good and think they were -- happened yesterday because

4    I don't see so many things.  So things --

5    Q.   Do you remember -- do you remember every single thing

6    that Mr. Nadig said to you and on which specific day he said

7    each specific thing?

8            MS. ROOHANI:  Objection --

9            THE DEFENDANT:  No.

10           MS. ROOHANI:  -- relevance.

11           THE COURT:  Overruled.  He can answer.

12   BY MS. CONNOLLY:

13   Q.   Do you remember each specific thing that Mr. Marchese

14   said to you on exactly which day he said it to you?

15   A.   No.

16           MS. CONNOLLY:  I don't have anything else.

17           THE COURT:  Ms. Roohani?

18           MS. ROOHANI:  Briefly, Your Honor.

19                   FURTHER RECROSS-EXAMINATION

20   BY MS. ROOHANI:

21   Q.   Mr. Fuechtener, you read that affidavit before you signed

22   it.  Correct?

23   A.   Yes.

24   Q.   You read the motion before you had signed the affidavit.

25   Correct?

JAN ROUVEN FUECHTENER - Further Recross-Examination

1    A.    Not right before but before.

2    Q.    At some point before?

3    A.    I read it, um-hum.

4    Q.    You'd read the reply at some point before you signed that

5    affidavit.  Correct?

6    A.    Yes.

7    Q.    The motion had nouns, adjectives, and verbs in it.

8    Correct?

9    A.    Yes.

10   Q.    The reply had nouns, adjectives, and verbs in it.

11   Correct?

12   A.    Yes.

13   Q.    And so did the affidavit.  Correct?

14   A.    Yes.

15   Q.    Ms. Connolly asked you to put together some nouns,

16   adjectives, and verbs, and to read something.  Correct?

17   A.    Yes.

18   Q.    And you read it?

19   A.    Yes.

20   Q.    And she asked you to read it to determine if those

21   factual assertions were true --

22   A.    Yes.

23   Q.    -- correct?

24         And then you swore that they were true.  Correct?

25         **MS. CONNOLLY:**  Objection.  This has already been

JAN ROUVEN FUECHTENER - Further Recross-Examination

```
 1    asked and answered.  Multiple times.
 2            MS. ROOHANI:  She went into it, Your Honor.
 3            MS. CONNOLLY:  She's asked and answered multiple
 4    times.  Yes, he read it and he signed the affidavit because
 5    everything in it was true.
 6            THE COURT:  Sustained.
 7    BY MS. ROOHANI:
 8    Q.   Today, as you sit here, is it your testimony that you did
 9    not read that motion completely?
10            MS. CONNOLLY:  Objection.  Misstates his testimony.
11            MS. ROOHANI:  I'm asking if it is his testimony, Your
12    Honor.
13            THE DEFENDANT:  I read it completely.
14    BY MS. ROOHANI:
15    Q.   So that affidavit that was sworn that everything in it
16    was true and that everything in the motion was true, you read
17    that, too.  Correct?
18    A.   Yes.
19    Q.   That affidavit -- if there's things in the motion that
20    are not true, then the affidavit is a lie.  Correct?
21    A.   I wouldn't call it a lie.
22    Q.   Okay.  If you testified that things are not true,
23    Mr. Fuechtener, what would you call it if not a lie?
24    A.   No one tried to lie here.  Neither me nor my lawyer.  A
25    lie is a -- if you want to lie, you decide to lie and then you
```

JAN ROUVEN FUECHTENER - Further Recross-Examination

```
 1    lie.  I -- I didn't -- I don't think at least I lied.
 2    Q.   Mr. Fuechtener, you took an oath to tell the whole truth.
 3    Do you remember that?
 4    A.   Yes.
 5    Q.   And we talked about that.  Correct?
 6         MS. CONNOLLY:  Objection.  She's being argumentative
 7    and going over the same stuff --
 8         THE COURT:  Sustained.
 9    BY MS. ROOHANI:
10    Q.   And the whole truth means everything.  Correct?
11    A.   Yes.
12         MS. CONNOLLY:  You sustained the objection.  She's
13    already established that with him before what an oath was, and
14    he understood what an oath was.
15         THE COURT:  Ms. Roohani, move to a different subject.
16    BY MS. ROOHANI:
17    Q.   Mr. Fuechtener, is it your testimony that you're standing
18    by that affidavit?
19    A.   We talked about that (inaudible).
20    Q.   Are you standing by the affidavit?  Is everything --
21         MS. CONNOLLY:  He said -- he's already answered it.
22    He's asked -- she's asked him and he's answered it ten
23    different ways.  She's badgering him.
24         THE COURT:  Sustained.
25    ///
```

JAN ROUVEN FUECHTENER - Further Redirect Examination

1    **BY MS. ROOHANI:**

2    Q.   Is it your testimony that everything in the motion is

3    true?

