TRANSCRIBED FROM DIGITAL RECORDING

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:16-cr-00100-GMN-CWH
 4              Plaintiff,          )
                                    ) Las Vegas, Nevada
 5   vs.                            ) May 16, 2018
                                    ) Courtroom 7D
 6   JAN ROUVEN FUECHTENER,         )
                                    )
 7                                  ) Recording method:
                Defendant.          ) Liberty
 8   _____)     11:05 a.m. - 1:04 p.m.

 9                                  EVIDENTIARY HEARING, Day 5

10                      C E R T I F I E D   C O P Y

11                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE GLORIA M. NAVARRO
12              CHIEF UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:      ELHAM ROOHANI, AUSA
                             LISA CARTIER-GIROUX, AUSA
16                           UNITED STATES ATTORNEY'S OFFICE
                             501 Las Vegas Boulevard South, Suite 1100
17                           Las Vegas, Nevada 89101
                             (702) 388-6336
18

19   (Appearances continued on page 2.)

20   Recorded by:        Araceli Bareng

21   Transcribed by:     Amber M. McClane, CCR 914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25
```

TRANSCRIBED FROM DIGITAL RECORDING

```
1    APPEARANCES CONTINUED:

2    For the Defendant:

3         KAREN A. CONNOLLY, ESQ.
          KAREN A. CONNOLLY, LTD.
4         6600 West Charleston Boulevard, Suite 124
          Las Vegas, Nevada 89146
5         (702) 678-6700

6

7    Also Present:

8         MARI PANOVICH, FBI Special Agent

9

10   For Brett Alan Humphries:

11
          DUSTIN A. MARCELLO, ESQ.
12        PITARO & FUMO, CHTD.
          601 Las Vegas Boulevard South
13        Las Vegas, Nevada 89101
          (702) 474-7554
14                            * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

AMBER M. McCLANE, CCR 914
(702) 384-0429

TRANSCRIBED FROM DIGITAL RECORDING

1                        *I N D E X*

2     Defense's Witnesses:                              Page

3     Bret Alan Humphries

4         Cross-Examination by Ms. Cartier-Giroux        5

5         Redirect Examination by Ms. Connolly          56

6         Recross-Examination by Ms. Cartier-Giroux     70

7         Further Redirect Examination by Ms. Connolly  73

8         Further Recross-Examination by Ms. Cartier-Giroux 74

9

10    Government's Witnesses:

11    Mari Panovich

12        Direct Examination by Ms. Roohani             76

13        Cross-Examination by Ms. Connolly            106

14

15                        * * * * *

16                     *E X H I B I T S*

17    For the Government:

18    EXHIBIT:        ADMITTED:

19      2                81

20

21    For the Defense:

22    EXHIBIT:        ADMITTED:

23      H               114

24                        * * * * *

25

TRANSCRIBED FROM DIGITAL RECORDING

1      LAS VEGAS, NEVADA; WEDNESDAY, MAY 16, 2018; 11:05 A.M.

2                          --oOo---

3                    P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  All rise.

5          **THE COURT:**  Thank you.  You may be seated.

6          **COURTROOM ADMINISTRATOR:**   This is the time set for

7      the evidentiary hearing, Day 5, in

8      Case No. 2:16-cr-100-GMN-CWH, *United States of America versus*

9      *Jan Rouven Fuechtener.*

10          Counsel, your appearances, please.

11          **MS. ROOHANI:**  Good morning, Your Honor.  Ellie

12      Roohani and Lisa Cartier-Giroux for the United States.  We are

13      joined at counsel table by Special Agent Mari Panovich.

14          **THE COURT:**  Good morning, Special Agent Panovich,

15      Ms. Giroux, and Ms. Roohani.

16          **MS. CONNOLLY:**  Karen Connolly appearing with the

17      defendant, Jan Rouven Fuechtener, who's present in custody.

18          **THE COURT:**  Good morning, Ms. Connolly.  Good

19      morning, Mr. Fuechtener.  I believe we have Mr. Humphries back

20      on the witness stand.

21          Nick, if you don't mind, please, swearing him in

22      again just to -- so that it's clear.

23      *(The witness is sworn.)*

24          **COURTROOM ADMINISTRATOR:**  Thank you.  Please take a

25      seat.

BRET ALAN HUMPHRIES - Cross-Examination

1          Please state your name and spell it.

2          **THE WITNESS:**  Bret Alan Humphries; B-R-E-T, A-L-A-N,

3   H-U-M-P-H-R-I-E-S.

4          **THE COURT:**  Whenever you're ready, Ms. Giroux.

5          **MS. CARTIER-GIROUX:**  Thank you, Your Honor.

6                        **CROSS-EXAMINATION**

7   **BY MS. CARTIER-GIROUX:**

8   Q.   Good morning, Mr. Humphries.

9   A.   Good morning.

10  Q.   Do you remember me, Mr. Humphries?

11  A.   Yes.

12  Q.   I am the original prosecutor on your current child

13  pornography charges; is that correct?

14  A.   Yes.

15  Q.   And Ms. Roohani, who's sitting at counsel table over

16  here, she is the current prosecutor on those charges.

17  Correct?

18  A.   Yes.

19  Q.   And, in fact, you and I had previously met.  I believe

20  the last time we had met, other than this past date where you

21  testified on direct examination, when I cross-examined you in

22  front of -- a hearing in front of Judge Ferenbach on July, the

23  7th, of 2015; is that correct?

24  A.   Yes, it is.

25  Q.   And that hearing was on a motion to suppress a statement

BRET ALAN HUMPHRIES - Cross-Examination

1    that you had purportedly made to a Detective Ramirez.

2    Correct?

3    A.    Yes.

4    Q.    And that statement had been recorded?

5    A.    Yes.

6    Q.    And the issue at that hearing was whether or not you had

7    been Mirandized?

8    A.    Yes.

9    Q.    Okay.  And, in fact, you testified on your own behalf.

10   Right?

11   A.    Yes.

12   Q.    And the Court, Judge Ferenbach specifically, found that

13   based on the evidence presented at the hearing, that you had

14   not been provided with your Miranda rights?

15          **MS. CONNOLLY:**  I'm going to object to the relevance

16   of this.

17          **MS. CARTIER-GIROUX:**  Judge, this is

18   cross-examination.  I'm going to get to the -- the point, but

19   I have to lay a foundation of where my questions are going to

20   go.

21          **THE COURT:**  All right.  Let's get there quickly.

22   **BY MS. CARTIER-GIROUX:**

23   Q.    Is that correct, the statement was ultimately suppressed

24   based on the evidence?  The judge found that your statement --

25   you were not Mirandized?

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    A.    Yes.
 2    Q.    Okay.  And soon thereafter -- how did you find that out?
 3    How did you find out about the -- the order?
 4    A.    You mean the -- the -- Judge Ferenbach's order?
 5    Q.    Yeah.
 6    A.    I called my lawyer's office, Tom Ericsson, and he told me
 7    over the telephone --
 8          MS. CONNOLLY:  Objection.  Attorney-client privilege,
 9    anything Mr. Ericsson said to him.
10          THE COURT:  Sustained.
11  BY MS. CARTIER-GIROUX:
12    Q.    You were advised of the contents of the -- of the order.
13    Correct?
14    A.    Yes.
15    Q.    Okay.  And your lawyer advised you of those?
16    A.    Yes.
17    Q.    And that's in the public record, the order.  Correct?
18    A.    Yes.
19    Q.    As far as you know?
20    A.    As far as I know.
21    Q.    Okay.  And now, after hearing about that your
22    statement -- that I couldn't use your statement against you,
23    that recorded statement against you at trial, you talked about
24    the hearing with individuals who you were housed with.
25    Correct?
```

BRET ALAN HUMPHRIES - Cross-Examination

1   A.   You want to rehash the -- the second evidentiary hearing?

2   Q.   Sir, I'm asking you questions.  You're under oath, and

3   you are required to answer my questions.  The question --

4   A.   Well, I'm sorry but I'm not going to answer questions

5   about my case in this hearing because of the simple fact is

6   that this has been settled in my case.  If you want to raise

7   these questions with me, please raise them with me in front of

8   my judge, Judge Gordon, on my case.

9        **MS. CARTIER-GIROUX:**  Well, Judge, I ask --

10       **THE COURT:**  Mr. Humphries, please -- are we going to

11   be getting into issues regarding his case?

12       **MS. CARTIER-GIROUX:**  It's not regarding his case.  It

13   goes to motive to lie, bias, and the reason why he's here

14   testifying.  I can proffer out of the hearing of the witness,

15   if you want to, but this is very, very specific.  I'm not

16   going to talk about the confession that he made.  I'm not

17   going to talk about the circumstance of the child pornography

18   on his computer.  What I want to talk to him about is why he

19   would be here to testify.

20       **MS. CONNOLLY:**  Well, Judge, I don't --

21       **THE COURT:**  Your question was whether he discussed

22   with other inmates the results of --

23       **MS. CARTIER-GIROUX:**  Correct.

24       **THE COURT:**  -- the Court's decision --

25       **MS. CARTIER-GIROUX:**  Decision, yeah.

BRET ALAN HUMPHRIES - Cross-Examination

1          **THE COURT:** -- which was to suppress his statement?

2          **MS. CARTIER-GIROUX:** Not about the legitimacy of it

3  or not.

4          **THE COURT:** All right. So without getting into the

5  details about the facts of your hearing or your case, the

6  question is just whether or not you discussed the Court's

7  decision to suppress your statement. Did you discuss that

8  with other inmates?

9          **THE WITNESS:** Yes.

10  **BY MS. CARTIER-GIROUX:**

11  Q.   And when -- and where were you housed at that time?

12  A.   At the Southern Nevada -- the Nevada Southern Detention

13  Center in Pahrump.

14  Q.   All right. And there was another individual housed with

15  you at that time named Sylvester Moore. Correct?

16  A.   Yes.

17  Q.   And Mr. Moore, he actually -- his bed was catty-corner to

18  yours. Correct?

19  A.   Again, you're --

20          **MS. CONNOLLY:** I will object to --

21          **THE WITNESS:** I'm sorry, Your Honor.

22          **MS. CONNOLLY:** Judge, I'm going to object. If she --

23  if she's asking for a prior inconsistent statement, then it

24  may be relevant. But this is -- I don't -- this is all

25  irrelevant and it's not foundational. It's irrelevant and

BRET ALAN HUMPHRIES - Cross-Examination

1   it's just meant to be argumentative with the witness.

2           **MS. CARTIER-GIROUX:**  Judge, it's not.  And I

3   indicated to the Court I can proffer to the Court but I don't

4   want him present when I proffer if the Court has an issue with

5   the questions that I'm asking.

6           **MS. CONNOLLY:**  And, Judge, we already went over this

7   in the prior hearing, that she wasn't going to get into all

8   the issues with -- if she's trying to impeach him, she hasn't

9   even asked him a question yet with which to impeach him.  If

10  he's made a prior inconsistent statement, she has to confront

11  him with the statement --

12          **MS. CARTIER-GIROUX:**  I'm not going that way.

13          **MS. CONNOLLY:**  -- first.

14          **MS. CARTIER-GIROUX:**  That's not where I'm going to.

15  I'm going to bias and motive to lie.

16          **THE COURT:**  All right.  So the question was whether

17  Mr. Moore was also an inmate at the Pahrump facility and had a

18  bed kitty-corner?

19          **MS. CARTIER-GIROUX:**  Yeah.  His bed was kitty-corner

20  in the same dorm as him.

21          **MS. CONNOLLY:**  Which is irrelevant.

22          **MS. CARTIER-GIROUX:**  Yes, it is relevant, Judge.  And

23  I can proffer, as I indicated, or we can just do the

24  questions.  It's really up to the Court.

25          **THE COURT:**  He can answer that question.

BRET ALAN HUMPHRIES - Cross-Examination

1          **THE WITNESS:**  Yes.

2     **BY MS. CARTIER-GIROUX:**

3     Q.    In fact, you had had -- you had been housed with

4     Mr. Moore prior to the hearing, that hearing, for almost a

5     full year.  Correct?

6     A.    For over a year.

7     Q.    Over a year.

8            And you had had multiple conversations with

9     Mr. Moore.  Right?

10    A.    Yes.

11    Q.    And, in fact, you had originally sought out Mr. Moore's

12    help on your case when you first met him?

13    A.    Yes.

14    Q.    But then you learned at some point in time that Mr. Moore

15    was a snitch?

16    A.    Say that again.

17          **MS. CONNOLLY:**  Again, Judge, I'm going to object to

18    the relevance of this.  I don't -- this has nothing to do with

19    his testimony in this case.  It is merely them trying to get

20    information apparently to use in his other case, get a shot at

21    him under oath again.  She's already had that opportunity.

22          **MS. CARTIER-GIROUX:**  That's not what I'm doing, Your

23    Honor.

24          **THE COURT:**  I think I'm following what the prosecutor

25    is getting at.  So I'll allow him to answer the question

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    whether or not he learned after the year, when he had multiple
 2    conversations with Mr. Moore, that Mr. Moore was cooperating,
 3    providing information about other individuals to law
 4    enforcement.
 5    BY MS. CARTIER-GIROUX:
 6    Q.   Is that correct?
 7    A.   No.
 8    Q.   So it's not a fact that there -- withdrawn.
 9         So you -- it's a fact that you originally sought out
10    Mr. Moore's help in your case.  Correct?
11    A.   Yes.
12    Q.   And, in fact, you had hundreds of conversations with
13    Mr. Moore?
14    A.   Yes.
15    Q.   And when you learned about the fact that your statement
16    was suppressed, you discussed that with, as you indicated, a
17    number of people in your dorm.  Correct?
18    A.   Yes.
19    Q.   And Mr. Moore was one of the people in your dorm?
20         MS. CONNOLLY:  Objection.  It's already been asked
21    and answered.  He's already answered these questions.
22         THE COURT:  Sustained.
23    BY MS. CARTIER-GIROUX:
24    Q.   There came a point in time, however, where you learned
25    that Mr. Moore had been writing letters to me about --
```

BRET ALAN HUMPHRIES - Cross-Examination

1    purportedly about your conversations with him?

2              MS. CONNOLLY:  Objection.  Assumes facts not in

3    evidence.

4              MS. CARTIER-GIROUX:  That's not true, Judge.  He

5    knows whether or not he --

6              MS. CONNOLLY:  In this case --

7              MS. CARTIER-GIROUX:  -- learned it.

8              MS. CONNOLLY:  -- it's not relevant to this case --

9              MS. CARTIER-GIROUX:  It is very relevant.

10             MS. CONNOLLY:  -- and it assumes facts not in

11   evidence not presented in this case.

12             THE COURT:  He can answer the question whether or not

13   he learned or was aware that Mr. Moore was providing

14   information to Ms. Giroux.

15             THE WITNESS:  Well, actually, Sylvester Moore wasn't

16   providing information straight to Ms. Giroux.  She was -- he

17   was actually providing information to a U.S. attorney in San

18   Francisco from -- that he knew through his case, and then that

19   got forwarded to her.  So he wasn't technically writing to

20   her.  He was writing to somebody else, and then it got

21   forwarded to Ms. Giroux.

22   BY MS. CARTIER-GIROUX:

23   Q.   And originally -- actually, that is true.  Originally he

24   wrote to the prosecutor in the Northern District of

25   California, right, and then -- correct?

1    A.    Yes.

2    Q.    And ultimately he started writing letters to me.

3    Correct?

4            **MS. CONNOLLY:**  Objection.  Foundation.  Speculation.

5            **MS. CARTIER-GIROUX:**  Judge, this was turned over in

6    discovery in this case.  He can -- he either knows or he

7    doesn't know.

8            **THE COURT:**  He can answer whether or not he knows.

9            **THE WITNESS:**  I know there were letters that were

10   turned over to you.  I don't know if he ever actually wrote

11   you any letters.  I'm not --

12   **BY MS. CARTIER-GIROUX:**

13   Q.    In any event --

14   A.    I'm not positive of that.

15   Q.    Okay.  In any event, there came a point in time when

16   Mr. Moore was -- came to your knowledge that Mr. Moore was

17   going to cooperate with me against you in your case --

18           **MS. CONNOLLY:**  Again --

19   **BY MS. CARTIER-GIROUX:**

20   Q.    -- correct?

21           **MS. CONNOLLY:**  -- objection.  Relevance.

22           **THE COURT:**  It goes to motive.  He can answer the

23   question.

24           **THE WITNESS:**  Yes.

25   ///

BRET ALAN HUMPHRIES - Cross-Examination

1   **BY MS. CARTIER-GIROUX:**

2   Q.   And, in fact, he was going to cooperate in the sense that

3   he was purportedly going to testify about statements that you

4   allegedly made to him while at the Pahrump facility.  Correct?

5       **MS. CONNOLLY:**  I'm going to object based on hearsay.

6   All this is going to be based on hearsay.

7       **MS. CARTIER-GIROUX:**  Judge, I'm not going to go

8   into --

9       **MS. CONNOLLY:**  Lack of foundation.

10      **MS. CARTIER-GIROUX:**  -- the contents of those

11  statements.

12      **THE COURT:**  All right.  Without going into the

13  contents of the statements that anyone believes that

14  Mr. Humphries was going to be testifying about, the question

15  is just whether or not -- I'm sorry.  Not Mr. Humphries.

16  Mr. Moore.

17      **MS. CONNOLLY:**  I guess, Judge, my --

18      **THE COURT:**  Whether Mr. Moore --

19      **MS. CONNOLLY:**  -- objection is to the whole --

20      **THE COURT:**  -- believes that Mr. -- I'm sorry,

21  whether Mr. Humphries, who's on the stand, believes that

22  Mr. Moore was going to be cooperating and testifying against

23  him regarding statements made while they were inmates together

24  at the Pahrump jail.

