DAYLE ELIESON
United States Attorney
ELHAM ROOHANI
Nevada Bar No. 12080
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Fax: (702) 388-5087
Email: elham.roohani@usdoj.gov

Attorney for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
## -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 2:16-cr-00100-GMN-CWH |
| Plaintiff, | |
| vs. | GOVERNMENT'S SUPPLEMENTAL BRIEFING IN RESPONSE TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA |
| JAN ROUVEN FUECHTENER, | |
| Defendant. | |

The United States of America, by and through the undersigned, provides the following briefing requested by the Court after the conclusion of the five-part evidentiary hearing held on the Defendant's Motion to Withdraw Guilty Plea. For the reasons set forth below, the Government respectfully requests that this Honorable Court deny the motion, and set the matter for sentencing.

…

…

…

…

# ARGUMENT

1. <u>**The Defendant has failed to meet his burden to show any fair and just reason why he should be allowed to withdraw his guilty plea.**</u>

A criminal defendant has no right to withdraw a guilty plea. *United States v. Rubalcaba*, 811 F.2d 491, 493 (9th Cir. 1987). However, a district court may permit withdrawal of a guilty plea prior to sentencing upon a showing by the defendant of any "fair and just reason." Fed. R. Crim. Proc. 11(d)(2); *United States v. Ortega-Asciano*, 376 F.3d 879, 883 (9th Cir. 2004); *United States v. Nagra*, 147 F.3d 875, 880 (9th Cir. 1998). "Fair and just reasons for withdrawal include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Ortega-Asciano*, 376 F.3d at 883. "The defendant has the burden of demonstrating the existence of at least one of these conditions." *United States v. Showalter*, 569 F.3d 1150, 1154 (9th Cir. 2009). The Defendant does not rely on any of the recognized bases for withdrawal of his plea. *See Ortega-Asciano*, 376 F.3d at 883.

Instead, and tellingly, the Defendant's argument has evolved during the course of the proceedings. First, the Defendant relied on arguments about ineffective assistance of counsel (claiming that his attorneys allegedly failed to tell him that the stipulated sentencing guidelines under the plea agreement gave rise to a sentencing guidelines range of 292-365 months' imprisonment), and that his plea was coerced because of some

disagreement between Mr. Marchese and Mr. Nadig a full three months before trial.[1] *See* ECF No. 194.

After the Government pointed out fatal errors in the Defendant's initial argument and the lack of any sworn statement to support those arguments, the Defendant's position shifted. *See* ECF No. 221. In his reply, the Defendant pivoted and contended that his prior attorneys did not "discuss relevant conduct, specific offense characteristics, [or] variances, etc." *Id.* at 221. Then, fundamentally misunderstanding federal sentencing and conflating the difference between variances, departures, and the breadth of the evidence the Court may consider at the time of sentencing under 18 U.S.C. 3661,[2] the Defendant, through current counsel, asserted it was ineffective for his attorneys to even consider arguing for a downward adjustment. *Id.* at 6-7. After the Defendant made this wholly new argument in his reply, he then claimed actual innocence.[3] *Id.* at 11. Recognizing that he had not met his burden with his original motion, the Defendant

---

[1]     The Defendant also mentioned an "obvious conflict" of interest, but provided no argument to support that claim. ECF No. 194, at 4. As was repeatedly shown during the evidentiary hearing, through the testimony of Mr. Marchese, Mr. Nadig, Mr. Sanft, and the Defendant, there was no antagonistic defense during the time that the attorneys were working together.

[2]     To be sure: "*No limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added).

[3]     Notably, the Defendant abruptly abandoned his "actual innocence" argument as the Government was about to elicit testimony from the Defendant's former counsel that would directly refute that baseless claim. ECF No. 261, at 147-148 (Transcript of Evidentiary Hearing – Day 1). Also relevant is that this was the first of many times during the evidentiary hearing that Ms. Connolly made the specious argument that the Defendant should not be held responsible for the pleadings filed in this case as he did not personally write the motion and reply, notwithstanding the fact that the Defendant's affidavit affirmed all the facts contained therein. *Id.*

attached a perjured affidavit to his reply. ECF No. 222.

