KAREN A. CONNOLLY
**KAREN A. CONNOLLY, LTD.**
6600 W. Charleston Blvd., Ste. 124
Las Vegas, NV 89146
Telephone:    (702) 678-6700
Facsimile:    (702) 678-6767
E-Mail:        advocate@kconnollylawyers.com
*Attorney for Defendant, Jan Rouven Fuechtener*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

JAN ROUVEN FUECHTENER,

           Defendant.

**2:16-cr-00100-GMN-CWH**

**CLOSING BRIEF IN SUPPORT OF MOTION TO WITHDRAW GUILTY PLEA**

In the Ninth Circuit, leave to withdraw a plea prior to the imposition of sentence "should be freely granted" wherever a "fair and just" reason is presented. United States v. Navarro-Flores, 628 F.2d at 1184 (citing United States v. Webster, 468 F.2d 769, 771 (9th Cir. 1972); Kadwell v. United States, 315 F.2d 667, 670-71 (9th Cir. 1963)). A defendant need only present a "plausible reason" for withdrawal prior to the imposition of sentence. Navarro-Flores, 628 F.2d at 1184 (citing Kercheval v. United States, 274 U.S. 220, 224 (1927); United States v. Erlenborn, 438 F.2d 165, 168 (9th Cir. 1973)). "Such a motion should be considered liberally in favor of the accused." United States v. Artabane, 868 F. Supp. 76, 77 (M.D. Pa. 1994) (citing United States v. Young, 424 F.2d 1276, 1279 (3rd Cir.1970)).

Given the fact that Jan Rouven Fuechtener has presented multiple "plausible reasons" for withdrawing his guilty plea entered on November 17, 2016, and given that his request should be considered liberally in his favor, his request should be granted for the following reasons:

• None of his attorneys went over or explained the sentencing guidelines with Rouven.

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1   •   The first time an offer was broached[1] was in the middle of trial on November 16,

2   2016.  Rouven was erroneously led to believe that the terms of the agreement were

3   that he would receive a sentence of 5-15 years. Steve Pacitti, though not a criminal

4   defense attorney was Rouven's trusted legal advisor and confirmed this erroneous

5   advice.

6   •   Rouven was not given adequate time to review and digest the plea agreement. He

7   did not even have a copy when Ben Durham summarized it for him from the other

8   side of a mesh barrier separating the two men minutes before the plea was entered.

9   The attorneys were not aware that given stipulated facts, Rouven was exposed to

10   additional enhancements not specifically delineated in the agreement.  There was

11   insufficient time for counsel and Rouven to review and digest the contents of the

12   plea agreement in conjunction with the United States Sentencing Guidelines.

13   •   The attorneys advised Rouven that he could receive as little as 5 years.  Not only

14   was that not feasible under the guilty plea executed, it was not reasonable under the

15   circumstances.

16   •   There was no credible evidence that any of the attorneys explained to Rouven his

17   guideline range in terms of years, under the plea agreement or the significance of

18   the guideline range.  None of them contemplated the additional 7 points to which

19   Rouven was exposed given stipulated facts craftily drafted by the government which

20   would bring the guideline range up to 47 with a life sentence.

21   •   The government purposefully inserted facts which were not needed to support the

22   guilty plea, knowing they could warrant imposition of additional enhancements not

23   specifically delineated in the agreement.  It was apparent, that given time

24   constraints, counsel would not have an opportunity to thoroughly analyze the 17

25   page guilty plea agreement in conjunction with the guidelines to realize that facts

26

27   ─────────────────

28   [1]   There was an oral offer very early on in the case which was summarily
     rejected. TR 3/19/18 P. 64

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

1  contained therein could warrant additional enhancements not agreed upon.  This

2  begs the question of whether or not the government negotiated/acted in good faith.

