RUSSELL E. MARSH, ESQ.
Nevada Bar No. 11198
SUNETHRA MURALIDHARA, ESQ.
Nevada Bar No. 13549
WRIGHT MARSH & LEVY
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101
Phone: (702) 382-4004
Fax: (702) 382-4800
Email: russ@wmllawlv.com
       smuralidhara@wmllawlv.com

Attorneys for Jan Rouven Fuechtener

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00100-GMN-CWH |
| Plaintiff, | **Mr. Fuechtener's Sentencing Memorandum** |
| v. | |
| JAN ROUVEN FUECHTENER, | |
| Defendant. | |

Certification: This sentencing memorandum is timely filed.

Defendant Jan Rouven Fuechtener, by and through his attorneys of record, Russell E. Marsh, Esq. and Sunethra Muralidhara, Esq., Wright Marsh & Levy hereby submits his Sentencing Memorandum for consideration at the sentencing hearing currently set for Thursday, February 28, 2019.

/ / /

**Memorandum of Points and Authorities**

### I.  An Argument in Mitigation of Sentence:  A Request for A 96-Month Sentence

Jan asks this Court to vary downward and sentence him to a term of 96 months; a sentence of eight years is sufficient but not greater than necessary to meet sentencing goals and punish him for the possession, receipt, and distribution of child pornography, while taking into consideration 18 U.S.C. § 3553(a) factors.

Few legal principles are as deeply entrenched as the concept of individualized sentencing. As the Supreme Court, has observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

*Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).  Thus, in each case, a sentence should reflect an individualized assessment of a particular offender's culpability and potential success in the community rather than a mechanical application of a given sentence to a particular category of crime. This Court must recognize the "strong connection between the sentence imposed and the offender's real conduct."  *United States v. Booker*, 542 U.S. 543 U.S. 220, 246 (2005).  At its crux, Jan's naiveté led to a short-lived methamphetamine addiction, fueled by unknown, unindicted co-conspirators, that culminated in the possession, receipt, and distribution of child pornography.

Since this case was indicted on March 14, 2016, Jan's understanding of the American criminal justice system has come a long way.  Jan has already spent almost three years in custody for these offenses.  In retrospect, Jan knows that he violated the rules, but his unassuming personality and submissive nature pushed him to follow a crowd rather than

independently think and challenge universal notions of right versus wrong, moral versus immoral, and socially acceptable behavior versus criminal conduct. Although following the conduct and encouragement of others, while simultaneously not comprehending the severity of his own conduct, was naïve and stupid, this helps explain his conduct. Jan does not enjoy child pornography. He did not wish to break the law. Nonetheless, he pleaded guilty and takes full legal responsibility for his conduct.

Here, Jan pled guilty by way of plea agreement to: Count 1-Possession of Child Pornography; Count 2-Receipt of Child Pornography; and Count 3 Distribution of Child Pornography. The Government agreed to dismiss Count 4 at sentencing and to bring no new charges as a result of the underlying investigation.

The Pre-Sentence Investigation Report (PSI), pursuant to U.S.S.G. § 2G2.2, finds that the Total Offense Level is 43, and a Criminal History Category I (PSI at ¶¶ 61,67). The resulting calculated Guideline range of imprisonment is Life, which exceeds the statutory maximum for any specific count. Thus, U.S. Probation recommends a sentence of 222 months as to Count 1, 60 months as to Count 2, and 60 months as to Count 3. PSI at 44. U.S. Probation recommends Count 1 be served consecutive to Counts 2 and 3, yielding a total of 282 months imprisonment. *Id.*

The plea agreement calculates Jan's total offense level a 42. While the plea agreement contemplated a two-level reduction for acceptance of responsibility, the government now indicates that it will oppose any reduction due to Jan's prior motion to withdraw his plea, previously filed by prior counsel, litigated, and denied by this Court on November 13, 2018. (ECF No. 310.) A level 42 (without acceptance of responsibility) with a Criminal History Category of I, yields a Guideline range of 360 to life. With acceptance of responsibility, Jan's Guidelines range would be 292-365 months. Pursuant to the plea agreement, Jan may argue for a downward variance pursuant to 18 U.S.C. § 3553. The statutory minimum sentence is

five years in prison.  In accordance with this agreement, Jan now requests the Court sentence him to 96 months.

## II.     The Statutory Sentencing Factors in 18 U.S.C. § 3553(a) Require a Sentence Below the Guidelines Range

Core principles in sentencing have now been resolved by the Supreme Court in *United States v. Booker,* 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); and *Kimbrough v. United States*, 552 U.S. 85 (2007)*.* The Guidelines are not mandatory and sentencing courts may not presume them to be reasonable.  *Nelson v. United States*, 555 U.S. 350, 351-52 (2009).

What the Supreme Court has described as the "overarching provision" of 18 U.S.C. § 3553(a) is set forth in that provision's very first sentence – that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in subparagraph (2) of this subsection." *Kimbrough*, 552 U.S. at 101. The Supreme Court makes clear that this "parsimony principle" is not mere precatory language, but is a key – in fact, *the* key – requirement that a sentence must satisfy. Thus, factors justifying a sentence outside the Guideline range are no longer required to be "extraordinary." *Gall*, 552 U.S. at 47.  "No limitation shall be placed on the information concerning the background, character, and conduct of a defendant that a [district] court may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3577.  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 562 U.S. at 488 (citation omitted).

U.S. District Judge Reade has recognized this matter of law, while also weighing potential dangerousness, in a very similar sexual exploitation case:

> I want to talk about the variance motion. I do know that I can vary
> from the advisory guidelines and impose a non-guideline sentence

4

1
2
3

> somewhere within the statutory range. And when I'm considering
> whether or not to vary, I have to consider every factor…The issue,
> I think, that most people will talk about in these types of cases is
> will the defendant reoffend against a child in the future.

4  *United States v. Archer* (N.D. Iowa, Case No. 11-cr-00001-LRR-1).

5  A sentence that is too severe is unjust, and, therefore, also fails to promote respect for

6  and confidence in the law. Also, this Court is free to disagree with the advisory Guideline

7  range on general policy grounds, individualized fact grounds, or simply because this Court

8  concludes that a different sentence is appropriate "regardless" of the guideline range. *Rita*,

9  551 U.S. at 347, 351 and 356. Thus, the challenge, in this case, is to determine a fair sentence

10  that is sufficient, but not greater than necessary upon review of Jan's entire history and

11  background.

