NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar #13644
ELHAM ROOHANI
Nevada Bar #12080
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
elham.roohani@usdoj.gov

Attorney for the United States of America

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
-oOo-

| | |
|---|---|
| United States of America, | Case No. 2:16-cr-100-GMN-CWH |
| Plaintiff, | **Government's Response to "Mr. Fuechtener's Sentencing Memorandum" [ECF No. 329]** |
| vs. | |
| Jan Rouven Fuechtener, | |
| Defendant. | |

### I. Introduction

Ignoring evidence does not make it disappear. Methamphetamine addiction does not cause people to develop a sexual attraction to children. Fuechtener's proclamation that he "accepts responsibility" means nothing when he continues to blame "unindicted co-conspirators" for his criminal conduct. The Court should reject Fuechtener's ongoing attempts to minimize the severity of his crime and sentence him to 365 months in custody.

The government limits this response to the arguments and positions set forth in Fuechetner's Sentencing Memorandum. ECF No. 329.

### 1. Child pornography possession, receipt, and distribution is a grave, damaging crime and Congress has punished it accordingly.

Child pornography is not an easy thing to discuss; it is not an easy thing to describe; and it most certainly is not an easy thing to view. For these reasons, and the need to protect the victims of these crimes, sentencings in child exploitation cases typically proceed in a sterilized and generalized manner. Judges, understandably, do not want to view the videos, and do not want to be haunted by the whimpering, crying, and screaming of young children as they are being violently raped. The need for self-preservation stops judges from seeing and hearing the humiliation of these children – the same humiliation that defendants use to become sexually aroused. This sterile process allows other considerations to obscure the damage a defendant causes, by perpetuating the cycle of a victims' pain while sexually gratifying himself with the exploitation and suffering of hundreds of victims.

Child pornography is the savage rape, abuse, and permanent scarring of children. In its modern iteration, it is all of this amplified and exacerbated by the proliferation of the Internet and file-sharing. Victims of child pornography have described – in detail – the pain they continue to suffer based upon the distribution and possession of images and videos of their abuse by people like Fuechtener. As recounted by a mother of three of Fuechtener's victims, "[i]t can never be in the past for them; it is always in the present, and it keeps on happening." Because of people like Fuechtener, these children can never heal. One of Fuechtener's victims tells the Court, "My life continues to get worse, not better. My abuser stole my childhood and [Fuechtener and others like him], who possess and distribute pictures of my abuse, steal my life."

Because of the severity of this crime, Congress has demonstrated its interest in providing serious penalties, reflecting the reality that child pornography is becoming more

rampant, violent, and likely to involve younger victims. *See* 18 U.S.C. § 2252(b)(2) (the Child Protect Act of 2012 doubled penalty for possessing images of prepubescent minors under age twelve). Congress's consistent, gradual increases in the penalties for child pornography offenses, even in the face of vocal critics who minimize these offenses, reflect society's collective desire to protect children and significantly punish these grave offenses.

**2. Even if imperfect, the Guidelines have strong bases and appropriately further society's interest in protecting children.**

Congress, via the Sentencing Commission, has appropriately sought to protect children, a goal with strong bases in the Commission's assessment of child pornography offenses and empirical research regarding child exploitation offenses and offenders.

A. <u>The Child Pornography Guidelines properly reflect societal values.</u>

By requiring the Commission to consider public concerns when establishing guidelines, Congress ensured that ordinary citizens, who find offenses such as trading child pornography particularly egregious, have a voice in the justice system and that the punishment for these crimes reflects the community's concerns. 28 U.S.C. § 994(c). Congress also established mandatory minimum sentences for child exploitation crimes because of the particular harm they cause to society's most vulnerable members.

Fuechtener asks the Court to disregard § 2G2.2 because it was not based on empirical data and includes offense characteristics that are greatly exaggerated and apply in the majority of cases. ECF No. 329, at 12-14. He is wrong. The Commission's report and statistics do not negate the validity of § 2G2.2. Instead, they demonstrate the growing depravity of, continued concern about, and dangers relating to child pornography.

