RUSSELL E. MARSH, ESQ.
Nevada Bar No. 11198
SUNETHRA MURALIDHARA, ESQ.
Nevada Bar No. 13549
WRIGHT MARSH & LEVY
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101
Phone: (702) 382-4004
Fax: (702) 382-4800
Email: russ@wmllawlv.com
        smuralidhara@wmllawlv.com

Attorneys for Jan Rouven Fuechtener

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAN ROUVEN FUECHTENER,<br><br>Defendant. | Case No. 2:16-cr-00100-GMN-CWH<br><br>**Mr. Fuechtener's Response to the Government's Sentencing Memorandum** |

Certification: This response is timely filed.

Defendant Jan Rouven Fuechtener, by and through his attorneys of record, Russell E. Marsh, Esq. and Sunethra Muralidhara, Esq., Wright Marsh & Levy, hereby submit this Response to the Government's Sentencing Memorandum for consideration.

### Memorandum of Points and Authorities

*Justice is not only the absence of oppression — it is the presence of opportunity. Justice is making sure that every young person knows that they are special and their lives matter. Justice is living up to the common creed that I am my brother's keeper and I am my sister's keeper. Justice and redemption go hand in hand.*

President Barack Obama, July 2015 Speech at the Annual Convention of the NAACP Regarding Prison Reform.

*We'll be very tough on crime, but we will provide a ladder of opportunity to the future.*

President Trump, January 11, 2018, Remarks by the President from the Roosevelt Room about Prison Reform.

## I.    Response to the Government's Sentencing Memorandum

The government ignored these calls from both presidents.  The government's only position in this case is to severely punish Jan by asking for a 365 month—almost 30.5 year—sentence.  It appears U.S. Probation and the government do not want to provide Jan with an opportunity of a future, in spite of this Country's dedication to swift punishment *and an opportunity* for reformation. The government wants to foreclose a second chance for this first-time offender because it believes Jan a liar and disputer; someone incapable of taking responsibility for his actions.  And mainly because of this, he should serve 30 years in prison instead of a reasonable sentence less than one-half or one-third that long called for by the circumstances of this defendant and case.

In support of its request, the government touts Jan's online chats, his alleged lack of acceptance of responsibly and attempts to withdraw his plea, and statements made to Dr. Mark Chambers.  The government also cites to Jan's celebrity status and "unabash[ed] behavior" as grounds for the severely long incarceration request.  ECF No. 325 at 13.  In the government's eyes, the consummation of all of this conduct must be put in check by a heavy-handed sentence with no room for critical thought about the man standing before this Court: about why he is here, about rehabilitation, or about how similarly situated defendants have been treated.

There is nothing redeeming or even understandable about these types of crimes.  But our system of justice requires the Court to remove emotion and vengeance from consideration and sentence the defendant standing before us, with the shortest sentence that will further the goals of federal sentencing.  *See* 18 U.S.C. § 3553(a) (the "court shall impose a sentence

2

sufficient, but not greater than necessary… [the so-called 'parsimony' principle of federal sentencing]").

Jan asks this Court to set aside the government's emotional plea for a 365-month prison sentence. There is a need for punishment. There is also a need for justice. But there is also a need to provide a ladder of opportunity for Jan's future after he has served his sentence. That ladder of opportunity begins now with a 96-month sentence.

## II.     The Buck Stops Here—Additional Arguments in Support of Mitigation.

Jan is a highly intelligent, warm, and caring person. He can critically think about magic and how to create his next best illusion. He created the dropping swords illusion where he lays cuffed to a metal sheet while an audience member pulls strings that release swords, four of which will not impale him and one that would pierce his heart. He has done so much for the Las Vegas community through his charitable giving and ability to bring people together for a love of magic. He has been a productive member of society with no prior criminal history.

Because he is naïve, he is subject to people taking advantage of him. He has a need to please others.  He seeks affirmation and looks for reward. He cannot be faulted for this as many of us seek attention and affirmation from our peers. But his need to please others serves as a basis for the instant conduct. Since the age of 15, he has been with his now husband, Frank Alfter. Frank, who is much older, has provided guidance, support, and love to Jan. Frank was Jan's protector. Frank made all the decisions—business and otherwise. He sheltered him from outside forces who he knew could take advantage of Jan, became Jan's business manager. He oversaw and facilitated Jan's life and career: financially, physically, and emotionally. It is no coincidence that a majority of the conduct here occurred when Frank was absent from Jan's life.

From 2015-2016, when the offense conduct occurred, Jan was associating with people who used methamphetamine and who watched, received, and distributed child pornography.

3

He was introduced into a whole new world he never knew existed. Once involved, he began to understand the immorality and illegality of his conduct. What he didn't fully understand was his own culpability in facilitating and allowing others to perpetrate this conduct, which make him just as culpable in the American justice system.  Now Jan is finally able to accept full responsibility for his actions.   Jan recognizes that the government will not allow for an additional two-level reduction pursuant to the plea agreement because of his attempts to withdraw the plea.   Nonetheless, he wants the Court to recognize that his critical misunderstandings led to every decision made at the trial level.

With his new counsel, he recognizes the scope of his conduct and how he is culpable. Associating with the wrong crowd coupled with methamphetamine use perpetuated the illegal conduct in this case.  Now sober, and with a vow never to use drugs again, Jan can confidently say he will never possess, receive or distribute child pornography again.[1]  He is remorseful for his conduct.  He is apologetic to the victims because he now realizes that by possessing child pornography one is re-victimizing an abused child.  Jan does believe he needs substance abuse treatment and mental health counseling.  *See* Harder Report at 8.  He believes that these types of counseling will provide self-reflective and critical thinking that he will use in evaluating social situations, and learning not to follow a crowd.

### A.   Jan is a humble man and the government's erroneous statements to the contrary are unsupported

Jan is an extremely humble man.  The government falsely concludes that Jan's "celebrity status…and…wealth emboldened" his behavior and made him think he was "untouchable" or "that money and his fame would save him."  ECF NO. 325 at 13-14.  Given

---

[1]      Jan elaborates on this in a supplement filed under seal for the Court's consideration.

4

the lengthy record in this case, the government cannot point to one instance where Jan used his status in that way.

