TRANSCRIBED FROM DIGITAL RECORDING

1                   IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )
                                   ) Case No. 2:16-cr-00100-GMN-CWH
4               Plaintiff,          )
                                   ) Las Vegas, Nevada
5   vs.                            ) February 28, 2019
                                   ) Courtroom 7D
6   JAN ROUVEN FUECHTENER,         )
                                   )
7                                  ) Recording method:
                Defendant.         ) Liberty
8   _____  ) 1:44 p.m. - 1:45 p.m.
                                     2:03 p.m. - 2:55 p.m.
9                                    3:21 p.m. - 4:40 p.m.
                                     SENTENCING AND DISPOSITION
10
                        *C E R T I F I E D   C O P Y*
11
                    **PARTIAL** TRANSCRIPT OF PROCEEDINGS
12             BEFORE THE HONORABLE GLORIA M. NAVARRO
                 UNITED STATES DISTRICT COURT JUDGE
13

14

15   (Appearances contained on page 2.)

16

17

18

19

20

21   Recorded by:        Araceli Bareng

22   Transcribed by:     Amber M. McClane, CCR 914
                         United States District Court
23                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
24                       AM@nvd.uscourts.gov

25   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    APPEARANCES:

 2    For the Government:

 3         ELHAM ROOHANI, AUSA
           LISA C. CARTIER-GIROUX, AUSA
 4         UNITED STATES ATTORNEY'S OFFICE
           501 Las Vegas Boulevard South, Suite 1100
 5         Las Vegas, Nevada 89101
           (702) 388-6336
 6

 7    For the Defendant:

 8         RUSSELL E. MARSH, ESQ.
           SUNETHRA MURALIDHARA, ESQ.
 9         WRIGHT MARSH & LEVY
           300 South 4th Street, Suite 701
10         Las Vegas, Nevada 89101
           (702) 382-4004
11

12

13    Also Present:

14         Mari Panovich, FBI

15         Wendy Beckner, USPO

16         Brian Blevins, USPO

17

18                        *  *  *  *  *

19

20

21

22

23

24

25
```

TRANSCRIBED FROM DIGITAL RECORDING

1                            *I N D E X*

2    Government's Witnesses:                              Page

3    **SPECIAL AGENT MARI PANOVICH**

4         *Direct Examination by Ms. Roohani*            50

5         *Cross-Examination by Mr. Marsh*               57

6

7    Defense's Witnesses:

8    **GREGORY HARDER, Psy.D.**

9         *Direct Examination by Mr. Marsh*              30

10        *Cross-Examination by Ms. Roohani*             42

11        *Redirect Examination by Mr. Marsh*            47

12        *Recross-Examination by Ms. Roohani*           48

13

14

15                         *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

1          LAS VEGAS, NEVADA; THURSDAY, FEBRUARY 28, 2019; 1:44 P.M.

2                              --o0o--

3                      P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  This is the time set for

5    the imposition of sentence in Case No. 2:16-cr-100-GMN-CWH,

6    United States of America versus Jan Rouven Fuechtener.

7          Counsel, please make your appearances for the record.

8          **MS. ROOHANI:**  Good afternoon, Your Honor.

9    Ellie Roohani and Lisa Cartier-Giroux for the United States.

10         **THE COURT:**  Good --

11         **MS. ROOHANI:**  At counsel table with us is

12   Special Agent Mari Panovich.

13         **THE COURT:**  Good afternoon.

14         **MR. MARSH:**  Good afternoon, Your Honor.  Russell

15   Marsh for Defendant Jan Rouven Fuechtener, and he is present

16   and in custody.

17         **MS. MURALIDHARA:**  Co-counsel Sunethra Muralidhara.

18         **THE COURT:**  Good afternoon.

19         **MR. MARSH:**  Thank you, Your Honor.

20         **THE COURT:**  All right.  This is the time set for

21   imposition of sentence upon Mr. Fuechtener.  Is there any

22   reason we should not be going forward with sentencing this

23   morning?

24         **MS. ROOHANI:**  No, Your Honor.

25         **MR. MARSH:**  No, Your Honor.  Obviously we asked for

TRANSCRIBED FROM DIGITAL RECORDING

1    more time, but we appreciate the additional time you did give

2    us.

3          We did have a matter that we wanted to address at

4    sidebar.  I notified your clerk about that beforehand and also

5    talked to the prosecutor.

6          **THE COURT:**  All right.  So if you want to come

7    forward to sidebar.

8          **MR. MARSH:**  And we would waive our client's presence

9    at that, Your Honor.

10       *(Paused, 1:45 p.m.)*

11       *(The transcript at page 6, line 13, through page 22,*

12       *line 6, has been sealed.)*

13   / / / / /

14   / / / / /

15   / / / / /

16   / / / / /

17   / / / / /

18   / / / / /

19   / / / / /

20   / / / / /

21   / / / / /

22   / / / / /

23   / / / / /

24   / / / / /

25   / / / / /

TRANSCRIBED FROM DIGITAL RECORDING

1      / / / / /

2      / / / / /

3      / / / / /

4      / / / / /

5      / / / / /

6      / / / / /

7          *(Resumed, 2:03 p.m.)*

8          **THE COURT:**   All right.   So Mr. Fuechtener, this is

9      the time set for imposition of sentence upon you in Case No.

10     16-cr-100.   On November 17th of 2016 you appeared before the

11     Court and you entered a plea of guilty to Count 1, possession

12     of child pornography, in violation of Title 18 of the

13     United States Code § 2252(a)(5)(B); as well as Count 2,

14     receipt of child pornography, in violation of Title 18 of the

15     United States Code § 2252(a)(5)(A) and (B); and then in

16     Count 3 you pled guilty to distribution of child pornography

17     in violation of Title 18 of the United States Code

18     § 2252A(a)(2) and (b).

19          Having reviewed the presentence report and the plea

20     agreement and the other documents submitted, as well as the

21     victim impact statements, I do accept your plea of guilty.

22     You are adjudicated hereby now as guilty of these charges.

23     And we'll begin first with making sure that all the

24     information is complete.

25          Mr. Marsh, did you have sufficient time to review the

TRANSCRIBED FROM DIGITAL RECORDING

1  presentence report -- the updated presentence report?  Let me

2  make sure I pull up the right one so that we're all using the

3  same date.  It's February 16th of 2019 is the version that I'm

4  looking at.  Did you have a chance to go over that with your

5  client?

6          **MR. MARSH:**  We did, Your Honor, yes.  And -- and we

7  do appreciate the U.S. Probation for turning that around so

8  quickly and for Your Honor allowing the further revision.

9          **THE COURT:**  All right.  Let me see why this is not

10 opening.  For goodness sake.

11         Okay.  And Mr. Fuechtener, did you have sufficient

12 time to review the -- the revised presentence report dated

13 February 16th, 2019?

14         **THE DEFENDANT:**  Yes, Your Honor.

15         **THE COURT:**  And did -- were there any mistakes,

16 typos, or changes that you want me to consider making other

17 than those that are already cited as objections to the report?

18         **THE DEFENDANT:**  No thank you.

19         **THE COURT:**  All right.  So let's look first at the

20 offense level computation, which is on page 26.  We'll see

21 there that the Probation Office did use the 2016 edition of

22 the guidelines to determine that the appropriate base offense

23 level is a 22 pursuant to guideline § 2G2.2(a)(2).  And then

24 two levels were added because the materials involved a

25 prepubescent minor or a minor who had not yet attained the age

TRANSCRIBED FROM DIGITAL RECORDING

1    of 12 years.  So pursuant to § 2G2.2(b)(2), two levels were

2    added to the 22.

3            And then five levels were added because the defendant

4    distributed the child pornography in exchange for any valuable

5    consideration but not for pecuniary gain pursuant to

6    § 2G2.2(b)(3)(B).

7            Then four levels were added because the material

8    portrayed sadistic or masochistic conduct or other depictions

9    of violence or sexual abuse or exploitation of an infant or

10   toddler pursuant to § 2G2.2(b)(4).

11           And then five levels were added because the defendant

12   engaged in a pattern of activity involving the sexual abuse of

13   a -- or exploitation of a minor pursuant to § 2G2.2(b)(5).

14           And two levels were added because the offense

15   involved the use of a computer pursuant to § 2G2.2(b)(6).

16           And finally, five levels were added because the

17   offense involved 600 or more images pursuant to

18   § 2G2.2(b)(7)(D) for an adjusted offense level of 45.

19           And then pursuant to chapter 5, part A, comment two,

20   in those rare instances where the total offense level is

21   calculated in excess of 43, the offense level is treated as

22   43.  So the adjusted offense level of 45 was reduced by two

23   levels to 43.

24           The defendant does not have any prior criminal

25   history, so his score is zero, which places him in a

TRANSCRIBED FROM DIGITAL RECORDING

 1   category I.

 2          Count 1 provides for a statutory sentence of up to 20

 3   years, and the recommended sentence by the Probation Office is

 4   222 months of imprisonment.

 5          For Count 2 the statute provides a five-year

 6   mandatory minimum and a 20-year maximum.  The Probation Office

 7   is recommending the 60-month sentence as to Count 2

 8   consecutive to Count 1.

 9          And then, for Count 3, the statute provides a

10   mandatory minimum sentence of five years with a maximum of 20

11   years, and the Probation Office is recommending 60 months

12   concurrent to Counts 2 -- yes.  Concurrent just to Count 2.

13   And that is a total of 282 months.

14          Supervised release, pursuant to the statute, has a

15   mandatory minimum of five years with a maximum of life;

16   likewise under the guidelines.  And the Probation Office is

17   recommending lifetime supervised release as to Count 1 as well

18   as Count 2 and Count 3 with Count 1 served consecutive to

19   Count 2 and 3, and Counts 2 and 3 concurrent to each other.

20          The defendant is not eligible for probation, and the

21   fine amount for Count 1 is $50,000 minimum, up to $500,000

22   maximum under the guidelines.  The statute provides for a fine

23   of up to $250,000, and the Probation Office is recommending a

24   $500,000 fine for all three of the counts.  I guess I should

25   probably clarify.

TRANSCRIBED FROM DIGITAL RECORDING

1          So for each count the statute provides a maximum of

2     $250,000, and there are three counts.  So the maximum is

3     $750,000.  And the Probation Office is recommending $500,000.

4          Restitution is pursuant to the statutory calculation

5     $70,000; likewise under the guideline calculation.  And the

6     Probation Office is recommending the full $70,000.

7          There's a 100-dollar special assessment for each of

8     the counts.  Three counts, so that's $300, and that's the

9     recommendation of the Probation Office.

10          Also there is a special assessment for this

11     particular crime under the JVTA, and that is for Count 1,

12     $5,000; for Count 2, $5,000; and for Count 3, $5,000,

13     consecutive to each other for a total of $15,000.

14          So let's hear first from the government, and then

15     we'll hear from the defense.

16          **MS. ROOHANI:**  Your Honor, would you like to hear the

17     witnesses first or argument first?  I'm not exactly sure.  And

18     there's some unresolved objections as well.

19          **THE COURT:**  I thought you had a witness or somebody

20     has a witness who can only be here for a limited period of

21     time.  So we can go ahead and do that first.

22          **MS. ROOHANI:**  It's the defense's witness, Your Honor.

23          **THE COURT:**  All right.  Then let's go ahead and hear

24     the defense witness first so that we don't run out of time,

25     and then we can resolve --

TRANSCRIBED FROM DIGITAL RECORDING

1    **MR. MARSH:**  Did you want to talk about the guideline

2    calculations at this point?  Because I don't think they're in

3    dispute except for one matter, which is that Probation applied

4    a five-level increase for pecuniary gain.  And I believe that

5    in the -- the plea agreement, that the government agreed not

6    to apply that enhancement or not to seek it.  And I believe

7    that the only difference that would cause in the guideline

8    calculation is it would go from 43 down to 42 if we were -- if

9    the government follows its agreement and doesn't seek that

10   enhancement.

11       **THE COURT:**  Ms. Roohani.

12       **MS. ROOHANI:**  Your Honor, in comporting with the

13   terms of the plea agreement, the government will not be

14   providing any additional evidence to the Court to support the

15   plus-5 enhancement.  We would ask that you apply the plus-2

16   enhancement for distribution, and that's in paragraph 50.

17       **THE COURT:**  So wouldn't that result in an adjusted

18   offense level of 40?

19       **MS. ROOHANI:**  No, Your Honor.  Because you start from

20   45 and then subtract three.  It dropped down to 43 because the

21   guidelines --

22       **THE COURT:**  No, I understand why it dropped to 43.

23   But the distribution in exchange for any valuable

24   consideration was a plus-5?

25       **MS. ROOHANI:**  Yes, Your Honor.

TRANSCRIBED FROM DIGITAL RECORDING

1          **THE COURT:**  So instead of 45, it drops down to 40?

2          **MS. ROOHANI:**  No.  It drops to 42.  Because you still

3     have to add a plus-2 enhancement, Your Honor, instead of a

4     plus-5 enhancement.

5          **THE COURT:**  Oh.  Under 2G2.2?

6          **MS. ROOHANI:**  Yes.  It would be (b) --

7          **MR. MARSH:**  (b)(2).

8          **MS. ROOHANI:**  (b)(2).

9          **THE COURT:**  And this is 2016?

10         **MR. MARSH:**  I'm sorry.  That's wrong.

11         **MS. ROOHANI:**  No.  It would be (b)(3)(D), Your Honor.

12         **THE COURT:**  Well, let's ask the probation officer.

13    Do you follow what they're saying?

14         If 2G2.2(b)(3)(B), which is the five-level

15    enhancement for a defendant distributing the child pornography

16    in exchange for valuable consideration, if that is not

17    applied, then wouldn't it be 40 instead of 45?

18         **PROBATION OFFICER BLEVINS:**  Your Honor, my -- my

19    calculations came down with the -- with the plus-2 instead of

20    plus-5, my calculations were actually -- they came out to a 42

21    total offense level.

22         **THE COURT:**  So where does the plus-2 come from?

23         **PROBATION OFFICER BLEVINS:**  It comes under

24    2G2.2(b)(3)(F), which I believe that's what's cited in the

25    plea agreement.  And my citation, based upon my guideline --

TRANSCRIBED FROM DIGITAL RECORDING

1    my calculations --

2            **THE COURT:**  Okay.  Because it's distribution other

3    than for consideration?

4            **PROBATION OFFICER BLEVINS:**  Yes, Your Honor.

5            **THE COURT:**  All right.  So we're not eliminating the

6    five altogether.  It's -- it's a two.  Okay.

7            **PROBATION OFFICER BLEVINS:**  Correct.

8            **THE COURT:**  That makes more sense.

9            All right.  So -- so we're all in agreement that the

10   total offense level is a 42; right?

11           **MS. ROOHANI:**  Correct, Your Honor.  And that just

12   changes the -- it's my understanding that it just changes the

13   guideline range on the sentence.  I don't know that it

14   actually changes the -- the fine range or the restitution --

15   or the fine range or the supervised release range.

16           **THE COURT:**  To the officer, 360 to life?

17           **PROBATION OFFICER BLEVINS:**  That's correct,

18   Your Honor; 360 to life at a total offense level of 42.  All

19   other provisions remain the same to include the fine that --

20   the fine range.

21           **THE COURT:**  And is your recommendation still the

22   same?

23           **PROBATION OFFICER BLEVINS:**  That is correct,

24   Your Honor.

25           **THE COURT:**  And that is because the Probation Office

GREGORY HARDER, Psy.D. - DIRECT

```
 1    recommended a downward departure to 282 months.

