———2:16-cr-00100-GMN-CWH———

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                 Plaintiff,         )  Case No. 2:16-cr-00100-GMN-CWH
                                     )
6         vs.                        )  Las Vegas, Nevada
                                     )  April 19, 2016
7   JAN ROUVEN FUECHTENER,           )
                                     )
8                 Defendant.         )  MOTION HEARING
    ─────────────────────────────────)

9

10

11

12

13                  TRANSCRIPT OF PROCEEDINGS

14              THE HONORABLE GLORIA M. NAVARRO,
                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:            See Next Page

20  DIGITALLY RECORDED:     Liberty Court Recorder
                            11:12 a.m.

21

22  TRANSCRIBED BY:         PATRICIA L. GANCI
                            (702) 385-0670

23

24  Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.
25

```
                    ─2:16-cr-00100-GMN-CWH─
```

1  APPEARANCES:

2  For the Plaintiff:
           **ELHAM ROOHANI, AUSA**
3          **CRISTINA D. SILVA, AUSA**
           UNITED STATES ATTORNEY'S OFFICE
4          501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada 89101
5          (702) 388-6336

6  For the Defendant:
           **JESS R. MARCHESE, ESQ.**
7          LAW OFFICE OF JESS R. MARCHESE
           601 South Las Vegas Boulevard
8          Las Vegas, Nevada 89101
           (702) 385-5377

9
           **MICHAEL W. SANFT, ESQ.**
10         SANFT LAW
           228 South Fourth Street, 3rd Floor
11         Las Vegas, Nevada 89101
           (702) 497-8008

12
   ALSO PRESENT:
13         Samira Barlow, Pretrial Services Officer

14

15

16

17

18

19

20

21

22

23

24

25

─────2:16-cr-00100-GMN-CWH─────

1          LAS VEGAS, NEVADA; TUESDAY, APRIL 19, 2016; 11:12 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  This is the time set for the

5    motion hearing regarding first motion of review and amend the

6    order of detention in the matter of -- in the case of

7    2:16-cr-00100-GMN-CWH, the United States of America versus Jan

8    Rouven Fuechtener.

9          Counsel, your appearances, please.

10         MS. ROOHANI:  Good morning, Your Honor.  Eli Roohani

11   and Cristina Silva on behalf of the United States.

12         THE COURT:  Good morning, Ms. Roohani.  Good morning,

13   Ms. Silva.

14         MS. SILVA:  Good morning.

15         MR. MARCHESE:  Good morning, Your Honor.  Jess Marchese

16   and Michael Sanft on behalf of the defendant, who is present and

17   in custody.

18         THE COURT:  Good morning, Mr. Marchese.  Good morning,

19   Mr. Sanft.

20         MR. SANFT:  Good morning, Your Honor.

21         THE COURT:  And how do we pronounce the defendant's

22   last name?

23         MR. MARCHESE:  Fuechtener, correct?

24         THE DEFENDANT:  Fuechtener.

25         THE COURT:  Fuechtener.  Okay.

—2:16-cr-00100-GMN-CWH—

1          Fuechtener?  Is that close?  Okay.  Fuechtener.  Good

2  morning, sir.

3          All right.  Well, this is the time for a motion hearing

4  that was filed by the defendant appealing from the magistrate

5  judge's detention order.  On March 14th, Mr. Fuechtener --

6  Fuechtener, you were arrested pursuant to a criminal complaint.

7  On March 15th you had your initial appearance in front of Judge

8  Leen.  On March 16th, the next day, you appeared before Judge

9  Leen again for a detention hearing, and you were ordered

10 detained pending trial.  She found by clear and convincing

11 evidence that you are a danger to the community, a finding that

12 does require detention pending trial.

13         Then on March 30th you were indicted on a criminal

14 indictment by the federal grand jury here in the District of

15 Nevada, which is on the Docket at Number 12, and April 6th you

16 were arraigned in front of Judge Hoffman.  Today you are seeking

17 a revocation -- the revocation of that order, the appeal of that

18 order, and to be released on bond.

19         Now, just to be clear, on an appeal of a detention

20 order, pursuant to Title 18, United States Code Section 3145(b),

21 this court does perform a de novo review, so brand new review.

22 Pursuant to 3142(f), the court has to determine whether any

23 condition or set of conditions, combination of conditions, will

24 reasonably assure, number one, your appearance.  The appearance

25 of the defendant is required.  Number two, the safety of any

1    other person in the community.

2          Now, the -- previously Magistrate Judge Leen did find

3    that you were a danger to the community, but not a flight risk.

4    The Government is -- is now stating that they still believe that

5    you are also a flight risk.  And since this court does review

6    everything de novo, that's also a finding that I will be making

7    today as well, is whether or not you're a flight risk even

8    though that was already addressed earlier.

9          Also pursuant to Section 3142(e)(3), certain offenses

10   do create a rebuttable presumption that no condition or

11   combination of conditions will reasonably assure the appearance

12   of a person who's -- who's required to be in court and for the

13   safety of the community.  Here, in this case the defendant is

14   facing at least one count alleging an offense involving a minor

15   victim, I think in fact there are three, Title 18, United States

16   Code Section 2252A and 2251(d).

17         So I saw that the Government did state that the

18   rebuttable presumption applies.  Also saw that Magistrate Leen

19   had found that a rebuttable presumption applied even before

20   there was an indictment.  Now there is an indictment.  I didn't

21   see in the Defense counsel's motion or reply what your position

22   was on whether the rebuttable presumption applies.