4              **MS. CONNOLLY:**  Objection.  Asked and answered.

5              **THE COURT:**  Sustained.

6              **MS. ROOHANI:**  Your Honor, I'm done.

7              **MS. CONNOLLY:**  I have one question.

8              **THE COURT:**  Go ahead.

9              **MS. CONNOLLY:**  May I question?

10             **THE COURT:**  Yes.

11                    **FURTHER REDIRECT EXAMINATION**

12   **BY MS. CONNOLLY:**

13   Q.   Mr. Fuechtener, what does a lie mean to you?

14             **UNIDENTIFIED SPEAKER:**  I'm sorry?  I didn't hear

15   that.

16   **BY MS. CONNOLLY:**

17   Q.   What does a lie mean to you?

18   A.   Something predetermined which you make up with a bad mind

19   behind it in -- in a way.

20   Q.   When you signed that affidavit, did you have -- make up

21   anything with the intention to mislead?

22             **MS. ROOHANI:**  Objection.  Leading.

23             **THE COURT:**  Sustained.

24   **BY MS. CONNOLLY:**

25   Q.   When you read -- when you signed that affidavit -- strike

 1     that.

 2             **MS. ROOHANI:**  Nothing further, Your Honor.

 3             **THE COURT:**  All right.  Thank you, Mr. Fuechtener.

 4     You can go ahead and --

 5             **THE DEFENDANT:**  Thank you.

 6             **THE COURT:**  -- be excused.

 7             So, Aaron, what's our time line for Mr. Humphries?

 8             **COURTROOM ADMINISTRATOR:**  Your Honor, I'm being told

 9     4:30 to 4:45.

10             **THE COURT:**  All right.  So we'll go ahead and take a

11     break, and he'll let us know when he --

12             **MS. ROOHANI:**  Your Honor?

13             **THE COURT:**  Yes.

14             **MS. ROOHANI:**  Ms. Cartier-Giroux has to leave at

15     4:30.  But before we do that, I'm going to ask that you quash

16     the writ for Mr. Humphries.  Mr. Rouven has testified that the

17     information in the motion was false and that was the basis

18     upon which you issued the writ.  So I'm going to ask that you

19     quash the writ.

20             **THE COURT:**  So you want me to quash the writ that is

21     bringing Mr. Humphries here?

22             **MS. ROOHANI:**  In the sense that Mr. Humphries can't

23     testify because the basis upon that the writ was issued for

24     him to testify, Mr. Fuechtener has testified that that is now

25     false.  So I would ask that you quash the writ and not allow

AMBER M. McCLANE, CCR 914
(702) 384-0429

1    Mr. Humphries to testify.

2              THE COURT:  How has he testified that that is false?

3    What is false?  What does that mean?

4              MS. ROOHANI:  That being that Mr. Humphries told him

5    the actual sentencing range, and he has testified now that

6    Mr. Humphries did not, in fact, tell him that.

7              THE COURT:  He told him it was over 20 years.

8              MS. ROOHANI:  Which is not what was represented in

9    the motion and is not what was represented in the application

10   for the writ to allow Mr. Humphries to testify.  The

11   application for the writ, as it was provided to me by

12   Ms. Connolly, is that Mr. Humphries told him the actual

13   sentencing range that he was facing which is 24.3 to 30 years

14   and that's also in the reply.  Mr. Fuechtener has now

15   testified that that is false, and so I would ask that you not

16   allow Mr. Humphries to testify.

17             THE COURT:  The general claim that the defendant made

18   was that his counsel did not provide him with accurate

19   information and that it was revealed to him only later after

20   he spoke to an inmate who did provide him with different

21   information that later was verified and the specifics, I

22   realize, are not always consistent with the details of how the

23   stories are told or retold by counsel or affidavit or

24   testimony, which is why we're here.  The motion to quash is

25   denied.