25      **MS. CONNOLLY:**  Then part of my objection is

1   everything that she's asking him would be based on hearsay,

2   what somebody else told him, and also -- so in addition to my

3   relevance objection, I make a hearsay objection, foundation

4   objection.

5           **THE COURT:**  Well, the question is not what the

6   statement was or the truth of the matter of the statement.

7   The question is his state of mind, whether or not he believes

8   that -- even if it's not true, if he believes that it would

9   provide a motivation.  So the question is not the truth of the

10  statement but whether or not he believes that Mr. Moore was

11  actually going to be testifying against him.

12          I think the question was whether or not Mr. Humphries

13  believed that Mr. Moore was going to be cooperating with the

14  United States Attorney's Office against him by providing

15  statements that were made by Mr. Humphries at the Pahrump

16  facility.

17          **MS. CARTIER-GIROUX:**  That is -- yes.

18  **BY MS. CARTIER-GIROUX:**

19  Q.   Is that true?

20  A.   Yes.

21          **THE COURT:**  He can answer that.

22  **BY MS. CARTIER-GIROUX:**

23  Q.   And, in fact, Mr. Moore did testify against you at a

24  hearing conducted on June, the 30th, of 2016.  Correct?

25  A.   Yes.

BRET ALAN HUMPHRIES - Cross-Examination

1    Q.    And you were present during that hearing?

2    A.    Yes.

3    Q.    Now, you and Mr. Fuechtener, as you testified, met in

4    June of 2016 at the Henderson facility; is that correct?

5    A.    Yes.

6    Q.    And it's your testimony that you had daily contact with

7    Mr. Fuechtener while there?

8    A.    Well, pretty -- I don't know if it was every day, but I

9    would say yes.

10   Q.    And you testified that you had conversations with him at

11   least one half hour to an hour per day?

12   A.    Well --

13   Q.    Do you remember that?

14   A.    -- most every day, yes.  I couldn't say exactly every

15   day --

16   Q.    Okay.

17   A.    -- but yes.

18   Q.    And so would you qualify your relationship with him as a

19   friendship?

20   A.    I'd call it a jailhouse friendship, yes.

21   Q.    Okay.  And according to you, you are very familiar with

22   the child pornography statutes.  You -- you familiarized

23   yourself with them?

24   A.    Yes.

25   Q.    And you are very familiar with the sentencing guidelines?

BRET ALAN HUMPHRIES - Cross-Examination

1   A.   No.

2   Q.   Just the statutes?

3   A.   Just the statutes.

4   Q.   Okay.  Meaning the elements of the crime?

5   A.   Interesting question there.

6   Q.   Well, if you looked at the statute, what is --

7   A.   I know.  I'm -- I'm thinking about it in my mind.  I

8   mean, it's like -- the statutes, receipt or, you know,

9   distribution, but getting into the actual elements when I was

10  talking to Mr. Fuechtener, I don't necessarily think I had

11  looked into the different elements or did any research, say,

12  on -- on elements or anything like that.  I was more

13  interested in finding other case laws that had to do with

14  the -- the -- the statutes themselves, not necessarily the

15  nuts and bolts of the statute.  So --

16  Q.   The case law dealing with --

17  A.   -- about the elements, no, I would say I was not really

18  all that familiar at that time with the elements.

19  Q.   So, sir, what is -- what is -- for example, you're

20  familiar with the -- with the statute on possession of child

21  pornography.  Correct?

22       Give me one that you're very familiar with.

23  A.   Receipt and distribution.

24  Q.   Okay.  Receipt or distribution of child pornography.

25  When you look at that statute, what does that statute tell

BRET ALAN HUMPHRIES - Cross-Examination

1    you?

2          **MS. CONNOLLY:**  I'm going to object to the relevance

3    of this.

4          **MS. CARTIER-GIROUX:**  I'm probing his claim that he is

5    very --

6          **MS. CONNOLLY:**  Again, Judge, I --

7          **MS. CARTIER-GIROUX:**  -- familiar with the statutes.

8          **MS. CONNOLLY:**  I think she's trying to get

9    information.  There's a case pending against Mr. Humphries.

10   This has got nothing to do with my client's request to

11   withdraw the guilty plea and what information he gave to him.

12   The source of the information or his knowledge is irrelevant.

13   What's relevant is what he said to my client and what my

14   client, his state of mind was in regard to that.  All the

15   other stuff is, I believe, a fishing expedition for her to be

16   able to take more testimony under oath from Mr. Humphries when

17   he has a potential trial pending.

18          **THE COURT:**  Well, Ms. Connolly, you don't have

19   standing to object to that.  Mr. Marcello, who is here and is

20   appointed as the attorney for Mr. Humphries, does have

21   standing to object to that if he believes that this

22   questioning is getting into specifics regarding Mr. Humphries'

23   case.  But the question here was the familiarity of Mr. Moore

24   with the statutes regarding child pornography.  He testified

25   that he was familiar with them and had familiarized himself

BRET ALAN HUMPHRIES - Cross-Examination

1    with them and specifically the receipt or distribution of

2    child pornography.

3              But now, Ms. Giroux, I'm not sure why you are testing

4    his knowledge of the child pornography statutes.  That --

5         MS. CARTIER-GIROUX:  Because, Your Honor, the statute

6    itself just sets out the elements of an offense and the

7    statutory minimum, if there is one, and a maximum.  It doesn't

8    say anything else other than that.  So I'm trying to

9    understand where -- where he's professing his knowledge about

10   the statutes, what he's talking about.  So I'm just trying to

11   assess this out to see --

12        THE COURT:  How about just asking that, what is --

13   what did he do to familiarize himself with the statute or what

14   is the statute, something --

15        MS. CARTIER-GIROUX:  I'll ask him more specifically,

16   Judge.

17        MR. MARCELLO:  And, Your Honor, just to be clear,

18   Dustin Marcello appearing for Mr. Humphries.  I have already

19   communicated to both attorneys that it's my belief that

20   nothing is relevant as to his specific case as to him but I

21   was going to leave it to the Court's discretion to limit the

22   testimony.  So I would object to the questions with regards to

23   findings that were made as to the informant.  My understanding

24   is that that informant was -- S.M. I guess he's referred to --

25   was ultimately deemed not credible and that was what the

BRET ALAN HUMPHRIES - Cross-Examination

1    decision was based off of.  And, again, asking Mr. Humphries

2    his knowledge of orders that were filed by the Court, again, I

3    don't think would be relevant to these proceedings.  I did

4    advise Mr. Humphries, however, of those facts and -- and leave

5    it to the Court's discretion.

6          But if the Court would like me to object to certain

7    questions, then I -- I would object to that -- that line of

8    questioning with regards to the informant all together.  I do

9    think it is relevant, his knowledge of the -- it's my

10   understanding is the testimony is that he helped

11   Mr. Fuechtener go through the guidelines.  So I think it is

12   relevant his -- his extent of knowledge of the guidelines and

13   the offenses, but anything to do with his case with regards to

14   this jailhouse informant I believe is not relevant and should

15   be objected to, Your Honor.  Thank you.

16         **THE COURT:**  All right.  Well, my understanding is

17   that this line of questioning is to demonstrate bias on behalf

18   of Mr. Humphries based on his understanding of what

19   Mr. Moore's intentions were as to whether or not Mr. Moore was

20   credible ultimately, but the testimony regarding

21   Mr. Humphries' motivation and bias, that is admissible and

22   appropriate.  So the objection is overruled to that extent,

23   but let's see if we can get more quickly to the point of his

24   knowledge of the child pornography statutes.

25         **MS. CARTIER-GIROUX:**  So I withdraw my prior

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    question --
 2              MR. MARCELLO:  Just real quick, Your Honor.  The one
 3    thing I was going to add to that was the -- if there was a
 4    motivation and bias to lie, that has since been extinguished.
 5    Because anything that could have negatively occurred has
 6    already happened and has already been ruled against.  So if
 7    there was a motion -- or a -- a relative reason to lie today,
 8    it's been -- it's long been extinguished and so --
 9              MS. CARTIER-GIROUX:  But Judge that's --
10              MR. MARCELLO:  -- there wouldn't be --
11              MS. CARTIER-GIROUX:  -- an opinion of counsel.
12              THE COURT:  Right.  And so -- and you don't have
13    standing to make that argument because it's related for
14    Mr. Fuechtener, not for Mr. Humphries' case.  But I understand
15    your position, and I'm sure that Ms. Connolly will explain
16    that in closing argument.
17              But go ahead, Ms. Giroux.
18    BY MS. CARTIER-GIROUX:
19    Q.   Sir, isn't it fair to say that a -- the -- for example,
20    the receipt or distribution statute, it lays out the elements
21    of an offense.  Correct?
22              THE WITNESS:  May I ask a question, Your Honor?
23              THE COURT:  Yes.
24              THE WITNESS:  Now, I talked to Mr. Fuechtener --
25              THE COURT:  Well, that's not a question.
```

BRET ALAN HUMPHRIES - Cross-Examination

1          THE WITNESS:  -- about --

2          THE COURT:  What -- what is your question?

3          THE WITNESS:  Okay.  Well, I talked to Mr. Fuechtener

4    about the sentencing guidelines.  I -- I told him what --

5          THE COURT:  All right.  Well, that's not a

6    question --

7          THE WITNESS:  -- Paul Riddle had told me --

8          THE COURT:  You're telling me a statement.  So the

9    question was about your familiarity --

10          THE WITNESS:  No --

11     (Simultaneous crosstalk.)

12          THE COURT:  -- with the receipt or distribution of

13    child pornography.

14          THE WITNESS:  What does my understanding of the --

15    the -- the statute of -- of child pornography have to do with

16    what I told him about the -- the -- the sentencing guidelines

17    from what I was told by a public defender back in

18    September/October of 2014?

19          MS. CONNOLLY:  And, Judge, that was my objection --

20          THE COURT:  All right.  So that's not a question that

21    the Court can answer.  So we'll go ahead and allow Ms. Giroux

22    to continue with her statement -- her question, rather.

23   BY MS. CARTIER-GIROUX:

24   Q.   You said you're familiar with the statute -- withdrawn.

25          You just testified that you have greater familiarity

AMBER M. McCLANE, CCR 914
(702) 384-0429

BRET ALAN HUMPHRIES - Cross-Examination

1  with the child pornography statutes than you do with the

2  sentencing guidelines.  Correct?

3  A.   Yes.

4  Q.   So I'm asking you -- and then when I asked you the

5  question about so you're familiar with the elements of the

6  offenses, you indicated, no, I'm familiar with the case law

7  about the child pornography --

8  A.   Yes.

9  Q.   -- statutes?

10       Is it fair to say, when you look at the

11  receipt/distribution statute, a statute that you've just

12  indicated that you are very familiar with, that that statute

13  simply sets out the elements of the offense; is that correct?

14  A.   Yes.

15  Q.   And provides a statutory maximum or a statutory minimum?

16  A.   Yes.

17  Q.   Now, you just testified that you aren't as familiar with

18  the sentencing guidelines.  Is it fair to say, then, that the

19  information that you purport -- purportedly advised

20  Mr. Fuechtener of after his plea was based on some information

21  that was provided to you by a third party?

22  A.   Yes.

23  Q.   And, in fact, that third party, as far as you knew, never

24  saw Mr. Fuechtener's plea agreement.  Right?

25  A.   No.

BRET ALAN HUMPHRIES - Cross-Examination

1    Q.    Was not familiar with his case?

2    A.    No.

3    Q.    Didn't know what he was charged with?

4    A.    They didn't know Mr. Fuechtener.

5    Q.    Now, because you were friends, though -- you categorize

6    it as jailhouse friends -- before Mr. Fuechtener pled guilty,

7    did you speak to him about his case?

8    A.    Yes.

9    Q.    Did you talk to him about the charges against him?

10   A.    Yes.

11   Q.    And did you talk to him about possible defenses in his

12   case?

13   A.    Yes.

14   Q.    And you, too, discussed with him your case?

15   A.    Yes.

16   Q.    Okay.  The charges in your case?

17   A.    Yes.

18   Q.    The facts and circumstances of your case?

19   A.    Yes.

20   Q.    And the possible defenses that you might use at trial?

21   A.    I'd have to say no to that.

22   Q.    Okay.  Well, Mr. Humphries, did you discuss with

23   Mr. Fuechtener that Ms. Roohani and I were the same

24   prosecutors on that case as -- as I -- as we were in yours?

25   A.    I probably did, yes.

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    Q.    Did you discuss with Mr. Fuechtener what had happened in
 2    your suppression hearing?
 3    A.    Yes.
 4    Q.    Did Mr. Fuechtener ask you questions about your case?
 5    A.    I don't recall him specifically asking me questions, no.
 6    Q.    But you believed that you may have discussed with him
 7    some of the facts and circumstances of your case?
 8              MS. CONNOLLY:   Objection.  Asked and answered.  He
 9    already said yes.
10              THE COURT:   Sustained.
11    BY MS. CARTIER-GIROUX:
12    Q.    Do you believe that you may have discussed with him some
13    of the defenses to your case?
14    A.    No.
15    Q.    Mr. Humphries, you wrote a motion to withdraw the guilty
16    plea for Mr. Fuechtener?
17    A.    Yes.
18    Q.    And you asked to be moved to Pahrump when he was moved
19    from Henderson to Pahrump so that you could help him; isn't
20    that a fact?
21    A.    No.
22    Q.    Sir, did you not speak to your wife on the telephone on
23    February 17 of 2017 and advised her that you needed to be
24    moved to Pahrump to help Jan?
25    A.    Well, that's one of the reasons.  But that's the reason
```

BRET ALAN HUMPHRIES - Cross-Examination

1    why I -- I asked my lawyer to move me back to Pahrump as soon
2    as I got moved to Henderson because Pahrump doesn't have a
3    legal library where you can look up anything other than the
4    statutes.  So immediately, as soon as I got to Henderson, I
5    asked Mr. Ericsson to return me to Pahrump.
6    Q.   I'm not questioning that you may have other motives, but
7    was one of your motives to go to Pahrump was so that you could
8    help your friend, Jan?  It's a very straight question.
9    A.   I would say no.
10   Q.   So when you told your wife on January -- sorry, on
11   February 17 of 2017 in a recorded call that you made to her
12   that you were moving to Pahrump because you needed to help
13   Jan --
14   A.   I needed --
15   Q.   -- that was a lie to your wife?
16   A.   No.
17   Q.   But today, now, it's not the reason?
18          **MS. CONNOLLY:**  Objection.  Asked and answered.
19   Argumentative.
20          **THE COURT:**  Overruled.  He can answer the question.
21          **THE WITNESS:**  Look it, I mean, if I go to Pahrump, I
22   can help Jan.  If I don't go to Pahrump, I can't help Jan.  I
23   needed to go back to Pahrump to help myself so I could have
24   access to better legal library so that I can do things for
25   myself.  Okay?  If a -- if by me moving back to Pahrump

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    allowed me to assist Jan, okay, yes, that's good.  That's not
 2    the reason why I needed to go back to Pahrump.  It gave me the
 3    opportunity to help Jan.  Okay?  And I'm -- in Pahrump, I'm
 4    going to take advantage of that opportunity.  Was that my
 5    overriding motive?  No, it was not.  All right?
 6    BY MS. CARTIER-GIROUX:
 7    Q.   I'm asking you if it was a reason, sir.  Was it a reason
 8    for you to return to Pahrump?
 9              MS. CONNOLLY:  Objection.  Asked and --
10    BY MS. CARTIER-GIROUX:
11    Q.   I didn't ask you whether it was your overriding motive.
12              MS. CONNOLLY:  Objection.
13    BY MS. CARTIER-GIROUX:
14    Q.   I asked you if it was a reason.
15              MS. CONNOLLY:  Objection.  Asked and answered and
16    argumentative.
17              THE COURT:  No.  He failed to respond to the
18    question.
19              THE WITNESS:  Phrase the question again.  Say it
20    again.
21    BY MS. CARTIER-GIROUX:
22    Q.   Wasn't a reason for you to go to Pahrump so that you
23    could help Jan?
24    A.   No.
25    Q.   So when you told your wife on February 17th of 2017 that
```

BRET ALAN HUMPHRIES - Cross-Examination

1   that was a reason for you to go to Pahrump, that was a lie?

2   A.   You're misconstruing basically what I said to my wife.

3   When I told my wife that, basically what I'm telling her --

4   what I'm meaning by what I am saying to her, however, it's

5   phrased in the -- in the conversation with my wife is that, if

6   I go to Pahrump, I can help him.  It's not a reason for me to

7   go to Pahrump.  The reason to go to Pahrump was to help

8   myself.  If a -- if that enables me to help Jan, then I'm

9   going to help Jan.  That was not a reason for me going to

10  Pahrump was to help Jan.  Period.  I was going back to Pahrump

11  to help myself, and if I'm in Pahrump and I can help Jan, then

12  I will help Jan.  I didn't know for sure whether or not I'd be

13  even housed in the same place where -- where Jan was.  Most

14  likely I was, but it wasn't guaranteed.

15  Q.   So you actually did write a motion for Jan to withdraw

16  his guilty plea.  Correct?

17  A.   Yes.

18  Q.   And that was done while you were at Pahrump?

19  A.   Yes.

20  Q.   So not only did you go to Pahrump, but you, in fact,

21  followed up and wrote a motion for him to withdraw guilty

22  plea?

23  A.   I've written motions for about five or six people.

24  Q.   Right.  And --

25  A.   Including him.

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    Q.    In that -- let's just very briefly go back to that call.
 2   You just testified that you told your wife in that call that
 3   you needed to help yourself; is that what you're --
 4   A.    No.
 5   Q.    -- saying today?
 6   A.    No.
 7   Q.    You didn't tell your wife that you needed to help
 8   yourself --
 9         MS. CONNOLLY:  Objection.
10   BY MS. CARTIER-GIROUX:
11   Q.    -- in that call?
12         MS. CONNOLLY:  Asked and answered.  He just said no.
13         THE COURT:  He can answer the question.
14         THE WITNESS:  What was --
15   BY MS. CARTIER-GIROUX:
16   Q.    Go ahead.
17   A.    Say what was the question again.
18   Q.    You just testified that I'm misconstruing that call to
19   your wife --
20         MS. CONNOLLY:  And, Judge, I would also do an
21   objection on the rule of completeness.  If she's going to
22   refer -- if she's taken -- it appears to me she's taken one --
23   one sentence out of a conversation and placing it out of
24   context.  In the rule of completeness, if she wants to bring
25   in that conversation and play it, I think that would be
```

BRET ALAN HUMPHRIES - Cross-Examination

1    appropriate.  But continuing to badger him and take one

2    sentence out of a conversation he apparently had, which I

3    would assume consists of more than one sentence, I think is

4    improper.