At preliminary oral argument on the motion, Ms. Connolly falsely represented to the Court that Bret Humphries told the Defendant the night of the plea "Jan, you just stipulated to 24.3 to 30 years."[4] ECF No. 232, at 9-10 (Transcript of Motion Hearing). Implicitly recognizing that the Court had rejected almost all of his arguments, the Defendant then latched himself onto a question posed by the Court *sua sponte* regarding specific offense characteristics. *Id.* at 32, 54-56.

The constant shifting, pivoting, abandoning, and maneuvering to artificially manufacture a factually unsupported basis for the Defendant to receive a hearing and to withdraw his plea demonstrates that the Defendant never had a good faith basis to file his motion in the first place. What has become abundantly apparent is that Mr. Marchese's assessment is correct – the Defendant got "buyer's remorse." ECF No. 261, at 158 (Transcript of Evidentiary Hearing – Day 1). Even if the Court credits the Defendant's and Mr. Humphries' testimony, the Court also knows that the completely incorrect legal information provided to the Defendant by Mr. Humphries is what precipitated the Defendant's remorse.

Now, after forcing the Court to expend countless hours of time and resources to hold five continued evidentiary hearings, the Defendant still has not withdrawn or

---

[4]     Of course, the Court now knows that, according to the sworn testimony of Defendant and Mr. Humphries, Ms. Connolly's statement was not true and never has been true. ECF No. 258, at 121 (Transcript of Evidentiary Hearing – Day 3); ECF No. 263, at 40 (Transcript of Evidentiary Hearing – Day 5). The Defendant and his counsel have repeatedly misrepresented the evidence in a bid to obtain an evidentiary hearing, to secure a writ for Mr. Humphries' testimony, and to deceive this Court into allowing the Defendant to withdraw his plea.

conceded a single argument,[5] including the demonstrably false and factually

unsupported argument regarding Mr. Humphries instructing the Defendant about his

"true exposure" under the stipulated and agreed-upon sentencing guideline provisions

in the plea agreement. Aside from the perjured testimony offered by the Defendant, this

maneuvering should leave the Court with a firm conviction that the Defendant has failed

to meet his burden.

## 2. **The Defendant is not a credible witness.**

The Government does not intend to belabor this point and draw the Court's

attention to each and every inconsistency between the Defendant's sworn affidavit (and

its incorporation of the factual assertions contained in the motion and reply), the

Defendant's testimony when asked rehearsed questions by Ms. Connolly, and the

Defendant's testimony on cross-examination while being coached by Ms. Connolly with

her speaking objections.[6] The overall tenor of the Defendant's testimony was simply this

– the Defendant will say and do anything to be able to withdraw his plea and that

includes repeatedly lying under oath, recanting previous sworn testimony, and making

---

[5]     The only exception is that the Defendant withdrew the actual innocence argument after the Government had already prepared to respond to the new argument that was raised for the first time in the reply, and after the Government began eliciting testimony that would lay bare the complete falsity of the claim.

[6]     *See, e.g.*, ECF No. 258, at 45 and 46 (Transcript of Evidentiary Hearing – Day 3). Ms. Connolly coached the Defendant to say that the answer to a straightforward question called for a more complicated answer than "yes or no." However, only seconds later, the Defendant answered "yes" to the exact same question when not coached by Ms. Connolly's speaking objections. Likewise, after hearing multiple speaking objections from Ms. Connolly regarding whether the Defendant wrote the motion, the Defendant refused to answer a simple "yes or no" question regarding the truth or falsity of a material statement in the motion. *Id.* at 153.

baseless accusations against his trial attorneys.