3  •  The shenanigans between the attorneys was unprofessional and unacceptable

4  particularly in such a serious case and prejudiced Rouven.  Ben Nadig had an

5  obvious conflict in representing both Rouven and Alfter.  Nadig who had clear

6  conflict in advising Rouven since he represented Frank Alfter, an alternate suspect,

7  met with Rouven behind Marchese's back, at Alfter's request, and planted seeds of

8  dissension and doubt in Rouven's mind about the abilities of his defense team. Sanft

9  who was aligned with Nadig also had a conflict since he and Nadig worked

10  together.  Marchese and Nadig undermined each other to Rouven.  Marchese

11  permitted Nadig who had an obvious conflict, to participate in Rouven's defense.

12  By the time a plea was offered, Rouven had lost faith in his defense team and did

13  no know who to trust.  When mid way through trial where nothing unexpected had

14  transpired, and his defense team suggested that he consider a plea, Nadig's warning

15  that he would be convicted with Marchese at the helm resonated in his head.  At that

16  juncture, Rouven felt he had no options; his will was overborne by the

17  circumstances of the plea and the conduct of the lawyers in weeks leading up to

18  trial.

19  Nadig and Sanft had real and actual conflicts of interest

20  •  Humphires and Rouven's testimony matched in it's major aspects. Rouven did not

21  know of his exposure under the guilty plea agreement.

22  •  The fact that English is not Rouven's native language is also a contributing factor

23  given rushed nature of the guilty plea.

24  ///

25  ///

26  ///

27

28

Closing Brief 05-30-18.wpd                3

1   A summary or the evidentiary hearing testimony which supports Rouven's request is set forth

2   herein below:

3   **3/9/18**

4   **JESS MARCHESE**:

5   Jess Marchese was lead counsel for Rouven. *He agreed there would be a conflict in*

6   *representing both Rouven and his husband Frank Alfter.*

7   *Ben Nadig met with one of the defense experts.* P. 24-25,38, 46 49 *Nadig and Sanft were*

8   *working on Jan's case with him.* P. 25

9   *One of Jan's potential defenses was to blame Frank. There would be a conflict to represent*

10   *both.* P. 34-35, 112

11   *Nadig visited with Jan in jail after he was relieved from the case without contacting*

12   *Marchese.* P. 41–42.  He felt Nadig was torpedoing him.  *He went to visit Jan who was very*

13   *emotional, scared and very upset as a result of the conversation with Nadig.* P. 43-44  The meeting

14   with Jan took place September 10th.

15   After Amber Craig was disqualified, Sanft was brought back on P. 51.  This was 2 weeks

16   before trial.  P. 55

17   He does not specifically recall going over the guidelines with Rouven. P. 64

18   *On November, 16, 2017, there was no discussion between him with Jan about the base*

19   *offense level of applicable enhancements.* P. 72-73  *Generally the discussions revolved around*

20   *years.  He communicated to Jan he thought he would get 5-15 years.*  P. 76

21   *He never advised him P and P could give him an obstruction enhancement or a distribution*

22   *enhancement.* He never compared the plea agreement with the guidelines P. 96-7.

23   He believed that under the terms of the agreement, he could argue for 5 years. P. 97, 102

24   He has no written waiver of conflict even with Sanft coming back on the case. P. 107

25   There was never any potential for a joint defense between Jan and Frank. P. 108-109

26   The purpose of Nadig's email was to attack him. P. 114  *Nadig visited Rouven without*

27   *permission.* P. 115

28

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1    After the email Jan wanted to bring Mike back on the case.  P. 117-118  *He had to talk*

2    *Rouven down off of the ledge after Nadig's email. Jan was anxious, and upset about Nadig's*

3    *"false" representations.*  P. 152-156  Nadig did not want to have to give money back.