### A.    Jan's History and Characteristics Support A 96-Month Sentence

### 1.    Familial History and the Early Years

14  Jan and his family are from Western Germany. Within the Rhein-Efft-Kreis region

15  near the Rhine river sits the small community of Frechen and the small city in nearby Kirpin,

16  where Jan was raised. The primary industry in the area was coal mining. During World War

17  II, Frechen and the surrounding areas were heavily bombed by the Allies, causing decades of

18  financial ruin and needed recovery. The reconstruction of Germany after World War II was a

19  long process. Germany had suffered heavy losses during the war, both in lives and industrial

20  power. During World War II, 6.9 to 7.5 million Germans were killed, roughly 8.26 to 8.86

21  percent of the population.  Jan's parents grew up in this post-war backdrop.

22  Jan's father, Hans Joachim, was the son of an agricultural family.  Later in life, he

23  pursued work in the culinary field eventually evolving into a very successful chef. Jan's

24  mother, Rita, also grew up in the area. Rita worked for the local railway industry and

25  eventually stayed home to raise Jan.

26

5

Jan Rouven was born on July 8, 1977, to the marital union of Hans and Rita. Jan is an only child. The family was well-established in the progressive town of Frechen. The family describes it as a beautiful German village[1] with a real sense of "community". Hans Joachim was a hard-working and industrious man who was able to financially provide for the family. Hans worked as a classically trained chef and was employed by the finest restaurants in the area. Hans made a handsome living that provided for the family. At home, Rita maintained a beautiful chalet that was comfortable and more than sufficient for the family. Jan was loved dearly by his parents growing up.

Jan recalls that his family probably lived an upper-middle-class lifestyle. Jan does not describe it as a privileged life but also understands he was far from being in need or close to poverty. Early memories include a seemingly quiet childhood in which he attended neighborhood nursery and elementary schools. He remembers riding bicycles, playing soccer, and reading books. Jan recalls his father was always working; however, he has fond memories of his mother during these early years. Rita was very involved with all the school and youth activities. She was probably overprotective of Jan, as he was her only child. In retrospect, Jan recalls a very business-like environment in the home where outward signs of affection were rarely given by his father. His mother was not shy and adored Jan like a prize-winning baby boy. Jan was awkward and uncoordinated. Jan was not athletic as a young boy, which caused rifts and teasing between Jan and school peers. However, Jan won over his peers with charisma and personality. Despite being a good student, Jan describes himself as the class clown, who excelled exceptionally in all courses during middle and secondary school years. School came easy to him.  But at the age of eight, he knew he wanted to be a magician.

---

[1] Today, Frechen has a population of 51,000 people.

Jan was raised Catholic by his very religious mother. Jan and his mother would walk to church every Sunday to attend mass.  Jan's father was not quite as devout, as he would usually wait for Jan and Rita at a nearby pub. Jan completed all the required sacraments and even participated in mass as an altar boy. Jan describes his work in the church as his "first stage performances."  Jan recalls that these early years were simple but filled with love and memories of family gatherings, neighborhood parties, and good times.

### 2.    Jan and His Lifelong Love of Magic

The most impactful and life-changing moment for Jan Rouven occurred at his own birthday party at the age of 6. Jan is able to describe it as if it happened yesterday. A loving aunt brought Jan a gift that would start his life's path in magic. Jan received an age-appropriate magic kit for beginners.  The kit was simple and consisted of cards, multiplying balls, and vanishing coins. Jan was fascinated by the kit. As a young boy, he practiced for hours until he would master each trick. These very simple magic toys kickstarted Jan's interest in magic.

Jan recalls later being mesmerized by American magicians who aired on German television reruns. When weekly *Doug Henning Magic Hour* and variety specials starring David Copperfield aired and Jan was glued to the television. As a pre-teen boy, Jan would read about the Hungarian-born Harry Houdini as part of book report projects. Jan had learned that the Great Houdini had traveled throughout Germany and neighboring countries. Jan was fascinated by Houdini's early visit to nearby Cologne, where he escaped from police incarceration to much fanfare. Whether it was books, television, or just practicing magic tricks, Jan was in love with magic and he knew it would become more than a pastime or hobby.

During Jan's teen years, he and a neighborhood friend would join the "Magic Circle." The group was a social gathering of magic enthusiasts that met weekly in nearby Cologne.

Participants learned and practiced magic with each other. Jan and his friend would also travel to regional magic shows and watch others perform. Soon after, Jan would himself travel, usually with his family, to festivals, food markets, and fairs and perform magic as a street performer. Jan was usually a huge success at these events and he earned money from the adoring crowds that would gather to watch him perform. Thirteen-year-old Jan was amazed and inspired by the crowd reaction to his magic. The "oohs and ahs" always confirmed to Jan, that he was doing well with his magic.

### 3.    Jan's Formative Years

Jan continued with secondary school and his success as a student continued.  He made consistently good marks and found history and letters to be of interest. As Jan's adolescent years progressed, his physical stature evolved. He was no longer an awkward kid. He grew into a muscular young man who loved performing. This is also the time in life that Jan was first exposed and fascinated by pornography. The early years of the Internet, in the early 90's, were also, a "free for all" as far as the availability of pornography.  Like his interest in magic, he was mesmerized by pornography.

While magic was at the forefront of life for Jan, he was also conflicted on a personal basis. While he recognized early that he was homosexual, Jan struggled "coming out" and disclosing this to his parents. Jan's father, Hans, was dismissive about the idea, and even to this day, refuses to talk about it.  Rita, of course, was accepting of Jan's sexuality.

Jan was first sexualized at age 15. A much older man, perhaps in his 50's or 60's had befriended Jan. The two had met by way of the "Magic Circle" group. Jan indicates he had felt "sorry" for the man and was vulnerable to his advances. Jan engaged in a brief sexual relationship with the older man.  Jan seems to have never had a significant age-appropriate relationship with anyone as he has only dated much older men.

### 4.    The Love of Jan Rouven's Life

At the age of 15, Jan met Frank Alfter. Frank was 17 years older than Jan. Frank was an accomplished professional magician who toured throughout Germany and Europe. Frank specialized in corporate and private engagements.  Jan and a friend met Frank backstage at one of these local shows. Frank was impressed with Jan's knowledge and passion for magic. A few months later, Frank visited Jan in Frechen. Jan was star-struck by Frank who was a local celebrity. Frank met Jan's parents and advised them that Jan was a natural talent. Frank offered to mentor Jan and personally train him. Frank taught Jan the inner-workings of the magic business. Jan would tour with Frank throughout Europe at theme parks and on cruise ships. Jan would also perform with Frank. Jan was developing into a true professional. At the same time, a serious relationship between Frank and Jan developed. Apparently, Frank had a propensity to date young teenage boys.