B. The Commission has not advocated abandoning these guidelines and has reported compelling reasons for serious penalties for these crimes.

In 2012, the Commission submitted its most recent evaluation of the child pornography guidelines in its Report to the Congress: Federal Child Pornography Offenses (*available at* http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses) (the "2012 Report."). Although this report criticized certain aspects of these guidelines, it did not recommend that courts abandon them, and it confirmed the extreme and damages that result from these crimes. The first section of the "Highlights of the Report" begins: "All child pornography offenses, including the simple possession of child pornography,[1] are extremely serious because they both result in perpetual harm to victims and validate and normalize the sexual exploitation of children." 2012 Report, Executive Summary, at vi.

It also explains that modern child pornography typically involves very young children: about one half of offenders possess one or more videos/images "depicting the sexual abuse of a child under six years old and approximately one quarter of offenders possess one or more images depicting the sexual abuse of a child two years old or younger." *Id*. at vi-vii. The report further describes how the Internet has perpetuated and heightened the harm to victims by causing them to "live with persistent concern over who has seen images of their sexual abuse and suffer by knowing that their images are being used by offenders for sexual gratification and potentially for 'grooming' new victims of child sexual

---

[1] Fuechtener repeatedly describes his crime as mere possession. The Court has seen the evidence of the true nature of Fuechtener's offenses, so the government will not belabor the point. For a summary of the evidence presented at trial, the government refers the Court to the Government's Sentencing Memorandum. ECF No. 325.

abuse." Internet distribution, the Committee states, is a lifelong harm. Online communities validate and escalate the abuse of children and normalize this horrific violence.[2] *Id.* at vi-vii.

Thus, at the beginning of its report, the Sentencing Commission emphasized the terrible impact of child pornography. It described what those in the criminal justice system have long known: child pornography has a highly destructive, life-long impact on victims. It devastates children and undermines all of society because the effects of this abuse extend to those who are close to the victim, including parents, partners, spouses, friends, and siblings, and because it destroys the fabric of a community when rape, violence, and exploitation of children are normalized and traded, collected, and used for sexual gratification.

As noted, the Commission also criticized components of the current guideline structure for child pornography crimes and suggested potential revisions. But the Commission *did not* advocate abandoning § 2G2.2 and indeed simply revised this guideline in order to (1) add involvement of materials portraying an infant or toddler as a basis for the "sadistic and masochistic" enhancement, and (2) clarify the different levels of enhancement for distribution. U.S.S.G. §§ 2G2.2(b)(3), (b)(4); *see* U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines*, 9-12 (April 28, 2016).

Thus, the Commission demonstrated that, given the content and nature of Fuechtener's child pornography collection and his distribution behavior, it agrees with

---

[2]   As an example, one online community discussing a child pornography series in Fuechtener's collection included this comment: "The [series name] vids are the absolute best cp I've ever found. The little cocksucker was so fucking hot. There's one vid in particular where her [abuser] is fucking her ass while she rubs her clit, and she has the most satisfied look on her face as she cums. I used the vids as 'training' films when I started fucking my own daughter, and they really helped her get into it." *These* are the people with whom Fuechtener was sharing files. The victim's advocate explains "[t]he thought that pictures and videos of her abuse are used to groom other children for the same treatment is a great source of guilt for [victim]." Additionally, the victim of this series has been stalked on multiple occasions by "fans" of her sexual exploitation, and has been harassed by others to make adult pornography as an ode to her childhood sexual exploitation at the hands of her abuser. Fuechtener and others like him are the cause of this victim's ongoing exploitation.

significant enhancements and a commensurate sentence. Furthermore, research in the area of child exploitation supports the need for incapacitating Fuechtener to protect children.[3]

    C. <u>Empirical evidence shows child pornography offenders are more, not less, dangerous than presumed, validating that § 2G2.2 offenses are serious.</u>