Jan and Frank immigrated to this country after selling everything they owned in Germany. They did this in an effort to pursue a magic career together. While Jan grew up affluent, he never looked down upon those who couldn't afford nice things. He helped where and when he could. When Jan came to America he and Frank had to hustle. They hustled to find magic opportunities to grow Jan's career. The hustle was not easy and the two of them struggled. When they landed "Illusions" at the Tropicana, they still had to run the show as a business. The Tropicana was not paying them to headline. They in fact had to pay the Tropicana for housing the show.

Now, the government makes a baseless accusation without full investigation. Specifically, the government notes that Jan was featured in a Netflix documentary called "Magicians: Life in the Impossible." The government wrongly concludes that Jan likely "will receive royalties" from this movie and needs harsher punishment to unwind his fame and fortune. ECF No. 325 at 19 n. 18.[2]

Jan and Frank were asked to be a part of this documentary. They participated for free. They will make no royalties off this movie. This documentary gives you a different perspective into the magic community and to a side of Jan that the government refuses to see. At one point

---

[2]     A copy of this documentary will be provided in a notice of manual filing and submitted to the court for review. While the Court may want to watch the entire documentary, we provide the timestamps that feature Jan.
- 6:20-8:40
- 14:50-19:00
- 37;40-41:40
- 44:30-48:00
- 58:00-1:00:40
- 1:14:30-11:19:20

5

in Jan's career, and as told in this documentary, Jan finds out that rival magician Criss Angel has taken one of his illusions.  Frank protests that this is unfair and wants to pursue litigation.  It is Jan who says they must let it go and just work to be better.

Jan continues to be better daily.  Since his incarceration at Pahrump, Jan has taken as many courses as he can.  For example, he has completed the Victim Impact course and "Unlock Your Thinking":  two programs that have given him a better understanding of victimization.  He was also a porter, making a modest prison salary.  As a porter, and because of his caring and humble demeanor, his counselor asked him to be another inmate's personal porter.  This other inmate was wheelchair bound and suffering from a spinal tumor.  Every day, Jan would assist this inmate from his bed to his wheelchair, help him go to the bathroom, assist in personal hygiene, play cards with him, and help with his medical needs.  Jan enjoyed helping this inmate and never felt like the job was beneath him.

Jan obtained a job to keep busy.  He had no idea that these jobs paid and that he could use the funds for the jail commissary.  Jan is fortunate to have family financially supporting him while he is in custody.  He has turned down a paid job to allow others in need of financial income to work these paying positions.  But Jan's humility doesn't stop there.  Jan works for free.  He helps his fellow inmates with the daily cleaning and porter assignments.  He is a team player who is finding opportunities to rehabilitate.

Most notably, Jan has started a small group session where he teaches fellow inmates how to speak German.  "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it

1   directed courts to consider, as a necessary sentencing factor, the history and characteristics of

2   the defendant." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D. N.Y. 2006).

### B.   Jan is Not "In A League Of His Own"; 96 Months Is an Appropriate Sentence Given Similarly Situated Defendants.

4       The government contends that Jan is in his "own league" when it comes to the offense

5   conduct in this case and as such it requests a 365-month sentence.  ECF No. 325 at 16 n.14.

6   The government's contention is contradicted by the results of other prosecutions for similar or

7   the same conduct and even far worse conduct. The following table summarizes the key facts of

8   defendants whose conduct is similar in nature to Jan's—or arguably far worse.

| Case Name/No. | Counts Indicted | Counts Pled | Ultimate Sentence | Other Notable Facts |
|---|---|---|---|---|
| Ryan Austin Rother  2:17-cr-148-JAD-GWF | Possession | Possession (no plea agreement) | 68 months | • Defendant possessed 15,676 images; 40 videos; 61,480 age difficult images; 126 age difficult videos.  • Defendant was on pre-trial supervision.  • 39 devices were seized and child porn was found on 4 of those devices.  • 3000 images included infant/toddler  • 300 images depicted bondage and violence.  • Government requested 84-month sentence based on a total offense level of 28/CHC 1.  • Defendant requests 24 months. |
| James Karman Ryan  2:15-cr-00118-KJD-VCF | Receipt | Possession | 78 months with self-surrender | • During search, Defendant barricaded himself in his room and began deleting files.  • Multiple devices seized; 7,915 images and videos found with 4,687 images and videos to be child sexual abuse |

7

| | | | | |
|---|---|---|---|---|
| | | | | • Defendant released on pre-trial supervision. |
| Fredy Hernandez-Gomez[3] 2:18-cr-00282-KJD-VCF | Coercion & Enticement 18 U.S.C. 2422(b) | Receipt | 96 months | • 13-year-old autistic child "sucked [defendant's] penis"<br>• Same victim texted sexually explicit images of herself to defendant.<br>• Plea agreement finds total offense level 28; Court found CHC I; 78-97-month guideline range.<br>• Parties jointly recommend 96-month sentence concurrent to an attempt sexual assault case prosecuted in Nevada State Court. |
| Randy Wren 2:17-cr-249 (D. Nev.) | Coercion and enticement under 18 U.S.C. § 2422(b) | Receipt | 97 months | • Defendant used coercive tactics to make victims send him pornography pictures of themselves (juveniles) |
| Jack Leftley 2:18-cr-0064-RFB-VCF<br><br>(D. Nev.) | | Possession Receipt | 84 months | • Defendant's guidelines range is 108-135 (31/I);<br>• Government agreed to a treaty transfer;<br>• Government agreed to recommend a 108-month sentence. |
| Jason Ivaska 3:17-cr-00004 (N.D. Georgia) | Possession Receipt | Possession | 57 months | • Government seized multiple digital devices from his residence;<br>• Devices contained more than 76,000 still images and 2,700 videos<br>• Ivaska was released on pre-trial supervision |

---

[3]   According to the DOJ press release, the defendant in this case reportedly sexually abused an autistic 13-year-old.   *See*   https://www.justice.gov/usao-nv/pr/las-vegas-man-sentenced-eight-years-prison-soliciting-and-receiving-sexually-explicit