 2              MR. MARSH:  Thank you, Your Honor.

 3              THE COURT:  All right.  So did you want to call your

 4    witness?

 5              MR. MARSH:  Yes, Your Honor.  We would call

 6    Dr. Gregory Harder.

 7              COURTROOM ADMINISTRATOR:  Please remain standing and

 8    raise your right hand.

 9         (The witness is sworn.)

10              COURTROOM ADMINISTRATOR:  Please state your full name

11    for the record and spell your last name.

12              THE WITNESS:  Dr. Gregory Harder, H-a-r-d-e-r.

13                          DIRECT EXAMINATION

14    BY MR. MARSH:

15    Q.   Dr. Harder, where are you presently employed?

16    A.   I'm self-employed in Las Vegas.

17    Q.   And what do you do?

18    A.   I'm a psychologist, licensed psychologist.  I work

19    primarily with court cases but I also work with children and

20    adults in counseling sessions.

21    Q.   Have you been retained by the defense in this case?

22    A.   I have.

23    Q.   And what were you retained to do?

24    A.   I was hired to do a psychosexual evaluation on the

25    defendant.
```

GREGORY HARDER, Psy.D. - DIRECT

1    Q.    Were you asked to do anything else?

2    A.    Just to prepare for today's case.  That's it.

3    Q.    Okay.  Were you asked to do some psychological testing in

4    addition to that psychosexual evaluation?

5    A.    I did.  I -- I would consider that part of the

6    evaluation, though.

7    Q.    Thank you.

8          MR. MARSH:  Your Honor, do you need copies of his CV

9    or his report?  I believe they've been previously filed, but I

10   have them, if you'd like them.

11         THE COURT:  Ms. Roohani, is the government objecting

12   to the expert status of this witness?

13         MS. ROOHANI:  No, Your Honor.  I have no objection to

14   his qualifications.  He can be qualified.

15         THE COURT:  All right.

16         MR. MARSH:  All right.  And you have that,

17   Your Honor?

18         THE COURT:  You may continue.  I don't need that.

19         MR. MARSH:  All right.  Thank you very much.

20   BY MR. MARSH:

21   Q.    Just briefly, can you tell the -- your -- the Court your

22   experience in conducting psychosexual evaluations.

23   A.    I've been doing risk assessment and psychosexual

24   evaluations for probably 21 years as a psychologist here in

25   Las Vegas.  I primarily am an expert witness for the

GREGORY HARDER, Psy.D. - DIRECT

1    Clark County Public Defender's Office, but I also work with

2    private attorneys.

3         I frequently do sexual risk assessments as well as

4    child abuse risk assessment cases and other cases as well.

5    Q.   Have you ever appeared in Federal Court before?

6    A.   This is the first time.

7    Q.   All right.  Can you tell the Court what a psychosexual

8    evaluation is and what its purpose is.

9    A.   The primary purpose is to evaluate the defendant's sexual

10   history, his mental history to come up with some kind of an

11   accurate assessment hopefully of his risk for reoffending

12   based on his entire presentation.

13   Q.   Okay.  And what are the various risk categories that you

14   have in doing --

15   A.   I'm not sure --

16   Q.   -- in doing the evaluation?  How -- what are the possible

17   outcomes?

18   A.   I mean, typically people -- conclude people might be a

19   low risk for reoffending, a high risk, a medium risk.  In some

20   cases there's a division into low-moderate or high-moderate

21   risk depending on the instrument that's used.

22   Q.   Okay.  And is that an important distinction under Nevada

23   state law?

24   A.   I'm not sure how the law is in Nevada in terms of

25   distinguishing that.

GREGORY HARDER, Psy.D. - DIRECT

```
1    Q.    Okay.
2    A.    I mean, I think it's important in terms of sentencing
3    whether you're low or high risk, but --
4    Q.    Have you ever heard that somebody who is a high risk is
5    not eligible for probation?
6    A.    I have definitely heard that.
7    Q.    All right.  Can you tell the judge the test that you
8    performed for Mr. Fuechtener to obtain a psychosexual
9    evaluation.
10   A.    When you say "the test," are you referring to just a test
11   or are you referring to the entire --
12   Q.    Well, what --
13   A.    -- evaluation process?
14   Q.    Yeah.  Tell -- tell the judge about the whole process.
15   A.    So the materials used would be the -- I believe the plea
16   bargain arrangement that was given, was provided to me, as
17   well as an interview of the defendant.  I used a test called
18   the Personality Assessment Inventory, which is a mental health
19   instrument.  I also used some research data that I'm familiar
20   with from having attended some workshops and having done a lot
21   of research on [indiscernible] cases.  I also used some
22   generally accepted risk assessment instruments like the
23   STATIC-2002R, Vermont -- the VASOR-2, those kind of
24   instruments, to provide just kind of general information about
25   his risk level.
```

GREGORY HARDER, Psy.D. - DIRECT

1    Q.    Okay.  And in -- what was your conclusion regarding

2    Mr. Fuechtener's risk of reoffending?

3    A.    My conclusion was, you know, in spite of the seriousness

4    of the charges, that he was a low risk for reoffending.

5    Q.    And what was that based on?

6    A.    It's based on the combination of all the data.  Primarily

7    research data showing that individuals with these type of

8    charges frequently are at low risk for reoffending.  The risk

9    assessment instruments I used, there's a series of risk

10   factors that are generally widely accepted in the community as

11   being predictive of reoffense or recidivism.  And those

12   instruments would also show that he does not have very many

13   risk factors.

14          The personality testing that I did on him did not

15   reveal any personality traits that suggest that he had a -- an

16   antisocial personality, which is generally considered to be a

17   predictive factor of -- of reoffending as well.

18   Q.    Okay.  You mentioned the risk assessment instrument.  Can

19   you tell the Court how you use that, and how many points the

20   defendant had?

21   A.    So the instruments are just a series of questions

22   essentially that you interview a client about, and they refer

23   to things like history of being arrested before, they have a

24   history of violating their probation, things like how long ago

25   were they most recently arrested, mental health history,

GREGORY HARDER, Psy.D. - DIRECT

1    substance abuse history.  There's about 10 or 15 categories

2    within these instruments that are analyzed.

3           And then the only risk assessment points he would

4    have earned would have been his age level increases his risk

5    slightly.  He's not extremely young, but he's not old either.

6    So he gets a point for that.

7           And then he has a history of substance abuse, which

8    he relates to some of these criminal acts that he's been

9    charged with.  So those also increase his risk.

10          But he doesn't have a history of --

11          **MR. MARSH:**  Your Honor, I thought I'd turned that

12   off.  My apologies.

13   **BY MR. MARSH:**

14   Q.   Go ahead.  I'm sorry.

15   A.   Okay.  But he doesn't have a history of being arrested

16   before, probation violations, all the -- all the general kind

17   of questions that we typically ask of people who've been

18   assessed for risk assessment.

19   Q.   All right.  And based on that --

20   A.   Based on that, all the -- all the data together, I mean,

21   my opinion was he was at low risk.  And on that instrument or

22   those instruments, that he was at low risk also.

23   Q.   All right.  And did your assessment also include your

24   observations regarding Mr. Fuechtener's personality and your

25   testing on that regard?

GREGORY HARDER, Psy.D. - DIRECT

1    A.    Right.

2    Q.    What did you learn through that testing and your

3    interview?

4    A.    Well, from the personality testing, he presented as

5    someone who's, you know, fairly normal in his -- in his mental

6    traits.  There was no significant scores on the test.  And as

7    I indicated in my report, you know, the -- the test has

8    built-in validity scales to determine if someone is trying to

9    present themselves in an overly favorable manner or

10   exaggerating their -- their problems.  And he scored in the

11   fairly normal range for that.  So there was no indication that

12   he was trying to distort his personality in an overly

13   favorable manner.  But the -- the personality testing showed

14   that he pretty much fit into average norms for all the scales.

15   Q.    Okay.  What were your conclusions regarding his

16   psychopathy, responsibilities, aggression, those type of

17   issues?

18   A.    Right.  So I -- I relate that to what I said earlier,

19   that antisocial personal traits, that he didn't really possess

20   those.  He doesn't have a history of criminal behaviors.  He

21   doesn't have a history of financial irresponsibility.  You

22   know, he went to school.  He graduated.  He's held a job

23   consistently.  He's been in a long-term stable relationship.

24   I mean, there's various predictors of antisocial behavior or

25   psychopathy.  And in my opinion, he does not meet that

GREGORY HARDER, Psy.D. - DIRECT

1   criteria.

2   Q.   How many -- how many of these evaluations have you done

3   through the years over in state court?

4   A.   I've probably done well over a thousand, not specifically

5   psych sexual but risk assessments in general.  I don't know

6   exactly how many psych sexuals I've done.  Probably 100 maybe?

7   I'm not sure of an exact count.

8   Q.   Okay.  And based on that experience and on the risk

9   assessment tools that you used, how does Mr. Fuechtener

10  compare with people who would be considered a medium or a high

11  risk of reoffending?

12  A.   Well, I -- as I indicated, I think he's a lower risk.  I

13  mean, primarily the charges against him are -- are -- reduce

14  his risk.  I mean, he doesn't have a lot of antisocial traits.

15  He doesn't have a history of prior offenses or violations of

16  probation.  He's had some stability in his life.  I mean, so

17  yeah, compared to those other individuals I've seen, he's

18  lower risk.

19  Q.   How did his drug use factor into the -- your assessment

20  and possibly the offense?

21  A.   Well, I think his drug use is a serious problem.  And he

22  admitted to using methamphetamines on a very regular basis,

23  and, you know, his -- it was his statement to me that that was

24  related to the alleged criminal offenses; that because he was

25  high on methamphetamine, his judgment was impaired, and that

GREGORY HARDER, Psy.D. - DIRECT

1   he was engaging in behaviors with his friends and other people

2   that he felt were inappropriate, but he wasn't really

3   recognizing that he was doing such inappropriate acts when he

4   was impaired under that drug.

5          That drug can also increase sexual impulsive

6   behavior, in my opinion, from having worked with many clients

7   with that type of addiction.  It doesn't specifically cause

8   someone to look at child pornography, et cetera, but it does

9   increase the risk of people having impaired judgment and

10  engaging in oversexualized behaviors

11  Q.   All right.  Have you ever viewed the government's

12  sentencing memo in response to the defendant's sentencing memo

13  in this case?

14  A.   I believe I have.

15  Q.   And have you read their critique of your report?

16  A.   I have.

17  Q.   Okay.  How do you respond to the claim that you should

18  have done additional testing?

19  A.   I'm not sure what other testing I could have done in this

20  particular case.

21  Q.   Well, specifically they recommended a -- I'm going to say

22  this wrong, and I -- but --

23          **MS. ROOHANI:**  PPG.

24  **BY MR. MARSH:**

25  Q.   -- a plethysmograph?

GREGORY HARDER, Psy.D. - DIRECT

1    A.   Okay.  You're -- you're referring to that particular

2    instrument, which I'm not familiar with that many cases where

3    people have actually used that in a court case at this level.

4    I've heard of many people using that instrument in situations

5    where people are in treatment or in a lifetime supervision

6    situation where they're starting out to see what their

7    baseline is for an interest in -- in that sort of thing.  It's

8    basically a device that measures an individual's sexual

9    interests based on attaching an electronic device to their

10   penis and seeing, as they are exposed to images or videos or

11   audio images -- there's different forms -- you know, if they

12   have any type of sexual interest in those things.  And they're

13   generally considered to be very intrusive instruments that

14   are -- you know, there's a lot of negative literature about

15   them.  And I've read many cases where it wasn't even admitted

16   in court because of the controversy about the validity of

17   those instruments.

18        They are typically considered to be valid instruments

19   for treatment.  If an individual's on probation and they're --

20   they're trying to get someone to admit to, you know, their

21   interest level in these activities and they're going to treat

22   them for that problem, then I believe that there has been some

23   success with using that.  But in terms of at this level,

24   presentencing level, I'm not sure that there's been too many

25   cases where that's typically done.  And I don't have the

GREGORY HARDER, Psy.D. - DIRECT

1    training to give that type of test nor do I know any way you

2    could have given that to him at the prison over there anyway.

3    It's typically -- you know, requires a little bit of privacy

4    to engage in that type of activity.  I can't imagine trying to

5    administer that test while there's guards standing around and

6    all that kind of stuff at the prison.

7    Q.   All right.  Do you have -- I believe in your report you

8    had an opinion generally about the risk of recidivism of child

9    pornography offenders; is that right?

10   A.   Right.  I've --

11   Q.   What is -- go ahead.

12   A.   I've attended some seminars on that subject and some of

13   the experts that have provided previous testimony in these

14   classes I've attended, as well as private research I've done

15   on my own.  I mean, there's been numerous articles by

16   respected authors in the -- in the field who've done these

17   kind of research that individuals who commit these kind of

18   crimes typically are very low risk for reoffending.  Many of

19   them -- 1, 2, 3 percent in terms of their risk for getting

20   arrested again for a similar charge or any kind of contact

21   sexual offense.

22   Q.   And have you read the -- are you aware of the materials

23   cited in the government's response --

24   A.   Right.

25   Q.   -- to your opinion?

GREGORY HARDER, Psy.D. - DIRECT

1           And what is your deal with that?

2    A.   Well, I think it was a good article.  I had not

3    previously read that article.  But having read it prior to

4    coming here today, I mean, I think it's a -- it's an

5    interesting article.  My position on it would be that, you

6    know, it's one -- it's one study that's been done that shows

7    risk is higher for individuals who've committed the type of

8    offenses that he's been charged with.  But there's also been

9    many previous studies, very large sample sizes, that -- that

10   have different levels of risk as the conclusion.  And like any

11   study, I mean, I would not put my entire weight of my report

12   on one study.  I would put it on a combination of studies.

13          I mean, the ones I cited in my report are based on

14   literature reviews of many studies including thousands of sex

15   offenders who've been evaluated.  And so that's why, you know,

16   my conclusion's based more on those instruments rather than on

17   this other one, which I think adds to the overall quality of

18   the research for sure.  But it doesn't necessarily negate all

19   the previous studies that have been done before

20   Q.   All right.  Are you aware of any specific risk assessment

21   that's just for child pornography offenses?

22   A.   There's other ones that have been put out there.  As far

23   as I know, none of them have been validated or researched well

24   enough that you could actually use them to conclusively

25   predict risk.  I mean, the ones that I'm using are not

GREGORY HARDER, Psy.D. - CROSS

1    specifically validated for child porn cases.  They're just for

2    general sex offender cases.  But I'm not aware of any that

3    are.

4            The government cited the CPORT in the rebuttal to --

5    to my report, and I looked that one up just to get more

6    information about it.  And it sounds promising, but it's not

7    readily available for people.  I don't have any training in

8    that instrument.  It's only been around a brief time, and as

9    far as I know it hasn't even been, you know, validated yet in

10   the -- in the general community.  Maybe it has.  I'm not aware

11   of it, though.

12   Q.  All right.

13          **MR. MARSH:**  Could I have a moment, Your Honor?

14          **THE COURT:**  Yes.

15          **MR. MARSH:**  All right.  Thank you, Your Honor.  I

16   have no further questions.

17          **MS. ROOHANI:**  Briefly, Your Honor?

18          **THE COURT:**  Yes.

19                       **CROSS-EXAMINATION**

20   **BY MS. ROOHANI:**

21   Q.  Good afternoon, Dr. Harder.

22   A.  Hello.

23   Q.  Do you have a copy of your report with you?

24   A.  I do.

25   Q.  Okay.  In your report, you recount several statements

GREGORY HARDER, Psy.D. - CROSS

1   that Mr. Fuechtener made to you on a variety of topics.  Are

2   there any statements in that report that are attributed to him

3   that are not accurate?

4   A.   I'm sorry?  The typing interfered with what I heard

5   you -- your last sentence?

6   Q.   Sure.

7        Are there any statements in your report that you

8   attributed to Mr. Fuechtener that are not accurate?

9   A.   Was there anything that he said that wasn't accurate; is

10  that what you're asking me?

11  Q.   Yes.

12       **MR. MARSH:**  Objection.  That's vague, Your Honor.

13       **THE COURT:**  Well, she stated:  In his report, any

14  statements that are attributed to the defendant that are

15  inaccurate?

16       **MS. ROOHANI:**  Correct.

17       **THE WITNESS:**  I mean, I'm not aware of anything I

18  wrote in my report that was inaccurate, but I'm not sure what

19  you're trying to say.

20  **BY MS. ROOHANI:**

21  Q.   I guess what I'm asking is, is if he told you something,

22  that's what you recounted in your report; correct?

23  A.   I certainly put some emphasis on what he said in my

24  report.

25  Q.   Okay.  With respect to the statements that Mr. Fuechtener

GREGORY HARDER, Psy.D. - CROSS

1    made to you during your meeting with him, are there any

2    statements in this report that you would need to change to

3    make those statements accurate?

4    A.   I'm not following you, what you mean by that.

5    Q.   Let me give you an example.

6             You write in your report on page 3:  "He stated" --

7    and then there's some words after that -- "there were

8    thousands of child pornography videos found on his computers

9    and hard drives."

10            Do you see that?

11   A.   I see -- I see where you're looking, yeah.

12   Q.   Is that what he said to you?

13   A.   Well, that's what he said.  If I've already stated it,

14   then he must have told me that.

15   Q.   And that's true for all the statements in your report;

16   when you say "he stated" or "Fuechtener said," those are all

17   accurate?

18   A.   As far as I know.  I would not have put it in there

19   unless I --

20   Q.   Okay.

21   A.   -- referenced that he stated that.

22   Q.   And your assessment of Mr. Fuechtener was based upon your

23   interview with him; correct?

24   A.   That was one piece of the puzzle, yes.

25   Q.   I believe several times in your report you say "he

GREGORY HARDER, Psy.D. - CROSS

1    self-reports, he self-reports."  So at least part of the

2    analysis was the statements that he made to you?

3    A.    Right.

4    Q.    Okay.  How long did you spend with him?

5    A.    Two, three hours probably.  Maybe more.

6    Q.    Would you agree with me that it's difficult to make an

7    accurate psychological assessment if somebody's lying to you?

8    A.    It's definitely a challenge, but that's one of the

9    reasons why I use the PAI test, is to get a general sense as

10   to his honesty level, which showed he was being honest at

11   least on that test.  I mean, clearly, with sex offenders,

12   there's always going to be a level of dishonesty in most

13   cases.  I can't predict who's telling me the truth.  It's

14   generally accepted in the literature, though, that most people

15   have more to the story than -- than they let on.  But I

16   couldn't -- I couldn't specify exactly what that would be in

17   his case.

18   Q.    Fair enough.

19         Are you familiar with the coding rules handbook for

20   the STATIC-2002?

21   A.    I am.

22   Q.    Are you aware that that handbook indicates that the test

23   should not be used for people charged or convicted with child

24   pornography offenses?

25   A.    Right.  And I think I addressed that earlier.  It's --

GREGORY HARDER, Psy.D. - CROSS

1    it's -- it's a general assessment for sex offender risk

2    because there really aren't any that are validated for child

3    porn cases.

4    Q.   Are you aware that the CPORT is, in fact, validated?

5    A.   It -- if it is, I'm not aware of it.  And I'm not aware

6    of how to be trained on it at this point.  So I have not

7    [indiscernible] that test yet.

8    Q.   Okay.  And same thing with the VASOR-2.  I believe you

9    testified that that is -- test is not supposed to be used for

10   offenders charged or convicted of child pornography offenses?

11   A.   It's recommended not to be used because it inflates risk,

12   actually.  That's the reason why it's not recommended.

13   Because it's hard to quantify victims, which is part of the

14   assessment.  You can't really quantify victims when you're

15   using those instruments.  That's really the issue.

16   Q.   And you indicated that you were familiar with the PPG, or

17   the penile plethysmograph?

18   A.   I'm familiar with it.  I just don't -- I don't use it.

19   Q.   Are you aware that most -- most researchers say that

20   that's the most accurate assessment of sexual interest in

21   children or recidivism?

22   A.   I believe it is used, like I said earlier, for treatment

23   purposes but not in court cases for establishing risk.  That's

24   why I wouldn't use it.  But it is an accurate measurement, I

25   believe, in some situations.

GREGORY HARDER, Psy.D. - REDIRECT

1    Q.    You didn't use that test?

2    A.    I did not.

3          **MS. ROOHANI:**  No further questions.

4          **THE COURT:**  Anything else, Mr. Marsh?

5          **MR. MARSH:**  Two questions.

6                        **REDIRECT EXAMINATION**

7    **BY MR. MARSH:**

8    Q.    What's it mean when something's a static test?

9    A.    A static test just means it's unchanging.  The reason for

10   using them is because it does address the issue of

11   defensiveness.  Many individuals who commit crimes of course

12   don't always tell the truth, but static instruments are -- are

13   basically risk factors that the defendant can't change.

14          So you can't change the fact whether you've been

15   arrested before.  You can't change that you violated your

16   probation before.  You can't change your age.  You can't

17   change those kind of things.  So -- and that's why we rely on

18   them heavily, because you can't change those things.  They're

19   not -- they're not things that a defendant can lie about.

20   Q.    And does that -- your assessment under that tool depend

21   on the defendant's honesty?

22   A.    It does not.

23   Q.    Okay.  Does your assessment overall depend on the

24   defendant's honesty?

25   A.    I think his honesty plays a -- a role.  I think it plays

GREGORY HARDER, Psy.D. - RECROSS

1    a role on any case.  But I wouldn't weigh my entire report on

2    it because there are other factors of more importance such as

3    the research and such as the tests and his history and all

4    that stuff.

5    Q.   All right.

6         **MR. MARSH:**  Thank you, Your Honor.

7         **THE COURT:**  Ms. Roohani?

8         **MS. ROOHANI:**  Briefly, Your Honor.

9                        **RECROSS-EXAMINATION**

10   BY MS. ROOHANI:

11   Q.   Would a person who's never been arrested before always

12   score low on a STATIC-2002?

13   A.   I'd have to look at it, but most likely they would score

14   lower for sure.

15   Q.   Same with the VASOR-2?

16   A.   I believe so.  I'd have to look at it exactly to compute

17   it.  If they scored high on all the other risk factors, it's

18   plausible they could score higher risk.

19   Q.   Of the 14 factors on the STATIC-2002, aren't 12 of them

20   related to prior charges or convictions?

21   A.   I believe that is accurate, but the reason why that's

22   accurate is because that is what predicts risk better than

23   whether a person's honest.

24   Q.   Fair enough.

25        I have a hypothetical for you.  If Mr. Fuechtener

GREGORY HARDER, Psy.D. - RECROSS

1   told you that he had raped 100 children but had never been

2   caught, wouldn't he still test as low risk on those two

3   assessments?

4   A.   In that particular case, I would definitely conclude he

5   was a high risk for reoffending, and it would not be based on

6   just that instrument.  And the authors of those tests, I

7   believe, would also agree that their tests are not perfect.

8   Q.   Okay.  So you would agree that a defendant's truthfulness

9   is important in coming to a conclusion about his risk of

10  reoffending?

11  A.   It is important.

12  Q.   Okay.

13  A.   It's not the only thing, but it is important.

14          MS. ROOHANI:  No further questions.

15          MR. MARSH:  May the witness be excused, Your Honor?

16          THE COURT:  Do you have any other questions?

17          MR. MARSH:  No, I don't.

18          THE COURT:  All right.  Thank you, Dr. Harder, for

19  coming in this afternoon.  You are excused.  Please be careful

20  with steps on the way down.

21          Any other witnesses?

22          MR. MARSH:  Not from the defense, Your Honor.

23          THE COURT:  All right.  So we did take him out of

24  order.  So now let's go back to the correct order and have the

25  government explain whether or not you agree or disagree with

MARI PANOVICH - DIRECT