23         MR. MARCHESE:  We do take the position that it applies,

24   but we take the position that we can overcome it, Your Honor.

25         THE COURT:  All right.  So there's no dispute that the

─2:16-cr-00100-GMN-CWH─

1   rebuttable presumption applies.

2          Then the burden of the persuasion still remains with

3   the Government, but the application of the presumption does have

4   the effect of shifting the burden of the production to the

5   defendant.

6          To avoid detention, the defendant will rebut the

7   presumption of detention using four factors pursuant to Section

8   3142(g).  The court will be looking at, number one, the nature

9   and circumstances of the offense, including whether the offense

10  is a crime of violence or involves a firearm; number two, the

11  weight of the evidence against the defendant, and now we have

12  the indictment; number three, the history and characteristics of

13  the defendant, including the characteristics of the defendant,

14  the physical and mental condition of the defendant, family ties,

15  employment, financial resources, length of residence in the

16  community, community ties, past conduct, history relating to

17  drug or alcohol abuse, criminal history, or any other records

18  regarding his appearance at prior court appearances; and, number

19  four, the fourth category is the nature and seriousness of the

20  danger to any person or the community that would be posed by the

21  person's release.

22          So there are two different questions, whether or not

23  the defendant poses a danger to the community, and the

24  Government must establish that by clear and convincing evidence.

25  The second question is whether the defendant is a risk of

—2:16-cr-00100-GMN-CWH—

1  nonappearance, and the Government must prove that by a

2  preponderance of the evidence.  The Government doesn't have to

3  prove both.  Either one of those would be sufficient for the

4  defendant to be detained.

5          So this is the defendant's motion.  So let's go ahead

6  and start with the defendant.

7          MR. MARCHESE:  Thank you, Your Honor.

8          It's our position that both factors are not met here.

9  First of all, Mr. Fuechtener is not a danger to the community,

10  and second that he is not a flight risk.  I'll go with the

11  flight risk first because I think that's the easier argument.

12  Although you're a different court and you can make whatever

13  ruling Your Honor sees fit, obviously the magistrate court found

14  that there was no risk of flight with my client, Jan.

15          One of the things that I put in my motion was a little

16  bit of the history of this case.  There was approximately a six-

17  to seven-week delay in which the charges were actually filed,

18  the complaint, and the search warrant.  Within that six- to

19  seven-week time period, Mr. Fuechtener had every opportunity to

20  flee the country.  As the Government has correctly pointed out,

21  he is not a citizen of the United States, although he does

22  legally reside here.  He had every opportunity to flee the

23  country, but he did not.  And I would submit to the court that

24  the reason he did not is because guilty people flee and innocent

25  people stay.

—2:16-cr-00100-GMN-CWH—

1          So he had every opportunity to do so, and he did not.

2   He has significant contacts with the community.  He has -- as is

3   has pointed out in the pretrial services report, he has large

4   economic interests locally here.  He did have a show.  Obviously

5   there's been some issues with that, but he has a lot of personal

6   contacts.  His husband is present in the courtroom here today.

7   They are legally married.  That's one of the issues that we

8   brought up in our opposition which we will get to momentarily.

9          I've spoken with his husband.  He will also serve as a

10  third-party custodian should the court see fit, as that will be

11  a term and condition that the court might want to put onto

12  Mr. Fuechtener if the court is -- decides to release him here

13  today.

14         In addition, he's also willing to give his passport to

15  the court.  He is also -- he doesn't have it in court today, but

16  his husband has represented there will be no problem getting it

17  here immediately over to pretrial services.  In addition, we

18  would submit that GPS monitoring would be a perfect avenue for

19  him.  He will go nowhere.  He can have limited access to

20  computers.  He is ready, willing, and able to comply with any

21  court orders in reference to that.

22         Also, as the court can see from the pretrial services

23  report, he is a man of means.  So if the court -- typically in

24  this jurisdiction I don't see it very often.  I have seen it in

25  the past, but if the court would like to have him post some sort

—2:16-cr-00100-GMN-CWH—

1  of a cash bond to make sure that he has an incentive, so to

2  speak, to appear in court, that is also something that we would

3  ask the court to entertain.

4         He has no criminal history whatsoever.  So there's no

5  issue there.  So we would submit that he is not a risk of flight

6  based on his ties to the community, lack of criminal history,

7  lack of failures to appear, obviously given the fact he has no

8  criminal history.  So those are all reasons that he is not a

9  risk of flight, and that's why we agreed with Judge Leen's

10 determination that he was not a risk of flight.

11        The obvious issue that Judge Leen had was this issue

12 that Mr. Fuechtener is supposedly a danger to the community.  We

13 respectfully disagree with the magistrate's ruling, and that's

14 why we appealed this matter up to Your Honor.  The first thing

15 that I would bring up is that anecdotally I have seen in this

16 particular jurisdiction and typically -- every case is

17 different.  Every defendant is different.  And every judge is

18 different, but typically I see that people situated such as my

19 client are in fact released on pretrial services.

20        So I guess the real question is what is it about Jan

21 that makes him such a danger to the community.  Now, obviously

22 the nature of the charges are severe.  I can't change that.  I

23 would like to.  There's a point in time when obviously we'll

24 have the opportunity to argue that in court.  Today is not

25 necessarily that time.  It is just to see if he's a danger to

—2:16-cr-00100-GMN-CWH—

1   release to the community.