BRET ALAN HUMPHRIES - Direct Examination

```
 1              So, Aaron, let me know when you --
 2          COURTROOM ADMINISTRATOR:  I'm sorry, Your Honor?
 3          THE COURT:  Let me know when you hear that he's
 4      closer to the courthouse --
 5          COURTROOM ADMINISTRATOR:  I will, Your Honor.
 6          THE COURT:  -- and we'll take our break.
 7          MS. ROOHANI:  Your Honor --
 8          COURTROOM ADMINISTRATOR:  All rise.
 9         (Recess at 4:09 p.m., until 4:34 p.m.)
10          THE COURT:  All right.  We're back on the record and
11      we have Mr. Humphries here now on the witness stand.  So,
12      Aaron, if you would please swear him in.
13          COURTROOM ADMINISTRATOR:  Yes, Your Honor.
14         (The witness is sworn.)
15          COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be
16      seated.  Please state and spell your full name for the record.
17          THE WITNESS:  Bret Alan Humphries; B-R-E-T, A-L-A-N,
18      H-U-M-P-H-R-I-E-S.
19                        DIRECT EXAMINATION
20      BY MS. CONNOLLY:
21      Q.   Mr. Humphries, where is your current living situation?
22      A.   I'm out in the Nevada Southern Detention Center.
23      Q.   So you're being held in --
24          MS. CONNOLLY:  It's not going on.
25          COURTROOM ADMINISTRATOR:  It might be dead.  Bring it
```

BRET ALAN HUMPHRIES - Direct Examination

1    here, Karen.

2            **MS. CONNOLLY:**  Thank you, Aaron.

3    **BY MS. CONNOLLY:**

4    Q.    You are being held in a federal correctional holding

5    facility out in Pahrump?

6    A.    Yes.

7    Q.    And why are you -- do you have federal charges pending?

8    Do you have federal criminal charges pending against you?

9    A.    Yes.

10   Q.    And what are those?

11   A.    Receipt and/or distribution of child pornography.

12   Q.    And have you had a trial on those case -- those charges?

13   What's the status of your case?

14   A.    No, not yet.

15   Q.    Okay.  Are you familiar with Jan Rouven --

16   Jan Rouven Fuechtener?

17   A.    Yes.

18   Q.    And do you see him in the courtroom?

19   A.    Yes.

20   Q.    And can you point to him and identify him, please?

21   A.    He's the person over there dressed as me, in yellow.

22   Q.    And how do you know him?

23   A.    I met him first in Henderson Detention Center in June of

24   2016, and I've basically known him ever since.

25   Q.    Okay.  Now, you indicate you're -- you're being held in

BRET ALAN HUMPHRIES - Direct Examination

1  custody on some charges pertaining to child pornography?

2  A.   Yes.

3  Q.   Okay.  Are you familiar with the -- the statutes and the

4  United States Sentencing Guidelines pertaining to child

5  pornography?

6  A.   Yes.

7  Q.   How familiar with those would you say you are?  How well

8  versed are you in -- in those guidelines and statutes?

9  A.   I think I'm very well versed.

10  Q.   What's the extent of your education?

11  A.   Some college.

12  Q.   And what was your employment -- what kind of work did you

13  do prior to incarceration?

14  A.   Immediately prior to my incarceration, I was driving a

15  taxi.

16  Q.   Okay.

17  A.   Before that I drove -- I worked security at Mandalay Bay

18  hotel.

19  Q.   Okay.  You're the type of person that reads a lot of

20  books or articles?

21  A.   I read (inaudible).

22  Q.   Were you aware of the charges that were -- let me strike

23  that.

24        How much -- on a daily basis, from June until

25  Mr. Rouven was recently segregated, how much contact did you

BRET ALAN HUMPHRIES - Direct Examination

1   have with him?

2   A.   I had daily contact with him.  I had -- in Henderson, we

3   talked usually for anywhere from between a half an hour to an

4   hour every day, and then when we both got moved back out to

5   Pahrump, we talked quite a bit more.  He was my cellie for

6   three months.