5            **MS. CARTIER-GIROUX:**  Judge, I can proffer to this

6    Court --

7            **THE COURT:**  Overruled.

8            **MS. CARTIER-GIROUX:**  I'm sorry.

9            **THE COURT:**  You may continue, Ms. Giroux.

10   **BY MS. CARTIER-GIROUX:**

11   Q.   Sir, isn't it a fact that you did not tell your wife in

12   that conversation that you needed to help yourself?

13   A.   I don't know.  I don't remember the conversation.  I

14   don't know what else was said other than the one sentence

15   you're telling me.

16   Q.   Isn't it a fact that, in that conversation when you were

17   referring to moving back to Pahrump, it was specifically that

18   you needed to help Jan?

19           **MS. CONNOLLY:**  Objection.  She's asked it about five

20   times, Your Honor.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  I don't remember the conversation.

23   **BY MS. CARTIER-GIROUX:**

24   Q.   Okay.

25   A.   Okay.  You're telling me one sentence out of a 20-minute

BRET ALAN HUMPHRIES - Cross-Examination

1    conversation or a 15-minute conversation.

2    Q.   Well, you seem to recall --

3    A.   Back then I think they were 15 minutes.

4    Q.   -- the conversation, sir, when you indicated to me under

5    oath that the conversation was much more extensive to that and

6    you were telling her that you needed to help yourself.

7    A.   No.  I'm telling you my -- what my frame of mind was --

8    however I said it to her, okay, that was not my motivation to

9    go back to Pahrump.  My motivation to go back to Pahrump and

10   I -- as soon as I got to Pahrump and I called my law office --

11           THE COURT:  Mr. Humphries, the question is not what

12   was your motivation to go to Pahrump.  The question was what

13   you discussed with your wife.

14           THE WITNESS:  Well, I don't remember the

15   conversation.  All she's --

16           THE COURT:  Okay.  Then --

17           THE WITNESS:  -- talking about is --

18           THE COURT:  -- that's the answer.

19           THE WITNESS:  -- one sentence.

20           THE COURT:  Move on, Ms. Giroux.

21           MS. CARTIER-GIROUX:  That's fine.

22   BY MS. CARTIER-GIROUX:

23   Q.   Sir, not only did you write a motion to withdraw a guilty

24   plea for Mr. Fuechtener when you were at Pahrump after you

25   were transferred there from Henderson, but Mr. Fuechtener also

BRET ALAN HUMPHRIES - Cross-Examination

1    gave you products from the commissary using his money.

2    Correct?

3            **MS. CONNOLLY:**  Objection.  Compound question.  She's

4    asking him two things.

5    **BY MS. CARTIER-GIROUX:**

6    Q.    Did he give you product from the commissary using his

7    money?

8    A.    Yes.

9    Q.    Did, in fact, a friend of his named Trina pick up your

10   wife for you?

11   A.    Yes.

12   Q.    And you don't know Trina.  Right?  You don't have --

13   you're not her friend?

14   A.    No.

15   Q.    It's his friend?

16   A.    Yes.

17   Q.    Mr. Humphries, are you aware that Mr. Fuechtener doesn't

18   consider you his friend?

19   A.    I wouldn't be surprised.

20   Q.    And that -- isn't it a fact that you -- during the time

21   where you all have spent together both at Henderson at -- and

22   at Pahrump, you have made statements to Mr. Fuechtener that

23   you are concerned that he may reveal to me?

24   A.    No.

25   Q.    Now, you had that experience with Mr. Moore.  Right?

BRET ALAN HUMPHRIES - Cross-Examination

1    A.    Yes.

2    Q.    And isn't it a fact that it would be a concern of yours

3    that someone who you spoke to could come in here and testify

4    against you?

5    A.    Yes.

6    Q.    Are you aware that Mr. Fuechtener's attorney,

7    Mr. Marchese, had previously --

8          **MS. CONNOLLY:**  Objection --

9    **BY MS. CARTIER-GIROUX:**

10   Q.    -- contacted the Government --

11         **MS. CONNOLLY:**  Objection.  Assumes facts not in

12   evidence.

13         **MS. CARTIER-GIROUX:**  I'm asking whether he's aware of

14   something.

15         **MS. CONNOLLY:**  And it's assuming facts not in

16   evidence.  Are you aware of something means it must have

17   occurred.  How can it be -- so they have to establish the

18   underlying fact they're asking him about first.

19         **MS. CARTIER-GIROUX:**  That's actually not correct.

20         **MS. CONNOLLY:**  Are you aware not -- she's not asking

21   did he --

22         **THE COURT:**  No, that's not true if you're going for

23   state of mind.  Go ahead.  Overruled.

24   **BY MS. CARTIER-GIROUX:**

25   Q.    Sir, are you aware that Mr. Fuechtener's attorney,

1   Mr. Marchese, had contacted me and Ms. Roohani indicating that

2   Mr. Fuechtener would want to talk to us about you?

3   A.   No.

4   Q.   Isn't it a fact, Mr. Humphries, that if Mr. Fuechtener

5   got out of his plea agreement, he would still have the option

6   of asking to cooperate to get a better deal?

7           **MS. CONNOLLY:**  Objection.  Calls for speculation.

8   Lack of foundation what my client knew or did not know or

9   think.

10          **MS. CARTIER-GIROUX:**  I didn't ask if her client knew.

11  I asked what he believes.

12          **THE COURT:**  Overruled.

13          **MS. CONNOLLY:**  What he believed might --

14          **THE COURT:**  The witness can answer what he believes.

15          **THE WITNESS:**  What is the question again?

16  **BY MS. CARTIER-GIROUX:**

17  Q.   The question is, Mr. Humphries, it's your understanding,

18  since you've dealt with cooperators before, that if

19  Mr. Fuechtener gets out of his plea agreement, that he could

20  potentially come to us and offer to cooperate?

21  A.   He could.

22  Q.   And if you testify for him here today at this hearing, it

23  would make him a lot -- it would make it a lot harder for him,

24  if he's ultimately not able to withdraw his plea, to testify

25  against you?

BRET ALAN HUMPHRIES - Cross-Examination

1   A.   I know everything there is to know about his case.  I've

2   read the evidence.

3   Q.   That's not my question.

4   A.   Okay.  I've read the evidence --

5   Q.   Sir --

6          **MS. CARTIER-GIROUX:**  I'd ask --

7          **THE WITNESS:**  -- I read the transcript of the

8   hearing --

9          **MS. CARTIER-GIROUX:**  -- that --

10         **THE WITNESS:**  -- and everything else --

11         **THE COURT:**  Mr. Humphries --

12         **MS. CARTIER-GIROUX:**  -- he be admonished to answer

13   the question.

14         **THE COURT:**  -- please answer the question --

15         **THE WITNESS:**  All right.

16         **THE COURT:**  -- and -- and we're striking everything

17   that he has said that is not responsive to the question.

18         **THE WITNESS:**  Okay.  What's the question again?

19   **BY MS. CARTIER-GIROUX:**

20   Q.   My question is if Mr. Fuechtener is not able to get out

21   of his plea agreement and you testify here today on his

22   behalf, he's not as valuable any longer as a cooperator

23   against you.  Correct?

24   A.   I have no idea.  That would be a legal question.  I would

25   have to ask my lawyer to explain that one to me because I have

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    not -- not done any research or anything on that.  I'm totally
 2    clueless.
 3    Q.   And if he's able to get out of his plea agreement and you
 4    testify and you've helped him, he wouldn't be able to
 5    cooperate against you either.  Right?
 6    A.   I don't know why that would prevent him from cooperating
 7    against me.  I --
 8    Q.   Sir --
 9    A.   -- have no idea.
10    Q.   -- isn't that the reason why you're here?
11    A.   Huh?
12    Q.   Isn't that the reason why you're here?
13    A.   No.
14    Q.   It's not a little revenge for us calling Mr. Moore --
15    A.   No.
16    Q.   -- to testify against you?
17    A.   No.
18    Q.   It's not a way to prevent Mr. Fuechtener to ever be able
19    to tell us what you might have said to him?
20    A.   You could ask him any time you want.
21    Q.   Mr. Humphries, you never saw that plea agreement that you
22    gave him advice for when you were talking -- before you were
23    talking to him that morning or the day after he pled guilty?
24    You never saw that plea agreement.  Right?
25    A.   At that time, I had not seen the plea agreement.
```

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    Q.    Okay.  And you didn't even know what he told the Court at
 2    the time of his plea.  Right?
 3    A.    Well, I asked him about that, and he more or less told me
 4    what he said to the Court.  He basically was --
 5    Q.    So you were aware of what he told --
 6    A.    -- trying to tell the Court what the Court wants --
 7    Q.    -- the Court?
 8    A.    -- to hear so that they're -- yeah.
 9    Q.    So you were aware of what he told the Court?
10    A.    About what --
11    Q.    Your understanding of the plea agreement.
12              MS. CONNOLLY:  Objection.  She keeps not letting him
13    finish when he's -- when he's --
14              MS. CARTIER-GIROUX:  I'm clarifying the question.
15              MS. CONNOLLY:  -- trying to talk.
16              THE WITNESS:  From the plea -- from -- from the plea
17    colloquy?  Yeah.
18    BY MS. CARTIER-GIROUX:
19    Q.    Yes, sir.
20    A.    I have a rough idea.  Yeah, I do.
21    Q.    Did he tell you that he told the Court that he understood
22    the plea agreement?
23    A.    Yes.
24    Q.    Did he tell you that he told the Court that under oath?
25    A.    Yes.
```

BRET ALAN HUMPHRIES - Cross-Examination

1    Q.    You have absolutely no personal knowledge of anything

2    that occurred the day that he took the plea.  Correct?

3    A.    Correct.

4    Q.    You have no personal knowledge of any of the

5    conversations that Mr. Fuechtener had with his attorney --

6              MS. CONNOLLY:  Object --

7    BY MS. CARTIER-GIROUX:

8    Q.    -- before he took the plea?

9              MS. CONNOLLY:  Objection --

10   BY MS. CARTIER-GIROUX:

11   Q.    -- correct?

12             MS. CONNOLLY:  -- this is all irrelevant.  What's

13   relevant is what he said to him.  Nothing else is relevant.

14             MS. CARTIER-GIROUX:  That's her opinion.

15             THE COURT:  Overruled.  It's relevant.  You may

16   answer.

17             THE WITNESS:  Correct.

18   BY MS. CARTIER-GIROUX:

19   Q.    And you have no idea what the plea negotiations were,

20   what Mr. Fuechtener told his attorney --

21             MS. CONNOLLY:  Objection --

22   BY MS. CARTIER-GIROUX:

23   Q.    -- or --

24             MS. CONNOLLY:  -- compound.  Compound.  Objection.

25   Compound.

BRET ALAN HUMPHRIES - Cross-Examination

1          **MS. CARTIER-GIROUX:**  It's not compound.  It's "or."

2          **THE COURT:**  Do one at a time.

3          **MS. CARTIER-GIROUX:**  Okay.

4     **BY MS. CARTIER-GIROUX:**

5     Q.   You have no idea what Mr. Fuechtener told his attorney

6     before he pled guilty, while he pled guilty, after he pled

7     guilty?

8     A.   I only know what Mr. Fuechtener told me he told his

9     lawyers.  I was not present, so, of course, I did not hear it

10    myself.  But he did tell me what he supposedly said to his

11    lawyers, yes.

12    Q.   And you didn't even know what offense characteristics

13    were negotiated and agreed on.  Correct?

14    A.   I'm not even sure what you're talking about.

15    Q.   You don't know what offense characteristics are, sir?

16    They're pretty important to the guidelines.

17    A.   Well, I'm not used to that phraseology.  I don't know if

18    it is phrased differently.  And that's -- let's say I'm an

19    expert on the -- the sentencing guidelines.  Alls I did was

20    tell him what Paul Riddle told me --

21    Q.   About --

22    A.   -- not what --

23    Q.   -- your case?

24    A.   No.  About the sentencing guidelines.  Period.  How they

25    work.

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    Q.   Well --
 2    A.   It wasn't necessarily about my case.  Paul Riddle
 3    basically just did a generalization thing.  If you want me to,
 4    I can almost give you a verbatim thing about what he said.
 5    Q.   I just asked you whether you understood or knew what the
 6    offense characteristics Mr. Fuechtener had pled guilty to on
 7    the day you gave him the purported advice that you give him.
 8    A.   Well, since I'm not sure what you're talking about, I
 9    have to say no.
10    Q.   Well, your testimony is that you believe your offense
11    level is a 34 based on those -- on the characteristics
12    pertaining to your case.  Correct?
13    A.   That's what Mr. -- no.  That's -- okay.  That's what you
14    mean by that.  Okay.  Well, that's what Mr. Riddle told me.
15    You start off at 22, go up to, like, 37, take a deal, you go
16    back down to 34.
17    Q.   Actually, your offense level before acceptance is a 35,
18    not a 34.
19             MS. CONNOLLY:  Objection.  Relevance.  Move to
20    strike.  Is there a question?
21             THE COURT:  Sustained.
22    BY MS. CARTIER-GIROUX:
23    Q.   Mr. Fuechtener told you that day that you had the
24    conversation when you gave him the advice about the sentencing
25    guidelines, that according to the plea agreement, Mr. Marchese
```

BRET ALAN HUMPHRIES - Cross-Examination

1     and myself and Ms. Roohani had agreed to -- to -- had agreed

2     that we would argue that -- argue for penalty and that

3     Mr. Marchese could ask for five years and that he could ask

4     for anything up to 30.  Was that his understanding?

5     A.   No.

6     Q.   He understood that the judge could give him anything up

7     to the statutory maximums --

8              MS. CONNOLLY:  I'm going to object.

9     BY MS. CARTIER-GIROUX:

10    Q.   -- correct?

11             MS. CONNOLLY:  Speculation as to what he understood.

12    She can ask --

13             MS. CARTIER-GIROUX:  Well, he had testimony about

14    what Mr. --

15             MS. CONNOLLY:  Can I finish my objection?

16             MS. CARTIER-GIROUX:  -- Fuechtener said.

17             MS. CONNOLLY:  She can ask him what he said, but she

18    can't ask him what he understood.

19    BY MS. CARTIER-GIROUX:

20    Q.   Based on your --

21             MS. CARTIER-GIROUX:  Withdrawn.

22             MS. CONNOLLY:  Judge, could she let me finish --

23    BY MS. CARTIER-GIROUX:

24    Q.   Based on your conversation --

25             MS. CONNOLLY:  -- my objection?

BRET ALAN HUMPHRIES - Cross-Examination

1          **MS. CARTIER-GIROUX:**  Withdrawn.

2          **THE COURT:**  The question was withdrawn.

3    **BY MS. CARTIER-GIROUX:**

4    Q.   Based on your conversation with Mr. Fuechtener, did

5    Mr. Fuechtener indicate in the statements that he made to you

6    that he understood that this Court could give him anything up

7    to the statutory maximums?

8          **MS. CONNOLLY:**  Again, objection based upon

9    speculation.  She can ask him what he said.  She can't ask him

10   what he understood.  That's speculation.

11         **MS. CARTIER-GIROUX:**  I asked him based on

12   the statements.

13         **MS. CONNOLLY:**  She can ask what he said.  What's

14   difficult about that?

15         **THE COURT:**  So the question really is did the

16   defendant discuss with him.

17   **BY MS. CARTIER-GIROUX:**

18   Q.   Did you discuss the statutory maximums with

19   Mr. Fuechtener?

20   A.   I told him that the -- we didn't necessarily talk about

21   the statutory maximum.  I --

22   Q.   Well, that would be --

23   A.   -- just told him that 40 points was above the statutory

24   maximum, and so that he would be looking at a 20-year

25   sentence.

BRET ALAN HUMPHRIES - Cross-Examination

1    Q.   So isn't it important, sir, what the statutory maximums

2    are when the guidelines itself exceed those statutory

3    maximums?

4            **MS. CONNOLLY:**  Again, objection to relevance.  What's

5    relevant is what he said to him and my client's understanding

6    and his state of mind.

7            **THE COURT:**  Overruled.  He can answer the question.

8    **BY MS. CARTIER-GIROUX:**

9    Q.   Wouldn't that be important to discuss?

10   A.   Yes.

11   Q.   Did you discuss that with him?

12   A.   The problem is, is trying to explain this properly.

13           **MS. CARTIER-GIROUX:**  Judge, I'm -- I'm not -- I'm

14   asking a very specific question.

15   **BY MS. CARTIER-GIROUX:**

16   Q.   Did you discuss how the statutory maximums work when

17   there is a guideline that exceeds the statutory maximums?

18   A.   No, I did not.

19   Q.   Do you even know what the statutory maximum is for

20   advertising, sir?

21   A.   Yes.

22   Q.   What is it?

23   A.   Thirty.

24   Q.   What is it for production?

25   A.   Thirty.

BRET ALAN HUMPHRIES - Cross-Examination

1    Q.    What is it for receipt/distribution?

2    A.    Twenty.

3    Q.    Yet you didn't discuss it with him?

4            **MS. CONNOLLY:**  Objection.  Asked and answered.

5            **THE COURT:**  Overruled.  You can answer the question.

6            **THE WITNESS:**  What was the question again?

7    **BY MS. CARTIER-GIROUX:**

8    Q.    You obviously know what the statutory maximums are, yet

9    you did not discuss them with him?

10   A.    On the morning that we're -- we're talking about?  All I

11   did was explain to him what Paul Riddle explained to me, and I

12   told him basically exactly what Paul Riddle told me.  Other

13   than that, I didn't tell him anything, really, more or less.

14   Q.    Sir, do you know if what you told him was actually

15   correct?

16   A.    Well, I assume it was correct because it came from a

17   public defender.

18   Q.    A public defender --

19   A.    I told him --

20   Q.    -- that was discussing --

21   A.    I told him what could have --

22   Q.    -- your case?

23   A.    I told him what I understood it to be.

24   Q.    A public defender that was discussing your case with you.

25   Correct?  Is that right?  Is that where your information was

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    sourced?
 2    A.   I would have to say no.
 3    Q.   Okay.  So your information was sourced from your own
 4    research?
 5    A.   No.  It was sourced from Paul Riddle.  Paul Riddle did
 6    not necessarily go over my particular case.  He just sat there
 7    and went over the guidelines as a general rule.  You start off
 8    at 22.  Possession starts off at 18.  You get two points for
 9    this.  You get four points for that.  You get three points for
10    this.  You get two points for that.
11    Q.   Okay.  I understand.
12              MS. CARTIER-GIROUX:  I have a question, Judge.
13              THE WITNESS:  It gives you a total, and that's
14    basically all I told Mr. Fuechtener.
15    BY MS. CARTIER-GIROUX:
16    Q.   So -- so basically what you're testifying today is your
17    attorney, Mr. Riddle, gave you a basic tutorial of the
18    statutory guidelines; is that correct?
19    A.   Yes.
20    Q.   And you gave Mr. Fuechtener a tutorial repeat of what
21    Mr. -- your public defender, Mr. Riddle, gave you?
22    A.   Yes.
23    Q.   So it was very general.  It wasn't specific to his case,
24    just like Mr. Riddle's wasn't specific to your case?
25    A.   Yes.
```