By way of example, the Government highlights the Defendant's prevarication and constant flip-flopping on a single fact as evidence that he is not a credible witness. In his affidavit, the Defendant swore and attested that "All of the factual assertions set forth [in the motion to withdraw and reply] are accurate." ECF No. 222, at 1, ln. 19-20. However, when confronted with material inconsistencies between his affidavit and motion when compared to his testimony (also given under oath), the Defendant deflected, asked a question, and then went to the answer his attorney had been coaching him with over the course of four speaking objections – that he did not write the motion. *Compare id.* at 116 ("he never signed the motion"), 118 ("He didn't say anything in the motion"), 120 ("He didn't say anything in that motion. Why don't you just say – continually misrepresenting what he said or didn't say or – or didn't say. He didn't sign the motion. So why does she keep saying he signed the motion? Or he said something in the motion?"), 148 ("He didn't – . . . write anything in the motion. She keeps saying he wrote in the motion. He didn't write anything in the motion."), *with id.* at 153 ("I mean, I talked to my lawyer, but, of course, she has to write the motion. I don't write the motion.").

The Defendant testified numerous times that he was fluent in English, and only claimed that he had difficulty with legal words and legal documents. But, astoundingly, the Defendant changed his answer about what the non-legal word "read" means at least three times during the course of the five hearings. The other glaring misrepresentation relates to what Mr. Humphries allegedly told the Defendant the night after the plea. These are just a few examples of the Defendant justifying and trying to explain away misrepresentations made to the Court by the Defendant and his attorney in his effort to

mislead the Court.

The Court may also consider that the Defendant testified inconsistently on numerous other matters. For example, in relation to this specific plea agreement and the alleged coercion, the Defendant testified incredibly about who he trusted generally, when he trusted them, and who he trusted when he signed the plea agreement. The Defendant's answer to the last of these questions changed at least three times throughout his testimony—it went from Mr. Pacitti, to Mr. Nadig, to his lawyers who explained the plea agreement to him. With respect to who he trusts, the Defendant testified inconsistently about who he trusts when signing agreements, which ranged from his husband, his friend who translated parts of agreements, his attorney or attorneys, FBI agents he had just met, and the person who drafted the agreement, even when that person is the Government prosecuting him for child pornography offenses.

The Court also has its own recollection and the credible testimony of SA Panovich regarding the Defendant's demeanor at trial both before and during SA Panovich's testimony, all of which occurred before the Defendant's attorneys approached the Government about a possible plea. ECF No. 263, at 97-100 (Transcript of Evidentiary Hearing – Day 5). Contrary to the Defendant's assertions that the prospect of a plea is what caused him concern, the Court knows from its observations and the testimony of SA Panovich that the damning nature of SA Panovich's testimony is what caused the Defendant concern. To be sure, SA Panovich's testimony proved that it was the Defendant behind the computer on the relevant dates and times. Therefore, the Defendant's assertions about trial counsel's lack of preparedness and Mr. Nadig's

"warnings"[7] are nothing more than after-the-fact fabrications to support the Defendant's bad-faith attempt to withdraw his plea.

Crediting the Defendant's testimony would require the Court to reconcile innumerable conflicts and completely disregard the first sworn statement of the Defendant – his plea colloquy. *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea."); *United States v. Castello*, 724 F.2d 814, 815 (9th Cir. 1984) (explaining that the Court need not grant any request to withdraw when the reasons given contradict statements made during the plea colloquy.) Short of engaging in unnecessary mental acrobatics, the Court cannot and should not credit the Defendant's testimony.

3. **Mr. Humphries is not a credible witness.**

Mr. Humphries has a reason to lie – in fact, he has 975,300 + 1 reasons to lie. If the Defendant is allowed to withdraw his motion, he will have $975,300.00 to squander from the victims of his crimes and to pay Mr. Humphries for his perjured testimony.[8] According to Mr. Humphries, the Defendant told Mr. Humphries that he would "owe" him. ECF No. 263, at 18 (Transcript of Evidentiary Hearing – Day 5). Indeed, showing the Defendant's indebtedness to Mr. Humphries for his testimony, the Defendant has

---

[7]     Even assuming the Court considers the email written by Mr. Nadig as the "warning," the Defendant's argument falls apart when the Court considers that the email warns against the use of a "hacking" or "pirated signal" defense, which the Court knows was not pursued at trial. *See* Evidentiary Hearing Exhibit C. Therefore, the Defendant's concern could not be about Mr. Nadig's "warning" at all.