4    Sanft came back on the case after Craig was removed.

5    He does not specifically recall going over the guidelines with Rouven.

6    *The plea was entered on November 17th.  As a result of a call he got from Rouven saying he*

7    *wanted to withdraw his plea, het met with Jan on Nov 19th.*  P. 159.  *On that date, Jan said he*

8    *wanted to withdraw his plea.*  P. 153

9    Jan had always indicated that he was going to trial. P. 157  *He does not have a recollection*

10   *of telling Jan that level 40 is a guideline range of 292-365 months.*  P. 168-169  *Durham was the*

11   *one who went over the plea agreement.*  P. 171

12   **MICHAEL SANFT**

13   Frank Alfter retained at the same time as Nadig to represent Jan. His role was to be co-

14   counsel with Marchese representing Jan.  *There was a discussion about Frank and Jan needing*

15   *separate attorneys.  It was pretty obvious.*  P. 176- 178

16   *Nadig was to represent Frank.* P. 178-179  *Nadig worked specifically on behalf of Frank.*

17   *When they met on behalf of Jan, Frank and Nadig would be there.*  P. 183

18   His representation was terminated in July 2016. P. 183 Durham substituted in.  P. 184

19   *There would be a conflict in representing both Frank and Jan unless there was a waiver.*

20   *Jan was very clear that he did not want a deal;  he wanted to go to trial.*  P. 194

21   Initially he tried to talk about the guidelines but Jan would say "I want to go to trial" and that

22   was it.  P. 263  *He never discussed an offer with Jan.*  P. 264

23   *He does not remember ever opening a guideline book and going over it with Jan; they never*

24   *got far enough.* P. 219.

25   *He did not believe Jan had a clear grasp of what he was looking at.*  P. 223

26   He never discussed the mandatory minimums with Jan. He had a conversation with Jan about

27   the possibility that it was Frank's, not his.   P. 239

28

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124,Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

**BEN NADIG**

*Mike Sanft represented Jan, he represented Frank.* P. 248

*In the email he represented that he was the attorney for Jan.* P. 254-255

*In the email he stated that he and Mike worked together extensively on the case and also represented Frank. He also indicated that he represented Frank and that he and Mike were ready to go to trial on Jan's case.* P. 256-257  In the email he indicated that based on Marchese's defense, Jan would be found guilty.  That rather than defending Jan, Marchese's focus was getting his friends paid.  P. 260

He was paid $200,000 for he and Sanft - $100,000 each.  After Sanft was terminated he was asked for a refund.  P. 263-264 The email was sent after Sanft was terminated. P. 264 *After the email dated September 3rd, he met with Jan after speaking with Frank.* P. 264  *During the meeting, he told Jan he should put Mike back on the case.* P. 265-266

Jan expressed concern about Jess and the things he was doing. *After talking with Frank, he felt the need to express to Jan the inadequacies that he saw and that Mike agreed with.*  P. 266.

After Amber was off the case, Frank directed him to go see Jan. Any time he met with Jan, it was at Frank's request.  P. 268

*Jan contacted him in January, 2017. He talked to him about withdrawing his plea.*  P. 271

**4/16/18**

*He met with Jan after he wrote the email without requesting Marchese's permission. He did it at Frank's request.* P. 11-12.

*He had a discussion with Marchese and Sanft about what the defense would be at trial.  He communicated to Jan that he did to have faith in their defense.* P. 12-13

**STEVE PACITTI**

he referred Nadig and Marchese to Jan.  P. 25

*He was present at defense table when there was discussion about the proposed guilty plea.* P. 28.  *He told him that under the proposed plea, the judge in her discretion could sentence him from 5-15 years.  There was no discussion about the sentencing guidelines by any of the attorneys.* P. 30 *He was trying to put what the attorneys were saying in layman's terms for Jan* P. 33 *He told*

KAREN A. CONNOLLY, LTD.

Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

*him that he could get out when he was 43, he was 38 at the time; whereas if he continued with trial*

*with a minimum of 15, he would get out at 53*. P. 35

**BEN DURHAM**

He cannot recall we he had for lunch yesterday.  P. 46 (in reference to his memory)

*Prior to trial, he did not go over sentencing guidelines with Jan*. Negotiations during trial were between Marchese and the government.  P. 40  *He did not understand the terms of the plea negotiations until that night or the next morning*. P. 41

He received the guilty plea agreement the next morning and met with Jan.  He does not recall if Jan had a copy.  P. 42-43, 47  He went over the guilty plea with Jan. P. 43 *He does not specially recall telling Jan what level 40 meant*. P. 45-46