The relationship eventually evolved into both a life and business partnership. The two were deeply in love. As Jan's talents became more evident to Frank and everyone else, Frank focused on producing and managing stage shows for Jan. The two were working six days a week, year-round, and traveling the world. Along with fame and money came difficulties in their lives. There were other partners, the introduction of drugs, and resentment from both Jan and Frank toward each other. Despite all of the turmoil, the two were dedicated to each other as they eyed opportunities in Las Vegas. Frank and Jan officially married in Las Vegas in 2015.

Today, Jan is heartbroken. While he speaks to Frank often, he still considers him to be his life partner, especially after a relationship of over 25 years. Sadly, Jan recognizes that Frank has abandoned him. According to Jan, Frank, who is now nearing 60, is traveling the world with a 20-year-old man. Jan recently received a photo book of the two highlighting their world travels. Jan was both saddened and angry. Frank is described as an

unindicted co-conspirator in the underlying conduct according to the Government. It is evident that Frank Alfter has no intentions to return to the United States and accept responsibility for his role in the underlying offense and has left Jan to fend for himself.

### 5.    Coming to Las Vegas — Too Much Fame, Too Fast

Jan will admit that performing on the Las Vegas Strip is every entertainer's dream and Frank and Jan set out to do just that in 2010. The couple left the comforts of their home in Western Germany and settled in Las Vegas. Upon arriving in Las Vegas, Jan was hired by the Fremont Street Experience in the downtown area. As the Court knows, the Fremont Street Experience is an outdoor event every evening in the center of downtown, between the major attractions and hotels. On a nightly basis, there are an array of different entertainment acts. Jan performed there on a regular basis for nearly two years. Jan was a very popular act. While Jan was performing, Frank managed and produced the shows. Frank built the framework for Jan's success by marketing and deal-making throughout the city. In 2011, Frank and Jan were able to rent out a showroom off the Vegas Strip. A gig at the Clarion Hotel provided the beginnings of Jan's stage show. While the venue was small, Frank and Jan made it into a grand event. The show was popular and earned Jan much fanfare. Local newspapers and television stations covered the show.  Jan was honored when other magicians like fellow Germans Siegfried and Roy attended the show. The show was a smashing success with performances nightly.

As Jan became popular, other venues sought him out. In 2012, Jan's show was the headline act at the famous Riviera Hotel and Casino. That show was again incredibly successful. Approximately two years later, the historic Tropicana Hotel convinced Jan to bring his show to their venue. On opening night at the Tropicana, Jan looked out his hotel room window, where he saw his name in lights. Just beyond, the Tropicana billboard, also in his view was the billboard lights of the adjacent MGM Hotel, where David Copperfield

performed on a nightly basis. Jan's years of hard work, struggles, and persistence had finally put him on the top of the entertainment world. Jan was literally working in the entertainment capital of the world, across the street from his childhood idol, the world's greatest illusionist. It was a surreal, joyful, and an introspective moment for Jan.

Jan's success came at a heavy price, however. With each increment of success, fame, and wealth came temptation and personal challenges. As Jan's shows became popular, hordes of groupies, both men and women, were surrounding Jan. On a nightly basis, Jan traveled to and from his shows with an entourage. Alcohol and narcotics were plentiful. After-show parties and dinners became a regular event. As time passed, Jan's party scene evolved into an addictive Chem-sex lifestyle.[2] Gatherings at his residence involved multiple sexual partners and the heavy use of methamphetamine, fueling the destructive lifestyle that Jan was becoming deeply entrenched in. Jan recalls that all types of pornography were used, viewed and traded. Jan was deeply addicted to the lifestyle. He found it an exciting adrenaline rush. Of course, today he is regretful and understands that his lifestyle led him down the path towards criminal conduct. In many ways, Jan is thankful that this part of his life is over.

## B.   A 96-Month Sentence Sufficiently Considers the Need for Just Punishment, Deterrence, and Protecting Society

Promoting respect for the law means more than merely doling out harsh punishment. As noted by the Supreme Court in *Gall*, 552 U.S. at 54 an overly harsh sentence "may work to promote not respect, but derision of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." And as explained by the Third Circuit with respect to child pornography sentences in particular:

---

[2] Chem-sex is the consumption of drugs to facilitate sexual activity. The term refers to a subculture of recreational drug users who engage in high-risk sexual activities under the influence of drugs.

> The hideous nature of an offender's conduct must not drive us to forget that it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment. Although there are clearly times when anything less than severe punishment undermines respect for the law, it is just as certain that unduly severe punishment can negatively affect the public's attitude toward the law and toward the criminal justice system. It is no doubt partly for that reason that jurists have referred to the responsibility of sentencing as "daunting." The power and responsibility of a sentencing court is, indeed, nothing short of "daunting." It requires a careful balancing of societal and individual needs, and an ability to determine a sentence based on dispassionate analysis of those often-competing concerns.

*United States v. Olhovsky*, 562 F.3d 530, 551-52 (3rd Cir. 2009) (emphasis in original).

Child pornography cases have become especially difficult at sentencing, as judges are required to determine punishment by striking a balance between punitive measures appropriate for those defendants who produce the disgusting, degrading and harmful images, and those defendants, like Jan, who has no previous criminal history and has been an otherwise productive member of society.

The child pornography offense related to Jan is, unfortunately, a fairly typical one; though it involves the use of a computer and possession of a large number of illicit files, some of which may involve prepubescent minors, that is true of the vast majority of child pornography offenses in this computer age. And while such possession of child pornography is certainly a serious offense, it is serious not so much for the direct conduct of possession but for the market it creates for those who actually willfully distribute images, produce the child pornography, and abuse children in the process. The possession offense falls at the lowest end of the continuum of child sex offenses. It is less serious than distribution of child pornography. It is less serious than production of child pornography and it is less serious than

12

the actual molestation of children. *See United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008):

The Third Circuit has offered an important caution when considering child pornography offense conduct:

> It has often been stated that possession and distribution of child pornography are very serious crimes that have a terrible impact on real victims. No one could sincerely disagree with that statement, and the seriousness of the crimes is reflected in the penalties that Congress has prescribed as well as in the Guidelines that are promulgated by the Sentencing Commission. However, revulsion over these crimes cannot blind us as jurists to the individual circumstances of the offenders who commit them.