Although the current Guidelines are higher than during the 1990s, Congress, the courts, and researchers have access to more and better information about these offenders. Published research speaks to the grave risk that child pornography crimes pose to children. The authors note that the lack of physical contact in these offenses leads to a frequent assumption that "these offenders are somehow distinct from child molesters (i.e., 'hands-on' abusers)" and therefore not deserving of guideline sentences. M.L. Bourke, et. al., *The use of tactical polygraph with sex offenders*, J. OF SEXUAL AGGRESSION 1, 5 (2014). However, the authors found this logic misplaced and reported a likelihood of "significant 'crossover'" between contact and non-contact child exploitation because of the shared motivational pathway – sexual interest in children - that links these types of offenders. *Id*.

The article reports its study, which was comprised of 127 people under investigation for possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on behavior. *Id.* at 8. These individuals had no known history of hands-on offending. *Id.* Six participants (4.7%) admitted to sexually abusing at least one child before the polygraph. *Id.* However, during the polygraph procedures, an additional 67 participants (52.8%) disclosed committing hands-on abuse. That means 57.7% of the sample admitted to *previously undetected* hands-on sexual offenses. *Id.*

---

[3] That Fuechtener may be permanently removed from the United States after he completes his prison sentence does not absolve the Court of its duty to protect the public; protection of the public contemplates the public at large, not just the American public.

This study affirms and supports earlier research results showing extensive prior hands-on offenses by child pornography offenders undisclosed and unknown at the time of sentencing. *E.g.*, Michael L. Bourke & Andres E. Hernandez, *The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders*, 24 J. FAM. VIOLENCE 183, 185 (2009). In this study, official records and information known at the time of sentencing, including the offenders' presentence reports in their child pornography cases, showed that 26% had previously committed a contact sex offense. *Id*. at 187. However, by the conclusion of the intensive therapy program, which included polygraph testing, 85% the offenders *self-reported* that they had committed prior "hands-on" sex offenses. *Id*. And, the number of known victims of these sex offenses went from 75 at the time of sentencing to 1,777 at the conclusion of treatment, equating to a 2,369% increase in the number of hands-on offenses[4] reported from the time of sentencing to the conclusion of treatment. *Id*. at 187, 188. The vast underrepresentation in detected behavior, as well as prior studies reaching similar results, led the authors to conclude that online child pornographers appear to manifest "their deviant sexual arousal" in ways that are "not limited to fantasy," but include hands-on sexual abuse. *Id*. at 188, 189-90.

The Commission's 2012 Report also discusses child pornography offender behavior, and concludes that although it cannot determine a causal nature, research shows "some correlation between viewing child pornography and sex offending, and some child pornography offenders use child pornography images for 'grooming' or as a 'blueprint' for contact child sex offending." *Id.* at 101-102.

---

[4] Using the tests advocated by Harder, all of these offenders would have been a low-risk of reoffending because they had not been previously convicted of a hands-on offense. As discussed below, this is just one of many reasons that Harder's conclusions are incorrect.

These studies highlight the seriousness of the offenses, the risk to society, and validity of the considerations in promulgating § 2G2.2. While § 2G2.2 may not be perfect, it is nonetheless due consideration based on the realities it represents and reflects.

> D. The application of certain enhancements in most cases does not render them unduly harsh or meaningless here.

The fact that certain enhancements (e.g., images of a prepubescent minor or minor under 12; images of sadistic, masochistic or other violent conduct; more than 600 images; use of a computer) apply in the vast majority of child pornography cases does not negate their utility. These enhancements reflect the evolution and increasing grave and pervasive nature of child pornography offenses in the age of the internet and vast computer storage. Additionally, the nature of child sexual abuse depicted in available child pornography images has become much more severe, with a marked increase in sadistic and masochistic abuse of younger children, including infants and toddlers. *See, e.g.*, Alexandra Gelber, Child Exploitation and Obscenity Section, Department of Justice, *Response to "A Reluctant Rebellion"* (2009) at 1-2, *available at* http://www.justice.gov/sites/default/files/criminal-ceos/legacy/2012/03/19/ReluctantRebellionResponse.pdf.