8

| Kenneth Shipp[4]  1:16-cr-00241 (N.D. Georgia) | Possession Distribution | Distribution | 97 months | • Involved P2P file sharing  • Multiple electronic devices seized  • Defendant had 447,268 images and 19,395 videos  • **Defendant had more than 60 terabytes of child porn**  • Released on pre-trial supervision  • Joint recommendation by plea agreement for 97 months |
|---|---|---|---|---|
| Jay Robert Sebben  4:18-cr-00076 (S.D. Iowa) | Possession Receipt | Receipt | 130 months | • 19,000 images and 490 videos |
| Richard Patrick Person[5]  (D. Wyoming) | Possession | Possession | 235 months | • Multiple devices seized  • The computing devices seized had approximately 47 terabytes of storage capacity. To put that in perspective, 1 terabyte holds approximately 1000 hours of standard definition video – or approximately 310,000 photos. |

     While the above individuals did not proceed to trial and rather pled straight up or accepted a plea deal, the amount of child pornography at issue and defendants' conduct is arguably worse than in Jan's case.  Even with these individuals receiving a three-level reduction for acceptance of responsibility, the government's 365-month request is excessive.

---

[4]     https://www.justice.gov/usao-ndga/pr/jonesboro-man-sentenced-prison-distributing-child-pornography

[5]     Most entries on this case docket are sealed.  Counsel is unable to obtain any additional facts other than what was reported in the news.  https://www.eastidahonews.com/2016/08/wyoming-resident-sentenced-possessing-largest-collection-child-pornography-u-s/

1    The government contends that Jan's case is most similar to Scott Alva.  *See* ECF 325 at

2   17 n.15.  Mr. Alva was originally charged in a four-count indictment for possession, receipt,

3   transportation and advertising child pornography.   Case No. 2:14-cr-00023-RCJ-NJK.   Mr.

4   Alva was originally released on a personal recognizance bond.   Due to pre-trial release

5   violations, he was later detained.   Upon review of Mr. Alva's docket, it appears that he is a

6   violent and defiant individual.  Magistrate Judge Koppe issued a minute order on June 29, 2017

7   requiring that Mr. Alva be shackled in court because of his clear pattern of defiant behavior

8   towards correctional officers, his previous disruptive courtroom behavior and threatening of

9   U.S. Marshals.  *Id.* at ECF No. 194.  Ultimately, a jury found him guilty of three counts.  Mr.

10   Alva used a P2P file sharing program to possess, receive, and advertise in child pornography.

11   Nine devices were seized and all contained child pornography.  Mr. Alva's child pornography

12   images totaled 28,403 images and 2,851 videos.  1,566 videos exceeded five minutes in length,

13   167 images depicted bondage, 1,136 images and videos depicted infants, and 20 image and

14   video depicted bestiality.  Mr. Alva was subject to a 15-year mandatory minimum sentence

15   because of his advertising conviction.

16    Mr. Alva had a criminal history category II.[6] According to the government, Mr. Alva

17   subscribed to sovereign citizen theories, claimed that he was the only true victim, noticed

18   fictitious alibi defenses at trial in order to falsely fabricate an alibi, was obstreperous during the

19   entire litigation, and attempted to manipulate the fact-finding function of trial.  *See Id.* at ECF

20   No. 320.  Given the facts of his case and his conduct during prosecution, Judge Jones sentenced

21   Mr. Alva to 293 months.

22    In stark contrast, Jan is not a sovereign citizen.  He has never engaged in disruptive

23   courtroom behavior, never threatened others, never claimed he was the only victim, and never

24

25   _____

26    [6]    Mr. Alva's criminal history is unknown to defense counsel.

fabricated evidence in an attempt to claim innocence.  He did seek to withdraw his plea, but that was on constitutional grounds:  ineffective assistance of counsel and due process.  ECF No. 194.  He properly exercised his constitutional rights given his understanding and belief of the charges against him alongside his counsels' advice.  Additionally, Jan's bench trial never concluded because he accepted the government's plea offer.

When reviewing child pornography cases that went to trial, it is still clear that the government's 365-month request remains excessively harsh in comparison to other defendants with similar or worse offense conduct.  The table below summarizes defendants within our District who were convicted with similar or worse offense conduct who were found guilty at trial.[7]

| Case Name/No. | Jury Verdict | Ultimate Sentence | Other Notable Facts |
|---|---|---|---|
| Anousone Savanh 2:14-cr-290-KJD | Receipt | 210 months | • Defendant was obstreperous and perjured himself on the stand; <br>• He confessed yet proceeded to trial; <br>• Unable to show any level of remorse. |
| Andrew Gibson 2:14-cr-287-KJD | Receipt | 168 months | • Defendant watching CP since he was 12 years old; <br>• Masturbated daily; <br>• 3 devices had 307 images/201 videos; <br>• Defendant represented himself at trial; <br>• Severely abused as a child; <br>• Defendant autistic; <br>• Exhibited some acceptance of responsibility (according to the government). |
| Frankie Peraza 2:14-cr-229-APG | Receipt | 150 months | • Defendant represented himself at trial; <br>• 4-day jury trial; <br>• More than 8,300 depictions of CP; |

---

[7]   All information contained within this table stems directly from each defendant's court docket and publicly available documents—namely, a complaint, available transcripts, and the government's sentencing memorandum.

11

| | | | |
|---|---|---|---|
| | | | • Defendant was never sexually abused a child;<br>• Defendant **twice** refused to participate in a court ordered psychosexual evaluation;<br>• Defendant went to a change of plea hearing twice, continually insisted that there were no victims, and delayed and stalled;<br>• Defendant confessed, signed a plea agreement, and had two colloquies wherein he admitted to the offense conduct, yet still put the government to its burden. |
| Ian Pincombe<br>2:14-cr-178-JAD | Possession<br>Receipt<br>Coercion<br>and<br>Enticement | 240 months on Possession and Receipt; 300 months concurrent on Coercion and Enticement | • **Government argued for the +5 enhancement for pattern of activity;**[8]<br>• **The Court refused to apply the +5 for said enhancement;**<br>• Defendant self-filmed him viewing CP and masturbating as he narrated;<br>• He trained to become a child therapist;<br>• He had a "sovereign citizen" mentality;<br>• Defendant refused to even engage with his lawyers;<br>• Probation called him a "predator of the worst kind";<br>• Government and U.S. Probation requested a 365-month sentence and the government suggested that life would be possible. |

Most of these defendants refused to acknowledge the jurisdiction and authority of the district court. Most perjured themselves on the stand and refused to follow court orders.