```
 1    the recommendations by the Probation Office and why.
 2            MS. ROOHANI:  Your Honor, I do have witnesses.  Do
 3    you want me to put them on?
 4            THE COURT:  Yes, you may.
 5            MS. ROOHANI:  Okay.  I call Special Agent
 6    Mari Panovich.
 7            COURTROOM ADMINISTRATOR:  Please remain standing and
 8    raise your right hand.
 9         (The witness is sworn.)
10            COURTROOM ADMINISTRATOR:  Please state your full name
11    for the record and spell your last name.
12            THE WITNESS:  Mari, M-a-r-i, Panovich,
13    P-a-n-o-v-i-c-h.
14                         DIRECT EXAMINATION
15    BY MS. ROOHANI:
16    Q.   Special Agent Panovich, I think Judge Navarro's heard
17    this three times, but -- at least -- tell us who you work for.
18    A.   I work for the FBI.
19    Q.   And how long have you worked for the FBI?
20    A.   I've been a special agent since Jan of 2009.
21    Q.   Okay.  And how long have you worked on the Internet
22    Crimes Against Children Task Force?
23    A.   I've worked on the Internet Crimes Against Children Task
24    Force for approximately four and a half years.
25    Q.   Were you the case agent assigned to this case?
```

MARI PANOVICH - DIRECT

1   A.   Yes, I was.

2   Q.   Did you review all of the evidence in this case?

3   A.   Yes, I did.

4   Q.   Did you view all of the videos of child pornography found

5   on Mr. Fuechtener's devices?

6   A.   Yes, I did.

7   Q.   And you testified at trial -- were there some images and

8   videos of child pornography that you did not include in your

9   count of how many images and videos there were?

10  A.   Yes.  We actually weren't able to get to that point to

11  discuss that at trial.

12  Q.   Can you tell me briefly what that evidence would have

13  been?

14  A.   It was from a Dropbox account -- excuse me -- and it was

15  over 2600 files of child pornography.

16  Q.   How did you learn about that Dropbox account?

17  A.   In July of 2016, Jess Marchese, who was Jan Rouven

18  Fuechtener's defense attorney at the time, had e-mailed

19  Cristina Silva a password to a Dropbox account.  I then, in

20  the beginning of August, submitted a search warrant affidavit

21  for that Dropbox account.

22  Q.   And Dropbox responded?

23  A.   Yes, they did.

24  Q.   And those images were not included in the count of the

25  9,000 that we were talking about at the time of trial and the

MARI PANOVICH - DIRECT

1    plea agreement; correct?

2    A.   Correct.

3    Q.   When you arrested Mr. Fuechtener -- well, let me back up.

4         When you executed the search warrant at

5    Mr. Fuechtener's house, did you collect the cell phone that he

6    had in his possession?

7    A.   Yes.  It was reviewed at the time.

8    Q.   Okay.  And at the time that he was arrested, was there a

9    new phone that he had?

10   A.   He had a phone in his possession at the time of his

11   arrest, which I did take into evidence.

12   Q.   Was -- to the best of your knowledge, was that new phone

13   purchased after the execution of the search warrant?

14   A.   That I'm not sure.  I do believe -- it appeared, I think,

15   to be a new phone because I think the screen -- there was a

16   cracked screen at some point on one of the phones, but I

17   believe it may have been a new phone.  I'm not 100 percent

18   sure.

19   Q.   Did you obtain a search warrant and search that phone?

20   A.   Yes, I did.

21   Q.   Did -- in searching that phone, did you find chats on

22   that phone?

23   A.   Yes, I did.

24   Q.   On what applications were there chats?

25   A.   There were several applications, but one in particular

MARI PANOVICH - DIRECT

1    was Scruff.

2    Q.   Okay.  And that was not evidence that was presented at

3    trial; correct?

4    A.   Correct.

5    Q.   Tell me a little bit about the Scruff chats on

6    Mr. Fuechtener's phone.

7    A.   There were several chats.  One of chats in particular he

8    said that he was -- he said to the person that he was talking

9    to, "Say hi to Lars.  Say hi to Lars for me," or say hi to

10   Lars somehow.

11          And then talked about how he had just found out that

12   he needed to be down on the Strip before 5:00 p.m -- it was

13   New Year's Eve -- and that he needed to be at work that

14   evening

15   Q.   During the course of that conversation with that

16   individual, did Mr. Fuechtener have a conversation about

17   pornography?

18   A.   It was a different individual around the exact same time

19   frame, the same days he had a discussion with an individual

20   about taboo and -- and about child pornography.

21   Q.   Did he refer to the child pornography as "young"?

22   A.   Yes.  He said that he was into young, straight, family,

23   and group.

24   Q.   At some point did Mr. Fuechtener say to that individual,

25   "How do we get a young?"

MARI PANOVICH - DIRECT

```
 1    A.    Yes.

 2    Q.    What was the date of that chat?

 3    A.    That was between December 31st of 2015 and January 1st of

 4    2016.

 5    Q.    Now, the Grindr chats that are referenced in the plea

 6    agreement, what was the date of those chats?

 7    A.    Jan 18th of 2016.

 8    Q.    And, again, were those chats similar in that he said,

 9    "How do we drug a young?"

10    A.    "Shall we drug a young."

11    Q.    Did you search Mr. Fuechtener's phone for child

12    pornography?

13    A.    Yes, I did.

14    Q.    Did you find any?

15    A.    I found one image.  It was an image of a computer screen,

16    and on the computer screen itself there were three images.

17    The middle image depicted an elder man, and it appeared to be

18    a child under the age of 18.  And the man was giving --

19    performing oral sex on the child.