2          Now, the issue here really about this case is whether

3   or not you can put Jan behind the keyboard of a computer.  There

4   have been no admissions in this case.  There have been some

5   issues with the IP address coming back to my client's address,

6   but the important thing to note and I brought it up is that this

7   is a huge property.  This is not your typical cookie-cutter Las

8   Vegas tract home.  This is 1.1 acres.  The actual home itself is

9   9,000 square feet.  There is a pool house which is actually as

10  large as many residences of, you know, your average home in Las

11  Vegas.  It's about 2,200/2,400 square feet.  There's a huge

12  garage.  There are about 35 different electronic devices taken

13  in the search, but the important part here is where these

14  particular items were found and who was coming in and out of the

15  residence.

16         We can certainly show the court that there were several

17  people coming in and out of this home.  Mr. Fuechtener is a very

18  social man, for lack of a better term.  There was several

19  overnight guests, and I even pointed out to the court that on

20  the date and time of the search warrant there was another

21  individual staying overnight.

22         Further, and it is -- that's buttressed by the reports

23  by the FBI, there was an individual staying in the pool house

24  just hours before the search warrant was conducted.  And that's

25  a very --

1           THE COURT:  Joel Rosales.  Is that who you're referring

2    to?

3           MR. MARCHESE:  No, Mr. Rosales was an overnight guest.

4    The actual individual who was staying in the pool house, his

5    name is not put in the 302s, but my investigator was actually

6    able to find this individual.  It's a Mr. Correia.  Mr. Correia

7    actually will admit and will also be supported by Mr. Rosales

8    that Mr. Correia was, in fact, in the pool house the night

9    before.  And that's important because that's where the greater

10   majority of these -- this elicit material is found, in the pool

11   house.

12          Coincidentally, although the FBI was unable to open any

13   of the videos, there are four videos or what was purported to be

14   four videos, four videos that were on a lock screen that based

15   upon their names of the -- of the files could be -- there could

16   be a very good argument made that that was in fact child

17   pornography.  So this -- we have --

18          THE COURT:  Wasn't there one that was on pause?

19          MR. MARCHESE:  And that's what I'm referring to.  I

20   don't believe that the FBI was able to extract it.  They -- I'm

21   a little -- I'm not exactly tech savvy, but from what I could

22   read from the reports, they went in there.  They tried some sort

23   of -- whatever mechanism that they use, and they could just --

24   they just got the file screen.  Maybe the Government when they

25   argue can add a little bit more light to that, but that's my

2:16-cr-00100-GMN-CWH

1    understanding from reading the reports.

2           So we have this laptop.  We have in the laptop there is

3    a SanDisk.  There's also another computer.  This is all in the

4    pool house where this material is found, and then outside on the

5    patio is a hard drive that's a significant amount of -- of child

6    pornography on it.

7           The only issue is there's the thumb drive that was

8    found in my client's husband's closet in, I guess for lack of a

9    better term, a jewelry-box-looking item.  So these items,

10   although he obviously resides there, we would argue that it's

11   very difficult for the Government to necessarily put him behind

12   the keyboard, so to speak.

13          Now --

14          THE COURT:  Well, it's reasonable to assume that if he

15   has guests in there all the time and there's something found in

16   the guesthouse in the pool house, but when there's a thumb drive

17   in that box in the master bedroom up in the closet, that's

18   what -- that's what I'm looking at when I consider the weight of

19   the evidence.

20          MR. MARCHESE:  Correct, and I agree with you, but let's

21   go back and look at the nature of the home.  This is a very

22   large home.  You know, this is a his and his, I guess, for lack

23   of a better term, closet.  The closet was not my client's

24   closet.  It's actually his husband's.  So I think that that, you

25   know, changes the argument a little bit as opposed to most

—2:16-cr-00100-GMN-CWH—

1    people just have one master bedroom closet and, you know, they

2    have one side and the husband or whoever has the other side.  So

3    that's my argument there, Your Honor.

4           Now turning to the husband and his statements that were

5    used.  The Government takes the position that they can in fact

6    use his statements.  Now, we filed an affidavit that my client's

7    husband wishes to invoke his spousal testimonial privilege.  Now

8    the Government says, "Well, we still can use that because it's

9    hearsay and hearsay is allowable at detention hearings," but I

10   would argue that the analysis goes one step further because the

11   Defense is placed in a very untenable position when they -- when

12   the Government takes that position.  What I mean by that is,

13   it's my position that Mr. Fuechtener has a right to -- to due

14   process, to confront witnesses.  Under due process he has the

15   right to question witnesses.

16          But the problem is when the Government uses these

17   statements against him and his husband is using the privilege,

18   we don't have that right.  So the Government basically gets

19   their cake and gets to eat it, too.

20          The only other option for us is to call him as a

21   witness.  And as I cited in my opposition or my reply, excuse

22   me --

23          THE COURT:  That would waive the privilege.

24          MR. MARCHESE:  -- there is case law that when you call

25   the witness, you waive the privilege.  So it's our position that

1    that -- those statements should not be made.  And even --

2           THE COURT:  You also pointed out that when the husband

3    gave the statement about being upset that the defendant was

4    looking at pornography that he didn't say it was child

5    pornography and that he was referring to adult pornography.

6           MR. MARCHESE:  That is 100 percent correct, Your Honor.

7    And, you know, the issue here that -- for us is, if the court

8    does allow it, that's the argument that we would like to make.