7   Q.   He was your cellmate?

8   A.   Yes, for three months.

9   Q.   From when to when?

10  A.   Oh, I don't remember from when to when.  I'm not good --

11  Q.   Do you know specifically?

12  A.   I'm not good with dates.

13  Q.   Was it the fall or in the summer?

14  A.   I would say I got back there February 14.  So probably

15  May to August?

16  Q.   Of 2017?

17  A.   Of 2017.

18  Q.   Okay.

19  A.   Thereabouts.

20  Q.   Prior to November -- November 17th of 2016, how much

21  contact did you have with him?

22  A.   Like I said, I had daily contact with him.  Anywhere

23  between a half an hour to an hour a day of conversations.

24  Q.   Prior to November 17th, did you ever -- did he ever have

25  discussions with you about his knowledge of the United States

1    Sentencing Guidelines?

2    A.    Prior to his trial?

3    Q.    Yes.  Prior to November of -- of 2017.

4    A.    November of 2017.  That's after his trial.

5    Q.    November of last year.  November 2016.  I'm sorry.  I got

6    my dates mixed up.  November of 2016.

7    A.    No, I don't remember ever talking to him about the

8    sentencing guidelines prior to that.

9    Q.    Prior to November of 2016?

10   A.    Prior to -- prior to his trial, November 2016, I don't

11   remember.

12   Q.    Were you aware there was a -- there was -- a time came

13   when he entered a plea in District Court to some charges?

14   A.    Yes.

15   Q.    Okay.  Prior to that point in time, had you had any

16   discussions with him about the United States Sentencing

17   Guidelines?

18   A.    No.

19   Q.    After he entered his plea -- guilty plea, did you have

20   any discussion with him about the United States Sentencing

21   Guidelines?

22   A.    Yes.

23   Q.    When do you recall where you first had discussions with

24   him about the United States Sentencing Guidelines?

25   A.    The day after he accepted a deal.

BRET ALAN HUMPHRIES - Direct Examination

1    Q.    What was the situation?  In other words, where -- how did

2    that conversation take place?

3    A.    Well, when he came back the night before the day that he

4    signed the deal, I asked him how it went at court, and he told

5    me he took a deal.  And I'm like, "What -- what do you mean?

6    Why did you take a deal?"

7    Q.    Why did you say that?

8    A.    Because he's not guilty.

9    Q.    Had you ever -- had he ever stated to you at any other

10   point in time that he intended to take a guilty plea in this

11   case?

12   A.    No.

13   Q.    Had he ever expressed to you a desire to negotiate his

14   case prior to that date?

15   A.    No.

16   Q.    Okay.  So you indicated the day after he entered his

17   guilty plea you had some discussions with him that evening?

18   A.    Yes.  I went to his cell and asked him about it.

19   Q.    Okay.  You asked him about it?

20   A.    Well, like I said, when he came back from court the day

21   he signed the deal, I asked him and he said he took a deal.

22   And I asked him why.  But before he could tell me why or

23   anything, the guard was telling me we need you to lockdown

24   because somebody else had to go out and finish their dayroom.

25   And so I had to wait until the next morning in order to talk

BRET ALAN HUMPHRIES - Direct Examination

1    to him.

2              So the next morning I went next door -- his cell's

3    next to mine -- and I asked him, "Okay.  What the hell

4    happened?"

5    Q.   So you started talking to him about it the night before,

6    but it got cut off and then you continued the next day?

7    A.   Yes.

8    Q.   Okay.  You indicated you were surprised that --

9    A.   I was very surprised.

10   Q.   And why were you surprised?

11   A.   Because --

12             MS. CARTIER-GIROUX:  Objection.  Objection.  What is

13   the relevance as to why he's surprised?  He already testified

14   that he thought he was innocent --

15             MS. CONNOLLY:  Well, it goes to --

16             MS. CARTIER-GIROUX:  -- and surprised by that.

17   What's the -- what's the purpose of the testimony?  It has

18   nothing to do with any relevant fact.

19             MS. CONNOLLY:  The purpose of the testimony would be

20   it goes to the fact that he was surprised -- if he was

21   surprised because Mr. Rouven had never before indicated a

22   desire to plead guilty.  It would be relevant for those

23   purposes given the fact of why we're here.