BRET ALAN HUMPHRIES - Cross-Examination

1   Q.   Isn't it a fact, Mr. Humphries, that after you spoke to

2   Mr. Fuechtener, he was frightened?

3   A.   I'm sure he would be.  I would be, too.

4   Q.   And you told him to withdraw his plea.  Correct?

5   A.   He asked me what could he do.

6   Q.   You told him to get a new attorney?

7   A.   Yes.

8   Q.   Have you ever told Mr. Fuechtener that he can serve his

9   sentence on a U.S. federal case in Germany?

10  A.   No.

11          **MS. CONNOLLY:**  Objection.  Relevance and exceeds the

12  scope of direct examination.

13          **THE COURT:**  Overruled.

14  **BY MS. CARTIER-GIROUX:**

15  Q.   Have you ever told him that?

16  A.   No.

17  Q.   Has he ever brought that up to you?

18  A.   Yes.

19  Q.   Have you told him that he cannot serve his sentence in

20  Germany?

21  A.   No.

22  Q.   You didn't dissuade him of that?

23  A.   No.

24  Q.   Are you aware that he cannot serve his sentence in

25  Germany?

1          **MS. CONNOLLY:**  Objection.  Relevance.

2          **THE COURT:**  It goes to bias and motives.  So that's

3     my understanding.  He can answer the question.

4          **THE WITNESS:**  I had no idea that he wouldn't be able

5     to get a -- a -- heck, I can't even think of -- can't even

6     remember what it's called -- and -- and serve his sentence in

7     Germany unless the U.S. Attorney John Ashcroft, or whatever

8     the representative, turns it down or whatever, but I -- I --

9     as far as --

10   **BY MS. CARTIER-GIROUX:**

11   Q.   All right.  All right.

12   A.   -- that he could put in for a treaty transfer.  That's

13   what it is.

14   Q.   Is this from your legal research, sir?  Is this where

15   you're getting this information?

16   A.   No.  I got this information mainly from Jan for -- that

17   made phone calls to somebody about it.

18   Q.   So somebody told Jan that he could serve a sentence in

19   Germany?

20   A.   Yes.

21   Q.   And you never said to him, "Hey, that doesn't make any

22   sense.  That can't happen"?

23   A.   No.  Me and him looked it up on the law library and saw

24   that it actually could happen.

25   Q.   Sir, you've -- you've done a lot of research in the law

BRET ALAN HUMPHRIES - Cross-Examination

1   library.  Right?

2   A.   Yes.

3   Q.   Isn't it a fact that you filed pro se motions in your own

4   case based on that research.  Right?

5   A.   Yes.

6   Q.   And, in fact, isn't it true that every single pretrial --

7   sorry, pro se motion you filed has been denied?

8   A.   No --

9            **MS. CONNOLLY:**  Objection --

10           **THE WITNESS:**  -- that's not true.

11           **MS. CONNOLLY:**  Objection.  Relevance.

12  **BY MS. CARTIER-GIROUX:**

13  Q.   Sir --

14  A.   One of them was accepted.

15           **MS. CONNOLLY:**  This is Mr. Rouven's motion to

16  withdraw his guilty plea.  What was in his head or his

17  understanding is what's relevant.

18           **THE COURT:**  It goes to bias and motives, so it's

19  overruled.

20  **BY MS. CARTIER-GIROUX:**

21  Q.   Sir, which one was granted, according to you?

22  A.   I don't remember which one.  I put it in myself, and the

23  judge hadn't made a determination after two weeks.  And then I

24  talked to my lawyer, Mr. Ericsson, and Mr. Ericsson said he

25  would contact the Court and ask the Court to accept it as if

BRET ALAN HUMPHRIES - Cross-Examination

1   it was from him.  And then that motion was accepted.

2   Q.   Accepted from the attorney?

3   A.   Yes.  But it had not been rejected by the judge.

4   Q.   But, in fact, the previous what you're calling rejected,

5   the Court denied them not because they were pro se but because

6   they were legally incorrect?

7              **MS. CONNOLLY:**  The same objection.  And hearsay.

8   Foundation.

9              **MS. CARTIER-GIROUX:**  Judge, I can --

10             **MS. CONNOLLY:**  Relevance --

11             **MS. CARTIER-GIROUX:**  -- go through the docket numbers

12   and you can take judicial notice of them, if you -- if it's

13   better to do it that way.

14             **THE COURT:**  Go ahead.

15             **MS. CARTIER-GIROUX:**  The first one is in

16   14-cr-279-APG-VCF.  It's Document No. 154.  Judge, I'll

17   provide you with the other one.  I don't have it in front of

18   me right now.  There are two that I'd offer.

19             **THE COURT:**  All right.

20   **BY MS. CARTIER-GIROUX:**

21   Q.   Sir, you told Mr. Fuechtener to get a new lawyer.

22   Correct?

23   A.   Yes.

24   Q.   Did you talk to Mr. Fuechtener, when you were discussing

25   with him about withdrawing his guilty plea, that if he is

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    successful in withdrawing his guilty plea and loses on the
 2    charges currently in the indictment, he could go to prison for
 3    a minimum of at least 15 years on the advertising?  Did you
 4    tell him that?
 5    A.   I don't remember telling him that, but he already knew
 6    it.
 7    Q.   He already knew it?
 8    A.   Well, he knew what the advertising minimum was because he
 9    told me that that was how one of the ways that his lawyers
10    sold him on signing the plea agreement was that they told him
11    they got rid of the statutory 15-year minimum on the
12    advertising --
13    Q.   Right.  So that he could --
14    A.   -- so he knew that already.
15    Q.   -- argue for the five?
16         MS. CONNOLLY:  Objection.  She's talking over him
17    again.
18         THE COURT:  Sustained.
19    BY MS. CARTIER-GIROUX:
20    Q.   So he could argue for the five.  Right?  He knew he could
21    argue for the five.  Right?
22    A.   I guess.  I don't know.
23    Q.   Well, you just --
24    A.   Well, actually, yes.  I should say yes.  He knew.
25    Q.   So he had an idea of what the statutory maximum and
```

BRET ALAN HUMPHRIES - Cross-Examination

1   minimums were?  He knew that 15 was advertising.  Correct?

2   A.   Yes.

3   Q.   Do you know how many counts he actually pled guilty to

4   on -- in the plea agreement?

5   A.   I believe it was three.

6   Q.   How many was he charged with, do you know?

7   A.   Four.

8   Q.   Did you talk to Mr. Fuechtener about the fact that, if he

9   withdraws his guilty -- if he was able to withdraw his guilty

10  plea, that we could supersede on that indictment and add a

11  charge of production?  Did you talk to him about that?

12  A.   No.

13  Q.   And that you already indicated you talked to him about

14  that -- that if he -- oh.  Withdrawn.

15          Did you talk to Mr. Fuechtener about that, if he went

16  through with this hearing and he testified here under oath,

17  that if he chose to -- and he was successful with withdrawing

18  his plea, if he chose to testify at trial, that I could

19  cross-examine him with the facts that he pled to under oath

20  during the plea allocution?  Did you talk to him about that?

21  A.   Yes.

22  Q.   Mr. Humphries, you have great concern that Mr. Fuechtener

23  will turn against you, don't you?

24  A.   No.

25  Q.   You have great concern about some of the statements that

BRET ALAN HUMPHRIES - Cross-Examination

1    he made to you -- that you made to him?

2    A.   No.

3    Q.   Mr. Humphries, you don't want to have happen what

4    happened with Mr. Moore.  Right?

5            MS. CONNOLLY:  Objection.  Relevance.  Mr. --

6            THE COURT:  It goes to bias and motive.  It's

7    overruled.

8            THE WITNESS:  What was the question again?

9    BY MS. CARTIER-GIROUX:

10   Q.   I said you don't want to have happen what happened with

11   Mr. Moore, that someone came in and testified against you?

12   A.   I could care less.  They'd be lying.  So I don't care.

13   Q.   You were -- did you talk to Jan about the possibility

14   that -- withdrawn.

15           You're aware that, if Mr. Fuechtener is able to

16   withdraw his guilty plea, that there's approximately

17   $1 million that he may have back in his custody?  Did you talk

18   to him about that?

19   A.   No.  Because, at the time, he didn't have any money.

20   Q.   He didn't have any money?

21   A.   No.  It's all in his husband's control.

22   Q.   So he never talked to you about the fact that there was

23   money of his that was in dispute?

24           MS. CONNOLLY:  Objection.  Asked and answered.

25           THE WITNESS:  Well, that was not actually --

BRET ALAN HUMPHRIES - Cross-Examination

1           **MS. CARTIER-GIROUX:**  That wasn't asked.

2           **THE COURT:**  Overruled.  It's a different question.

3  **BY MS. CARTIER-GIROUX:**

4  Q.    Did he ever talk to you about that?

5  A.    Yes.

6  Q.    He did talk to you about it?

7  A.    Yes.  About the money that was in dispute, the house,

8  yes.

9  Q.    And while he was in the facility, he didn't -- he no

10 longer had access to that money.  Correct?

11 A.    Well, I don't think he ever had access to that money.

12 From my understanding, it took both him and Frank to access

13 that money.

14 Q.    Well, you were aware that the money had been kept from

15 him because it's a possibility that he would lose that

16 money -- that the Government had --

17 A.    Well --

18 Q.    -- that money, was holding --

19 A.    -- when I --

20 Q.    -- on to it?

21 A.    -- when I was talking to him back in Henderson about the

22 plea deal, okay, the house hadn't even been sold yet.  So

23 there was no money.  There was no nothing.  That didn't happen

24 until, what, a year later or something like that?

25 Q.    Actually, the house was sold in June and your motion

BRET ALAN HUMPHRIES - Cross-Examination

```
 1    was --
 2              MS. CONNOLLY:  Objection.  Relevance.
 3    BY MS. CARTIER-GIROUX:
 4    Q.   -- filed in July.
 5              MS. CONNOLLY:  Objection.  She's making a statement.
 6    That's not a question.
 7    BY MS. CARTIER-GIROUX:
 8    Q.   Isn't it a fact that your motion was filed in July?
 9    A.   Which motion are you talking about?
10    Q.   The motion to withdraw was filed in July?
11    A.   I don't remember when it was -- was done.
12    Q.   Do you even know when the house was sold?
13    A.   It's not my house.  I don't -- I know roughly --
14    Q.   Well, sir, you just testified --
15    A.   -- when it was sold, but --
16    Q.   Sir, you just testified that my question wasn't correct
17    because you knew that the motion was filed before the house
18    was sold; isn't that right?
19    A.   No.  I was telling you, when I was talking to him
20    about -- about the plea agreement in Henderson back in
21    November of 2016 --
22    Q.   Um-hum.
23    A.   -- okay?  As far as I know, the house was not sold then.
24    Q.   Right.  But that was before you decided to come in here
25    and testify.  Right?
```

AMBER M. McCLANE, CCR 914
(702) 384-0429

BRET ALAN HUMPHRIES - Redirect Examination