[8]     Recouping this money is also independent motivation for the Defendant to lie in his effort to withdraw his guilty plea.

bought Mr. Humphries numerous items on multiple occasions, but Mr. Humphries never bought anything for the Defendant and no other inmate had ever purchased anything for Mr. Humphries. *Id.* at 57. Despite the fact that the Defendant did not characterize Mr. Humphries as his friend, the Defendant called Mr. Humphries' wife to give her updates when Mr. Humphries became sick, and even arranged for the Defendant's fan/friend Trina to pick up Mr. Humphries' wife and drive her to the detention facility. *Id.* at 33. It is a reasonable inference that the only motivation for the Defendant's actions and promises was to secure Mr. Humphries' perjured testimony.

The Government will momentarily assume for the sake of argument that the promise of money was not enough to induce Mr. Humphries, whose family could not afford the gas to see him while he was in custody or to put money on his books for jail calls and commissary, to lie for the Defendant. Even so, Mr. Humphries knew that if the Defendant was able to withdraw his plea, the Defendant could potentially stand to benefit by proffering against Mr. Humphries in Mr. Humphries pending child pornography case. ECF No. 263, at 35 (Transcript of Evidentiary Hearing – Day 5). As Mr. Humphries admittedly talked to the Defendant about Mr. Humphries' case, Mr. Humphries had a very real concern that the Defendant would proffer with the Government, as another cooperator had done in the past. *Id.* at 25. By helping the Defendant, Mr. Humphries ultimately was helping himself by making it difficult for the Defendant to proffer against him.

Mr. Humphries incredibly claimed that he had "no idea" whether the Defendant's testimony against Mr. Humphries would have any value to the Government if Mr. Humphries testified for the Defendant in the instant proceedings. Mr. Humphries, who

professed legal expertise in numerous areas of which, in reality, he has little to no knowledge,[9] played coy, claiming that a common sense question was a "legal question." *Id.* at 36. There is only the common sense conclusion that if Mr. Humphries and the Defendant would lie to benefit one another, the Government would have no use for the Defendant or any information he could provide relating to Mr. Humphries. Ultimately, Mr. Humphries' perjured testimony effectively insulated him from the potential of the Defendant proffering against him.

Moreover, Mr. Humphries provided the Defendant with verifiably incorrect legal advice. Mr. Humphries admitted that he was not very familiar with the sentencing guidelines, only the statutes. ECF No. 263, at 18 (Transcript of Evidentiary Hearing – Day 5). Yet Mr. Humphries led the Defendant to believe that Mr. Humphries, who admitted a lack of familiarity with the sentencing guidelines, knew more about the sentencing guidelines than Mr. Durham, who has been practicing law for 17 years and had represented up to 10 child pornography clients in federal court in the past. ECF No. 258, at 126-127 (Transcript of Evidentiary Hearing – Day 3); ECF No. 257, at 36-37 (Transcript of Evidentiary Hearing – Day 2). In fact, Mr. Humphries did not know what "offense characteristics" even were. ECF No. 263, at 40 (Transcript of Evidentiary Hearing – Day 5).  Although Mr. Humphries maintained that he gave the Defendant a "basic tutorial" of the guidelines, Mr. Humphries did not even remember all of the

---

[9]   *See United States v. Bret Alan Humphries*, No. 2:15-cr-279-APG-VCF, ECF No. 137 (Defendant's *pro se* Motion to Dismiss Indictment) denied by ECF Nos. 143 and 147; ECF No. 161 (Defendant's *pro se* Motion to Dismiss Indictment) summarily denied and stricken by ECF No. 164.

sentencing guideline enhancements at the time of his conversation with the Defendant. ECF No. 262, at 262 (Transcript of Evidentiary Hearing – Day 4); ECF No. 263, at 46 (Transcript of Evidentiary Hearing – Day 5).