He does not recall if he went over the guideline book with Jan.  P. 46

He would have told him the lowest he could get was 5 years.  P. 47, 54

He does not recall telling him based that on the facts on page 6, paragraph 9 that he was facing an obstruction charge.  P. 52

He does not recall advising Jan that based on paragraph 7, he was facing an additional 5 points under 2G2.2.  P. 52, 53

*He does not recall telling Jan he was facing an additional 7 points based upon facts to which he had stipulated*.  P. 74-75

He doesn't recall doing a guilty plea on a child porn case in federal court. P. 76

**JAN ROUVEN FUECHTENER**

Pacitti represented him since 2012.  He speaks and reads English sometimes in business or legal setting he doesn't find the right words. P. 105-106

*He does not understand every word spoken in English*. P. 106 *He can read a menu but if it is a novel or something legal, he has to look up certain words or ask people*. P. 107

*He has a good relationship with Pacitti and trusted him.*  P. 107

Marchese caused him to release Sanft and hire Durham. P. 109-110 Jess caused him to believe Sanft was doing nothing. P. 110

His understanding was that Nadig would work with Sanft on his defense. P. 111

1  Nadig, Sanft and Marchese were all supposed to work together. P. 111

2  He never singed a waiver stating it was ok for Nadig to represent both him and Frank.  P. 111

3  *He never had a discussion with Nadig about any potential conflicts with representing both he and*

4  *Frank*. P. 112

5  He let Sanft go and put Durham on the case because he was concerned Sanft was not doing

6  anything.  P. 117  In July , 2016 after Durham substituted in for Sanft, Nadig was still working in

7  the background on his defense.  P. 118-119

8  Jess brought him Nadig's email. P. 120  He received it about 2 weeks after it was sent. P. 120

9  prior to that date, he had had no discussion with lawyers about a plea or the guidelines.  *Noone had*

10  *gone over a guideline book with him*. P. 120-122

11  *After the email he received a visit from Nadig, he was left feeling confused.  He was terrified*

12  *when he received the email*. P. 122 Marchese met with him the same day as Nadig. P. 123

13  *He felt confused about Nadig and Marchese both being on his case. P. 124 He decided to put*

14  *Sanft back on the case as a result of his discussion with Nadig*. P. 125 *He still thought Nadig*

15  *worked on his defense.  He listened to what he had to say*. P. 127-128

16  *He was afraid when the government moved to disqualify his entire defense team*. P. 129

17  *There was no discussion about a plea prior to trial*. P. 129

18  *The first person to go over a sentencing guideline book with him was me, last summer*. P. 130

19  *He had no idea about the sentencing structure in federal court prior to trial*. P. 132

20  *Marchese broached the subject of a plea during trial*. P. 132 *It made him feel extremely confused*

21  *because they had never talked about a deal*. P. 133 *On that day, his understanding of the plea was*

22  *that the government would drop the advertising charge which carried an mandatory minimum of*

23  *15 years*. P. 134.  *He thought his exposure was 5-15*. P. 134. *He accepted the plea because he felt*

24  *he had no other choice.  He had lost all his confidence in his defense team and what Nadig had said*

25  *was in his head.; he was right all along.*

26  *He lost confidence in his defense team because of the things Nadig said*. P. 136.  *He told him*

27  *that they're unprepared, that this was over their head, they were ill equipped.  In the middle of*

28  *trial, his lawyer was asking him to take a deal when the whole year before that was never brought*

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1  *up. At that point he felt they could not win. He thought he made a mistake by not following Nadig's*

2  *advice.* P. 136-137. *The advice he had been getting from Marchese and Nadig was conflicting. It*

3  *was like a roller coaster ride it was up and down.  It was one team then the next.* P. 139

4  *When they were talking about pleading guilty, he was thinking about Nadig's advice that with*

5  *the defense he will lose.  Nadig said that before and in the middle of trial that is how he felt.* P. 140

6  *Before trial he trusted the defense team he went to trial with.  When they raise the prospect*