*Olhovsky*, 562 F.3d at 552.

### 1.    Just Punishment (18 U.S.C. § 3553(a)(2)(A))

The child pornography guidelines are unique to the extent that they have been so grossly increased in just recent years. As a result of the Protect Act, which was passed by Congress in April, 2003, the Guidelines added a greater base offense level; an enhancement for material portraying sadistic conduct, which can include any sexual intercourse with a prepubescent minor; and additional enhancements for larger quantities of images, and enhancements for using file-sharing software as "distribution" with no need for the overt act of distribution to be an actual element of the offense. Also, according to the guidelines, each video file containing child pornography is the equivalent of 75 images. U.S.S.G. § 2G2.2 App. Note 4 (B)(ii). The impact on Jan's potential sentence is significant, as a matter involving 6653 illegal files, his conduct is now calculated to well over 450,000 images. The attempt to quantify videos with arbitrary numbers in an effort to increase penalties is perhaps the most glaring example of where the guidelines do not correlate with present-day technology, resulting in the gross over representation of an offender's conduct. Additionally, mandatory minimum sentences were enacted for both Receipt and Distribution cases. As seen

in the underlying matter, the effect of the multiple enhancements on Jan is to make his calculated Guidelines range exposure significantly more than it would have been in recent years past. His Base Offense Level conduct of 22 nearly doubles to an Adjusted Offense Level of 43 as a direct result of the enhancements. PSR, pp. 26-27.  Ironically, had Jan actually engaged in sexual conduct with a minor under the age of 18, the Guidelines would advise that he could be sentenced to as low as 27 to 33 months. (*See* U.S.S.G. § 2A3.2(a). "Most of the revisions [to the child pornography guidelines] were congressionally mandated and not the result of an empirical study."  *United States v. Henderson*, 649 F.3d 955, 962 (9th Cir. 2011) (holding that district courts may use their discretion under *Kimbrough* to vary from the child pornography guidelines).

## 2.    Deterrence (18 U.S.C. § 3553(a)(2)(B))

There are two types of deterrence for the Court to consider – general deterrence, that is, deterrence of others, and specific deterrence, deterrence of Jan.  At least some courts have questioned whether child pornography sentences can accomplish general deterrence. In *United States v. Beiermann*, 599 F.Supp. 2d 1087, 1103-04 (N.D. Iowa 2009), the court opined:

> While the public's outcry for harsher sentences in child pornography cases is certainly understandable, there is not a single sliver of evidence in this sentencing record remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet. From the rapid growth of these cases that my colleagues around the country and I are seeing, we cannot sentence Internet users and sharers of child pornography fast enough for long enough to make a dent in the availability of such material on the Internet. This does not mean that the defendant should not receive a lengthy sentence for his criminal conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.

14

It is also must be noted that scientific studies regarding deterrence suggest that it is the *fact* of a sentence, not its length, that has a deterrent impact.[3] This would seem particularly true in the case of child pornography offenders, like Jan, who are usually first-time offenders who have never been to prison before and who feel punished not just by incarceration but also by the social embarrassment, the ongoing stigma, and the destruction of their lives and career.

As to specific deterrence, the Court can be very sure that Jan has learned a lesson and will never do anything like this again. As one district court articulated with respect to the defendant before it in that case:

> [The defendant] has been the symbol of how society will treat someone who accesses child pornography on the Internet. For this middle-class white collar professional, educated, suburban husband and father, the thought of one day in prison is horrifying, particularly given the offense of conviction. Any prison sentence, let alone the mandatory minimum of five years, accomplishes specific and general deterrence.

*United States v. Grober*, 595 F.Supp. 2d 382, 409 (D. N.J. 2008).

### 3.    The Need to Protect Society (18 U.S.C. § 3553(a)(2)(B))

Initially, in evaluating the need to protect society, the court shall consider child pornography offenders generally have a low risk of recidivism.[4]  This is particularly true in Jan's case, as evidenced by the psycho-sexual evaluation of Dr. Greg Harder.

Dr. Harder, Ph.D., a clinical psychologist who is an expert in the evaluation of

---

[3] Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623, 653 (2005).

[4] *Sex Offenders: Recidivism and Collateral Consequences,* Tweksbury R., Zboga, K., et al: Report for National Institute of Justice, March 2012.

child pornography offenders, conducted a psycho-sexual evaluation of Jan.  A summary of

Dr. Harding's psychosexual evaluation (hereinafter, "Harder Report" and submitted under

seal as Exhibit A) makes a variety of favorable findings.[5] Most noteworthy:

> His risk is reduced by the fact that he has never been convicted of a
> previous sexual crime. He has never been arrested for any crimes
> in the past as an adult or juvenile. He has no history of violent
> crime. He has never been on probation or violated any kind of
> community supervision agreement. He has maintained stable
> employment, stable relationships, and stable residency. He has no
> history of mental health problems or treatment. He never
> completed sexual offending treatment but is willing to participate
> in treatment. He has no prior contact or noncontact sexual offenses.
> Since he does not have a contact offense, there was no physical
> harm made directly by the Defendant to the victims, no threats of
> harm, and no penetration. He denied being a victim of abuse. He
> denied suicidal, homicidal, or psychotic thoughts.

Harder Report at 13.

These findings are consistent with Jan's history of law-abiding behavior for more than

40 years. Dr. Harder also concludes that Jan poses a low risk of reoffending.

> Based on the totality of information that is provided from the risk
> assessment instruments, arrest report, and interview provided
> above from the risk assessments, arrest report, and interview
> provided above, Jan's risk is in the low range. Mitigating factors,
> such as his German culture, history of different age of consent in
> Germany, and history of having sexual relations with much older
> men since his youth, should also be considered.

> Jan's risk for re-offending should be considered low. Treatment
> For substance addiction and pornography addiction would likely be
> helpful for him.

*Id.* at 13-14.

Jan's status as a low-risk offender is integral to this Court's sentencing determination.

---

[5] Dr. Harder's C.V. is attached as Exhibit B.