Thus, the broad applicability of certain enhancements reflects the growing trend in worsening and widening abuse of children. As one judge stated in rejecting this argument, "[i]f anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence." *United States v. Cunningham*, 680 F. Supp. 2d 844, 851 (N.D. Ohio 2010), *aff'd,* 669 F.3d 723 (6th Cir. 2012).

**3.     Many courts give and affirm Guideline sentences in non-production child pornography cases throughout the country.**

While a handful of judges have criticized § 2G2.2 and varied downward, the vast majority of judges have found Guideline sentences in these cases to be appropriate and just. The Ninth Circuit and every other circuit has routinely affirmed Guidelines sentences in child pornography cases. *See e.g.*, *United States v. Savanh*, 727 F. App'x 931, 936 (9th Cir.), cert. denied, 139 S. Ct. 292 (2018); *United States v. Byington*, 600 F. App'x 553, 554 (9th Cir. 2015); *United States v. Maier*, 646 F.3d 1148 (9th Cir. 2011); *United States v. Carlson*, 395 F. App'x 413 (9th Cir. 2010); *United States v. Blinkinsop*, 606 F.3d 1110 (9th Cir. 2010).[5]

Exhibit A shows that the overwhelming majority of judges in the United States agree with this Court that a downward adjustment is "completely out of the question." *United States v. Byington*, No. 2:11-cr-349-GMN-PAL, ECF No. 111, at 31. In that typical peer-to-peer child pornography case, involving 723 images and 13 videos, this Court sentenced Byington on one-count of receipt. He was 69 years old with no criminal history. Facing a guideline range of 168-210 months, and based on a single image of a little girl tied with yellow rope, the Court advised Byington, "you're fortunate that I'm not considering an upward departure in this case, quite frankly." *Id.* Recognizing the meaningful role that § 2G2.2 plays in sentencing those who commit child pornography offenses, *even absent distribution and a pattern of exploitation*, this Court imposed a low-end guideline sentence. *Id.*

---

[5]     For a non-exhaustive list of other appellate courts affirming Guidelines sentences in similar cases, see the illustrative list attached as Exhibit A.

at 32. Although Byington will be released from custody when he is 83 years old, the Ninth Circuit affirmed this substantively reasonable sentence. *Byington*, 600 F. App'x at 554.

As it did in *Byington*, the Court should impose a guidelines sentence, reflecting Fuechtener's advertising and distribution, chats and watch parties with other pedophiles, attempt to coordinate a hands-on offense against a child, and denial of responsibility. The Court would be fully justified in imposing a high-end sentence under these facts. The government's suggested sentence in this case balances all relevant factors and provides an individualized determination that considers penalties imposed on similarly situated defendants. Fuechtener's attempt to minimize the severity of his crime, deflect blame, and disregard considerations (like the age of the victims; the circumstances surrounding how he got caught; the sheer number of sadistic videos; that he had these videos on nine devices, all over this house, downloaded on varying dates over the course of almost 10 years) should be rejected. The government's low-end request is substantively reasonable, legally and factually warranted, and not greater than necessary to meet the goals of sentencing.