---

[8]    Defense counsel is unaware of the type of conduct that supported this enhancement other than it pertained to internet chats.

Probation called Mr. Pincombe a sexual predator of the worst kind who was known to physically assault children.  He even went so far as to train to become a therapist for children.

Most notably, Mr. Pincombe was convicted of three offenses—possession, receipt, and coercion and enticement—and U.S. Probation recommended the +5 enhancement for pattern of activity, claiming there were chats that supported this enhancement.  At sentencing, the government indicated that there needed to be two or more separate instances of sexual abuse or sexual exploitation of a minor.  In support of this enhancement, the government used: 1) Mr. Pincombe's instant coercion and enticement conviction where he specifically chatted with a UC agent regarding sexual encounters with minors; 2) family court filings regarding Mr. Pincombe's prior sexual abuse towards his own child; and 3) the government's evidence that Mr. Pincombe had produced child pornography by directing another individual to take picture of a 5-year-old child.  The government indicated that these photographs were not commercially available or downloaded online and that all of this information supported the +5 enhancement for pattern of activity.[9]

At sentencing, Judge Dorsey **did not** apply the +5 enhancement.  Instead, she found that there were too many levels of hearsay and that it would require too much speculation on her part.  *See* 2:14-cr-00178, ECF 228, Transcript of Sentencing at 18-25.  Had the court applied the 5-level enhancement, Mr. Pincombe would have had a total offense level of 41 and a criminal history category I, yielding a Guideline range of 324-405 months.  However, the court found that it did not apply, thus yielding a range of 188-235 months based on a total offense level of 36 and criminal history category I.  Before the court's change to the Guidelines, Probation had recommended 365-month sentence.  After the change, Probation and the government still recommended 365 months based on an upward variance.  The government

---

[9]     *See infra* Section II(C) regarding further argument pertaining to the +5 enhancement for pattern of activity.

13

then invoked the rebuttable presumption that there was some degree of undue influence that existed because the defendant was 32 years older than the minor child and as such this warranted an upward departure.  Judge Dorsey pronounced a 300-month sentence.  She commented at sentencing: "I can confidently say that Mr. Pincombe is one of the most dangerous defendants that I have sentenced." *Id.* ECF No. 228 at 61.

The government also points out that the Ninth Circuit has affirmed 120-month sentences for defendants with single counts of conviction.  *See* ECF No. 325 at 17:8 (*citing United States v. Gillespie*, 463 Fed. App'x. 692 (9th Cir. 2011).  In *Gillespie*, the Ninth Circuit held that a 120-month sentence was not substantively unreasonable for a possession of child pornography case.  *Id.*  This argument is unpersuasive and one-sided.  In contrast, counsel is aware of at least 114[10] cases where courts across the country have sentenced a defendant to either probation or only one day in custody for possession of child pornography cases.

Additionally, the government concludes that because the Ninth Circuit has given its "approval of a 30-year sentence on two counts of conviction" the government's current request is reasonable.  *See* ECF No. 325 at 17:14 (*citing to United States v. Aguirre*, 448 Fed. App'x 670 (9th Cir. 2011)).  In *Aguirre*, the defendant was convicted of receipt/distribution of child pornography.  The district court weighed all § 3553 (a) factors but found several aggravating factors that warranted a 30-year sentence.  Specifically, the defendant received the +5 enhancement for pattern of activity.  *See infra* Section II(C) for additional argument.  This enhancement was supported by the defendants unprosecuted sexual relationship with a 17-year old former student.  The defendant admitted to sexual intercourse with minor children.  In further support of a 30-year sentence, the defendant was formally diagnosed as a pedophile.  448 Fed. App'x. at 672.  At the time of sentencing, the defendant objected to the +5

---

[10]    For brevity, counsel does not include a string cite to 114 cases but will be able to provide the court with more information at the sentencing hearing should it be needed.

14

enhancement because the "relationships" he had with the minors were consensual.  In its sentencing memorandum in Aguirre's case, the government used internet chats between the defendant and another individual as further evidence in support of the +5 pattern of activity enhancement.  In those chats, the defendant admitted to having sexual conduct with other victims ages 4 and 12.  *See* 1:08-cr-00434, ECF No. 23.  Given this conduct, the Ninth Circuit held such a sentence was reasonable.

A sentencing judge must consider the individual before the Court and review this person's § 3553 factors.  Jan submits that 365-month sentence is excessively harsh and the court should consider a lower sentence.

**C.     The Parties Agreed to a +5 Enhancement for Pattern of Activity**

In the plea agreement, the parties agreed to a +5 enhancement for pattern of activity. The pattern of activity was applied based on internet chats as outlined in the plea agreement, ECF No. 146 at 6. *See also* ECF 325 at 10.  The government outlines three instances of sexual exploitation of a minor that qualify under the +5 enhancement.

1.     The Skype chat where "Fuechtener attempted to induce the other user to have sex with his minor daughter…" ECF 325 at 10.

2.     The Grindr chat referencing "drug[ing] a young." *Id.* The government's use of this chat, as agreed to in the plea agreement, shows that "Fuechtener conspired to commit sexual abuse on a minor…" *Id.*