20    Q.    Can you approximate the age of the child?

21    A.    I would say the child was between the ages of 10 and 11

22    years old.

23    Q.    Do you know the date that that image was created on that

24    phone?

25    A.    February 11th, 2016.
```

MARI PANOVICH - DIRECT

1    Q.    That's after the execution of the search warrant;

2    correct?

3    A.    [No audible response.]

4    Q.    Now, did you read Dr. Harder's report?

5    A.    Yes, I did.

6    Q.    And I believe you previously testified you reviewed all

7    the discovery in this case?

8    A.    Yes.

9    Q.    Knowing what you know about this case and reviewing the

10   discovery, did you find discrepancies between what

11   Mr. Fuechtener told Dr. Harder and what the discovery

12   revealed?

13   A.    Yes.

14   Q.    Specifically let's talk about the Skype chats.  Who

15   initiated the conversations on Skype?

16   A.    It was Lars.

17   Q.    And you know Lars to be Mr. Fuechtener?

18   A.    Yes, I do.

19   Q.    Have you spoken to Mr. Fuechtener's husband in the past?

20   A.    Yes, I have.

21   Q.    You recognize his voice?

22   A.    Yes, I do.

23   Q.    Did you listen to the jail calls in this case?

24   A.    Yes, I did.

25   Q.    Did you recognize jail calls between Mr. Fuechtener and

MARI PANOVICH - DIRECT

1    his husband?

2    A.    Yes.

3    Q.    Were those in the English language?

4    A.    They were in German.

5    Q.    Did you send some of those calls to be translated?

6    A.    Yes, I did.

7    Q.    And did you review the translations of those calls?

8    A.    Yes, I did.

9    Q.    In those calls, in the translations, when Mr. Fuechtener

10   is talking to his husband, at any point does he indicate that

11   he intends to travel after he's released from custody?

12   A.    Yes.  To perform a show.

13   Q.    Did he name any specific locations?

14   A.    Several.  He said Thailand, Prague, Dubai, Mexico, maybe

15   doing cheap cruises, and Mr. Alfter suggested I believe it was

16   Switzerland.

17   Q.    Did Mr. Fuechtener indicate anything that he was going to

18   do about the show or change about the show?

19   A.    He wanted to change the name of the show either to world

20   of magic or magic of the south.

21   Q.    Okay.  Did he indicate anything about changing his name?

22   A.    He said he wanted it -- he was talking about changing

23   maybe his last name but then talked about changing his first

24   name and his last name and then also changing his appearance.

25        **MS. ROOHANI:**  Just a moment, Your Honor.

MARI PANOVICH - CROSS

```
1              No further questions, Your Honor.
2              THE COURT:  Mr. Marsh?
3                      CROSS-EXAMINATION
4    BY MR. MARSH:
5    Q.   Good afternoon, Agent Panovich.
6    A.   Good afternoon.
7    Q.   Did you prepare a 302 after you reviewed the --
8    Mr. Fuechtener's iPhone?
9    A.   Yes, I did.
10   Q.   It was pretty recently, wasn't it?
11   A.   Yes, it was.
12   Q.   There wasn't a priority to review that?
13   A.   The cell phone, it was locked at the time that I had
14   reviewed it.  And so it had to be sent off to the lab in
15   Quantico, and it had taken over a year to be unlocked.  And at
16   the time it was unlocked, Mr. Fuechtener had -- there was the
17   entrance of the guilty plea.  And then we were going through
18   the potential of the withdraw of the plea.  So it was -- at
19   that point the -- the case had been kind of at a standstill.
20   So I hadn't reviewed it at that point.
21   Q.   Okay.  You're aware that there were -- the defendants
22   agreed that there were thousands of videos in this case;
23   correct?
24   A.   Yes.
25              MS. ROOHANI:  I'm sorry, Your Honor.  I can't hear --
```

MARI PANOVICH - CROSS