9    Throughout his one-hour, it's just short of one hour, statement

10   that he made at the airport, the husband that is, to the FBI, he

11   categorically denies over and over and over that his husband is

12   into child pornography.  At no point in time does he say

13   anything like that.

14           Now, I would submit to the court that if someone is

15   unaware of all of the facts was to look at the criminal

16   complaint and read that last paragraph, that I could see how it

17   could possibly be misconstrued or communicated in such a fashion

18   that my client does in fact watch child pornography when that is

19   not the case.  Those words never came out of his husband's

20   mouth.

21           So if the court does allow those statements to come in,

22   I would ask that the court consider it in that fashion because,

23   yes, he did make statements that his husband watches child --

24   adult, excuse me, pornography regularly, I would submit to the

25   court that's nothing more than a red herring given the fact that

 1  that is a 100 percent legal activity.

 2       Now, morally, we can argue that for days upon end, but

 3  we're not here to talk about morals.  We're here to talk about

 4  the law.  And in my opinion, I would submit to the court that

 5  under the law it's irrelevant and shouldn't be considered.

 6       THE COURT:  All right.  So let me just make sure that I

 7  understand.  There's allegations that in that pool house there

 8  was an Apple iMac.

 9       MR. MARCHESE:  Correct.

10       THE COURT:  So a box computer, for lack of a better

11  word, right, that had 251 videos and six images of child

12  pornography.  Then outside of the patio of the pool house, I

13  suppose in the curtilage, I didn't see any photographs, but in

14  my mind I'm thinking so right outside is 3,235 videos and 105

15  images that was on the Passport Ultra Exterior Drive.  But then

16  in -- on the thumb drive that's inside that box in the master

17  bedroom closet of the master bedroom in the closet of --

18  apparently you're saying they have separate closets, he and his

19  husband.

20       MR. MARCHESE:  Correct, Your Honor.

21       THE COURT:  They don't share the one closet.  So in the

22  husband -- in the closet that was used primarily by his husband

23  that's where the thumb drive is found.  And on that thumb drive

24  the allegation is that -- that thumb drive contained some of the

25  same images and videos that were provided to the undercover

—2:16-cr-00100-GMN-CWH—

1   officer by the individual using the name Lars45 in that -- in

2   that peer-to-peer network communication.

3          MR. MARCHESE:  My -- my notes indicate that the shared

4   files -- there were 12 files on the external hard drive.  That

5   was the one on the ground plugged into the router outside of the

6   home.  I did not make any notes indicating that the thumb drive

7   had any of those shared files.  However, as an officer of the

8   court, I must -- I feel compelled to let the court know that on

9   that thumb drive there were some pictures of my client and his

10  husband and their dog.  I'm just -- you know, I just want to be

11  100 percent and not try to miscommunicate or misconstrue the

12  facts to the court.

13         THE COURT:  All right.  So on page 5, lines 13 and 14,

14  of the Government's brief, which is Number 18 on the docket, it

15  says that thumb drive contained images and videos depicting

16  child pornography including some of the same images and videos

17  provided to the undercover by Lars45.

18         So I take that to mean provided during that time when

19  they were having the conversation that led to this, I guess, to

20  the August 3rd, 2015/August 4th, 2015, that timeline with the

21  peer-to-peer network sharing.  Well, we'll hear from Ms. Roohani

22  and she can fill us in.

23         All right.  So anything else that you want to add,

24  Mr. Marchese?

25         MR. MARCHESE:  Court's indulgence.

—2:16-cr-00100-GMN-CWH—

1          (Defense counsel conferring with defendant.)

2          THE COURT:  He's not a U.S. citizen.  Did you say he's

3    a legal permanent resident or what's the standing?

4          MR. MARCHESE:  He has an E-2 visa currently, Your

5    Honor.

6          THE COURT:  Okay.

7          I think there was different information provided, and I

8    looked at a lot of things in this case.  There was the pretrial

9    service report, and I think we have Officer Barlow here who

10   maybe can clarify this for me.  On the first page of the

11   pretrial service report it says that Mr. Fuechtener stated he

12   entered the United States in April 2011 on an E-2 Investor Visa

13   and applied for a green card in 2015.  That Immigration and

14   Customs Enforcement advised the pretrial service department that

15   the defendant entered the United States on December 14th, 2015,

16   and is in the process of becoming a legal resident and the

17   status is pending.  I suppose that's not too contradictory, but

18   it's a little different.

19         OFFICER BARLOW:  No, what happens, Your Honor,

20   sometimes is that -- and I could be corrected by ICE, but when a

21   person applies or becomes a legal permanent resident, that's

22   when they mark it as date of entry.

23         THE COURT:  Day one, right.

24         OFFICER BARLOW:  So ... but that's the status of where

25   he is right now, pending.

1          THE COURT:  All right.  Thank you.

2          All right.  Anything else, Mr. Marchese, you wanted to

3  add?

4          MR. MARCHESE:  Your Honor, the only other thing I would

5  say just that I would just reiterate from my original point that

6  in equity it's my position that I don't think that there's

7  anything that differentiates my client from all of the other

8  individuals that had been released on pretrial services in this

9  jurisdiction.  I believe that there are in fact terms and

10 conditions that can be applied by this court that will, number

11 one, make his appearance at court and, number two, will not make

12 him a danger to the community.