24             MS. CARTIER-GIROUX:  He's being called to testify

25   with regard to what he told Mr. Rouven.  He's not being called

BRET ALAN HUMPHRIES - Direct Examination

1   to testify about his opinion about the defendant's guilt or

2   innocence.  And, in fact, the defendant hasn't denied the

3   factual allegations that he allocuted to at the time of the

4   plea.

5           **THE COURT:**  Sustained.

6   **BY MS. CONNOLLY:**

7   Q.   So what did Mr. Rouven tell -- Mr. Rouven tell you was

8   his understanding of -- of what he was facing or did he tell

9   you?

10  A.   Say that again.

11  Q.   What did Mr. Rouven tell you about what he was facing in

12  terms of his -- his sentencing exposure?

13  A.   He didn't know.

14  Q.   Did you ask him?

15  A.   Yes, I specifically asked him, "Well, what -- how much

16  time did you get?"  And he said he didn't know.  And I said,

17  "Well, but the deal is usually specific -- or specifies a time

18  range.  What kind of time?"  He goes, from what he could

19  remember, he said it didn't specify a time range.

20  Q.   Did you tell -- did you ask him how much time he thought

21  he was facing under the terms of plea?

22  A.   No, I didn't ask him that.

23  Q.   Okay.  What was -- what was your discussion?

24  A.   Well, when he told me he didn't know, I said, "Well, tell

25  me about the deal."

BRET ALAN HUMPHRIES - Direct Examination

1    Q.   What did he tell you about the deal?

2    A.   He told me -- he said, "Well, there was 40 points."  And

3    I'm like, "Well, was that 40 points before or after they took

4    away deductions?"  And he wasn't sure, and he said he thinks

5    that was the total.

6    Q.   So he was aware that he was facing 40 points, but he said

7    he didn't know how much time he was facing?

8    A.   Yes.

9    Q.   Okay.  So then what happened?  Then what was the

10   discussion?

11   A.   So I said, "Okay.  Well, 40 points.  You stipulated to 40

12   points?"  And he said yes.  And I said, "Well, you're looking

13   at 20 years."

14   Q.   And how did he react when you said that?

15   A.   He goes, "That's not what my lawyers told me."

16   Q.   What did he tell you -- what was his understanding of

17   what he was facing?

18   A.   That he was looking at no more than 15 years and he'd be

19   able to argue for five.

20   Q.   So he indicated to you that his understanding was a

21   minimum of five and a maximum of 15?

22   A.   From what his lawyers told him, yes.

23   Q.   And how did you respond to that?

24   A.   I said, "Well, you stipulated to 40 points.  40 points is

25   going to be over the statutory maximum."

BRET ALAN HUMPHRIES - Direct Examination

1    Q.    How did you -- okay.  How did you know that 40 -- what

2    was your understanding of what the statutory maximum was?

3    A.    Well, my -- my understanding of the statutory maximum

4    basically comes from using math.  I never really paid that

5    much attention to the sentencing guidelines because I plan on

6    winning my case, and I never really paid that close of

7    attention to them.  Alls I know is what I was told by my

8    initial public defender, Paul Riddle, and a conversation that

9    I had with him.  From what he told me for what 34 points was

10   worth, I figured, by simple math, that the 40 points was going

11   to be over the statutory maximum.

12   Q.    So you said you were aware of how much time 34 points

13   was?

14   A.    Yes.

15   Q.    And how were you aware of -- you're aware of that based

16   upon discussions you'd had with Mr. Riddle?

17   A.    Yes.

18   Q.    What was your understanding of how much time level 40 --

19   34 equated to?

20   A.    For 34 points, it was going to be -- from my

21   understanding, when I talked to Jan, was going to be 151

22   months to a 168 months.  I know now that's wrong.  It's 151 to

23   188.

24   Q.    So that's what your understanding of what a level 40 --

25   34 was?

BRET ALAN HUMPHRIES - Direct Examination

1    A.    Yes.

2    Q.    And -- and why was that level 34 significant to you?

3    A.    Because when Mr. Riddle explained to me the sentencing

4    guidelines back in -- I don't know -- it was September or

5    October 2014, he started -- you know, the -- the point levels

6    for, you know, each crime has its own starting point --

7    starting point for receipt.  Distribution is 22 points.  You

8    get increases for this, that, and everything else.  And he

9    said usually it goes up to 36, 37 months.  Then you get --

10   take a deal, you get three points off.  Two points for

11   acceptance of responsibility.  One point for signing the deal.