```
 1   A.   I was -- always been willing to testify for him.  I told
 2   him that at the very beginning.
 3   Q.   You've always been willing to testify for him?
 4   A.   In a situation like this, yes.
 5   Q.   You're a good friend, Mr. Humphries.
 6            MS. CONNOLLY:  Objection.  Improper --
 7            MS. CARTIER-GIROUX:  I don't have any other questions
 8   for him.
 9            MS. CONNOLLY:  -- move to strike.  Argumentative.
10            MS. CARTIER-GIROUX:  Withdrawn.
11            THE COURT:  Any other questions, Ms. Giroux?
12            MS. CARTIER-GIROUX:  No questions.  I apologize,
13   Judge.  I'm finished --
14            THE COURT:  All right.
15            MS. CARTIER-GIROUX:  -- with Mr. Humphries.
16            THE COURT:  Redirect, Ms. Connolly?
17                        REDIRECT EXAMINATION
18   BY MS. CONNOLLY:
19   Q.   Was Mr. Fuechtener -- has Mr. Fuechtener promised you
20   hundreds of thousands of dollars for coming here and
21   testifying for him?
22   A.   Mr. Fuechtener, at one point in time, told me that he
23   would owe me, and I said you don't owe me nothing.
24   Q.   So he hasn't promised you money for coming in and
25   testifying?
```

AMBER M. McCLANE, CCR 914
(702) 384-0429

BRET ALAN HUMPHRIES - Redirect Examination

1    A.    No.

2    Q.    Has he promised you that he would purchase you more items

3    from the commissary if you came in and testified?

4    A.    No.

5    Q.    Has he promised that somebody would buy you vehicles or

6    gifts if you came in and testified?

7    A.    No.

8    Q.    You were asked if he had purchased you items from the

9    commissary.  What did he obtain for you from the commissary?

10   A.    Oh, I don't remember what it was.  I didn't have any

11   money that week and I needed soap or something like that, and

12   he bought soap for me.

13   Q.    What's the most expensive item that they have in the

14   commissary?

15   A.    That's like a -- well, now it's an -- what is it?  An MP3

16   player.

17   Q.    Has he ever bought you an MP3 player from the commissary?

18   A.    No.

19   Q.    So your recollection is he bought you soap on one

20   occasion because you didn't have money that week?

21   A.    He's bought me a couple of different things like that

22   because I didn't have money and -- at that time because my mom

23   had not put money on my books.  And one time in Henderson he

24   bought me some slip-on shoes because he got tired of hearing

25   me flipping and flopping around in the flip-flops that they

BRET ALAN HUMPHRIES - Redirect Examination

1    give us.

2    Q.   So you recall he bought you soap one time and he bought

3    you a pair of flip-flops one time?

4    A.   Well, slip-on shoes.

5    Q.   Okay.  So a bar of soap and slip-on shoes.  Besides that,

6    has he bought you anything else from the commissary?

7    A.   I can't remember there was.  You know, I don't know.

8    Q.   Anything --

9    A.   Razor --

10   Q.   Anything --

11   A.   -- blades, deodorant, something like that.  Just things

12   that I needed that I didn't have money to buy at that time,

13   and then I always promised that, okay, on the next commissary

14   he could -- I would pay him back.  I would buy him something.

15   Then when it came back for him to -- to do that, he said,

16   "Don't worry about it."

17   Q.   Have you ever purchased him anything from the commissary?

18   A.   Not that I can recall, no.

19   Q.   Is it usual or unusual for inmates to help each other out

20   by purchasing others items from the commissary --

21   A.   It's very usual --

22   Q.   -- when they're low on funds?

23            MS. CARTIER-GIROUX:  Objection.  Relevance.

24            MS. CONNOLLY:  It's totally relevant.  She seems to

25   be implying that, because my client purchased him a couple of

1    items from commissary, that he must be bias or have some

2    motive.  So whether or not this was a regular practice amongst

3    inmates is certainly relevant.

4           **MS. CARTIER-GIROUX:**  Judge, I don't know how you

5    establish that it's a regular practice because you don't know

6    what the motivations are of other inmates in purchasing items

7    for one another.

8           **MS. CONNOLLY:**  I'm not asking for their motive --

9        *(Simultaneous crosstalk.)*

10          **MS. CARTIER-GIROUX:**  -- to have to go into that --

11   no.  Because she doesn't want to go into that.

12          **THE COURT:**  Is your question, Ms. Connolly, whether

13   it's a regular practice in Pahrump or in Henderson or just in

14   general?

15          **MS. CONNOLLY:**  Just I can -- let me stop.

16          **THE COURT:**  Okay.

17   **BY MS. CONNOLLY:**

18   Q.   When he purchased these items from the commissary, was

19   that in Pahrump or Henderson?

20   A.   Say that again.

21   Q.   When he purchased you the soap and the flip-flops, was

22   that in Pahrump or Henderson?

23   A.   The slip-on shoes were in Henderson.  The soap and

24   whatever else was in Pahrump.

25   Q.   Okay.  Has any other inmate ever purchased you anything

BRET ALAN HUMPHRIES - Redirect Examination

1    from the commissary?

2    A.    No.

3    Q.    Is it unusual for one inmate to help another inmate out

4    by purchasing something from the commissary when they're low

5    on funds?

6    A.    It's very common.  I've done it myself.

7    Q.    So you've purchased items for other inmates when they're

8    low on funds?

9    A.    Yes.

10   Q.    And when you did that, did they -- was it because they

11   promised you something in exchange for that?

12   A.    They were going to give me that equal amount of money

13   on -- when they got money on their commissary.  I'd rather buy

14   something off of their commissary to compensate for me buying

15   them something off of mine.

16   Q.    So it's not unusual then?

17   A.    Not unusual.

18   Q.    Let's talk about the conversation you had with your wife.

19   How often do you have conversations with your wife?

20   A.    How long do the conversations last?

21   Q.    How often do you have conversations with your wife?

22   A.    Well, it depends upon how -- right now money's very tight

23   for her, so she hasn't been -- she just put money on for the

24   first time in, I don't know, four months or something like

25   that.

BRET ALAN HUMPHRIES - Redirect Examination

 1   Q.   I think the conversation being referred to --

 2         THE COURT:  The question was how many times.  Right?

 3   How often?

 4         MS. CONNOLLY:  How often.

 5         THE COURT:  How often.

 6   BY MS. CONNOLLY:

 7   Q.   Was it a regular occurrence?

 8   A.   Well, when she puts money on the phone, I call her every

 9   week.  When she doesn't have money to put on the phones, I

10   have to wait till she puts money on the phones.  Sometimes it

11   takes months because -- because I'm in here.  I was the

12   moneymaker.  She's living off of disability.  So she doesn't

13   necessarily have money to put on the phones.

14   Q.   The conversation you were asked about was --

15         THE COURT:  I still didn't get an answer to the

16   question.  How often do you speak to your wife on the phone?

17         THE WITNESS:  Well, it varies.  It depends upon

18   whether she has money to put on the -- on the phone.  I

19   mean --

20         THE COURT:  I understand it varies and it depends.

21   So how often?

22         THE WITNESS:  Well, I hadn't -- I just talked to her

23   the last two weeks, and then before that I probably haven't

24   talked to her on the phone for four months.

25         THE COURT:  All right.  Thank you.

AMBER M. McCLANE, CCR 914
(702) 384-0429

BRET ALAN HUMPHRIES - Redirect Examination

1   BY MS. CONNOLLY:

2   Q.   We're in February of 2017.  That was a conversation where

3   the Government was referring to a conversation that took place

4   about a year and a half ago.  Do you remember everything you

5   said to her during that conversation?

6   A.   I don't remember anything.

7   Q.   You don't have a photographic memory where you can

8   remember everything you say to everybody?

9   A.   No.

10  Q.   Okay.  So do you recall that conversation you had with

11  your wife in February of 2017?

12  A.   No.

13  Q.   Okay.  Do you remember how many conversations weekly you

14  were having with your wife back in February of 2017?

15  A.   Well, I usually only call her once a week.

16  Q.   And that conversation that the Government was referring

17  to that happened in February of 2017, do you remember or do

18  you have any recollection of how long that conversation

19  lasted?

20  A.   What -- if it was -- it was probably 15 minutes.

21  Because, back then, the phone conversations -- you know, you

22  can only talk for 15 minutes and then it -- it disconnected

23  you.

24  Q.   So it would be fair to say you talked about a lot of

25  things during that conversation?

BRET ALAN HUMPHRIES - Redirect Examination

1    A.    Yes.

2    Q.    And you don't deny having said I need to get back to

3    Pahrump so I can help Jan?

4    A.    No, I don't recall that at all.

5    Q.    And you indicated the context of that was that you also

6    needed to get back there to help yourself.  I would assume you

7    didn't tell your wife that because she probably knew that.

8    Right?

9    A.    I have told her that before.  I just -- actually, if --

10   if they had a decent law library at Henderson, I'd much rather

11   be in Henderson than in Pahrump.

12   Q.    What is your motivation?  Why are you coming in here

13   today to help your, as the Government referred to, friend?

14   A.    Because I've -- he was my cellie for a while.  I've gone

15   through all of the evidence with him.  I've read the

16   transcript of the hearing and everything else, and I'm

17   convinced he is not guilty.  I'm convinced his --

18            **MS. CARTIER-GIROUX:**  Objection.  Move to strike --

19            **THE WITNESS:**  -- husband Frank is --

20            **MS. CARTIER-GIROUX:**  -- relevance.

21            **THE WITNESS:**  -- the guilty party.

22            **MS. CARTIER-GIROUX:**  Does he continue to testify when

23   I've made an objection, Judge?  I'd ask the witness be

24   admonished that he's to stop speaking when there's an

25   objection made.

BRET ALAN HUMPHRIES - Redirect Examination

1           THE WITNESS:  I'm sorry.

2           THE COURT:  Well, the question was the motivation for

3     him to testify.  And your objection is?

4           MS. CARTIER-GIROUX:  It goes to -- it's not relevant

5     whether or not he believes that he's guilty or innocent.  The

6     question is whether or not he was adequately advised before he

7     entered into a plea agreement.  It's not about whether or not

8     he's guilty or innocent.  Or I can put in, in evidence during

9     this hearing, as fact --

10          MS. CONNOLLY:  And I agree.  I agree.

11          MS. CARTIER-GIROUX:  -- his plea allocution.

12          THE COURT:  All right.  So the --

13          MS. CONNOLLY:  I can rephrase the question.

14          THE COURT:  No, it's sustained.  I mean -- I'm sorry,

15    it's overruled because the question is his motivation, which

16    is an appropriate question since motivation was explored

17    during cross-examination.  But the Court understands that this

18    particular individual's belief or frame of belief, whether or

19    not the defendant is innocent or not innocent, has no weight.

20    It's whether -- it's what his motivation is, what his belief

21    is.  Even if he believes that Mr. Fuechtener's 10 feet tall,

22    I'm not going to have an evidentiary hearing to determine

23    whether or not he is 10 feet tall.  It doesn't matter what he

24    believes.  It's -- what matters is his motivation.  If he's

25    testifying because he thinks he's 10 feet tall, then that's

1    the answer to the question.  But, otherwise, I'm -- we're not

2    getting into the details.

3            So the question is just what is his motivation to

4    testify:  Money, fame, whatever.  You know, I -- so that's --

5    that's an appropriate question based on the cross-examination.

6    You can answer.  Which I only got to write down because he was

7    his cellie, and then we had an objection.  So that's the only

8    motivation I have so far, his cellie.

9            **THE WITNESS:**  Okay.  I've gone over the evidence with

10   Jan.  I'm convinced that he is innocent.  There's evidence in

11   there that proves Frank is lars45, not Jan.

12           **MS. CARTIER-GIROUX:**  Objection.  Objection to his

13   qualification of the evidence, does he believe he's guilty or

14   not guilty.

15           **MS. CONNOLLY:**  The question is on motivation.  I

16   don't think he's understanding what the question is.  So that

17   I may rephrase it?

18           **THE COURT:**  Please stay responsive to the question

19   which is your motivation.  He's your cellie.  He's convinced

20   he's innocent.  Anything else?

21   **BY MS. CONNOLLY:**

22   Q.   Is your motivation to come in here and lie or to tell the

23   truth?

24   A.   To tell the truth.

25   Q.   It's your testimony that Jan, once you explained to him

1   what Mr. Riddle had said to you, he responded, "Why didn't my

2   lawyers tell me that?"

3   A.   Yes.

4   Q.   And it's your testimony that he was not aware of what

5   level 40 translates to in terms of years under the guidelines?

6   A.   Yes.

7   Q.   And it's your testimony he was unfamiliar with how the

8   guidelines actually operate because he wasn't advised by his

9   lawyers?

10   A.   Yes.

11   Q.   And it was Jan approached you to discuss with you the

12   plea that he had just entered?

13   A.   I would say no.

14   Q.   Or was it just conversation because you were cellmates?

15   A.   We weren't even cellmates at the time.

16   Q.   Out in Henderson.   Correct?

17   A.   In Henderson we were not cellmates.

18   Q.   Is your testimony Mr. -- Mr. Riddle came over and met

19   with you and went over the guidelines in general for --

20   A.   I met him in his office --

21   Q.   -- as they relate to child pornography charges?

22   A.   Yes.

23   Q.   And that's what you shared with Mr. Fuechtener after he

24   entered his plea?

25   A.   Yes.

BRET ALAN HUMPHRIES - Redirect Examination

1    Q.    And he was surprised by the information you gave him?

2    A.    Yes.

3              **MS. CARTIER-GIROUX:**  Objection.

4              **THE COURT:**  Overruled.

5    BY MS. CONNOLLY:

6    Q.    And he was unaware of his exposure under the guidelines?

7              **MS. CARTIER-GIROUX:**  Objection.  She made objections

8    to my questions with regard to him deciding whether or not

9    what Mr. Fuechtener knew or didn't know.  I'm making the same

10   type of objections.  It's what Mr. Fuechtener said.

11             **THE COURT:**  You want to rephrase the question,

12   Ms. Connolly?

13   BY MS. CONNOLLY:

14   Q.    Did Mr. Fuechtener indicate that he was aware of his

15   exposure under the guidelines?

16   A.    No.

17   Q.    Did he indicate that he was unaware of his exposure under

18   the guidelines?

19             **MS. CARTIER-GIROUX:**  Objection to the word

20   "indicate."

21   BY MS. CONNOLLY:

22   Q.    Did he say he was unaware?  Indicate.  Indicate.  Did he

23   indicate to you that he was unaware of his exposure under the

24   guidelines?

25             **MS. CARTIER-GIROUX:**  Objection to the form of the

BRET ALAN HUMPHRIES - Redirect Examination

1    question.

2             **THE COURT:**  Want to rephrase the question,

3    Ms. Connolly?

4    **BY MS. CONNOLLY:**

5    Q.   Did he tell you whether or not he was aware of his

6    exposure under the guidelines?

7    A.   All I can say is that he said, "Why are you telling me

8    this, not my attorneys?"

9    Q.   Now, when he said to you, "Why are you telling me this

10   and not my lawyers," that was in response to specifically

11   what?  What did you say that evoked that response from him?

12   A.   I had just got done explaining to him what Mr. Riddle had

13   explained to me about --

14   Q.   I want you --

15   A.   -- the sentencing guidelines.

16   Q.   -- to remember, if you can recall, specifically the words

17   you used that evoked the response from him, "Why did my

18   lawyers not tell me that," to the best of your recollection.

19   A.   I mean, you want me to tell you what I -- what I told

20   him, the whole --

21   Q.   Yes.

22   A.   -- thing?

23   Q.   In regard to -- you testified that he said, "Why didn't

24   my lawyers tell me that?"  What did you say immediately before

25   he said that to you, if you recall?

BRET ALAN HUMPHRIES - Redirect Examination

1    A.    I don't recall exactly what it was that I said --

2    Q.    Do you remember generally what you said?

3    A.    I told him that he was looking -- looking at before --

4    between 35 and 40 years.

5    Q.    Okay.  And did he tell you that he believed or his

6    attorneys led him to believe that he could get five years?

7    A.    Yes.

8    Q.    Did he tell you whether or not he was aware of what

9    specific offense characteristics applied in this particular

10   case under the terms of the plea agreement?

11   A.    I'm sure he mentioned a couple of them.  But other than

12   that, I can't say.

13   Q.    Okay.  Did you explain to him the meaning of specific

14   offense characteristics?

15            **MS. CARTIER-GIROUX:**  Judge, I'm going to object.  My

16   understanding was on direct -- on my cross-examination he

17   testified that he doesn't know what specific offense

18   characteristics are.

19            **MS. CONNOLLY:**  (Inaudible.)

20      *(Simultaneous crosstalk.)*

21            **MS. CARTIER-GIROUX:**  -- not recollecting the

22   testimony or are we trying to elicit different testimony?

23            **MS. CONNOLLY:**  Well, then, he can say no.

24            **THE COURT:**  My recollection was the same, but he can

25   answer the question.

BRET ALAN HUMPHRIES - Recross-Examination

1          **THE WITNESS:**  Well, Ms. Cartier-Giroux mentioned

2    my -- my -- that mine I said was 34 and he -- and she said

3    that mine was actually 35 points.  So I assume that that was

4    what she meant by the -- the -- whatever it was you just said,

5    the defense -- whatever.  The offense characteristics.  Having

6    that explanation to me, he knew what the 40 -- he knew he had

7    40 points, but he didn't know what 40 points meant.  So I'd

8    say he didn't know.

9    BY MS. CONNOLLY:

10   Q.   Are you saying that because that's what he actually said

11   to you or because you're lying because you're afraid he's

12   going to come in and snitch you out on your case and --

13   A.   I'm not afraid of anybody coming in and snitching me out.

14   If they want to, they can go ahead and try, but they'd be

15   lying.

16          **MS. CONNOLLY:**  I don't have anything else.

17          **THE COURT:**  Ms. Giroux, recross?

18          **MS. CARTIER-GIROUX:**  Just very briefly.

19                    **RECROSS-EXAMINATION**

20   BY MS. CARTIER-GIROUX:

21   Q.   Mr. Humphries, between the time that I sat down and

22   Mr. -- Ms. Connolly got up here to ask you questions, did you

23   remember the conversation with your wife on the phone that we

24   talked about from February?

25   A.   No.

BRET ALAN HUMPHRIES - Recross-Examination

1  Q.   So when you just told her that you talked about a lot of

2  things with her during that conversation, you don't really

3  remember?

4  A.   We always talk about a lot of things.

5  Q.   So --

6  A.   She tells me everything that's been going on at home.  I

7  mean --

8  Q.   I know.  But wasn't it clear to you, sir, that she was

9  asking you about a specific date and conversation and not

10 about generally what you talked to your wife about?

11 A.   Yes.

12 Q.   So when you said -- so which is it?  Do you not remember

13 the conversation, or do you think you talked about a whole lot

14 of stuff?  Do you have a recollection about talking about a

15 whole lot of stuff?

16 A.   I do not have a direct recollection of talking about a

17 whole lot of stuff.

18 Q.   Sir, you gave your opinion of your motivation that

19 Mr. Fuechtener is -- is not guilty.  Okay?  Didn't commit the

20 crimes.

21         Are you aware that, under oath, he admitted to

22 committing the offenses when he took his plea?

23 A.   Yes.

24 Q.   Now, you understand, because you have some understanding

25 of the court system, that when you take a plea, when you --

BRET ALAN HUMPHRIES - Recross-Examination

```
 1   when you admit to the things that you purportedly did in the
 2   indictment that's charged in the indictment, you're under
 3   oath.  Right?
 4   A.   Yes.
 5   Q.   Same oath you took here today.  Correct?
 6   A.   Yes.
 7   Q.   So is it your testimony that you believe that Jan will
 8   lie under oath?
 9        MS. CONNOLLY:  Objection.  It misstates his
10   testimony.  It's improper.  And it's irrelevant.
11        THE COURT:  Overruled.  He can answer the question.
12   BY MS. CARTIER-GIROUX:
13   Q.   Is that your testimony?
14   A.   The way you phrased the question, I'd have to say yes.
15   Q.   Sir, Mr. Fuechtener --
16   A.   I answered the question.
17   Q.   -- pled guilty.  Correct?
18   A.   Yes.
19   Q.   And you're aware that, when he pled guilty, he made
20   statements under oath admitting his guilt.  Correct?
21        MS. CONNOLLY:  Objection.  Asked and answered
22   multiple times.
23        MS. CARTIER-GIROUX:  Judge, she asked him --
24        MS. CONNOLLY:  It's asking the same question over and
25   over again.
```

BRET ALAN HUMPHRIES - Further Redirect Examination

1   **BY MS. CARTIER-GIROUX:**

2   Q.   Then I'll ask you if you believe that he pled guilty and

3   he was administered the oath when he pled guilty.  Is that

4   your belief?

5           **MS. CONNOLLY:**  We already -- Judge, she already went

6   over this with him --

7           **MS. CARTIER-GIROUX:**  I'm just rephrasing --

8           **MS. CONNOLLY:**  -- multiple times.

9           **MS. CARTIER-GIROUX:**  -- the question at his request.

10          **THE WITNESS:**  No.  I said the way you phrased the

11  question, I would have to say yes.  You must have mis --

12  misunderstood what I said.  You didn't hear me say yes.

13          **MS. CARTIER-GIROUX:**  Oh.  I apologize.

14  **BY MS. CARTIER-GIROUX:**

15  Q.   So you do believe that Mr. Fuechtener will lie under

16  oath?

17          **MS. CONNOLLY:**  Objection.  Asked and answered.

18          **THE COURT:**  Overruled.  If he was unequivocal, she

19  can follow up.

20          **THE WITNESS:**  Yes.

21          **MS. CARTIER-GIROUX:**  I don't have any other

22  questions.  Thank you, sir.

23          **THE COURT:**  Anything else, Ms. Connolly?

24                  **FURTHER REDIRECT EXAMINATION**

25  **BY MS. CONNOLLY:**

BRET ALAN HUMPHRIES - Further Recross-Examination