But, even if the Court were to credit Mr. Humphries' testimony, the testimony confirms that the Defendant will lie under oath when it benefits him. Mr. Humphries confirmed twice that he believed the Defendant would lie under oath. ECF No. 263, at 72-73 (Transcript of Evidentiary Hearing – Day 5).  Mr. Humphries also directly testified that the Defendant only said, "Why didn't my lawyers tell me that?" in response to the completely incorrect legal advice that Mr. Humphries gave the Defendant – namely, "[Mr. Humphries] told him that he was looking -- looking at before -- between 35 and 40 years." ECF No. 263, at 69 (Transcript of Evidentiary Hearing – Day 5). Under no circumstances is the 35-40 year range correct, whether considering the stipulated guideline range in the plea agreement (292-365 months), the guideline range as set forth in the PSR before objections (360-life), the statutory range under the Indictment (up to 80 years), or the statutory range that resulted as a basis of the plea agreement (up to 60 years).

The Defendant's reliance on incorrect legal advice provided by Mr. Humphries was the basis for initially seeking to file the motion and the Defendant's incorrect presumption that Mr. Humphries provided correct legal advice is the basis for the Defendant claiming ineffective assistance of counsel. What is clear now, after five hearings on the matter, is that the Defendant's trial attorneys did not tell him that he was looking at 35 to 40 years because *that would* constitute incorrect legal advice and ineffective assistance of counsel. Boiled down to its essence, the Defendant is upset that

11

Mr. Durham's legal counsel as to the *correct* sentencing guidelines range was not the same as the *incorrect* "legal advice" provided by Mr. Humphries so as to justify a basis to withdraw his knowing and voluntary plea.

The Court should find that Mr. Humphries was not a credible witness and that he provided the Defendant with legally incorrect advice, which formed the basis of the motion to withdraw the plea but cannot justify granting the same.

### 4.  **The Defendant's former attorneys were credible witnesses who provided effective assistance of counsel.**

Both Mr. Marchese and Mr. Sanft credibly testified that they had spoken to the Defendant about the sentencing guidelines prior to trial and after reviewing evidence to determine that all of the specific offense characteristics would apply. ECF No. 261, at 125-128 (Marchese); 219-226 (Sanft) (Transcript of Evidentiary Hearing, Day 1).

Mr. Durham credibly testified that he conveyed the terms of the Plea Agreement to the Defendant on Wednesday, and that those terms were consistent with the written plea agreement conveyed to the Defendant on Thursday. ECF No. 257, at 64-66 (Transcript of Evidentiary Hearing, Day 2). Mr. Durham reviewed the written plea agreement with the Defendant. *Id.* at 66. Mr. Durham explained to the Defendant how certain facts lined up with certain enhancements in the plea agreement. *Id.* at 62. Mr. Durham explained to the Defendant how base offense levels, enhancements, and concurrent/consecutive sentences worked. *Id.* at 62-63.

Mr. Durham testified unequivocally that he had the sentencing table with him, that he showed it to the Defendant, that the Defendant saw it, and that the Defendant acknowledged seeing it. *Id.* at 67-68. Mr. Durham testified unequivocally that he

explained to the Defendant that his exposure under the negotiated terms of the plea agreement was 292 to 365 months. *Id.* at 70.

Considering the sworn and credible testimony of the Defendant's former attorneys, Mr. Marchese, Mr. Sanft, and Mr. Durham all provided effective assistance of counsel both in explaining the sentencing guidelines generally and specifically as they related to the written plea agreement.

During the course of the instant proceedings, the Court asked why certain facts were included in the plea agreement, when those facts would "justify a higher guideline range than what's in the plea agreement[.]" ECF No. 232, at 55 (Transcript of Motion Hearing). Specifically, the Court inquired about paragraph 7 (relating to the distribution enhancement)[10] and paragraph 9 (relating to the obstruction of justice enhancement).[11] Defense counsel then latched onto the Court's questioning and framed the issue as another basis for the Court to find ineffective assistance of counsel.