7  *of a plea he lost confidence in them.  He thought about everything and thought "yeah, Nadig was*

8  *right"* P. 141

9  *Of all the people in the court room (On November 16th) - he trusted Pacitti the most.* P. 141

10  *He did not have a copy of the guilty plea agreement.  Marchese brought Durham a copy.*

11  P. 143 *he had to look through the mesh at Durham's copy.  He heard more what he said rather than*

12  *looking at the document.* P. 143-144 *He was not reading it to him line by line. Durham paraphrased*

13  *it.* P. 144  *He saw the number 40 in the agreement. He did not know what it meant.* P. 145-146 *he*

14  *was not told it meant 24.3-30 years.* P. 146

15  *He was not told that based upon stipulated facts there could be more enhancements.  He did*

16  *not understand the concept of enhancements back then.* P. 146. *He had the option of taking the plea*

17  *or proceeding to trial.  He took the plea because he had lost confidence and trust in his team.*

18  P. 147 *There had been no surprising testimony when his team started saying we need to talk*

19  *negotiations. It was like a building breaking apart in front of him. His first thought was "oh, my*

20  *God, Nadig was right.* P. 148

21  *He thought he was facing 5-15 years.* P. 150 *He found out what it all meant the next*

22  *day–that night and the next morning, based upon conversations he had with somebody at the jail.*

23  *He found out what level 40 meant the next evening.*  P.  151 *The next morning he called Jess*

24  *and told him he did not understand it and he wanted to undo it.* P. 151-152

25  *There were no years in the plea agreement. He would not have accepted the deal if he knew*

26  *level 40 was 24.3-30 years.* P. 158

27  He was not aware that the court could go higher than level 40. P. 158

28

1    *He was not aware that based upon the stipulated facts, his range was actually life.* P. 158 *If*
2    *he had known, he would not have pled guilty.* P. 159 154.

3                                    **4/20/17**

4    He ordered a dictionary to look up words because sometimes there are little differences which
5    are important. P. 6-7 He did not have a dictionary when he received the guilty plea agreement.
6    P. 7

7    *They were still going over the plea when he was notified it was time to go back into court.*
8    P. 7 *They continued to review it in the courtroom.* P. 8

9    *The judge asked him if he had a sufficient time to go over the plea with his lawyers.  He said*
10   *yes because he didn't ask them questions about things they did not explain.*  P. 10

11   *He did not ask question about the guidelines because they were not explained to him.* P. 10

12   *When the judge asked him if he was happy with his legal representation he said yes*
13   *because there was nothing more to say or do if he had known they had no explained to him the*
14   *guidelines or that 40 meant - 24.3 - 30 years, he probably would have said 'No", I'm not happy.*
15   P.  11-12

16   *At one point Ms. Roohani said "well, if he is not accepting to the facts, then we proceed to*
17   *trial." He knew that after what Nadig said, there was no chance to win at trial; he lost trust in his*
18   *team because of what Nadig said earlier and he realized he had no other chance.  "What shall I*
19   *do, stop at that time and proceed to trial where I know I will lose"* P. 13

20   *He became aware of how much time he was facing the next day.* P.  14

21   He talked with Bret Humphries.  P. 15

22   *Humphries talked about his experience with his lawyer Paul Riddle.* P. 18 *They talked about*
23   *level 32 and 33 which related to 12-14 years.* P. 18  *If 33 is 12-14, what is 20? What is 40? He*
24   *realized he was looking at over 20 years.*

25   *The next morning he immediately called his lawyer.* P. 19 *A few hours later Jess and Pacitti*
26   *met with him. He told them he wanted to withdraw his plea.*

27   Humphries made him aware of the time he was facing.  P. 116

28   *He never got a copy of the guilty plea before he entered the courtroom.* P. 117

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

**511/18**

*The first time he saw a guilty plea was the morning he entered the plea.* P. 11

*He did not have a copy when Durham went over it with him.* P. 12 *The discussion about whether or not he should he should or go to trial took place that morning.*  P. 15

He was not thinking about details of the plea when he first got there that morning. In his mind he was thinking he had to make a decision going to trial, continue the trail or take a plea deal which wasn't there yet. P.16 Marchese brought the agreement. Durham and Sanft were already there.