16

This is because Dr. Harder's experience supports a 96-month sentence.  Most of his cases involve psychosexual evaluations in connection with state child pornography cases.  Under Nevada law, defendants who are convicted of possession or distribution of child pornography are eligible for a sentence of probation so long as they do not pose a high risk of reoffending. Nev. Rev. Stat. §§ 176A.100; 176A.110(1) and (3)(e).  Given that Dr. Harder has assessed Jan as a low risk, he could have been sentenced to probation if this prosecution were brought in state court.  The State of Nevada strongly believes that society's interests can be protected when low-risk offenders are sentenced to probation.  The court may consider this disparity between state and federal sentences in granting a variance.  *United States v. Wilkerson*, 411 F.3d 1, 10 (1st Cir. 2005) (remanded under *Booker* where district court did not consider disparity under previously mandatory Guidelines); *United States v. Ringgold*, 571 F.3d 948, 950-53 (9th Cir. 2009) (no abuse of discretion in refusing to consider federal-state sentencing disparity, but not deciding the issue at hand).  In a post-*Booker* regime, the court is allowed to take the sentence that a defendant might have received in the state system into account in molding an appropriate sentence.

An additional factor to consider in evaluating the need to protect society is that offenders like Jan (a first-time offender) generally have a low risk of recidivism. This lack of criminal history is significant and relative to recidivism. The Sentencing Commission has stated as follows in this regard:

> The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system.

U.S.S.C., *"Recidivism and The First Time Offender"* (May 2004).

17

The sentence imposed must also "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(c). The Supreme Court in *Gall* aptly observed that the standard conditions of probation imposed upon defendants "substantially restrict their liberty." *Gall*, 128 S. Ct. at 591. With appropriate conditions, supervised release empowers the court to ensure rehabilitation, full restitution to victims, payment of fines, protection of the public, and compliance with the law. If the defendant fails to comply, the violation of probation gives the judge power to mete out even greater punishment, including incarceration. The Ninth Circuit has noted "Probation is not leniency." *United States v. Bragg*, 582 F.3d 965, 968 (9th Cir. 2009).

## C.   Other Arguments in Support of a Downward Variance

Jan provides the following additional arguments in support of a 96-month sentence.

### 1.   Jan is Vulnerable to Victimization or Abuse in Prison

Jan has never lived alone. As a child, Jan was overly protected by his mother. Jan has never been to jail or prison nor has he had any previous encounter with law enforcement. He is physically diminutive and struggles in social settings due to a thick accent. Jan's world is very small, due to his celebrity status and focused on the inner circle of his loved ones. His world does not include interaction with hardened criminals in a closed prison setting. His sexual orientation, and diminutive physique, coupled with a conviction for child pornography make him prone to attack in prison.  A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure or variance *United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) (citing *Koon v. United States*, 116 S. Ct. 2035 (1996)).[6]

---

[6] In *Parish*, the district court found that the defendant was susceptible to abuse in prison because of a combination of factors: his stature, his demeanor, his naiveté, and the nature of the offense. 308 F.3d at 1031-1032.

18

In its ground-breaking 2001 report on male rape in prison, Human Rights Watch revealed a broad range of factors that correlate with increased vulnerability to rape. Specifically, prisoners fitting any part of the following description are more likely to be targeted: young, small in size, physically weak, white, gay, first offender, possessing "feminine" characteristics such as long hair or a high voice; being unassertive, unaggressive, shy, intellectual, not street-smart, or "passive"; or having been convicted of a sexual offense against a minor. Inmates with any one of these characteristics typically face an increased risk of sexual abuse, while prisoners with several overlapping characteristics are much more likely than other prisoners to be targeted for abuse.

Jan Rouven Fuechtener is physically small, timid, passive, soft-spoken, unassertive, unaggressive, not street-smart, awkward, homosexual, and *a first-time offender who has been convicted of child pornography offenses*. Jan will be among the most vulnerable to abuse simply because of his sexual orientation. Add this to his demeanor, and the nature of the crime—possession of child pornography—and Jan's susceptibility for abuse in prison becomes a virtual certainty.

## 2. Sexual Addiction vs. Sexual Offending

As a result of the concomitant increase in Internet connectivity and funding to law enforcement agencies tasked with the important duty of preventing child exploitation, courts across the country have experienced a surge in Internet child pornography and obscenity prosecutions.[7] Sentencing rationales specific to Internet pornography offenses vary and often have little basis in a defendant's background or history. Sentences aimed at punishment

---

[7] Friedman, Pimentel, Supler, Weiss, "Sexual Offenders: How to Create a More Deliberative Sentencing Process" 12-18, The Champion Magazine, December 2009.

without understanding the different type of Internet offenders and their potential for successful treatment fail to promote the goals of effective sentencing.[8] A strong effort must be made to differentiate among the type of offenders by obtaining pertinent psychological and psychosexual information when such offenders are adjudicated. From a legal perspective, the goal of psychological evaluations is to assist participants in the justice system on who is, and who is not, most likely to respond to treatment and mental health counseling as opposed to incarceration.

Sex addicts are men and women who engage compulsively in one or more sexual behaviors, continue these behaviors despite significant negative consequences, and spend a great deal of time thinking about, planning and engaging in sexual activity. Over time, sex becomes the primary focus of their lives. Like other addictions, sex addiction can lead down a self-destructive path. A sex offender may have similar symptoms, but sex offenders differ in that they engage in sexual activities that violate the rights of others.[9]

Cybersex definitions have many variations but are closely associated with the concept of sexual addiction.[10] Generally speaking though, cybersex occurs when individuals use the Internet to engage in sexual expression or sexually gratifying activities that may include: looking at pictures, *sexual chat*, or contacting other adults for consensual sexual activity. Cybersex can provide an avenue for extreme sexual behaviors that are likely to lead to an addictive sexual disorder. Researchers identified that a number of Internet users have

---

[8] Weiss, Schneider (2006), *Untangling the Web; Sex, Porn and Fantasy obsession in the Internet Age,* N.Y., Alyson Books.

[9] Remington, Gast, "Cybersex Use and Abuse: Implications for Health Education" 34-40, American Journal of Health Education, January 2007.

[10] *Id.*

preexisting sexual compulsions or addictions. Conversely, use of the Internet may also trigger compulsive behavior for some who would not have a problem with pornography otherwise.[11]

Sexual addiction likely affects a much larger percentage of the general population than does sexual offending. Some research estimates that as much as 3 to 5 percent of the general population may have an active sexual addiction problem.  However, unlike hands-on offenders, most sex addicts often have no direct victims. Treatment for sexual addicts who have not escalated into offending behavior often involves 12-step support and outpatient therapy.

Following a thorough investigation into the background and personal history of Jan, there are clear indications that the underlying conduct was predicated by sexual addiction and related behaviors.  *See supra*, at Sections (II)(A)(5) and (II)(B)(3).