**4.    The Court should reject Fuechtener's minimization**

Fuechtener contends that his conduct in this case was not that bad and asserts that if he had raped a child, he would be subject to a lesser sentence. ECF No. 329, at 14. He is wrong. First, his reliance on U.S.S.G. § 2A3.2 is incorrect as that provision is for statutory rape, which only applies if the defendant is four years or less younger than the victim. 18 U.S.C. § 2243(a). If Fuechtener committed a hands-on offense against a child depicted in the images of child pornography that he distributed, received, and possessed (some of the videos exceeding *3 hours in length* depicted *toddlers* being raped), U.S.S.G. § 2A3.1 would

apply, providing a base offense level of 38. This also does not consider that Fuechtener would be prosecuted by the state for sexual assault, and would serve 35 years to life.[6]

### 5. Fuechtener's sexual attraction to children is not sexual addiction.

The Court should reject Fuechtener's attempts to frame his pedophilia as "sexual addiction." Getting sexual gratification from watching child rape is not "sexual addiction." Fuechtener's after-the-fact explanation of "addiction" for his criminal, deviant behavior rings hollow because he did not seek or receive counseling, therapy, or sex offender services when he was caught in January to when he was detained March 2016. Even if the Court were inclined to consider this excuse, rehabilitation is a relevant factor for supervised release. *Tapia v. United States*, 564 U.S. 319, 335 (2011); 18 U.S.C. § 3562(a)

### 6. Fuechtener's stated concerns about custodial treatment are incorrect.

Fuechtener's concerns about custodial treatment demonstrates a lack of understanding about how the Bureau of Prisons (BOP) classifies sex offenders. The BOP takes the safety of its prisoners exceptionally seriously and has adjusted their sex offender units specifically to ensure prisoner protection. The BOP houses sex offenders only with other non-violent offenders, and places sex offenders within these units at much higher rates, *i.e.* a 3 to 1 ratio of sex offender to other non-violent offender. This formula has

---

[6] Contrary to Fuechtener's assertions, had the State charged him for his conduct in this case, he could face 16 years to life imprisonment based on the facts that he admitted. After speaking with the district attorney's office, the government is aware of no case where a defendant convicted of more than a single count of possession has received probation. The state's charging scheme would mean that Fuechtener would face nine counts of possession of child pornography under NRS § 200.730 (one count for each device) each carrying a sentence of one to six years. He would face two counts under NRS § 200.725, for his acts of advertising and distribution, each carrying a sentence of one to 15 years imprisonment. For his chats on Skype, he would face prosecution under NRS § 200.710 or NRS § 200.720, and be subject to a mandatory minimum sentence of five years and up to life. And, his chats on Grindr would subject him to prosecution under NRS § 201.560, which carry a sentence of one to 10 years. Because each of these acts occurred at different times, with different people, each of these counts could run consecutively.

effectively eliminated acts of violence against sex offenders. Thus, Fuechtener's assertions in this regard should carry no weight in the Court's consideration of his sentence.[7]

**7. Harder's report lacks sufficient indicia of reliability to support its conclusion and is misleading at best.**

The government asks that the Court give no weight to Harder's report, as it lacks "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

    A. <u>Harder's almost exclusive reliance on Fuechtener's statements during the interview,[8] which contradict the evidence, his admissions, and prior testimony, renders the conclusions of the report meaningless.</u>

Rather than reviewing any relevant documents such as 302's or the PSR, which would have given Harder a basis to challenge Fuechtener's boldface lies, Harder instead relied almost exclusively on his interview with the only person in this case who has an obvious incentive to lie, and minimize or distort his behavior. Fuechtener deceived Harder.

For example, Harder says Fuechtener takes "full responsibility" for his actions, but then almost immediately quotes Fuechtener minimizing his own actions by blaming "bad people" for his behaviors.[9] Fuechtener's latest excuses contradict previous denials he provided to law enforcement and Chambers, whereby Fuechtener initially blamed an individual named "Ferrell" for downloading the child pornography, before later claiming that his friend "Joel" likely downloaded it. The government has lost track of all the people

---

[7] Moreover, Fuechtener's characterization of himself as "timid, passive, soft-spoken, [and] unassertive" is in direct conflict with the behavior he has demonstrated in front of this Court.
[8] The government intends to prove the falsity of many of these statements, separate and apart from the statements the Court already knows to be false, at sentencing.
[9] Fuechtener's sentencing memorandum also repeatedly suggests that there were multiple unindicted coconspirators. This is false. Frank Alfter is the only unindicted co-conspirator in this case. As the government made abundantly clear during trial, Alfter was a co-conspirator on the possession count *only*, based on a thumb drive containing child sexual abuse material found in Alfter's closet. Fuechtener had joint possession of this item.