3.     TFO Ahmed's trial testimony and Trial Exhibits 1, 2, 2B and 2C showing advertising of child pornography.

Jan does not contest the applicability of the +5 enhancement, but requests the court to consider others convicted under the same enhancement and vary downward. The content of the

instant chats pale in comparison to the chats used to enhance others' sentences. While he agreed

to that enhancement, the chats in his case meet the threshold level by the slightest degree.[11]

| Case Name | Chats used in support of +5 enhancement and the Court's Holding |
|---|---|
| *United States v. Rothenberg*, 610 F.3d 621, 625 (11th Cir. 2010) | **Chat 1:** "You ever try and do him?" "What's his age?" The answer given was 16, and Rothenberg declared: "HOT ... he's ready ... go slow and you can do it ... start with lubing him up and relaxing him with just one finger ... after a while, insert two fingers ... keep him relaxed ... suck his cock as u insert fingers ... so he associates feeling good with fingers up his ass ... begin slow ... it might take a couple of attempts ... he'll soon begin to enjoy it ... especially after a beer or two ... allow him to feel no guilt ... like it's a normal thing ... which it is."<br><br>**Chat 2:** In the chat that occurred on June 1, 2007, Rothenberg was having conversation with a person who described himself as a 30 year old divorced male with custody of two young sons, ages 8 and 11. First, with reference to the 11 year old child, Rothenberg declared: "[B]eautiful ... are you training him? ... any sucking or jacking yet? ... what a hot age ... let him sleep with u ... things will happen naturally ... put your hand on his and help him out ... you're so lucky to have that ... he's ready ... he wants u ... oh believe me ... you have the best of the best ... you can groom him any way u want ... I think he's basically wanting it ... just my guess ..." It was at this point the father disclosed that he also had an 8 year old son in his home. Rothenberg stated: "[O]h even nicer ... let him in the bed ... kiss him and show him affection while you guide him ... take all guilt and shame away ... its natural and its good ... if you just gently grasp his hand and show him how to sensually feel you ... it would be great beginning ... and you, of course, can do him ... all the while re-inforcing [sic] that it is natural and good for dads and sons to bond like that ... it's the ultimate in father/son bonding ... you don't need to say anything if u don't want to ... you can just have all non-verbal activity ... you can do so much without saying a word ... words will eventually come ... take it slowly ... he's very eager to |

---

[11]      *See supra* Section II (B) discussing *Pincombe* and *Aguierre*'s cases.

| | |
|---|---|
| | play with you sexually ... and that is so natural between dad and son ..." |
| | **Result:**  That the +5-enhancement applied because "the chats were specific instructions to adults with influence over young children; these graphic guides to sexual exploitation showed the adults both how, physically, to molest the children and how, emotionally, to persuade the children to comply with the abuse. Accordingly, the chats constituted "important action[s] leading to the commission" of inducing particular children to engage in illegal sexual activity." *Id.* at 627. |
| | **Sentence:  300 months** |
| *United States v. Bilus*, 626 Fed. App'x. 856, 878 (11th Cir. 2015) | **Both Chats: "**Bilus engaged in a series of Skype "chats" with individuals who were believed to be minors. The Presentence Report contains detailed summaries of five chats in which the other participants inform Bilus that they are underage. Some of the chats included video sessions during which Bilus and/or the other participant would masturbate. During some chats, Bilus asked the participant to take off her clothes and show him her private parts. During others, he told the other party that he wanted to perform sexual acts with her in person. On one occasion, he asked the other participant in the online chat where she lived, and whether she wanted him to visit her." *Id.* at 878.

"During one chat, Bilus asked the other participant where she lived and if she wanted him to visit her. During other chats, Bilus stated that he would have to "be careful" with the other participant if they met in person because of her age. ECF No. 117, at 9. He told some participants he wanted to have sex with them, and he described specific sex acts he wanted to perform." *Id.* at 879.

**Result:**  Followed the reasoning in *Rothenberg* and applying the 5-level enhancement.

**Sentence:  168 months** |
| *United States v. Stacy*, 269 Fed. App'x. 322, 324 (4th Cir. 2008) | **Chats:** "In one particular instant message conversation between Stacy and an individual who called himself "uncutdaddy32", Stacy set up a meeting with "uncutdaddy32" who agreed to bring his 12 year old daughter, who has multiple sclerosis and is confined to a wheelchair, to Stacy so that Stacy could sexually abuse her. Stacy organized the meeting at a specific Cracker Barrel restaurant at |

17

| | |
|---|---|
| | 5:00 p.m. on a specific date, described the type of car he drove, obtained the description of the vehicle "uncutdaddy32" drove so that they could identify each other, and planned the sexual abuse of "uncutdaddy32" 's 12 year old wheelchair bound disabled child. Further, a subsequent instant message conversation supports the Government's position that this planned encounter actually occurred. This conduct goes far beyond the mere Internet chat room banter Stacy claims."<br><br>The record also contains instant messaging conversations between Stacy and other individuals where Stacy and the individuals discuss the location of their homes, the distance between them, whether they are able to travel, and possible locations to meet so that Stacy could sexually abuse these individual's minor children. The district court correctly found that several of these instant message conversations constituted attempts to engage in unlawful conduct."<br><br>**Result:**  The 5-level enhancement was applied appropriately by the district court.<br><br>**Sentence: 360 months**<br><br>Of note: Defendant pled guilty to transmission, receipt and possession of child pornography, transportation of obscene matters over the internet and transportation of obscene matters for sale or distribution |
| *United States v. Stewart*, 462 F.3d 960 (8th Cir. 2006) | **Chats:**  Defendant posted "numerous website links depicting images of minors engaged in sexually explicit conduct. Using his undercover identity, the officer contacted daddiez_hands by initiating an Internet chat conversation, during which daddiez_hands identified himself as Jim, admitted posting the links, and stated that he collected such material on his computer. Daddiez_hands bragged about previous sexual assaults he had committed against an eight-year old girl and that he was dating a woman with a ten-year old girl, whom he was grooming for sexual encounters." *Id.* at 961.<br><br>"At sentencing, the government attempted to demonstrate the existence of a pattern of activity of sexual abuse or exploitation of a minor, introducing photographs from Stewart's computer showing K.L. partially nude and nude, with Stewart in some of the photographs with her, and statements made by Stewart in Internet chat room conversations. In those conversations, Stewart stated that |

| | he was sexually involved with K.L. and had also abused another young girl." *Id.* at 962.<br><br>**Result:**  The court applied the +5 for pattern of activity.<br><br>**Sentence:  300 months** |
|---|---|

In each of the above chats, the defendant's itemize specific requests, instructions, and guidance to others on how to sexually abuse a minor.  In one case, there was photographic evidence of defendant with a minor child as he perpetrated the abuse.

In this case, with regards to the Skype chat, the parties engage in back and forth conversation in an attempt to arrange a time to watch the sexual act.  The Grindr chat was short-lived with the question "shall we drug a young, lol" followed by "f*** yes."  There is no evidence that the acts in these chats actually occurred.  Further, Jan never directed, guided or itemized specific sexual requests in either of the chats like the above defendants.  The banter, while sufficient for the +5 enhancement, was superficial in that it never detailed the types of sexual perversions that needed to occur.