```
 1            MR. MARSH:  Thousands of videos.
 2            MS. ROOHANI:  Sure.  Okay.
 3  BY MR. MARSH:
 4  Q.    Did you find any videos on that phone?
 5  A.    No videos.
 6  Q.    All right.  You found one image of suspected child
 7  pornography; right?
 8  A.    Yes.
 9  Q.    And did you put the description that you just gave in
10  open court in your 302?  You didn't, did you?
11  A.    I did not.  I said that there was a -- an image that I
12  believed to be potential child pornography.
13  Q.    It was questionable; right?
14  A.    Questionable.
15  Q.    All right.  The jail calls that you listened to between
16  Jan and his husband, Frank Alfter, those took place back in
17  early 2016 right after he'd been arrested; correct?
18  A.    They were between March and May, late -- like between
19  early March and late May of 2016.
20  Q.    Okay.  And he was arrested...
21  A.    I'm sorry?
22  Q.    I'm sorry.  When was he arrested?
23  A.    He was arrested on March 14th of 2016.
24  Q.    Okay.  So in the first two months after he was arrested,
25  he was talking to his husband about possibly doing shows after
```

MARI PANOVICH - CROSS

1    this case was done; right?

2    A.    According to the jail calls, yes.

3    Q.    That was the timing; correct?

4    A.    Yes.

5    Q.    All right.  You have no idea what his current plans are,

6    do you?

7    A.    We have not listened to any of the jail calls.  Again,

8    the case, at this point, we have no ability to listen to the

9    calls.  His -- he had entered his guilty plea, and at that

10   point we were not going to listen to any of the further phone

11   calls.

12   Q.    That wasn't my question.  You're not aware of any calls

13   after that in which he discussed his plans; right?

14   A.    No.

15   Q.    All right.  And this was what he talked about right after

16   he was arrested; correct?

17   A.    Within the past -- the few months, yes.

18   Q.    All right.  Thank you.

19   A.    You're welcome.

20        **MS. ROOHANI:**  No further questions from this witness,

21   Your Honor.

22        **THE COURT:**  All right.  Thank you for coming up.

23        **MS. ROOHANI:**  Your Honor, my next witness would be in

24   relation to the sidebar.  I don't know how we want to handle

25   that.

TRANSCRIBED FROM DIGITAL RECORDING

1          **THE COURT:**  Would you want a sealed proceeding?

2          **MS. ROOHANI:**  I don't, but I'm sure that he does.  So

3    I believe you have to rule on that.

4          **THE COURT:**  Mr. Marsh?

5          **MR. MARSH:**  We've submitted a number of matters under

6    seal, and we believe that those -- they're properly considered

7    in a closed hearing for a variety of reasons that we don't

8    need to get into here.  I think that's been established

9    through those -- those filings themselves.

10         **THE COURT:**  And as a housekeeping matter, then are

11   you also moving to seal the sidebar that we just had earlier

12   at the start of this hearing?

13         **MR. MARSH:**  Yes, Your Honor.  Thank you.

14         **THE COURT:**  All right.  So that will be the order.

15   We'll go ahead and seal the transcript for the sidebar, and

16   we'll ask everyone to please exit the courtroom while we

17   proceed with a sealed portion of the hearing.  And then we

18   will reopen the courtroom when that portion is --

19         **MS. ROOHANI:**  Your Honor, does that apply just to

20   members of the public, or can members of the United States

21   Attorney's Office and the FBI remain in the room?

22         **THE COURT:**  Mr. Marsh, do you have any objection to

23   the other members of the U.S. Attorney's Office who are

24   working on this case or related to this case staying in the

25   room.

TRANSCRIBED FROM DIGITAL RECORDING

1          **MR. MARSH:**  I don't have any problem with my old

2     friends at the U.S. Attorney's Office being here, and their --

3     members of the -- that represent the government.  That's fine.

4          **THE COURT:**  All right.

5          **MR. MARSH:**  And obviously we can have our consultant

6     and the other people who've worked with us in the case?

7          **MS. ROOHANI:**  Your Honor --

8          *(Simultaneous cross talk.)*

9          **THE COURT:**  I think there are some FBI as well

10    besides --

11         **MS. ROOHANI:**  There's FBI as well.  There's members

12    of the Probation Office, Your Honor.  If they're court staff,

13    I don't believe that there's a reason -- it's mostly -- I

14    think the concern is for members of the public.

15         **THE COURT:**  Is that right, Mr. Marsh?  Do you see in

16    the courtroom you don't recognize that we need to inquire

17    whether they need to be excused?  I'm not familiar with

18    everybody who's here --

19         *(Simultaneous cross talk.)*

20         **MR. MARSH:**  [Indiscernible] here, too.  No, that's

21    fine, Your Honor.  And obviously everybody should be

22    admonished not to discuss anything that -- that should come up

23    during this hearing.

24         **THE COURT:**  Correct.  Do you have a -- a time

25    estimate for those folks that are walking out, how much time

TRANSCRIBED FROM DIGITAL RECORDING

1    we'll be?

2            **MS. ROOHANI:**   Maybe 20 minutes, Your Honor, on

3    direct.

4            **THE COURT:**   Okay.

5        *(Paused, 2:55 p.m.)*

6        *(The transcript at page 62, line 8, through page 83, line*

7        *8, has been sealed.)*

8    / / / / /

9    / / / / /

10   / / / / /

11   / / / / /

12   / / / / /

13   / / / / /

14   / / / / /

15   / / / / /

16   / / / / /

17   / / / / /

18   / / / / /

19   / / / / /

20   / / / / /

21   / / / / /

22   / / / / /

23   / / / / /

24   / / / / /

25   / / / / /

TRANSCRIBED FROM DIGITAL RECORDING

1    / / / / /

2    / / / / /

3    / / / / /

4    / / / / /

5    / / / / /

6    / / / / /

7    / / / / /

8    / / / / /

9         *(Resumed, 3:21 p.m.)*

10        **THE COURT:**  All right.  So we're back on the record.

11   The rest of the proceeding is unsealed.

12        And Ms. Roohani, you may continue now with your

13   explanation for the Court of whether or not you agree or

14   disagree with the recommendations by Probation for the

15   appropriate sentence.

16        **MS. ROOHANI:**  Your Honor, may I approach?

17        **THE COURT:**  Yes, you may.

18        **MS. ROOHANI:**  Your Honor, I'm not going to reiterate

19   everything that I wrote in my sentencing memorandum.  I know

20   that you're very thorough, and you -- you make it a point to

21   read everything.  I just want to highlight a few things in

22   asking for a sentence of 365 months.  You'll note that that's

23   higher than the recommendation of Probation, and I believe

24   that it's justified in this case.

25        I just want to spend a minute responding to some of

TRANSCRIBED FROM DIGITAL RECORDING

1    the things that Mr. Fuechtener put for the first time into his
2    response to the government's sentencing memorandum.
     Mr. Fuechtener alleged that the government couldn't point to a
4    single instance where he used his wealth to manipulate these
5    proceedings.  I can point to ten.  That's the number of
6    attorneys that he hired and for the most part fired.
7            You remember we were supposed to start trial on
8    October 24th, but then we had to have hearings on the Amber
9    Craig matter.  You'll remember that Mr. Fuechtener --
10           **THE COURT:**  I'd forgotten that.  You're right.
11           **MS. ROOHANI:**  Right.
12           You'll remember that Mr. Fuechtener hired and then
13   fired then rehired Mr. Sanft who showed up on the first day of
14   trial ready to proceed because he had reviewed all the
15   discovery months and months prior.  You'll remember that we
16   had to delay sentencing because he had to interview five
17   different attorneys to see who would make his frivolous
18   arguments for his motion to withdraw his guilty plea.
19           Then it took a year to litigate that motion to
20   withdraw the guilty plea.  We had five days of evidentiary
21   hearing, two full days of Mr. Fuechtener sitting on the stand
22   perjuring himself.
23           Then we had Judge Hoffman making findings that he was
24   deliberately creating a conflict with Ms. Connolly so that he
25   could hire David Chesnoff and Richard Schonfeld.  You held

1    another hearing on that matter.  You released money that was

2    designated for victims and for fines to enable him to hire

3    Chesnoff & Schonfeld, but after that he didn't.  He hired

4    Mr. Marsh and Ms. Muralidhara.

5            At the hearing you told him in no uncertain terms

6    that we were going forward at sentencing on February the 21st,

7    and Mr. Marsh was going to be his attorney.  And then there's

8    two motions to continue this hearing.

9            Mr. Fuechtener has had the best defense available.

10   Every one of his attorneys has been exceptionally competent,

11   every one of them have been vigorous advocates for him, and

12   quite frankly, they've been giving him the most vigorous

13   representation of any defense attorneys that I've encountered

14   in my time at the United States Attorney's Office.

15           He's had an opportunity to fully litigate every

16   possible issue that could be litigated in this case with the

17   best attorneys in town.  But even now he continues to lie and

18   manipulate and obfuscate because he thinks he can escape

19   justice if he throws enough money at it.

20           Mr. Fuechtener wants you to give him credit because

21   he was a porter to a wheelchair-bound inmate.  That inmate was

22   Christopher Busby.  He appeared before you this morning and

23   pled guilty to child pornography offenses.  Now, despite the

24   fact that Mr. Fuechtener has previously lied under oath, he

25   hopes that you're going to accept everything that he says and

TRANSCRIBED FROM DIGITAL RECORDING

1    that nobody will dig deeper for the truth.  Perhaps he wants

2    to tell you how he knew Mr. Busby before he went into custody.

3    Mr. Busby, a meth-addicted male prostitute who just pled

4    guilty to child pornography offenses.

5         Mr. Fuechtener argues that there's other defendants

6    in this district who are similarly situated to him, and

7    they've received lower sentences.  He points to nine cases in

8    this district.  His arguments are limited because he only

9    knows what's in the public record.  I'm familiar with every

10   one of those cases.  I accepted them for prosecution,

11   negotiated the plea agreements, went to trial on them,

12   litigated the pretrial motions, appeared at sentencing on one

13   aspect of that on every one of those cases.  And because I'm

14   familiar with the discovery in those cases and the PSRs in

15   those cases and the strengths and the weaknesses of the

16   government's case, I can confidently say that this case is, in

17   fact, in a league of its own.

18        He cites the case of William Thompson, which I

19   personally negotiated that plea agreement.  Let me be clear.

20   Mr. Thompson is a monster.  He's much worse than

21   Mr. Fuechtener.  His actions were completely reprehensible.

22   He's a prolific producer of child pornography.  He has

23   multiple live victims.  Mr. Thompson signed up for 29 and a

24   half years in federal custody this week.  What Mr. Fuechtener

25   doesn't know is he also signed up for 50 years in the state of

TRANSCRIBED FROM DIGITAL RECORDING

1   California, and it's very likely to be consecutive to his

2   federal sentence.  So 79 and a half years is what Mr. Thompson

3   is looking at.  He is going to die in prison because he's 59

4   years old.  Mr. Fuechtener is not going to die in prison.

5          And this is just one example of the cases that he

6   cites for you that they don't have the entirety of the facts,

7   and so the limited facts that they do have they're making

8   these arguments.

9          I'm happy to answer any of the questions that you

10  might have about any of those cases.

11         He offers to give you a list of cases where

12  defendants have gotten probation on a possession of child

13  pornography charge.  What he doesn't tell you is no judge in

14  this district has given less than 30 months on a single count

15  of child pornography.  In fact, Your Honor gave Armando

16  Rodenas 37 months.  Now, you'll remember, Mr. Rodenas pled

17  guilty pre-indictment.  All of his image -- all of the

18  images -- he had less than 150 -- had been deleted off of his

19  phone.  He immediately sought sex offender treatment; right

20  after the search warrant was executed at his house and before

21  he got the target letter, and you still imposed a low-end

22  guideline sentence of 37 months on him.

23         And as far as I know, you've only varied down on one

24  child pornography case, and that was Kristopher Gerry.  Now,

25  Mr. Gerry, as you'll remember, served in the military for 14

TRANSCRIBED FROM DIGITAL RECORDING

1    years.  He did three tours of duty in war zones, and he

2    suffered a traumatic brain injury.  His private viewing of

3    child pornography didn't even begin until after he suffered

4    that injury.  You only gave him ten months of credit.  A

5    ten-month downward variance because of his military service

6    and because you believed that the traumatic brain injury is

7    what precipitated his viewing of child pornography.

8            Aaron, can you turn on the ELMO, please?

9            So Kristopher Gerry gets ten months, and

10   Mr. Fuechtener is asking for a 264-month downward variance

11   based on him being employed and being a nice guy.

12           **THE COURT:**  Just to be clear, Mr. Gerry was not

13   sentenced to ten months.

14           **MS. ROOHANI:**  No.  He was sentenced to 60 months.

15   The low end of the guideline range was 70 months, and you gave

16   him a ten-month downward variance.

17           He asks you to rely on Dr. Harder's assessment of

18   him.  Dr. Harder spent two to three hours with him.  You've

19   spent more time with Mr. Fuechtener than Dr. Harder has.

20           And let's set aside for the fact, just for a moment,

21   that Dr. Harder admitted that the tests that he administered

22   are not calibrated to child pornography offenses at all, and

23   they shouldn't have been used in the first place.  And the

24   test that he should have used, the PPG, he didn't use it.

25           Let's just focus on the fact that Mr. Fuechtener lied

TRANSCRIBED FROM DIGITAL RECORDING

1    to Dr. Harder over and over and over again.

2            In his plea agreement, he admits that he is the owner

3    of the GigaTribe account, and the e-mail address that was used

4    to sign up for that account.  He tells Dr. Harder that other

5    people were using the file-sharing software, and he never

6    opened the files.  He admitted in the plea agreement that the

7    videos in his possession were downloaded off the Internet by

8    him.  He tells Dr. Harder that it was other gay men who had

9    access to his devices, and that they downloaded the child

10   pornography.

11           The evidence that came in at trial that Special Agent

12   Panovich also testified to today is that Mr. Fuechtener is the

13   person who started the Skype chat, but he tells Dr. Harder the

14   other guy started the chat.

15           The evidence at trial showed that he'd been

16   collecting child pornography since 2007, but he tells

17   Dr. Harder that he's only been viewing child pornography since

18   2015.  Dr. Harder told you it's important for people to tell

19   the truth; otherwise, how can the psychological assessment be

20   accurate?  How can you rely on the output of an assessment

21   when the input is lies?

22           Mr. Fuechtener concedes that there's no double

23   jeopardy issues in this case, but then he tells the Court it's

24   moot as long as you give him less than 20 years.  You

25   shouldn't be swayed by his threat of an appeal.  He's long --

TRANSCRIBED FROM DIGITAL RECORDING

 1   wrong on the law in terms of the law governing his plea

 2   agreement as well as these offenses.

 3          First, the case that he cites, *Chilaca*, it just

 4   doesn't apply here.  *Chilaca* dealt with four counts of

 5   possession for three devices that were connected to each other

 6   and also connected to a cloud-based storage account.

 7          Mr. Fuechtener pled guilty to one count of

 8   possession, one count of receipt, and one count of

 9   distribution based on nine different devices found all over

10   his house.

11          Second, he's already waived his appellate rights in

12   this -- regarding this issue.  On a direct appeal, he can only

13   appeal the portion of his sentence that is above the high-end

14   of the guidelines as determined by you.  That's life.  So

15   you'd have to sentence him to more than life for him to be

16   able to appeal.

17          He also forgets that he has to be sentenced on the

18   distribution count, and that doesn't merge with possession.

19   But let's assume that you believe that they do merge for some

20   reason.  You're still not bound by our recommendation.  You

21   can run the distribution and receipt counts back to back.

22          But even putting all that aside, put aside the

23   appellate waiver, put aside the fact that he's wrong on the

24   law, he's still not going to be able to appeal it because he's

25   explicitly conceded it before Your Honor.  That is a waiver in

TRANSCRIBED FROM DIGITAL RECORDING

1    the Ninth Circuit.  He won't be able to appeal this issue.

2    And his threat of appeal is nothing more than that; it's an

3    empty threat

4            So what are you left with, Your Honor?  You have a

5    man who possessed, received, distributed, and advertised child

6    pornography.  He repeatedly encouraged a father to sexually

7    assault his daughter so that he could watch on a webcam.  He

8    gave that man child pornography in exchange for that.  He

9    talked to other people on Grindr and Scruff about how he could

10   drug a young and find a 13 to 16-year-old boy that he could

11   sexually molest.  He admitted engaging in drug-fueled orgies

12   while watching child pornography.  He still continues to blame

13   everybody else for his criminal actions.  I've never once

14   heard him say that he did anything except for at the time of

15   his change of plea when he was under oath.

16           He's perjured himself continually through this trial.

17   He's lied about every aspect of his case to literally anybody

18   who would listen.  He tried to hide money from the Court,

19   money that should have gone to his victims, and only because

20   we were diligent were be able to save that money for the

21   victims.

22           He'd been planning to change his name and his

23   appearance and start traveling the world when he got out.  And

24   he's going to serve no time on supervised release.  So when

25   he's released, he's unleashed on the world.

TRANSCRIBED FROM DIGITAL RECORDING

1          These facts demand a 365-month sentence to protect

2    the public.

3          As the government does in every child pornography

4    case, before trial the attorneys and the case agent review the

5    videos.  You hear the whimpering little boy as he's being

6    raped.  You listen to the heart wrenching screams of the child

7    who's crying out while being raped.  And the pain that those

8    children felt should never have happened in the first place.

9    At the very least their pain should have stopped the day that

10   their abuse did.  But because of people like him, like

11   Mr. Fuechtener, they relive that violence every single day

12   because they know that the videos of the worst days of their

13   life are being used for his sexual gratification.  He gets to

14   avoid a life sentence in this case, but they don't.

15         Anyone who watched those videos would be haunted by

16   that whimpering and those screams and the daily torture that

17   those children continue to feel.  Anyone who's seen the

18   evidence in this case, who's read the chats, and who's watched

19   those videos could stand here and look at you with a straight

20   face and tell you that a 365-month sentence is fair and just.

21   It reflects the gravity of the conduct, and it's the minimum

22   sentence that's necessary to protect the public.

23         **THE COURT:**  Thank you, Ms. Roohani.

24         Mr. Marsh, is Mr. Fuechtener going to be making a

25   statement before you speak or after you speak?  He doesn't

TRANSCRIBED FROM DIGITAL RECORDING

1    have to make a statement at all, obviously.  It's optional.

2    But if he would like to make a statement, would he like to

3    make it before you speak or after?

4            **MR. MARSH:**  He'd like to make it after, Your Honor.

5            **THE COURT:**  All right.

6            **MR. MARSH:**  Let me propose what we're going to do.

7            **THE COURT:**  Okay.

8            **MR. MARSH:**  I'm going to make an argument.  I'm going

9    to address some of the legal arguments, and I'm going to give

10   you a basis for vary downward as we've requested.  I'm not

11   going to repeat [indiscernible] Ms. Roohani, then I'm not

12   going to repeat everything that's in the hundreds of pages of

13   briefing on this.

14           Ms. -- Ms. Muralidhara is going to talk to you about

15   Jan and some of the people who are supporting him, including

16   people who couldn't be here from Germany on such short notice,

17   and she was hoping to play a short clip of the video that we

18   submitted to Your Honor, like five or six months, that was

19   done before any of this happened.  It will give an accurate

20   portrayal of Mr. Fuechtener's life.

21           After that, he'd like to speak.  But in addition, we

22   have two -- two people, his former attorney, Jess Marchese,

23   and one of his -- Brad Cleary who's come from Germany who he's

24   worked with on production in the past would also like to make

25   a statement in support.  So we'll do it in whatever order --

TRANSCRIBED FROM DIGITAL RECORDING

1        **THE COURT:**  I don't take oral statements during

2   sentencing hearings.  I consider them -- they can videotape

3   them, they can send them in a letter, but I don't take oral

4   statements --

5        **MR. MARSH:**  They --

6        **THE COURT:**  -- during sentencing.

7        **MR. MARSH:**  -- submitted letters, Your Honor.  So you

8   have -- you have their views on this, and I can paraphrase it

9   during our argument.  But that's how we'd like to proceed.

10        **THE COURT:**  All right.  Go ahead.

11        **MR. MARSH:**  Obviously the conduct here is abhorrent.

12   You cannot justify looking at those images, and we start from

13   that.  But that does not justify giving Mr. Fuechtener a

14   sentence longer than somebody would have received for murder.

15   That's several times taller -- longer than the typical

16   sentence for homicide in this country.

17        We're here -- we're not going -- I know there's been

18   a lot of water under the bridge.  Sometimes I feel like

19   joining this case was jumping on a moving train.  And honestly

20   I don't know if we're the 10th attorneys here or not, but

21   if -- this was not Mr. Fuechtener using his wealth to try to

22   sway this Court.  He's entitled to whatever attorneys that

23   he -- that the Court allows him to retain, and all of this was

24   approved by the Court.  And we do appreciate you allowing us

25   to come on just three or four short months ago and try to get

TRANSCRIBED FROM DIGITAL RECORDING

1    up to speed on all of these things.  And obviously we haven't

2    been able to do everything we wanted to, but I think we've

3    given him a good defense and made the arguments that needed to

4    be made.  And we can't undo everything that's been done

5    before, but we're not here to contest guilt.  We -- we realize

6    he's bound by the guidelines.  He's here to accept

7    responsibility.

8            We realize we're not -- we're not writing on a blank

9    slate.  But we've tried in our sentencing memo and in response

10   to the government's sentencing memo to present a more full

11   picture of Mr. Fuechtener beyond -- beyond that we've met,

12   that his prior counsel have engaged with, that his friends and

13   family know.  And while his conduct was admittedly despicable,

14   he's not the monster that he's been portrayed by the

15   government.  He is, in the words of his counsel, Mr. Marchese,

16   a good person, an essentially good person, a nice guy --

17   that's certainly been my experience -- who did a very bad

18   thing.

19           Now, the guideline range here -- I think we've ended

20   up at 42 at this point, 360 to life.  If we were not dealing

21   with the fact that he had sought to withdraw his plea

22   agreement, which is a violation of the plea agreement and it

23   can result in loss of acceptance of responsibility, the

24   guideline range would have been 291 to 365.

25           The -- and I will say, from what I read -- and

TRANSCRIBED FROM DIGITAL RECORDING

1    obviously we tried to go back and read every word of those

2    transcripts and read the motions and read Your Honor's ruling,

3    you denied that motion.  That motion was based on an alleged

4    conflict of interest among his counsel.  And allegedly that

5    his plea was coerced.

6         And it was an unusual plea in that it occurred in the

7    middle of his -- middle of his trial, and he was given a plea

8    agreement and basically take it or leave it.  The benefit that

9    he got was he was able to argue down to five years because he

10   lost the 15-year mandatory minimum for the advertising count.

11        The other side of that, which he has to live with

12   now, is he has a guideline range of over 24 years.  And I

13   think realizing that was what caused him to go through and

14   waste all of his -- as the government characterized, take up

15   everybody's time.

16        Now, the government now asks you for 365 months.

17   That's above the -- above the guideline range.  I don't know

18   how they came up with that.  I don't know whether that's one

19   month for every day of the year.  Even Probation, which does

20   not often, in my experience, recommend variances, recommends

21   that you vary down to 282 months.  That's 23 and a half years,

22   which is ten months lower than the range under the plea

23   agreement with acceptance.  So even if we were there, they're

24   recognizing that that guideline range is too high when it

25   comes to Mr. Fuechtener.

TRANSCRIBED FROM DIGITAL RECORDING

1          And I -- I would add -- I mean, I think this is

2     recognized.  Obviously some judges have disagreed vehemently

3     with the child pornography guidelines.  There's lots of

4     literature on this.  Many fine opinions on both sides.  But I

5     think we all would recognize that the child pornography

6     guidelines are the result of political influence and not

7     really any kind of empirical data.

8          And it's almost a sham the way that they talk about

9     having a -- a starting range of level 22 when you also add 2

10    for computer that almost always applies.  You have young kids.

11    If it wasn't young kids, they wouldn't be prosecuting it.  You

12    have [indiscernible] masochistic conduct, and you have over

13    600 images.  Well, with videos, every case has over 600 videos

14    [sic].  And so you end up at a level 35.  With -- with no

15    criminal history, that's a range of 168 to 210, 14 years.

16    That's where you start.  And then the government added pattern

17    of activity.  Mr. Fuechtener agreed to that so we're not going

18    to challenge it here, but we are arguing that that can be a

19    basis for a variance; that this is not among the extreme edge

20    of that enhancement where he should receive all five levels,

21    and that you should vary down.

22          If you read the -- I mean, the guideline for that

23    pattern of activity talks about involving the sexual abuse and

24    exploitation of a minor.  Now, what they used here was either

25    an attempt or conspiracy to commit coercion or enticement,

TRANSCRIBED FROM DIGITAL RECORDING

1    something that wasn't charged here.  But that could arguably

2    apply.  It doesn't need to result in a conviction, and it can

3    include attempt or conspiracy.  But we're not talking about

4    any contact offenses.  We're not talking about the horrible

5    grooming of some of the other examples that we gave in the

6    charts in our sentencing memo.

7              So I ask you to take into account whether a variance

8    should apply towards the low end of that five levels.  And,

9    again, that puts you down in the 168 month range, 14 years.

10   It gets us close to what we're asking for, which is eight

11   years, and that's, of course, why he agreed to take this plea

12   agreement.  If he had proceeded to a verdict before

13   Your Honor -- and this was a bench trial, pretty unusual

14   situation -- we could have argued all of these enhancements.

15   But he gives that up in order to be able to argue down to five

16   years, but now he's stuck with the guideline range of over 20

17   years.

18             And I will say, I mean, you ask why eight years?  We

19   could have said nine.  We went back and forth on that.  What

20   we looked at was the sentence that Mr. Leftly received,

21   Jack Leftly, who was sentenced recently by Judge Boulware.  He

22   got a sentence of seven years.  He's from Australia.  He was a

23   member of the Australian Bee Gees, a performer like

24   Mr. Fuechtener.  And the government agreed to -- they agreed

25   to jointly recommend a sentence of nine years, and the judge

TRANSCRIBED FROM DIGITAL RECORDING

1    gave him seven.  And also the government agreed not to oppose
2    a treaty transfer back to Australia so he could serve his time
3    there, something that was never available in this case.  So
4    that's how we came up with that.
5         You know, we felt that it was appropriate to add a
6    year or two for the fact that acceptance of responsibility
7    doesn't apply here because of a technical violation of the
8    agreement and because -- and so that should be given some
9    additional time.  But not the six and a half additional years
10   that you get for that.  Because we're talking about the
11   high-end of the guidelines where murderers and terrorists are
12   sentenced.  At that point, every level can be a huge amount.
13   Here two levels was six and a half years to the low -- to the
14   low end.
15        When we look -- and those guidelines are not to be
16   presumed by this Court as reasonable.  The appellate courts
17   can, and they don't particularly in the Ninth Circuit but
18   other -- other circuits give presumptions.  But this Court is
19   not to presume it as reasonable.  It's a starting point, and
20   we look at the factors under 3553.  We talk about just
21   punishment, just desserts.  We talk about deterrence, both
22   specific and general.  And I would argue, as we did in our
23   sentencing memo, that any lengthy prison sentence for somebody
24   in Mr. Fuechtener's situation is going to provide general
25   deterrence.  It could be five years or it could be a gazillion

TRANSCRIBED FROM DIGITAL RECORDING

1    years.  He's not going to be doing these things again, and

2    they've asked for lifetime supervision.  He's going to be

3    deported from the only country that he's known for the past

4    years since he moved to -- to Las Vegas.

5          You know, there's a -- there's an article I go back

6    to when I really want to get to the heart of what sentencing's

7    about, and it's by the often philosopher C.S. Lewis.  He wrote

8    an essay called "The Humanitarian Theory of Punishment," and

9    actually was arguing against the humanitarian theory of

10   punishment.  And he talked about the idea of general

11   deterrence, and he said, when you punish a man in

12   [indiscernible], make him an example to others, you're

13   admittedly using him as a means to an end, someone else's end.

14   This, in itself, would be a very wicked thing to do.  And his

15   point is you don't treat human beings who have rights as

16   something to make an example of others.

17         Now, he believed that the only moral basis for

18   sentencing was just desserts or it could be called

19   retribution.  The goals of federal sentencing are much broader

20   than that and do include deterrence.  They also include

21   protecting the public, and they include providing

22   rehabilitation.

23         Here, I think the government has shown that it's

24   driven by retribution or revenge; that it's not just for his

25   inexplicable acts regarding child pornography but it's for

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    lying, for refusing to take the degree of responsibility that
 2    the government wants.  But the real reason -- and I -- I
 3    believe this was made clear today at the hearing, but it's
 4    also right there in the government's sentencing memo at
 5    page 16.  It says the defendant wasted countless hours of the
 6    Court's time.  Well, asserting his rights and putting the
 7    Court and everyone through this hearing may cause him to lose
 8    acceptance of responsibility, but it's not the basis for
 9    giving somebody a 30-year sentence, I would argue.
10            The double jeopardy argument, we could -- we could
11    get into the weeds there.  I don't want to do that.  We
12    mentioned it in our -- our brief.  I -- I don't think
13    Ms. Roohani's given a full explanation.  The recent case
14    talked about multiple possession counts.  There's another
15    case -- I think it's called Thompson -- that talks about how
16    you can't have a receipt and possession; they're the same
17    thing.  The plea agreement here doesn't make the distinction.
18    I'm -- I'm going to leave that alone.  That's preserved.
19            The -- I want to talk about -- before I turn it over
20    to Ms. Muralidhara, I want to talk about another case because
21    you do have the compare these cases.  And I don't think that
22    the guidelines tell you everything.  And it shouldn't just be
23    up to Ms. Roohani how she wants to charge people or plead
24    them.  It's up to the Court to decide what a fair sentence is.
25            I hesitate to bring this up because it's somebody I
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    represented on appeal.  I believe it was one of her cases.
 2    The man's name was Randy Wren.  He's in the -- he's in the
 3    table.  He was sentenced by Judge Mahan to I believe it was
 4    eight or nine years for child pornography.  He was originally
 5    charged with coercion and enticement for cyberstalking a
 6    minor.  I mean, and his relationship with that minor -- which
 7    I can't talk about in court -- is disgusting.  And he -- he
 8    got -- he was allowed to plead to child pornography.  And they
 9    didn't seek an enhancement based on chats or based on his
10    conduct in the original charges.  He -- he got his eight or
11    nine years.
12            When the PSR came back, it was at a lower range than
13    the one that was calculated with the government.  Judge Mahan
14    filed the joint -- filed the joint recommendation, and he
15    appealed because he wondered how he didn't get a lower
16    sentence.  And eventually he dismissed that appeal.
17            But when you compare the underlying conduct there --
18    and I went back and I read the -- the complaint in that -- the
19    original coercion and enticement complaint there.  I have to
20    believe that the only difference there was that Jan went to
21    trial, and Jan went through the motions to withdraw and that's
22    why we're getting a -- a 30-year recommendation.
23            I'll leave it at that.  I would turn it over to my
24    colleague to talk about Jan and present other evidence to give
25    a full picture of the defendant.
```