13         With that, we will submit it.

14         THE COURT:  And I do see on page 5 of the Government's

15 response that they claim the defendant did admit after being

16 Mirandized that his e-mail address was in fact

17 larsschmidt22@hotmail.com, and that was the one where the Skype

18 account of larsusa22 was created, was using that e-mail.

19         MR. MARCHESE:  That is a correct statement, and that

20 brings up an important point.  I am still waiting on

21 clarification from GigaTribe, but there's a transaction that

22 goes on on March 21st at 12:31, which is -- I'm assuming it's

23 military time, and this is where I need to get some of the

24 clarification for GigaTribe.  I have an e-mail out to an

25 individual.  I have not got a response.

1        It's our understanding that these -- that GigaTribe

2   does their times in what they call UTC Time.  I don't know if

3   the court's familiar with that.  I'll be honest, I just learned

4   it myself.

5        It's seven hours ahead, and the reason that's important

6   is it would make it at 7:31.  March 21st, 2015, was a Saturday.

7   At 7:31 on March 21st, 2015, my client would have been at work.

8   So it would have been impossible for him to be the one who is

9   making these transactions.

10       Now, I haven't gotten 100 percent clarification, but I

11  will say that in looking at page 128 of the discovery that's

12  what I've looked at and I've sent it to my expert.  He believes

13  it as well, but I need 100 percent clarification.

14       So the issue here is it's our position that someone

15  else did this and used his information because we all know that

16  someone who's into this is obviously going to try to mask their

17  identity given the serious nature of such charges.

18       THE COURT:  And this was 7:30 a.m. or p.m. on March

19  21st?

20       MR. MARCHESE:  It says 12:31, and so we're assuming

21  that's military time; because if you look at all of the

22  listings, it would be such as you'd see in a typical police

23  report.  And based upon that that would comport with military

24  time.  That was one of the questions I asked.  Is this military

25  time?  And it's our understanding it's also UTC Time.  So you

1   have to add seven hours.  So basically wherever you're at in the

2   world would be that same time when you do UTC.

3          Little bit confusing.  Like I said, I had to learn it

4   myself for the first time.  And I want to get a clarification

5   from GigaTribe because they're really the only ones who can tell

6   me for sure.

7          THE COURT:  So it would be 7:30 p.m. or 7:31 p.m.?

8          MR. MARCHESE:  Right.  Right.  And it would be

9   uncontroverted.  I think even the Government would agree that if

10  it was 7:31 on a Saturday, that Mr. -- my client would have been

11  on stage.

12         THE COURT:  All right.  Ms. Roohani?

13         MS. ROOHANI:  Thank you, Your Honor.

14         If I may begin briefly with the risk of flight, as

15  Mr. Marchese began with that argument as well.  The Government

16  has renewed this argument in part based on changed

17  circumstances.  The last time that this matter was before Judge

18  Leen, Judge Leen did state that she had reason to believe that

19  the defendant may have been a risk of flight, but that that was

20  outweighed by his connections to the community and his

21  employment history.

22         As Your Honor is aware and as Mr. Marchese has

23  indicated, the -- since then the Tropicana Hotel has terminated

24  the defendant's employment and, therefore, the Government

25  submits that that is a changed circumstance before this court.

─2:16-cr-00100-GMN-CWH─

1  Therefore, the Government believes that the defendant is a risk

2  of flight, not only based upon the seriousness of the charges

3  and the penalties that are possible in this case and the

4  substantial weight of the evidence that I'll speak about in just

5  a moment, his immigration status, his now lack of ties to this

6  community, as well as his lack of employment, and also his

7  financial ability to abscond based on the large amount of money

8  that he has accessible to him.

9          In terms of danger to the community --

10         THE COURT:  Well, let's not -- hold on.  Let's move

11 back to flight risk.  So he's saying that he's willing to turn

12 in his passport and place a monetary bond, cash bond, and that

13 his husband would be a custodian for him.  So why is that not a

14 set of conditions that would assure his appearance?

15         MS. ROOHANI:  Your Honor, without engaging in any

16 conspiracy theory, the large amount of money available to the

17 defendant as well as his ties to Germany, the fact that he has

18 parents there, he has an excellent relationship with his

19 parents, and facing the charges and the amount of time that he's

20 facing if he -- if he's convicted on these charges, the

21 Government submits that that is sufficient -- it is Your Honor's

22 determination whether there is a condition or combination of

23 conditions, but it's our position that there is no combination

24 of conditions that could assure that he will appear and not

25 leave the country.

————2:16-cr-00100-GMN-CWH————

1        In terms of being a danger to the community,

2  Mr. Marchese focussed largely on the weight of the evidence,

3  which as Your Honor knows is the least important factor.  There

4  are other -- two other factors at least that weigh heavily in

5  favor of detention, specifically the nature and circumstances of

6  the offense charged, the seriousness of the charges of

7  possession, receipt, distribution, and advertising of child

8  pornography.  Counts Two and Three carry a mandatory minimum of

9  five years and up to 20 years of imprisonment.  Count Four

10  carries a mandatory minimum of 15 years of imprisonment and up

11  to 30 years.

12        And the other element that weighs heavily in favor

13  of -- the other factor that weighs heavily in favor of detention

14  is the nature and seriousness of the danger to the community,

15  the fact that the defendant possessed, received, and distributed

16  disturbing graphic images of very young children being brutally

17  raped and also sexually abused both by adults and also that

18  adults had set up other children to engage in sex acts with one

19  another.