12   So you go down to 33, 34.  And he showed me in the chart that

13   34 or 33 points was 135 on the low end and then 100 -- I mean,

14   34 points was 151 on the low end.

15   Q.    So is that -- was that pertaining to your particular case

16   and the charges that were facing --

17   A.    Yes.

18   Q.    -- you were facing?  So --

19   A.    Yes.

20   Q.    -- Mr. Riddle sat with you with a guideline book and

21   get -- went over with you your exposure on the guidelines

22   given what you had been charged with; is that accurate?

23   A.    Yes.

24   Q.    Okay.  And based upon that, you explained to Jan that his

25   guideline range had to be greater?

BRET ALAN HUMPHRIES - Direct Examination

1    A.    Yes.  I told him, I said, "Well, if 34 -- or 33 points

2    started off at 135, 34 points went to -- started off at 151.

3    It's a difference of 16 points.  Okay?  So if there's 16

4    points per -- per point upward, okay, you have 40 points.  40

5    points minus 34, the difference of 6.  6 times 16 is a

6    difference of 96.  So make it -- round it off to 100 and make

7    it easy.  100 plus 151 makes 251 points.  240 is 20 years,

8    which is the maximum."  So 40 points is going to be over

9    the -- the statutory maximum for him.

10   Q.    So you were aware that the statutory maximum for the

11   charges that he and you were facing was 20 years?

12   A.    Yes.

13   Q.    And you're aware that level 40 was above the 20 years?

14   A.    Yes.

15   Q.    Okay.  Was he aware --

16   A.    Well, actually, I shouldn't say -- I did not know for

17   100 percent sure.  I assume that it was by, as I explained,

18   doing that basic math.

19   Q.    Now, was he -- was -- was this -- was he aware of this

20   information when you provided it to him?

21   A.    No.

22   Q.    How did he respond?  Well, you said he responded, "That's

23   not what my lawyers told me"?

24   A.    Yes.

25   Q.    Did you have any -- any further discussion after that?

BRET ALAN HUMPHRIES - Direct Examination

1    A.   Yes.

2    Q.   And what did -- what did you say after that?

3    A.   He asked me what consecutively and concurrently meant.

4    And I asked him why, and he told me, he said that the -- the

5    judge, when she was going over the deal, stopped, turned to

6    the prosecuting attorney and said, "Is this correct, that

7    you're going to run the" -- whatever -- "receipt concurrent --

8    or consecutively to the concurrent running of the -- of the

9    receipt and distribution charges?"  And they told him yes --

10   or told her yes.  And so he told me he didn't know what that

11   meant, and I'm like, "Don't tell me this."  And I said,

12   "You're fooled.  Because if it's running consecutively," I

13   said, "you just doubled your sentence.  You're not looking at

14   20 years.  You're looking at 40 years."

15   Q.   Did you -- did -- when you were having this discussion

16   with him, did you have a copy of his guilty plea agreement?

17   A.   Of the plea agreement?

18   Q.   Yes.

19   A.   No.

20   Q.   Okay.  So you made -- so you made him aware that it was

21   your understanding that he was facing in excess of 20 years

22   with a level 40?

23   A.   Say that again.

24   Q.   Level 40, four-zero.

25   A.   Oh.  Level 40.  Yes.

BRET ALAN HUMPHRIES - Direct Examination

1    Q.    You indicated to him that he was -- that was greater than

2    20 years?

3    A.    Well, it would be 20 years for that, and then 20 years

4    for receipt.  20 plus 20 would be up to 40 years.

5    Q.    And that was your understanding of what he had pled to

6    based upon what he was telling you?

7    A.    Yes.

8    Q.    Okay.  And did you have any discussion with him about

9    specific offense characteristics or enhancements or anything

10    of that nature?