```
 1   Q.   When you say he would lie under oath, you're referring to
 2   the situation he was under when he pled guilty and when the
 3   Court canvassed him at the time of the guilty plea agreement.
 4   Correct?
 5   A.   Yes.
 6            MS. CONNOLLY:   Thank you.
 7                      FURTHER RECROSS-EXAMINATION
 8   BY MS. CARTIER-GIROUX:
 9   Q.   Sir, is there one oath?
10   A.   Pardon?
11   Q.   Is there a different oath that you took today than you
12   took any other time you testified?
13   A.   No.
14   Q.   Are you aware of any other oath when someone comes in and
15   is sworn?
16   A.   No.
17            MS. CARTIER-GIROUX:   I don't have any questions.
18            THE COURT:   Anything else, Ms. Connolly?
19            MS. CONNOLLY:   I'm done.   Thank you.
20            THE COURT:   All right.   Thank you, Mr. Humphries.
21   You are excused.
22            THE WITNESS:   Thank you.
23            THE COURT:   Any other witnesses?
24            MS. CONNOLLY:   No.
25            THE COURT:   Any rebuttal witness?
```

TRANSCRIBED FROM DIGITAL RECORDING

1      **MS. ROOHANI:**  Your Honor, we have one witness, but

2  can we take a very quick restroom break, please?

3      **THE COURT:**  Um-hum.

4      **MS. ROOHANI:**  Thank you.

5      **THE COURT:**  Sure.  It's 12:18.  How long do you need?

6      **MS. ROOHANI:**  Five minutes, Your Honor.

7      **MS. CONNOLLY:**  (Inaudible) I need to leave at 1:00.

8  I have another court hearing in Federal Court at 1:30.

9      **MS. ROOHANI:**  Okay.  So we'll be very quick.

10     **THE COURT:**  Five minutes?

11     **MS. ROOHANI:**  Yes.

12     **THE COURT:**  All right.  We're back in five.

13     **COURTROOM ADMINISTRATOR:**  All rise.

14     *(Recess at 12:18 p.m., until 12:23 p.m.)*

15     **COURTROOM ADMINISTRATOR:**  All rise.

16     **THE COURT:**  All right.  Government, you may go ahead

17  and call your witness.

18     **MS. ROOHANI:**  Your Honor, the United States calls

19  Special Agent Mari Panovich.

20     *(The witness is sworn.)*

21     **COURTROOM ADMINISTRATOR:**  Thank you.  Please be

22  seated.  State and spell your name.

23     **THE WITNESS:**  Mari Panovich; M-A-R-I,

24  P-A-N-O-V-I-C-H.

25     **MS. ROOHANI:**  Your Honor, may I approach and proceed?

1              **THE COURT:**  Yes, you may.

2          **MS. ROOHANI:**  Thank you.

3                      **DIRECT EXAMINATION**

4    BY MS. ROOHANI:

5    Q.    Special Agent Panovich, who is your employer?

6    A.    I work for the Federal Bureau of Investigation.

7    Q.    And how long have you been working for the FBI?

8    A.    I've been employed since June of 2004.

9    Q.    And before that, what did you do?

10   A.    I worked at -- in a funeral home as a funeral director.

11   Q.    And since 2004, since you've been working with the FBI,

12   how long have you been a special agent?

13   A.    I've been a special agent since January of 2009.

14   Q.    And since January of 2009, how long have you been working

15   on child exploitation cases?

16   A.    For the past three years.

17   Q.    Are you familiar with the case that we're -- been talking

18   about for the last five sessions?

19   A.    Yes, I am.

20   Q.    Have you been present during all of that testimony?

21   A.    Yes, I have.

22   Q.    During -- are you the main case agent on this particular

23   case?

24   A.    Yes, I am.

25   Q.    Were you the person who swore off the search warrant in

MARI PANOVICH - Direct Examination

1   this particular case?

2   A.   Yes.

3   Q.   And as part of your duties as the case agent, have you

4   reviewed jail calls in this case?

5   A.   Yes, I have.

6   Q.   Have you reviewed the jail calls of Mr. Fuechtener?

7   A.   Yes.

8   Q.   Now, I want to talk about the jail calls that are in

9   English only.  Have you heard jail calls where

10  Mr. Fuechtener's speaking English?

11  A.   Yes.

12  Q.   In listening to those, was his English understandable?

13  A.   Yes, it was.

14  Q.   Was the people -- or the people who he was speaking to,

15  was their English understandable?

16  A.   Yes.

17  Q.   At any point, did Mr. Fuechtener, based upon the calls

18  that you've listened to, ever ask for an explanation of

19  anything that anybody had said on the phone?

20  A.   No.

21  Q.   At any point, did Mr. Fuechtener speak with Joel Rosales

22  on the phone?

23  A.   Yes.

24  Q.   Can you tell us about that?

25  A.   He was just worried about Joel.  He talked to him on

MARI PANOVICH - Direct Examination

1    several occasions -- and I reviewed the jail calls a while

2    ago -- but he talked to him, he was concerned about him,

3    wanted to make sure that he was okay, and was going to have

4    Frank bring him to I believe it was Henderson at the time so

5    that Joel could visit with him.

6    Q.    Okay.  Were those conversations in English?

7    A.    Yes, they were.

8    Q.    And, at any point, did Mr. Fuechtener accuse Joel of

9    downloading the child pornography that was in his house?

10   A.    No, he did not.

11   Q.    Were you present at the time of execution of the search

12   warrant?

13   A.    Yes, I was.

14   Q.    And, at that time, did you have a conversation with

15   Mr. Fuechtener?

16   A.    Yes, I did.

17   Q.    Can you tell us briefly your recollection of that

18   conversation.

19   A.    When we first met, I introduced myself, showed him my

20   credentials, explained why we were there at his home that

21   morning, and myself and my partner, Detective Ramirez, with

22   Las Vegas Metropolitan Police Department, asked if he would be

23   willing to speak with us.  He said that he would.  So we went

24   into Detective Ramirez's vehicle and, at that point, before we

25   went into any particular questions, we went over the Advice of

MARI PANOVICH - Direct Examination

1    Rights Form.

2    Q.   Was that conversation with Mr. Fuechtener in English?

3    A.   Yes, it was.

4    Q.   And did you offer to get him a translator?

5    A.   We did.  We asked him specifically if he was comfortable

6    speaking English, and he said that he read, wrote, and spoke

7    in the English language and he was very comfortable because --

8    and he went on to say that so comfortable that he would sign

9    business contracts in English.

10   Q.   Did he indicate that he had any of those contracts

11   translated into German before he signed them?

12   A.   No.

13   Q.   Tell -- at -- did you indicate to him that there was a

14   German speaking officer available?

15   A.   Yes, we did.  And he declined this -- the use of the

16   German speaking officer.

17   Q.   And did you indicate to him, if at any time he changed

18   his mind, you could make that officer available?

19   A.   Yes.

20          MS. CONNOLLY:  Objection to leading.

21   BY MS. ROOHANI:

22   Q.   Tell me what you told him about the German speaking

23   officer.

24   A.   That we had a German speaking officer available and on

25   scene in the event he was not comfortable with the English

MARI PANOVICH - Direct Examination

1    language or didn't understand anything that we said, that we

2    could bring that officer over.

3    Q.    And you talked about this Advice of Rights Form?

4    A.    Yes, we did.

5    Q.    Is that a standard FBI form?

6    A.    Yes, it is.

7    Q.    Please tell me a little bit about it.

8    A.    It's the Miranda waiver.  It's the FD-395, which the day

9    of the search warrant we had in English for him, and we went

10   over that form.

11   Q.    Can you tell me about what your recollection was

12   regarding the Advice of Rights Form.

13   A.    As far as when I showed him the form, I read each of the

14   first couple statements, and afterwards he verbally agreed to

15   each sentence that I said.  And at the end there's a line that

16   says, "I understand my rights," I had him read that aloud to

17   Detective Ramirez and myself.

18   Q.    If I show you a copy of that form, would it help refresh

19   your recollection as to the exact things -- the rights that

20   you went through with --

21   A.    Yes.

22         **MS. ROOHANI:**  Your Honor, may I approach?

23         **THE COURT:**  Yes, you may.

24         **THE WITNESS:**  Thank you.

25   ///

MARI PANOVICH - Direct Examination

1   BY MS. ROOHANI:

2   Q.   Special Agent Panovich -- I would mark that as

3   Government's Exhibit 2 -- do you recognize that?

4   A.   Yes, I do.

5   Q.   What is it?

6   A.   It was the FD-395 Advice of Rights Form that I filled out

7   the top and Jan and myself and Detective Ramirez went over the

8   morning of the search warrant.

9          MS. ROOHANI:   Your Honor, I'd move to admit

10   Government's Exhibit 2 at this time.

11          MS. CONNOLLY:   Can I just see it, please?

12          MS. ROOHANI:   I'm sorry?

13          MS. CONNOLLY:   May I see it, please?

14          MS. ROOHANI:   I gave you a copy.

15          MS. CONNOLLY:   Is this -- oh.  I'm sorry.  That's

16   fine.

17          THE COURT:   Exhibit No. 2 will be admitted.

18      (Government's Exhibit No. 2, received.)

19          MS. ROOHANI:   And, Your Honor, I've given your

20   courtroom administrator a copy for Your Honor.

21          THE COURT:   Yes, I have it.

22   BY MS. ROOHANI:

23   Q.   Special Agent Panovich, tell me specifically about the

24   rights that you went through with Mr. Fuechtener.

25   A.   I went through and word for word read to him, "Before we

MARI PANOVICH - Direct Examination

1    ask you any questions, you must understand your rights."

2    Q.   Did he indicate to you that he understood that?

3    A.   Yes.

4    Q.   Next one.

5    A.   "You have the right to remain silent."

6    Q.   Did he indicate that he understood that?

7    A.   I followed up by saying, "Do you understand that?"  And

8    he said, "Yeah."

9    Q.   Okay.

10   A.   "Anything you say can be used against you in court."

11   Q.   Did he indicate --

12   A.   Oh.  I said, "Do you understand that?"

13            "Yes."

14   Q.   Okay.

15   A.   "You have the right to talk to a lawyer for advice before

16   we ask you any questions."

17            Then, "Do you understand that?"

18            "Yes."

19            "You have the right to have a lawyer with you during

20   questioning."

21            And, again, I asked him, "Do you understand that?"

22            He said, "Yes."

23            "If you cannot afford a lawyer, one would be

24   appointed for you before any questioning, if you wish."

25            He said, "Yes."

MARI PANOVICH - Direct Examination

1          "And if you decided to answer questions now without a
2  lawyer present, you have the right to stop answering at any
3  time."
4          And he said, "Yes."
5          We told him that he was not under arrest, and that he
6  was free to leave at any time.
7  Q.    Now, did Mr. -- and are those commonly referred to as
8  Miranda rights?
9  A.    Yes.
10 Q.    Those are legal rights.  Correct?
11 A.    Yes, ma'am.
12 Q.    And I think you indicated that he read that last line to
13 himself.  Can you tell us what that line says?
14 A.    I asked him to read aloud the next line, which says, "I
15 have read the statement of my rights and I understand what my
16 rights are.  At this time, I'm willing to answer questions
17 without a lawyer present."
18 Q.    And did he sign that document?
19 A.    I asked him, "Are you okay with that?"  He said, "Yes,"
20 and he signed it.
21 Q.    And that's his signature that appears there?
22 A.    Yes, it is.
23          And then I did explain that Detective Ramirez and
24 myself would also sign it, and we did that in his presence.
25 Q.    And your signatures also appear on that document?

MARI PANOVICH - Direct Examination

1    A.    That's correct.

2    Q.    At any point during the Advice of Rights, did

3    Mr. Fuechtener ask for a translator?

4    A.    He did not.

5    Q.    Now, Mr. Fuechtener, that same day, submitted himself to

6    a polygraph; is that correct?

7    A.    Voluntarily, yes.

8    Q.    Can you explain to us briefly about -- were you the

9    person that asked him to potentially take a polygraph?

10   A.    Detective Ramirez and --

11          MS. CONNOLLY:   Objection to relevance.

12          MS. ROOHANI:   Your Honor, the Advice of Rights Form

13   regarding the polygraph is really what I'm trying to get into.

14   I'm trying to get -- lay the foundation to get to that.

15          THE COURT:   All right.   Overruled.

16   BY MS. ROOHANI:

17   Q.    Were you the person who asked him to present himself for

18   that?

19   A.    Detective Ramirez and I both spoke with him about that.

20   Q.    Okay.   And did he consent to that?

21   A.    Yes, he did.

22   Q.    Now, did you -- where did -- where did that polygraph

23   take place?

24   A.    At our FBI office in Las Vegas.

25   Q.    And did you drive Mr. Fuechtener there?

MARI PANOVICH - Direct Examination

```
 1    A.    I did not.  He drove himself to the office.

 2    Q.    And you weren't the person who performed the polygraph.

 3    Correct?

 4    A.    No.

 5    Q.    All right.  But you're aware, I believe, that you

 6    produced to me the Advice of Rights that related to polygraph.

 7    Correct?

 8    A.    Yes.

 9    Q.    And is that substantially similar to what's been admitted

10    as Government's Exhibit 2 before you?

11    A.    Yes.

12    Q.    Exactly the same rights?

13    A.    Yes.

14    Q.    Okay.  Now, at some point during the time that

15    Mr. Fuechtener was at the FBI office, did you receive

16    information that he wanted to speak with you?

17    A.    Yes.

18    Q.    Can you tell us about that?

19    A.    Detective Ramirez and myself were upstairs in the break

20    room, and Special Agent McCamey came up to the break room and

21    said that Jan had requested specifically to speak with me.