Aside from the exceptionally common nature of plea negotiation fact bargaining, this argument is not yet ripe for adjudication. This issue will only become ripe if the Court elects to apply the PSR's calculation over that negotiated by the parties in the plea agreement. The Government responds to the Court's inquiry considering both outcomes as discussed next, but notes that the Defendant has not articulated this argument

---

[10]   Although the Court can choose to apply this enhancement, the Government intends to abide by the negotiated terms of the plea agreement and ask that the Court apply the +2 enhancement agreed upon by the parties in the plea agreement.

[11]   The Government maintains that this enhancement does not apply with the facts in the plea agreement as written.

himself.[12]

The Supreme Court has recognized that "fact bargaining" is a key component of plea-bargaining. *United States v. Booker*, 543 U.S. 220, 290 (2005). While the government may not coerce a defendant into an involuntary plea, the government has wide latitude in how it reaches a plea. *United States v. Yeje-Cabrera*, 430 F.3d 1, 24 (1st Cir. 2005). This includes having the Defendant admit to facts that give the Court a true assessment of the case and evidence.[13] For example, in white-collar cases, the Government will frequently have the Defendant admit to facts of the true loss amount or victim count (for restitution purposes) while simultaneously agreeing to a smaller number for guideline calculation purposes. In a robbery series case, the Government will frequently  have the Defendant admit to facts of multiple robberies (for restitution and relevant conduct purposes) while simultaneously agreeing that the Defendant is only pleading to one robbery and the sentencing guideline calculations for that single robbery. Or, in the child pornography context, the Government will frequently have the Defendant admit to a true description of the child pornography on the Defendant's devices including bondage and infant pornography (to give the Court a clear view of the evidence) while simultaneously agreeing to not seek the sadistic or masochistic image

_____

[12]    To the extent that the Defendant responds indicating that this argument goes to the "gross mischaracterization" of the possible sentence, a difference of three levels is not a gross mischaracterization. *See United States v. Williams*, 678 F. App'x 467, 468 (9th Cir. 2017); *United States v. Briggs*, 623 F.3d 724, 728-729 (9th Cir. 2010) (holding that guideline range that nearly doubled the expected sentence was not a gross mischaracterization); *United States v. Garcia*, 909 F.2d 1346, 1348–49 (9th Cir. 1990).
[13] Mr. Durham confirmed that the Government refused the Defendant's offer to remove facts from the plea agreement. ECF No. 257, at 60 (Transcript of Evidentiary Hearing, Day 2).

enhancement.  In this case, the facts in paragraphs 7 and 9 were based on three considerations:  (1) the Court, acting as the fact-finder, had already heard the evidence; (2) in the Government's estimation, those facts had already been proven beyond a reasonable doubt through testimony subject to cross-examination and admitted exhibits; and (3) failure to include those facts, in the posture of this case where the Court had already heard the evidence as the fact-finder, could be unethical.[14]  *See United States v. Dukes*, 936 F.3d 1281, 1282 (D.C. Cir. 1991) (*citing* Memorandum of the Attorney General to Federal Prosecutors Concerning Plea Bargaining under the Sentencing Reform Act, reprinted in G. McFadden, J. Clarke & J. Staniels, *Federal Sentencing Manual*, App. 11B, at 11-87 (1991), and USSG § 6B1.4).

If the Court declines to apply the enhancements based on facts in the plea, then

---

[14]    The U.S. Attorneys' Manual states that fact bargaining that fails to disclose readily-provable, relevant facts related to sentencing enhancements is improper: "Plea agreements should honestly reflect the totality and seriousness of the defendant's conduct, and any departure to which the prosecutor is agreeing, and must be accomplished through appropriate Sentencing Guideline provisions. . . . The Department's policy is to stipulate only to facts that accurately represent the defendant's conduct." U.S. Attorneys' Manual, Sec. 9-16.300; *see also id.*, Sec. 9-27.400 ("Plea bargaining, both charge bargaining and sentence bargaining, must honestly reflect the totality and seriousness of the defendant's conduct and any departure to which the prosecutor is agreeing, and must be accomplished through appropriate guideline provisions."); *id.*, Sec. 9-27.430 ("[T]he Department's policy is only to stipulate to facts that accurately represent the defendant's conduct. If a prosecutor wishes to support a departure from the guidelines, he or she should candidly do so and not stipulate to facts that are untrue. Stipulations to untrue facts are unethical. If a prosecutor has insufficient facts to contest a defendant's effort to seek a downward departure or to claim an adjustment, the prosecutor can say so. If the presentence report states facts that are inconsistent with a stipulation in which a prosecutor has joined, the prosecutor should object to the report or add a statement explaining the prosecutor's understanding of the facts or the reason for the stipulation."). As the Defendant has moved to withdraw his plea prior to sentencing, the Government has not yet had the opportunity to explain the prosecutor's understanding of the facts or the reason for the stipulation.