*Before they looked into the plea, there was discussion about the decision to make.* P. 16 *Durham did not read the agreement.  He skipped certain things saying- this is standard.  He explained some things more than others.* P. 16  *He did not have an opportunity to read it line by line himself.* P. 17

*At that point specific offense characteristic did not mean anything to him. "I had no grasp about that" Durham did not have the guideline table.* P. 19 *None of the lawyers had a book.*  P.18 *Durham went over it but Marchese signed* it. P. 22

## BRET HUMPHRIES

He never talked to Jan about guidelines prior to trial. There fist discussion about them was the day after his plea.  P. 11

Jan had never said he wanted to take a deal, or had a desire to negotiate his case. P. 11- 12 Jan was unaware of his sentencing exposure. P. 12-13 *He specifically asked him how much he got and Jan said he did not know.* P. 121

*He asked him about the deal.  Jan said there was 40 points.  He told Jan he was looking at more than 20 years. Jan responded "that's not what my lawyers told me"* P. 122  *He thought he was looking at no more than 15 years and he'd be able to argue from what his lawyers told him. His understanding was that he was facing a minimum of 5 and maximum* of 15. P. 122 -125

*He told Jan 40 points was greater than the statutory maximum.*  P. 122, 125  *His lawyer Paul Riddle told him what 34 points was worth. He used simple math to determine 40 was over statutory maximum.*  P. 123

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1   *Jan asked him what consecutive and concurrent meant.* P. 126 *He didn't know what that*

2   *meant.*

3      Jan's statements indicated he had no clue before he told him this stuff . P. 129 Jan asked him

4   what he could do. He told him he could try to withdraw his plea. P. 130-131

5                                          **5/16/18**

6      *Jan did not know what level 40 translates to in terms of years. He was unfamiliar with how*

7   *guidelines work because he was not advised by his lawyers. He shared with Jan the information*

8   *Paul Riddle gave to him.*  P. 66-68.  *Jan responded, why are you telling me this and not my lawyers.*

9   P.  66-69

10                                      **CONCLUSION**

11      Given that under Rule 11, a request to withdraw a guilty plea prior to sentencing should be

12   liberally granted when a defendant presents a plausible reason for doing so, it would be an abuse

13   of discretion for the court to deny Jan Rouven Fuechtener's request to withdraw his guilty plea.

14      The fact that Rouven was unaware of his exposure is supported by the fact that he called

15   Marchese and told him he wanted to withdraw his plea as soon as he realized his exposure under

16   the guidelines as advised by Humphries.

17      Durham was the attorney who "summarized" the guilty plea agreement for Rouven who did

18   not even have his own copy and was separated from Durham by a wire mesh screen.   The

19   guidelines had never been explained to Rouven.  He had never entertained the idea of a plea and

20   had less than 2 hours to discuss the plea agreement, which he did not have as well as discussing

21   whether or not he should even accept guilty plea.

22      It was clearly not explained to Rouven him that by stipulating to certain facts he was

23   exposing himself to an additional 7 points which increased his base offense level from 40-47, which

24   carries with it a life sentence under the guidelines. Counsel was not aware and it was not explained

25   to that Rouven that he was exposed to the 7 points based upon stipulated facts set forth on page 6

26   of the guilty plea agreement specially paragraphs 7 and 9.

27      Under USSG 3C1.1, an additional (2pts) are applicable given that based upon facts stipulated

28   to on page 6 of the GPA, paragraph 9, that Rouven directed Frank to destroy evidence. Based upon

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1  facts set forth in paragraph 7, he admitted to distribution in *exchange for thing of value* warranting

2  an additional 5 points under U.S.S. G Sec. 2GG2.2. See, PSR P.25, para 50 and 57.

3      It was not explained to Rouven that under the United States Sentencing Guidelines, the

4  district court is compelled to rely upon stipulated facts set froth in the plea agreement.