### 3.    Aberrant behavior is a ground to vary downward

As a life-long, hard-working man, Jan's behavior, in this case, is incongruent with the responsibility he has shown in other areas of his life.  The aberrant behavior that he engaged in over a period of months – driven by severe addiction to methamphetamine – do not warrant the sentence of over 20 years called for under the Guidelines, or recommended by U.S. Probation and the government.  This conduct was short lived: less than one year and starting in 2015 and ending with his arrest in 2016.  His dedication to magic, his family and husband, and doing the right thing have been a guiding principle in his life.  He is rehabilitating and committed to never doing methamphetamine again, never associating with a crowd that could easily influence him, and never possessing child pornography.

---

[11] *Id*.

### 4.    Good Employment History

Jan has had exceptional employment history.  He headlined his own magic show on the Strip at the Tropicana Hotel from 2011 until his arrest in 2016.  He has been in show business his entire adult life.  He has taken his show to theme parks, cruise ships, theaters, and other hotels in Las Vegas.  He has been financially responsible and there is no evidence to the contrary.

### 5.    Long custodial sentence is unnecessary and counterproductive; family support aids rehabilitation

"The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures." Shirley R. Klein et al., Inmate Family Functioning, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).  Jan has an extremely supportive family.  Unfortunately, they all reside in Germany.  Jan and Frank have a strong, loving relationship.  They talk as often as they can and write letters to one another.  Their relationship has actually grown stronger since Jan entered custody in march 2016.  Jan also frequently communicates with his mother, Rita.  She loves and cares for Jan and still wants to support Jan through his incarceration. Jan has even rekindled the relationship with his father.  They talk on the phone and have started to write each other letters.  Jan's close group of friends remain by his side, sending him letters, putting money on his books, and giving him warm regards as he faces his sentencing.  Strong family support, in spite of the convictions, is a grounds for variance because strong support will aid in rehabilitation. *See United States v. Wachowiak*, 412 F.Supp. 2d 958, 964 (E.D. Wis. 2006) (in possession of pornography case, where guideline range was120-151 months, a below guideline sentence of 70 months was imposed in part because "the guidelines failed to account for the strong family support defendant enjoyed, which would aid in his rehabilitation and re-integration into the community. Because defendant's family and friends have not shunned him

despite learning of his crime, he will likely not feel compelled to remain secretive if tempted to re-offend. Rather, he will seek help and support").

### 6. Jan faces collateral consequences like deportation and loss of professional reputation

At the end of Jan's custodial sentence, he will be deported from this country never to return. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (deportation is a "drastic measure, often amounting to life-long banishment or exile."); *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (deportation as the result of a conviction is a "particularly severe penalty" and is the "equivalent to "banishment or exile").

Additionally, U.S. Probation argues that a 20-year sentence will significantly diminish Jan's ability to re-create a charismatic show, continue to practice magic, and foreclose his ability to spend time and travel with his husband who is 20 years older. PSR ¶ 145. The apparent purpose of U.S. Probation's and the government's request is to unwind Jan's fame and fortune. This request is exceptionally punitive and results in the loss of his livelihood. These collateral consequences should be considered in light of Jan's 96-month request. *See United States v. Stewart*, 590 F.3d 93 (2d. Cir. 2009) (stating "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D. N.M. 2007) (finding variance appropriate where defendant in public corruption case was already collaterally punished by loss of his position, loss of his reputation, widespread media coverage of his case, and the emotional toll of two lengthy, public trials); *United States v. Baird*, 2008 WL 151258 (D. Neb. Jan. 11, 2008) (in child pornography case where guidelines were 41-57 months, and the court imposed a 24-month sentence in part because "the defendant has already suffered serious consequences as a result of his actions. A conviction for possession of child pornography carries considerable stigma. Baird has lost his military career, has a felony conviction on his record, and will have to register as a sex offender.).

23

Another collateral consequence is that Jan will rarely have his family visit with him while he is in custody.  Without that human contact, Jan's physical and mental health have begun to deteriorate. *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) ("[W]e do know that as a statistical matter, the life expectancy of an incarcerated person drops 2 years for each year of incarceration.) See Evelyn J. Patterson, The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003, 103 Am, J. of Pub. Health 523, 526(2013)).

### 7.    Acceptance of Responsibility

At first, Jan had a hard time accepting responsibility for his conduct in this case. Notwithstanding a partial bench trial and ultimate plea negotiations in this case, Jan accepts responsibility for all of the illicit material that was located at his residence.  Because of issues with his prior counsel and cultural clashes, he was unable to wrap his mind around the conduct, the American Criminal Justice System, the Guidelines, and his potential sentencing. It has taken him a while to recognize and comprehend how his life changed because of his poor decisions.  He now recognizes his fault, error, and criminal behavior.  He now understands who the victims are in this case and how they were re-victimized with the perpetuation of the images.

However, the Government and Jan are both aware of other parties who viewed, accessed, and possessed child pornography at Jan's residence. The Government has made reference to an "unindicted co-conspirator" on many occasions. A review of computer forensics information also confirms at least one other user of some of the seized digital devices. Jan is aware that others viewed the child pornography he made available.

Jan has many personal challenges at the moment, but nevertheless, he is ready to accept responsibility for his actions and move forward with his life. This is evidenced by both his guilty plea and his willingness to pay restitution in full. To that end, it is clear that leniency and

24

compassion will be the vehicle that will return Jan to the continued path of law-abiding citizenship.  The Court is asked to impose a sentence that reflects moderation, compassion, and recognition of the immensely difficult and painful situation in which this otherwise decent man, through his mistakes and poor judgment—failed by drug and sexual addiction—has placed himself and his loved ones.

### D.   This Court Can Disregard the Advisory Guidelines and Policy Statements to sentence Jan to 96-Months

The Ninth Circuit has held that district courts have the discretion to disregard the child pornography guidelines based on a categorical disagreement with them.  *United States v. Henderson,* 649 F.3d 955, 962-64 (9th Cir. 2011); *see also United States v. Dorvee,* 616 F.3d 174, 186-88 (2d Cir. 2010).  The fact of the matter is that child pornography sentencing guidelines are among those most frequently varied from. There are multiple reasons for this.