that Fuechtener has blamed.[10] The forensic evidence in this case shows that Fuechtener lied to Harder when he said he only began viewing child pornography in 2015. Had Harder reviewed the evidence, he would have known Fuechtener's computers contained evidence of child pornography downloads beginning in at least 2007.[11] Because Harder's reflections on Fuechtener are firmly tethered to demonstrable lies, they are unhelpful to the Court.

Dismissing any concerns about honesty because honesty allegedly has not been shown to reduce risk assessments, Harder concludes that Fuechtener's lack of honesty was "almost irrelevant." Harder fails to explain how honesty could be irrelevant in assessing recidivism risk (e.g., if a defendant lies about having committed hands on offenses, Harder would still rate that person a low risk of recidivism without taking into account those facts). The Court should disregard Harder's report because it relies on lies.

        B.  <u>The psychosexual tests used by Harder lack sufficient indicia of reliability to measure for recidivism in this case.</u>

The government asks that the Court give no weight to any predictions of recidivism because those predictions rely on the STATIC-2002R and VASOR-2 tests, which are not to be used with child pornography offenses. "The STATIC–99 [the predecessor to the STATIC-2002R] and most other risk assessment scales have not been normed for individuals possessing child pornography." *United States v. Robinson*, 669 F.3d 767, 770 (6th Cir. 2012). The coding rules <u>explicitly</u> state that the STATIC-2002 "should not be used" for "offenders" charged or convicted of "crimes relating to child pornography". Phenix, et al., *Coding Rules for Static-2002*, at 21-22[12] ("*Static-2002*") So too with the VASOR-2. McGrath,

---

[10]   At a minimum, this list included Alfter, homeless people, hackers, and a rival magician.
[11]   Harder also curiously refers to the admitted facts in the plea agreement as allegations. This too should give the Court considerable pause.
[12]   Available at http://www.static99.org/pdfdocs/static2002codingrules.pdf.

et al., *VASOR-2 Vermont Assessment of Sex Offender Risk-2 Manual*, at 1[13] ("*VASOR-2*"). This is apparent when the measured "risk factors" look at *past hands-on sexual violence* and *convictions* as predictors of future *convictions* for sexual violence.[14]

But even if the tests could measure "recidivism," this is a misleading term. Recidivism does not mean reoffending according to the STATIC-2002R and VASOR-2. **The tests define recidivism as the likelihood of a future charge or conviction for a hands-on sex offense.** *See* Static-2002, at 109; VASOR-2, at 3. Therefore, to raise recidivism risk, the tests require Fuechtener to commit a new hands-on sex offense, get caught, and get charged or convicted. This is the direct opposite of the Court's concern.

The Court's goal in assessing recidivism is to determine if Fuechtener will commit *any* sex offense, including child pornography offenses. The tests' definition of recidivism would always end the inquiry at the first question in child pornography cases, or cases in which a defendant had sexually assaulted 100 children but had never been charged. To be sure, *any* person who has not been caught[15] for hands on sex offenses will *always* score as a low-risk of reoffending. These tests are thus inherently unreliable as a recidivism measurements because they are validated on an absurd definition of recidivism. Therefore, even if these tests were appropriate for use in this case, they offer no help to the Court.