While the chats are used to enhance Jan's sentence 5 levels, it subsequently raises his sentencing exposure by more than 12.5 years.  As such, Jan requests this Court consider them in comparison to the egregiousness of the chats in the cases discussed and vary downward.

**D.    The government is asking this Court to sentence Jan extremely above sentences given to Murders, Kidnappers, Hostage Takers, and those Physically Abusing Children. Such a request is unjust.**

After review of the United States Sentencing Commissions Fiscal Year 2018 third quarterly data report, it is clear that the government wants to punish Jan more severely than those offenders punished for federal murder, kidnapping, hostage takering, and those physically abusing children.  *See*  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_FY18.pdf.

19

According to this report (Table 6) and after reviewing 50,928 (N) cases, the following are the mean and median sentencing for the above offenses.

| Offense | Mean (Months) | Median (Months) | N (cases of this type reviewed) |
|---|---|---|---|
| Murder | 300 | 300 | 49 |
| Kidnapping/Hostage Taking | 150 | 120 | 49 |
| Sexual Abuse | 135 | 120 | 457 |
| Child Porn | 151 | 100 | 1,343 |

Of the 1,343 child pornography cases, 29% of these cases were sentenced to a within guideline range, 0.2 % received an upward departure, and 61.4 % received a downward variance. *See Id*. at Table 10A. The Commission also studied downward variance cases and the degree of decrease for offenders in child pornography cases. Out of 801 cases reviewed, the mean sentence was 119 months and there was a mean decrease from the Guideline minimum of 110 months, which was a 40.6% decrease from the Guideline minimum. *See id*. at Table 16A. Child pornography defendants received the highest percentage of downward variances, especially considering they rarely received downward departures for substantial assistance. *Id*. at Table 10A.

The government is requesting this Court sentence Jan to 65 months over the mean/median sentence given to those convicted of federal murder. This request does not comport with the notions of just sentencing.

**E.    Jan is not minimizing his conduct by commenting on Germany's child pornography views**

The government's repetitive comments regarding Jan's minimization of his conduct in comparison to Germany's child pornography sactions is otherwise unavailing. "A defendant's

20

cultural background can provide important information to a sentencing judge that may justify a lower sentence…"  Ramirez (ed.), *Cultural Issues in Criminal Defense*, at 627 (2d ed. 2007). Jan was born and raised in Germany.  His morals, values, and conceptions of justice were formed based on German society and culture.  Jan does not contest that he has to follow the rules of the United States and is subject to criminal prosecution under its laws.  But his understanding of punishment given his cultural background and the society he was raised within is relevant in understanding his thought process and views when juxtaposed with the American Criminal Justice System.  Afterall, the U.S. didn't penalize child pornography as severely as it now does until 2003.  *See* ECF No. 329 at 13-14.   The government's attempt to associate Jan's cultural perspective as minimizing should be rejected.

While this Court cannot take into consideration a defendant's nationality when fashioning a just sentence, the court surely can consider why Jan's journey within our criminal justice system unfolded the way in which it did.  Upon consideration, the Court will not find adequate basis to punish him as the government requests.  He is not an experienced litigant trying to take advantage of the system.  He is not a manipulative person who took advantage of his prior, seasoned, counsel.  Rather his conduct can be explained because he brought with him his understanding of the German justice system.

German society believes child pornography and many other criminal laws should be punished less severely than American society does.  And, the converse is true.  The fact that his home country treats similar offenses less severely cannot translate into Jan's minimization of child abuse amounting to a lack of acceptance or a cavalier ideology.  There are numerous differences between the German and American justice systems that support Jan's understanding and decision-making ability.  Namely, in Germany, there is resistance to plea bargaining and the general feeling is that punishment should follow culpability.  Also, most criminal cases are

tried by a judge.  In the United States, most criminal cases are resolved by plea agreements and when cases go to trial they are usually tried by a jury.

As U.S. Probation readily researched, Section 184(a) of the German Code promulgates distribution of Pornography Depicting Violence or Sodomy.  It punishes a person to a maximum of three years or a fine.  Subsection (b) promulgates distribution, acquisition and possession of child pornography.  It punishes a person from three months to five years in custody.  *See* PSR ¶ 140.  The ways in which German child sexual abuse laws are legislated may not be as fine-tuned as the laws in the United States, which parses out varying levels of conduct and creates a spectrum of criminal liability.  For example, in October 2018, a German court sentenced a man to five and half year's custody for paying to watch children be abused via webcam.  For over two years, a man livestreamed a woman on webcam as she abused her young children and he gave her instructions on how to do so.  He transferred more than $3000 to facilitate the abuse.[12] In the United States, this same man would have faced potentially both state and federal offenses and surely would have served more than five and half years in custody, possibly life imprisonment under some state systems.

While ignorance of the law is no excuse—we all are presumed to know illegal conduct—we cannot presume to know how each jurisdiction around the world criminalizes various behavior.  For example, in Germany, crimes are divided into two categories: Vergehen, which are minor crimes; and Verbrechen, which are more serious crimes punishable by a minimum term of one year. While the former is sometimes translated in the U.S. to mean a "misdemeanor," this is not accurate because it includes many crimes of moderate-to-high severity that would be considered felonies in the U.S., such as burglary, forgery, extortion,

---

[12]    https://www.dw.com/en/german-man-sentenced-to-five-and-a-half-years-for-livestreaming-sex-abuse/a-43330106

aggravated assault, and many drug crimes. Richard Frase, Sentencing in Germany and the United States: Comparing Äpfel with Apples (Freiburg, Germany: Max Planck Institute for Foreign and International Criminal Law, July 2001), 5-6.  Jan's questioning and confusion during his entire legal proceeding can be explained in part by culture shock.  It is no excuse but serves as a basis for his conduct.  And the government's insinuation that this shows he is minimalizing is patently wrong.