TRANSCRIBED FROM DIGITAL RECORDING

1          **MS. MURALIDHARA:**   Judge Navarro, there is nothing

2    redeeming or even understandable about child pornography case.

3    I think we can all agree on that.   This is a difficult crime

4    to understand why it's so pervasive and why it happens in our

5    society.

6          But what is understandable is that each one of us

7    came to work today with a difficult task; the government to

8    prosecute the case, Mr. Marsh and I to defend this case, and

9    Your Honor to judge this case, to judge the man, Mr. Jan

10   Rouven Fuechtener, for these offenses.   This triangle of

11   justice does not work unless each one of us plays our own

12   integral role.

13         Jan went down the wrong path in life.   We can all

14   agree upon that.   But he did not go down the worst path

15   possible.   He did not go down the path that results in a

16   365-month sentence leaving him in his 70s upon release from

17   custody; deported from this country; Frank, his husband, who

18   is 20 years his senior, probably dead; and his mom and dad

19   surely would be passed by then.   And because of this, we must

20   not forget that it is not severe punishment that promotes

21   respect for law, but it's the most appropriate punishment.

22   And, Judge, we assert to you that the most appropriate

23   punishment in this particular case is a 96-month sentence in

24   custody.

25         I want to give you a little bit of a background about

TRANSCRIBED FROM DIGITAL RECORDING

1      Jan and who he is to provide a more complete picture.  Jan's

2      mother, Rita, was unable to fly from Germany to the

3      United States.  She fell ill and was unable to travel.  But I

4      had an opportunity to correspond with her, and in her

5      correspondence with me she shared the following for

6      Your Honor:

7              She says that Jan has always been an upstanding,

8      hardworking, and dedicated individual, especially to the craft

9      of magic.  That he was able to pull himself up by his

10     bootstraps and make his dream career a reality.  She says that

11     Jan has always been known to defend those who are less

12     fortunate than him, and he frequently volunteered back in his

13     home country of Germany.

14             As a child, Jan was known to give away his toys to

15     poor children who could not afford them.  He saw a difference

16     in the way that he was raised and found a need to help those

17     around him survive as well.  His mom remembers him as a

18     gullible, naive, and a credulous child always trying to find

19     the good in people.  And Rita asked this Court to give him a

20     second chance so that one day she can reunite with her son.

21             Another individual I had the opportunity to

22     correspond with is Jan's first boyfriend, an individual I will

23     call Ian to protect his identity.  Ian and Jan met in Germany

24     when they were very, very young teens.  You can call it a

25     puppy love sort of story.  And --

TRANSCRIBED FROM DIGITAL RECORDING

1    **THE COURT:**  I thought his first boyfriend was an

2    older man.

3    **MS. MURALIDHARA:**  It was, Judge.  The term boyfriend

4    in German culture is not the way that we use the word

5    boyfriend here in the United States.  It's a very -- as you

6    know, Jan is gay.  It's a very open and acceptable practice to

7    have numerous individuals that you are dating or experimenting

8    with, and so this was one of Jan's first boyfriends when he

9    was young.

10   Ian recalls the two of them met at a discotheque, and

11   that night Ian had to be home by 11:00 p.m.  He shared with me

12   that it was Jan who made sure that he got home safe and walked

13   him home even though Jan lived on the other end of town.

14   Ian shared with me that the night they first met he

15   had his first kiss with Jan.  And that night, in pure

16   young-love fashion, Jan professed his love for Ian saying that

17   he was going to marry him one day and be a big illusionist on

18   the Las Vegas Strip; that they would come to America and would

19   live this life together.  And that was puppy love, Judge.

20   A few months later, Ian broke up with Jan and Jan was

21   devastated.  He didn't understand why his friend, his

22   boyfriend, wanted to leave him.  The truth is, as Ian shared

23   with me, Ian was a victim of child sexual abuse and

24   exploitation, and a much older man in Germany had taken

25   advantage of him when he was much younger.  Ian said that he

TRANSCRIBED FROM DIGITAL RECORDING

1    couldn't be with Jan because of the issues that he, himself,

2    was facing and trying to figure out, and so he had to end the

3    relationship with Jan.

4            Ian now shares how shocked he is finding out the

5    situation that Jan is in and the convictions that he has pled

6    guilty to.  Ian didn't know how he should have felt when he

7    heard about what Jan had done, and he contemplated back and

8    forth retribution, burning in hell, versus forgiveness.  And

9    after three years, Ian decided that he wanted to forgive Jan.

10   Judge, this individual called me out of the blue.  I answered

11   the phone.  I had no idea who this person was.  I had to check

12   with Jan, Hey, who is this individual that's calling and

13   trying to talk to me about this case and share with me these

14   stories?

15           Ian had saw it in the news, and so he had reached out

16   to share his -- his feeling on what had happened and what he

17   wanted the Court to know.  And after contemplation, Ian has

18   decided to forgive Jan and ask the Court if the Court can give

19   him a second opportunity.

20           The other individuals who were not able to make it

21   from Germany, Steffan (phonetic) Alfter, who is Jan's

22   brother-in-law, and Steffan's companion, Danielle.  They

23   describe Jan as a warmhearted, sensitive individual who's

24   biggest joy is to make other people happy.

25           While Jan has been in custody in Pahrump, he has had

TRANSCRIBED FROM DIGITAL RECORDING

1    an opportunity to participate in the Crossroads Prison

2    Ministry.  He has successfully completed part one of the

3    course, and staff at the Crossroads Prison Ministry says that

4    Jan has been a faithful student and a joy to work with.  He's

5    challenging himself, and he's trying to be a better person.

6            Your Honor, one of Jan's very close friends, Brad

7    Cleary, is actually in court here today.  He flew here from

8    Germany to show his support when the rest of Jan's family was

9    unable to fly.  Brad was prepared to read a letter to

10   Your Honor, and I understand Your Honor's policy not having

11   individuals share these stories in court.  But I would like to

12   share a small portion of what Brad was prepared to share in

13   court today.

14           Brad expresses that he has known Jan for 20 years,

15   and that this conduct that Jan has pled guilty to is not

16   indicative of who Jan truly is.  But he recognizes in 2015,

17   when he was here with Jan, he saw something change within Jan.

18   And he could see that Jan was going down the wrong road.  And

19   he wishes that he was there, that Frank was there, that his

20   family was there to pull Jan away and say, Hey, you're going

21   down the wrong path, but it was too late and Jan went down the

22   wrong path.

23           Judge, this individual's a law abiding citizen who

24   hopes the Court can see the good in him despite the very bad

25   situation that he is in.  We know we've provided you a

TRANSCRIBED FROM DIGITAL RECORDING

1   significant amount of information for Your Honor to -- to

2   consider, and we hope that you see that Jan is on his way and

3   that he needs an opportunity and a ladder of opportunity to be

4   better.  Thank you, Judge.

5           THE COURT:  Thank you.

6           Do you want to play your video?

7           MS. MURALIDHARA:  Judge, we submitted a copy of that

8   video to you, and we -- we hope that you had an opportunity to

9   watch that video.

10          THE COURT:  I did not.

11          MS. MURALIDHARA:  Then I would like to play a small

12  clip for you.

13          THE COURT:  Go ahead.

14          Is this the Netflix video?

15          MR. MARSH:  It is.  It is.

16          MS. MURALIDHARA:  Yes, Judge.  We are prepared to

17  play a seven-minute clip from the Netflix documentary,

18  "Magicians" --

19          THE COURT:  Oh, that?  Then, yes.  Okay.  No, I'm

20  familiar with that.  I thought this was a different --

21          MS. MURALIDHARA:  Um-hum.

22          THE COURT:  -- video that you had made separately

23  that I wasn't aware of.  No, I understand.  I've --

24          MS. MURALIDHARA:  It's actually two clips that we've

25  put together so Your Honor doesn't have to watch the entire

TRANSCRIBED FROM DIGITAL RECORDING

1   documentary right now in court.

2          THE COURT:  I'm familiar with the clips from the --

3   the documentary that were provided.  Let me see if I can find

4   where they were filed.  Exhibit A to No. 334?

5          MS. MURALIDHARA:  Correct.

6          THE COURT:  The "Magicians:  Life in the

7   Impossible" --

8          MS. MURALIDHARA:  Yes, Judge.

9          THE COURT:  -- documentary?  Yeah, I'm familiar with

10   that.  You don't need to play it.  I thought you were --

11          MS. MURALIDHARA:  Okay.

12          THE COURT:  I'm sorry.  I thought you were referring

13   to something else that I hadn't seen.

14          MS. MURALIDHARA:  Thank you, Judge.

15          THE COURT:  Anything else, Mr. Marsh, that you wanted

16   to add before we hear from Mr. Fuechtener?

17          MR. MARSH:  I did just want, since we're not playing

18   it, to talk about one I thought particularly in retrospect

19   with where we're at now.

20          THE COURT:  Okay.

21          MR. MARSH:  There's a scene near the end of the movie

22   where Jan -- they show Jan when he's got his headlining gig at

23   the Tropicana, and he has a voice-over and he says:  I've

24   always dreamed of having my own show in Las Vegas -- and I'm

25   paraphrasing -- now I have it, and that creates kind of an

TRANSCRIBED FROM DIGITAL RECORDING

1    emptiness not having the next goal because you've made it.

2         And Jan's going to elaborate on this, but

3    unfortunately the way he filled that void, that emptiness that

4    he felt after he'd been successful, was with methamphetamine

5    and -- which led to what happened here.  And without

6    understanding that fog of drug abuse that he was in, you can't

7    fully judge his conduct here.  So I'd like for Mr. Fuechtener

8    to talk about that and address the Court.

9         **THE COURT:**  All right.  Mr. Fuechtener.