20        The Skype chats which Mr. Marchese has not identified

21  show the defendant's willingness to conspire with another adult

22  to commit a crime against a child where the defendant -- we

23  submit lars20 -- usa22 which was registered with the e-mail

24  address the defendant admitted was his -- was attempting to

25  coordinate a viewing of a father having sex with his daughter.

——2:16-cr-00100-GMN-CWH——

 1  In exchange larsusa22 would masturbate on the Skype chat for the

 2  other viewer to -- to see.  And also in exchange that the Lars45

 3  GigaTribe folder that contained child pornography that was

 4  downloaded by the agent in the preliminary investigation would

 5  be available for the other user to download.

 6          Further, the sheer --

 7          THE COURT:  What about the argument -- and I'm sorry I

 8  didn't even mention this with you, Mr. Marchese, but in the

 9  Defense motion was that this exchange of information included

10  the viewing of a woman having sex with the man and that he's

11  homosexual and so, for lack of a better word, would not

12  necessarily be aroused by watching a man having sex with a

13  woman.  And so that it's not likely that he was the one that was

14  requesting that type of a viewing in exchange for sharing the

15  child pornography that he had.

16          MS. ROOHANI:  Your Government -- Your Honor, the

17  Government submits that there is no scientific or any other type

18  of evidence that shows that homosexuals might only view

19  homosexual pornography or heterosexuals might only view

20  heterosexual pornography.  Furthermore, based on child

21  pornography, as Your Honor is well aware, the younger the child

22  the more asexual these children might appear.

23          It's unclear based upon the Skype chats the age of the

24  daughter.  However, the Government submits that that child is

25  absolutely a minor because the other user talks about shuttling

1  the child back and forth between the mother's house and the

2  father's house.

3          On that basis, without anything further, Your Honor, I

4  think that that at least suggests that the defendant is willing

5  to engage in this type of behavior.

6          Furthermore, the fact that the defendant was willing to

7  exchange a thing of value, the sharing of child pornography

8  through the Lars45 folder, and as well as the fact the defendant

9  was willing to masturbate for the other viewer to see, which of

10  course the other viewer is a male so there is some type of

11  homosexual arousal, if you will, Your Honor.

12          Finally, turning to the weight of the evidence.  I'd

13  like to clarify a little bit of what Mr. Marchese was talking

14  about.  There's over 4,000 images and videos of child

15  pornography found throughout the house, not only in the casita,

16  but also in the main house, in the master bedroom closet on a

17  thumb drive, and also on a device in the kitchen.  The thumb

18  drive that was found in the closet, as Your Honor has noted, did

19  include the same -- at least 12 to 14 of the same files that

20  were downloaded by the agent in a Lars45 folder on the thumb

21  drive.  The thumb drive also included photos of the defendant,

22  the defendant's husband, and their dog.

23          As Your Honor's aware of how thumb drives work, you

24  have to plug them into a computer, intentionally move the files

25  onto the thumb drive, the thumb drive has to be then removed

─────2:16-cr-00100-GMN-CWH─────

1  from the computer, and then placed wherever it's going to be

2  placed.  That's not accidental.  The photos did not magically

3  appear on the thumb drive and then end up in the master bedroom

4  closet.

5        Furthermore, Your Honor, based on the statement of the

6  husband which I'll address in a moment why I believe that the

7  court should consider the statements of Mr. Alfter.  Mr. Alfter

8  did make a statement to the agent that he does not know how to

9  use a thumb drive, he has not used it in the past, and that the

10  defendant is the person who would be able to use the thumb

11  drive.

12        As I've talked about both the Lars45 folder as well as

13  the Skype chats were set up and done by the e-mail address that

14  the defendant has admitted was his.

15        In -- I'm sorry.  I just wanted to clarify, Your Honor.

16  The child pornography that was found on pause, the photo that is

17  part of the search warrant that has been turned over in

18  discovery, the child pornography is on the background.  We can

19  see the file name at the top, and then there is the lock screen

20  where the user has to login.  That piece of child pornography

21  has been verified as being on that device.  So it was on pause,

22  but you can sort of see the edges of the -- of the child

23  pornography in terms of that being done.

24        Also, the --

25        THE COURT:  I'm not finding -- and I realize I don't

1   have everything.  I just have a couple of motions and responses

2   here, but I don't have anything showing that there was -- there

3   were videos found in the kitchen.

4           MS. ROOHANI:  I do have a forensic report.  I have

5   provided a copy to Mr. Marchese.  I'm happy to provide a copy to

6   the court for that, but there is a device that was titled -- if

7   you'd give me one moment, Your Honor.

8           The device 1B16 is a damaged Macro Pro screen.  It was

9   found in the kitchen in the main house.  There's two users

10  identified -- sorry -- three users identified on it:  a guest, a

11  shared, and Jan Rouven, which as Your Honor knows is the

12  defendant, as well as an attached 500 gigabyte hard drive.  On

13  that device was found a file name that matched both the -- a

14  file name that was found on a device found in -- two devices

15  found in the casita as well as on the thumb drive.

16          I'm happy to provide --

17          THE COURT:  A file name that was indicative of child

18  pornography?

19          MS. ROOHANI:  Yes, it's Boy Scout Sexual Acts, Your

20  Honor.

21          THE COURT:  And that was found in the kitchen?

22          MS. ROOHANI:  That was found in the kitchen in the main

23  house, yes.