11    A.    Well, the only two enhancements I could remember from

12    Paul Riddle's discussion with me was the enhancement for two

13    points for computer and then the enhancements of -- what is

14    it?  I can't remember how many points.  Five or six points or

15    four points for the 600 images or more.  And I know he had

16    more than four videos.  So -- or eight videos or he was going

17    to get the maximum enhancement for that.  I could not remember

18    what the other enhancements were.  So I told him about those

19    two.  And then I said and then you get -- and I said, as Paul

20    Riddle explained to me, it usually comes out to about 15

21    points in enhancements.

22    Q.    And how did he react?

23    A.    How did he react?  He asked me -- he said, "Why are you

24    telling me this and not my lawyers?"

25    Q.    How long did you -- this was a discussion you took the

BRET ALAN HUMPHRIES - Direct Examination

1    day -- you had with him the day after he entered the plea, the
2    morning after, you indicated?
3    A.   Yes.
4    Q.   And then was there any other information that you gave
5    him?
6    A.   Well, he told me he didn't understand the points or any
7    of that.  I explained to him the same way Paul Riddle
8    explained to me how the points worked.  You get 18 for each --
9    you know, Category 1 for criminal history because he has no
10   criminal -- criminal history.  Possession starts at 18.
11   Receipt and distribution starts off at 22.  And then you get
12   the points and stuff.  And then I kind of modified what I told
13   him about the 40 years because I said, "Well, since possession
14   starts off" -- and I don't know how they're going to do it
15   because I'm -- I'm not -- I hadn't really researched the
16   sentencing aspects or anything like that because, like I said,
17   I plan on winning my case, and so I had not really done any
18   research into mitigating factors or anything like that --
19   Q.   Let me ask you, mitigating factors, did you have any
20   discussion with him about mitigating factors or anything of
21   that nature?
22   A.   For getting points off?
23   Q.   Yes.  Let me strike that.
24        Did he -- was he aware of how the guidelines work
25   and -- and how the judge's -- let me strike that.

BRET ALAN HUMPHRIES - Direct Examination

1              Did he have an awareness of how the guidelines work

2    in terms of whether or not the judge takes those into

3    consideration when she determines the sentence?  Was there any

4    discussion about that?

5              **MS. CARTIER-GIROUX:**  Objection as to what his

6    awareness was, what the -- this individual can testify to is

7    the statements made and the responses he gave.  He can't get

8    into the defendant's mind.

9              **THE COURT:**  Sustained.

10   **BY MS. CONNOLLY:**

11   Q.   Where in --

12             **THE COURT:**  You want to just rephrase it?

13             **MS. CONNOLLY:**  Okay.

14   **BY MS. CONNOLLY:**

15   Q.   Statements, did he make any statements to you regarding

16   his understanding of the guideline range and what that meant

17   in terms of the judge's sentencing?

18   A.   I can't remember specifically if he made any statements

19   or not.  I can say, at the end of me giving him my

20   explanation, he asked me, "Why are you telling me this and not

21   my lawyers?"  Which, to me, indicated that he had no clue as

22   to what I was -- he had no clue prior to, before I told him

23   this stuff.

24   Q.   Did he say anything that indicated that he did have a

25   clue about what he was facing?

BRET ALAN HUMPHRIES - Direct Examination

1    A.    No.

2    Q.    Did he say anything that indicated that he did not have a

3    clue in regard to what he was facing?

4              **MS. CARTIER-GIROUX:**  Objection.

5              **THE COURT:**  What is the objection?

6              **MS. CARTIER-GIROUX:**  Again, did he -- well, did he

7    say -- we already -- it's asked and answered.  He said he

8    already gave his opinion about whether or not he believed the

9    defendant understood based on his interaction with him.

10             **MS. CONNOLLY:**  That's not what I asked him.  I'm

11   saying did he say anything that indicated to not have a clue.

12             **THE COURT:**  Overruled.  He can answer that question.

13             **THE WITNESS:**  He asked me, "Why are you telling me

14   this and not my lawyers?"

15   **BY MS. CONNOLLY:**

16   Q.    Okay.  After your discussion, did he indicate what he was

17   going to do?

18   A.    He asked me what could he do.

19   Q.    He asked you what he should do?

20   A.    Yes.

21   Q.    And what did you tell him?

22   A.    I said, "Well, you can try and withdraw the plea.  I

23   don't know if you can do that after you've already" -- I asked

24   him if he'd changed his plea, and he said yes.  And I said,

25   "Well, I don't know if you can do that, you know, after you've

BRET ALAN HUMPHRIES - Direct Examination

1    accepted the plea in open court.  I don't know if it's

2    possible to now, but you could try doing it by saying that

3    something" -- because, as far as I was concerned, it was --

4    his counsel was inept.