22    Q.    Did he refer to you by name?

23    A.    He referred to me --

24          MS. CONNOLLY:  That would be hearsay.

25          MS. ROOHANI:  It's the defendant's statement, Your
```

1   Honor.

2          **MS. CONNOLLY:**  You asked -- you asked her about what

3   was communicated to her about him wanting to talk to her.

4   That was hearsay.

5          **THE COURT:**  Were you asking what -- how detective --

6       *(Simultaneous crosstalk.)*

7          **MS. ROOHANI:**  No.  What Mr. --

8          **THE COURT:**  Or --

9          **MS. ROOHANI:**  -- Fuechtener --

10         **THE COURT:**  -- the defendant?

11         **MS. ROOHANI:**  Yes.  The defendant.

12         **THE COURT:**  The defendant.  Overruled.

13  **BY MS. ROOHANI:**

14  Q.   Did Mr. Fuechtener refer to you by name?

15  A.   Yes, he did.

16  Q.   What did he specifically --

17  A.   He asked Special Agent -- asked Special Agent McCamey to

18  speak with --

19         **MS. CONNOLLY:**  Objection.

20         **THE WITNESS:**  -- and his words were --

21         **MS. CONNOLLY:**  Objection.  He asked Mr. -- Special

22  Agent McClure [sic].  She's not -- if she was not privy to

23  that, what McClure [sic] told her is hearsay.

24         **THE COURT:**  Ms. Roohani, what was the question?

25  ///

MARI PANOVICH - Direct Examination

**BY MS. ROOHANI:**

Q.   Was Special Agent Panovich -- did Mr. Fuechtener refer to Special Agent Panovich by name when he requested to speak with her?

**MS. CONNOLLY:**  She wasn't present.

**MS. ROOHANI:**  And, Your Honor, I'm not offering it for the truth of what it is.  It's just --

**MS. CONNOLLY:**  Then it's irrelevant.

**MS. ROOHANI:**  -- for the state of mind as to why she would have gone to speak with him about this.  Next topic that I'm -- I'm trying to lay foundation, Your Honor.

**THE COURT:**  All right.  So it sounds like she doesn't have foundation.  She was not present.  She doesn't have personal knowledge.  So the objection is sustained.

**BY MS. ROOHANI:**

Q.   Regardless, at some point did you go down and speak with Jan?

A.   Yes, I did.

Q.   Okay.  And when you spoke with him, did he refer to you by name?

A.   Yes, as Mari.

Q.   Did he indicate that he wanted to talk to you?

A.   Yes.

Q.   And what did he want to talk to you about?

A.   He wanted to help in the case, and he said that he would

MARI PANOVICH - Direct Examination

1   do what he could to help.

2         **MS. CONNOLLY:**  I'm going to object to the relevance

3   of this, what this has to do with his motion to withdraw his

4   guilty plea.

5         **MS. ROOHANI:**  Specifically it goes to the consent to

6   assume, which has already been admitted as Government's

7   Exhibit 1.

8         **THE COURT:**  Overruled.

9   **BY MS. ROOHANI:**

10  Q.   At some point, did you talk to him about this Consent to

11  Assume online?

12  A.   Yes.  I told him that how he could help was by offering

13  up the password and information to his account with -- to the

14  GigaTribe account, and I explained I did not have the form in

15  front of me but I explained the form and the purpose of it and

16  what he would be signing.

17  Q.   And what did you explain to him?

18  A.   I explained to him that the -- we had an account -- an --

19  a form that was online -- a -- the authority to assume online

20  identity, something to that effect, and that he would be

21  giving us the permission to take over his -- the lars45

22  GigaTribe account.

23  Q.   And I believe you testified you didn't have the form in

24  front of you?

25  A.   I did not at the time.

MARI PANOVICH - Direct Examination

1    Q.    So you were just explaining how the form worked?

2    A.    That's correct.

3    Q.    And did Mr. Fuechtener express agreement with that or --

4    or what was his response?

5    A.    Yes, I told him that I needed -- we would need the e-mail

6    and the password to the account.  He told me that he didn't

7    have the password, he would need to go home and check in his

8    password book, but that was something that he would be willing

9    to do.

10   Q.    Okay.  And did you take further steps to make that

11   happen?

12   A.    Yes.

13   Q.    Can you tell us about that?

14   A.    He -- he offered for -- to Detective Ramirez and I to

15   meet him at his home so that he can look for his password book

16   and he would give us the -- the password to the account.

17   Q.    And did you eventually make it to his home?

18   A.    We did not.

19   Q.    Can you tell us about how -- what were the events that

20   transpired?

21   A.    Detective Ramirez and I were driving towards his home on

22   Lake Mead and Jan was behind us, and he was flashing his

23   headlights and so we turned off into the nearest parking lot,

24   which was the Walmart just east of Rancho.  And we rolled down

25   the window and Jan had said that he realized he wasn't going

MARI PANOVICH - Direct Examination

1    to have enough time to go home and then get back down to the

2    Tropicana for his show, and so he would have to just talk to

3    us there.

4    Q.   Okay.  And did he get into the car?

5    A.   He did.  I got out of the front seat and let him sit in

6    the front seat and I sat in the backseat.

7    Q.   And did you have a conversation with him about the form?

8    A.   Yes, we did.  I had the form with me at that time, and I

9    put it down and I explained it to him.

10          **MS. CONNOLLY:**  Ongoing objection to the relevance of

11   this whole line of questioning.  If she wants to ask him about

12   something he signed, she can ask him that.

13          **MS. ROOHANI:**  And, Your Honor, it's --

14          **MS. CONNOLLY:**  Getting into the polygraph and

15   everything else is -- is completely irrelevant.

16          **MS. ROOHANI:**  It's to impeach Mr. Fuechtener's

17   statement regarding this form, Your Honor.

18          **THE COURT:**  Overruled.  She may answer the question.

19   BY MS. ROOHANI:

20   Q.   Go ahead, Special Agent Panovich.

21   A.   I had him read the form with me, and as he read it, he

22   filled it out.  I explained it a second time, as I did at

23   the -- the FBI office, and when we got done, he wrote the

24   e-mail address and -- and what he believed the password to be.

25   And then he asked if he could add on that form that any child

MARI PANOVICH - Direct Examination

1   pornography that would be found in that account, if there was

2   any, that it did not belong to him.

3   Q.   And I want to show you what's already been admitted as

4   Government's Exhibit 1.

5         **MS. ROOHANI:**  Your Honor, may I approach?

6         **THE COURT:**  Yes, you may.

7         **THE WITNESS:**  Thank you.

8   **BY MS. ROOHANI:**

9   Q.   And is that the Consent to Assume Online Identity that

10  we've been talking about?

11  A.   Yes.

12  Q.   Now, is that your handwriting on that form?

13  A.   That is not.  That is Jan Rouven's.

14  Q.   Jan's handwriting?

15  A.   Yes.

16  Q.   And, specifically, under account it has an e-mail and a

17  separate log-in.  Correct?

18  A.   Yes.

19  Q.   And that's the -- the log-in that you had been

20  investigating regarding the GigaTribe account.  Correct?

21  A.   Yes.

22  Q.   Now, in terms of the -- is this a situation where -- I'm

23  sorry.  Let me strike that.

24        You indicated that Jan wanted to write something on

25  that form?

MARI PANOVICH - Direct Examination

1   A.   He wanted to write if -- that the child pornography that

2   would be found in -- and if it was found in this account, that

3   it did not belong to him.

4   Q.   And did you have a conversation with him about that?

5   A.   Yes, I did.

6   Q.   What --

7   A.   Detective Ramirez and myself both did.

8   Q.   Now, Ms. -- you heard Mr. Fuechtener testify.  Correct?

9   A.   Yes.

10  Q.   And he testified, I believe, that this conversation was

11  with you and Mr. Ramirez and he was not involved in that.  Do

12  you remember that?

13  A.   Correct.  Yes, I do.

14  Q.   Is that your recollection?

15  A.   That is not.

16       **MS. CONNOLLY:**  That is improper to ask one witness to

17  comment on another witness' testimony.

18       **MS. ROOHANI:**  I'm asking if it's her recollection if

19  that's what happened, Your Honor.

20       **MS. CONNOLLY:**  It's improper to ask one witness to

21  comment on another witness' testimony.

22       **THE COURT:**  Overruled.  She can answer the question.

23  BY MS. ROOHANI:

24  Q.   Is that your recollection of what happened?

25  A.   That is not.

MARI PANOVICH - Direct Examination

1    Q.    Can you tell me your recollection of what happened.

2    A.    My recollection of what happened is that Detective

3    Ramirez and I were both speaking directly to Jan --

4         **MS. CONNOLLY:**  I'm going to object to her -- her and

5    Detective Ramirez -- that she be admonished to only talk about

6    what -- what she said or what Mr. Fuechtener said and not

7    anything about what Detective Ramirez said.

8         **THE COURT:**  Overruled.  There's no reason for that.

9    She can testify about who was present.  She can't tell me

10   hearsay what other people said, but she can tell me who was

11   present when she was there.

12        **MS. CONNOLLY:**  Exactly.  I have no objection to her

13   saying he's present, but I want to make sure that when she's

14   testifying, she's only testifying about what she said.

15   **BY MS. ROOHANI:**

16   Q.    Special Agent Panovich, can you tell me just what you

17   said to Jan?

18   A.    I explained again the form to Jan and told him that I --

19   we had talked about this, this is the same form we talked

20   about at the FBI office.  He said, yeah, yes, that he

21   understood.  And then we started going through it directly,

22   myself and Jan.

23   Q.    Okay.  And at some point he indicated that he wanted to

24   write something on there?

25   A.    That's correct.

MARI PANOVICH - Direct Examination

1    Q.   You indicated to him that he could not do that?

2    A.   That's correct.

3    Q.   Did you explain to him why he couldn't do that?

4    A.   I told him that we -- yes, I did.  I told him that we'd

5    be taking the account over as is and he would be giving us

6    permission to do that.

7    Q.   And did Mr. Fuechtener consent to that?

8    A.   He said that that was fine -- no, I'm sorry.  He did not

9    consent.  I didn't even really give him the opportunity

10   because I told him that we -- the form is as it is and that we

11   would just stop at that point.

12   Q.   Okay.  And, at that point, he did not give you the

13   password.  Correct?

14   A.   He said what he thought it was and my -- I -- I had said

15   before that he wrote it down.  He did not write it down.  He

16   said, "I think that it is," and whatever he had said, and

17   then -- but he needed the password to be sure.

18   Q.   And so when Mr. Fuechtener indicated that he wanted to

19   write something on there and you told him that he couldn't do

20   that, what was the next thing that you did at that point?

21   A.   I told him that, at that point, I was going to tear the

22   consent form in half because I didn't want him -- I wanted him

23   to see that so that he knew that nobody else would be able to

24   sign or use that form.

25   Q.   Okay.  And is that why on that copy there's, like, a

MARI PANOVICH - Direct Examination

1   white strip that goes down the middle?

2   A.   Yes.

3   Q.   Is that where the tear was?

4   A.   Yes.

5   Q.   And for the purposes of Bates stamping that document for

6   discovery, did you put it back together?

7   A.   I did myself, yes.

8   Q.   Okay.  Now was that the last conversation that you had

9   with Mr. Fuechtener about that document?

10  A.   No, it was not.

11  Q.   Can you tell us about any further conversations that you

12  had with him.

13  A.   Jan had contacted me via telephone on January 22 in the

14  evening.  I believe I was on my way home from work.  He had

15  called me and said that he wanted to provide help and he

16  wanted to be able to sign this form.  And that -- but he also

17  said he wanted to also make sure that he could write on there

18  again that the child pornography in the account did not belong

19  to him.

20  Q.   And did you again indicate to him that he could not do

21  that?

22  A.   Yes.

23  Q.   Now I want to go back to the time where he flashed his

24  lights at you.

25  A.   Um-hum.

MARI PANOVICH - Direct Examination

```
 1    Q.   You said he wouldn't -- couldn't make it back home and
 2    then make it to work.  Did he indicate that he was in a hurry?
 3    A.   Yes.  He said that he had to get to the show.
 4    Q.   Okay.  And did you indicate to him that you didn't want
 5    to keep him?
 6    A.   Yes.  At the end of our conversation --
 7              MS. CONNOLLY:  Objection to leading question.
 8    They're all leading.
 9              MS. ROOHANI:  Just laying foundation, Your Honor.
10              THE COURT:  Overruled.  She can lead for foundation.
11    BY MS. ROOHANI:
12    Q.   Did you indicate to him that you didn't want to keep him?
13    A.   Yes.  And I told him that I knew that he was in a hurry
14    to get to work, which is what he told us, and at the end of
15    the conversation he told myself that -- and with -- in the
16    presence of Detective Ramirez, that he did -- that it was
17    okay, that he was the boss, and the show wouldn't start
18    without him.
19    Q.   Okay.  And after that conversation is when he called you?
20    A.   The next --
21    Q.   The next day he called you?
22    A.   I had several conversations with him.  He called me
23    several times the next day.
24    Q.   Okay.  Were you present during trial?
25    A.   Yes, I was.
```

1    Q.   Okay.  And at some point you were testifying, would that

2    be fair to say?

3    A.   Yes.

4         **MS. ROOHANI:**  Your Honor, I'm going to lead just a

5    little bit just to lay foundation very briefly.

6    **BY MS. ROOHANI:**

7    Q.   At some point, did we take a break?

8    A.   Yes, we did.

9    Q.   And, at that point, did you speak either to me or

10   Ms. Cartier-Giroux?

11   A.   No.  I was sitting up here on the stand.

12   Q.   Okay.  And was there a reason why you didn't speak to

13   either me or Ms. Cartier-Giroux?

14   A.   I was in the middle of testimony.

15   Q.   Were you on the stand for some lengthy period of time?

16   A.   Yes.

17   Q.   All right.  And you -- you testified that you had been

18   here during the course of trial.  Did you observe

19   Mr. Fuechtener's demeanor during the course of trial?

20   A.   Yes.

21   Q.   Okay.  What was his demeanor during the course of trial

22   before you testified?

23   A.   At times very jovial.  He was smiling and every -- you

24   know, every morning he would come in and wave and say good

25   morning and he seemed his spirits to be high.

MARI PANOVICH - Direct Examination

1   Q.    Okay.  Did he smile at you at any point?

2   A.    Yes, he did.

3   Q.    Was he admonished by his attorneys about that at any

4   point?

5   A.    Yes, he was.

6         MS. CONNOLLY:  Objection.  Objection regarding

7   communications between him and his attorney.  How would she be

8   privy to what his attorneys --

9         THE COURT:  In the courtroom.  She was in the

10  courtroom.

11        MS. ROOHANI:  Yes, Your Honor.

12        THE COURT:  This is all happening in the courtroom.

13  Overruled.

14  BY MS. ROOHANI:

15  Q.    At some point, did you hear his attorney admonish him?

16  A.    Yes, I did.

17  Q.    And what did you hear his attorney tell him?

18  A.    His attorney stood in front of him and -- and with his

19  hands went like this (indicating) and said, "Enough."

20  Q.    And when you say hands went -- hands like this, as in --

21  A.    To stop.

22  Q.    To stop him.  Okay.

23        And that was in response to what?

24  A.    To Jan smiling and --

25        MS. CONNOLLY:  Objection.  Calls for speculation.

MARI PANOVICH - Direct Examination

1    She wouldn't know to what the attorney was referring.

2    **BY MS. ROOHANI:**

3    Q.    Did that happen directly after Mr. Fuechtener had done

4    something?

5    A.    While he was doing --

6    Q.    Okay.

7    A.    -- the actions.

8    Q.    And what exactly was he doing?

9    A.    He was making little, like, movements with his hands and

10   smiling and kind of, like, making, like, gestures with his

11   eyes.

12   Q.    Okay.  And after -- which attorney told him to -- the

13   hand movements?

14   A.    Jess Marchese.

15   Q.    Okay.  And after Mr. Marchese did that, what was

16   Mr. Fuechtener's response?

17   A.    Then he just sat and was kind of quiet.  He also leaned

18   back and looked at me and kind of went (indicating).

19   Q.    And so like a --

20   A.    Like as if he was in trouble.

21   Q.    -- like a grimace face?

22   A.    Um-hum.

23   Q.    Okay.  Was his demeanor the same from what you could

24   observe in the courtroom during trial versus how -- when you

25   were testifying?

MARI PANOVICH - Direct Examination

1  A.   While I was testifying, no, it changed.

2  Q.   Okay.  And did you see him during the course of your

3  testimony?

4  A.   Yes, I did.

5  Q.   Did you make it a point to look at him during --

6  A.   Yes, I did.

7  Q.   And when you were testifying, can you tell me how his

8  demeanor changed?

9  A.   He was quiet.  He was just kind of not making -- not

10  smiling, not as happy, not nearly -- just very quiet and just

11  very somber almost.

12  Q.   Okay.  And that was -- did you learn -- later learn that

13  during the break there was some plea negotiations going on?

14  A.   Very late into the break.

15  Q.   Now, did that demeanor change happen before plea

16  negotiations began?

17  A.   Yes.

18  Q.   At some point, were you advised that plea negotiations

19  were going on?

20  A.   Yeah.  Towards the end of the -- of the day.

21  Q.   Okay.  That was Wednesday afternoon?

22  A.   Yes.

23  Q.   And were you advised that it was a possibility that trial

24  would continue?

25  A.   Yes.

MARI PANOVICH - Direct Examination

1    Q.    Did you see Mr. Fuechtener's attorneys speaking with him?

2    A.    Yes, I did.

3    Q.    Do you know specifically what they were saying?

4    A.    I do not.

5    Q.    Did they have certain documents in front of them that

6    they were looking at?

7    A.    Yes.  They were all writing on notepads.

8    Q.    Now, during the course of your testimony, did you observe

9    Mr. Marchese?

10   A.    I did.

11   Q.    What was he doing?

12   A.    He was taking a lot of notes.

13   Q.    Did you later learn that Mr. Marchese was the individual

14   who was supposed to cross-examine you?

15   A.    Yes, I did.

16   Q.    At some point on Thursday, were you also here in the

17   courtroom?

18   A.    Yes I was.

19   Q.    And, at that point, did you know that there was plea

20   negotiations going on?

21   A.    Yes.

22   Q.    At any point did you talk with me or Ms. Cartier-Giroux

23   about the content of your testimony?

24   A.    I did not.

25   Q.    Were you present at -- at the table when Mr. Marchese and

MARI PANOVICH - Direct Examination

1    Mr. Durham approached our table?

2    A.    Yes.

3    Q.    And do you specifically remember what they asked?

4    A.    Yes.

5    Q.    What did they ask?

6    A.    They asked if a certain section could be --

7           **MS. CONNOLLY:**  Objection.  Hearsay what they asked.

8           **THE COURT:**  Sustained.

9           **MS. ROOHANI:**  And, Your Honor, I'm not offering it

10   for the truth.  I'm offering it to show -- or essentially to

11   impeach what Mr. Fuechtener has then indicated was his state

12   of mind.

13          **MS. CONNOLLY:**  Well, objection.  She had an

14   opportunity to cross-examine both of those attorneys.  That's

15   what's relevant, and what she should have done.

16          **THE COURT:**  How would it impeach his state of mind?

17          **MS. ROOHANI:**  Well, he's indicating that he didn't

18   talk to them about the facts or that I didn't give specific

19   information.  So if she heard that information, I believe she

20   can testify to it.

21          **THE COURT:**  She's saying that he had not received

22   information from his attorney but she overheard his attorney

23   provide him the information; is that what you're saying?

24          **MS. ROOHANI:**  She at least heard the -- me say

25   certain things to the attorneys that Mr. Fuechtener has now

MARI PANOVICH - Direct Examination

1    testified that those -- those statements never happened

2    because his attorneys never came back and told him that.

3            THE COURT:  Statements -- okay.  They were two

4    different statements?

5            MS. ROOHANI:  Correct, Your Honor.  And so maybe I

6    can -- I'll be a little bit more clear.  Mr. Fuechtener had

7    testified that he had wanted certain facts taken out of the

8    plea agreement; that he testified that his attorneys never

9    talked to him about specific offense characteristics.  I'm

10   just laying a little bit of foundation.  I believe that

11   Special Agent Panovich is going to testify that it's more than

12   just the facts, and so that's what I'm attempting to get out,

13   is that he's testified that something never happened in terms

14   of he never asked his attorney to take out specific offense

15   characteristics and they did.

16           THE COURT:  All right.  So I'll allow it for that

17   limited purpose.

18           MS. ROOHANI:  Okay.

19   BY MS. ROOHANI:

20   Q.   So tell -- did his attorney approach Government counsel?

21   A.   Yes.

22   Q.   On one occasion or on multiple occasions?

23   A.   On at least one occasion.

24   Q.   Okay.  And at that time that they came over, what did

25   the -- his attorney specifically ask?

MARI PANOVICH - Direct Examination

1    A.   He --

2          **MS. CONNOLLY:**  Objection again.  What the attorneys

3    asked is hear -- what they said is hearsay.  She's offering it

4    for the truth of the matter, and the appropriate testimony

5    would be from the attorneys asking them what they said, not

6    what she recollects she heard.  It's hearsay.

7          **THE COURT:**  They testified -- the attorneys did

8    testify and the defendant did testify and now she's testifying

9    to what she heard them say.  So, with that condition, I'll

10   allow it.

11         **MS. ROOHANI:**  Okay.

12   **BY MS. ROOHANI:**

13   Q.   Special Agent Panovich, what did you hear the attorneys

14   ask?

15   A.   They asked if a certain section could be taken out of the

16   plea agreement.

17   Q.   And did that refer to the facts or did that refer to a

18   guideline characteristics?

19   A.   I believe it was the facts of the case.

20   Q.   And did you -- did you hear specifically the Government

21   counsel indicate that it couldn't be taken out?

22   A.   Yes.

23   Q.   And did you specifically hear Government counsel indicate

24   that it's because it supported the guidelines in the plea?

25   A.   Yes.

MARI PANOVICH - Direct Examination

1    Q.   At that point, did you see his attorneys return back to

2    counsel table?

3    A.   Yes.

4    Q.   Did you -- without -- did you necessarily hear what they

5    said?

6            MS. CONNOLLY:   Objection.  Leading.

7            MS. ROOHANI:   I don't believe it's leading, Your

8    Honor.

9            MS. CONNOLLY:   It's all leading.

10           THE COURT:   Overruled.  The question is did you hear

11   what they said.  That's not leading.

12   BY MS. ROOHANI:

13   Q.   Did you hear what they said?

14   A.   I did not.

15   Q.   Did you hear them -- did you at least see them speaking

16   to Mr. Fuechtener?

17   A.   Yes.

18   Q.   At that point, did you see Mr. Fuechtener later then sign

19   the plea agreement?

20   A.   I'm sorry?  Say that again.

21   Q.   Did you later then see Mr. Fuechtener put --

22   A.   Yes, I did.

23   Q.   -- pen to paper and sign the plea agreement?

24           MS. ROOHANI:   A moment's indulgence, Your Honor.

25           Your Honor, I'll pass the witness.

MARI PANOVICH - Cross-Examination

```
 1              THE COURT:  Ms. Connolly?