the issue never ripens because there is no prejudice to the Defendant. Indeed, in the past this Court has declined to apply the PSR enhancements notwithstanding a plea agreement admission.[15] In *United States v. Nicholas Jones et al.*, Case No. 2:16-cr-242-GMN-CWH, Defendant Jose Ugarte admitted in his plea agreement that the robbers with whom he conspired took a firearm from the victim. *Id.* at ECF No. 70, at 4 ("The robbers took M.A.'s firearm . . .") The PSR proposed a one-level enhancement under U.S.S.G. § 2B3.1(b)(6) because a firearm was taken during the commission of the offense. The plea agreement, which calculated the guidelines under the same guideline provision, did not include that enhancement. *Id.* at ECF No. 70, at 7. At the time of sentencing, the Government did not seek the application of that enhancement and this Court declined to include it in the Court's calculation of the total offense level. This Court held that the Government did not produce any evidence to support the enhancement so the Government did not meet its burden of proof. Likewise here, the Government does not intend to seek, or provide any evidence to support, the +5 distribution enhancement and +2 obstruction of justice enhancement at sentencing. Therefore, this Court could similarly hold that those enhancements do not apply and neither party would have a basis to appeal the Court's decision.

But even if the Court did apply the enhancements in the PSR, the Defendant's admission to those facts still cannot be a basis for withdrawal of the plea under the ineffective assistance of counsel framework. For there to be ineffective assistance of

---

[15]    Mr. Durham confirmed that this was his understanding, as well. ECF No. 257, at 90 (Transcript of Evidentiary Hearing, Day 2).

16

counsel, there must be deficient performance *and* resultant prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 692 (1984). However, here, there is no deficient performance or prejudice because, as Mr. Durham confirmed, the Court is entitled to consider the sworn testimony presented at trial and subject to cross-examination as a basis to apply the enhancements regardless of the Defendant's admissions.[16]   Mr. Durham also testified he explained this concept of relevant conduct to the Defendant prior to entry of his guilty plea. ECF No. 257, at 71 (Transcript of Evidentiary Hearing, Day 2). Mr. Durham's understanding of this and his explanation to the Defendant was correct. To be sure, paragraph 7 was based on the sworn testimony of Kellie Badalucco and Government's Exhibits 20A and 20B, admitted through Ms. Badalucco. Mr. Marchese fully cross-examined Ms. Badalucco. Paragraph 9 was based on the sworn testimony and translation of jail calls by Phillip Schapery and Government's Exhibits 25A, 25B, 26A, 26B, 27A, and 27B. Mr. Sanft fully cross-examined Mr. Schapery. As the Court, sitting as the fact-finder, had already received the evidence under a higher burden of proof and could consider it in any event under a much lower burden of proof, there could be no prejudice from the Defendant admitting those facts in the written plea agreement.

---

[16]     This is inherently different from the typical negotiated case where the Defendant pleads prior to trial and the Court has no other information that bears sufficient indicia of reliability to support an enhancement beyond the factual admissions contained in the written plea agreement. The Defendant chose to plead guilty only after sitting through nearly the entirety of the Government's case-in-chief, *where the Court was sitting as the fact-finder*, and witnessing the overwhelming amount of evidence against him. Ergo, the Court had already heard virtually all the evidence. If the Defendant did not want the Court to have that information before it, he should have chosen to plead guilty earlier.