5      Also, in play issue is the issue of whether or the government acted in good faith.  The

6  government has a duty of good faith and fair dealing in plea bargaining. <u>Santobello v. New York</u>,

7  404 U.S. 257, 262 (1971). The government and the government alone determined which facts

8  would be in the plea agreement.  The government had from recess on the 16th until 10:00 AM on

9  the 17th to mull over which facts to include.  Once they made that unilateral decision as to which

10  facts Rouven must agree, they presented a take it or leave it scenario.  During the plea colloquy,

11  the government announced that if Rouven did not "*admit to all the factual allegations as set forth*

12  *in the plea agreement, the government is prepared to proceed with trial*" TR 11/17/201 p. 35  The

13  government was well aware of the time constraints Rouven and his counsel were facing.  It was

14  readily apparent they would have insufficient to opportunity to thoroughly analyze the 17 plage

15  plea agreement in conjunction with the guidelines, and to explain the ramifications to their client.

16  Under the circumstances, there is the appearance that government breached its covenant of good

17  faith and fair dealing by sneaking in facts that left Rouven exposed to additional enhancements not

18  specifically delineated.  Under different circumstances, had counsel had sufficient time and

19  opportunity to analyze the facts in conjunction with the guidelines, the odor of underhandedness

20  would not be nearly as pungent.  However, as it stands, it cannot be ignored and should be factored

21  into the determination as to whether or not Rouven should be permitted to withdraw his plea. has

22      As set forth in the Presentence Investigation Report (PSR), taking into consideration relevant

23  conduct and grouping all counts[2], the calculated base offense level is 47 or 43 since an offense level

24  greater than 47 is treated as level 43, Chapter 5 USSG , part A (comment n.2); PSR para 61. The

25  requisite guidelines imprisonment range is ***life***.  This is a far cry from the 5-15 years Rouven was

26  lead to believe he was facing.  Had he known, he would never have accepted the guilty plea

27

28
_____

[2]      Under the plea, count 1 runs consecutive to count 2 and 3.

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700   Facsimile: (702) 678-6767

KAREN A. CONNOLLY, LTD.

Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1   Rouven was erroneously led to believe that 5 years was feasible under the terms of the plea

2   extended.  He was told that the judge in her "discretion" could give him 5-15yeras.  The attorney

3   he trusted the most, Steve Pacitti, explained to him in layman's terms what the lawyers were saying:

4   if he took the plea he could be out by the time he was 43 (5) years whereas if he went to trial he

5   would be 53 (15 years) As stated by Pacitti, on November 16th there was no mention of the

6   guidelines.

7   Additionally, under the terms of the guilty plea, 5 years was not viable never mind

8   reasonable.   Count 1 (possession of child pornography) was to run consecutive to counts 2

9   ( receipt) and 3 (distribution).  Counts 2 and 3 each carried a mandatory minimum of 5 years of 60

10  months.  However, the possession count was to run consecutive.  The base offense level for that

11  count is 22 or 41-51 months.  U.S.S.G Sec. 2G2.2, PSR page 15, par 48.  If the court gave Rouven

12  the minimum on that count he would be looking at 101months or 8.4 years.  There was no basis to

13  suggest that the court would give Rouven the minimum on counts 2 and 3 and nothing on count 1.

14  It was not objectively reasonable to advise Rouven that was even feasible, particularly given the

15  sheer volume and nature of the images which according to Parole and Probation was

16  unprecedented.  PSR, page 38, par 137.

17   'Plea agreements are contractual in nature and are measured by contract law standards.'