First, many, if not most, of the child pornography guideline enhancements are of questionable significance. The most basic problem is that most of the enhancements – including in particular the maximum number of images, use of a computer, the presence of images of prepubescent minors, and sado-masochistic content – apply in every or almost every case. *See Henderson,* 649 F.3d at 965 (Berzon, J., concurring). As one district court summarized testimony on the question given by a government agent:

> SA Chase is the veteran of 100,000 images from 180 collections. In her testimony, SA Chase recognized that *every one* of her 180 investigations involved a possessor with 600 or more images. SA Chase testified that *every one* of the cases she had worked on – "100 percent" – "involved the use of a computer and of interactive computer service." Further, according to SA Chase, "all" of the cases she has worked on involved images of prepubescent minors under age 12, either posing or engaged in sexual activity. Even a vast majority –"80 percent" – had at least one image and video depicting sadomasochistic content.

*United States v. Grober*, 624 F. 3d 592,597 (3rd. Cir. 2010).[12]

Secondly, these various enhancements operate exponentially. With a base offense level of 22, Jan's exposure is also exponentially increased. Here the specific offense characteristics add 21 *levels* and skyrocket his base offense level guideline range from 41-52 months (level 22) to life, a period which exceeds the statutory maximum

Third, and more generally, the child pornography Guidelines, like the drug Guidelines considered by the Supreme Court in *Kimbrough* are not a result of "the Commission's exercise of its characteristic institutional role" of making "'determinations based on empirical data and national experience, guided by a professional staff with appropriate expertise,'" which, at least ideally, lead to "a sentencing range that will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*; see *also Henderson,* 649 F.3d at 962-63, *citing Kimbrough*, 552 U.S. at 109.

Thus, the overly punitive child pornography Guidelines are entitled to less weight than any the Sentencing Guidelines, which is reflected in the frequency with which courts across the country have varied from the guidelines.

---

[12]  Indeed, because the enhancements in the child pornography guidelines do nothing to differentiate more culpable offenders from less culpable ones, they result in arbitrary sentencing distinctions that can raise due process and equal protection concerns.  *Chapman v. United States*, 500 U.S. 453, 465 (1991).  These dysfunctional guidelines result in unduly harsh sentences for first-time, low-end offenders such as Jan, and the arbitrariness of this sentencing regime is reflected in the facts, for example, that pedophiles can actually molest children and serve less time than is called for by the child pornography Guidelines and corporate wrongdoers can steal millions of dollars and ruin thousands of lives and be punished by relatively short prison sentence, fines, and sometimes even probation.

**E.      The National Landscape of Sentencing in Child Pornography Cases**

Possessing, receiving, and trafficking child pornography are serious federal crimes that deserve significant punishment. However, federal penalties for child pornography offenses have risen ever higher, driven by politics and revulsion rather than justice and empirical evidence.  In a critical article in *The Champion* magazine, former senator Arlen Specter and Linda Dale Hoffa noted that between 1987 and 2009 Congress prompted revisions of the guidelines nine times and each time the changes resulted in longer sentences.[13] Increasingly long sentences are designed to make us feel better rather than make us safer or promote rehabilitation.

In 2012, the United States Sentencing Commission submitted to Congress an analysis on Child Pornography penalties. In preparation for the report, the Commission reviewed the most current social science, case law, and legislation concerning child pornography offenses and conducted extensive data analyses of several thousand federal child pornography cases. It also sought the views of experts in technology and the social sciences, treatment providers, law enforcement officials, legal practitioners, victims' advocates, and members of the judiciary.

In a press release dated February 27, 2013, Judge Patti B. Saris, chair of the Commission, concluded:

> Because of changes in the use of Internet-based technologies, the existing penalty structure is in need of revision. Child pornography offenders engage in a variety of behaviors reflecting different degrees of culpability and sexual dangerousness that are not currently accounted for in the guidelines…The Commission will continue to study child pornography sentencing practices, and

---

[13] Senator Arlen Specter & Linda Dale Hoffa, *A Quiet but Growing Judicial Rebellion Against Harsh Sentences for Child Pornography Offenses – Should the laws be changed?*, The Champion Magazine, Oct. 2011, at 12; *see also generally* The History Of The Child Pornography Guidelines (describing the nine guideline alterations).

27

> looks forward to working with Congress on developing a
> sentencing scheme that serves to better distinguish offenders,
> thereby reducing unwarranted sentencing disparities in these
> serious crimes.

In response to the Commission Report on Child Pornography, the United States Department of Justice agreed with many of the findings outlined. In a letter addressed to the Sentencing Commission and dated March 5, 2013, Anne Gannon, USDOJ National Coordinator for Child Exploitation Prevention and Interdiction concurred as follows:

> And the Department agrees with the Commission's conclusion that advancements in technology and the evolution of the child pornography "market" has led to a significantly changed landscape-one that is no longer adequately represented by the existing sentencing guidelines. Specifically, we agree with Report's conclusion that the existing Specific Offense Characteristics in U.S.S.G § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness. The current guidelines can at times underrepresent and at times over-represent the seriousness of an offender's conduct and the danger an offender poses.

In the history of this country, when the legislature has lost its way in assessing what is fair, it has been the judiciary who is ultimately the voice of reason and moderation. The defendant and his family ask the Court to act similarly in this case; and sentence Jan Rouven Fuechtener, a first-time offender, to a just and reasonable term of imprisonment of 96 months with an appropriate term of supervised release to follow.

## III.   Conclusion

Jan Rouven Fuechtener is before the Court for sentencing. He has entered a guilty plea to multiple Child Pornography related matters, after being found in possession of a large number of illegal pornography files. Jan is regretful and embarrassed by his behavior.

28

However, Jan's also recognizes that his conduct correlated with an unhealthy and self-destructive lifestyle that involved the overindulgence of alcohol, drugs, and a pervasive addiction to pornography. Nevertheless, Jan stands before the Court and requests compassion and understanding.

Jan is a first-time offender who with continued counseling and appropriate supervision, is not likely to become a repeat offender, which has been corroborated by a clinical psychologist with expertise in evaluating and treating child pornography offenders.

Jan will live with the stigma of his conviction for his entire life as a result of the cessation of infamy that will always follow him. The conviction has already resulted in the end of his professional career, the end of intimacy with his husband and other familial relationships, and will result in deportation from the United States. Further, Jan will be required to register as a sex offender in any community where he lives and works. The collateral consequences, in this case, are many, thus, a sentence below the advisory Guidelines should not be interpreted as leniency.

Jan has many personal challenges at the moment, but nevertheless, he is ready to accept responsibility for his actions and move forward with his life. Jan requests that the Court impose a "just and reasonable" sentence of 96 months with an appropriate period of supervised release.

DATED: This 21st day of February 2019.