Sex offenses are the most-under reported crimes in society, even more so with child victims. With few exceptions, child pornography offenses are committed in secret and are difficult to detect until the offender begins to distribute, as was the case here. And the Court knows, Fuechtener went much further than distribution. The STATIC-2002R and VASOR-

---

[13] Available at http://www.robertmcgrath.us/index.php/risk-instruments/vasor-2/.
[14] The government requested the coding forms on February 17, but has not received them.
[15] These tests and their exceptionally narrow use provide little consolation to children who are violently raped by sexual predators who have not yet been convicted of the hands-on offenses.

account for none of this because they were designed to measure something else entirely. Thus, the government asks that the Court disregard the Harder's report and its resultant conclusions, and any testimony provided by Harder should he appear at sentencing, as lacking "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

### C. Harder omits the most recent research regarding child pornography offenses.[16]

Harder failed to utilize "the single biggest predictor of sexual offense recidivism" – phallometric assessment (penile plethysmograph), which "involves the direct monitoring of sexual response when viewing or listening to sexual stimuli." Hanson, R.K., Morton, K.E., & Harris, A. Jr., (2003). *Sexual Offender Recidivism Risk: What We Know and What We Need to Know*. That Harder failed to administer this test, or even consider it, is suspect.

Harder's conclusions fail because, even when he cites certain studies, he selectively omits crucial details. Harder omits a study in 2015 that utilized an average period of approximately eight years. The results of this study found the total recidivism rate (new contact offenses and child pornography offenses) to be 16%. Seto, M. C., & Eke, A. W. (2015, April 6). *Predicting Recidivism Among Adult Male Child Pornography Offenders: Development of the Child Pornography Offender Risk Tool (CPORT)*. This number is <u>eight times larger</u> than the figure selectively singled out by Harder. ECF No. 329, Ex. A at 11.

Harder omits that many researchers are limited by relying upon new criminal *charges or convictions* and not the actual behaviors of the offenders; results do not capture offenders who commit new offenses undetected. It is widely accepted that sexual crimes are commonly underreported, especially among child victims. Thus, virtually all significant

---

[16] At the Court's request, the government will produce the cited psychology articles.

research into recidivism rates of sex offenders relying on criminal charge and conviction data agree that any results *are likely significantly lower than the true rate*. Hanson, Morton, & Harris ("How to interpret the observed rates, however, remains debatable given that most sexual offences never appear in official records.") And, the likelihood that sexual assault will be reported to authorities decreases with victim age. Kilpatrick, D.G., Saunders, B.E., & Smith, D.W. (2003). *Youth Victimization: Prevalence and Implications*; Sorenson, T., & Snow, B. (1991). *How children tell: The process of disclosure in child sexual abuse*.

   Harder omits that additional research has identified more problems with relying on criminal *charges or conviction* data to determine the relationship between online child pornography offenders and contact sexual offenses. A publication that examined over 20 separate studies found that virtually every study which relied solely on arrest or conviction data resulted in *substantially lower rates of contact offenses by online child pornography offenders than those which incorporated additional data* (e.g., use of additional investigative techniques, sex offender treatment programs). Seto, M. C., Hanson, R. K., & Babchishin, K. M. (2011). *Contact sexual offending by men with online sexual offenses*. In fact, some of the studies utilizing this additional data revealed contact sexual offense rates among online child pornography offenders higher than 50%, with one study as high as 85%. *Id.*

   Harder ignores the Screening Scale for Pedophilic Interests (SSPI), developed in 2001 and revised in 2015, which included child pornography as a fifth item on the scale in addition to the items referenced in Harder's report (i.e., male victims, young victims, and strangers). Seto, M.C., Stephens, S., Lalumiere, M.L, & Cantor, J.M. (2015). *The Revised Screening Scale for Pedophilic Interests (SSPI-2): Development and Criterion-Related Validation*. "Recent research suggests that child pornography offending is a valid and perhaps *independent* indicator of pedophilia," and that the revised version (SSPI-2) "was

significantly associated with phallometrically assessed sexual arousal to children." *Id.* (emphasis added). Thus, by relying almost exclusively on Fuechtener's self-reporting, Harder not only excluded the very item for which Fuechtener has been convicted, but also the one item that can be an independent diagnostic indicator of pedophilia.