The first 10 months of Jan's pre-trial detention occurred in Henderson where he was placed into solitary confinement.  He was housed with individuals who were charged with misdemeanors or low custodially sentenced felonies.  With the very little interaction he had with inmates, his understanding of the American criminal justice system was skewed and impractical.  But Jan did not know this at the time.  In retrospect, Jan reflects: he under-estimated his offense conduct because of what he was being told from the inmates around him. He did not recognize the difference between being a state and federal detainee.  He did not know the differences in sentencing exposure.  He did not hear about the U.S. Sentencing Guidelines from other inmates because the Guidelines didn't apply to the vast majority housed in Henderson's jail.  He got the wrong perception of his case and the seriousness of his offense. And for this, he cannot be entirely blamed or faulted.

### F.    The Child Porn Guidelines are not based on empirical evidence; As such a downward variance is appropriate

The first United States Sentencing Commission Guideline Manual was promulgated in 1987.  The discussion below is a breakdown of Jan's potential exposure over the years, and shows that the applicable range has increased by perhaps more than 1000% before any acceptance of responsibility is considered.

The **1987 Guidelines** does not provide for criminal liability for possession of child pornography.  The guidelines only criminalized sexually exploiting a minor by production of child pornography; transporting, receiving or trafficking in material involving the sexual

exploitation of a minor; or importing, mailing, or transporting obscene matters.  In 1987, Jan's appropriate guideline range might have fallen under importing, mailing, or transporting obscene matters.  Thus, Jan's base offense level would be 6, +5 levels considering an appropriate "loss amount", +4 for S&M, yielding a total offense level of 15.  For purposes of this calculation, counsel uses the government's restitution amount of $85,000. (Government's sentencing memorandum at 21).[13]   A total offense level of 15 with a criminal history category of I, would have yielded a **18-24-month sentence.**

The **1991 amendments** add U.S.S.G. § 2G2.4 for receipt or possession of materials depicting a minor engaging in sexually explicit conduct.  In 1991, Jan would have had a base offense level of 10, +2 for prepubescent minor, yielding a total offense level of 12.  With a criminal history category I, his potential guideline range would have been **10-16 months.**

The **1997 amendments** parse out possession from receipt of child pornography.  Reviewing the U.S.S.G. § 2G2.2 receipt, it promulgates a base offense level of 17.  Given Jan's case history, the following enhancement would have applied:  +2 prepubescent minor, +5 for loss amount, +4 for S&M, +5 for pattern of activity involving the sexual abuse or exploitation of a minor, +2 for computer.  This Guideline calculation yields a total offense level of 35.  With a criminal history category I, this yields a Guideline range of 168-210 months.

The **2003 amendments** for § 2G2.2 includes additional enhancements.  Applying all enhancements, Jan's base offense level would have been 20, +2 for prepubescent, +2 for distribution, +4 for S&M, +5 for pattern of activity, +2 for use of a computer, +5 for 600 or more images. His total offense level would have been 40.  With a criminal history category I, this yields a Guideline range of 292-365 months.

---

[13]   This calculation is used for the remainder of the applicable Guideline calculations.

Over this 16-year timeframe, Congress has increased the severity of sentences available for child pornography cases every chance it had.  Of note, Congress did not even implement mandatory minimums for receipt and distribution until 2003.  Prior to then, these offenses would have been probationary as they still are in the Nevada state system.  ECF No. at 329 at 17.  It is also clear that child pornography guidelines are not empirically based when child pornography offenders are getting more time than actual sexual abusers, i.e. hands-on offenders. *See Id.* at 25-26.

### G.   By virtue of the plea agreement, Jan concedes that there are no double jeopardy issues in this case

The parties agreed in the plea agreement that Jan would plead guilty to possession, receipt, and distribution of child pornography so Jan is not challenging that issue here. He notes, however, that the Plea Agreement in this case does not discern nor parse out which images are attributable to the possession offense and which images are attributable to the receipt and distribution offense.

Jan agrees with the government's recitation of case law, ECF No. 325 at 12, regarding double jeopardy but further notes a more recent Ninth Circuit case about the possession of child pornography when multiple devices are at issue.  In *United States v. Chilaca*, 909 F.3d 289 (9th Cir. 2018), a matter of first impression, the Ninth Circuit held that possession of multiple devices in the same location with images of child pornography and access to cloud-based storage gave rise to only one count of possession.  While Jan was convicted of only one count of possession, the holding in *Chilaca* as applied to *United States v. Johnston*, 789 F.3d 934 (9th Cir.) applies to Jan's case because, arguably, the plea agreement is vague as to which images on which devices were used to support each conviction.

Nonetheless, this issue will be moot so long as the court sentences Jan to less than 20 years in custody.

25

**H.      Jan Will Not be Able to Receive any Time Off His Sentence for Programing and Rehabilitated Efforts**

With the passage of the First Step Act numerous inmates are receiving additional benefits for good behavior and efforts to rehabilitate.  Namely, qualifying inmates will receive 10 days off for every 30 days of successful program completion.  In addition to the 54 days good time credit, inmates can receive up to 174 days off per year of their sentence. This means that qualifying inmates will serve only 53% of their sentences.  This is not even taking into account BOP policy for placement into halfway houses, home confinement, or other pre-release programs.

Because Jan is a German National, he will be deported at the end of his custodial sentence.  He will not qualify for programing reduction due to his offense of conviction.  He will not qualify for any pre-release programing or halfway house placement.  He will serve his full custodial sentence and be transferred to ICE custody where he will remain until he is deported.  As the Court knows, ICE can keep a person detained for as long as necessary before deportation occurs.

**I.      The Atypical Harsh Conditions of Pretrial Confinement is this Case Justify a Variance**

Jan was arrested in March 2016 and immediately taken to Henderson Detention Center. He was confined there for nearly 10 months. Because there is no protective custody at Henderson, they immediately took Jan to the "hole."  The hole is solitary confinement.  It consists of 16 individual cells where one man is housed in each cell.  The cells are small, and just enough room for a bed and toilet.  There was a small, skinny window at the top of the back cell wall.  It was covered in a film to prevent Jan from looking outside.  It provided minimal filtration of light.  There were no clocks in the hole, which Jan describes as dungeonous. He never knew what time of the day it was and his day was dictated by his three meals.   He was on 23-hour lock down a day for all 10 months.  He had one-hour of "day room" time.  Each

26

inmate in the hole had a different hour of the day to ensure that there was total solitariness. The day room had no windows or clocks. During his one hour "day room" time, Jan had to shower, perform hygiene functions, make phone calls, and obtain commissary. Because his "day room" time occurred at different times each day, he was unable to connect with his family in Germany due to the time difference. He had no control over the lights in his cell. They automatically turned on at 6 am and off at 10 pm. He had no ability to talk with the other inmates housed in the hole.