10        **THE DEFENDANT:**  Ever since I received my first magic

11   kit at the age of six, I wanted to become a magician.

12   Striving for that goal at the age of 15, I met a man, Frank,

13   who would become my mentor.  Frank started teaching me all

14   about magic, and as I progressed, he also became my manager,

15   show producer, and eventually my partner and husband.

16        I moved out of my parents' home and moved in with

17   Frank when I was 18 and he was 36.  Also, at the age of 18,

18   Frank took me for the first time to Las Vegas.  We met with

19   fellow Germans and my idols, Siegfried & Roy.

20        Ever since I had worked with the intent to become a

21   headliner on the Las Vegas Strip.

22        During the years that follow, we lived a vagabond

23   life with the need to constantly find new locations and

24   engagements for shows, as well as working on the illusion acts

25   and production values.

TRANSCRIBED FROM DIGITAL RECORDING

1          During this period, I performed all over Europe,

2    cruise ships, and then the world during which I became quite

3    famous while at the same time I was -- I was a virtual

4    unknown.  I wasn't recognized on the street.

5          Also during these years, as I had left the comfort

6    and protection of my parents' household and moved in with a

7    man who, at the age of 36, took on the role of provider and

8    protector.  Unfortunately, while I was very interested in

9    learning about magic, I was not as interested in learning

10   about life.  Frank, therefore, had to deal with all the

11   problems of everyday living.  I, other than the show, had a

12   free ride, but at the same time, due to the vagabond nature of

13   our business, I was unable to fully enjoy the fruits of my

14   labor.

15         That all changed when I found success in Las Vegas.

16   In Vegas, with a steady nightly show on -- in -- in one city,

17   I, for the first time, was able to truly live the life I had

18   earned.  Unfortunately, like it happened with many others, the

19   sudden freedom led to my downfall.

20         I was at the pinnacle of my career as a professional

21   entertainer, and by March 14th, 2016, the night of my

22   last-ever headline performance, my show was literally the only

23   aspect of my life that I still had any control over.  Six

24   nights per week I had something I had to live up to, the only

25   constant factor which kept me from becoming truly consumed by

TRANSCRIBED FROM DIGITAL RECORDING

1   this [inaudible], ignorant, and unhealthy lifestyle that had

2   infected everything else in my world.

3        Your Honor, I would like to share with you the story

4   of how I realized my childhood dream without realizing that I

5   had left behind all that defined the good and honest man I

6   used to be, my free fall into moral ignorance and ethical

7   abandonment whenever the curtain was down, how I ended up here

8   standing before you today.

9        I had been with my husband, Frank, for 25 years.

10  He's also my manager, producer, and responsible for many of my

11  successes.  Moving to Las Vegas presented us with the

12  opportunity to be legally wed, to solidify our union.

13  However, as with many things in Vegas, behind the smoke screen

14  of our wedding we were actually swiftly drifting apart.

15  Unfortunately, I didn't see it then, but I had started to

16  surround myself with the wrong kind of people.  And Frank, in

17  turn, fell into his own new routine.

18       Now not governed by the task of having to promote me

19  or manage my working life on a show-to-show basis, Frank found

20  himself flooded with free time.  He's 18 years my senior, and

21  the temptation to see me retire, to travel more, and begin

22  leading a life of leisure whilst I kept the economic wheels

23  turning was too much to keep up.

24       I didn't feel it happening, but Las Vegas had

25  provided us with totally opposing schedules and provided new

TRANSCRIBED FROM DIGITAL RECORDING

1    opportunities and distractions preventing us noticing how we

2    were slipping into estrangement.  In fact, Frank ended up

3    being away from home more often than not, and his absence

4    meant that I had all the space in the world to fill my

5    immediate surroundings with these new different and very

6    liberated types of people that I was beginning to collect

7    [indiscernible] because in their eyes I was somebody, and

8    because I was very social.

9            My new friends were always in a fun and energetic

10   mood and were totally different from any social circle I had

11   ever been a part of before.  These new people satisfied not

12   only my lack of companionship without Frank around but also my

13   intimate needs.

14           Unfortunately, being gay in Las Vegas had other

15   components that I have never before encountered.  To say I can

16   be naive would be an understatement, but I guess you don't

17   really notice things you aren't accustom to looking for.

18           My friends were all using drugs.  I rarely consume

19   alcohol, and I had never used any illegal substance before.

20   The way these people used drugs like methamphetamine was so

21   casual, so open, to me it seemed innocuous.  It was as if they

22   were just smoking cigarettes.  Everything had the appearance

23   of total liberation, in lifestyle and in sexuality.  And in my

24   ignorance, I was too overwhelmed with this carefree approach

25   to socializing to see the harm that drugs really did.

TRANSCRIBED FROM DIGITAL RECORDING

1          And to my everlasting shame, now I always will be

2    considered a substance abuser, even though I'm certain I will

3    never use methamphetamine again.   If I had not been blinded by

4    my naivety, my ignorance, and hiding behind the stability of

5    performing six nights per week, I know I would have never have

6    let drug use impair my judgment, influence my choices, and

7    impair my ability to assess right from wrong and tell moral

8    from immoral.

9          I would like to apologize to everybody who got

10   affected, direct or indirect, by the result of my poor choices

11   and judgment.   My parents, my husband, my closest friends, and

12   supporters.   I would like to apologize to the Court and to the

13   government for my critical misunderstandings and

14   misconceptions of the American justice system, which led to

15   every decision I made in the past three years.   But most of

16   all, I would like to apologize to the victims.   I realize

17   that, by possessing and sharing child pornography, one is

18   revictimizing an abused child.

19         During my incarceration, I signed up to a victim

20   impact class at the detention center where I learned with

21   other inmates about the lifelong suffering victims of child

22   pornography have to endure and how this suffering is a

23   distinguished one from the one put upon the victims by the

24   original abuser, the one who produced the video.

25         I also know that there is restitution in this case,

Case 2:16-cr-00100-GMN-DJA   Document 356   Filed 04/08/19   Page 79 of 97

TRANSCRIBED FROM DIGITAL RECORDING

1    and I'm willing to pay restitution.

2         And I just have to say that [indiscernible] talked

3    with you before, but I never looked at these videos with a

4    gratification or a -- and it is -- it is my need to say that,

5    for everybody who listens [indiscernible] victims, I never --

6    I got involved.  I got -- found the wrong path, but this is

7    something I can leave behind.  I never will do this again.

8         THE COURT:  If not for gratification, then what is

9    the purpose of watching the videos?

10        THE DEFENDANT:  Your Honor, I don't know.  To please

11   others, to make -- it's -- I don't know.  But I know I live

12   with sexual offenders since the past three years, and I know

13   people have issues I don't have.  And this is the way I have

14   to go down.  And I know there's -- there is some treatment

15   available to me, and I have to find out what happened and why

16   it happened.

17        It is with a heavy heart that I realize today will be

18   the last time I ever see Las Vegas, the place I wanted to call

19   home and perform at since I came here for the first time at

20   age 18.  But [indiscernible] not to be.  It could be forgiven

21   for thinking that I would have grown accustom to the idea but

22   the dream is over during the last three years I have been

23   incarcerated.  This is not the case either, and it is still

24   one I'm coming to terms with.  And I'm horizons away from

25   forgiving myself for allowing every part of my former identity

AMBER M. McCLANE, CCR 914
(702) 384-0429                      *Page 115*

TRANSCRIBED FROM DIGITAL RECORDING

1    slip away and become ignorant to myself and my childhood dream
2    of magic.
3            This is my wake-up call, and I would like to ask
4    Your Honor to give me a second chance at life.  Thank you.
5            **THE COURT:**  Does the Probation Office have anything
6    to add?
7            **PROBATION OFFICER BLEVINS:**  Thank you, Your Honor.
8            Not a lot to add with respect to this other than the
9    fact that perhaps there have been a lot of things that have
10   been said in this courtroom today that I didn't -- I haven't
11   heard of before, and I just want to defer to the Court beyond
12   the recommendation.
13           **THE COURT:**  All right.  Thank you.
14           Mr. Fuechtener, if you'll please stand.  The Court
15   has heard statements from counsel for the government, for the
16   defense, the defendant's statement.  I've also considered the
17   factors set forth in Title 18 of the United States Code
18   § 3553(a), which has me also consider not just the nature and
19   circumstances of the offense but also the history and
20   characteristics of the defendant as well as to reflect the
21   seriousness of the offense, to provide a sentence that
22   promotes respect for the law, just punishment for the offense,
23   and so forth.  Restitution for the victims and so forth.
24           Government has done a very successful job of showing
25   me as well, I think, as everyone else that, sir, you have a

TRANSCRIBED FROM DIGITAL RECORDING

1    problem in that you are a liar.  And it's been my experience

2    here in court that you're also a manipulator.  For you,

3    everything is about the show and the show must go on and on

4    and on.  For years we have been here.

5          And you still show very little remorse.  This is the

6    first time that you've said anything that shows me any remorse

7    in your statement, and I would not be surprised to find that

8    it is something that you read and then copied verbatim from

9    something that you saw in a victim impact panel, that that

10   very little bit of remorse is enough that I will take it

11   because I want you to start understanding and not be in denial

12   of what you've done and why you've done it.  Because without

13   it, you just can't move on.  You can't rehabilitate if you

14   keep denying to yourself that you've done nothing wrong or

15   that you watched these videos for no reason and not for

16   gratification.  I mean, you see the -- the lack of logic

17   there.

18         And it's not for my good.  I mean, I -- I've been

19   doing this long enough that it doesn't matter as much what you

20   say as what you believe, and you need to start looking more

21   seriously, more seriously than you have in the last three

22   years, about whether or not you have a problem, what that

23   problem is, and what you can do to help yourself if, in fact,

24   you want to be a successful member of the community again some

25   day.  I'm not seeing a whole lot of that.  You still only

TRANSCRIBED FROM DIGITAL RECORDING

1    regret the consequences.  You've never shown any regard for

2    the children who are abused as Ms. Roohani very well said, and

3    I could read into the record pages and pages of descriptions

4    of chats and descriptions of the videos and the horrendous

5    physical sexual rapes that are being performed on these

6    children.  And you're only concerned with your sexual

7    gratification or satisfaction or those of your friends as you

8    throw these parties with rent boys, which I don't even know

9    what that is and don't want to go down that road.  You said

10   they're not prostitutes.  I don't know what a rent boy is if

11   it's not a prostitutes.

12          But regardless, you're having these parties at the

13   pool house, at the cabana -- the Fun House, you call it -- as

14   these videos are played, hours long, of children being raped

15   and screaming and whimpering.  And you're not just doing this

16   for other people.  They're nine devices all over your house.

17   This isn't just in the party room.  And there's even one

18   that's found on pause as one of the videos was being played.

19          You know, we didn't go into the argument today that I

20   anticipated, which was that in Germany this is not really a

21   crime or it's treated as a misdemeanor and so forth because

22   that was all in the documentation.  As Mr. Marsh very aptly

23   said, hundreds of pages of documents were provided.  And trust

24   me, I have read all of them, and so I anticipated something

25   like that would come up.  And, you know, I'm glad that -- that

TRANSCRIBED FROM DIGITAL RECORDING

1    you didn't try to argue that again as some of the other

2    counsel have because I think that's probably very offensive to

3    the German people, including your own mom.  You wouldn't show

4    her these videos.  Guaranteed you would not want her to see

5    these videos.

6            And even your husband, you hid these videos from him;

7    that was your statement.  And you knew that -- and he -- and

8    he's German.  This is not acceptable anywhere.  Not in

9    Germany, not in the United States, not anywhere.

10           Dr. Harder's statement in his report that you were a

11   low risk of offending -- reoffending because of your stable

12   relationship, but then you explained that you had hundreds of

13   sexual partners while you're married to him and he is going on

14   cruises with other men.  So I -- I put very little weight on

15   Dr. Harder's opinion, not because I don't respect him as a

16   person, but because the information that you provide to him is

17   nonsensical and illogical and it was very much in contrast to

18   the information that was provided earlier.  And, you know, in

19   short, again, you know, more lies.

20           Your -- your behavior has been nothing short of

21   disgusting in watching these videos, but your lack of shame

22   for doing so and instead blaming others, not thinking twice

23   about lying to benefit yourself, even at the expense of

24   others, of so many attorneys that have represented you, and

25   friends and family that you've also, you know -- you know, one

TRANSCRIBED FROM DIGITAL RECORDING

1    of them was, like, Jeff with a last name unknown and all these

2    people that you point the finger at at being the ones who are

3    either watching these videos or giving you methamphetamine,

4    which you claim you thought was marijuana, and that was

5    possibly the cause of all this problem.  And -- and -- and

6    then claiming falsely that you're a victim of violent

7    offenses, the irony of that is not lost on me.

8            But dragging out these court proceedings like an

9    amateur soap opera that I'm sure one day you're going to shop

10   around to someone with some talent that maybe can make a

11   decent screenplay out of this.  Quite frankly, I am and have

12   been ready to turn the channel for a long time, and in this

13   courtroom at least, the show is finally over.

14           And you are hereby sentenced to 240 months, which is

15   20 years.  You're 41 years old.  That makes you 61, minus good

16   time credit.  That's plenty of time to have a successful life

17   if you choose to do that.  Otherwise, I have no doubt you will

18   be picked up right again, even if you're in Germany, wherever

19   you are, if you're doing anything like this again.

20           240 months is the sentence that the Court does find

21   to be sufficient but not more than necessary to comply with

22   the purposes of sentencing.  I would like to give you more.  I

23   really would.  But I'm doing it not because I like you but

24   despite the fact that I really don't like you.  The things

25   that you've done, the things that you've said, and so I am

TRANSCRIBED FROM DIGITAL RECORDING

1    ignoring that for the time being and pretending that you're --

2    you behave like a normal person, like every other defendant

3    that's here, so that I can give you the sentence that is fair

4    despite your shenanigans.

5         So as I said, I believe this is the sentence that is

6    sufficient but not more than necessary to comply with the

7    purposes of sentencing.

8         The fine in this case is a little bit different

9    because it is a child pornography case.  So I am fining you

10   $500,000 for Counts 1, 2, and 3.

11        The -- and I guess I should specify because the

12   Probation Office is going to ask me about it.  For Count 1,

13   it's 240 months -- well, actually, no.  It can't be, can it?

14   It has to be 180 to come up to 240, or can it be -- because do

15   they have to run consecutive?

16        **PROBATION OFFICER BECKNER:**  No.  Your Honor, does not

17   have to run it consecutive --

18        **THE COURT:**  Okay.  So 280 -- okay.  So -- yeah.  So

19   240 months for Count 1; 60 months for Count 2, concurrent; 60

20   months for Count 3, concurrent.  So all three are concurrent

21   to each other.  240 months is the total sentence that I think

22   is appropriate.

23        Supervised release, you know, the mandatory minimum

24   is five years.  He's probably going to be deported, but I'll

25   go ahead and sentence him to five years of supervised release

TRANSCRIBED FROM DIGITAL RECORDING

1    for Counts 1, 2, and 3, concurrent.