24          THE COURT:  All right.  Thank you.  I'm sorry to

25  interrupt you.  I just --

2:16-cr-00100-GMN-CWH

1          MS. ROOHANI:  No, that's fine, Your Honor.

2          In terms of the consideration of the husband's

3    statements, I think that Mr. Marchese has to admit that the

4    spousal privilege simply doesn't apply in this case at this

5    time.  The Government has not sought to call Mr. Alfter.  And as

6    Your Honor knows, hearsay doesn't apply in detention hearings.

7    Therefore, Your Honor may consider it.

8          However, if I may have an opportunity to respond to the

9    new argument that was raised for the first time in reply, the

10   due process argument.  There's two reasons why the line of cases

11   that the defendant cites should not be followed by the court.

12   First, supervised release -- two legal reasons at least.

13   Supervised release violation hearings, as Your Honor knows, are

14   completely different than detention hearings.  Your Honor would

15   be tasked with actually making a determination of guilt in a

16   supervised violation hearing.  And, further, the second legal

17   point, they're governed by two completely different statutes and

18   different rules of criminal procedure.

19         Factually speaking, even if Your Honor was inclined to

20   follow that line of reasoning, the Comito case and its progeny

21   are simply not relevant to what's happening here.  In Comito the

22   only evidence of the violation was the hearsay statement.  As

23   we've talked about before, between the Skype chats, the

24   excessive amount of child pornography that was found all over

25   the house, and the fact that it was tied to the defendant is

1   sufficient by itself to support detention in this case.

2          And, second, in Comito the statements did not have any

3   indicia of reliability, and in this case they do.  Not only was

4   Mr. Alfter Mirandized, but he waived Miranda.  The agents

5   explained the nature of the investigation and the nature of the

6   items that they found in the house with the child pornography,

7   and only then did Mr. Alfter make the statements.  So,

8   therefore, the Government submits that it has indicia of

9   reliability.

10          Mr. Marchese talks about how the Government would like

11  to have its cake and eat it, too, but the same is then true for

12  the defendant.  He would like to assert the spousal privilege

13  and then also not have us consider any of the statements that

14  were said.  So he can't also have his cake and eat it, too.

15          If -- we submit, Your Honor, that the correct analysis

16  on whether to consider the statements of Mr. Alfter is properly

17  done under a cost/benefit analysis as laid out in a brief as set

18  forth in Leon.  However, if for any reason Your Honor is

19  uncomfortable looking at Mr. Alfter 's statements in any regard,

20  there's more than enough other evidence that you can rely --

21  rely on and make the detention determination based on that.

22          Finally, Your Honor, in any event, Mr. Alfter's

23  statements go to the weight of the evidence.  Those statements,

24  even if given little to no weight, are -- that -- that factor's

25  already heavily tipped in favor of detention and it's already

1  the least important factor.  And I think that there's rebuttable

2  presumption in this case, and the defendant simply has not

3  rebutted that presumption.

4          THE COURT:  All right.  Thank you.

5          MS. ROOHANI:  Thank you, Your Honor.

6          THE COURT:  So, Mr. Marchese, were you provided with

7  any evidence -- and don't tell me if you think it's -- just is

8  there something in the kitchen also that was found with child

9  pornography?

10         MR. MARCHESE:  That is correct.  There was a computer,

11  and as I pointed out earlier there was several items taken, but

12  there was a computer with a damaged screen.  So I don't know to

13  what extent the damage was, but I don't even -- from what I've

14  been represented, they can't -- they couldn't even -- you

15  couldn't even view it.  But there was -- that is correct.  There

16  was one item found.  It was the MacBook Air laptop.

17         THE COURT:  All right.  So it was a laptop which is ...

18         MR. MARCHESE:  That is correct.  It wasn't Mr. --

19         THE COURT:  ... transportable, for lack of a better

20  word.

21         MR. MARCHESE:  Correct.  And it was not the computer

22  that my client used on a regular basis.  And with the nexus to

23  my client is obviously this Lars45, and that's where the dispute

24  between the parties arises.  That's when I brought up the

25  GigaTribe and the timing and all that.  The Lars45, this is the

2:16-cr-00100-GMN-CWH

1   individual who's -- it's our position that is the one who is

2   doing these downloads and transfers, et cetera.

3           THE COURT:  But the defendant does admit that he used

4   an e-mail that had the name Lars in it as well.

5           All right.  Well, the court has considered the parties'

6   briefs, oral arguments, the factors set forth in 3142(g).  The

7   presumption does apply.  The original presumption is not erased

8   when the defendant offers evidence to rebut it, but the

9   presumption does remain in the case as an evidentiary finding

10  that goes against release and it is weighed with all of the

11  other relevant factors in 3142(g).

12          The court does find by a preponderance of the evidence

13  that the defendant is a flight risk.  His family ties out of the

14  country in Germany along with the now indictment that he is

15  facing where a jury has found probable cause to believe that he

16  has committed at least four different counts.  Two of the counts

17  have a five-year minimum.  One of the counts, Count Four, has a

18  15-year minimum.  So we're looking at 20- and 30-year maximum

19  sentences, but regardless minimums.  He's got Counts Two and

20  Three have a five-year minimum, and Count Four has a 15-year

21  minimum.  Is that right, Ms. Roohani?

22          MS. ROOHANI:  That is correct, Your Honor.

23          THE COURT:  All right.  Well, his travel history from

24  the pretrial service report is pretty long, and he does travel

25  quite often out of the country and has for some time, which is

--------2:16-cr-00100-GMN-CWH--------

1  not really unusual for someone who's from Europe and not the

2  United States, but it's sort of like us traveling from one state

3  to another.  You know, it's a very natural thing, but

4  unfortunately makes it -- so he has a lot of ties and a lot of

5  places he could go.