5            **MS. CARTIER-GIROUX:**  Objection to his opinion about

6    what his counselor was.

7            **THE COURT:**  Sustained.

8    **BY MS. CONNOLLY:**

9    Q.   So you indicated to him that he could try to withdraw his

10   plea?

11   A.   Yes.

12   Q.   And how did you -- did you make any suggestions to him as

13   to how he should proceed in that regard?

14   A.   Well, I said, "The first thing to do is you need to hire

15   a new lawyer."

16   Q.   And this was -- did this discussion all take place the

17   next day or was it over a period of time?

18   A.   Well, the discussion about a new lawyer and -- and

19   withdrawing the plea and everything else, that discussion

20   started the day after and then continued on for a period of

21   time.

22   Q.   And did you offer to help him?

23   A.   I did help him.

24   Q.   And what did you do to help him?

25   A.   I typed up a motion because he was having a hard time

BRET ALAN HUMPHRIES - Direct Examination

1    finding a lawyer because he's restricted with access to phone

2    numbers and everything else.  He had nobody in Las Vegas to

3    really help him contact lawyers and everything else.  So I was

4    concerned that time was running out, it was getting closer and

5    closer to the sentencing date, and so I actually typed up a

6    motion for him to turn in to the Court asking the Court for --

7    to appoint counsel for him on a temporary basis that he

8    would -- that he would pay for to help him find another

9    lawyer, and also as -- typed up -- part of the motion was also

10   a reason for the withdraw.  You know, it was kind of a

11   combination of the two.  One, to replace counsel, and a -- and

12   a withdraw of the plea.

13   Q.   Was he paying you to help him?

14   A.   No.

15   Q.   Was he buying you anything in the commissary to help him?

16   A.   No.

17   Q.   Did he make any promises to you to help him?

18   A.   No.

19           **MS. CONNOLLY:**  Court's indulgence.

20           **THE COURT:**  Yes.

21           **MS. CONNOLLY:**  I don't have anything else.  Thank

22   you.

23           **THE COURT:**  Ms. Giroux.

24           **MS. CARTIER-GIROUX:**  Judge, are we going to -- I

25   think we all -- both Ms. Connolly and I have childcare issues.

1          **THE COURT:**  All right.  So we're going to continue

2     this until, was it, May 16, Wednesday?  What time, Aaron?

3          **COURTROOM ADMINISTRATOR:**  At 11:00 a.m. Your Honor.

4          **THE COURT:**  11:00 a.m.

5          **MS. CARTIER-GIROUX:**  Judge, I think we'll be finished

6     on that day based on the amount of time that --

7          **THE COURT:**  All right.  And so will the no-contact

8     order still be requested?

9          **MS. ROOHANI:**  Yes, Your Honor.

10          **THE COURT:**  And --

11          **MS. ROOHANI:**  And, Your Honor, I would also ask that

12     Ms. Connolly not speak with Mr. Humphries about the content of

13     his testimony now that he's taken the stand and been sworn.

14          **THE COURT:**  Yeah.  So, Mr. Humphries, now that we've

15     started the testimony that you have provided -- you are

16     providing and you haven't completed it, I need to admonish you

17     not to speak to anyone about this yet until we're all done

18     before that Wednesday at 11:00 a.m.

19          All right.  So that will be the order.  We'll try to

20     get this done on Wednesday, I guess.

21          **MS. CARTIER-GIROUX:**  Yes.  Definitely.

22          **THE COURT:**  Okay.  Thank you.  All right.  Off the

23     record.

24     *(Proceedings concluded at 4:58 p.m.)*

25                              * * *

AMBER M. McCLANE, CCR 914
(702) 384-0429

1     I, AMBER M. McCLANE, court-appointed transcriber, certify

2   that the foregoing is a correct transcript transcribed from

3   the official electronic sound recording of the proceedings in

4   the above-entitled matter.

5

6     /s/  *Amber M. McClane*                    5/24/2018

7          Amber M. McClane, CCR 914            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25