 2                      CROSS-EXAMINATION

 3   BY MS. CONNOLLY:

 4   Q.    Agent Panovich, did you see any of the attorneys, when

 5   they were in the ante room, going over a plea agreement with

 6   Mr. Fuechtener?

 7   A.    In the what room?  I'm sorry.

 8   Q.    Did you see any of the attorneys in the ante room or the

 9   room where they -- where he's housed, go over the plea

10   agreement with him?

11   A.    No, I did not.

12   Q.    Did you see -- were -- you were not present when he had

13   discussions with his attorneys prior to coming into the court?

14   A.    No, I was not present.

15   Q.    Fair to say that, when he was in court, did you observe

16   Mr. Durham holding the guilty plea agreement while he was

17   talking to Mr. Fuechtener?

18   A.    I saw all of them holding the --

19   Q.    And you're talking about he actually signed the guilty

20   plea agreement in court?

21   A.    I believe he did.

22   Q.    And that was minutes before the judge took the bench?

23   A.    As far as, like, time line, I don't remember exactly, but

24   I do believe that he signed the plea agreement in court.

25   Q.    So it was briefly -- shortly before the judge took the
```

MARI PANOVICH - Cross-Examination

```
 1    bench?
 2            MS. ROOHANI:  Objection.  She's already testified
 3    that she doesn't know.
 4    BY MS. CONNOLLY:
 5    Q.   So you remember all this other stuff and you remember
 6    discussions that the attorneys had, but you don't have any
 7    idea how long it was between when he signed the guilty plea
 8    agreement and the judge came in the courtroom?
 9    A.   I did not keep a record of that.
10    Q.   Hours?
11    A.   I wouldn't --
12            MS. ROOHANI:  Your Honor, she's already testified
13    that she doesn't remember.
14            MS. CONNOLLY:  I'm allowed to explore that.
15            THE COURT:  She can answer the question.
16            THE WITNESS:  I wasn't sitting at the table, so I
17    wouldn't be able to say exactly.
18    BY MS. CONNOLLY:
19    Q.   I'm sorry?  I can't hear you.
20    A.   I wasn't sitting at the table with the defendant and his
21    legal team, so I would not be able to say when he exactly
22    signed the plea agreement versus when --
23    Q.   Okay.  Do you remember what time the judge came in the
24    courtroom?
25    A.   I know that it was around -- like, maybe around noon,
```

MARI PANOVICH - Cross-Examination

```
 1    lunchtime.  I know we were late to start.  We were supposed to

 2    start at 9:00 a.m. that morning.

 3    Q.    Around about noon.

 4          So when did you enter the courtroom?

 5    A.    I was there -- probably here at 8:45.

 6    Q.    When did you see the defendant enter the courtroom?

 7    A.    I cannot tell you that.

 8    Q.    When did you see the attorneys enter the courtroom?

 9    A.    Honestly, I wouldn't be able to tell you that.  I don't

10    know.

11    Q.    Was there -- was there a break between after -- so you

12    say you saw him sign the guilty plea agreement in the

13    courtroom?

14    A.    Yes.

15    Q.    Was there a break after he signed the courtroom -- the

16    guilty plea agreement before the judge came in?

17    A.    Given that it was almost two years ago, I wouldn't be

18    able to remember that.

19    Q.    That's almost two years ago and you don't remember that,

20    but you remember all these other specifics.  How is that?

21    A.    Because this is a very high-profile investigation, which

22    I knew from the beginning given Mr. Fuechtener's status and

23    his entertainment on the Strip.  I knew that it was going to

24    be a high-profile investigation.

25    Q.    And you understood that a high-profile investigation, you
```

MARI PANOVICH - Cross-Examination

1   have an entertainer entering a guilty plea to child

2   pornography charges, that's pretty important.  Right?

3   A.    Absolutely.

4   Q.    But you don't remember how long it was between him

5   signing the guilty plea and the judge taking the bench?

6   A.    I didn't take note of that.

7   Q.    Okay.  But it wasn't hours, was it?

8        MS. ROOHANI:  Your Honor, she's already testified

9   four times that she doesn't remember.

10       THE COURT:  What is the relevance of the difference

11  between the time when he signs the plea agreement and the

12  court --

13       MS. CONNOLLY:  I can move on, Your Honor.

14       THE COURT:  Because she already testified that the

15  court was supposed to begin at 9:00 a.m. but didn't begin

16  until after lunchtime.

17  BY MS. CONNOLLY:

18  Q.    So you observed Mr. Fuechtener with his attorneys huddled

19  around with the guilty plea agreement?

20  A.    I remember his attorneys being with him and if --

21  Q.    Please.  Yes or no?

22  A.    State your question again, then.

23  Q.    Do you remember Mr. Fuechtener sitting at the table with

24  the guilty plea agreement and his attorneys?

25  A.    I do remember that.

MARI PANOVICH - Cross-Examination

```
 1    Q.   Did each individual person have their own guilty plea
 2    agreement?
 3    A.   I did not pay that close of attention.
 4    Q.   You weren't paying attention?
 5    A.   Not that close --
 6         MS. ROOHANI:  Objection.  That misstates her
 7    testimony.
 8         MS. CONNOLLY:  She can answer.  The Government's
 9    answering for her.
10         MS. ROOHANI:  And it's argumentative, Your Honor.
11         MS. CONNOLLY:  She's a special agent perfectly
12    capable of answering my questions.
13         THE COURT:  It is argumentative.  Sustained.
14    BY MS. CONNOLLY:
15    Q.   What was your focus when you were in that courtroom?
16    A.   Just to be there.  If I'm going to testify and we're
17    going on with trial, then we're going to go ahead.  I didn't
18    talk to the -- my -- the U.S. attorneys.  I sat by myself and
19    waited for a decision to be made.
20    Q.   Okay.  Now, when you were testifying -- and testifying's
21    pretty important.  Right?
22    A.   Correct.
23    Q.   And it's pretty -- and you have the Government asking you
24    questions and defense lawyers asking you questions?
25    A.   Correct.  We didn't get to that point, but yes.
```

MARI PANOVICH - Cross-Examination

1   Q.   So you -- you -- all that happened, in terms of your

2   testimony, was the Government questioning you.  Right?

3   A.   Right.  We didn't even finish.

4   Q.   And I assume that the Government -- was the -- was it

5   this courtroom?

6   A.   I believe it was the same courtroom, yes.

7   Q.   The Government sitting at this table?

8   A.   Yes.

9   Q.   And the defendant was sitting over at this table?

10  A.   Yes.

11  Q.   And the jury's sitting here.  Right?

12  A.   We did not have a jury.

13  Q.   Oh.  You had a Judge.

14       And so I would assume it's your practice to look at

15  somebody when they talk to you like you're looking at me right

16  now as I question you.  Right?

17  A.   Correct.

18       **MS. ROOHANI:**  Objection.  Relevance to this entire

19  line of questioning.

20       **THE COURT:**  Overruled.  She can answer the question.

21  **BY MS. CONNOLLY:**

22  Q.   You're looking at me when you're answering my questions?

23  A.   Absolutely.

24  Q.   And that's what we do in polite society; when somebody

25  asks us a question, we look at them.  Right?

MARI PANOVICH - Cross-Examination

1   A.   Yes.

2   Q.   And your focus is on me right now.  Right?  It's not on

3   my client sitting there?

4   A.   Correct.

5   Q.   And it would be fair to say that, when Ms. Roohani or

6   Ms. Cartier-Giroux were asking you questions, you showed them

7   the same courtesy?  You looked at them when they asked you

8   questions, and you looked at them and you answered them.

9   Right?

10   A.   I looked at them and I looked --

11   Q.   Yes or no?

12   A.   -- at the judge and I looked at you.

13   Q.   Yes or no?

14   A.   Yes.

15         **MS. CARTIER-GIROUX:**  Objection.

16         **THE COURT:**  Sustained.

17         **MS. CONNOLLY:**  I don't have anything else.

18         **THE COURT:**  Redirect?

19         **MS. ROOHANI:**  I have no questions, Your Honor.

20         **THE COURT:**  Thank you, Ms. --

21         **THE WITNESS:**  Thank you.

22         **THE COURT:**  -- Special Agent Panovich.  You are

23   excused.  You may be seated.

24         Any other witnesses from the Government?

25         **MS. ROOHANI:**  Not from the Government, Your Honor.

TRANSCRIBED FROM DIGITAL RECORDING

1     **THE COURT:**  And any other witnesses, Ms. Connolly?

2     **MS. CONNOLLY:**  No, Your Honor.  I just wanted to --

3  one thing.  I wanted to make sure we have the PSR.  I had

4  provided and marked as an exhibit the old one.  What I would

5  ask is I have copies of the -- the updated one that was

6  revised on September 15, 2017, and I would just ask that to be

7  marked as an exhibit under seal because we've had a lot of

8  discussion about the PSR.

9     **MS. ROOHANI:**  Your Honor, I would object to that.

10  That was completed after the motion was filed, and it wouldn't

11  be a basis for the motion, and so I would object to that.

12     **MS. CONNOLLY:**  I had a discussion about this

13  previously.  That's fine.  Can we have the one that's been

14  admitted?  I want to make sure that it's filed under seal.

15     **THE COURT:**  All right.  So which is the date of the

16  PSR that --

17     **MS. CONNOLLY:**  It's --

18     **THE COURT:**  -- predates the motion?

19     **MS. CONNOLLY:**  It's an exhibit up there.  I don't

20  know --

21     **COURTROOM ADMINISTRATOR:**  Exhibit H.

22     **MS. CONNOLLY:**  Can I see?  May I approach?

23     **THE COURT:**  Yes.  Let's double-check that.

24     **MS. ROOHANI:**  It's Government -- it's Defense

25  Exhibit H, Your Honor.

AMBER M. McCLANE, CCR 914
(702) 384-0429

TRANSCRIBED FROM DIGITAL RECORDING

1          **MS. CONNOLLY:**  Yes.

2          **MS. ROOHANI:**  H, as in Harry.

3          **THE COURT:**  And there's no objection to Exhibit H

4    being filed under seal?

5          **MS. ROOHANI:**  No, Your Honor.  I believe that would

6    be appropriate.

7          **THE COURT:**  All right.

8      *(Defense's Exhibit No. H, received.)*

9          **THE COURT:**  Anything else?

10         **MS. CONNOLLY:**  No.

11         **MS. ROOHANI:**  No, Your Honor.

12         **THE COURT:**  All right.  So the parties will have

13   until 12:00 noon on May 30th, 2018, to file closing briefs.

14   You don't have to if you don't want to, but if you would like

15   to highlight and bring to my attention what the testimony was

16   or was not, you may go ahead and do that by filing your

17   closing brief by May 30th before 12:00 noon.

18         **MS. ROOHANI:**  And, Your Honor, those are simultaneous

19   briefs?

20         **THE COURT:**  Yes.

21         **MS. ROOHANI:**  Thank you.

22         **MS. CONNOLLY:**  So just supplemental briefs.  Right?

23   Is that --

24         **THE COURT:**  Just like a closing argument of whatever

25   it is --

TRANSCRIBED FROM DIGITAL RECORDING

1          **MS. CONNOLLY:**  Okay.

2          **THE COURT:**  -- that you want to highlight and remind

3    me that someone said or didn't say that you think is relevant

4    to your argument.  And then I'll issue my written order and

5    we'll go ahead and set this for either a sentencing hearing or

6    whatever else, if we're resetting trial, depending on what the

7    result is.  But we'll set it now for a hearing that --

8    depending on the decision.  The decision will be out fairly

9    soon after you submit your closing argument but June --

10   June 21 it looks like at 11:00 a.m. we're open.  Does that

11   look the same on your calendar?

12         **MS. CONNOLLY:**  Judge, I'm out of the jurisdiction

13   from -- from the 13th through the 22nd.

14         **THE COURT:**  Oh, okay.  So let's see.  All right.  So

15   the -- let's see.  June 26...

16         **MS. CONNOLLY:**  I'm sorry.  I have CPS court all day

17   Tuesdays.

18         **THE COURT:**  All right.  And 27 and 28 are the

19   training days that we agreed not to set any criminal cases

20   for.

21         Okay.  We're getting into the July 4th and the

22   holidays right in the middle of the week this year.

23         **MS. ROOHANI:**  Your Honor, the week of July 9 I'm

24   going to be in trial.  I don't know if you're looking at that

25   week.

TRANSCRIBED FROM DIGITAL RECORDING

1          **THE COURT:**  All right.  So, Ms. Connolly, what's your

2     first available date?

3          **MS. CONNOLLY:**  After the 30th of May?

4          **THE COURT:**  Yes.

5          **MS. CONNOLLY:**  June 6.

6          **THE COURT:**  I'm at a committee meeting.

7          **MS. CONNOLLY:**  The afternoon of the 7th.  I leave --

8     I leave on the 13th of June.

9          **THE COURT:**  And when do you return?

10          **MS. CONNOLLY:**  22nd.

11          **THE COURT:**  22nd.  Okay.  And then... how about

12     Monday, June 25th?

13          **MS. CONNOLLY:**  Wednesday what?

14          **THE COURT:**  Monday, June 25th.

15          **MS. ROOHANI:**  That's fine, Your Honor.  Any time.

16          **MS. CONNOLLY:**  What time?  I just have an

17     11:00 o'clock in family court that day.  That's it.

18          **THE COURT:**  At 9:00 a.m.?

19          **MS. ROOHANI:**  That's fine, Your Honor.

20          **THE COURT:**  All right.  So we'll set this for

21     June 25th, which is a Monday, at 9:00 a.m., for either

22     sentencing or setting a new calendar call and trial date

23     depending on the Court's written decision, and the deadline

24     for closing briefs by the parties is May 30th by 12:00 noon.

25          Anything else from the parties?

TRANSCRIBED FROM DIGITAL RECORDING

1    **MS. CONNOLLY:**  Yeah, Judge.  Can you just order that

2    he doesn't need to be in segregation anymore?  Because he's

3    been segregated to keep him and Humphries apart.

4        **THE COURT:**  All right.  So I think the order was to

5    keep Mr. Humphries from having contact with Mr. Fuechtener.

6    So that order is now completed, and so they can have contact.

7    As to whether or not he's segregated, I'm not going to

8    order --

9        **MS. CONNOLLY:**  They've segregated him --

10       **THE COURT:**  -- that he should or should not be

11   segregated.  That's up to the --

12       **MS. CONNOLLY:**  I meant he was -- they had put him in

13   segregation to keep them separate.  So just that there's no

14   longer a requirement to keep Humphries and Rouven separated.

15       **THE COURT:**  Right.  There's no longer a requirement

16   for Mr. Humphries or Mr. Fuechtener to be kept separated.

17       **MS. CONNOLLY:**  Thank you.

18     *(Proceedings concluded at 1:03 p.m.)*

19                              *  *  *

20     I, AMBER M. McCLANE, court-appointed transcriber, certify

21   that the foregoing is a correct transcript transcribed from

22   the official electronic sound recording of the proceedings in

23   the above-entitled matter.

24

25     /s/  *Amber M. McClane*                5/25/2018
          Amber M. McClane, CCR 914          Date