Finally, even if the Court were inclined to apply the PSR's enhancements, the Government would still seek a sentence consistent with the negotiated terms of the plea agreement.  Therefore, the Defendant would still receive the benefit of his bargain by binding the Government.[17]

**5.   There was no conflict of interest.**

The Defendant repeatedly contended that Mr. Nadig's representation of Frank Alfter and communication with the Defendant somehow represented a conflict of interest. However, even according to the Defendant himself, there was no conflict of interest. First, the email exclusively relied upon by the Defendant, i.e. the email sent by Mr. Nadig to his client, Frank Alfter, confirms that every defense being pursued was a mutual defense – hacking and alternative suspects.[18] *See* Evidentiary Hearing Exhibit C. The Defendant himself repeatedly absolved his husband of wrongdoing in his initial interview with SA Panovich, during his polygraph with SA McCamey when he changed his story at least twice and eventually blamed "Ferrell," and after trial, when he provided an alternative suspect during his interview with Dr. Chambers and blamed his friend, Joel Rosales.[19] ECF No. 258, at 128, 130-133, 136-137 (Transcript of Evidentiary Hearing, Day 3).

Notwithstanding the fact that the Defendant could not decide who to blame when

---

[17]    The Defendant acknowledged that nothing in the plea agreement bound the Court. ECF No. 166, at 26.

[18]    The Government notes that the first time an unredacted copy of this email was provided to the Government or the Court was at the hearing when Ms. Connolly asked for it to be admitted over the Government's objection.

[19]    This same Joel Rosales appeared on the Defendant's witness list. ECF No. 258, at 145 (Transcript of Evidentiary Hearing, Day 3).

all the forensic evidence pointed directly to him,[20] the Defendant's position is consistent with that of Mr. Nadig, who stopped communicating with the Defendant when he believed that the trial team would seek to blame Mr. Nadig's client, Frank Alfter, as a potential alternative suspect. ECF No. 261, at 284-285 (Transcript of Evidentiary Hearing, Day 1).

This entire argument was borne out of Mr. Marchese's frustration that Mr. Nadig went to visit the Defendant. That matter was the subject of a complaint to the State Bar of Nevada and has been resolved in Mr. Nadig's favor. The Defendant's reliance on this previously adjudicated red herring is telling. Because the Defendant realizes his plea colloquy directly contradicts his most recent position, he improperly asks this Court to second-guess the State Bar on a completely collateral, irrelevant, and factually unsupported basis. The Court should decline the invitation and reject this argument.

## **CONCLUSION**

The Defendant has failed to meet his burden and his motion should be denied. The Defendant and Mr. Humphries are not credible witnesses, and the Court should disregard their testimony and sworn statements. The Court should credit the testimony of the Defendant's retained criminal defense attorneys, Mr. Marchese, Mr. Sanft, and Mr. Durham. The Court should find that those attorneys provided competent assistance of counsel and apprised the Defendant of the terms of the plea agreement. The Court

---

[20]     The Government's theory was that Mr. Alfter was an unindicted coconspirator on the possession count, as is evidenced in the Court records. The evidence on the remaining counts pointed to the Defendant as the sole perpetrator. In fact, the Government had shown that Mr. Alfter could not have been the perpetrator on the remaining counts as he was traveling outside the United States during key periods.

should reject the red herring arguments related to any purported "coercion" arising from a non-existent conflict of interest. As it did at the plea colloquy, the Court should find the Defendant's plea of guilty was knowing and voluntary, and supported by an independent basis in fact containing the essential elements of the offenses charged. Accordingly, the Court should deny the Defendant's motion and set the matter for sentencing.

**DATED** this 30th day of May, 2018.

Respectfully,

DAYLE ELIESON
United States Attorney

/ s / Elham Roohani

_____
ELHAM ROOHANI
Assistant United States Attorney

1

2

## **<u>CERTIFICATE OF SERVICE</u>**

3

     I certify that I am an employee of the United States Attorney's Office.  A copy of

4

the foregoing was served upon counsel of record, via Electronic Case Filing (ECF).

5

     **DATED** this 30th day of May, 2018.

6

7

                / s / Elham Roohani

8

                _____

                ELHAM ROOHANI

9

                Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24