18  United States v. Keller, 902 F.2d 1391, 1393 (9th Cir.1990). In construing an agreement, the court

19  must determine what the defendant reasonably understood to be the terms of the agreement." United

20  States v. De La Fuente, 8 F.3d 1333, 1338 (9th Cir.1993) Rouven did not understand the terms of

21  his agreement

22   It is quite clear that Rouven was unaware of his exposure under the guilty plea he was

23  essentially forced to sign- given the circumstances and testimony delineated herein above.  He had

24  no concept of the sentencing guidelines; he had never even entertained the idea of a plea.  He was

25  led to believe that the court would sentence him to between 5-15 years without any explanation

26  whatsoever of what it would take in order for that to be even viable.  The concept of variance and

27  departures was never broached with him.  The consequences of stipulated facts was never explained

28  to him.  The nature and kind of departure/variance needed to reach 15 years let alone 5 years -

KAREN A. CONNOLLY, LTD.
Karen A. Connolly
6600 W. Charleston Blvd., Ste. 124, Las Vegas, Nevada 89146
Telephone: (702) 678-6700  Facsimile: (702) 678-6767

1  which was not reasonably realistic given the facts of the case- was not even discussed!  Of note,

2  the government in footnote 14 on page 21 of its opposition to the moving motion states that Rouven

3  would be breaching the plea agreement by objecting to the stipulated offense level –**24-3 -30** years!

4      Also the court must be mindful of the conflict among his defense team which was

5  communicated to him.  Ben Nadig was meeting with and advising Rouven behind Marchese's back.

6  Nadig had a clear conflict as he also represented Frank Alfter.  He planted seeds of dissension in

7  Rouven's mind apparently at Frank's direction since he claimed he only met with Jan at Frank's

8  request.  Frank at best was an unindicted co-conspirator and at worst the real culprit.

9      Defendants whose interests are hostile to one another have a conflict interest.  Holloway v.

10  Arkansas, 435 U.S. at 475, 481-84; A criminal defendant's Sixth Amendment right to counsel

11  includes the right to be represented by an attorney with undivided loyalty. See Wood v. Georgia,

12  450 U.S. 261, (1980) This guarantee is so important that, unlike with other Sixth Amendment

13  claims, when a defendant alleges an unconstitutional actual conflict of interest, "prejudice must be

14  presumed," Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000) (citing Cuyler v. Sullivan, 446

15  U.S. 335, 350, (1980), and Flanagan v. United States, 465 U.S. 259, 268, (1984)), and harmless

16  error analysis does not apply. United States v. Allen, 831 F.2d 1487, 1494-95 (9th Cir. 1987) (citing

17  Cuyler, 446 U.S. at 349).  At least one if not 2 of Rouven's lawyers, had an actual conflict of

18  interest.  The attorneys, including Marchese, acknowledged thee was a conflict with Nadig

19  representing both Jan and Frank yet he permitted Nadig to meet with at least one expert.

20      Additionally, The actions of his lawyers render Rouven's plea involuntary. A guilty plea can

21  be rendered involuntary by the actions of defense counsel. *Iaea v. Sunn*. 800 F.2d 861, 867 (9th

22  Cir.1986). Coercion is a basis for withdrawing a plea. *United Sates v. Caro*, 997 F.2d 657 (9th Cir,

23  1992)  Not only did Rouven have to deal with the stress of his trial but also the infighting amongst

24  the defense "team."  His will was overborne.

25      Further, the one lawyer with whom Rouven had an established relationship predating the

26  Indictment and trusted implicitly, gave him legally flawed advice.  Pacitti who had no familiarity

27  or experience with the practice of federal criminal defense, was enlisted to counsel Rouven to

28  accept the plea. Pacitti confirmed what had already been told to Rouven; that he could be out in as

little as five years.  He did no independent research but merely repeated what defense counsel had told him.

Given that leave to withdraw plea prior to imposition of sentence should be FREELY GRANTED whenever a FAIR AND JUST REASON IS PRESENTED, it would be an abuse of discretion for this court to deny Rouven's request, given the unique facts and circumstances and circus surrounding his case.

DATED this 30th day of May 2018.

**KAREN A. CONNOLLY, LTD.**

 _/s/ Karen A. Connolly_
KAREN A. CONNOLLY
6600 W. Charleston Blvd., Ste. 124
Las Vegas, NV  89146
Telephone:     (702) 678-6700
*Attorney for Jan Rouven Fuechtener*