WRIGHT MARSH & LEVY

*/s/ Russell E. Marsh*
Russell E. Marsh, ESQ.
Attorney for Jan


*/s/ Sunethra Muralidhara*
Sunethra Muralidhara, ESQ.
Attorney for Jan

29

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

The undersigned hereby certifies that she is an employee of Wright Marsh & Levy and is a person of such age and discretion as to be competent to serve papers.

That on February 21, 2019, she served an electronic copy of the above and foregoing **Mr. Fuechtener's Sentencing Memorandum** by electronic service (ECF) to the person named below:

NICHOLAS A. TRUTANICH
United States Attorney District of Nevada
ELHAM ROOHANI
Assistant United States Attorney
elham.roohani@usdoj.gov
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101


*/s/ Debbie Caroselli*
Employee Wright Marsh & Levy

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT A

# [FILED UNDER SEAL]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT B

# Greg Harder, Psy.D.
## Licensed Psychologist #PY0338
### 9510 W. Sahara Ave. Suite 110
### Las Vegas, NV 89117
### gregharderpsyd@aim.com

**Phone:  (702) 685-5297**                                    **Fax:  (702) 685-5314**

---

License:                Psychologist, State of Nevada, PY0338 since 1997

---

Specialty Areas:        Forensic Psychology, Psychological Testing, Counseling
                        Competency evaluations, Risk for-reoffending assessments
                        Psychosexual Evaluations, Fitness for Duty evaluations,
                        Child, Adolescent, and Adult Counseling and Evaluations
                        ADHD Testing, Learning Disorder evaluations, Autism testing,
                        General Neuropsychological Testing, Medical Records Review,
                        Testifying Personal Injury Cases

---

Education:              California School of Professional Psychology, Fresno Campus
                        1350 "M" St. Fresno, CA  93721
                        American Psychological Association approved school
                        Psy.D. (Doctorate in Psychology) Degree, 9/95
                        Master's Degree 6/93

                        California State of University, Hayward
                        25800 Carlos Bee Blvd, Hayward, California 94542
                        BA degree in psychology 6/91

                        Chabot College
                        25555 Hesperian Blvd, Hayward, California 94545
                        AA degree, Liberal Studies 12/88

---

Work Experience:        Private Practice since 11/1997.

                        Child, Adolescent, and Adult evaluations and counseling
                        All ages 3 and up
                        Most insurances

1

Expert witness for Clark County Public Defender's office,
Specialty Court, Juvenile Court, Henderson Court,
(Risk for re-offending evaluations, Psychosexual evaluations,
Competency evaluations, Violence risk assessments,
Mental health evaluations and treatment recommendations)

Fitness for duty/public safety evaluations for Department of Energy,
Nuclear test site, "Q" level security clearance for federal government
Designated Test Site Psychologist

Disability evaluations for Social Security Administration, Bureau of
Disability, Veteran's Administration

PTSD evaluations for VA, Competency to manage funds evaluations

Public Safety/Pilot evaluations for FAA, Public Safety
evaluations/Emergency First Responders for MGM Grand Hotel

Parental Fitness Evaluations for Department of Family Services & Child
Protective Services

Psychological evaluations for clearance to have various medical
procedures (gastric bypass, spinal cord stimulator trial, etc.)

Testifying for Personal Injury Cases (private attorneys)

_____

Harmony Healthcare, Harmony Counseling Center
1701 W. Charleston Suite 300, Las Vegas, NV 89102
Phone:  (702) 251-8000   Fax:  (702) 471-0120
Dates worked 8/1995 to 12/2002
Title:  Clinical Director, Salaried Psychologist, Supervisor of Rapid
Response Crisis Team, Clinical Supervisor of all Therapists
Psychotherapy with children, adolescents, adults,
ADHD specialist, evaluations of medical competency to refuse treatment
Post-Doctoral Internship site
Supervisor:  Allen Flagg Jr, CEO, Norton Roitman, MD

_____

2

Las Vegas Center for Children
6171 W. Charleston Blvd. Bldg. 9, Las Vegas, NV 89102
Dates worked:  8/1995-2/1996
Title:  Post-doctoral intern
Day treatment milieu, psychological testing on seriously emotionally
disturbed SED children, individual and group therapy with "at risk"
children
Supervisor:  Tom Kinsora, Ph.D., psychologist, Norton Roitman, MD
_____

Wasatch Mental Health
750 N. 200 W.  Provo,   UT  84601
Pre-doctoral internship site
Supervisor:  "Butch" Freeman Dunn, Ph.D., Psychologist
Dates worked:  7/1994-7/1995

Rotations:  Utah Valley Regional Medical Center (inpatient psychiatric
hospital for seriously mentally ill adults, individual therapy, group
therapy, psychological testing)
Juvenile Court (psychological testing, risk assessment for youth
offenders)
Park View Center (school for emotionally disturbed children,
psychological testing and therapy and treatment coordinator)
New Vista Group Home (counselor, psychological testing for adolescent
sexual offenders)
Youth and Adult Outpatient (counseling and psychological testing for
children and adults)
Social Security Disability evaluations for state of Utah


_____

Psychological Service Center
1260 "M" St, Fresno CA 93721
5/1993 to 12/1993
Third Year clinical practicum
Parental fitness evaluations for Child Protective Services,
Psychological testing, Parent-Child Attachment Evaluations,
Outpatient family therapy, couples therapy, individual therapy
Supervisors: Kevin O'Connor, founder of Association for Play Therapy
Scott Van de Putte, Ph.D., Lillian Brown-Harrison, Ph.D.


_____

3

Stanislaus County Mental Health
1100 Kansas Ave., Suite A,  Modesto CA, 95351
8/1992 to 5/1993
Second year clinical practicum
Youth and Adult Outpatient therapy, psychological testing with SED
Children and adults
Supervisor:  Norbert Ralph, Ph.D.

_____

Fresno Unified School District
Calwa Elementary School
4303 E. Jensen Ave. Fresno CA 93700
1/92- 8/92
First Year Clinical Practicum
Intellectual assessments on elementary school children
Learning disability evaluations, IQ testing, achievement testing
Individual and group therapy with ages 6-12
Supervisor:  Bud Noether, School Psychologist

_____

New Perspectives Group Home
4811 Palm Ave. Fresno, CA 93711
6/93-9/93
Counselor for six Seriously Emotionally Disturbed adolescents

_____

Certifications:      Nevada Competency evaluations Current 2017-2018

_____

References:          Available upon request

4