Harder erred when he relied on Fuechtener's claim of adult pornography preference, as this cannot be considered the foremost indicator of his sexual. A publication that examined the behavioral patterns of over 250 online child sex offenders found it was *common* for these offenders to possess adult pornography. In fact, of the cases which could be determined, over 80% of online child sex offenders also possessed adult pornography. Shelton, J., Eakin, J., Hoffer, T., Muirhead, Y., & Owens, J. (2016). *Online child sexual exploitation: An investigative analysis of offender characteristics and offending*.

The Court should not rely on Harder's report or his conclusions.

### III. Conclusion

The government requests that this Court sentence Fuechtener to 365-months' imprisonment and a lifetime term of supervision. Based on the totality of circumstances, 365 months is sufficient but not greater than necessary to meet the goals of sentencing.

DATED this 25th day of February, 2019

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

//s//

ELHAM ROOHANI
Assistant United States Attorney

# Exhibit A

*United States v. Stone*, 575 F.3d 83 (1st Cir. 2009)

*United States v. Spoor*, 904 F.3d 141 (2d Cir. 2018)
*United States v. Rosenberg*, 423 F. App'x 54 (2d Cir. 2011)
*United States v. Davis*, 402 F. App'x 607 (2d Cir. 2010)

*United States v. Stabile*, 633 F.3d 219 (3rd Cir. 2011)
*United States v. Elston*, 423 F. App'x 190 (3d Cir. 2011)
*United States v. Humanik*, 415 F. App'x 404 (3d Cir. 2011)

*United States v. Strieper*, 666 F.3d 288 (4th Cir. 2012)
*United States v. Garcia*, 402 F. App'x 768 (4th Cir. 2010)

*United States v. Rios*, 477 F. App'x 209 (5th Cir. 2012)

*United States v. Gamble*, 709 F.3d 541 (6th Cir. 2013)
*United States v. Gamble*, 709 F.3d 541 (6th Cir. 2013)
*United States v. Alhakk*, 505 F. App'x 51 (6th Cir. 2012)
*United States v. Bailey*, 420 F. App'x 559 (6th Cir. 2011)
*United States v. Warner*, 399 F. App'x 88 (6th Cir. 2010)

*United States v. Mantanes*, 632 F.3d 372 (7th Cir. 2011)
*United States v. Armes*, 415 F. App'x 729 (7th Cir. 2011)
*United States v. Coopman*, 602 F.3d 814 (7th Cir. 2010)
*United States v. Maulding*, 627 F.3d 285 (7th Cir. 2010)
*United States v. Rodgers*, 610 F.3d 975 (7th Cir. 2010)

*United States v. Manning*, 738 F.3d 937 (8th Cir. 2014)
*United States v. Pappas*, 715 F.3d 225 (8th Cir. 2013)
*United States v. Koch*, 625 F.3d 470 (8th Cir. 2010)
*United States v. Bauer*, 626 F.3d 1004 (8th Cir. 2010)
*United States v. Sampson*, 606 F.3d 505 (8th Cir. 2010)

*United States v. Ilgen*, 417 F. App'x 728 (10th Cir. 2011)
*United States v. Regan*, 627 F.3d 1348 (10th Cir. 2010)
*United States v. Goldberg*, 295 F.3d 1133 (10th Cir. 2002)

*United States v. McDaniel*, 631 F.3d 1204 (11th Cir. 2011)
*United States v. Wayerski*, 624 F.3d 1342 (11th Cir. 2010)
*United States v. Turner*, 626 F.3d 566 (11th Cir. 2010)
*United States v. Alfaro-Moncada*, 607 F.3d 720 (11th Cir. 2010)
*United States v. Sarras*, 575 F.3d 1191 (11th Cir. 2009)

**CERTIFICATE OF ELECTRONIC SERVICE**

This is to certify that the undersigned has served counsel for Defendant with the foregoing by means of electronic filing.

February 25, 2019

                                        //s//
                                 ELHAM ROOHANI
                                 Assistant United States Attorney