He was placed in the hole because he was charged with a "sex offense," not because of bad conduct. The prison made him sign a document stating that he was a danger to others so it could place him in the hole. As it was explained to him by prison officials, he was in danger from the prison population because the general prison population would harass and even harm him because of his alleged offense. To protect Jan, they placed him in solitary confinement. No one told Jan the rules of the hole or how one-hour day room occurred. Thus, for the first 48 hours, he remained in his cell without a shower, hygiene products, phone calls or access to the commissary. He did not know that his "door clicked" opened and that his name would be announced on the PA system. This process indicated that inmate's turn to use the day room and shower. The prison's treatment of Jan was unduly harsh given that he did not deserve to be in solitary confinement. Jan, an active participate in his defense, had no access to legal books or library. The 10 months he spent in the hole were long and severe enough to warrant a downward variance in this case.

Severity and duration are the two aspects of punishment. Particularly harsh conditions of confinement make punishment qualitatively worse. Thus, "[u]nusual pretrial confinement, however, in either length or severity of condition, can properly be considered by the sentencing court. *United States v. Sutton*, 973 F.Supp. 488, 493 (D. N.J. 1997). Courts have long recognized that when a defendant suffers consequences for his conduct in addition to the

27

sentence imposed through the criminal court process, such collateral punishment can be taken into account in fashioning an appropriate sentence. *See, e.g., United States v. Pressley*, 345 F.3d 1205, 1218-19 (11th Cir. 2003) (finding that district court had discretion to grant downward departure based on defendant having been on 23-hour-a-day lock-down during pre-trial confinement). Further, when a defendant experiences harsh conditions of confinement, beyond what a pre-trial detainee normally endures, this additional punishment is a legitimate basis for a lower sentence. *Pressley*, 345 F.3d at 1218-19; *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures). Post-*Booker* this Court can consider this argument and the facts presented to justify a downward variance. *See United States v. Cuevas-Mendoza*, 2018 WL 4120060 (D. Kan. 2008) (wherein the court considered pre-trial conditions as part of the its § 3553(a) factor analysis when fashioning a just sentence);

There are two lines of reasoning for granting departures or variances based on such collateral consequences. First, the collateral punishment itself serves § 3553(a)'s goals of specific and general deterrence, eliminating the need for the full range of punishment called for by the guidelines. *See, e.g., United States v. Gaind*, 829 F.Supp. 669, 671 (S.D.N.Y. 2013). Second, in such circumstances, a variance is needed to avoid unwarranted sentencing disparities vis-a-vis defendants who face the same guideline recommendation but who have not suffered the collateral punishment endured by the defendant. *See, e.g.*, *United States v. Mateo*, 299 F. Supp. 2d 201, 211-12 (S.D.N.Y. 2004) (explaining that departure may be needed where defendant endured "forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced in the typical case during the period of incarceration prescribed by the Guidelines").

These atypical circumstances of Jan's pre-trial confinement justify a downward variance in this case.

**J.     BOP Placement and Plan During Custodial Sentence**

Jan respectfully requests this Court recommend a Bureau of Prisons (BOP) placement for service of his sentence at one of the following facilities.  For brevity, he provides a few reasons why each facility would aid in his rehabilitation, keeping in mind that each facility offers programs that are of interest.  Namely, he is interested in participation in sex offender treatment and drug rehabilitation even though he most likely will not qualify for time off his sentence.  Jan will also obtain a job at any facility he is assigned to in order to stay productive.

**1.     FCI Seagoville, Texas**

- Has a work assignment program that requires all inmates participation;
- Has psychological services such as the DAP program.  Jan would like to participate in either the DAP or RDA program even though he will not get time off his sentence. DAP is available to all inmates at this facility by request; and
- SOMP—Sex offender management program:  Jan will be able to participate in this program, which will evaluate his risk for reoffending and will provide group class for reintegration.  While Jan will be deported, he will learn valuable lessons from active participation.

**2.     FCI Terminal Island, California**

- This facility has Adult Continuing Education (ACE) courses ranging from foreign languages to business skills courses;
- Jan will be able to participation in Wellness and Social Programs geared towards goal setting, fitness, and nutrition; and

- The facility also has personal one-on-one counseling, drug abuse educational courses (separate from DAP/RDAP), and specialized mental health programs.

3.    **FCI Englewood, Colorado**

- The facility makes ever attempt to supply a greater denomination of stamps so that inmates can corresponded with family members in foreign countries; and

- Satellite distance learning programs, career counseling and a leisure library.

**III.   Conclusion**

Based on the argument set forth in this memorandum, along with those set forth in Jan's initial sentencing memorandum and arguments and statements made at sentencing, Jan requests a sentence of 96 months, followed by a reasonable period of supervised release.  Jan asks that this Court reject the governments and U.S. Probation's request for a punitive fine of $500,000 given that he is not opposing the restitution amount sought by the government and will be serving a lengthy prison sentence prior to his deportation.


DATED: this 25th day of February 2019.

WRIGHT MARSH & LEVY

*/s/ Russell E. Marsh*
Russell E. Marsh, ESQ.


*/s/ Sunethra Muralidhara*
Sunethra Muralidhara, ESQ.
Attorneys for Mr. Fuechtener

30

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of Wright Marsh & Levy and is a person of such age and discretion as to be competent to serve papers.

That on February 25, 2019, she served an electronic copy of the above and foregoing **Mr. Fuechtener's Response to the Government's Sentencing Memorandum** by electronic service (ECF NO.) to the person named below:

NICHOLAS A. TRUTANICH
United States Attorney District of Nevada
ELHAM ROOHANI
Assistant United States Attorney
elham.roohani@usdoj.gov
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101


_/s/ Debbie Caroselli_
Employee Wright Marsh & Levy

31