2         The restitution amount is $70,000, which is for the

3    various victims that have filed the documentation required.

4    And the special assessment is $100 per count.  There's three

5    counts, so that's $100 per count, $300 total.  But then

6    there's also the JVTA special assessment, which is $5,000 for

7    Count 1, plus $5,000 for Count 2, and $5,000 for Count 3.  So

8    that's $15,000.

9         You're going to ask me why I varied downward from the

10   guideline range.  I do agree with Mr. Marsh's argument that in

11   these cases, unfortunately, it's too common that the child

12   pornography is on a computer and it does involve children and

13   it does involve multiple images.  And so the guideline range

14   does skyrocket, quite frankly --

15   *(Interruption in proceedings.)*

16        **UNIDENTIFIED SPEAKER:**  Oh, shit.  Are you okay?

17   *(Pause in the proceedings.)*

18        **THE COURT:**  Do you need some water?  He probably

19   needs some water.

20        Are you all right to continue, Mr. Fuechtener?

21        **THE DEFENDANT:**  Yes.

22        **THE COURT:**  All right.  At your plea hearing you did

23   waive some of your appellate rights.  However, there are other

24   rights which can never be waived.  So if you do wish to

25   appeal, you do have only 14 days to file your notice of

TRANSCRIBED FROM DIGITAL RECORDING

1    appeal, and then, if you file your notice of appeal and you
2    cannot afford counsel to represent you, please let the Court
3    know so that we can make sure that an appellate counsel is
4    appointed to represent you.  And likewise, if you need a free
5    copy of the documents for that appeal, let the Court know so
6    we can make those available to you at the government's
7    expense.
8            There is an amended Preliminary Order of Forfeiture.
9    Mr. Marsh, I forgot to ask you, do you have any objection to
10   my signing the Preliminary Order of Forfeiture that's an
11   amendment.  Usually we file -- we sign a final at this point,
12   but this is --
13           **MR. MARSH:**  [Indiscernible.]
14           **THE COURT:**  -- an amended preliminary.
15           Any objection?
16           **MR. MARSH:**  No, Your Honor.
17           **THE COURT:**  I'll go ahead and sign and date that for
18   today so it can be made a part of the record.
19           Any remaining counts to be dismissed, Ms. Roohani?
20           **MS. ROOHANI:**  Government would move to dismiss
21   Count 4, Your Honor, [indiscernible] child pornography.
22           **THE COURT:**  Okay.  So Count 4 will be dismissed.  And
23   there were three different locations -- facilities that were
24   recommended in the documentation that was filed by Mr. Marsh
25   in one of the many documents filed.  Now I don't remember

TRANSCRIBED FROM DIGITAL RECORDING

1    where, which one that was in.  It was --

2         (Simultaneous cross talk.)

3             **MS. MURALIDHARA:**  Judge, it's ECF 333.

4             **THE COURT:**  333.  Thank you.

5             **MR. MARSH:**  Page 29 and 30.

6             **THE COURT:**  All right.  So, Aaron, on docket 333,

7    near the end, it's the very last -- [indiscernible] didn't

8    take.  So it's back here.  No. 1 is FCI Seagoville,

9    S-e-a-g-o-v-i-l-l-e, Texas.  Second one is FCI Terminal

10   Island, California; and the third location is FCI Englewood,

11   California.  So I will recommend those three facilities, as

12   well as the opportunity to participate in either a DAP or RDA

13   program even though he would not likely be eligible to receive

14   any time off his sentence for that, but I think those programs

15   are very helpful and would be helpful specifically to

16   Mr. Fuechtener, as well as the SOMP, sexual assault [sic]

17   management program.

18        One of the locations had the ACE, adult continuing

19   education program, and as well I would recommend that.  I

20   think maybe only the one in California had that.

21        Now, as a term of your supervised release, there are

22   conditions that you are required to follow.  If you want to

23   follow along, they begin on page 46 of the presentence report.

24   I am imposing the standard and mandatory conditions as well as

25   the following special conditions:  The minor prohibition.  You

TRANSCRIBED FROM DIGITAL RECORDING

1    must not have direct contact with any child you know or

2    reasonably should know to be under the age of 18, including

3    your own children, without the permission of the probation

4    officer.  If you do have any direct contact with any child you

5    know or reasonably should know to be under the age of 18,

6    including your own children, without the permission of the

7    probation officer, you must report the contact to the

8    probation officer within 24 hours.  Direct contact includes

9    written communications, in-person communications, or physical

10   contact.  Direct contact does not include incidental contact

11   during ordinary daily activities in public places.

12           2.  Computer search --

13           MS. ROOHANI:  Your Honor, I'm sorry, before you go

14   on?

15           THE COURT:  Yes.

16           MS. ROOHANI:  If you are going to impose the

17   restriction as to his own children, you need to make specific

18   findings as to that, and I believe you can rely on the facts

19   of the case.  It's a greater restriction, so Your Honor needs

20   to make specific findings as to why he is restricted from

21   associating with his own children.

22           THE COURT:  Well, he doesn't have any children.  But

23   if he were to have children, he would be restricted from

24   contact with those children until -- and this is what I've

25   done with other folks -- until we can set up some kind of a

TRANSCRIBED FROM DIGITAL RECORDING

1  program, counseling for the child to be aware that they --

2  that it is safe for them to report any kind of contact.

3  Usually there's family counseling and other things that occur.

4        But certainly in this case, because of the nature of

5  the videos, they're not just children having sex but they're

6  sadistic, violent acts --

7        **MS. ROOHANI:**  Thank you, Your Honor --

8     *(Simultaneous cross talk.)*

9        **THE COURT:**  -- adults with children.  So that would

10  be the reason why.

11        No. 2 is the computer search monitoring software

12  condition.  To ensure compliance with the computer monitoring

13  condition, you must allow the Probation Office to conduct

14  periodic unannounced searches of any computers as defined in

15  § 1030(e)(1) of Title 18 subject to computer monitoring.  The

16  searches shall be conducted for the purpose of determining

17  whether the computer contains any prohibited data prior to

18  installation of the monitoring software to determine whether

19  the monitoring software is functioning effectively after its

20  installation and to determine whether there has been any

21  attempt to circumvent the monitoring software after its

22  installation.  You must warn any other people who use these

23  computers that the computers may be subject to search pursuant

24  to this condition.

25        There is a financial penalty, and you must pay the

TRANSCRIBED FROM DIGITAL RECORDING

1    financial penalty in accordance with the schedule of payments

2    sheets of the judgment.  You must also notify the Court of any

3    changes in economic circumstances that -- that may affect the

4    ability to pay this financial penalty.

5              If you are ordered deported from the United States,

6    you must remain outside the United States unless legally

7    authorized to reenter.  If you reenter the United States, you

8    must report to the nearest Probation Office within 72 hours

9    after you return.

10             You must not view or possession any visual depiction

11   as defined in § 2256, including any photograph, film, video,

12   picture, or computer or computer-generated image or picture,

13   whether made or produced by electronic, mechanical, or other

14   means of sexually explicit product as defined in Title 18 of

15   the United States Code § 2256 that would compromise your sex

16   offense treatment.

17             6.  You must not view or possess any visual depiction

18   or any photograph, film, video, picture, computer, or

19   computer-generated image or picture, whether made or produced

20   by electronic, mechanical, or other means, of sexually

21   explicit conduct involving children or actual sexually

22   explicit conduct involving adults that would compromise your

23   sex offense-specific treatment.  These restrictions do not

24   apply to materials necessary to and used for any future

25   appeals or materials prepared or used for the purpose of sex

TRANSCRIBED FROM DIGITAL RECORDING

1    offender treatment.

2            Visual depiction as defined in Title 18 of the

3    United States Code § 2256(5) includes undeveloped film and

4    videotape data stored on computer disc or by electronic means

5    which is capable of conversion into a visual image and data

6    which is capable of conversion into a visual image that has

7    been transmitted by any means, whether or not stored in a

8    permanent format.

9            Sexually explicit conduct is defined by Title 18 of

10   the United States code § 2256(2) involves children, meaning

11   actual or simulated sexual intercourse, including

12   genital-genital, oral-genital, or oral-anal, whether between

13   the same or opposite sex; bestiality; masturbation; sadistic

14   or masochistic abuse; lascivious exhibition of the genitals or

15   pubic areas of any person.

16           And actual sexually explicit conduct defined by

17   § 2257(h)(1) of Title 18 includes involving adult, means but

18   not simulated conduct as defined in clauses (i) through (v),

19   as in victory, above.

20           The search and seizure clause.  You must submit your

21   person, property, house, residence, vehicle, paper, computers

22   as defined in § 1030(e)(1), Title 18, and other electronic

23   communications or data storage device or media or office to a

24   search conducted by the United States Probation Office.  And

25   failure to submit to a search may be grounds for revocation of

TRANSCRIBED FROM DIGITAL RECORDING

1    release.  And you must warn any other occupants that the

2    premises may be subject to searches pursuant to this

3    condition.  And the probation officer may conduct a search

4    under this condition only when reasonable suspicion exists

5    that you have violated a condition of supervision and that the

6    area to be searched contains evidence of the violation.  Any

7    search must be conducted at a reasonable time and in a

8    reasonable manner.

9           And last, No. 8, you must participate in a sex

10   offense-specific treatment program and follow the rules and

11   regulations of the program.  And the probation officer will

12   supervise your participation in the program, the provider, the

13   location, the modality, the duration, intensity, and you must

14   pay the cost of the program.

15          I think we need to set a payment schedule for the

16   restitution.

17          **MS. ROOHANI:**  Your Honor?

18          **THE COURT:**  Yes.

19          **MS. ROOHANI:**  I would ask that it be due and payable

20   immediately from the funds that are on hold with the Clerk of

21   the Court.  Both that and the fine.

22          **THE COURT:**  Any objection, Mr. Marsh?

23          **MR. MARSH:**  I actually have three requests, two of

24   which involve the fines and the money that's being held.

25          **THE COURT:**  All right.

TRANSCRIBED FROM DIGITAL RECORDING

1        **MR. MARSH:**  First, I'd ask that you actually set a

2    hearing regarding the disposition of those funds so that any

3    other affected parties may appear.  I know we've gone through

4    this before.  There's been a lot of litigation before I became

5    involved, our firm became involved on that issue.  And I think

6    it also goes to the fine, which is -- you know, that money was

7    not just Jan's money.  It was his husband, Frank's, as well

8    from the proceeds from the sale of his house.  And so I -- I'd

9    make the request that you consider cutting the fine in half

10   for that reason.

11        Barring that, we should still have a hearing, I'd

12   suggest, in early April regarding the final disposition of the

13   funds.  We may be making some additional requests, whether

14   it's for counsel or whether it's for sentencing consultants

15   regarding Mr. Fuechtener and how he's going to serve his

16   sentence.

17        And that's also what my -- my last request is, and

18   it's regarding treaty transfer.  I know that the government

19   opposes it.  We asked them about this issue awhile ago.  We'd

20   ask you for a recommendation from the Court regarding that

21   issue regarding the Court's recommendation -- it's simply a

22   recommendation that he be allowed an international treaty

23   transfer to serve his time in Germany

24        **MS. ROOHANI:**  And, Your Honor, we would ask that you

25   oppose that transfer.  Based upon my research, Germany would

TRANSCRIBED FROM DIGITAL RECORDING

1    not honor your sentence.  So ultimately, if the treaty

2    transfer would be approved, he would be released in Germany.

3    He would not be held in Germany pursuant to the treaty.  So

4    that's why I would ask that you not make that recommendation.

5          MR. MARSH:  Well, the treaty says that Germany's

6    bound by the sentence.

7          THE COURT:  Well, the Court declines to make a

8    recommendation for a treaty transfer, and the restitution

9    payment will be made from the funds that are being held by the

10   Court for the -- from sale of the home.  Any remaining amount

11   will be -- well, actually the mandatory assessment is paid

12   first from the funds that are held from the sale of the house.

13   Then the -- I believe it's the restitution, and then the fine.

14         MS. ROOHANI:  Correct, Your Honor.

15         THE COURT:  I think that there's sufficient there to

16   cover all three.

17         MS. ROOHANI:  That -- that's correct, Your Honor.

18   And I understand Mr. Marsh's argument, but you've already

19   actually ruled that this amount is appropriate to be applied

20   for these reasons, and that, under the law, Mr. Fuechtener and

21   Mr. Alfter's respective interests have already been preserved

22   in that -- in that way.  So I believe that it should be paid

23   immediately.

24         THE COURT:  Now, there was also -- did I mention the

25   installation of the computer monitoring software?  I don't

TRANSCRIBED FROM DIGITAL RECORDING

1    remember if I said that clause or not.  Officer Blevins?

2          **PROBATION OFFICER BLEVINS:**  No, Your Honor.  That --

3    that was an additional condition.

4          **THE COURT:**  All right.  So an additional condition of

5    supervision is that you must also allow the probation officer

6    to install computer monitoring software on any computer as

7    defined in § 1030(e)(1) of Title 18 on any computer that you

8    use.

9          Anything else that I need to address, Officer

10   Blevins?

11         **PROBATION OFFICER BLEVINS:**  [Indiscernible] the

12   defendant his conditions.

13         **THE COURT:**  Oh.  Yes.

14         So Officer Blevins is providing to you,

15   Mr. Fuechtener, documentation there.  Those are the conditions

16   of supervised release.  If you lose those for any reason, you

17   can get another copy at any Federal Probation Office.

18         Ms. Roohani.

19         **MS. ROOHANI:**  Your Honor, I don't know that -- I

20   think you need to say some magic words; that you order that

21   that amount be paid -- due and payable immediately, and then

22   it should be entered as part of the judgment.  And then we can

23   get the money from the Clerk of the Court for those purposes

24   in the order that you stated.

25         **THE COURT:**  All right.  The Court orders that the

TRANSCRIBED FROM DIGITAL RECORDING

1    fine, restitution, and mandatory penalty assessments that have

2    been ordered today be paid from the funds that are being held

3    by the Court that are proceeds from the sale of the home.

4              Anything else?

5              **MR. MARSH:**  We do have money in our trust account,

6    Your Honor.  I may make some applications regarding the use of

7    what's left there, and that obviously we'll return the balance

8    to the Court.  And I will make a filing on that forthwith.

9              **THE COURT:**  All right.  Thank you.

10             All right then.  We'll be in recess.  Good luck --

11             **MS. ROOHANI:**  Thank you, Your Honor.

12             **THE COURT:**  -- good luck, Mr. Fuechtener.

13             **COURTROOM ADMINISTRATOR:**  Off record.

14        *(Proceedings adjourned at 4:40 p.m.)*

15                                 * * *

16        I, AMBER M. McCLANE, court-appointed transcriber, certify

17   that the foregoing is a correct transcript transcribed from

18   the official electronic sound recording of the proceedings in

19   the above-entitled matter.

20

21   /s/  *Amber M. McClane*                4/8/2019

22        Amber M. McClane, CCR 914         Date

23

24

25