6         I agree that having had the employment at the time that

7  Judge Leen made the original decision probably factored in as

8  well as the fact that there wasn't an indictment yet.  Now

9  there's an indictment and he's lost his employment here in the

10  United States which will make it more difficult for him to

11  remain here, especially if he has to post a cash bond.  So I

12  don't think that those combinations of conditions that were

13  discussed earlier would be sufficient to make the -- the court

14  comfortable that he would be -- that we could assure that his

15  appearance would actually occur as required.

16         Looking at the danger to the community, I do also find

17  that the clear and convincing standard has been met.  I agree

18  that the weight of the evidence is by case law the least of the

19  important factors that we look at.  That's a 1985 case, but

20  nonetheless that is what they tell us.  But there's a

21  significant amount of child pornography here and we don't need

22  to get into the details.  I think we all feel uncomfortable with

23  it, but there's some very graphic, very violent descriptions

24  provided to the court of what the pornography was and the acts

25  that were being done to these children who could be heard

1   whimpering and crying as they were being anally penetrated,

2   children as young as two and three.

3          One of the videos being on pause at the time that the

4   computer was seized indicates that this is not something old,

5   but something that is occurring as well as the Skype chat that

6   it appears someone, which may or may not be the defendant, but

7   because it's his home and there's so much of it all over the

8   place -- I could see overlooking one computer in the pool house

9   where he doesn't go in and only his guests are there and so

10  forth.  That that might actually be helpful, but it's all over

11  the place.  Now we know it's even on a laptop in the kitchen,

12  the thumb drive in the bedroom closet in a box that also has

13  other videos that include the defendant and his husband with an

14  animal.

15         And so the weight of the evidence does -- does indicate

16  that there is a danger to the community as well as the nature

17  and circumstances of the offense, the severity of the offense,

18  the sentence that he's looking at.

19         He does have no known criminal history.  His history

20  and characteristics, his -- in this community in the very short

21  time that he's been here appear to have been without any

22  indication that he would be posing or potentially posing a

23  danger to the community.  However, it is a very short period of

24  time that he's been in the community.

25         Applying the cost/benefit analysis in Leon, it does

 1  appear to the court that there is a danger to the community.  So

 2  the defendant accordingly shall remain detained pending trial.

 3  He will be committed to the custody of the U.S. Marshal Service

 4  for confinement in a correctional facility with a reasonable

 5  opportunity for private consultation with counsel.

 6       If you wish to appeal, you do have pursuant to Section

 7  3145(c) only 30 days to file your appeal.  If you can't afford

 8  an attorney, the court will appoint one for you.  And if you

 9  can't afford a copy of the court transcript, it will be prepared

10  for you at the Government's expense.

11       Anything else, Ms. Roohani, that you need me to address

12  at this time?

13       MS. ROOHANI:  No, Your Honor.

14       THE COURT:  Mr. Marchese?

15       MR. MARCHESE:  Yes, Your Honor.  It's not necessarily

16  in reference to detention, but in reference to discovery I just

17  wanted to make a record that tomorrow I'm going to be sending a

18  letter over to the United States Attorney's Office.  They have

19  given us an initial batch of discovery.  However, my expert has

20  been trying to procure I believe they're called EO1's from the

21  FBI which he's been unable to procure.  And unfortunately it

22  kind of leaves him in limbo.  He's unable to do his job.

23       There are also some other odds and ends that I feel

24  might be missing from the discovery.  So I'm just making a

25  record.  I'll send a letter over tomorrow.  I've dealt with

2:16-cr-00100-GMN-CWH

1    Ms. Silva before.  She's always been above board with these

2    sorts of issues.  Nobody wants to file a motion.  If we have to,

3    we will, but I'm confident we will be able to work it out.

4              THE COURT:  Ms. Silva, are you aware of any EO1s from

5    the FBI?

6              MS. SILVA:  Yes, Your Honor.  I actually received a

7    copy of the request and we are working on that.  The items need

8    to be forensically preserved before we can produce that.  It's

9    my understanding that at least seven of the items are ready, and

10   so there will be -- I'll be in contact with Mr. Marchese, and

11   we'll get that taken care of.

12             THE COURT:  Okay.

13             MS. SILVA:  And as they get produced, we'll continue to

14   let him know when they're ready.

15             THE COURT:  All right.  Thank you.

16             Anything else, Mr. Marchese?

17             MR. MARCHESE:  That is it, Your Honor.  Thank you.

18             THE COURT:  All right.  Well, thank you very much.

19   Both counsel prepared the issues very well and did a very good

20   job at oral argument as well.  It's a difficult case, a painful

21   case, but I appreciate the professionalism of both counsel.

22   Thank you very much.

23             MR. MARCHESE:  Thank you.

24             MS. ROOHANI:  Thank you, Your Honor.

25             THE COURT:  We're in recess.

—2:16-cr-00100-GMN-CWH—

1          (Whereupon the proceedings concluded at 11:57 a.m.)

2                              --oOo--

3      I, Patricia L. Ganci, court-approved transcriber, certify

4  that the foregoing is a correct transcript transcribed from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8     /s/ PATRICIA L. GANCI        MAY 5, 2019
              Patricia L. Ganci                Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25